Westlaw

S. REP. 107-205                                                      Page 1
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

**\*1** PUBLIC COMPANY ACCOUNTING REFORM AND INVESTOR PROTECTION ACT OF
2002

SENATE REPORT NO. 107-205
July 3, 2002

Mr. Sarbanes, from the Committee on Banking, Housing, and Urban Affairs,
submitted the following

REPORT

[To accompany S. 2673]

The Committee on Banking, Housing and Urban Affairs reported an original bill to
improve quality and transparency in financial reporting and independent audits and
accounting services for public companies, to create a Public Company Accounting
Oversight Board, to enhance the standard setting process for accounting practices,
to strengthen the independence of firms that audit public companies, to increase
corporate responsibility and the usefulness of corporate financial disclosure, to
protect the objectivity and independence of securities analysts, to improve Secur-
ities and Exchange Commission resources and oversight, and for other purposes, and
reports favorably thereon and recommends that the bill do pass.

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

(II)

CONTENTS

                                                                        Page
Introduction ............................................................... 1
Purpose of the Legislation ................................................. 2
Hearings ................................................................... 2
Title-by-Title Summary of Major Provisions ................................. 4
Title I-Public Company Accounting Oversight Board .......................... 4
A. Appointment and Operation of Board ...................................... 6
B. Registration of Accounting Firms ........................................ 7
C. Auditing, QualityControl, Ethics, and Independence Standards and Rules ... 8
D. Inspections of Registered Accounting Firms ............................... 9
E. Investigations and Disciplinary Proceedings ............................ 10
F. Foreign Public Accounting Firms ........................................ 11
G. SEC Oversight of the Board ............................................. 12
H. Accounting Principles .................................................. 12
I. Funding ................................................................ 13
Title II-Auditor Independence ............................................. 14

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

A. Services Outside the Scope of Practice of Auditors ...................... 15
B. Audit Committee Pre-Approval of Audit and Non-Audit Services ............ 19
C. Audit Partner Rotation ................................................. 21
D. Disclosures of Accounting Issues ....................................... 21
E. Cooling Off Period ..................................................... 22
F. The Bill Does Not Create State Regulatory Standards .................... 23
Title III-Corporate Responsibility ....................................... 23
A. Issuer Audit Committees ............................................... 23
B. Corporate Responsibility for Financial Reports ........................ 25
C. Prohibited Influence .................................................. 26
D. Forfeiture of Bonuses and Profits ..................................... 26
E. Officer and Director Bars and Penalties ............................... 26
F. Prohibition on Insider Trades During Pension Fund Blackout Periods ...... 27
Title IV-Enhanced Financial Disclosures .................................. 28
A. Accounting Adjustments ................................................ 28
B. Off-Balance Sheet Transactions ........................................ 28
C. Pro-Forma Financial Disclosures ....................................... 28
D. Enhanced Disclosures of Loans ......................................... 29
E. Disclosures of Transactions Involving Management ...................... 30
F. Management Assessment of Internal Controls ............................ 31
G. Exemptions for Investment Companies ................................... 31
H. Code of Ethics for Senior Financial Officers .......................... 32
I. Disclosure of Audit Committee Financial Expert ........................ 32
Title V-Analyst Conflicts of Interest .................................... 32
Title VI-Commission Resources and Authority .............................. 39
Title VII-Studies and Reports ............................................ 42
Section-by-Section Analysis .............................................. 43
Section 1. Short title and table of contents ............................. 43
Section 2. Definitions ................................................... 43
Section 3. Commission Rules and Enforcement .............................. 44
Title I-Public Company Accounting Oversight Board ........................ 44
Section 101. Establishment ............................................... 44
Section 102. Registration with the Board ................................. 45
Section 103. Auditing, qualitycontrol, and independence standardsand
  rules .................................................................. 46
Section 104. Inspections of registered public accounting firms ........... 47
Section 105. Investigations and disciplinary proceedings ................. 48
Section 106. Foreign public accounting firms ............................. 49
Section 107. Commission oversight of the Board ........................... 49
Section 108. Accounting standards ........................................ 50
Section 109. Funding ..................................................... 50
Title II-Auditor Independence ............................................ 51
Section 201. Services outside the auditor scope of practice .............. 51
Section 202. Pre-approval requirements ................................... 51
Section 203. Audit partner rotation ...................................... 51
Section 204. Auditor report to Audit Committees .......................... 52

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)

**(Cite as: S. REP. 107-205)**

Section 205. Conforming amendments ........................................ 52
Section 206. Conflicts of interest ........................................ 52
Section 207. Studyofmandatoryrotationofregisteredpubl accounting firms ... 52
Section 208. Commission authority ......................................... 52
Section 209. Considerationsbyappropriatestateregulato authorities ........ 52
Title III-Corporate Responsibility ........................................ 52
Section 301. Issuer Audit Committees ...................................... 52
Section 302. Corporate responsibility for financial reports ............... 53
Section 303. Prohibited influence ......................................... 53
Section 304. Forfeiture of certain bonuses and profits .................... 53
Section 305. Officer and director bars and penalties ...................... 53
Section 306. Insider trades during pension fund black outperiods
  prohibited .............................................................. 53
Title IV-Enhanced Financial Disclosures ................................... 54
Section 401. Disclosures in periodic reports .............................. 54
Section 402. Enhanced disclosures of loans ................................ 54
Section 403. Disclosures of transactions involving management ............. 54
Section 404. Management assessment of internal controls ................... 54
Section 405. Exemption .................................................... 54
Section 406. Code of ethics for senior financial officers ................. 54
Section 407. Audit Committee financial expert ............................. 55
Title V-Analyst Conflicts of Interest ..................................... 55
Section 501. Treatment of securities analysts by registered securities
  associations ........................................................... 55
Title VI-Commission Resources and Authority ............................... 56
Section 601. Authorization of appropriations .............................. 56
Section 602. Appearance and practice before the SEC ....................... 56
Section 603. Federal court authority to impose penny stock bars ........... 56
Section 604. Qualificationsofassociatedpersonsofbroke dealers ......... 56
Title VII-Studies and Reports ............................................. 56
Section 701. GAO study and report regarding consolidation of public
  accounting firms ....................................................... 56
Section 702. Commission study and report regarding rating agencies ........ 57
Changes in Existing Law ................................................... 57
Regulatory Impact Statement ............................................... 57
Cost of Legislation ....................................................... 58
Additional views of:Senator Gramm ........................................ 66
Senator Enzi .............................................................. 68

107th Congress

INTRODUCTION

On June 18, 2002, the Senate Committee on Banking, Housing, and Urban Affairs
considered the "Public Company Accounting Reform and Investor Protection Act of
2002," a bill to improve quality and transparency in financial reporting and inde-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

pendent audits and accounting services for public companies, to create a Public
Company Accounting Oversight Board, to enhance the standard-setting process for
accounting practices, to strengthen the independence of firms audit public compan-
ies; state authorities should not presume that the standards applied under the
bill should apply to those companies under state regulatory schemes.

The bill also requires steps to enhance the direct responsibility of senior cor-
porate management for financial reporting and for the quality of financial dis-
closures made by public companies. The bill establishes clear statutory rules to
limit, and expose to public view, possible conflicts of interest affecting secur-
ities analysts. Finally, the bill authorizes substantially higher funding for the
Securities and Exchange Commission.

                                  HEARINGS

The Banking Committee's action followed ten hearings on the accounting and in-
vestor protection issues raised by the financial revelations involving Enron and
other public companies. These issues include: the integrity of certified financial
audits; appropriate accounting principles and auditing standards; the effective-
ness of the accounting regulatory oversight system; the importance of auditor in-
dependence for the quality of audits; conflicts of interest, and the compromise to
auditor independence, raised by accounting firms' increased offering of consulting
services to audit clients; the completeness of corporate disclosure in SEC filings
and shareholder communications; conflicts of interest among securities under-
writers and affiliated stock analysts; insider abuses; corporate responsibility;
and the adequacy of resources available to the Securities and Exchange Commission
to meet its responsibilities.

On February 12, 2002, the Committee heard from a panel of five former Chairmen
of the Securities and Exchange Commission: Roderick M. Hills, Chairman, 1975-77;
Harold M. Williams, Chairman, **3** 1977-81; David Ruder, Chairman, 1987-89; Richard
C. Breeden, Chairman, 1989-93; and Arthur Levitt, Jr., Chairman, 1993-2000. [FN1]

On February 14, 2002, Paul Volcker, Chairman of the Trustees of the Internation-
al Accounting Standards Committee, and former Chairman of the Board of Governors
of the Federal Reserve System, and Sir David Tweedie, Chairman of the Internation-
al Accounting Standards Board, and former Chairman of the United Kingdom's Ac-
counting Standards Board, appeared before the Committee to discuss "International
Accounting Standards and Necessary Reforms to Improve Financial Reporting."

On February 26, 2002, a panel of three former Chief Accountants of the Securit-
ies and Exchange Commission and a former Chairman of the Financial Accounting
Standards Board testified on "Oversight of the Accounting Profession, Audit Qual-
ity and Independence, and Formulation of Accounting Principles." The witnesses
were Walter P. Schuetze, Chief Accountant, 1992-95; Michael H. Sutton, Chief Ac-
countant, 1995-98; Lynn E. Turner, Chief Accountant, 1998-2001; and Dennis R.
Beresford, Chairman, Financial Accounting Standards Board, 1987-97.

On February 27, 2002, the Committee heard testimony on "Corporate Governance"
from John H. Biggs, Chairman, President, and Chief Executive Officer, Teachers'
Insurance and Annuity Association-College Retirement Equities Fund (TIAA CREF),
and former member of the Public Oversight Board; and Ira M. Millstein, Senior

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Partner, Weil, Gotshal & Manges LLP, and Co-Chair of the Blue Ribbon Committee on
Improving the Effectiveness of Corporate Audit Committees.

On March 5, 2002, the Committee heard from David M. Walker, Comptroller General
of the United States; as well as Robert Glauber, Chairman and Chief Executive Of-
ficer, National Association of Securities Dealers, Inc., and former Under Secret-
ary for Finance, Department of Treasury, under President Bush (1989-1992); Joel
Seligman, Dean and Ethan A. H. Shepley University Professor, Washington University
School of Law; and John C. Coffee, Jr., Adolf A. Berle Professor of Law, Columbia
University Law School.

On March 6, 2002, the Committee heard testimony on "Oversight of the Accounting
Profession, Audit Quality and Independence, and Formulation of Accounting Prin-
ciples" from Shaun O'Malley, Chairman, 2000 Public Oversight Board Panel on Audit
Effectiveness, and former Chairman, Price Waterhouse LLP; Lee Seidler, Deputy
Chairman, 1978 American Institute of Certified Public Accountants ("AICPA") Com-
mission on Auditors' Responsibilities, and Managing Director Emeritus, Bear Ste-
arns & Co.; Arthur R. Wyatt, former President, American Accounting Association,
and Professor of Accountancy Emeritus, University of Illinois; Abraham Briloff,
Emanuel Saxe Distinguished Professor Emeritus, Baruch College, City University of
New York; and Bevis Longstreth, Member, 2000 Public Oversight Board Panel on Audit
Effectiveness, and former Commissioner, Securities and Exchange Commission
(1981-84).

On March 14, 2002, the Committee heard from representatives of the accounting
industry, the American Enterprise Institute, and The Brookings Institution. The
witnesses were James G. Castellano, Chairman, AICPA, and Managing Partner, Rubin,
**\*4** Brown, Gornstein & Co. LLP; James S. Gerson, Chairman, Auditing Standards
Board, AICPA, and Partner, PricewaterhouseCoopers LLP; William Balhoff, Chairman,
AICPA Private Company Practice Section; Olivia F. Kirtley, former Chair, AICPA;
James E. Copeland, Jr., Chief Executive Officer, Deloitte & Touche LLP; Peter J.
Wallison, Resident Fellow and Co-Director, Financial Deregulation Project, Americ-
an Enterprise Institute; and Robert E. Litan, Director, Economic Studies Program,
The Brookings Institution.

On March 19, 2002, the Committee heard from two members of the recently-disban-
ded Public Oversight Board ("P.O.B."): Charles A. Bowsher, former Comptroller Gen-
eral of the United States, who was the P.O.B.'s Chairman; and Aulana L. Peters,
former Commissioner, Securities and Exchange Commission (1984-88), who was a mem-
ber of the P.O.B.; as well as from L. William Seidman, former Chairman, Federal
Deposit Insurance Corporation and Resolution Trust Corporation, and former Part-
ner, Seidman & Seidman; John C. Whitehead, former Co-Chairman, Goldman Sachs &
Co., Co-Chair of the Blue Ribbon Committee on Improving the Effectiveness of Cor-
porate Audit Committees, and former Deputy Secretary of State (1985-89); and Mi-
chael Mayo, Managing Director, Prudential Securities, Inc.

On March 20, 2002, the Committee heard from a variety of interested parties in-
cluding Thomas A. Bowman, President and Chief Executive Officer, Association for
Investment Management and Research; Howard M. Metzenbaum, Chairman, Consumer Fed-
eration of America, and former U.S. Senator; Damon Silvers, Associate General
Counsel, AFL-CIO; and Sarah Teslik, Executive Director, Council of Institutional

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

Investors.
   On March 21, 2002, the Committee heard testimony from Harvey L. Pitt, Chairman,
Securities and Exchange Commission.

                    TITLE-BY-TITLE SUMMARY OF MAJOR PROVISIONS

            TITLE I-PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD

   Title I of the bill creates a Public Company Accounting Oversight Board (the
"Board"), to provide for more effective oversight of the part of the nation's ac-
counting industry that audits public companies. Title I reflects significant por-
tions of S. 2004, authored by Senators Dodd and Corzine, as well as the terms of
an amendment offered at the Committee's June 18 mark-up by Senator Enzi, which was
adopted by voice vote.
   The new Board may, subject to review by the Securities and Exchange Commission
(the "SEC" or the "Commission"), establish, adopt, or modify auditing, quality
control, ethics, and independence standards for public company audits, inspect ac-
counting firms, investigate potential violations of applicable rules relating to
audits, and impose sanctions if those violations are established. The Board will
have authority only with respect to audits of public companies. It has no juris-
diction over the work of accountants in auditing other companies.
   The Board will bring together various issues and responsibilities that have in
the past been subject to what one Committee witness **5 characterized as " a bewil-
dering array of monitoring groups" [FN2] under the auspices of the accounting pro-
fession. As Shaun O'Malley, Chairman of the 2000 Panel on Audit Effectiveness (and
former Chairman of Price Waterhouse LLP), explained to the Committee in greater
detail:
      The profession's combination of public oversight and voluntary self-regulation
   is extensive, Byzantine, and insufficient. The Panel found that the current system
   of governance lacks sufficient public representation, suffers from divergent views
   among its members as to the profession's priorities, implements a disciplinary
   system that is slow and ineffective, lacks efficient communication among its vari-
   ous entities and with the SEC, and lacks unified leadership and oversight. [FN3]
   Twenty witnesses who appeared before the Committee in its ten days of hearings
on accounting reform and investor protection stressed the need for a strong Board
to oversee the auditors of public companies. Paul Volcker, the former Chairman of
the Federal Reserve Board, told the Committee that:
      [o]ver the years, there have also [i.e., in addition to the SEC] been repeated
   efforts to provide oversight by industry or industry/public member boards. By and
   large, I think we have to conclude that those efforts at self-regulation have been
   unsatisfactory. Thus, experience strongly suggests that governmental oversight,
   with investigation and enforcement powers, is necessary to assure discipline.
   [FN4]
      Charles W. Bowsher, the Comptroller General of the United States from
   1981-1996 and the last Chairman of the Public Oversight Board (P.O.B.), [FN5] as
   well as former SEC Commissioner Aulana Peters and John Biggs, who were also mem-
   bers of the P.O.B., made the same recommendation when they testified before the

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

Committee. [FN6] They were also among the number of witnesses who emphasized that
any Board must be created by statute to establish its authority properly and
firmly.

   The concerns of the Committee extend beyond immediate allegations of wrongdoing,
to the fundamental principles on which the functioning of free markets and the
protection of investors are based. Each of the country's federal securities laws-
the 1933, **6** 1934, 1935, and 1940 Acts-requires comprehensive financial statements
that must be prepared, in the words of the Securities Act of 1933, by "an inde-
pendent public or certified accountant." [FN7] Professor Benjamin Graham's seminal
textbook for securities analysts explains why:

   Prior to the SEC legislation * * * it was by no means unusual to encounter
semi-fraudulent distortions of corporate accounts * * * almost always for the pur-
pose of making the results look better than they were, and it was generally asso-
ciated with some scheme of stock-market manipulation in which the management was
participating. [FN8]

   However, the franchise given to public accountants by the securities laws is
conditional; it comes in return for the CPA's faithful assumption of a public
trust. (The Supreme Court's now-classic statement of that trust, in United States
v. Arthur Young, 465 U.S.C. 805 (1984) is discussed below.) The testimony heard by
the Committee repeatedly indicated that a number of forces have undermined the
fulfillment of this public trust over the years. Lee Seidler, Deputy Chairman of a
1978 commission organized to review "auditors' responsibilities," told the Commit-
tee that, twenty-five years ago, that commission had found a gap between the reas-
onable expectations of users of financial statements and the performance of audit-
ors that has not improved since. He continued:

   in 1978 [the commission] also said: the public accounting profession has
failed to react and evolve rapidly enough to keep pace with the speed of change in
the American business environment. And unfortunately, a quarter of a century
later, I have to repeat that. It's identical. [FN9]

A. Appointment and operation of board

   The successful operation of the Board depends upon its independence and profes-
sionalism. The Board will have five members, each of whom must have a demonstrated
commitment to the interests of investors, as well as an understanding of the fin-
ancial disclosures required of public companies, and the responsibilities for
those disclosures, under the federal securities laws. Three members of the Board
will have a general background, and two members will have an accountancy back-
ground. [FN10] (The Board's Chairperson may have an accountancy background, but if
so, he or she may not have been a practicing accountant for at least five years
prior to appointment to the Board.)

   Board members are to be appointed by the SEC after consultation with the Federal
Reserve Board and the Department of the Treasury. They will serve full-time, for
five-year (staggered) terms, with a two-term limit. To further assure their inde-
pendence, Board members may engage in no other business activities of any nature,
**7** or receive any payments from any accounting firms (except for standard retire-
ment payments) or other persons. In addition, former Board members will be subject

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

to a one-year "cooling off" period at the end of their Board service, during which
time they may not work for an accounting firm registered with the Board.

It is essential that the Board have a strong, well-trained, and experienced
staff, of sufficient size to carry out its responsibilities. A number of witnesses
emphasized, for example, that inspections must no longer be left to "peer reviews"
of one accounting firm by another. [FN11] The bill makes it plain, as the Commit-
tee intends, that the Board is to provide for staff salaries that are fully com-
petitive with those for comparable private-sector self-regulatory, accounting,
technical, supervisory, or related staff or management positions. [FN12]

Prompt Action is Essential. The Committee believes that the new oversight ar-
rangements must come into effect quickly. The SEC is to appoint the initial Board
within three months of the bill's enactment, so that the Board can take the steps
necessary to begin its operation within six months of its appointment, and the re-
gistration of accounting firms (below) can be completed within six months after
the Board begins operation.

B. Registration of accounting firms

Accounting firms that audit public companies must register with the Board, no
later than six months after the SEC determines that the Board is ready to begin
operation. It is unlawful for a firm that has not registered to continue to audit
public companies.

Conditioning eligibility to audit public companies on registration with the
Board is the linchpin of the Board's authority. Suspension or revocation of regis-
tration renders a firm unable to continue its public company audit practice.

As part of its registration process, each accounting firm must execute a consent
to comply with any requests, within the Board's authority, for documents or testi-
mony made in the course of the Board's operation. The firm must also agree to ob-
tain (and ultimately, if necessary, to enforce) similar consents from the firm's
partners and employees, who are subject to the Board's investigative and discip-
linary jurisdiction.

Certain necessary information is to accompany the registration materials
(including a list of the firm's accountants who perform public company audits),
and the Board will determine within 45 days of receipt whether an application is
complete and the applicant can be registered. Basic registration information is to
be public, but each accounting firm may protect from public disclosure information
that it reasonably identifies as proprietary or that is otherwise **8** protected by
law. Each registrant is to file a report annually to update the required informa-
tion.

The Board is to assess a registration fee, and an annual fee, to recover the
costs of processing and reviewing applications and annual reports.

C. Auditing, quality control, ethics, and independence standards and rules

The bill requires the Board to establish or adopt auditing, quality control, and
ethics standards for the audit of public companies. The Committee has concluded
that the Board's plenary authority in this area is essential for the Board's ef-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

fective operation, a position taken during the hearings by a number of witnesses,
including former SEC Chairman Levitt, former Comptroller General Bowsher, and
former FDIC Chairman Seidman (himself once a principal of a substantial accounting
firm). [FN13]

The Board's standard-setting authority, however, is neither intended nor struc-
tured to exclude practicing accountants from participation in the standard-setting
process. The Board may adopt as part of its rules (and modify as appropriate for
that purpose, at the time of adoption or thereafter), any portion of a statement
of auditing, quality control, or ethics standards that meets the bill's statutory
tests and that is proposed (i) by a professional group of accountants (designated
by a rule of the Board for that purpose), or (ii) by one or more advisory groups
of practicing accountants or other interested parties convened by the Board.
(Pre-existing standards of designated professional groups of accountants may be
adopted during the Board's transitional period.) The Board is to cooperate on an
ongoing basis with the designated professional groups of accountants noted above,
with its own advisory groups, and with other interested groups (and the accounting
profession and the investing public at large), in examining the need for changes
in any standards subject to Board authority. It is to recommend issues for inclu-
sion on the agendas of these groups, take other steps to facilitate the standard-
setting process, and respond in a timely fashion to requests for changes in the
standards. Finally, rules are open to comment by accountants and any other inter-
ested persons in a public process before they are approved either by the Board or,
ultimately, by the SEC. Many of these provisions were suggested by Senator Enzi.

