# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated,      )<br>)<br>)<br>) | **CIVIL ACTION NO. 07-9901-SHS**<br><br>**ECF Filed** |

TILLIE SALTZMAN, Individually and On )
Behalf of All Others Similarly Situated,     )    **CIVIL ACTION NO. 07-9901-SHS**
)
)    **ECF Filed**
Plaintiff,       )
)
vs.         )
)
)
CITIGROUP INC., CHARLES O. PRINCE,   )
ROBERT E. RUBIN, STEPHEN R. VOLK,    )
SALLIE L. KRAWCHECK, GARY L.       )
CRITTENDEN and ROBERT DRUSKIN,     )
)
Defendants.       )

LENNARD HAMMERSCHLAG,         )    **CIVIL ACTION NO. 07-10258-RJS**
Individually, and On Behalf of All Others    )
Similarly Situated,         )
)
Plaintiff,       )
)
vs.         )
CITIGROUP INC., CHARLES PRINCE,     )
SALLIE KRAWCHECK, GARY        )
CRITTENDEN,          )
)
Defendants.       )

## THE U.S. PUBLIC FUND GROUP'S MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF ITS MOTION FOR APPOINTMENT AS
## LEAD PLAINTIFF AND IN OPPOSITION TO ALL COMPETING MOVANTS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................3

    **I.**    The U.S. Public Fund Group Is The Most Adequate Plaintiff............................. 3

        **A.**    The U.S. Public Fund Group Has The Largest  Financial
                Interest Of Any Qualified Applicant............................................. 4

    **II.**    The Global Pension Funds' Motion Should Be Denied Because
        They Are Not A Proper Group................................................................. 8

        **A.**    The Global Pension Funds Are An Aggregation Of
                Unrelated Entities  Joined Together By Their Lawyers............................ 8

        **B.**    The Global Pension Funds Lacks Cohesion ............................................. 12

    **III.**    The ATD Group Should Be Disqualified Because It Is Atypical
        And Subject To Unique Defenses.......................................................... 17

CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Barnet v. Elan Corp.*,
    236 F.R.D. 158 (S.D.N.Y. 2005) ...................................................................................3, 7, 11

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988).........................................................................................................22

*Bhojwani v. Pistiolis*,
    No. 06 Civ. 13761(CM)(KNF) 2007 WL 2197836 (S.D.N.Y. July 31, 2007).......................12

*Borochoff v. Glaxosmithkline PLC*,
    246 F.R.D. 201 (S.D.N.Y. 2007) ...........................................................................3, 15, 17

*City of Brockton Ret. Sys. v. Shaw Group, Inc.*,
    No. 06 Civ. 8245(CM)(MHD), 2007 WL 2845125 (S.D.N.Y. Sept. 26, 2007) .................5, 8

*Coopersmith v. Lehman Bros., Inc.*,
    344 F. Supp. 2d 783 (D. Mass. 2004) ....................................................................................24

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990)......................................................................................................22

*Glauser v. EVCI Career Colleges Holding Corp.*,
    236 F.R.D. 184 (S.D.N.Y. 2006) ..................................................................................12, 26

*Goldberger v. PXRE Group, Ltd.*,
    No. 06 Civ. 3410(KMK), 2007 WL 980417 (S.D.N.Y. March 30, 2007).............................11

*Grace v. Perception Tech. Corp.*,
    128 F.R.D. 165 (D. Mass. 1989)..........................................................................................23

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)....................................................................................................26

*Hilton v. Guyot*,
    159 U.S. 113 (1895)..............................................................................................................16

*In re Baan Co. Sec. Litig.*,
    186 F.R.D. 214 (D.D.C. 1999)................................................................................................6

*In re Bally Total Fitness Sec. Litig.*,
   No. 04 C 3530, 2005 U.S. Dist. LEXIS 6243 (N.D. Ill. March 15, 2005) .............................15

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001).............................................................................................11, 13

*In re Critical Path, Inc. Sec. Litig.*,
   156 F. Supp. 2d 1102 (N.D. Cal. 2001) ...................................................................23, 24, 25

*In re Donnkenny Inc. Sec. Litig.*,
   171 F.R.D. 156 (S.D.N.Y. 1997) ........................................................................................6

*In re eSpeed, Inc. Sec. Litig.*,
   232 F.R.D. 95 (S.D.N.Y. 2005) ..............................................................................6, 13, 15

*In re Flight Safety Techs., Inc. Sec. Litig.*,
   231 F.R.D. 124 (D. Conn. 2005).......................................................................................13

*In re Gemstar-TV Guide Int'l Sec. Litig.*,
   209 F.R.D. 447 (C.D. Cal. 2002) ......................................................................................13

*In re Indep. Energy Holdings PLC*,
   210 F.R.D. 476 (S.D.N.Y. 2002) ......................................................................................19

*In re Network Assocs., Inc. Sec. Litig.*,
   76 F. Supp. 2d 1017 (N.D. Cal. 1999) .........................................................................14, 23

*In re Peregrine Sys., Inc. Sec. Litig.*,
   No. Civ. 02 CV 870-J(RBB), 2002 WL 32769239 (N.D. Cal. Oct. 11, 2002).................24, 25

*In re Razorfish, Inc. Sec. Litig.*,
   143 F. Supp. 2d 304 (S.D.N.Y. 2001)..............................................................................6, 12

*In re Royal Ahold N.V. Sec. & ERISA Litig*,
   219 F.R.D. 343 (D. Md. 2003).....................................................................................15, 17

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) .......................................................................3, 15, 16, 17

*Olsen v. N.Y. Comm. Bancorp, Inc.*,
   233 F.R.D. 101 (E.D.N.Y. 2005) ......................................................................................8

*Sczensy Trust v. KPMG LLP*,
   223 F.R.D. 319 (S.D.N.Y. 2004) ..............................................................................4, 13, 26

*Smith v. Suprema Specialties, Inc.*,
   206 F. Supp. 2d 627 (D.N.J. 2002) ..................................................................................15

*Xianglin Shi v. SINA Corp.*,
   No. 05 Civ. 2154(NRB), 2005 WL 1561438 (S.D.N.Y. July 1, 2005).....................................8


**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

15 U.S.C. § 78u-4(a)(3)(B) *et seq.* .........................................................................4, 6, 22

Fed. R. Civ. P. 23 .....................................................................................................4, 5, 17, 18


**OTHER AUTHORITIES**

Stefano M. Grace, *Strengthening Investor Confidence in Europe: U.S.-Style Securities
   Class Actions and the Acquis Communautaire*, 15 J. Transnat'l Law and Pol. 281
   (2006).......................................................................................................................17

Travis Newport, *Tortious Interference with International Contracts*, Int'l Trade L.J. 80
   (2000).......................................................................................................................16

Yoav Oestreicher, *The Rise and Fall of "Mixed" and "Double" Convention Models
   Regarding Recognition and Enforcement of Foreign Judgments*, 6 Wash. U. Global
   Stud. L. Rev. 339 (2007)...........................................................................................16

## PRELIMINARY STATEMENT

The U.S. Public Fund Group[1] suffered a loss of more than $50 million from its trading in shares of Citigroup, Inc. ("Citigroup" or "the Company")[2] and is the only adequate and cohesive group seeking appointment as Lead Plaintiff in this case.  As established in its initial application seeking Lead Plaintiff status, the U.S. Public Fund Group is a group of sophisticated domestic public pension funds represented by responsible public officials, which is precisely the type of movant that the Private Securities Litigation Reform Act of 1995 (the "PSLRA") prefers to serve as Lead Plaintiff.  Moreover, as noted in the Joint Declaration supporting their initial application, the members of the U.S. Public Fund Group, on their own accord, decided to pursue joint appointment as Lead Plaintiff given the important domestic public policy concerns underlying this case.  Appointing the U.S. Public Fund Group as Lead Plaintiff thus serves the fundamental purpose of the PSLRA to ensure that this litigation will be controlled by Citigroup investors, and not their lawyers.

