UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

No. 05-2165

IN RE OCA, INC. SECURITIES
AND DERIVATIVE LITIGATION          SECTION: R(3)

JUDGE VANCE

**THIS DOCUMENT RELATES
TO: ALL CASES**

<u>**ORDER AND REASONS**</u>

Before the Court are motions for appointment as lead plaintiff in the securities cases and in the derivative cases that have been consolidated in this proceeding.  For the reasons stated below, the Court conditionally appoints Samuel Boodman as the lead plaintiff in the securities actions, and it approves his selection of Kaplan Fox & Kilsheimer LLP as lead counsel and Neblett, Beard & Arsenault as liaison counsel.  The Court appoints Eric Nagel as lead plaintiff in the derivative actions, and it approves his selection of Federman & Sherwood and Brodsky & Smith, LLC as co-lead counsel and Barasso Usdin Kupperman Freeman & Sarver, L.L.C. as liaison counsel.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

Defendant OCA, Inc. is a Louisiana-based company that provides business services to orthodontic and pediatric dental practices throughout the United States.  Specifically, OCA provides affiliated practices with information systems and a range of operational, purchasing, financial, marketing, administrative and other business services.  It generally provides its services to affiliated practices under long-term service, consulting, or management service agreements with terms that typically range from 20 to 25 years.  As of December 31, 2004, OCA had approximately 565 affiliated centers in the United States and abroad, and the company had customers in 46 states and in international locations.

On May 18, 2004, OCA announced that it would adopt Financial Accounting Standards Board Interpretation No. 46R ("FIN 46R"), which requires a company to consolidate the financial results of variable interest entities under certain circumstances when the company has an interest in the entities.  OCA stated that its adoption of FIN 46R would require it to make a number of changes to its financial statements effective January 1, 2004.  Those changes included changes to the way OCA recorded patient revenue and patient receivables.  OCA's chief executive officer, Bart F. Palmisano, Sr., stated in OCA's May 18, 2004 press release that

2

the accounting changes would make OCA's accounting simpler and more transparent and would lead to financial reporting that was more consistent with the way OCA managed its business.

Plaintiffs allege that over the remainder of 2004 and the early part of 2005, defendants made a series of false statements concerning OCA's quarterly financial results and its future prospects. According to plaintiffs, those statements were materially false or misleading and had the effect of artificially inflating OCA's stock price.

On March 17, 2005, OCA announced that it would delay the filing of its Form 10-K for the fiscal year ended December 31, 2004 because it had identified certain accounting errors relating to 2004 and earlier years. OCA stated that it would continue to review its accounting and that it had not made a decision about whether the errors were material or would require it to restate earlier financial results. On June 7, 2005, OCA announced a further delay the filing of its 2004 Form 10-K and reported that it had identified material errors in its calculation of patient receivables reported during the first three quarters of 2004. It revealed that its audit committee required it to restate its financial results for those periods. OCA also announced that it had organized a special committee of the board of directors to review the origins of certain journal entries in the company's

3

general ledger and their impact on OCA's financial statements.
OCA's chief operating officer, Bart. F. Palmisano, Jr., went on
administrative leave pending the outcome of the company's
internal investigation.  On the heels of OCA's June 7
announcement, shares of OCA stock fell $1.55, or 38%, to close at
$2.48 per share.

Shortly after OCA's June 7, 2005 announcement, a number of
plaintiffs filed securities class actions and shareholder
derivative actions in this district against OCA and certain of
its officers and directors.  The complaints allege generally that
defendants engaged in improper accounting practices that
materially overstated OCA's patient receivables reported during
2004.  The complaints further allege that defendants made
improper journal entries in the company's general ledger, altered
information that they provided to OCA's independent accounting
firm, and failed to maintain adequate internal controls to ensure
accurate financial reporting.  The securities plaintiffs assert
claims against defendants under sections 10(b) and 20(a) of the
Securities Exchange Act of 1934.  The derivative plaintiffs
assert claims for breach of fiduciary duty, abuse of control,
mismanagement, waste of corporate assets, unjust enrichment and
disgorgement under the Sarbanes-Oxley Act of 2002.

To date, 14 shareholder class actions and 7 shareholder

derivative actions have been filed in this district and consolidated before this Court.  On August 2, 2005, the Court held a preliminary conference and determined that separate lead plaintiffs should be appointed for the consolidated securities actions and the consolidated derivative actions.  The Court directed the parties to file motions for appointment as lead plaintiff in the securities actions and in the derivative actions no later than August 12, 2005.  Six plaintiffs or groups of plaintiffs timely moved for appointment as lead plaintiff in the securities actions, and two candidates timely moved for appointment as lead plaintiff in the derivative actions.  The Court gave the plaintiffs the opportunity to respond to the respective motions by August 19, 2005.  In the meantime, Hurricane Katrina struck, which delayed the resolution of these issues.

## II.  THE SECURITIES CASES

### A.  Applicable Law

The appointment of a lead plaintiff in a federal securities class action is governed by the Private Securities Litigation Reform Act of 1995.  *See* 15 U.S.C. § 78u-4.  The history and purposes of the PSLRA have been extensively discussed in the case law, and the Court will not repeat that discussion here.  *See generally, e.g., Newby v. Enron Corp. (In re Enron Corp. Sec.*

*Litig.)*, 206 F.R.D. 427, 441-42 (S.D. Tex. 2002); *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, app. at 1046-50 (N.D. Cal. 1999) (Amicus Brief of Securities and Exchange Commission); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 813-15 (N.D. Ohio 1999). Suffice it to say, the PSLRA was enacted to curb perceived abuses in federal securities class actions and to ensure that securities plaintiffs, not lawyers, exercise control over federal securities class actions.

To that end, the statute sets out a detailed procedure for determining the appropriate lead plaintiff. Under the PSLRA, the first plaintiff to file a complaint must publish notice in a widely circulated business publication or wire service notifying putative class members that, no later than 60 days after publication of the notice, any putative class member can move to be appointed as the lead plaintiff for the purported class of plaintiffs. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). The district court must consider any timely motion for appointment as lead plaintiff, and it must appoint the "most adequate plaintiff" as the lead plaintiff. The "most adequate plaintiff" is the class member who is most capable of adequately representing the interests of class members. *Id.* § 78u-4(a)(3)(B)(i).

The PSLRA creates a rebuttable presumption that the most adequate plaintiff is "the person or group of persons" that (i)

has moved for appointment as the lead plaintiff in response to the notice described above; (ii) has "the largest financial interest in the relief sought by the class;" and (iii) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* § 78u-4(a)(3)(B)(iii)(I).  Of Rule 23's requirements for the maintenance of a class action, only two, typicality and adequacy of representation, are relevant in the lead plaintiff context. *See Newby*, 206 F.R.D. at 441; *Tarica v. McDermott Int'l, Inc.*, No. Civ.A.99-3831, 2000 WL 377817, at *4 (E.D. La. Apr. 13, 2000).

