**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |
|---|---|
| IN RE ROYAL AHOLD N.V.  SECURITIES & "ERISA" LITIGATION | §<br>§<br>§<br>§<br>§<br>§<br>§ 1:03-MD-01539<br>§<br>§ ALL SECURITIES ACTIONS<br>§<br>§<br>§<br>§<br>§<br>§ |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF THE MOTION OF THE
PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO AND
GENERIC TRADING OF PHILADELPHIA, LLC FOR APPOINTMENT AS LEAD
PLAINTIFFS, FOR APPROVAL OF THEIR SELECTION OF LEAD COUNSEL, AND
IN REPLY TO OTHER LEAD PLAINTIFF APPLICATIONS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................................. 2

ARGUMENT................................................................................................................................... 5

I.    COPERA AND GENERIC TRADING ARE THE MOST
      ADEQUATE PLAINTIFFS TO LEAD THIS LITIGATION............................................5

      A. COPERA and Generic Trading Have The Largest
         Financial Interest of Any Qualified Movant..........................................................5

      B. COPERA and Generic Trading Have Carefully Investigated
         And Developed The Case Against Royal Ahold, Its Officers
         and Directors, and Deloitte & Touche Over The Past Five Months.........................6

      C. COPERA and Generic Trading's Application Is Supported
         By Sophisticated Domestic and Foreign Institutional
         Investors With Significant Financial Interests In The
         Outcome of This Litigation....................................................................................8

      D. Generic Trading's Claims Are Typical of the Claims of the Class ...........................9

II.   THE UNION AG GROUP'S UNIQUE DEFENSES AND
      CONFLICTS OF INTEREST CONCLUSIVELY
      DEMONSTRATE THAT IT IS INADEQUATE TO SERVE
      AS LEAD PLAINTIFF....................................................................................................12

      A. The Union AG Group's Failure to Address Its Disabling
         Conflicts of Interest Requires That Its Motion Be Rejected
         By the Court.........................................................................................................13

      B. The Union AG Group Has Disguised Its True Financial
         Interest In This Litigation By Providing This Court With
         Incomplete and Inadequate Trading Information ...................................................15

      C. The Union AG Group Has Failed to Adequately Address
         the Law and the Facts That Create Significant Doubts
         Concerning Whether This Court May Exercise Subject
         Matter Jurisdiction Over the Foreign Purchasers' Claims.......................................17

D. The Union AG Group Has Failed to Address the Substantial
Impediments That Exist to Certifying a Class That Includes
Foreign Purchasers ..................................................................................................20

III.  THE CENTRAL STATES/SBA GROUP IS INADEQUATE
TO SERVE AS LEAD PLAINTIFF ............................................................................23

A. Central States Does Not Possess the Largest Financial
Interest Among the Domestic Purchasers .............................................................23

B. SBA Is An Ineligible "Net Seller" That Also Suffers From
Unique Defenses That Prevent It From Serving As A Lead Plaintiff......................24

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alfadda v. Fenn,*
  935 F.2d 475 (2d Cir. 1991).................................................................................................. 18

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988)............................................................................................................. 11

*Berger v. Compaq Computer Corp.,*
  279 F.3d 313 (5th Cir. 2002) ............................................................................................. 9, 14

*Bersch v. Drexel Firestone, Inc.,*
  519 F.2d 974 (2d Cir. 1975)................................................................................................. 18

*East Tex. Motor Freight Sys., v. Rodriguez,*
  431 U.S. 395 (1977)............................................................................................................. 20

*Foley Bros., Inc. v. Filardo,*
  336 U.S. 281 (1949)............................................................................................................. 19

*Grunenthal GmbH v. Hotz,*
  712 F.2d 421 (9th Cir. 1983) ............................................................................................... 19

*In re Baan Co. Sec. Litig.,*
  103 F. Supp.2d 1 (D.D.C. 2000) .......................................................................................... 18

*In re Cable & Wireless, PLC Sec. Litig.,*
  Civ. A. No. 02-1860 (E.D. Va. April 21, 2003).................................................. 6, 17, 20, 24

*In re Cendant Corp. Litig.,*
  264 F.3d 201, 266 (3d Cir. 2001) *cert. denied, sub. nom. Mark v. Cal Publ Emple. Ret. Sys.,* 535 U.S.
  929 (2002)............................................................................................................................ 14

*In re Century Bus Servs Sec. Litig.,*
  202 F.R.D. 532 (N.D. Ohio 2001) ....................................................................................... 21

*In re CMS Energy Sec. Litig.,*
  Civ. No. 02-CV-72004-DT (E.D. Mich.).............................................................................. 10

*In re DaimlerChrysler Sec. Litig.,*
  No. 00-993 (JJF) ............................................................................................................ 21, 22

*In re E.spire Communs., Inc. Sec. Litig.,*
  2000 U.S. Dist. LEXIS 19517, at *9 (D. Md. Aug. 15, 2000)............................................ 8, 9

*In re E.spire Communs., Inc. Sec. Litig.,*
  No. H-00-1140, 2000 U.S. Dist. LEXIS 19517, at *9 (D. Md. Aug. 15, 2000) ............. 6, 11, 12, 14, 24

*In re Enron Corp. Sec. Litig.,*
  206 F.R.D. 427 (S.D. Tex. 2002)............................................................................. 4, 15, 16, 20

*In re Lucent Techs., Inc. Sec. Litig.,*
  221 F. Supp. 2d 472 (D.N.J. 2001) ........................................................................................ 8

*In re MicroStrategy Inc. Secs. Litig.*,
    110 F. Supp. 2d 427 (E.D. Va. 2000) ............................................................................... 16, 24

*In re Northern Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)............................................................................... 21

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    199 F.R.D. 119 (S.D.N.Y. 2001) ..................................................................................... 11

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    MDL 1222 (CLB) (S.D.N.Y.).................................................................................. 8, 10, 11

*In re USEC Sec. Litig.*,
    168 F. Supp. 2d at 565 ..................................................................................................... 24

*Int'l Woodworkers Am. v. Chesapeake Bay Plywood Corp.*,
    659 F.2d 1259 (4th Cir. 1981) ......................................................................................... 21

*Itoba Ltd. v. LEP Group, PLC*,
    54 F.3d 122 (2d Cir. 1995)............................................................................................... 18

*Kauthar SDN BHD v. Sternberg*,
    149 F.3d 659 (7th Cir. 1998) ........................................................................................... 19

*Krangel v. Golden Rule Res., Inc.*,
    194 F.R.D. 501 (E.D. Pa. 2000)....................................................................................... 22

*Laborers Local 1298 Pension Fund v. Campbell Soup Co.*,
    2000 U.S. Dist. LEXIS 5481 (D.N.J. 2000) .................................................................... 20

*Leist v. Tamco Enterprises, Inc.*,
    1982 U.S. Dist. LEXIS 17389, No. 80 Civ. 4439 (CLB) ................................................ 11

*Miller v. Balt. Gas & Elec. Co.*,
    202 F.R.D. 195 (D. Md. 2001 (Blake, J.) ....................................................................... 21

*Robinson v. TCI/U.S. West Communis.*,
    117 F.3d 900 (5th Cir. 1997) ........................................................................................... 19

*Savino v. Computer Credit*,
    164 F.3d 81 (2d Cir. 1998)............................................................................................... 13

*Schulman v. Lumenis, Ltd.*,
    No. 02 Civ. 1989 (DAB), 2003 U.S. Dist. LEXIS 10348 (S.D.N.Y. June 18, 2003)............................ 8

*SEC v. Kasser*,
    548 F.2d 109 (3d Cir. 1977)............................................................................................. 19

*Smith v. B & O R. Co.*,
    473 F. Supp. 572 (D. Md. 1979)...................................................................................... 12

*Switzenbaum v. Orbital Sciences Corp.*,
    187 F.R.D. 246 (E.D. Va. 1999) ................................................................................. 13, 14

*Tri-Star Farms Ltd. v. Marconi, PLC*,
    225 F. Supp. 2d 567 (W.D. Pa 2002)............................................................................... 20

*Zaltzman v. Manugistics Group, Inc.*,
    1998 U.S. Dist. LEXIS 22867, at *11 (D. Md. Oct. 8, 1998) ................................................. 8

*Zaltzman v. Manugistics Group, Inc.*,
    No. S-98-1881, 1998 U.S. Dist. LEXIS 22867, at *11 (D. Md. Oct. 8, 1998) ........................... 6, 12, 14

*Zemel Family Trust v. Philips Int'l Realty Corp.*,
    205 F.R.D. 434 (S.D.N.Y. 2002) .............................................................................................. 13, 18