Particular Standards Required by the Bill. Although the Board's power to estab-
lish or adopt auditing and related standards extends to the full range of those
standards, the bill specifies certain provisions that must be part of the stand-
ards. These include (i) preparation, and maintenance for at least seven years, by
public company auditors of audit work papers and related information in sufficient
detail to support each audit's conclusions, (ii) "second partner" review and ap-
proval of each public company audit report and its issuance, and (iii) inclusion
in each audit report of a description of the auditor's testing of the public com-
pany's systems for compliance with the requirements of section 13(b)(2) of the Se-
curities Exchange *9 Act and of the company's controls over its receipts and ex-
penditures, together with specific notation of any significant defects or material
noncompliance of which the auditor should know on the basis of such testing. In
addition, the quality control standards adopted by the Board must address an ac-
counting firm's monitoring of ethics and independence; internal and external con-
sulting on audit issues; audit supervision; hiring, development, and advancement
of audit personnel; acceptance and continuance of engagements; and internal in-
spection.

Auditor Independence. The Board is also authorized to issue rules to implement
the provisions of title II of the bill relating to auditor independence. That au-
thority is discussed in greater detail in connection with title II, below.

D. Inspections of registered accounting firms

Virtually every witness who addressed the details of auditor oversight agreed on

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the critical need for a regular and comprehensive review, by an independent body
of inspectors, of each audit firm's compliance with audit standards and proced-
ures. A program of inspections is essential to identify problems in firm proced-
ures, training, and "culture" before those problems can produce audit failures
that trigger large investor losses and threaten confidence in the capital markets.
[FN14]

   The Board is to inspect the operations of each registered accounting firm, in
order to assess compliance of that firm, and of its partners and employees, with
the new statute, the Board's rules, and professional accounting standards. Ini-
tially, firms that audit more than 100 public companies are to be inspected each
year, and firms that audit 100 or fewer public companies are to be inspected at
least every three years. The Board is given the power to adjust these inspection
schedules if it finds different schedules to be consistent with the bill's pur-
poses, the protection of investors, and the public interest.

   During an inspection, the Board is to review particular audit engagements (that
it selects) of a firm and the firm's general quality control systems and policies,
as well as to perform such other testing of the firm's audit, supervisory, and
quality control procedures as is necessary or appropriate. The Board is specific-
ally given authority to require firms to retain their records for inspection pur-
poses regardless of whether retention of those records is otherwise required.

   After each inspection, the Board will prepare an inspection report, which will
be available for comment in draft form by the firm under inspection. Quality con-
trol defects found by the Board may be disposed of simply by corrective action,
but specific violations identified during inspections may form the basis for a
more formal investigation or disciplinary action by the Board and are to be repor-
ted, if appropriate, to the SEC and relevant state accountancy boards; final in-
spection reports are to be sent to the SEC and relevant state accountancy boards
in any event. The reports will also be made public, subject to appropriate protec-
tion of confidential or proprietary information. However, firms will be given 12
months to **\*10** correct defects in their quality control systems, to the satisfac-
tion of the Board, before portions of the reports dealing with those defects are
added to the public record. [FN15]

E. Investigations and disciplinary proceedings

   Committee witnesses stressed that the Board must possess investigative and dis-
ciplinary authority. Arthur Levitt, who served as Chairman of the SEC during most
of the 1990s, told the Committee that:

   We need a truly independent oversight body that has the power not only to set
the standards by which audits are performed, but also to conduct timely investiga-
tions that cannot be deferred for any reason and to discipline accountants. [FN16]

   Robert Glauber, the Chairman and CEO of the National Association of Securities
Dealers, explained that:

   Any form of private-sector regulation must be empowered to effectively enforce
the rules: [it must possess] the ability to levy meaningful fines, place condi-
tions on continued participation in the industry, suspend, and where appropriate,
banish those who misbehave from the industry. This "ultimate sanction" is both a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

powerful deterrent for would-be violators and an important investor protection.
[FN17]

   In response, the bill grants the Board broad authority to investigate any act
or practice, or omission, by a registered accounting firm, or its associated per-
sons, that may violate the new statute, the Board's rules, professional accounting
standards, or the portions of the Federal securities laws (and SEC rules) relating
to the preparation and issuance of audit reports and the obligations and liabilit-
ies of accountants with respect to those reports.

   The Board's rules are to prescribe fair investigative and disciplinary proced-
ures. It may, under those rules, require testimony or the production of audit work
papers and other documents from (and may inspect the records of) registered firms
or their associated persons, and it may suspend or revoke the registration of a
firm, or suspend or bar from further association with a firm an "associated per-
son," for non-cooperation with a Board investigation, subject to review of that
action by the SEC. [FN18]

   Committee witnesses also emphasized that information gathered by Board investig-
ators should be "privileged from outsiders" during the investigative process. Un-
der the bill, any information gathered in the course of an investigation is to be
confidential and privileged for all purposes (including civil discovery), unless
and until particular information is presented in connection with a public proceed-
ing. However, the Board may disclose investigative information, if it determines
that such disclosure is "necessary to accomplish the purposes of the Act or to
protect investors," to the SEC, **11** any federal financial supervisor (if the in-
vestigation pertains to an institution under the latter's supervision), the Attor-
ney General, and, with the SEC's permission, to state attorneys general, in con-
nection with criminal investigations, or state accountancy boards. (The Board may
also refer an investigation to the SEC or other agencies to which disclosure of
information is permitted.)

   A full range of sanctions is available if the Board finds that a registered firm
(or its partners or employees) has violated one or more of the rules within the
Board's investigative jurisdiction. Potential sanctions include revocation or sus-
pension of an accounting firm's registration, or of the ability of particular in-
dividuals to remain associated with that firm or become associated with any other
registered accounting firm (effectively barring the subject of the sanction from
participating in audits of public companies), substantial civil money penalties,
[FN19] required professional education or training, and censure; the breadth of
these sanctions is intended to encourage flexible and appropriate action, designed
to correct if possible. The Board's ability to suspend or bar an associated person
from the auditing of public companies, and its ability to impose civil money pen-
alties above a certain amount, is limited to situations involving intentional,
knowing, or reckless conduct, or repeated negligent conduct.

   An important provision of the bill permits the Board to impose sanctions upon a
registered accounting firm for failure reasonably to supervise a partner or em-
ployee who is found to have violated applicable rules. The terms for liability for
failure to supervise are similar to those that apply to broker-dealers under sec-
tion 15(b)(4) of the Securities Exchange Act of 1934; they permit an accounting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                                   Page 12
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

firm to defend itself from supervisory liability by showing that its internal con-
trol procedures were reasonable and were operating fully in the situation at is-
sue.

    The Board's determination that a violation has occurred and that a sanction
should be imposed may be appealed to the Commission (as described below). Disci-
plinary sanctions must be reported to the Commission, appropriate state or foreign
boards of accountancy, and the public (once any stay of enforcement pending appeal
has been lifted).

F. Foreign public accounting firms

    Companies that sell shares to U.S. investors, and are subject to the federal se-
curities laws, can be organized and operate in any part of the world. Their finan-
cial statements are not necessarily audited by U.S. accounting firms, and the Com-
mittee believes that there should be no difference in treatment of a public com-
pany's auditors under the bill simply because of a particular auditor's place of
operation. Otherwise, a significant loophole in the protection offered U.S. in-
vestors would be built into the statutory system.

    Thus, accounting firms organized under the laws of countries other than the
United States that issue audit reports for public companies subject to the U.S.
securities laws are covered by the bill in the same manner as domestic accounting
firms, subject to the exemptive authority of both the Board and the SEC.
(Registration **\*12** under the bill will not in itself provide a basis for subjecting
a foreign accounting firm to U.S. jurisdiction other than with respect to contro-
versies between such a firm and the Board.) The Board is also authorized to de-
termine that other foreign accounting firms play a sufficiently substantial role
in the preparation and furnishing of such reports for particular issuers that
their coverage under the bill is necessary or appropriate to protect investors and
the public interest.

    Finally, the bill sets terms for the production in the United States by a for-
eign public accounting firm of its audit work papers, for any audit in which the
foreign accounting firm issues an opinion or otherwise performs material services
upon which an accounting firm registered under the bill relies in issuing all or
part of a public company audit report. The foreign firm is deemed, by performing
such work, to have consented to production, and the domestic accounting firm that
relies on the foreign accounting firm's work must have secured, as a condition of
its reliance, the foreign firm's agreement to the production.

G. SEC oversight of the Board

    The Board is subject to SEC oversight and review to assure that the Board's
policies are consistent with the administration of the federal securities laws,
and to protect the rights of accounting firms and individuals subject to the
Board's jurisdiction. Oversight also allows the public an important forum for com-
menting on Board rules relating to auditing, quality control, and related stand-
ards.

    The rules for SEC oversight of the Board are generally the same as those that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

apply to SEC oversight of the National Association of Securities Dealers, under
section 19 of the Securities Exchange Act. Thus, the Board's proposed rules will
be filed with the SEC and published by the SEC for public comment; SEC approval is
necessary in most cases before rules of the Board take effect, and the SEC may it-
self abrogate or amend Board rules (as well as disapprove proposed Board rules).
(Transitional rules are to be separately approved by the SEC at the time of the
SEC's determination that the Board is ready to begin operation.) Disciplinary
sanctions imposed by the Board are subject to SEC review and may be canceled or
modified (or in some cases enhanced) by the SEC. The SEC can relieve the Board of
any responsibility to enforce any provision of the bill, or censure or limit oper-
ations of the Board, or remove a Board member, for cause. Finally, the bill makes
clear that any violations of its terms will constitute a violation of the Securit-
ies Exchange Act itself for purposes of the SEC's enforcement (including injunct-
ive and cease-and-desist) authority under that Act, so that the SEC may proceed
under the bill's provisions directly if appropriate.

H. Accounting principles

   Since 1973, the SEC has generally required public companies operating in the
United States to prepare their financial statements in accordance with "prin-
ciples, standards, and practices" promulgated by the Financial Accounting Stand-
ards Board (the "FASB") in the absence of specific SEC pronouncements on particu-
lar accounting **13** questions. [FN20] The bill seeks to formalize the SEC's reli-
ance on the FASB and, as discussed below, to strengthen the independence of the
FASB by assuring its funding and eliminating any need for it to seek contributions
from accounting firms or companies whose financial statements must conform to
FASB's rules. Thus, the bill amends the Securities Act of 1933 specifically to al-
low the SEC to recognize as "generally accepted" (for securities law purposes) ac-
counting principles established by a private entity that is funded as outlined in
the bill (described below) and that has adopted procedures (including acting by
majority vote) to ensure prompt consideration of necessary changes to the body of
accounting principles.
   An important issue presented to the Committee was the potential difference
between an accounting regime that contains detailed rules for the treatment of
particular items, and a regime that simply outlines general concepts (or "prin-
ciples") to be applied to particular items. Witnesses noted the possibility that
the overly-detailed approach of U.S. standard-setters may have delayed updating of
necessary guidance and at the same time drawn the focus of auditors away from the
overriding principle that a set of financial statements, taken as a whole, must
fairly and completely reflect the economic results and operations of the company
being audited. To allow more careful consideration of the differences between
various formulations of accounting standards, the bill requires the Commission to
conduct a study, within 12 months, of the adoption by the U.S. financial reporting
system of a principles-based accounting system.

I. Funding

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

The Committee's witnesses overwhelmingly agreed that both the Board and the FASB
required guaranteed sources of funding, in order to protect their independence.
Several witnesses testified to the problems various attempts at oversight of aud-
itors had encountered when voluntary funding was withheld. With respect to the
FASB, Michael Sutton, a former SEC Chief Accountant, testified to the Committee
that "[t]o restore confidence in our standards setters, we should take immediate
steps to secure independent funding for the FASB-funding that does not depend on
contributions from constituents that have a stake in the outcome of the process."
[FN21]

Under the bill, public companies are required to pay "accounting support fees"
to support the annual budgets of the Board and the FASB. (The Board's budget will
be subject to approval by the SEC.) Amounts payable by public companies to either
body will generally be allocated among those companies based on relative average
annual monthly market capitalization for the 12 months prior to the year to which
the support fee relates; both the Board and the FASB are permitted to differenti-
ate among various classes of public companies in allocating fees.

**\*14 TITLE II-AUDITOR INDEPENDENCE**

The issue of auditor independence is at the center of this legislation. Public
confidence in the integrity of financial statements of publicly-traded companies
is based on belief in the independence of the auditor from the audit client. As
noted above, each of the country's federal securities laws requires comprehensive
financial statements that must be prepared, in the words of the Securities Act of
1933, by "an independent public or certified accountant."

The statutory independent audit requirement has two sides. It grants a franchise
to the nation's public accountants-their services, and only their services, and
certification, must be secured before an issuer of securities can go to market,
have the securities listed on the nation's stock exchanges, or comply with the re-
porting requirements of the securities laws. This is a source of significant
private benefit to the public accountants.

But the franchise is conditional. It comes in return for the CPA's assumption of
a public duty and obligation. As a unanimous Supreme Court noted nearly 20 years
ago: "In certifying the public reports that collectively depict a corporation's
financial status, the independent auditor assumes a public responsibility. * * *
[That auditor] owes ultimate allegiance to the corporation's creditors and stock-
holders, as well as to the investing public. This 'public watchdog' function de-
mands that the accountant maintain total independence from the client at all times
and requires complete fidelity to the public trust." United States v. Arthur
Young, 465 U.S. 805, 817-18 (1984) (emphasis added).

Richard Breeden, Chairman of the SEC from 1989-93, put it succinctly in testi-
mony before the Committee:

While companies in the U.S. do not have to employ a law firm, an underwriter,
or other types of professionals, federal law requires a publicly-traded company to
hire an independent accounting firm to perform an annual audit. In addition to
this shared federal monopoly, more than a hundred million investors in the U.S.
depend on audited financial statements to make investment decisions. This imbues

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

accounting firms with a high level of public trust, and also explains why there is
a strong federal interest in how well the accounting system functions. [FN22]

   There is arguably an inherent conflict in the fact that an auditor is paid by
the company for which the audit is being performed. That conflict is implicit in
the relationship between the auditor and the audit client. In the last 15 years,
however, the rapid growth in management consulting services offered by the major
accounting firms has created a second, more substantial conflict that has eroded
the independence that the auditor must bring to the audit function.

   According to the SEC, 55 percent of the average revenue of the big five account-
ing firms came from accounting and auditing services in 1988. Twenty-two percent
of the average revenue came from management consulting services. By 1999, those
figures had fallen to 31 percent for accounting and auditing services, and risen
to 50 **15** percent for management consulting services. Recent data reported to the
SEC showed on average public accounting firms' non-audit fees comprised 73 percent
of their total fees, or $2.69 in non-audit fees for every $1.00 in audit fees. At
the same time, the frequency of financial restatements by public companies has
dramatically increased. From 1990-97, the number of public company financial re-
statements averaged 49 per year, but jumped to an average of 150 per year in 1999
and 2000.

   For these reasons, the bill includes a number of provisions directed to the is-
sue of auditor independence.

A. Services outside the scope of practice of auditors

   A number of the witnesses who testified before the Committee during the course
of the hearings, as well as other informed observers, argued that the growth in
the non-audit consulting business done by the large accounting firms for their
audit clients has so compromised the independence of the audits that a complete
prohibition is required on the provision of consulting services by accounting
firms to their audit clients.

   Perhaps the strongest advocates of this view have been the managers of large
pension funds who are entrusted with people's retirement savings. James E. Burton,
Chief Executive Officer of the California Public Employees' Retirement System
(CalPERS), which manages pension and health benefits for more than 1.3 million
members with aggregate holdings totaling almost $150 billion, has stated: "We be-
lieve that the inherent conflicts created when an external auditor is simultan-
eously receiving fees from a company for non-audit work cannot be remedied by any-
thing less than a bright-line ban. An accounting firm should be an auditor or a
consultant, but not both to the same client." [FN23]

   John Biggs is Chairman of Teachers Insurance and Annuity Association-College Re-
tirement Equities Fund (TIAA-CREF), the largest private pension system in the
world providing pensions and other financial products to the education and re-
search community. TIAA-CREF manages approximately $275 billion in pension assets
for over 2 million participants. Mr. Biggs has stated:

      Another critical element in reforming audit practices is a bright line divi-
sion between audit and consulting functions. We believe such separation will help
restore public trust in corporate financial statements. For example, TIAA-CREF

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                          Page 16

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

does not allow our public audit firm to provide any consulting services to us, and
our policy even bars our auditor from providing tax services. * * *

   Our long-term policy has served us well in assuring the independence of our
auditors. Because auditors owe their primary duty to the shareholders, questions
about the primacy of that duty are raised if the audit firm provides other, poten-
tially more lucrative, consulting services to the company. The board and the pub-
lic auditor should both see to it that, in fact as well as in appearance, the aud-
itor reports to the independent board audit committee and acts on behalf of share-
holders. The key reason why awarding **16** consulting contracts and other non-audit
work to the audit firm is troubling is because it results in conflicting loyal-
ties. While the board's audit committee is formally responsible for hiring and
firing the outside auditor, management controls virtually all the other types of
non-audit work the audit firm may do for the company. Those contracts with manage-
ment blur the reporting relationship-it is difficult to believe that auditors do
not feel pressure for the overall success of their firm with the client. Even
their own compensation packages may be tied to consulting and non-audit services
being provided by their firm to the company. * * *

   Congress has a clear mandate from the shareholders and the general public to
act strongly and swiftly. By requiring public companies to use different account-
ing firms for their audit and consulting services and by establishing an independ-
ent board with real authority to oversee the accounting profession you will be
taking important steps toward reversing the crisis of confidence in financial mar-
kets that exists today. [FN24]

   In addition, respected former corporate leaders and former public officials en-
dorsed this approach. For example, John Whitehead, former Co-Chairman of Goldman
Sachs and former Co-Chairman of the Blue Ribbon Committee on Improving the Effect-
iveness of Corporate Audit Committees, told the Committee:

   I have reached the conclusion that the accounting firm that does the audit
should not do other advisory work for the company. Without that, the independence
of the auditor's work will always be suspect. I reach that decision reluctantly
but I don't see that it is possible to restore public confidence in the independ-
ence of the auditors without it. [FN25]

   Walter Schuetze, a former SEC Chief Accountant (who is also a former Big 8 ac-
counting firm partner and an original member of the FASB), stated, "I would sup-
port a complete separation and allow the audit firm to provide only audit services
to the audit client. No other services whatsoever." [FN26] Former SEC Chairman
Harold Williams also suggested that a complete ban on consulting services be con-
sidered for audit clients of accounting firms. [FN27]

   The Committee considered adopting a complete prohibition on non-audit services
by accounting firms for their audit clients, but instead decided on a somewhat
more flexible approach. The approach adopted by the Committee is supported by
former Comptroller General Bowsher, former SEC Chairman Arthur Levitt, and former
Federal Reserve Board Chairman Paul Volcker. [FN28]

   **17** The bill provides that it shall be unlawful for a public accounting firm re-
gistered with the Board which performs an audit for a public company to provide,
contemporaneously with the audit, the following non-audit services:

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

    (1) bookkeeping or other services related to the accounting records or finan-
cial statements of the audit client;

    (2) financial information systems design and implementation;

    (3) appraisal or valuation services, fairness opinions, or contribution-
in-kind reports;

    (4) actuarial services;

    (5) internal audit outsourcing services;

    (6) management functions or human resources;

    (7) broker or dealer, investment adviser, or investment banking services;

    (8) legal services and expert services unrelated to the audit; and

    (9) any other services that the Board determines, by regulation, is impermiss-
ible.

The Board may, on a case-by-case basis, exempt any person, issuer, public ac-
counting firm, or transaction from the prohibition on the provision of non-audit
services to the extent that such exemption is necessary or appropriate in the pub-
lic interest and is consistent with the protection of investors. A registered pub-
lic accounting firm may engage in any non-audit service, including tax services,
that is not on the list for an audit client only if the activity is approved in
advance by the audit committee of the issuer. No limitations are placed on ac-
counting firms in providing non-audit services to public companies which they do
not audit or to any non-public companies.

The need for this provision was clearly stated by David M. Walker, Comptroller
General of the United States, in a statement he released on June 18, in which he
said:

    I believe that legislation that will provide a framework and guidance for the
SEC to use in setting independence standards for public company audits is needed.
History has shown that the AICPA [American Institute of Certified Public Account-
ants] and the SEC have failed to update their independence standards in a timely
fashion and that past updates have not adequately protected the public's in-
terests. In addition, the accounting profession has placed too much emphasis on
growing non-audit fees and not enough emphasis on modernizing the auditing profes-
sion for the 21st century environment. Congress is the proper body to promulgate a
framework for the SEC to use in connection with independence related regulatory
and enforcement actions in order to help ensure confidence in financial reporting
and safeguard investors and the public's interests.

    The independence provision [of the bill] * * * strikes a reasoned and reason-
able balance that will enable auditors to perform a range of non-audit services
for their audit clients and an unlimited range of non-audit services for their
non-audit clients. Most importantly, the proposed legislation adopts a "principle
based" and "substance over form" approach that can stand the test of time and, if
adopted, **\*18** will better protect the public's interests. In my opinion, the time
to act on independence legislation is now. [FN29]

Some argue that standards for auditor independence should be left to the SEC and
the new Board. The approach adopted by the bill reflects the Committee's belief
that the issue of auditor independence is so fundamental to the problems currently
being experienced in our financial markets that statutory standards are needed to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

assure the independence of the auditor from the audit client.