In contrast, the Global Pension Funds, which claim an ostensibly larger financial interest than the U.S. Public Fund Group, are a group of **twelve entities** comprised of eight Danish pension funds, two Swedish pension funds and two U.S. pension funds that, collectively, lack the

---

[1]  The U.S. Public Fund Group is comprised of the State Teachers Retirement System of Ohio ("Ohio STRS") and the State Universities Retirement System of Illinois ("SURS").  The Division of Investment of the Treasury of the State of New Jersey ("New Jersey") originally sought to be appointed Lead Plaintiff together with Ohio STRS and SURS but withdrew after deciding to make an investment in Citigroup after the U.S. Public Fund Group filed its Lead Plaintiff motion.  *See* Notice of Withdrawal of New Jersey Division of Investment, Docket #27.  Accordingly, the U.S. Public Fund Group is no longer seeking approval of New Jersey's counsel, the law firm of Berger Montague, as Lead Counsel for the Class.

[2]  Specifically, the U.S. Public Fund Group incurred a loss of approximately $51 million during the period from January 1, 2004 through November 5, 2007 – the longest class period in a complaint filed prior to the lead plaintiff deadline and for which a notice was published in accordance with the PSLRA.  Applying the shorter class period in *Saltzman*, the first filed and noticed action (April 17, 2006 to November 2, 2007), the U.S. Public Fund Group incurred a loss of approximately $45 million.  On the day of the lead plaintiff motion deadline, just before the close of business, the Global Pension Funds filed their own complaint that purported to extend the class period to November 21, 2007.  The Global Pension Funds failed to publish notice of the filing of that complaint as required by the PSLRA.  During the class period alleged in the Global Pension Funds' complaint (January 2, 2004 to November 21, 2007), the U.S. Public Fund Group has a loss of $53 million.

necessary cohesion to effectively manage this case and supervise counsel.[3]  In addition, it seems rather clear that the Global Pension Funds were joined together at the eleventh hour by their counsel, not on their own accord, in order to outmatch the anticipated application of the U.S. Public Fund Group.  Indeed, counsel for the Swedish funds, now part of the Global Pension Funds, repeatedly approached the Office of the Ohio Attorney General and Ohio STRS in an effort to persuade Ohio STRS to act as the Swedish funds' domestic partner.  Ohio STRS and the Ohio Attorney General rejected that proposal.  The paradigmatic display of lawyer-driven conduct evinced by the Global Pension Funds' counsel is precisely the type of activity the PSLRA sought to end and is, in and of itself, a sufficient basis for denying their motion.  *See, e.g., Barnet v. Elan Corp., PLC*, 236 F.R.D. 158, 162 (S.D.N.Y. 2005) (Holwell, J.) (noting courts' concern that "allowing unrelated groups to aggregate losses in an effort to generate the 'largest financial interest,' the possibility emerges that lawyers will form such groups to manipulate the selection process, and in that way gain control of the litigation").

Finally, recent decisions in this District raise questions concerning whether the foreign funds that are members of the Global Pension Funds group can serve as Lead Plaintiffs.  These decisions have found that such foreign funds could face challenges by defendants at class certification on the ground that they are subject to unique defenses because this Court's orders may not be enforceable in their respective home jurisdictions.  *See Borochoff v. Glaxosmithkline PLC*, 246 F.R.D. 201, 204-05 (S.D.N.Y. 2007) (refusing to appoint as lead plaintiff a group of foreign institutional investors in light of the possibility that a foreign court would not give a U.S.

---

[3] The Global Pension Funds are:  Pensionskassen for Kontorpersonale, Pensionskassen for Kost- og Ernæringsfaglige, Pensionskassen for Bioanalytikere, Pensionskassen for Lægesekretærer, Pensionskassen for Jordemødre, Pensionskassen for Ergoterapeuter og Fysioterapeuter, Pensionskassen for Socialrådgivere og Socialpædagoger and Pensionskassen for Sygeplejersker (collectively, the "Danish Funds"), Sjunde AP-Fonden and Fjärde APFonden (collectively, the "Swedish Funds") and the Public Employees' Retirement Association of Colorado ("ColPERA") and the Tennessee Consolidated Retirement System ("TCRS").

judgment *res judicata* effect); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 105 (S.D.N.Y. 2007) (excluding foreign shareholders from class based on concern that foreign courts would not give *res judicata* effect to U.S. judgment). This issue subjects the Global Pension Funds to unique defenses that the Class would not be burdened with if the U.S. Public Fund Group is appointed the Class representative.

The other group seeking appointment as Lead Plaintiff, the "ATD Group," consists of individuals who obtained their shares of Citigroup when they sold their business, Automated Trading Desk, LLC ("ATD"), to Citigroup in a privately negotiated transaction for $102.6 million in cash and 11,171,938 million shares of ***unregistered*** Citigroup common stock. Courts have repeatedly refused to appoint as Lead Plaintiff investors who acquired their shares in a defendant issuer through a privately negotiated transaction, rather than on the open market. Further, in this case, the close ties between the ATD Group's members and Citigroup go well beyond this privately negotiated sale and include the fact that the ATD Group's members are presently directors of ATD, which is wholly owned by Citigroup, rendering the ATD Group a particularly inappropriate representative for the Class.

Lastly, an individual movant, David Garden, who incurred a loss of just $2 million, seeks to be appointed Lead Plaintiff. Mr. Garden clearly does not have the largest financial interest required by the PSLRA for appointment as Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B).

For these reasons, as set forth more fully below, the U.S. Public Fund Group should be appointed Lead Plaintiff.

## ARGUMENT

## I.    The U.S. Public Fund Group Is The Most Adequate Plaintiff

Under the PSLRA, this Court is directed to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of

adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i); *Sczensy Trust v. KPMG LLP*, 223 F.R.D. 319, 323 (S.D.N.Y. 2004) (Stein, J.)  The PSLRA provides a rebuttable presumption that the "most adequate plaintiff" is the movant or group of movants that "has the largest financial interest in the relief sought by the class," and also satisfies the elements of Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

### A.     The U.S. Public Fund Group Has The Largest Financial Interest Of Any Qualified Applicant

The U.S. Public Fund Group claims the largest financial interest of any adequate and typical lead plaintiff group,[4] having suffered approximately $51 million in losses.[5]  Given their common thread of significant losses and public policy concerns regarding the mortgage lending and structured finance industries, as well as the numerous other facts reflecting the U.S. Public Fund Group's cohesion set forth in its Joint Declaration, the losses of the two members of the U.S. Public Fund Group are properly aggregated under the PSLRA.