Once the Court has determined the presumptive most adequate plaintiff, the statutory presumption can be rebutted only by proof that the presumptive plaintiff "will not fairly and adequately protect the interests of the class[,] or . . . is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

**B.    The Most Adequate Plaintiff**

In this case, six parties timely moved for appointment as lead plaintiff in the securities cases.  These parties and their interests are described below.

(1) Cannell Capital, LLC, an institutional investment advisor, asserts a loss of $2,649,791.25 from its investments in

OCA securities.  Cannell Capital originally asserted a loss of $3,016,046.  (*See* Cannell Cap. Mem. at 6).  It later submitted a declaration stating that one of its clients had not given it permission to pursue this action.  Accordingly, Cannell Capital revised its purchases and sales to exclude transactions on behalf of that client, and it now asserts a loss of $2,649,791.25.  (*See* Cannell Decl. Ex. A, at 7).

(2) The "OCA Investors Group" consists of Louisiana School Employees' Retirement System; Lawford Overseas Management, Inc.; B.V. Brooks, acting on behalf of himself, his wife (over whose account he holds a power of attorney) and a family trust the activities of which he directs as trustee; Brooks Torrey & Scott, Inc.; B.V. Brooks & Colin Gunn TTEE; Westbrook, Inc.; and Bryan Cardinal.  (*See* OCA Inv. Group Mem. at 1 & n.1).  It asserts a loss of $482,625.68.  The OCA Investors Group initially asserted a loss of $468,376.18. (*See id.* at 10).  In its responsive memorandum, however, it states that it has identified additional class period transactions in OCA securities, resulting in a total loss of $482,625.68.  (*See* OCA Inv. Group Resp. Mem. at 6 n.3).

(3) Douglas Levine and Samuel Boodman, two individual investors who seek appointment as co-lead plaintiffs, assert a loss of $417,134.  (*See* Levine & Boodman Mem. at 1).

(4) Robotti & Company Advisors LLC, an investment management

firm, asserts a loss of $318,399.  (*See* Robotti & Co. Mem. at 5-6).  In its responsive memorandum, Robotti & Company asserts a loss of $373,480, a figure that includes the individual losses of Robert E. Robotti.  (*See* Robotti & Co. Resp. Mem. at 11-12). Because only Robotti & Company, not Robotti personally, timely moved for appointment as lead plaintiff, the Court will not consider Robotti's personal loss in determining Robotti & Company's financial interest in this action.

(5) The "MEL Capital Group," which consists of MEL Capital; Penmont Securities, LP; Richard Feinberg; Scott Goebel; and Greg Konny, asserts a loss of $214,400.  (*See* MEL Cap. Group Mem. at 1, 5).

(6) Dr. Martin DeSomma, an individual investor, asserts as loss of $108,430.  (*See* DeSomma Mem. at 2).

By filing their motions, each of the applicants has complied with the first of the statute's three criteria for becoming the most adequate plaintiff.  The Court must next determine which of the movants has "the largest financial interest in the relief sought by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

The PSLRA does not define the term "largest financial interest."  *See In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 302 (S.D. Ohio 2005); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *3 (N.D.

Ohio May 12, 2004).  A number of courts have held that four factors are relevant to determining which proposed lead plaintiff has the greatest financial interest.  They consider (i) the total number of shares purchased during the class period; (ii) the total net shares purchased during the class period; (iii) the total net funds expended during the class period; and (iv) the approximate amount of loss suffered.  *See, e.g., In re eSpeed, Inc. Sec. Litig.*, No. 05 Civ.2091(SAS), 2005 WL 1653933, at *3 (S.D.N.Y. July 13, 2005); *Cardinal Health*, 226 F.R.D. at 303-04; *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *3.  Other courts have eschewed the four-factor inquiry and held that the inquiry should be based solely on each plaintiff's approximate loss.  *See In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2005 U.S. Dist. LEXIS 6243, at *14-15 (N.D. Ill. Mar. 15, 2005) ("We believe that the best yardstick by which to judge 'largest financial interest' is the amount of loss, period.").  Because the parties focus primarily on approximate loss in their submissions, the Court will employ only that measure to determine which plaintiff has the largest financial interest here.

     1.  *Cannell Capital*

On the face of the lead plaintiff motions, Cannell Capital's purported loss of $2,649,791 is almost $2.2 million larger than the next-largest purported loss, which would give it by far the

greatest loss of any proposed lead plaintiff.

Several parties argue that Cannell Capital is an inadequate lead plaintiff regardless of the size of its purported loss because it may not be able to establish that any such loss was caused by the defendants' fraud. Those parties point out that Cannell Capital sold all of its OCA shares by April 15, 2005, nearly two months before OCA's June 7, 2005 announcement that it would restate its financial results for the first three quarters of 2004. As a result, they argue, Cannell Capital's claims might be subject to a defense for lack of loss causation. *See* 15 U.S.C. § 78u-4(b)(4) (plaintiff in section 10(b) action must prove that defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover"); *Dura Pharms., Inc. v. Broudo*, 125 S.Ct. 1627, 1631-34 (2005) (plaintiff must allege and prove a causal connection between defendant's misrepresentations and the alleged loss). Cannell Capital responds that it will be able to allege and prove loss causation because OCA's March 17, 2005 press release announcing that the company would delay the filing of its 2004 Form 10-K was a partial disclosure of defendants' alleged fraud and led to a decline in the market price of OCA stock. Cannell Capital asserts that it still held OCA shares at the time of the March 17, 2005 partial disclosure, and that it will therefore be able to establish loss causation.

Notwithstanding this argument, the fact remains that Cannell Capital faces issues concerning loss causation that the other lead plaintiff candidates do not. Those issues are substantial enough to render Cannell Capital inadequate to serve as the lead plaintiff in this action. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (presumption that party is most adequate plaintiff may be rebutted by showing that plaintiff is "subject to unique defenses that render such plaintiff incapable of adequately representing the class"). It is a safe bet that, if Cannell Capital were appointed lead plaintiff, defendants would challenge its claims on loss causation grounds. Regardless of whether such a challenge would be successful, Cannell Capital would be required to devote substantial time and resources to establishing that the defendants' alleged fraud caused its loss, an issue that is not relevant to a significant number of class members. That alone makes Cannell Capital inadequate to serve as lead plaintiff. *See, e.g., Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *19 (plaintiff inadequate when "the time and attention [it] would be required to devote to the loss causation issue . . . would distract it from the claims of the rest of the class"); *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *4 (lead plaintiff candidates inadequate when they would likely face motion to dismiss for lack of loss causation); *In re Carreker*

*Corp. Sec. Litig.*, No. 3:03-CV-0250-M, 2003 U.S. Dist. LEXIS 25988, at *8-9 (N.D. Tex. Aug. 14, 2003) (same).