*Zoelsch v. Arthur Andersen & Co.*,
    824 F.2d 33 (D.C. Cir. 1987) .................................................................................................... 19

**Statutes, Rules and Regulations**

15 U.S.C. §78u-4(a) *et seq.* ...................................................................................................... *passim*

**Federal Rules of Civil Procedure**

Rule 23 .................................................................................................................................... *passim*

## PRELIMINARY STATEMENT

The Public Employees' Retirement Association of Colorado ("COPERA") and Generic Trading of Philadelphia, LLC ("Generic Trading") (sometimes referred to herein collectively as the "Domestic Institutions") respectfully submit this reply Memorandum of Law in further support of their motion for appointment as lead plaintiffs in this securities fraud litigation against the Dutch supermarket group, Royal Ahold, N.V. ("Ahold" or the "Company") and related defendants, for approval of their selection of Entwistle & Cappucci LLP ("Entwistle & Cappucci") to serve as lead counsel, and for approval of their selection of Adelberg, Rudow, Dorf & Hendler, LLC to act as local / liaison counsel. The proceedings to date before this and other Courts confirm that:

COPERA and Generic Trading Are The Most
Adequate Plaintiffs To Lead This Litigation Because:

- They possess the largest financial interest of all eligible movants;
- Their claims are typical of the claims of the class;
- They have confirmed their commitment to vigorously litigate this action in the best interests of the class;
- They are supported by movant and non-movant domestic and foreign institutions that suffered tens of millions of dollars in losses;
- COPERA has a demonstrated ability to successfully prosecute a complex securities fraud litigation against a major public company and a major accounting firm; and
- Their conduct to date demonstrates that they are dedicated to fulfilling the PSLRA's goal of having sophisticated institutional investors actively supervise this litigation.

Union AG Is Ineligible To Serve As Lead Plaintiff Because:

- It possesses issues and interests atypical of and antagonistic to those of the rest of the class based upon, among other things, its Class Period owners' involvement in Ahold underwriting;
- The fragmentary nature of Union AG's certified financial information makes it impossible to determine Union AG's actual financial interest in this litigation;
- Union AG has omitted substantial transaction information from its sworn certification;
- There is a likelihood that this Court will not grant subject matter jurisdiction over Union AG's claims, and the claims of the other Foreign Purchasers;

- Union AG is likely not a member of a certifiable class;
- Union AG effectively ignores significant developing facts in its jurisdictional arguments, including the ongoing criminal investigations in the Netherlands based upon Ahold's $24.8 billion overstatement of revenues in connection with multinational joint ventures; and
- A joint application with Detroit General which has suffered minimal losses, does not cure Union AG's defects.

Central States/SBA Is Ineligible To Serve As Lead Plaintiff Because:

- Central States does not have the largest financial interest of Domestic Purchasers, and its losses are substantially less than represented;
- Central States includes Ahold shares it received in exchange for U.S. Foodservice shares it owned pre-acquisition.  Such shares were not acquired in open market purchases and the proof by the Class of the U.S. Foodservice pre-acquisition fraud will likely impair Central States' losses in this regard. There shares thus present issues and interests atypical and antagonistic to the class.
- SBA is an ineligible "net seller."

Ms. Tsai Is Ineligible To Serve As Lead Plaintiff Because:

She has a *de minimis* financial interest in Ahold ADRs.

## SUMMARY OF THE ARGUMENT

Several rounds of briefing in multiple courts demonstrate that COPERA and Generic Trading -- with more than $17.35 million in Class Period losses -- are the most adequate plaintiffs to represent the interests of *each* of the three categories of persons who purchased Ahold securities during the Class Period:  (1) domestic purchasers of Ahold common stock on foreign exchanges ("Domestic Purchasers") -- of which COPERA unequivocally has the greatest financial interest by any method of calculation; (2) purchasers of Ahold American Depositary Receipts ("ADRs") on domestic exchanges ("ADR Purchasers") -- of which Generic Trading unequivocally has the greatest financial interest by any method of calculation; and (3) foreign purchasers of Ahold common stock on foreign exchanges ("Foreign Purchasers").

Affirming the facts referenced above, COPERA and Generic Trading's application to serve as lead plaintiff in this litigation has earned the support of the following respected institutional investors, all of which have been directly participating in and/or monitoring these proceedings, and all of which have significant financial interests in the successful prosecution of this litigation:

### Lead Plaintiff Movants Supporting COPERA and Generic Trading

- The District of Columbia Retirement Board  ($6.27 million loss)
- The City of Philadelphia Board
  of Pensions and Retirement          ($2.17 million loss)

- Itzehoer Aktien Club GbR          ($1.81 million loss)

### Interested Institutions Supporting COPERA and Generic Trading[1]

- State Retirement and Pension System of Maryland
  (through the Office of the Maryland Attorney General)

- State Universities Retirement System of Illinois

COPERA and Generic Trading respectfully submit that the documented support of each of these institutional investors is compelling evidence that the Domestic Institutions are the most adequate plaintiffs to lead this litigation. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii).[2]

In a self-serving effort to enhance its jurisdictional arguments under the "conduct test" at the risk of compromising the ultimate prosecution of this case, Union AG effectively ignores: (i) Ahold's unprecedented restatement of $24.8 *billion* in revenues from multinational joint ventures with companies in Scandinavia, Brazil, Guatemala, and Argentina; (ii) at least $84.5 million in restatements for "intentional accounting irregularities" from as yet undisclosed locations; (iii) ongoing criminal

---

[1] Only financial information previously certified in these proceedings is included herein. The losses for Maryland and Illinois are also available if the Court so requests.

[2] The other movants include: Union AG and the City of Detroit ("Union AG" or "Union AG Group"); the Central States, Southeast & Southwest Areas Pension Fund ("Central States") and SBA Artenpensmenfondsen ("SBA") (collectively, the "Central States/SBA Group"); and Linda Tsai ("Ms. Tsai"). Ms. Tsai's original co-movant, BWK, has dropped out of the process. Itzehoer Aktien Club Gbr ("Itzehoer") recognizes COPERA and Generic Trading's primacy in this matter.

investigations in the Netherlands, Europe and South America; (iv) the termination or forced resignation of 12 senior officers of Ahold to date; and (v) the "firesale" of many of Ahold's global holdings. Union also strains mightily to ignore its own unique conflicts and other defenses to its service as a lead plaintiff here including: (i) the fact that Union was part-owned during the Class Period by Rabobank (one of Ahold's most active bankers, underwriters and co-managers), DZ Bank and WGZ Bank, both of which also had ties to both Rabobank and Ahold; (ii) Union AG's abject failure to report its ownership of Ahold corporate debt, common stock, options, and convertible securities in its Luxembourg and other subsidiaries; (iii) the numerous other interrelationships between Union AG, its owners at Rabobank, WGZ Bank and, DZ Bank and their respective professionals, and Royal Ahold; and (iv) the likelihood that one or more of these interrelated parties may become a defendant in this case because of their involvement with Royal Ahold.

Union's application thus presents myriad issues and interests atypical and antagonistic to those of the rest of the class. Under the unique circumstances presented here COPERA and Generic Trading respectfully submit that this Court should conclude with respect to Union and Ahold as Judge Harmon did with respect to the FSBA in *Enron*:

> In good conscience this Court cannot endanger this litigation by ignoring the issues created by FSBA's unique involvement with Enron.

*In re Enron Sec. Litig.*, 206 F.R.D. 427, 456 (S.D. Tex. 2002) and just as with FSBA in *Enron*, Union's joint application with another investor does not cure its infirmity. *Id* at 457.

Moreover, although it is axiomatic that a lead plaintiff and class representative must be a member of the class, the Union AG Group and the Central States/SBA Group fail to demonstrate that the Foreign Purchasers will be members of the Class under the developing case law. Since the Foreign Purchasers may not be able to serve as a lead plaintiff even if they can establish subject matter jurisdiction, which is *very* much in doubt, no Foreign Purchaser should be appointed lead plaintiff.

Simply stated, the Foreign Purchasers carry "baggage" that should not be allowed to distract from the

prosecution of this case.