   The intention of this provision is to draw a clear line around a limited list of
non-audit services that accounting firms may not provide to public company audit
clients because their doing so creates a fundamental conflict of interest for the
accounting firms. The list is based on simple principles. An accounting firm, in
order to be independent of its audit client, should not audit its own work, which
would be involved in providing bookkeeping services, financial information systems
design, appraisal or valuation services, actuarial services, and internal audit
outsourcing services to an audit client. The accounting firm should not function
as part of management or as an employee of the audit client, which would be re-
quired if the accounting firm provides human resources services such as recruit-
ing, hiring, and designing compensation packages for the officers, directors, and
managers of an audit client. The accounting firm should not act as an advocate of
the audit client, which would be involved in providing legal and expert services
to an audit client in legal, administrative, or regulatory proceedings, or serving
as a broker-dealer, investment adviser, or investment banker to an audit client,
which places the auditor in the role of promoting a client's stock or other in-
terests.

   The accounting industry itself has announced voluntarily that it will not
provide two of these non-audit services-internal audit services and financial in-
formation systems design and implementation-to public company audit clients be-
cause of the conflicts they present. The other prohibited non-audit services also
pose clear conflicts of interest for accounting firms when provided for audit cli-
ents. For example, in its oversight hearing earlier this year on the failure of
Superior Bank, FSB, in Hinsdale, Illinois, the Committee learned first-hand the
risks associated with allowing accounting firms to audit their own work. [FN30] In
that case, the accounting firm audited and certified a valuation of risky residual
assets calculated according to a methodology it had provided as a consultant. The
valuation was excessive and led to the failure of the institution.

   The Board is given authority to make case-by-case exemptions in instances where
the Board believes an exemption is in the public interest and consistent with the
protection of investors. Further, no limitations are placed on accounting firms in
providing non-audit services to public companies that they do not audit or to any
private companies. The purpose is to assure the independence of the audit, not to
put an end to the provision of non-audit services by accounting firms.

   **\*19** In summary, the bill adopts a strong, balanced approach to assure that in
return for the significant private benefits conferred on accounting firms by our
securities laws, they maintain their independence from the companies they audit
and fulfill their "public trust."

B. Audit committee pre-approval of audit and non-audit services

   The legislation requires that audit services, as well as non-audit services oth-
er than those proscribed by the bill, must be pre-approved by the audit committee
of the public company's board of directors. The Committee heard testimony on the
role that the audit committee of a public company should play in connection with
the engagement of an auditor to provide audit and non-audit services contemporan-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

eously. Michael Sutton, former Chief Accountant of the SEC, said, "Whatever non-audit services might be permitted, I think they should be permitted only with the approval of the audit committee." [FN31] Former SEC Commissioner Bevis Longstreth told the Committee:

   I suggest a simple exclusionary rule covering virtually all non-audit services, in place of the deeply complex, existing rule that I hope, by now, to have convinced you is ineffective. This rule would redefine the category of services to be barred as including everything other than the work involved in performing an audit and other work that is integral to the function of the audit. Use of such an exception should require at least the following: (a) Before any such service is rendered, a finding by the client's audit committee that special circumstances make it obvious that the best interests of the company and its shareholders will be served by retaining its audit firm to render such service and that no other vendor of such service can serve those interests as well; (b) Forthwith upon the making of such a finding, submission of a written copy thereof to the SEC and the SRO having jurisdiction over the profession; and (c) In the company's next proxy statement for election of directors, disclosure of such finding by the audit committee and the amount paid and expected to be paid to the auditor for such service. [FN32]

   After studying this issue, the Committee believes the protection of investors warrants a requirement that a public company's audit committee approve in advance the services that the auditor will provide to such company (if those services are not explicitly prohibited under the bill). Accordingly, the bill requires the audit committee of a public company to pre-approve all of the services, both audit and non-audit, provided to that company by a registered public accounting firm. The bill does not require an issuer's audit committee to pre-approve non-audit services provided by an accounting firm that is not auditing the issuer.

   The bill does not require the audit committee to make a particular finding in order to pre-approve an activity. The members of the audit committee shall vote consistent with the standards they **\*20** determine to be appropriate in light of their fiduciary responsibilities and such other considerations they deem to be relevant.

   The audit committee must pre-approve a non-audit service before it commences. The audit committee may pre-approve at any time in advance of the activity. For example, an audit committee may grant pre-approval at its March meeting for a non-audit service that would begin in August. However, the Commission or the Board under its general authority may specify a maximum period of time in advance of which the approval may not be granted, such as, for example, requiring the pre-approval to be granted no earlier than one year prior to the commencement of the service.

   The bill does not limit the number of non-audit services that the audit committee may pre-approve at one meeting or occasion. The Committee intends, however, that each non-audit service be specifically identified in order to be approved by the audit committee. The Committee does not intend for the statutory requirement to be satisfied by an audit committee voting, for example, to permit "any service that management determines appropriate for the auditor to perform" or "all non-audit services permissible under law."

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

The Committee has chosen to offer audit committees a delegation option in their
administration of the pre-approval requirement. The bill permits the audit commit-
tee to delegate to one or more of its members (who are members of the board of
directors) the authority to pre-approve non-audit services. After a delegated mem-
ber has granted a pre-approval, he or she is required to report the decision at
the next meeting of the full audit committee. This delegation of authority may be
useful where, for example, the audit committee is asked to determine whether or
not to permit the issuer's auditor to perform a new non-audit service within a
short period of time.

The Committee has taken into account the atypical circumstance where an auditor
is providing to the issuer a service that was anticipated to be an audit service
within the scope of the engagement, but is later discovered to be a non-audit ser-
vice. The bill provides that the pre-approval requirement is waived with respect
to a non-audit service if: (1) the service was not recognized by the issuer at the
time of the audit engagement to be a non-audit service, (2) the aggregate amount
paid for all services described in (1) is not more than 5 percent of the total
amount of revenues paid by the issuer to the auditor, and (3) the service is
promptly brought to the attention of the audit committee, and (4) the audit com-
mittee approves the activity prior to the conclusion of the audit. This post-
approval may be granted by the entire audit committee or by one or more audit com-
mittee members (who are members of the board of directors) to whom authority to
grant such approvals has been delegated by the audit committee. This flexibility
was suggested by Senator Enzi.

The bill requires that the audit committee approvals be disclosed to investors
in periodic reports filed with the Commission.

The bill specifically notes that audit services "may entail providing comfort
letters in connection with securities underwriting" in order to make clear that
providing such a comfort letter is an audit service.

**\*21** C. Audit partner rotation

The Committee heard testimony from numerous witnesses on whether, in order to
maintain the objectivity of its audits, an issuer should be required to rotate its
audit firm after a number of consecutive years. For example, former SEC Chairman
Arthur Levitt proposed "that serious consideration be given to requiring companies
to change their audit firm-not just the partners-every 5-7 years to ensure that
fresh and skeptical eyes are always looking at the numbers." [FN33] Former SEC
Chairman Harold Williams recommended a requirement that issuers "[h]ire auditors
with a fixed term with no right to terminate for five or seven years." [FN34] John
Whitehead, former Co-Chairman, Goldman Sachs & Co., recommended requiring "[t]erm
limits of 8 to 10 years." [FN35] Lynn Turner, former SEC Chief Accountant, recom-
mended requiring "mandatory rotation (5 to 7 years)." [FN36]

Other witnesses felt that accounting firm rotation could be disruptive to the
issuer and that the costs of mandatory rotation might outweigh the benefits.
Former SEC Chairman Rod Hills said that "[f]orcing a change of auditors can only
lower the quality of audits and increase their costs." [FN37] Shaun O'Malley,
Chairman, 2000 Public Oversight Board Panel on Audit Effectiveness, said that "for-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                                Page 21
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

cing issuers to change auditors every few years * * * would undermine audit ef-
fectiveness." [FN38]

   The Committee determined that the possibility of requiring audit firm rotation
merits further study. The bill directs the U.S. General Accounting Office ("GAO")
to analyze the merits and potential effects of requiring mandatory rotation of
auditors, and to report its analysis to Congress within one year.

   While the bill does not require issuers to rotate their accounting firms, the
Committee recognizes the strong benefits that accrue for the issuer and its share-
holders when a new accountant "with fresh and skeptical eyes" evaluates the issuer
periodically. Accordingly, the bill requires a registered public accounting firm
to rotate its lead partner and its review partner on audits so that neither role
is performed by the same accountant for the same issuer for more than five consec-
utive years. [FN39]

D. Disclosures of accounting issues.

   The Committee believes that it is important for the audit committee to be aware
of key assumptions underlying a company's financial statements and of disagree-
ments that the auditor has with management. The audit committee should be informed
in a timely manner of such disagreements, so that it can independently review them
and intervene if it chooses to do so in order to assure the integrity of the
audit.

   **\*22** Accordingly, the bill requires a registered independent public accounting
firm performing an audit for a public company to report in a timely manner to that
company's audit committee (1) the critical accounting policies and practices to be
used; (2) all alternative treatments of financial information within GAAP
(generally accepted accounting principles) that have been discussed with manage-
ment; (3) any accounting disagreements between the auditor and management; and (4)
other material written communications between the auditor and management.

E. Cooling off period

   The Committee received extensive testimony on whether to impose a cooling off
period between an accountant's employment by an auditor and his or her employment
by an issuer. Several witnesses advocated this requirement, in order to enhance
the integrity of an audit. Former Comptroller General Bowsher recommended to the
Committee that "[e]ngagement and other partners who are associated with an audit
should be prohibited from taking employment with the affected firm until a two-
year 'cooling off' period has expired." [FN40] Lynn Turner, former SEC Chief Ac-
countant, said, "Cooling off periods should last two years. Close the door between
the audit firm, its partners and employees, and the company being audited." [FN41]
Other witnesses also gave testimony that "the revolving door between audit firms
and their audit clients" should be closed by enacting a cooling off period. James
E. Copeland, Jr., Chief Executive Officer, Deloitte & Touche LLP, opposed a cool-
ing off period because of concerns that it would "impose unwarranted costs on the
public, the client and the profession." [FN42]

   The Committee considered various options, including imposing a cooling off peri-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

od of one, two, or three years, and applying a cooling off period to all employees
who worked for the auditor, regardless of whether they worked on the audit of a
particular issuer and regardless of the position they would take with that issuer,
or applying a cooling off period only to certain groups of employees.

The Committee decided to impose a one-year cooling off period that would apply
to an employee of the accounting firm who worked on the issuer's audit and sub-
sequently seeks to be employed by that issuer in a senior management capacity.
Thus, the bill provides that an accounting firm may not provide audit services for
a public company if that company's chief executive officer, controller, chief fin-
ancial officer, chief accounting officer, or other individual serving in an equi-
valent position, was employed by the accounting firm during the one year before
the start of the audit services. The cooling off period does not take effect if
the CEO or other senior official worked for the auditor but did not work on the
issuer's audit or if a member of the audit team is hired by the issuer for a posi-
tion other than CEO, CFO, controller, chief accounting officer, or an equivalent
position. However, if an issuer hires an accountant from the audit team as its
CEO, for example, it would be required to change auditors.

**\*23** F. The bill does not create state regulatory standards

Titles I and II are designed to apply only to accounting firms that audit public
companies. They are not designed to apply to audits of private companies. Nonethe-
less, some have raised the concern that the bill could lead state regulatory au-
thorities to impose similar requirements for audits of private companies.

The bill indicates clearly that Congress does not intend that state regulatory
authorities should find this Act controlling in their regulation of non-registered
accountants. The bill states that it is the intention of the Act that, in super-
vising non-registered accounting firms, state regulatory authorities should make
an independent determination of the proper standards, and should not presume the
standards applied by the Board under this bill to be applicable to small- and me-
dium-sized non-registered accounting firms. Senators Hagel and Enzi proposed this
provision.

### TITLE III-B CORPORATE RESPONSIBILITY

In further response to recent corporate failures, title III of the bill makes a
number of changes to improve the responsibility of public companies for their fin-
ancial disclosures. To that end, the bill incorporates a number of reform propos-
als made by the President on March 7, 2002. These reforms are supplemented with
additional provisions that the Committee believes will improve investor protection
in connection with the operation of public companies.

Recent events have highlighted the failure of companies' internal audit commit-
tees to properly police their auditors and have raised awareness of the need for
strong, competent audit committees with real authority. Several witnesses sugges-
ted that the Committee make changes in the role of audit committees in order to
enhance the audit process. In response, under the bill, the SEC must draft rules
directing national securities exchanges and associations to require listed compan-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ies to comply with a number of enumerated provisions regarding audit committees.
The Committee believes that the bill's approach to strengthening audit committees
will help avoid future auditing breakdowns.

   The bill also contains a number of provisions aimed at corporate management. De-
fects in procedures for monitoring financial results and controls have been blamed
for recent corporate failures. The bill therefore requires CEOs and CFOs to certi-
fy their companies' financial reports, outlaws fraud and deception by managers in
the auditing process, prevents CEOs and CFOs from benefitting from profits they
receive as a result of misstatements of their company's financials, and facilit-
ates the imposition of judicial bars against officers and directors who have viol-
ated the securities laws. Finally, title III includes a provision intended to pre-
vent employees from being required to hold company stock in their retirement ac-
counts while officers and directors are free to sell their shares.

A. Issuer audit committees

   Oversight of Auditors. Witnesses at the Committee's hearings suggested that the
auditing process may be compromised when auditors view their main responsibility
as serving the company's management rather than its full board of directors or its
audit committee. For this reason, the bill requires audit committees to be dir-
ectly **\*24** responsible for the appointment, compensation, and oversight of the work
of auditors, and requires auditors to report directly to the audit committee.

   Many witnesses testified as to the importance of these provisions. In particu-
lar, witnesses believed that the hiring and firing of the auditor should be the
exclusive province of the audit committee. A number of witnesses emphasized that
"audit committees [should] be solely responsible for the retention of accounting
firms and be responsible for the fees paid to them." [FN43] Sarah Teslik, Execut-
ive Director of the Council of Institutional Investors, told the Committee that
"perhaps [the] single first step [Congress] should take to increase auditor inde-
pendence is to require a listing standard [of the national securities exchanges
and associations] that the audit committee of the board hire and fire the audit-
ors," the approach taken by the bill. [FN44] Additional witnesses who supported
making the audit committee responsible for hiring and firing the auditors in-
cluded: Robert E. Litan, Director of the Economic Studies Program of The Brookings
Institution; Damon Silvers, Associate General Counsel of the AFL-CIO; and former
U.S. Comptroller General Bowsher. [FN45]

   Audit Committee Member Independence. Many recent failures have been attributed
to close ties between audit committee members and management. In 1998-99, the NYSE
and Nasdaq sponsored the Blue Ribbon Committee on Improving the Effectiveness of
Corporate Audit Committees. The Blue Ribbon Committee, chaired by Committee wit-
nesses Ira Millstein and John Whitehead, made a number of recommendations to en-
hance audit procedures and effectiveness, including recommendations to increase
the independence of audit committee members. Mr. Millstein and Mr. Whitehead, as
well as Blue Ribbon Committee member John Biggs, testified at the hearings in sup-
port of adoption of the Blue Ribbon Committee's recommendations. [FN46] Consistent
with their recommendations, the bill enhances audit committee independence by bar-
ring audit committee members from accepting consulting fees or being affiliated

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 24 of 74
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

persons of the issuer or the issuer's subsidiaries other than in the member's ca-
pacity as a member of the board of directors or any board committee.

The audit committee independence provisions were supported by a number of wit-
nesses in addition to Messrs. Millstein, Whitehead, and Biggs. Former SEC Chairman
Arthur Levitt testified that "as a listing condition, stock exchanges should re-
quire at least a majority of company boards to meet a strict definition of inde-
pendence," including barring audit committee members from accepting consulting
fees from the company. [FN47] Former SEC Chairman Roderick M. Hills and Washington
University School of Law Dean Seligman also recommended that Congress require that
companies have independent **\*25** audit committees. [FN48] Former Senator Howard Met-
zenbaum, the Chairman of Consumer Federation of America, testified that lack of
independence frequently leads audit committees to have a "fealty to the management
that an audit committee shouldn't have." [FN49]

Additional Audit Committee Responsibilities. The bill contains several addition-
al provisions regarding audit committees. The bill requires audit committees to
have in place procedures to receive and address complaints regarding accounting,
internal control, or auditing issues. Further, the bill includes an amendment by
Senator Stabenow providing protection for corporate "whistleblowers" by specifying
that audit committees must establish procedures for employees' anonymous submis-
sion of concerns regarding accounting or auditing matters.

The bill also requires public companies to provide their audit committees with
authority and funding to engage independent counsel and other advisers as they de-
termine necessary in order to carry out their duties. Comptroller General Walker
agreed that audit committee members must be "adequately resourced," suggesting
that audit committee members "may need their own staff." [FN50]

In light of recent events, the Committee believes that these audit committee
provisions should be codified in the securities laws in order to help rectify
auditing misconduct and to enhance the effectiveness of audit committee oversight
of public company audits.

B. Corporate responsibility for financial reports

The Committee believes that management should be held responsible for the finan-
cial representations of their companies. The bill therefore clearly establishes
that CEOs and CFOs are responsible for the presentation of material in their com-
pany's financial reports. Under one of the recommendations put forward by the
President on March 7, "CEOs would personally attest each quarter that the finan-
cial statements and company disclosures accurately and fairly disclose the inform-
ation of which the CEO is aware that a reasonable investor should have to make an
informed investment decision." In effect the bill adopts this proposal, in an ap-
proach developed with Senator Miller, by requiring CEOs and CFOs to certify, in
periodic reports containing financial statements filed with the Commission pursu-
ant to section 13(a) or 15(d) of the Exchange Act, the appropriateness of finan-
cial statements and disclosures contained therein, and that those financials and
disclosures fairly present the company's operations and financial condition.

These provisions reflect the Committee's concern regarding the reliability of
companies' audited financial statements. In his testimony before the Committee,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

former SEC Chairman Breeden recognized that there is "growing doubt about whether
audited financial statements are believable." [FN51] Council of Institutional In-
vestors Executive Director Sarah Teslik echoed this concern in testifying that **\*26**
"CEOs, audit committee members and outside auditors" should be required to "sign
the financials as true and accurate." [FN52]

C. Prohibited influence

   Numerous witnesses testifying before the Committee, including Shaun O'Malley,
Chair of the 2000 Public Oversight Board Panel on Audit Effectiveness, and Sarah
Teslik, Council of Institutional Investors Executive Director, were concerned with
addressing fraud and misconduct in the audit process. [FN53] In response, title
III of the bill makes it unlawful for any officer or director of an issuer, or
person acting under the direction thereof, to fraudulently influence, coerce, ma-
nipulate, or mislead any accountant engaged in preparing an audit of that issuer,
for the purpose of rendering the audit report misleading. The Commission is
provided with exclusive authority to enforce this section. The bill establishes a
90-day deadline for proposed rules or regulations by the Commission under this
section, and a 270-day deadline for final rules or regulations.

D. Forfeiture of bonuses and profits

   Recent events have raised concern about management benefitting from unsound fin-
ancial statements, many of which ultimately result in corporate restatements. The
President has recommended that "CEOs or other officers should not be allowed to
profit from erroneous financial statements," and that "CEO bonuses and other in-
centive-based forms of compensation [sh]ould be disgorged in cases of accounting
restatement and misconduct."

   Title III includes provisions designed to prevent CEOs or CFOs from making large
profits by selling company stock, or receiving company bonuses, while management
is misleading the public and regulators about the poor health of the company. The
bill requires that in the case of accounting restatements that result from materi-
al non-compliance with SEC financial reporting requirements, CEOs and CFOs must
disgorge bonuses and other incentive-based compensation and profits on stock
sales, if the non-compliance results from misconduct. The required disgorgement
applies to amounts received for the 12 months after the first public issuance or
filing of a financial document embodying such financial reporting requirement. Un-
der this section, the SEC may exempt any person from this requirement as it deems
necessary and appropriate.

E. Officer and director bars and penalties

   Title III also includes several measures affecting officers and directors who
have violated the securities laws. The staff of the Commission indicated to the
Committee staff that when enforcement proceedings are brought under the securities
laws, courts in some cases have been reluctant to impose prospective bars against
violators serving as officers or directors of companies. The bill would facilitate
not only the SEC's prevention of individuals who have violated the securities laws

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

from serving as officers and directors, but also the imposition of penalties on
violators of securities laws.

**\*27** Currently, it must be proved that an officer or director has both violated
the securities laws, and has shown "substantial unfitness" to serve before a bar
can be imposed. The Commission has argued that the "substantial unfitness" stand-
ard for imposing bars is inordinately high, causing courts to refrain from impos-
ing bars even in cases of egregious misconduct. The proposed bill rectifies this
deficiency by modifying the standard governing imposition of officer and director
bars from "substantial unfitness" to "unfitness."

These provisions also reflect the President's recommendation that "CEOs or other
officers who clearly abuse their power should lose their right to serve in any
corporate leadership positions."

The Commission has also suggested that it should be allowed to obtain additional
relief in enforcement cases. For a securities law violation, currently an indi-
vidual may be ordered to disgorge funds that he or she received "as a result of
the violation." Rather than limiting disgorgement to these gains, the bill will
permit courts to impose any equitable relief necessary or appropriate to protect,
and mitigate harm to, investors.