The PSLRA must be read in light of the "understanding that Congress intended to avoid 'the manipulation by class action lawyers of the clients whom they purportedly represent.'" *City*

---

[4]   Competing movants might challenge the U.S. Public Fund Group on the grounds that it is a "net seller" or "net gainer" based on its transactions in Citigroup shares.  The challenge is baseless.  First, SURS is neither a net seller nor net gainer and has the largest financial interest under the last-in, first-out methodology ($5.4 million) or the first-in, first-out methodology ($12.9 million) of any single movant that satisfies the adequacy and typicality requirements of Rule 23.  Second, Ohio STRS is only a net seller and net gainer under the class period alleged in the second filed complaint.  However, under the class period alleged in the first filed and noticed case, Ohio is neither a net gainer nor net seller.  *See* Certification of Ohio STRS, attached as Exhibit A to the Declaration of Gerald H. Silk, dated Jan. 7, 2008 ("Silk Decl.") (Docket # 24).  Thus, Ohio STRS' status as a net gainer or net seller depends upon the operative class period that is ultimately asserted in the consolidated complaint filed by the Court-appointed Lead Plaintiff and, subsequently, determined by the Court on class certification.  It is therefore premature to make any determination of Ohio STRS' status based solely on the application of differing class periods.

[5]   As required under the PSLRA, the Certifications of the U.S. Public Fund Group filed together with its Lead Plaintiff motion set forth all of Ohio STRS' and SURS' transactions during class periods alleged in each of the filed complaints.  In support of its motion, the U.S. Public Fund Group also submitted exhibits reflecting the calculation of their losses that included post-class period transactions relevant to those loss calculations.  One of those exhibits inadvertently omitted certain post-class period transactions of Ohio STRS.  A corrected loss calculation exhibit is provided as Exhibit A attached to the Supplemental Declaration of Gerald H. Silk ("Suppl. Silk Decl.").  These additional transactions have no impact on the U.S. Public Fund Group's loss when calculated on a first-in, first-out basis; the impact when losses are calculated on a last-in, first-out basis is approximately $200,000.

*of Brockton Ret. Sys. v. Shaw Group, Inc.*, No. 06 Civ. 8245(CM)(MHD), 2007 WL 2845125, at

*3 (S.D.N.Y. Sept. 26, 2007) (citing H.R. Conf. Rep. No. 104-369, at 31 (1995), *reprinted in*

1995 U.S.C.C.A.N. 730).  Given this statutory purpose, one of the primary questions courts have

addressed in relation to the appointment of lead plaintiffs under the PSLRA concerns which

groups of movants can appropriately be considered together for purposes of identifying the

movant with the largest financial interest and, in contrast, which groups must be rejected as

lawyer-driven aggregations that are not suitable for appointment because they will not be able to

supervise counsel's prosecution of the litigation.   These courts have held that permitting

"lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would

allow and encourage lawyers to direct the litigation" and defeat one the primary purposes of the

PSLRA.  *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 308-09 (S.D.N.Y. 2001) (Rakoff,

J.) (rejecting group because its members had no independent existence or prior relationship and

appeared to be an "artifice cobbled together by cooperating counsel"); *In re Donnkenny Inc. Sec.*

*Litig.*, 171 F.R.D. 156, 158 (S.D.N.Y. 1997).

     Consistent with this reasoning, the majority of courts, including those in the Second

Circuit, allow movants to aggregate their losses in seeking lead plaintiff status under the PSLRA

when a group is client-driven and cohesive.  *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D.

95, 97 (S.D.N.Y. 2005); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) (providing for the

appointment of the "person or group of persons" that meets the PSLRA's rebuttable presumption

requirements).   Along these lines, the Securities and Exchange Commission has consistently

cautioned that lead plaintiff groups should set forth information about their members, structure,

and intended functioning so that courts can independently assess the propriety of any aggregation

of losses.  *See* Memorandum of Securities and Exchange Commission, *Amicus Curiae*, appended

to *In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 229 (D.D.C. 1999). In *Baan*, the SEC recommended that such information include:

> detailed descriptions of its members, including their background, experience, and capabilities relating to the role of lead plaintiff; any pre-existing relationships among them; the manner in which the "group" was formed; an explanation of how its members would function collectively; and a description of the mechanism that the group members and lead counsel have established to communicate with one another about the litigation.

While the U.S. Public Fund Group clearly met the requirements set forth by the SEC in its opening papers, the Global Pension Funds made no such showing. An after-the-fact filing of a declaration is insufficient to "cure" the Global Pension Funds lawyer-driven group and establish, instead, that the members of the group came together, on their own, with a litigation plan to satisfy the SEC's recommendation. Similarly, an after-the-fact meeting simply strengthens the appearance—if not the likelihood—that such a meeting was orchestrated by counsel.

In *Barnet*, the court set forth the primary factors used in determining the propriety of a lead plaintiff group:

> Recognizing that the question is one of degree, several courts have adopted a "rule of reason" test, pursuant to which the acceptability of the proposed "group" is tested against its ability to represent the interests of the class, and only allowed to proceed as a group if the court determines that "lawyer-driven" litigation is not likely to result.

236 F.R.D. at 162. The "rule of reason" requires consideration of (1) the size of the group; (2) evidence whether the group was formed in bad faith; and (3) the relationship between the parties. *Id.* The U.S. Public Fund Group clearly satisfies the rule of reason as it is comprised of two public pension systems that came together independently of their outside counsel to jointly seek appointment as Lead Plaintiffs in this Action. *See generally* Joint Declaration of the Honorable Marc Dann, William J. Neville, John Michael Vazquez, William G. Clark and Dan Slack in

- 6 -

Support of the Motion of the U.S. Public Fund Group for Appointment as Lead Plaintiff (the "Joint Decl."), attached as Exhibit H to the Silk Decl. (Docket #24). The independence of the U.S. Public Fund Group from the control of their counsel, and their ability to work together cohesively to manage this litigation, is demonstrated by, among other things:

1. The U.S. Public Fund Group was formed at the initiative of Attorney General Dann and Ohio STRS, in recognition of the critical importance of this litigation and the broad impact of Defendants' misconduct upon the institutional investor community. Joint Decl. ¶6.

2. The Ohio Attorney General's Office directly contacted the office of the Executive Director of SURS without the involvement of outside counsel. Joint Decl. ¶¶6, 9, 12.

3. Ohio STRS and SURS determined to move jointly for appointment as Lead Plaintiff in this litigation without the participation of outside counsel. Joint Decl. ¶¶6, 9, 12.

In the recent lead plaintiff decision in *City of Brockton*, the court appointed two public pension funds to serve as co-lead plaintiffs, holding that the aggregation of such proactive institutional investors was appropriate in the circumstances:

These pension systems have vast assets, apparent investment sophistication, experience in some prior and current class-action lawsuits, and an administrative structure under which they fulfill their fiduciary obligations to their members by choosing counsel to represent them and then maintaining oversight over those attorneys. Under these circumstances, the legislative concern that class actions not be controlled by counsel is plainly satisfied regardless of how close or attenuated is the relationship between Brockton and Norfolk.