In addition, Cannell Capital's interests in this litigation are potentially divergent from the interests of other putative class members. Because Cannell Capital sold all of its OCA shares before the June 7, 2005 disclosure that marks the end of the class period, its overarching interests in this case are to establish that OCA's March 17, 2005 press release was a disclosure of the alleged fraud and to maximize the significance of that disclosure. Cannell Capital's incentive to effectively front-load the disclosure of the alleged fraud might, however, cause it to make arguments or take legal positions that are adverse to the interests of those class members who purchased OCA shares after March 17, 2005. Indeed, it has already done so on this motion. In its responsive memorandum, Cannell Capital argues that plaintiffs who purchased OCA stock after March 17 are inadequate to serve as lead plaintiff because they purchased OCA stock "with knowledge of the company's accounting problems." (Cannell Cap. Resp. Mem. at 8). The existence of this potential conflict creates significant concerns about whether Cannell Capital could be a typical or adequate representative of the entire class, and it is an additional reason for finding that

13

Cannell Capital is not the most adequate plaintiff in this case.[1]

    2.   *OCA Investors Group*

The OCA Investors Group purports to have the next-greatest financial interest in this case, as its members assert a combined loss of $482,625.68. The OCA Investors Group cannot be the most adequate plaintiff, however, because the Court finds that it is not an appropriate "group of persons" to serve as a lead plaintiff in this action.

Courts are divided on whether a previous relationship among investors, independent of the lawsuit, is required for a group of investors to be appointed as lead plaintiff. *Compare, e.g., Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *8 ("'Where the members of the group do not share business or other relationships independent of the lawsuit . . . appointment of such an artificial group of persons as lead plaintiffs should be rare under the PSLRA.'" (quoting *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845, 847 (S.D. Ind. 1999))), *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *5 ("[L]ead plaintiff movants must have a pre-existing relationship and basis for acting as a

---

[1]Levine and Boodman also argue that Cannell Capital is an inadequate lead plaintiff because it is an investment advisor and it has not shown that it has standing to bring this action in its own name on behalf of its clients. As the Court has found that Cannell Capital is not the most adequate plaintiff, the Court need not address this additional argument.

collective unit to qualify under the PSLRA as a viable lead
plaintiff group."), *and In re Donnkenny Inc. Sec. Litig.*, 171
F.R.D. 156, 157 (S.D.N.Y. 1997) ("To allow an aggregation of
unrelated plaintiffs to serve as lead plaintiffs defeats the
purpose of choosing a lead plaintiff."), *with In re Cendant Corp.
Litig.*, 264 F.3d 201, 266 (3d Cir. 2001) ("We disagree with those
courts that have held that the statute invariably precludes a
group of 'unrelated persons' from serving as a lead plaintiff
under the PSLRA."), *and In re Am. Bus. Fin. Servs., Inc. Sec.
Litig.*, No. 04-0265, 2004 U.S. Dist. LEXIS 10200, at *12 (E.D.
Pa. June 3, 2004) (PSLRA does not mandate that members of a group
have a preexisting relationship).  The PSLRA does not, by its
express terms, prohibit groups of unrelated plaintiffs from
banding together to move for appointment as lead plaintiff, and
this Court has permitted a group of investors to serve as co-lead
plaintiffs in other litigation.  *See Tarica,* 2000 WL 377817, at
*5.  Nevertheless, it is equally apparent that the practice of
aggregating unrelated plaintiffs into groups in order to seek
appointment as lead plaintiff, if permitted without scrutiny,
could undermine the PSLRA's goal of fostering plaintiff-driven
securities class action litigation.  *See, e.g., Sakhrani*, 78 F.
Supp. 2d at 847 ("[I]n most situations the appointment of an
artificial group as lead plaintiffs will tend to undermine the

15

goals of the PSLRA.").

Like a number of other courts, this Court will not take a categorical approach on the issue.  It will permit an unrelated group of investors to serve as lead plaintiff if the group shows that its assemblage "is not a manipulated effort to aggregate larger losses than other proposed Lead Plaintiffs." *Newby*, 206 F.R.D. at 455; *In re Microstrategy, Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000) (refusing to appoint group of unrelated plaintiffs when evidence suggested that group "was merely a diverse collection of plaintiffs assembled . . . for the purpose of winning the lead plaintiff role").  Thus, to be eligible to serve as lead plaintiff, a group of unrelated investors must show that it is a cohesive group that will operate efficiently and that the group's appointment as lead plaintiff will provide some benefit to the class that would not be achieved by the appointment of a single lead plaintiff.  *See In re Waste Mgmt., Inc. Sec. Litig.*, 128 F. Supp. 2d 401, 413 (S.D. Tex. 1999) ("The burden is on those seeking to aggregate to demonstrate the cohesiveness of their purported 'group' . . . ."); *see also Carreker Corp.*, 2003 U.S. Dist. LEXIS 25988, at *10-11 (stating that court will consider "whether an appointment of previously unrelated persons best serves the interest of the class and whether a sufficient governance structure is in

16

place"). Moreover, any group of plaintiffs must be small enough in size to assure the Court that it can manage the litigation effectively. For that reason, the Securities and Exchange Commission has stated that groups should generally contain no more than three to five members. *See Network Assocs.*, 76 F. Supp. 2d at app. at 1041 (Amicus Brief of Securities and Exchange Commission).

The OCA Investors Group consists of nine different plaintiffs, six of which are related and grouped under the moniker the "Brooks Family."[2] The OCA Investors Group asserts that it is a "small, cohesive and diverse group" that will provide the class "with benefits of joint decision-making and funding" and will allow the class to "wield more control" over counsel. (OCA Inv. Group Resp. Mem. at 7). The members of the OCA Investors Group have also signed a joint declaration stating that they "have agreed to communicate to discuss material developments and strategy and to establish a method of reporting by Lead Counsel" and have "exchanged contact information so that [they] may discuss issues outside the presence of counsel, if

---

[2]The "Brooks Family" consists of B.V. Brooks, his wife (over whose account he holds a power of attorney), a family trust whose activities he directs as trustee, and several companies he controls – Brooks Torrey & Scott, Inc., B.V. Brooks & Colin Gunn TTEE and Westbrook, Inc. (*See* OCA Inv. Group. Mem. at 1 & n.1).

[they] feel it necessary to do so." (*Id.* Ex. C, at 2).