## ARGUMENT

### I.    COPERA AND GENERIC TRADING ARE THE MOST ADEQUATE PLAINTIFFS TO LEAD THIS LITIGATION

#### A.    COPERA and Generic Trading Have The Largest Financial Interest of Any Qualified Movant

COPERA's loss of more than $16.2 million resulting from its Class Period purchases of Ahold

common stock is unquestionably the largest financial interest claimed by any Domestic Purchaser of

such securities, and Generic Trading's loss of more than $1,148,281 in connection with its Class Period

purchases of Ahold ADRs clearly constitutes the largest financial interest claimed by any of the lead

plaintiff applicants that purchased Ahold ADRs.[3]  COPERA and Generic Trading's $17.35 million

financial interest grows to more than $26 million if one considers the losses of the District of Columbia

Retirement Board and City of Philadelphia Board of Pensions and Retirement, and supporting interested

institutional investors, the State Retirement and Pension System of Maryland and Illinois SURS -- all of

whom support COPERA and Generic Trading's application to serve as co-lead plaintiffs in this case.

The Domestic Institutions have the largest financial interest in the relief sought by the Class of any

applicant that *otherwise satisfies the typicality and adequacy requirements of Fed. R. Civ. P. 23* -- which

the Foreign Funds do not.[4]  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *see also In re E.spire Communs., Inc.*

---

[3] A copy of COPERA's Class Period transactions in Ahold common stock with losses calculated on a FIFO basis is attached as Ex. 1 to the Declaration of Andrew J. Entwistle ("Entwistle Declaration"), submitted concurrently herewith. An analysis of COPERA's Class Period losses calculated on a "net/net" basis is attached to the Entwistle Declaration as Ex. 2 and a copy of Generic Trading's Class Period transactions and damages analysis in Ahold ADRs is attached to the Entwistle Declaration as Ex. 3. COPERA and Generic Trading previously submitted to this Court detailed and accurate trading information and calculations pertaining to their respective interests in this litigation based upon their transactions in Ahold securities during the period from March 10, 1998 through February 24, 2003. *See* Exhibits 1 and 12 to the July 16, 2003 Entwistle Declaration.

[4] The Central States/SBA Group's attempt to impugn COPERA and Generic Trading for supposedly applying inconsistent damages calculation methodologies (which they have not) is -- to put it charitably -- ironic given that Central States and SBA have reported their respective putative financial interests to this Court based upon wholly inconsistent computation methods.

*Sec. Litig.*, No. H-00-1140, 2000 U.S. Dist. LEXIS 19517, at *9 (D. Md. Aug. 15, 2000); *Zaltzman v.*

*Manugistics Group, Inc.*, No. S-98-1881, 1998 U.S. Dist. LEXIS 22867, at *11 (D. Md. Oct. 8, 1998).[5]

> **B.    COPERA and Generic Trading Have Carefully Investigated And Developed The Case Against Royal Ahold, Its Officers and Directors, and Deloitte & Touche Over The Past Five Months**

COPERA and Generic Trading's sworn submissions to this Court and to the other courts in

these proceedings demonstrate that COPERA and Generic Trading have sustained a deliberate and

detailed investigation of Ahold's global fraud since the inception of these now consolidated actions.

The Domestic Institutions are well aware that the Sarbanes-Oxley Act of 2002 enabled them to file a

complaint asserting a maximum five-year class period.  However, at the time of the April 28, 2002 filing

of opening lead plaintiff motions in this matter, sufficient facts did not exist to justify extending the

operative class period back to March 10, 1998, *even though doing so would have increased COPERA's*

*original financial interest in this litigation from $10.45 million to $16.20 million – a $5.75 million*

*increase*.  Instead of acting prematurely, COPERA and Generic Trading continue to systemically

investigate Ahold related matters here and abroad to develop facts concerning to the already revealed

fraud, and to investigate and analyze the potential claims against Deloitte & Touche and Ahold's

investment bankers, underwriters and other professionals.

---

Central States presents its putative Class Period financial interest under the "net/net" methodology while it co-movant SBA presents its putative Class Period financial interest based upon the first-in-first-out ("FIFO") methodology.  The foregoing internal contradiction is even more curious in light of the Central States/SBA Group's repeated references to Judge Lee's decision in *In re Cable & Wireless, PLC Sec. Litig.*, Civ. A. No. 02-1860, slip op. (E.D. Va. April 21, 2003) ("*Cable & Wireless*"), a copy of which is attached as Ex. 2 to the July 16, 2003 Entwistle Declaration.  As set forth herein and in the Domestic Institutions' July 16, 2003 Opposition Memorandum, COPERA and Generic Trading believe that Judge Lee's rejection of the FIFO methodology in *Cable & Wireless* is a minority view that this Court should not adopt.  *See* July 16, 2003 Opposition Memorandum at 45-46.  Nevertheless, as discussed in Point III (A) *infra*, even under the "net/net" methodology that the Central States/SBA Group urges this Court to endorse, the Domestic Institutions' financial interest exceeds Central States financial interest and SBA is exposed as an ineligible "net seller."  *See Cable & Wireless*, slip op. at 14.  The Central States/SBA Group's claim that it is impossible to determine the exchange rate that COPERA used to calculate its financial interest is similarly baseless.  The exchange rate that COPERA applied was the rate at which each transaction was made.

[5] Copies of these decisions are attached as Ex. 29 and Ex. 30, respectively, to the July 16, 2003 Entwistle Declaration.

On May 8, 2003, Ahold announced a downward restatement of an additional $380 million extending back to April 2000. COPERA and Generic Trading promptly filed a Joint Amended Complaint in the Southern District of New York extending the operative class period back to April 2000 and naming additional defendants, including Deloitte & Touche Tohmatsu ("Deloitte").[6] Notably, COPERA and Generic Trading were the *only* lead plaintiff applicants to incorporate these new facts into an amended pleading. Similarly, as set forth in the Declaration of COPERA's General Counsel, Gregory Smith, and the Affidavit of Generic Trading's President, Ronald Shear (Exhibits 1 and 12 to the July 16, 2003 Entwistle Declaration, respectively), COPERA and Generic Trading concluded that the Class Period should be extended back to March 10, 1998 when additional information recently became public confirming that Ahold overstated its revenues by $24.8 billion based upon improper accounting for its interests in joint ventures located across the globe, including Scandinavia, Brazil, Guatemala, and Argentina. Dutch prosecutors have confirmed that the July 5, 2003 "raids" on Ahold's headquarters and on three offices of Ahold's Class Period accountants, Deloitte, in the Netherlands are part of the investigation into to Ahold's falsification of financial information in connection with its foreign joint ventures, and are not related to U.S. Foodservice.[7]

The Central States/SBA Group attempts to discredit COPERA's and Generic Trading's insightful and thorough continuing investigation of the facts pertinent to this litigation by claiming that COPERA and Generic Trading did not initially provide financial information for the "correct" (1998-2003) Class Period. To the contrary, the fact that COPERA and Generic Trading waited to extend the Class Period until sufficient facts were developed to justify extending the Class Period back to 1998 evidences the precise leadership that Congress envisioned for lead plaintiffs when it enacted the PSLRA.

---

[6] A copy of COPERA and Generic Trading's Joint Amended Complaint is attached as Ex. 3 to the July 16, 2003 Entwistle Declaration.

[7] *See* Exs. 10 and 11 to the July 16, 2003 Entwistle Declaration and Exs. 18, 19, and 20 to the Entwistle Declaration.

*See, e.g., In re E.spire*, 2000 U.S. Dist. LEXIS 19517, at *8 (Harvey, J.) (Congressional intent in

enacting the PSLRA was to increase the likelihood that institutional investors will actively participate in

the litigation); *Zaltzman v. Manugistics Group, Inc.*, 1998 U.S. Dist. LEXIS 22867, at *13 (D. Md. Oct.

8, 1998) (Smalkin, J.) (Congressional intent in enacting the PSLRA was to "transfer primary control of

private securities litigation from lawyers to investors"') (quoting S. Rep. No. 67, 104th Cong., 1st Sess. 2

(1995), reprinted in 1995 U.S.C.C.A.N. 679, 685). *See also Schulman v. Lumenis, Ltd.*, No. 02 Civ.

1989 (DAB), 2003 U.S. Dist. LEXIS 10348, at *21 (S.D.N.Y. June 18, 2003)[8] (adequacy requirement of

Rule 23 requires that lead plaintiff "ensure vigorous advocacy"); *In re Lucent Techs., Inc. Sec. Litig.*,

221 F. Supp. 2d 472, 487 (D.N.J. 2001).

C.    **COPERA and Generic Trading's Application Is Supported By Sophisticated Domestic and Foreign Institutional Investors With Significant Financial Interests In The Outcome of This Litigation**

The Domestic Institutions possess proven experience in leading, directing, and successfully

resolving the type of complex securities litigation now before this Court. In this regard, COPERA's

service as co-lead plaintiff in *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (CLB) (S.D.N.Y.),

recently resulted in a $300 million recovery for the class, including a $75 million recovery against the

accountants, KPMG LLP. This exemplary service as a fiduciary for a class of investors clearly

demonstrates that COPERA has the experience and dedication required to lead the complex

multinational fraud litigation currently before this Court. For this and related reasons, COPERA and

Generic Trading's lead plaintiff application is supported by the District of Columbia Retirement Board

(a domestic institutional purchaser of Ahold Common Stock with losses of $6.27 million), the City of

Philadelphia Board of Pensions and Retirement (a domestic institutional purchaser of Ahold common.

stock with losses of $2,172,350), the State Retirement and Pension System of Maryland and the State

---

[8] A copy of this decision is attached as Exhibit 22 to the Entwistle Declaration.