F. Prohibition on insider trades during pension fund blackout periods

As former SEC Chairman Breeden observed, "The spectacle of corporate insiders
plundering their own companies or selling their stock quietly in advance of a
looming collapse has awakened a sense of revulsion among investors who were left
with worthless stock." [FN54] In some cases, officers and directors have profited
by selling off large portions of company stock during a time when employees were
prevented from selling company stock in their section 401(k) retirement plans. To
address this problem, the bill prohibits key individuals from engaging in transac-
tions involving any equity security of the issuer during a "blackout" period when
at least half of the issuer's individual account plan participants are not permit-
ted to purchase, sell, or otherwise transfer their interest in that equity secur-
ity. Upon Senator Miller's recommendation, this section applies to directors and
executive officers in order to ensure that the prohibition is limited to individu-
als in policy-making positions.

The bill provides added protection for participants in retirement plans by re-
quiring that they be provided with written notice at least 30 days before a black-
out period. Two exceptions to the 30-day notice are provided in response to Senat-
or Enzi's recommendations. First, an exception is allowed in cases where a defer-
ral of the blackout period to comply with the 30-day notice requirement would vi-
olate ERISA provisions that require fiduciaries to act exclusively on behalf of
participants, and those that require trustees to act prudently, in their decisions
regarding plan assets. Second, an exception may be provided where the inability to
provide the notice is due to unforeseeable events or circumstances beyond the
reasonable control of the plan administrator.

The Committee is concerned that without the provisions of title III, our finan-
cial markets will witness numerous corporate restatements in the future. The Com-
mittee believes that title III incorporates **\*28** needed reforms that will enhance

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 24
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
(Cite as: S. REP. 107-205)

corporate responsibility among public companies.

### TITLE IV-ENHANCED FINANCIAL DISCLOSURES

The Committee heard testimony about the imperative necessity for investors to have accurate and full financial information available on a timely basis in order to make appropriate investment decisions. The Committee has identified certain key disclosures that require legislative action.

A. Accounting adjustments

The bill requires that financial statements filed with the Commission reflect the material adjustments under GAAP that have been identified by the auditor.

B. Off-balance sheet transactions

Former SEC Chairman Richard Breeden testified, after the problems of Enron Corp. and its special purpose entities, on the need for "enhance[d] disclosure of 'off-balance sheet' transactions and debt." [FN55] To address this need, the bill requires annual and quarterly reports filed with the SEC to disclose all material off-balance sheet transactions, arrangements, obligations (including contingent obligations), and other relationships of the issuer with unconsolidated entities or other persons that may have a material current or future effect on financial condition, changes in financial condition, results of operations, liquidity, capital expenditures, capital resources, or significant components of revenues or expenses.

C. Pro-forma financial disclosures

Thomas A. Bowman, President and CEO of the Association for Investment Management and Research (AIMR), testified before the Committee on his concerns about the use of pro forma disclosures:

Another creative way in which managements mislead investors and manipulate investor expectations is by communication of "pro forma earnings," company-specific variations of earnings, or "earnings before the bad stuff." With all its deficiencies, we believe that earnings data based on Generally Accepted Accounting Principles (GAAP) are still the most useful starting point for analysis of a company's performance. Analysts and other investors at least know how GAAP earnings are computed and, hence, there is some comparability across companies. We believe that GAAP earnings should always be displayed more prominently than non-GAAP earnings data.

Unfortunately, just the opposite seems to be the norm, particularly in press releases where pro forma earnings get the most emphasis and GAAP earnings may not be mentioned at all. GAAP earnings and associated balance sheet may only become available to investors in SEC filings one to two weeks after pro forma earnings are announced.

While pro forma earnings can be helpful supplemental information for analysts, the practice of providing pro forma earnings is widely abused. Companies select-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ively exclude **\*29** all sorts of financial reporting items, including depreciation,
amortization, payroll taxes on exercises of options, investment gains and losses,
stock compensation expenses, acquisition-related and restructuring costs. John
Bogle, the respected investment professional, recently noted in a speech to the
New York Society of Securities Analysts, "In 2001, 1,500 companies reported pro
forma earnings, what their earnings would have been if bad things hadn't
happened." We recommend that either the FASB or SEC curtail this practice or en-
sure that pro forma earnings data never have more prominence than GAAP earnings in
company communications. [FN56]

   Former Federal Reserve Board Chairman Paul Volcker also testified about con-
cerns with pro forma earnings: "Those problems, building over a period of years,
have now exploded in a sense of crisis, a crisis as exemplified by the Enron col-
lapse. But Enron is not the only symptom. We've had * * * too many doubts about
pro forma earnings." [FN57] Dean Joel Seligman testified that, after taking into
account current regulatory efforts on disclosure of pro forma figures, "[m]ore
needs to be done." [FN58]

   The Committee seeks to address problems attendant to pro forma financial dis-
closures by requiring the SEC to promulgate rules requiring that issuers publish
pro forma data with a reconciliation to comparable financial data calculated ac-
cording to GAAP and in a way that is not misleading and does not contain untrue
statements. The reconciliation presumes, and would require, the issuer to publish
financial data calculated according to GAAP at the same time as it publishes pro
forma data. This should enable investors to, at the least, simultaneously compare
the pro forma financial data with the same types of financial disclosures (e.g.,
earnings) calculated according to GAAP for the comparable reporting period.

   The Committee recognizes from the recent experience of Enron Corp. and other
public companies the need for additional types of disclosures. The Committee sup-
ports public and private efforts that result in greater quality, clarity, and com-
pleteness in the disclosures made by public companies.


D. Enhanced disclosures of loans

   Enron Corp. and other corporations have made loans to directors and executive
officers totaling many millions of dollars. [FN59] Many of **\*30** these insider loans
are disclosed to investors in the annual proxy materials months after they occur.

   In his testimony, former SEC Chairman Richard Breeden recommended that  "immedi-
ate 8-K disclosure" of insider loans be required. [FN60]

   The Committee is aware that investors are concerned about loans to insiders and
want to know this information promptly after the loans are made in order to better
inform their investment decisions. The bill requires an issuer in its current re-
ports to disclose within seven days, or such other time period determined to be
appropriate by the SEC, all loans, except credit card loans, made by the issuer
and its affiliates to any director or executive officer, specifying amounts paid
and balances owed on such obligations and any conflicts of interest, as defined by
the SEC. The Committee created an exemption from reporting for credit card loans
made by the issuer to a director or executive officer in the ordinary course of
the issuer's consumer credit business, of a type generally made available by the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                   Page 29

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

issuer to the public on market terms. The bill gives the SEC the flexibility to
shorten the period to less than seven days or extend it to more than seven days if
it deems appropriate.

   These provisions will result in information about insider loans and other con-
flicts of interest being disclosed in a timely manner so investors can consider
such data in making their investment decisions.

E. Disclosures of transactions involving management

   The Committee received testimony that insiders should be required to report
their transactions in the stock of their companies more promptly. Ira Millstein,
Senior Partner, Weil, Gotshal & Manges LLP and Co-Chair of the Blue Ribbon Commit-
tee on Improving the Effectiveness of Corporate Audit Committees, testified that,
"SEC rules should be amended to mandate prompt disclosure of transactions between
the corporation (or its affiliates) and members of senior management, directors or
controlling shareholders." [FN61] Former Comptroller General Bowsher echoed this
objective when he testified: "To discourage conflicts of interest involving public
corporations, Congress should amend the Securities Exchange Act of 1934 to require
more meaningful and timely disclosure of related party transactions among of-
ficers, directors, or other affiliated persons and the public corporation." [FN62]

   At present, Section 16(a) of the Exchange Act requires insiders to report trades
by the tenth day of the month following the month in which the transaction was ex-
ecuted. The Committee recognizes **\*31** that some investors find trades by insiders
to be probative of whether investing in a company is desirable and feel that, in
today's markets, the current deadline imposed by Section 16(a) allows too long a
delay in reporting.

   The bill would amend Section 16(a) to require directors, officers and 10 percent
equity holders to report their purchases and sales of securities more promptly,
that is, by the end of the second day following the transaction or such other time
established by the SEC where the two-day period is not feasible. The purpose is to
make available to investors information about insider transactions more promptly
so they can make better informed investment decisions.

F. Management assessment of internal controls

   The Committee heard testimony from former Comptroller General Bowsher, who re-
commended:

      Management of public companies should be required to prepare an annual state-
   ment of compliance with internal controls to be filed with the SEC. The corpora-
   tion's chief financial officer and chief executive officer should sign this at-
   testation and the auditor should review it. An auditor's review and report on the
   effectiveness of internal controls would-as the General Accounting Office (GAO)
   found in a 1996 report-improve "the auditor's ability to provide more relevant and
   timely assurances on the quality of data beyond that contained in traditional fin-
   ancial statements and disclosures." Both the POB and the AICPA supported the re-
   commendation when the GAO made it, but the SEC did not adopt it. [FN63]

   In order to enhance the quality of reporting and increase investor confidence,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the bill requires that annual reports filed with the SEC must be accompanied by a
statement by the management of the issuer that management is responsible for cre-
ating and maintaining adequate internal controls. Management must also present its
assessment of the effectiveness of those controls. A similar requirement was en-
acted in 1991 and has been imposed on depository institutions through Section 36
of the Federal Deposit Insurance Act.

In addition, the company's auditor must report on and attest to management's as-
sessment of the company's internal controls. In requiring the registered public
accounting firm preparing the audit report to attest to and report on management's
assessment of internal controls, the Committee does not intend that the auditor's
evaluation be the subject of a separate engagement or the basis for increased
charges or fees. High quality audits typically incorporate extensive internal con-
trol testing. The Committee intends that the auditor's assessment of the issuer's
system of internal controls should be considered to be a core responsibility of
the auditor and an integral part of the audit report.

G. Exemptions for investment companies

The bill exempts investment companies from certain disclosure requirements. The
Committee feels that the objectives of those disclosure sections are adequately
addressed by existing Federal securities **\*32** laws and the rules thereunder affect-
ing investment companies.

For example, Section 17(a) of the Investment Company Act of 1940 and Rule 17j-1
thereunder prohibit affiliated persons of an investment company from borrowing
money or other property from, or selling or buying securities or other property to
or from the investment company, or any company that the investment company con-
trols. Investment company officials therefore would not have any insider loans to
report, as would be required under the bill.

H. Code of ethics for senior financial officers

The problems surrounding Enron Corp. and other public companies raise concerns
about the ethical standards of corporations and their senior financial managers.
The Committee believes that investors have a legitimate interest in knowing wheth-
er a public company holds its financial officers to certain ethical standards in
their financial dealings. The bill requires issuers to disclose whether or not
they have adopted a code of ethics for senior financial officers and, if not, why
not. This section was recommended by Senator Corzine.

I. Disclosure of audit committee financial expert

As discussed above, the Committee received testimony about the important role
played by the audit committee in corporate governance. The Committee believes the
effectiveness of the audit committee depends in part on its members' knowledge of
and experience in auditing and financial matters. Investors may find it relevant
in making their investment decisions whether an issuer's audit committee has at
least one member who has relevant, sophisticated financial expertise with which to
discharge his or her duties.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


The bill requires the SEC to adopt rules requiring issuers to disclose whether
their audit committees include among their members at least one "financial ex-
pert." In defining "financial expert," the SEC shall consider whether a person un-
derstands GAAP and financial statements, has experience preparing or auditing fin-
ancial statements, has experience with internal accounting controls, and under-
stands audit committee functions.

### TITLE V-ANALYST CONFLICTS OF INTEREST

The Committee heard persuasive testimony that a serious problem exists regarding
conflicts of interest between Wall Street stock analysts and their employing
brokerage firms, on the one hand, and the public companies that the stock analysts
cover, on the other hand. Growing knowledge of these conflicts is harming the in-
tegrity and credibility to the public of stock analyst recommendations.

The Committee heard testimony from Thomas A. Bowman, President and CEO of the
Association for Investment Management and Research, who said, "Clearly, the
erosion of investor confidence in the independence and objectivity of 'Wall
Street' research reports and recommendations * * * could seriously harm the repu-
tation of the entire investment profession." [FN64] He added, "Only if the invest-
ing **33 public believes that the information available to them is fair, accurate,
and transparent can they have confidence in the integrity of the financial markets
and the investment professionals who serve them." [FN65] He explained how "some
Wall Street firms may pressure their analysts to issue favorable research on cur-
rent or prospective investment-banking clients" and that investors who receive re-
commendations "may not be aware of the pressures on Wall Street analysts." [FN66]
Former SEC Chairman Richard Breeden suggested as a goal that Congress "[i]mprove
independence of stock analyst recommendations," explaining that "[a]nalyst recom-
mendations should be driven by analysis and fundamentals, not the pursuit of in-
vestment banking business for their firms." [FN67]

The Attorney General of the State of New York, Eliot Spitzer, in a letter to
Chairman Sarbanes, stated, "Problems in this area have existed for several years
and recently appear to have grown worse." [FN68] In his office's extensive invest-
igation of analyst recommendations, he said he has found that "research reports
and stock ratings of companies that were potential banking clients of [a major
broker-dealer] were often distorted to assist the firm in obtaining and retaining
investment banking business. One management document we obtained actually acknow-
ledged the conflict and its results, stating: 'We are off base on how we rate
stocks and how much we bend over backwards to accommodate banking, etc.' We be-
lieve that the lack of research independence from investment banking likely ex-
tends to other firms as well." [FN69]

The Committee feels that it is critical to restore investor confidence in this
area. The bill is intended to prevent certain pressures on analysts which could
compromise their objectivity and to provide disclosure to investors of certain
conflicts of interest that can also influence the objectivity of the analyst in
preparing a research report.

The Committee received testimony specifically demonstrating that conflicts of
interest distort securities analysts' recommendations. Professor John Coffee of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                      Page 32

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Columbia Law School told the Committee of a number of studies that sought to as-
sess the impact of conflicts of interest on the objectivity of securities ana-
lysts' recommendations:

  Several studies find that 'independent' analysts (i.e., analysts not associ-
ated with the underwriter for a particular issuer) behave differently than ana-
lysts who are so associated with the issuer's underwriter. For example, Roni Mi-
chaely and Kent Womack find that the long-run performance of firms recommended by
analysts who are associated with an underwriter was significantly worse than the
performance of firms recommended by independent securities analysts.* * *

  Still another study by CFO Magazine reports that analysts who work for full-
service investment banking firms have 6% higher earnings forecasts and close to
25% more **34** buy recommendations than do analysts at firms without such ties. Sim-
ilarly, using a sample of 2,400 seasoned equity offerings between 1989 and 1994,
Lin and McNichols find that lead and co-underwriter analysts' growth forecasts and
particularly their recommendations are significantly more favorable than those
made by unaffiliated analysts. [FN70]

  The Committee also heard testimony on a variety of specific analyst conflicts
and the manner in which they might be addressed. These conflicts included the
firm's manner of compensating the analyst, revenues to the firm from the subject
company, pressure and coercion from the investment banking staff and others on the
analyst, retaliation against the analyst, and the analyst's or the analyst's
firm's ability to profit from stock ownership and trading.

  Chinese Walls. Dean Joel Seligman recommended addressing "whether investment
banks have adequately maintained 'Chinese walls' between retail brokerage and un-
derwriting and whether, more fundamentally, securities firms that underwrite
should be separated from retail brokerage." [FN71] The bill creates new Section
15A(n)(1)(C) of the Securities Exchange Act of 1934, which mandates rules "to es-
tablish structural and institutional safeguards within registered brokers or deal-
ers to assure that securities analysts are separated by appropriate informational
partitions within the firm from the review, pressure, or oversight of those whose
involvement in investment banking activities might potentially bias their judgment
or supervision."

  Blackout Periods. Professor Coffee cited abuses involving the so-called  "Boost-
er Shot" and recommended that research reports not be issued during certain peri-
ods. He testified:

  Firms contemplating an IPO increasingly seek to hire as lead underwriter the
firm that employs the star analyst in their field. The issuer's motivation is
fueled in large part by the fact that the issuer's management almost invariably is
restricted from selling its own stock (by contractual agreement with the under-
writers) until the expiration of a lock-up period that typically extends six
months from the date of the offering. The purpose of the lock-up agreement is to
assure investors that management and the controlling shareholders are not "bailing
out" of the firm by means of the IPO. But as a result, the critical date (and mar-
ket price) for the firm's insiders is not the date of the IPO (or the market value
at the conclusion of the IPO), but rather the expiration date of the lock-up
agreement six months later (and the market value of the stock on that date). From

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the perspective of the issuer's management, the role of the analyst is to "main-
tain a buzz" about the stock and create a price momentum that peaks just before
the lock-up's expiration. To do this, the analyst may issue a favorable research
report just before the lock-up's expiration (a so-called "booster shot" in the
vernacular). To the extent that favorable ratings issued at this point seem par-
ticularly **35** conflicted and suspect, an NASD rule might forbid analysts associ-
ated with underwriters from issuing research reports for a reasonable period (say,
thirty days) both before and after the lock-up expiration date. Proposed Rule 2711
[of the NASD] stops well short of this and only extends the "quiet period" so that
it now would preclude research reports for this first 40 days after an IPO. Such a
limited rule in no way interferes with the dubious tactic of "booster shots."
[FN72]

The bill directs that rules be adopted "to define periods during which brokers
or dealers who have participated, or are to participate, in a public offering of
securities as underwriters or dealers should not publish or otherwise distribute
research reports relating to such securities or to the issuer of such securities."
The "booster shot" is a type of situation that the SEC and the self-regulatory or-
ganizations should consider in framing such rules.

Services Provided. Mr. Bowman recommended disclosure of "the nature of the rela-
tionship or services provided" by an analyst's firm to the subject company. [FN73]
The bill requires disclosure of the types of services provided.

Supervision by Investment Bankers and Disclosure of Investment Banking Relation-
ships. Michael Mayo, Managing Director of Prudential Securities, recommended that
Congress "[t]ake actions to minimize the interference of investment bankers with
the job of research analysts" and "[d]isclose investment banking relationships to
investors." [FN74] The bill prohibits the pre-publication clearance of research or
recommendations by investment banking or other staff not directly responsible for
investment research and requires disclosure of whether the issuer is or has re-
cently been a client of the analyst's firm, and if so, the services provided.

Lynn Turner, former SEC Chief Accountant, testified: "As long as the investment-
banking arm of Wall Street has influence over the work of the research analysts or
their compensation, analysts will not be able to provide independent research."
[FN75] The bill requires the creation of rules that limit the supervision and com-
pensatory evaluation of research personnel to officials who are not engaged in in-
vestment banking activities.

Compensation from the Subject Firm to the Broker and Deal-Based Analyst Pay. Mr.
Mayo raised the concern, "Does the retail investor know that the brokerage firm
pitching shares is also earning investment banking fees from the company?" and
also recommended that the Congress "eliminate deal-based incentive pay" for re-
search analysts. [FN76] The bill requires disclosure of whether any compensation
has been received by the broker-dealer from the issuer, subject to such exemptions
as the Commission may determine necessary and appropriate to prevent disclosure of
material non-public information regarding specific potential future investment
banking transactions of such issuer, as is appropriate in the public interest and
consistent with the protection of investors. The **36** bill, while not eliminating
deal-based pay, requires disclosure of whether the analyst received compensation

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

based on an affiliate's investment banking revenues from the subject of any re-
search report.

Retaliation. The Committee heard testimony about the serious problem of retali-
ation against analysts who wrote negative research reports. Professor Coffee test-
ified, "In self-reporting studies, securities analysts report that they are fre-
quently pressured to make positive buy recommendations or at least to temper neg-
ative opinions." [FN77] He added, "According to one survey, 61% of all analysts
have experienced retaliation-threats of dismissal, salary reduction, etc.-as the
result of negative research reports. Clearly, negative research reports (and rat-
ings reductions) are hazardous to an analyst's career. Congress could either ad-
opt, or instruct the NASD to adopt, an anti-retaliation rule: no analyst should be
fired, demoted, or economically penalized for issuing a negative report, downgrad-
ing a rating, or reducing an earnings, price, or similar target." [FN78]

Eliot Spitzer, Attorney General of the State of New York, concluded that the
analyst conflict regulations put forth by the self-regulatory organizations "fall
short of what should be legislated in this area [because], [f]or example, the reg-
ulations fail to address the problem of intimidation or retaliation against ana-
lysts who publish unfavorable research about a company." [FN79]

The bill requires rules to be promulgated to protect securities analysts from
retaliation or intimidation because of negative, or otherwise unfavorable, re-
search reports, subject to the proviso that such rules may not limit a broker-
dealer from disciplining a securities analyst in accordance with firm policies and
procedures for causes other than writing such a research report.

Professor Coffee recommended that a no-retaliation rule should:

not bar staff reductions or reduced bonuses based on economic downturns or in-
dividualized performance assessments. Thus, given the obvious possibility that the
firm could reduce an analyst's compensation in retaliation for a negative report,
but describe its action as based on an adverse performance review of the individu-
al, how can this rule be made enforceable? The best answer may be NASD arbitra-
tion. That is, an employee who felt that he or she had been wrongfully terminated
or that his or her salary had been reduced in retaliation for a negative research
report could use the already existing system of NASD employee arbitration to at-
tempt to reverse the decision. Congress could also establish the burden of proof
in such litigation and place it on the firm, rather than the employee/analyst.
Further, Congress could entitle the employee to some form of treble damages or
other punitive award to make this form of litigation viable. Finally, Congress
could mandate an NASD penalty if retaliation were found, either by an NASD arbit-
ration panel or in an NASD disciplinary proceeding. [FN80]

**\*37** The exception is intended to make certain that writing a negative research
report does not protect an analyst who is, for example, incompetent or otherwise
deficient. However, it is not intended to be used to permit a broker-dealer to
discipline a good analyst for writing a negative report using a false pretext. In
adopting a proposed rule, the SEC or a self-regulatory organization should con-
sider Professor Coffee's recommendations.

Additional Analyst Issues. The Committee heard testimony about various addition-
al concerns and recommendations to prevent analyst conflicts of interest and oth-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

erwise enhance investor protection, some of which are discussed below.