*City of Brockton*, 2007 WL 2845125, at *12.[6]

---

[6] As a small, cohesive group of sophisticated domestic institutions, the U.S. Public Fund Group is the exact type of "group" that courts have found to be appropriate under the PSLRA. *See, e.g., Olsen v. N.Y. Comm. Bancorp, Inc.*, 233 F.R.D. 101, 107 (E.D.N.Y. 2005) ("Here, given the PSLRA's preference for institutional investors, and given that the NYCB Group consists of a manageable number of members, the Court finds that the two member NYCB Group is a valid group under the PSLRA."); *Xianglin Shi v. SINA Corp.*, No. 05 Civ. 2154(NRB), 2005 WL 1561438, at *5 (S.D.N.Y. July 1, 2005) (Buchwald, J.) (appointing plaintiff group consisting of three Michigan city employee pension funds).

Here, the interests of the domestic U.S. Public Fund Group are aligned squarely with the interests of the Class, both in seeking to recover and maximize damages for similarly-situated Citigroup investors, and to address the core subprime mortgage practices and other misconduct through corporate governance changes as appropriate.  Joint Decl. ¶¶13-15 ("it is an important function of United States public pension funds to serve the public interest as Lead Plaintiffs in securities class actions that raise significant public policy concerns," and that the instant litigation against Citigroup "is just such a case.").  In addition, these state pension funds, and their representatives, are highly-motivated in pursuing this litigation as the alleged subprime mortgage practices and other corporate misconduct have had devastating effects on these pension funds, as well as other adverse economic consequences in their home states.

## II.    The Global Pension Funds' Motion Should Be Denied Because They Are Not A Proper Group

The attempt by the Danish Funds, Swedish Funds, ColPERA and TCRS to artificially inflate their financial interest in this litigation by aggregating their losses as the "Global Pension Funds" must be rejected as lawyer-driven litigation denounced by the PSLRA.[7]  The twelve funds from three different countries that comprise the Global Pension Funds clearly fail the "rule of reason" test, as they have not demonstrated – and cannot demonstrate – that their group was formed for any reason other than to aggregate their losses to obtain control over this litigation.

### A.    The Global Pension Funds Are An Aggregation Of Unrelated Entities Joined Together By Their Lawyers

There is no question that the combination of Swedish, Danish and U.S. funds lacks any rational basis and that these funds were evidently joined for the sole purpose of aggregating a

---

[7]  Eight of these funds submitted a single certification executed by Pensionskassernes Administration A/S ("PKA"), and purport to act as a single entity.  As discussed below, because PKA is merely an administrator for eight independent pension funds each of which has its own Board of Directors, separate assets and a narrowly defined group of beneficiaries, each must be considered a separate movant under the PSLRA.

loss large enough to secure appointment as Lead Plaintiffs.[8]  The Global Pension Funds have not submitted a declaration or any evidence demonstrating that they came together independently of their lawyers for some legitimate purpose.  Nor can they.  The evidence indicates further that this effort by the Global Pension Funds was, and continues to be, sustained by confidential information obtained from Ohio STRS and put to use only after Ohio STRS spurned an offer to form an artificial group with the Swedish Funds.  As set forth below, the prospect that the Global Pension Funds utilized confidential information obtained from Ohio STRS in creating the competing group—and did so only after Ohio STRS refused to work together with them—speaks volumes regarding the adequacy of their group.

Specifically, the law firm of Schiffrin Barroway Topaz & Kessler, LLP ("Schiffrin Barroway") – one of the counsel to the Global Pension Funds – approached the Office of the Ohio Attorney General to propose that Ohio STRS move jointly with the Swedish Funds that Schiffrin Barroway represents in connection with the pending Lead Plaintiff motions in this case. *See* Declaration of the Honorable Marc Dann and William J. Neville in Further Support of the U.S. Public Fund Group's Motion for Appointment as Lead Plaintiff ("Ohio Decl."), attached as Exhibit B to the Supp. Silk Decl., at ¶5.  Schiffrin Barroway knew that Ohio STRS intended to seek appointment as Lead Plaintiff in this Action, and was privy to confidential information concerning Ohio STRS' strategy and financial interest in this Action through Schiffrin Barroway's attorney-client relationship with Ohio STRS.  *See* Ohio Decl.  ¶4.  Schiffrin Barroway continued to press that proposal as late as the afternoon of January 4, 2007 – the last business day prior to the January 7 Lead Plaintiff deadline.  Ohio Decl.  ¶5.  Ohio STRS never received any indication that the Swedish Funds were working together with any other investors

---

[8]  Whatever connections the two Swedish Funds or the eight Danish Funds may have to the other funds from their own countries (which has not been established), there appears no relationship between the Swedish Funds, the Danish Funds and ColPERA or TCRS.

with which it might jointly move for appointment as Lead Plaintiff.  Ohio Decl.  ¶5.  Thus, it appears that, after unsuccessfully presenting their Swedish clients as potential partners to Ohio STRS, and after having their proposal rejected by Ohio STRS, Schiffrin Barroway and their co-counsel reached out to the Danish Funds, ColPERA and TCRS to form a group with a facially larger financial interest than Ohio STRS.  It seems fairly clear that Schiffrin Barroway felt compelled to combine the foreign funds with a U.S.-based institutional investor in order to inoculate those foreign institutions from a potential challenge by defendants on typicality grounds.  Ohio STRS was unwilling to assist Schiffrin Barroway in that regard.[9]

As the Third Circuit noted in *In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001), when there is evidence that the group claiming the largest losses has been formed in bad faith as part of the "efforts of lawyers hoping to ensure their eventual appointment as lead counsel," a court "could well conclude, based on this history, that the members of that 'group' could not be counted on to monitor counsel in a sufficient manner."  Courts in this District also consider whether there is evidence that a group of movants was formed in bad faith in determining whether to allow unrelated investors to aggregate their losses.  *Barnet*, 236 F.R.D. at 162.

Indeed, the law is well-established that groups which fail to explain their formation and purpose violate the very purpose of the PSLRA to empower plaintiffs and must be rejected.  *See*, *e.g.*, *Goldberger v. PXRE Group, Ltd.*, No. 06 Civ. 3410(KMK), 2007 WL 980417, at *5 (S.D.N.Y. March 30, 2007) ("one cannot but suspect that the Campfield Group—comprised, as it

---

[9] It its worth noting that, given the significant time difference between the United States and Sweden, by the time Ohio STRS and the Office of the Attorney General had again rejected the proposed partnership with the Swedish Funds on Friday, January 4, the business week in Europe was long since over.  This left just a single business day – the day the Lead Plaintiff motions were due – for Schiffrin Barroway and its co-counsel to orchestrate the combination of these twelve funds.  The eight hour time difference between Colorado and Sweden and Denmark makes it highly improbable that those funds conferred at all – let alone at their own initiative or in any depth – before their lawyers moved to have them appointed co-Lead Plaintiffs.

is, of disparate and apparently unrelated plaintiffs—is itself the result of the type of lawyer-driven action that the PSLRA eschews"); *Glauser v. EVCI Career Colleges Holding Corp.*, 236 F.R.D. 184, 190 (S.D.N.Y. 2006) ("The Kahn Group appears to be nothing more than a lawyer-created group of unrelated investors who were cobbled together in the hope of thereby becoming the biggest loser for PSLRA purposes – a tactic disapproved of by this Court.") (internal quotation marks omitted).