Although the size of the OCA Investors Group exceeds that typically found acceptable, the Brooks Family would effectively function as a single investor by virtue of the relationships among its members. For practical purposes, then, the OCA Investors Group consists of only four members, and its size alone does not prevent it from serving as lead plaintiff.

The Court nevertheless finds that the OCA Investors Group is not an adequate lead plaintiff because it has not met its burden of showing that it is anything but a diverse collection of plaintiffs with no reason for being other than the aggregation of losses. The OCA Investors Group provides little or no information on matters relevant to its cohesiveness and ability to function efficiently. A proposed group should provide the Court with a description of how and why the group was formed, the specific benefits that each group member will bring to the prosecution of the litigation, other than the size of its loss, and the specific manner in which the group proposes to make decisions. *See Network Assocs.*, 76 F. Supp. 2d at 1026 (group should provide "descriptions of its members, including any pre-existing relationships among them; an explanation of how it was formed and how its members would function collectively; and a description of the mechanism that its members and the proposed

18

lead counsel have established to communicate with one another about the litigation." (quoting Amicus Brief of Securities and Exchange Commission at 12, 15, *Parnes v. Digital Lightwave, Inc.*, No. 99-11293 (11th Cir. Aug. 2, 1999))); *Newby*, 206 F.R.D. at 455 (denying group's motion for appointment as lead plaintiff when there was "no clear or persuasive reason why FSBA and NYC Funds have joined together to apply for Lead Plaintiff in this litigation other than an effort to amalgamate their losses to be greater than their competitors'").

Here, the OCA Investors Group provides no real explanation as to how or why it was formed, other than its generic statements about the benefits of joint decision-making and generalizations about a group's ability to control counsel more effectively than a single plaintiff.  Even if those statements were accurate, they would apply to virtually any group of investors put together by counsel to move for appointment as lead plaintiff.  Moreover, the OCA Investors Group has failed to provide an adequate description of how the group would function to manage this litigation.  The group's joint declaration merely states that it will "discuss material developments and strategy" and that it intends to "establish a method of reporting." (*See* OCA Inv. Group. Resp. Mem. Ex. C, at 2).  General statements like these are inadequate. *See Carreker Corp.*, 2003 U.S. Dist. LEXIS 25988, at *9-11

19

(counsel's declaration that group "'implemented procedures,' [had] a 'regular schedule' and [would] make decisions . . . on a majority vote" insufficient to show that group would effectively manage litigation).

The failure to provide any specifics about how the group will function is particularly problematic in a case such as this when the group consists of an unlikely conglomeration of very diverse parties.  The OCA Investors Group consists of a public pension fund, an investment advisor based in Mexico, a commercial fisherman, and an individual businessman who invested on behalf of his family and several family-owned companies.  With such a motley assortment of members, it is vital that such a group establish communication and decision-making structures to ensure that it is able to operate effectively.  Thus, despite the OCA Investors Group's assertion that it is a "cohesive" group, without some detail as to why the group was formed or how it will function, the Court cannot find that it is an appropriate lead plaintiff.[3]

_____

[3]Levine and Boodman also challenge the OCA Investors Group on additional grounds, including that Lawford Overseas Management does not have standing to pursue this action on behalf of its clients and that Louisiana School Employees' Retirement System cannot serve as a lead plaintiff in this action because it would violate the PSLRA's restriction on "professional plaintiffs." *See* 15 U.S.C. § 78u-4(a)(3)(B)(vi).  As the Court has found that the OCA Investors Group is not an appropriate group of plaintiffs

Although the OCA Investors Group is not itself an appropriate plaintiff, the Court can consider whether any of its individual members is the most adequate plaintiff. *See Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *12 (considering individual group members as independent lead plaintiff candidates); *Cardinal Health*, 226 F.R.D. at 308 ("A group vying for lead plaintiff does not necessarily rise and fall as a group."). None of the individual members of the OCA Investors Group independently has the largest financial interest of the remaining candidates; thus, none of them can qualify as the most adequate plaintiff. Nor does the "Brooks Family," which itself is an acceptable "group" of investors, have a sufficiently large financial interest to serve as lead plaintiff.

       3.   *Douglas Levine and Samuel Boodman*

Levine and Boodman purport to have the next-largest financial interest in this action, with $417,134 in asserted losses. Like the OCA Investors Group, however, Levine and Boodman are a group of unrelated investors, and they have also failed to provide the Court with sufficient reason to justify their serving as co-lead plaintiffs.

On his own, however, Samuel Boodman asserts a loss of

under the PSLRA, it will not consider the additional challenges raised by Levine and Boodman.

$318,501.50, which is greater than the asserted loss of any other single investor.  Moreover, Boodman also satisfies the typicality and adequacy requirements of Rule 23.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Typicality under Rule 23 requires that the claims or defenses of the representative party be typical of the claims or defenses of the putative class of plaintiffs.  *See* Fed. R. Civ. P. 23(a)(3).  Here, Boodman and the class of plaintiffs both claim that the market price for OCA securities was artificially inflated during the class period as a result of defendants' false or misleading public statements, that they purchased OCA securities during the class period without knowledge of defendants' alleged fraud and in reliance upon the integrity of the market price for OCA securities, and that they suffered damages as a result.  Nor does it appear likely that Boodman will be subject to any unique defenses that would render him an atypical class representative.  Boodman purchased OCA shares between January 3, 2005 and February 3, 2005, while the market for OCA shares was allegedly inflated and before the March 17, 2005 "partial disclosure."  Moreover, Boodman retained those shares through the end of the class period and the disclosure of the alleged fraud.  The Court therefore finds that Boodman's claims are typical of the claims of the putative class members.

To satisfy Rule 23's adequacy requirement, the

22

representative party's interests must not be antagonistic to those of the class members, and the class representative's selected counsel must be qualified, experienced, and able to vigorously prosecute the action on behalf of the class. *See Tarica*, 2000 WL 377817, at *5.  Here, Boodman's interests appear to be fully aligned with the interests of the other putative class members, and as discussed below, Boodman has retained experienced counsel who will prosecute this action vigorously. The Court therefore finds that Boodman satisfies the requirements of Rule 23.

The OCA Investors Group challenges Boodman's application on the ground that his certification of transactions in OCA securities during the class period is limited to his transactions in OCA common stock and does not include options traded during the class period.  The OCA Investors Group asserts that without such information, it is impossible to determine whether Boodman actually has the largest financial interest of any of the proposed lead plaintiffs.  (*See* OCA Inv. Group Resp. Mem. at 17).