Universities Retirement System of Illinois.[9]  Moreover, Itzehoer has conceded COPERA and Generic

Trading's primacy in these proceedings.[10]

In addition to possessing the largest financial interest in the outcome of this litigation and

satisfying the pertinent requirements of Rule 23, COPERA and Generic Trading's documented results

and sworn dedication to work tenaciously and cooperatively to obtain the greatest possible recovery for

the Class render the Domestic Institutions the most adequate plaintiffs under both the PSLRA and the

law of this District.  *See In re E.spire*, 2000 U.S. Dist. LEXIS 19517, at *9; *Zaltzman*, 1998 U.S. Dist.

LEXIS 22867, at *11.  *See also Berger v. Compaq Computer Corp.*, 279 F.3d 313 (5th Cir. 2002)

("Congress enacted the 'lead plaintiff' provisions of the PSLRA, 15 U.S.C. §78u-4(a)(3)(B), to direct

courts to appoint, as lead plaintiff, the most sophisticated investor available and willing so to serve in a

putative securities class action").  None of the competing lead plaintiff submissions in these proceedings

evidence anything approaching COPERA and Generic Trading's demonstrated dedication and

willingness to lead this class action.[11]

### D.    Generic Trading's Claims Are Typical of the Claims of the Class

Generic Trading clearly has the largest financial interest in this litigation among all purchasers of

Ahold ADRs.  Generic Trading is an active and sophisticated securities investor and trader.

Nevertheless competing movants continue to assert meritless arguments against Generic Trading's

---

[9] *See* Declaration of Anthony K. Johnson, Chief Investment Officer, City of Philadelphia Board of Pensions and Retirement, attached as Ex. 13 to the July 16, 2003 Entwistle Declaration; Declaration of Thomas K. Lee, Secretary to the Board of Trustees of the State Retirement and Pension System of Maryland of the Maryland Retirement System, attached as Ex. 14 to the July 16, 2003 Entwistle Declaration; and Declaration of Dan Slack, Esq., General Counsel to Illinois State Universities Retirement System, attached as Ex. 15 to the July 16, 2003 Entwistle Declaration. *See also* Memorandum of the District of Columbia Retirement Board Submitted In Connection With Lead Plaintiff Motions and In Support of Motion of COPERA and Generic Trading of Philadelphia, LLC To Be Appointed Lead Plaintiff; and Declaration of Bruce Gamble, General Counsel of the District of Columbia Retirement Board, submitted therewith on July 16, 2003.

[10] *See* Plaintiff IAC's July 16, 2003 Memorandum In Further Support of Motion For Appointment of Lead Plaintiff and Lead Counsel.

[11] In fact, COPERA's General Counsel, Gregory Smith was the only movant representative to attend the MDL Panel proceedings and he is the only movant representative to date to file a *pro hac vice* motion in this District. *See* Ex. 25 to the Entwistle Declaration.

appointment as a lead plaintiff. In the Domestic Institutions' July 16, 2003 Opposition Memorandum, Generic Trading addressed at length the arguments raised and the cases cited by the Union AG Group and by Ms. Tsai.[12] The Central States/SBA Group now proffers an identically flawed argument.

The Central States/SBA Group's contention that Generic Trading's pattern of transactions in Ahold securities demonstrates that Generic Trading "may be subject to unique defenses . . ." (*See* Central States/SBA July 16, 2003 Opposition Memorandum at 40, 42) evidences a complete lack of candor. The Central States/SBA Group fails to inform this Court that *its own counsel currently represents, as co-lead counsel, an institutional investor, Andover Brokerage LLC that opponents attacked on identical grounds* in connection with a *joint* lead plaintiff application in *In re CMS Energy Sec. Litig.*, Civ. No. 02-CV-72004-DT (E.D. Mich.). Remarkably, in the *CMS Energy* litigation, Milberg Weiss's client made a joint motion with Andover Brokerage LLC to be appointed as lead plaintiffs. As counsel at Milberg Weiss well know, in the *CMS* lead plaintiff proceedings, Judge Steeh rejected the precise argument against Andover Brokerage LLC, that the Central States/SBA Group and their counsel nevertheless now urge this Court to accept against Generic Trading, finding:

> regarding the dispute over whether a trading methodology affects the typicality prong under Fed R. Civ. P. 23, the court is in agreement with Andover/Steiger **that the length of time the shares are held does not affect the typicality of the claims** –*i.e.* its similarity and ability to protect the claim of an individual (or entity) who held the shares for a longer period. **The court is convinced that the claim of a plaintiff who bought and sold in short order will also protect the individual who had a long position in those securities.**[13]

Judge Steeh's decision -- which precisely tracked the arguments that Milberg Weiss and Entwistle & Cappucci successfully made as co-counsel for the co-lead plaintiffs in *CMS* -- was by no

---

[12] *See* July 16, 2003 Opposition Memorandum at 19-22.

[13] *See In re CMS Energy*, Opinion and Order Granting Andover Brokerage and Herbert Steiger's Motion For Appointment as Lead Plaintiffs and Approving Lead Plaintiffs' Selection of Lead and Liaison Counsel, at *7-8 (emphasis added) (a copy of this decision is attached as Ex. 32 to the July 16, 2003 Entwistle Declaration). The arguments Judge Steeh rejected in appointing Andover as a lead plaintiff were advanced by counsel at Bernstein Litowitz and yet they do not mention Judge Steeh's opinion, which rejected their precise arguments they make here.

means unique. For example, in the *Oxford* litigation Judge Brieant soundly rejected virtually the same argument:

> As this Court has previously explained, "where the public market of a quoted security is polluted by false information, or where price, supply and demand are distorted as a result of misleading omissions, all types of investors are injured." *Leist v. Tamco Enterprises, Inc.*, 1982 U.S. Dist. LEXIS 17389, No. 80 Civ. 4439 (CLB).[14] Included among those injured are so-called market makers. As the Supreme Court has stated in quoting this Court, "*it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?*" *Basic Incorporated v. Levinson*, 485 U.S. 224, 245, 99 L.Ed. 2d 194, 108 S.Ct. 978 (Blackmun, J. 1988) (quoting *Schlanger v. Four-Phase Systems, Inc.*, 555 F. Supp. 538 (S.D.N.Y. 1982)).

*Oxford*, 199 F.R.D. at 124 (emphasis added) (further citations omitted).[15] Judge Brieant recognized that all securities trading strategies are premised upon the assumption that the information that a corporate entity disseminates to the public is truthful and accurate. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 124 (S.D.N.Y. 2001). Indeed, it is for this very reason that the United States Supreme Court propounded the fraud-on-the-market doctrine of reliance.[16]

Generic Trading's claims are typical because they are based upon the same conduct and legal theories as all putative Class members' claims (and in particular all ADR purchasers which purchased the only security trading on a domestic exchange), and "arise "from the same event, practice or course of conduct that gives rise to the claims of the class, and is based on the same legal theory." *Zaltzman*, 1998

---

[14] A copy of this decision is attached as Ex. 23 to the Entwistle Declaration.

[15] The Court rendered this decision in the context of a motion for class certification, where it is well-established that Rule 23's adequacy and typicality requirements are more closely scrutinized than during the Court's consideration of competing lead plaintiff applications. *See, e.g. In re E.spire*, 2000 U.S. Dist. LEXIS 19517, at *23-24.

[16] The Supreme Court further noted: "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Basic Inc. v. Levinson*, 485 U. S. 224, 246-47 (1988) *Id.* at 247. This is precisely the point in the post-PSLRA marketplace, where institutional investors engage in myriad trading, investment and allocation strategies to respond to rapidly changing market conditions -- the precise situation that led the Supreme Court to adopt the fraud-on-the-market doctrine as a substitute for actual reliance in the first place. *Id.*

U.S. Dist. LEXIS 22867, at *20-21 (quoting *Smith v. B & O R. Co.*, 473 F. Supp. 572, 581 (D. Md.