Professor Coffee recommended "A No-Selling Rule." He testified:

If we wish the analyst to be a more neutral and objective umpire, one logical step might be to preclude the analyst from direct involvement in selling activities. For example, it is today standard for the "star" analyst to participate in "road shows" managed by the lead underwriters, presenting its highly favorable evaluation of the issuer and even meeting on a one-to-one basis with important institutional investors. Such sales activity seems inconsistent with the much-cited "Chinese Wall" between investment banking and investment research * * *.

Although a "no-selling" rule would do much to restore the objectivity of the analyst's role, one counter-consideration is that the audience at the road show is today limited to institutions and high net worth individuals. Hence, there is less danger that the analyst will overreach unsophisticated retail investors. For all these reasons, this is an area where a more nuanced rule could be drafted by the NASD at the direction of Congress that would be preferable to a legislative command. [FN81]

Dean Joel Seligman also recommended considering "a new form of adviser liability for recommendations without a reasonable basis." [FN82]

Mr. Bowman recommended disclosure of "[i]nvestment holdings of Wall Street analysts, their immediate families, the Wall Street firm's management and the firms themselves" as well as disclosure of "[m]aterial gifts received by the analyst from either the subject company or the Wall Street firm's investment-banking or corporate finance department." [FN83]

Mr. Bowman explained the need for greater explanatory information about analysts' rating systems. He said that "rating systems need to be overhauled so that investors can better understand how ratings are determined and compare ratings across firms. Ratings must be concise, clear, and easily understood by the average investor" and he recommended disclosures of "where and how to obtain information about the firm's rating system." [FN84] He also said that "Wall Street analysts and their firms should also be required to update or re-confirm their recommendations on a timely and regular basis, and more frequently in periods of high market volatility. **38** They should be required to issue a "final" report when coverage is being discontinued and provide a reason for discontinuance. Quietly and unobtrusively discontinuing coverage or moving to a "not rated" category, i.e., a "closet" sell, does not serve investors' interests." [FN85]

The Committee also heard testimony about the intimidation of analysts by issuers. Mr. Bowman testified that:

strong pressure to prepare "positive" reports and make "buy" recommendations comes directly from corporate issuers, who retaliate in both subtle, and not so subtle, ways against analysts they perceive as "negative" or not "understanding" their company. Issuers complain to Wall Street firms' management about "negative" or uncooperative analysts. They bring lawsuits against firms and analysts personally for negative coverage. But more insidiously, they "blackball" analysts by not taking their questions on conference calls or not returning their individual calls to investor relations or other company management. This puts the "negative" analyst at a distinct competitive disadvantage, increases the amount of uncertainty

S. REP. 107-205                                                        Page 36
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

an analyst must deal with in doing valuation and making a recommendation, and dis-
advantages the firm's clients, who pay for that research. Such actions create a
climate of fear and intimidation that fosters neither independence nor objectiv-
ity. Analysts walk a tightrope when dealing with company managements. A false step
may cost them an important source of information and ultimately their jobs. [FN86]

Mr. Mayo, a victim of issuer retaliation, gave testimony from first-hand experi-
ence of the problem. He said, "It is still hard for an analyst to be objective and
critical. When an analyst says "Sell," there can be backlash from investors who
own the stock, from the company being scrutinized, and even from individuals in-
side the analyst's firm. While much attention in Washington is being paid to the
pressures related to a firm's investment banking operations, other pressures can
be as great or more. The main point: Some companies may intimidate analysts into
being bullish. Those who stand up may face less access to company information and
perhaps backlashes, too." [FN87]

While the bill does not specifically identify remedies to these situations, it
authorizes the Commission, or a registered securities association or exchange at
the Commission's direction, to create rules to address such other issues as it de-
termines appropriate and to require such other disclosures of conflicts of in-
terest that are material to investors, research analysts, or the broker or dealer
as it deems appropriate. The Commission, and the association and exchanges, should
consider the issues noted above as they adopt other rules necessary and appropri-
ate to protect investors in the area of analyst recommendations. The prohibition
of specific activities identified in title V is not an exhaustive solution to the
analyst conflicts problem, and the Committee expects the Commission and **39** the
self-regulatory organizations to use their authority to apply such additional
rules as they deem appropriate.

The bill requires that rules be adopted within one year. Existing rules that
satisfy the requirements of the bill do not have to be reproposed or readopted.
Existing rules that do not contradict the bill or that impose requirements that
are not imposed by the bill do not have to be withdrawn or reproposed. For ex-
ample, self-regulatory organization rules that require disclosure of statistics
regarding analyst ratings or of the securities holdings of an analyst's family
members in a subject company are not adversely affected by this bill.

It should be noted that title V of the bill creates a new Section 15A(n)(B),
(C) and (D) of the Exchange Act, which requires disclosure of simply "affirmative"
or "negative" in response to "whether" an event has occurred. Further, Section
15A(n)(C) requires a description of the types of services provided, rather than a
list of all specific services. This requirement is to enable the investor to as-
sess whether the relationship is likely to influence the objectivity of the sub-
jective portions of the research report.

The new Section 15A(n)(B) of the Exchange Act created by the bill authorizes the
Commission to grant exemptions to prevent disclosure of material non-public in-
formation about specific future investment banking revenues. In determining wheth-
er to grant an exemption, the Commission should take into account the importance
that Congress places on providing investors with this information for making in-
vestment decisions and the likelihood that stating an affirmative response would

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                                    Page 39

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

divulge material non-public information that would be understood by investors,
particularly in light of the size and complexity of the brokerage firm. For ex-
ample, a complex brokerage firm which has received money from an issuer may be far
less likely to disclose material nonpublic information simply by responding "yes,"
and therefore not merit an exception, than a small firm that only is engaged to
find buyers for an issuer and has received compensation.

The Committee heard testimony from authorities which stated that the rules set
forth by self-regulatory organizations are inadequate to address the analyst con-
flicts of interest issue. Former SEC Chairman Arthur Levitt testified, "we must
better expose Wall Street analysts' conflicts of interest * * * the New York Stock
Exchange and the National Association of Securities Dealers [rulemaking] * * * is
not enough." [FN88] Also, Attorney General Spitzer stated "the proposed regula-
tions by the National Association of Securities Dealers and the New York Stock Ex-
change fall short of what should be legislated in this area." [FN89] The Committee
feels that while the NYSE and NASD rules will improve the quality of analysts'
stock recommendations, title V is needed to address analyst conflicts and to
strengthen investor protection.

## TITLE VI-COMMISSION RESOURCES AND AUTHORITY

The Committee determined that it is necessary to increase the resources avail-
able to the SEC and to increase the authority of the **\*40** SEC to enable it more ef-
fectively to accomplish its mission of assuring the integrity of the markets and
protecting investors.

SEC Authorization. Witnesses before the Committee testified consistently and
strongly that the SEC needs additional resources in order to effectively carry out
its mission and protect investors. John Whitehead, former Co-Chairman, Goldman
Sachs & Co., testified: "I think the SEC is under-funded and has been for some
years. When you consider the seriousness [to] the system of just one Enron, it's
dangerous to fool around with relatively small increases in budgets that the SEC
asks for." [FN90] David Walker, U.S. Comptroller General, testified, "[T]he SEC's
ability to fulfill its mission has become increasingly strained due in part to im-
balances between the SEC's workload (such as filings, complaints, inquiries, in-
vestigations, examinations and inspections) and staff resources * * *. Over the
last decade, securities markets have experienced unprecedented growth and change *
* *. At the same time, the SEC has been faced with an ever-increasing workload and
ongoing human capital challenges, most notably high staff turnover and numerous
vacancies." [FN91]

Former SEC Chairmen Roderick Hills, Harold Williams, Richard Breeden, and Arthur
Levitt all supported increasing the SEC's resources. [FN92] Chairman Breeden re-
commended that Congress "[s]trengthen the SEC's resources through expanded budget
authority (offset by increased user fees), immediate and continuing funding of pay
parity provisions, and addition of 200 new accounting positions." [FN93]

Professor John Coffee testified, "I think you're hearing from all of us that the
SEC is resource-constrained and I think the less visible casualty of that are the
offices such as the office of the chief accountant, where you can't really measure
the output until a scandal like Enron comes along." [FN94]

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                        Page 73
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

The Committee also received and considered the General Accounting Office report, "SEC OPERATIONS: Increased Workload Creates Challenges," March 5, 2002 (GAO-02-302). GAO found that industry officials said "the SEC's limited staff resources have resulted in substantial delays in SEC regulatory and oversight processes, which hampers competition and reduces market efficiencies. In addition, they said information technology issues need additional funding, and SEC needs more expertise to keep pace with rapidly changing financial markets. Finally, the officials said that SEC's reliance on a small number of seasoned staff to do the majority of the routine work does not allow those staff to adequately deal with emerging issues."

The bill authorizes an appropriation of $776,000,000 for the SEC for fiscal year 2003. This includes:

$102,700,000 to fund pay on a par with the federal bank regulators for SEC employees' salaries as well as their fringe benefits, as authorized by the Investor and Capital Markets Fee Relief Act (P.L. 107-123);

**\*41** $108,400,000 to fund enhanced information technology, security enhancements, and recovery and mitigation activities; and

$98,000,000 to fund at least 200 more professionals to oversee auditors and auditing services, and additional staff to improve SEC investigative and disciplinary efforts and strengthen the SEC's oversight and regulation of market participants and of issuer disclosure, securities markets, and investment companies.

Codifying Rule of Procedure. In its Rules of Procedure, the SEC has a procedure to discipline professionals, including accountants, who lack the requisite qualifications to practice before the Commission. Professor Coffee testified before the Committee that "[t]he SEC's authority under Rule 102(e) was clouded by the D.C. Circuit's decision in Checkosky v. SEC, 139 F.3d 221 (D.C. Cir. 1998) (dismissing Rule 102(e) proceeding against two accountants of a "Big Five" firm). The SEC revised Rule 102 in late 1998 in response to this decision (see Securities Act Rel. No. 7593 (Oct. 18, 1998)), but its authority in this area is still subject to some doubt that Congress may wish to remove or clarify." [FN95] Lynn E. Turner, former SEC Chief Accountant, said, "[t]he statutory authority of the SEC also needs to be examined and beefed up as it relates to Rule 102(e) proceedings." [FN96]

The bill codifies the authority of the SEC in 17 CFR 210.102(e) to censure or deny, temporarily or permanently, the privilege of appearing or practicing before it to any person found by the SEC after notice and opportunity for hearing: (i) not to possess the requisite qualifications to represent others, (ii) to be lacking in character or integrity or to have engaged in unethical or improper professional conduct, or (iii) to have willfully violated, or willfully aided and abetted the violation of, any provision of the federal securities laws or the rules and regulations thereunder.

Penny Stock Bar. Under current law, the penny stock bar is available only in administrative proceedings. However, the Commission frequently brings cases involving serious microcap or penny stock fraud in federal district court in order to obtain injunctive relief. In such a case, if the Commission also wishes to obtain a penny stock bar, it must bring a separate administrative proceeding, typically after the district court case is concluded. The Commission would be able to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

obtain all necessary relief more efficiently if the district courts had the au-
thority to order penny stock bars.

   The bill authorizes federal courts to impose penny stock bars, or conditionally
or unconditionally and temporarily or permanently prohibit a person from particip-
ating in a penny stock offering. The Commission has requested this authority in
order to deal more swiftly with penny stock fraud.

   Qualifications of Associated Persons of Brokers and Dealers. The SEC staff has
advised the Committee that in recent years, there has been a growing perception
that fraud artists are able to exploit gaps in federal and state regulatory sys-
tems and to move from one sector of the financial services industry to another
without sufficient **\*42** impediment. The SEC lacks the enforcement authority to bar
individuals from coming into the securities industry who have been found by other
financial regulators to have engaged in fraudulent, deceptive, or dishonest con-
duct in other financial industries. The bill gives the SEC this power. In order to
reduce the migration of fraud perpetrators into the securities industry, the bill
authorizes the Commission to bar from the securities industry persons who have
been suspended or barred by a state securities, banking, or insurance regulator
because of fraudulent, manipulative, or deceptive conduct. The Commission reques-
ted this authority.

### TITLE VII-STUDIES AND REPORTS

   The Committee identified two subjects of concern for additional study: the ongo-
ing consolidation of the accounting industry and the performance of credit rating
agencies.

   Historically, the accounting industry has been consolidating into fewer large
accounting firms. James E. Copeland, CPA and Chief Executive Officer, Deloitte &
Touche, testified, "I've been on record since the last spate of proposed mergers
saying that I thought the further consolidation of our industry would not be in
the public's interest." [FN97]

   The bill, in a section authored by Senator Akaka, directs the Comptroller Gener-
al, in consultation with the SEC, similar regulatory agencies of the other G-7 na-
tions, and the Department of Justice, to conduct a study identifying the factors
that have led to the consolidation of public accounting firms since 1989, the im-
pact of such consolidation, and solutions to any problems caused by such consolid-
ation. The study shall also examine the problems faced by businesses as a result
of limited competition among public accounting firms, and consider whether federal
or state regulations impede competition among public accounting firms. A report is
to be submitted to the Senate Banking Committee and the House Financial Services
Committee within one year of enactment of this legislation.

   The Federal regulation of credit-rating bureaus was raised at the hearing of
March 21, 2002. The bill, in a section authored by Senator Bunning, directs the
SEC to conduct a study of the role of credit rating agencies in the operation of
the securities market, including an examination of the role of credit rating agen-
cies in the evaluation of issuers, the importance of that role to investors, any
impediments to the rating agencies' accurate appraisal of issuers, any barriers to
entry into the business of acting as a credit rating agency, measures to improve

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the dissemination of information about issuers when credit rating agencies an-
nounce credit ratings, and any conflicts of interest in the operation of credit
rating agencies. A report is to be submitted to the President, the Senate Banking
Committee, and the House Financial Services Committee within 180 days of enact-
ment.

**\*43** SECTION-BY-SECTION ANALYSIS

Section 1. Short title and table of contents

Section 2. Definitions

   Section 2 contains a set of definitions of terms that are used in the bill.
   1. An "appropriate state regulatory authority" is a state authority responsible
for licensing or other regulation of the practice of accounting in a state that
has jurisdiction over an accounting firm or its personnel in connection with a
particular matter.
   2. An "audit" is an examination of the financial statements of an issuer by an
independent public accounting firm, in accordance with rules of the new accounting
oversight board or the SEC, for the purpose of expressing an opinion on those
statements. This definition should be read in connection with the definitions of
"issuer" and "audit report," below.
   3. An "audit committee" is a committee of an issuer's board of directors created
to oversee the accounting and financial reporting processes and audits of the fin-
ancial statements of the issuer.
   4. An "audit report" is a document, prepared following an audit performed for
purposes of an issuer's compliance with the federal securities laws, in which a
public accounting firm sets forth its opinion regarding a financial statement, re-
port, or other document, or asserts that no such opinion can be expressed.
   5. The "Board" is the Public Company Accounting Oversight Board established by
section 101 of the bill.
   6. The "Commission" is the U.S. Securities and Exchange Commission.
   7. An "issuer" is a company that issues or proposes to issue securities, if the
securities are registered under section 12 of the Securities Exchange Act of 1934,
or if the company is required to file reports with the SEC under section 15(d) of
the Securities Exchange Act (or will be required to file those reports at the end
of the fiscal year in which a registration statement for the issuer's securities
has become effective under the Securities Act of 1933).
   8. "Non-audit services" are professional services provided to an issuer by an
accounting firm registered with the Board, other than those required to be
provided in connection with an audit or other review of the issuer's financial
statements.
   9. A "person associated with a public accounting firm" is a proprietor, partner,
shareholder, principal, or an accountant or other professional employee of a pub-
lic accounting firm, or any independent contractor or entity that shares in com-
pensation or profits, or that participates on behalf of the firm in an activity,
in connection with preparation or issuance of an audit report.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

10. "Professional standards" include (i) accounting principles established by
the standard-setting body recognized under the bill or prescribed or recognized by
the SEC that are relevant to particular audit reports or accounting firm quality
control systems, and (ii) auditing standards, standards for attestation engage-
ments, quality control policy, ethical and competency standards, and independence
standards that relate to the preparation of audit reports and are established or
adopted by the Board or SEC.

**\*44** 11. A "public accounting firm" includes a proprietorship or entity engaged
in the practice of public accounting or preparing or issuing audit reports. To the
extent the new oversight board designates in its rules, the term can also include
an associated person of an accounting firm.

12. A "registered public accounting firm" is a firm that registers with the new
oversight board, as required by section 102 of the bill.

13. The "rules of the Board" include both the formal bylaws and rules adopted by
the new oversight board (subject to action of the SEC under section 107 of the
bill) and stated policies, practices, and interpretations of the board that the
SEC deems to be rules of the board.

14. The term "security" has the same meaning as in section 3(a) of the Securit-
ies Exchange Act.

15. The term "securities laws" has the meaning given that term in section
3(a)(47) of the Securities Exchange Act, and includes the SEC's rules, regulations
and orders. (Section 2(b), in a conforming amendment, makes the bill a part of the
section 3(a)(47) definition.)

16. A "State" includes any state of the United States, the District of Columbia,
Puerto Rico, the Virgin Islands, and any other U.S. territory or possession.

Section 3. Commission rules and enforcement

Section 3 generally gives the Securities and Exchange Commission (the "Commis-
sion" or the "SEC") authority to promulgate rules consistent with the Act and
provides that a violation of the Act, or of any rule of the Commission or of the
new Public Company Accounting Oversight Board created by title I of the Act, will
be treated for all purposes as a violation of the Securities Exchange Act of 1934
and the rules thereunder; similarly, the new Board will be treated as if it were a
self-regulatory organization under the 1934 Act for purposes of the Commission's
investigative and enforcement authority. It should be emphasized that the new
Board's own authority is limited to the work of accountants in auditing public
companies; the Board has no jurisdiction with respect to the work of accountants
in performing audits of other companies.

Section 3 thus confirms that the Commission will have the authority to enforce
the Act directly. Section 3 also makes clear that nothing in the Act or the rules
of the new Board limits the Commission's own authority over accounting firms and
their personnel, or accounting, auditing, independence, or other standards relat-
ing to auditors' reports.

TITLE I-PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Section 101. Establishment

  Section 101 creates a new Public Company Accounting Oversight Board (the
"Board"). The Board will oversee the auditing of companies that are subject to the
federal securities laws (i.e., companies ("public companies" or "issuers") that
have chosen to sell stock or debt instruments to public investors). Accounting
firms that perform audits of public companies must register with the Board, and
the Board will possess authority, subject to action by the Commission, to (i) set
auditing, quality control, ethics, and independence standards (the latter supple-
menting statutory provisions on that **\*45** subject), with respect to audits of the
financial statements of public companies, (ii) inspect accounting firms' audit op-
erations with respect to public companies, (iii) investigate potential violations
by the firms or their partners or employees of the Act, the Board's rules, related
provisions of the securities laws (and the Commission's rules), and professional
accounting and conduct standards, and (iv) impose sanctions for violations. Again,
the Board's authority in these areas is focused on, and limited to, the audit of
public companies; it has no jurisdiction over accountants performing other audits.
The Board is to submit an annual report of its activities to the Commission, which
in turn is to send a copy to the House Committee on Financial Services and the
Senate Committee on Banking, Housing, and Urban Affairs within 30 days of receipt.
  Legally, the Board will be a private nonprofit corporation subject to the Dis-
trict of Columbia Nonprofit Corporation Act. The Board will not be an agency or
establishment of the United States. It is explicitly given authority to set com-
pensation for its employees at levels comparable to similar positions in the
private sector.
  Membership. Section 101(e) provides that the Board will have five members. The
initial Board will be appointed by the Commission, after consultation with the
Federal Reserve Board and the Department of the Treasury, within 90 days of the
date of enactment; vacancies will be filled by the Commission after similar con-
sultations. Board members will serve full-time, for five-year (staggered) terms,
with a two-term limit. All Board members must have an understanding of the re-
sponsibilities for and the nature of the financial disclosures and accountants'
responsibilities required by the securities laws. Three members of the Board will
have a general background, and two members will have an accountancy background;
the Board's Chairperson may be one of the two Board members with an accountancy
background, but if so, he or she may not have been a practicing accountant for at
least five years prior to appointment to the Board. Internal Board standard of
conduct rules must include a one-year ban on practice before the Board (or before
the Commission, with respect to Board-related matters) for former Board members
and appropriate "cooling off" periods (not to exceed one year) for former Board
staff.
  The initial Board's first task will be to hire staff, propose or adopt its first
sets of rules and generally bring the organization into operational existence, so
that the Commission can make a determination, required under section 101(d) within
270 days of enactment, that the Board possesses the capacity to carry out its re-
sponsibilities and enforce compliance with title I of the Act.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205     Page 47
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Section 102. Registration with the Board

   The Commission's determination that the Board can begin to exercise its author-
ity starts the running of a 180-day period within which each public accounting
firm that prepares or issues audit reports for public companies must register with
the Board. At the end of the 180-day period it will become unlawful for an unre-
gistered accounting firm to audit a public company. (Again, lack of registration
will have no effect on an accounting firm's ability to perform any other sort of
work.) An application for registration must include information about the identity
of the public companies for which an accounting firm currently or during the pre-
vious **\*46** year performs or has performed audit work, certain current financial in-
formation about the accounting firm itself, a statement of the firm's quality con-
trol policies for its accounting and auditing practice, a list of the firm's ac-
countants who participate in public company audits, and information about pending
civil, criminal, or disciplinary actions, and client-auditor disputes, relating to
the firm's audits of public companies. The application must also include a consent
to compliance with any requests for documents or testimony, within the Board's au-
thority, made to the registrant in the course of the Board's operation and an
agreement to obtain and if necessary to enforce similar consents from the firm's
partners and employees who participate in public company audits. Registered ac-
counting firms will be required to report changes in this information to the Board
annually (or more frequently if the Board so requires).
   Information submitted to the Board as part of each application will be made
available to the public, subject to limitations to protect the confidentiality of
proprietary, personal, and other information for which such protection is neces-
sary or required by law. In particular, information "reasonably identified by [the
registrant] as proprietary information" will be withheld from disclosure.
   The Board is authorized by section 102(f) to impose a registration fee and an
annual fee on each registrant, to cover the cost of processing and reviewing ap-
plications and annual reports.