> That the PSLRA does not explicitly prohibit a group of persons from being appointed lead counsel is not, in the Court's view, a sufficient reason to allow otherwise unrelated group members to aggregate their losses for the sole purpose of claiming to have the largest financial interest in the relief sought by the class. The possibility that lawyers formed these groups to manipulate the selection process, and thereby gain control of the litigation is too great to be disregarded because such machinations are precisely what PSLRA was enacted to restrict.

*Bhojwani v. Pistiolis*, No. 06 Civ. 13761(CM)(KNF) 2007 WL 2197836, at *6 (S.D.N.Y. July 31, 2007) (internal citations and quotations omitted). Courts have long rejected attempts by counsel to "cobble together" an artificial group of investors simply to secure appointment as lead plaintiff and lead counsel:

> The tenuous connection and inadequate communication between counsel and client also infects, in a different way, the motion brought by the collection of counsel purporting to represent what they term the "Azimut Group," an ad hoc combination of a large financial institution, two smaller "day-trading" companies, and an individual investor, that have no prior connection with each other or with each other's counsel. … The "Azimut Group" is simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as "lead plaintiff," which can then select the equally artificial grouping of counsel as "lead counsel" and its "executive committee."

*In re Razorfish Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001) (Rakoff, J.).

- 11 -

### B.     The Global Pension Funds Lacks Cohesion

One of the principal reasons that courts routinely reject unrelated plaintiff groups is the concern that they lack the cohesion necessary to jointly oversee counsel's prosecution of a complex securities class action.   As Judge Scheindlin observed, "Appointing a group of unrelated investors lead plaintiff could lead to fragmentation and the problem of determining whose voice reigns when the group cannot agree."   *In re eSpeed,* 232 F.R.D. at 99.

The concern that the Global Pension Funds will not be able to control their counsel or the litigation effectively is particularly acute because of the size of their group and the far-flung nature of the twelve entities.   The lack of any explanation as to how they came together and intend to jointly lead the prosecution of this complex litigation raises additional concerns.[10] Accordingly, any declaration submitted after the fact by the Global Pension Funds will not cure their deficiencies because it will not demonstrate that these twelve entities came together through their own initiative (rather than at the direction of their counsel) as the U.S. Public Fund Group did.

Despite the Global Pension Funds' claim that they are a group of just five movants, there

---

[10]   *See In re Flight Safety Techs., Inc. Sec. Litig.*, 231 F.R.D. 124, 128 (D. Conn. 2005) ("Moreover, the joint motion submitted by the parties contains no indication of how the newly expanded group would function, such as whether certain lead plaintiffs would handle certain aspects of the litigation or whether decisions would be made by group consensus.  Therefore, the Court finds that appointing eight unrelated and unfamiliar plaintiffs as co-lead plaintiffs, when no preexisting relationship is evident, would be counter to both the terms and the spirit of the PSLRA."); *In re Gemstar-TV Guide Int'l Sec. Litig.*, 209 F.R.D. 447, 451 (C.D. Cal. 2002) (rejecting group that failed to detail any procedures by which they would "provide for efficient prosecution of the action," conduct meetings, or participate in the discovery process given that its members and attorneys were geographically scattered, or how the group would reach a consensus when intra-group conflicts arose); *Sczesny Trust*, 223 F.R.D. at 323 (rejecting attempt by shareholder to aggregate losses suffered by members of group that "banded together" where group members had not proffered "sufficient evidence…to support aggregation of the financial interests of that putative group of shareholders for purposes of determining which moving party has the largest financial interest.").

are in fact **twelve** independent entities that comprise the Global Pension Funds.[11]  That is because "PKA" is not a Citigroup investor itself but a mere "administrator" for eight different Danish pension funds.  *See* www.pka.dk/public/forside/this_is_pka.htm ("This Is PKA"), Silk Supp. Decl. Exhibit C.  Each of the Danish Funds has its own independent Board of Directors which determines an investment plan appropriate to its respective fund.  *Id.*  Neither does PKA make the investment decisions on behalf of the Danish Funds; rather, independent, external investment advisors made the decision for the Danish Funds to invest in Citigroup shares.  *Id.*  PKA is therefore not an "investment advisor" which, in certain limited circumstances, might have standing to bring suit on behalf of its clients.  In *In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1027-28 (N.D. Cal. 1999), the court refused to appoint a "fund administrator" similar to PKA as Lead Plaintiff because it was a group of movants rather than a single movant.

> [ING Fund Management] manages a number of separate funds, each fund being the actual owner of the shares. These funds are separate legal entities with their own directors. The funds were the entities that actually bought and sold the Network securities. ING Fund Management is the business unit that by contract provides administrative support to the funds. This candidate is, thus, a group of investment funds (or investors). It would qualify as a "group" within the meaning of the PSLRA

Even if PKA is construed as an "investment advisor" it has failed to establish that it has standing to serve as a lead plaintiff on behalf of the Danish Funds.  The conclusory statement in PKA's Certification that it has "authority" to bring suit does not satisfy the requirement that an investment advisor be "attorney-in-fact" for its clients and have full investment discretion.  As Judge Scheindlin held in *eSpeed,* "In order for an investment advisor to attain standing on behalf

---

[11]  Courts routinely hold that groups of more than five participants are too large and unwieldy to function cohesively and exercise the necessary control over counsel.  *In re Cendant,* 264 F.3d at 267 (appointing group of three U.S. public pension fund and stating "We do, however, agree with the Securities and Exchange Commission that courts should generally presume that groups with more than five members are too large to work effectively.") (citing SEC *Amicus* Brief, at 17 n.13).

of investors the transaction in question must have been executed as if by a single person.

Moreover, the advisor must be the attorney in fact for his clients, and he must be granted both

unrestricted decision-making authority and specific right to recover on behalf of his clients."

232 F.R.D. at 98.  Moreover, even an investment advisor with true authority to bring suit can

serve as lead plaintiff on behalf of its clients only because it also has full investment discretion, a

fact that PKA has not established with regard to its eight clients here.  PKA has failed to

establish these requirements and thus does not have standing to maintain this action on behalf of

the eight funds for which it provides administrative services.[12]

    In addition, the Global Pension Funds are not typical of the Class because ten of them

could face challenges by defendants as a result of their status as foreign investors from Sweden

and Denmark.   Defendants will certainly challenge whether those funds can serve as

representative plaintiffs by raising questions concerning whether any judgment of this Court will

be afforded *res judicata* effect in their home jurisdictions.  *See Borochoff*, 246 F.R.D. at 204-05

(refusing to appoint as lead plaintiff a group of foreign institutional investors in light of the

possibility that a foreign court would not give a U.S. judgment *res judicata* effect); *In re Vivendi*,

242 F.R.D. at 107 (excluding foreign shareholders from class because foreign courts "w[ould]

not give *res judicata* effect to judgments or settlements in a U.S. opt-out class action."); *In re*

*Royal Ahold N.V. Sec. & ERISA Litig*, 219 F.R.D. 343, 352 (D. Md. 2003) (refusing to appoint

foreign lead plaintiff because "[f]oreign courts might not recognize or enforce such a decision

---

[12] Moreover, none of the Danish Funds "administered" by PKA submitted a Certification as required by the PSLRA. Even if PKA's Certification provided all of those funds' transactions in Citigroup (a fact that cannot be verified absent a signed Certification by representatives of each of the Danish Funds), PKA's Certification does not satisfy the PSLRA requirement that each movant affirm that it has approved the filing of a lead plaintiff motion and is willing to serve as a representative party.  *Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627, 636 (D.N.J. 2002) (rejecting motion of putative representative of 22 different investors where "the 22 entities did not satisfy the procedural requirements of the Reform Act because they neither submitted certifications nor moved individually for lead plaintiff status.").  The Danish Funds have thus failed to comply with the PSLRA's Certification requirements, and cannot serve as Lead Plaintiffs.

from an American court, which would allow foreign plaintiffs in the class to file suit against the defendant again in those foreign courts").[13]

Because they might not be bound by a dismissal of the claims in this Court, and could have a second opportunity to prosecute those claims in a foreign jurisdiction, defendants would likely argue that these foreign funds are not in the same position as the U.S. Public Fund Group and other members of the Class. Indeed, if defendants succeed in arguing that this Court's judgments will not be given preclusive effect in Sweden and Denmark, investors from those countries could be excluded from the Class entirely. *See Vivendi*, 242 F.R.D. at 107.