The Court notes that although the majority of the securities complaints purport to represent only purchasers and sellers of OCA common stock during the class period, several of the complaints define the class more broadly to include purchasers of all "publicly traded securities" of OCA, or OCA "common stock and

23

sold put options." *See Thomas v. OCA Inc.*, No. 05-2220 (E.D. La.
filed June 10, 2005); *Klein v. OCA, Inc.*, No. 05-2433 (E.D. La.
filed June 15, 2005).  The Court further notes that a plaintiff
who purchased only OCA common stock can serve as lead plaintiff
for purchasers of stock and options, unless or until a conflict
arises between stock purchasers and options purchasers.  *See
Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 325
(S.D.N.Y. 2004) (declining to appoint separate lead plaintiff for
sub-class of options purchasers); *Waste Mgmt.*, 128 F. Supp. 2d at
432 (same).  Thus, that Boodman did not buy or sell any OCA
options during the class period would not affect his eligibility
to serve as lead plaintiff.

The OCA Investors Group's attack does not go to Boodman's
ability to represent the class, however, but to whether he has
the largest financial interest in the litigation.  The OCA
Investors Group asserts that Boodman's failure to state whether
or not he bought or sold any OCA options during the class period
renders it impossible to determine his financial interest in this
litigation because undisclosed options trades could alter
Boodman's asserted loss materially.  Since Boodman's
certification identifies only stock transactions, the Court
orders Boodman to file a supplemental certification within five
days of the date of this order stating whether he had any

24

transactions in OCA stock options during the class period and revising his estimated loss to reflect any such transactions.  In the interim, the Court provisionally finds that Boodman is the most adequate plaintiff for the purposes of this motion.

Aside from this issue, the other lead plaintiff applicants have not come forward with any evidence to rebut the statutory presumption that Boodman is the most adequate plaintiff. Specifically, no party has shown that Boodman would not fairly or adequately represent the interests of the class members or that he is subject to any unique defense that renders him incapable of adequately representing the class.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).  Accordingly, the Court conditionally appoints Samuel Boodman as the lead plaintiff in the securities actions.

### C.    Approval of Lead Counsel

The PSLRA directs that, subject to the court's approval, the most adequate plaintiff shall select and retain counsel for the class.  *See id.* § 78u-4(a)(3)(B)(v).  Boodman has selected Kaplan Fox & Kilsheimer LLP as his proposed lead counsel and Neblett, Beard & Arsenault as proposed liaison counsel.  The Court has reviewed the firm résumés of Boodman's proposed lead and liaison counsel, and it is satisfied that Boodman has retained competent and experienced counsel to represent the class in this matter.

25

Kaplan Fox & Kilsheimer has extensive experience representing plaintiffs in securities litigation over the past 20 years, and it has played a role in many cases that have generated substantial recoveries for shareholders. (*See* Levine & Boodman Mem. Ex. D, at 1-3).  Mr. Arsenault of Neblett, Beard & Arsenault has many years of experience in complex litigation and has previously served as liaison counsel in complex actions before this Court.  The Court is satisfied that Boodman's chosen counsel will adequately represent the class in this litigation.  The Court therefore conditionally approves Boodman's selection of lead and liaison counsel.

## III. THE DERIVATIVE CASES

Two parties move for appointment as lead derivative plaintiff.  A group titled the "Derivative Plaintiffs," consisting of Eric Nagel, Kevin Koch, Lemon Bay Partners, L.L.P., Daniel Taub and Xiafang Barr (hereinafter "Nagel"), moves for the appointment of Eric Nagel as lead plaintiff.  Plaintiffs Aleksy Shkuratkov and Ryan Bulmer jointly move to appoint themselves as co-lead plaintiffs.

### A.   Appropriate Legal Standard

Although the PSLRA provides a detailed process for appointing a lead plaintiff in securities class actions, no similar statutory scheme governs the appointment of a lead

26

plaintiff in shareholder derivative actions.  Further, relatively few cases have discussed the appointment process for a lead derivative plaintiff.  In the absence of a clearly defined standard to apply, the Court directed the parties to brief the issue of the criteria the Court should consider in appointing a lead derivative plaintiff in this case.

The parties urge the Court to consider a variety of factors in determining the adequacy of shareholder derivative plaintiffs. Nagel relies primarily on cases that consider factors extrapolated from Federal Rule of Civil Procedure 23.1, which requires, among other things, that a derivative plaintiff fairly and adequately represent the interests of similarly situated shareholders.  *See Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990) (considering eight relevant factors to determine whether plaintiff was adequate under Rule 23.1); *Rothenberg v. Sec. Mgmt. Co.*, 667 F.2d 958, 961 (11th Cir. 1982) (five-factor inquiry into adequacy under Rule 23.1); *Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005) (considering three factors to determine whether proposed lead plaintiffs satisfied Rule 23.1).  Nagel additionally cites to cases that consider the size of each plaintiff's relative financial stake as a factor in appointing a lead derivative plaintiff.  *See TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, No. 18336, 2000 WL 1654504, at *4

27

(Del. Ch. Oct. 17, 2000).

Shkuratkov and Bulmer, on the other hand, argue that the appointment of a lead plaintiff and lead counsel should be made based on a consideration of (i) the quality of the pleadings filed by each party; (ii) the vigor with which each plaintiff has prosecuted the suit; and (iii) whether each plaintiff is represented by competent counsel. *See, e.g., Dollens v. Zionts*, No. 01 C 5931, 2001 WL 1543524, at *5-6 (N.D. Ill. Dec. 4, 2001); *see also Horn*, 227 F.R.D. at 3; *Millman v. Brinkley*, No. 1:03-CV-3831-WSD, 2004 WL 2284505, at *3 (N.D. Ga. Oct. 1, 2004). Although Shkuratkov and Bulmer assert that these three factors should be given controlling weight, some of the cases they cite considered additional factors, including the relative size of each plaintiff's economic stake in the outcome of the litigation. *See Dollens*, 2001 WL 1543524, at *5-6.

The key difference between the approach advocated by Nagel and that favored by Shkuratkov and Bulmer is that Nagel focuses on factors that measure the adequacy of the plaintiffs themselves, while Shkuratkov and Bulmer look to a greater degree to the quality of each plaintiff's counsel. Although the Court finds that the factors relied on by both movants are relevant, it concludes that it should accord more weight to factors that reflect the adequacy of the plaintiff than to factors that depend

28

upon the quality of the plaintiff's counsel.  Congress, through the lead plaintiff provisions of the PSLRA, has mandated that private securities litigation should, to the extent possible, be driven and controlled by plaintiffs rather than by their lawyers. Although those provisions apply only to class actions, the policies underlying them are relevant to shareholder derivative actions, and the Court finds it appropriate to take those policies into account when it appoints a lead derivative plaintiff.  *See id.* at *5 (PSLRA factors relevant to appointment of lead derivative plaintiff); *In re Conseco, Inc. Sec. Litig.*, 120 F. Supp. 2d 729, 734 (N.D. Ind. 2000) (applying PSLRA factors, though noting "unique circumstances" of case). Accordingly, to determine which movant to appoint as lead plaintiff, the Court will consider (i) which plaintiff best satisfies the requirements of Rule 23.1; (ii) each movant's relative economic stake in the outcome of the litigation; (iii) the quality of the pleadings filed by each party; (iv) the vigor with which each plaintiff has prosecuted this litigation; and (v) whether each movant is represented by competent counsel.  The Court will give more weight to the first two factors than the last three.