1979).[17] Simply stated, the competing movants' arguments against Generic Trading are specious and

are contradicted by numerous recent lead plaintiff appointments pursuant to the PSLRA and Rule 23 of

the Federal Rules of Civil Procedure. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii)(II); *see also In re E.Spire*,

2000 U.S. Dist. LEXIS 19517, at *23.

**II.    THE UNION AG GROUP'S UNIQUE DEFENSES AND CONFLICTS OF INTEREST CONCLUSIVELY DEMONSTRATE THAT IT IS INADEQUATE TO SERVE AS LEAD PLAINTIFF**

The Union AG Group has opted to completely ignore the substantial unique[18] and disqualifying

conflicts of interest, subject matter jurisdiction, and class certification issues, that preclude it from

serving as lead plaintiff including:

- The Union AG Group's numerous documented conflicts of interest arising from the direct and indirect involvement of Union AG's Class Period owners, Rabobank, DZ Bank, and WGZ Bank, with each other and with Royal Ahold as Royal Ahold's bankers, underwriters, co-managers, offering banks, investment bankers, securities analysts, and financial advisors;

- Despite three months of briefing, the Union AG Group's abject failure to submit complete trading information continues. Union provides mere snippets of its holdings/securities trading information, making it impossible for this Court to determine Union AG Group's financial interest in this litigation. In this regard, the Union AG Group fails to *even acknowledge* that it has not included Union Luxembourg's transactions in Ahold securities for any time period in Union AG's certification;

- Significant obstacles that impede this Court's ability to certify a class including Foreign Purchasers because the laws of many foreign countries, including Germany where Union AG is headquartered, will not recognize the preclusive effect of a settlement or judgment rendered in a Rule 23(b)(3) class action in the United States;

- Emerging facts, including Dutch prosecutors' July 5, 2003 "raid" on Ahold's corporate offices in the Netherlands in connection with their criminal investigation of Ahold's

---

[17] In fact, according to courts within this District, appointing Generic Trading would honor Congress' intent in enacting the PSLRA because, "as Congress has noted, 'parties with significant holdings in issuers whose interests are more strongly aligned with the class of shareholders, [are more likely to] participate in the litigation and [to] exercise control over counsel." *In re E.Spire*, 2000 U.S. Dist. LEXIS 19517, at *20 (quoting H.R. Rep. No. 104-369, at 32 (1995), reprinted in 1996 U.S.C.C.A.N. at 731.

[18] As discussed in Section II (B) below, the limited transaction information that the Union AG Group has provided to date indicates that Union AG is most likely a "net seller," and thus *cannot* be appointed lead plaintiff.

fraudulent accounting for *$24.8 billion* in revenues from international joint ventures, which demonstrate that Ahold committed a global fraud orchestrated from the Netherlands and underscore the likelihood that this Court will be unable to exercise subject matter jurisdiction over the Foreign Purchasers' claims under the "conduct test;"

- Union AG's certification is false because, as the Domestic Institutions first identified in briefing before Judge Lee on May 16, 2003, the Union entity proposed as lead plaintiff in this litigation has, in fact, never served as lead plaintiff in a United States securities class action. A different Union entity, Union Investment Privatfonds GmbH, serves as lead plaintiff in the *Merck* litigation; and

- The Union AG Group has not explained how the German entity, Union AG, intends to manage, supervise, and control this litigation in the United States, a jurisdiction in which Union AG's explicit investment policies limit United States investments to 10% of the assets under Union AG's management and provide that "the funds managed by Union Investment *are not for sale in the United States and are not meant for U.S. citizens.*"[19]

The Union AG Group's election to ignore each of the foregoing critical issues underscores its' pervasive lack of candor in these proceedings and conclusively demonstrates that the Union AG Group "will not fairly and adequately protect the interests of the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II)(aa); *see also Switzenbaum v. Orbital Sciences Corp.*, 187 F.R.D. 246, 251 (E.D. Va. 1999) (disqualifying lead plaintiff candidate because "the Group has never been forthcoming about any of these conflicts," it "cannot credibly claim to offer adequate representation to others"); *Zemel Family Trust v. Philips Int'l Realty Corp.*, 205 F.R.D. 434, 437 (S.D.N.Y. 2002) ("Courts may consider the honesty and trustworthiness of the named plaintiff in judging the 'adequacy of representation'") (quoting *Savino v. Computer Credit*, 164 F.3d 81, 87 (2d Cir. 1998)).

### A. The Union AG Group's Failure to Address Its Disabling Conflicts of Interest Requires That Its Motion Be Rejected By the Court

COPERA and Generic Trading's detailed investigation to date reveals that Union AG possesses numerous disabling conflicts of interest and other issues that are atypical and antagonistic to those of the other members of the Class based upon Union AG's Class Period relationships with its owners,

---

[19] *See* Ex. 43 to the July 16, 2003 Entwistle Declaration.

13

Rabobank, DZ Bank, WGZ Bank, their professionals, and other parties. (*See, e.g.,* COPERA and Generic Trading's July 16, 2003 Opposition Memorandum at 33-44 and Exhibits 18-28 to the July 16, 2003 Entwistle Declaration). The Union AG Group seeks to sidestep these issues by characterizing them as "baseless, speculative, and hyperbolic." (*See* Union AG Group July 16, 2003 Opposition Memorandum at 6, 16-17). Union AG offers no proof to refute the actual evidence that COPERA and Generic Trading have provided to the Court, including representations found on Union's various websites and other public sources. The Union AG Group's decision not to even acknowledge, much less address, such conflicts compels the denial of its lead plaintiff application. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii)(II)(aa). *See also Switzenbaum,* 187 F.R.D. at 251.

The fact that COPERA and Generic Trading are so committed to the proper prosecution of this matter that they would attempt to unravel the Ahold-related activities of Union AG, Rabobank, WGZ Bank and DZ Bank in Germany, Luxembourg, Switzerland, the Netherlands and Spain underscores the fact that COPERA and Generic Trading have actively participated in these proceedings in the precise manner that Congress envisioned when it enacted the PSLRA.[20] *See Berger*, 279 F.3d 313 ("Congress enacted the 'lead plaintiff' provisions of the PSLRA, 15 U.S.C. §78u-4(a)(3)(B), to direct courts to appoint, as lead plaintiff, the most sophisticated investor available and willing so to serve in a putative securities class action"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 266 (3d Cir. 2001) *cert. denied, sub. nom. Mark v. Cal Pub. Emple. Ret. Sys.*, 535 U.S. 929 (2002)("the goal of the Reform Act's lead plaintiff provision is to locate a person or entity whose sophistication and interest in the litigation are sufficient to permit that person or entity to serve as an active agent for the class"). *See also In re E.spire*, 2000 U.S. Dist. LEXIS 19517, at \*9; *Zaltzman*, 1998 U.S. Dist. LEXIS 22867, at \*11. Union AG's abject failure to explain, refute, or resolve the numerous documented conflicts that the Union AG

---

[20] A copy of a table listing Rabobank's participation in Ahold Class Period securities offerings is attached as Ex. 5 to the Entwistle Declaration.

Group possesses, serves only to "delay this litigation even more than the procedural requirements of the PSLRA require while additional information is derived . . . to uncover all the facts about the relationships." *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 456 (S.D. Tex. 2002).

Each step of the investigation of Union AG raises new issues. For example, COPERA and Generic Trading have now learned that Rabobank, 5% co-owner of Union AG during the Class Period, was not only one of Ahold's principal bankers, an underwriter and co-manager of various Ahold securities (at least some of which were purchased by Union AG), and an Ahold financial advisor, but also that Rabobank *issued its own* securities *secured by Ahold stock.*[21] Similarly, continuing investigation has revealed additional ties between Rabobank, 19% Union AG owner WGZ Bank, 65% Union owner DZ Bank and Royal Ahold as well as substantial discrepancies between Union's reported Ahold holdings and the information reflected on its certification. Union AG's silence in response to these critical issues is deafening.

COPERA and Generic Trading respectfully submit that there are simply too many unanswered questions regarding the Union AG Group to entrust it to serve as a fiduciary for the Class in this case. *See In re Enron*, 206 F.R.D. at 456 (evidence of conflicts presented through media articles "raises more than mere specter of antagonistic interests.... In good conscience, this Court cannot endanger this litigation by ignoring the issues created by FSBA's unique involvement with Enron").