Section 103. Auditing, quality control, and independence standards and rules

   Section 103 requires the Board to establish auditing, quality control, and eth-
ical standards, as required by the Act or the rules of the Commission or necessary
or appropriate in the public interest or for the protection of investors, to be
used by registered accounting firms in the preparation of audit reports for public
companies. The Board is also to adopt rules to implement the provisions on the in-
dependence of public company auditors contained in title II of the Act.
   The Board's rules specifically must require (i) preparation and maintenance for
7 years by public company auditors of audit work papers and related information in
sufficient detail to support each audit's conclusions, (ii) "second partner" re-
view and approval of each public company audit report and its issuance, and (iii)
inclusion in each audit report of a description of the auditor's testing of the
public company's systems for compliance with the requirements of section 13(b)(2)
of the Securities Exchange Act and of the company's controls over its receipts and
expenditures, together with specific notation of any significant defects or mater-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ial noncompliance of which the auditor should know on the basis of such testing.

Section 103 also specifies the subjects that the quality control standards adop-
ted by the Board must address. These are: monitoring of ethics and independence;
internal and external consulting on audit issues; audit supervision; hiring, de-
velopment, and advancement of audit personnel; acceptance and continuance of en-
gagements; and internal inspection.

The Board may adopt as part of its rules (and modify as appropriate for that
purpose, at the time of adoption or thereafter), any portion of a statement of
auditing, quality control, or ethics standards **\*47** that meet the statutory test
prepared (i) by a professional group of accountants designated by a rule of the
Board for that purpose, or (ii) by one or more advisory groups convened by the
Board. (Pre-existing standards of designated professional groups of accountants
that may be adopted during the Board's nine-month transitional period are to be
separately approved by the Commission at the time of the Commission's determina-
tion (pursuant to section 101(d), noted above) that the Board is ready to begin
operation.)

The Board will convene advisory groups of practicing accountants and other ex-
perts, as well as representatives of other interested groups (subject to appropri-
ate conflict of interest rules), to make recommendations concerning, or propose
drafts of, the content of any required standards for public company auditors.

The Board is to cooperate on an ongoing basis with both the designated profes-
sional groups of accountants noted above, and with its own advisory groups, in ex-
amining the need for changes in any standards subject to Board authority. The
Board is to recommend issues for inclusion on the agendas of these groups, and
take other steps to facilitate the standard-setting process, and it is to respond
in a timely fashion to requests for changes in the standards over which the Board
has authority.

Finally, the Board is to include a summary of the results of its standard-set-
ting responsibilities in each of its annual reports. Each summary must include a
discussion of the Board's work with any designated professional group of account-
ants or advisory group, as well as the Board's pending agenda for future standard-
setting projects.

Section 104. Inspections of registered public accounting firms

Section 104 outlines the duty of the staff of the Board to undertake annual in-
spections of registered public accounting firms that prepare audit reports for
more than 100 public companies, and triennial inspections of firms that prepare
audit reports for 100 or fewer public companies, to assess the degree of compli-
ance by those firms with the Act, the rules of the Board, and professional stand-
ards relating to audits of public companies. (The inspection cycles for different-
sized accounting firms may be subsequently changed by the Board.) The Board is to
(i) identify in the course of each inspection any act, practice, or omission by
the firm or its partners or employees revealed by the inspection that may violate
the Act, the Board's or related Commission rules, the firm's own quality control
policies, or professional standards, (ii) report any such finding, if appropriate,
to the Commission and each state accountancy board with jurisdiction over the mat-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ter, and (iii) commence a formal investigation or take any appropriate disciplin-
ary action with respect to the violation.

   The scope of each inspection will include both particular audit and review en-
gagements (which may include engagements that are otherwise the subject of ongoing
controversy between the accounting firm under inspection and third parties), se-
lected solely by the Board, as well as a review of each firm's quality control
system and its compliance with professional standards relating to audit reports
for public companies. The term "professional standards" means, for purposes of
title I and the Board's authorization, (i) generally accepted **\*48** accounting prin-
ciples, (ii) auditing standards, standards for attestation engagements and quality
control policies, and ethical and competency standards that the Board adopts, and
(iii) independence standards that the Board adopts to implement title II of the
Act.

   The rules of the Board are to provide a procedure for review and comment on a
draft inspection report by the firm inspected; the text of any comment by the firm
on a draft inspection report is to be attached, with appropriate redactions to
protect confidential information, to the final report. That report is to be sent
to the Commission and the appropriate state board of accountancy and made avail-
able to the public (subject, again, to protection of confidential and proprietary
information). Portions of an inspection report which deal with criticisms of or
potential defects in the quality control systems of a firm will not be made public
if the defects are addressed to the satisfaction of the Board within 12 months of
the date of the report. In certain cases interim Commission review of certain in-
spection-related disputes is available.

Section 105. Investigations and disciplinary proceedings

   Section 105 outlines the investigative and disciplinary authority of the Board
over firms that audit public companies and partners and employees of these firms.

   Investigations. Section 105(a) authorizes the Board to investigate any act or
practice by a registered accounting firm, or its partners or employees, that may
violate the Act, the Board's rules, professional standards, and the portion of the
securities laws and SEC rules that relate to the preparation and issuance of audit
reports and the obligations and liabilities of accountants with respect thereto.
The Board may require testimony or production of documents or information, or in-
spect documents or information, in the possession of any registered public ac-
counting firm or its partners or employees. The Board's investigative activities
and any information gathered in the course of an investigation are to be confiden-
tial and privileged for all purposes (including civil discovery), unless and until
particular information is presented in connection with a public proceeding. The
Board may refer investigations to the Commission, any other federal functional
regulator (in the case of an investigation relating to the audit of an institution
subject to the jurisdiction of such functional regulator), and, at the direction
of the Commission, to the Attorney General, state attorneys general in connection
with any criminal investigation, or appropriate state boards of accountancy, and
may share information derived from investigations with the same parties, but only
if the Board determines that such disclosure is "necessary to accomplish the pur-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

poses of the Act or to protect investors." The Board's investigators are granted
civil immunity for their activities during an investigation to the same extent
that a federal investigator would enjoy such immunity.

Disciplinary proceedings. Section 105(b) authorizes the Board to impose a full
range of sanctions if it finds that a registered firm, or its partners or employ-
ees, have engaged in any act or practice that violates the Act, the Board's rules,
professional standards, or the portion of the securities laws (and SEC rules) re-
lating to audits of public companies. Potential sanctions include revocation or
suspension **49** of the registration of an accounting firm, or of the ability of
particular individuals to remain associated with that firm or become associated
with any other registered accounting firm (effectively barring the subject of the
sanction from participating in audits of public companies), substantial civil
money penalties, required professional education or training, or censure; the
Board's ability to suspend or bar an associated person from the auditing of public
companies, and the Board's ability to impose civil money penalties above a certain
amount, is limited to situations involving intentional, knowing, or reckless con-
duct, or repeated negligent conduct. The Board may also impose sanctions upon a
registered accounting firm for failure reasonably to supervise a partner or em-
ployee (in terms similar to those that apply to broker-dealers under section
15(b)(4) of the Securities Exchange Act of 1934, which permit the firm to defend
by showing that its internal control procedures were reasonable and were operating
fully in the case at issue).

The Board's rules must set out fully the procedural requirements for disciplin-
ary proceedings. Disciplinary sanctions finally imposed must be reported to the
Commission, appropriate state or foreign boards of accountancy, and the public
(once any stay of enforcement pending appeal has been lifted). Any sanction may be
appealed to the Commission under the provisions of section 107(c) (described be-
low).

Fines imposed by the Board are to be used to fund a scholarship program for stu-
dents in undergraduate or graduate programs in accounting.

Section 106. Foreign public accounting firms

Section 106 provides that accounting firms organized under the laws of countries
other than the United States that issue audit reports for public companies subject
to the U.S. securities laws are covered by the Act in the same manner as domestic
accounting firms, subject to the exemptive authority of both the Board and the
Commission. (Registration under the Act will not in itself provide a basis for
subjecting a foreign accounting firm to U.S. jurisdiction other than with respect
to controversies between such a firm and the Board.) The Board is authorized to
determine that other foreign accounting firms play a sufficiently substantial role
in the preparation and furnishing of such reports for particular issuers that
their coverage under the Act is necessary or appropriate, in light of the purposes
of the Act and in the public interest or for the protection of investors.

Section 106 also sets terms for the production in the United States by a foreign
public accounting firm of its audit work papers, for any audit in which the for-
eign accounting firm issues an opinion or otherwise performs material services

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

upon which an accounting firm registered under the Act relies in issuing all or part of an audit report for a public company.

Section 107. Commission oversight of the Board

  Section 107 makes the Board generally subject to the same degree of control by the Commission as the National Association of Securities Dealers or the New York Stock Exchange. Section 107(b) provides that the Board's proposed rules must be filed with the **\*50** Commission and published by the Commission for public comment. No Board rule may take effect without Commission approval (except in limited situations), and the Commission retains the power not only to disapprove, but to abrogate or amend, any rules of the Board. Section 107(c) incorporates the provisions of section 19(d)(2) and (e)(1) of the Securities Exchange Act of 1934 to give the Commission full authority to review, modify, or cancel any disciplinary sanction imposed by the Board (including any sanction imposed for failure to comply with a demand for testimony or documents in the course of a Board investigation), either upon the Commission's own motion or on the motion of an aggrieved party. (The Commission may, in some cases, also review registration- or inspection-related disputes.) Finally, the Commission possesses authority to limit the authority and activities, or to censure, or even to remove members, of the Board itself, if the Commission finds that the Board, or a particular member, has violated, is unable to comply with, or has failed to enforce compliance with the Act, the Board's or the Commission's rules, or the securities laws, has failed to enforce compliance with professional standards, or, in the case of a particular Board member, has willfully abused his or her authority.

Section 108. Accounting standards

  Section 108 amends section 19 of the Securities Act of 1933 specifically to allow the Commission to recognize as "generally accepted" (for securities law purposes) accounting principles established by a standard-setting body that meets certain criteria. First, the body must be a private entity and be funded by public companies in the same manner as the Board (provided in section 109 of the Act), and it must have adopted procedures, including acting by majority vote, to ensure prompt consideration of necessary changes to the body of accounting principles. Second, the Commission must determine that the standard-setting body has the ability to assist the Commission, because the standard-setting body has proved able to improve the accuracy and effectiveness of financial reporting and the protection of investors. Any such standard-setting body must report annually to the Commission. Finally, section 108 requires the Commission to conduct a study of the adoption by the U.S. financial reporting system of a principles-based accounting system.

Section 109. Funding

  Section 109 provides that the Board and the accounting principles standard-setting body recognized under section 108 of title I are to be funded by an "accounting support fee." (The Board's budget, but not the budget of the standard-setting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

body, is to be subject to approval by the Commission.) In the case of both the
Board and the standard-setting body, the annual support fee is to be assessed
against each public company. Amounts payable by public companies to either body
will generally be allocated among those companies based on relative average annual
monthly market capitalization for the 12 months prior to the year to which the
support fee relates; both the Board and the standard-setting body are permitted to
differentiate among various classes of public companies, as necessary or appropri-
ate, in allocating fees. Fees are to be collected in such manner as is deemed ap-
propriate in each case.

### *51 TITLE II-AUDITOR INDEPENDENCE

Section 201. Services outside the auditor scope of practice

   The Act restricts a registered public accounting firm in the non-audit services
it may provide to its audit clients that are public companies in order to preserve
the firm's independence. The Act specifies eight categories of activities that an
auditor may not provide to a public company that is its audit client. These in-
clude: (1) bookkeeping or other services related to the accounting records or fin-
ancial statements of the issuer; (2) financial information systems design and im-
plementation consulting services; (3) appraisal or valuation services, fairness
opinions, or contribution-in-kind reports; (4) actuarial services; (5) internal
audit services; (6) any management or human resources function; (7) broker, deal-
er, investment adviser, or investment banking services; and (8) legal services and
expert services unrelated to the auditing service. In addition, the Public Company
Accounting Oversight Board may determine that any other non-audit service is pro-
hibited. The Board has the authority to grant exemptions on a case-by-case basis
to the extent necessary or appropriate in the public interest and consistent with
the protection of investors, subject to SEC review. A registered public accounting
firm would be permitted to perform for a public company audit client any other
non-audit service, including tax services, that the public company's Audit Commit-
tee pre-approves in accordance with the requirements adopted in Section 202.
   The Act would not affect the services that a registered public accounting firm
provides to non-public companies or to public companies that are not its audit
clients. Thus, a firm could provide any consulting service to any public company
for which it does not provide audit services as well as to any non-public company.

Section 202. Pre-approval requirements

   The Audit Committee of a public company must pre-approve all the services, both
audit and non-audit, provided to that company by a registered public accounting
firm. The public company is required to disclose the Audit Committee's approvals
of non-audit services to shareholders in SEC filings. The pre-approval requirement
is waived if an auditor provides a service that was not recognized to be a non-
audit service at the time of the engagement and if the aggregate amount of all
such non-audit services is 5% or less of total auditor fees and such services are
promptly brought to the attention of the Audit Committee and approved by the Audit

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 73

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Committee prior to the completion of the audit. Approval may be made by one or
more members of the Audit Committee, to whom such authority has been delegated.
The decisions of any delegated member to pre-approve an activity shall be presen-
ted to the full Audit Committee at each of its meetings.

Section 203. Audit partner rotation

   A registered public accounting firm must rotate its lead partner and review
partner on its audits of a public company so that no partner performs an audit on
the same issuer as a lead partner or review partner for more than five consecutive
years.

**\*52** Section 204. Auditor report to Audit Committees

   A registered independent public accounting firm performing an audit for a public
company will timely report to that company's Audit Committee the critical account-
ing policies and practices to be used and all alternative treatments of financial
information within GAAP that have been discussed with management, any accounting
disagreements between the auditor and management and other material written commu-
nications between the auditor and management.

Section 205. Conforming amendments

Section 206. Conflicts of interest

   An accounting firm may not provide audit services for a public company if that
company's chief executive officer, controller, chief financial officer, chief ac-
counting officer, or other individual serving in an equivalent position, was em-
ployed by the accounting firm and worked on the audit of the public company during
the one year before the start of the audit services.

Section 207. Study of mandatory rotation of registered public accounting firms

   The GAO will study the potential effects of requiring the mandatory rotation of
registered public accounting firms and report to Congress within one year.

Section 208. Commission authority

   A registered independent public accounting firm must comply with the restric-
tions in sections 201-204 and 206 in order to perform an audit for a public com-
pany.

Section 209. Considerations by appropriate state regulatory authorities

   It is the intent of this Act that in supervising non-registered accounting
firms, state regulatory authorities should make an independent determination of
the proper standards, and should not presume the standards applied by the Board
under this Act to be applicable to small- and medium-sized non-registered account-
ing firms.


© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


TITLE III-CORPORATE RESPONSIBILITY

Section 301. Issuer Audit Committees

   The Exchange Act is amended to require the SEC to draft rules directing national
securities exchanges and national securities associations to require listed com-
panies to make Audit Committees responsible for the appointment, compensation, and
oversight of the work of auditors and to require auditors to report directly to
the Audit Committee. The amendments also: bar Audit Committee members from accept-
ing consulting fees or being affiliated persons of the issuer or the issuer's sub-
sidiaries other than in the member's capacity as a member of the board of direct-
ors or any board committee; require Audit Committees to have in place procedures
to receive and address complaints regarding accounting, internal control or audit-
ing issues; require Audit Committees to establish procedures **\*53** for employees'
anonymous submission of concerns regarding accounting or auditing matters; and re-
quire public companies to provide their Audit Committees with authority and fund-
ing to engage independent counsel and other advisers as they determine necessary.

Section 302. Corporate responsibility for financial reports

   CEOs and CFOs must certify, in periodic reports containing financial statements
filed with the Commission pursuant to section 13(a) or 15(d) of the Exchange Act,
the appropriateness of financial statements and disclosures contained therein, and
that those financials and disclosures fairly present the company's operations and
financial condition.

Section 303. Prohibited influence

   It is unlawful for any officer, director, or person acting under their direction
to fraudulently influence, coerce, manipulate, or mislead any accountant engaged
in preparing an audit report, for the purpose of rendering the audit report mis-
leading.

Section 304. Forfeiture of certain bonuses and profits

   In the case of accounting restatements that result from material non-compliance
with SEC financial reporting requirements, CEOs and CFOs must disgorge bonuses and
other incentive-based compensation and profits on stock sales, if the non-
compliance results from misconduct. The required disgorgement applies to the 12
months after the first public issuance or filing of a financial document embodying
such financial reporting requirement. The SEC may exempt any person from this re-
quirement as it deems necessary and appropriate.

Section 305. Officer and director bars and penalties

   The sanction of barring securities law violators from serving as officers or
directors of public companies is strengthened by modifying the standard that gov-
erns judicial imposition of officer and director bars. In addition, courts may im-
pose any equitable relief necessary or appropriate to protect, and mitigate harm

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

to, investors.

Section 306. Insider trades during pension fund blackout periods prohibited

   Directors and executive officers are prohibited from engaging in transactions
involving any equity security of the issuer during a "blackout" period when at
least half of the issuer's individual account plan participants are not permitted
to purchase, sell or otherwise transfer their interest in that equity security. No
blackout period may take effect until at least 30 days after written notice of the
blackout is provided by the plan administrator to the participants or beneficiar-
ies. Exceptions to the 30-day notice are allowed in cases: (1) where a deferral of
the blackout period would violate ERISA fiduciary provisions; or (2) where the in-
ability to provide the notice is due to unforeseeable events or circumstances bey-
ond the reasonable control of the plan administrator.

                    **\*54** TITLE IV-ENHANCED FINANCIAL DISCLOSURES

Section 401. Disclosures in periodic reports

   A public company in periodic reports filed with the SEC will present: (1) dis-
closures of financial information that reflect all material correcting adjustments
that have been identified by the auditor in accordance with GAAP and (2) the ma-
terial off-balance sheet transactions, arrangements, obligations, and other rela-
tionships of the issuer with unconsolidated entities or other persons that may
have a material current or future effect on financial condition, changes in finan-
cial condition, results of operations, liquidity, capital expenditures, capital
resources or significant components of revenues or expenses.
   Issuers that disseminate "pro forma" financial information in their filings with
the SEC, press releases or other public disclosures must present pro forma data in
a manner that does not contain an untrue statement or omit to state a material
fact necessary in order to make the information, in light of the circumstances un-
der which it is presented, not misleading, and that reconciles it with the is-
suer's financial condition under GAAP.

Section 402. Enhanced disclosures of loans

   An issuer in its current reports must disclose within 7 days, or such other time
period determined to be appropriate by the SEC: (A) all loans, except credit card
loans, made by the issuer and its affiliates to any executive officer or director,
specifying amounts paid and balances owed on such obligations and (B) any con-
flicts of interest, as defined by the SEC.

Section 403. Disclosures of transactions involving management

   Section 16(a) of the Exchange Act is amended to require directors, officers and
10% equity holders to report their purchases and sales of securities more
promptly, by the end of the second day following the transaction or such other
time established by the SEC in any case in which the two-day period is not feas-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


ible.

## Section 404. Management assessment of internal controls

Annual reports filed with the SEC must be accompanied by a statement by the man-
agement of its responsibility for creating and maintaining adequate internal con-
trols. Management must also present its assessment of the effectiveness of those
controls. In addition, the company's auditor must report on and attest to manage-
ment's assessment of the company's internal controls. Such attestation shall not
be the subject of a separate engagement.

## Section 405. Exemption

Investment companies are exempted from the disclosure requirements of sections
401, 402 and 404.

## Section 406. Code of ethics for senior financial officers

Issuers are required to disclose whether or not they have adopted a code of eth-
ics for senior financial officers, and if not, the reason therefor.

## *55 Section 407. Audit Committee financial expert

The SEC is required to adopt rules to require issuers to disclose whether their
Audit Committees include among their members at least one "financial expert." In
defining "financial expert," the SEC shall consider whether a person understands
GAAP and financial statements, has experience preparing or auditing financials,
has experience with internal accounting controls, and understands Audit Committee
functions.

### TITLE V-ANALYST CONFLICTS OF INTEREST

## Section 501. Treatment of securities analysts by registered securities associ-
ations

The Act requires the Commission, or upon the authorization and direction of the
Commission, a registered securities association or national securities exchange,
within one year to adopt rules designed to address conflicts of interest facing
securities analysts. The rules will (A) foster greater public confidence in secur-
ities research and protect the objectivity and independence of stock analysts who
publish research intended for the public by (i) prohibiting the pre-publication
clearance of such research or recommendations by investment banking or other staff
not directly responsible for investment research, (ii) limiting the supervision
and compensatory evaluation of such research personnel to officials who are not
engaged in investment banking activities, and (iii) protecting securities analysts
from retaliation or threats of retaliation by investment banking staff because of
negative or otherwise unfavorable research reports that might adversely affect in-
vestment banking relations with the issuer described in the report, provided that
the rules shall not limit the authority of a broker or dealer to discipline a se-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

curities analyst for causes other than such report in accordance with the firm's
policies and procedures, (B) define periods during which broker-dealers who parti-
cipate in a public offering of securities as underwriters or dealers shall not
publish research or recommendations about the securities of the issuer, (C) estab-
lish structural and institutional safeguards within broker-dealers to assure that
securities analysts preparing research reports are separated by appropriate in-
formational partitions from the review, pressure, or oversight of those whose in-
volvement in investment banking activities might potentially bias their judgment
or supervision, and (D) address such other issues as the SEC or the SROs deem ap-
propriate.