The Supreme Court's seminal decision in *Hilton v. Guyot* provides support for the proposition that Swedish and Danish courts have traditionally declined to give *res judicata* effect to judgments of U.S. courts absent a treaty. *See Hilton v. Guyot*, 159 U.S. 113, 218 (1895) ("In Sweden the principle of reciprocity has prevailed from very ancient times. The courts give no effect to foreign judgments, unless upon that principle; and it is doubtful whether they will even then, unless reciprocity is secured by treaty with the country in which the judgment was rendered."); *id.* ("In Denmark the courts appear to require reciprocity to be shown before they will execute a foreign judgment.") (internal citations omitted). Likewise, defendants might cite to more recent commentators who note that Swedish and Danish courts remain reluctant to recognize judgments of foreign jurisdictions. *See, e.g.*, Yoav Oestreicher, *The Rise and Fall of "Mixed" and "Double" Convention Models Regarding Recognition and Enforcement of Foreign Judgments*, 6 Wash. U. Global Stud. L. Rev. 339, 345 n.35 (2007) ("For example, Sweden and the Netherlands seem to refrain from enforcing foreign judgments if no treaty is available.") (*citing* Symeon Symeonides et al., Conflict of Laws: American, Comparative, International 860

---

[13] *See In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2005 U.S. Dist. LEXIS 6243, at *19 (N.D. Ill. March 15, 2005) ("The PSLRA…provides that we ask simply whether [a proposed lead plaintiff] is likely to be 'subject to' [a] unique defense…*we do not have to determine that the defense is likely to succeed.*") (emphasis added).

(St. Paul 1998)); Travis Newport, *Tortious Interference with International Contracts*, 9 Int'l Trade L.J. 80, 87 (2000) ("Many nations including China, Denmark, Sweden and the Netherlands, only give a foreign judgment *persuasive* authority when a party attempts to enforce it.") (emphasis added). The fact that Sweden's version of the class action, put into effect just over five years ago, requires class members to affirmatively "opt in," and is thus fundamentally different from Rule 23 of the Federal Rules of Civil Procedure, will also likely be cited by defendants in furtherance of that argument. *See* Stefano M. Grace, *Strengthening Investor Confidence in Europe: U.S.-Style Securities Class Actions and the Acquis Communautaire*, 15 J. Transnat'l Law and Pol. 281, 294-95 (2006) (describing features of Lag om Gruppr tteg ng, Sweden's "Group Proceeding Act").[14]

That defendants, armed with these arguments and others, might attempt to challenge the typicality of the Swedish and Danish Funds, presents a risk that is appropriately considered on this lead plaintiff motion. *See Glaxosmithkline*, 246 F.R.D. at 203-05*; Vivendi,* 242 F.R.D. at 105*; In re Royal Ahold*, 219 F.R.D. at 352.[15]   Indeed, this potential risk to the Swedish and Danish Funds reveals why their counsel may have been so focused on partnering these funds with a domestic co-Lead Plaintiff. Recognizing these potential problems, Schiffrin Barroway sought to persuade Ohio STRS to move jointly with the Swedish Funds. After those efforts failed, and with the Lead Plaintiff deadline looming, it appears that Schiffrin Barroway hastily

---

[14] The differences between the Swedish group action and U.S. class action mirror those between the German and U.S. systems identified in *Glaxosmithkline,* 246 F.R.D. at 204, and *Vivendi*, 242 F.R.D. at 104, that led those courts to conclude that recognition of a U.S. class action judgment would be contrary to German public policy. For example, the Swedish parliament specifically adopted "opt in" procedures based on policy concerns that the U.S. class action model created incentives for abuse. *See* Grace, *supra*, at 294.

[15] Indeed, ColPERA – itself a member of the Global Pension Funds – has previously argued that foreign investors should not be allowed to serve as Lead Plaintiffs because they are subject to unique defenses that threaten to derail the focus of the litigation. For example, ColPERA argued previously that "[s]imply stated, the Foreign Purchasers carry 'baggage' that should not be allowed to distract from them prosecution of this case." Reply Memorandum in Further Support of the Motion of the Public Employees' Retirement Association of Colorado and Generic Trading of Philadelphia, LLC, at 5, *In re Royal Ahold N.V. Sec. & "ERISA" Litig.*, 1:03-MDL-01539 (N.D. Md. filed July 18, 2003), attached as Exhibit D to the Supp. Silk Decl.

combined the Swedish and Danish funds with ColPERA and TCRS.  Defendants, of course, will not view that "partnership" as insulating the foreign funds from the unique defenses that defendants will raise, as every class representative and lead plaintiff must independently satisfy the requirements of Rule 23.

### III.    The ATD Group Should Be Disqualified Because It Is Atypical And Subject To Unique Defenses

The ATD Group cannot serve as the Lead Plaintiff on behalf of Citigroup investors in this action because the ATD Group's members are far from typical of other Class members and are subject to defenses unique to the ATD Group's atypical circumstances.

The ATD Group consists of several individuals who acquired their Citigroup shares in a privately negotiated sale of their company, Automated Trading Desk ("ATD"), to Citigroup during 2007.  Several of these individuals continue to serve as members of the Board of Directors of ATD, and are thus presently directors of a wholly-owned unit of Citigroup—hardly the typical profile for an appropriate Lead Plaintiff in this action *against* Citigroup.  Indeed, by virtue of their close relationship with Citigroup and the consequent mechanics of the private sale of ATD, members of the ATD Group are themselves potentially liable to Citigroup investors under the Securities Act for the very same statements that form the basis of Citigroup's liability under the Securities Exchange Act, and thus have a strong incentive to defend those statements as accurate in contrast to the interests of Class members.  Recognizing the manifold problems— such as preferential access to nonpublic information—created by such close contacts between Defendants and proposed Lead Plaintiffs, courts have repeatedly barred atypical investors such as the ATD Group from serving as Lead Plaintiffs.