**B.    Analysis**

    1.    *Federal Rule of Civil Procedure 23.1*

Rule 23.1 provides a number of requirements for the maintenance of a shareholder derivative action in federal court. Under Rule 23.1, a shareholder derivative complaint filed in federal court must be verified and must allege both that the plaintiff was a shareholder at the time of the actions complained of and that the suit is not a collusive attempt to confer jurisdiction upon a federal court that it would not otherwise have.  Fed. R. Civ. P. 23.1.  The complaint must also allege with particularity the plaintiff's efforts, if any, to obtain the desired action through the board of directors, or the reasons why no such efforts were made.  *Id.*  Finally, Rule 23.1 provides that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders . . . similarly situated in enforcing the right of the corporation."  *Id.*

Each proposed lead plaintiff filed a derivative complaint in this litigation,[4] and each of those complaints facially complies with the requirements of Rule 23.1.  Each of the complaints is

---

    [4]*See Bulmer v. Palmisano*, No. 05-2421 (E.D. La. filed June 15, 2005); *Shkuratkov v. Palmisano*, No. 05-2223 (E.D. La. filed June 10, 2005); *Nagel v. Palmisano*, No. 05-2222 (E.D. La. filed June 10, 2005).

verified, each plaintiff alleges that he held OCA shares during the relevant time period, each alleges that there has been no collusion to create federal jurisdiction, and each alleges that it would be futile to demand action by OCA's board of directors.[5]

Nagel challenges the sufficiency of Shkuratkov's verification on the ground that the verification that he initially submitted with his complaint was signed by Shkuratkov's attorney, rather than by Shkuratkov himself. The Court need not decide this issue, however, because even were Shkuratkov's initial verification defective, such a defect is curable, and Shkuratkov has since filed a verification that he personally executed. *See Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177, 180 (N.D. Ill. 1987).

Each of the lead plaintiff candidates also at least preliminarily satisfies Rule 23.1's requirement that a derivative plaintiff fairly and adequately represent the interests of similarly situated shareholders in enforcing the rights of the corporation. Whether a party is adequate under Rule 23.1 is an issue that is firmly committed to the discretion of the district

---

[5]The Court emphasizes that its findings concerning compliance with the requirements of Rule 23.1 are merely preliminary findings of facial compliance with Rule 23.1 and are made only for purposes of this motion. The Court does not consider whether, for example, plaintiffs' allegations of demand futility are legally sufficient.

court.  *See Smith v. Ayres*, 977 F.2d 946, 948 (5th Cir. 1992).

Courts that have considered Rule 23.1's adequacy requirement have

established a laundry list of factors that can bear on this

inquiry.  In *Larson*, for example, the court found it appropriate

to consider (i) whether the plaintiff is the real party in

interest; (ii) the plaintiff's familiarity with the litigation;

(iii) the degree of control exercised by the plaintiff's

attorneys; (iv) the degree of support the plaintiff received from

other shareholders; (v) the plaintiff's personal commitment to

the litigation; (vi) the remedy sought in the derivative action;

(vii) the relative magnitude of the plaintiff's personal

interests as compared to his interest in the action itself; and

(viii) whether the plaintiff is vindictive toward the

defendants.[6]  *Larson*, 900 F.2d at 1367.  The Court will consider

these factors to the extent they are relevant here.

    Nagel argues that Shkuratkov and Bulmer are inadequate under

Rule 23.1 because they are phantom plaintiffs who are unwilling

to participate in this litigation.  Nagel charges that Shkuratkov

and Bulmer are plaintiffs in name only and that their counsel is

---

    [6]*See also Rothenberg*, 667 F.2d at 961 (considering (i)
indications that plaintiff is not real party in interest; (ii)
plaintiff's unfamiliarity with the action; (iii) degree of
control exercised by counsel; (iv) degree of support received by
other shareholders; and (v) plaintiff's lack of personal
commitment to the action).

32

actually driving the litigation.  Disqualification on this ground
requires a substantial showing that the plaintiff lacks knowledge
of, or interest in, the pursuit of the claims and that the
litigation is completely controlled by the plaintiff's attorney.
In *Rothenberg*, upon which Nagel relies, for example, the Court
found the plaintiff inadequate because she had "an almost total
lack of knowledge about the facts of the case," was essentially
unable to comprehend the nature of the derivative action, and
sought primarily to recover her personal losses, not losses to
the corporation.  *Rothenberg*, 667 F.2d at 963.  The plaintiff in
that case also admitted at a deposition that she did not believe
that she could fairly and adequately represent the interests of
the corporation.  *Id.* at 962 n.11; *Mills v. Esmark, Inc.*, 573 F.
Supp. 169, 176 (N.D. Ill. 1983) (deposition showed that plaintiff
had "little, if any comprehension of the litigation" and that
lawyers had "total control" of litigation).

Nagel has not shown that Shkuratkov and Bulmer completely
lack knowledge about this action or that their counsel exercises
total control over the case.  Nagel points out that Shkuratkov's
initial verification of his complaint was executed by counsel.
He also notes that when Shkuratkov gave his personal verification
later, he incorrectly referred to his complaint as an amended
complaint, and he based it "on discussions with and reliance

33

upon" counsel.  This showing falls short of establishing the kind
of ignorance that courts have found sufficient to render a
plaintiff inadequate.  Moreover, Nagel fails even to point to any
similar flaws that would disqualify Bulmer.  The Court therefore
finds that Shkuratkov and Bulmer preliminarily satisfy the
requirements of Rule 23.1 for purposes of this motion.

Shkuratkov and Bulmer do not argue that Nagel fails to
satisfy Rule 23.1's adequacy requirement, and the Court finds
nothing in the record before it that would call his adequacy into
question.  Moreover, on the record before the Court, Nagel
appears to be a more adequate derivative plaintiff than
Shkuratkov and Bulmer.  First, Nagel's educational and
professional background suggests that he would be a more adequate
lead plaintiff than Shkuratkov and Bulmer.  Nagel has a degree in
accounting, he worked at a major accounting firm for a year, he
has worked on Wall Street since 1997, and he is currently an
institutional bond broker.  This background is relevant in this
case because the allegations of the complaints center on
accounting and financial reporting errors at a publicly traded
company.  Nagel's experience with accounting and securities makes
it likely that he will understand the facts and issues in the
case and be able to take an active role in this litigation.
Shkuratkov and Bulmer have not provided the Court with any

34

similar background information.