### B.   The Union AG Group Has Disguised Its True Financial Interest In This Litigation By Providing This Court With Incomplete and Inadequate Trading Information

Union AG's certification fails to fulfill the PSLRA's requirement of setting "forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the Class Period

---

[21] *See* January 21, 2000 prospectus disseminated in connection with an offering of "EUR 50,000,000 9.25% Knock-out Reverse Convertible Notes Due 2002 on ordinary shares Koninklijke Ahold N.V." (the "2002 Note Prospectus"), attached as Exhibit 6 to the Entwistle Declaration. Union AG's suggestion that RaboBank has now sold its interest does not alter the nature of its conduct *during the Class Period*.

specified in the complaint . . . ." 15 U.S.C. §78u-4(a)(2)(A)(iv).  After three months of motion practice in various courts, Union AG still fails to disclose all transactions in Ahold securities in funds managed by at least two of the related Union AG entities. *See* 15 U.S.C. §78u-4(a)(2)(A)(iv); *see also In re MicroStrategy Inc. Secs. Litig.*, 110 F. Supp. 2d 427, 436 (E.D. Va. 2000) (rejecting lead plaintiff candidate for, among other reasons, submitting a "conclusory affidavit" and "indecipherable financial statements").  This defect in the Union AG certification is fatal to its application.

Notably, the only transactions that appear to be reflected on "Union Investment AG's" certification are captioned as being for "Union Investment Privatfonds GmbH" which is Union AG's German fund manager.[22]  No calculations are captioned as being for "Union Investment Luxembourg S.A." or for any of the Union 's other German, Spanish, Polish and Swiss subsidiaries.[23]  The only logical inference to be drawn from Union AG's omission of critical transaction information is that Union AG elected to provide this Court with partial Class Period common stock transactions from select portfolios that suffered losses and <u>ignored</u> the common stock and myriad other Ahold securities Union AG holds in the balance of its managed investment portfolios and families of mutual funds that may have experienced gains -- i.e. "*cherry picking*."    *See* 15 U.S.C. §78u-4(a)(2)(A)(iv).[24]

COPERA and Generic Trading's continuing investigation into this matter confirms that there are additional unexplained gaps in the certification that Union AG submitted to this Court.  To briefly summarize, Union AG's certification reflects *only 4 of the 22 transactions in Ahold common stock that*

---

[22] A copy of Union AG's "Loss Calculations" is attached as Ex. 15 to the Entwistle Declaration.

[23] A chart setting out all of Union AG's subsidiaries is attached as Ex. 25 to the July 16, 2003 Entwistle Declaration.

[24] Union AG also fails to make any disclosure of transactions in any of the entities that manage funds for its institutional clients.  If, after all that is presented here, the Court still believes that Union's motion may be considered, then discovery into the Ahold holdings of each and all of Union's hundreds of managed portfolios will be necessary to determine Union AG's actual losses both for purposes of this PSLRA lead plaintiff proceeding and, if Union AG is selected as a lead plaintiff, defendants will certainly seek the same, if not greater information during class discovery. *See* 15 U.S.C.§78u-4(a)(3)(B)(iv). COPERA and Generic Trading, however, respectfully submit that such discovery -- whether taken in connection with lead plaintiff proceedings or during class discovery -- would unnecessarily "delay this litigation even more than the procedural requirements of the PSLRA require while additional information is derived . . . to uncover all the facts about the relationships." *In re Enron*, 206 F.R.D. at 456.

*are reflected on Bloomberg L.P. from Union AG reports for the periods ending 9/31/02 and 3/31/03 --*

the two reporting periods immediately before and after the close of the Class Period.[25]  The information

available on Bloomberg L.P. further indicates that Union AG's certification omits:

- Additional purchases of 540,949 shares during the 9/31/02 - 3/31/03 period;
- Additional sales of 3,421,486 shares during that period; and
- Post Class Period holdings of 739,693 shares -- rather than the "0 shares remaining" that Union AG report on its certification.[26]

Under such circumstances the Court is simply unable to determine whether Union AG has accurately

presented its financial interest in the outcome of this litigation, as the PSLRA requires.  15 U.S.C. §78u-

4(a)(3)(B)(iii)(II)(aa).[27]

       **C.**      **The Union AG Group Has Failed to Adequately Address the Law and the Facts That Create Significant Doubts Concerning Whether This Court May Exercise Subject Matter Jurisdiction Over the Foreign Purchasers' Claims**

      In their July 16, 2003 Opposition Memorandum, COPERA and Generic Trading set forth

detailed analyses of the impediments that exist for this Court to exercise subject matter jurisdiction over

the Foreign Funds' claims under the "conduct test," pursuant to which federal subject matter jurisdiction

---

[25] Attached to the Entwistle Declaration as Exhibit 8 is a compilation of Union AG transactions in Ahold common stock and other securities based upon information currently available on Bloomberg L.P.  A chart incorporating the trading information listed on Bloomberg L.P. is attached as Ex. 7 to the Entwistle Declaration.  Union Germany and Union Luxembourg report holding and change in position information every six months.  While these reports do not provide direct information on every transaction, they provide a window into the changes in position during the relevant period.  In the four transactions that do match up, the Court will note the uniqueness of the amounts suggesting that Union AG certified information to the Court from certain funds and not others.

[26] Similarly, Union AG failed to report on its certification any of the other purchases and sales of Ahold securities underwritten by RaboBank that it had in its German and Luxembourg portfolios.  We compared the holdings reported for both Union AG entities to the extent available on its website (in German) and created the chart attached to the Entwistle Declaration as Ex. 9.  A review of Union AG publicly available information confirms a portion of the Bloomberg L.P. data, and reveals that Union AG reported on its certification just 6 of 35 Ahold related transactions reflected on its own website reports.  The Union AG authored information that serves as the basis for the foregoing is attached as Exs. 10, 11, 12, and 13 to the Entwistle Declaration.

[27] Compounding this issue is the fact that Union AG also appears to have "cherry picked" the period for which it originally provided information.  By setting the start of the original class period back from 5/15/01 (which was the generally accepted beginning of the Class Period at the time), to 3/6/01, Union AG avoids being cast an ineligible "net seller" under *Cable and Wireless* by including 440,000 purchases that would otherwise have been pre-class period purchasers.  While Union AG's lack of candor in setting forth its other transactions makes it impossible for this court to conclusively make a "net seller," or any other loss-related determination, Union AG's manipulation of the information it does provide is certainly telling.  *See* Exs. 15 and 17 to the Entwistle Declaration.

is appropriate if: (1) the defendants' activities within the United States are more than "merely preparatory" to the fraud; and (2) these activities (or omissions) "directly caused" losses to foreign investors abroad. *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 992 (2d Cir. 1975)(declining to exercise jurisdiction over claims of foreign purchasers on foreign exchanges); *see also Alfadda v. Fenn*, 935 F.2d 475 (2d Cir. 1991).[28] Under *Bersch* and its progeny, the factual analysis in connection with the "conduct test" for subject matter jurisdiction focuses upon the location from which the "gun" was fired, not where it was "made." *Bersch*, 519 F.2d at 987 . Thus, a foreign investor's loss is "directly caused" only if the defendant made actionable misstatements or omissions *within* the United States and such misstatements or omissions are a "substantial" or "significant contributing cause" of the decision to purchase stock. *See Itoba Ltd. v. LEP Group, PLC*, 54 F.3d 118, 122 (2d Cir. 1995).[29]

The Court's ability to exercise subject matter jurisdiction over the Foreign Purchasers claims has been tenuous since the inception of this litigation. It is beyond peradventure that all financial decisions and reporting (i.e. the "firing of the gun" under *Bersch*) occurred in the Netherlands. Over time, additional facts have emerged that now make it clear that the underlying misconduct (i.e., the "manufacture" of the gun) also occurred, in substantial part, abroad.[30] Union fails to even acknowledge, much less analyze, the impact of the ongoing criminal investigations in the Netherlands and Royal Ahold's $24.8 billion overstatement of revenues -- a fraud that *is more than twice the size of the unprecedented WorldCom fraud* -- in its subject matter jurisdiction "analysis." Such a lack of candor is a disqualifying disability here. *See Zemel Family Trust*, 205 F.R.D. at 437.

---

[28] COPERA and Generic Trading respectfully refer the Court to their July 16, 2003 Opposition Memorandum at 22-29 for a detailed discussion of these issues. Because COPERA is a domestic purchaser of Ahold common stock and because Generic Trading is a domestic purchaser of Ahold ADRs trading on the New York Stock Exchange, the claims of the Domestic Institutions clearly satisfy the "effects test," which "only extends jurisdiction as to those American plaintiffs who are affected." *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 11 (D.D.C. 2000) (citing *Bersch*, 519 F.2d at 988-89.