   The Act also requires the Commission, or upon the direction of the Commission, a
registered securities association or national securities exchange, to adopt rules
requiring disclosures about conflicts of interest in reports and public appear-
ances. These disclosures include (A) the extent to which the analyst holds secur-
ities in the issuer, (B) whether compensation has been received from the issuer,
subject to such exemptions as the Commission may determine appropriate and neces-
sary to prevent disclosure of material non-public information regarding specific
potential future investment banking transactions as is appropriate in the public
interest and consistent with investor protection, (C) whether the issuer is or has
recently been a client of the analyst's firm, and if so, the types of services
provided, (D) whether the analyst received compensation **\*56** based on an affili-
ate's investment banking revenues, and (E) such other disclosures as the SEC or
the SROs deem appropriate. The regulator would have the authority to amend its
rules.

### TITLE VI-COMMISSION RESOURCES AND AUTHORITY

Section 601. Authorization of appropriations

   There is authorized an appropriation of $776,000,000 for the SEC for fiscal year
2003, of which: $102,700,000 would fund the pay parity of salary and benefits for
SEC employees, as authorized in the Investor and Capital Markets Fee Relief Act
(P.L. 107-123); $108,400,000 would fund information technology, security enhance-
ments, and recovery and mitigation activities in light of the terrorist attacks of
September 11, 2001; and $98,000,000 would fund at least 200 more professionals to
oversee auditors and auditing services, and additional staff to improve SEC in-
vestigative and disciplinary efforts and strengthen the SEC's oversight and regu-
lation of market participants and of issuer disclosure, securities markets and in-
vestment companies.

Section 602. Appearance and practice before the SEC

   The SEC is authorized to censure or deny, temporarily or permanently, the priv-
ilege of appearing or practicing before it to any person found by the SEC after
notice and opportunity for hearing: (i) not to possess the requisite qualifica-
tions to represent others, (ii) to be lacking in character or integrity or to have
engaged in unethical or improper professional conduct, or (iii) to have willfully

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 54

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

violated, or willfully aided and abetted the violation of any provision of the
federal securities laws or the rules and regulations thereunder. This codifies
Section 102(e) of the SEC's Rules of Practice.

Section 603. Federal court authority to impose penny stock bars

  Federal courts are authorized to conditionally or unconditionally and temporar-
ily or permanently prohibit a person from participating in a penny stock offering.

Section 604. Qualifications of associated persons of brokers and dealers

  The SEC is authorized to bar from the securities industry persons who have been
suspended or barred by a state securities, banking or insurance regulator because
of fraudulent, manipulative or deceptive conduct.

                        TITLE VII-STUDIES AND REPORTS

Section 701. GAO study and report regarding consolidation of public accounting
firms

  The Comptroller General, in consultation with the SEC, similar regulatory agen-
cies of the other G-7 nations, and the Department of Justice, is to conduct a
study identifying the factors that have led to the consolidation of public ac-
counting firms since 1989, the impact of such consolidation, and solutions to any
problems caused by such consolidation. The study shall also examine the problems
faced by businesses as a result of limited competition among public accounting
firms, and consider whether federal or state regulations impede competition among
public accounting firms. A report is to **\*57** be submitted to the Senate Banking
Committee and the House Financial Services Committee within one year of enactment.

Section 702. Commission study and report regarding credit rating agencies

  The SEC is to conduct a study of the role of credit rating agencies in the oper-
ation of the securities market, including an examination of the role of credit
rating agencies in the evaluation of issuers, the importance of that role to in-
vestors, any impediments to the rating agencies' accurate appraisal of issuers,
any barriers to entry into the business of acting as a credit rating agency, meas-
ures to improve the dissemination of information about issuers when credit rating
agencies announce credit ratings, and any conflicts of interest in the operation
of credit rating agencies. A report is to be submitted to the President, the Sen-
ate Banking Committee, and the House Financial Services Committee within 180 days
of enactment.

                        CHANGES IN EXISTING LAW

  On June 18, 2002, the Committee unanimously approved a motion by Senator Sar-
banes to waive the Cordon rule. Thus, in the opinion of the Committee, it is ne-
cessary to dispense with the requirement of section 12 of Rule XXVI of the Stand-
ing Rules of the Senate in order to expedite the business of the Senate.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


REGULATORY IMPACT STATEMENT

   In accordance with paragraph 11(b), rule XXVI, of the Standing Rules of the Sen-
ate, the Committee makes the following statement concerning the regulatory impact
of the bill.
   The bill make structural changes in various aspects of the federal securities
laws. Titles I through IV and portions of title VI affect the auditing of public
companies and financial disclosures by those companies and their managers. Title V
affects conflicts of interest by employees of broker-dealers who issue research
reports dealing with particular companies or industries.
   There are, according to the SEC, approximately 16,500 public companies subject
to the federal securities laws. [FN98] Fewer than 15 percent of the nation's ac-
counting firms audit any public companies, and only 20 firms have more than 30
audit clients. [FN99] There are perhaps 75-100 registered broker-dealers that is-
sue research reports of the type dealt with in title V, and perhaps as many as
5000 analysts who prepare those research reports.
   The bill establishes a comprehensive framework to modernize and reform the over-
sight of public company auditing, improve quality and transparency in financial
reporting by those companies, and strengthen the independence of auditors. It pro-
motes competition among service providers, enhances accurate investor decision-mak-
ing **58 throughout the capital markets, and seeks to correct shortcomings that
have threatened the reputation of those markets for integrity.
   The legislation should have little additional impact upon the privacy of partic-
ular individuals. Information and documents held by the Public Company Accounting
Oversight Board created by the bill are generally confidential and privileged un-
til made public in connection with a particular public enforcement proceeding.
Corporate managers and others affected by the bill are already subject to extens-
ive reporting requirements under the federal securities laws.
   Specific rules issued by the SEC under various provisions of the bill will con-
tain their own regulatory and paperwork estimates, as required by applicable law.
Otherwise, it is difficult to measure, at this time, the extent to which the bill
would impose additional costs beyond those described in the CBO estimate, below.
In addition, the bill's net regulatory impact upon the economy can be positive,
especially as its terms operate to reduce crises in corporate management and value
of the sort the economy is now witnessing. Finally, the immediate regulatory im-
pact of the bill must be weighed against the continuing serious adverse economic
impact on investors, the markets, and the national economy of the failure of ex-
isting regulatory arrangements and the decline in investor confidence, here and
abroad, that this failure has generated. For all of these reasons, the Committee
has determined that more extensive compliance with rule XXVI(11)(b) than that con-
tained above is impracticable.


COST OF LEGISLATION

   Section 11(b) of rule XXVI of the Standing Rules of the Senate, and Section 403
of the Congressional Budget Impoundment and Control Act, require that each commit-
tee report on a bill contain a statement estimating the cost of the proposed le-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


gislation. The Congressional Budget Office has provided the following cost estim-
ate and estimate of costs of private-sector mandates.

     U.S. Congress,

     Congressional Budget Office,

     Washington, DC, June 27, 2002.

Hon. Paul S. Sarbanes,
Chairman, Committee on Banking, Housing, and Urban Affairs,
U.S. Senate, Washington, DC.
   Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed
cost estimate for the Public Company Accounting Reform and Investor Protection Act
of 2002.
   If you wish further details on this estimate, we will be pleased to provide
them. The CBO staff contacts are Ken Johnson (for federal costs), Greg Waring (for
the state and local impact), and Paige Piper/Bach (for the private-sector impact).

Sincerely,
     Robert A. Sunshine

     (For Dan L. Crippen, Director).
   Enclosure.

                    **\*59** CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

Public Company Accounting Reform and Investor Protection Act of 2002

   Summary: The bill would establish two new organizations-the Public Company Ac-
counting Oversight Board (Oversight Board) to regulate the accounting industry and
the Standard-Setting Body to write national standards for accounting practices.
The activities of these organizations would be overseen by the Securities and Ex-
change Commission (SEC). In addition, the bill would authorize the appropriation
of $776 million in 2003 for the SEC's activities. Under the bill, both the SEC and
the Oversight Board could assess civil penalties for violations of the bill's pro-
visions. Any civil penalties collected by the Oversight Board would be spent on a
scholarship program for accounting students. The bill also would require the Gen-
eral Accounting Office (GAO) to complete two studies of the accounting industry
within one year of enactment.
   Based on information from the SEC, CBO estimates that implementing this bill
would cost about $787 million over the 2003-2007 period, assuming the appropri-
ation of the necessary amounts. Under current law, the SEC's discretionary costs
are offset by fees the agency collects from securities markets. Enactment of the
bill would not change the amount of fees expected to be collected in the future.
Assuming the continued collection of the regulatory fees assessed by the SEC, the
commission would collect $1.3 billion in fees in 2003, and its net outlays would
be --$621 million in that year. The two GAO studies also would cost an estimated

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                                    Page 56

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


$1 million in 2003, subject to the availability of appropriated funds. CBO estim-
ates that the bill would have effects on revenues and direct spending, but that
the net effect of those changes would be negligible each year. Because the bill
would affect revenues and direct spending, pay-as-you-go procedures would apply.

  The bill contains an intergovernmental mandate as defined in the Unfunded Man-
dates Reform Act (UMRA), but CBO estimates that complying with that mandate would
result in no costs to state, local, or tribal governments. Therefore, the
threshold established by UMRA ($58 million in 2002, adjusted annually for infla-
tion) would not be exceeded.

  The bill would impose several private-sector mandates, as defined by UMRA, on
certain accounting firms, companies that issue registered securities, officers and
directors of those companies, investment banking firms, and securities analysts.
CBO cannot determine whether the direct cost of those mandates would exceed the
annual threshold set by UMRA for private-sector mandates ($115 million in 2002,
adjusted annually for inflation). The mandate costs are difficult to estimate be-
cause (1) we do not have sufficient information to estimate the cost of prohibit-
ing insider trading during blackout periods when investment activity is restric-
ted; (2) the cost to comply with several of the mandates would depend on rules
soon to be prescribed by the SEC under current authority; and (3) the cost to com-
ply with several of the mandates would depend on rules that would be prescribed by
the SEC under the bill.

  Estimated cost to the Federal Government: The estimated budgetary impact of the
bill is shown in the following table. The costs of this legislation would fall
within budget functions 370 (commerce **60** and housing credit-for the SEC) and 800
(general government-for GAO).

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Basis of estimate

  For this estimate, CBO assumes that the bill will be enacted by the end of fisc-
al year 2002. Assuming appropriation of the necessary funds, CBO estimates that
implementing the bill would cost the SEC about $787 million and GAO about $1 mil-
lion during the 2003-2007 period. We estimate that the bill also would affect both
revenues and direct spending, but that the net impact of those effects would be
negligible for each year.

  The SEC is typically funded through fees the agency collects for registrations,
transactions, and mergers of securities. Under current law, the fee rates are de-
termined periodically by the SEC, and they are collected only to the extent
provided in advance in appropriations acts. These fees are classified in the
budget as offsets to the SEC's discretionary spending.

Spending subject to appropriation

  The bill would authorize the appropriation of $776 million for all SEC activit-
ies in 2003. Of this amount, the bill would earmark $103 million for higher salar-
ies for SEC employees, $108 million for security and information technology en-
hancements needed by the agency after the September 11th attacks, and $98 million

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

for additional staff to monitor audit services. Based on the agency's historical
spending patterns, CBO estimates that implementing this provision would result in
gross outlays of about $592 million in 2003 and $768 million over the 2003-2004
period, assuming the appropriation of the necessary amounts. Adding these amounts
to CBO's projections for fee collections in 2003, we estimate that the SEC's net
spending would be --$621 million in that year.

   The bill also would require the SEC to review any sanctions or rules proposed by
the Oversight Board. CBO estimates that the cost of these activities would be
roughly comparable to the SEC's **\*61** oversight of national securities exchanges and
associations. Based on information from the SEC about the cost of such oversight,
CBO estimates that the SEC would require about 40 staff members, at a cost of
about $5 million a year, to review the rules and sanctions proposed by the new
Oversight Board. Any amounts the SEC would spend to oversee accounting practices
under the bill would be subject to the availability of appropriated funds.

   Under the bill, GAO would complete two reports to the Congress on the accounting
industry within one year of enactment. Based on information from GAO, CBO estim-
ates that conducting these two studies would cost the agency about $1 million in
2003, subject to the availability of appropriated funds.

Revenues and direct spending

   CBO estimates that implementing this bill also would affect direct spending and
revenues. The effects would result from the bill's provisions creating an Over-
sight Board and a Standard-Setting Body to oversee the accounting industry and
from provisions relating to civil penalties.

   Costs of Creating the Oversight Board and Standard-Setting Body. The bill would
require that annual financial reports filed by public companies under the securit-
ies laws must be audited by an accountant who is deemed qualified to do so by a
new organization called the Public Company Accounting Oversight Board. CBO expects
this provision would give the Oversight Board substantial authority to regulate
and control entry into the accounting industry, thus exercising the sovereign
power of the federal government. The fact that the board's rules, sanctions, fund-
ing sources, and annual budget would be approved by the SEC indicate a significant
level of federal control over the board's operations and funding. For these reas-
ons, CBO would consider the board's spending and the fees it would collect under
the bill from public companies and accounting firms as part of the federal budget
(even though the bill states it would not be part of the government).

   The bill also would require the SEC to designate an organization called the
Standard-Setting Body to write national standards for accounting practices. Under
current law, all annual financial statements filed by public companies must comply
with such standards. The bill also would mandate that the Standard-Setting body
assess fees on public companies using a formula that would be approved by the SEC,
thereby giving the federal government control over the Standard-Setting Body's
funding. Therefore CBO also would consider this body's collections and spending a
part of the federal budget (even though the bill states it would be organized as a
private entity).

   CBO expects that operating the Oversight Board, when fully implemented, would

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 73

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

cost at least as much as similar activities that are now performed by the Public
Oversight Board (POB) and the Independence Standards Board, and through peer re-
views administered by the American Institute of Certified Public Accountants
(AICPA). Before they recently disbanded, the POB and the Independence Standards
Board spent about $8 million a year. The peer reviews administered by AICPA are
conducted by other accounting firms. Based on information from AICPA, CBO estim-
ates that these reviews could cost the Oversight Board at least $50 million **\*62** a
year. Similarly, CBO expects that the annual costs of the Standard-Setting Board
would approach the $20 million spent each year by the Federal Accounting Standards
Board (FASB), which performs standard-setting duties today.

  Under the bill, the Oversight Board and the Standard-Setting Body would assess
fees on the public to cover their costs. CBO expects that the net effect of the
two organizations' collections and spending under this bill would not be signific-
ant in any year. Whether such collections would be categorized in the budget as
revenues or offsetting receipts is uncertain because we do not know how the organ-
izations would assess those fees.

  Civil Penalties.The bill also would authorize the SEC and the Oversight Board to
enforce the bill's provisions with civil penalties. Such penalties are recorded in
the budget as governmental receipts (revenues). Based on information from the SEC,
CBO estimates that these provisions would increase revenues by less than $500,000
a year.

  Under the bill, any civil penalties collected by the Oversight Board would be
spent on scholarships for accounting students in undergraduate or graduate pro-
grams. Because the amounts spent would equal the penalties collected by the ac-
counting board, CBO estimates that the increase in direct spending also would be
less than $500,000 per year.

  Pay-as-you-go considerations: The Balanced Budget and Emergency Deficit Control
Act sets up pay-as-you-go procedures for legislation affecting direct spending or
receipts. CBO estimates that the net pay-as-you-go effects of this bill would be
insignificant for each year.

  Estimated impact on state, local, and tribal governments: Because it would pree-
mpt state authority to license or regulate the Public Company Accounting Oversight
Board as a nonprofit corporation, the bill contains an intergovernmental mandate
as defined in UMRA. CBO estimates that this preemption would not affect state
budgets because, while it would limit the application of state law towards the
board, it would not impose a duty on states that would result in additional spend-
ing. Therefore, the threshold established by UMRA ($58 million, in 2002, adjusted
annually for inflation) would not be exceeded. The remaining provisions of the
bill contain no intergovernmental mandates and would impose no costs on state,
local, or tribal governments.

Estimated impact on the private sector

  The bill would impose private-sector mandates, as defined by UMRA, on certain
accounting firms, companies that issue registered securities, officers and direct-
ors of those companies, investment banking firms, and securities analysts. CBO
cannot determine whether the direct cost of those mandates would exceed the annual

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                        Page 60

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

threshold set by UMRA fro private-sector mandates ($115 million in 2002, adjusted
annually for inflation). The mandate costs are difficult to estimate because (1)
we do not have sufficient information to estimate the cost of prohibiting insider
trading during blackout periods when investment activity is restricted; (2) the
cost to comply with several of the mandates would depend on rules soon to be pre-
scribed by the SEC under current authority; and (3) the **\*63** cost to comply with
several of the mandates would depend on rules that would be prescribed by the SEC
under the bill.

Regulation of accounting firms

   Under the bill, a registered public accounting firm would be:
     Subject to a system of review by the Public Company Accounting Oversight Board
to be established under the bill;
     Prohibited from offering both audit and certain non-audit consulting services
(designing or implementing financial information systems or providing internal
audit services); and
     Required to retain all audit work papers for at least seven years.
   According to the American Institute of Certified Public Accountants (AICPA) and
other industry representatives, the accounting industry currently:
     Sponsors a transitional private entity that reviews independent accountants:
     Has voluntarily stopped offering both audit and such non-audit consulting ser-
vices; and
     Retains financial statement working papers and records for seven years.
   Therefore, CBO estimates that the direct cost to comply with those new mandates
would be small.
   The bill would require an accounting firm to obtain a second review of audit re-
ports from another auditor within the firm, and test and express an opinion on
certain internal controls of public companies. The cost to obtain a second review
and provide an opinion on compliance by a company would depend on rules to be pre-
scribed by the SEC. Since the regulations have not been established, CBO cannot
estimate the cost to comply with those mandates.

Registration and accounting support fees

   The bill would require that the new Oversight Board and a designated Standard-
Setting Body be independently funded by public companies. Based on information
from the SEC, CBO estimates the annual cost of operating the oversight board and
the standard-setting body would be approximately $80 million. The bill would re-
quire those organizations to levy fees on registered public accounting firms and
an annual accounting support fee on issuers of securities. Currently, the account-
ing industry is self-regulated and voluntarily provides the funding for the regu-
latory organization, including peer reviews. According to the SEC and the in-
dustry, the cost of oversight and review required by the bill are similar to the
costs now voluntarily incurred by the industry. Therefore the incremental cost to
the private sector would be small.

Auditor independence

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Section 203 of the bill would prohibit the lead and review partners of an ac-
counting firm from providing audit services for the same company for more than
five consecutive years. Based on information from the AICPA, CBO estimates that
the direct cost to rotate lead and review partners would be minimal.

Section 206 would prohibit an accounting firm from providing audit services for
a public company if that company's chief executive **\*64** officer, financial officer,
controller, or other equivalent position was employed by the accounting firm dur-
ing the year before the start of the audit services. Based on information from the
AICPA, CBO anticipates that some firms would lose business that other accounting
firms would gain. Therefore, CBO estimates that total direct cost to the account-
ing industry would be negligible.

Corporate responsibility

The bill contains provisions that would require greater corporate responsibility
for financial reports. The cost of complying with those requirements would depend
on rules that the SEC has agreed to propose, but not yet promulgated. Therefore,
CBO cannot estimate the direct costs of complying with the following mandates:

Section 301 would require the audit committee of a corporate board to be re-
sponsible for the appointment, compensation, and oversight of the work of their
auditors. This section also would prohibit national securities exchanges and asso-
ciations from listing companies that do not comply with certain audit committee
standards.

Section 302 would require chief executive officers and chief financial officers
of public companies to certify the appropriateness of their company's periodic re-
ports and to ascertain that the financial reports fairly reflect the operations
and conditions of their companies.

Periodic restrictions on insider trading

Section 306 would prohibit certain owners and officers of a company from selling
equity securities issued by that company during periods (called "blackout" peri-
ods) when participants in the retirement plan are restricted in their ability to
direct investments. Such periods may occur for administrative reasons-for example,
when a plan changes recordkeepers. This restriction would increase the financial
exposure of affected owners and officers and, thus, could impose a cost on them.
CBO does not have sufficient information to estimate the amount of that cost.

Enhanced financial information disclosure

Section 403 would require officers and directors of companies that issue secur-
ities and certain owners of such securities to disclose to the SEC any insider
trading by a certain time. According to the SEC, insider trading disclosure is
currently required to be reported to the SEC by the tenth day following the month
in which the trade occurred. Thus, CBO estimates that the cost of providing such
information on an expedited basis would be small.

The bill also contains provisions that require increased disclosure of financial
information. The cost of complying with those requirements would depend on rules

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

that the SEC has agreed to propose, but not yet promulgated. Therefore, SEC cannot
estimate the direct costs of complying with the following mandates:

Under Title IV, the SEC would prescribe rules that would require companies that
issue securities to report loans to insiders within a certain time period, to dis-
close material off balance sheet transactions and conflicts, and present pro forma
data in a manner that is not misleading in periodic financial reports to the SEC.

**\*65** Section 404 would require a company and the company's auditor to attest to
the company's internal control procedures in their annual reports. Public compan-
ies also would be required to disclose whether they have adopted a code of ethics
for senior financial officers, and whether their audit committee has among its
members a "financial expert."