The ATD Group concedes that it acquired all of its Citigroup shares as the result of a privately negotiated transaction, unlike the U.S. Public Fund Group and the rest of the Class.  On

October 2, 2007, Citigroup closed on its acquisition of ATD, a closely-held South Carolina company. According to the Declaration of David Whitcomb (the "Whitcomb Decl."), co-founder of ATD and the only member of the ATD Group to submit a declaration in this matter, the members of the ATD Group "received Citigroup stock as part of the consideration of our agreement on June 30, 2007, to sell ATD to Citigroup." *See* Whitcomb Decl., attached as Exhibit E to Affidavit of Ira M. Press, dated Jan. 7, 2008 ("Press Aff."), (Docket # 16). According to a press release by the ATD Group's counsel, Blank Rome, ATD was sold to Citigroup for $680 million in cash and stock. *See* Press Release, Automated Trading Desk Sold to Citigroup for $680 Million (Oct. 3, 2007), attached as Exhibit E to the Supp. Silk Decl. Based on the registration statement for the transaction subsequent filed with the SEC, the total consideration for Citigroup's purchase of ATD appears to have been $102.6 million in cash and 11,171,938 shares of unregistered Citigroup stock.[16]

As a result of this transaction, members of the ATD Group continue to have significant close ties to Citigroup. As presently reflected on ATD's own website, three of the ATD Group's members—Messrs. Altman, Butler, and Whitcomb—are currently members of the Board of Directors of ATD. *See* ATD – Team Director Biographies, attached as Exhibit F to the Supp. Silk Decl. As the ATD Group itself makes clear, Citigroup now owns all of ATD as a result of purchasing all of ATD outstanding shares in a private transaction with the ATD Group. Accordingly, the ATD Group's members are presently on the Board of Directors of a wholly-owned unit of Citigroup and are, therefore, entirely atypical of other Class members. *See, e.g., In re Indep. Energy Holdings PLC*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002) (Scheindlin, J.)

---

[16] On October 2, 2007—the date the transaction closed and the ATD Group aquired their Citigroup shares—the high price of Citigroup stock was $48 per share. The Certifications submitted by the members of the ATD Group state that they acquired their Citigroup shares at a price of $52 per share, demonstrating that the ATD Group did not pay market price for those shares and, accordingly, cannot avail themselves of the fraud-on-the-market theory.

("[C]ourts have routinely found a disqualifying unique defense where the potential named plaintiff has had a direct or personal relationship with a board member or officer of the issuing company.")

Further highlighting the close connections and identity of interest between the ATD Group's members and the Citigroup defendants in this action is the fact that the ATD Group's members *could actually be liable as defendants for the very same misstatements that Citigroup is charged with in this action*.  The Citigroup shares that the ATD Group received in their private sale were initially unregistered.  However, the day after the deal closed, on October 3, 2007, Citigroup filed an SEC Form S-3ASR registration statement—commonly known as a "shelf registration"—allowing the former ATD shareholders to sell their Citigroup shares "from time to time" and "in various types of transactions, including sales in the open market."  *See* ATD Registration Statement, Supp. Silk Decl., Exhibit G.  Significantly, that registration statement *incorporates by reference the very financial statements that the class members in this action allege are false and misleading*, including Citigroup's Annual Report on Form 10-K for the year ended December 31, 2006 and Citigroup's quarterly reports on Form 10-Q for the quarters ended March 31, 2007 and June 30, 2007.  *See id.* at 4.  *See* Memorandum in Support of the Motion of the ATD Group *(* "ATD Mem."), at 2 (Docket # 20) (stating that the "suits allege that Citigroup's class period financial statements were materially inaccurate in their description of Citigroup's exposure to subprime mortgage related securities").

Sales of Citigroup shares by former ATD shareholders pursuant to this registration statement could give rise to liability on the part of the ATD Group.  Two members of the ATD Group *have already* sold shares pursuant to this registration statement, the Whitcomb Trust and Butler, (*see* Butler and Whitcomb Lead Plaintiff Certifications, attached as Exhibit C to the Press

- 19 -

Aff. (Docket # 16)), and they could be defendants in a suit by Citigroup investors under Sections 11 and 12(a)(2) of the Securities Act of 1933, for the identical reasons being asserted in this class action. The ATD Group thus has interests that are directly contrary to the Class because its members will be forced to argue, in their own defense, that the Citigroup financial statements incorporated in their registration statement were accurate, while the Class is seeking to prove that those statements were false and misleading.

Indeed, members of the ATD Group have already publicly demonstrated their willingness to overlook Citigroup's transgressions and shown their disinclination to zealously advocate the claims in this action. For example, David Whitcomb—who submitted the only Declaration on behalf of the ATD Group—would now have the Court believe in the "close alignment of interests between [the ATD Group] and other Class Period purchasers" and his "strong desire to prosecute the claims on behalf of" the Class. ATD Mem. at 9 (Docket # 20). On November 5, 2007, however, Mr. Whitcomb had the following to say in a message he posted on *Marketbeat,* an online blog maintained by the *Wall Street Journal*:

> Citi's loss of $50 billion in market cap is a ***ridiculous over-reaction***. While there may be write-downs in excess of what they have taken and forecast to date, there is no possible way Citi could lose $50 billion. That would be more than half of their total exposure. ***The credit instruments in question are just not that bad.***
>
> By way of full disclosure, I should note that I am Chairman Emeritus of ATD, which was sold to Citi recently, so I hold a lot of Citi stock and am NOT a disinterested party. However, as a retired professor of finance (Rutgers Univ), I'd say this whether I owned Citi stock or not.

Posting of David K. Whitcomb, PhD, MarketBeat Blog – WSJ.com: Erasing $120 Billion in Market Cap, http://blogs.wsj.com/marketbeat/2007/11/05/erasing-120-billion-in-market-cap/, attached as Exhibit H to the Supp. Silk. Dec. With public statements such as this one effectively conceding key elements of the Class's claims to the defendants, there is little reason to believe

that the ATD Group will, in light of the unusual circumstances of its members, be able to effectively fulfill the obligations of a Lead Plaintiff.

The close relationship between the members of the ATD Group and Citigroup, and their joint involvement in a sophisticated privately negotiated sale, also suggest a strong likelihood that—unlike other Class members—the ATD Group did not acquire its shares based purely on public information.  Rather, through their access to nonpublic information, the members of the ATD Group would not have relied on the integrity of the public markets in the same way that other Class members necessarily did—thereby subjecting the ATD Group to unique defenses and rendering the group an inappropriate Lead Plaintiff.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (barring a movant that "is subject to unique defenses that render such plaintiff incapable of adequately representing the class"); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 247-48 (1988) ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.… [But a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance…. [The presumption would be rebutted as to] plaintiffs who would have divested themselves of their … shares without relying on the integrity of the market.").

The Second Circuit has explained why the presence of unique defenses can result in a finding of atypicality:

> While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.  Regardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation, there

> is a danger that absent class members will suffer if their
> representative is preoccupied with defenses unique to it.

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180

(2d Cir. 1990) (internal citations omitted).

Thus, as explained in *Grace v. Perception Tech. Corp.,* 128 F.R.D. 165, 169 (D. Mass.

1989), a problem can arise when the proposed class representative has relied upon "information

that is not generally available to the public, and hence to the unnamed class representatives."

> Even though questions of reliance virtually disappear when
> plaintiffs employ a fraud on the market theory, if a plaintiff has
> relied on non-market information that plaintiff may be subject to
> unique defenses at trial. Such a plaintiff could hurt the class he
> seeks to represent by having to litigate issues that solely relate to
> his special reliance. The fraud on the market theory is specifically
> aimed at protecting open market purchasers who did not directly
> rely on any representations regarding the stock. Thus, if a plaintiff
> relies on representations, specifically those which are not available
> through market sources, then he cannot be said to have relied on
> the integrity of the market, and is atypical of those who have so
> relied.