It is also relevant that the verification Nagel submitted with his complaint is based on his own knowledge, information and belief, while Shkuratkov's verification expressly relies upon counsel. Although, as stated *supra*, that Shkuratkov's verification was made in reliance upon counsel does not render him an inadequate plaintiff, it does indicate that he has less personal knowledge of the case than Nagel and that his personal involvement in the case may be more limited.

The Court further notes that five of the seven plaintiffs who filed derivative complaints support Nagel's appointment as lead plaintiff. As OCA shareholders, those plaintiffs have an economic interest in seeing this litigation prosecuted successfully on behalf of OCA. That those plaintiffs agree that Nagel should be the lead derivative plaintiff suggests that they also believe that Nagel will most adequately represent OCA's interests in this action.

On the basis of these considerations, the Court concludes that Nagel appears to be most able to represent the interests of similarly situated shareholders adequately in enforcing the rights of OCA. Accordingly, this factor weighs in favor of Nagel.

2.    *Relative Economic Stake*

The movants do not dispute that Nagel has a greater economic stake in the outcome of this litigation than Shkuratkov and Bulmer combined.  Nagel has been an OCA shareholder since 2001, and he currently holds 16,000 shares of OCA stock.  (*See* Nagel Mem. at 1).  Shkuratkov and Bulmer hold a combined total of 350 OCA shares.  (*See* Shkuratkov & Bulmer Resp. Mem. at 13 n.11). The parties' dispute instead focuses on the weight that this factor should be given in this case.  Shkuratkov and Bulmer argue that when, as here, neither movant holds a significant portion of the corporation's outstanding shares, the economic stake of the plaintiffs should be given little weight.  *See Wiehl v. Eon Labs*, No. Civ.A. 1116-N, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005) (economic stakes of competing plaintiffs not given great weight when largest stake represented only 0.065 percent of corporation's outstanding shares).

It is true that, since any recovery in the shareholder derivative actions would go to the corporation, the plaintiffs' economic interests in the outcome of this action are only indirect interests in any event.  Nevertheless, the Court is not convinced by Shkuratkov's and Bulmer's argument that economic interest should be given little weight in this case.  First, the analogous provision of the PSLRA, which creates a presumption

36

that the plaintiff with the largest financial interest is the most adequate plaintiff, applies even when no party's asserted loss is significant in relation to the size of the company or its total number of outstanding shares.  Moreover, the size of the competing plaintiffs' stake in the company relative to each another provides a measure of their relative incentives to litigate vigorously, particularly when there is a large disparity in the size of their holdings.  Shkuratkov's and Bulmer's approach would rob this consideration of significance in cases like this one.

Although economic interest alone is not dispositive, the Court finds that it should be given substantial weight.  Here, for example, Nagel's 16,000 shares is over 45 times greater than the combined holdings of Shkuratkov and Bulmer.  Nagel thus has a substantially greater incentive to make every effort to secure an outcome favorable to OCA.  This factor therefore weighs in favor of Nagel.

> 3.  *Quality of the Pleadings*

Shkuratkov and Bulmer assert that the quality of their complaints compared to Nagel's strongly favors appointing them as lead plaintiffs.  Shkuratkov and Bulmer argue that Nagel's complaint is inferior because Nagel failed to invoke this Court's jurisdiction properly and failed to include certain causes of

37

action.  The Court considers each of these contentions in turn.

Nagel identifies two possible bases for this Court's subject-matter jurisdiction.  He first alleges that jurisdiction exists on the basis of diversity of citizenship.  He then asserts that the Court has federal question jurisdiction over his claim for contribution under the Securities Exchange Act of 1934, which allows the Court to exercise supplemental jurisdiction over his state law claims.  Shkuratkov and Bulmer argue that Nagel's jurisdictional allegations are deficient because he has failed to plead the citizenship of each of the parties and because his contribution claim is not yet ripe.

Shkuratkov and Bulmer are correct that Nagel's complaint does not properly plead jurisdiction on the basis of diversity of citizenship.  Because the burden of establishing diversity of citizenship rests with the plaintiff, the plaintiff must affirmatively plead the citizenship of the parties.  *See Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 804-05 (5th Cir. 1991).  Nagel's complaint alleges generally that Nagel is diverse from each of the defendants, but it fails to allege the citizenship of any of the individual defendants.  Such a pleading defect is curable, *see Strain v. Harrelson Rubber Co.*, 742 F.2d 888, 889-90 (5th Cir. 1984), and there are no facts before the Court to suggest that Nagel cannot establish that he is diverse from each

of the defendants.  Nevertheless, this defect negatively impacts Nagel's application.

Shkuratkov and Bulmer are also correct that a contribution claim under federal law is not yet ripe and, accordingly, cannot provide the basis for the Court's jurisdiction.  *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 385 (5th Cir. 2001) (noting that federal court cannot exercise supplemental jurisdiction over state law claims when plaintiff's sole federal claim is unripe (citing *Samaad v. City of Dallas*, 940 F.2d 925, 934 (5th Cir. 1991))).  The right to contribution under the Securities Exchange Act arises only once a defendant has incurred an obligation to pay a judgment.  *See* 15 U.S.C. § 78u-4(f)(8) (providing right of contribution to one who "becomes jointly and severally liable for damages in any private action"); *id.* § 78u-4(f)(9) (statute of limitations for contribution claim calculated from date of final, nonappealable judgment); *see also In re Cendant Corp. Derivative Action Litig.*, 96 F. Supp. 2d 394, 397 (D.N.J. 2000) (contribution claim under section 11 of Securities Act of 1933 not ripe when settlement had not been approved by court).  Thus, if diversity jurisdiction does not exist, the Court could not at this point exercise supplemental jurisdiction over Nagel's state law claims.

Of less significance is Shkuratkov's and Bulmer's assertion

that their complaints are superior because they include a cause
of action for disgorgement under section 304 of the Sarbanes-
Oxley Act of 2002. *See* 15 U.S.C. § 7243. Whether derivative
plaintiffs can maintain claims under section 304 may be an open
one, but one court has squarely held that they cannot. *See Neer
v. Pelino*, No. Civ.A. 04-4791, 2005 WL 2434685, at *3-8 (E.D. Pa.
Sept. 27, 2005) (holding that section 304 does not provide a
private right of action). Thus, the Court does not find that the
inclusion of such a claim makes Shkuratkov's and Bulmer's
complaints superior to Nagel's complaint in any significant way.