[29] While the Central States/SBA Group at least acknowledges the substantial challenges that the facts of Ahold's global fraud present to exercising subject matter jurisdiction over the claims of Foreign Purchasers of Ahold securities on foreign exchanges, the Union AG Group blithely ignores this threshold question.

[30] *See* Ex. 7 to the July 16, 2003 Entwistle Declaration and Exs. 18, 19, and 20 to the Entwistle Declaration.

Similarly, the Union AG Group fails to recognize that while the Fourth Circuit has not yet decided a case applying the "conduct test" for subject matter jurisdiction, other courts have adopted and followed the "conduct test" as articulated in *Bersch*. *See, e.g., Robinson v. TCI/U.S. West Communs.*,117 F.3d 900, 906 (5th Cir. 1997) (holding that the Second Circuit standard is the better view because of a presumption that legislation is "meant to apply only within the territorial jurisdiction of the United States") (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)); *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 667 (7th Cir. 1998) ("the Second and Fifth Circuit's iterations of the test embody a satisfactory balance between these competing considerations"). Moreover, the D.C. Circuit Court has adopted an even more stringent articulation of the Second Circuit's "conduct test." *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 33 (D.C. Cir. 1987) ("jurisdiction is appropriate when the fraudulent statements or misrepresentations originate in the United States, are made with *scienter* in connection with the purchase or sale of securities, and 'directly cause' the harm to those who claim to be defrauded….") (citation omitted).

Instead, the Union AG Group blithely argues that "the case law is clear." In support, Union points to a twenty-five year old Third Circuit decision (*SEC v. Kasser*, 548 F.2d 109, 114 (3d Cir. 1977)), and a twenty-year-old Ninth Circuit's decision (*Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir. 1983)) (*see* Union AG Group July 16, 2003 Opposition Memorandum at 11-12) -- both of which have been rejected by those Circuit Courts considering the issue during the last few years, including the Seventh Circuit's 1998 decision in *Kauthar* which specifically rejected the Third, Eighth, and Ninth

Circuit's articulations of the conduct test. *Kauthar*, 149 F.3d at 666.[31] Moreover, even a case that the

Union AG Group attempts to cite in support of its skewed presentation of the law warns that:

> the Third Circuit has not addressed whether the principles announced in
> *Kasser* would support jurisdiction under the entirely different factual
> scenario presented here – *class claims brought by foreign investors who
> purchased securities on a foreign exchange stemming from allegedly
> fraudulent misrepresentations made by foreign defendants primarily in a
> foreign country.*

*Tri-Star Farms Ltd. v. Marconi, PLC,* 225 F. Supp. 2d 567, 577 (W.D. Pa 2002) (holding that the Third

Circuit's decision in *Kasser* did not support a finding of subject matter jurisdiction) (emphasis added).

Thus, even applying the law that the Union AG Group urges upon this Court will likely lead to a finding

that subject matter jurisdiction does not exist.[32]

### D.   The Union AG Group Has Failed to Address the Substantial Impediments That Exist to Certifying a Class That Includes Foreign Purchasers

It is axiomatic that a lead plaintiff must be a "member or members of the purported plaintiff

class." 15 U.S.C. §78u-4(a)(3)(B)(i). *See Laborers Local 1298 Pension Fund v. Campbell Soup Co.,*

No. 00-152 (JEI), 2000 U.S. Dist. LEXIS 5481, at *4-5 (D.N.J. 2000).[33] ("A lead plaintiff must be a

member of the purported class"). *See also East Tex. Motor Freight Sys., v. Rodriguez*, 431 U.S. 395,

403 (1977) ("class representative must be part of the class") (citations omitted). There is significant

---

[31] Most recently, in *Froese v. Staff*, No. 02-CV-5744 (RO), Slip Op at 3. (S.D.N.Y. July 3, 2003), Judge Owen found that the court did not have subject matter jurisdiction over the claims of foreign plaintiffs who purchased securities on a foreign exchange because:

> the fraud itself occurred, if at all, when the allegedly fraudulent statements were
> conceived, engineered, and published in Germany. It is these misstatements and not any
> activity which lead to the alleged misrepresentations which 'directly caused' the financial
> losses.

*Froese v. Staff*, No. 02-CV-5744 (RO), Slip Op at 3. (S.D.N.Y. July 3, 2003). A copy of this decision and order is attached as Ex. 21 to the Entwistle Declaration.

[32] The Union AG Group's attempt to cite Judge Lee's decision in *Cable & Wireless* as support is perplexing given that Judge Lee explicitly acknowledged that a foreign investor who purchased shares on a foreign exchange "is subject to several unique defenses, particularly lack of subject matter jurisdiction and *forum non conveniens.*" *Cable & Wireless*, slip op. at 10. It is for this reason that Judge Lee appointed a *separate movant*, an ADR purchaser, as co-lead lead plaintiff. The City of Detroit cannot cure Union AG's numerous defects because "the purpose in grouping lead plaintiffs is not to balance out each other's deficiencies." *In re Enron*, 206 F.R.D. at 457 .

[33] A copy of this decision is attached as Ex. 24 to the Entwistle Declaration.

doubt concerning whether this Court can certify a class including Foreign Purchasers of foreign securities on a foreign exchange for settlement or for trial. *See In re DaimlerChrysler Sec. Litig.*, No. 00-993 (JJF) slip op. at 21(excluding foreign investors from the class);[34] *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 450 (S.D.N.Y. 2000) (excluding foreign investors from the class). Indeed, if this Court determines that it cannot certify a class consisting of foreign persons and entities that purchased Ahold securities on a foreign exchange, *then no Foreign Fund can serve as lead plaintiff*. In such a situation courts have recognized that they:

> Cannot in good conscience appoint a lead plaintiff group that . . . jeopardizes the finality of class certification. Not only would this contravene the letter of the Reform Act's lead plaintiff requirements (must comply with Rule 23), but it would frustrate the purpose behind certifying a class.

*In re Century Bus Servs., Sec. Litig.*, 202 F.R.D. 532, 539 (N.D. Ohio 2001).

In the Fourth Circuit, "the burden of meeting Rule 23 requirements falls upon the party seeking certification." *Miller v. Balt. Gas & Elec. Co.*, 202 F.R.D. 195, 201 (D. Md. 2001 (Blake, J.) (citing *Int'l Woodworkers Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981). The Union AG Group, however, has not even attempted to make a *prima facie* showing of how it will meet this burden. The Union AG Group's failure to acknowledge that is may not be a member of a certifiable class, together with their abject mischaracterization of the court's decision in the *DaimlerChrysler* (described below), demonstrates that Union AG "will not fairly and adequately protect the interests of the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II)(aa).

Lacking any substantive response to the palpable impediments to certification of a class that includes foreign purchasers,[35] the Union AG Group asks this Court to accept its transparent

---

[34] *See* Ex. 16 to the July 16, 2003 Entwistle Declaration.

[35] Certainly, these arguments came as no surprise to the Union AG Group, as they were set forth in COPERA and Generic Trading's opposition memorandum that was filed with Judge Davis "on May 9, 2003." Union AG July 16, 2003 Opposition Memorandum at 5 n. 8.

mischaracterization of the class certification decision in the *DaimlerChrysler* securities litigation. *See* Union AG Group July 16, 2003 Opposition Memorandum at 3 (wromgly claiming that Judge Farnan declined to include foreign purchasers in the class "because lead plaintiff did not include a foreign representative"). Even under the most liberal reading of Judge Farnan's decsion, the Union AG Group's characterization is grossly untenable.[36]

Recognizing "practical difficulties" which according to Judge Farnan, include "a significant likelihood that foreign courts will not recognize and enforce a United States judgment, and therefore, defendants may be subject to multiple and potentially inconsistent judgments in foreign countries," the *Daimler* Court excluded foreign investors from the class. *In re DaimlerChrysler*, at slip op. at 20.[37] The *Daimler* Court's observation in dicta that "[c]ourts have also recognized the value of foreign class representatives in representing foreign stockholders" cannot credibly be read to suggest -- particularly in light of Judge Farnan's holding to the contrary -- that the mere presence of a foreign class representative could talismanically change the applicable law in Germany or the notice requirements of the Hague Convention that the Court recognized as constituting "a significant likelihood that foreign courts will not recognize and enforce a United States judgment." *Id.*[38]

[36] The fact that the Union AG Group's counsel, Bernstein Litowitz Berger & Grossman, serves as *Daimler* co-lead counsel with Entwistle & Cappucci LLP (counsel to the State of Florida in *Daimler* and COPERA here) and Barrack Rodos & Bacine (counsel to supporting movant the District of Columbia here and to the Denver Employees Retirement Plan and two Chicago-based public pension funds in *Daimler*) makes the Union AG Group's self-serving mischaracterization of the *Daimler* decision even more surprising.

[37] *See* Ex. 16 to the July 16, 2003 Entwistle Declaration.

[38] Moreover, the facts that the court considered in *Krangel v. Golden Rule Res., Inc.*, 194 F.R.D. 501, 506 (E.D. Pa. 2000) are easily distinguishable from those presented here. The proposed class in *Krangel* involved "a number of Canadian members," but the court recognized that "the inclusion of the named Canadian plaintiff allows the court to *exercise jurisdiction over these class members.*" *Id.* Notably, the securities at issue traded on the Toronto Stock Exchange, and unlike the law in Germany, the law of the Canadian Province of Ontario expressly recognizes opt out class actions. Civil Proceedings Act, 1992, R.S.O. S.O. 1992, c.6, S.9 (Can.) (Attached as Ex. 42 to the July 16, 2003 Entwistle Declaration). Thus, the Canadian plaintiffs in that case may be bound by a Rule 23 settlement or judgment, unlike the Foreign Funds at issue here, which reside in jurisdictions that do not recognize the preclusive effect of opt out classes.

### III.    THE CENTRAL STATES/SBA GROUP IS INADEQUATE TO SERVE AS LEAD PLAINTIFF

The Central States/SBA Group acknowledges both the jurisdictional and the Rule 23 infirmities that infect all Foreign Purchasers in this case. This acknowledgment of these two issues by the Central States/SBA Croup -- itself a Foreign Purchaser -- underscores both the patently untenable nature of Union AG's arguments on these issues and the unsuitability of any Foreign Purchaser to act as a lead plaintiff in connection with the prosecution of this matter. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(bb).

### A.    Central States Does Not Possess the Largest Financial Interest Among the Domestic Purchasers[39]

Applying the FIFO methodology applied by SBA, COPERA (even without considering the additional losses of the movants and non-movants supporting its application) has losses of $16,207,923, and Central States claims to have losses of $7,973,308.[40] Under a net/net calculation, COPERA has losses of $10,476,165,[41] which is approximately $2.5 million greater than Central States' putative financial interest (and almost double its interest if the conflict laden U.S. Foodservice acquisition related shares are backed out of the Central States calculation). Because it lacks the largest financial interest in this litigation under *any* calculation methodology -- for any category of purchasers, much less all applicants -- Central States is ineligible to serve as lead plaintiff for the Domestic Purchasers or the

---

[39] Neither Central States nor SBA purchased ADRs and thus may not serve as a lead plaintiff or class representative for purchasers of those securities.

[40] Central States includes in its calculation 161,000 Ahold shares that it received in exchange for U.S. Foodservice shares it owned when Ahold acquired U.S. Foodservice in April 2000. *See* Ex. 4 to the Entwistle Declaration. Central States allocates a loss of $2,657,924.65 to the U.S. Foodservice acquisition and related shares. The inclusion of shares received in exchange for U.S. Foodservice shares present several unique defenses. First, since we now know that Ahold has taken a substantial charge for pre-acquisition fraudulent conduct at U.S. Foodservice, it is clear that U.S. Foodservice holders -- like Central States -- received Ahold shares of greater value than their U.S. Foodservice holdings which were inflated by the underlying U.S. Foodservice fraud. Second, as a result, all of the $2,657,924.65 in losses that Central States allocates to its U.S. Foodservice related Ahold shares is substantially in question and thus is not properly included in any damages calculation. Under such circumstances Central States claimed losses of $7,973,308 should be reduced by $2,657,924.65 to *$5,315,383.* Third and lastly, the acquisition related shares are not open market purchases and thus present additional unique defenses (including reliance issues and the fact that proof of U.S. Foodservice pre-acquisition fraud, while in the interests of the class, could impact the value of these shares).

[41] *See* Exhibit 2 to the Entwistle Declaration. This calculation does not include losses on shares held after the Class Period, which are properly included under the PSLRA.

23

Class as a whole. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(bb). *See also In re USEC Sec. Litig.*, 168 F.

Supp. 2d 560, 565 (D. Md. 2001); *In re E.Spire*, 2000 U.S. Dist. LEXIS 19517, at **22-23.

### B. SBA Is An Ineligible "Net Seller" That Also Suffers From Unique Defenses That Prevent It From Serving As A Lead Plaintiff

The Central States/SBA Group urges -- on no fewer than four separate occasions on brief -- that

a "*complete and consistent*" (emphasis added) approach to damages is necessary. (*See, e.g.*, The Central

States/SBA Group's July 16, 2003 Opposition Memorandum at pages 6, 10, 13, 19.) Nevertheless, the

Central States/SBA Group itself urges two completely inconsistent damages calculation methodologies

upon the Court -- the "net/net" methodology for Central States and the FIFO approach for co-movant

SBA -- all while contending that COPERA should *not* have used the same FIFO approach as SBA.[42]

The Central States/SBA Group's wholly inconsistent arguments are nothing more than a transparent

effort to avoid conceding that under any approach, SBA is an ineligible "net seller" and Central States

does not have the greatest financial interest. *See In re Cable & Wireless*, slip op. at 14.[43]

---

[42] We note that applying the Central States "net/net" approach to Union AG's numbers for the original May 15, 2001 to February 24, 2003 Class Period reveals that they are a net seller for that period and results in a reduction in their damages to $13,554,049. *See* Entwistle Declaration Exs. 16 and 17.

[43] In the unlikely event the Court believes that the Foreign Funds require separate representation, then we respectfully submit that the Court should appoint COPERA for the Domestic Purchasers, Generic Trading for the ADR Purchasers and the Foreign Fund that the Court determines to be the most adequate under the PSLRA for the Foreign Purchasers. COPERA and Generic Trading continue to believe that bifurcation and/or separate subclasses are not warranted here. *See, e.g., In re Microstrategy*, 110 F. Supp. 2d at 440 (to the extent that a subclass - or classes represented by separate counsel are required for the proper administration of this litigation and representation of the members of the class, that issue may be addressed at a later stage pursuant to Rule 23, Fed. R. Civ. P."). Nevertheless, if the Court appoints separate lead plaintiffs then it may, should appoint separate lead counsel. *See, e.g., In re USEC Sec. Litig.*, 168 F. Supp.2d at 568 (noting that "the PSLRA does not restrict lead counsel to one law firm" and that "there are certain instances in which a class is well served by having two or more firms combine to direct the litigation") (citation omitted).

## CONCLUSION

COPERA and Generic Trading have the largest financial interest in the outcome of this litigation of all lead plaintiff applicants that are not subject to unique defenses that render them inadequate to represent the interests of the Class. COPERA and Generic Trading, therefore, respectfully request that this Court, confirm COPERA and Generic Trading as Lead Plaintiffs, and further request that this Court appoint their selected attorneys, Entwistle & Cappucci, as Lead Counsel (together with Adelberg, Rudow, Dorf & Hendler as local / liaison counsel) to prosecute this significant litigation on behalf of the Class.

Dated: July 28, 2003

Respectfully submitted,
/s/

Andrew Radding, Esq. (Bar No. 00195)
Gregory M. Kline, Esq. (Bar No. 14363)
**ADELBERG, RUDOW, DORF &**
**HENDLER, LLC**
600 Mercantile Bank & Trust Building
2 Hopkins Plaza
Baltimore, MD 21201
(410) 539-5195

*Local Counsel for Plaintiffs Public Employees'*
*Retirement Association of Colorado and Generic*
*Trading of Philadelphia, LLC, and Proposed*
*Liaison Counsel*

Andrew J. Entwistle, Esq. (AE-6513)
Stephen D. Oestreich, Esq. (SO-8933)
Asuncion Cummings Hostin, Esq. (Bar No.24008)
Robert N. Cappucci, Esq. (RC-2193)
Johnston de F. Whitman, Jr., Esq. (JW-5781)
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 14th Floor
New York, NY 10171
(212) 894-7200

*Attorneys for Plaintiffs Public Employees'*
*Retirement Association of Colorado and Generic*
*Trading of Philadelphia, LLC, and Proposed Lead*
*Counsel*

25

## CERTIFICATE OF SERVICE

I, Tanya Daly, hereby certify that I caused a true and correct copy of the foregoing

Memorandum and accompanying Declaration of Andrew J. Entwistle to be served upon

all involved parties by electronic filing or by mailing a copy of the same, first class,

postage prepaid, to all counsel of record.


Date:  July 28, 2003


_____/s/_____
Tanya Daly