Analyst conflicts of interest

Section 501 would require the SEC or a registered securities association or ex-
change to adopt rules to prohibit certain conflicts within investment banking
firms that could compromise securities analysts' independence and to require se-
curity analysts to disclose other potential conflicts. The cost of prohibiting
certain conflicts and disclosing additional information would depend on rules to
be prescribed by the SEC or the directed authority. CBO does not have sufficient
information to estimate the cost to comply with those mandates.

Previous CBO Estimate: On April 26, 2002, CBO transmitted a cost estimate for
H.R. 3763, the Corporate and Auditing Accountability, Responsibility, and Trans-
parency Act of 2002, as passed by the House of Representatives on April 24, 2002.
H.R. 3763 would require the SEC to oversee a new board that would regulate the ac-
counting industry and to accelerate its review of annual reports filed by public
companies. CBO estimated that implementing H.R. 3763 would cost about $150 million
over the 2003-2007 period, assuming the appropriation of the necessary amounts.
Because of provisions that would create new civil penalties and a new accounting
board that CBO considered part of the federal budget, CBO estimated that H.R. 3763
also would cause revenues and direct spending to rise to insignificant net amounts
for each year.

For H.R. 3763, CBO identified similar private-sector mandates on accountants,
companies that issue registered securities, officers and directors of those com-
panies, and certain owners of the securities. CBO could not determine whether the
total direct cost of those mandates would exceed the annual threshold established
by UMRA for private-sector mandates as we did not have sufficient information to
estimate the cost of prohibiting insider trading during blackout periods when in-
vestment activity is restricted.

Estimate prepared by: Federal costs: Ken Johnson; impact on state, local and
tribal governments: Greg Waring; impact on the private sector: Paige Piper/Bach.

Estimate approved by: Peter H. Fontaine, Deputy Assistant Director for Budget
Analysis.

**\*66** ADDITIONAL VIEWS OF SENATOR GRAMM

President Bush's Ten Point program for regulatory reform in corporate accounting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
(Cite as: S. REP. 107-205)

and governance is an excellent plan, and he and his administration are to be com-
mended for wasting no time in implementing it. The actions already being taken by
the Securities and Exchange Commission, together with their published regulatory
proposals, as well as the actions taken by our nation's stock markets, are firm,
clear, and directed to the real problems. They represent substantial reform. It is
also undeniable that changes are occurring in every board room, on every corporate
audit committee, and with every accounting firm in America. But a legislative re-
sponse is also called for.

First of all though, it would be hard to overestimate the importance of main-
taining our system of private setting of accounting standards through the Finan-
cial Accounting Standards Board (FASB). Neither Congress nor any other agency of
the government should be in the business of setting accounting standards. A bad
accounting standard set by an independent board is better than a good standard set
by Congress. But we do need to establish a stable, reliable funding mechanism for
FASB.

With regard to legislation, the reported bill is better today than the bill as
first proposed, yet the fundamental problems of the original bill remain. We
should pass a bill that sets up an independent ethics supervisory board that will
oversee and enforce the highest standards of ethics in public accounting. This
board should be given power to determine what are conflicts of interest and to
make determinations on questions of auditor independence. It should also be inde-
pendently funded by a source that is committed to the purpose of funding that
activity, and the funding source should be reliable.

Yet, even though some flexibility has been added, the structure of the bill is
still troubling. If we are going to create this independent panel, we should cre-
ate one in which we can place our confidence, allowing the panel, for example, to
set the standards as to what represents a conflict of interest. While it is tempt-
ing to vote on these things and to set out in government writ for all time what we
mean and what we want, if we are trying to make this board powerful, why would we
want to prejudge what the panel is going to decide? There is a fundamental differ-
ence between having the board make decisions or having Congress make them.

When Congress prejudges the board's activities, we eliminate the flexibility
that the board will need to apply statutory principles to the variety of circum-
stances that appear in the real world. The one-size-fits-all approach of the bill
cripples the ability of the board to adjust to differences in situations among
companies-particularly to distinguish between large and small companies-as well as
to stay up to date with changes that occur over time.

*67 This will be particularly hard on smaller companies. While the legislation
allows for exceptions to its ban on auditors providing companies with additional
services, these exceptions can only be obtained on a case-by-case basis. It is the
smaller companies who routinely obtain a number of services from their auditor and
who can least afford to pay for a second or third auditing firm to provide these
additional services. These smaller business will be most likely to need the exemp-
tions. But the smaller the company, the less likely it will be able to afford the
legal services to get its needed exemptions from the new board. This is not a
small problem, as the bill would impose its new regulatory requirements on 17,000

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

companies-the vast majority of which are small businesses-all across the country.

It may be easy to envision requiring that General Motors have six different ac-
counting firms to comply with the conflict of interest rules. But it stretches
reason and good judgment to legislate those same standards for Joe Green and Son
Motor Repair of Texarkana. We should trust the board that we create and let them
look at the feasibility for large and small companies, ask them to look at the be-
nefits to shareholders, the integrity of the financial system and long term growth
prospects. It is easy to envision that they might end up with standards that would
be differentiated based on the size of accounting firms and the size of the busi-
nesses that are affected. We would preserve flexibility in doing this. One-
size-fits-all will hurt a lot of shareholders and the businesses in which they
have invested. And heaping unnecessary costs on struggling small enterprises, it
will hurt the economy.

The point is, when you start setting out in law what auditing standards are,
what the conflict of interest standard is, and the many other specific mandates in
the bill, you eliminate flexibility, you eliminate the ability of the board to
learn what works and what does not work, and you eliminate the ability of the
board to differentiate between General Motors and Joe Green and Son, Incorporated.
In the process of setting up a strong, independent board we have largely done our
work. We ought not to be doing the board's work after that.

In addition, before this legislation becomes law, the concerns of constitutional
experts with regard to the appointment, regulatory powers, and taxing authority of
this new supervisory board will need to be resolved.

     Phil Gramm.

               ***68** ADDITIONAL VIEWS OF SENATOR ENZI

The collapse in the faith of corporate financial statements is alarming. Corpor-
ate executive abuses have shattered the savings and dreams of countless Americans.
Broad and strong changes need to be implemented to restore that confidence and en-
sure these abuses do not take place in the future.

A wave of new regulations and legislative proposals have been introduced to pro-
tect America's investors against corporate abuses. The securities' self-regulatory
organizations (SROs), the Securities and Exchange Commission (SEC), the White
House, and Congress are all working on different approaches with the same goal-to
ensure executives are providing accurate and reliable information to the public.

However, any approach must also be sensitive to the fact that auditors are a
critical element in assuring the quality of a financial statement. Legislation
that does not provide adequate liability protections for auditing firms will de-
crease the already minimal number of companies which can audit and evaluate com-
plex and fast-growing companies. Without a competitive auditing industry, con-
sumers may, at the end of the day, experience less reliable financial statements.

I believe this legislation, as reported by the Senate Banking Committee, will
provide a disincentive for small accounting firms to continue to audit publicly
traded companies. These small accounting firms may only audit a relatively few
public companies, and my fear is that this legislation would increase their liab-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ility exponentially, thus the firms would decide to cease offering services to
public companies. With current litigation downsizing an already limited number of
accounting firms, we cannot allow additional regulations to drive more firms from
offering auditing services to public companies.

The legislation also places a negative presumption on any approval of non-
prohibited consulting services. Legislation should not mandate to audit committees
that all consulting services are inherently conflicted. Audit committees should be
left to make their own determination as to what services provided by their audit-
ing companies is in the best interest of their shareholders.

I also have concerns that the setting of auditing standards will be taken out of
the hands of accountants. Auditing standards are complicated and detailed and the
setting of them requires the knowledge and expertise of individuals who understand
and work in the field of accounting. I am hesitant to allow a Board, of which the
majority must be non-accountants, to establish the standards under which account-
ants operate.

**\*69** I continue to support reform of the accounting industry and will continue to
work toward that goal with this legislation. I, however, will work to change as-
pects of the bill which I believe will impose severe unintended and unnecessary
consequences on the accounting industry and their clients.

    Mike Enzi.

FN1 John Shad, the SEC's Chairman from 1981-87, is deceased.

FN2 Testimony of John H. Biggs, Chairman, President and CEO, Teachers' Insurance
and Annuity Association-College Retirement Equities Fund (TIAA-CREF), and former
member of the Public Oversight Board, before the Committee on February 27, 2002.

FN3 Testimony of Shaun O'Malley, Chairman, 2000 Public Oversight Board Panel on
Audit Effectiveness, and former Chairman, Price Waterhouse LLP, before the Commit-
tee on March 6, 2002.

FN4 Testimony of Paul Volcker, Chairman of the Trustees of the International Ac-
counting Standards Committee, and former Chairman of the Board of Governors of the
Federal Reserve System, before the Committee on February 14, 2002.

FN5 The Public Oversight Board was created in 1977 as part of self-regulatory
efforts by the accounting industry. In January 2002, the P.O.B. voted unanimously
to disband, in "recognition of the obstacles to achieving this goal [i.e., effect-
ive self-regulation] which have been encountered in recent years, and given the
proposal of the SEC in consultation with the AICPA and the SEC Practice Section
Executive Committee, without input from the Public Oversight Board, to reorganize
the self-regulatory structure. * * *" Resolution of the Public Oversight Board,
January 20, 2002. Available at http:// www.publicoversightboard.org/about.htm.

FN6 Testimony of Charles A. Bowsher, Chairman, Public Oversight Board, and
former Comptroller General of the United States, before the Committee on March 29,
2002; testimony of Aulana L. Peters, Member, Public Oversight Board and former

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Commissioner, Securities and Exchange Commission (1984-88), before the Committee
on March 19, 2002; Biggs Testimony, February 27, 2002.

   FN7 Schedule A(25) of the Securities Act of 1933, 15 U.S.C. S 77(aa)(25)
(emphasis added); see also section 13(a)(2) of the Securities Exchange Act of
1934, 15 U.S.C. S 78m(a)(2), section 14 of the Public Utility Holding Company Act
of 1935, at U.S.C. S 79n, and section 30(g) of the Investment Company Act of 1940,
15 U.S.C. S 80a-29(g).

   FN8 Graham, Dodd, and Cottle, Security Analysis, 108 (4th ed., 1962).

   FN9 Testimony of Lee Seidler, former partner, Bear Stearns & Co. and Deputy
Chair of the 1978 Commission on Auditors' Responsibilities, before the Committee
on March 6, 2002.

   FN10 Senator Enzi suggested that the bill require, not merely permit, that two
Board members have an accountancy background.

   FN11 Testimony of Harold M. Williams, former SEC Chairman (1977-81), before the
Committee on February 12, 2002; Biggs Testimony, February 27, 2002; testimony of
Joel Seligman, Dean and Ethan A.H. Shepley University Professor, Washington Uni-
versity School of Law, before the Committee on March 5, 2002; testimony of Bevis
Longstreth, Member, 2000 Public Oversight Board Panel on Audit Effectiveness, and
former Commissioner, Securities and Exchange Commission (1981-84), before the Com-
mittee on March 6, 2002; cf. testimony of Robert Glauber, Chairman and Chief Exec-
utive Officer, National Association of Securities Dealers, Inc., and former Under
Secretary for Finance, Department of Treasury, under President Bush (1989-1992),
before the Committee on March 5, 2002.

   FN12 The Board itself will be a corporation created under the D.C. Nonprofit
Corporation Act. It will be neither an agency nor establishment of the federal
government, and its members and employees are not to be deemed to be federal of-
ficers or employees by reason of their Board service.

   FN13 Testimony of Arthur Levitt, former SEC Chairman (1993-2000), before the
Committee on February 12, 2002; Bowsher Testimony, March 19, 2002; testimony of L.
William Seidman, former Chairman, Federal Deposit Insurance Corporation and Resol-
ution Trust Corporation, and former partner, Seidman & Seidman, before the Commit-
tee on March 19, 2002.

   FN14 See, e.g., Ruder Testimony, February 12, 2002; Seligman Testimony, March 5,
2002; Seidler Testimony, March 6, 2002.

   FN15 The bill creates a right to interim SEC review of certain inspection-re-
lated disputes.

   FN16 Levitt Testimony, February 12, 2002.

   FN17 Glauber Testimony, March 5, 2002. John Biggs said simply: "Accounting firms

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205    Page 67

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

must know that they cannot refuse to open their books or prevent their staff from
cooperating with this new agency." Biggs Testimony, February 27, 2002.

FN18 The Board may request, but not require, the testimony of, or production of
documents, in the possession of any other person (for example, an audit firm's
client). Its rules may provide for procedures to seek issuance of a subpoena from
the SEC to any person.

FN19 Fines imposed by the Board are to be used to fund a scholarship program for
students in undergraduate or graduate programs in accounting.

FN20 Accounting Series Release No. 150, 3 SEC Dock. 275 (1973).

FN21 Testimony of Michael Sutton, former SEC Chief Accountant (1995-98), before
the Committee on February 26, 2002.

FN22 Testimony of Richard Breeden, former SEC Chairman (1989-93), before the
Committee on February 12, 2002.

FN23 Letter from James E. Burton, Chief Executive Officer, California Public Em-
ployees' Retirement System (CalPERS), to Chairman Paul S. Sarbanes, June 26, 2002.

FN24 Letter from John H. Biggs, Chairman, President and CEO, Teachers' Insurance
and Annuity Association-College Retirement Equities Fund (TIAA-CREF), to Chairman
Paul S. Sarbanes, June 28, 2002.

FN25 Testimony of John C. Whitehead, former Co-Chairman, Goldman Sachs & Co.,
and former Deputy Secretary of State, before the Committee on March 19, 2002.

FN26 Testimony of Walter P. Schuetze, former SEC Chief Accountant (1992-95), be-
fore the Committee on February 26, 2002.

FN27 Williams Testimony, February 12, 2002.

FN28 Bowsher Testimony, March 19, 2002; Levitt Testimony, February 12, 2002;
Volcker Testimony, February 14, 2002.

FN29 Statement of David Walker, Comptroller General of the United States, June
18, 2002.

FN30 "Analysis of the Failure of Superior Bank, FSB, Hinsdale, Illinois," Hear-
ing before the Senate Committee on Banking, Housing, and Urban Affairs, February
7, 2002.

FN31 Sutton Testimony, February 26, 2002.

FN32 Longstreth Testimony, March 6, 2002.

FN33 Levitt Testimony, on February 12, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 68
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

FN34 Williams Testimony, February 12, 2002.

FN35 Whitehead Testimony, March 19, 2002.

FN36 Testimony of Lynn Turner, former SEC Chief Accountant (1998-2001), before
the Committee on February 26, 2002.

FN37 Testimony of Roderick M. Hills, former SEC Chairman (1975-77), before the
Committee on February 12, 2002.

FN38 O'Malley Testimony, March 6, 2002.

FN39 The "lead" partner is the partner who is in charge of the audit engagement.
The "review" partner refers to the outside partner brought in to review the work
done by the lead partner and the audit team.

FN40 Bowsher Testimony, March 19, 2002.

FN41 Turner Testimony, February 26, 2002.

FN42 Testimony of James E. Copeland, Jr., Chief Executive Officer, Deloitte &
Touche LLP, before the Committee on March 14, 2002.

FN43 See, e.g., Seligman Testimony, March 5, 2002.

FN44 Testimony of Sarah Teslik, Executive Director, Council of Institutional In-
vestors, before the Committee on March 20, 2002.

FN45 Testimony of Robert E. Litan, Director, Economic Studies Program, The
Brookings Institution, before the Committee on March 14, 2002; testimony of Damon
Silvers, Associate General Counsel, AFL-CIO, before the Committee on March 20,
2002; Bowsher Testimony, March 19, 2002.

FN46 Testimony of Ira Millstein, Senior Partner, Weil, Gotshal & Manges LLP, be-
fore the Committee on February 27, 2002; Whitehead Testimony, March 19, 2002;
Biggs Testimony, February 27, 2002.

FN47 Levitt Testimony, February 12, 2002.

FN48 Hills Testimony, February 12, 2002; Seligman Testimony, March 5, 2002.

FN49 Testimony of Howard M. Metzenbaum, Chairman, Consumer Federation of Amer-
ica, and former U.S. Senator, before the Committee on March 20, 2002.

FN50 Testimony of David Walker, Comptroller General of the United States, before
the Committee on March 5, 2002.

FN51 Breeden Testimony, on February 12, 2002.

FN52 Teslik Testimony, March 20, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


FN53 O'Malley Testimony, March 6, 2002; Teslik Testimony, March 20, 2002.

FN54 Breeden Testimony, on February 12, 2002.

FN55 Breeden Testimony, February 12, 2002.

FN56 Testimony of Thomas A. Bowman, President and Chief Executive Officer, Asso-
ciation for Investment Management and Research, before the Committee on March 20,
2002.

FN57 Volcker Testimony, February 14, 2002.

FN58 Seligman Testimony, March 5, 2002.

FN59 For example:
Two of Enron's top officials who were also board members-Kenneth Lay and Jef-
fery Skilling-received personal loans from Enron. Mr. Lay received more than $70
million in cash during one 12-month period and repaid the loan with his own Enron
stock. Wall Street Journal (May 3, 2002).
WorldCom's board extended its former chief executive, Bernard Ebbers, a per-
sonal loan of $366.5 million. Richard Waters, Pressure Forces Ebbers to Leave
WorldCom, Financial Times (May 1, 2002).
Adelphia Communications made $3.1 billion in off-balance sheet loans to its
founder, John Rigas, reportedly without the knowledge of its shareholders or
board. Richard Waters, Rigas Agrees to Give Up Adelphia, Financial Times (May 24,
2002).
In April, Qwest revealed in its proxy statement that it lent $4 million to
President and COO Afshin Mohebbi. It was reported that a portion of the loan will
be used to pay the premium on his life insurance policy. Jim Seymour, Nacchio Dip:
Qwest CEO Delays His Pay Raise, TheStreet.com (April 9, 2002).
Global Crossing Ltd. eliminated or substantially reduced the terms of $18 mil-
lion worth of personal loans the company made to two of its top executives in the
months before the telecommunications company filed for bankruptcy protection, reg-
ulatory filings show. Elizabeth Douglass, Global Eased Loan Terms Compensation:
The firm forgave or reduced advances to executives in the months before its
Chapter 11 filing, L.A. Times (February 7, 2002).
AES Corp., a power producer, granted $1.5 million personal loans to both its
chief financial officer and an executive vice president in October to prevent them
from being forced to immediately sell company shares due to margin calls. AES
Makes Loans To Two Executives To Cover Margin Calls, Wall Street Journal (March
26, 2002).

FN60 Breeden Testimony, February 12, 2002.

FN61 Millstein Testimony, February 27, 2002.

FN62 Bowsher Testimony, March 19, 2002.

FN63 Bowsher Testimony, March 19, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


FN64 Bowman Testimony, March 20, 2002.

FN65 Bowman Testimony, March 20, 2002.

FN66 Bowman Testimony, March 20, 2002.

FN67 Breeden Testimony, February 12, 2002.

FN68 Letter from Eliot Spitzer, Attorney General of the State of New York, to
Chairman Paul S. Sarbanes, June 5, 2002.

FN69 Spitzer Letter, June 5, 2002.

FN70 Testimony of John C. Coffee, Jr., Adolf A. Berle Professor of Law, Columbia
University Law School, before the Committee on March 5, 2002 (internal citations
omitted).

FN71 Seligman Testimony, March 5, 2002.

FN72 Coffee Testimony, March 5, 2002 (internal citations omitted).

FN73 Bowman Testimony, March 20, 2002.

FN74 Testimony of Michael Mayo, Managing Director, Prudential Securities, Inc.,
before the Committee on March 19, 2002.

FN75 Turner Testimony, February 26, 2002.

FN76 Mayo Testimony, March 19, 2002.

FN77 Coffee Testimony, March 5, 2002.

FN78 Coffee Testimony, March 5, 2002 (internal citations omitted).

FN79 Spitzer Letter, June 5, 2002.

FN80 Coffee Testimony, March 5, 2002.

FN81 Coffee Testimony, March 5, 2002.

FN82 Seligman Testimony, March 5, 2002.

FN83 Bowman Testimony, March 20, 2002.

FN84 Bowman Testimony, March 20, 2002.

FN85 Bowman Testimony, March 20, 2002.

FN86 Bowman Testimony, March 20, 2002.

FN87 Mayo Testimony, March 19, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


FN88 Levitt Testimony, on February 12, 2002.

FN89 Spitzer Letter, June 5, 2002.

FN90 Whitehead Testimony, March 19, 2002.

FN91 Walker Testimony, March 5, 2002.

FN92 Hills Testimony, February 12, 2002; Williams Testimony, February 12, 2002;
Breeden Testimony, February 12, 2002; Levitt Testimony, February 12, 2002.

FN93 Breeden Testimony, February 12, 2002.

FN94 Coffee Testimony, March 5, 2002.

FN95 Coffee Testimony, March 5, 2002.

FN96 Turner Testimony, February 26, 2002.

FN97 Copeland Testimony, March 14, 2002.

FN98 SEC budget testimony for FY 2003 gives the number as over 17,000, Testimony
Concerning Appropriations for Fiscal 2003 by Harvey L. Pitt, Chairman, U.S. Secur-
ities & Exchange Commission, before the Subcommittee on Commerce, Justice, State,
and the Judiciary, Committee on Appropriations, United States House of Represent-
atives, April 17, 2002, while SEC Release 33- 8109 gives the number as 16,242, SEC
Release 33-8109 (Proposed Rule: Framework for Enhancing the Quality of Financial
Information Through Improvement of Oversight of the Auditing Process), ht-
tp://www.sec.gov/rules/proposed/33- 8109.htm at 71.

FN99 See Proposed SEC Release 33-8109 at footnote 111, page 111.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.