*Id.* (internal citations omitted). Likewise, in *Network Assocs.*, the court denied the application of

a party seeking to be appointed lead plaintiff where "the lion's share of [its] acquisition of

Network [Associates] securities was not in open-market transactions but via a merger."  76 F.

Supp. 2d at 1029.  The court, noting the importance of the fraud-on-the-market presumption in

securities class actions, found that "KBC, unfortunately, would be encumbered with the unique

question whether it acquired its Network shares on better terms than the investing public and not

fully in reliance on the market price."  *Id.* at 1029-30.

Similarly, in *In re Critical Path, Inc. Sec. Litig.,* 156 F. Supp. 2d 1102 (N.D. Cal. 2001),

three members of a family who acquired shares of Critical Path stock in exchange for shares in

PeerLogic sought appointment as lead plaintiff.  The court concluded that the group was "not

- 22 -

adequate because of the manner in which it acquired its shares, which was the apparently privately negotiated acquisition of PeerLogic." *Id*. at 1110. Finding that "the concerns raised by a private transaction are appropriately addressed at this stage," the court held that "[a]ppointing as lead plaintiff one who acquired its shares in a private transaction *invites lengthy litigation both at the class certification stage and thereafter of whether that plaintiff is subject to unique defenses*. Certainly the Court should not appoint as lead plaintiff one whose appointment will invite scrutiny of the details of a private transaction." *Id*. at 1110-11 (emphasis added). The court further concluded that "[e]xposure to the concerns raised by a private transaction would disserve the class that the Court is charged with protecting." *Id*. at 1111.[17]

While the ATD Group claims that no confidential information was provided, *see* ATD Mem. at 9 (Docket # 20), it has refused to provide a copy of the June 30, 2007 Purchase Agreement or the "acquisition documents" that it claims establish that it did not receive any non-public representations or information concerning Citigroup. *See* Letter from Peter S. Linden to Michael J. Pucillo (Jan. 11, 2008), attached as Exhibit I to the Supp. Silk Decl. Instead, it has submitted a declaration from only one of its five members, David Whitcomb, stating that Citigroup's SEC filings and information on Citigroup's website "represented the sole sources of information that the ATD Group had respecting the financial condition of Citigroup." *See*

---

[17] *See also Coopersmith v. Lehman Bros., Inc.,* 344 F. Supp. 2d 783, 788 (D. Mass. 2004) (noting that court had previously denied party's motion for appointment as lead plaintiff where that party "had not purchased her shares on the open market, but had actually obtained her shares when she sold a company ... in a private transaction"); *In re Peregrine Sys., Inc. Sec. Litig.§,* No. Civ. 02 CV 870-J(RBB), 2002 WL 32769239, at *6-7 (N.D. Cal. Oct. 11, 2002) (denying motion for appointment as lead plaintiffs where movants acquired shares via a merger transaction rather than on the open market, thereby raising issues as to whether those movants were privy to non-public information that would subject them to unique defenses that they did not acquire their shares solely in reliance on the market price).

Whitcomb Decl., at 3.[18]

In *In re Peregrine,* 2002 WL 32769239, at *6-7, as in this case, not all of the members of the group submitted declarations to support their assertion that they did not rely on non-public information. The court rejected the movant group because it "ha[d] not presented sufficient evidence of the information on which it did rely in obtaining its shares." *Id.* at *7. Noting that it could not resolve questions as to reliance at the lead plaintiff stage, the court found nonetheless that "[t]he fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members." *Id.* at *7 (quoting *Landry v. Pricewaterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989).

> The exact financial knowledge held by these individuals at the time they acquired their shares will no doubt be fleshed out during discovery and issues unique to the Group raised at that time. Those issues loom too large for the court to determine at this preliminary stage that the Remedy Group is able to adequately represent the interests of the remaining class members.

*Id.*

Similarly, in *Critical Path,* 156 F. Supp. 2d at 1110-11, the court noted that in an effort to demonstrate its suitability as lead plaintiff, the movant had "submitted a declaration stating that it 'did not rely on non-public information in making the decision to exchange [its] PeerLogic shares for Critical Path shares. Rather, [its] investment decision was based upon publicly available information that was known to the entire market." *Id.* The court found the applicant's

---

[18] In addition to the right of indemnification provided to the ADT Group by Citigroup, there may well be various warranties and representations contained in the June 30, 2007 Purchase Agreement between Citigroup and ATD that would raise typicality concerns. Indeed, it would be customary for representations and warranties to be made in a deal of this magnitude. In response to a request by the U.S. Public Fund Group, counsel for ATD Group refused to provide a copy of the June 30, 2007 "agreement" referenced in the Whitcomb Declaration that would speak to those issues. As a result, there are many unanswered questions concerning those representations and warranties that raise possible conflicts and typicality problems. Because the ATD Group's counsel have not made the Purchase Agreement part of the record, and refused to provide it when asked, it is impossible for the Court to determine whether the ATD Group relied on warranties not made to the general public, or whether there might be potential counterclaims that Citigroup might bring against the ATD Group. The likelihood that defendants will focus on these issues if the ATD Group is appointed Lead Plaintiff – and thereby distract from the prosecution of this litigation – is sufficient basis to find that the ATD Group is atypical of the Class.

"conclusory statement that it did not rely on nonpublic information" insufficient to satisfy the court's concerns regarding typicality and possible unique defenses. *Id.*

The concerns expressed in *Peregrine* and *Critical Path* apply with equal force here. The ATD Group's motion for appointment as lead plaintiff lacks the necessary information to put these concerns to rest. One conclusory declaration, from one of five group members, without the documentation relating to the underlying acquisition of Citigroup stock, is simply not sufficient.

In sum, given the ATD Group members' current direct affiliation with Citigroup, their potential liability as defendants to Citigroup investors, their public declarations against the interest of the Class, and the likelihood that they acquired Citigroup shares based on preferential access to nonpublic information, the ATD Group is inappropriate Lead Plaintiff and should not be appointed by the Court.

## **CONCLUSION**

For all the above reasons, the U.S. Public Fund Group respectfully requests that the Court: (1) appoint the U.S. Public Fund Group as Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the PSLRA; (2) approve the U.S. Public Fund Group's selection of Lead Counsel for the Class; (3) consolidate all related securities class actions; and (4) grant such other and further relief as the Court may deem just and proper.

Dated:  January 28, 2008                    Respectfully submitted,

/s/ Gerald H. Silk
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Gerald H. Silk (GS-4565)
Avi Josefson (AJ-3532)
Noam Mandel (NM-0203)
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400
Facsimile:  212-554-1444

**BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO**
Jeffrey C. Block (JB-0387)
Kathleen M. Donovan-Maher
Leslie R. Stern
One Liberty Square
Boston, Massachusetts 02109
Telephone: 617-542-8300
Facsimile: 617-542-1194

Michael J. Pucillo
Anne O'Berry
Esperante Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401
Telephone: 561-835-9400
Facsimile: 561-835-0322

*Counsel to the U.S. Public Fund Group and
Proposed Lead Counsel for the Class*