Shkuratkov and Bulmer also point to their claim for breach
of fiduciary duty for insider selling, which is based on an OCA
director's sale of 4,800 shares of OCA stock while he was
allegedly in possession of material, non-public information.
Nagel's complaint also refers to insider stock sales in its claim
for breach of fiduciary duty, but it makes only a passing,
unspecific reference to such sales, and it does not include
specific facts concerning any particular defendant or any
particular sale of stock. In this respect, Shkuratkov's and
Bulmer's complaints are at least moderately more detailed than
Nagel's complaint.

On the whole, each plaintiff has filed a detailed and
professional complaint. For the reasons stated above, however,

40

the Court finds that Shkuratkov's and Bulmer's complaints are somewhat more thorough and carefully drafted.  Accordingly, this factor weighs in favor of Shkuratkov and Bulmer.

      4.   *Vigorous Prosecution*

Each movant and his counsel has been active in the prosecution of the early stages of this litigation, and the Court is confident that each movant would continue to prosecute this action vigorously if selected as lead plaintiff.  Although the movants argue over which party has been more vigorous to date, the Court finds that this factor favors neither Nagel nor Shkuratkov and Bulmer.

      5.   *Competence of Counsel*

Likewise, each movant is represented in this action by able lawyers who are experienced in the field of shareholder derivative litigation.  The Court has reviewed the parties' submissions on this issue and the attached firm résumés, and it is comfortable that each party's proposed leadership structure would capably prosecute this action.

Nagel's proposed leadership structure consists of Federman & Sherwood and Brodsky & Smith, LLC as proposed co-lead counsel, with Barasso Usdin Kupperman Freeman & Sarver, L.L.C. as proposed liaison counsel.  Nagel's co-lead counsel have served and currently serve as lead counsel in a large number of shareholder

41

derivative actions in state and federal courts around the United States. (*See* Nagel Mem. at 6-9 & Exs. E-F; Nagel Resp. Mem. at 2-4). Federman & Sherwood has successfully represented the interests of derivative plaintiffs in a number of actions. (*See* Nagel Mem. at 8-9). Nagel's proposed liaison counsel, Barasso Usdin Kupperman Freeman & Sarver, L.L.C., are reputable attorneys with a great deal of experience in complex litigation, including shareholder derivative litigation, and Mr. Kupperman of that firm has served as liaison counsel in complex litigation in this district. (*See id.* at 9-10).

Shkuratkov and Bulmer propose the appointment of Barrett, Johnston & Parsley and Robbins Umeda & Fink, LLP as co-lead counsel, with Smith & Fawer, LLC as liaison counsel. Barrett, Johnston & Parsley have successfully represented plaintiffs in a number of complex securities litigations, and currently serve as co-lead counsel in at least two shareholder derivative actions pending in federal courts. (*See* Shkuratkov & Bulmer Mem. at 12-13). Robbins Umeda & Fink has also successfully represented plaintiffs in a number of securities class actions and shareholder derivative actions. (*See id.* at 14-15). Moreover, Smith & Fawer are also well qualified to serve as liaison counsel. Mr. Smith of that firm has long practiced before the courts of this district and has ample experience in complex

litigation.  (*See id.* at 16).

Shkuratkov and Bulmer, however, seek to break the tie on this issue by asserting that Nagel's lawyers have committed ethics violations or have a disabling conflict of interest.  They rely on June 8, 2005 press releases issued by Brodsky & Smith and Federman & Sherwood that announce the filing of a class action lawsuit against OCA.  The press releases in question are generally similar and state that a securities class action was filed against OCA in this Court on June 7, 2005, that members of the putative class might have certain rights and that putative class members could contact the firms if they have questions about their legal rights.  (*See* Shkuratkov & Bulmer Resp. Mem. Ex. A).  Shkuratkov and Bulmer argue that, since neither Brodsky & Smith nor Federman & Sherwood filed securities actions in this Court, the press releases violate Louisiana Rule of Professional Conduct 7.1(a), which prohibits a lawyer from, *inter alia*, making false, misleading or deceptive communications about his services. They argue alternatively that if either of those firms does, in fact, represent clients suing OCA for securities fraud, then the firm has a conflict of interest that prevents it from serving as counsel to plaintiffs suing derivatively on behalf of OCA.

This Court is not persuaded by these arguments.  First, neither Brodsky & Smith nor Federman & Sherwood filed a complaint

43

or has otherwise appeared before this Court as attorneys for any
securities plaintiff.  Nor is there any evidence that they ever
formed an attorney-client relationship with, or received
confidential information from, any securities plaintiff.  There
is therefore no basis to find that they have a conflict of
interest in representing plaintiffs in the derivative actions.
Second, the press releases themselves do not actually assert that
either of those firms filed a class action complaint.  They state
only that a class action had been filed in this Court, which, of
course, is true.  There is nothing inherently false, misleading
or deceptive about the press releases that would lead this Court
to conclude that counsel violated Louisiana Rule of Professional
Conduct 7.1(a).

Thus, each plaintiff's proposed leadership structure for
counsel is competent and adequate to pursue this action, and the
Court finds that this factor does not favor either Nagel or
Shkuratkov and Bulmer.

### C.   Lead Derivative Plaintiff

Based on the foregoing analysis, the Court appoints Nagel as
the lead derivative plaintiff.  The Court bases this decision on
its findings that Nagel is the most adequate of the proposed lead
derivative plaintiffs under Rule 23.1 and that he has by far the
largest economic stake in the outcome of the litigation.  The

Court is also satisfied that Nagel has vigorously prosecuted this action and that he is represented by competent and experienced counsel.  Although Shkuratkov and Bulmer have filed somewhat better pleadings to date, as stated *supra*, the Court finds that the lead plaintiff inquiry should give primary consideration to the relative adequacy of the plaintiffs themselves.  Here, that factor favors Nagel.  Accordingly, the court appoints Eric Nagel as lead derivative plaintiff.  The Court also approves his selection of Brodsky & Smith and Federman & Sherwood as co-lead counsel and Barasso Usdin Kupperman Freeman & Sarver as liaison counsel.

IV.  **CONCLUSION**

For the reasons stated above, the Court conditionally appoints Samuel Boodman as lead plaintiff in the securities actions.  The Court conditionally approves his selection of Kaplan Fox & Kilsheimer as lead counsel and Neblett, Beard & Arsenault as liaison counsel.  The Court appoints Eric Nagel as lead derivative plaintiff and approves his selection of Brodsky &

Smith and Federman & Sherwood as co-lead counsel and Barasso
Usdin Kupperman Freeman & Sarver as liaison counsel.

New Orleans, Louisiana, this __18th__ day of November, 2005.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE