UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC. SECURITIES LITIGATION | Master File No. 07 Civ. 9901 (SHS) **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

**Page No.**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.    SIVs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        1.    Non-Prime Market Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2.    Leveraged Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        3.    Auction Rate Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        4.    Alt-A RMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        5.    Solvency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        6.    Improper Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        7.    Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    A.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    C.    Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

EFFICIENT MARKET ALLEGATIONS:  FRAUD ON THE MARKET DOCTRINE . . . . . . 20

CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.    CDOs:  THE MARKET, THE INSTRUMENTS AND CITIGROUP'S
    ACTIVITIES IN IT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.    What CDOs Are . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    B.    Citigroup's CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
        1.    Citigroup's CDO Exposures: Overview and Categorization . . . . . . . . . 42
            a.    Plaintiffs' Investigation and Conclusions . . . . . . . . . . . . . . . . . . 47
            b.    Timeline: Citigroup's CDO Operations and Scheme . . . . . . . . 52
        2.    Citigroup's Commercial Paper CDOs . . . . . . . . . . . . . . . . . . . . . . . . 55
        3.    Citigroup's Mezzanine CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
        4.    Citigroup's High Grade CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
        5.    Citigroup's Hedged CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

II.    CDOs:  WHAT THE MARKETPLACE KNEW AND BELIEVED . . . . . . . . . . . . . 83
    A.    The Housing Price Bubble and The Nonprime Mortgages Originated
        Under Bubble Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
    B.    The Bubble Bursts in Early 2006 and Housing Prices Fall . . . . . . . . . . . . . . 103
    C.    Refinancing Becomes Impossible and a Wave of Nonprime

Defaults Inevitable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
    1.    The Mid-2006 Spike in Early Payment Defaults Leads Some
        Mortgage Originators to Collapse and Leads All Mortgage
        Originators to Tighten Lending Standards . . . . . . . . . . . . . . . . . . . . . . . 119
    2.    Mortgage Origination Standards Further Constrict Under New
        Regulatory Guidance on Mortgage Lending in September 2006
        and February 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
    3.    The Final Collapse in Early 2007: Subprime Originators are
        Rendered Extinct, Lending Standards Constrict Severely, and the
        Possibility of Nonprime Refinancing Ends . . . . . . . . . . . . . . . . . . . . . . 139
D.    What The Marketplace Knew and Believed . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
    1.    The Market Understood, Correctly, That CDOs Would be Devastated
        by Nonprime Mortgage Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
        a.    Late 2006: Recognition Emerges . . . . . . . . . . . . . . . . . . . . . . . . 150
        b.    February 2007 - March 2007: Market Consensus Solidifies . . . 159
    2.    The Market Believed, Incorrectly, that Banks Such as Citigroup Had
        Sold Off the CDOs They Had Underwritten and Would Thus Be Spared
        from CDO Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172
    3.    Citigroup Knew Best Just How Precarious Its CDOs Were . . . . . . . . 175
        a.    Losses Climb the Securitization Ladder from Mortgage to
            RMBS to CDO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
        b.    Citigroup's Degraded "High Grade" CDOs . . . . . . . . . . . . . . . 179
        c.    Citigroup Structured its CDOs so that They Could Only Work
            Under Boom Scenarios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179
        d.    Citigroup Structured its CDOs By "Assuming" that
            Underlying Assets Were Not Highly Correlated, When in
            Fact the Underlying Assets Were Largely Identical and
            Exposed in the Same Way to the Same Degree to the
            Same Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186
E.    Inside the CDO Market - February to June 2007: Loss and Despair . . . . . . . . . 194
    1.    UBS – March 2007: UBS Conducts Experiment to Find Price at
        Which Subprime-Backed Securities Actually Can Be Sold – And
        Learns that Market Value of Subprime-Backed Securities is Only
        50 Cents on the Dollar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
    2.    Merrill Lynch: Merrill Tries to Conceal Its CDO Exposures
        Through "Parking" Schemes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195
    3.    Bear Stearns – March 2007 through June 2007: the CDO-Invested
        BSAM Hedge Funds Undergo a Private Crisis and Then a Public
        Implosion, Resulting in Investor Losses of 100% . . . . . . . . . . . . . . . . 196

III.    CDOs: STRATAGEMS, CONTROLS AND DISCLOSURES . . . . . . . . . . . . . . . . . . 198
    A.    Schemes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198
        1.    Citigroup's Commercial Paper CDO "Sales": How to Make $25 Billion

of Subprime Exposures and Risks (Appear to) Disappear . . . . . . . . . . . 198

    a.    Further Schemes:  How to Make Returning Subprime Exposures and Risks (Appear to) Disappear *Again* . . . . . . . . . . . . . . . . . . . 205

  2.    Citigroup's CDO Ponzi Schemes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

    a.    Case Study 1:  Citigroup's Tallships Funding CDO and Citigroup's Participation in Everquest Financial . . . . . . . . . . . 208

    b.    Case Study 2:  Citigroup's "High Grade" Bonifacius CDO  . . . 213

    c.    Case Study 3:  Citigroup's Degradation of its "High Grade" CDOs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

  3.    The Continuation and Culmination of the Ponzi Scheme: Citigroup's Falsely Hedged CDOs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

    a.    Case Study 4: The Ponzi Scheme Continues in and Culminates With the Hedged CDOs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

    b.    Citigroup's False Claim to Have Obtained Insurance Against Loss Via its Hedged CDO Transactions  . . . . . . . . . . . . . . . . . . 223

B.    Controls  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

  1.    Operational Risk:  Defendants Misrepresent the Independence and Rigor of Citigroup's Risk Management and Control Functions  . . . . . . 227

  2.    Credit Risk and Market Risk:  "We Had a Market-Risk Lens Looking at Those Products, Not the Credit-Risk Lens Looking at Those Products" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

  3.    Stress Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

  4.    Red Flags:  AIG, Concerned About Subprime and U.S. Housing Prices, Stops Insuring Super Senior Tranches of ABS CDOs in Early 2006  . . 242

  5.    Red Flags:  Citigroup's Failure to Sell Any of the Tens of Billions of Dollars of Super Senior CDO Tranches that it Produced During 2004-2007 Was a Risk Management "Red Flag"  . . . . . . . . . . . . . . . . 243

  6.    Red Flags – The Risk/Reward Imbalance: In Order to Support Hundreds of Millions of Dollars of Annual Underwriting Fees, Citigroup Was Amassing Tens of Billions of Dollars of Subprime Risk  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

  7.    Red Flags:  Citigroup's Commercial Paper CDO Scheme Was Premised on Citigroup's Willingness to Take On $25 Billion of Subprime Risk for Lower-Than-Market Payments for Such Risk  . . . . . . . . . . . . . . . . 245

C.    Disclosures, Misrepresentations, Omissions  . . . . . . . . . . . . . . . . . . . . . . . . . . 245

  1.    Citigroup's Disclosures Were Materially False and Misleading, Omitted Material Information, Precluded Any Independent Assessment of Citigroup's Exposure to Potential Risks, and Precluded Understanding that Any Material Subprime CDO Risks Existed At All . . . . . . . . . . . 245

    a.    What Citigroup Said Throughout the Class Period Until November 4, 2007  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 247

    b.    Securitizations and Variable Interest Entities  . . . . . . . . . . . . . 249

    c.    CDOs Were Presented as Distinct From Mortgage Securitizations

iv

and "Mortgage-Related Transactions" . . . . . . . . . . . . . . . . . . . . . 252

d.     Citigroup Presented its Mortgage Securitizations as Transactions
That Transferred to Others the Risk of Any Credit Losses from those
Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

e.     Citigroup Presented its CDOs as Instruments that Contained
Diverse Assets to Diversify Risk (rather than as Instruments
that Contained Correlated Assets and Concentrated Risk) . . . . 254

f.     Citigroup Represented Its Role with Respect to CDOs as
One of "Limited Continuing Involvement" After Citigroup's
Initial Warehousing, Structuring and Underwriting Activities . 255

g.     Citigroup's Disclosure of Aggregate CDO Assets Said Nothing
At All As to Citigroup's Actual Interest in Those Assets
(i.e., the Retained Super Seniors) . . . . . . . . . . . . . . . . . . . . . . . . 257

h.     Citigroup's Reliance on Hypothetical Phrasing Masked
Actual Operations and Risk Exposures . . . . . . . . . . . . . . . . . . . 258

2.     Citigroup's Fundamental Misrepresentation of its CDO Operations . . . 260

3.     Citigroup's Financial Statements Understated and Misrepresented
Citigroup's Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

a.     Citigroup Omitted to Disclose the Material Risk
Concentration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

b.     Citigroup Understated Value at Risk and "Risk Capital" . . . . . 263

c.     Citigroup Overstated "Return on Risk" . . . . . . . . . . . . . . . . . . . 267

4.     Citigroup's Financial Statements Materially Overstated the Fair Value
of Citigroup's Super Seniors, and Defendants Ignored Numerous,
Observable, Relevant Indicators that the Fair Value
Was Substantially Impaired . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

5.     Citigroup's November 2007 Disclosures and Valuations Were *Still*
False and Misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

a.     Defendants' November 5, 2007 Explanations Were Not Credible
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

b.     Defendants' November 5, 2007 Valuations and Writedowns
Were Not Credible, and Overstated the Value of Citigroup's
CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278

c.     Defendants' Later, Larger Writedowns Finally Brought Citigroup's
CDO Valuations in Line with Evident, Observable Market
Realities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

6.     Citigroup's Pre-November 2007 Super Senior Valuations Were
Simplistic, Solipsistic and Reckless Reliance on Credit Ratings –
*Despite the Fact that the CDO Prospectuses Authored by Citigroup
Stated That Such Ratings Were Not Reliable Indicators of CDO
Value* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

a.     Reliance on Ratings for Valuation Was Invalid Because it Was
Long Clear that the Ratings Were No Longer Valid . . . . . . . . . 282

        b.     Citigroup's Reliance on Credit Ratings for Valuation Invalid Because Citigroup Itself Warned Investors in its CDOs Not to Rely on Credit Ratings for Valuation . . . . . . . . . . . . . . . . . . . . 284

        c.     Citigroup's Reliance on Credit Ratings for Valuation Invalid Because More Timely and Accurate Valuation Information Was Readily Available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

    7.    Citigroup's CDO Valuation Methods, Pre-April 2008, Were Without Basis and Contradicted Citigroup's Stated CDO Valuation Principles . 287

IV.    STRUCTURED INVESTMENT VEHICLES ("SIVs") . . . . . . . . . . . . . . . . . . . . . . . . 288

    A.    SIVs: What They Did, Why They Existed, and What Their Risks Were . . . . . 290

    B.    Citigroup's SIVs: Schemes, Omissions, Misrepresentations and False Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

        1.    SIV Risks Materialize . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

        2     Citigroup SIV Exposures Are Revealed . . . . . . . . . . . . . . . . . . . . . . . 304

        3.    Citigroup SIV Exposures Had Been Concealed, Omitted and Misrepresented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 312

V.    CITIGROUP / CITIMORTGAGE'S MORTGAGE UNDERWRITING AND MORTGAGE PORTFOLIO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

    A.    CITIGROUP, DURING THE CLASS PERIOD, HARMFULLY AND INCREASINGLY EXPANDED ITS AMASSMENT OF TOXIC HOME LOANS WHICH WERE GENERATED BY LAX OR NON-CONTROLLED UNDERWRITING AND AS TO WHICH IT, ON A SYSTEMIC BASIS, LACKADAISICALLY ENFORCED ITS RIGHTS . . . . . . . . . . . . . . . . . . . . . 326

        1.    General Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

        2.    Citigroup's Massive Illusory Growth in Mortgage Market Share from 2005 to 2007 Was Only Achieved by the Company's Deliberate Expansion into the Subprime Market and Reliance on Risky Correspondent Channel Loans; Unbeknownst to the Public, as Early as Mid-2006, Citigroup Was Aware of Significant, Actual Impairments to the Value of These Risky Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328

            a.     In Late Summer of 2005, Citigroup Began Consolidating Its Mortgage Operations, Readying Itself to Expand Its Mortgage Origination Business and Become One of the Largest Mortgage Originators in the U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328

            b.     Citigroup Also Expanded Its Offering of Other High Risk Loans Such as High Loan-to-Value HELOC Loans that, Unbeknownst to the Public, Became Seriously Impaired by No Later Than Mid-2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

            c.     Citigroup Increasingly Relied on Loans Generated by Its Correspondent Channel to Build and Sustain Mortgage Origination

Market Share Growth, and Consistent with the Elevated Risk Inherent in These Loans, Citigroup's Correspondent Loans, Unbeknownst to the Public, Became Significantly Impaired in as Early as 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

    d.    Citigroup, Unbeknownst to the Public, Also Added to Its Heightened Risk Exposure of Poor Quality Loans by Loosening Its Lending Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335

3.    Citigroup's Own Filings in Lawsuits Against its Multiple Correspondent and Warehouse Lenders Evidences its Class Period Knowledge of the Widespread Fraud and Delinquencies Plaguing the Subprime Loan Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

    a.    Citigroup, During the Class Period, Experienced  A Multitude of Various Dramatic Problems Involving Many of its Correspondent Channel Loan Originators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

        i.    Citigroup Recklessly Failed to Implement Meaningful Underwriting Standards and Recklessly Failed to Conduct Quality Control Audits or Reviews of the Correspondent Loans It Was Buying, Contributing to the Vast and Publicly Undisclosed Accumulation of Actually Impaired Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

        ii.    Unbeknownst to the Public, As Early As Mid-2006, Citigroup's Mortgages Were Increasingly Experiencing First and Early Payment Defaults – Strong Indicators of Borrower Fraud – As Evidenced in Citigroup's Actions Filed Against Certain Correspondent Lenders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

        iii.    Citigroup Failed to Implement Basic Compliance Procedures to Detect and Prevent Owner Occupancy Fraud or Misrepresentation . . . . . . . . . . . . . . . . . . . . . . 343

        iv.    Citigroup Recklessly Purchased Loans That Failed to Comply with Fannie Mae Underwriting Guidelines . . . 344

        v.    Citigroup's Representative Action Against Silver State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 344

        vi.    Citigroup's Representative Action Against Certified Home Loans of Florida . . . . . . . . . . . . . . . . . . . . . . . . . 347

        vii.    Citigroup's Representative Action Against Accredited Home Lenders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350

    b.    Citigroup Was Alerted, As Early As Mid-2006, of the Disastrous Performance of Stale Loans Sitting in the Warehouse Facilities of First Collateral Services, Citigroup's Warehouse Lender . . . . . . . . . . . . . . . . . . . . . . . . . 354

        i.    First Collateral's Warehouse Lending Business . . . . . . 354

        ii.    First Collateral's Accumulation of Stale Loans Were a

Key Indicator of Problems and Significant Deterioration
in the Mortgage Market . . . . . . . . . . . . . . . . . . . . . . . . . 356

B.   CITIGROUP KNOWINGLY ISSUED FALSE AND MISLEADING STATEMENTS
REGARDING THE QUALITY OF ITS MORTGAGE LOAN
PORTFOLIO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 361

1.   Citigroup, Notwithstanding its Knowledge That Significant Portions
of its Portfolio Were Greatly Becoming Impaired, Issued Numerous
False Statements Touting its Loan Portfolio Quality as Well as its
Overall Financial Success, Misleading Investors into Believing
That Citigroup's Purported Financial Growth from 2005-2007 Was
Based Firmly in the Origination of Sound Mortgages . . . . . . . . . . . . . 361

a.   July 31, 2006 *American Banker* Magazine Article . . . . . . . . . 361

b.   November 15, 2006 Merrill Lynch Banking and Financial
Services Investor Conference Presentation . . . . . . . . . . . . . . . . 362

c.   December 2006 *Mortgage Banking* Magazine Article ("CitiMortgage
on the Move") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363

d.   Sept. 12, 2007 Lehman Conference Brothers Financial Services
Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366

2.   Citigroup Issued Materially False and Misleading Financial Statements
That, in Violation of Gaap, Inflated Earnings by Materially Understating
its Loan Loss Reserves and Failing to Disclose Material Weaknesses
in Internal Controls over its Loan Underwriting Practices and
Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

a.   General Accounting Principles Relating to Loan Loss
Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 372

b.   Citigroup's Violations of the Relevant Accounting
Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 375

3.   As Citigroup Knowingly Used its Own Deficient Loans as the Base
Collateral for its Initial Rmbs Securitizations, Citigroup's Failure to
Disclose its Massive Retention of Virtually Worthless Rmbs and
Cdo Securities Was a Knowing, Fraudulent Omission . . . . . . . . . . . . 383

4.   Citigroup's 2008 Reform of its Lending Practices Confirm That
Their Loan Underwriting Was Fundamentally Flawed and
Materially Risky . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385

5.   Citigroup Suffers Severe Credit Losses in 2008 as a Result
of its Risky Lending Practices, Necessitating an Unprecedented
$301 Billion Federal Bailout . . . . . . . . . . . . . . . . . . . . . . . . . . . 387

VI.  LEVERAGED LOANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391

A.   Background on leveraged loans and CLOs . . . . . . . . . . . . . . . . . . . . . . . . 393

B.   Citigroup's leveraged-loan and CLO machine . . . . . . . . . . . . . . . . . . . . . . 396

C.   CLOs ramp up demand for leveraged loans . . . . . . . . . . . . . . . . . . . . . . . . . 397

D.   Negative basis trades increase gains/risks . . . . . . . . . . . . . . . . . . . . . . . . 397

E.  Synthetics, CLO collateral baskets, and market value deals fuel the fire, increase the risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 398

F.  Citigroup's  false statements and omissions concerning its leveraged loan commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

G.  Citigroup's write-downs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

VII. AUCTION RATE SECURITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

A.  Citigroup Continues to Issue and Accumulate ARS Even as the ARS Market Threatens to Collapse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 409

B.  The ARS Market Collapses and Citigroup Is Left Holding the Bag . . . . . . . . 411

C.  Citigroup Fails to Timely Disclose its Massive and Risky ARS Exposures . . . 411

D.  The Magnitude of Citigroup's ARS Holdings is Disclosed . . . . . . . . . . . . . . . 411

E.  The Market Learns that Citigroup's ARS Assets Were Materially Overvalued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

F.  Citigroup Knew That Its ARS Assets Were Growing and Becoming Riskier . . 414

VIII. ALT-A RMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 416

A.  A Description of Alt-A RMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417

B.  The Risks Posed By ALT-A RMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417

C.  The Market Learns of Accelerating Losses in Alt-A RMBS . . . . . . . . . . . . . . 418

D.  Citigroup Fails to Disclose Its Massive Alt-A RMBS Holdings . . . . . . . . . . . 420

E.  Citigroup Finally Reveals $22 Billion in Alt-A RMBS Exposure But Materially Understates the Extent of Losses Stemming From These Assets . . . 421

F.  Citigroup's $80 Billion Accounting Gambit Hints at the True Extent of the Company's Alt-A RMBS Losses; Stock Losses Result . . . . . . . . . . . . . 422

G.  The November 23, 2008 Government Bailout Confirms the Market's Dire Assessment of Citigroup's Alt-A RMBS Valuations . . . . . . . . . . . . . . . . 423

IX.   SOLVENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

X.   DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 436

A.  Overview of GAAP Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 436

B.  GAAP Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 437

C.  Citigroup Failed to Disclose a Concentration of Credit Risk From CDOs, Loans and Financing Transactions With Direct Subprime Exposure . . . . . . . . . . . . . . . 447

D.  Citigroup Failed to Consolidate its Commercial Paper CDOs . . . . . . . . . . . . 441

E.  Citigroup Overstated The Fair Value of its CDOs With Direct Subprime Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 443

F.  Citigroup Failed to Consolidate its SIVs on its Balance Sheet . . . . . . . . . . . . 449

G.  Citigroup Overstated the Fair Value of its Total Assets and Stockholders' Equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 451

XI.    SCIENTER:   CITIGROUP'S   OWN   ACTIONS   FURTHER   DEMONSTRATE
       CITIGROUP'S SCIENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 455
       A.    *Ab Initio*: As A Structurer of RMBS and CDO Securitizations, Citigroup
             Knew Exactly The Assumptions Used to Structure These Instruments,
             and Thus Knew, as the Boom Ended, that Its CDOs Would Go Bust . . . . . . . . 455
       B.    Late 2006 and Early 2007:  Citigroup's Collaboration with BSAM and the
             BSAM Funds Demonstrate Citigroup's Awareness that CDO Risks were
             Increasing and CDO Values were Decreasing . . . . . . . . . . . . . . . . . . . . . . . . . 456
       C.    January 2007: Citigroup Recognizes that the Subprime Mortgages Originated
             During 2006 Are the "Worst Vintage in Subprime History" . . . . . . . . . . . . . . 467
       D.    February 2007: Citigroup's Purchase of Risk Insurance Reflects Scienter  . . . . 467
       E.    February 2007:  Citigroup's Foraois Scheme Evidences Citigroup's Awareness
             of its Exposure to $25 Billion of Commercial Paper CDO Super Seniors  . . . . 458
       F.    March 2007:  Citigroup's Quantitative Credit Strategy and Analysis Group's
             Report Demonstrates Citigroup's Understanding and Awareness that Even
             Super Senior CDO Tranches Were Already Impaired and Were at Risk of
             Severe Downgrades and Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 459
       G.    March 2007:  Citigroup's March 2007 Credit Conference in Monaco
             Demonstrates Its Awareness of Subprime's Risks, Their Correlated
             Concentration in CDOs, and the Likelihood of Loss for Those Exposed to
             those Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 462
       H.    March 2007:  Citigroup's Collateral Demands on New Century Financial,
             and Citigroup's Withdrawal of its Warehouse Credit Line, Demonstrate
             Citigroup's Awareness of the Devaluation of Subprime Mortgage Assets  . . . . 464
       I.     April 2007:  Citigroup's Insertion of New, Detailed Subprime "Risk Factors"
             in Citigroup's CDO Prospectuses Demonstrates Citigroup's Awareness of The
             Exact Subprime Risks for CDOs At Issue Here  . . . . . . . . . . . . . . . . . . . . . . . 465
       J.     July 2007: The Introduction of Daily Risk Exposure Sessions Reflects
             *Scienter*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 471
       K.    July 2007:  Citigroup's Role in the July 2007 Collapse of the Basis Capital
             Hedge Funds Evidences Citigroup's Awareness of the Collapse in Value
             of CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 472
       L.    Citigroup's Firing of its CDO, Investment Banking and Risk Management
             Executives Further Supports an Inference of Scienter . . . . . . . . . . . . . . . . . . . . 475
       M.    The Accounts Provided by Confidential Witnesses Further Demonstrate
             Scienter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 477
       N.    Citigroup's  ATD Acquisition Supports An Inference of Scienter . . . . . . . . . . 478
       O.    Motive: The Particular Acuity of the "Operating Leverage" Problem for
             Citigroup and Defendants, and Defendants' Turn to CDOs As the Purported
             Solution to Their Problem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 479
             1.    Citigroup's Two Tasks: Improve Controls and Generate Operating
                   Leverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 479
             2.    Defendants' Solution to Their Operating Leverage Problem: Release

Risk Controls on Citigroup's Investment Bank Division, Expand
CDO Operations, and Thereby Generate the Revenue Needed for
Operating Leverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 486

P.    Motive: Insider Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 492

XII.   LOSS CAUSATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 501

CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 529
COUNT I:
Violation of § 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 530
COUNT II:
Violation of § 20(a) of The Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . 532

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 534

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 535

Plaintiffs, by and through their undersigned counsel, on behalf of themselves and a class of investors (the "class") who acquired Citigroup Inc. ("Citigroup") common stock during the period beginning January 1, 2004 through and including January 15, 2009 (the "class period"), allege the following for their class action complaint (the "complaint") for violations of the Securities Exchange Act of 1934 ("Exchange Act"). These allegations are based on personal knowledge as to plaintiffs' own acts, and are based upon information and belief as to all other matters alleged herein.

Plaintiffs' information and belief is based upon, *inter alia*, the investigation by counsel into the facts and circumstances alleged herein including without limitation review and analysis of: (1) press releases, public statements, news articles and other publications disseminated by or concerning Citigroup and the other defendants named herein; (2) Citigroup's analyst conference calls and conference presentations, and corresponding transcripts thereof; (3) the filings that Citigroup and related parties made with the Securities and Exchange Commission (the "SEC"), the London Stock Exchange ("LSE"), and the Irish Financial Services Regulatory Authority; (4) securities analysts' reports concerning Citigroup and its operations; (5) analyses, presentations, reports and other published materials, concerning Collateralized Debt Obligations ("CDOs"), Residential Mortgage-Backed Securities ("RMBS"), Structured Investment Vehicles ("SIVs"), and the U.S. mortgage markets authored, *inter alia*, by investment banks, credit rating agencies, expert market practitioners, academic experts, and various governmental/regulatory organizations; (6) Congressional testimony concerning CDOs, RMBS, SIVs and the U.S. mortgage markets; and (7) interviews with dozens of former employees of Citigroup and its operating subsidiaries. Many additional facts supporting the allegations herein are known only to the defendants and/or are within their exclusive custody and control. Plaintiffs believe that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## INTRODUCTION

1.      This complaint concerns Citigroup's practices with respect to mortgages and mortgage-related securities, including principally a class of securities known as Collateralized Debt Obligations, or "CDOs".  The complaint also concerns Citigroup's practices with respect to auction rate securities, leveraged loans, and special investment vehicles ("SIVs").  This action does not complain of lack of foresight.  It does not depend at all on Citigroup's poor investment decisions. The complaint arises because Citigroup responded to the widely-known financial crisis by concealing both the extent of its ownership of toxic assets – most prominently, CDOs backed by nonprime mortgages – and the risks associated with them.  Defendants omitted to disclose the existence or acknowledge the market value of or risks associated with tens of billions of dollars of financial instruments.  In addition to the conventional failures of disclosure, Citigroup concealed the true facts by the use of shamelessly fraudulent schemes that had the effect of creating the false impressions that sales had been made when they had not been, and that risks had been eliminated, spread or hedged when they had not been.

2.      During the class period, Citigroup's public statements and financial statements created an impression of a state of financial affairs that differed materially from what actually existed.  During the class period, Citigroup issued a stream of false positives – revenue growth, earnings growth, improved returns on capital and returns on risk, and strong capitalization ratios speaking to the company's fundamental financial condition.  Citigroup knew, concealed or distorted these representations by concealing or distorting its possession of these securities, their associated values, and risks.  How did defendants accomplish this?

2

A.    CDOs

3.    The CDOs in question were collateralized by nonprime mortgages.  Section I.A of the complaint demonstrates what these CDOs were and how they worked.  Section I.B details Citigroup's CDOs and CDO operations.  Citigroup during the class period underwrote in excess of $70 billion of such instruments, but, unbeknownst to the market, had retained approximately $57 billion of the very CDO securities it underwrote.

4.    Section II demonstrates that the risks of these instruments and the impairment in their value became both apparent and widely known between late 2006 and February/March 2007.  As Section II also demonstrates, the sole matter not known, outside Citigroup, was the extent of the exposure that Citigroup had with respect to these increasingly risky and decreasingly valuable securities.  The market believed that Citigroup had escaped exposure by selling off these instruments into the wider capital markets.  Why?

5.    As Section III demonstrates, Citigroup concealed, misrepresented, and brazenly schemed to obscure the material, fundamental realities of the CDO holdings it possessed, the risks those holdings presented, and the severe and growing impairment those holdings were experiencing.  To emphasize:  the risks of these securities had long been known, but the extent to which Citigroup was exposed to them was a secret that Citigroup kept.

6.    Citigroup first disclosed $46 billion of its CDO holdings in November 2007 simultaneously with their estimated writedown of $8 to $11 billion.  The deterioration in these securities' value had occurred long before; and even in November 2007 was substantially and demonstrably greater than defendants acknowledged.  In January 2008, defendants revealed a further $11 billion of CDO exposures and increased the actual writedown to $18 billion.  In the ensuing

3

months, Citigroup wrote down its CDOs by a further $13 billion, for total write downs in excess of $31 billion.

7.      Plaintiffs' complaint is replete with direct evidence and supporting indirect inferences establishing that throughout the class period and no later than the fourth quarter of 2006 Citigroup knew its CDO holdings were unmarketable.  Citigroup concocted a scheme whereby it repackaged many of these investments into other freshly-baked vehicles to avoid incurring a loss. With respect to many of these unsaleable positions, Citigroup was, remarkably, both the seller and the buyer.  At a minimum, Citigroup clearly ignored the deterioration of the CDO market beginning in the fourth quarter of 2006, and Citigroup's inaction or actions with respect to these CDO positions constituted extraordinarily reckless indifference.

8.      Sections IV through VIII detail like misrepresented realities with respect to different (but related) classes of instruments:  Section IV -- Structured Investment Vehicles, or SIVs; Section V -- nonprime mortgages held in Citigroup's loan portfolios and loan warehouse; Section VI -- leveraged corporate loans; Section VII – Auction rate securities, or ARS; Section VIII – Alt A residential mortgage backed securities.

**B.      SIVs**

9.      Citigroup misrepresented and concealed its exposure to SIVs.  Citigroup was the world's largest sponsor of SIVs, with such assets approaching $100 billion.  These off-balance sheet entities were ticking time bombs that eventually exploded back on to Citigroup's balance sheet. With respect to its SIV operations, Citigroup provided back-stop guarantees that these largely short-term funded vehicles would roll over.  However, Citigroup omitted to disclose that it had retained this risk.  As a consequence of its undisclosed part in insuring roll-overs, Citigroup per force

4

came into possession of instruments of questionable marketability and overstated value.  This practice required billions of dollars of write offs.

### 1.   Non-Prime Market Exposure

10.   Citigroup, through its primary mortgage subsidiary, CitiMortgage, aggressively expanded into the subprime and Alt-A mortgage market from the fall of 2005 through the summer of 2007.  As detailed herein, CitiMortgage recklessly purchased billions of dollars worth of deficient loans from recidivist correspondent lenders, brokers and subprime lenders.  These high-risk loans suffered alarming default rates as well as startling loss severity.  Beyond causing losses at Citigroup's consumer division, they also proceeded to infect Citigroup's balance sheet RMBS and CDO positions. By the third quarter of 2006 Citigroup was aware of these problems, including the severe problems its correspondent and warehouse lenders were experiencing.  Court filings, including filings by Citigroup and its subsidiaries, in lawsuits against various correspondent lenders and warehouse lenders, confirm Citigroup's knowledge.

### 2.   Leveraged Loans

11.   At the same time, Citigroup was increasing its investments in the secondary market for leveraged loans.  This market, like the subprime mortgage market, was driven by investors' demand for the higher yield of risky lending.  Here, Citigroup had the added motivation to finance these loans because the Company's investment bankers earned exorbitant fees from arranging these loans, structuring their securitization, and advising on the corporate deals they financed.

### 3. Auction Rate Securities

12.    Unbeknownst to Citigroup's investors, the market for auction rate securities began to deteriorate during 2007.  Despite Citigroup's first hand knowledge of the impending market collapse, the Company bought billions of dollars worth of auction rate securities in an ill-fated attempt to prop up demand for its ARS underwriting business.  Citigroup would did not disclose its ownership of billions in these illiquid deteriorating assets until long after they had been accumulated, and months after it had become obvious that ARS could not be sold at face value.  Recently disclosed internal emails confirm that senior Citigroup management was aware of the unprecedented buildup in these increasingly risky assets, and recently released details of the November 23, 2008 government bailout confirm that Citigroup's previous valuations of its ARS had been materially inadequate.

### 4. Alt-A RMBS

13.    Even after Citigroup belatedly admitted the amount of its direct exposure subprime-backed CDOs, it failed to disclose the magnitude of its closely related direct exposure to billions in risky Alt-A residential mortgage backed securities (Alt-A RMBS).  These Alt-A securities were largely originated by Citigroup in 2006 and 2007 – a time in which "Alt-A" loans were widely recognized to have been made with poor mortgage underwriting standards.  Its exposure to Alt-A RMBS was not disclosed by Citigroup until well into 2008.  Once Citigroup admitted to the massive size of its Alt-A RMBS portfolio writedowns of this troubled asset class were materially understated and inexplicably delayed, dribbled out quarter by quarter.  Not until details of the November 23, 2008 government bailout were released on January 16, 2009, was it confirmed that the assets continued to be materially overvalued.

### 5.    Solvency

14.    The massive losses incurred by Citigroup on the above described asset classes from late 2007 through 2008 had so battered Citigroup's balance sheet that it threatened the very ability of the Company to continue as a going concern.  Yet defendants repeatedly assured the market that Citigroup was adequately capitalized.  Mere days after its latest pronouncements of financial strength, Citigroup, then on the brink of insolvency, reached an eleventh hour agreement with the federal government, which offered to guarantee more than $300 billion of the Company's toxic assets.  Recently disclosed information confirms that it is the very asset classes described above that were subject to this extraordinary measure.  Section IX describes defendants misrepresentations concerning Citigroup's continued solvency, and how the government bailout disclosed the truth that the Company was on the verge of insolvency.

### 6.    Improper Accounting

15.    Citigroup's efforts to conceal its losses and delay the revelation of its alarming positions were complemented by Citigroup's improper accounting practices.  Section X describes these practices.  Rather than disclose the truth regarding its nonprime-related assets with respect to the valuation of its CDO positions and its exposure to losses in the subprime and nonprime market, Citigroup resorted to accounting manipulations in violation of Generally Accepted Accounting Principles ("GAAP").  Instead of utilizing objective, available and evident criteria to mark its positions, Citigroup used inflated, unreliable and unsupportable marks to keep its CDO-related quasi-Ponzi scheme alive and to give the appearance of a healthy asset base.  While Citigroup was an active participant in the denouement of the subprime market – Citigroup forced a margin call on New Century Financial in March of 2007 – Citigroup ignored these factors so that it may value its

7

assets in an inflated manner and avoid write-offs in assuming that the subprime market was satisfactory for accounting purposes.

    **7.**  **Impact**

    16.  By misrepresentations and omissions of what amounted to more than two years of income and an entire significant line of business, Citigroup artificially manipulated and inflated its stock prices throughout the class period.  Citigroup's illegal actions caused its stock price to trade in a range of $42.56 to  $56.41 per share for most of the Class Period.  Disclosure, beginning in the fourth quarter of 2007, caused the stock to drop from $47.89 to $2.80 per share at the close of January 20, 2009.  These disclosures placed Citigroup in serious danger of insolvency, a danger that was averted only through a $300 billion dollar emergency Government bailout.  That rescue was required to save Citigroup from the very securities, assets and exposures that are the subject of this complaint.  By January of 2009, it had become clear that not even this unprecedented bailout could not guarantee Citigroup's continued solvency.

**JURISDICTION AND VENUE**

    17.  This action arises under Sections 10(b), 20(a) and 20A of the Exchange Act, as amended, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a), 78t-1(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

    18.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

    19.  Venue is proper in this District pursuant to § 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Citigroup maintains its corporate headquarters in this District and many of the acts and omissions alleged herein, including the preparation and dissemination of materially false

8

and misleading information, occurred in substantial part in this District.

      20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, internet communications and the facilities of the New York Stock Exchange.

## PARTIES

**A.    Plaintiffs**

      21.     Lead Plaintiff ATD Group comprises certain former employees and/or directors of Automated Trading Desk, Inc., Jonathan Butler, M. David Diamond, David K. Whitcomb both individually and as trustee for the David K. Whitcomb 2001 Trust, and Henrietta C. Whitcomb as trustee for the Henrietta C. Whitcomb 2001 Trust.  Group members acquired Citigroup shares at a price inflated by the fraud alleged herein (as reflected in sworn certifications previously filed with the court) and in reliance on publicly available false and misleading statements and omissions complained of and have been injured thereby.  Like all class members, members of the ATD Group seek to recover damages incurred by the acquisition of artificially inflated Citigroup securities.

      22.     John A. Baden, III purchased Citigroup common stock on the open market during the Class Period,  as reflected in the sworn certification previously filed with this Court, at a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants.

      23.     Warren Pinchuck purchased Citigroup common stock on the open market during the Class Period, as reflected in the sworn certification previously filed with this Court, at a

price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants.

24.     Anthony Sedutto purchased Citigroup common stock on the open market during the Class Period, as reflected in the sworn certification previously filed with this Court, at a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants.

25.     Edward Claus purchased Citigroup common stock on the open market during the Class Period, as reflected in the sworn certification previously filed with this Court, at a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants.

26.     Carol Weil purchased Citigroup common stock on the open market during the Class Period, as reflected in the sworn certification previously filed with this Court, at a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants.

27.     Joseph DiBenedetto purchased 50,000 shares of Citigroup common stock on the open market on May 1, 2008, at $26.00 per share, a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants.

**B.     Defendants**

28.     Defendant Citigroup is a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries. The Company was incorporated in 1988 under the laws of the state of Delaware, and its

principal executive offices are located in New York, New York. Citigroup's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "C." As of December 31, 2006, the Company had approximately 144,000 employees within the United States and 183,000 employees outside of the United States. Citigroup, as of December 31, 2006, was organized into five segments, the Global Consumer Group, Corporate and Investment Banking ("CIB"), Global Wealth Management ("GWM"), Alternative Investments, and Corporate/Other.

29.     The Global Consumer Group provides a wide array of banking, lending, insurance, and investment services through a network of over 8,000 branches and over 18,000 ATMs, and serves over 200 million customer accounts, providing products and services to meet the financial needs of both individuals and small businesses. Citigroup's U.S. Consumer Lending division, which provides home mortgages and home equity loans to prime and non-prime customers, auto financing to non-prime consumers and educational loans to students, is a part of its Global Consumer Group.   The U.S. Consumer Lending division's loans are originated throughout the United States and Canada through the Citibank, CitiFinancial and Smith Barney branch networks, Primerica Financial Services agents, third-party brokers, direct mail, the Internet and telesales. Loans are also purchased in the wholesale markets.  U.S. Consumer Lending also provides mortgage servicing to a portfolio of mortgage loans owned by third parties.  Revenues are comprised of loan fees, net interest revenue and mortgage servicing fees.  According to the Company's respective Form 10-Ks, Citigroup's U.S. Consumer division, of which U.S. Consumer Lending was a large part, had $17.51 billion in net interest revenue in 2005, $16.712 billion in net interest revenue in 2006, and $17.480 billion in net interest revenue in 2007.

30.     CIB provides corporations, governments, institutions, and investors in

11

approximately 100 countries with a broad range of financial products and services. Capital Markets and Banking, a part of CIB, provides a wide array of investment and commercial banking services and products, including investment banking and advisory services, debt and equity trading, institutional brokerage, foreign exchange, structured products, derivatives, and lending. Capital Markets and Banking generates revenue primarily from fees for investment banking and advisory services, fees and spreads on structured products, foreign exchange and derivatives, fees and interest on loans, and income earned on principal transactions. According to the Company's respective Form 10-Ks, the CIB division had $21.786 billion in revenues, net of interest expense, in 2004, $23.863 billion in 2005, $27.187 billion in 2006, and $10.522 billion in 2007.

31.     Citigroup GWM is comprised of the Smith Barney Private Client businesses (including Citigroup Wealth Advisors outside the United States), Citigroup Private Bank, and Citigroup Investment Research.

32.     Alternative Investments manages capital on behalf of Citigroup, as well as for third-party institutional and high-net-worth individuals. Alternative Investments manages a wide range of products including private equity, hedge funds, real estate, structured products and managed futures. According to the Company's respective Form 10-Ks, AI had $1.703 billion in revenues, net of interest expense, in 2004, $3.430 billion in 2005, $2.901 billion in 2006, and $2.103 billion in 2007.

**C.     Individual Defendants**

33.     Defendant Charles Prince ("Prince") has been a Citigroup (or predecessor company) employee since 1979. He served as Chief Executive Officer of Citigroup from October 2003 and Chairman of the Board of Directors from April 2006 until he was forced to resign on

November 5, 2007. He retired from employment with Citigroup effective December 31, 2007. Prior to serving as CEO and Chairman, Prince was the Chairman and Chief Executive Officer of the Global Corporate and Investment Bank from September 8, 2002 until October 2003 and Citigroup's Chief Operating Officer from 2001 to 2002. During the Class Period, Defendant Prince served on the Executive Committee of the Board of Directors in 2004, 2005, and 2006. Prince received salary and bonus of $10,673,333 in 2004, $13,000,000 in 2005, $14,200,000 in 2006, and $11,400,958 in 2007.

34.     During the Class Period, Defendant Prince sold approximately 508,306 shares of Citigroup common stock for proceeds of approximately $25,716,471.11, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Prince.

35.     Defendant Prince signed and certified the accuracy of Citigroup's financial statements on Forms 10-Q and 10-K for the first three quarters and full year 2004, the first three quarters and full year 2005, the first three quarters and full year 2006, and the first three quarters of 2007.

36.     Defendant Robert Rubin ("Rubin") has been a Director of Citigroup and Chairman of the Executive Committee since 1999. Following Defendant Prince's departure, Rubin was named Chairman of the Board of Directors. Rubin received salary and bonus of $9,400,000 in 2004, $9,400,000 in 2005, and $9,400,000 in 2006.

37.     Defendant Lewis Kaden ("Kaden") joined Citigroup in September 2005 as Vice Chairman and Chief Administrative Officer, positions he continued to hold through the end of

the Class Period. Kaden is responsible for audit and risk review at Citigroup as well as being a member of Citigroup's Executive Committee. For 2007, Defendant Kaden received salary and bonus of $4,500,000.

38.     Defendant Sallie L. Krawcheck ("Krawcheck") was Citigroup's Chief Financial Officer ("CFO") from 2004 until March 2007, when Krawcheck became the Chairman and CEO of Citigroup's Global Wealth Management Division. Krawcheck joined Citigroup on October 30, 2002 as Chairman and Chief Executive Officer of Smith Barney. Following the end of the Class Period, Defendant Krawcheck was forced to resign from Citigroup. Defendant Krawcheck received salary and bonus of $5,780,000 in 2005, $6,320,000 in 2006, and $3,410,000 in 2007.

39.     During the Class Period, Defendant Krawcheck sold approximately 59,013 shares of Citigroup common stock for proceeds of approximately $3,149,506.93, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Krawcheck.

40.     Defendant Krawcheck signed and certified the accuracy of Citigroup's financial statements on Forms 10-Q and 10-K for the full year 2004, the first three quarters and full year 2005, and the first three quarters and full year 2006.

41.     Defendant Gary Crittenden ("Crittenden") replaced Defendant Krawcheck as Chief Financial Officer on March 12, 2007. As Chief Financial Officer, Crittenden is responsible for the financial management of the Company. He is a member of Citigroup's Senior Leadership and Executive Committees. In 2007, Crittenden received salary and bonus of $14,433,410.

42.     Defendant Crittenden signed and certified the accuracy of Citigroup's

14

financial statements on Forms 10-Q and 10-K for the first three quarters and full year 2007 and the first quarter of 2008.

43.     Defendant Steven Freiberg ("Freiberg") is Chief Executive Officer of the Global Card division of Citigroup, formerly the Global Consumer Group. Freiberg is directly responsible for the North American cards business and during the class period, as Chairman and Chief Executive Officer of the Global Consumer Group Freiberg's responsibilities included consumer lending (mortgage, auto, and student loans).

44.     Defendant Robert Druskin ("Druskin") was the President of Citi Markets and Banking until December 2006, and the CEO of that business segment until May 2007. From December 2006 until his retirement in December 2007, Defendant Druskin was Citigroup's Chief Operating Officer ("COO") and a member of the Office of the Chairman. As a member of the Office of Chairman, the heads of all Citigroup's businesses reported to Defendant Druskin. As COO, Defendant Druskin supervised all of Citigroup's businesses. Defendant Druskin was also a member of Citigroup's Business Heads, Operating and Management Committees. Accordingly, Defendant Druskin had direct involvement in the daily affairs of Citigroup during the Class Period. Previously, from August 2002 to December 2003, Druskin had been the President and Chief Operating Officer of Citigroup's Corporate and Investment Banking division and had served as Chief Executive Officer of that division from December 2003 to December 2006. Defendant Druskin received salary and bonus of $5,360,000 in 2004, $7,100,000 in 2005, and $8,600,000 in 2006.

45.     During the Class Period, Defendant Druskin sold approximately 618,932 shares of Citigroup common stock for proceeds of approximately $31,988,422.42, while privy to material, non-public information, which had not been disclosed to the investing public, including

Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Druskin.

46.     Defendant Todd S. Thomson ("Thomson") was Citigroup's CFO until 2004 when he became the CEO of Global Wealth Management. Defendant Thomson left the Company in January 2007 to "pursue other interests." Thomson signed the following documents that the Company filed with the SEC during the Class Period, which contained materially false and misleading statements and/or omissions of material facts: the First Quarter 2004 10-Q; the Second Quarter 2004 10-Q; the Third Quarter 2004 10-Q; and the 2003 10-K.

47.     During Class Period, Defendant Thomson sold approximately 508,306 shares of Citigroup common stock for proceeds of approximately $25,716,471.11, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Thomson.

48.     Defendant Thomas G. Maheras ("Maheras") was the co-President of Citi Markets & Banking from January 2007 and co-Chairman and co-CEO of Citi Markets & Banking from May 2007 until his resignation in October 2007. From 2004 through his resignation, Defendant Maheras was also the CEO of Global Capital Markets, a division of Citi Markets & Banking. Citi Markets & Banking is the business segment that arranged the CDOs and other risky subprime off-balance-sheet VIEs. Notably, the $55 billion in sub-prime direct exposure that led to Citigroup's massive $8 to $11 billion write-down was in Maheras' business segment. Because of his high-level positions, Defendant Maheras was directly involved in the everyday business of Citigroup. During the Class Period, Defendant Maheras participated in the drafting, preparation and/or approval of

16

misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

49.     Defendant Maheras sold approximately 23,946 shares of Citigroup common stock on July 13, 2007 for proceeds of approximately $1,266,257.76, while privy to material, nonpublic information, which had not been disclosed to the investing public, including, but not limited to, the fact that billions of dollars of commercial paper was being returned to Citigroup as a result of Liquidity Puts issued by Defendant Maheras' business segment.

50.     Defendant Michael Stuart Klein ("Klein") has been the co-President of Citi Markets & Banking since January 2007 and co-Chairman and co-CEO of Citi Markets & Banking since May 2007. From 2004, Defendant Klein was the CEO of Global Banking, a division of Citi Markets & Banking. Notably, the $55 billion in sub-prime direct exposure that led to Citigroup's massive $8 to $11 billion write-down was in Klein's business segment. Defendant Klein is also a member of Citigroup's Business Heads, Operating and Management Committees. Because of his high-level positions, Defendant Klein was directly involved in the daily affairs of Citigroup.  During the Class Period, Defendant Klein participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

51.     Defendant Klein sold approximately 19,282 shares of Citigroup common stock on July 17, 2007 for proceeds of approximately $1,006,327.58, while privy to material, non-public information, which had not been disclosed to the investing public, including, but not limited to, the fact that billions of dollars of commercial paper was being returned to Citigroup as a result of Liquidity Puts issued by Defendant Klein's business segment.

17

52.     Defendant David C. Bushnell ("Bushnell") was Citigroup's Senior Risk Officer from December 2003, and Citigroup's Chief Administrative Officer ("CAO") from September 2007 until his retirement in December 2007. Defendant Bushnell was also a member of Citigroup's Business Heads, Operating and Management Committees. As Citigroup's Senior Risk Officer, Defendant Bushnell was responsible for managing market, credit and operational risk and for regulatory compliance at the Company. As Citigroup's CAO, Defendant Bushnell was responsible for the Human Resources, Legal, Security and Investigative Services, and Compliance functions for the entire Company. Accordingly, Defendant Bushnell had direct involvement in the daily affairs of Citigroup during the Class Period. During the Class Period, Defendant Bushnell participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

53.     Defendant Bushnell sold approximately 244,843 shares of Citigroup common stock during the Class Period for proceeds of approximately $12,345,172.68, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Bushnell.

54.     Defendant John C. Gerspach ("Gerspach") has been the Company's Chief Accounting Officer and Controller since March 2005. Prior to that time, Defendant Gerspach was the CFO of Citigroup Latin America from July 2003 until March 2005, and CAO of Citigroup Latin America from April 2002 until March 2005. Defendant Gerspach is also a member of Citigroup's Management Committee.

55.     Gerspach signed the following documents that the Company filed with the

18

SEC during the Class Period, which contained materially false and misleading statements and/or omissions of material facts: the First Quarter 2005 1O-Q; the Second Quarter 2005 10-Q; the Third Quarter 2005 10-Q; the First Quarter 2006 1O-Q; the Second Quarter 2006 10-Q; the Third Quarter 2006 10-Q; the First Quarter 2007 10-Q; the Second Quarter 2007 10-Q; the Third Quarter 2007 10-Q; the 2005 10-K; and the 2006 10-K.

56.     Defendant Gerspach sold approximately 97,813 shares of Citigroup common stock during the Class Period for proceeds of approximately $5,000,275.06, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Gerspach.

57.     Defendant Stephen R. Volk ("Volk") has been Citigroup's Vice Chairman and Senior Advisor at Citi Markets & Banking since 2004. Defendant Volk is also a member of Citigroup's Business Heads, Operating and Management Committees. Because of his positions, Defendant Volk had direct involvement in the daily affairs of Company. During the Class Period, Defendant Volk participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

58.     During the Class Period, Defendant Volk sold approximately 79,193 shares of Citigroup common stock for proceeds of approximately $4,003,161.83, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Volk.

19

59.     Defendant Vikram Pandit ("Pandit") was appointed Citigroup's Chief Executive Officer on December 11, 2007 following Defendant Prince's forced resignation. Previous to his appointment, Pandit was Chairman and CEO of Citigroup's Institutional Clients Group, which includes Markets & Banking and Alternative Investments. Formerly the Chairman and CEO of Alternative Investments, Mr. Pandit was a founding member and chairman of the members committee of Old Lane, LP, which was acquired by Citigroup in 2007. Prior to forming Old Lane, Mr. Pandit held a number of senior positions at Morgan Stanley over more than two decades, including President and Chief Operating Officer of Morgan Stanley's institutional securities and investment banking business and was a member of the firm's Management Committee.

60.     Defendant Pandit signed and certified the accuracy of Citigroup's financial statements on Forms 10-Q and 10-K for the full year 2007, the first three quarters of 2008.

61.     Defendants Prince, Rubin, Krawcheck, Kaden, Crittenden, Freiberg, Druskin, Thomson, Maheras, Klein, Bushnell, Gerspach, Volk and Pandit are referred to herein, collectively, as the "Individual Defendants." Citigroup and the Individual Defendants are collectively referred to as the "Defendants."

## EFFICIENT MARKET ALLEGATIONS:  FRAUD ON THE MARKET DOCTRINE

62.     At all relevant times, the market for Citigroup common stock was an efficient market for the following reasons, among others:

(a)     Citigroup's common stock was listed and actively traded on the NYSE, a highly efficient national market, with more than 4.9 billion shares issued and outstanding, a public trading float of 4.745 billion shares as of the end of the Class Period, and average daily trading volume of approximately 40 million shares;

20

(b)      As a registered and regulated issuer of securities, Citigroup filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;

(c)      Citigroup regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

(d)      Citigroup was followed by several different securities analysts employed by major brokerage firms, including Oppenheimer, Punk, Ziegel & Company, Banc of America Securities LLC, CIBC, Credit Suisse and Deutsche Bank, which were distributed to the sales force and customers of their respective brokerage firms.  Those reports were publicly available and affected the public marketplace.  In addition, news concerning Citigroup was widely reported in the national and international financial press and through media outlets such as the *Wall Street Journal*, *Barrons*, the *Financial Times*, the *New York Times*, and CNBC;

(e)      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Citigroup's securities;

(f)      Citigroup's stock price reacted quickly to all new material information concerning Citigroup's finances, operations and prospects; and

(g)      Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired Citigroup securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Citigroup securities was artificially inflated by Defendants'

misrepresentations and omissions.

## CLASS ALLEGATIONS

63.     Plaintiffs bring this class action pursuant to Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and a class of all persons who purchased

Citigroup common stock during the Class Period (or their successors in interest), and who thereby

suffered damages.  Excluded from the Class are the Defendants named herein, members of the

immediate families of the Defendant, any firm, trust, partnership, corporation, officer, director or

other individual or entity in which a Defendant has a controlling interest or which is related to or

affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or

assigns of any such excluded person.

64.     The Class is so numerous that joinder of all members is impracticable.

According to the Company, as of September 30, 2007, Citigroup had more than 4.9 billion shares

of common stock issued and outstanding.  Citigroup shares were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiffs at this time and can only be

ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, thousands

of geographically dispersed Class members.  Record owners and Class members can be identified

from records maintained by Citigroup, or its transfer agent, and can be notified of the pendency of

this action by mail and publication, using forms of notice similar to those customarily used in

securities class actions.

65.     Plaintiffs' claims are typical of the members of the Class, because Plaintiffs

and all of the Class members sustained damages that arose out of the Defendants' unlawful conduct

complained of herein.

22

66.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, and Plaintiffs have no interests that are contrary to, or in conflict with, the interests of the Class members that they seek to represent.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intend to prosecute this action vigorously.

67.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.    The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants.  Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  The questions of law and fact common to the Class include:

(a)    whether defendants' acts violated the federal securities law as alleged herein;

(b)    whether defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)    whether defendants participated in and pursued the common course of conduct

23

complained of herein;

(d)     whether defendants acted with scienter in omitting and/or misrepresenting material facts;

(e)     whether the price of Citigroup common stock was artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;

(f)     whether the Individual Defendants were controlling persons as alleged herein;

(g)     whether members of the Class have sustained damages and, if so, the proper measure of such damages.

69.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     such misrepresentations and omissions were material;

(c)     the securities of the Company traded in an efficient market;

(d)     the misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     plaintiffs and the other members of the Class purchased Citigroup common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

70.     Based upon the factors set forth in the preceding paragraph, Plaintiffs and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

24

I.      CDOs:  THE MARKET, THE INSTRUMENTS AND CITIGROUP'S ACTIVITIES
        IN IT

        71.     Basic, operative facts with respect to Citigroup's CDO operations are provided

below (Section I.B), together with a brief primer that provides better understanding of such

instruments (Section I.A).  These basic facts were not and could not be gleaned from Citigroup's

class period statements and disclosures, for the simple reason that they nowhere appeared in

Citigroup's statements or disclosures. That fact gives rise to this action.

        72.     With respect to the CDOs that Citigroup created and underwrote, the essence

is that Citigroup was, secretly, by far their largest purchaser.  Citigroup had amassed, undisclosed,

huge swathes of these decreasingly valuable and increasingly risky assets, and Citigroup concealed

– affirmatively schemed – to keep this information away from the public.  The CDOs' decreasing

value and increasing risk, as demonstrated in Section II, had long been known.  The only matter *not*

known was that Citigroup was holding any such instruments, *let alone $57 billion of them*.  The

omissions, concealments and schemes by which Defendants suppressed such material exposure are

alleged in detail in Section III.

        73.     By November 2007, when Citigroup first disclosed $46 billion of such

holdings *simultaneously* with their estimated writedown of $8 to $11 billion (both numbers soon

substantially increased – the holdings by $11 billion and the writedowns to $18 billion), the shock

was not that the value of these instruments had declined materially, but rather and only that Citigroup

held approximately $57 billion of such instruments – holdings whose existence had never before

disclosed and whose value had disintegrated long before.

A.      **What CDOs Are**

74.     CDOs are a class of Asset-Backed Securities ("ABS"), also referred to as "structured finance" and "structured credit" securities for reasons that will be made clear in this brief introduction.  The assets backing (or "collateralizing") the CDOs at issue here were, primarily, *another* class of ABS: primarily, nonprime Residential Mortgage-Backed Securities ("RMBS").  The assets backing nonprime RMBS were pooled collections of nonprime mortgages.  How this all worked is explained below.

75.     ABS creation consists of three steps.  First, the ABS underwriter assembles the assets that will back the securities.  In an RMBS securitization, for example, the underwriter assembled a pool of nonprime mortgages – typically, 3,000-4,000 mortgages having an aggregate value of approximately $1 billion, which generated a stream of monthly payments of principal and interest. Second, the underwriter transfers these assets to a special purpose entity, whose sole purpose is to receive these assets and issue securities backed by them.  Third, the underwriter *structures* the securitization (hence, "structured finance") by creating  a set of *tranched* securities representing differently-prioritized claims to cashflows generated by the pooled assets.  This last step is the crucial one, and though it sounds abstruse it is capable of straightforward explanation.

76.     ABS (such as RMBS and CDOs) can be thought of as mutual funds.  Just as a mutual fund invests in a basket of securities, ABS (such as RMBS and CDOs) invest in a basket of assets.  Just as a mutual fund issues shares representing an interest in the fund's pooled assets, ABS (such as RMBS and CDOs) issue securities representing an interest in the RMBS' or CDOs' pooled assets.

77.     The key difference between mutual funds and ABS securitizations is that

26

whereas mutual fund shares represent *equal* interests in the pooled assets, ABS securities are issued in tranched sets representing *unequal* interests in the pooled assets.  The more senior tranches of an RMBS securitization have first claim on the principal and interest generated by the entire underlying asset pool (i.e., the pool of mortgages), and only after the senior tranche securities are paid in full are the more subordinate tranche securities paid.    How is this accomplished – and why is it done?

78.    The RMBS securitization structure functions as a sort of prism that redirects the cash flows generated by the underlying asset pool (i.e., the mortgages) sequentially to the set of tranched securities backed by those assets.  The useful (and actually used) metaphor is a "cash flow waterfall": the cash flow generated by the *entire* asset pool (i.e., the monthly mortgage payments) first is directed to the senior tranche until senior tranche payments are satisfied in full (think of a bucket being filled), and then proceeds to flow to each more subordinate tranche in turn (filling each tranche bucket and then moving on to the next).  Initially, the securitization is structured so that the underlying assets generate a sufficient cash flow waterfall to fill all tranche buckets, from most senior to most subordinate.  However, if the underlying assets (i.e., mortgages) become delinquent and/or default and thus stop making monthly payments, the cash flow waterfall is thus diminished.

79.    The result is that the shortfall will first be felt by the most junior tranche: sufficient cash flow still exists to repay the more senior tranches in full, but by the time the diminished cash flow waterfall reaches the more junior tranches, it has run dry.  As more and more assets (i.e., mortgages) become delinquent and/or default and thus stop making payments, the cash flow waterfall further diminishes, shortfalls climb higher into the securitization tranche structure, and progressively more senior tranches experience payment shortfalls.

80.    Conversely: as the underlying assets' cash flow cascades in a waterfall from

27

top to bottom, from most senior tranche to most junior, principal losses suffered by the underlying assets flow from bottom to top, from most junior tranche to most senior. The useful metaphor here is that of a flood. As the underlying assets default and suffer losses (i.e., as the mortgages default, go through the foreclosure process, and fail to recoup the full sum initially lent), those losses first accrue to the most junior tranches, whose principal value is written down. As underlying asset defaults and losses accumulate, the "flood" of losses seeps upward.

81.     Envision an RMBS securitization as a multi-story building, with each tranche representing a separate floor. As underlying mortgage losses accumulate, the flood of losses rises through the first story (the most junior tranche). When the flood reaches the first story's ceiling, the entire junior tranche is "under water", and its principal value is written down to zero. The flood then continues to rise, story by story and tranche by tranche, causing principal writedowns and losses for each more senior tranche in turn.

82.     In this manner, RMBS junior tranches "protect" the RMBS senior tranches by insulating them from initial deterioration in the underlying mortgage pool. Each more senior tranche is progressively nearer to full payment of interest and progressively further from loss of principal. And, indeed, this is the "why" of it all: by structuring the securitization into such different tranches, the senior tranches, farthest removed from loss, are thus less risky and can bear the highest credit ratings, with progressively more junior tranches, progressively nearer to loss, bearing lower credit ratings.

83.     The tranching structure of RMBS (and CDO) securitizations is developed by the underwriter (such as Citigroup) precisely to garner targeted credit ratings for each tranche. Each credit rating (e.g., triple-A, double-A, single-A, triple-B, double-B, etc.) represents a standard degree

28

of remove from expected loss (within each of these broader categories are three finer categories: e.g., AA+, AA, and AA-). Thus, in order to create a tranche bearing a triple-A credit rating, the RMBS underwriter has to: (1) calculate the "expected loss" of the underlying assets backing the securitization (i.e., the pool of mortgages); and (2) structure the securitization to provide a set of more junior tranches that sufficiently distance the intended triple-A tranche from that "expected loss". The same process is repeated at each progressively lower credit rating. An example illustrates:

84.     The pool of mortgages serving as the assets for an RMBS securitization is $1 billion. The underwriter, based on its assessment and modeling of detailed data on each and every mortgage in that pool, determines that the "expected loss" is $50 million. The standard for triple-A ratings requires securities be able to withstand losses four times greater than expected (hence, $200 million). Thus, on the basis of the $1 billion of nonprime mortgages underlying the securitization, a large triple-A rated tranche amounting to $800 million can be created – because it will have $200 million of more subordinate tranches below it to protect it from losses four times greater than expected. This process is repeated at each rating level down the line to create further, more subordinate tranches. A last illustration: (1) the standard for double-A ratings requires securities to be able to withstand losses three times greater than expected (hence, $150 million); (2) therefore, in addition to the $800 million triple-A tranche, a $50 million double-A tranche can be created, because it will still have $150 million of more subordinate tranches to provide it with the requisite protection.

85.     The safer tranches with higher credit ratings were structured to provide low yields (because of their low risk), while more junior tranches offered higher yields (to compensate for their increased risk). The high yields offered by junior tranches of nonprime RMBS

securitizations made them attractive assets for CDOs, which as detailed below began to invest heavily in them.

86.     The real world results of this structuring process, for 2006 subprime RMBS securitizations and for 2006 Alt-A RMBS securitizations, are displayed graphically on the pages that follow.  The charts show, in scale, the average tranching structure for subprime and Alt-A mortgage securitizations during 2006.  The charts demonstrate rather vividly two very consequential matters: (1) the relative lack of protection, especially for the BBB tranches, from loss; and (2) the dramatic "thin-ness" of the more junior tranches, especially at the BBB and single-A levels.  These were consequential because it was exactly these tranches that constituted the lion's share of the assets collateralizing Citigroup's CDOs.  As the charts demonstrate and as explained next, underlying asset losses (i.e., nonprime mortgage losses) did not have to rise very much at all in order to render these RMBS tranches worthless.  Thus, relatively small loss increases at the underlying asset level would cause losses to climb into rated RMBS tranches *but leap throughout CDOs*, because CDOs were primarily collateralized by these lower, thinner RMBS tranches.

(a)     **Relative Lack of Protection from Underlying Asset Losses**.   On average, subprime RMBS securitizations provided the BBB tranches with subordinate tranches totaling only 4.5% of the entire securitization.  Should underlying asset losses exceed that 4.5% of "first loss" protection, the BBB tranches would start suffering principal losses – first the BBB-, then the BBB, then the BBB+.  And as these tranches were themselves quite thin (as next detailed), they did not provide all that much protection for the more senior tranches above them, especially the single-A rated tranches next in line for losses.

Because Alt-A mortgages were purportedly safer than subprime, expected

30

losses from Alt-A mortgages were lesser, and thus less subordination was required in Alt-A securitizations.  Alt-A BBB tranches were therefore even closer to the bottom, protected by a "first loss" tranche totaling only 1.8% of the entire securitization.  Should underlying asset losses exceed that 1.8% of "first loss" protection, the BBB tranches would start suffering principal losses.  Again, as these tranches were themselves quite thin (the three BBB tranches totaled only a further 1.2% of the securitization), they did not provide all that much protection for the more senior tranches above them.  In Alt-A securitizations, the single-A rated tranches were protected against only 3% of underlying asset losses (i.e., the 1.8% first loss tranche and the 1.2% of more subordinate BBB tranches); the double-A tranches against loss level of only 4.7%, etc..

(b)     **Tranche Thin-ness**.  As the charts illustrate, nonprime BBB tranches and single-A tranches represent a very thin, very specific slice of subprime risk: they begin to be liable for aggregate losses suffered by the underlying pool of subprime mortgages when such losses exceed approximately "X"%, and they are rendered worthless if such losses rise to X+1%. The very thin-ness of these tranches gives them an evident *ab initio* risk/return profile.  A thin tranche speedily loses its value: a small deterioration in overall asset performance suffices to swing a thin tranche from 100% return of principal to 100% loss.  Experts refer to this risk profile as "cliff risk": everything is fine for a while, but then value "falls off a cliff".  Such thin tranches are, effectively, an "all or nothing" proposition.  There is very little chance that they will suffer a partial loss: they will provide a 100% principal return (having been protected by tranches below it) or a 100% principal loss (having been engulfed by poor asset performance).  Thus, the risk of these tranches has been termed "digital": 1 or 0.

31

# Subprime RMBS:
# Average Structure and Tranche Sizes



**AS UNDERLYING MORTGAGE POOL LOSSES MOUNT, THEY CLIMB UP THE TRANCHES**

1   The lowest tranches -- equity and BB -- amount to 4.5% of the entire securitization.
    Principal losses experienced by the underlying mortgages will accrue here first.
    The BB/Equity tranches are written down by the amount of those losses.

2   If principal losses exceed the size of the equity/BB tranches (4.5%), then losses begin
     to accrue against the more senior tranches above.

3   Next above equity are a series of thin BBB tranches (BBB+, BBB and BBB-).  Each is
     about 1% to 1.5% of the entire securitization; in total, 4.3% of the entire securization.
     Each is successively written down as underlying mortgage losses mount.  If losses
     rise above 8.8% (the 4.5% of equity/BB tranches and the 4.3% of BBB tranches), all
     of the BBB tranches are worthless.

4   The process continues, except, at each successive level, the tranches are "thicker".
     The A tranches account for 5.4% of the securitization.
     The AA tranches account for 6.6% of the securitization.
     The AAA tranches account for 79% of the securitization.

# Alt-A RMBS:
# Average Structure and Tranche Sizes



Pool of Assets
Serving as
Collateral

Tranche Structure
Of RMBS
Securities Issued

**4,000
Alt-A
Mortgages**

Alt-A Mortgage 4,000
Alt-A Mortgage 3,999
...
...
...

**AAA Tranche**

Large AAA Tranche
93% of total securitization

| | | Size of Tranches |
|---|---|---|
| 7.2% | AA Tranches | 3 AA Tranches (AA+, AA, AA-) | 2.50% |
| 4.7% | A Tranches | 3 A Tranches (A+, A, A-) | 1.70% |
| 3% | BBB Tranches | 3 BBB Tranches (BBB+, BBB, BBB-) | 1.20% |
| 1.8% | BB/Equity Tranches | BB and Equity Tranches | 1.80% |

## AS UNDERLYING MORTGAGE POOL LOSSES MOUNT, THEY CLIMB UP THE TRANCHES

**Because Alt-A mortgages have less risk than subprime mortgages, there is less subordination and the subordinate tranches are thinner**

1   The lowest tranches -- equity and BB -- amount to 1.8% of the entire securitization.
    Principal losses experienced by the underlying mortgages will accrue here first.
    The BB/Equity tranches are written down by the amount of those losses.

2   If principal losses exceed the size of the equity/BB tranches (1.8%), then losses begin
        to accrue against the more senior tranches above.

3   Next above equity are a series of thin BBB tranches (BBB+, BBB and BBB-).  Each is
        about 0.4% of the entire securitization; the three total 1.2% of the entire securization.
        Each is successively written down as underlying mortgage losses mount.  If losses
        rise above 3% (the 1.8% of equity/BB tranches and the 1.2% of BBB tranches), all
        of the BBB tranches are worthless.

4   The process continues, except, at each successive level, the tranches are "thicker".
    The A tranches account for 1.7% of the securitization.
    The AA tranches account for 2.5% of the securitization.
    The AAA tranches account for 93% of the securitization.

87. The basic picture is clear.[1]  A triple-B subprime or Alt-A RMBS tranche is – as was clear from the outset –  a very precise, very thin, and very close-to-the-bottom slice of nonprime risk.  Mortgage performance deterioration that may seem relatively slight when considered in light of the entire mortgage pool (e.g., losses increasing by only 1% or 2%) are sufficient to substantially impair the value of these instruments – or entirely destroy them.

88. CDOs are in essence little different from the RMBS securitizations described above.  Any assets can serve to collateralize CDOs[2]: the CDOs at issue here are specifically ABS CDOs – and as detailed herein, ABS CDOs came during the class period to be collateralized primarily by the junior tranches of subprime RMBS and Alt-A RMBS.  For that reason, they will hereinafter be referred to as subprime CDOs.

89. Just like RMBS, CDOs: (1) invested in a set of assets, and (2) issued a further round of tranched securities backed by those assets.  The principles are the same: based on the expected loss of the CDO's collected assets (the collateral for the CDO securities), the CDO securitization would be structured with "X" amounts of triple-A rated securities, "Y" amount of

---

[1]        Nonprime securitizations were also structured to provide an additional layer of protection through "excess spread".  Excess spread refers to the fact that nonprime securitizations were structured to take more money in (from mortgage payments) than they had to pay out (to security purchasers).  Some of this excess spread was devoted to serving as an additional "first loss" buffer.  If losses are moderate over the life of the securitization, the added protection through excess spread can be substantial.  But if losses are substantial and/or early, the protection provided by excess spread vanishes.

[2]        Indeed, CDOs were born in the 1980s under the premise that a diversified underlying asset portfolio mitigated risk.  Over time several different subsets of CDOs emerged, classified by their predominant underlying assets.  These included CDOs backed by bonds ("Collateralized Bond Obligations", or CBOs), CDOs backed by high-yield corporate loans ("Collateralized Loan Obligations", or CLOs), and CDOs backed by already-securitized assets (termed variously as "Asset Backed Security CDOs" or ABS CDOs, or "structured finance CDOs" or SF CDOs).

double-A, etc.  The cash flow waterfall generated by the CDO's underlying assets marches down the CDO tranches from top to bottom, while principal losses suffered by the underlying assets climb up the CDO tranches from bottom to top.

90.    CDOs had one structural difference.  The large triple-A tranche at the top of capital structure was, in CDOs, split into two separate tranches: a "junior" triple-A tranche and a "super senior" triple-A tranche, as shown below:

| Original Structure: Undivided Triple-A Tranche | New "Super Senior" Tranche Structure |
|:---:|:---:|
| AAA Tranche | Super Senior AAA |
| | Junior AAA |
| Mezzanine Tranches | Mezzanine Tranches |
| Equity | Equity |

91.    Why?   The new super senior tranche allowed CDO arrangers / underwriters to "reshuffle" the cash flows of the entire CDO securitization, so as to make the junior tranches more marketable.  This is summarized in the graphic on the following page.  Yield that otherwise would have gone to the large super senior portion of the triple A tranche could be "stolen" and rerouted to "juice" all the more junior tranches, making them more attractive. CDO underwriters such as Citigroup sought to enhance the attractiveness of CDOs' junior and equity tranches by: (1) breaking

35

up the large triple-A tranche into a small "junior" triple-A tranche and large "super senior" triple-A tranche, so that the new "super senior" received additional credit protection by the new "junior" triple-A tranche; (2) providing the new, large super senior tranche with very low yields (because it was marginally safer than a normal triple-A tranche); and (3) redirecting the resulting yield savings to the junior and equity tranches. By this device, the yield provided to the junior tranches could be "juiced", and the arbitrage returns to the equity tranche multiplied.[3] The graphic on the next page illustrates the process:

---

[3]      The CDO equity tranche was the "first loss" tranche, just as in RMBS securitizations. It was not provided with a yield, but rather was the primary recipient of the "excess spread" between: (1) the money the CDO took in from its underlying assets and (2) the money the CDO paid out to investors. As the excess spread (e.g., 2%) was generated over the entire CDO portfolio (e.g., $1 billion), and as the equity tranche was a tiny fraction of that amount (e.g. $50 million), the excess spread arbitrage returns to equity holders were leveraged. Put concretely: holders of the $50 million equity tranche would receive the excess spread generated by entire portfolio (2% of $1 billion, or $20 million), thus producing annual returns of 40%. Such returns mitigated the "first loss" nature of the equity tranche.

# Super Senior Creation
## Allows Yield Diversion to "Juice" Lower Tranches



**BEFORE**

LIBOR +.45%     Traditional Securitization, Large Triple-A Tranche

Dotted-Line Represents:

Possible division between Junior/Senior AAA

Possible yield savings from Super Senior

AAA

AAA

AA     LIBOR + .60%

A     LIBOR + 1.15%

BBB

Equity     LIBOR + 2.85%



**AFTER**

LIBOR + 0.3%

Diverted as Further "Excess Spread" to Equity Tranche

Yield "Stripped" from the New Super Senior is Applied to "Juice" the Yields of Lower Tranches and the "Excess" Spread Returns to Equity

Mezzanine Super Senior

Diverted to "Juice" BBB tranche

Diverted to "Juice" A-tranche

Junior AAA     LIBOR + 0.45%

AA     LIBOR + .60%

A     LIBOR + **1.45%**

BBB     LIBOR + **3.75%**

Equity     **Extra "Excess Spread" Passed on to Equity**

92.     Because the new super senior tranche was thus even farther removed from loss than the normal triple-A tranche (by virtue of being protected by the new junior triple-A tranche), they ostensibly carried less risk than a normal triple-A tranche and thus could be assigned a lower yield than a normal triple-A tranche.  For example, a normal CDO triple-A tranche (i.e., the junior triple-A) could be assigned a yield of LIBOR + 0.50%, but the super senior tranche could be assigned a substantially lower yield, such as LIBOR + 0.25%.  Because the super senior tranche was such a large part of the entire securitization – approximately 64% of Citigroup's Mezzanine CDO structures and 77% of Citigroup's High Grade CDO structures – the yield savings on the super senior tranche were magnified.

93.     The yield "saved" in this manner was then ferried to two places: (1) to boost the yield that could be assigned to the smaller, junior tranches; and (2) to boost the arbitrage returns available to equity tranche investors.  Because both the super senior tranche was so large and the junior and equity tranches so small, the saved yield on the super senior tranche (a few basis points on a large amount of principal) was substantially magnified when applied to the junior and equity tranches (many basis points on a small amount of principal).  The added yield/arbitrage returns made the junior tranches and equity tranches substantially more enticing to investors.

94.     The CDOs at issue here (ABS CDOs, backed primarily by subprime RMBS) were of two primary types, Mezzanine CDOs and High Grade CDOs, and a third, more rare type, CDO-Squared.  A brief introduction of each follows, together with a final note on super seniors to end this introduction.

95.     **Mezzanine ABS CDOs** invested in "mezzanine"-level assets – meaning, primarily, the thin, close-to-loss BBB-rated tranches discussed above (referred to as "mezzanine"

because such tranches are neither the most senior nor the most junior).  Mezzanine CDOs were little more than a vast expansion of this very thin, very precise, very close-to-the-bottom slice of subprime mortgage risk.  In essence, they were a subprime RMBS BBB tranche writ large. These CDOs' extreme asset concentration in nonprime RMBS BBB tranches meant, *ab initio*, that a relatively small rise in underlying mortgage pool losses – sufficient to wipe out the thin, close-to-the-bottom BBB- and BBB tranches – would simultaneously destroy most of the collateral value of a Mezzanine CDO.  All the CDO's junior tranches, including the junior triple-A tranche, would be rendered worthless, and even the top-most tranche, the super senior, materially impaired.

96.     **High Grade ABS CDOs** invested in slightly higher-rated assets than did Mezzanine CDOs: the average credit rating of the assets held by High Grade CDOs was between single-A and double-AA.  Typically, High Grade CDO assets included a mix of single-A and double-A RMBS tranches, as well as some more highly-rated and some more low-rated tranches. Additionally and very importantly, High Grade CDOs often included in their asset base some single-A, double-AA and triple-A rated tranches from *other* CDOs.  As detailed herein, *Citigroup's* High Grade CDOs were unique in the degree to which they were collateralized by tranches of *other* CDOs. Citigroup's own statistics showed that on average, 19% of High Grade CDO assets were other CDO tranches.  Citigroup's High Grade CDOs, however, contained a concentration of other CDO tranches nearly twice as high – 35%.  The high concentration of such assets in Citigroup's CDOs resulted from the fact that Citigroup, as detailed in this complaint, began to find it difficult in late 2006 to sell the junior CDO tranches it was underwriting, even with their "juiced" yield.  Citigroup's solution to this problem?  To create buyers for such unwanted securities, in the form of new Citigroup-sponsored CDOs collateralized by the unsold remnants of the old.

97.     In so doing, *inter alia*, Citigroup literally degraded its "High Grade" CDOs, which came increasingly to be filled with the junior tranches from Mezzanine CDOs that Citigroup had previously underwritten but had been otherwise unable to sell.  Citigroup thus exposed its High Grade CDOs to exactly the thin, close-to-the-bottom BBB tranches that collateralized its Mezzanine CDOs.  This helps explain the fact that Citigroup's High Grade CDOs were impaired nearly to the same degree as its Mezzanine CDOs.

98.     **CDO Squared** are CDOs that are collateralized primarily by tranches of *other* CDOs.  Several Citigroup CDOs labeled as "High Grade" were very close to being CDO-squared, and several of the Citigroup CDOs discussed herein as the "Hedged CDOs" were CDO-squared.  As detailed herein, Citigroup's Hedged CDOs marked Citgroup's recognition in early 2007 that the junior CDO tranches piling up unsold (and undisclosed) on Citigroup's books were effectively worthless.  The explanation of Mezzanine and High Grade CDOs already provided begins to make clear why Citigroup thought that, and why Citigroup was correct.  So, as detailed herein, Citigroup gathered in excess of $5 billion of them, resecuritized them into four new CDOs, and then attempted – in a clear break from prior practice – to obtain a form of insurance for the large, resulting super senior tranches.  In short, by February 2007 at the latest, Citigroup understood that its CDOs, even at the super senior tranche levels, were in substantial and imminent danger of impairment.

99.     **Citigroup's Undisclosed Super Senior CDO Tranche Hoard**.  As detailed in the following sections of this complaint, Citigroup, throughout the class period and unbeknownst to plaintiffs, the class and the market, had been unable to sell the super senior tranches of the

subprime CDOs it underwrote.[4]  They sat, invisible and undisclosed, on and off Citgroup's books, accumulating to the staggering sum of approximately $55 billion.

100.    Though these tranches were "super seniors" at the top of CDOs, the CDOs were collateralized primarily by the thin, close-to-the-bottom, already-tranched, much-lower rated slices of risk of subprime RMBS mortgage pools.  This was not a secret, above all to Citigroup. Citigroup itself had assembled these assets and created these CDOs.  Nor was it a secret to the market, which, as demonstrated herein, reached consensus no later than March 2007 that CDOs were in for a bloodbath. The only secret was that of Citigroup's massive, massive exposure.

101.    Prior to November 4, 2007, Citigroup never disclosed that it was holding any super senior CDO tranches, let alone $55 billion of them.  Citigroup revealed their existence for the first time only in November 2007 (though it then understated its super senior holdings, which it put at $43 billion) *simultaneously* with the fact of their writedown by an expected $8-$11 billion. Citigroup had valued these super seniors at par throughout, despite the fact that their value had become materially impaired by February 2007 and had only plummeted thereafter.  Two months later, in January 2008, Citigroup raised both its CDO exposures and its writedowns by $10 billion each.  CDO writedowns continued totalling $12.9 billion in Q1 and Q2 2008, and a further $6.0 billion thereafter in Q3 2008 and Q4 2008.

---

[4]    Why?  By "reshuffling" the CDOs' cash flows so that cash/yield that otherwise would have been directed to the super senior tranche was diverted to the junior and equity tranches, the super senior tranche itself was rendered a less attractive investment.  Though the risk of the super senior may have been reduced at the margin, the "reward" of the super senior had been even further reduced (so that its yield was half that of the normal triple-A tranche).  Such low-yielding super seniors were, compared with other triple-A securities, a less enticing investment.

**B.** **Citigroup's CDOs**

102.    Citigroup held itself out as a leading underwriter of CDOs (i.e., a seller of CDO securities).   In fact and undisclosed, it was the world's largest repository for the CDO instruments it underwrote.   Throughout the class period, Citigroup's financial statements concealed what Citigroup was doing, what Citigroup was holding, and what risks Citigroup was exposed to with respect to CDOs.   What Citigroup told the public revealed neither the size nor nature of Citigroup's interests in, nor exposure to CDOs, nor indeed that Citigroup had any exposure.   Nor did the disclosures indicate that an enormous portion of the CDOs – those at issue here – were backed largely by subprime.   On the contrary, the disclosures distinguished between CDOs and "mortgage-related investments".

103.    Citigroup's class period disclosures failed to provide any "meaningful... data for an independent assessment of the potential risks of the Company's involvement in various [CDOs] and asset classes".   The quotation is taken from Citigroup's *mea culpa* contained in its 2007 Form 10-K, explaining the expanded disclosure therein of the very information Citigroup had previously failed to provide.

**1.**    **Citigroup's CDO Exposures: Overview and Categorization**

104.    Following Citigroup's practice, the subprime CDO holdings revealed by Citigroup on and after November 4, 2007 fall into several basic categories, summarized in the chart below:

| Category | Exposure |
|---|---|
| Commercial Paper CDO Super Seniors | $ 25.0 billion |
| Mezzanine CDO Super Seniors | $ 9.0 billion |

42

| High Grade CDO Super Seniors | $ 10.0 billion |
|---|---|
| Hedged CDO Super Seniors | $ 10.5 billion |
| CDO Junior Tranches | $ 2.7 billion |

105.    Plaintiffs discuss each of these categories/exposures in separate sections below.  Citigroup's writedowns of the above positions are presented here:

## Citigroup's CDO Exposures: $57 Billion
## Citigroup's CDO Writedowns: $31 Billion

| | CP CDOs | Mezzanine CDOs | High Grade CDOs | CDO-Squared | Hedged CDOs | Warehouse CDOs | Total |
|---|---|---|---|---|---|---|---|
| **Holdings Disclosed November 2007** | $25 billion | $9 billion | $10 billion | $0.2 billion | $10.5 billion | $2.7 billion | $57 billion |
| **Writedown January 2008** | ($ 4.3 billion) | ($ 5.2 billion) | ($ 4.9 billion) | ($0.1 billion) | ($0.9 billion) | ($2.6 billion) | $18.0 billion |
| **Writedown April 2008** | ($3.1 billion) | ($1.5 billion) | ($ 1.0 billion) | ($0.1 billion) | ($1.5 billion) | ($0.1 billion) | $7.3 billion |
| **Writedown July 2008** | ($2 billion) | $0.1 billion writeup | ($ 1.3 billion) | 0 | ($2.4 billion) | 0 | $5.6 billion |
| **Total $ Writedown** | ($9.4 billion) | ($7.6 billion) | ($ 7.2 billion) | ($0.2 billion) | ($4.5 billion) | ($2.7 billion) | $31.0 billion |
| **Total % Writedown** | 37.6% | 84.4% | 72.0% | 100% | 42.9% | 100% | 54.4% |

106.    **Commercial Paper CDOs**.  Citigroup arranged and underwrote, principally

in 2004-2005, approximately $28 billion of CDOs in which the super senior tranches (totaling $25 billion) were issued not as long-term debt but as short-term commercial paper. Citigroup "sold" $25 billion of such commercial paper super senior tranches with a guarantee to repurchase them all, at full price, if collateral concerns (i.e., subprime worries) ever disrupted the rollover of that commercial paper. Citigroup earned approximately $375 million on account of what it underwrote. For providing this money-back guarantee, Citigroup was paid approximately $50 million per year. During much of the class period, Citigroup concealed the fact and consequently the risks associated with its guarantee. The end result: $25 billion of super senior subprime exposure vanished from Citigroup's books for years, replaced by $50 million annual boost to revenues.

107.    **Mezzanine CDOs**. Mezzanine CDOs are so named because their asset base is composed primarily of "mezzanine"-level assets that bear the lowest investment-grade credit rating (triple-B). Citigroup arranged and underwrote, principally in 2005-2006, approximately $19.64 billion of Mezzanine CDOs containing $12.76 billion of super senior tranches. Citigroup never sold a single Mezzanine CDO super senior tranche during the class period. Instead, it silently and without disclosure retained every single one. As presentations from Citigroup's own credit strategists provided further along demonstrate, the risks of Mezzanine CDOs are clear, and stunning.

108.    A small deterioration in subprime mortgage performance would suffice to make Mezzanine CDO securities, at all junior tranche levels, a 100% loss, and produce losses substantially exceeding 50% for super senior tranche investors. This deterioration was evident beginning in late 2006, and by early 2007 many market participants, including Citigroup's own credit experts, foresaw a Mezzanine CDO bloodbath. By March 2007, there was no longer any question as to the risk. Instead, the only questions were "Where did the risk go? Who was holding these

44

Mezzanine CDO tranches?"  Here, by far the largest holder of these Citigroup-underwritten instruments was Citigroup itself, a fact undisclosed until November 2007.

109.  **High Grade CDOs**.  High Grade CDOs are so named because, in contrast to Mezzanine CDOs, their asset base is meant to be primarily composed of assets rated double-A and single-A (rather than the mezzanine triple-B). Citigroup arranged and underwrote, almost entirely between late 2006 and mid-2007, approximately $14 billion of High Grade CDOs containing $10.8 billion of super senior tranches.  Citigroup never sold a single High Grade CDO super senior tranche during the class period; instead, it silently and without disclosure retained every single one.

110.  High Grade CDOs, because of their more highly-rated asset base, would be expected to perform better than Mezzanine CDOs.  Citigroup's High Grade CDOs, however, did not: as Citigroup's own writedowns best evidence.  Why?

111.  Citigroup used its High Grade CDOs as receptacles for the junior tranches of Citigroup's prior Mezzanine CDO securitizations that Citigroup was otherwise unable to sell. Because of the risks of the mezzanine asset base, each Mezzanine CDO securitization produced a relatively large amount of junior tranches (on average, 36% of the entire CDO securitization).  In late 2006 and early 2007, as subprime concerns mounted and as subprime performance became clear, Citigroup began to experience difficulties in selling these Mezzanine CDO junior tranches, even after those tranches were "juiced" by added yield imported from the super senior.  Now, in addition to the super senior tranches, the junior tranches too began to pile up, undisclosed, on (and off) Citigroup's books.

112.  How did Citigroup cover up this problem?  It created new "High Grade" CDOs, into which ever larger amounts of unsold tranches from Citigroup's previously-underwritten

CDOs were transferred.  By the end of 2006, Citigroup's warehouse of subprime assets designated for securitization stood at approximately $30 billion, a sizeable portion of which being unsold junior CDO tranches.  Citigroup's High Grade CDOs from this period are objectively distinguished by the extent to which their asset base was itself composed of previously-underwritten CDOs.  Statistics published by Citigroup itself indicate that 19% of High Grade CDOs' asset base, on industry-wide average, was made up of other CDO tranches.[5]  The facts demonstrate that Citigroup's CDOs from this period, on average, contained nearly twice that amount.   These large amounts of CDO assets explain the poor performance of Citigroup's High Grade CDOs.  Citigroup was systematically degrading its "High Grade" CDOs.

113.    **Hedged CDOs**.  The Hedged CDOs were a subset of Citigroup CDOs, underwritten primarily during the first half of 2007, in which – in contrast to prior practice – Citigroup arranged to free itself of the credit risks posed by the retained super senior tranches by "swapping" those risks off to the Monoline[6] insurers, and particularly to AMBAC.  Citigroup's *newfound* initiative to divest itself of super senior risks is, among other things, strongly indicative of scienter.

114.    As the foregoing summary of Citigroup's Mezzanine and High Grade CDOs indicates, by late 2006 and early 2007, Citigroup's CDO operations had become a Ponzi scheme. The unmarketable junior tranches from prior CDO securitizations were transferred to freshly-baked

---

[5]    *See* Basel Committee on Banking Supervision report, *Credit Risk Transfer Developments from 2005 to 2007*, July 2008, at p. 5 (citing Citigroup as source).

[6]    Monoline insurers (the "Monolines") guarantee the timely repayment of bond principal and interest when an issuer defaults. They are so named because they provide services to only one industry.

CDOs; the new CDO securitizations produced yet another round of unmarketable junior securities, which Citigroup sold to yet newer CDOs, etc.  As for the super seniors, nothing could be done: their low yields made their inclusion in new CDOs impossible.  So Citigroup kept them, and kept quiet about them.

115.    The Hedged CDOs were Citigroup's attempt to resolve the inherent contradictions in this process.  During the first half of 2007, Citigroup created – in addition to the Mezzanine and High Grade CDOs already discussed – $8 billion of new CDO securitizations.  A distinguishing feature of these securitizations was their even higher asset concentrations of previously-underwritten CDO tranches, accounting for $5 billion of these CDOs' assets in the aggregate.  Three of these Hedged CDOs were collateralized in their *entirety* by tranches of other CDOs.  In short, these Hedged CDOs were a sleight-of-hand shuffle of Citigroup's previously-unsold junior CDO tranches, from one warehouse to another.

116.    With respect to each of the Hedged CDOs, Citigroup unburdened itself of the super senior tranche's risks of loss by swapping its risk off to monoline financial insurers, particularly AMBAC.  In these transactions, Citigroup was conceding (1) that the underlying assets (the junior CDO tranches) were worthless, and (2) that the resulting new securities were also worthless.  The key was that the largest portion of the resulting new securities – the super senior – would not burden Citigroup, but rather the monolines.  By these Hedged CDO transactions Citigroup sought to cut impending losses (from 100%) by unburdening itself, at the least, of the resulting large super senior tranches (representing 50%-70% of the securitizations).

### a.    Plaintiffs' Investigation and Conclusions

117.    CDOs operate in an opaque corner of the financial markets.  CDOs are

incorporated as "offshore" limited liability companies, their securities are not registered in the U.S., and they do not publicly report their asset holdings or security performance.  These are provided only to actual and potential CDO investors, through password-protected websites.  Citigroup added a further layer to such opacity by concealing at all times prior to November 4, 2007 that it retained any CDOs, let alone $57 billion of them.

118.    Nevertheless, plaintiffs' investigation has allowed identification of almost every subprime CDO that Citigroup arranged/underwrote between calendar years 2004-2007, the tranching structure of each of these CDOs, and the holdings of many of those CDOs.[7]  This forms the basis for the allegations below – which,  plaintiffs believe, constitutes the most detailed public assessment/analysis of Citigroup's CDO-related activities.

119.    Plaintiffs' investigation yielded the following conclusions.

120.    **First:  Citigroup's Super Seniors Were Unsellable – Citigroup Retained Every Super Senior Tranche From CDOs it Underwrote Between 2004 and 2007**.  Plaintiffs' identification of Citigroup's High Grade and Mezzanine CDO underwritings between 2004 and 2007 show these CDOs to have produced, respectively,$10.8 billion and $12.76 billion of super senior tranches.   These aggregate super senior tranche totals match the super senior holdings disclosed by

_____

[7]    No truly public disclosure of such information exists; certainly none made by Citigroup.  Plaintiffs' identification of Citigroup's CDOs is based on, *inter alia*: (1) information from credit rating agencies such as Moody's, Standard & Poors, and Fitch; (2) several years of weekly and biweekly reports on CDO issuance pipelines authored by investment banks active in the field, including JP Morgan's Global Structured Finance Research division (the "Global ABS/CDO Weekly Market Snapshot") and Nomura's Fixed Income Research division ("CDO/CDS Update"); (3) further information provided by the Monoline AMBAC, whose CDO-related troubles, largely resulting from Citigroup's CDOs, resulted in relatively detailed disclosures; and (4) occasional reports in the financial press and in industry publications.

Citigroup on November 4, 2007 ($10 billion and $9 billion, respectively).[8]   Thus, Citigroup never sold a single super senior tranche issued in its Mezzanine and High Grade CDO securitizations. Citigroup concealed the existence of these unsold assets at all times until November 4, 2007. Additionally, Citigroup created the illusion of sales of $25 billion of super senior tranches from the Commercial Paper CDOs, but only managed to make such "sales" by embedding into them a full-price, money-back guarantee should collateral quality deteriorate.   When collateral quality indeed deteriorated, these $25 billion of super senior tranches rebounded to Citigroup.

121.   **Second: The Record of Citigroup's CDO Underwriting Thus Establishes Exactly Which Super Senior Tranches Citigroup was Holding at Any Given Time, as well as Citigroup's Aggregate Super Senior Exposure at any Given Time.**   As Citigroup never sold these CDO super seniors, plaintiffs' lists of Citigroup's CDOs thus serve as a detailed factual record of *exactly* what super senior tranches Citigroup was holding at any given time between 2004 and 2007, and of Citigroup's aggregate exposure at any given time.   This provides requisite specificity: plaintiffs can show, at any given time, that Citigroup was holding super senior tranches from CDOs

---

[8]      The minor discrepancy – a $3.76 billion difference between the amount of Mezzanine super seniors Citigroup produced ($12.76 billion) and the amount Citigroup retained "*net exposure*" to ($9 billion) is easily explained. There is no substantive incongruence; the discrepancy only arises from Citigroup's continuing lack of specific disclosure concerning any individual CDOs. Citigroup disclosed that in addition to its net CDO exposures, it had hedged away its exposure to a further aggregate total of $10.5 billion of super senior holdings by swapping off their credit risks to other parties, primarily the Monolines.   Detailed disclosures made by the Monoline AMBAC, the counterparty for most of Citigroup's hedged $10.5 billion of super seniors, have allowed plaintiffs to identify the precise CDO super senior tranches whose risks Citigroup assigned to AMBAC (discussed separately herein as the "Hedged Super Seniors"). There remains a further $2.2 billion of super senior exposure that Citigroup hedged with other Monolines ($1.5 billion with FGIC, $600 million with ACA, and $100 million with Radian) and a further $2.9 billion of super senior exposure hedged with other counterparties.   Thus, the seeming $3.76 billion surplus in plaintiffs' list of Citigroup's Mezzanine super senior is merely $3.76 billion that Citigroup managed to assign to FGIC, ACA, Radian and other counterparties.

"A", "B" and "C" in the amounts of "X", "Y" and "Z".

122.     **Third: By Late 2006, Citigroup's CDO Operations Had Devolved Into a Ponzi Scheme**.  By late 2006, Citigroup's CDO operations had devolved into a ponzi scheme where (1) the unsold junior tranches from older CDO securitizations were (2) recycled as the asset base for new CDO securitizations.  Whereas previously Citigroup had never been able to sell the super senior tranches; in late 2006 Citigroup began to find it difficult to sell even the higher-yielding junior tranches, particularly from its more risky Mezzanine CDOs.  Precisely because those CDOs were riskier, they produced a relatively large amount of more junior tranches (i.e., more subordination for the senior tranches).  These junior tranches stood closer to first loss, and subprime concerns were mounting – exactly the reasons why (a) the junior tranches were proving difficult to sell, and (b) Citigroup did not wish to appear to retain them.  Citigroup sought to resolve the two above facts by creating new "High Grade" CDOs as receptacles for those assets.  This permitted Citigroup to conceal that it was holding many billions of dollars of unmarketable securities.

123.     Unsold tranches from Citigroup's older CDOs began to turn up, in ever-increasing numbers, as the assets collateralizing Citigroup's newly-created "High Grade" CDOs.  Citigroup's High Grade CDOs were underwritten, in virtual entirety, in late 2006 and early 2007, and were filled to a unique degree with the unsold detritus of Citigroup's prior CDO securitizations.  Citigroup's own analysis of the High Grade CDO category concluded that, on average, 19% of the asset base of High Grade CDOs consisted of tranches from other CDOs.  But Citigroup's High Grade CDOs contained nearly twice that average level – generally, 35%.  Substantial amounts of these plus-sized allocations consisted of tranches from Citigroup-underwritten CDOs.  This material information was concealed during the class period.

50

124.    **Fourth: In Late 2006 and Early 2007, Citigroup's CDO Operations Were Devoted to the Attempt to "Clean Out the Warehouse" of Junior Subprime Assets**.  By the end of 2006, Citigroup's "warehouse" of subprime assets being held for securitization – subprime mortgages to be made into RMBS; subprime RMBS to be made into CDOs; and unsold junior CDO tranches, to be recycled into new CDOs – had swelled to $30 billion.   A substantial portion consisted of unsold CDO tranches from prior securitizations.  Subprime concerns were mounting; these more junior CDO tranches stood closer to loss.  By securitizing these assets, Citigroup could (a) transform its 100% front-line exposure into a smaller, more-distanced-from-loss exposure (the retained super senior), and (b) attempt to dispose of the resulting junior tranches in any way possible, even at a loss.  During the class period, Citigroup did not disclose the amounts of unsold junior CDO tranches or how it was "recycling" them.

125.    **Fifth: Between February and June 2007, Citigroup Conceded "Endgame" Through a Final Round of CDO Securitizations in which Citigroup Swapped Off the Risk of the Resulting Super Senior Tranches**.    No later than February 2007, Citigroup internally recognized both that junior CDO tranches were imperiled, and that the super senior tranches were as well.  Citigroup then began, in marked departure from prior practice, to purport to hedge the risk of its retained super seniors by "swapping" the risk off to Monoline insurers.  In a last series of CDO securitizations stretching from February to June 2007, including several collateralized in their *entirety* by other CDO tranches, Citigroup (1) removed from its warehouse well in excess of $4 billion of unsold CDO tranches; (2) swapped off the risk of the largest portion of the resulting CDO securitizations (the super senior) to AMBAC and others; while (3) conceding that the resulting junior tranches would likely remain Citigroup's liability.  This series of CDO  securitizations also showed

Citigroup's recognition of endgame.  By a last wholesale emptying of its CDO warehouse, Citigroup sought to cut losses from 100% to less than 50%.  The resulting CDO securitizations would themselves produce a new round of junior CDO tranches.

126.    Thus, no later than February 2007, Citigroup *internally* acknowledged its CDO risk exposure, but Citigroup said nothing about that risk or that exposure until November 2007. In November 2007, Citigroup disclosed that in addition to $43 billion of super senior tranches it had been left holding $2.7 billion of unsold junior CDO tranches.  In January 2008, Citigroup wrote down the value of those junior CDO tranches by $2.6 billion – effectively, 100%.  In January 2008, Citigroup disclosed a *further* $10.5 billion of CDO super senior tranches, which it claimed to have hedged through use of a form of insurance.  The claim was made to avoid recognition of loss.  The claim was false, because it was clear that the insurer could never – and did not, as it turned out – make good on a significant portion of the risks purportedly "insured".

### b.    Timeline: Citigroup's CDO Operations and Scheme

127.    The next chart demonstrates that Citigroup's CDO activities followed a clear pattern over time.

128.    During 2004 and 2005, Citigroup's underwriting was dominated by the Commercial Paper CDOs, marketed with Citigroup's undisclosed money-back guarantees. During the same period, Mezzanine CDO issuance was minor, High Grade issuance nonexistent, and hedging nonexistent as well.

129.    During 2006, Mezzanine CDO issuance was dominant – resulting in substantial amounts of junior tranche issuance – with Commercial Paper CDOs fading (only one transaction, in March 2006) and High Grade CDOs rising.  High Grade CDO issuance occurred

almost *entirely* during the last quarter of 2006, between October 2006 and December 2006.  The leap in late-2006 High Grade CDO issuance – after two years of dormancy – was  (1) Citigroup's attempt to solve the problem of accumulating, unsold, junior Mezzanine CDO tranches by (2) creating new, "High Grade" CDOs collateralized to a uniquely high degree by those unwanted assets.

130.    During 2007, Citigroup's CDO issuance was dominated by High Grade CDO issuance, and by the Hedged CDOs.  These represent: (1) Citigroup's attempt to empty its warehouse of the riskier assets (by piling them into new High Grade CDOs); (2) to procure hedges for its super senior exposures (now well understood by Citigroup to be at risk); and (3) in "endgame" to protect itself, to the greatest degree possible, from the coming failure of these assets (by hedging the large super senior and accepting the junior tranches as unavoidable loss).

# The Pattern of Citigroup's CDO Underwriting



### 2.    Citigroup's Commercial Paper CDOs

131.    Citigroup first disclosed on November 4, 2007 that it was holding $43 billion of subprime CDO super senior tranches, and $2.7 billion of subprime CDO junior tranches. Citigroup disclosed a further $10.5 billion of super senior holdings in January 2008. $25 billion of the $43 billion of super seniors first revealed in November 2007 were the "Commercial Paper CDOs" discussed below.

132.    Between late 2003 and early 2006, Citigroup catapulted itself from a bit-player in CDO underwriting (7th place in 2003) to the second-largest underwriter of CDOs by 2005.  It did so by arranging/underwriting approximately $28 billion of subprime-backed CDOs that contained two distinguishing features: (1) a super senior tranche issued in the form of short-term commercial paper rather than traditional long-term debt; and (2) an irresistible feature for those commercial-paper-funded super seniors: a full-price money-back guarantee from Citigroup in the event that the backing collateral deteriorated.  As alleged below, the guarantee provided by Citigroup was, in effect: "We promise to buy these back from you at full price if the price declines".

133.    Citigroup's rise to prominence in CDO underwriting was itself underwritten by this money-back guarantee.  Between 2003 and 2005, Citigroup arranged/underwrote in excess of $20 billion of such guaranteed CDOs.  During the same period, Citigroup arranged/underwrote only $4.2 billion of CDOs without such guarantees.

134.    Until November 4, 2007, Citigroup never disclosed anything to indicate that it had guaranteed to repurchase, at full price, $25 billion of subprime CDO super senior CDO tranches.

135.    Plaintiffs' investigation has uncovered the substantial majority of these CDOs,

whose names, sizes and tranche structures are presented below:

## Citigroup's Commercial Paper Super Senior CDOs

| CDO | Issuance Date | Size (millions) | CP Super Senior | Tranche Structure and Ratings | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Junior Aaa | Aa | A | Baa | Equity |
| Grenadier Funding | 7/29/2003 | 1,500 | **1,320** | 75 | | 83 | | |
| Blue Bell Funding | 12/17/2003 | 1,250 | **1,125** | 55 | 20 | 38 | 19 | |
| Millstone Funding | 1/30/2004 | 1,010 | **880** | 50 | | 65 | | |
| Klio Funding I | 4/5/2004 | 2,423 | **2,132** | 122 | | 38 | | 29 |
| Saturn Ventures II | 4/12/2004 | 410 | **289** | 50 | 25 | | 20 | 26 |
| Pinnacle Point Funding I | 7/21/2004 | 1,004 | **880** | 60 | 22 | 14 | 11 | 17 |
| Klio Funding II | 9/28/2004 | 5,050 | **4,444** | 292 | 70 | 50 | 50 | 86 |
| McKinley Funding I | 11/22/2004 | 1,010 | **870** | 75 | 20 | 17 | 11 | 17 |
| Zenith Funding I | 11/23/2004 | 1,500 | **1,346** | 71 | 36 | 23 | 10 | 25 |
| Kent Funding I | 2/25/2005 | 1,010 | **900** | 60 | 15 | | 19 | 16 |
| Athos Funding 2005-1 | 4/14/2005 | 1,004 | **900** | 40 | 28 | | 20 | 16 |
| McKinley Funding II | 7/27/2005 | 1,000 | **863** | 71 | 17 | | 31 | 22 |
| KLIO III Funding | 10/5/2005 | 4,000 | **3,600** | 205 | 75 | 50 | 40 | 60 |
| Raffles Place Funding | 12/5/2005 | 1,000 | **880** | 60 | 40 | 10 | 7 | 7 |
| Tierra Alta ABS CDO | 3/13/2006 | 2,500 | **2,125** | 245 | 50 | 30 | 22 | 35 |
| Total | | $ 25,671 | 22,554 | 1,531 | 418 | 418 | 260 | 355 |
| Tranche Sizes | | 100% | **88%** | 7% | 2% | 2% | 1% | 3% |

136.    The above chart evidences several things.

137.    First, it allows relatively precise understanding of the exact CDO super senior tranches, and their amounts, that Citigroup had guaranteed at any given time during the class period. Indeed, the above chart actually understates matters: Citigroup acknowledged in November 2007 that it had guaranteed $25 billion of such super senior tranches, but plaintiffs have only been able to identify $22.5 billion of those tranches.  It is evident that the majority of these guaranteed super seniors were issued (with their guarantees) long ago: $13.3 billion in 2003 and 2004, $7.1 billion in 2005, and $2.1 billion in early 2006.  They had been on – or rather, off – Citigroup's books in substantial amounts since 2004.

138.    Second, the chart demonstrates how the super senior is by far the largest part of the entire securitization, accounting on average for 88% of the capital structure.  The residual "junior" triple-A tranche is quite small by comparison, accounting for only 7% of the securitizations.

139.    As previously alleged, creating such large super seniors allowed Citigroup to reduce CDO funding costs and improve CDO "arbitrage".  The "natural" yield diverted from the large super senior was diverted to the smaller subordinate tranches, substantially magnifying their yields/returns and thus enhancing their marketability.  The yield rerouting was particularly oriented to the lowest, riskiest equity tranches, which arrangers/underwriters such as Citigroup were often forced to retain as one of the costs of the business.

140.    But , super seniors' low yields rendered them effectively unsellable.

141.    The sole exception to this rule were the Commercial Paper CDOs, which Citigroup was able to "sell" only by promising to repurchase them, at full price, were the backing collateral to deteriorate.  For providing this guarantee, Citigroup received fees amounting to $50

57

million per year.  This scheme – alleged in detail in the "Schemes" section of this complaint – created the false and misleading appearance that a sale had been made and that a risk had been transferred.  Its intended result:  $25 billion of subprime CDOs vanished from Citigroup's financial statements, replaced by $50 million in annual revenues.  But, precisely because of Citigroup's undisclosed, full price money-back guarantee, the risk of these $25 billion of subprime CDO remained – undisclosed – with Citigroup.  As subprime performance deteriorated in 2006 and 2007, Citigroup was forced to honor its undisclosed guarantees and repurchased (again, without disclosure) at full price $25 billion of Commercial Paper CDO super senior tranches just as such instruments were losing their full price.  Citigroup first revealed its $25 billion exposure to these instruments, and first revealed the fact of its long-standing guarantees, on November 4, 2007.

142.    For the sake of particularity, case studies of several CDOs provide further illumination.

143.    Citigroup's Blue Bell Funding is a $1.25 billion CDO with a $1.125 billion super senior commercial paper tranche guaranteed by Citigroup.  Citigroup's guarantee fee: 19 basis points (0.19%) per year for the $1.125 billion super senior tranche, or $2.14 million per year. Citigroup's underwriting fee (at 1.5%): approximately $19 million.

144.    The super senior tranche amounted to 90% of the entire CDO, meaning that the first 10% of losses suffered by the underlying collateral pool (the asset base of the CDO) would be absorbed by the more junior tranches.  Any losses above 10% accrue to the super senior.  Blue Bell Funding's collateral base: 44% subprime RMBS (21% of the total from the worst-performing 2005-2007 vintages); 10% Alt-A RMBS (8% of the total from the worst-performing 2005-2007 vintages); 10% tranches of other CDOs collateralized by like amounts of RMBS.  The triple-A

58

tranche immediately below the super senior tranche whose risk Citigroup retained is currently rated triple-C – indicating that it will default, and thus that the super senior tranche is itself exposed to loss.

145.    Citigroup's Millstone Funding is a $1 billion CDO with a $ 880 million super senior commercial paper tranche guaranteed by Citigroup.  Citigroup's underwriting fee (at 1.5%): $15 million; Citigroup's guarantee fee (at 0.20%): $2 million per year.  The super senior tranche amounted to 88% of the entire CDO, meaning that the first 12% of losses suffered by the underlying collateral pool (the asset base of the CDO) would be absorbed by the more junior tranches. Millstone Funding's collateral base: 17.3% subprime RMBS from the worst-performing 2005-2007 vintages; 21.1% Alt-A RMBS from the worst-performing 2005-2007 vintages; 23.3% tranches of other CDOs collateralized by like amounts of RMBS.  The triple-A tranche immediately below the super senior tranche whose risk Citigroup retained is currently rated triple-C;  and currently 25% of the CDO's collateral is rated as "below investment grade" (including 11% at CCC or lower ratings). Again, this indicates that substantial amounts of the underlying collateral will default, that all junior tranches of the CDO will do the same, and that the super senior tranche is exposed to substantial loss.

146.    Citigroup's Grenadier Funding is a $1.5 billion CDO with a $ 1.32 billion super senior commercial paper tranche guaranteed by Citigroup.  Citigroup's underwriting fee (at 1.5%): $22.5 million; Citigroup's guarantee fee (at 0.20%): $3 million per year. The super senior tranche amounted to 88% of the entire CDO, meaning that the first 12% of losses suffered by the underlying collateral pool (the asset base of the CDO) would be absorbed by the more junior tranches.  Grenadier Funding's collateral base: 27.7% subprime RMBS from the worst-performing

2005-2007 vintages; 16.2% Alt-A RMBS from the worst-performing 2005-2007 vintages; 10.6%

tranches of other CDOs collateralized by like amounts of RMBS.  The triple-A tranche immediately

below the super senior tranche whose risk Citigroup retained is currently rated triple-C;  and

currently 13% of the CDO's collateral is rated as "below investment grade", including 10% rated

CCC or lower.  The situation of Grenadier Funding's super senior tranche thus parallels those of

Blue Bell's and Millstone's.

       147.    The above three CDOs – Blue Bell, Grenadier, and Millstone – are believed

to be the CDOs in the *best* shape of all the Commercial Paper CDOs listed in the table above.  That

is because they are the oldest, and as such, the most likely to have accumulated portfolios that

avoided the worst nonprime RMBS and CDO vintages of 2005, 2006 and 2007.  Later-issued CDOs

have larger exposure to these more perilous assets.  It is precisely because of this fact (i.e., that the

Commercial Paper CDOs are among the oldest of Citigroup's CDOs) that Citigroup's writedowns

on its Commercial Paper CDOs – 36% – are substantially less than the 75%-100% writedowns that

Citigroup recognized on its more recent CDOs.

### 3.    Citigroup's Mezzanine CDOs

      148.    Of the $43 billion of subprime CDO super senior holdings Citigroup first

disclosed on November 4, 2007, $8 billion were super senior tranches from Mezzanine CDOs.  On

January 15, 2008, Citigroup revised that figure upwards to $9 billion.  Between January 2008 and

April 2008, Citigroup took writedowns of $7.6 billion on these instruments – i.e., near-total loss

severity of 84%.  As explained below, severe losses had long been apparent for such Mezzanine

instruments.  What was not apparent was that Citigroup was holding these instruments.

      149.    Below, plaintiffs list the Mezzanine subprime CDOs that Citigroup

60

underwrote between 2004 and 2007, and detail the tranched structure of each. These CDOs contained $12.76 billion of super senior tranches (i.e., $3.8 billion more than Citigroup indicated). The discrepancy is easily explained (*see* fn. 9, *supra*).

## Citigroup's Mezzanine CDOs Underwriting and Super Senior Holdings

| CDO | Date of Issuance | Size | | Type | Super Senior | Aaa | Aa | A | Baa | Ba / Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Tranche Structure and Credit Ratings** | | | | | |
| G-Star 2004-4 | 7/27/2004 | $ | 500 | Cash | **420** | 20 | 10 | 12 | 14 | 24 |
| Summer Street 2004-1 | 11/18/2004 | $ | 400 | Cash | **278** | 41 | 37 | 6 | 18 | 20 |
| G-Star 2005-5 | 3/2/2005 | $ | 600 | Cash | **423** | 60 | 37 | 21 | 24 | 35 |
| Orchid Struc. Finance CDO II | 3/11/2005 | $ | 301 | Cash | **204** | 40 | 26 | 15 | | 16 |
| Trinity CDO 2005-1 | 3/28/2005 | $ | 300 | Cash | **210** | 30 | 24 | 8 | 15 | 13 |
| Saturn Ventures 2005-1 | 5/13/2005 | $ | 400 | Cash | **268** | 56 | 35 | 6 | 17 | 18 |
| Summer Street 2005-1 | 10/4/2005 | $ | 400 | Cash | **279** | 38 | 33 | 12 | 18 | 20 |
| Camber 5 | 12/6/2005 | $ | 500 | Cash | **340** | 23 | 67 | 19 | 22 | 28 |
| Topanga CDO | 12/21/2005 | $ | 502 | Hybrid | **382** | 49 | 37 | 26 | 20 | |
| Neptune CDO III | 2/24/2006 | $ | 400 | Cash | **270** | 42 | 36 | 14 | 19 | 20 |
| GSC ABS CDO 2006-1c | 3/31/2006 | $ | 550 | Hybrid | **250** | 130 | 40 | 32 | 15 | 33 |
| Ivy Lane CDO | 4/6/2006 | $ | 500 | Cash | **350** | 50 | 36 | 19 | 25 | 21 |
| Avanti Funding | 5/26/2006 | $ | 400 | Cash | **279** | 38 | 32 | 18 | 15 | 16 |
| Coldwater CDO | 7/20/2006 | $ | 401 | Cash | **290** | 32 | 29 | 20 | 13 | 17 |
| Cetus ABS CDO 2006-1 | 7/20/2006 | $ | 1,000 | Synthetic | **700** | 100 | 50 | 55 | 40 | 55 |
| Cetus ABS CDO 2006-2 | 9/27/2006 | $ | 1,000 | Synthetic | **700** | 100 | 50 | 55 | 40 | 55 |
| FAB US 2006-1 | 11/2/2006 | $ | 400 | Cash | **216** | 99 | 34 | 25 | 19 | 17 |
| Mugello ABS CDO 2006-1 | 11/14/2006 | $ | 562 | Synthetic | **394** | 54 | 40 | 26 | 20 | 28 |
| Topanga CDO II | 11/21/2006 | $ | 1,000 | Synthetic | **650** | 161 | 60 | 45 | 42 | 57 |
| Lacerta ABS CDO 2006-1 | 11/27/2006 | $ | 2,000 | Synthetic | **1,400** | 200 | 100 | 110 | 80 | 110 |
| Cetus ABS CDO 2006-4 | 11/29/2006 | $ | 1,500 | Synthetic | **1,050** | 150 | 75 | 83 | 60 | 82 |
| Octans III CDO | 12/6/2006 | $ | 1,000 | Hybrid | **700** | 100 | 50 | 55 | 40 | 55 |
| Tallships Funding | 12/14/2006 | $ | 1,527 | Hybrid | **940** | 360 | 65 | 50 | 38 | 77 |
| Octonion I CDO | 2/15/2007 | $ | 1,000 | Hybrid | **622** | 150 | 88 | 70 | 50 | 60 |
| Laguna Seca Funding I | 3/2/2007 | $ | 500 | Hybrid | **250** | 130 | 40 | 32 | 28 | 20 |
| Plettenberg Bay CDO | 3/8/2007 | $ | 500 | Hybrid | **300** | 96 | 40 | 24 | 23 | 20 |
| STACK 2007-1 | 3/30/2007 | $ | 1,500 | Hybrid | **600** | 525 | 151 | 159 | 10 | 55 |

| | | | | | | |
|---|---|---|---|---|---|---|
| TOTAL | $ 19,642 | **$12,765** | $ 2,874 | $1,322 | $ 1,017 | $ 725 | $ 971 |
| Percentages | 100% | **65%** | 15% | 7% | 5% | 4% | 5% |

150.    The above chart evidences the following:

151.    First, that Citigroup failed to sell a single Mezzanine CDO super senior tranche throughout the class period. Between 2004 and 2007, Citigroup arranged and underwrote approximately $19.6 billion of Mezzanine CDOs, containing $12.7 billion of super senior tranches. Citigroup admitted in November 2007 and January 2008 net exposure to such tranches of $9 billion. (The discrepancy is not due to any sales, but rather to the fact that Citigroup hedged some $3.7 billion of the super senior tranches listed above with FGIC, ACA, Radian and other counterparties. *See* fn. 8, *supra*.

152.    Second, the above chart serves a precise and detailed record of exactly what Citigroup was holding when. By the close of 2004, Citigroup held $700 million of Mezzanine super seniors; by the close of 2005, $2.8 billion; by the end of 2006, $10 billion, and by early 2007 $12.76 billion.

153.    Third, Mezzanine CDOs contain large super senior tranches that, on average, account for 65% of each securitization. Thus, on average, the Mezzanine CDOs are protected by subordinate tranches – including a junior triple-AAA tranche constituting 15% of the securitization – from the first 35% of losses suffered by the CDOs' underlying collateral. This may seem substantial protection – until one examines what that underlying collateral was. Plaintiffs do so below.

154.    Fourth, the Mezzanine CDO securitizations produced a relatively large amount of more junior tranches (i.e., 35% of the Mezzanine CDO capital structure). By contrast,

the Commercial Paper CDO securitizations featured a much larger super senior (88% of the capital structure) with more junior tranches thus totaling only 12% of the issue.

155.    As plaintiffs later demonstrate, in late 2006 and early 2007 these relatively larger amounts of Mezzanine CDO junior tranches– even with the yield "stolen" from super senior – became increasingly difficult to sell.  They too began to pile up on Citigroup's internal books, alongside the super seniors.  In late 2006 and early 2007, Citigroup began hiding these junior tranches in ever larger amounts into newly-arranged CDOs, which resulted in new rounds of unmarketable super seniors and juniors, which were put into yet new CDOs.

156.    The essence of Mezzanine CDOs is neatly encapsulated in one simple diagram (*see* following page), taken from a presentation made in February 2008 by Citigroup credit products strategist Michael Hampden-Turner.  As the diagram shows, and as plaintiffs next explain, Mezzanine CDOs typically invested 75% of their funds into the "mezzanine", triple-B tranches of nonprime RMBS.  This was no secret, but rather their explicit investment mandate.

157.    These particular RMBS tranches, as plaintiffs detailed above: (1) lie near the bottom of the initial RMBS securitization, putting those tranches close to first in line for losses suffered by the underlying mortgages; and (2) are very "thin", meaning that even a small change in overall mortgage performance can move the triple-B tranche from 100% recovery to total loss.  The effect, as Citigroup's diagram shows, was to leverage, *immensely*, Mezzanine CDOs' exposure to a very small, very specific slice of subprime risk.

# Bank writedowns: what went wrong?



## Typical Mezz CDO of ABS

## Typical CLO Structure

The extra layer makes CDOs of ABS unique

fixed income strategy and analysis

Source: Citi.

Citigroup Global Markets Ltd    6

158.    The first three rectangles in the diagram represent: (1) the tranching structure of the initial subprime RMBS securitization; (2) the composition of a Mezzanine CDO asset pool, filled primarily by the lowest, thinnest tranches of the initial subprime RMBS; and (3) the ensuing round of CDO securities issued by the CDO on the basis of that pool of assets.  We examine each in turn, providing clarifying detail and statistics.

159.    Mezzanine CDOs held a concentrated position in a very specific asset: BBB-rated subprime RMBS and BBB-rated Alt-A RMBS.  Plaintiffs have already detailed the nature of these assets, emphasizing (1) their relative proximity to loss, and (2) their thinness.  The risk presented by such instruments is "digital": either 1 or 0, either complete return of principal or total loss.  Mortgage performance deterioration that may seem relatively slight when considered in light of the entire mortgage pool (e.g., actual or expected losses moving from 6% overall to 8%) is sufficient to substantially impair the value of these instruments – or entirely destroy it.

160.    To the extent these subprime BBB-rated assets form the asset base for a Mezzanine CDO, they transfer exactly the same risks to it, but magnified massively for CDO investors.  If mortgage performance deteriorates enough to capsize the BBB tranche of the initial subprime RMBS securitization, investors in the single-A and double-A *RMBS* tranches still have some reason to expect some/all return of principal, and triple-A *RMBS* tranche investors are still far removed from loss.  *But at the CDO level, capsizing of the initial RMBS triple-B tranches means wipeout even for the triple-A CDO tranches, and substantial losses at the super senior level.*

161.    To make matters more precise, plaintiffs re-present (1) the average capital structure of subprime RMBS with precise figures for tranching, together with (2) the resulting asset base of mezzanine CDOs (again, precise), and (3) the resulting capital structure of the mezzanine

66

CDO securitization (again, precise – representing the average structure of Citigroup's own Mezzanine CDOs):

| Initial Subprime RMBS Securitizations | Mezzanine CDO Asset Pool | Mezzanine CDO Securitization |
|---|---|---|
| | Other BBB | |
| | Other BBB | |
| | Other BBB | |
| | Other BBB | |
| | Other BBB | |
| | **NONPRIME BBB 75%** | Super Senior 62% |
| | Other CDO A | |
| | Alt-A BBB - 2 | |
| | Alt-A BBB - 1 | |
| AAA - 79.3% | Subprime BBB - X | |
| | Subprime BBB X-1 | |
| | Subprime BBB - 9 | |
| | Subprime BBB - 8 | |
| | Subprime BBB - 7 | |
| | Subprime BBB - 6 | AAA - 16% |
| | Subprime BBB - 5 | |
| | Subprime BBB - 4 | AA - 7% |
| AA - 6.6% | | |
| A - 5.4% | Subprime BBB - 3 | A - 5% |
| BBB - 4.5% | Subprime BBB - 2 | BBB - 4% |
| BB / Equity - 4.8% | Subprime BBB - 1 | BB/Equity 5% |

162.    The basic picture is clear.  Mezzanine CDOs were (1) a vast expansion of (2) a very thin, very junior, and very precise slice of subprime risk into (3) the substantial majority of the CDOs' entire asset base.

163.    Mortgage performance deterioration that may seem relatively slight when considered in light of the entire mortgage pool (e.g., actual or expected losses moving from 6% overall to 8%) is sufficient to substantially impair the value of these instruments – or entirely destroy it.

164.    The weighted average rating of the assets backing Mezzanine CDOs was towards the lower end of the BBB-range: between BBB and BBB-.  On average, 84% of the collateral pool backing Mezzanine CDOs was rated triple-B or lower.  The foregoing diagrams demonstrate this vividly.

165.    Most of those assets were subprime RMBS and Alt-A RMBS.  As the table below shows, on average, 70%-80% of the assets of more recently-underwritten Mezzanine CDOs were subprime and Alt-A RMBS:

## Mezzanine CDOs: Average Collateral Composition

| CDO Vintage | % Assets Subprime | % Assets Alt-A | % Assets CES | % Assets Other CDOs | Total Nonprime |
|-------------|-------------------|----------------|--------------|---------------------|----------------|
| 2003        | 33.7%             | 7.6%           | 1.8%         | 7.0%                | 50.1%          |
| 2004        | 43.2%             | 10.1%          | 2.7%         | 5.9%                | 61.9%          |
| 2005        | 55.1%             | 9.3%           | 2.2%         | 5.9%                | 72.5%          |
| 2006        | 64.2%             | 6.9%           | 2.1%         | 5.5%                | **78.7%**      |
| 2007        | 62.9%             | 5.8%           | 0.8%         | 6.9%                | **76.4%**      |

(Source: Standard & Poors)

166.   As the foregoing diagrams illustrate (the third rectangle from the left), a new round of CDO securities is issued, collateralized by the pile of triple-B nonprime assets just discussed.  Citigroup's diagram depicts matters quite accurately.  As plaintiffs' list of Citigroup's actual Mezzanine CDOs demonstrates, the super senior tranche of Citigroup's Mezzanine CDOs accounted for 65% of the entire securitization (just as depicted in the diagram), the junior triple-A tranche for the next 15% (just as in the diagram), etc.  Arrayed against that CDO capital structure is the CDO asset structure: 65%-75% triple-B nonprime RMBS.  This pile of triple-B assets dwarfs the size of all junior tranches and cuts deeply into the super senior.

167.   Again, Citigroup's diagram shows this quite clearly.  By expanding (1) the original triple-B slice of risk of the initial subprime RMBS so that (2) that very risk forms 75% of the collateral base of a Mezzanine CDO, (3) the "likely loss", as the diagram states, is 75%.

168.   As the diagram shows, this looming loss: (1) overwhelms the all the more junior tranches (even at the "junior" triple-A level) of the Mezzanine CDO, which serve as the super senior tranche's credit protection; and (2) deeply impairs the super senior tranche.

169.   An understanding of underlying fundamentals serves as the basis for higher-level indicators and conclusions.  Plaintiff's goal was to explain these instruments sufficiently to make a certain chain of causation clear.  That chain starts with a deterioration in mortgage performance sufficiently severe to endanger the thin triple-B tranches of subprime RMBS.  Because those tranches are so thin and so close to the bottom, that deterioration need not be terribly severe.  After that, the rest is automatic: if the mortgages perform sufficiently badly to threaten to wipe out the triple-B tranches, it is a straight line to massive Mezzanine CDO losses, even at the super senior

level.

170.    Citigroup's Mezzanine CDOs were just as mezzanine CDOs were designed to be: heavily invested in the BBB/BBB- slice of subprime/nonprime risk.  The results are essentially the same, no matter the case.

171.    To allow but one illustration to stand for many:  Citigroup's Tallships Funding CDO was backed by 71% subprime BBB tranches (all from 2005-2007), 1% Alt-A BBB tranches, 1% prime RMBS, and 22% CDO tranches (of which 20% were from CDOs issued between 2005-2007).  Of particular note: Tallships Funding's holdings of other CDO tranches (22%) more than triple the average allocation (per Citigroup's own statistics) to such assets in Mezzanine CDOs generally (6%). As plaintiffs later detail in the "Schemes" section of this complaint (Section III.A, *infra*), Citigroup had stuffed into Tallships the tranches from prior Citigroup CDO securitizations that Citigroup had otherwise been unable to sell.  75% of Tallships Funding's assets were downgraded to junk, and by July 2008, Citigroup's super senior tranche was rated triple-C.  Tallships Funding is now, as of October 6, 2008, in liquidation.

172.    Octans III is now being liquidated as well.  Stack 2007-1 was liquidated in September 2008, as was  Mugello.  Octonion CDO had 80% of its assets downgraded by October *2007*.  It is now in the "acceleration" phase where all payments from underlying collateral are forwarded only to the super senior tranche, together with Lacerta ABS CDO 2006-1, Cetus ABS CDO 2006-4, Ivy Lane, FAB US 2006-1.   Other CDOs have experienced sufficiently poor performance to trigger "Events of Default" ("EOD"), which in turn allow the super senior tranche holder to decide whether to accelerate or liquidate the CDO. These CDOs include GSC ABS CDO 2006-1, Laguna Seca Funding I, and Camber 5.

173.    As Credit Investment News reported on March 3, 2008, "roughly $16 billion of $23 billion of the transactions underwritten by the bank [Citigroup] to hit EOD have now accelerated payments to senior noteholders. Both amounts are more than any other underwriter".

**4.    Citigroup's High Grade CDOs**

174.    Of the $43 billion of subprime CDO super senior holdings first disclosed on November 4, 2007, $10 billion were super senior tranches from Citigroup-underwritten "High Grade" CDOs.  Until November 4, 2007 Citigroup did not disclose and affirmatively concealed that it was holding $10 billion of super senior tranches from High Grade CDOs.

175.    High Grade CDOs are similar to Mezzanine CDOs, but instead of investing in BBB-rated nonprime securities, High Grade CDOs invest largely on the borderline between single-A and double-A.  Because the underlying assets of High Grade CDOs are thus further removed from loss than the BBB tranches owned by the Mezzanine CDOs – a removal aided by the thicker tranche sizing of the single-A and double-A tranches – High Grade super senior tranches should have fared much better than the above-detailed Mezzanine CDOs.

176.    A look at Citigroup's High Grade CDO writedowns reveals that Citigroup's High Grade CDOs did not.  Impairment in their value has paralleled the Mezzanine CDO super seniors:  High Grade CDO super seniors were written down by 72%; Mezzanine super seniors by 84%.  Why?

177.    Citigroup's High Grade CDO securitizations were collateralized to a uniquely high degree  by *other* CDO tranches, particularly those from Citigroup's previously-underwritten Mezzanine CDOs.  Citigroup was thus using also its High Grade CDO securitizations to clean out unsold inventory of risky, lower-rated CDO tranches from prior CDO securitizations – and in so

71

doing, systematically degrading its "High Grade" CDOs.  The details are presented in the "Schemes" section of this complaint (Section III.A, *infra*).

178.    A complete list of Citigroup's High Grade CDO securitizations during the class period is provided below:

**Citigroup's High Grade CDO Securitizations, 2004-2007
Dollar Amounts and Tranche Structures**

| CDO | Date | Size (millions) | Type | Tranche Structure and Credit Ratings | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Super Senior AAA | Aaa | Aa | A | Baa | Ba / Equity |
| Stockbridge CDO Ltd. I | 9/24/2004 | $ 250 | Cash HG and CDO | 170 | 45 | 13 | 8 | | 14 |
| Madaket Funding | 7/6/2006 | $ 1,000 | Cash HG and CDO | 800 | 130 | 28 | 29 | 8 | 7 |
| Singa Funding | 10/31/2006 | $ 1,000 | Cash HG and CDO | 860 | 88 | 30 | 10 | 9 | 7 |
| Raffles Place II Funding | 11/21/2006 | $ 1,000 | Cash HG and CDO | 860 | 80 | 40 | 10 | 7 | 7 |
| HSPI Diversified CDO Fund I | 12/12/2006 | $ 623 | Synthetic CDO2 | 384 | 75 | 77 | 24 | 28 | 35 |
| Palmer 2007-1 | 3/7/2007 | $ 1,000 | Synthetic | 700 | 100 | 50 | 55 | 40 | 55 |
| Armitage ABS CDO | 3/29/2007 | $ 3,001 | Cash HG | 2,400 | 445 | 72 | 30 | 27 | 27 |
| HSPI Diversified CDO Fund II | 6/14/2007 | $ 733 | Hybrid CDO2 | 350 | 195 | 85 | 61 | 5 | 30 |
| Pinnacle Peak CDO I | 7/3/2007 | $ 1,501 | Cash HG and CDO | 1,275 | 140 | 35 | 30 | | 21 |
| Bonifacius | 7/27/2007 | $ 2,505 | Cash HG and CDO | 1,850 | 515 | 88 | 15 | 16 | 21 |
| Jupiter High Grade CDO VII | 8/2/2007 | 1,480 | Cash HG | 1,200 | 230 | 20 | 30 | | 20 |
| Total Percentages | | $ 14,093 | | $10,849 77% | $2,043 14% | $538 4% | $302 2% | $140 1% | $ 244 2% |

179.    The above table evidences several matters.

180.    First, Citigroup arranged/underwrote $14 billion of High Grade CDO securitizations between 2004 and 2007.  These securitizations produced $10.8 billion of super senior tranches.

73

181.   Second, the total super senior production from the above CDOs matches exactly the High Grade super senior exposure that Citigroup disclosed on November 4, 2007. Citigroup was not able to sell a single super senior tranche from its High Grade CDO securitizations during the entire class period; Citigroup kept all of them.

182.   Third, Citigroup's High Grade CDO underwriting took place in effective entirety in a concentrated burst of activity between October 2006 and August 2007. The start date marks the beginning of Citigroup's attempt to unburden itself of unsold CDO tranche inventory: as real investors were turning away from these instruments, Citigroup created new CDOs to appear to take their place. The end date marks when this scheme collapsed. And the seeming boom in issuance masked a reality that was the opposite: investors were turning away from CDOs, leaving Citigroup with the undesired detritus of its own prior CDO securitizations – which Citigroup attempted to offload and/or conceal by creating new CDOs in which to store them.

183.   So long as Citigroup was able to conceal that its High Grade CDOs were packed with Citigroup's prior failed CDO securitizations, the market for Citigroup's CDOs – and Citigroup's share price – remained artificially high.

**5.   Citigroup's Hedged CDOs**

184.   Citigroup's super senior tranche holdings in the above-mentioned CDOs – the Commercial Paper CDOs, the Mezzanine CDOs, and the High Grade CDOs – were first disclosed on November 4, 2007. They totaled $43 billion. Citigroup also disclosed a further $2.7 billion of junior CDO tranche holdings.

185.   But not until January 15, 2008 did Citigroup disclose that, in addition to that $43 billion of "net" super senior exposure, Citigroup held a *further* $10.5 billion of subprime CDO

super seniors against which it had procured purported hedges with monoline bond insurers (the "Monolines") that purportedly insured Citigroup against any loss.  These latter CDOs are the "Hedged CDOs".  By its November 2007 omissions and January 2008 disclosures, Citigroup sought to create the false impression that it had meaningful insurance against a further $10.5 billion of potential CDO losses.  This impression was indeed false, because the Monolines could not – and did not – provide the insurance that Citigroup claimed to have obtained.

186.    During a conference call that Citigroup held on November 5, 2007, defendant Crittenden, when directly questioned, alluded to further "secondary and tertiary" exposures to CDOs above and beyond the "net" $43 billion exposure detailed on November 4, 2007 – but refused to disclose anything about them:

> GUY MOSZKOWSKI, ANALYST, MERRILL LYNCH: ...Maybe you can comment for us as a follow-up on the dependence or lack thereof in any of the vehicles that you have exposure to on guarantees or credit support from the monoline insurers like MBIA or Ambac that have obviously had some pretty significant credit spread blowouts?

> GARY CRITTENDEN: Well we haven't quantified what that exposure is. They obviously are important counterparties for us in a number of different instruments. And **I think you raise an important point which is all that I have talked about today are direct exposures and there is obviously potentially secondary and tertiary exposures that potentially could exist for the Company that are not part of what we talked about today**. This is really the direct exposure that we have. But we, like I would assume virtually everyone else that is a significant financial institution, have counterparty exposure to the monoline.

> GUY MOSZKOWSKI: And again, you can't sort of give us a sense for how much that might be?

> GARY CRITTENDEN: **No, we haven't disclosed it**.

(Unless otherwise indicated, all emphasis in quotations contained in this complaint has been added).

187.   Not until January 15, 2008 did Citigroup disclose that, in addition to the $43 billion of net exposure, Citigroup held $10.5 billion of subprime CDO super seniors against which it had procured purported hedges.

188.   On February 22, 2008, Citigroup provided further detail concerning those exposures, including detail as the amounts hedged with the Monolines.  As Citigroup's 2007 Form 10-K revealed for the first time, $7.6 billion of the $10.5 billion in "Hedged Super Seniors" had been hedged with the Monolines, primarily AMBAC ($5.5 billion).  In addition, AMBAC had provided a further $1.4 billion hedge against an instrument identified as a "Trading Instrument - Subprime" (the "Class V Funding IV" instrument in the tables below).

189.   Citigroup has never disclosed any further detail concerning the above-mentioned hedges, except insofar as disclosing substantial writedowns to the value of those hedges (summarized in the table of Citigroup's writedowns at Section I.B.1, *supra*).

190.   AMBAC, however, has[9], and the table below lists seven Citigroup arranged/underwritten CDOs (and one further entity that functions like a hedged CDO-square) in which Citigroup (1) after underwriting the CDO and retaining the super senior tranche, (2) purported to hedge the risk represented by that tranche by entering into a credit default swap with AMBAC.

---

[9]   *See*, *inter alia*, AMBAC, *CDO of ABS Data Supplement*, August 6, 2008 (detailing very precisely 23 of its worst CDOs); AMBAC, *Ambac Collateralized Debt Obligations Exposure*, August 6, 2008 (a different view of those CDOs, together with four further and even worse ones, all underwritten by Citigroup, as further alleged in detail below); AMBAC, *Ambac Collateralized Debt Obligations Exposure*, November 5, 2008 (similar).

## Citigroup CDOs for which Citigroup Hedged its Retained Risk
## By Swapping the Risk to AMBAC

| CDO | Issuance Date | Size (millions) | Type | Tranche Structure and Credit Ratings | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Super Senior AAA | Aaa | Aa | A | Baa | Ba / Equity |
| **Diversey Harbor ABS CDO** | 5/5/2006 | $ 2,500 | Cash HG and CDO | 1,925 | 445 | 60 | 25 | 24 | 21 |
| **Ridgeway Court Funding I** | 6/30/2006 | $ 2,000 | Cash HG and CDO | 1,600 | 288 | 46 | 35 | 13 | 18 |
| **ESP Funding I** | 8/8/2006 | $ 1,000 | Hybrid HG and CDO | 750 | 217 | 27 | 15 | 10 | 14 |
| **Adams Square Funding II** | 3/6/2007 | $ 1,000 | Hybrid MZ | 600 | 110 | 140 | 50 | 69 | 53 |
| **Class V Funding III** | 2/13/2007 | $ 1,000 | Synthetic CDO2 | 500 | 360 | 75 | 50 | 35 | 22 |
| **888 Tactical Fund** | 2/14/2007 | $ 1,000 | Hybrid CDO2 | 500 | 360 | 75 | 50 | 35 | 23 |
| **Ridgeway Court Funding II** | 6/27/2007 | $ 3,007 | Hybrid HG and CDO | 2,250 | 626 | 80 | 68 | | 33 |
| **Subtotals** | | **$11,507** | | **$ 8,125** | $2,046 | $ 428 | $243 | $151 | $ 184 |
| Percentages | | 100% | | 71% | 18% | 4% | 2% | 1% | 2% |
| **Class V Funding IV** | 6/29/2007 | **$ 2,000** | CDS on CDO | 1,400 | | | 600 | | |
| **Total** | | **$13,508** | | **Ambac Insured   9,525** | | | | | |

191.    The table shows that beginning in early 2007, Citigroup sought, to a greater
extent than ever before, to hedge away the super senior risks it retained as a result of the CDO
transactions it underwrote.  Approximately 65% of Citigroup's entire hedging with AMBAC for
CDO-related transactions throughout the last four years took place in four months beginning in

77

February 2007 and ending in June 2007.  The sudden jump-up is because Citigroup became sufficiently aware of the risks associated with its assets.

192.     Accordingly, in a burst of CDO securitizations between February 2007 and June 2007, Citigroup departed from its prior practice by hedging the risk presented by the resulting, retained super senior tranches.  These Hedged CDO transactions marked Citigroup's concession of "endgame" and a wrap-up of Citigroup's unsustainable ponzi scheme.

193.     Why?  Because, to an even greater extent than the High Grade CDOs just discussed, the Hedged CDOs were collateralized largely, and in three cases, completely, by the junior tranches of other Mezzanine CDOs.  Imminent losses on Mezzanine CDOs, as plaintiffs' allegations and Citigroup's diagrams make clear, would overwhelm Mezzanine CDO single-A tranches, Mezzanine CDO double-A tranches, Mezzanine CDO junior triple-A tranches, and bite deeply into Mezzanine super senior tranches.

194.     In this series of Hedged CDO transactions, Citigroup was conceding (1) that the underlying assets (the junior CDO tranches) were worthless, and (2) that the resulting new securities were also worthless.  The key was that the largest portion of the resulting new securities – the super senior – would not appear to burden Citigroup, but rather the Monolines to whom Citigroup had swapped off the risk.  By these Hedged CDO transactions Citigroup sought to cut impending losses (from 100%) by unburdening itself, at the least, of the resulting large super senior tranches (representing 50%-70% of the securitizations).

195.     Examination of the Hedged CDOs shows them to be united primarily by their timing (February 2007 - June 2007) and their sizeable collateralization in the form of junior tranches from *other* subprime CDOs.

78

196.    Three later transactions – the $1 billion Class V Funding III, the $1 billion 888 Tactical Fund, and the $2.0 billion Class V Funding IV – are *each 100% backed by other CDOs*. This collateral was almost entirely junior tranches from Mezzanine CDOs previously underwritten by Citigroup, as the chart below makes clear:

**Cleaning Out the Warehouse**

| CDO | Total Assets | Source of Assets | | Rating of Assets | |
|---|---|---|---|---|---|
| | | Mezzanine CDOs | High Grade CDOs | Single-A | Double-A |
| 888 Tactical Fund | $1 billion | $930 million | $70 million | $1 billion | 0 |
| Class V Funding III | $1 billion | $1 billion | 0 | $1 billion | 0 |
| Class V Funding IV | $2 billion | $2 billion | 0 | 0 | $2 billion |
| Total | $4 billion | $3.93 billion | $0.07 billion | $2 billion | $2 billion |

197.    Given the fact that these $4 billion of CDOs were collateralized in their entirety by junior tranches of Mezzanine CDOs, they were among the most toxic CDOs that Citigroup produced.

198.    In November 2007, long-growing concerns about the Monolines' exposure to CDO losses led AMBAC to disclose details concerning the 28 riskiest CDOs for which it had provided insurance.[10] *Each* of the eight above-mentioned Hedged CDOs underwritten by Citigroup

---

[10]     *See*, e.g.: (1) AMBAC, *AMBAC Update: Subprime Exposure – November 2007*, November 26, 2007 at p.8 (four of the last five CDOs, labeled only as "CDO of Mezzanine ABS", were in fact Citigroup CDOs); (2)   William Ackman, *Letter to Eric Dinallo, New York Superintendent of Insurance re Bond Insurer Transparency: Open Source Research*, January 30, 2008, at p. 13 (reproducing AMBAC's November 2007 list, but specifically identifying the "CDO

was on AMBAC's list.

199.    Citigroup's Hedged CDOs are qualitatively and quantitatively distinguishable from all the other CDOs on AMBAC's "worst of" list by their far greater proportions of collateral in the form of other CDOs (*see Ambac Update: Subprime Exposure – November 2007*, at p. 8).[11]

200.    After AMBAC's November 2007 disclosures, investor and regulator concerns as to AMBAC's losses from its guaranteed CDOs focused particularly on the Citigroup-underwritten CDOs listed above.  AMBAC's list of its worst 28 CDOs showed that AMBAC had provided $29.2 billion of insurance for them.  Citigroup's CDOs accounted for $8.96 billion, or 30.7%, of this total. Working from AMBAC's list and full data on the underlying collateral of all the CDOs on that list, one analyst calculated that AMBAC would suffer losses of $6.95 billion.[12]   The Citigroup CDOs accounted for $4.0 billion of those losses, or 57.5% of all of AMBAC's losses (*Id.*).   According to the analyst's calculations, four separate Citigroup CDOs – the Class V Funding III, Class V Funding IV, 888 Tactical Fund, and Adams Square Funding II CDOs – would result in effectively total losses

---

of Mezzanine ABS" as Citigroup's Adams Square II, Class V Funding IV, 888 Tactical Fund, and Class V Funding III).

[11]    Citigroup's Hedged CDO-squareds – Class V Funding IV, 888 Tactical Fund, and Class V Funding III – each contained 100% CDOs; Citigroup's Ridgeway Court Funding II contained 40% CDOs, and Citigroup's Ridgeway Court Funding I contained 30% CDOs.  *See also*, AMBAC, *CDO Performance Update*, April 23, 2008, at p. 37 ("CDO Squared Portfolio: $2.472 billion... 4 transactions... 2 transactions exclusively contain mezzanine formerly single A-rated tranches of inner CDO's... likely [] 100% severities for subordinated inner CDO tranches") and p. 39 ("CDO of High Grade... Performance was primarily caused by poor performance in the CDO buckets:  30-40% buckets versus subordination of 19-20%"); and *Ambac Update: Subprime Exposure – November 2007* (appendix at pp. 16-19 titled "CDO2 – 'How We Do It", which diagrams the structure of the Class V Funding III and 888 Tactical Fund CDOs though without naming them explicitly).

[12]    S*ee* William Ackman, *Letter to Eric Dinallo, New York Superintendent of Insurance et al. re Bond Insurer Transparency; Open Source Research*, January 30, 2008, at p. 13.

even at AMBAC's super senior level (*Id.*).

201.    No CDOs underwritten by any other bank was predicted to cause more than a 50% loss. (*Id.*).

202.    Citigroup knew full well no later than February 2007 that it had highly risky assets on hand.  By its Hedged CDO transactions, Citigroup sought to foist the largest part of those risks off to AMBAC – but in so doing, undermined the very insurance it claimed to have obtained.

203.    At a November 26, 2007 conference convened to discuss the CDO risk to the Monolines, Citigroup analyst Heather L. Hunt provided a presentation titled *Financial Guarantors: The Subprime Overhang*.  That analysis, *sotto voce*, showed that AMBAC's most severe problems stemmed from Citigroup's own CDOs.  In a slide titled "How the Companies Stack Up", the Citigroup analyst noted for AMBAC that there were "four mezzanine CDOs that are likely to see stress" (Citigroup, *Financial Guarantors: The Subprime Overhang*, November 26, 2007,  p. 10). Again, in a slide titled "What's Driving the Stocks?", the Citigroup analyst noted with respect to AMBAC that the market was "concerned about Mezz CDO and CDOs of Mezz CDOs" (*Id.*, p. 16). More explicitly yet, in a slide titled "AMBAC's Exposure", the Citigroup analyst wrote:

>   AMBAC's Exposure
>
>   CDOs with Mezzanine Collateral the focus
>
>   -       Transacted in 1Q07 and 2Q07
>   -       Three pieces: $500 mil., $500 mil., and $1.4 billion
>   -       One CDO of BBB RMBS – downgraded to
>           BBB

(*Id.*, p. 32)

204.    The four troubling CDOs referred to by the Citigroup analyst were all Citigroup-underwritten CDOs, namely: (1) the $1 billion Class V Funding III (for which AMBAC

had super senior exposure of $500 million), (2) the $1 billion 888 Tactical Fund  (for which AMBAC had super senior exposure of $500 million), (3) the $2.0 billion Class V Funding IV (for which AMBAC had super senior exposure of $1.4 billion)  – i.e., the un-named "three pieces" of $500 mil., $500 mil., and $1.4 billion referred to by the analyst – and (4) the $1 billion Adams Square Funding II  (for which AMBAC had super senior exposure of $500 million).  The Citigroup presentation continued by detailing, still un-named, the structure of the three CDO-squareds whose risks Citigroup had unloaded to AMBAC (*Id.*, pp. 33-34).

205.    These three transactions constitute Citigroup's internal recognition that it needed to shield itself to the greatest degree possible from imminent losses on $4 billion of mezzanine CDO tranches that had been accumulating unsold in Citigroup's warehouse.  The chart below shows how:

## Citigroup's Endgame Strategy

| Citigroup's Problem | The Solution | The Result | |
|---|---|---|---|
| | | New Super Senior No Longer Citigroup's Problem | New Worthless Junior Tranches An Acceptable Loss |
| $1 billion of Mezzanine CDO tranches, rated single A, about to become worthless | 888 Tactical Fund | $500 million | $500 million |
| $1 billion of Mezzanine CDO tranches, rated single A, about to become worthless | Class V Funding III | $500 million | $500 million |
| $2 billion of Mezzanine CDO tranches, rated double-A, about to become worthless | Class V Funding IV | $1.4 billion | $600 million |
| $4 billion of imminently worthless junior tranches from Mezzanine CDOs | 3 New CDOs, containing those $4 billion of old CDOs | $2.4 billion of losses avoided | $1.6 billion remaining loss |

## II.    CDOs:  WHAT THE MARKETPLACE KNEW AND BELIEVED

206.    Market participants, Citigroup included, the market as a whole, and members of the wider public recognized – between October 2006 and March 2007 – that ABS CDOs would suffer savage losses, and indeed that even the super senior tranches were substantially impaired. Indeed, by March 2007, *there was no longer any question as to whether CDOs were at risk, but only as to who was holding that risk*.  The sole question, from that point on, was simply: Where did the risk go?  Although Citigroup formed a large part of the answer, it concealed or misrepresented this material information.

83

207.    That ever-riskier mortgages were being made during 2005 and 2006 was not a secret, but rather – and often – front page news.  Plaintiffs detail those nonprime mortgages, and their on-their-face risks, in Section A below.  As plaintiffs demonstrate, these mortgages were guaranteed to fail, predictably, and no later than early 2007.

208.    To summarize: a stunning share of these mortgages – approximately 70%-80% of all subprime mortgages – were "hybrid ARM" mortgages originated with a low "teaser" rate fixed for two or three years, after which point the rates would reset to sky-high levels (on average, 11%-12%).  Borrowers "qualified" for such mortgages on the basis of their ability to pay only the low initial rates, rather than the rates to which the mortgages would reset.  Worse, even this purported "basis" to pay the low initial rates was often without basis.[13]  Upon rate reset, such mortgages would produce "payment shock": payment burdens (as measured by borrower "debt to income" ratios) that no mortgage banker considered bearable, and that borrowers (who only qualified under the low initial rates) were demonstrably unable to bear.

209.    This feature of nonprime mortgages made mortgage performance dependent not on borrowers' ability to continue to pay the mortgages, but on borrowers' ability to *escape* those mortgages before or shortly after rate reset and payment shock.  As Citigroup explained:

**Other Subprime / Alt-A Characteristics**

---

[13]By 2006, 40% of all subprime mortgages, and 80% of Alt-A mortgages, were originated on the "basis" of borrower income that was merely "stated" by the borrower rather than documented or verified by the lender.  Such "stated income" loans (now famous as "liar loans") were originally offered only in exceptional cases, primarily for self-employed borrowers whose incomes could not be objectively verified by normal means (e.g., wage payment stubs, W-2 forms).  But in nonprime mortgages of 2005 and 2006, "stated income" lending was extended wholesale to wage earners – i.e., borrowers whose income was capable of easy and objective verification.  Why would a wage earner mortgage be based on "stated" income?  In order to "qualify" a borrower for a mortgage that his or her objective income would not allow him or her to qualify for.

**70+% of 2005-2006 subprime originations loans were "2-28" or "3-27" ARMs with low "teaser" rates**

- **ARMs are really not intended to be long term mortgages, but rather "bridge" financings**

- **Expectations were that they would be refinanced at the time of the rate reset**

**When ARMs reset, higher interest rates mean that borrowers experience payment shock of 30% or more...**

**(Source: Citi - Fixed Income Research: "Explaining 2006: Worst Vintage in Subprime History", Jan. 26, 2007)**

(Citigroup, *The Subprime Crisis: An Overview*, March 3, 2008)

210.     There were only two avenues of escape:  (1) selling the house and using the proceeds to pay off the mortgage, or (2) refinancing the mortgage.  These means of escape were thus dependent on two factors: (1) continued housing price appreciation (which would (a) allow for profitable sale of the property and thus repayment of the mortgage, or (b) make refinancing palatable to lenders); and (2) continued laxity in nonprime lending standards (which would allow dubious borrowers with dubious mortgages to refinance).

211.     As demonstrated in Sections B and C *infra*, in late 2006 and early 2007 both these avenues of escape were closed off.  Housing prices began to decline, and nonprime lending standards began to constrict, at first at the margins, and then severely.  As subprime defaults and losses began mounting in the middle of 2006, lenders began tightening standards.  As those losses mounted in late 2006 and early 2007, they bankrupted and forced the closure of most subprime mortgage originators, and convinced the few that remained to dramatically tighten mortgage origination standards.  The result: no more refinancing, especially of the sort of mortgages that had

been made in 2005 and 2006.  Nonprime mortgages, at the cusp of an immense $1 trillion-plus wave of rate resets beginning in 2007 and ending in 2009, were locked into imminent payment shock and default.  To give a sense of scale: during 2007, 35% of resetting mortgages either defaulted upon reset or became delinquent within the six months following rate reset.[14]  And because housing prices were declining and because most of these mortgages had been made with little or no down payment, the mortgages would experience substantial loss upon default.

212.    As demonstrated in Section D, the consequences of these nonprime mortgage market developments for CDOs were: (1) straightforward, and (2) widely understood at the time. These widely known facts led to a widely known reality: (1) that losses would rise higher into the RMBS tranche structure than initially expected; (2) that extant RMBS (and CDO) credit ratings were no longer valid, because each tranche was not as far removed from real loss as its originally-assigned ratings indicated; and (3) that the consequences would actually be most drastic for CDOs, precisely because they were collateralized by the lower and middle tranches of nonprime RMBS (i.e., the ones closest to encroaching mortgage losses).

213.    It was indeed market awareness of these facts – and their implications for mortgage performance, RMBS performance and CDO performance – that caused market prices for RMBS tranches and CDO tranches, and indexes tracking such market prices, to decline substantially during each of the first three quarters of 2007.

214.    These fundamental facts and their consequences are not matters of hindsight. They were recognized and well understood at the time.  By March 2007 at the latest, experts and market participants – including Citigroup – had assembled these fundamental facts into a coherent

---

[14]      Citigroup, *The Subprime Crisis: An Overview*, March 3, 2008, at p. 21.

and correct analysis of what was then happening and what the consequences were.  No later than March 2007, Citigroup's internal documents show awareness of the enhanced risks of those products.  Its own credit strategists acknowledged the risks associated with even the most senior tranches of CDOs and urged hedging or sale.  Citigroup, as an organization, adopted this conclusion, and starting as early as February 2007 it initiated transactions in which it sought to unload onto others billions of dollars of risk and of soon-to-be-worthless CDO securities.

215.   By April and May 2007, many market participants were predicting a CDO bloodbath.  The only question remaining was "Who was holding the risk?".

216.   As Section D further demonstrates, *the only CDO-related matter that was not known was that Citigroup had any exposure at all, let alone $57 billion, to such doomed instruments*.  It was already recognized that such instruments were impaired and would only become more so.  The only questions that remained were "Where did the risk go?  Who was holding these instruments?"  The market was already focusing on who was on the hook for the losses these instruments carried.  Despite such market focus, the fact of Citigroup's exposure – let alone the extent – was completely unrecognized.  That was because these instruments made no appearance in Citigroup's books.  Therefore, the market believed that Citigroup had escaped exposure under the (mistaken) belief that Citigroup had sold these instruments to others.

217.   But Citigroup had not.  Throughout the class period, Citigroup had retained huge swathes of decreasingly valuable and increasingly risky CDO assets, and Citigroup concealed – affirmatively schemed – to keep this information away from the public.  *So, by November 2007, the shock was not that the value of these instruments had declined materially, but rather and only that Citigroup held approximately $57 billion of such instruments – holdings whose existence had*

*never before disclosed and whose value had disintegrated long before.*

218.     It cannot be emphasized enough that throughout their existence, the ABX and TABX indexes (the TABX was introduced in February 2007) worked at all times to synthesize the above-discussed fundamental factors (subprime mortgage performance, refinancing opportunities, housing price data) into efficient market valuation of CDOs' primary assets (subprime RMBS tranches, via the ABX) and of Mezzanine CDO tranches (via the TABX).   These indexes were, in sum, directly relevant, directly observable market indicators of CDO value.  Both the relevant ABX and TABX indexes plunged in February/March 2007; fell further during June 2007; and plunged again in July and August 2007 – indicating: (1) by March 2007, that even super senior tranches were substantially impaired; (2) by June 2007, that super senior tranches were deeply impaired; and (3) by July/August 2007, that super senior tranches had already lost the majority of their value.

219.     The reality of severe CDO losses had long been known – indeed, as demonstrated below in myriad ways, Citigroup itself understood that reality very early on.

220.     The only matter not *publicly* known was that Citigroup was actually, and massively, exposed to such losses.  That was because, even as ABS CDO values were plummeting throughout 2007, Citigroup never disclosed that it had amassed an ABS CDO position of any size, let alone that it was in fact holding (now deeply impaired) ABS CDO tranches with a face value exceeding $57 billion.

**A.     The Housing Price Bubble and The Nonprime Mortgages Originated Under Bubble Conditions**

221.     Prior to the class period, mortgage lending had been dominated by "conforming" mortgage origination.   The term "conforming" refers to a set of standards and

practices, developed and refined over decades of mortgage banking experience to reduce mortgage lending risk, to which these mortgages conformed.  Mortgage risks are at the most basic level two-fold: (a) the risk that a mortgage will default, and (b) the degree of loss upon default (also termed "loss severity").  Among the conforming practices and standards developed to reduce these risks: (1) requirement of a substantial down payment of 20% (which lessened default risks and loss severity upon default); (2) objective verification and documentation of borrower income (to ensure the borrower had the ability to pay, thus lessening default risk); (3) maximum debt-to-income ratios of approximately 35% (again, ensuring that the borrower had the ability to pay, thus lessening default risk); (4) to the extent that the mortgage was an adjustable rate mortgage, assessing debt-to-income qualification at the "fully indexed" rate to which the mortgage would reset (again, ensuring that the borrower had the ability to pay, thus lessening default risk); and (5) certain minimum standards of borrower creditworthiness (i.e., prime borrowers).

222.    During the class period, these conforming standards and practices fell by the wayside, and "nonconforming" mortgage origination – i.e., subprime mortgages and Alt-A mortgages – boomed.  Subprime mortgage origination tripled from $190 billion in 2001 to $600 billion 2006; while Alt-A mortgage origination sextupled from $60 billion of $380 billion.

223.    Before detailing these nonconforming nonprime mortgages, and the risks they presented, plaintiffs briefly turn to why they were made.

224.    Most briefly: they were products of a housing boom.  This boom initially operated under a self-reinforcing "virtuous" credit cycle that operated in the following manner. Unprecedentedly low interest rates operative between 2001 and 2005 meant low mortgage rates. That, in turn, meant that borrowers could afford more "house" with the same income (e.g., because

their monthly payments were calculated on 6% rates rather than 9% rates).[15]  That allowed housing

prices to rise.  Rising housing prices acted to "cure all evils".  Defaults were few (because, rather

than defaulting, a borrower could sell the house at a profit).  Loss upon default was nearly

nonexistent (because, upon foreclosure, the lender could sell the property and recoup the amount it

lent).  Under these conditions, any loan was a "good" loan.  Lenders began to relax standards and

originate more nonprime loans, and given rising housing prices, these loans appeared to perform well

as well.  Indeed, by relaxing standards, lenders relaxed their bottleneck on the pool of housing

demand (i.e., borrowers qualifying for a mortgage), and the increased supply of qualifying borrowers

acted as a further boost to housing prices.  Thus, as Defendant Krawchek termed it, the 2003-2005

time period was a "credit nirvana".

225.    The virtuous cycle continued: as the mortgages performed well, so did the

mortgage-backed securities such as nonprime RMBS and CDOs.  Increased demand for CDOs led

to increased CDO demand for nonprime RMBS, which led to increased demand for nonprime

mortgage origination.  This is evident in the issuance and securitization tables in Section I.A: the

boom in CDOs created a boom in nonprime mortgages that were originated precisely because they

could be securitized.  The flood of CDO-driven funding for nonprime mortgages led mortgage

originators to further relax their standards, in order to originate more mortgages to meet the boom

in securitization demand.  As more and more "qualified" buyers poured into the housing market with

---

[15]     Between 2001 and 2004, the Federal Reserve cut interest rates to 46-year lows.
Lower interest rates, even in the absence of any increase in household income, allow housing prices
to rise.  The problem is that interest rates themselves fluctuate.  Rising interest rates undo the
increased affordability provided by lower interest rates.  As interest rates rise, borrowers can afford
"less house" than under lower interest rates.  The low interest rates had predictable and obvious
effects on housing prices, which soared.

mortgages, housing prices rose yet further.

226.    The result: a housing price bubble, vividly demonstrated on the following

page:



# A History of U.S. Home Values (1890-2006)

Source: "Irrational Exuberance," 2nd Edition, 2006, by Robert J. Shiller

Bill Marsh/The New York Times

227.    Though housing prices are intermediated by operative interest rates and by operative lending standards, they nevertheless are ultimately rooted to one bedrock – borrowers' incomes.  As housing prices rose, fewer and fewer borrowers had the income to allow them to qualify for mortgages that would allow them to purchase properties at such inflated prices.  Fewer borrowers had the assets to provide the customary down payments on ever-more expensive houses.

228.    So, in order to maintain origination volume, lenders further loosened their standards.  The mortgages, as detailed below, became ever riskier.  And thus, as in every boom, the seeds of the bust were sown.  The virtuous cycle contained within it its own destruction.  This was not a secret, either in principle or in fact.  Rather, this cycle has a well-understood and long history.  As Moody's explained in March 2007:

> During periods of growth in the housing and mortgage markets, increased borrowing demand allows existing mortgage lenders to expand their business and new lenders to enter the market. Eventually, these trends create overcapacity in the mortgage lending market as borrowing demand slows or falls. As the lending market cools (e.g., when interest rates rise, home price increases abate, or the economy slows), **competition among lenders for the reduced pool of borrowers heats up and lenders may lower credit standards (i.e., make riskier loans) in order to maintain origination volume. The riskier loans are more likely to become delinquent and default**.
>
> **Lending behavior in the subprime mortgage market over the past few years has, on average, followed this pattern. Through 2005 and 2006, in an effort to maintain or increase loan volume, lenders introduced alternative mortgage loans that made it easier for borrowers to obtain a loan**...
>
> (Moody's Investors Service, *Challenging Times for the US Subprime Mortgage Market*, March 7, 2007)

229.    Such nonprime loans, originated to feed to the securitization market, formed

the basis for the collapse of the virtuous cycle.  This is the way the cycle eternally turns:

> Many current sub-prime mortgage problems are **classic end-of-the-cycle problems** such as risk stacking and eased underwriting to maintain volumes by boosting so-called affordability to more would-be homeowners. **We have been to this movie before in this cyclical real estate market. It usually doesn't turn out well** for the heroine...

(Moody's Investors Service, *Sub-Prime Mortgages: An Integrated Look into Credit Issues Today and What to Expect*, March 9, 2007)

230.    When the cycle turns, it sets in motion self–reinforcing conditions that transform the cycle from "virtuous" to "vicious".  Risky loans are made, defaults start to rise, mortgage performance begins to worsen, and mortgage-backed security performance begins to worsen.  Investors turn away from mortgage-backed securities, leading to decreased demand for mortgages, and lenders tighten their lending standards, further decreasing mortgage origination.  As the old risky loans head to default and as fewer new loans are being made, the available supply of properties increases and the funds available to purchase those properties decreases.  Housing prices begin to fall.  Falling housing prices themselves increase mortgage defaults and increase loss severity upon default.  Mortgage-backed security performance worsens, decreasing demand for and funding of mortgages, leading to further decreases in housing prices, leading to greater mortgage defaults and greater loss severity upon default...

231.    During 2005 and 2006, it was no secret that the mortgages being originated were ever riskier; rather, it was a frequent source of front-page news.  All the standards to which mortgages had previously and primarily "conformed" were loosened and obliterated, one by one and in conjunction ("risk layering").

(a)     Loans were made to ever-less-creditworthy borrowers on ever-more-risky

terms.  The less credit-worthy the borrower, the greater the risk of default.

(b)  Down payment requirements were first loosened and then ignored all together, through "no money down" loans and through providing a "simultaneous second" mortgage (known as a "piggyback") originated in conjunction with the first.  In such piggyback arrangements, a first lien mortgage for approximately 80% of the property value was originated in conjunction with a simultaneous piggyback, often for the remaining 20% of the property value.  Such high "loan to value" (LTV) mortgages increased both the risk of default, and the severity of loss upon default.  The former, because the less equity a borrower has invested in a property, the more likely the borrower is to default.  The latter, because borrower down payments operate to cushion the lender from losses if the mortgage defaults.  In conforming loans with 20% down payments, the lender puts up 80% of the property value: if the mortgage defaults, the lender can foreclose, sell the property, and still recoup (after substantial foreclosure costs) the 80% sum it advanced.  In the absence of substantial down payments, where the lender has advanced a sum approaching the total value of the property, the lender is exposed to more severe loss upon default.

(c)  Debt-to-income levels were likewise raised so that mortgages were originated whose payments consumed 40% or more of borrower income.  Debt to income is the primary dynamic behind the risk of default.  The higher the share of borrower income dedicated to monthly mortgage payments, the higher the risk of default.

(d)  In order to maintain origination volume and produce more mortgages, lenders developed the "hybrid" adjustable rate mortgage, or hybrid ARM.  These mortgages featured a low, fixed rate for two or three years (the "teaser rate"), after which point the rates would adjust to a certain level above a given interest rate index (the "fully indexed rate").  In practice, during the class

95

period, the initial teaser rates were between 6% and 8%, and the fully indexed rates were 11% and up. Thus, when rates reset after 2 or 3 years, such borrowers would experience "payment shock" as their monthly payments rose 30% or more. *As the table below indicates, 80% of subprime mortgages originated during 2005 and 2006 were just such hybrid ARMs.* Such mortgages could not actually continue to be paid: they could only be escaped from through refinance or sale, or they would default. Such mortgages thus carried precisely-defined, obvious risk of default.

(e)     Worse, in order to make the mortgages "work" – i.e., in order to "qualify" the borrower for such a mortgage – the borrower's debt-to-income ratio was calculated at the low initial teaser rates rather than the rates to which the mortgages would soon reset. More concretely: the borrower income was sufficient to bear the mortgage payment burden under the teaser rate, but not sufficient to bear the burden under the fully-indexed rate that would approach in two or three years. This practice made the risk of default a near certainty for such mortgages were refinancing not an option.

(f)     Worse yet, in order to make the mortgages "work" even under such debased debt-to-income standards, income was often "stated" by the borrower rather then documented or objectively verified by the lender. Initially, such "stated income" loans (now famous as "liar loans") were offered only in exceptional cases, primarily for self-employed borrowers whose incomes could not be objectively verified by normal means (e.g., wage payment stubs, W-2 forms). During the class period, "stated income" lending moved from exception to norm. By 2006, in excess of 40% of subprime loans and 80% of Alt-A loans were originated on a stated income basis, primarily to wage earners – i.e., borrowers whose income was capable of easy and objective verification. Why would a wage earner mortgage be based on "stated" income? In order to "qualify" a borrower for

96

a mortgage that his or her objective income would not allow him or her to qualify for.  Again, "stated income" lending increased the risk of default.

    (g)  Finally, in order to qualify more borrowers for more mortgages, a variety of once-rare mortgages became prevalent, all of which were structured to require even lower initial payments.  First, 40, 45 and 50 year mortgages were widely offered, all of which required lower monthly payments than the 30 year mortgage.  Second, interest-only mortgages were widely offered, which required lower payments for an initial term of 5-10 years during which no principal had to be repaid.  Third, option-ARMs were widely offered, giving borrowers the "option" to make very low monthly payments for an initial period that were substantially less than the mortgage's requisite monthly payment.  Most borrowers chose this option.  The difference between the minimum payment and the requisite payment was added back onto the loan balance ("negative amortization").  After years of such minimum payments, the loan balance would actually swell to a price as much as 125% greater than the entire value of the house.  Option ARMs typically capped such negative amortization at 125% – which, when hit, would cause the mortgage to reset to a payment level that would pay off the mortgage fully in the remainder of its 30 year term.  The payment shock produced by such Option ARMS was astronomical, both because of (1) the difference between the minimum payment and the fully-amortizing payment; and (2) because the loan balance was substantially larger than it was at inception.  The common theme of all these mortgages was that principal was paid back ("amortized") more slowly, which increased both the risk of default (the borrower had less equity in the property) and the severity upon default (the lender was protected by less borrower equity).  In a sentence, in these loans, amortization was loosened (the 40-year term), extinguished for an initial period (interest only loans), and even made negative (Option ARMs).

232.    What did the payment shock produced by such loans look like?   The key matter is what these resetting rates will do to debt-to-income (DTI) ratios.   Even at the initial teaser rates, borrower DTI was already high (on average, 40%).   Analysis by Federal Reserve Board economists Adam B. Ashcraft and Til Schuermann shows what happens as rates reset:   *these mortgages will impose impossible payment burdens on the borrowers.*[16]  Assuming the index interest doesn't change, at first reset, in month 25 of 2/28 ARMs, DTI for regular 2/28 ARMs will go to 45.5%, and at next reset in month 31 will go to 50.4%.  For 40-year-term ARMs, DTI increases will be more severe yet:   DTI rises to 47.3% in month 25 and 52.9% in month 31.   The interest-only ARMs will experience yet more severe increases:   not only does DTI rise to 47.4% in month 25 and 58.1% in month 31, but, after the initial five-year interest-only period expires, the inception of principal payments in month 61 will cause DTI to rise to 62.3%.

233.    In short, most nonprime mortgages would produce waves of "payment shock" that, in the third year of these mortgages, would result in borrower payment burdens that any mortgage banker would consider insane.   Indeed, as the Federal Reserve Board economists concluded:

> Without significant income growth over the first two years of the loan, **it seems reasonable to expect that borrowers will struggle to make these higher payments.   It begs the question why such a loan was made in the first place.** (*Id.*)

---

[16]    *See*  Adam B. Ashcraft and Til Schuermann, *Understanding the Securitization of Subprime Mortgage Credit*, Federal Reserve Bank of New York - Staff Reports, Staff Report No. 318, March 2008, pp. 16-19.  Their analysis focused on one specific subprime RMBS securitization known as GSAMP Trust 2006-NC2.  The mortgages underlying it were absolutely typical, and are substantively identical to the overall averages presented in the tables below.  For the record, a September 2006 Citigroup-arranged CDO named ESP Funding I invested in this very security, purchasing $6 million of the AA tranche and $5 million of the AA- tranche.

234.    The answer:  because borrowers thus secured loans they would not otherwise be able to access (and which they were highly likely to be unable to pay at rate reset), while lenders secured more high-paying mortgages that could be sold into the securitization markets.  But, all of it worked only if housing prices continued to rise and lending standards continued to be lax, so that refinancing would be possible before payment shock.  Such loans were little more than "bridge" financing for two or three years.

235.    The nonprime mortgages originated between 2005 and 2007 featured all the above risks to unprecedented degree.  They featured lower down payments than ever before.  They featured less amortization than ever before.  They were made on the basis of "stated", unverified income to a higher degree than ever before.  Almost all of them were hybrid ARMs or option ARMs.  Most often, they featured several of these risks in conjunction: e.g., stated income, interest-only hybrid ARMs with no down payments, accompanied by "simultaneous second" piggybacks.  The relevant statistics are presented below:

| Nonprime Mortgages: 2001 vs. 2005 and 2006 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | ARM | 2/28 ARM | 3/27 ARM | 5/25 ARM | Option ARM | Interest Only | 40 year term |
| **Alt-A** | | | | | | | |
| 2001 | 20.0 | 4.9 | 2.3 | 8.8 | **0** | **3.9** | 0 |
| 2005 | 69.7 | 4.0 | 6.3 | 15.6 | **34.2** | **38.6** | 2.7 |
| 2006 | 69.8 | 1.8 | 1.7 | 15.8 | **42.3** | **35.6** | 11 |
| **Subprime** | | | | | | | |
| 2001 | 66.0 | 52.1 | 12.4 | 0.8 | 0 | 0 | 0 |
| 2005 | **83.5** | **66.7** | 13.3 | 1.5 | 0 | **27.7** | **5.0** |
| 2006 | **81.7** | **68.7** | 10.0 | 2.5 | 0 | **18.1** | **26.9** |

| Nonprime Mortgages: 2001 vs. 2005 and 2006 | | | |
|---|---|---|---|
| | CLTV | % Full Documentation | % with Piggyback |
| **Alt-A** | | | |
| 2001 | 77.7 | **34.8** | **1.4** |
| 2005 | 79.0 | **27.4** | **32.4** |
| 2006 | 80.6 | **16.4** | **38.9** |
| **Subprime** | | | |
| 2001 | 80.3 | **71.5** | **2.8** |
| 2005 | 85.3 | **58.3** | **24.6** |
| 2006 | 85.5 | **57.7** | **27.5** |

(Source:   LoanPerformance 2007)

      236.   The characteristics of subprime and Alt-A mortgages of 2005-2006 made several fundamental matters clear.

237.    First, most of these mortgages could not actually survive much past the rate resets looming at their two-year, three-year or negative-amortization-cap anniversaries.  Borrowers had been squeezed into these mortgages on the basis of debt-to-income levels – even under dubious "stated" income – calculated at the initial low rates rather than the rates to which payments would reset.

238.    Second, this meant that these mortgages were dependent on borrowers' ability to refinance their way out of these mortgages before experiencing extended payment shock upon rate reset.  Nonprime mortgages were uniquely dependent on this refinancing escape hatch.  By contrast, prime, conforming mortgages were often fixed rate mortgages which generated no payment shock at all.  Moreover, many prime borrowers in adjustable rate mortgages often had "extra" income to divert to any increased mortgage payments: their loans had been underwritten on the basis of borrower debt-to-income at the fully-indexed rate, rather than the low initial rate.

239.    Third, the ability to refinance was dependent primarily on two matters.  First, continued housing price appreciation.  As mentioned above, rising housing prices work to erase all sins.  If housing prices continued to rise, a new loan could be secured in an amount sufficient to pay off the old, because the property securing the new loan had appreciated since the old loan was originated. Second, continued leniency in origination/underwriting standards.  Nonprime 2005-2006 loans broke all objective records for degree of risk: low or no borrower equity; low or no documentation; low, no or negative amortization; near-total reliance on low initial rates provided by hybrid ARMS and Option ARMs.  Were underwriting standards to tighten, many borrowers dependent on such mortgage products would not be able to secure new loans to pay off the old.

240.    To sum up, then, the nonprime mortgages of 2005-2006 were not sustainable

101

in and of themselves.  On the contrary, left to their own devices, it was clear that large numbers would default soon.  The fact that they were made was, in essence, a bet that housing prices would continue to rise and that lending standards would continue to be loose.  This bet was objectively clear at the time of the mortgage originations.  Whether it should or should not have been made is one matter; the clarity of the risk proposition is another.  The risk proposition was clear.

241.    Between mid-2006 and early 2007, as next detailed in Sections III.B and III.C, it became increasingly clear that this bet would fall on the wrong side of its risk proposition, and in so doing lose a tremendous amount of money.  Both pillars on which this bet rested collapsed.  Housing prices slowed and began to fall, steeply, especially in the largest mortgage markets (Florida, California and western Sunbelt states).  After monthly mortgage reports began to show in late 2006 that 2006-vintage mortgages were performing worse than any prior mortgage vintage on record, subprime and Alt-A lending contracted and largely collapsed.  Refinancing was no longer an available option, and housing prices  were no longer able to save anyone.  The underlying mortgages were locked into imminent default as a vast wave of 2/28 and 3/27 ARM rate resets, for mortgages originated in 2005-2006, would begin in 2007, with no escape hatch either through refinancing (unavailable) or profitable sale (housing prices were declining).  As most of these mortgages had been made at peak prices, with little or down payment and with little or no amortization, losses upon default would be severe.

242.    The consequences for CDOs, collateralized by the lower, already-tranched risks of pools of these very mortgages, would be severe – as was widely recognized in early 2007 (Section II.D *infra*).

102

**B.     The Bubble Bursts in Early 2006 and Housing Prices Fall**

243.    Boom of course preceded bust.  By mid-2005, housing prices had enjoyed such dramatic price appreciation that The Economist (among many others) identified it as the "biggest financial bubble in history".  Housing prices had detached themselves to an unprecedented degree from underlying fundamentals (household income, rental prices), and the ultimate correction of this anomaly, The Economist concluded, would entail the first fall in nationwide average housing prices since the Great Depression and could "decide the course of the entire world economy over the next few years":

> PERHAPS the best evidence that America's house prices have reached dangerous levels is the fact that house-buying mania has been plastered on the front of virtually every American newspaper and magazine over the past month. **Such bubble-talk hardly comes as a surprise to our readers. We have been warning for some time that the price of housing was rising at an alarming rate all around the globe, including in America. Now that others have noticed as well, the day of reckoning is closer at hand. It is not going to be pretty. How the current housing boom ends could decide the course of the entire world economy over the next few years**.
>
> This boom is unprecedented in terms of both the number of countries involved and the record size of house-price gains. **Measured by the increase in asset values over the past five years, the global housing boom is the biggest financial bubble in history. The bigger the boom, the bigger the eventual bust**.
>
> \*\*\*\*\*
>
> The economic damage this time could be worse than in the past because house prices are more likely to fall in nominal, not just real terms. **Not only do houses in many countries look more overvalued than at previous peaks, but with inflation so low, prices would have to stay flat for at least a decade to bring real prices back to long-run average values. Most important of all, in many countries this house-price boom has been driven far more**

103

**by investors than in the past, and if prices start to dip, they are more likely to sell than owner-occupiers. In America this could mean the first fall in average house prices since the Great Depression.**

(The Economist, *The danger of a global house-price collapse*, June 16, 2005)

244.    Housing price growth peaked in the final quarter of 2005.   Nobel Prize-winning economist Paul Krugman greeted 2006 by concluding, in a January 2, 2006 column published in the New York Times, that "at this point the overall market value of housing has lost touch with economic reality. And there's a nasty correction ahead":

No Bubble Trouble?

... Last summer I suggested that when discussing housing, we should think of America as two countries, Flatland and the Zoned Zone.

In Flatland, there's plenty of room to build houses, so house prices mainly reflect the cost of construction. As a result, Flatland is pretty much immune to housing bubbles...

In the Zoned Zone, by contrast, buildable lots are scarce, and house prices mainly reflect the price of these lots rather than the cost of construction. As a result, house prices in the Zoned Zone are much less tied down by economic fundamentals than prices in Flatland.

By my rough estimate, slightly under 30 percent of Americans live in the Zoned Zone, which comprises most of the Northeast Corridor, coastal Florida, much of the West Coast and a few other locations...

But because Zoned Zone homes are much more expensive than Flatland homes, the Zone looms much larger in the housing story than its share of the population might suggest. By my estimate, more than half of the total market value of homes in the United States lies in the Zoned Zone.

And because home prices have risen much more rapidly in the Zone than in the rest of the country, the Zoned Zone accounts for the great bulk of the surge in housing market value over the last five years.

104

So if we want to ask whether housing values make sense, data on the median house nationwide are irrelevant. We need to focus on houses in the Zoned Zone. And there the numbers are anything but reassuring.

**In the Zoned Zone, the story that rising home prices have been offset by falling interest rates is all wrong: prices have risen so much that housing has become much less affordable. According to Economy.com, the cost of owning a home in the New York metropolitan area went from 25 percent of median income in 2000 to 38 percent today. In Miami, the numbers were 21 percent and 42 percent, respectively; in Los Angeles, 31 percent and 55 percent**.

**Even so, the current cost of owning a home in the Zoned Zone isn't entirely unprecedented. Roughly similar percentages of median family income were needed to afford houses in the early 1980's.**

**But that's hardly a comforting comparison, which is where the economic history comes in. You see, the unaffordability of housing in the early 1980's led to an epic collapse in the housing industry. Housing starts fell from more than 2 million in 1978 to only 1.06 million in 1982. And the housing implosion was one of the main factors in the worst economic slump since the Great Depression, which brought the unemployment rate to a peak of 10.8 percent at the end of 1982**.

**It's also worth noting that the reason housing was so expensive in 1981 and 1982 was that mortgage interest rates were extremely high. That made recovery easy, because all it took to make housing affordable again was for interest rates to return to normal levels**.

**This time, with interest rates already low by historical standards, restoring affordability will require a big fall in housing prices**.

So here's the bottom line: yes, northern Virginia, there is a housing bubble. (Northern Virginia, not Virginia as a whole. Only the Washington suburbs are in the Zoned Zone.) **Part of the rise in housing values since 2000 was justified given the fall in interest rates, but at this point the overall market value of housing has**

105

**lost touch with economic reality. And there's a nasty correction ahead**.

(Paul Krugman, New York Times, *No Bubble Trouble?*, January 2, 2006)

245.    As 2006 progressed, hard data and objective fact everywhere evidenced that the bubble was deflating.

246.    Some of this hard data is provided in the tables below, which set forth the National Association of Realtors' monthly statistical reports on home sales activity, home sales prices, and home sales inventory (which, as is evident in the following paragraphs, were closely watched by economists, market participants, and market observers).  These tables show, respectively: (1) accelerating declines in the numbers of homes sold during 2006, which continued and deepened throughout 2007; (2) steadily decreasing year-over-year price appreciation in early 2006, no year-over-year price appreciation by June 2006, and nationwide year-over-year price declines beginning in August 2006 and continuing thereafter; and (3) steadily rising amounts of unsold home "inventory", expressed in the form of the number of months it would take to sell off that inventory, rising 50% by August 2006 and doubling by late 2007.

**Median Home Prices (Year-over-Year Changes)**

| 2006 | US YOY | | Northeast YOY | Mid West YOY | South YOY | West YOY |
|---|---|---|---|---|---|---|
| Jan-06 | NA | | NA | NA | NA | NA |
| Feb-06 | 15.30% | | 12.40% | 3.90% | 11.70% | 21.60% |
| Mar-06 | 7.40% | | 3.10% | 3.20% | 5.90% | 8.30% |
| Apr-06 | 3.70% | | 5.60% | -2.40% | 4.00% | 4.50% |
| May-06 | 5.50% | | 4.10% | 0.00% | 6.10% | 4.20% |
| Jun-06 | 0.00% | | 4.00% | -1.70% | -1.60% | -0.60% |
| Jul-06 | 0.90% | | -2.10% | -1.10% | 3.80% | -0.60% |
| Aug-06 | -2.20% | | -3.90% | -3.40% | -2.60% | 0.30% |
| Sep-06 | -1.80% | | -4.40% | -2.90% | -1.10% | -2.30% |
| Oct-06 | -4.40% | | -4.50% | -3.50% | -7.50% | 0.00% |

106

| | US YOY | | Northeast YOY | Mid West YOY | South YOY | West YOY |
|---|---|---|---|---|---|---|
| Nov-06 | -3.10% | | -2.20% | -3.50% | -3.20% | -0.80% |
| Dec-06 | 0.00% | | 3.70% | -2.90% | 0.00% | 1.50% |
| **2007** | **US YOY** | | **Northeast YOY** | **Mid West YOY** | **South YOY** | **West YOY** |
| Jan-07 | -3.10% | | -1.20% | -3.50% | -1.70% | -4.60% |
| Feb-07 | -2.30% | | -5.10% | -2.00% | -3.50% | 1.20% |
| Mar-07 | -0.30% | | -0.70% | -0.20% | 0.40% | -2.90% |
| Apr-07 | -0.80% | | -0.60% | 1.90% | -0.30% | -2.10% |
| May-07 | -2.50% | | 1.50% | -3.30% | -4.40% | -0.50% |
| Jun-07 | 0.00% | | 1.30% | -2.50% | 0.10% | 1.80% |
| Jul-07 | -0.70% | | 6.40% | -1.80% | -3.60% | 0.90% |
| Aug-07 | 0.20% | | 3.60% | 3.50% | -0.90% | -3.80% |
| Sep-07 | -4.80% | | 0.20% | -1.40% | -5.60% | -7.80% |
| Oct-07 | -5.50% | | 1.20% | -3.70% | -6.90% | -7.60% |
| Nov-07 | -4.00% | | -3.30% | -2.10% | -3.30% | -6.80% |
| Dec-07 | -6.00% | | -8.90% | -3.90% | -4.10% | -11.10% |
| **2008** | **US YOY** | | **Northeast YOY** | **Mid West YOY** | **South YOY** | **West YOY** |
| Jan-08 | -5.30% | | 2.40% | -7.90% | -6.40% | -7.90% |
| Feb-08 | -8.40% | | 0.60% | -8.00% | -8.60% | -13.20% |
| Mar-08 | -8.00% | | 4.10% | -6.20% | -6.80% | -15.00% |
| Apr-08 | -8.40% | | -7.60% | -4.50% | -5.60% | -15.50% |
| May-08 | -6.60% | | -2.50% | -1.90% | -4.30% | -16.40% |
| Jun-08 | -6.20% | | -9.60% | 1.50% | -2.00% | -17.80% |
| Jul-08 | -7.10% | | -4.70% | 0.90% | -3.30% | -21.80% |

(Source: National Association of Realtors)

**Number of Existing Home Sales (Year over Year Changes)**

| **2006** | **US YOY** | | **Northeast YOY** | **Midwest YOY** | **South YOY** | **West YOY** |
|---|---|---|---|---|---|---|
| Jan-06 | NA | | NA | NA | NA | NA |
| Feb-06 | -0.4% | | 1.70% | 2.50% | 3.10% | -10.60% |
| Mar-06 | -1.0% | | 2.60% | 3.80% | 1.10% | -12.30% |
| Apr-06 | -6.6% | | -2.50% | -3.10% | -3.70% | -13.60% |
| May-06 | -6.0% | | -3.40% | -5.00% | -5.50% | -13.50% |
| Jun-06 | -9.2% | | -9.80% | -6.20% | -5.90% | -17.10% |
| Jul-06 | -11.2% | | -12.50% | -10.10% | -7.00% | -18.00% |
| Aug-06 | -12.6% | | -11.60% | -11.10% | -7.40% | -22.80% |
| Sep-06 | -13.8% | | -12.60% | -12.40% | -9.00% | -23.80% |
| Oct-06 | -11.5% | | -10.70% | -9.60% | -8.10% | -20.10% |
| Nov-06 | -10.7% | | -4.50% | -9.60% | -10.20% | -17.50% |
| Dec-06 | -7.9% | | -5.50% | -5.80% | -7.10% | -15.50% |

| 2007 | US YOY | | Northeast YOY | Midwest YOY | South YOY | West YOY |
|---|---|---|---|---|---|---|
| Jan-07 | -1.7% | | 8.10% | 6.30% | -8.00% | -3.60% |
| Feb-07 | -3.0% | | 3.40% | -1.90% | -4.10% | -8.30% |
| Mar-07 | -11.3% | | -5.90% | -14.70% | -9.40% | -16.10% |
| Apr-07 | -10.6% | | -11.90% | -12.10% | -8.80% | -15.00% |
| May-07 | -10.9% | | -4.30% | -7.20% | -10.50% | -16.30% |
| Jun-07 | -12.7% | | -9.00% | -9.20% | -11.70% | -22.00% |
| Jul-07 | -9.2% | | -2.90% | -5.60% | -10.70% | -15.20% |
| Aug-07 | -13.0% | | -6.50% | -11.10% | -13.10% | -21.70% |
| Sep-07 | -19.3% | | -13.50% | -14.90% | -19.40% | -27.80% |
| Oct-07 | -20.6% | | -12.60% | -16.90% | -19.10% | -33.10% |
| Nov-07 | -20.0% | | -19.40% | -16.90% | -19.40% | -25.00% |
| Dec-07 | -22.0% | | -22.40% | -20.50% | -20.90% | -24.80% |

(Source: National Association of Realtors)

108

## Unsold Housing Supply
## (as expressed in Months of Inventory)



(Source:  National Association of Realtors)

247.    During 2006 economists and other expert market participants and observers understood the hard data.  The fate of the nation's housing markets was prominently debated and reported throughout 2006.  The main debate was not whether a "bubble" existed but whether its collapse would result in a "soft landing" (i.e., a new plateau at current price levels) or a "hard landing" (i.e., the sharp decline necessary to return to historical norms).  As 2006 progressed, increasing numbers of experts began to find themselves in the "hard landing" camp.

248.    On May 5, 2006, Fortune reported that certain of the higher-flying bubble markets had become "dead zones" – housing prices had escaped the orbit of affordability, sales were plunging and inventory rising.  Throughout the bubble markets, the ratio between housing prices and income levels was 40% higher than historical norms – so the impasse between housing prices and household income would likely be widespread and severe. For affordability to be restored, either household income would have to rise substantially, or housing prices would have to fall substantially, or some combination of the two.  In the short term, Fortune concluded, housing prices were likely to fall substantially (10%-15%) and then stagnate for years as household incomes rose to close the rest of the affordability gap.  Alternatively, Fortune noted, if household incomes proved unable to rise, housing prices would fall severely, by 30% or more:

> Welcome to the dead zone
>
> Real estate survival guide: The great housing bubble has finally started to deflate, and the fall will be harder in some markets than others.
>
> The stories keep piling up. In many once-sizzling markets around the country, accounts of dropping list prices have replaced tales of waiting lists for unbuilt condos and bidding wars over humdrum three-bedroom colonials.

The message is clear. Five years of superheated price gains rescued America from stock market collapse, put billions in consumers' pockets, and ignited a building boom that bolstered the nation's economy. But it's over. The great housing bubble has finally started to deflate.

*****

**And what's happening in these areas is a sign of what may be coming in the rest of the bubble zone -- the two dozen or so mainly coastal cities and their suburbs that have seen prices soar in recent years and account for 60 percent of the nation's residential real estate value.**

**The problem is as basic as beams and trusses: The triple threat of soaring prices, higher mortgage rates and relentlessly rising property taxes has drastically increased the cost of ownership and put many homes out of reach for a huge number of potential buyers**.

*****

With houses hovering beyond the reach of most potential purchasers, formerly frantic markets grow eerily calm. People who rush to list their homes, hoping to grab a fat gain just before prices break, take them off the market.

Sales shrink as buyers float low-ball offers, and sellers refuse them. Realtors and mortgage brokers find other jobs. **The bubble areas turn into Dead Zones.**

**There's no mystery about what it will take to close the affordability gap and bring the markets back to life: Prices will have to come down...**

*****

**The real losers will be those who bought recently at inflated prices and are forced to sell, usually because they're taking a job in another city or can't make the payments when their adjustable mortgage rate jumps**. And speculators who bought overpriced condos in hope of a quick killing are going to get hosed.

(Fortune, *Welcome to the Dead Zone*, May 5, 2006)

249.    In May 2006, the California Association of Realtors lowered their

111

expectations for California home sales from a 2% decline (2006 sales vs. 2005 sales) to a 16.8%

decline.  This dramatic decline led the Association's chief economist to abandon continued usage

of the term "soft landing", as it no longer matched the reality it purported to describe:

> *Realtors: `Soft Landing' Falls Short*
>
>  Leslie Appleton-Young is at a loss for words.
>
> **The chief economist of the California Assn. of Realtors has stopped using the term "soft landing" to describe the state's real estate market, saying she no longer feels comfortable with that mild label**.
>
> "Maybe we need something new. That's all I'm prepared to say," Appleton-Young said Thursday.
> *****
> For real estate optimists, the phrase "soft landing" conveyed the soothing notion that the run-up in values over the last few years would be permanent. It wasn't a bubble, it was a new plateau.
>
> **The Realtors association last month lowered its 2006 sales prediction from a 2% slip to a 16.8% drop. That was when Appleton-Young first told the San Diego Union-Tribune that she didn't feel comfortable any longer using "soft landing."**
>
> (LA Times, *Realtors: `Soft Landing' Falls Short*, July 21, 2006, p. C-2)

250.    In August 2006, after recent data demonstrated dramatically slowing sales,

the highest inventory of unsold homes in decades, and stagnant home prices the chief economist for

the National Association of Realtors – a long-time advocate of the "soft landing" school – joined his

California Association of Realtors counterpart in abandoning further usage of "soft landing", and

admitted that "hard landings" in certain markets were probable:

> *Existing-home sales plunge to a two-year low; Inventories of unsold homes rise to 13-year high*

112

**July was dry for the U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated and the number of homes on the market soared to a 13-year high, according to a report from the National Association of Realtors released Wednesday.**

**The report shows a continued implosion in the housing market, with inventories up sharply while prices are softening. Sales are down 11.4% in the past year** to a seasonally adjusted annual rate of 6.33 million compared with 6.60 million in June.

(Marketwatch, *Existing-home sales plunge to a two-year low; Inventories of unsold homes rise to 13-year high,* Aug. 23, 2006)

*****

*Existing home sales drop 4.1% in July, median prices drop in most regions*

**Existing home sales posted an unexpectedly sharp drop last month to the lowest level since January 2004 and home prices fell in all regions of the country but the South, the National Association of Realtors said Wednesday.**

**The downward pressure on prices probably will continue through the beginning of next year because the inventory of homes for sale has surged to the highest level in 13 years.** There are now 3.86 million homes for sale, a 7.3-month supply.

The weakness in the market is being driven by higher interest rates, low affordability, and speculators who are dumping investment properties back on the market because they couldn't flip them for a profit.

"I was disappointed, it was a lot lower than I anticipated," said David Lereah, NAR's chief economist. "What is clear to me is sellers are more stubborn than I expected them to be. We definitely need a correction in prices in order for buyers to come back into the market."

**He said he expects home prices to come down 5% nationally, more in some markets, less in others. And a few cities in Florida**

113

and California, where home prices soared to nose-bleed heights, could have "hard landings," he said.

(USA Today, *Drop in Home Sales Puts Pressure on Prices*, Aug. 24, 2006)

251.    Others looking at the same NAR data were even less sanguine.  Economist Nouriel Roubini observed "every housing indicator is in free fall, including now housing prices", and concluded that the ongoing housing collapse would push the U.S. into a "much nastier, deeper and more protracted" recession than any in recent memory:

> *Recession will be nasty and deep, economist says*
> *Housing is in free fall, pulling the economy down with it, Roubini argues*
>
> The United States is headed for a recession that will be "much nastier, deeper and more protracted" than the 2001 recession, says Nouriel Roubini, president of Roubini Global Economics.
>
> Writing on his blog Wednesday, Roubini repeated his call that the U.S. would be in recession in 2007, arguing that the collapse of housing would bring down the rest of the economy.
>
> Roubini wrote after the National Association of Realtors reported Wednesday that sales of existing homes fell 4.1% in July, while inventories soared to a 13-year high and prices flattened out on a year-over-year basis.
>
> **"This is the biggest housing slump in the last four or five decades: every housing indicator is in free fall, including now housing prices," Roubini said. The decline in investment in the housing sector will exceed the drop in investment when the Nasdaq collapsed in 2000 and 2001, he said.**
>
> **And the impact of the bursting of the bubble will affect every household in America, not just the few people who owned significant shares in technology companies during the dot-com boom, he said. Prices are falling even in the Midwest, which never experienced a bubble, "a scary signal" of how much pain the drop in household wealth could cause**.

114

(MarketWatch, *Recession will be nasty and deep, economist says: Housing is in free fall, pulling the economy down with it, Roubini argues*, August 23, 2006)

252.    A more detailed analysis, provided on the same day and provoked by the same data, led *Barron's* Lon Witter to exactly the same conclusions:

*The No- Money Down Disaster*

**A housing crisis approaches: According to the Commerce Department's estimates, the national median price of new homes has dropped almost 3% since January. New-home inventories hit a record in April and are only slightly off those all-time highs. Existing-home inventories are 39% higher than they were just one year ago. Meanwhile, sales are down more than 10%**.
*****
**By any traditional valuation, housing prices at the end of 2005 were 30% to 50% too high. Others have pointed this out, but few have had the nerve to state the obvious: Even if wages and GDP grow, the national median price of housing will probably fall by close to 30% in the next three years. That's simple reversion to the mean**.

A careful look at the reasons for the rise in housing will give a good indication of the impact this drop will have on the stock market. They include, in chronological order: The collapse of the Internet bubble, which chased hot money out of the stock market; rock-bottom interest rates; 50 years of economic history that suggested housing never goes down, and creative financing.

**The first three factors might not be enough to cause a crash, except that together they led to the fourth factor. Irresponsible financing causes bubbles. It causes individuals to buy houses they can't afford. It causes speculation to run wild by lowering the bar to entry. Finally, it leads individuals who bought houses years ago at reasonable prices into the speculative borrowing trap. The home-equity credit line has supported American consumer spending, but at a steep price: Families that tapped into their home equity with creative loans are now in the same trap as those who bought homes they couldn't afford at the top of the market**.

115

**The cost and risk of adjustable-rate financing can be devastating. Consider a typical $250,000 three-year adjustable-rate mortgage with a 2% rate-hike cap. If the monthly payment now is $1,123, after the first adjustment, the monthly payment is $1,419. After the second adjustment, the monthly payment is $1,748, a $625-per-month increase. That's $7,500 more per year just to maintain the same mortgage. If you think high gas prices are biting the consumer, consider the cost of mortgage adjustments.**

**Some more numbers:**

**-- 32.6% of new mortgages and home-equity loans in 2005 were interest only, up from 0.6% in 2000**

**-- 43% of first-time home buyers in 2005 put no money down**

**-- 15.2% of 2005 buyers owe at least 10% more than their home is worth**

**-- 10% of all home owners with mortgages have no equity in their homes**

**-- $2.7 trillion dollars in loans will adjust to higher rates in 2006 and 2007.**

**These numbers sound preposterous, but the reasoning behind them is worse.** Lenders have encouraged people to use the appreciation in value of their houses as collateral for an unaffordable loan, an idea similar to the junk bonds being pushed in the late 1980s. The concept was to use the company you were taking over as collateral for the loan you needed to take over the company in the first place. The implosion of that idea caused the 1989 mini-crash.

Now the house is the bank's collateral for the questionable loan. But what happens if the value of the house starts to drop?

The answer, at least from banks, is already clear: Float the loans. The following figures are from Washington Mutual's annual report: At the end of 2003, 1% of WaMu's option ARMS were in negative amortization (payments were not covering interest charges, so the shortfall was added to principal). At the end of 2004, the percentage jumped to 21%. At the end of 2005, the percentage jumped again to 47%. By value of the loans, the percentage was 55%.

116

Every month, these borrowers' debt increases; most of them probably don't know it. There is no strict disclosure requirement for negative amortization.

This financial system cannot work; houses are not credit cards. But WaMu's situation is the norm, not the exception. The financial rules encourage lenders to play this aggressive game by allowing them to book negative amortization as earnings. In January-March 2005, WaMu booked $25 million of negative amortization as earnings; in the same period for 2006 the number was $203 million.

**Negative amortization and other short-term loans on long-term assets don't work because eventually too many borrowers are unable to pay the loans down -- or unwilling to keep paying for an asset that has declined in value relative to their outstanding balance. Even a relatively brief period of rising mortgage payments, rising debt and falling home values will collapse the system. And when the housing-finance system goes, the rest of the economy will go with it.**

**By the release of the August housing numbers, it should become clear that the housing market is beginning a significant decline. When this realization hits home, investors will finally have to confront the fact that they are gambling on people who took out no-money-down, interest-only, adjustable-rate mortgages at the top of the market and the financial institutions that made those loans. The stock market should then begin a 25%-30% decline. If the market ignores the warning signs until fall, the decline could occur in a single week**.

(Barron's,  *The No- Money Down Disaster*, August 23, 2006)

253.    By October 4, 2006 Federal Reserve Chairman Ben S. Bernanke conceded that

"There is currently a substantial correction going on in the housing market".

254.    The same day, Moody's released a 195 page report titled "Housing at the

Tipping Point", predicting imminent double-digit housing price declines in bubble markets and the

first "calendar year" nationwide home price decline since the Great Depression.

117

*Study sees '07 `crash' in some housing*

**Applying the word "crash" to sagging real estate markets in some parts of the country, a new study predicts that in the coming year, the nation's median home price will decline for the first time since the Depression**.

\*\*\*\*\*

**The prognosis was [] dire for 20 other cities in the report's so-called "crash" area, where it predicted that prices would decline by double digits from their peaks** ....

The most serious price slides are seen in southwest Florida, numerous California metro areas and in the Phoenix, Las Vegas, Washington and Detroit areas, according to Zandi.

**His prediction of a 3.6 percent median price decline nationwide also crosses a line drawn by many economists during the most heated debates about the housing bubble–that home prices have never gone into negative territory countrywide.**

**"Prices have never declined on a calendar-year basis for that length of time [since housing records have been kept]," Zandi said. "There have been quarters, but never an entire year."**

(Chicago Tribune, *Study sees '07 `crash' in some housing*, October 5, 2006)

255.    The monthly year-over-year data provided by the National Association of Realtors showed that by August 2006, year-over-year home prices had in fact declined – for the first time in 11 years:

> ...**each passing week shows the nation's housing statistics heading down**... **According to the National Association of Realtors, sales of existing homes were down 12.6% in August from a year earlier, and the median price of homes sold dropped 1.7% over that period -- the first year-to-year price decline in 11 years**. Sales of new homes were down 17.4% in August from a year ago, according to the Census Bureau... A report by Moody's Economy.com said house prices could keep falling until 2008 or 2009 in some areas...

118

(Wall Street Journal, *Whistling Past Housing's Graveyard? ---
Builders' Shares Have Been Hot, Sparking Debate Among Investors
On Whether Sector Has Hit Bottom*, October 9, 2006)

256.     These declines were not the "crisis" itself, but just its beginning.  They were

merely the initial stages of the much longer and larger drop necessary to realign housing prices with

objective realities:

> **The damage is likely to spread beyond the subprime sector to the
> real estate market as a whole**, said analysts such as San
> Diego-based Rich Toscano and Christopher Thornberg, an economist
> at the UCLA Anderson School. These analysts, who have long
> warned of a housing "bubble," say that **a stream of must-sell homes
> re-entering the market will depress home prices by increasing
> supply. On the demand side, tighter credit requirements will
> reduce the pool of eligible buyers and send buyers on shaky
> financial ground into default when they can't refinance their
> loans**.  (North County Times, *Accredited Stock Collapses; Home
> Lender Considers Sale*, March 14, 2007)

**C.     Refinancing Becomes Impossible and a Wave of Nonprime Defaults Inevitable**

257.     The nonprime mortgages underlying ABS CDOs were fundamentally

dependent on rising housing prices and on the ability to refinance before rates reset to payment shock

levels.  As demonstrated above, by August 2006, housing prices were no longer rising, but declining.

As detailed below, in various stages between mid-2006 and March 2007, the ability to refinance

collapsed as well.

**1.     The Mid-2006 Spike in Early Payment Defaults Leads Some Mortgage
     Originators to Collapse and Leads All Mortgage Originators to Tighten
     Lending Standards**

258.     Beginning in early 2006, record numbers of subprime loans began to go bad

*immediately*: i.e., borrowers did not even make their first payment ("First Payment Default" or

119

"FPD") or failed to make their first three payments ("Early Payment Default" or "EPD").  To emphasize: these defaults were not caused by higher *resetting* rates, which were still one to three years off, but rather indicated borrower inability/unwillingness to pay the initial, low teaser rates.

259.    During 2005, only 1 in every 10,000 subprime loans originated experienced an FPD.  During the first half of 2006, the FPD rate had risen by a multiple of 31: nationwide, about 31.5 out of every 10,000 subprime loans originated between January and June 2006 had a delinquency on their first monthly payment, according to LoanPerformance, a subsidiary of First American Real Estate Solutions.

260.    By the end of 2006, EPD rates for 2006 subprime mortgages had risen to ten times the mid–2006 FPD rate: 3% of all 2006 subprime mortgages were going bad immediately. 2006 subprime mortgages from First Franklin, Long Beach, Option One and Countrywide had EPD rates of approximately 2%; those originated by Ameriquest, Lehman, Morgan, New Century and WMC had EPD rates of 3%-4%; and those originated by Fremont had EPD rates higher than 5%. *See* Moody's Investors Service, *2006 Review and 2007 Outlook: Home Equity ABS*, January 22, 2007, p. 12 at Figure 14.

261.    Initially, EPD was "inside baseball": it took place deep within the mortgage industry (which included Citigroup) and rarely became apparent to the wider public.  Industry insiders reported in specialized mortgage publications that EPD was also a game of "hardball" – because securitizers who purchased mortgages from originators could "put back" EPD and FPD mortgages to the originators, forcing originators to repurchase at full price their defective mortgages. EPD buy-back demands were often settled, not necessarily through actual buy-backs, but through significant price concessions on the sale of further loans, or via originator lump-sum payments to

reimburse Wall Street securitizers for the decreased collateral value of the loans. *See* National Mortgage News, *Street Gets Tough on Buybacks*, April 24, 2006.

262.     As 2006 progressed and the amounts at stake became ever larger, EPD emerged into the public realm as the first visible indicator of subprime deterioration.

263.     During the first half of 2006, the California subprime shop Acoustic Home Loans became the first subprime originator driven out of business by EPD buy-back requirements. In April 2006, Bear Stearns' EMC Mortgage, reputed to be a primary EPD enforcer, sued subprime originator MortgageIT over approximately $70 million in EPD buyback demands.  California's Fremont General Corporation, a leading subprime originator, reported a 185% increase in loan repurchases during the first half of 2006 compared with the first half of 2005, though total loan origination volume grew just 7% during the same period.  On August 31, 2006, H&R Block reported a $131 million quarterly loss, its largest loss in at least 17 years, driven by a $102 million reserve charge for EPDs at H&R Block's subprime originator Option One Mortgage Corp.  On October 16, 2006, Accredited Home Lenders revealed that it had been forced to buy back $38.6 million in mortgages in the previous quarter, a 145% increase from the same period a year earlier.  Accredited further informed that the "leading" indicators of EPD loans were documentation levels (i.e., "stated" income loans) and high-LTV loans, especially loans made together with simultaneous second liens. In November 2006, California subprime lender ECC Capital Corp. reported a "stunning" $54 million loss for the third quarter of 2006 due to EPDs and loan buybacks that had caused $23 million in losses.  On December 1, 2006, Texas subprime lender Sebring Capital discontinued operations after being presented with EPD buyback demands it could not afford.

264.     By October 2006, EPDs became front page news in the Wall Street Journal:

AS THE HOUSING SECTOR cools, the mortgage market faces an awkward question: Who takes the hit when loans go bad?   A generation ago, nobody asked. Banks made loans and suffered the consequences when borrowers didn't pay. Today, a complex Wall Street machine buys and sells mortgages and packages the loans into securities that are diced and sliced and sold again to investors world-wide.... players on Wall Street and beyond are starting to grapple over bad loans, especially in the market for borrowers with scuffed credit -- so-called subprime customers.

… Under contracts that govern the exchange of mortgages, lenders often must take back loans that default very early in their lives or that come with underwriting mistakes, such as flawed property appraisals. As the housing boom fizzles, cases of bad underwriting are popping up and more mortgages are defaulting early. That has investment banks and other mortgage buyers invoking these contract provisions and pressing lenders to repurchase mortgages that get sold to third parties, creating big losses for some lenders... In response, some originators are tightening standards, and mortgage buyers are beefing up due diligence... H&R Block Inc. recorded a $131 million loss for the quarter ending July 31, largely because it added $102 million to reserves for loans its unit Option One Mortgage Corp. had to repurchase.... Impac Mortgage Holdings Inc., a REIT that earned $270 million last year, saw repurchases triple between the first and second quarters of this year, rising to about $100 million. Impac said its repurchases peaked in the second quarter.

(Wall Street Journal, *Whistling Past Housing's Graveyard? --- Bad Loans Draw Bad Blood*, October 9, 2006)

265.   During the first week of December 2006, EPD buyback demands felled California-based OwnIt Mortgage Solutions, one of the fifteen largest subprime originators in the country, which closed its doors "amid reports that the subprime lender had been hit by huge loan buyback requests from an investor" (Workout Wire, *BuyBacks Appear to Shutter Two Firms*, December 8, 2006).  In the ensuing weeks, Ownit explored trying to sell itself, but its potential losses from outstanding EPD demands were too high for any buyers to be interested (American Banker, *OwnIt Selloff Try Nixed by Buyback Hit*, December 8, 2006).  OwnIt filed for bankruptcy December

28, 2006.

266.    Simultaneously, another large subprime lender, ResMAE Mortgage Corp., was presented with a staggering EPD demand of $308 million (stemming from its sale of $3.5 billion of subprime loans) – meaning that *9% of its recent subprime mortgage output had defaulted immediately*.  ResMAE could not meet its EPD demands and  filed for bankruptcy February 12, 2007.

267.    Smaller subprime originators, meanwhile, were being rendered extinct. Secured Funding Corp., a California subprime lender focused on home equity loans ($1.3 billion of originations in 2005),  closed on January 8, 2007 due to buyback demands.  Bay Capital ($0.8 billion of originations during 2005) closed for same reasons on January 12, 2007.  Lenders Direct Capital Corp. shuttered  wholesale operations on February 8, 2007 amid rumored loan buybacks; it had been originating $200 million of subprime mortgages per month.  Maribella Mortgage LLC (Minnesota, $900 million of 2005 subprime originations) shut down under EPD buyback pressure on March 9, 2007.  Sunset Direct Lending (Oregon, $1. 2 billion of 2005 subprime originations), one of three firms sued by Credit Suisse for failing to honor EPD demands, filed for bankruptcy on March 22, 2007.

268.    The record presented above with respect to EPDs was not merely visible to securitizers such as Citigroup, but was in fact the result of the securitizers' own actions.  EPD demands were demands made by a small set of securitizing banks (such as Citigroup), as those banks realized – before anyone else – that subprime mortgages were defaulting at record levels.

269.    The immediate consequences of the securitizers' EPD demands were plainly visible: a substantial reduction in subprime origination capacity (and thus, refinancing capacity)

123

resulting from the wave of subprime originator bankruptcies and closures.

270.    Subprime originators, with record numbers of defective loans now being returned back to them through EPD demands, became directly and highly motivated to improve their origination standards.  This development was "game changing" insofar as it served to reconnect originators to the risks of their originated loans.  Now that the risks of those loans were materializing on originators' doorsteps, originator standards changed drastically.   As one observer put it, "subprime lenders, having witnessed their erstwhile competitors swinging from the gallows, are trying to slip the noose" by making less risky loans.

271.    In practice, this meant, as detailed below, withdrawing from a precise and definable segment of the market: (1) loans made on the basis of unverified, undocumented "stated" income; and (2) loans that required little or no borrower down payment, especially first-liens originated together with "simultaneous second" piggyback loans, through which borrowers obtained the full amount of the property's purchase price with "no money down".

272.    The foreseeable consequence of this was, as detailed below, clearly and immediately foreseen: approximately 40% of subprime borrowers who had obtained exactly such loans during 2005 and  2006, at peak housing prices, would no longer be able to refinance their homes once the adjustable rates reset to payment shock levels.  These borrowers had only qualified for their loans by virtue of "stated" rather than objective income, had taken out those loans with little or no money down, and thus had little, no or even negative equity in their properties – all of which meant that they would no longer be able to secure a new mortgage to pay off the one they were now trapped in. In short, a massive wave of subprime defaults upon rate resets was now guaranteed.

273.    Fremont General, the fifth-largest subprime originator during 2006 with $32.3

billion of subprime loans generated, was among the worst producers of EPD loans. Between July 2005 and May 2006, Fremont's EPD rates more than doubled from 2.64% to 5.82% – i.e., more than 1 in 20 subprime loans was going bad immediately. In response, Fremont began in May 2006 to tighten its origination standards, focusing particularly on stated income loans and high-CLTV combination loans featuring a first-lien for 80% of the property value and a second-lien piggyback from the remaining 20% of the property value. Some examples: to extend any loan to a wage earner under "stated" rather than verified income, Fremont raised its FICO score minimum from 500 to 550; to extend a 100% LTV piggyback package under full documentation, the minimum FICO score was raised to 600 from 580; to extend such loans to wage- earning borrowers under stated income, the minimum FICO requirement was raised to 640 from 620. (Fitch Ratings, *Subprime Mortgage Distress on CDOs*, July 2007, pp. 33-34).

274.    As Asset Securitization Report concluded in November 2006, Fremont's EPD problems and its solutions (tightening origination standards, particularly with respect to stated income and high CLTV loans) were representative of industry-wide developments (Asset Securitization Report, *2006 HE ABS Vintage: the Worst Ever?*, November 27, 2006).

275.    First Franklin, the ninth-largest subprime originator in 2006 with $27.7 billion of loans, tightened its standards in exactly the same way (but more so) in response to exactly the same problem (Bankrate.com, *Lenders Tighten Standards on Subprime*, April 18, 2007).

276.    New Century Financial, the second-largest subprime originator during 2006 with $51.6 billion of loans generated, made similar changes to its lending standards in December 2006 with respect to "stated income" and high-CLTV loans. More momentously, New Century began, for a subset of riskier borrowers (those bearing FICO scores of less than 580 and seeking

125

loans with LTVs greater than 80%), to originate loans based on borrower debt-to-income calculated *not* at the initial teaser rates but rather at higher rates to which the mortgage would reset (Bloomberg, *New Century Tightens Sub-Prime Mortgage Standards*, January 4, 2007).

277.     The industry-wide constriction of subprime credit began to be apparent in aggregate Federal Reserve quarterly statistics beginning in late 2006. During the first quarter of 2007, banks' constriction of credit standards leaped to highest degree of constriction reported during the last fifteen years (15.1% net).  These aggregate figures understated matters, because they were based on residential real estate lending as a whole (i.e., prime loans in addition to subprime and Alt-A).  Beginning in the second quarter of 2007, the Federal Reserve refined its survey so that it inquired as to each category of residential real estate lending:  prime, subprime, and Alt-A.  These numbers revealed that subprime and Alt-A credit tightening was far more dramatic: more than 50% of banks reported tightened subprime standards, more than 40% reported tightened Alt-A standards.

278.     And so, subprime credit contracted in late 2006 and early 2007 on an industry-wide basis.  Moreover, the credit contracted in the *same* way industry-wide, focusing on identical kinds of loans and borrowers that were recognized, industry-wide, to pose the greatest risks.  As already indicated, these were: (a) stated income loans, particularly to wage earners (i.e., persons whose income was capable of easy objective verification); (b) high-CLTV loans, either via simultaneous second piggybacks or through little- or no-money down single loans; and (c) borrowers at the lower ends of the subprime credit spectrum.

279.     Because the industry-wide credit contraction was so clearly defined, its effects were also precisely defined, foreseeable and foreseen.  A sizeable, precisely-defined and highly-at-risk set of subprime mortgages could no longer – under new standards – be refinanced, would soon

126

hit rate resets, and upon those rate resets would default at extreme rates.

280.    The key underlying fundamental factor that made nonprime performance both so bad and so forseeably bad was that  80% of all subprime loans were 2/28 or 3/27 hybrid ARMS whose rates would soon reset to payment shock levels.  40% of subprime borrowers during 2006 obtained mortgages with simultaneous second liens, thus borrowing the full price of the property without providing any equity.  Even had property prices remained stable, such borrowers would no longer be able to obtain a new loan in sufficient amounts to pay off the old (because of lenders' reduced willingness to make high-CLTV loans).  That property prices were declining only made matters worse: the loan amounts available through refinancing  would be lower to start with, and would no longer be for 100% of the already-reduced property value.  Finally, the withdrawal from lending to wage-earners based on their  "stated" income made many such borrowers unlikely to qualify at refinancing –  based on their objectively verified income – for a new loan that would suffice to pay off the original one.

281.    Given the concrete manner in which subprime was contracting, it was clear exactly which subprime borrowers and mortgages were headed for imminent default.  Jim Svinth, chief economist for LendingTree.com, made clear that an easily-identified segment of subprime borrowers/mortgages was in "big trouble":

> **Svinth says one type of subprime customer could end up in big trouble: "If you were a 2/28 borrower a couple of years ago, and you can't document your income and don't have enough equity to put 10 percent down, and your credit hasn't got any better, you're in a bad spot," he says.**
>
> **The equity problem is particularly knotty. A lot of borrowers bought houses with no money down and made interest-only payments, counting on home values to rise so they would have**

**equity when it came time to refinance. With house values dropping in many markets, some homeowners have no equity, and some even owe more than the house is worth. They may find it impossible to refinance.**

Stuck in a subprime loan
**"There's a lot of borrowers who are going to be stuck in loans they can't get out of," Lazerson** [president of Mortgage Grader, a mortgage brokerage in California] **says. If they can't afford the higher loan payments and can't refinance, they'll end up losing their homes to foreclosure.**

**For at least a year, analysts have warned that the loose lending standards of the past few years would result in a spike in foreclosures. That's starting to happen among subprime borrowers.**

**"Within the last five years, there have been virtually no underwriting standards at all," Lazerson says. There used to be a joke that you could get a mortgage if your breath could fog a mirror. Then, Lazerson says, "in the last five years, you could be dead and get a loan. It was ridiculous. We had people with zero down and bad credit and getting loans."**[17]

Brokers can't believe how lax the subprime lending requirements were just a short time ago. Investors were eager to buy mortgages, especially high-rate, risky home loans with prepayment penalties, because they were profitable. So investors pushed loan officers and mortgage brokers to find borrowers with lousy credit. Brokers and loan officers were paid handsomely -- practically bribed -- for delivering subprime borrowers.

(Bankrate.com, *Lenders Tighten Standards on Subprime*, April 18, 2007)

282.    That the door to refinancing as closing for a vast segment of subprime

borrowers was not a unique insight, but a common one repeatedly uttered during late 2006 and early

---

[17]    This is not an exaggeration.  On January 9, 2007, Fremont General made news when it announced that it would "*stop* giving mortgages to individuals who can't prove their income when buying a home with no money down" (Bloomberg, *Fremont Toughens Sub-Prime Mortgage Loan Guidelines*, January 9, 2007).

2007. For example:

> ..."**The 2006 vintage is on track to be the worst ever," an RMBS analyst said last week. Slowing home price appreciation and weakened underwriting standards are creating dramatically poor performance across a wide swath of 2006 mortgages. To many, the performance of 2006 deals backed by the mortgages hinges primarily on two things: the economy, and the ability for the borrowers to refinance**. (Asset Securitization Report, *2006 HE ABS Vintage: the Worst Ever?*, November 26, 2006)

> ＊＊＊＊＊

> New Century Financial Corp., the third-largest U.S. home lender to people with poor credit, last month tightened its lending guidelines amid surging defaults on so-called subprime mortgages... Other subprime lenders, including San Diego-based Accredited Home Lenders Holding Co. And Santa Monica, California-based Fremont General Corp., have said they've also cut their offerings, in part due to rising concern among bond investors who buy the riskiest securities backed by the loans.

> **Tighter guidelines may prevent subprime borrowers – who typically get loans whose rates adjust higher after two or three years – from refinancing into lower initial rates, leading to more defaults**, according to analysts including Chris Bendler of Stifel, Nicolaus & Co., Inc. [] and mortgage-bond researchers at UBS AG...

> (Bloomberg, *New Century Tightens Sub-Prime Mortgage Standards*, January 4, 2007)

> ＊＊＊＊＊

> This sudden deterioration in early performance has also come as a wake-up call to originators, with many reacting with tightened lending practices in the second half of 2006 to improve performance. Some of the key changes were restricting stated income loans to borrowers with stronger credit profiles and limiting underwriting exceptions only when in conjunction with strong compensating factors. **Originators are expected to continue to tighten guidelines through 2007. As a result, Moody's expects origination volume to fall both due to the softer real estate environment and tighter underwriting standards. Many borrowers with weak credit profiles may no longer qualify for a mortgage. A significant**

**number of hybrid loans will reach their reset dates in 2007 and Moody's expects performance to continue to weaken** as the real estate market approaches its trough...

...The long predicted slowdown in the US housing market became a reality in the second half of 2006... **A significant number of sub-prime borrowers will be looking to refinance at the end of the fixed term of their hybrid mortgages this year. While some of these borrowers might have realized price appreciation, others who bought or refinanced at high loan-to-value ratios at the peak of the market in 2005 might have trouble refinancing in face of current market conditions**.

(Moody's Investors Service, *2006 Review and 2007 Outlook: Home Equity ABS: 2006 Was Tough – Will 2007 Be Even More Challenging?*, January 22, 2007, pp. 2, 15-16)

*****

**The shakeout in the subprime industry began last year as housing prices leveled off and interest rates rose higher, curbing demand for loans. At first, some companies loosened lending standards to keep loan volume high -- a tactic that has produced a wave of early loan defaults**. More recently, companies such as New Century have tightened their loan policies to reduce their exposure to mortgages that could go sour.

**<u>As part of the fallout, marginal borrowers who snapped up loans with initial easy-money terms in 2004 and 2005 will find it impossible to refinance this year to avoid sharply higher payments, especially with home prices flat or lower in many areas, said industry analyst Zach Gast</u>**.

**Up to $800 billion of adjustable-rate mortgages will reset to higher payments in 2007, and one in every 11 home loans is both adjustable and subprime**, according to the Mortgage Bankers Association.

**"There could be a good chunk of borrowers with nowhere to go to get loans,"** said Gast, who follows the industry for the Center for Financial Research and Analysis, a Rockville, Md., forensic accounting and due-diligence firm with mutual funds, hedge funds and insurers as clients.

130

"It means a lot of people are going to lose their homes."

**Gast said investors in mortgage-backed bonds, who for years demonstrated an unquenchable demand, have begun backing away from securities created from the riskiest pools of loans**.

(Seattle Times, *Lenders report huge losses on subprime mortgages*, February 9, 2007)

*****

...during a conference call with bond and other investors last month, Merrill's analysts said early payment defaults on subprime residential loans are accelerating.... **Merrill Lynch analyst Kenneth Bruce said lenders are under intense pressure to tighten their underwriting guidelines, which could lead to a credit crunch for subprime borrowers.**

**During the same conference call, Merrill researcher Kamal Abdullah raised the specter that a subprime "contagion" could lead to the "bottom" 25% of all subprime borrowers being unable to get loans**.

(Origination News, *Merrill Making Some Originators Pay with Buybacks*, March 1, 2007)

283.    As 2006 turned to 2007 and evidence of worsening subprime mortgage performance became ever more clear and apparent, lender standards continued to tighten – and thus the possibility of refinancing continued to recede – under severe regulatory and economic pressures discussed next.

### 2.    Mortgage Origination Standards Further Constrict Under New Regulatory Guidance on Mortgage Lending in September 2006 and February 2007

284.    Concerned over the deterioration of loan underwriting standards, federal regulators intervened in September 2006 and February 2007 with very clear warnings about the

mortgages at the heart of the issues here: hybrid ARMS (and their Option ARM and interest-only variants) for which borrowers "qualified" by their ability to pay the lower initial rates rather than the far higher fully-indexed rates, and "stated" income loans.  Although economic pressures were already leading originators to back away from both of these loans, the federal guidance gave a further push. The result: an enormous portion of recently-originated subprime mortgages (80% hybrid ARMs during 2005/2006; 40% originated on the basis of stated income) would not be able to be refinanced, would encounter payment shock upon rate resets starting in 2007, and would default in unprecedented numbers.  The bases on which subprime borrowers had qualified for those mortgages were no longer valid, and would not serve to allow them to escape those old mortgages with new ones.  There would be no "new ones".

285.   On September 29, 2006, federal financial regulators – including the Department of the Treasury, the Office of the Comptroller of the Currency, the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration – released, after an extended comment period, a new set of regulatory guidelines concerning residential real estate lending, focused particularly on origination practices associated with adjustable rate mortgages, Option ARM mortgages, and interest-only mortgages. The guidelines, titled *Interagency Guidance on Nontraditional Mortgage Product Risks*, led to further contraction of the market.  It began with the preamble:

> **Interagency Guidance on Nontraditional Mortgage Product Risks**
>
> Residential mortgage lending has traditionally been a conservatively managed business with low delinquencies and losses and reasonably stable underwriting standards. In the past few years consumer demand has been growing, particularly in high priced real estate markets, for closed-end residential mortgage loan products that allow borrowers

to defer repayment of principal and, sometimes, interest. These mortgage products, herein referred to as nontraditional mortgage loans, include such products as "interest-only" mortgages where a borrower pays no loan principal for the first few years of the loan and "payment option" adjustable-rate mortgages (ARMs) where a borrower has flexible payment options with the potential for negative amortization.

While some institutions have offered nontraditional mortgages for many years with appropriate risk management and sound portfolio performance, the market for these products and the number of institutions offering them has expanded rapidly. Nontraditional mortgage loan products are now offered by more lenders to a wider spectrum of borrowers who may not otherwise qualify for more traditional mortgage loans and may not fully understand the associated risks.

Many of these nontraditional mortgage loans are underwritten with less stringent income and asset verification requirements ("reduced documentation") and are increasingly combined with simultaneous second-lien loans.2 Such risk layering, combined with the broader marketing of nontraditional mortgage loans, exposes financial institutions to increased risk relative to traditional mortgage loans. Given the potential for heightened risk levels, management should carefully consider and appropriately mitigate exposures created by these loans. To manage the risks associated with nontraditional mortgage loans, management should:

• Ensure that loan terms and underwriting standards are consistent with prudent lending practices, including consideration of a borrower's repayment capacity;

• Recognize that many nontraditional mortgage loans, particularly when they have risk-layering features, are untested in a stressed environment. As evidenced by experienced institutions, these products warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectibility of the portfolio; and

• Ensure that consumers have sufficient information to clearly understand loan terms and associated risks prior to making a product choice.

133

The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (Board), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS) and the National Credit Union Administration (NCUA) (collectively, the Agencies) expect institutions to effectively assess and manage the risks associated with nontraditional mortgage loan products.

Institutions should use this guidance to ensure that risk management practices adequately address these risks. The Agencies will carefully scrutinize risk management processes, policies, and procedures in this area. Institutions that do not adequately manage these risks will be asked to take remedial action.

The focus of this guidance is on the higher risk elements of certain nontraditional mortgage products, not the product type itself. Institutions with sound underwriting, adequate risk management, and acceptable portfolio performance will not be subject to criticism merely for offering such products.

(*Interagency Guidance on Nontraditional Mortgage Product Risks*, September 29, 2006)

286.     The substance of the Interagency Guidance lay in its clear statements concerning loan origination/underwriting practices.  The Interagency Guidance made crystal clear that, in originating subprime loans, financial institutions needed to qualify borrowers for ARMs by assessing borrowers' ability to pay the fully-indexed rates, rather than merely the initial rates (in other words, verify such borrowers' ability to actually pay the mortgage).  Additionally, the September 29, 2006 Interagency Guidance strongly advised that, given the payment shock risks inherent in such mortgages, borrower income be objectively verified through easily-available objective data (rather than merely "stated" by the borrower):

LOAN TERMS AND UNDERWRITING STANDARDS

**When an institution offers nontraditional mortgage loan products, underwriting standards should address the effect of a**

**substantial payment increase on the borrower's capacity to repay when loan amortization begins**. Underwriting standards should also comply with the agencies' real estate lending standards and appraisal regulations and associated guidelines.

**Central to prudent lending is the internal discipline to maintain sound loan terms and underwriting standards despite competitive pressures. Institutions are strongly cautioned against ceding underwriting standards to third parties that have different business objectives, risk tolerances, and core competencies**. Loan terms should be based on a disciplined analysis of potential exposures and compensating factors to ensure risk levels remain manageable.

**Qualifying Borrowers – Payments on nontraditional loans can increase significantly when the loans begin to amortize. Commonly referred to as payment shock, this increase is of particular concern for payment option ARMs where the borrower makes minimum payments that may result in negative amortization. Some institutions manage the potential for excessive negative amortization and payment shock by structuring the initial terms to limit the spread between the introductory interest rate and the fully indexed rate. Nevertheless, an institution's qualifying standards should recognize the potential impact of payment shock, especially for borrowers with high loan-to-value (LTV) ratios, high debt-to-income (DTI) ratios, and low credit scores. Recognizing that an institution's underwriting criteria are based on multiple factors, an institution should consider these factors jointly in the qualification process and may develop a range of reasonable tolerances for each factor. However, the criteria should be based upon prudent and appropriate underwriting standards, considering both the borrower's characteristics and the product's attributes**.

**<u>For all nontraditional mortgage loan products, an institution's analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule</u>** In addition, for products that permit negative amortization, the repayment analysis should be based upon the initial loan amount plus any balance increase that may accrue from the negative amortization provision.

> **Furthermore, the analysis of repayment capacity should avoid over-reliance on credit scores as a substitute for income verification in the underwriting process. The higher a loan's credit risk, either from loan features or borrower characteristics, the more important it is to verify the borrower's income, assets, and outstanding liabilities.**

(*Interagency Guidance on Nontraditional Mortgage Product Risks*, September 29, 2006)

287.    The agencies that issued the September 29, 2006 Interagency Guidance noted that, during the comment period, most originating institutions protested that the requirement to qualify borrowers at fully-indexed rates was unnecessary.  The agencies emphasized that they had considered the issue and concluded the opposite:

> **The Agencies believe that institutions should maintain qualification standards that include a credible analysis of a borrower's capacity to repay the full amount of credit that may be extended. That analysis should consider both principal and interest at the fully indexed rate. Using discounted payments in the qualification process limits the ability of borrowers to demonstrate sufficient capacity to repay under the terms of the loan. Therefore, the proposed general guideline of qualifying borrowers at the fully indexed rate, assuming a fully amortizing payment, including potential negative amortization amounts, remains in the final guidance.**

(*Interagency Guidance on Nontraditional Mortgage Product Risks*, September 29, 2006)

288.    On February 28, 2007, federal financial regulators – including the Department of the Treasury, the Office of the Comptroller of the Currency, the Federal Reserve, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision – released a document titled *Proposed Statement on Subprime Mortgage Lending* setting forth a set of proposed regulatory guidelines governing subprime mortgage originations (the "Regulatory Statement").  The Regulatory

Statement was motivated by regulator concern over a variety of subprime mortgage practices and features. At the top of the list, were hybrid ARMs and stated income lending:

> The Agencies developed this Statement to address emerging issues and questions relating to certain subprime mortgage lending practices... In particular, the Agencies are concerned with ARM products marketed to subprime borrowers with the following characteristics:
> • Offering low initial payments based on a fixed introductory or "teaser" rate that expires after a short initial period then adjusts to a variable index rate plus a margin for the remaining term of the loan3;
> • Approving borrowers without considering appropriate documentation of their income;
>
> (February 28, 2007 *Regulatory Statement*, p. 6)

289.    The Regulatory Statement made crystal clear that, in originating subprime loans, financial institutions needed to: (1) qualify borrowers for ARMs at their fully-indexed rates, rather than their initial rates (in other words, verify such borrowers' ability to actually pay the mortgage); and (2) verify borrower income through easily-available objective data, rather than turn a blind eye to it under the fiction of "stated" income:

> **Prudent qualifying standards recognize the potential effect of payment shock in evaluating a borrower's ability to service debt. An institution's analysis of a borrower's repayment capacity should include an evaluation of the borrower's ability to repay the debt by its final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. One widely accepted approach in the mortgage industry is to quantify a borrower's repayment capacity by a debt-to-income (DTI) ratio**...
>
> **This assessment is particularly important if the institution relies upon reduced documentation or allows other forms of risk layering. Risk-layering features in a subprime mortgage loan may significantly increase the risks to both the institution and the borrower**. Therefore, an institution should have clear policies governing the use of risk-layered features, such as reduced documentation loans or simultaneous-second lien mortgages...

> **The higher a loan's risk, either from loan features or borrower characteristics, the more important it is to verify the borrower's income, assets, and liabilities. When underwriting higher risk loans, stated income and reduced documentation should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity. For many borrowers, institutions should be able to readily document income using recent W-2 statements, pay stubs or tax returns.** A higher interest rate is not considered an acceptable mitigating factor.

(February 28, 2007 *Regulatory Statement*, p. 8)

290.     The abandonment of twin fictions on which subprime lending had boomed – (1) originating ARMs on the basis of borrower DTI calculated at the initial teaser rates, rather than at the fully-indexed rates, and (2) originating such already-deficient loans on the further, fictional basis of stated income – would render great numbers of 2005/2006 subprime mortgages impossible to refinance.   Objective incomes, upon examination at refinance, would likely be lower than previously "stated" incomes: thereby qualifying the borrower for lower maximum loan amounts (which would thus not suffice to pay off the original loan).   More important, upon refinance, by considering the payment burden at fully-indexed rates rather than teaser rates, the borrower would only be able to qualify for a much, much lower loan amount (which would thus not suffice to pay off the original loan).

291.     80% of subprime loans originated in 2005 and 2006 were hybrid ARMS with rates due to reset between 2007 and 2009.   Refinancing, for many of these loans, would be impossible.   Indeed, during 2007, 35% of resetting mortgages either defaulted upon reset or became delinquent within the six months following rate reset.[18]

---

[18]     Citigroup, *The Subprime Crisis: An Overview*, March 3, 2008, at p. 21.

3.   **The Final Collapse in Early 2007: Subprime Originators are Rendered Extinct, Lending Standards Constrict Severely, and the Possibility of Nonprime Refinancing Ends**

292.   The final blow to refinancing came during the first three months of 2007, during which time severe economic pressures drove most subprime originators out of business and drove the few that remained to drastically revise their origination standards so as to produce safer loans.  The end result was that by March 2007 subprime origination had almost entirely collapsed.  This collapse had obvious consequences for the wave of hundreds of billions of dollars of subprime 2/28 and 3/27 ARMs, originated during 2005 and 2006, whose rates were due to reset to payment shock levels between 2007 and 2009.  Many of these mortgages would not be able to refinance: most subprime lenders no longer existed; the few that remained were no longer taking on risky loans. Hundreds of billions of dollars of subprime mortgages were headed for imminent default.

293.   The economic pressures driving this final collapse were twofold.

294.   First, as subprime mortgage risks materialized and subprime mortgage performance deteriorated during late 2006 and early 2007, the prices fetched by subprime loans on the secondary market (i.e., the prices paid by securitizers such as Citigroup) fell.  In fact, prices fell to levels substantially less than the amount actually lent – meaning that, with every subprime loan made, subprime originators were losing money.  A vivid example:

> Shares of NovaStar Financial, which makes loans to people with weak credit, fell almost 43 percent Wednesday after the company announced a surprise loss of $14.4 million for the fourth quarter and *told investors* **that it might not make enough money to pay dividends for the next four years**.
> *****
> Some analysts and investors say the problems at NovaStar and other subprime lenders have been evident for some weeks and months.

In late January, NovaStar posted the performance of the mortgages it securitized and sold to investors on its Web site. Investors who had been paying attention would have noted that the delinquency rate for loans made in 2006 had jumped to 7 percent from 2 percent in 2005, Gast of the Center for Financial Research and Analysis said.

(New York Times, *Home Lenders Hit by Higher Default Rates*, February 22, 2007)

295.    Second, most subprime originators were dependent on "warehouse lines of credit", advanced to them by securitizers such as Citigroup so as to obtain and secure pools of loans for securitizers' RMBS and CDO securitization machines.  These warehouse lines provided the originators with the funds to make their loans, and the loans served as the collateral for those warehouse lines.  Periodically, the originators would sell large pools of loans to their warehouse credit providers; the funds received from loan sales effectively "reset" the revolving warehouse credit line and were plowed back into a new round of originations.  Thus, the loans were really being made not with the originators' money, but with the originators' *funders'* money.  This meant that the funders (such as Citigroup) were losing money with each new loan being made.  As detailed below, in the first three months of 2007, those funders (with Citigroup playing a prominent role) ceased their funding, made a series of "collateral calls" on originators (because the loans' value had fallen below the amount of money lent by the funders), and withdrew their warehouse credit lines.  The result: most subprime originators went bankrupt, and subprime origination halted.

296.    One of the first casualties of collateral calls and warehouse credit withdrawal was Mortgage Lenders Network USA Inc. (the fifteenth-largest subprime originator in the U.S., with approximately $12 billion of loans funded during 2006).  In late December 2006, MLN was forced to suspend funding loans due to "unresolved issues" with its warehouse credit funders.  On January

2, 2007, MLN stated it was in "strategic negotiations" with several Wall Street firms about its loan operations, stopped funding loans and accepting loan applications, and temporarily laid off 80% of its 1,800 employees.

297.   MLN filed for Chapter 11 bankruptcy on February 5, 2007.

298.   It was followed by a flood of others.  Rose Mortgage Corp. closed down abruptly on January 23, 2007 after Deutsche Bank withdrew the company's last lifeline, a $50 million line of credit.  Deep Green Financial Inc., a 2nd lien lender with $5 billion of such loans outstanding, was closed by its parent company on January 31, 2007.  Washington Mutual cut off funding for Ameritrust Mortgage Co. LLC on March 6, 2007 (a North Carolina subprime wholesaler, with $0.9 billion in 2005 originations).  Central Pacific Mortgage (California, $2.3 billion in 2005 originations) shut down on March 6, 2007; FMF Capital LLC (Michigan, $3.8 billion in 2005 originations) on March 9, 2007.  People's Choice Financial Corp. (California, $4.5 billion in 2005 originations) filed for bankruptcy on March 14, 2007, as a result of margin calls, EPD demands, and warehouse credit withdrawals.  H&R Block Mortgage (Florida, $4 billion in 2005 originations) shut down on March 29, 2007.  First NLC Financial Services Inc. (Florida, $6 billion in 2005 originations) closed March 30, 2007.  SouthStar Funding LLC (Georgia, $5.6 billion in 2005 originations), a self-described "aggressive" subprime lender, abruptly discontinued operations on April 2, 2007 due to "unprecedented downturn and policy changes in the mortgage industry" and filed for bankruptcy protection ten days later on April 11, 2007.  Millenium Funding Group (Washington State, $1 billion in 2005 originations), after having cut 40% of its staff in March in a bid to stay alive, called it quits on the same day; so did Alterna Mortgage (New Jersey), a niche wholesaler which identified itself as "an aggressive wholesale Alt-A lender specializing in

141

alternative documentation programs".  Alt-A originator Homefield Financial (California, $2.5 billion in 2005 originations) closed its wholesale unit on April 13, 2007.  On May 7, 2007, Opteum Financial Services (New Jersey, $6.5 billion in 2005 originations) shut down.

299.     The subprime giants toppled as well.

300.     On February 8, 2007, HSBC, the largest originator of subprime loans during 2006 (in excess of $50 billion), raised its subprime loan loss reserves to a staggering $10.6 billion to cover anticipated losses from its subprime lending (more than doubling its reserve levels from where they had stood less than half a year ago).  During a February 8, 2007 conference call, HSBC officials explained that ARM resets were set to explode, and that subprime borrowers likely would not be able to make their payments when their rates rise (Home Equity Wire, *HSBC Raises Reserves, Awaiting ARM Reset Losses*, February 15, 2007).  Not surprisingly, HSBC also announced plans to cut back on further subprime lending and to eliminate all stated income lending.  HSBC's February 2007 bombshells marked the a basic turning point everywhere: they began to make the scale of subprime risks widely apparent; they sparked further and severe contraction in subprime origination; and – as further detailed below – they caused indexes tracking the BBB tranches of subprime RMBS to crater.  A sense of the immediate impact, both upon origination standards and warehouse funding:

> HSBC Holdings PLC's decision to change course in the U.S. subprime market has made life even more difficult for small and midsize originators, a segment that has already been under considerable stress.
>
> **Originators say that even before HSBC's disclosure of its struggles in subprime , they were encountering tightening in areas like credit scores, loan-to-value ratios, and income documentation. The pullback by a player of HSBC's size has brought those constraints to a new level of intensity**.

**"The whole industry is tightening up on their criteria for subprime," said Andrew Thaw, a loan officer at First Lincoln Mortgage Bankers in Huntington Station, N.Y. "There is a huge impetus towards tightening up in terms of loan-to-value and credit."** ... **All told, he has "never seen such rapid tightening," Mr. Thaw said**. "It's reminiscent of the mid-1980s" when Resolution Trust Corp. was liquidating thrifts.

*****

For at least one subprime originator, LownHome Financial, it was tough simply getting creditors on the phone Thursday.

The management at **the San Jose subprime lender was scheduled to have a conference call with a warehouse lender. But Marc Geredes, LownHome's chief executive, said that Wall Street was "in complete meltdown mode," and that the bankers did not phone in. "When we called them back, they got on the phone and said, 'Don't you know what's going on?' and hung up on us. Everyone is going crazy."**

(American Banker, *Originators Brace for HSBC Impact*, February 9, 2007)

301.    On March 2, 2007, the fifth largest subprime originator, Fremont Investment and Loan ($36.2 billion of originations in 2005, $32.3 billion in 2006) was shut down by its parent Fremont General Corp.  As further detailed below, New Century Financial, the second largest subprime lender ($51.6 billion in 2006 originations) filed for bankruptcy on April 2, 2007 – after a round of collateral calls and warehouse credit withdrawals led by Citigroup beginning in early March 2007.   Two weeks later, the seventh largest subprime originator, Option One Mortgage Corp. (California, $31 billion in 2005 originations and a further $28.8 billion in 2006) was sold off by its parent H&R Block.

302.    Behind this mass extinction was the whoosh of capital receding from the no-longer profitable industry:

143

Another month and another column about the subprime meltdown. As Mortgage Servicing News went to press this month, a tidal wave of bad news was sweeping the B&C or "nonprime" industry.

\*\*\*\*\*

...Subprime wholesaler Ownit Mortgage Solutions of California goes bust. Six weeks later, MLN and Sebring Capital of Texas close their doors. **What do all these firms have in common? They were privately held B&C lenders that depended on warehouse lines of credit from - you got it - Wall Street**.

Wall Street (Merrill Lynch, others) said to Ownit and MLN: buyback the delinquent loans you sold us or we won't lend you more money. MLN and Ownit said: can't we talk about this? We don't have a lot of money. (I'm paraphrasing.) Wall Street said: we can talk all you want but we want our money...

(Mortgage Servicing News, *The B&C Meltdown: It's All About Capital*, March 1, 2007)

303.    And behind that withdrawal of capital, securitizers such as Citigroup were finding themselves increasingly unable to sell subprime mortgages, in repackaged form as RMBS and ultimately CDOs, to investors.  The decreased demand for subprime-backed RMBS and CDOs stood at the beginning of the causal chain.  Because demand for RMBS and CDOs was decreasing, securitizer demand for subprime mortgages (to turn into RMBS) and for subprime RMBS (to turn into CDOs) was decreasing.  Because securitizer demand for subprime mortgages  was decreasing, subprime mortgage origination itself decreased (as securitizers withdrew their warehouse credit lines).  And seen in this light, the extent to which the prior years' booms – in RMBS and CDO underwriting, subprime mortgage originations, and housing price appreciation – had itself been a creature of booming RMBS and CDO demand.

304.    The chain connecting CDOs and RMBS to securitizers and originators to

144

subprime mortgages and housing prices is likewise witnessed by the March 2007, Citigroup-instigated collapse of New Century Financial, the second largest subprime lender in the country.  As the Wall Street Journal reported on March 12, 2007:

> **In the clearest sign yet of how rapidly funding is vanishing for the risky loans that helped fuel the housing boom, nervous creditors forced New Century Financial Corp., the nation's second-largest subprime mortgage lender, to stop making new loans**... Yesterday, people close to the matter said New Century got fresh financing from one of its biggest creditors, investment bank Morgan Stanley. Even so, the company's mounting woes intensified speculation that it may be forced to file for protection from creditors under Chapter 11 of the federal Bankruptcy Code unless it can find a suitor or sell assets soon...
>
> New Century said one of its lenders, which it didn't identify, has provided it with $265 million in financing secured by the company's portfolio of loans held as an investment. **That lender also provided $710 million of financing for mortgage loans previously financed by another lender, which exercised its right to withdraw that financing, New Century said. People familiar with the matter cited Citigroup as the company that withdrew funding and Morgan Stanley as the provider of new financing. A Citigroup spokesman declined to comment**...
>
> … **Until a few weeks ago, the mortgage industry was awash in cash from investors searching for higher yields. That made it easy for borrowers to get a mortgage -- even if they had bad credit or couldn't document their income or provide a down payment. Now, rising defaults have soured investors' appetite for securities backed by such mortgages, making it hard for subprime lenders to sell their loans and raise cash to make new ones. The industry's troubles are quickly and sharply cutting the availability of credit for borrowers with weak credit**...
>
> (Wall Street Journal, *Second-Biggest Subprime Lender Halts New Loans --- New Century Move Feeds Bankruptcy Speculation; Funding Crunch Widens*, March 12, 2007)

*****

[New Century SEC filing says it has been served notices of default from Bank of America, Citigroup, Credit Suisse, Goldman Sachs and Morgan Stanley, analysts say bankruptcy imminent]… Companies like New Century relied heavily on big Wall Street banks for financing in order to provide mortgages to buyers who would have had a hard time securing a loan through more traditional means because of poor credit ratings or high levels of debt relative to their income. **Many of the loans made by New Century and its brethren were dished out without so much as a shred of supporting documentation about the buyer's income or assets. Wall Street firms then gobbled up the sketchy loans and rolled them into securities that were sold to hedge funds and other investors hungry to unearth fresh ways to profit from the soaring housing market**...

**As might have been predicted, New Century's borrowers encountered trouble in making their payments, and default rates soared over the past year. Concerned that they'll be the ones left wearing a lampshade as the subprime party fizzles, the company's creditor's began to call in their loans. Indeed, New Century said this morning that some of its bank lenders are "accelerating" its obligations to buy back all outstanding mortgages**. If all its lenders demand repurchases, New Century's total obligation could come to a whopping $8.4 billion, a burden that the company said it simply can't meet...

(Wall Street Journal, *The Afternoon Report: New Century Crunch*, March 12, 2007)

305.    In fact, as subsequent reporting by the Wall Street Journal made clear, Citigroup was the prime mover in New Century's collapse.  The alacrity with which Citigroup acted in recognizing that New Century's mortgages were devalued assets, in demanding additional collateral payments against the money it had lent New Century to fund those mortgages, and in securing the return of $700 million before other banks could claw back their funds, all demonstrate Citigroup's understanding that subprime mortgage-backed assets were in imminent peril:

The largest debt listed by New Century, owed to Morgan Stanley, was $2.5 billion. **New Century said that after Citigroup Inc.**

146

**demanded additional collateral of $80.3 million to cover a "margin deficit" on some of the company's debt last Tuesday,** Goldman Sachs filed a default notice on Wednesday, seeking repayment of roughly $100 million. In a filing yesterday, New Century also listed outstanding debts of about $900 million to Credit Suisse Group Inc., $800 million to IXIS Real Estate Capital Inc. and $600 million to Bank of America Corp... Morgan Stanley advanced New Century a fresh $265 million last week but notified the company on Friday it was "discontinuing financing." **On Thursday, the fresh financing from Morgan Stanley was used to help pay back $717 million that New Century owed Citigroup, the company said yesterday. The same day, default notices came in from Bank of America, Citigroup and IXIS**...

(Wall Street Journal, *Banks Go on Subprime Offensive --- HSBC, Others Try to Force Struggling Smaller Players To Buy Back Their Loans*, March 13, 2007)

\*\*\*\*\*

**By extending generous credit to subprime lenders, Wall Street firms financed the borrowing binge that helped fuel the housing boom. Those firms now are turning off the money spigot. They see more borrowers having trouble paying off those mortgages in a slowing economy, which has made investors less willing to pour money into the sector.** More than two dozen subprime mortgage lenders have closed shop, and there is concern that the defaults could spread to other types of risky loans and to less-risky mortgages, exacerbating the housing market's slowdown and possibly weighing on the economy. Accredited Home Lenders Holding Co., a subprime lender, recently was forced to sell $2.7 billion of loans at a big discount to meet lenders' demands for more collateral...

\*\*\*\*\*

**In February, New Century mortgages that had been worth $8 billion fell by more than $300 million within days, someone familiar with the matter says. The result: More lenders demanded additional collateral, also called margin, from New Century**, including Goldman and Credit Suisse, people familiar with the matter say. Banks also invoked terms allowing them to demand that the company buy back loans if borrowers failed to make payments. New Century was running out of options. It was unable to get new financing and in violation of its existing lending agreements, in part because it was low on cash. So the company convened the

147

March 6 conference call with its 11 lenders....

**The banks were holding New Century mortgages as collateral for $8.5 billion worth of loans. Under the plan, the banks would return those collateral mortgages to New Century so it could cobble them together into new bonds that would be sold to raise money... That night, Citigroup moved forward with a decision to declare New Century in default. Others followed**. The next day, Mr. Einhorn resigned from New Century's board. Though Morgan Stanley agreed to a $265 million loan, it demanded as collateral a loan portfolio worth even more, and reversed course a few days later and cut off additional financing.

(Wall Street Journal, *How Street Hit Lender --- 'Subprime' King New Century Was Down but Not Quite Out; Then, Banks Shut Cash Spigot*, March 29, 2007)

**D.      What The Marketplace Knew and Believed**

306.      Market participants observed, in real time, the above-detailed facts and dynamics and understood their consequences for, *inter alia*, housing prices, nonprime mortgage performance, nonprime RMBS, and CDOs.  Beginning in approximately October 2006, market participants began to understand that CDOs were at risk (Section II.D.1.a).  No later than March 2007, market *consensus* was that CDOs were at great risk of great loss (Section II.D.1.b).  Citigroup itself knew that both the  risks and the losses were greater than the market then believed (Section II.D.3).

307.      By March 2007, there was no question as to CDO's risk and impairment: the only remaining questions were "Where did the risk go? Who was holding the CDOs?" (Section II.D.2).  As demonstrated below, the market understood this risk actually to have "gone" somewhere: CDO underwriters had, presumably, sold it off.  This understanding, in Citigroup's case, was incorrect.  The vast majority of the CDO securities it had underwritten had not been sold and had not

148

in fact gone anywhere.  By means of the schemes, omissions and misleading disclosures detailed in Part III, Citigroup concealed that it was holding $57 billion of such securities.

### 1. The Market Understood, Correctly, That CDOs Would be Devastated by Nonprime Mortgage Losses

308.    No later than March 2007, market consensus had already recognized that subprime losses would be substantial enough to materially impair even the super senior tranches of ABS CDOs.   By March 2007 it is incontrovertible that market participants and experts had recognized certain fundamental facts and factors – including (1) subprime mortgage performance deterioration, (2) the oncoming wave of rate resets, (3) the new inability to refinance, (4) housing price declines, and (5) a wave of rate-reset-sparked defaults that would intensify mortgage performance deterioration and housing price declines – that, when put together, led market participants and experts to conclude that subprime mortgage pool losses would rise through the BBB RMBS tranches and thus leap into Mezzanine CDOs.  Market participants had concluded that the credit ratings still born by these securities no longer matched evident credit realities, and that the value of these securities was substantially impaired and even, imminently, worthless.

309.    Consequently and evidently, the value and market prices for these securities plunged during the first quarter of 2007, together with indexes tracking the prices of those securities. These indexes were: (1) the ABX, tracking the prices of subprime RMBS tranches, and (2) the TABX, tracking the prices of Mezzanine CDO tranches.  These indexes, representing efficient market synthesis of available information, visibly registered this market synthesis and consensus. During February and March 2007, ABX indexes for BBB and BBB- tranches had both suffered substantial declines, with some BBB- indexes having dropped to approximately 60% of par.

Likewise, the TABX index for super senior Mezzanine CDO tranches, reflecting Mezzanine CDO's near-total dependence on BBB RMBS collateral, had fallen to approximately 85% of par. TABX declines for more junior Mezzanine CDO tranches were far more severe: double-A tranches had fallen below 60%; single-A tranches below 50%; and triple-B tranches below 40%.

### a.      Late 2006: Recognition Emerges

310.    By the Fall of 2006, market participants observing the above-detailed facts and dynamics – i.e., falling housing prices, constricting lending standards, record nonprime mortgage delinquencies and defaults even *prior* to rate resets, the looming wave of nonprime ARM rate resets and payment shock, and the receding possibility of refinancing such mortgages – began to assemble them into a coherent understanding of the then-materializing subprime disaster, and of its consequences for CDOs.

311.    During October and November 2006, the market prices for subprime RMBS, and the ABX index tracking those prices, began to decline as market participants took note of housing price declines, housing inventory increases, rising subprime mortgage delinquency rates, and the insight provided by spiking EPDs as to the dubious qualities of 2006 subprime mortgages.

312.    Even at this early stage, people were already looking ahead to the implications for CDOs. In an October 30, 2006 Wall Street Journal article noting the ABX declines, a portfolio manager active in the subprime RMBS market warned that "[i]t could get ugly. If there is a significant pickup in defaults there are going to be a lot of bad bonds out there, and CDOs could be in trouble":

> So far, the subprime market has held up relatively well. But it's beginning to show some cracks -- most evident in the nascent derivatives trade, which provides a useful window into investor

sentiment. **Since August, when house prices logged their first year-on-year decline in more than a decade, the cost of insurance against defaults on bonds backed by subprime loans has risen as much as 16%, suggesting investors are concerned** that more homeowners will start to renege...

*****

Lately, though, more investors have started worrying about what will happen to subprime borrowers as house prices plateau and start to fall. Rising home values rescued many borrowers who didn't have enough income to make their payments, because they were able to take the needed cash out of their homes. Now, if homeowners run into income problems and can't sell their houses for enough to pay off their loans, they will be left with no option but to let the bank take the house. "While prices are appreciating or steady, people try harder to make those mortgage payments," says Stuart Feldstein, president of SMR Research Corp. in Hackettstown, N.J., which has done studies of house prices and foreclosures during previous downturns in California, Texas and other states. "But when their investments become worth less than what they owe, they tend to just walk away."

**What's more, many will face an added shock as the monthly payments on their loans -- most of which are fixed for only two years -- reset to reflect higher interest rates. Christopher Cagan, director of research at First American Real Estate Solutions in Santa Ana, Calif., estimates that about $640 billion in subprime loans made in 2004 and 2005 will reset to higher rates over the next five years -- a trend that he expects will lead to some 450,000 added defaults. "And that's just resets," he says. "That's not including things like job loss, divorce, death in the family or serious illness."...**

**Meanwhile, data on loan delinquencies suggest that lending standards have indeed fallen. As of August, about 3% of borrowers who took out subprime loans in 2006 were more than 60 days behind on their payments -- about three times the level two years earlier** and more than four times the level for all types of borrowers. Kenneth Rosen, chairman of the Fisher Center for Real Estate and Urban Economics at the University of California, Berkeley, predicts that by 2008 as many as one in five of all subprime borrowers will be in arrears... "While 80% of this is a good thing, the 20% that's bad is going to come home to haunt us," he says. "That's just the way it happens: Bad practices get exposed in the downturns."

151

That worry is reflected in the derivatives market. The annual cost of $1 million in insurance against moderately risky subprime-backed bonds has gone from a low of about $21,500 in early August to $25,000 Friday, and has spiked as high as $27,800. Market participants say big hedge funds increasingly are using the derivatives to make outright bets against U.S. homeowners. This summer, for example, New York hedge-fund manager Paulson & Co. launched a fund that has aimed specifically at profiting on subprime defaults. "People are more nervous," says Greg Miller, a portfolio manager at Saye Capital, a Los Angeles-based hedge fund active in the subprime market. **"It could get ugly. If there is a significant pickup in defaults there are going to be a lot of bad bonds out there, and CDOs could be in trouble."**...

(Wall Street Journal, *Risk Management: As Home Owners Face Strains, Market Bets on Loan Defaults --- New Derivatives Link Fates Of Investors and Borrowers In Vast 'Subprime' Sector --- 'These Are the Marginal Guys'*, October 30, 2006)

313.     By November 2006, two of the twenty bonds underlying the ABX 2006-1 index were already experiencing interest payment shortfalls as a result of deteriorating mortgage performance in underlying subprime mortgage pools.

314.     During December 2006 and January 2007, market prices for subprime RMBS and the ABX indexes tracking such subprime RMBS values fell further in response to the ever-deteriorating performance of the mortgages and to the above-detailed collapse of subprime originators (capsized by subprime mortgage losses). As already detailed, in December 2006 and early January 2007, OwnIt and Mortgage Lenders Network – two of the top twenty subprime originators – collapsed under the weight of EPD repurchase demands and collateral calls by warehouse lenders. Simultaneously, incoming data on 2006 vintage subprime mortgage performance was indicating, above and beyond EPDs, that unprecedented numbers of 2006 subprime mortgages were experiencing delinquency and even foreclosure within a year of origination.

315.   The issue was first brought to attention in a UBS conference call held November 21, 2006 (later regarded as a watershed moment), in which UBS reported, *inter alia*: (1) that 8% of subprime loans originated during 2006 were already at least 60 days delinquent (vs. 4.5% a year ago), that foreclosure rates had doubled as well, that 2006 vintage loans were on track to match or top the worst years, 2000 and 2001, and that problems were especially severe on mortgages originated with less-than-full documentation.   All subsequent analyses of 2006 mortgage performance (for example, Moody's and Standard & Poors both weighed in starting in January 2007) only confirmed UBS' initial one.

316.   As a result, the ABX indexes for the riskiest RMBS tranches – the BBB- – took what market participants then called "a pounding":

*Cracks in the Mortgage Market are Becoming Visible*

Signs of distress in subprime loans could be the canaries in the coal mine for a housing bust
*****
**One of the largest providers of mortgages to borrowers with marginal credit abruptly closed its doors earlier this week. Moreover, derivatives based on the lowest tier of subprime mortgage securities have been plummeting in price in recent days**, sending the cost of insuring against these loans' default sharply higher...
*****
Tuesday, Ownit Mortgage Solutions of California shut down, citing "the unfavorable conditions of the mortgage industry." That's a euphemism for subprime home borrowers getting into trouble and defaulting on loans at unprecedented speed.
*****
**The deteriorating conditions for subprime mortgages also have been evident in the relatively opaque market for credit derivatives. The benchmark for these loans is an index known as ABX, which are split into the various sub-indices of varying quality**. According to Markit, an online source of valuation for derivatives, the lowest-quality indices, the ABX.HE 06-1 BBB and

153

BBB-minus, recently suffered a "credit event." Two underlying bonds had interest shortfalls resulting in losses, according to a Nov. 27 release from Markit.

**This week, the ABX has taken "a pounding," according to one mortgage professional, especially in the triple-B-minus indexes. Investors have been trying to get protection by selling this lowest tier of the ABX index**. But, according to this pro, the value of the constituent credits in the index may be even lower than implied by the index's value -- because there's no market for credit protection for the individual names. So still more selling may be ahead.

Grant's Interest Rate Observer has been among the first to pick up the warning signs of the trouble in the subprime mortgage market. The current issue, dated Dec. 1, points out that **loans made in 2006 already are turning bad. In past cycles, it generally took a few years for borrowers to go bust.**

**But such have been the excesses of this housing bubble, and now, bust. Borrowers whose main qualification was the possession of a pulse could avail themselves of an array of new "affordability" products -- 45-year, interest-only adjustable-rate option Libor-based loans. That gibberish boiled down to a monthly nut that got homebuyers into houses with inflated prices that they really couldn't afford. Not surprisingly, foreclosures are soaring -- up 51% in the three months ended October from a year earlier, according to Realty Trac**.

*****

The cracks in the subprime mortgage market may be the canaries in the coal mine for the housing downturn and further slowing in the economy...

(Barrons, *Cracks in the Mortgage Market are Becoming Visible* , December 8, 2006)

317.   In a December 13, 2006 report titled *2007 Global CDO and Credit Derivatives Outlook*, the Fitch credit rating agency reviewed recent developments and opined as to future collateral/ratings performance with respect to numerous types of CDOs.  Taking note of the recent deterioration of subprime mortgage performance, its implications for subprime RMBS BBB

154

tranches, and therefore the implications for Mezzanine ABS CDOs, Fitch concluded that the 2007

outlook for Mezzanine CDO collateral and ratings was uniquely "negative".  For every other type

of CDO, Fitch concluded that the ratings outlook was either "stable" or "positive".

318.    The negative outlook for Mezzanine ABS CDO ratings, Fitch explained,

resulted from those CDOs' concentrated exposure to subprime RMBS:

> Unlike early vintage SF CDOs, newer SF transactions have more
> concentrated exposures to RMBS.  Recent portfolios have up to 80%
> exposure to RMBS, which ties their performance closer to changes in
> the housing climate... [D]elinquencies have been rising in the prime
> and sub-prime RMBS sectors as strained borrowers try to keep up
> with rising mortgage payments.  At present, more borrowers are
> sensitive to a slowdown in housing price appreciation because of the
> increased leverage they have assumed in recent years to afford higher
> house prices.   Spiking interest rates and the housing market
> slowdown may result in a much slower pace of prepayments for the
> 2004-2005 SF CDO vintages.  Fitch is closely monitoring the
> performance of recent transactions as they have the potential to show
> signs of deterioration.

319.    As the risks presented by subprime mortgage collateral became not only

evident but the stuff of daily front page news, investors began to back away from securities backed

by such collateral:

> *High-risk loans revealing shaky foundations*
>
> **In the closing days of last year, something came unstuck in a
> small but important corner of the US mortgage market, causing
> pain for investors and resulting in several mortgage lenders
> shutting their doors.**
>
> **The problem was that for some home buyers last year, it had
> become too easy to get a mortgage.** In the past couple of years,
> promotional campaigns have become ubiquitous in the US mortgage
> market, offering financing to cash-strapped homeowners, often
> without the need to produce documentation.
> *****

155

...."subprime" mortgage lending became big business. It helped low credit-quality borrowers buy homes while also feeding insatiable investor demand for exposure to US mortgages, since the loans are often packaged into securities and sold to investors to help lenders reduce risk. More than $500bn of such securities were issued in the US last year.

**The problem for investors who bought last year's crop of high-risk mortgage originations, was that as the US housing market slowed, so too did mortgage applications.**

**To prop up sagging origination volumes, mortgage lenders relaxed their underwriting standards - lending to ever-riskier borrowers at ever more favourable terms.**

**In the last few weeks of 2006, the poor credit quality of the 2006 vintage subprime mortgage origination came home to roost.**

**Delinquencies and foreclosures among high-risk borrowers increased at a dramatic rate, weakening the performance of the mortgage pools.**

**In one security backed by subprime mortgages issued last March, foreclosure rates were already 6.09 per cent by December, while 5.52 per cent of borrowers were late on their payments by more than 30 days.**

**Lenders also began shutting their doors, sending shock waves through the high-risk mortgage markets.**

**Another lender, Mortgage Lenders Network, last week joined the ever-growing list of originators closing, bringing the high-risk market kicking and screaming into the new year.**

**Traders say the problems have kept new investor money at bay, and dramatically weakened a key derivative index tied to the performance of 2006 high-risk mortgages, the ABX.**

(Financial Times, *High-risk loans revealing shaky foundations*, January 11, 2007)

320.    At first, the spirit was one of abiding caution: a "wait and see" attitude. As

detailed below, after the events of February and March 2007, "wait and see" solidified into "no way".

321.     By January 26, 2007, Citigroup's Fixed Income Research had already issued a report titled "Explaining 2006: Worst Vintage in Subprime History".  This conclusion was shared by Moody's and Standard & Poors, who issued reports at the same time on the same topic with the same conclusion.

322.     In February 2007, as subprime mortgage deterioration became ever clearer, as the scale of losses became stunningly apparent (e.g., HSBC's $10.6 billion loss reserve), and as the collapse of subprime originators and originators spread, the value of subprime RMBS and of the ABX indexes "fell off a cliff".  By the end of February 2007, many subprime RMBS BBB tranches had lost approximately half their value, and ABX indexes for BBB- tranches had declined to approximately 62%.

323.     Worse, on the basis of the fundamental facts and dynamics already described – declining mortgage performance, declining housing prices, rising unsold home inventories, an imminent wave of rate resets that would spark a wave of defaults and foreclosures, thus adding to unsold inventory and putting additional pressure on housing prices – many market participants believed that this was only the *beginning* of the decline.  The BBB tranches of subprime RMBS were very thin, "second loss" slices of the risk of subprime mortgage pools: a relatively small rise in overall losses would suffice to cause 100% losses at the BBB level. Many market participants "believe[d] the index will go lower", and some already had concluded that the BBB tranches of subprime RMBS were heading straight "to zero".  As reported in real time:

*Subprime Mortgage Derivatives Extend Drop on Moody's Reviews*

**The perceived risk of owning low- rated subprime mortgage bonds rose to a record for a fifth day** after Moody's Investors Service said it may cut the loan servicing ratings of five lenders.

**An index of credit-default swaps linked to 20 securities rated BBB-, the lowest investment grade, and sold in the second half of 2006 today fell 5.6 percent to 74.2**...

*****

The level of delinquencies and defaults on subprime mortgages made last year is the highest ever for such loans at a similar age, according to New York-based Bear Stearns Cos.

Concern about low-rated subprime mortgage bonds have caused yield premiums to rise on low-rated bonds of so-called collateralized debt obligations backed by the debt. Yields on typical BBB bonds from such CDOs widened 1 percentage point relative to benchmarks in the week ended Feb. 15 to 5.50 percentage points, according to JPMorgan Securities Inc.

"Liquidity has taken a hit as market participants wait for the dust to settle," Christopher Flanagan, an analyst at New York-based JPMorgan, wrote in a Feb. 20 report. CDOs buy loans, bonds and derivatives, and resell the cash flows in new bonds, some of which have higher credit ratings.

*****

<u>**The BBB- rated portions of ABX contracts are ``going to zero,''**</u> **said Peter Schiff, president of Euro Pacific Capital, a securities brokerage in Darien, Connecticut. ``It's a self- perpetuating spiral, where as subprime companies tighten lending standards they create even more defaults'' by removing demand from the housing market and hurting home prices, he said**.

Schiff said he has steered his clients to invest in the U.S. Residential Real Estate Hedge V fund, which has $17 million in bearish bets through ABX contracts. The fund has made about 50 percent this year, said Andrew Lahde, head of Ladhe Capital Management in Santa Monica, California and manager of the fund.

(Bloomberg, *Subprime Mortgage Derivatives Extend Drop on Moody's Reviews*, February 22, 2007)

*****

158

*Subprime Mortgage Bond Risks Rise, Derivatives Show*

The perceived risk of owning low-rated subprime mortgage bonds rose again, heading for the fifth straight weekly increase, as companies that lend to the riskiest borrowers continued to report losses.

**An index of credit default swaps on 20 securities rated BBB-, the lowest investment grade, and sold in the second half of 2006 tumbled 7.7% to 68.5 today**, according to Deutsche Bank AG.  It's down 30% since trading started Jan. 18...

"**Despite some sporadic buying, sentiment remains mostly negative and many believe the index will go lower**" said Peter DiMartino, an asset-backed securities strategist at RBS Greenwich Capital...

*****

**Declines in the ABX accelerated early this month as New Century and HSBC Holdings PLC, the biggest lender, said more of their loans were going bad then they expected**...

(Bloomberg, *Subprime Mortgage Bond Risks Rise, Derivatives Show*, February 23, 2007)

### b.      February 2007 - March 2007: Market Consensus Solidifies

324.    February and March 2007 brought further, and largely conclusive, bad news for nonprime RMBS, and CDOs – primarily in the form of a definitive collapse of the ability of nonprime borrowers to refinance out of their mortgages.  The severe constriction of lending standards and the collapse of subprime originators marked the end of refinancing hopes for many of the lax nonprime mortgages originated during 2005 and 2006 because it marked the end of easy subprime credit.  Regulators were cracking down on it, most originators no longer existed to provide it, and the few originators remaining were no longer willing to extend it.

325.    Also during this time, the market focused on following subprime's risks to

159

their ultimate repository, CDOs.  As detailed below, market consensus emerged that CDOs, and particularly Mezzanine CDOs backed by nonprime RMBS tranches, were in imminent danger of severe writedowns, losses and ratings downgrades.  This consensus was reflected in CDO prices, which plummeted, and in the TABX index tracking the value of Mezzanine CDO tranches, which also plummeted at every Mezzanine CDO tranche level, including the super senior.

326.    During late 2006 and early 2007, economist Joseph R. Mason and Joshua Rosner, a managing director of Graham Fisher & Co. investment bank, set out to research "who is investing in the riskiest portions of these [subprime] MBSs" given that their risks were now becoming imminent. The answer, as Mason and Rosner found out, was CDOs ("We found the answer to the big question: the CDO sector").[19]

327.    On February 15, 2007, Mason and Rosner presented this answer in a report titled *How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?*.[20]    Mason and Rosner concluded that, given the recent events in the subprime mortgage market: (1)  "we now know the defaults are in the [RMBS] mortgage pools"; (2) "it is only a matter of time before they accumulate to levels that will threaten rated mezzanine RMBS"; and (3) that, "[g]iven the high proportion of CDO investments in mezzanine RMBS"  "even investment

---

[19]    Marketwatch, *Subprime shakeout could hurt CDOs: Complex structures helped fuel mortgage boom, but may suffer losses*, March 13, 2007.

[20]    The later version of this report published on May 14, 2007 under the title *Where Did the Risk Go? How Misapplied Bond Ratings Cause Mortgage Backed Securities and Collateralized Debt Obligation Market Disruptions*, is mentioned further below, and elaborated the points made initially.

grade rated CDOs will experience significant losses".[21]  Mason and Rosner added that extant credit

ratings of the RMBS and CDO tranches had yet to reflect these facts, were thus invalid, and would

require downgrading.  Mason and Rosner's study was widely reported, and made the front page of

the Business section of the New York Times on three days later, on February 18, 2007[22]:

> *Will Other Mortgage Dominoes Fall?*
>
> **IT'S amazing how long it can take investors to see that the wheels are coming off a prized investment vehicle. Denial, after all, is a powerful thing.**
>
> **But when an imperiled favorite happens to be a pool of asset-backed securities — especially those involving home mortgages — denial can be compounded by outright blindness to the real risks of that investment. That may explain why, even as everyone concedes that the subprime or low-grade mortgage market has fallen into the sea, the vast pools of mortgage-backed securities built in part on those risky mortgage loans still appear to be on solid ground**.
>
> **Investors, chasing the buzz of ever higher yields, have flocked into the mortgage-backed market in recent years. Nobody wants to think that the possibility of a wide-ranging subprime debacle is also a harbinger of looming problems for investments tied to those loans. But the reality is that these vehicles — and the collateralized debt obligations that hold them — are not as secure as many believe. And that has broad implications for the capital markets**.
>
> Consider how torrid the issuance of these securities has been in recent years. In the last three years, for example, big banks and brokerage firms almost doubled the amount of residential loans they issued, going to $1.1 trillion last year from $586 billion in 2003. Many of

---

[21]      Mason and Rosner, *How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?*, February 15, 2007, pp. 2, 30.

[22]      And in numerous other publications in the days, weeks and months that followed. *See*, e.g., Marketwatch, *Subprime shakeout could hurt CDOs: Complex structures helped fuel mortgage boom, but may suffer losses*, March 13, 2007.

these loans have been packaged into collateralized debt obligations and sold to pension funds, hedge funds, banks and insurance companies. For example, 81 percent of the $249 billion in collateralized debt obligation pools in 2005 consisted of residential mortgage products.

**Collateralized debt obligations are made up of different segments — known as tranches — based on credit quality. Because buyers of these securities were looking for yields, subprime loans make up a large portion of most collateralized debt obligations.**

Wall Street, of course, has coined major money in this area. Mortgage-related activities at the major firms generate an estimated 15 percent of total fixed-income revenue, according to Brad Hintz, an analyst at Sanford Bernstein.

*****

**One of the arguments for why mortgage loan pools have held up even as the subprime mortgage industry has collapsed is that their collection of a wide array of debt obligations provides a margin of safety. In addition, downgrades on these loans from the major rating agencies have been relatively modest.**

**This is puzzling, given the wreckage in the subprime market — lenders going bankrupt, stocks of issuers falling, default rates on new loans well above historical averages**...

*****

It is becoming clear, however, that subprime mortgages are not the only part of this market experiencing strain. Even paper that is in the midrange of credit quality — one step up from the bottom of the barrel — is encountering problems. That sector of the market is known as Alt-A, for alternative A-rated paper, and it is where a huge amount of growth and innovation in the mortgage world has occurred.

*****

Relying on rating agencies to analyze the risk in collateralized debt obligations may be unwise, however. Back in May 2005, Alan Greenspan noted the complexity of collateralized debt obligations and the challenges they pose to "even the most sophisticated market participants." He warned investors not to rely solely on rating agencies to identify the risks in these securities.

**THAT is also the view of Joshua Rosner, a managing director at Graham & Fisher & Company, and Joseph R. Mason, associate**

162

professor of finance at Drexel University's LeBow College of Business. The pair published a paper last week, "How Resilient Are Mortgage-Backed Securities to Collateralized Debt Obligation Market Disruptions?" analyzing C.D.O.'s. The Hudson Institute, a nonpartisan policy research organization in Washington, financed their research.

Mr. Mason and Mr. Rosner find that insufficient transparency in the C.D.O. market, significant changes in asset composition, and a credit rating industry ill-equipped to assess market risk and operational weaknesses could result in a broad financial decline. That ball could start rolling as the housing industry weakens, the authors contend.

"The danger in these products is that in changing hands so many times, no one knows their true make-up, and thus who is holding the risk," Mr. Rosner said in a statement. Recent revelations of problem loans at some institutions, he added, "have finally confirmed that these risks are much more significant than the broader markets had anticipated."

Mr. Mason and Mr. Rosner say it is only a matter of time before defaults in mortgage pools hit returns in collateralized debt obligation pools. Of greater concern, they say, will be the effect on the mortgage market when investors, unhappy with poorly performing C.D.O.'s, sell them and move on to other forms of collateral. They cite the manufactured housing market as a disturbing precedent; after that market collapsed in 2002, managers of collateralized debt obligations avoided the sector.

A similar shrinkage could occur in the residential mortgage sector as defaults mount. "Decreased funding for residential mortgage-backed securities could set off a downward spiral in credit availability that can deprive individuals of homeownership and substantially hurt the U.S. economy," the Mason/Rosner paper said.

So far, the pain from subprime defaults has been muted. Market participants are cheered that lenders are finally tightening their loan standards, albeit a bit late. Unfortunately, the damage of the mortgage mania has been done and its effects will be felt. It's only a matter of when.

163

(New York Times, *Will Other Mortgage Dominoes Fall?*, February 18, 2007)

328.    Other experts agreed.  For example, Mark Adelson stated in mid-March 2007 that the "scenario where the BBBs all blow up is a reasonably possible scenario" – i.e., that the BBB RMBS tranches underlying Mezzanine CDOs could largely and correlatedly be wiped out, taking most of Mezzanine CDOs' value with them:

> **Bond investors rattled by mounting losses in subprime U.S. mortgages say trouble is brewing in collateralized debt obligations**...
>
> "There will ultimately be a shakeout," said Oliver Wriedt, a partner at New York-based GoldenTree Asset Management LP, which oversees about $8 billion and manages CDOs and was founded in 2000.
>
> *****
>
> As of Dec. 31, about 10 percent of subprime loans in securities were either delinquent by at least 90 days, in foreclosure or turned into seized property, the most in at least seven years, according to securities firm Friedman, Billings, Ramsey Group Inc. in Arlington, Virginia. Subprime delinquencies overall rose to 13.33 percent last quarter, the Mortgage Bankers Association said today.
>
> **``When you talk about no documentation loans, you can't have any less of a standard than that,'' said Martin Fridson, chief executive officer of high-yield research firm FridsonVision LLC in New York. The lenders ``lower their standards and say `Well, we can put them into CDOs.' Like that's somehow burying that it's toxic waste.''**
>
> *****
>
> **<u>Investors ``need to worry a good bit'' about subprime delinquencies spilling over into the CDO market, said Mark Adelson, head of structured finance research at Nomura Securities Inc. in New York. ``The scenario where the BBBs all blow up is a reasonably possible scenario,'' Adelson said</u>**.
>
> CDOs backed by asset-backed securities have already lost about $20 billion in value as delinquencies have increased, according to Lehman Brothers Holdings Inc. data.

164

(Bloomberg, *CDOs May Bring Subprime-Like Bust for LBOs, Junk Debt (Update3)*, March 13, 2007)

329.    Similarly, structured finance textbook author and consultant Janet Tavakoli warned that CDO credit ratings bore little relation to reality, and that – agreeing with Mr Adelson – the BBB RMBS tranches were on the verge of suffering actual principal losses. (Los Angeles Times, *Getting A Handle on CDOs is a Complex Challenge*, March 18, 2007).

330.    On March 23, 2007, Moody's published a report titled *The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review*.   Noting *inter alia* widespread concern over poor subprime mortgage performance, the constriction and collapse of subprime mortgage lending, and the high concentration of subprime RMBS as the collateral for CDOs, Moody's performed a set of controlled, simple experiments to demonstrate the potential effects of such assets' deterioration CDOs.[23]

331.    Moody's conclusion: for Mezzanine CDOs with above-average exposure to subprime RMBS,  "the potential downgrade impact on the SF CDO Notes was severe – in some cases 10 or more notches" (Moody's Investors Service, *The Impact of Subprime Residential*

---

[23]    Moody's analysis made no mention of and did not consider Alt-A mortgage performance deterioration, which was then proceeding in parallel to subprime and which was affecting Alt-A RMBS in like manner.  The results of Moody's March 23, 2007 analysis were substantially understated for this reason.  There are many other reasons as well.  For example, the average subprime concentrations reported by Moodys (40%-45% of Mezzanine CDO assets) are substantially understated.  For example, an August 21, 2006 report by Fitch titled *U. S. Subprime RMBS in Structured Finance CDOs* noted that CDOs that closed in the first half of 2006 averaged a 64% concentration in subprime – i.e., 150% the amount reported by Moodys.  The reason for Moody's March 2007 understatement became clear in September 2007 Congressional hearings examining the credit rating agencies' subprime credit ratings: Moody's had created an artificial distinction between "subprime" RMBS and "midprime" RMBS, which it later abandoned after conceding that "midprime" assets looked and acted no different from "subprime" assets.

*Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review*,
March 23, 2007, pp. 1-2). A "notch" represents the difference between a plain letter rating (such as
BBB) and its modifiers "plus" or "minus" (i.e., BBB versus BBB+). A ten notch downgrade moves
an asset from the highest rating, triple-A, down through the three AA notches, the three A notches,
the three BBB notches, and deposits it at the below-investment grade rating of BB+.

332.    Moody's conclusion that "where the concentration levels were higher, the
potential downgrade impact on the SF CDO Notes was severe - in some cases 10 or more notches"
was correct. What was incorrect was Moody's statement of average subprime concentration of 45%
(based, as explained in the last footnote, on an invalid distinction that Moody's later withdrew
between subprime and "midprime" assets).

333.    In fact, almost all 2005 and 2006 ABS CDOs had subprime RMBS
concentrations that were at the "higher" levels warned of by Moody's. As Standard & Poor's
reported only one week after Moody's, in an April 5, 2007  report titled *Standard & Poor's Weighs
In On The U.S. Subprime Mortgage Market*, the average subprime RMBS concentration in 2005
CDOs was between 52%-64%, and in 2006 CDOs between 70%-76%.

334.    On March 30, 2007, Deutsche Bank's Anthony Thompson, the Managing
Director of Deutsche Bank's US ABS and CDO Securitization Research, published a CDObserver
report on the state of the CDO market. Mr Thompson's analysis and conclusions with respect to
CDOs were congruent with those of Mr Adelson, Ms Tavakoli, and Moody's (Deutsche Bank,
*CDObserver*, March 30, 2007).

335.    On March 28, 2007, the American Enterprise Institute held a conference titled
"Mortgage Credit and Subprime Lending: Implications of a Deflating Bubble", and convened a panel

166

of four experts[24] to provide their views on the topic.  All four experts were in complete agreement as to what was happening in nonprime mortgage markets and what the effects would be on CDOs. The analysis each presented on March 28, 2007 is exactly the same as that presented by plaintiffs here.  Plaintiffs' allegations are not *post-facto* reconstructions with the benefit of hindsight, but rather restate the consensus shared by experts as events were unfolding in March 2007.

336.    Mr Lachman spoke first.  His analysis of the situation as of March 28, 2007 is exactly the one presented by plaintiffs now (and for that reason will not be quoted – the point has been made).  Of especial interest were his closing remarks: after explaining that housing prices would suffer a steep decline and that subprime mortgages would suffer increased defaults and losses, the only matter he was not sure of was where the securities backed by such mortgages (namely, CDOs) had ended up and thus which entities were exposed to these losses.

337.    Mr Roubini's conclusions and analysis were in full agreement with Mr Lachman's (and, as Mr Roubini noted, with Mason and Rosner's analysis):

> First point... **any indicator you have right now from the housing market, whether it is building permits, whether it is the housing starts, whether it's construction, whether it's completions, where is the demand for new homes, it's just heading south. The glut of existing and new homes is becoming worse by any standard - unprecedented. The price pressure is downwards**.

*****

---

[24]    The experts: (1) Desmond Lachman, previously a Wall Street economic strategist and currently an American Enterprise Institute fellow; (2) Nouriel Roubini, Professor of Economics at the New York University Stern School of Business, who had previously served as the Senior Economist for International Affairs at the White House Council of Economic Advisors among many other assignments; (3) Chris Whalen, Senior Vice President and Managing Director of Institutional Risk Analytics, having worked previously both as an investment banker research analyst and in risk management; and (4) Tom Zimmerman, a Managing Director at UBS in charge of UBS' Mortgage, Credit and Asset Backed Securities research (the UBS team of fixed income analysts had won first place in the latest Institutional Investor analyst survey).

So **if you look at any indicator of the housing market, before we even talk about subprime or mortgages, it's a disaster. This is going to be the worst housing recession we're going to have since 1960**.

Second point... **think about the reckless lending practices that were essentially being used for the last four or five years. You have zero down payments, no documentation of assets or income, what people refer to as "liar loans." Interest only mortgages. Teaser rates. Negative amortization. Option ARMs. Was it only subprime? Look at the numbers - it was subprime, it was Alt-A**, was piggyback loans, was home equity, was also a good chunk of the option ARMs. Subprime, near-prime, prime. If you look carefully, the numbers, I would argue that about fifty percent if not more of all original mortgages for the last couple of years would be things I would consider as reckless - as just toxic waste.

So that's what's happening. Of course the rate at which Alt-A and other stuff is going to start defaulting and get in trouble is going to be later. It's going to start with subprime and going to go to all the other stuff. But **the idea that this is just a niche, that subprime is only ten percent of the stock of mortgages and therefore it's not a problem is just nonsense**...

*****

The reality is otherwise. When you look at the whole series of indicators and the chart that Desmond showed about … now **loan officers are getting more worried by tightening standards. They're not tightening standards only for subprime. They're doing it across the board**.

The borrowers now are facing a credit crunch...

*****

Fourth point. **People say, you know, the residential mortgage backed security market is still kind of OK. So, as long as it's OK, then there's going to be financing and all the rest. <u>I think there's already evidence that actually, that there have been massive losses in the CDO market</u>, and in a recent study by Rosner and Mason show that if you're going to have a significant interruption in the CDO market then the whole financing base for the residential MBS market is, figure about 1.33 trillion dollars of issues of new residential mortgage based securities last year, is going to essentially falter. So that's the kind of thing we're facing**.

168

Securitization helped the growth of this credit boom and bubble, and this squeeze now on the other side is going to create a mess on the other side around...

*****

**As long as home prices were going up, you could keep up with this party. Right now home prices are falling**, and home equity withdrawal was at a 700 billion dollar annual rate in 2005, Q4 it is down to 270. **In the meanwhile debt servicing ratio is going up. This year alone you are going to have one trillion of ARMs that are coming to maturity and being reset at much higher interest rates**...

(Nouriel Roubini, *AEI Conference Transcript*, March 28, 2007)

338.     Mr Whalen's comments echoed the closing remarks of Mr Lachman: subprime losses would be severe, *but no one knew where those losses were*.  Although no one knew where the risk was, the perception – as Mr Whalen's remarks evidence – was that at least the banks had sold it off.  And, in this regard, Mr Whalen's comments demonstrate the validity of plaintiffs' fundamental claim: everyone was aware of subprime-based risks; everyone thought that securitizing banks such as Citigroup had sold off securitized risk to others; and no one had any inkling that Citigroup had in fact retained the largest share of those risks:

> **This is what scares the regulators, it's not that the banks have kept a lot of this risk, it's that they've sold it to somebody else and now the zillion dollar question in Washington is "where is all of this risk?" that has been packaged and sold by the sell side to buy-side investors,** whether you're a homeowner, whether you're **a hedge fund that owns CDOs you have basically the same problem right now**. It's a shame we can't get them together sufficiently.

(Christopher Whalen, *AEI Conference Transcript*, March 28, 2007)

339.     Unknown to the market was that the "somebody else" to whom Citigroup sold its risk was Citigroup.

340.    Mr Zimmerman's observations, analysis and conclusions with respect to housing prices, subprime mortgages and their risks and performance, and the looming disaster of ARM rate resets coupled with the now-closed door to refinancing, were in full agreement with those of the other three experts speaking on March 28, 2007 and with plaintiffs' claims here.   Mr Zimmerman's comments are thus not reproduced at length here, but they are recommended reading for their plain-speaking ring of truth.

341.    Based on this analysis, Mr Zimmerman concluded: (1) that underlying BBB RMBS tranches would fail, and with them CDOs ("The lower rated tranches triple-B minus, those guys, they've got problems - they'll get hit. Some of them will go down, half of them will go down..."), but (2) like Mr Whalen, *asserted that such CDO exposure had been sold off by banks and spread throughout the world* ("So the guys who are going to get hit with this in the capital markets from losses in here and losses in the CDO market, are all around the world. It's really spread out, and this is back to your question about who's got the risk, it's just all over...").

342.    Mr Zimmerman's March 28, 2007 remarks, therefore, validate the essence of plaintiffs' claims here.   The subprime/CDO risks were long known; the only matter not known was that Citigroup had, contrary to all market understanding, retained the lion's share of those very CDO risks:

> **So we knew it was going to happen. Now … and take a look at this subprime number roughly - and this is historical data - at zero to five percent HPA we're looking like, you know, eight percent kind of losses. [slide 6 - bottom rightmost bar]. That's an ugly number to a lot of CDO investors. That's a bad number. That's not good. The old numbers were three and four percent. So if the market slows down, if the housing market slows down - a flat market, forget going negative, then there's a lot of problems. So … this is what we've been talking about for the last**

**couple of years**.

*****

**The industry, you know, is in a shambles. The only people who will survive are the very large companies who are part of a major commercial bank or investment bank. The rest of them will be gone**. That's basically it.

*****

What that number is and how that impacts the overall economy. You're a better judge of that, I don't have a good idea what [inaudible] **One last comment. In terms of the impact on two other groups of people. The impact on the banks is marginal. The only big banks who are involved in it, it's just a small part of their business. Even HSBC, it doesn't bother them. It's too small. The independent investment banks claim that it's like 3 percent, right? Goldman 3, Bear 3 Lehman 3, something. The most, you know, 2 or 3 percent of their revenue is coming from this business. You shrink it in half, it's not going to be a big deal.**

**So Wall Street is going to take some hits here and there - trading desks will get hit, but it's not going to be a serious systemic problem**.

**Who owns this stuff? The subprime … first of all, 75 percent of the subprime securitized product in subprime, 75 percent is triple-A. You're home free, not a problem**. I can stress these numbers as much as I want and that triple-A guy is not going to get hit. His spreads might widen out a bit but he isn't going to lose a dollar or principal.

That's good, because Freddie and Fannie owns about half of that. So they've got about half of that risk. It's triple-A, it's not going to go anywhere. So 75 percent of the subprime market is not a problem.

**The lower rated tranches triple-B minus, those guys, they've got problems - they'll get hit. Some of them will go down, half of them will go down**. People who own the equity pieces will down, but that's spread all around the world. It's spread out into private money coming out of Central America, it's State money coming out of China, it's Hedge Fund money coming out of Europe and America, it's all over the place.

**So the guys who are going to get hit with this in the capital markets from losses in here and losses in the CDO market, are all**

171

**around the world. It's really spread out, and this is back to your question about who's got the risk, it's just all over, so in a way that's good, not bad, right? It's not concentrated it's all over the place**. So I don't see that as a systemic problem.

(Thomas Zimmerman, *AEI Conference Transcript*, March 28, 2007)

## 2.     The Market Believed, Incorrectly, that Banks Such as Citigroup Had Sold Off the CDOs They Had Underwritten and Would Thus Be Spared from CDO Losses

343.     Thus, by March 2007, market consensus had recognized that CDOs were the concentrated repository of subprime risk, and  CDO values even at the super senior level were already materially impaired.

344.     The question was no longer whether CDOs were at risk, but rather – and only – who was holding these CDOs and thus who would suffer the already-recognized losses.

345.     What no one understood – that Citigroup had not actually sold most of the CDO tranches that it underwrote, and had thus retained the very risks that the market believed to have been dispersed.  The market believed – reasonably – that those already-recognized CDO risks had been dispersed by CDO underwriters into the "great unknown" of worldwide capital markets. In the case of Citigroup, the risks had remained with it – safely hidden from public view.

346.     The above-mentioned statements and conclusions of Mr Lachman, Mr Whalen and Mr Zimmerman (*see* ¶¶ 335-342, *supra*) vividly evidence the fact and efficacy of Citigroup's concealment.  Each had correctly analyzed the situation and had concluded that CDOs were at great risk of great loss.  The only aspect of the situation that they misunderstood was where these risks had gone.  Each understood CDO underwriters to be safe from the risks of these instruments by virtue of having sold off the resulting CDO securities (*Id*).

347.    Indeed, markets devoted much of the rest of 2007 to searching for where this

risk had gone.  Common conclusions were that it had been purchased by hedge funds, by Asian

banks, by insurance companies:

> *Mortgage crisis to hit holders of risky derivatives*
> *Most hedge funds made money, but some lost; Asian investors fingered*
>
> The shakeout in the subprime-mortgage business is inexorably worming its way through the credit markets that fueled the sector's rapid growth. **As delinquencies and foreclosures rise, losses will likely hit some of the riskiest parts, or tranches, of subprime mortgage-backed securities, or MBS, experts say. Then collateralized debt obligations, which invested in some of the lowest-rated subprime MBS tranches, will feel the pain.**
>
> **But who holds these securities?**
>
> Hedge funds have become big credit-market players in recent years, and many firms trade the riskiest bits of subprime MBS and CDOs. But while some funds, such as Saye Capital's Tranquility fund and others managed by Cheyne Capital and Cambridge Place Investment Management, have suffered, most hedge funds made a lot of money in February betting that the subprime crisis would hit, according to several investors who didn't want to be identified.  A credit fund run by Paulson & Co. was up almost 67% in February, while other hedge funds run by Harbinger Capital Partners, MKP Capital Management and Bear Stearns also generated gains from the trend, investors said. <u>So who ultimately holds the risk?</u>
>
> <u>**Most experts say it's almost impossible to know. Sales teams at investment banks and other firms that offered CDOs won't talk**</u> and no one else contacted by MarketWatch has kept track. The Federal Deposit Insurance Corporation, which monitors risk in the banking system, tracks holdings of MBS, but not the different tranches. It has no information on who holds CDOs.
>
> **Many experts point vaguely to Asian and especially Japanese investors** who have been hungry for any assets yielding more than the almost-nonexistent interest rates offered by the world's second-largest economy in recent years.

173

**But that's where the trail ends, which is a big problem, according to some.**

**"It's pathetic, but it's almost impossible to find out, which is no good for the system or anyone really," Josh Rosner, a managing director at research firm Graham Fisher & Co., said. "On the CDO side we know even less and regulators know even less**...

\*\*\*\*\*

Rosner and Joseph Mason, an associate finance professor at Drexel University's business school, published a study in March highlighting CDOs' big exposure to the subprime mortgage business.

**Despite toiling for months on the project, the two can't give a definitive answer on who holds the risk**.  Rosner's theory is that hedge funds hold a lot of the lowest-rated bits of subprime MBS and CDOs, called the equity tranches.  **Pension funds and insurers probably hold the less risky, senior tranches because rules restrict them from investing in lower-rated securities, he added. Still, many CDOs bought the lower-rated bits of subprime MBS, so Rosner is concerned that rising losses from mortgage defaults and foreclosures could even eat their way up into the investment-grade tranches of CDOs**.  Pension funds and insurers may also have invested in hedge funds that hold the riskier CDO tranches, Rosner and Mason said.  "There is a real risk that a lot of these assets are held by unsuspecting end holders like pension plans," Rosner said.

Karen Weaver, a veteran MBS analyst who runs a 300-person research group at Deutsche Bank, thinks foreign investors hold a lot of the riskiest parts of these securities.

Since the subprime crisis began to emerge in February, Weaver has been getting phone calls from many different people, asking advice. Most of the callers have been either senior bank managers, business reporters or overseas investors.  "I've had almost no calls from investors in the U.S.," she said.  Most investors in the U.S. haven't been surprised by subprime problems and because of that, they've avoided buying these securities, she concluded.

**"We don't know exactly who holds these risks, but, in a way, we all hold this risk," Mason said. "The risk doesn't go away. Somebody has to have it."**

174

(Marketwatch, *Mortgage crisis to hit holders of risky derivatives: Most hedge funds made money, but some lost; Asian investors fingered*, April 2, 2007)

348.    No one suspected that the great chain of securitization was not in fact a line leading away from securitizers but in fact a circle, depositing with securitizers such as Citigroup tens of billions of dollars of CDO risk commonly understood to be somewhere else.

### 3.    Citigroup Knew Best Just How Precarious Its CDOs Were

### a.    Losses Climb the Securitization Ladder from Mortgage to RMBS to CDO

349.    The world that came into existence between mid-2006 and March 2007, a world of falling home prices and limited refinancing opportunities for risky loans, was not unprecedented.  It simply marked a reversion to historical means (with respect both to housing prices and to loan origination standards).  What was the state of affairs in the new mortgage world of early 2007?

350.    More than a trillion dollars of nonprime mortgages had been made during 2005 and 2006: mostly hybrid and option ARMs; mostly with little or no down payment; mostly with little, no or negative amortization; for properties purchased at peak prices.   These mortgages were now collateralizing nonprime RMBS and CDOs.  Housing prices were declining.  Refinancing had become largely impossible.  Rates on 2/28 ARMs originated in 2005 were going to reset starting in 2007, beginning a wave of resets that would last through 2009 (the 3/27 ARMs originated in 2006).  Payment shock would ensue and defaults would spike.  The wave of foreclosed-upon properties, and the constriction of credit, would lead to increased supply of housing and a decreased supply of borrowers qualifying for the means with to purchase it – pushing housing prices down farther.  This

175

in turn would lead to more defaults – and the vicious cycle would continue.

351.     And finally, even before the coming reset disaster, in a healthy economy with low unemployment: (1) overall subprime delinquency, default and foreclosure rates were the highest they had been for years, and (2) 2006 subprime mortgages, in their short pre-reset lives, were already delinquent and defaulting at rates far higher than any other subprime vintage on record.  The latter bears emphasis: even before reset, even in a booming economy with low unemployment, 2006-originated subprime mortgages were performing materially worse than any other subprime vintage at a comparable point in their lives.

352.     Upon reset, the disparity would only grow to the 2005 and 2006 vintages' further discredit: in contrast to prior years, when refinancing had been a viable option and thus reset-inspired defaults had been muted, now refinancing was no longer an option, and reset-inspired defaults would be unlike anything seen before.  The chart below provides a sense of proportion:

# Sub-Prime Fallout:  It is Going to Get Worse...

## ~$800 Billion of sub-prime mortgages to reset



*Sources: LoanPerformance, Deutsche Bank*

26

353.    Most of these mortgages had been securitized.  They were sitting in RMBS special purpose securitization vehicles, collateralizing in excess of $1 trillion of 2005 and 2006 nonprime RMBS.  As mortgage defaults and losses mounted, losses in RMBS securitizations would rise, first eating away excess spread credit protection, then the "first loss" equity tranches.  In subprime securitizations, the equity tranche on average could only absorb losses amounting to no more than 4.5% of the entire mortgage pool principal; in Alt-A securitizations, on average, losses amounting to no more than 1.8% of the entire mortgage pool principal.  What if the equity tranche protection was insufficient to absorb the losses being generated?

354.    Losses would rise up the ranks of the rated RMBS tranches.  At the bottom of the capital structure, these tranches were very thin.  First, losses would seep into the thin, BBB-rated tranches (BBB-, BBB, and BBB+), each of which constituted no more than 1%-1.5% of the securitization, next to similarly-sized A-rated tranches, then to the larger AA tranches, and finally – should underlying mortgage pool losses exceed 20% –  to the triple-A tranche.

355.    CDO losses, however, would be far more swift and severe.  Why?

356.    Because CDOs were collateralized almost entirely by the lower, thinner tranches of RMBS.  That meant that, as losses in the underlying mortgage pools rose, and rose into the lower, thinner RMBS tranches, losses would simultaneously *leap* into even the highest CDO tranches.

357.    Mezzanine CDOs were collateralized in near entirety by the BBB tranches of nonprime RMBS.  Should underlying mortgage losses rise into the BBB *RMBS* tranches, nearly the entire collateral base of the Mezzanine *CDO* would be worthless, and thus along with it every single *CDO* tranche from top to bottom – from unrated equity to triple-A super senior.  In short, losses at

178

the BBB level of RMBS meant losses at the super senior level of Mezzanine CDOs.  Losses only had to rise a little bit in RMBS to flood Mezzanine CDOs entirely.

358.    High Grade CDOs worked similarly, except at a slightly farther initial remove from loss given that their collateral base consisted of single A-rated and AA-rated RMBS tranches. Underlying mortgage pool losses would have to eat through the BBB-rated tranches first (wiping out Mezzanine CDOs) before they rose into the A-rated RMBS tranches that would begin to result in losses for High Grade CDOs.

### b.    Citigroup's Degraded "High Grade" CDOs

359.    However: Citigroup's High Grade CDOs were collateralized, to a uniquely high degree (generally 35% of total CDO assets), not by A- and AA-rated *RMBS* tranches, but by A- and AA-rated *CDO* tranches.  When such tranches originated from Mezzanine CDOs, they were worthless – as per above – merely when underlying mortgage losses rose to BBB RMBS level.  So Citigroup's High Grade CDOs were not as "high grade" as their name indicated.  Effectively, they were collateralized 33% by BBB-rated nonprime RMBS, 33% by A-rated  nonprime RMBS, and 33% by AA-nonprime RMBS.  Thus, as losses rose only to BBB RMBS levels, the collateral of Citigroup's High Grade CDOs would be sufficiently impaired so as to wipe out all tranches below the super senior level and so as to impair the value of the super senior.

### c.    Citigroup Structured its CDOs so that They Could Only Work Under Boom Scenarios

360.    Thus, Citigroup's Mezzanine and High Grade CDOs were not merely "exposed" to nonprime mortgages, but rather were exposed in a magnified way to a relatively thin and relatively junior "slice" of risk of those mortgages.  They were protected from a certain amount

of initial losses that those mortgages might suffer, but should losses rise slightly higher – disaster.

361.    How was it possible, then, for ABS CDOs to be structured on this basis and produce large, highly-rated tranches?   The simple answer, as detailed below, is that ABS CDOs were structured on the basis of "boom" times, and only "worked" under "boom" conditions.

362.    No one knew this better than Citigroup: Citigroup itself had structured the CDO and RMBS securitizations. In this structuring process, Citigroup employed several key assumptions – detailed below – to arrive at low "expected loss" calculations for the underlying assets.  That meant, in turn, that relatively little credit protection and subordinate tranching were "needed" in order to generate tranched, highly-rated securities at various requisite levels of remove from that expected loss.

363.    During 2006, as the housing bubble deflated, as nonprime mortgages grew ever riskier, and as nonprime mortgage performance began to deteriorate, investors began to explore on their own the potential consequences of such factors on RMBS and CDOs.  Their efforts began to make clear what Citigroup had known all along: that RMBS and CDOs had not been structured with such a world in mind, that the credit ratings currently borne by RMBS and CDO tranches were now deeply in error, and that the real world performance of housing prices and mortgages would devastate CDOs even at their highest, triple-A super senior levels.

364.    At all times through at least March 2007, Citigroup modeled RMBS (and CDOs collateralized by RMBS) with the assumption that housing prices would rise at least 6% per year through the life of those mortgages.  This was not a conservative assumption, but rather a "boom" assumption.  As already detailed, a housing price "bubble" had long been evident, housing prices had become detached to record degree from historical relationships with their objective

180

fundamentals (e.g., household income), a sharp correction would be needed to bring prices back in line with such fundamentals, and data everywhere showed that such correction was in fact underway.

365.    Irrespective of the degree to which such an assumption was without basis, it in any event was the assumption used in order to calculate the "expected loss" that would be generated by the nonprime mortgage pool.

366.    Effectively, this assumption transformed current boom performance into "baseline" expected performance throughout the life of the mortgages.  When housing prices rise, as they recently had, defaults are muted (because properties can be sold at a profit, rather than default) and losses are even more muted (because defaults disappear to begin with, and the few mortgages that do default nevertheless do not experience much loss severity upon foreclosure sale). Under rising housing price scenarios, therefore, defaults are low and losses are low.

367.    Using such a positive assumption yielded a very low "expected loss", with direct effects on RMBS tranche structures and ratings.  At the initial RMBS level, such low expected losses allowed correspondingly large triple-A tranches, a set of smaller lower-rated tranches, and very small BBB-rated tranches not far removed from that "expected loss".

368.    But – and to make the point explicit – BBB rated tranches were not far removed from "expected loss" *only under the assumption that housing prices continued to rise at a clip of 6% per year*.  If housing prices did not in fact so behave, and performed worse than assumed, matters became an entirely different ball game.  The BBB tranches would not be removed from expected loss at all, but would rather be swamped by it.

369.    Indeed, as demonstrated below, *for RMBS BBB tranches to begin to be in trouble, and for Mezzanine CDO tranches to be in far more serious trouble, housing prices did not*

*even need to decline, but merely fail to appreciate.*  If housing price appreciation was not 6% per year, but merely 0%, the lowest BBB tranche – the BBB- -- would be a total loss, and thus so would 30%-40% of a Mezzanine CDO's assets.  And if housing prices actually declined – as they began to do in mid-2006 – matters would be far, far worse.

370.    As subprime mortgage performance worsened in late 2006 and housing prices began to decline, some skeptical investors began to take an independent look at exactly what level of losses nonprime RMBS and CDOs would be able to withstand. One such analysis, conducted in October 2006 by Paul Singer and Elliot Associates, estimated the losses that would be suffered by the underlying mortgage pools under several different housing price scenarios, and then traced how those losses would flow through RMBS tranches and Mezzanine CDO tranches:

| Mortgage Schematic*<br>House Prices, Mortgage Defaults and CDO Loss Transmission Mechanism | | | | |
|---|---|---|---|---|
| Home Price Appreciation** | Mortgage Pool Cumulative Loss | Most Senior RMBS Tranche Written Off | Loss to CDO | Most Senior CDO Tranche Written Off |
| +7% to +10% | 2% | none | 0% | none |
| +4% to +7% | 4% | BB | 3% | none |
| **0% to + 4%** | **6%** | **BBB-** | **39%** | **AA** |
| **0% to -4%** | **10%** | **BBB+** | **84%** | **AAA (partial)** |
| -4% to -7% | 12% | A | 100% | AAA |
| -7% to -10% | 16% | AA- | 100% | AAA |

* Assumes CDO constructed from BBB-rated tranches of subprime RMBS; rough approximation of estimated collateral losses and tranche writedowns

** Cumulative price appreciation over two years

(Source: Paul Singer / Elliot Associates)

371.     As the October 2006 Singer / Elliot analysis shows: (1) housing prices that are flat or that decline 2% per year; (2) would cause underlying mortgage losses to climb to between 6% and 10% of the principal balance, (3) resulting in lower RMBS tranches getting written off, but (4) causing loss to *leap* into Mezzanine CDOs, destroying 40%-85% of their collateral and resulting in partial/near-complete losses at the super senior level (and total losses for every more subordinate tranche).

372.     *The above October 2006 analysis was confirmed, exactly, by an analysis that Citigroup conducted some time prior to April 11, 2007* (when it appeared as a presentation slide). That analysis – titled "CDO Losses Under Different Model Scenarios in Sub-Prime" – is reproduced on the following page.  As it makes graphically clear: (1) Mezzanine CDO losses are minor under an assumption of 6% housing price appreciation ("HPA") per year; (2) Mezzanine CDO losses climb substantially to approximately 35% if housing prices merely remain flat, wiping out all tranches rated lower than triple-A; but (3) should housing prices decline 2% per year or more, all CDO tranches below the super senior will be worthless, and the super senior itself substantially devalued:

# Sub-Prime: An Example

## CDO Losses Under Different Model Scenarios in Sub-Prime





Source: Citigroup *See "ABS CDOs In a Mezz", April 11, 2007

373.    In this manner, RMBS and CDOs were structured, literally, only to work in a particular world – one that operated on boom times forever.

374.    This was known, for a long time, only by the parties that did the structuring: the securitization underwriter (i.e., Citigroup) and the rating agencies.  Such structuring assumptions were not publicly disclosed: they were part of the "black box" financial engineering models from which these securities were born.  Apart from those operating the black box , no one knew what went on inside it.  That assumptions were used was known; but exactly *what* assumptions were being used was not.

375.    By employing these assumptions, Citigroup created securities that were not well adapted to real-world risks, let alone  to the real world that emerged in 2006 and early 2007.  The tranche structures, tranche ratings, and credit protection for these securitizations – to the extent they were ever valid – were certainly no longer so by early 2007.  No one knew better than Citigroup, as no one knew the optimistic assumptions that Citigroup had used to devise the securitizations' structures in the first place.

376.    Furthermore: the CDO structuring process centered on three key factors: (1) the risk of default of each underlying asset (e.g., each distinct RMBS tranche); (2) the loss severity upon default of each underlying asset; and (3) the degree of correlation between the underlying assets (i.e., the degree to which individual assets' risk of default were not independent/random, but rather "correlated" to some degree).  The first two of these factors were boom-biased as alleged below; and the third was without basis, as alleged in the following subsection.

377.    Subprime and Alt-A mortgage securitization was effectively a phenomenon that began in 2000/2001 – coincident with the housing boom and the boom in subprime and Alt-A

mortgage originations. Therefore, nonprime RMBS not only had a limited operating history, but an operating history limited to boom times.  Their life span was almost entirely confined to the period that Defendant Krawchek termed a "credit nirvana", a period defined by the virtuous cycle of lower interest rates, leading to increased housing prices, leading to lower rates of default and loss, leading to increased lending, itself further boosting housing prices, etc.

378.    In short, the historical record compiled by nonprime RMBS looked good – but it looked good because of the boom.  The historical record of RMBS defaults showed that their default rate (during boom times) was low.  The historical record of RMBS loss severity upon default showed that their losses (during boom times) were low.

379.    CDOs were structured on that very (boom time) record.  The "expected loss" of a CDO's collateral was a function of (1) the default risks of the RMBS tranches; and (2) the loss severity upon default of the RMBS tranches.  Both the default risks and the loss severities were calculated wholly on the basis of performance during the recent boom.  Both were correspondingly low, and thus the "expected loss" calculated for the CDO was low.  On the basis of that low expected loss, the CDO was structured into rated tranches at various removes from that loss, with not that much in the way of subordinate tranches and with a very large proportion of triple-A tranches.

380.    Wholly apart from the matter of whether such structuring was with or without basis, the fact was that, given such structuring, CDOs were fundamentally incongruent with the world that took shape between mid-2006 and early 2007.  CDOs  had been structured to withstand only the risks of boom-time world that no longer existed, and were wholly unprepared for the risks of the new world that had come into being.

> **d.    Citigroup Structured its CDOs By "Assuming" that Underlying Assets Were Not Highly Correlated, When in Fact the Underlying Assets Were Largely Identical and Exposed in the Same Way to the Same Degree to the Same Risks**

381.    Just as housing prices were a very consequential assumption in determining RMBS expected losses and therefore RMBS tranche structures and ratings, correlation assumptions performed the same function and had the same effect in CDOs.

382.    CDOs invested, typically, in 40-300 different nonprime RMBS securitizations. As each of the RMBS securitizations was itself based on a pool of 3,000-4,000 mortgages, this meant that CDOs rested on 120,000 to 1.2 million mortgages.   Although this provided massive diversification, it did *not* mean that the underlying assets were uncorrelated.  The distinction between diversification and correlation helps make clear, as Citigroup's own analysts persuasively stated in March 2007, that though ABS CDOs invested in massively-diversified assets: (1) ABS CDO assets were nevertheless highly correlated, thus (2) putting even super senior CDO tranches at risk.

383.    As Mark Adelson[25] explains, diversification at its simplest is a strategy to reduce risk by not putting all one's eggs in one basket: portfolio risk is reduced when one invests in several different assets, rather than in just one.  But within the common sense understanding of diversification is the more precise distinction of correlation: when one attempts to benefit from diversification, what one really is doing is seeking not merely diverse assets, but *uncorrelated* ones:

Why Do We Care About Correlation?

---

[25]    Mark Adelson, in the 1990s, headed Moody's mortgage-backed securities ratings. After clashing with Moody's executive Brian Clarkson, who pushed for more lenient rating methods, Mr Adelson became managing director and head of structured finance research at Nomura Securities International in New York between 2001 and mid-2007.  After the subprime scandal, Mr Adelson was recruited by Standard & Poors to become their Chief Credit Officer.

> **Correlation is important in the credit markets. It affects the likelihood of extreme outcomes in a credit portfolio. Therefore, it plays a central role in pricing structured credit products, such as tranches of CDOs**.... Intuitively, when correlation among credits in a portfolio is high, credits are likely to default together (but survive together, too). In other words, defaults in the portfolio would cluster.
>
> Correlation is closely related to the idea of "diversification." "Diversification" describes a strategy of reducing risk in a portfolio by combining many different assets together. Diversification presumes that movements in the values of individual assets somewhat offset each other. More formally, a diversification strategy relies on the assumption that movements in asset values are not perfectly correlated. In fact, diversification can achieve the greatest reduction in risk when assets display negative correlation. For example, suppose a portfolio consists of two assets of equal value. If returns on the two assets are perfectly negatively correlated, a decline in the value of one asset would be exactly offset by an increase in the value of the other.
>
> In the real world, there is usually some degree of positive correlation among the credit risk of individual assets in a portfolio. The actual degree of correlation strongly influences the distribution of outcomes that the portfolio may experience.

(Nomura Fixed Income Research (Mark Adelson), *Correlation Primer*, August 6, 2004, pp. 1-2)

384.    The issue of correlation is best seen in Mezzanine CDOs.  Mezzanine CDOs, during 2005 and 2006, were largely (approximately 70%) collateralized by BBB tranches of nonprime RMBS: i.e., by already-tranched mortgage risks with a BBB-rating. (Standard & Poors, *Standard & Poor's Weighs In On The U.S. Subprime Mortgage Market*, April 5, 2007 at p. 17).[26]

385.    So how could a Mezzanine CDO, backed by such *already*-tranched BBB-rated risks, produce a new round of CDO securities 65% of which were rated triple-A?  The answer: only

---

[26]    In 2000, the average ABS CDO exposure to subprime RMBS was 9.9%; by 2003, 41.2%; and by 2006, the average exposure of Mezzanine CDOs to subprime RMBS collateral was 70.6%. (*Id.*)

by assuming that the underlying assets – the BBB nonprime tranches – or, more precisely, the risks of those assets, were *not* correlated with each other.

386.    The correlation used in CDO structuring, with respect to subprime RMBS tranches, was 0.3. Using this low correlation assumption, the CDO was built on the proposition that the risk of one asset (subprime BBB tranche 1) going bad had little or nothing to do with the risk of other, like assets (subprime BBB tranches 2 through 200) going bad. In essence, using low correlation assumptions meant "assuming" that the underlying assets were not subject to the same risks, but rather behaved relatively independently and idiosyncratically.  Thus, a Mezzanine CDO collateralized primarily by BBB-rated nonprime RMBS could, by using low correlation assumptions, generate a new round of triple-A securities – but only by presuming that the underlying assets/risks were not correlated.

387.    But, in fact and on their face, the underlying assets were highly similar, highly correlated and highly sensitive to exactly the same risks.  To illustrate:

(a)    Whereas in 2000, only approximately 50% of subprime mortgages were ARMs, during 2005 and 2006, approximately *80% of subprime mortgages were hybrid ARMs*.  Thus, 80% of the 2005/2006 subprime vintages were, on their face, subject to exactly the same risks at the same times: rate resets and payment shock.

(b)    Moreover, the susceptibility to those risks was worsened by a (correlated) deterioration in underwriting/origination standards that made 2005/2006 mortgages more like each other, less like their predecessors, and even more susceptible to exactly the same risks. In 2000, subprime mortgages were evenly divided between adjustable rated mortgages and fixed rate mortgages.  However, both for fixed and adjustable rate mortgages, the borrower's ability to pay the

189

monthly payment *throughout the mortgage's life* had been objectively verified.  In 2005 and 2006, the situation was the opposite.  80% of 2005 and 2006 subprime mortgages were hybrid ARMs, for which borrowers had "qualified": (1) based on their ability to pay only the low, initial teaser rates, rather than the fully-indexed rates that would prevail over the life of the mortgage; and (2) based on income that was "stated" rather than objectively documented and verified.  Both of these factors made the governing risks –  rate reset and payment shock – even more severe.

(c)     Making matters worse was the accumulation of "risk layering": not only were more subprime mortgages hybrid ARMs, but approximately 23% of 2005/2006 subprime mortgages were interest-only, 16% were 40-year term mortgages, and 26% were accompanied by simultaneous second-lien piggybacks.  The comparable numbers for 2000 were 0% (with the slight exception of piggybacks, which were less than 5%).  The interest-only and 40-year term features – 42% of the subprime origination in 2005/2006 – intensified the risks of rate resets and payment shock, principally by structuring the mortgage to be "affordable" on the basis of even lower initial monthly payments.  Not having to make principal payments, for example, made a mortgage more affordable during the initial "interest only" period, but worsened the payment shock once that period ended and principal amortization began in concentrated fashion.

388.     In these mortgages the exact same risk – rate reset and payment shock – was thus intensified through layer upon layer of addition: (1) a predominance of hybrid ARMs; (2) qualification (de)based on borrowers' ability to pay those ARMs only at the initial teaser rates; (3) borrower's "ability" to pay even those teaser rates itself not verified; and (4) the initial rates made more "affordable" through interest-only and 40-year term features.

389.     This made these mortgages highly dependent, for successful performance, on

exactly the same two things: (1) rising housing prices (so that, if borrowers found it difficult to continue to pay, they could sell the house and pay off the mortgage, or refinance) and (2) the ability to refinance before or shortly after payment shock (which itself depended on continued housing price appreciation and continued laxity in lending standards).

390.    But housing prices began declining steeply in bubble markets by mid-2006, and nationwide by August 2006; and the door to refinancing closed between mid-2006 and -March 2007.  These developments spoke directly to the concentrated, correlated risk to which the bulk of subprime mortgages were exposed.   These developments were going to affect immense amounts of nonprime mortgages in exactly the same way – very negatively.

391.    Again, irrespective of the degree to which the low asset correlation assigned to nonprime RMBS was ever with basis, by early 2007 at the latest it was clear that this structuring assumption had created CDOs unprepared for the imminent, correlated and very poor mortgage performance they were about to witness.

392.    CDO structures and ratings, having come into being on the presumption that BBB-rated subprime RMBS tranches were *not* substantially exposed to the same risks, were literally not built to withstand a world in which BBB-rated subprime RMBS tranches *were* substantially exposed to the same risks.   In this latter world, a Mezzanine ABS CDO backed primarily by nonprime RMBS (such as most Mezzanine CDOs during 2004-2006) simply could not exist: it would not be possible to take a pile of highly-correlated BBB-rated subprime assets and on their basis generate a new large pile of triple-A rated securities.   One could resecuritize that asset pile, but with no benefit and to no end: the resulting securities would be rated BBB, rather than AAA.   Which serves to demonstrate how low correlation assumptions conditioned the very possibility of subprime-

backed CDOs.

393.    Finally, correlation was of particular importance to CDO super senior tranches.  Given the credit protection provided by the subordinate tranches, losses at the super senior level can not result from "random" underlying asset defaults (low correlation), but rather *only from highly-correlated asset defaults*:

> The actual degree of correlation strongly influences the distribution of outcomes that the portfolio may experience. Slicing the portfolio into several "tranches" of credit priority magnifies the importance of correlation because the degree of correlation affects the value of different tranches differently.
>
> *****
>
> Now **consider the CDO's senior tranche**... **The situation for the senior tranche is exactly opposite to that of the equity tranche. When the portfolio's correlation is zero, there is only a slight possibility that many defaults occur and cause losses for the senior tranche. On the other hand, a high correlation means an increased possibility of a large number of defaults, where all junior tranches are exhausted and losses reach the senior tranche. Accordingly, an increase in correlation decreases the value of the senior tranche**.
>
> (Nomura Fixed Income Research (Mark Adelson), *Correlation Primer*, August 6, 2004, pp. 2-3)

394.    In March 2007, Citigroup's chief credit strategist Matt King issued a report recognizing: (1) that ABS CDO assets were in fact highly correlated; and (2) that such correlation had substantial effects on the value of the super senior tranches (which, the reported noted, had already suffered substantial declines in value).

395.    First, Citigroup's report noted that although each RMBS itself contained a diverse array of mortgages, when a CDO invested primarily in RMBS it wasn't increasing diversification but rather reversing it, by increasing correlation:

192

The report argues that, unlike CLOs, **US CDOs of ABS seem to be relatively undiversified. The individual triple-B and triple-B minus ABS tranches within CDOs of ABS are actually quite well diversified, but when incorporated in CDOs the effect is reversed**.

Rather than being concentrated in particular regions , ABS tranches tend to span several regions - even if there is still a preponderance of exposure to 'hot' states like California. This renders the individual ABS more stable. **But from a CDO perspective , it actually makes the collateral more similar - thus reducing diversification**.

(Structured Credit Investor, *CDO of ABS Sub-prime exposure Assessed*, March 28, 2007)

396.    High correlation, Citigroup analysts stated (in agreement with Mr Adelson and basic logic), meant that either everything would be OK (and the BBB-rated RMBS tranches would all pull through), or everything would be a disaster (and the BBB-rated RMBS tranches would all deteriorate).  Because correlation was the Achilles heel of super senior tranches, Citigroup analysts concluded that effects at the super senior tranche level would be "far worse" than at other levels. Indeed, Citigroup's analysts noted that such correlation logic lay behind the already visible and substantial decline of the TABX index tracking Mezzanine CDO super senior tranche pricing:

> **"As we see it, this creates a classic 'ball in bowl' phenomenon , in which either no ABS tranches get downgraded , or a great many do," King says .**
>
> **The report argues : "translated into the CDO space, widespread downgrades would, relatively speaking, be far worse for senior tranches than for junior ones... Such findings seem comfortably priced into TABX - and indeed help to explain the otherwise absurd levels reached by its super-senior tranches...**"

(Structured Credit Investor, *CDO of ABS Sub-prime exposure Assessed*, March 28, 2007)

E.    **Inside the CDO Market - February to June 2007: Loss and Despair**

397.    Given the events detailed above, it comes as no surprise that during early and mid-2007, CDO market insiders – and especially major CDO underwriters and investors – were in state bordering panic.  Some examples:

1.    **UBS – March 2007:  UBS Conducts Experiment to Find Price at Which Subprime-Backed Securities Actually Can Be Sold – And Learns that Market Value of Subprime-Backed Securities is Only 50 Cents on the Dollar**

398.    After HSBC reported its massive subprime write-downs in early February 2007, hedge fund managers at UBS's Dillon Read Capital Management ("DRCM") began to internally revalue its subprime CDO exposure in response.  DRCM management conducted a very simple experiment to see whether the then-current asset values were correct.  They attempted to sell $100 million worth of CDOs.  They received only $50 million, or 50 cents on the dollar in return.  DRCM executives recognized that DRCM's inventory of subprime CDOs was extensively overvalued.[27]  In response, UBS shut down DRCM and suppressed this information.

399.    According to internal sources interviewed for an October 12, 2007 Wall Street Journal article titled  *US Investors Face an Age of Murky Pricing – Values of Securities Tougher to Pin Down: Discord at Dillon Read*, a DRCM trader named John Niblo ("Niblo"), who was in charge of a $1 billion portfolio of RMBS and CDOs, sought prices in April 2007 from at least a dozen Wall Street dealers to determine the value of the $1 billion portfolio. Niblo sought the pricing data after witnessing the issues in the rising amount of subprime mortgage delinquencies and their affect on the mortgage-backed securities market in February and March 2007. According to the internal

---

[27]    *See, inter alia*: Financial Times, *Corroded to the Core*, April 21, 2008.

sources interviewed, based on the prices that he was quoted, Niblo marked down his $1 billion portfolio by $100 million in April 2007 – an average writedown of 10%, but, according to the Wall Street Journal's sources, Niblo "priced many of the mortgage-backed securities in the range of 50-80 cents on the dollar, while UBS valued similar securities in the 80s."  Multiple UBS executives complained to Niblo that his valuations were lower than UBS's marks on similar securities. Niblo responded by asking how UBS could value the similar securities at a higher level "'if we can't sell them at these prices.'"

### 2.    Merrill Lynch: Merrill Tries to Conceal Its CDO Exposures Through "Parking" Schemes

400.    Meanwhile, at Merrill Lynch, which vied with Citigroup throughout the class period for top ranking in the CDO underwriting league tables, executives were panicking over Merrill's CDO exposure.  One of their responses to this crisis was to attempt to conceal it.  In early November 2007, the SEC launched an investigation of Merrill after reports surfaced that Merrill had been attempting to "park" its CDO holdings with other entities.   In such parking schemes, an unwanted asset is temporarily "sold" to another party with a simultaneous agreement to repurchase it later at a guaranteed price.  Such parking schemes are illegal precisely because they hide exposures and delay recognition of losses.  CDO consultant Janet Tavakoli stated that she had close knowledge of Merrill "making the rounds asking hedge funds to engage in one-year off-balance-sheet credit facilities".[28] As Investment Dealers' Digest reported on November 12, 2007:

> At the heart of the issue is whether Merrill placed CDO and RMBS tranches with some hedge funds to put off reporting big losses. "They

---

[28]    *See*, *inter alia*, Investment Dealers Digest, *Merrill's Other Issue:  Firm May Have to Answer to SEC for Hedge Fund Actions*,  November 12, 2007; Reuters, *Merrill Shares Fall as Credibility Questioned*, November 2, 2007.

didn't permanently place CDOs with hedge funds, they parked them there:  it was a temporary arrangement" says Mark Adelson... "There is nothing wrong with selling risky securities, but there is almost always something wrong with parking them.  You are misleading shareholders about the real condition and prospects of your business"

(Investment Dealers Digest, *Merrill's Other Issue:  Firm May Have to Answer to SEC for Hedge Fund Actions*,  November 12, 2007)

### 3.  Bear Stearns – March 2007 through June 2007: the CDO-Invested BSAM Hedge Funds Undergo a Private Crisis and Then a Public Implosion, Resulting in Investor Losses of 100%

401.    During 2006 and 2007, two hedge funds managed by Bear Stearns Asset Management ("BSAM") – Bear Stearns High-Grade Structured Credit Strategies Master Fund and Bear Stearns High-Grade Structured Credit Strategies Enhanced Master Fund (the "BSAM Funds") – had employed substantial leverage to become among the world's largest purchasers of subprime CDOs.  The BSAM Funds began to encounter severe problems in February 2007 and collapsed in early June 2007, resulting in a total loss of investors' $1.8 billion (which had been leveraged as much as 20 times).

402.    As a recent federal indictment[29] makes clear, the BSAM Fund managers were already despondent over subprime CDOs no later than March 2007.  By April 2007, they understood that systematic downgrades lay in store for subprime CDOs even at the highest triple-A tranche levels.

403.    On March 3, 2007, the primary BSAM Fund manager, Ralph Cioffi, told his partner Matthew Tannin that:

"the worry for me is that subprime losses will be far worse than

---

[29]    *See U.S.A. v. Ralph Cioffi and Matthew Tannin*, 08-cr-415 (E.D.N.Y. June 18, 2008) ("Indictment").

anything people have modeled" (Indictment, ¶ 28)

Four days later, Cioffi emailed to a colleague

> "I'm fearful of these markets.  Matt [Tannin] said it's either a
> meltdown or the greatest buying opportunity ever.  I'm leaning more
> towards the former.  As we discussed it may not be a meltdown for
> the general economy but in our world it will be" (Indictment, ¶ 28).

Cioffi's email continued:

> "Wall Street will be hammered with lawsuits.  Dealers will lose
> millions and the CDO business will not be the same for years"
> (Complaint in *SEC v. Cioffi et al.*, 08-civ-2457 (E.D.N.Y. June 19,
> 2008), at ¶ 64) ("SEC Complaint").

404.    On March 23, 2007, Cioffi began transferring his own money out of the

BSAM funds (Indictment, ¶ 35).

405.    Not surprisingly, given developments in subprime mortgage performance and

in the  subprime mortgage market, demand for CDOs was collapsing.  In mid-April 2007, Cioffi

admitted to a broker that there was no:

> buy interest on anything anywhere in this world or universe.  **I think
> we need to go into outer space to find new buyers of CDOs**. (SEC
> Complaint, ¶ 90)

406.    On April 19, 2007, a member of the BSAM Funds' portfolio management

team produced a report (the "CDO Report") showing that the CDOs held by the funds were worth

significantly less than had previously been determined (Indictment, ¶ 40).  On April 22, Tannin

recommended to Cioffi that they either shut the BSAM Funds down or significantly change

investment strategies.  In support of closing the funds, Tannin stated:

> **that the subprime market looks pretty damn ugly... If we believe
> the [CDOs report is] ANYWHERE CLOSE to accurate I think
> we should close the funds now. The reason for this is that if [the**

197

**CDO report] is correct then the entire subprime market is toast.
. . . If AAA bonds are systematically downgraded then there is
simply no way for us to make money - ever... caution would lead
us to conclude the [CDO Report] is right - and we're in bad bad
shape.** (Capitalization in original; emphasis added) (*Id.*, ¶ 41)

## III.    CDOs:  STRATAGEMS, CONTROLS AND DISCLOSURES

407.   Defendants knew full well that Citigroup was exposed to increasingly risky

assets and decreasingly valuable assets, primarily in the form of mortgage-related instruments, and

dissembled, concealed and schemed to avoid having those facts fall into public hands.

### A.    Schemes

#### 1.    Citigroup's Commercial Paper CDO "Sales":  How to Make $25 Billion
of Subprime Exposures and Risks (Appear to) Disappear

408.   As Citigroup first revealed in November 2007, Citigroup had $25 billion of

exposure to the super-senior tranches of its Commercial Paper CDOs.  As plaintiffs' identification

of those Commercial Paper CDOs demonstrated, this exposure had been generated primarily during

2004 and 2005, and existed in $25 billion totality by early 2006.  Though this exposure had long

existed, it had never been disclosed prior to November 2007.

409.   Through the scheme detailed below, Citigroup created the appearance that

these $25 billion of subprime CDO super senior tranches had been sold, and that their risks had thus

been transferred.  In fact they had only been sold with an undisclosed, full-price money-back

guarantee, which guarantee meant that Citigroup had retained the risk all along.  The undisclosed

guarantee obligated Citigroup, precisely at the moment the underlying collateral began to deteriorate

and the securities began to lose their value, to repurchase the securities at their initial price.  In

November 2007, Citigroup represented that this repurchasing occurred during the summer of 2007.

But further schemes discovered by plaintiffs suggest that Citigroup recognized that its obligations were coming due no later than February 2007.

410.    As plaintiffs' explanation demonstrates, Citigroup, as the underwriter of these CDOs, structured them so that the super senior tranches, rather than offering yields sufficient to accomplish true and final sales to investors, bore much lower yields but carried Citigroup's guarantee. The difference between the higher yields they could have offered and the lower yields they actually offered was Citigroup's guarantee fee. From the perspective of the CDO, therefore, the payout was roughly the same: either higher yields to one set of investors, or lower yields to another set plus Citigroup's guarantee fee. But from Citigroup's perspective, the payout was opposite: zero under the higher-yield-but-true-sale scenario, or substantial under the lower-yield-plus-Citigroup-guarantee scenario. Citigroup thus paid itself to retain the risks with the funds that could have been used to transfer them. These payments totaled $50 million per year, which appeared in Citigroup's financial results as a boost to revenues and income. The risk that Citigroup retained in order to generate those payments made no similar appearance.

411.    In Citigroup's Commercial Paper CDOs, the super senior tranche was not issued/funded in the traditional form (long-term debt), but rather in the form of short-term commercial paper. This had certain benefits and certain risks.

412.    The benefit was simple. The market for asset-backed commercial paper was (1) enormous (nearly $1 trillion) and (2) accepting of low yields (given the extremely conservative investor base) below those investors demand for long term debt. By issuing commercial paper for the extremely large super senior tranche (on average, 88% of the entire securitizations), the "funding structure" of the CDOs – i.e., how much money the CDOs were required to pay out – was made

substantially cheaper.

413.    The net result was an increase to the CDO's arbitrage, or  "excess spread":
i.e., the difference between the money flowing into the CDO (from the collateral) and the money
flowing out of the CDO (in interest payments to investors).  By reducing the required payout on the
large super senior tranche, some of the "excess spread" savings could be redistributed to the junior
and equity tranches.  Because the junior and equity tranches were so small (totaling 5% of the these
CDOs on average), the effect of the transferred excess spread was greatly magnified, resulting in
extremely high coupons/returns to better entice investors to purchase these more risky securities.

414.    The risk was also simple.  The risk was the gap between short term funding
and long-term obligations.  The need to "rollover" the commercial paper funding on a regular, short-
term basis gives rise to what is known as "liquidity risk".  As the commercial paper comes due,
investors must be persuaded to "roll over" their investments for a new short-term round of
investment, and/or new investors must be found to replace the old.  If old investors refuse to rollover
their investments and new investors cannot be found, then the CDO will self-destruct: it will be
forced to sell assets to pay off maturing short-term debt.

415.    When does rollover risk manifest itself?  Generally, when the collateral
backing the commercial paper takes a turn for the worse.  By this manner, the credit risk of the
underlying collateral results in a liquidity risk for the instruments backed by that collateral.

416.    What happens when collateral quality deteriorates and rollover becomes more
problematic?  Many things have a price:  by increasing the interest rates offered by the commercial
paper, rollover can proceed by enticing investors via added/comparatively superior yield.

417.    However, at a certain point, raising commercial paper yields to achieve

200

rollover defeats the purpose of commercial paper issuance in the first place – cheaper funding. Concretely, a CDO cannot raise the yield offered on commercial paper *too* much, because doing so will first (1) eat right back into the saved excess spread, and (2) even require the CDO to make more in payouts than it takes in from the collateral, thus again leading to implosion.

418.    The way out of this impasse, both from the perspective of the CDO and from the perspective of commercial paper investors concerned about credit risk, was provided by a guarantee made by Citigroup.  The guarantee was that, upon any serious trouble that had the effect of raising commercial paper yields to unsupportable levels, Citigroup would repurchase the commercial paper, at full price.  Thus, Citigroup ostensibly sold CDO's but retained the risks associated with them.

419.    Specifically, in connection with the above-listed CDOs, Citigroup provided a "liquidity put" which obligated Citigroup to buy back the commercial paper at full price and at low yields if commercial paper rates were to rise above a certain level (LIBOR + 0.4%).

420.    For providing this guarantee, Citigroup charged approximately 20 basis points per year (0.20%) on the amount guaranteed.  On $25 billion of super senior subprime CDO tranches, that amounts to $50 million per year.

421.    Citigroup had been engaged in this practice prior to the beginning of the class period, but it was not, however, until November 2007 that Citigroup admitted its existence.

422.    A primary reason why rates would rise to such a level would be collateral concerns.  If the collateral deteriorated or was perceived as more risky, the rates demanded by investors (for paper backed by that collateral) would rise.  Therefore, Citigroup's guarantee was the following: if the underlying assets deteriorate seriously, Citigroup will repurchase the commercial

paper backed by those assets at full price.

423.    And in fact, by early 2007, the declining credit quality of these CDOs' subprime collateral, in foreseeable fashion, had transmuted the credit risk of the assets into a liquidity risk for Commercial Paper CDO funding, triggering Citigroup's obligations.  Quietly, even before the paper could be "put" back to it, Citigroup – "in order to forestall the formal exercise of the liquidity puts" (as Citigroup later explained in its 2007 Form 10-K, p. 91) – purchased during the summer months of 2007 $25 billion of the commercial paper used to fund the super senior tranches of the Commercial Paper CDOs that Citigroup had underwritten.

424.    Importantly, Citigroup's guarantee gave comfort not simply to the commercial paper investors, but to the CDO.  Why?

425.    This level – 40 basis points over LIBOR – was the point at which the CDO ceased to benefit from the (no longer) cheaper commercial paper issuance.  Though commercial paper was cheaper in terms of sheer yield, it also imposed two added costs. First, a stream of continuing underwriting/marketing fees and administrative costs associated with rolling over the commercial paper on a regular basis.  Second, the cost of the guarantee provided by Citigroup.

426.    If commercial paper yield is cheaper than long term debt by an amount exceeding the administration costs and guarantee costs, then it is advantageous for the CDO: the CDO is saving money through CP funding.  If commercial paper yields rise, however, the higher yield plus the administration and guarantee costs may exceed the cost of funding through long term debt – at which point the arrangement ceases to be advantageous for the CDO.

427.    Through structuring CDOs in this way, Citigroup achieved the following: (1) rather than issue traditional long-term debt (2) at yields sufficiently acceptable to long-term debt

202

investors to (3) convince them to invest in super senior tranche risk *without* guarantees and thus (4) achieve true transfer of super senior through true sale; Citigroup instead  (5) structured these CDOs with guaranteed short-term debt issuance that (6) did not transfer super senior risk away from Citigroup, but rather (7) obligated Citigroup to assume it exactly at the moment such risks became evident –  in exchange for which (8) Citigroup received an annual fee.

428.    Having understood the details, the essence – and it is somewhat shocking – also becomes clear.  In these CDOs, Citigroup arranged to pay itself (for retaining the risk of $25 billion of subprime super seniors) a slightly smaller sum than that which could have been used to fund appropriately-yielding long-term debt (the sale of which would have transferred the risk of those super seniors).  Put most simply: if the market would have purchased long-term debt backed by $25 billion of subprime super seniors for $100 million in annual interest payments, Citigroup agreed to take on that risk for less than $100 million.

429.    And by this artifice, Citigroup took on $25 billion of subprime risk for returns substantially lower than those otherwise demanded by the market.  This, in and of itself, reasonably implies Citigroup's awareness that its risks and returns were dangerously imbalanced.

430.    By structuring the above-mentioned CDO transactions in this manner, Citigroup achieved several ancillary benefits.  First, the $25 billion of subprime super seniors disappeared from Citigroup's balance sheet and financial statements, freeing up substantial amounts of capital that Citigroup otherwise would have had to set aside for such a massive set of risky assets. Second, by providing its money-back guarantees, Citigroup attracted a huge new audience willing to  invest  in  Citigroup-underwritten CDOs, and Citigroup's CDO issuance boomed.   CDO arranging/underwriting fees are among the most lucrative in the fixed income world, generally

between 1% and 2% of the amount underwritten.  Using the more conservative figure, Citigroup earned $250 million in underwriting fees for the above-mentioned CDOs alone.

431.    This serves only to emphasize plaintiffs' claim that Citigroup's disclosures and financial statements fundamentally distorted Citigroup from a financial point of view.  In order to procure regulatory capital benefits and boost underwriting revenues, Citigroup was taking on $25 billion of off-balance sheet subprime exposure.

432.    The extent of that exposure was unknown to the investing public.  The risks of subprime had long been known; as subprime roared into view at the end of 2006 and the beginning of 2007, subprime exposure became a ruling principle in investment decisions the world over.  Had investors known of Citigroup's obligation to purchase $25 billion of subprime-backed securities at full price if their price fell, this would have been a material factor in investors' investment decisions.  Subprime risks were known – Citigroup's exposure to them was not.  To the contrary.

433.    Citigroup revealed the return of these assets to its balance sheet, their multi-billion dollar writedown, and the fact of Citigroup's initial guarantee simultaneously on November 4, 2007.

434.    Between 2003 and early 2006, as Citigroup guaranteed $25 billion of subprime-backed commercial paper, Citigroup did not make adequate disclosure.  As subprime concerns mounted at the end of 2006 and the beginning of 2007, Citigroup continued to remain silent – even though subprime was an explicit topic of concern during Citigroup's early 2007 conference calls.

435.    Crediting for the moment Citigroup's explanation that it repurchased the

Commercial Paper CDOs during the summer of 2007 (evidence discussed immediately below suggests the Commercial Paper CDOs were returning earlier), the fact remains that Citigroup declined to mention the actual return of the Commercial Paper CDOs in, *inter alia*, its July 20, 2007 conference call discussing Citigroup's financial results for the second quarter of 2007 (as well as recent developments relating to subprime), its August 3, 2007 Form 10-Q, its October 1 and  15, 2007 press releases warning about and announcing third quarter 2007 financial results, and its October 15, 2007 conference call discussing Citigroup's financial results for the third quarter of 2007.

### a.   Further Schemes:  How to Make Returning Subprime Exposures and Risks (Appear to) Disappear *Again*

436.   Plaintiffs' investigation suggests that, *contra* defendants' *post facto* explanations, the Commercial Paper CDOs had in fact been returning to Citigroup well before the summer months of 2007, and in fact as early as February 2007.  Citigroup's continuing silence was motivated by the fact that, despite the general panic touching on all things subprime, Citigroup still hoped to find a way to offload these highly unwelcome assets.  As Citigroup later explained in its 2007 Form 10-K, it purchased the Commercial Paper CDOs' commercial paper quietly and without formal exercise of the liquidity puts because "holding the commercial paper was believed to provide some additional flexibility in finding third-party investors in the event of improved market conditions" (Citigroup, 2007 Form 10-K, p. 91).

437.   Plaintiffs' investigation has uncovered one of the ways in which Citigroup sought to find investors who would take these returning super senior tranches off of Citigroup's hands – and most importantly, off of Citigroup's balance sheet.

205

438.     No later than February 9, 2007, Citigroup set up a special purpose entity named Foraois Funding Ltd.  Its purpose, as an April 17, 2007 offering prospectus reveals, was to serve as the conduit for a transaction known as "Leveraged Super Senior" trade.  In this particular transaction, Citigroup and Foraois entered into a credit default swap on February 9, 2007 for the $1.32 billion super senior tranche of Citigroup's Grenadier Funding Commercial Paper CDO.  Pursuant to this credit default swap, Citigroup paid Foraois a protection premium in exchange for swapping off the credit risk of the Grenadier Funding super senior.  In essence, Citigroup was reversing its prior role with respect to the Commercial Paper CDOs.  Before, Citigroup had been paid to assume their risk.  Now, Citigroup had created an alter-corporate entity called Foraois.  By so doing, Citigroup could ostensibly pay its alter-ego to appear to assume the credit risk.

439.     Among other things, the February 9, 2007 credit default swap and the April 17, 2007 Foraois prospectus strongly indicate that Citigroup was aware of impending liability for and losses from Commercial Paper super seniors no later than February 2007.

440.     However, in order to have any validity whatsoever as a counterparty to $1.32 billion of credit risk that it had "agreed" to take from Citigroup, Foraois had to have some minimum level of funding.  This was accomplished through: (1) selling $92 million of new debt securities (the "Foraois LSS notes") representing leveraged interests (at a 15 to 1 leverage ratio) in the protection amounts to be paid by Citigroup on the entire $1.32 billion Grenadier Funding super senior; and (2) another round of asset-backed commercial paper representing the remaining $1.23 billion.  The $92 million of Foraois LSS Notes (representing 6.67% of the entire structure) functioned as "first loss" protection for the $1.23 billion of senior commercial paper.  These first-loss LSS Notes were made enticing precisely through their leverage: the credit protection payments on the entire $1.32 billion

206

(at 38 basis points over LIBOR) were funneled mostly to investors who put up only $92 million, with the result being that such investors received leveraged returns of nearly 600 basis points above LIBOR (i.e., 38 basis points on the entire $1.32 billion flowing to investors who had put only 1/15th of that amount).

441.   The risks in such a transaction are significant.  Were the $1.32 billion Grenadier Funding to lose one-fifteenth of its value, a mere 6.7% drop, investors' $92 million of Foraois LSS Notes would be wiped out entirely.  Were the declines steeper, the senior commercial paper investors would start to incur losses.  Thus, such Leveraged Super Senior transactions contain various "triggers" that, upon market value fluctuations in the underlying collateral, can either call for the first-loss investors to put up more funds or unwind the transaction entirely.  The latter event seeks to limit the damage by selling off the collateral before it falls any further and causes even more substantial losses.

442.   Who would invest in the Foraois LSS Notes?

443.   For one, another Citigroup-sponsored CDO.

444.   As detailed below at Section IIIA.2.b below, Citigroup had the honor of issuing the last subprime CDO, on or about July 27, 2007, before the doors to subprime-backed investments closed for good.  This CDO, a $2.5 billion entity named Bonifacius (later nicknamed by the financial press as "The Last of the Romans"), was – as plaintiffs demonstrate in detail at Section IIIA.2.b – little more than a desperate attempt to transport Citigroup's CDO inventory from one warehouse to another by packaging together as many of Citigroup's imminently-worthless subprime-backed assets as possible, transferring them to the Bonifacius CDO, and then selling off as much of the Bonifacius notes as possible.

445.    Among Bonifacius' assets were $20 million of Foraois LSS Notes – i.e., more than 20% of all the $92 million of Foraois Notes issued – as well as a further $405 million of subprime CDO tranches recently underwritten by Citigroup.

446.    Almost certainly as a result of the corruption of the ratings industry, the $92 million of Foraois LSS Notes were assigned triple A ratings in March 2007.  On August 20, August 28, and September 11, 2007, Moody's repeatedly downgraded the ratings due to "rapid deterioration in the current market value of the reference portfolio" – i.e., the Grenadier Funding super senior. Foraois LSS Note investors (including Bonifacius and any other Citigroup CDOs in which Citigroup placed further LSS Notes) almost certainly suffered a total loss and the asset-backed commercial paper investors a substantial one.

447.    Citigroup by this means sought to escape the *appearance* of liability for any losses accruing to the Grenadier super senior tranche.

## 2.    Citigroup's CDO Ponzi Schemes

448.    By late 2006 and early 2007, much of Citigroup's CDO underwriting had become a shell game, dumping unwanted old assets into new securitization vehicles which issued new securities that would then be purchased by yet new securitization vehicles, etc.

### a.    Case Study 1:  Citigroup's Tallships Funding CDO and Citigroup's Participation in Everquest Financial

449.    A closer look at Citigroup's Tallships Funding CDO helps to reveal the true nature of Citigroup's CDO underwriting enterprise in late 2006 and early 2007, and supports plaintiffs' characterization of that enterprise.

450.    Tallships Funding was a $1.5 billion hybrid CDO, investing in both cash

assets and in credit default swaps referencing cash assets.  The CDO securities issued by Tallships included $580 million of actually funded securities (i.e., investors actually paid for them), notes representing a $250 million loan from Citigroup, and a $690 million unfunded "swap" provided by Citigroup (which functioned as an "unfunded" super senior tranche).  This unfunded super senior swap would be drawn upon (i.e., Citigroup would be called upon to fund its obligation) in the event that losses on the $1.5 billion of assets exceeded the $540 million that investors had provided and the $250 million that Citigroup had loaned.  In essence: (1) the $580 million of funds raised from investors, and the $250 million loan from Citigroup, served as the basis for acquiring the initial assets; and (2) served as the initial credit protection for the entire $1.5 billion asset risk, with (3) Citigroup agreeing to take on the remaining risk through its unfunded super senior swap obligation.

451.    Citigroup's obligation as super senior swap counterparty was, in essence, exactly the same as its "money back" guarantees of the Commercial Paper CDO super senior tranches.  Citigroup undertook exposure to risk at the super senior tranche level, in exchange for which it earned a fee.  In the Tallships transaction, this fee was 15 basis points (0.15%) per year on the entire $690 million unfunded amount, or $1.03 million per year.

452.    Tallships was managed by Bear Stearns Asset Management ("BSAM").  BSAM committed to buy $250 million of the funded CDO securities to be issued by Tallships.

453.    Thus, for this $1.5 billion CDO: (1) $250 million of initial funding was provided by Citigroup; (2) $250 million of the $580 million of Tallship's funded securities were purchased by BSAM; (3) leaving only $330 million to be raised from outside investors by Citigroup's efforts as an underwriter; while (4) Citigroup retained possession of the $690 million unfunded obligation under the super senior swap, for which Citigroup earned $1 million per year.

454.    Citigroup had difficulty finding investors for even $ 330 million of the notes. So Citigroup created new, artificial investors, in the form of new CDOs, to purchase these and other like assets accumulating in Citigroup's warehouse.  Citigroup's subsequent CDO Bonifacius (itself detailed in the following subsection of this complaint) purchased $20 million of Tallships' notes. In likelihood, other Citigroup-manufactured CDOs – and especially the "High Grade" CDOs and the "Hedged" CDOs discussed in the next two subsections – purchased a substantial portion of the remaining notes.

455.    Tallships Funding, aided (1) by Citigroup's $250 million loan and (2) the buying power of other Citigroup-arranged CDOs, purchased for its collateral base a number of CDO tranches and subprime RMBS tranches that were themselves the products of prior Citigroup-underwritten securitizations.   Those that plaintiffs have been able to identify total $107 million. These include $14.6 million of Diversey Harbor CDO tranches; $15 million of Klio Funding CDO tranches; $3 million of Avanti CDO tranches; and $74 million of nonprime RMBS tranches underwritten by Citigroup.

456.    Thus, of the $250 million loaned by Citigroup to Tallships, Tallships used at least $107 million to purchase from Citigroup other CDOs and RMBS that Citigroup had underwritten.

457.    The scheme continues.  At least $37 million of BSAM-underwritten CDO securities were purchased by Tallships.  These $37 million, in their entirety, were the more toxic CDO-square securities that, as further discussed below, had been accumulating in two large BSAM-managed hedge funds – which publicly imploded in June 2007, resulting in a 100% loss to investors.

458.    And the scheme continues further: in early 2007, Citigroup provided a $200

million line of credit to a vehicle called Everquest Financial set up by BSAM.  Citigroup received a 4% equity stake in Everquest.  Everquest then used this line of credit to purchase toxic CDO assets from the BSAM Funds and Citigroup.  The intention was take Everquest public through an IPO, part of whose proceeds would be used to pay back Citigroup.

459.    Among the assets transferred to Everquest were: (1)  Tallships Funding equity-class notes (i.e., the lowest tranche) with a face value of $10 million; (2)  $24 million of the Citigroup-underwritten Octonion's equity tranche (half of Octonion's entire equity tranche); and (3) $370 million of the lowest tranches of a new $500 million *CDO-cubed* named Parapet, that had gathered together unwanted CDO-squared securities and issued a new round of securities based on them.

460.    Nearly 40% of Parapet's underlying assets were Citigroup-underwritten CDOs managed by BSAM and/or held by the BSAM Funds.  Parapet was collateralized *inter alia* by $192 million of tranches from the Klio Funding CDOs underwritten by Citigroup and managed by BSAM: specifically, $19 million of Klio Funding's A-rated tranche, $30 million of Klio Funding's BBB-rated tranche, $5 million of Klio Funding III's BBB-rated tranche, the entire $86 million of Klio Funding II's equity tranche, $14 million of Klio Structured Investments' BBB tranche; the entire $38 million of Klio Structured Investments' equity tranche.

461.    As a recent federal indictment makes clear, the BSAM Fund managers were despondent by March 2007, particularly because of the BSAM funds' exposure to subprime CDOs. On March 3, 2007, the primary fund manager, Ralph Cioffi, told his partner Matthew Tannin that:

> "the worry for me is that subprime losses will be far worse than anything people have modeled" (Indictment, ¶ 28)

211

Four days later, Cioffi emailed to a colleague

> "I'm fearful of these markets.  Matt [Tannin] said it's either a meltdown or the greatest buying opportunity ever.  I'm leaning more towards the former.  As we discussed it may not be a meltdown for the general economy but in our world it will be" (Indictment, ¶ 28).

Cioffi's email continued:

> "Wall Street will be hammered with lawsuits.  Dealers will lose millions and the CDO business will not be the same for years" (Complaint in *SEC v. Cioffi et al.*, 08-civ-2457 (E.D.N.Y. June 19, 2008), at ¶ 64) ("SEC Complaint").

462.   On March 23, 2007, Cioffi began transferring his own money out of the BSAM funds (Indictment, ¶ 35).

463.   Apart from this ceaseless round of new special purpose vehicles set up by CDO underwriters themselves, there was increasingly less and less demand for CDO securities.  In mid-April 2007, on Ralph Cioffi, the BSAM manager who participated with Citigroup in portions of the scheme of laying off toxic assets on to artificial vehicles, admitted to a broker that there was no:

> "buy interest on anything anywhere in this world or universe.  *I think we need to go into outer space to find new buyers of CDOs.*" (SEC Complaint, ¶ 90)

464.   In sum, Citigroup was manufacturing CDOs such as Tallships Funding to purchase the unsold detritus of prior Citigroup and BSAM securitizations, or to offload unwanted holdings from BSAM-managed hedge funds.   These funds were serving as a burial ground for certain of the most toxic CDO byproducts: the lowest equity tranches of CDO securitizations,  and the lower tranches of CDO-squared securitizations. The effect of a CDO-squared is much the same as a Mezzanine CDO: on the basis of a big pile of small, close-to-loss securities, a new round of

212

securities is created that, like the Mezzanine CDO, are susceptible to extreme levels of loss.  In June 2007, the BSAM Funds became the first public CDO-related meltdown, resulting in a 100% loss for investors.

        **b.**       **Case Study 2:  Citigroup's "High Grade" Bonifacius CDO**

       465.    Bonifacius – one of the Citigroup's "High Grade" CDOs – provides another illustration.  Bonifacius' $2.5 billion in assets included $777 million of *other* CDOs, accounting for approximately 33% of Bonifacius' entire asset base.  This is consistent with Citigroup's structuring of Bonifacius (specifically) and Citigroup's "High Grade" CDOs (generally) to contain a 35% "bucket" for such other CDO investments.

       466.    Nearly half of those other CDOs in Bonifacius– specifically, $309 million – were CDOs underwritten by Citigroup, as the table below specifies:

213

**Bonifacius' Assets:**
**Prior Citigroup CDOs**

| CDO | Rating | | Amount | Percent of Original CDO Tranche |
|---|---|---|---|---|
| Armitage 2007 | AA | $ | 22,500,000 | 31.3% |
| Avanti Funding 2006 | A | $ | 15,000,000 | 83.3% |
| Class V Funding III 2007 | AA | $ | 32,000,000 | 42.7% |
| Diversey Harbor 2006 | A | $ | 17,000,000 | 68.0% |
| Diversey Harbor 2006 | AA | $ | 5,000,000 | 8.3% |
| Foraois Funding | AAA | $ | 20,000,000 | 21.6% |
| Lacerta 2006-1 | A | $ | 15,000,000 | 13.6% |
| Octonion 2007 | AAA | $ | 20,000,000 | 13.3% |
| Pinnacle Peak 2007 | AA | $ | 34,500,000 | 98.6% |
| Raffles Place Funding 2006 | AAA | $ | 16,000,000 | 20.0% |
| Ridgeway Court 2007 | A | $ | 11,000,000 | 16.2% |
| Ridgeway Court 2007 | AA | $ | 36,000,000 | 45.0% |
| Saturn Ventures 2005 | AAA | $ | 5,000,000 | 8.9% |
| Singa Funding 2006 | AAA | $ | 20,000,000 | 22.7% |
| Stack 2007 | AA | $ | 20,000,000 | 13.2% |
| Tallships 2006 | AAA | $ | 20,000,000 | 14.6% |
| Total | | $ | 309,000,000 | |

467.    Thus, $309 million of Bonifacius' $2.5 billion of assets – or 12% of the total asset base – consisted of CDO securities from prior, Citigroup-underwritten CDO securitizations, which Citigroup had been unable to sell.

468.    The above table further evidences Citigroup's inability to sell substantial percentages of its previously-underwritten CDOs by comparing (1) the size of Bonifacius' investment in these CDOs to (2) the total size of the corresponding CDO tranche as issued.  For example, Bonifacius' investment in the single-A tranche of the Diversey Harbor CDO ($17 million) represented 68% of the entire single-A tranche of Diversey Harbor.  Bonifacius' interest in the

double-A tranches of Class V Funding III and Ridgeway Court 2007 constituted, in each case, nearly 50% of the entire double-A tranche issuance of those CDOs. Bonifacius' purchase of $34.5 million of the double-A tranche of the Pinnacle Peak CDO amounted to purchasing that tranche in its issued entirety ($35 million).

469.    Furthermore, in Bonifacius were substantial holdings of two dubious entities, underwritten by Citigroup, that plaintiffs have detailed previously:

(a)    $20 million of Foraois Funding LSS Notes (Section III.A.1.a, *supra*), and

(b)    $20 million of Tallships Funding notes (Section III.A.2.a *supra*).

470.    The matter of Foraois is especially egregious. As earlier detailed, the Foraois securities were issued as "first loss" securities collateralized by a leveraged repackaging and resecuritization of the super senior tranche of Citigroup's Grenadier Funding CDO. Issuance of such securities served as the basis for Citigroup's ability to disclaim Grenadier Funding as an asset for which Citigroup had any liability (i.e., because others bore the risk of "first loss"). But the sale of such "first loss" securities in turn seems to have been accomplished only by Citigroup setting up yet further vehicles – such as Bonifacius – to purchase them.

### c.    Case Study 3:  Citigroup's Degradation of its "High Grade" CDOs

471.    Bonifacius looked just like Citigroup's other High Grade CDOs.

472.    On average, according to Citigroup's own statistics, 19% of the asset base of High Grade CDOs was composed of *other* CDOs. But Citigroup's High Grade CDOs departed markedly from this industry average.

473.    First, as the table below shows, of Citigroup's nine High Grade CDOs issued

215

during 2006 and 2007, five were structured to mandate that a "bucket", generally sized at 35% of

the CDOs' underlying assets, be reserved for investments in *other* CDO tranches.  These five High

Grade CDOs amounted to $8.5 billion, or 65.3% of Citigroup's total High Grade issuance:

**Citigroup High Grade CDOs**
**35% Asset Allocation Reserved for *Other* CDOs**

| CDO | Total Size | 35% Other CDO Bucket |
|---|---|---|
| **Raffles Place Funding II CDO** | $1 billion | $350 million |
| **Armitage ABS CDO** | $3 billion | $1.05 billion |
| **Pinnacle Peak CDO** | $1.5 billion | $500 million |
| **Bonifacius CDO** | $2.5 billion | $777 million |
| **Jupiter High Grade VII CDO** | $1.5 billion | $500 million |
| **Total** | $8.5 billion | $3.2 billion |

474.     Second, of the remaining four High Grade CDOs, two featured an *even higher*

allocation to other CDOs, mandating that *at least 90% of collateral assets be tranches of other*

*CDOs*.

**Citigroup High Grade CDOs**
**90%+ Asset Allocation Reserved for *Other* CDOs**

| CDO | Total Size | 90%+ Other CDO Bucket |
|---|---|---|
| **HSPI Diversified Funding I** | $ 620 million | $560 million |
| **HSPI Diversified Funding II** | $ 730 million | $660 million |
| **Total** | $1.35 billion | $1.2 billion |

475.     By arranging and underwriting the above seven CDOs, Citigroup sold

approximately $4.4 billion of other CDO tranches to those High Grade CDOs.

476.    As Bonifacius evidences, a substantial part of those sales consisted of CDO tranches from Citigroup's prior CDO securitizations that Citigroup had been unable to sell.  Most CDO prospectuses are not publicly available; many are definitively unavailable.  Both are therefore in the exclusive possession of defendants or third parties.  Of those CDO prospectuses that plaintiffs have been able to locate, most do not list the specific assets held by the CDOs.  The exceptions to the above rules provide support for plaintiffs' assertion.

477.    With respect to more than 90% of its offerings, Citigroup in its CDO prospectuses stated the general or hypothetical, which misled investors away from the particular reality fully known to Citigroup..  For example, the Armitage ABS CDO Prospectus stated:

*Potential Conflicts of Interest Involving the Initial Purchaser.*

\*\*\*\*\*

**Some of the Collateral Debt Securities (and Reference Obligations) included in the Collateral are obligations of issuers or obligors, or obligations sponsored or serviced by companies, for which Citigroup Global Markets or one of its Affiliates acted as underwriter, agent, placement agent or dealer** or for which an Affiliate of Citigroup Global Markets has acted as lender or provided other commercial or investment banking services.

\*\*\*\*\*

**Certain of the Collateral Debt Securities (or Reference Obligations) acquired by the Issuer may consist of obligations of issuers or obligors, or obligations sponsored or serviced by companies, for which the Initial Purchaser or an Affiliate of the Initial Purchaser has acted as underwriter, agent, placement agent or dealer** or for which an Affiliate of the Initial Purchaser has acted as lender or provided other commercial or investment banking services. (Armitage ABS CDO prospectus dated April 12, 2007)

478.    Nowhere did Citigroup disclose that it knew and intended that its High Grade CDOs would be stocked with otherwise-unsellable Citigroup-underwritten assets that (a) other

217

investors did not want and (b) Citigroup itself did not want.

479.    The seeming boom in Citigroup's High Grade CDO issuance masked that reality was the opposite: investors were turning away from CDOs, and Mezzanine CDOs particularly, leaving Citigroup with their detritus.  So Citigroup turned to High Grade CDOs, but degraded them by packing them high with Citigroup's stockpile of unsold, junior Mezzanine and High Grade CDO tranches.  The chart on the next page illustrates:

# "High Grade" Degradation



The left column represents 3,000 subprime mortgages that serve as the collateral pool for the RMBS securitization. The right column represents the RMBS security tranches collateralized by those mortgages. The Subprime RMBS BBB tranche is a thin slice of risk, with little subordinate protection

The left column represents the collateral pool underlying a Mezzanine CDO securitization. Approximately 75% of the assets are triple-B rated tranches of nonprime RMBS securitizations. The right column represents the tranched CDO securities issued on the basis of those assets. Subprime BBB tranche risk is highly concentrated in the Mezzanine CDO. Correlated BBB defaults endanger CDO notes at all levels…

… translating, via 35% asset concentration in other junior tranches of *other* CDOs, into High Grade CDO risk at all levels.

480.   It was for this reason that Citigroup's "High Grade" CDOs fared almost as poorly as its Mezzanine CDOs.  Citigroup wrote the former down by 72% and the latter by 84%. Bonifacius was recently liquidated, as were Pinnacle Peak, Jupiter High Grade VII, HSPI Diversified I, and Armitage.  These CDOs amounted to $9 billion of Citigroup's entire $13 billion issuance of High Grade CDOs.  Of Citigroup's few High Grade CDOs to still survive, all have experienced EOD (event of default), and Singa Funding, Palmer, and HSPI Diversified II are now in the "acceleration" phase in which payments are only being made to the holder of the super senior tranche.

### 3.   The Continuation and Culmination of the Ponzi Scheme: Citigroup's Falsely Hedged CDOs

481.   Citigroup's "Hedged CDOs" were detailed above (Section I.B.5, *supra*).  To recap:  in a burst of CDO securitizations between February 2007 and June 2007, Citigroup departed from its prior practice by hedging the risk presented by the resulting, retained super senior tranches. The Hedged CDOs were united (1) by their timing (February 2007 - June 2007) and (2) their sizeable collateralization in the form of junior tranches from *other* subprime CDOs.  Three of these CDOs – the $1 billion Class V Funding III, the $1 billion 888 Tactical Fund, and the $2.0 billion Class V Funding IV – were *each 100% backed by junior  tranches of other Mezzanine CDOs*.  Citigroup's last Hedged CDO – the massive $3 billion Ridgeway Court Funding II – was 34% backed by other CDO tranches (including, as detailed below, junior tranches from the Class V Funding and 888 Tactical Fund CDOs), meaning it swallowed *another* $1 billion in junior tranches from other CDOs.

482.   These Hedged CDO transactions marked Citigroup's concession of "endgame" and a wrap-up of Citigroup's unsustainable ponzi scheme.  Each time Citigroup created a new CDO to purchase the unsold detritus of Citigroup's prior CDOs, it created a new set of

unsellable securities.  Citigroup's February 2007 - June 2007 Hedged CDOs brought an end to this cycle through one last, large attempt to "clean out the warehouse".  In this series of Hedged CDO transactions, Citigroup was conceding (1) that the underlying assets ($5 billion of junior CDO tranches) were worthless, and (2) that the resulting new securities were also worthless.  The key was that, via these CDO resecuritizations, the largest portion of the resulting new securities – the super senior – would not appear to burden Citigroup, but rather the Monolines to whom Citigroup had swapped off the risk.  By these Hedged CDO transactions Citigroup sought to cut impending losses (from 100%) by unburdening itself, at the least, of the resulting large super senior tranches (representing 50%-70% of the securitizations).

483.    But Citigroup's purported hedges were appearance rather than substance.  In fact, precisely by foisting billions of dollars of certain losses on its hedge counterparties, Citigroup had degraded the ability of those counterparties to provide the insurance Citigroup claimed to have obtained.

> **a.    Case Study 4: The Ponzi Scheme Continues in and Culminates With the Hedged CDOs**

484.    Even with respect to its "endgame" Hedged CDOs, Citigroup sought to remove the unsold junior tranche detritus of these new CDOs by, as usual, selling them to other Citigroup-arranged CDOs.

485.    For example, in the February 2007 $1 billion 888 Tactical Fund CDO: (1) Citigroup had hedged away $500 million in super senior risk; (2) leaving Citigroup with approximately $500 million of junior tranche exposure; (3) *at least $127 million of which Citigroup then sold off to seven other Citigroup-arranged CDOs* (specifically – Armitage, Ridgeway Court

Funding I, Ridgeway Court Funding II, Pinnacle Peak, Class V Funding III, Adams Square II and Octonion).

486.    As a result of such ponzi scheme operations, the maze of cross-collateralization within Citigroup's CDOs became literally mind-boggling.  For example, one of 888 Tactical Fund's holdings was tranches from the simultaneously-issued February 2007 Class V Funding III.  But one of Class V Funding III's holdings was tranches from 888 Tactical Fund.  The result is the sort of infinite recursion produced by a hall of mirrors: 888 Tactical Fund was collateralized by Class V Funding III, which itself was collateralized by 888 Tactical Fund, which as already stated was collateralized by Class V Funding III.

487.    This "hall of mirrors" effect was everywhere.  For example, 888 Tactical Fund was collateralized in part by tranches from the Armitage CDO, while the Armitage CDO itself was collateralized by tranches from 888 Tactical Fund.  The same was true for 888 Tactical Fund and Ridgeway Court Funding I – each was collateralized by tranches from the other.

488.    Citigroup's last Hedged CDO – the $3 billion Ridgeway Court Funding II – proved of assistance in this regard. 34% of Ridgeway Court Funding II was composed of other CDO tranches – and given its $3 billion size, this means it swallowed *another* $1 billion in junior tranches from other CDOs.  Among the CDO tranches to be found as Ridgeway Court Funding II assets are – not surprisingly –  tranches from multiple CDOs previously underwritten by Citigroup, including: (1)   888 Tactical Fund (itself 100% backed by other CDO tranches); (2) Pinnacle Peak (itself collateralized *inter alia* by junior tranches of 888 Tactical Fund); (3) Octonion  (likewise, itself collateralized *inter alia* by junior tranches of 888 Tactical Fund); (4) Lacerta; and (5) Jackson. Indeed, 41% of Ridgeway Court Funding II's $3 billion of collateral consisted of Citigroup-

underwritten RMBS and CDOs.  Put plainly, Citigroup "dumped" a further $1.2 billion of unsellable and imminently worthless subprime assets in Ridgeway Court Funding II – and subsequently offloaded the largest portion of the resulting CDO risk (the $2 billion super senior tranche).

> **b.**  **Citigroup's False Claim to Have Obtained Insurance Against Loss Via its Hedged CDO Transactions**

489.    Though Citigroup had signed contracts transferring billions of dollars of risk to AMBAC, that did *not* mean those risks were actually transferred, and Citigroup knew or should have known that its counterparty could not implement insurance  The viability of Citigroup's $7-$9 billion of "hedges" through AMBAC was only as good as AMBAC's ability to pay.  It had long been evident AMBAC did not have that ability.  No later than May 2007 analysts were concluding that Monolines, AMBAC included, would be bankrupted by their CDO-related claims.

490.    Citigroup's initial disclosures of its subprime super senior exposures were therefor understated and misleading.  In November 2007, Citigroup referred only to a net position of $43 billion of super seniors.  Only in January 2008 did Citigroup admit to holding $10.5 billion *more* of such instruments whose risks, purportedly, had been "hedged" away.  Most of these hedges were with AMBAC; most of the remainder with other monolines in exactly the same position as AMBAC. These hedges were simply not worth what Citigroup said they were worth.  Belatedly, Citigroup began to write down the value of its hedges: by $0.9 billion in January 2008, a further $1.5 billion in April 2008, and a further $2.4 billion in July 2008.

491.    On August 1, 2008, AMBAC announced that it had reached a settlement with Citigroup to terminate the $1.4 billion Hedged CDO transaction identified herein as Class V Funding IV (referred to by AMBAC as "AA-Bespoke" and by Citigroup as a "Trading Instrument -

223

Subprime").  AMBAC agreed to pay Citigroup $850 million in exchange for tearing up the credit default swap that had transferred $1.4 billion of certain loss from Citigroup to AMBAC.  As AMBAC's chief executive officer explained in an August 1, 2008 statement issued by AMBAC concerning the settlement, "We view the final outcome as favorable in light of the numerous widely circulated models that assumed a 100 percent write off for this transaction".

492.    On November 19, 2008, AMBAC announced that it had reached a $1 billion settlement to terminate a further $3.5 billion of insurance on four "hedged" CDOs, which AMBAC described as two High Grade CDOs and "two CDO-squared transactions originally comprised collateral consisting of A-rated CDO of ABS tranches".  These latter two CDO-squared transactions were, as plaintiffs' prior allegations make clear (Section I.B.5, *supra*), none other than Citigroup's 888 Tactical Fund and Class V Funding III.  As AMBAC stated on November 19, 2008:

> "We have now successfully commuted five CDO transactions representing $4.9 billion of notional exposure **including three of the CDO-squared transactions that had been widely perceived to be the riskiest segment of our CDO portfolio**."

**B.     Controls**

493.    Citigroup's class period SEC filings made numerous representations as to Citigroup's controls and risk management, and specifically to Citigroup's management of "operational" risk, credit risk and market risk.  With respect to CDOs, as detailed below, these representations were operatively misleading.  Citigroup's risk management was effectively not operational, Citigroup risk management performed no credit risk analysis of its CDO positions (despite the fact that they were credit instruments), and Citigroup's market risk analysis was so superficial and deeply flawed as to fail to register that these securities posed any risk at all.

494.     In the wake of Citigroup's CDO disaster, one of Citigroup's regulators, the Federal Reserve, presented Citigroup with a "scathing" review of its risk management.[30]  Citigroup presented itself with a similar review: Citigroup CEO Prince resigned; Citigroup CAO Kaden, whose brief included oversight of risk management, was relieved of operational duties; Citigroup Chief Risk Officer Bushnell resigned "effective immediately"; Citigroup head of investment banking Maheras resigned after his lieutenant, Randy Barker, in charge of fixed income trading, was fired; and Citigroup's most senior CDO executives were fired, joined later by thirty further CDO bankers. New management subsequently, and thoroughly, overhauled risk management as one of their first priorities.  Finally, a risk management report issued by an international regulatory consortium including the Federal Reserve and the SEC identified certain deficient risk management practices, all of which, as detailed herein, Citigroup had employed.[31]

495.     Defendants Prince, Rubin and Maheras had orchestrated Citigroup's plunge into CDOs during 2005, as further detailed in the scienter/motive sections of this complaint, in order to generate the appearance of revenue growth.  They explicitly relaxed extant risk limits and authorized Citigroup to take on more risk:

> Maheras is now global head of capital markets… Prince is counting on him and his colleagues at the company's corporate and investment bank to come to the rescue again and help restore the pace of 10 % plus annual profit growth that Citigroup produced in the Weill era. ... Today, Prince finds himself under pressure to improve Citigroup's profit and stock price.  Citigroup shares have climbed 8.5% since he took over in October 2003, compared with gains of 33% for rival

---

[30]     New York Times, *Citigroup Saw No Red Flags Even as It Made Bolder Bets*, November 22, 2008.

[31]     *See* Senior Supervisors Group, *Observations on Risk Management Practices During the Recent Market Turbulence*, March 6, 2008.

JPM and 32% for BofA...

**Investors want more evidence that Prince's strategy of pursuing organic growth is working… "… I do think their board will come under pressure if we don't see a noticeable increase in their revenue growth" says Marshall Front… Lifting revenue, at least in capital markets, sometimes means taking more chances. That's where Maheras comes in.**..

The biggest part of Maheras's empire remains fixed income trading. **Last year, he and Rubin sought Prince's support for a new investment plan for the fixed income department.  The CEO agreed, and the three executives, along with Barker and Coley, developed a strategy to ramp up Citigroup's trading in newer markets such as credit derivatives**... **One business in which Citigroup has sought to expand is the trading of credit derivatives and structured products, or securities derived from bonds, mortgages or other debt.**  The market for one type of those instruments, credit default swaps, has expanded eightfold to $17 trillion since 2002.  Citigroup still trails banks such as JP Morgan and DB in trading those derivatives… **Maheras hired DB's Michael Raynes earlier this year to run the structured credit unit and improve its position**...

(Bloomberg, *Maheras, Citigroup's High Roller, Sheds Caution in Profit Quest*, September 5, 2006)

496.     Simultaneously, Citigroup misrepresented the degree to which it was incurring risk in order to generate these revenues.  For example, in the above-quoted September 2006 Bloomberg profile of Maheras and Citigroup's expansion into CDOs and structured credit, Defendant Maheras represented: (1) that Citigroup was not risking its own capital in proprietary trading in these areas; and (2) that Citigroup had adopted a careful stance in current markets:

Making more of the bank's capital available to its clients is the kind of risk Maheras and Prince are convinced is necessary.  **<u>Citigroup, he notes, is still not in the business of risking capital on the kind of proprietary trading for which Salomon was known</u>**...
*****
**Maheras says that right now there's good reason to be careful**.

226

"Firms just haven't been through any significant volatility since the summer of 1998. Memories are short, and **the next time you see real dislocation in the markets, the volatility in these trading businesses will be revealed again**"...

(Bloomberg, *Maheras, Citigroup's High Roller, Sheds Caution in Profit Quest*, September 5, 2006)

497. Neither of these representations were true. In fact: (1) Citigroup was risking staggering amounts of its own capital, and ultimately approximately $57 billion, by purchasing the great majority of the subprime CDOs that it underwrote; and (2) Citigroup was not adopting a careful stance, but rather charging full-speed ahead – while leaving risk management functions behind– so as to generate more subprime CDOs, more subprime CDO underwriting fees, and the sort of revenue growth upon which defendants were under substantial pressure to demonstrate.

## 1. Operational Risk: Defendants Misrepresent the Independence and Rigor of Citigroup's Risk Management and Control Functions

498. Citigroup represented at all times that risk management functioned in an independent manner. But in practice, Citigroup's risk management controls with respect to CDOs had effectively abdicated any actual independent control of risk management. This abdication of independence occurred at multiple levels.

499. First, as a very practical matter, the structural organization of risk management within Citigroup did not promote risk management independence from trading, but rather the opposite:

> Yet as the bank's C.D.O. machine accelerated, its risk controls fell further behind, according to former Citigroup traders, and risk managers lacked clear lines of reporting. At one point, for instance, risk managers in the fixed-income division reported to both Mr. Maheras and Mr. Bushnell — setting up a potential conflict because that gave Mr. Maheras influence over employees who were supposed

227

to keep an eye on his traders.

(New York Times, *The Reckoning: Citigroup Saw No Red Flags
Even as It Made Bolder Bets*, November 23, 2008)

500.    Second, as an even more practical matter, the informal organization of risk
management within Citigroup acted further to diminish risk management independence.  Rather than
regulate Mr Barker, who headed Citigroup's fixed income trading, Defendant Bushnell, Citigroup's
Senior Risk Officer (until his "effective immediately" "resignation" in November 2007), was at the
effective command of Mr Barker.  Mr Barker, Citigroup insiders reported, could push approvals
through and over risk management:

> One of Mr. Maheras's trusted deputies, Randolph H. Barker, helped
> oversee the huge build-up in mortgage-related securities at Citigroup.
> But Mr. Bushnell, Mr. Maheras and Mr. Barker were all old friends,
> having climbed the bank's corporate ladder together. It was common
> in the bank to see Mr. Bushnell waiting patiently — sometimes as
> long as 45 minutes — outside Mr. Barker's office so he could drive
> him home to Short Hills, N.J., where both of their families lived. The
> two men took occasional fly-fishing trips together; one expedition left
> them stuck on a lake after their boat ran out of gas.
>
> Because Mr. Bushnell had to monitor traders working for Mr.
> Barker's bond desk, their friendship raised eyebrows inside the
> company among those concerned about its controls.
>
> . . . . But insufficient boundaries were established in the bank's
> fixed-income unit to limit potential conflicts of interest involving Mr.
> Bushnell and Mr. Barker, people inside the bank say.
>
> Indeed, **some at Citigroup say that if traders or bankers wanted
> to complete a potentially profitable deal, they could sometimes
> rely on Mr. Barker to convince Mr. Bushnell that it was a risk
> worth taking**.
>
> **Risk management "has to be independent, and it wasn't
> independent at Citigroup, at least when it came to fixed income,"
> said one former executive in Mr. Barker's group who, like many**

228

other people interviewed for this article, insisted on anonymity because of pending litigation against the bank or to retain close ties to their colleagues. "We used to say that if we wanted to get a deal done, we needed to convince Randy first because he could get it through."

(New York Times, *The Reckoning: Citigroup Saw No Red Flags Even as It Made Bolder Bets*, November 23, 2008)

501.    There are certain home truths here.  Among the more prominent, that a position exceeding $50 billion of subprime CDOs did not go unnoticed by risk management.  That such a position could be amassed was not due to the blindness of risk management, but to the failure to heed risk management and/or the over-riding of risk management:

Whatever the limitations of the risk models and systems, these were not the culprits in the case of the multi-billion dollar write-downs over the past year. **These positions were patently visible; no models or detective work were needed. Furthermore, it was clear that the inventory was not liquid and that its market value was uncertain. So I do not believe the failure was from inadequacies in the risk management systems themselves**.

Indeed, what occurred leaves me scratching my head; it is hard to understand how this risk was missed. How can a risk manager see inventory grow from a few billion to ten billion and then to thirty or forty billion and not react by forcing that inventory to be brought down? I can only surmise where the failure occurred: **my view is that it was a failure of management. The risk managers did not have the courage of their conviction to insist on the reduction of this inventory, or the senior management was not willing to heed their demands.**

(Senate Banking, Housing and Urban Affairs Subcommittee on Securities, Insurance and Investment, *Testimony of Richard Bookstaber*, June 19, 2008)[32]

---

[32]    Mr Bookstaber worked extensively in risk management: during the 1990s, Mr Bookstaber was in charge of market risk at Morgan Stanley and later oversaw firm-wide risk at Salomon Brothers and Citigroup.  Mr Bookstaber subsequently oversaw risk for buy-side firms including Moore Capital Management and Ziff Brothers Investments.

502.    From the top down, risk management was dysfunctional.  Defendant Prince's understanding of CDOs was limited to the revenues they generated.  Defendant Kaden, ostensibly with oversight over risk management, had no financial/operational training or experience.  Defendant Rubin, who did have such financial and operational expertise, made it a condition of his employment *not* to involve himself in operational matters.  Defendant Bushnell was managed by Citigroup's traders, rather than vice versa.  Defendant Maheras was benefitting so lavishly from CDO operations, with salary and bonuses approximating $30 million, that he was loathe to scale them down, even as CDOs became increasingly unsellable.

503.    Third and most importantly, Citigroup's risk management abdicated independence by conducting CDO risk and valuation assessments in a simplistic manner that was utterly dependent on the credit ratings the CDOs bore.  Citigroup's valuation practices are discussed at length in the "Disclosures" section below.  To summarize: Citigroup relied on the credit rating agencies' triple-A ratings to value its CDO super seniors at par throughout the first nine months of 2007, even as: (1) market consensus solidified no later than March 2007 that super senior tranches were materially impaired, and (2)  market indices expressing market valuations visibly showed these very securities to have lost one third of their value by June 2007 and (3) two thirds of their value by September 2007.

504.    Stunningly, Citigroup risk managers caught none of those declines.  Placing total and blind faith in the credit ratings assigned by the rating agencies, Citigroup's risk managers did not conduct any independent credit analysis to "look through" the rating these securities bore to the long-apparent credit risks of the underlying collateral.  They believed the risk presented by these triple-A securities was so remote that *they didn't even need to include them in risk analysis at all*:

C.D.O.'s were complex, and even experienced managers like Mr. Maheras and Mr. Barker underestimated the risks they posed, according to people with direct knowledge of Citigroup's business. Because of that, they put blind faith in the passing grades that major credit-rating agencies bestowed on the debt.

*****

Even as the first shock waves of the subprime mortgage crisis hit Bear Stearns in June 2007, Citigroup's top executives expressed few concerns about their bank's exposure to mortgage-linked securities.

In fact, when examiners from the Securities and Exchange Commission began scrutinizing Citigroup's subprime mortgage holdings after Bear Stearns's problems surfaced, **the bank told them that the probability of those mortgages defaulting was so tiny that they excluded them from their risk analysis,** according to a person briefed on the discussion who would speak only without being named.

Later that summer, when the credit markets began seizing up and values of various C.D.O.'s began to plummet, Mr. Maheras, Mr. Barker and Mr. Bushnell participated in a meeting to review Citigroup's exposure.

**The slice of mortgage-related securities held by Citigroup was "viewed by the rating agencies to have an extremely low probability of default (less than .01%),"** according to Citigroup slides used at the meeting and reviewed by The New York Times.

(New York Times, *The Reckoning: Citigroup Saw No Red Flags Even as It Made Bolder Bets*, November 23, 2008)

### 2. Credit Risk and Market Risk: "We Had a Market-Risk Lens Looking at Those Products, Not the Credit-Risk Lens Looking at Those Products"

505.    CDOs are structured credit products: their value is a function of the credit performance of the underlying collateral. Here, that underlying collateral was primarily the already-tranched risks of pools of nonprime mortgages, namely, the mezzanine tranches of nonprime RMBS. As demonstrated above, credit analysis made clear to some during late 2006 – and constituted market

consensus no later than March 2007 – that nonprime mortgage defaults and losses would erase the value of these mezzanine RMBS tranches and, with them, the value of CDOs collateralized by such assets.  Citigroup's own credit strategists so acknowledged, in March 2007.

506.    The key word in the preceding paragraph is "credit".  Although CDOs were credit products subject to credit risks, and although the materialization of those credit risks was widely recognized by the beginning of 2007 (including recognition by Citigroup), Citigroup's risk management failed to apply any credit analysis to its CDO positions, and instead – as detailed herein and below – applied only a very simplistic "market risk" analysis.  As neatly summarized by Defendant Crittenden on October 16, 2007: "We had a market-risk lens looking at those products, not the credit-risk lens looking at those products" (New York Times, *Citigroup Acknowledges Poor Risk Management*, October 16, 2007).

507.    Citigroup held its CDOs (undisclosed) in its "trading book".  Citigroup's credit analysis focused solely on its "banking book" – i.e., the loans and mortgages it held in its loan portfolios.  Citigroup's banking book risk management had long been cognizant of subprime risks, as Defendant Prince informed on January 31, 2007 and April 16, 2007:

> Over the last couple of years **we've not relaxed our FICO scores or our LTV standards. We've held those standards up. It costs us revenue over the last couple of years, but I think the positive payback for that is coming. We do not have -- we've never written any of the riskier products like option ARMs and interest only. It's not that we wrote it and dumped it on some poor soul, we didn't write it.** And as I said, as we look at our competitors, we feel as we go into the credit part of the cycle that we're -- knock wood -- feeling a little better, again cautiously, cautiously but a little better.
>
> (Citigroup Financial Services Conference, Transcript, January 31, 2007)

*****

**I feel good about the composition of our portfolios**, not only in the corporate and sovereign area, but **especially in the U.S. mortgage area where we have avoided the riskier products at some cost to revenues in prior years and I think we are seeing that play out in the results we have on the credit side... I assure you that we remain very diligent in managing our credit exposures**.

(Citigroup Conference Call, Transcript, April 16, 2007)

508.    However, the very mortgages that Defendant Prince insisted Citigroup had avoided in its banking book due to credit concerns – the "riskier products like option ARMs and interest only", the "relaxed [] FICO scores [and] LTV standards" – were the collateral for $57 billion of subprime CDOs that Citigroup amassed, undisclosed, in its trading book.

509.    Thus, Citigroup's risk management was operationally "silo-ized", or divided into different "silos" between which information was not shared.  The Senior Supervisors Group noted this risk management silo-ization as a significant failure:

> Firms that understood quickly the kinds and scale of risks they faced and that generally avoided significant losses through year-end 2007 relied on information from many parts of their businesses and communicated that information both up to senior management and across businesses.
>
> In contrast, the existence of organizational "silos" in the structures of some firms appeared to be detrimental to the firms' performance during the turmoil. Silos tended to compartmentalize information: in some cases, information gathered by one business line was not shared with other business lines where the information would have been useful. This inadvertent diversion or withholding of key information left different business areas to make decisions in isolation and in ignorance of other areas' insights. For example, although some business line managers recognized that underwriting standards for some products were loosening, other business line managers did not; instead, they continued to add to the firms' warehouses assets whose credit quality was likely deteriorating.

***** 

Senior managers at firms that experienced more significant unexpected losses tolerated a more segregated approach to internal communications about risk management. This behavior may have contributed to the lack of awareness among managers of the risks they faced and the resulting losses. Several firms that were challenged by market events acknowledged the need to improve their integration of credit and market risk management with accounting and financial control functions. Some firms lacked an effective forum in which senior business managers and risk managers could meet to discuss emerging issues frequently; some lacked even the commitment to open such dialogue.

(Senior Supervisors Group, *Observations on Risk Management Practices During the Recent Market Turbulence*, March 6, 2008, p. 9)

510.    Because of such silo-ization, rather than being "diligent in managing our credit exposures", Citigroup risk management was turning a blind eye to in excess of $50 billion of those very credit exposures in Citigroup's trading book.  There, Citigroup applied a simplistic "market risk" analysis that viewed CDO price risks as a function of changes in interest rates rather than as a function of their underlying collateral.  As Defendant Crittenden explained during Citigroup's October 15, 2007 conference call:

CRITTENDEN: ... there is no question that we underperformed certain competitors even considering turbulent market conditions. We must examine the situation, learn lessons from it, and make changes.

To give you a sense of some of the things we are working on, first, we have reorganized credit trading and have changed the leadership of this business... Fourth, **we are examining our risk management organization to enhance particular areas such as convergence risk management and the management of aggregate exposures by asset class**.

*****

JEFF HARTE: ... How able are you to aggregate things like credit

234

risk and even interest rate risk kind of across the franchise?

GARY CRITTENDEN: Yes, it is actually more a question of how we think about things, I think. So let me just give you a quick example. So **we have had a process over the last couple of years that has kept our growth in subprime mortgages on the consumer side in check** basically. That has not expanded very much. If you look at our mortgage trading results in the second quarter, although we didn't split that out as a separate category, they were actually okay during the course of the quarter. In part that was because **our credit risk team were very focused on the exposures in both of those categories**.

**The CDOs in large measure were managed by our market risk teams; and they were very concerned about the change in interest rates as it would affect the valuation on the CDO warehouse. The cross-pollenization between the credit risk team and the market risk team was not as strong as it needed to be.**

(Citigroup, Conference Call, October 15, 2007)

511.    As Defendant Crittenden correctly stated on October 15, 2007, subprime credit risks had long been "apparent" and had been heeded in Citigroup's Consumer mortgage division.  Incredibly, news of such risks – which had been every day headline news since February 2007 – did not travel to Citigroup's "trading book" risk management.  Defendant Crittenden's remark that these risks "historically have not been relevant for another area" (meaning, in context, CDOs backed by subprime collateral) was incorrect.  The reality is opposite: CDOs backed by subprime mortgages were fundamentally dependent on credit risk posed by those subprime mortgages.

512.    A primary measure of risk that Citigroup and other like firms use to assess (and report) their "trading book" risk is value at risk, or "VAR".  However, Citigroup's VAR was contaminated by fundamental mis-measurement of both value and risk.  As only became clear after

Citigroup so admitted in numerous ways between October 2007 and April 2008, Citigroup had been assessing both the risk and value of its CDOs through simple and superficial reliance on the credit ratings these instruments bore, while failing to "look through" to the underlying nonprime collateral. The essence: Citigroup's risk management and Citigroup valuations viewed its CDOs as rock-solid triple-A assets, rather than as subprime assets. Thus, it remained blind to the subprime risks that had long been apparent; indeed, to risks that credit-focused divisions of Citigroup had long heeded.

513.    The flaws in Citigroup's CDO valuations are detailed in the "Disclosures" sections below. To summarize here: valuation proceeded in a simple two-step process. First, Citigroup based its fundamental valuation on the credit rating of the security; and second, Citigroup applied a "discount" rate, purportedly to reflect market prices of similar securities bearing similar credit ratings.

514.    Both steps were without basis – indeed, each violated Citigroup's own statements concerning CDO valuation –  and resulted in materially  misleading, inaccurate and overstated valuations. How?

515.    First, CDO credit ratings were, no later than March 2007, recognized to be demonstrably illegitimate. By then it was clear, based on simple and fundamental credit analysis, that nonprime mortgage defaults and losses would rise far higher into the mezzanine RMBS tranches than initially projected, and in so doing leap throughout the CDOs collateralized almost entirely by those RMBS tranches. Efficient market consensus, synthesizing this fundamental data, resulted no later than February 2007 in plummeting RMBS tranche prices and CDO tranche prices – and in the ABX and TABX indexes tracking those prices – and by March 2007 super senior tranche prices were already significantly impaired. But RMBS and CDO credit ratings had yet to budge. That the credit

236

ratings had remained at their high levels, despite all data indicating that the ratings no longer conveyed the risk, was itself becoming a public scandal – and later occasioned at least four rounds of Congressional hearings on the rating agencies' conduct.  A sense of the outrage over these instruments' credit ratings during the period at issue emerges clearly in the below excerpt from a conference call held by Standard & Poors on July 10, 2007, to explain their first large wave of credit rating downgrades on RMBS tranches:

> (Steven Eisman): Yeah, hi. **I'd like to know why now. I mean, the news has been out on subprime now for many, many months. The delinquencies have been a disaster now for many, many months. (Your) ratings have been called into question now for many, many months. I'd like to understand why you're making this move today when you - and why didn't you do this many, many months ago**.
>
> (Tom Warrack): Yes, it's a good question. It takes a period of time for these deals to begin to show their true performance. We have been surveiling these transactions a regular basis beginning in 2005 and 2006. We believe that the performance that we've been able to observe now warrants action. And that…
>
> (Steven Eisman): If I may press that for a moment, I mean, **I track this market every single day.  The performance has been a disaster now for several months. I mean, it can't be that all of a sudden, the performance has reached a level where you've woken up.  I'd like to understand why now when you could've made this move many, many months ago. I mean, the paper just deteriorates every single month like clockwork. I mean, you need to have a better answer than the one you just gave**.
>
> (Tom Warrick): So our answer remains that we took action as soon as possible given the information at hand. And…
>
> (Steven Eisman): **So you think that only up till now with the credit where it is today that you feel capable making this rating change? That you could not have done this a couple of months ago when - given the performance and where it was**. Is that what you're saying?

237

(Tom Warrack): What we're saying is we felt at this time there was an appropriate level of seasoning where the actual performance showed itself as opposed to speculating where the performance would go, which caused us to take action at this time.

(Steven Eisman): So **you think two or three months ago, the delinquency levels on the '06 paper was merely speculative? Is that what you're saying?**

Ernestine Warner: Well, we were trying to look at the delinquency rates in conjunction with the EPD dynamics and determining how many of those delinquencies would be sustainable on a future basis as opposed to being worked through on…

(Steven Eisman): I press my point again. **Are you saying that two, three months ago, you couldn't make - you didn't see enough information to make this move when the rest of the world was yelling and screaming about your ratings?**

(Standard & Poors, Conference Call Transcript, July 10, 2007)

516.    As the Senior Supervisors Report on risk management concluded:

In particular, the **firms did not consider that the positions might be of poorer credit quality than the external rating indicated and that even senior tranches could lose considerable market value if the underlying collateral suffered losses** (or was downgraded) or if market liquidity receded for these products.  Such firms typically sustained significant losses because they retained the super senior position of CDOs backed by subprime mortgages or other similar assets and treated them as "par assets

(Senior Supervisors Group, *Observations on Risk Management Practices During the Recent Turbulence*, March 6, 2008, at p. 5)

517.    Over and above the fact that the credit ratings these instruments bore in early 2007 were widely recognized, at the time, to be illegitimate, *Citigroup itself had long stated that reliance on credit ratings for valuation was illegitimate*.  In the prospectus of every CDO it underwrote during late 2006 and 2007, Citigroup warned CDO investors – the largest of whom was

238

Citigroup itself – *not* rely on credit ratings for valuation.  Among the reasons Citigroup so warned, as Citigroup explicitly stated in each CDO prospectus, were that credit ratings did not speak to market valuation risks and that credit rating agency ratings were often untimely/outdated:

> Credit Ratings... Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value, therefore, they may not fully reflect the true risks of an investment. Also, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates...

> (Armitage ABS CDO prospectus, p. 21, April 12, 2007)

518.    Second, the "discount rate" Citigroup applied to its CDOs was likewise without basis.  The discount rate that Citigroup used was derived from market prices for different securities, CLOs, backed by different assets, corporate loans.  These securities and their backing assets were of far greater credit quality than CDOs and their subprime mortgage assets – and, for that very reason, traded at substantially higher market prices. Indeed, Citigroup itself had stated, in a February 15, 2006 Citigroup publication titled *A General Review of CDO Valuation Methods*, that this exact  "apples to oranges" valuation method – using CLOs to value CDOs – was illegitimate. Simultaneously, Citigroup turned a blind eye to an extant, directly relevant "apples to apples" discount rate – that provided by the TABX and ABX indexes, which tracked the market discounts for the very securities and assets (CDOs and subprime RMBS) that Citigroup was valuing.

519.    In sum, Citigroup was relying for valuation on what Citigroup itself warned was unreliable, using methods Citigroup itself decried as illegitimate, and ignoring all the while directly relevant and directly observable information (such as the ABX and TABX indexes) that evidenced the substantial deterioration in the value of these instruments.

520.     By tying valuation to no longer valid credit ratings and to apples-to-oranges security comparisons, the real, evident and ongoing declines in the value of these securities failed to register within Citigroup and failed to ring risk management alarm bells.  This is perhaps nowhere better demonstrated than in Defendant Crittenden's November 5, 2007 representations that the decline in the value of Citigroup's super seniors had occurred entirely during October 2007 and as a result of credit rating downgrades:

> CRITTENDEN: ...Our exposure to high end investment grade securities which we believe had very little risk associated with them had historically held up in value and hence they were termed super senior and we did not consider this to be a significant risk for markdowns. The $43 billion that we disclosed yesterday falls into this super senior category.
>
> *****
>
> **Now once the October downgrades occurred**, the value of the junior tranches were driven down to very low levels. And as you all know, this increased the likelihood or the riskiness of the senior tranches as the subordination below them eroded. And **this drove down the value then of the super senior tranches as well, something that had not occurred during the course of the first nine months of the year**.

(Citigroup, Conference Call, November 5, 2007)

521.     Defendant Crittenden's statement that the decline in the value of the super senior tranches was "something that had not occurred during the course of the first nine months of the year" was false.  In truth, the value of CDO super seniors had been materially – and, by virtue of the ABX and TABX indexes, *visibly* – impaired by February 2007, was nearly half gone by June 2007, and had shrunk to only 33% of par by September 2007.  More precisely: the value of super seniors had been devastated during the first nine months of 2007, and it was only *Citigroup's valuation* of those super seniors – tied to credit ratings that were finally downgraded in October 2007

– that had not declined during that period.

### 3.     Stress Testing

522.     Citigroup represented in each of its class period SEC filings that it performed

"stress testing":

> Trading Portfolios
>
> Price risk in trading portfolios is monitored using a series of measures, including:
>
> > • factor sensitivities;
> > • Value-at-Risk (VAR); and
> > • stress testing.
> >
> > *****
>
> **Stress testing is performed on trading portfolios on a regular basis to estimate the impact of extreme market movements**. It is performed on both individual trading portfolios, as well as on aggregations of portfolios and businesses. Independent market risk management, in conjunction with the businesses, develops stress scenarios, reviews the output of periodic stress testing exercises, and **uses the information to make judgments as to the ongoing appropriateness of exposure levels and limits**.
>
> (Citigroup, Form 10-K, February 23, 2007, p. 73)

523.     This representation was materially misleading.  As demonstrated earlier, Citigroup had structured its CDOs so that they could only perform in boom scenarios.  Multiple analyses of Mezzanine CDOs, including Citigroup's own, all show that in order for  all tranches below the super senior to be wiped out and for the super senior itself to be substantially impaired, housing prices did not have to decline but just fail to appreciate.  The scenario in which housing prices merely fail to appreciate is not all that stressful, and yet it would suffice to erase most of the value of a Mezzanine CDO.

524.     Had Citigroup's "stress testing" conducted tests worthy of the name, it would

have revealed that Citigroup's CDOs were little more than a massive bet on continued house price appreciation.  In the absence of such appreciation, Citigroup's CDO losses would be in the tens of billions.

525.    As Scott Polakoff, Senior Deputy Director and Chief Operating Officer of the Office of Thrift Supervision testified to the Senate Subcommittee on Securities, Insurance and Investment:

> [T]he risk management frameworks in place at these firms [] were clearly inadequate for the key problems of identifying major imbalances as they built over time – as evidenced by the increasingly large bets at many of these organizations on continued house price appreciation.  The risk management frameworks also failed to consider an appropriate range of adverse outcomes, and of the impact of adverse scenarios related to the housing market, structured product valuations and performance... OTS has observed that the **events of the past year laid bare the inadequacy of stress testing at many financial institutions**.
>
> (Senate Subcommittee on Securities, Insurance and Investment, Testimony of Scott Polakoff, Senior Deputy Director and Chief Operating Officer of the Office of Thrift Supervision, June 19, 2008)

### 4.    Red Flags:  AIG, Concerned About Subprime and U.S. Housing Prices, Stops Insuring Super Senior Tranches of ABS CDOs in Early 2006

526.    Until early 2006, AIG – through a division named AIG Financial Products – was the world's largest repository of super senior CDO risk.  During the three years between 2003 and 2005, AIG took on approximately $100 billion of ABS CDO super senior tranche risk by acting as a protection seller in credit default swap transactions referencing those super senior tranches.  AIG was estimated to have a 50% share of the market for High Grade CDOs and 30%-40% of Mezzanine CDOs.  During the first quarter of 2006, AIG became concerned about trends in subprime mortgage lending and U.S. housing prices.  AIG exited this line of business and stopped writing any more

insurance for ABS CDOs.    AIG's unwillingness to take on further super senior risks was a prominent risk management "red flag", especially as it came from the insurance industry's leader in the assessment of those risks.

> **5.    Red Flags:  Citigroup's Failure to Sell Any of the Tens of Billions of Dollars of Super Senior CDO Tranches that it Produced During 2004-2007 Was a Risk Management "Red Flag"**

527.    Citigroup's in excess of $30 billion of subprime CDO losses stems from two separate factors: (a) the instruments themselves; and (b) Citigroup's *retention* of those instruments. As plaintiffs' investigation of Citigroup's subprime CDOs demonstrates, Citigroup's 2004-2007 subprime CDOs produced tens of billions of dollars of super senior tranches – and, effectively, Citigroup never sold (except with its money-back guarantees) a single one.  The essence of an underwriter's function is to sell the securities it underwrites.  Citigroup's inability/failure to accomplish any such sales was  an alarming but unheeded red flag as to the value and liquidity of these instruments.

528.    The difficulty in selling these super senior tranches was of Citigroup's own making: it had stripped yield from these super seniors in order to make the junior tranches more marketable.  These super seniors thus became, effectively, all risk and no reward.

529.    Though these super seniors were less marketable as a result, that did not mean that they could not be sold.  They could be sold – at prices the market was willing to bear.  That the "clearing price" of super seniors was lower than Citigroup desired was itself a strong signal concerning the risk of these instruments, which again went unheeded.

530.    In essence, the market was informing Citigroup that Citigroup was pricing these instruments too highly.  In the face of this market response to the products it underwrote,

Citigroup could either: (a) acknowledge market realities, and lower its super senior prices so as to actually be able to sell the products it underwrote, or (b) turn its back on market realities, and retain the instruments. This latter course amounted to Citigroup's insistence that super senior tranches were worth "X+1" when the market insisted super seniors were only worth "X".

531.     Citigroup, as only became clear in November 2007, had chosen the latter course and had retained in excess of $43 billion of subprime super seniors. But Citigroup had only amassed such a staggering sum of super seniors by ignoring what the market had been telling it for the past three years.

### 6.     Red Flags – The Risk/Reward Imbalance: In Order to Support Hundreds of Millions of Dollars of Annual Underwriting Fees, Citigroup Was Amassing Tens of Billions of Dollars of Subprime Risk

532.     Citigroup, in order to continue its lucrative CDO underwriting business, silently swallowed tens of billions of dollars of the super senior tranches that business produced. This fact alone suggests a substantial failure to balance risks and rewards. If an underwriting business involves failing to sell most of the products underwritten, that is in itself a strong message. If one continues and even accelerates this business of producing unsellable products, this suggests something stronger: losing sight of risk and focusing single-mindedly on reward.

533.     This particular focus was noticed by the Senior Supervisors Group:

> ... some firms' senior management was for more assertive than others' in encouraging the increased risk-taking. For example, firms that experienced material unexpected losses in relevant business lines typically appeared to have been under pressure over the short term either to expand the business aggressively, to a point beyond the capacity of the relevant control infrastructure...
>                          *****
> ... senior management at some other firms that recorded relatively larger unexpected losses tended to champion the expansion of risk

without commensurate focus on controls across the organization or at the business line level.  At these firms, senior management's drive to generate earnings was not accompanied by clear guidance on the tolerance for expanding exposures to risk.  For example, balance sheet limits may have been freely exceeded rather than serving as a constraint to business lines.  The focus on growth without an appropriate focus on controls resulted in a substantial accumulation of assets and contingent liquidity risk that was not well recognized.

(Senior Supervisors Group, *Observations on Risk Management Practices During the Recent Market Turbulence*, March 6, 2008)

**7.      Red Flags:  Citigroup's Commercial Paper CDO Scheme Was Premised on Citigroup's Willingness to Take On $25 Billion of Subprime Risk for Lower-Than-Market Payments for Such Risk**

534.      In underwriting $28 billion of Commercial Paper CDOs, Citigroup, as alleged in the "Schemes" section above, took on $25 billion of super senior risk for returns substantially lower than those otherwise demanded by the market.  This, in and of itself, reasonably implies Citigroup's awareness that its risks and returns were dangerously imbalanced.  Rather than arrange to pay external investors the fee they demanded to shoulder those risks (and thus, truly transfer the risks), Citigroup arranged to pay *itself* a lesser fee for retaining the risks.

**C.      Disclosures, Misrepresentations, Omissions**

**1.      Citigroup's Disclosures Were Materially False and Misleading, Omitted Material Information, Precluded Any Independent Assessment of Citigroup's Exposure to Potential Risks, and Precluded Understanding that Any Material Subprime CDO Risks Existed At All**

535.      In each of Citigroup's quarterly and annual SEC filings on Forms 10-Q and 10-K, Citi provided a rote set of disclosures with respect to CDOs. Those disclosures were materially misleading and omitted material information in the following ways.

536.      This conclusion is not plaintiffs' alone.  It is shared by the market and

245

Citigroup itself.

537.    Prior to Citigroup's expanded/improved disclosures beginning in November 2007, even those whose professional lives and expertise are devoted to close scrutiny of Citigroup's financial statements had absolutely no idea that Citigroup was exposed to any subprime CDO-related risk, let alone a staggering $55 billion of it.

538.    The public record conclusively so demonstrates.  Subprime was headline news since late 2006.  Analysts and the market focused on it, and Citigroup discussed the issue explicitly in early 2007 conference calls.  The focus was exclusively on Citigroup's exposure through its Consumer division's portfolio of mortgages.  In mid-2007, analysts also began to grow concerned about another potential concentration of risk within Citigroup – the credit risk stemming from Citigroup's portfolio of leveraged loans and leveraged loan commitments.  That analysts were concerned about Citigroup's exposure to subprime and credit risks, but *never mentioned Citigroup's exposure to subprime CDOs*, indicates that, along with everyone else outside Citigroup, they had no idea it was there.

539.    In conjunction with its expanded disclosures beginning in November 2007, Citigroup stated that the expansion was meant to provide investors with

> meaningful... data for an independent assessment of the potential
> risks of the Company's involvement in various [CDOs] and asset
> classes.  (Citigroup 2007 Form 10-K, filed February 22, 2008)

540.    It was precisely such "meaningful" data that was previously lacking; with the result being – exactly – that no "independent assessment of the potential risks" was possible.

a.   **What Citigroup Said Throughout the Class Period Until November 4, 2007**

541.   Plaintiffs have reviewed all of the CDO-related disclosures in all of Citigroup's class period SEC filings.  Those disclosures were rote and standardized:  the language changes little, the substance not at all.  Meanwhile, in excess of $50 billion of undisclosed Citigroup assets were degrading in a manner that put the entire entity at risk.  Rather than detail those disclosures, filing by filing, from 2004 to 2007, plaintiffs present below those made in one SEC filing – Citigroup's Form 10-Q filed August 3, 2007.[33]  This filing was made relatively late in the class period, and well after the risks of subprime were headline news.  One might expect an SEC filing at such date to disclose any material exposures to such material risks.

542.   Each of Citigroup's class period SEC filings made mention of CDOs in two places: first, in a section titled "Off-Balance Sheet Arrangements"; second, in a footnote to the financial statements titled "Securitizations and Variable Interest Entities."

543.   Citigroup's CDO-related disclosures in the "Off Balance Sheet Arrangements" section of its August 3, 2007 Form 10-Q stated:

OFF-BALANCE SHEET ARRANGEMENTS

Overview

Citigroup and its subsidiaries are involved with several types of off-balance sheet arrangements, including special purpose entities (SPEs), lines and letters of credit, and loan commitments.

---

[33]   Substantively identical disclosures were made in, and were false and misleading in: (1) Citigroup's Forms 10-Q filed with the SEC on May 5, 2004; August 4, 2004; November 4, 2004; May 4, 2005; August 4, 2005; November 4, 2005; May 5, 2006; August 4, 2006; November 3, 2006; and May 4, 2007; and (2) Citigroup's Forms 10-K filed with the SEC on February 28, 2005; February 24, 2006; and February 23, 2007.

The securitization process enhances the liquidity of the financial markets, may spread credit risk among several market participants, and makes new funds available to extend credit to consumers and commercial entities.

* * *

**Mortgages and Other Assets**

The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, **securitizing these assets also reduces the Company's credit exposure to the borrowers**. In addition to servicing rights, the Company also retains a residual interest in its student loan and other asset securitizations, consisting of securities and interest-only strips that arise from the calculation of gain or loss at the time assets are sold to the SPE. The Company recognized gains related to the securitization of mortgages and other assets of $144 million and $96 million in the second quarters of 2007 and 2006, respectively, and $189 million and $148 million in the first six months of 2007 and 2006, respectively.

Securitization of Client Assets

The Company acts as an intermediary for its corporate clients, assisting them in obtaining liquidity by selling their trade receivables or other financial assets to an SPE. In addition, Citigroup administers several third-party-owned, special purpose, multi-seller finance companies that purchase pools of trade receivables, credit card receivables, and other financial assets from its clients. At June 30, 2007 and December 31, 2006, total combined assets and liabilities in the unconsolidated conduits were $77 billion and $66 billion, respectively.

**Creation of Other Investment and Financing Products**

**The Company packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage collateralized debt obligations (CDOs) and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. Typically these instruments diversify investors' risk to a pool of**

248

**assets as compared with investments in individual assets**.

See Note 13 on page 63 for additional information about off-balance sheet arrangements.

(Form 10-Q, August 3, 2007, p. 42)

544.    The footnote referred to in the "Off Balance Sheet Arrangements" section is the footnote to the financial statements identified by plaintiffs as the other repository of CDO-related disclosures.   That footnote (e.g. – "See Note 13 on page 63 for additional information about off-balance sheet arrangements") was titled  "Securitizations and Variable Interest Entities".

545.    Citigroup's CDO-related disclosures in the "Securitizations and Variable Interest Entities" section of its August 3, 2007 Form 10-Q stated:

**b.        Securitizations and Variable Interest Entities**

The Company primarily securitizes credit card receivables and mortgages. Other types of assets securitized include corporate debt securities, auto loans, and student loans.

* * *

**The Company provides a wide range of mortgage and other loan products to a diverse customer base**. In connection with the securitization of these loans, the servicing rights entitle the Company to a future stream of cash flows based on the outstanding principal balances of the loans and the contractual servicing fee. Failure to service the loans in accordance with contractual requirements may lead to a termination of the servicing rights and the loss of future servicing fees. In non-recourse servicing, the principal credit risk to the Company is the cost of temporary advances of funds. In recourse servicing, the servicer agrees to share credit risk with the owner of the mortgage loans such as FNMA or FHLMC or with a private investor, insurer, or guarantor. Losses on recourse servicing occur primarily when foreclosure sale proceeds of the property underlying a defaulted mortgage are less than the outstanding principal balance and accrued interest of the loan and the cost of holding and disposing of the underlying property. **The Company's mortgage loan securitizations**

249

**are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchaser of the securities issued by the trust**.

\* \* \*

Variable Interest Entities

The following table represents the carrying amounts and classification of consolidated assets that are collateral for VIE obligations, including VIEs that were consolidated prior to the implementation of FIN 46-R under existing guidance and VIEs that the Company became involved with after July 1, 2003:

| In billions of dollars | June 30, 2007 | December 31, 2006 (1) |
|---|---|---|
| Cash | 0.3 | 0.5 |
| Trading Account Assets | 20.7 | 16.7 |
| Investments | 28.7 | 25.0 |
| Loans | 4.0 | 6.8 |
| Other Assets | 6.1 | 5.7 |
| Total assets of **consolidated VIEs** | 59.8 | 54.7 |

(1) Reclassified to conform to the current period's presentation.

\* \* \* \*

The Company may provide various products and services to the VIEs. It may provide liquidity facilities, may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, may be the investment manager, and may also have an ownership interest or other investment in certain VIEs. In general, the investors in the obligations of consolidated VIEs have recourse only to the assets of the VIEs and do not have recourse to the Company, except where the Company has provided a guarantee to the investors or is the counterparty to a derivative transaction involving the VIE.

250

**In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. These include multi-seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds**. In addition to these VIEs, the Company issues preferred securities to third-party investors through trust vehicles as a source of funding and regulatory capital, which were deconsolidated during the 2004 first quarter. The Company's liabilities to the deconsolidated trust are included in long-term debt.

\* \* \* \* \*

The Company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset. The VIEs, which are issuers of CDO securities, are generally organized as limited liability corporations. The Company typically receives fees for structuring and/or distributing the securities sold to investors. In some cases, the Company may repackage the investment with higher rated debt CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. These may include: the provision of liquidity or contingent liquidity facilities; interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE. **The Company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.**

In addition to the conduits discussed above, **the following table represents the total assets of unconsolidated VIEs where the Company has significant involvement**:

251

| In billions of dollars | June 30, 2007 | December 31, 2006 |
|---|---|---|
| **CDO-type transactions** | **74.7** | **52.1** |
| Investment-related transactions | 134.4 | 122.1 |
| Trust preferred securities | 10.3 | 9.8 |
| **Mortgage-related transactions** | **5.0** | **2.7** |
| Structured finance and other | 37.4 | 41.1 |
| Total assets of significant unconsolidated VIEs | 261.8 | 227.8 |

\* \* \* \* \*

**As mentioned above, the Company may, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, may be the investment manager, and may also have an ownership interest in certain VIEs. Although actual losses are not expected to be material,** the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $117 billion and $109 billion at June 30, 2007 and December 31, 2006, respectively. For this purpose, maximum exposure is considered to be the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, and the amount invested where Citigroup has an ownership interest in the VIEs. In addition, the Company may be party to other derivative contracts with VIEs. Exposures that are considered to be guarantees are also included in Note 17 on page 77.

(Form 10-Q, August 3, 2007, pp. 63-67)

546.    Citigroup's disclosures were false and misleading for the following reasons:

> **c.    CDOs Were Presented as Distinct From Mortgage Securitizations and "Mortgage-Related Transactions"**

547.    Citigroup's disclosures distinguished CDOs from Citigroup's mortgage

252

securitizations and from "mortgage-related transactions":

        (a)     In its "Off Balance Sheet Arrangements" disclosures, Citigroup first disclosed its mortgage securitization operations, but distinguished them from CDOs, which Citigroup mentioned under the rubric of "Creation of Other Investment and Financing Products";

        (b)     In its "Securitizations and Variable Interest Entities" disclosures, Citigroup provided further disclosures with respect to CDOs, which it classified as VIEs.  There again Citigroup distinguished "CDO-type transactions" from "Mortgage-related transactions".

548.    These disclosures were materially misleading. $70 billion of Citigroup's CDOs were collateralized primarily by subprime and Alt-A mortgages.  Specifically:  $28 billion of Commercial Paper CDOs, $16.5 billion of Mezzanine CDOs, $13 billion of High Grade CDOs, and $13 billion of Hedged CDOs.

549.    These disclosures (reinforced by the others below) made it appear as though Citigroup's CDOs were distinguished from mortgage-related activities, when in fact they were largely based on those very activities.

### d. Citigroup Presented its Mortgage Securitizations as Transactions That Transferred to Others the Risk of Any Credit Losses from those Mortgages

550.    Citigroup's disclosures as to its mortgage securitization activities represented the result to be the transfer of mortgage credit risk away from Citigroup:

        (a)     In its "Off Balance Sheet Arrangements" disclosures, Citigroup stated:

Mortgages and Other Assets

The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also

reduces the Company's credit exposure to the borrowers.

(b)      In its "Securitizations and Variable Interest Entities" disclosures, Citigroup stated:

> The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchaser of the securities issued by the trust.

551.    Having already created the misleading distinction between CDOs and mortgage securitizations, Citigroup compounded the misleading effect by representing its mortgage securitizations as ones that had transferred the risks of those mortgages away from Citigroup (to the purchasers of the mortgage-backed securities).

552.    In the circumstances made, what may have been literal truth was operatively false and misleading.  Why?

553.    Citigroup *had taken back* that transferred risk, through its own CDOs. Citigroup's own CDOs were among the largest purchasers of the securities to which the mortgage risks had been transferred (i.e., nonprime RMBS), and Citigroup retained the largest interest in those CDOs (i.e., the super senior tranche).  In this manner, the mortgage risks that Citigroup represented as having been transferred had not traveled in a straight line away from Citigroup, but rather in a circle that led back to Citigroup.  By its interest in its own CDOs, it was one of the largest purchasers of those very securities, and thus one of the largest owners of their risks.

> e.      **Citigroup Presented its CDOs as Instruments that Contained Diverse Assets to Diversify Risk (rather than as Instruments that Contained Correlated Assets and Concentrated Risk)**

554.     Citigroup represented its CDOs as instruments intended and structured to mitigate risk through diversification:

(a)      In its "Off Balance Sheet Arrangements" disclosures, Citigroup stated:

The Company packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage collateralized debt obligations (CDOs) and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.   Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.

(b)      In its "Securitizations and Variable Interest Entities" disclosures, Citigroup stated:

The Company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.

555.    These disclosures were materially false and misleading, and compounded the misleading effect of the "total mix" of disclosure provided by Citigroup.  Citigroup's subprime CDOs were not based on diversified assets, but on a singular investment in subprime mortgages. Citigroup's Mezzanine CDOs were, moreover, a concentrated investment in a very particular "slice" of concentrated subprime risk.   These CDOs were not built on diversification of risk but on concentration of risk.

> **f.      Citigroup Represented Its Role with Respect to CDOs as One of "Limited Continuing Involvement"  After Citigroup's Initial Warehousing, Structuring and Underwriting Activities**

556.    Citigroup held itself out primarily as the creator/underwriter of CDOs but omitted to disclose – *inter alia* –  that it was the single biggest purchaser of the CDO securities that it underwrote. Citigroup falsely represented that – after any initial warehousing of assets, structuring

of the securitization, and distribution of the securities – its role was one of "limited continuing involvement".

557.    In its "Securitizations and Variable Interest Entities" disclosures, Citigroup stated:

> The Company typically receives fees for structuring and/or distributing the securities sold to investors. In some cases, the Company may repackage the investment with higher rated debt CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. These may include: the provision of liquidity or contingent liquidity facilities; interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE. The Company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.

558.    Citigroup's true role was not one of "limited continuing involvement" but of massive continuing involvement.  Citigroup arranged and underwrote $70 billion of subprime CDOs during the class period (detailed in the above charts listing them), and retained an interest in those very CDOs exceeding $57 billion (i.e., $43 billion in net exposure to super seniors, $10.5 billion in "hedged" exposure, and $2.7 billion of unsold junior tranches) (as Citigroup only disclosed on and after November 4, 2007).    Moreover, the illiquidity of these super seniors – an illiquidity of Citigroup's own making – mandated Citigroup's massive, continuing involvement.

559.    The various "hypotheticals" ("The Company *may* also provide other services..."; "These *may* include..."), discussed separately below, do nothing to diminish plaintiffs'

assertion here.  None address the fact of Citigroup's role as, by far, the largest single investor in its own CDOs.  They are precisely the sort of assertion of the possible when the actual was known that the securities laws abhor.

> **g.**    **Citigroup's Disclosure of Aggregate CDO Assets Said Nothing At All As to Citigroup's Actual Interest in Those Assets (i.e., the Retained Super Seniors)**

560.    In its "Securitizations and Variable Interest Entities" disclosures, Citigroup made certain disclosures as to the "total assets of unconsolidated VIEs".

561.    These disclosures omitted material information necessary to make them meaningful: namely, Citigroup's actual interest in those aggregate CDO assets.  For example, the August 3, 2007 Form 10-Q informed that total CDO assets as of June 30, 2007 were $74.7 billion (and $52.1 billion at the end of 2006).  But this disclosure meant only that there were CDOs "out there" with $75 billion in assets.  It said nothing about the related fact that Citigroup held in excess of $55 billion of securities issued by those CDOs and backed by those assets.

562.    Thus, disclosure of aggregate CDO assets did not provide any "meaningful . . . data for an independent assessment of the potential risks of the Company's involvement in various [CDOs] and asset classes"  because, based on this information, there was no way at all to assess the size, extent, or nature of Citigroup's involvement.

563.    Compounding the misleading effect of the "total mix" of information was Citigroup's misleading distinction – in making these "total assets of unconsolidated VIEs" disclosures – between "CDO-type transactions" and "Mortgage-related transactions".

564.    "Mortgage-related transactions", according to Citigroup, accounted for only $5.0 billion of VIE assets as mid-2007 (and only $2.7 billion at the end of 2006).  CDOs – and their

far larger asset totals ($74.7 billion as mid-2007) – were presented by Citigroup as a *separate* matter.

This made Citigroup's mortgage-related exposure appear less than it was.

> ### h.    Citigroup's Reliance on Hypothetical Phrasing Masked Actual Operations and Risk Exposures

565.    In its "Securitizations and Variable Interest Entities" disclosures, Citigroup

made certain disclosures in the form of hypotheticals (e.g. "The Company may also provide other

financial services..."; "These may include..."; "The Company may be a party to derivative

contracts..."):

> The Company also packages and securitizes assets purchased in the
> financial markets in order to create new security offerings, including
> arbitrage CDOs and synthetic CDOs for institutional clients and retail
> customers, which match the clients' investment needs and
> preferences. Typically, these instruments diversify investors' risk to
> a pool of assets as compared with investments in an individual asset.
> The VIEs, which are issuers of CDO securities, are generally
> organized as limited liability corporations. The Company typically
> receives fees for structuring and/or distributing the securities sold to
> investors. In some cases, the Company may repackage the investment
> with higher rated debt CDO securities or U.S. Treasury securities to
> provide a greater or a very high degree of certainty of the return of
> invested principal. A third-party manager is typically retained by the
> VIE to select collateral for inclusion in the pool and then actively
> manage it, or, in other cases, only to manage work-out credits. **The
> Company may also provide other financial services and/or
> products to the VIEs for market-rate fees. These may include: the
> provision of liquidity or contingent liquidity facilities; interest
> rate or foreign exchange hedges and credit derivative
> instruments; and the purchasing and warehousing of securities
> until they are sold to the SPE. The Company is not the primary
> beneficiary of these VIEs under FIN 46-R due to its limited
> continuing involvement** and, as a result, does not consolidate their
> assets and liabilities in its financial statements.

> \* \* \* \* \*

> **As mentioned above, the Company may, along with other**

**financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, may be the investment manager, and may also have an ownership interest in certain VIEs. Although actual losses are not expected to be material,** the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $117 billion and $109 billion at June 30, 2007 and December 31, 2006, respectively. For this purpose, maximum exposure is considered to be the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, and the amount invested where Citigroup has an ownership interest in the VIEs. In addition, the Company may be party to other derivative contracts with VIEs.

566.    Disclosure of what Citigroup "may" do is not adequate disclosure when Citigroup actually had done it.

567.    Citigroup stated that "the Company may, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs".

568.    The plain truth is simple and not difficult to state: Citigroup had provided guarantees to repurchase $25 billion of commercial paper super senior CDO tranches backed by subprime mortgage assets. This truth was nowhere in Citigroup's SEC filings, or otherwise publicly known.

569.    The same applies to Citigroup's disclosure that it "may also have an ownership interest in certain VIEs". The Company may have an ownership interest... or may not; in one category of VIE... or another, which could be a CDO... or not (and even if a CDO, a CDO distinguished from "Mortgage-related investments").

259

570.    Again, the plain truth was not difficult to state: Citigroup owned $55 billion of super senior tranches from the $70 billion of subprime-backed CDOs that Citigroup had underwritten during the prior four years.  This truth likewise was nowhere in Citigroup's SEC filings.

571.    Between 2004 and 2007, Citigroup's financial statements did not inform and affirmatively concealed  that Citigroup had guaranteed $25 billion of subprime-backed commercial paper.  Nor did they inform that Citigroup had been by far the largest purchaser of the CDOs it had underwritten, or that Citigroup held $57 billion of such CDOs, or that those CDO holdings were backed by subprime mortgage risk.  Although subprime became analysts' primary concern in late 2006 and throughout 2007, no analyst ever uncovered, prior to Citigroup's November 4, 2007 disclosures, Citigroup's massive subprime CDO exposures.  Again, generally, the applicable risks had long been known; but the fact of Citigroup's *exposure* to those long-known risks had long been hidden.

## 2.    Citigroup's Fundamental Misrepresentation of its CDO Operations

572.    The allegations above addressed Citigroup's CDO-related disclosures on their own terms.  More broadly, however, Citigroup failed to disclose the true nature of its CDO operations and activities.

573.    First, as alleged, between 2004 and late 2006, Citigroup's CDO underwriting was itself underwritten by Citigroup's silent assumption of large, illiquid super senior CDO tranches. The underwriting and associated fees could continue only at the cost of assuming the large, low-yielding super senior tranches.

574.    Citigroup misrepresented this reality.  The benefits of Citigroup's CDO

260

business appeared in Citigroup's financial statements – in the form of revenues from underwriting fees, revenues from guarantee fees, interest revenues from the retained funded super seniors, and fees for assuming the risk of the unfunded super seniors. The risks that Citigroup undertook in order to generate those fees and revenues made no appearance. Indeed, there seemed to be no risks at all, because it was nowhere disclosed that Citigroup had any ownership of the CDO tranches it had underwritten, let alone a $57 billion stake.

575.    Second, in late 2006 and early 2007, this operating model – deficient as it was – broke down. Now, in addition to being unable to sell the super seniors, Citigroup was also having difficulties in selling the more junior tranches. At this point, Citigroup's CDO operations entered their Ponzi-scheme phase of creating new CDOs into which to hide the older, unsellable junior CDO tranches. Citigroup did not wish to retain them for the same reasons that Citigroup's customers increasingly refused to buy them: their risks, ever more apparent, outweighed even their "juiced" rewards.

576.    Citigroup did not publicly disclose that it was amassing these unsellable, even riskier products. On the contrary: in late 2006 and early 2007, Citigroup's CDO business appeared to boom. Citigroup poured forth larger amounts of CDOs than it ever had before, and even rose for the first (and worst) time to become the largest underwriter of CDOs during 2007. But behind the "boom" was the crisis: the ceaseless necessity to create new CDOs as receptacles for the unsellable tranches of the old.

577.    Third, in early 2007, Citigroup recognized – internally – that subprime risks would reach super senior levels and began hedging its super seniors, then conceded "endgame". At the start of the year, Citigroup's subprime warehouse had swelled to $30 billion of CDO spare parts,

261

largely in the form of junior securities closer to "first loss".  Citigroup's CDO operations from that point on were merely attempts to clean out the warehouse as much as possible, through a last round of securitizations and re-securitizations, and to hedge away the largest portion of the resulting new securitizations (the super seniors).  Though the resulting new junior tranches would likely be a total loss, at least further and even large losses had been averted.

578.     During this time, Citigroup did not disclose that it had these increasingly unsellable and risky products.  Citigroup remained reassuring with respect to subprime.  Citigroup emphasized that it had substantially shrunk the inventory in its subprime warehouse, but made no like mention of its massive super senior inventory, and continued to value its (undisclosed) super seniors at par.

579.     In sum, at no time during the class period were plaintiffs and other Citigroup investors offered materially accurate information as to Citigroup's CDO operations.  That is why the market reacted with such surprise when the truth was eventually disclosed.

### 3.     Citigroup's Financial Statements Understated and Misrepresented Citigroup's Risk

#### a.     Citigroup Omitted to Disclose the Material Risk Concentration

580.     Citigroup's subprime CDOs constituted a material concentration of risk (precisely specified and quantified in plaintiffs' GAAP-related allegations).  Citigroup had accumulated material nonprime mortgage-related risk, through retaining its own CDOs backed by the lower, already-tranched risks of nonprime.  By the close of 2004, Citigroup's exposure stood at $14.2 billion by 2004; $23.4 billion by 2005; $36.3 billion by 2006; $39.4 billion as of March 31, 2007; $39.7 billion as of June 30, 2007.

581.    Defendants failed, though required by GAAP, to disclose this material concentration of credit risk.  Indeed, Defendants failed to disclose that Citigroup had *any* CDO super senior holdings and exposures until November 2007, at which point defendants simultaneously disclosed: (1) holdings of and exposure to $43 billion of CDO super seniors and a further $2.7 billion of CDO junior tranches (which still understated matters by approximately $11 billion); (2) the preliminary writedown of those just-disclosed holdings by $8-$11 billion (which understated matters by approximately $20 billion); and (3) that these just-disclosed holdings constituted a material concentration of credit risk.

### b.    Citigroup Understated Value at Risk and "Risk Capital"

582.    Throughout 2007, Citigroup materially understated its primary quantitative disclosures of risk – "value at risk" and "risk capital" – by failing to capture in these metrics the risks then presented by Citigroup's $50 billion-plus subprime CDO exposure.  To emphasize: not only were $57 billion of subprime CDO exposures not disclosed in and of themselves, but the risks presented by those massive holdings were effectively excluded from Citigroup's reported measures of risk as well.  Citigroup therefore materially misrepresented its risk exposure throughout the class period.  Citigroup so admitted in August 2008.

583.    The primary quantitative measure of risk disclosed by investment banks is a calculation of "Value at Risk" (or VAR).  VAR measures the daily amount at risk under normal conditions.   The purported VAR reported by Citigroup between the end of 2006 and September 2007 is presented in the table below:

|  | Value at Risk (period end) | Value at Risk (period average) |
|---|---|---|
| As of December 31, 2006 | $106 million | $ 99 million |
| As of March 31, 2007 | $122 million | $121 million |
| As of June 30, 2007 | $153 million | $138 million |
| As of September 30, 2007 | $135 million | $141 million |

584.    During late 2006 and throughout 2007, Citigroup failed both the "value" and the "risk" aspects of value at risk.  Citigroup continued to value its $50 billion-plus exposures of subprime super seniors at par, despite the fact that numerous directly observable indicators of their value, such as indexes tracking the market prices of these CDOs' collateral (the ABX index) and these CDOs' tranches (the TABX index), evidenced that value was materially impaired.  Citigroup's purported basis for doing so – the credit ratings these instruments still bore – was itself without basis: as already demonstrated, the credit ratings were widely recognized to be invalid by early 2007, and Citigroup itself warned its CDO investors (of whom none was greater than Citigroup) not to rely on those very credit ratings.  Further, Citigroup assessed and reported the *risk* presented by these holdings, in the form of their purported value volatility, by: (1) failing to note the actual value volatility then taking place; and instead (2) merely relying on the credit ratings these instruments still bore and on historical volatilities experienced by corporate bonds with similar ratings.  By the latter, the "risk" of these instruments was made to appear nonexistent in Citigroup's risk disclosures: triple-A corporate bonds have not historically experienced much price volatility.

585.    Such valuation and value at risk methodologies were condemned by regulators, including the Federal Reserve and Senior Supervisor Group (an international organization

264

of securities regulators, including the SEC, the Federal Reserve, and the Office of the Comptroller

of the Currency).  As stated in the March 6, 2008 report issued by the Senior Supervisors group,

titled *Observations on Risk Management Practices during the Recent Market Turbulence*:

> ... some firms that encountered more substantial challenges tended to assume that they could apply the low historical return volatility of corporate credits rated AAA to super-senior tranches of CDOs... some firms placed too much reliance on the external credit ratings of structured products and did not challenge the resulting calculations of VaR (or static stress shocks calibrated from historical data series) that their risk measurement engines generated based on these ratings and related optimistic assumptions.  As mentioned earlier, the dependence of these firms on rating agencies' assessments stands in marked contrast to the sophistication of their existing internal credit assessment processes in other business lines...
>
> (Senior Supervisors group, *Observations on Risk Management Practices during the Recent Market Turbulence*, March 6, 2008, p. 5)

586.    After Citigroup renounced these valuation and risk measurement methods, and

began incorporating only in 2008 the CDO devaluation and volatility that had been occurring visibly

throughout 2007, *these CDOs alone accounted for as much as half of Citigroup's entire value at risk*

(*See* August 1, 2008 Form 10-Q, p. 37).  Concretely: the value at risk of Citigroup's CDOs, just by

themselves, equaled to total value at risk of all of the rest of Citigroup's holdings combined.  But

throughout 2007, when CDOs' values had visibly been at risk, the "value at risk" reported for these

instruments was effectively zero.  Therefore, Citigroup's VAR disclosures during 2007 understated

Citigroup's true value at risk by 50%.

587.    Likewise, Citigroup reported a further measure of risk – termed "risk capital"

– purportedly representing "the amount of capital required to absorb potential unexpected economic

losses resulting from extremely severe events over a one-year time period".  In other words, the

265

amount that could be lost were markets to turn really bad.  Citigroup's reported risk capital for late 2006 and 2007 is shown below:

|  | Risk Capital (period average) |
|---|---|
| As of December 31, 2006 | $28.2 billion |
| As of March 31, 2007 | $31.7 billion |
| As of June 30, 2007 | $33.6 billion |
| As of September 30, 2007 | $32.9 billion |

588.    Exactly the same failures and misrepresentations with respect to value at risk were operative with respect to Citigroup's 2007 reports of risk capital.  Citigroup's simplistic measures of both value and risk with respect to CDOs – again, based on invalid credit ratings and on irrelevant historical analogies to corporate bond behavior – again resulted in reporting that these instruments were not at risk of losing much value even in extreme circumstances.  This was the precise opposite of the truth.  CDOs, by their very structure, were at risk of losing nearly all of their value in circumstances not all that extreme (e.g., the scenario in which housing prices merely fail to appreciate).  Further, because of their structure, they possessed a fundamentally different risk profile than unstructured securities: they were more protected from "idiosyncratic", or uncorrelated risk, but far more exposed to systematic, correlated risk.  That is exactly the sort of risk that Citigroup's risk capital metric purported to measure, but in fact did not. As the Senior Supervisors Group stated:

> The practice at some firms of valuing super senior tranches of subprime CDOs at or close to par value and assuming that their risk profile could be approximated using the historical corporate AAA spread volatility as a proxy failed to recognize these instruments' asymmetric sensitivity to underlying risk (in contrast to an unstructured corporate bond of the same rating).  The first loss protection built into the securitization structure created an asymmetric

266

exposure to losses in the underlying assets, so that the senior tranche became more sensitive to default rates as credit quality deteriorated... the construction of CDOs tends to make them more sensitive to systematic shocks.  In contrast, highly rated corporate debt issuances tend to be more sensitive to "idiosyncratic" risk...

(Senior Supervisors group, *Observations on Risk Management Practices during the Recent Market Turbulence*, March 6, 2008, p. 15)

589.     As the above-detailed risk capital disclosures show, the purported risk capital for *all* of Citigroup was slightly less than the amount that Citigroup lost just on its CDOs.

590.     Citigroup thereby materially understated its exposure to extreme risks. Plaintiffs and the class learned this first hand in and after November 2007, as Citigroup revealed in excess of $50 billion of subprime exposure that had never before been disclosed and that had never before been included in calculations of Citigroup's risk metrics.

### c.     Citigroup Overstated "Return on Risk"

591.     Citigroup featured prominently in its financial statements a metric of its own device termed "Return on Risk Capital".  This metric simply divides income from continuing operations by the amount of "risk capital" (discussed just above).   This metric was intended to represent how much Citigroup was getting from how much Citigroup was risking:  as Citigroup put it, "the trade-off of risk and return".

592.     By making the extreme risks presented by CDOs vanish from its calculation of risk capital, Citigroup made its risks appear materially smaller and the degree of its returns materially larger. With respect to subprime super senior CDO tranches, this turned reality on its head.  They were almost all risk and almost no return.  The false and misleading "return on risk capital" reported by Citigroup:

267

|  | Return on Risk Capital |
|---|---|
| As of December 31, 2006 | 38% |
| As of March 31, 2007 | 31% |
| As of June 30, 2007 | 35% |
| As of September 30, 2007 | 12% |

593.    These representations presented matters at Citigroup to be fundamentally different than they in fact were.  They suggested that Citigroup was successfully reaping large returns on risk, when, instead, the returns were much smaller and the risks much larger.

**4.    Citigroup's Financial Statements Materially Overstated the Fair Value of Citigroup's Super Seniors, and Defendants Ignored Numerous, Observable, Relevant Indicators that the Fair Value Was Substantially Impaired**

594.    Citigroup valued its super senior CDO holdings substantially at par, or full, value up until September 30 ,2007.  This was materially false and misleading throughout, but especially in late 2006 and throughout 2007, when numerous observable, relevant indicators of CDOs' fair value made clear that such value was deeply impaired.

595.    Just as the S&P 500 index tracks the value of the U.S.'s largest corporations, two more specialized indices – known as the ABX.HE (the "ABX") and TABX.HE (the "TABX") – tracked the value of (1) the different tranches of subprime RMBS (i.e., triple-A, double-A, single-A, triple-B, and triple-B minus); and (2) the different tranches of Mezzanine CDOs.

596.    The ABX index, developed in January 2006 by a consortium of fifteen banks – including Citigroup –  was designed to track the value of subprime RMBS tranches at each rating level (AAA, AA, A, BBB and BBB-).  From price quotations for 20 representative BBB tranches, 20 representative AA tranches, etc., an average BBB tranche price was reported, an average AA

tranche price, etc. The TABX index was launched in February 2007 by the same consortium (including Citigroup).

597.    The ABX and TABX indices were shared market standards expressing aggregate market sentiment as to the value of representative subprime RMBS and Mezzanine CDO tranches.   As such, they were objective, directly observable indicators of the value of these instruments.   Citigroup was not only aware of these indices at all times, but in fact was one of their founding sponsors, made a market in them, and provided the very price quotations (along with other bank consortium members) that served as their basis.

598.    The ABX BBB indices began substantial declines in October 2006, after subprime risks began to materialize via monthly tracking reports showing that 2006 subprime mortgages were experiencing record levels of nonpayment.

599.    By February 2007, market participants were then on the record that the ABX BBB values were "going to zero" (Wall Street Journal, *Subprime Mortgage Derivatives Extend Drop on Moody's Reviews*,  February 22, 2007).  Given the direct relationship between subprime RMBS triple-B assets and Mezzanine CDO worth, the TABX indices for Mezzanine CDO tranches plunged as well.  By the end of the first quarter of 2007, the TABX index for Mezzanine super seniors had declined to approximately 85%.

600.    As of March 31, 2007, Citigroup was (secretly) holding $8.3 billion of Mezzanine CDO super senior tranches and falsely valuing them at par.  Had Citigroup valued its Mezzanine CDO super senior holdings at fair value as of March 31, 2007, it would have had to take a writedown of $1.2 billion.  This would have reduced Citigroup's reported revenues by $1.2 billion and pre-tax income by $1.2 billion.  This would also have served to warn plaintiffs and the class of

269

Citigroup's subprime/CDO exposures.  But Citigroup remained silent about its exposures and continued to conceal them, and retained its assets at inflated prices that were belied by market prices, so no sign of Citigroup's exposures and losses publicly emerged.

601.    Nor did Citigroup disclose that its High Grade CDOs were backed by substantial amounts of junior tranches of Mezzanine CDOs, which were by now – as TABX prices showed – nearly worthless.  Therefore, the value of Citigroup's High Grade CDO super senior holdings – $10.0 billion as of March 31, 2007 – was also impaired, to comparable but slightly lesser degree.

602.    During June 2007, the BSAM Funds (mentioned earlier at Section III.A.2.a in connection with Citigroup's Tallships Funding CDO) imploded.  The loss to investors was 100%.

603.    The subprime risks evidenced by the BSAM Funds, as well as continuing monthly reports evidencing that deteriorating performance of 2006 vintage of subprime mortgages caused further declines in the ABX and TABX indices.  By June 30, 2007 the ABX BBB indices had fallen to approximately 57%, and TABX index for Mezzanine super seniors had fallen to approximately 69%.

604.    As of June 30, 2007, Citigroup was (secretly) holding $8.3 billion of Mezzanine CDO super senior tranches and falsely valuing them at par.  Had Citigroup valued its Mezzanine CDO super senior holdings at fair value as of June 30, 2007, it would have had to take an additional  writedown of $1.4 billion.  This would have reduced Citigroup's reported revenues by $1.4 billion and pre-tax income by $1.4 billion.  This would also have served to warn plaintiffs and the class of Citigroup's subprime/CDO exposures.  But Citigroup remained silent about its exposures and continued to conceal them, and retained its assets at inflated prices that were belied

270

by market prices, so no sign of Citigroup's exposures and losses publicly emerged.

605.    Moreover, Citigroup's High Grade CDOs were backed by substantial amounts of junior tranches of Mezzanine CDOs, which were by now – as TABX prices showed – nearly worthless.   In addition, the ABX indices for single-A RMBS tranches (another substantial component of High Grade CDOs) had fallen to approximately 85%.   Therefore, the value of Citigroup's High Grade CDO super senior holdings – $7.3 billion as of June 30, 2007 – was also impaired, though not to the same degree.   But Citigroup remained silent about its exposures and continued to conceal them, retained its assets at inflated prices that were belied by market prices, so no sign of Citigroup's exposures and losses publicly emerged.

606.    During July 2007, credit rating agencies downgraded hundreds of triple-B rated subprime RMBS tranches, and a variety of other investment vehicles – including SIVs and SIV-lites – reported severe losses from investments in RMBS and CDOs.   The ABX triple-B indices fell below 40%.   ABX indexes for higher RMBS tranches also showed substantial declines: single-A ABX indices fell to 50%, and double-A ABX indices to 80%.   TABX indices fell at all levels, and the TABX index for Mezzanine super seniors declined to below 60%.   Citigroup continued to remain silent about its exposures and continued to conceal them, and retained its assets at inflated prices that were belied by market prices, so no sign of Citigroup's exposures and losses publicly emerged.

607.    By September 30, 2007, the ABX triple-B indices had fallen to 30%, and TABX indices for all junior Mezzanine CDO  tranches showed such tranches to be effectively worthless. The TABX index for Mezzanine super seniors had, by this point, fallen to 33%.   In addition, ABX indexes for higher RMBS tranches also showed substantial declines: single-A ABX indices at 50%, double-A ABX indices at 80%.

608.     As of September 30, 2007, Citigroup was (secretly) holding $8.3 billion of Mezzanine CDO super senior tranches and falsely valuing them at par.  Had Citigroup valued its Mezzanine CDO super senior holdings at fair value as of September 30, 2007, it would have had to take an additional writedown of $3.0 billion.  This would have reduced Citigroup's reported revenues by $3.0 billion and reported pre-tax income by $3.0 billion.  This would also have served to warn plaintiffs and the class of Citigroup's subprime/CDO exposures.  But Citigroup remained silent about its exposures and continued to conceal them, and retained its assets at inflated prices that were belied by market prices, so no sign of Citigroup's exposures and losses publicly emerged.

609.     Moreover, Citigroup's High Grade CDOs were backed by substantial amounts of junior tranches of Mezzanine CDOs, which junior tranches were by now – as TABX prices showed – nearly worthless.  In addition, the ABX indices for single-A and double-A RMBS tranches (the remainder of High Grade CDO assets) also demonstrated substantial losses for those instruments as well (a 50% loss at the single-A level, a 20% loss at the double-A level).  Therefore, the value of Citigroup's High Grade CDO super senior holdings – $4.1 billion as of September 30, 2007 – was also substantially  impaired, though not to the same degree as the Mezzanine CDOs.  But Citigroup remained silent about its exposures and continued to conceal them, and retained its assets at inflated prices that were belied by market prices, so no sign of Citigroup's exposures and losses publicly emerged.

610.     The movements in the ABX and TABX indices summarized above represented aggregate market judgments about the value of subprime RMBS and Mezzanine CDOs.  These judgments efficiently synthesized other more fundamental data – such as subprime mortgage origination standards, monthly reports of subprime mortgage performance and subprime RMBS

performance, housing price trends, mortgage industry developments, as well as market trading of RMBS and CDO tranches – that themselves served as objective "red flags" evidencing impairment in CDO value.  Many of these fundamental underlying factors were detailed in Sections II.A-C, *supra*.

611.    Citigroup's failure to value accurately its CDO holdings was not publicly known, as detailed above.  Nevertheless, as detailed above, in excess of $55 billion of exposure to these assets existed, hidden, on and off Citigroup's books.  On November 4, 2007, Citigroup disclosed – simultaneously – the existence of these assets as well the necessity to preliminarily write down their fair value by $8-$11 billion.  On January 15, 2008, Citigroup doubled that fair value writedown, to $18 billion.  In the ensuing months, Citigroup acknowledged further CDO writedowns of $13 billion.

612.    In fact, throughout 2007 Citigroup's (undisclosed) CDO holdings were worth far less than par.  It was further evident that, as of November 2007, Citigroup's initial writedown of $8-$11 billion was insufficient, and that fair value was lower still.

### 5.    Citigroup's November 2007 Disclosures and Valuations Were *Still* False and Misleading

613.    On November 4, 2007, Citigroup disclosed for the first time its "net" exposure to $43 billion of super senior CDO tranches, together with an estimated writedown of $8 billion on those instruments.  In so disclosing, Citigroup insisted that: (1) "super senior tranches are not subject to valuation based on observable market transactions"; and (2) the $8 billion of lost value was entirely a function of events in the prior month ("declines in the fair value of Citi's sub-prime related direct exposures followed a series of rating agency downgrades of sub-prime U.S. mortgage related

assets and other market developments, which occurred after the end of the third quarter") (Form 10-Q, November 5, 2007).

614.    Both of these *post-facto* explanations were false.  Observable, relevant indicators of super senior value existed: the ABX indexes at the triple-B tranche level, and the TABX index at the super senior level.  Both indicated a substantial loss of value as early as February 2007.  Citigroup utterly ignored these relevant and observable indicators of value and concealed the significance of what it held, as alleged, until November 2007 (Section III.C.5.a, *infra*), continued to disregard these visible indicators of value in November 2007 (Section III.C.5.b, *infra*), and ultimately admitted in 2008 their essential validity (Section III.C.5.c, *infra*).

a.    **Defendants' November 5, 2007 Explanations Were Not Credible**

615.    On November 4, 2007, Citigroup disclosed for the first time its "net" exposure to $43 billion of super senior CDO tranches, together with an estimated writedown of $8-$11 billion on those instruments.  On November 5, 2007, Citigroup held a conference call with analysts to discuss its November 4, 2007 disclosures.  During the conference call, defendant Crittenden misleadingly represented that Citigroup's November 4, 2007 writedown was a reflection of: (a) credit rating downgrades of subprime RMBS and CDOs that had occurred recently in October 2007, (b) recent declines in the ABX indices at the triple-A level; both of which, purportedly (c) "drove down the value then of the super senior tranches as well, something that had not occurred during the course of the first nine months of the year":

> CRITTENDEN... Our exposure to high end investment grade securities which we believe had very little risk associated with them had historically held up in value and hence they were termed super senior and we did not consider this to be a significant risk for markdowns. The $43 billion that we disclosed yesterday falls into this

super senior category.

* * *

On October 11, Moody's downgraded a little more than $33 billion worth of residential mortgage-backed securities that were backed by subprime bonds and puts. These were mostly senior tranches and $23.8 billion was put on negative watch. Then on October 17, S&P followed with similar types of downgrades.

Following the downgrades on these mortgage-backed securities, the rating agencies then turned their attention to the CDOs which of course have mortgage-backed securities as an important part of their collateral. And during October alone there were approximately 1000 negative actions taken against CDOs by S&P and Moody's. Moody's now has more than $30 billion of CDO securities on negative watch and Fitch also followed by putting on negative watch about $37 billion worth of ABS CDO tranches.

Now once the October downgrades occurred, the value of the junior tranches were driven down to very low levels. And as you all know, this increased the likelihood or the riskiness of the senior tranches as the subordination below them eroded. **And this drove down the value then of the super senior tranches as well, something that had not occurred during the course of the first nine months of the year**.

**Now the best way to kind of get an outside perspective on this is to look at the ABX indices which have dropped dramatically since the end of September. . .**

**So if you take the AAA 06-2 index, it had declined by an average of about half a percent per month during the first nine months of 2007 but in October alone, the index declined by 8.5%.** Additionally in the month of October, the single-A 06-2 and the BBB 06-2 indices lost about half of their value during the course of one month.

616.     Defendant Crittenden's representation that super senior tranche values had declined only recently was false: as already demonstrated, those values had been materially and visibly impaired since no later than February 2007.

275

617.    Defendant Crittenden's misrepresentations of CDO super senior writedowns as a function of declines in the <u>ABX</u> triple-A index amounted to a stunning category ploy.  The triple-A tranches of RMBS (whose value is measured by the ABX triple-A index) bear no relation to, and have nothing to do with, the value of CDO super senior tranches.  The triple-A tranches of RMBS are far more protected from loss than the super senior tranches of CDOs, because CDOs are collateralized by *lower-rated* RMBS tranches.  With respect to Mezzanine CDOs (backed in near entirety by the BBB tranches of RMBS), the relevant indices are (1) the triple-B ABX indices, and (2) the TABX super senior index.  Both indices had declined severely and long ago.

618.    The first analyst to point this out was Jeff Harte, of Sandler O'Neill, during the November 5, 2007 call.  "Analyst speak" obscures somewhat the plain meaning of his comments.  Mr. Harte pointed out that the relevant indices had declined severely and long ago ("we have seen a lot of deterioration in some of the credit derivative indices kind of *during the first three months of the year*... going from say par to $0.40...") without Citigroup having made any writedowns ("... but we didn't see much pain as far as marks from you guys"):

> JEFF HARTE, ANALYST, SANDLER O'NEILL: Good morning. **Can you talk a little bit more about the delta between I guess what you are calling the cash flow or the underlying credit performance of the assets behind some of these things relative to the accounting? And I suppose I may be coming at it from a perspective of we have seen a lot of deterioration in some of the credit derivative indices kind of during the first three months of the year, but we didn't see much pain as far as marks from you guys going from say par to $0.40. And now we are seeing a lot of pain going from $0.40 to $0.20.**

619.    Defendant Crittenden flatly denied the relevance of these facts to Citigroup.  He reiterated that the ABX triple-A index had declined only recently (while acknowledging that

ABX indices for lower-rated RMBS tranches had declined sharply long ago):

> **GARY CRITTENDEN: Yes, the way I would think about that is these were super senior securities, right? So they were in theory better than investment-grade securities. And if you track that index, at least the numbers that I have just as an example the AAA ABX that just to pick one, the 06-2 had very, very a little deterioration during the course of the first nine months of this year. I think in total it was off about 4% so it had dropped about a half a percent -- half a percent a month.**
>
> **If you go into the month of October after the first seven or eight days, I don't know exactly when it was, you see a very significant crack and it drops from 96 down to about 88 and loses 8% of its value in a very short period of time. The other indices had been down -- I'm talking about the single-As, the BBBs had been down during the course of the year. The big movement there was a reduction by about half during the course of October. So they had had movements, but again, you had significant movements in those.**
>
> **But it is really at the high investment-grade end where the values had held up very well during the course of the year but obviously you see that movement now**.

620.   The next analyst to query defendant Crittenden was Ron Mandel of GIC.  Mr Mandel asserted that the ABX triple-A index was not indicative of CDO values, that the TABX index was "more indicative", that the TABX's declines were severe (and had long been so), and asked why Citigroup wasn't using the TABX as the guide to value.  Defendant Crittenden denied any knowledge of that:

> RON MANDLE, ANALYST, GIC: . . . **My question primarily relates to your reference to the ABX and regarding CDOs I thought the TABX index was more indicative which was down about 30% or 40% in the third quarter and then down another 30% or 40% just in October**. **And I am looking at the super senior tranches of that. So I guess my question is primarily as why the TABX isn't more representative than the ABX of the super senior tranches?**

277

GARY CRITTENDEN: **The honest answer is I don't know. I don't know that. So we will be more than happy to follow up on it and give you our thoughts but I just don't know**.

> **b.      Defendants' November 5, 2007 Valuations and Writedowns Were Not Credible, and Overstated the Value of Citigroup's CDOs**

621.    Mr. Mandel continued, on November 5, 2007, to assert that the writedown indicated for Citigroup's super seniors ($8 billion at most) would still not serve to bring Citigroup's super senior valuations in line with observable indicators such as the ABX and TABX:

> RON MANDLE: ...so **taking the high end of the range, that was $8 billion in write-offs for the remaining 43 which strikes me as not exceptionally large given developments that we have seen in the -- you know in the third quarter and then since the end of the third quarter**.

> GARY CRITTENDEN: Well that's -- it's a judgment call. I think I underlined that we don't know if these will be the actual reductions that we'll take in revenue as we go during the course of the quarter. That will be driven by the facts and circumstances that happen. There are no of observable trades today against this book that would establish a value. There may very well be trades that will happen during the course of the quarter that will provide more insight into how they can be marked.

> We have taken what we believe is a reasonable stab at doing this but I would encourage you to do the same. I mean we don't think that what we have done is any more indicative necessarily of where we are going to come out at the end of the quarter than where we would be two weeks from now or four weeks from now. I mean these things are going to move around and change and we are just trying to make an assessment at this point in time about how we would think about it given that there is no observable trades at the super senior end of the market.

622.    Other analysts, in the following days, reached the same conclusion as Mr. Mandel.  The loss of value, as the ABX and TABX indicated, was substantially greater than the

writedown announced by Citigroup on November 5, 2007. "We wouldn't be surprised if additional write-downs were forthcoming", concluded Goldman Sachs analyst William Tanona in a November 5, 2007 note to investors. Sanford C. Bernstein analyst Howard Mason, for example, estimated that Citigroup's CDO-related losses could be $16 billion – or twice as much as Citigroup had indicated.

623.    Citigroup's November 4, 2007 disclosures and November 5, 2007 conference call statements still had not prepared the market for the true magnitude of Citigroup's problems.

### c.    Defendants' Later, Larger Writedowns Finally Brought Citigroup's CDO Valuations in Line with Evident, Observable Market Realities

624.    In January 2008 and April 2008, Citigroup announced $21.2 billion of writedowns to its "net" super senior exposures (as well as a further $2.5 billion to its hedged exposures and $2.7 billion to its warehouse exposures of junior CDO tranches). The aggregate super senior writedowns – $23.7 billion – tripled Citigroup's November 2007 statement of the requisite super senior writedown ($8 billion). As detailed below, the additional $16 billion of writedowns were the result of Citigroup's belated incorporation of ABX index valuations.

625.    On January 15, 2008, Citigroup announced its financial results for 2007, including a $14.5 billion writedown to its "net" super senior exposures – nearly twice the maximum writedown indicated for those exposures that Citigroup had disclosed in November 2007. In discussing this new and much larger writedown during Citigroup's January 15, 2008 conference call, Defendant Crittenden acknowledged that Citigroup had used the relevant, observable ABX indexes as a cross-check against Citigroup's valuation models:

> CRITTENDEN:... **Over and above the technical analysis I have just described, the team has looked at several other factors, including the ABX index** performance and continued rating agency

279

downgrades. **The combined effect of this analysis led to a total write-down of $18.1 billion**, reducing our $55 billion direct subprime exposure to $37 billion at the end of the third quarter

GUY MOSZKOWSKI: ... **you initially said that there was really nothing observable that you could use to mark these and yet you did at the end say that you did somehow incorporate the ABX indices. So maybe you can clarify for us a little bit how you did that**.

GARY CRITTENDEN: . . . **There are inherent disadvantages or inherent problems with the use of the ABX indice as kind of a basis for doing valuation. But it is a useful crosscheck against our cash flow model. So that is what we did. After we ran the cash flow model, we checked it against those indices to see if we could uncover any inconsistencies**.

626.    On April 18, 2008, Citigroup announced financial results for the first quarter of 2008, including further super senior writedowns of $7.3 billion.  In a remote section of Citigroup's May 2 , 2008 Form 10-Q devoted to Citigroup's policies and methods for the determination of fair value, Citigroup disclosed that it had made two "refinements" to its valuation model for super seniors.  One of these two refinements was to use the ABX index as a source of the "discount rate" to apply against Citigroup's valuation model so as to reach a determination of fair value.  That discount rate, Citigroup further added, was one of two "primary drivers" of the ultimate fair value determination:

> **When necessary, the valuation methodology used by Citigroup is refined and the inputs used for the purposes of estimation are modified, in part, to reflect ongoing market developments. More specifically, two refinements were made during the first quarter of 2008**: a more direct method of calculating estimated housing-price changes and **a more refined method for calculating the discount rate**. During the fourth quarter 2007, housing-price changes were estimated using a series of factors including projected national housing-price changes. During the first quarter of 2008 housing-price changes were estimated using a forward looking projection based on

280

the S&P Case-Shiller Home Price Index. This change facilitates a more direct estimation of subprime house price changes. **Prior to the first quarter of 2008, the discount rate used was based on observable CLO spreads applicable to the assumed rating of each ABS CDO super senior tranche. During the first quarter of 2008, the discount rate was based on a weighted average combination of the implied spreads from single named ABS bond prices, _ABX indices_ and CLO spreads depending on vintage and asset types.**

**The primary drivers that currently impact the super senior valuations are the discount rates** used to calculate the present value of projected cash flows and projected mortgage loan performance.

(Form 10-Q, May 2, 2008, pp. 96-97)

### 6. Citigroup's Pre-November 2007 Super Senior Valuations Were Simplistic, Solipsistic and Reckless Reliance on Credit Ratings – *Despite the Fact that the CDO Prospectuses Authored by Citigroup Stated That Such Ratings Were Not Reliable Indicators of CDO Value*

627. Citigroup's post-class period disclosures made clear that at all prior times, Citigroup had valued its super seniors at full, par value based simply and only on the credit ratings those instruments bore. The functioning of this valuation model was no more complex than the following proposition: if the instrument bears a triple-A rating, then its value is 100%. The May 2008 super senior valuation "refinement" referred to above (using the ABX as the source of the discount rate) amounted in essence to replacing discount rates derived from corporate bonds (i.e., triple-A equals no discount) with actually relevant such rates for the instruments at issue (ABX valuations).

628. Insider accounts from Citigroup so confirm:

When the market for mortgage securities entered a meltdown over the summer, financial firms holding billions of dollars of hard-to-trade assets used mathematical pricing models that were heavily dependent on credit ratings. When the credit-rating firms began a massive downgrade campaign last month, firms such as Citigroup Inc. and

Merrill Lynch & Co. saw the value of their holdings plummet. Citigroup's struggles to put an exact number on its losses demonstrate just how fallible the models can be, and how serious the consequences. Last night, Citigroup said that the downgrades will result in a reduction of fourth-quarter net income of $5 billion to $7 billion...

The source of Citigroup's write-down is at least as significant as its size. **The bank's estimate of its losses has changed so rapidly in large part because the models it used to value hard-to-trade securities relied heavily on credit ratings, according to people familiar with the models**.

**For lack of any market pricing, Citigroup used credit ratings as a key input in figuring out the value of the future payments it expected to receive on the securities, according to a person familiar with the bank's valuation models. For example, in valuing the payments on pieces of subprime-backed CDOs with the highest triple-A rating, the bank would look to how the market was valuing payments on corporate bonds with the same rating**... The problem with the ratings-based approach was that it ignored a key difference between corporate bonds and subprime-backed bonds: Defaults on the latter were growing at a fast rate, which would likely lead to ratings downgrades...

(Wall Street Journal, *Why Citi Struggles to Tally Losses --- Swelling Write-Downs Show Just How Fallible Pricing Models Can Be*, November 5, 2007)

### a.    Reliance on Ratings for Valuation Was Invalid Because it Was Long Clear that the Ratings Were No Longer Valid

629.    Plaintiffs have detailed already when and why CDO credit ratings became demonstrably invalid (early 2007), and when the market so realized (early 2007).  A brief recap:

(a)    On December 13, 2006, the Fitch credit rating agency published a report titled "2007 Global CDO and Credit Derivatives Outlook" concerning its expectations for CDO performance in the coming year.  Fitch's report concluded that the ratings outlook for every single CDO sector was either "positive" or "stable" *except for Mezzanine CDOs*.  The ratings outlook for

Mezzanine CDOs was "negative", the report explained, because of Mezzanine CDO's "concentrated exposure" to subprime RMBS, rising subprime mortgage delinquencies, and a slowdown in house price appreciation.

(b)     In February 2007, a study published by Joseph Mason (an associate finance professor at Drexel University's business school) and Josh Rosner (a managing director at research firm Graham Fisher & Co.) made clear the entire interlinked chain that started from poor subprime mortgage performance and ended in widespread, severe CDO downgrades.

(c)     In March 2007, Moody's warned that defaults and downgrades of RMBS would have "severe" – indeed, magnified – consequences for CDOs that had invested heavily in subprime RMBS.  Moody's warned that downgrades for such CDOs would be extreme: as much as ten "notches".  A ten notch downgrade would move the highest possible rating – triple-A – down through the three double-A ratings (AA+, AA, AA-), the three single-A ratings, and the three triple-B ratings, to deposit it at a below investment grade rating of BB+.

(d)     In April 2007, Clifford Chance partner Steve Kolyer predicted that widespread CDO downgrades would follow widespread lower-tranche RMBS losses and downgrades.  As reported by Reuters on April 26, 2007:

> Ratings may be cut on collateralized debt obligations by this summer as the subprime loans that back the debt structures continue to sour, according to a partner at law firm Clifford Chance.  Moody's Investors Service and Standard & Poor's may begin to downgrade credit ratings of CDOs in coming months... (Reuters, *Subprime Fears to Spur CDO Downgrades – Clifford Chance*, April 26, 2007)

(e)     In May 2007, Pershing Square Capital Management published an analysis likewise making the link between subprime mortgage performance and imminent devastation for

CDOs, including their super senior tranches. That analysis, titled "Who's Holding the Bag?" doubly proves plaintiffs' allegations here. First, it demonstrated that super senior tranches would suffer severe losses. Second, it concluded – mistakenly – that these super senior tranches had been sold off by CDO underwriters such as Citigroup (rather than retained by them), and thus that the risks and losses of these instruments were the burden of *other* institutions. In short, the risks were apparent, but who was exposed to those risks was not.

630. Market outrage over these securities' credit ratings mounted steadily, both with respect to the initial and now-invalid ratings provided, and with the rating agencies' failure to downgrade the securities. The credit rating agencies' conduct with respect to these securities – both as to initial rating failures and subsequent failures to downgrade – has been the subject of four separate Congressional hearings during 2007 and 2008.

631. Under moral and market pressure to correct their outstanding ratings, the credit rating agencies downgraded during 2007 essentially every single tranche below the double-A level (i.e., the single-A and triple-B tranches) of every single RMBS issued in 2006 and 2007, as well as a substantial majority of double-A RMBS tranches and a significant minority of triple-A RMBS tranches. As these securities (especially the harder-hit, lower-rated tranches) served as the primary asset base for Mezzanine CDOs and High Grade CDOs, hundreds of billions of dollars of CDO securities were put on notice for downgrades and were downgraded.

**b.** **Citigroup's Reliance on Credit Ratings for Valuation Invalid Because Citigroup Itself Warned Investors in its CDOs Not to Rely on Credit Ratings for Valuation**

632. Citigroup had no legitimate basis upon which to place such total, blind reliance on credit ratings for its own valuations. Citigroup had, after all, even explicitly warned

CDO investors against doing so. In the CDO prospectus that it authored during 2006 and 2007, Citigroup warned prospective CDO investors – such as Citigroup itself, the largest purchaser of the CDO securities that it underwrote – not to rely on credit ratings for valuation. Some examples:

> Credit Ratings. Credit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality. **Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value**, therefore, they may not fully reflect the true risks of an investment. **Also, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates**. Consequently, credit ratings of the Collateral Debt Securities will be used only as a preliminary indicator of investment quality.

> (Armitage ABS CDO prospectus, p. 21, April 12, 2007)

> *****

> Credit Ratings. Credit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating agency. In the event that a rating initially assigned to any class of Secured Notes is subsequently lowered for any reason, no Person is obligated to provide any additional support or credit enhancement with respect to such Notes. **Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value; therefore, ratings may not fully reflect the true risks of an investment. Also, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates.** Consequently, credit ratings of the Eligible Collateral Debt Securities will be used by the Manager only as preliminary indicators of investment quality. Although the Eligible Collateral Debt Securities will have investment grade ratings at the time that they are acquired by the Issuer, there can be no assurance that such ratings will not be subsequently reduced or withdrawn.

Rating agencies' assumptions for Asset Backed Securities and for structures employed as part of this transaction have not been tested in all conceivable credit environments. If any such assumptions prove to be incorrect over a period of time, the performance of the Notes could be adversely affected.

(FAB US 2006-1 Prospectus, December 5, 2006, p. 29).

> **c.    Citigroup's Reliance on Credit Ratings for Valuation Invalid Because More Timely and Accurate Valuation Information Was Readily Available**

633.    Finally, Citigroup's reliance on credit ratings also was invalid because it turned a blind eye to an easily available and better source of information of credit risk.

634.    Credit default swaps had long been understood – and, through numerous academic studies, proved – to provide more accurate and timely assessments of changes in credit risk than were provided by credit ratings.  The classic example is Enron – an investment grade corporation according to its credit ratings, which were downgraded less than a week before its bankruptcy.  Credit default swaps, however, had indicated long before that Enron would default.  The example is extreme, but the truth it expresses is a commonplace.

635.    Indeed, the credit rating agencies themselves so recognize.  In addition to their official credit ratings, the agencies also provide something called "market-implied ratings" – i.e., the credit ratings implied by what credit default swaps are indicating.

636.    Here, the relevant credit default swap indicators were the ABX and TABX indexes, which themselves were based on credit default swap trading. These indices were directly relevant (unlike corporate bond ratings) to the instruments at issue (CDO super seniors), and served as advance indicators of where credit ratings would later arrive.  Citigroup's blind eye to the ABX/TABX until and after November 2007 is thus doubly without basis.

### 7.   Citigroup's CDO Valuation Methods, Pre-April 2008, Were Without Basis and Contradicted Citigroup's Stated CDO Valuation Principles

637.   As Citigroup admitted in May 2008, "[p]rior to the first quarter of 2008", the discount rate, one of the "primary drivers" of Citigroup's CDO valuations, "was based on observable CLO spreads applicable to the assumed rating of each ABS CDO super senior tranche" (May 2008 Form 10-Q (Section III.C.5.3, *supra*)).  This valuation method was without basis, and resulting in misleading valuations throughout the class period, especially during 2007.

638.   Using CLO spreads to calculate CDO valuations was to compare apples to oranges.  The market valued CLOs (collateralized loan obligations – or CDOs whose assets were corporate loans) very differently, and much more highly, than it valued subprime-backed CDOs. That was because they contained vastly different assets and risks.  Most prominently, CLOs were not collateralized by nonprime mortgages, while ABS CDOs were collateralized in near-entirety by nonprime mortgages.  There were other, far more accurate and relevant "discount rate" indicators of CDO market values – namely, the ABX indices, which (unlike CLOs) were actually tied to the exact underlying assets at issue.  The ABX indices, not surprisingly, showed a far greater market discount at each credit rating level.

639.   *Use of CLO data to value CDO holdings was not merely bereft of basis and deeply false, but contradicted Citigroup's own stated valuation policies and principles – which plainly stated the illegitimacy of that exact comparison*.  Below, from a February 15, 2006 Citigroup publication titled *A General Review of CDO Valuation Methods*, is an excerpt of Citigroup's explanation as to how CDOs were priced by analyzing "comparable" transactions.  As Citigroup itself explained, "one must take care to make sure that only *appropriate* comparisons are made",

observing that "*it would not be fair to compare the prices of ABS CDO triple-B bonds to CLO triple-B bonds*":

> Many investors rely on third-party (dealer) valuation of their CDO positions to satisfy accounting regulations, but there is ambiguity around how the values are derived. This report is intended to clarify the valuation process.
>
> Three common CDO valuation techniques are reviewed: net asset value (NAV) analysis, cash flow analysis, and comparables analysis.
> *****
> Comparables
>
> Investors and traders also can infer a price for a bond based on the prices of similar bonds trading in the secondary market. However, **one must take care to make sure that only appropriate comparisons are made. For instance, it would not be fair to compare the prices of ABS CDO triple-B bonds to CLO triple-B bonds, even if both transactions are performing admirably**.
>
> (Citigroup, *A General Review of CDO Valuation Methods*, February 15, 2006, at pp. 2-7))

## IV.   STRUCTURED INVESTMENT VEHICLES ("SIVs")

640.   Prior to and during the class period, Citigroup created and operated seven off-balance sheet variable interest entities known as "Structured Investment Vehicles" ("SIVs").

641.   Citigroup invented the first SIV, Alpha Finance Corporation, in 1988, and ever since has dominated the SIV field . By July 2007, Citigroup's seven SIVs owned in excess of $100 billion of assets collateralizing a like amount of securities issued by the SIVs, and represented slightly more than 25% of the value of all SIVs in existence.  Citigroup's seven SIVs were: (1) Beta Finance Corporation, (2) Centauri Corporation, (3) Dorada Corporation, (4) Five Finance Corporation, (5) Sedna Finance Corporation, (6) Vetra Finance Corporation, and (7) Zela Finance Corporation:

288

| Citigroup's Seven SIVs – July/August 2007<br>(all amounts in billions of dollars) | | | |
|---|---|---|---|
| | **Assets \*** | **Senior Debt** | **Equity/Capital Notes** |
| Beta | 21.61 | 20.17 | 1.41 |
| Centauri | 23.13 | 21.62 | 1.51 |
| Dorada | 13.62 | 12.73 | 0.89 |
| Five Finance | 13.39 | 12.51 | 0.88 |
| Sedna | 16.85 | 15.75 | 1.10 |
| Vetra | 2.80 | 2.62 | 0.18 |
| Zela | 4.48 | 4.19 | 0.29 |
| Total | 95.84 | 89.58 | 6.26 |

\* Assets were approximated by adding together the amounts of senior debt and equity. As SIVs' net asset values were at that time approximately 100%, the estimate is essentially correct.
(Source: Fitch, *SIVs - Assessing Potential Exposure of Sponsor Banks* , November 14, 2007)

642.    Citigroup's seven off-balance sheet SIVs were entirely Citigroup's creatures. Citigroup created them, Citigroup operated them, swelled them to $100 billion in size, and Citigroup benefitted lavishly from them. Citigroup's SIV income amounted to at least $100 million per year of wholly unencumbered revenue as Citigroup, under Enron-like accounting: (1) disclaimed any exposure to the SIVs' $100 billion of assets and liabilities, which did not appear on Citigroup's own balance sheet; and (2) thus incurred neither capital charges against the risks of those assets nor reserves against the risks of those liabilities.

643.    In November and December 2007, Citigroup admitted that the purported "off balance sheet" aspect of its SIVS was and had always been a fiction. With the stroke of a pen, approximately $50 billion of SIV liabilities (and the lesser value of the impaired assets purportedly

collateralizing those liabilities) were transferred from "off" Citigroup's balance sheet to "on". Once there, they immediately degraded it. Citigroup's capitalization was further weakened, its credit ratings were cut immediately, and billions of dollars of writedowns ensued.

644.     As with CDOs, Citigroup had tens of billions of dollars of exposures with respect to the SIVs it sponsored, managed and underwrote. As with CDOs, Citigroup's SIVs generated a rich stream of revenues for Citigroup. As with CDOs, Citigroup concealed and flatly denied its SIV exposures. As with CDOs, Citigroup's disclosures with respect to SIVs were minimal, misleading, offered no "meaningful and consistent information regarding [Citigroup's] involvement in various VIE structures", and failed utterly to provide any "data for an independent assessment of the potential risks of the Company's involvement in various VIEs and asset classes" (Citigroup, Form 10-K, February 22, 2008, at p. 86). As with CDOs, when Citigroup belatedly acknowledged its long-concealed and long-misrepresented SIV exposures, Citigroup's credit ratings were cut, Citigroup was forced to write down billions of dollars of impaired and devalued assets, and, not surprisingly, Citigroup's share price fell.

## A.     SIVs: What They Did, Why They Existed, and What Their Risks Were

645.     Like CDOs, SIVs issue a set of tranched securities, the proceeds from which are used to invest in a portfolio of assets that collateralize the SIV-issued securities. As in CDOs, the subordinate tranches issued by SIVs (known as "capital notes" or equity) are the first to absorb any losses suffered by the asset portfolio, thus allowing the senior SIV tranches to bear the highest credit ratings, because they are protected from potential loss by the subordinate capital notes.

646.     The differences between SIVs and CDOs are twofold.

647.     First, where the securities issued by CDOs take the form of long-term debt,

the bulk of the securities issued by SIVs are in the form of *short-term* debt – specifically, commercial paper and "medium-term notes".

648.    Second, where CDOs are finite, SIVs are infinite.  CDOs have pre-defined sizes and end-dates; they invest in a fixed amount of assets, issue a fixed amount of securities, exist for a limited amount of time, and shrink over time as their assets and liabilities are paid down.  SIVs, however, are open-ended as to both size and time.  SIVs can issue more securities to fund more asset purchases, and thus grow larger, or can shrink by selling assets and using the proceeds to retire the SIV securities.  Moreover, SIVs have no pre-set expiration dates; rather, as assets mature, SIVs can buy new assets, etc.  Thus, SIVs are a hybrid: they are a structured finance product in the form of an operating company.

649.    As with CDOs, the high credit ratings of SIV senior debt allow SIVs – or rather, SIV investors and managers –  to profit from leveraged "money in / money out" arbitrage. The low-cost funding structure of SIVs – a large tranche of senior debt, in the form of lower-yielding commercial paper and medium term notes – allows SIVs to borrow money cheaply: they pay low interest rates to senior debt investors.  SIVs then turn around and invest in higher-yielding assets. Some of this "excess spread" flows to the holders of the small equity tranche.  The remainder flows as profits and fees to the SIV manager – Citigroup.

650.    The Citigroup executive in charge of Citigroup's SIV operations, Timothy Greatorex, has explained that "taking leveraged credit risk is actually the whole point of an SIV" (*See* TheBanker.com, *Citigroup SIV Enters Uncharted Space*, October 4, 2004).  This is correct.  But it requires several lines of further explanation in order to understand why.

651.    The small equity tranche (on average, the equity tranche of an SIV constitutes

8% of the capital structure, and the senior tranches the remaining 92%) is the precondition for the

rest of the SIV because, by absorbing "first loss", it: (1) protects the senior tranches from loss; (2)

thus allows the SIV to issue the senior tranches with high credit ratings and low yields; and thus (3)

allows the SIV to generate "excess spread" over a large portfolio of higher-yielding assets.

652.     In effect, an SIV "levers" its equity tranche (say, $1 billion) to allow it to

borrow 12 times more money ($12 billion) at low rates.  The SIV then invests the entire $13 billion

in higher yielding assets.  The excess spread from this $13 billion is then, in part, funneled down to

the small equity tranche (only $1 billion), providing that small tranche with more attractive yields

and returns *by virtue of the leverage* (excess returns from $13 billion of assets being funneled down

to only $1 billion of securities backed by those assets).  The remainder of that excess spread flows

to the SIV manager.

653.     Thus "taking leveraged credit risk" was "actually the whole point of an SIV"

because it allowed Citigroup to extract leveraged returns, for itself and for equity investors, on the

basis of small equity investments that made the larger, leveraged SIVs possible.

654.     The risks of SIVs were apparent and understood *ab initio*.  They violated one

of the oldest banking lessons on record by virtue of their tremendous maturity mismatch between

assets (long term) and liabilities (short term).

655.     As Commercial Paper CDOs issued super senior tranches in the form of

commercial paper, they closely resemble SIVs.  As in the case of the Commercial Paper CDOs,

SIVs' reliance on short-term debt exposed them to inherent "liquidity risk":  the necessity to

periodically "roll over" maturing short-term debt.  If current investors refuse to "roll over" their

commercial paper investments and new investors cannot be found to replace them, an SIV will be

forced to sell assets to generate the cash needed to pay back maturing short-term debt.

656.    The tinderbox for such liquidity risk was the credit risk and/or market value of the SIV's assets.  If the assets deteriorated in credit quality or market value, then investors would be more reluctant to purchase and/or roll over securities collateralized by those assets.  This would force the SIV to sell assets in order to be able to repay its maturing short-term debt.  But, precisely because it was asset deterioration that started the problem, the SIV would be selling its assets at a loss.  As more short-term debt became due, more assets would have to be sold, at further losses.  In sum, without new and willing investors to buy in and prevent such asset sales, the SIV would be locked into implosion, and losses would mount into equity tranche and even beyond it to the senior tranches.

657.    This risk was written into every SIV structure.  As Moody's stated in <u>2002</u>:

> **Given that SIVs fund a portfolio of longer dated assets with short debt the... funding role is of vital importance. If the SIV is unable to roll funding on assets the asset may need to be sold to pay off the maturing debt, thus potentially incurring mark to market losses**. The vehicle's debt portfolio must be managed to ensure that the vehicle has continuous access to the debt capital markets at levels that allow the vehicle to remain profitable. (Moodys, *An Introduction to Structured Investment Vehicles*, January 25, 2002 at p. 8)

658.    To mitigate against this risk, SIVs obtained guarantees from banks to purchase limited amounts of rolling over SIV securities if roll overs failed ("liquidity backstops").  Such liquidity backstops, however, generally amounted to only 5%-10% of SIVs' debt.

659.    To further mitigate against this risk, and ostensibly to protect investors in SIV senior debt, SIV covenants stipulated that, if SIV net asset values fell to a point at which the ability to repay senior investors were imperiled, SIVs would be declared in "defeasance" and would enter

293

"enforcement" – i.e., liquidation of assets so as to repay senior debt investors before further losses would ensue.

660.    In mid-2007, SIVs experienced just such an implosion.  The credit quality and market value of their assets deteriorated.  Investor willingness to roll over SIV commercial paper evaporated entirely.  SIVs were forced to sell devalued assets, and the forced sales further devalued those assets.  SIV net asset values plunged, equity losses became substantial, and SIVs approached their defeasance triggers, which would trigger asset liquidation.  Large losses for SIV investors were imminent.

**B.    Citigroup's SIVs: Schemes, Omissions, Misrepresentations and False Accounting**

661.    Citigroup insisted in September 2007 that its SIVs were fine, but they were not.  Citigroup insisted throughout that  it was not exposed to its SIVs in any way and was under no obligation to support them and/or assist in the rollover of their debt. This too was false and misleading: Citigroup was obligated to save its SIVs, by September 2007 had spent $3.3 billion doing so (undisclosed until November 2007), and in November 2007 stepped in to commit $10 billion to repurchasing rolling over debt that no other investors wanted – in the purported absence of any "contractual obligation" to do so.  Citigroup insisted that it would take no action that would require consolidating its SIVs onto its balance sheet.  But deconsolidation and off balance sheet treatment had always been a misleading fiction, as Citigroup's $10 billion lifeline made clear.  As Citigroup SIVs' net asset values plunged ever closer to malfeasance triggers during November and December 2007, Citigroup stepped in again in mid-December 2007 with a credit facility to ensure that SIV senior debt investors would receive their full money back, and consolidated the assets and

liabilities of its SIVs onto its balance sheet.

662.    Citigroup's seven SIVs were entirely Citigroup's creatures. Citigroup created them, Citigroup operated them, swelled them to $100 billion in size, and Citigroup benefitted lavishly from them.

663.    Citigroup's SIV income amounted to at least $100 million per year of wholly unencumbered revenue as Citigroup, under Enron-like accounting: (1) disclaimed any exposure to the SIVs' $100 billion of assets and liabilities, which did not appear on Citigroup's own balance sheet; and (2) thus incurred neither capital charges against the risks of those assets nor reserves against the risks of those liabilities:

> **...The vehicles provided SIV managers -- often banks -- with steady income and a share of the SIVs' investment earnings, without requiring any big expenditures or adding any liabilities to their balance sheets.  According to the filings, Citigroup's largest fund, Centauri, paid its core investors $62.7 million in the year ended September 2006, up from $45.7 million in the previous year. Citigroup collected fees of more than $24 million**[34].

> (Wall Street Journal, *Banks' SIVs, Emerging From Shadows --- U.K. Filings Show Vehicles Provided Rich Profit Streams*, October 26, 2007)

664.    In sum, improper off-balance sheet treatment of the SIVs was the pivot upon which this scheme turned.  Neither the assets nor their risks appeared on Citigroup's books, nor the liabilities and their risks, but, instead – and only – a constant stream of income generated by SIVs'

---

[34]    Centauri, as the table immediately above indicates, accounted for $23 billion of Citigroup's SIV total of $95 billion, or 24% of the total.  As Citigroup's fees from Centauri were $24 million, Citigroup's fees from the remaining six SIVs, 76% of the SIV total, were $76 million.  *See also* Bloomberg, *Citigroup SIVs Earned More than $41 Million in Fees (Update 1)*, October 26, 2007.

295

leveraged credit risks.  This was the scheme: hundreds of millions of dollars of income from nowhere, made possible by $100 billion of off balance sheet assets and liabilities for which Citigroup falsely disclaimed any liability, responsibility, or risk, and against which Citigroup incurred none of the customary costs (capital charges, reserves).

665.   By applying Enron-like accounting with Enron-like rationale Citigroup maintained a public fiction that its SIVs were "off balance sheet" variable interest entities.  In so doing, Citigroup's practices created the false and misleading appearances that: (a) Citigroup had no exposure to its SIVs' $100 billion of assets; (b) Citigroup had no exposure to its SIVs $100 billion of liabilities; and (c) Citigroup thus had no need to incur (1) capital charges against those $100 billion of SIV assets; or (2) reserves against those $100 billion of SIV liabilities.  All this was false, as Citigroup admitted in stages beginning November 5, 2007.  Why?

666.   Citigroup could not afford to let its SIVs fail.  Citigroup had created $100 billion of SIVs and had sold nearly $100 billion of SIV-issued securities to Citigroup clients the world over.  As SIVs began imploding in mid-2007, the investors to whom Citigroup had sold the SIV securities were locked in to imminent and sizeable losses from securities that Citigroup had marketed as among the safest investments possible.  Those investors would suffer their losses – and Citigroup would suffer an enormous reputational and in turn financial blow.  Investors the world over would shun Citigroup products.  Citigroup's choice was either: (1) to let the instruments fail, let investors take "their" losses, and suffer the consequences; or (2) to step in, support the instruments, and take upon itself the losses from tens of billions of billions of assets and liabilities to which Citigroup insisted it had no exposure:

Wall Street has a lot riding on the financial industry's effort to ease

296

frozen credit markets by creating an $80 billion rescue fund -- but no company more than Citigroup...

Citigroup is the largest participant in the $350 billion SIV market, managing seven of the vehicles that hold a combined $80 billion of assets... SIVs turned profits for years, before the credit crunch hit in July, by issuing short-term commercial paper and medium-term notes to investors and then using the proceeds to buy higher-yielding assets, some of them linked to mortgages. But investors are concerned about potential subprime exposure among these assets, and stopped buying the commercial paper from SIVs in August. The funds still owe money to commercial-paper holders. If they can't raise money by selling new commercial paper, they could be forced to unload the securities at fire-sale prices...

... **Citigroup and other SIV managers could find themselves in a bind that could force them to take financial hits. If [] buyers continued to stay away from the commercial-paper market, the bank might feel pressure to pony up cash to backstop the SIVs to preserve its reputation with the vehicles' investors, who would otherwise incur the bulk of the losses. But that prospect has raised the issue among accounting professionals about whether the bank shares in potential losses to such an extent that it should consolidate the SIVs onto its own books**...

(Wall Street Journal, *For Citi, Stakes Get Higher --- Some Question if SIVs Should Be Accounted On Firm's Balance Sheet*, October 31, 2007)

667.    The matter boils down to the issue of "recourse".  Citigroup insisted that its SIVs were "non recourse" securitizations and sales: it had sold collateralized SIV instruments to investors, and investors thus bore the risks of the collateralizing assets.  But the substantive reality was and had always been that "recourse" existed, because Citigroup could not afford to let these instruments fail.  This reality is summarized by the aphorism that "the first non-recourse securitization you do will be the last securitization you ever do":

**Investors were shocked recently to discover Citigroup and a handful of other banks were on the hook, morally if not legally,**

297

**for hundreds of billions of dollars' worth of a product so esoteric it had many scrambling for their finance dictionaries.   The product, structured investment vehicles, or SIVs, didn't appear on the banks' balance sheets.   Nor did SIVs show up among the liabilities banks scantily disclose as so-called off-balance-sheet items.   In other words, they were a black hole.   "There are no regulatory reports, no SEC filings.   Everyone's in the dark"** says Bert Ely, a Cato Institute scholar and banking consultant...

**The SIVs, with $400 billion or so in assets, didn't show up on their balance sheets, their off-balance sheet statements or anywhere else.     That's because they're categorized as "bankruptcy remote vehicles" which the banks have no fiduciary duty to disclose and no contractual obligation to support.   The problem with SIVs is that contracts are not the only form of binding obligation.   Citigroup set up the SIVs, with names like Beta, Centauri and Dorada, with $80 billion in assets.   When investors began fearing they were packed with doggy paper... financing dried up**... <u>**If Citi exercised its legal right to walk away, it would do damage to its ability to do other deals and to investor confidence generally.   Contract or not, Citi is on the hook**</u>...

(Forbes *Black Hole Banking*, November 12, 2007)

668.    Contract or not, Citigroup was on the hook, and always had been.   This became clear in November and December 2007, when Citigroup admitted in drips and drabs that it would provide – and actually had been providing – billions of dollars of recourse for SIV investors in the absence of any contractual obligation to do so.   By mid-December 2007, Citigroup finally gave up the lie and consolidated the SIVs – whose risks Citigroup now clearly bore and always had born, but not adequately disclosed – onto its own balance sheet.

669.    As an SIV market participant astutely concluded:

**What we've just learned is SIVs are not [the] off-balance sheet vehicle we thought they were.   The reality is the SIVs are off balance sheet when times were good and on balance sheet when times are bad.'**

298

*****

'In the end I think the calculation is the reputational damage would cost more than the incremental cash to bail it out"... said Don van Deventer, chief executive officers at Kamakura Corp., a Honolulu-based provider of software and research to financial companies that has done work for owners of SIV liabilities.

(Bloomberg, *Citigroup to Consolidate Seven SIVs on Balance Sheet (Update 3)*, December 13, 2007)

## 1.     SIV Risks Materialize

670.     SIVs began imploding in July and August 2007 when it became apparent that certain SIVs had, as their assets, CDOs of the very sort discussed in this complaint.  One of the first to blow up was the Rhineland SIV.  Its in excess of $25 billion of assets constituted a  sum approximately five times greater than the entire market capitalization of its sponsor IKB DeutschIndustriebank AG ("IKB").  As the Rhineland SIV failed, it therefore threatened to take IKB down with it – an outcome prevented at the last minute by an emergency bail-out led by the German government.  (*See* Wall Street Journal, *Global Scale: Impact of Mortgage Crisis Spreads --- How Subprime Mess Ensnared German Bank; IKB Gets a Bailout*, August 10, 2007).

671.     As Citigroup only revealed on October 15, 2007 in response to a stray question during Citigroup's conference call, Citigroup was directly exposed to IKB's Rhineland SIV as one of its liquidity backstop providers.  Just as investors were deserting Rhineland investments, Citigroup was obligated to purchase Rhineland's securities.  The result: a "big jump" in Citigroup's nonperforming assets "primarily driven" by Citigroup's Rhineland exposure:

JOHN MCDONALD, ANALYST, BANC OF AMERICA SECURITIES: Hi, Gary. Question on the nonperforming assets. There was a big jump in the commercial side on the back page, total corporate cash basis. Can you give some color on that?

299

GARY CRITTENDEN: Yes, that is primarily driven by one single name. There is actually two there in total; but one is the larger of the two. That is, let's see, IKB AG, right? IKB AG, standby commercial paper arrangement that we had. So they were the funder of a CP. They were a funder of a SIV in the UK. We had a standby arrangement to support that SIV. When they became unable to provide that funding we had a requirement to step in and provide that funding. You see that as an increase in the cash loans that are there on the balance sheet.

Now, you also see that we took a corresponding increase in our credit reserves in the corporate side of the loan loss reserve. We did that specifically in response to this. But that is the largest of the two pieces that are in that increase that you identify.

JOHN MCDONALD: Okay, so most of the increase from 600 to 1,200 is two things, and you gave us one of them?

GARY CRITTENDEN: And that is by far and away the largest of the two pieces.

672.    Of Citigroup's surprise exposure to others' SIVs, let alone its own, the New York Times noted:

... banking has evolved to the point where a large part of the revenue comes from things invisible to readers of financial statements, either commitments to make loans, or through vehicles carefully engineered to stay off the balance sheet.

A notable illustration came from Citigroup. Its write-offs were half a billion dollars more than the bank had forecast only two weeks earlier, and its optimism about the fourth quarter was toned down considerably.

But the most impressive fact was the bank's explanation of why its nonperforming corporate loan total had doubled, to $1.2 billion, in just three months.

Citi explained that the bulk of that came from just one loan -- and it was a loan that had not even been made a few months earlier. Citi had taken a fee to provide a backup line of credit to a structured investment vehicle -- a line that would be called on only if the S.I.V.

could not borrow and a German bank could not meet its promise to make the loan.

That happened, so Citi forked over the cash and immediately put the loan on nonperforming status.

That's a neat trick. You don't make the loan until you know it will be a bad loan.

(New York Times, *High and Low Finance; No Way to Make a Loan*, October 19, 2007)

673.    Problems at other SIVs, first sparked by their like investments in CDOs and subprime, soon followed.  For example, during August 2007, Cheyne Finance, a $6.6 billion SIV 48% of whose portfolio was invested in subprime RMBS with further amounts in CDOs, drew down its full $275 million of backstop liquidity from Bank of New York Mellon, Merrill Lynch and Danske Bank as investors fled rollover (Wall Street Journal, *U.K.'s Cheyne Joins the Chain of Firms Battered by the Credit-Market Turmoil --- Affiliate Unloads Assets To Repay Obligations As Global Selloff Grows*, August 30, 2007).

674.    Matters were exactly the same across the entire SIV landscape.  By August 2007, the commercial paper market had come to a stand still, as investors fled from SIV rollovers:

> SIVs have been a booming business for banks. The total value of SIV portfolios increased to $370 billion in June from $205 billion in December 2005, according to Citigroup Inc. research. SIV-lites have emerged in the past 18 months and have a total portfolio volume of about $13.5 billion, Citigroup said in an Aug. 3 report. The big problem for SIVs and other bank affiliates that rely on the commercial-paper market for funding: In the past few weeks, investors have stopped buying commercial paper sold by these structures because they are concerned that the vehicles are exposed to U.S. subprime mortgages. The banks are left without funding for the structures and are having trouble selling assets because many have significantly decreased in value. This week, for example, British bank HBOS PLC said it would step in to cover the maturing commercial

paper of one of its affiliates.

(Wall Street Journal, *Credit Crunch: Barclays Capital Executive Resigns as Investments Slip*, August 24, 2007)

675.    Given that Citigroup was by far the largest operator of SIVs – Citigroup's SIVs owned in excess of $100 billion of assets collateralizing a like amount of securities issued by the SIVs; amounting to slightly more than 25% of the value of all SIVs in existence – the spotlight soon swung to Citigroup:

> **Though few investors realize it, banks such as Citigroup Inc. could find themselves burdened by affiliated investment vehicles that issue tens of billions of dollars in short-term debt known as commercial paper. The investment vehicles, known as "conduits" and SIVs, are designed to operate separately from the banks and off their balance sheets. Citigroup, for example, owns about 25% of the market for SIVs, representing nearly $100 billion of assets under management. The largest Citigroup SIV is Centauri Corp., which had $21 billion in outstanding debt as of February 2007, according to a Citigroup research report. There is no mention of Centauri in its 2006 annual filing with the Securities and Exchange Commission**...
>
> **Yet some investors worry that if vehicles such as Centauri stumble, either failing to sell commercial paper or suffering severe losses in the assets it holds, Citibank could wind up having to help by lending funds to keep the vehicle operating or even taking on some losses. Citigroup has told investors in its SIVs (which stands for Structured Investment Vehicles) that they are sound and pose no problems. "Quite simply, portfolio quality is extremely high and we have no credit concerns about any of the constituent assets," said a recent letter from Paul Stephens and Richard Burrows, directors in Citigroup's London-based group that oversees the bank's SIVs. "Citi's SIVs remain robust and their asset portfolios are performing well." A Citigroup spokesman declined to comment on the bank's SIV disclosures or potential exposure that it might face from them**.
>
> So far, there hasn't been any suggestion of problems with Citigroup's SIV or conduit vehicles. Yet **recent turmoil in the**

**commercial-paper market, in which some issuers were unable to find buyers for new paper, raised concerns that SIVs and conduits could face problems that would force the banks affiliated with them to step in. This has left bank investors grasping at straws as they try to piece together the risks facing individual banks.** Accounting rules don't require banks to separately record anything related to the risk that they will have to loan the entities money to keep them functioning during a markets crisis. "Any off-balance-sheet issues are traditionally poorly disclosed, so to some extent, you're dependent on the insight that management is willing to provide you and that, frankly, is very limited," says Mark Fitzgibbon, director of research at Sandler O'Neill & Partners, which focuses on the financial-services industry.

… **Banks affiliated with the vehicles typically agree to provide a so-called liquidity backstop -- an assurance the vehicles' IOUs will be repaid when they come due even if they can't be resold, or rolled over -- for all the paper in a conduit. For SIVs, three to five banks typically offer a liquidity backstop, but only for a portion of the vehicles' debt. Those liquidity backstops have become important because gun-shy investors are in some cases refusing to buy commercial paper. That could force banks to ride to the rescue if it happened to one of their affiliated conduits or SIVs.** These conduits are substantial in some cases. Take Citigroup, the nation's largest bank as measured by market value and assets. Its latest financial results showed that it administers off-balance-sheet, conduit vehicles used to issue commercial paper that have assets of about $77 billion. Citigroup is also affiliated with structured investment vehicles, or SIVs, that have "nearly $100 billion" in assets, according to a letter Citigroup wrote to some investors in these vehicles last month.

. . . Accounting rule makers in the U.S. then looked at who controls the vehicles based on who shares the majority of risks and rewards associated with them. Banks found that **by selling to a third party any first loss associated with the vehicles, they could transfer the risks associated with them. That helped to keep the vehicles off their books. The current market turmoil has rekindled debate over whether the vehicles should be consolidated. Some also suggest banks should have to account for the liquidity backstops they offer these vehicles, since they resemble guarantees and could even force banks to take conduit or SIV assets onto their own books. To many observers, the off-the-books treatment flies**

**in the face of the banks' extensive involvement with SIVs and conduits. A 2005 Moody's Investors Service report said that Citibank International PLC, Centauri's investment manager, handles tasks such as evaluating investment opportunities, arranging funding and hedging**...

(Wall Street Journal, *Conduit Risks Are Hovering Over Citigroup --- If the Vehicles Go Sour, Rescues Could Be Costly; Bank Has 'No Concerns*, September 5, 2007)

## 2      Citigroup SIV Exposures Are Revealed

676.    In its November 5, 2007 Form 10-Q, Citigroup disclosed that, although it purportedly had "no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs", it nevertheless had (at some prior point in time) extended "$10 billion of committed liquidity"to its SIVs.  The SIVs could draw on this $10 billion liquidity commitment to repurchase maturing short-term debt, rather than having to sell assets to do so.  The November 5, 2007 Form 10-Q, in an obscure footnote, further stated that, by September 30, 2007, Citigroup had already repurchased $3.3 billion of its SIVs' securities (Citigroup, Form 10-Q, November 5, 2007, p. 65 fn. 6).  By November 5, 2007, the SIVs had drawn down $7.6 billion of the $10 billion in committed funds:

CAI's Structured Investment Vehicles (SIVs)

CAI's Global Credit Structures investment center is the investment manager for seven Structured Investment Vehicles (SIVs). SIVs are special purpose investment companies that seek to generate attractive risk-adjusted floating-rate returns through the use of financial leverage and credit management skills, while hedging interest rate and currency risks and managing credit, liquidity and operational risks. The basic investment strategy is to earn a spread between relatively inexpensive short-term funding (commercial paper and medium-term notes) and high quality asset portfolios with a medium-term duration, with the leverage effect providing attractive returns to junior note holders, who are third-party investors and who

304

provide the capital to the SIVs.

**Citigroup has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs** and does not own any equity positions in the SIVs. The SIVs have no direct exposure to U.S. sub-prime assets and have approximately $70 million of indirect exposure to sub-prime assets through CDOs which are AAA rated and carry credit enhancements. Approximately 98% of the SIVs' assets are fully funded through the end of 2007. Beginning in July 2007, the SIVs which Citigroup advises sold more than $19 billion of SIV assets, bringing the combined assets of the Citigroup-advised SIVs to approximately $83 billion at September 30, 2007.

**The current lack of liquidity in the Asset-Backed Commercial Paper (ABCP) market and the resulting slowdown of the CP market for SIV-issued CP have put significant pressure on the ability of all SIVs, including the Citi-advised SIVs, to refinance maturing CP.  While Citigroup does not consolidate the assets of the SIVs, the Company has provided liquidity to the SIVs at arm's-length commercial terms totaling $10 billion of committed liquidity, $7.6 billion of which has been drawn as of October 31, 2007. Citigroup will not take actions that will require the Company to consolidate the SIVs**.

(Citigroup, Form 10-Q, November 5, 2007, p. 7)

677.   Citigroup's November 5, 2007 disclosures began to expose the fiction (and contradictions) of Citigroup's SIV stance:  Where did this "$10 billion of committed liquidity" come from?  Either: (a) it had existed before but had never before been disclosed; or (2) it was a new commitment undertaken by Citigroup.   Crediting Citigroup's formal but not substantive insistence that it had "no contractual obligation" to its SIVs, and thus that the $10 billion commitment was a "new" one, why in the world would Citigroup expose $10 billion into this of all markets if no contract obligated it to?  Because Citigroup recognized and always had recognized obligations imposed on it by the marketplace.  Citigroup's real-world Hobson's Choice was to rest on its

assertion of no contractual liability, in which event it would lose its clients, or acknowledge its *dehors* contract obligations to its clients, and assume the risks associated with the investments. Because Citigroup thus and always bore the risks of these investments, Citigroup under applicable accounting standards should have and was required to consolidate these investments onto its own balance sheet. In reality, the risks were Citigroup's.

678. A vivid sense of the nature of this very obligation is revealed by Citigroup's pledge to SinoPac Financial Holdings, to whom Citigroup had sold $350 million of now-illiquid and fast-devaluing SIV securities:

> Citigroup has assured SinoPac Financial Holdings Co., the Taiwan lender with the most holdings in Structured Investment Vehicles, it will support products it sold to the company, a SinoPac executive said. The pledge was made in a letter Citigroup sent to SinoPac, which has bought 60% of its SIV investments from the US bank, said Richard Chang, executive vice president of the Taiwanese lender, in a phone interview today... "The Citigroup letter said its top levels will give the highest attention to our SIV investments and it will try its best effort to support this and provide liquidity", Chang said. "It's a relief to us as Citigroup wouldn't have said so if it feels the situation isn't under control. Overall losses will be limited"... Chang's comment came after the Taipei-based Commercial Times newspaper reported today that Citigroup assured SinoPac that it's determined to shore up the value of the SIVs it sold to the Taiwanese lender, citing SinoPac President Paul Lo… SinoPac on Oct. 24 said it's invested $350 million into SIVs [and has] booked a loss of $43 million on the investment...
>
> (Bloomberg, *Citigroup Vows to Support SinoPac SIVs, Taiwan Lender Says*, November 13, 2007)

679. Citigroup's situation vis a vis SinoPac was repeated countless times over: SinoPac had bought $350 million of SIV securities, other investors collectively purchased two hundred times more. Citigroup's SIV securities were roiling pension funds and money market funds

around the world (*See*, e.g., Bloomberg, *Public School Funds Hit by SIV Debts Hidden in Investment Pools*, November 15, 2007)[35]. Another example: Orange County's various funds held $837 million of SIV securities, including those issued by Citigroup's Centauri and Five Finance:

> Orange County, California, the wealthiest U.S. municipality ever to declare bankrupcty, bought structured investment vehicles similar to those that caused a run on funds invested by local governments in Florida.[36]

---

[35]    Some examples (of a list that could be extended *ad infinitum*): Fidelity's money market accounts had $7 billion invested in five SIVs, including Citigroup's Centauri and Dorada; Bank of America's Columbia Cash Reserve fund had invested in six SIVs, including Citigroup's Five Finance and Sedna (Fortune, *Even 'Safe' Funds Play with Fire*, October 19, 2007). Invesco's AIM Treasurers Series Trust Premier Portfolio held, as of September 30, 2007, $50 million of Dorada and $25 million of Five Finance (AIM Treasurers Series Trust Premier Portfolio, *Portfolio Holdings*, September 2007). The Connecticut State Treasurer's Short-Term Investment Fund held, as of September 2007, $100 million of Citigroup's Beta SIV, $100 million of Dorada, and $100 million of Five Finance (State of Connecticut Treasurer's Office, *Quarterly Report: Short-Term Investment Fund*, September 2007). West Virginia, as of June 30, 2007, owned $15 million of Beta's notes, $33 million of Centauri's notes, and $30 million of Dorada's notes (*see* West Virginia Board of Treasury Investments, *Financial Report: June 2007*, June 30, 2007). Barclay's Money Market Master Portfolio held, as of December 31, 2007, $115 million of Dorada's notes, $100 million of Sedna's notes, $150 million of Zela's notes (*See* Barclay's Government Money Market Fund, Institutional Money Market Fund, Prime Money Market Fund, and Treasury Money Market Fund, *2007 Annual Report to Shareholders*, December 31, 2007). As of June 30, 2007, the Nikko money market fund (Nikko was Citigroup's Japanese subsidiary) owned $90 million of Beta notes, $20 million of Centauri's $27.5 million of Dorada's notes, and $25 million of Five Finance (*see* Nikko Cordial, *Nikko Money Market Fund Mutual Investment Fund Luxembourg, Unaudited Semi-Annual Report*, June 30, 2007). The Northern Funds' Money Market Fund held, as of December 2007, $20 million of Beta's notes, $65 million of Centauri's, and $55 million of Dorada's (*see* Northern Trust, *Northern Funds - Money Market Fund – Holdings as of Dec 31, 2007*). As of June 30, 2007, Deutsche Bank's primary money market fund owned $70 million of Beta's notes, $115 million of Centauri's, and $145 million of Five Finance's (*see* DWS Money Market Series Institutional Shares, *Semiannual Report to Shareholders*, June 30, 2007). As of February 2008, the Citi Institutional Liquidity Fund Plc (managed by Legg Mason) held $200 million of Beta's notes, $250 million of Centauri's notes, and $200 million of Five Finance's notes (*see* Citi Institutional Liquidity Fund Plc, *Semi Annual Report for the Six Months Ended February 29, 2008*).

[36]    Further investigation reveals that $110 million of Orange County's SIV holdings were of Citigroup's Five Finance, and a further $100 million of Citigroup's Centauri (*See* Orange County, Office of the Treasurer-Tax Collector, *Changes in Eligibile Credits* January 10, 2008).

(Bloomberg, *Orange County Funds Hold SIV Debt on Moody's Review (Update3)*, December 5, 2007)

680.    Citigroup's stance with respect to SIVs is further demonstrated by the December 4, 2007 testimony of Citigroup's William Mills (Chairman and CEO of Citigroup's Europe, Africa and Middle East division) to the House of Commons' Select Committee of the Treasury:

> **Q1229 John Thurso: I am now thoroughly perplexed. You have something that is not an asset or a liability; it is classed as an exposure by other people. If you did bring it into your balance sheet it would have an impact but you do not intend to do so. Can you help me?**
>
> **Mr Mills: I will do the best I can. The facts are: we have sponsored vehicles that have outside investors that have provided the equity to support these vehicles. Those equity investors have an economic interest in these transactions. The exposure arises from the fact that from a business model point of view they are funded short term and their assets are long term. What the market is trying to estimate is, if, in fact the liquidity crisis continues, will we, Citigroup, provide the liquidity to fund these vehicles so they do not have to go into an asset disposal mode**, especially in an environment where people feel that that would just add more fuel to the fire. What we have said, particularly because we understand the assets in these vehicles, is that these vehicles are in the process of orderly unwinding. The vehicles have sold ...
>
> Q1230   John Thurso: **You are saying that you do not have an exposure?**
>
> **Mr Mills: There is the moral hazard issue as to whether or not from a reputational point of view if we do not step in and support these vehicles it will somehow hurt our reputation in the market**.
>
> **Q1231  John Thurso: But as far as your stated public balance sheet goes there is no asset or liability on you involved in these things?**
>
> **Mr Mills: Right now, Sir, we have supported the vehicles. I can**

**get back to the Committee with an exact number, but it is somewhere in the neighbourhood of $8 billion**.

*****

**Q1276  Chairman: As a result of this crisis do you agree that you have suffered reputational damage?**

**Mr Mills: I believe that we have suffered reputational damage, yes**.

(*House of Commons – Select Committee, Treasury – Minutes of Evidence*, December 4, 2007)

681.    However, given Citigroup's SIVs' size, collateral deterioration, and investors' complete distaste for SIV investments, even "somewhere in the neighbourhood of $8 billion" was insufficient.  During November 2007, as collateral deteriorated, more debt matured and no investors – save Citigroup – were to be found, Citigroup's SIVs were forced to sell devalued assets and incur losses.  SIVs' net asset values plummeted, and the rating agencies downgraded the "first loss" capital notes and indicated they would downgrade approximately *$65 billion* of triple-A rated senior SIV securities:

> **Centauri Corp., the largest SIV run by Citigroup with $16.9 billion of debt, had its P1 commercial paper rating placed on review for downgrade, as well as its AAA medium-term note program.  Centauri's Net Asset Value dropped to 60%** from 85% since Sept. 5, Moody's said.  **Beta Finance Corp., the second largest Citigroup SIV with $16 billion of debt, had its senior debt ratings placed on review for downgrade after its Net Asset Value declined to 60%** from 87%, Moody's said.  Four other Citigroup SIVs -- Sedna Finance Corp., with $10.7 billion of debt, Five Finance Corp., with $10.3 billion, Dorada Corp., with $8.5 billion, and Zela Finance Corp., with $2.5 billion, had their P1 commercial paper rating and AAA medium term note programs place on review.  **Sedna's NAV dropped to 56%, Five's to 63%, Dorada to 62% and Zela to 61%**.  Dorada's capital note program was reduced to Caa3 from Baa1.

309

(Bloomberg, *Moody's Says Citigroup SIV Debt Ratings Under Threat*, November 30, 2007)

*****

The drop in the market values and the inability to finance the SIV debt is expected to put new pressure on banks such as Citigroup to support the billions of dollars in debt that SIVs face having to pay in coming months... The worsening in performance [was] highlighted by Moody's on Friday...  "It's time for the bank-sponsored ones to step up, provide support," said Douglas Long, executive vice president at London-based structured-finance software firm Principia Partners. "Or they need to accelerate restructuring." A spokesman for Citigroup said that the SIVs it sponsors continue to rely on asset sales for funding.

(Wall Street Journal, *Moody's Warns Over Ratings of Some SIVs*, December 1, 2007)

682.   On December 13, 2007, Citigroup announced that it would extend a further "support facility" to its SIVs in order to "resolve uncertainties regarding senior debt repayment": i.e., Citigroup would provide the necessary funds to repay in full approximately $45 billion of its outstanding SIV senior debt.  Citigroup did not specify the terms or size of this facility, but did concede that its SIVs would henceforth be consolidated on its balance sheet "under applicable accounting rules"[37]:

> **Citi announced today that it has committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investment Vehicles** ("SIVs").
>
> **This action is a response to the recently announced ratings review for possible downgrade by Moody's and S&P of the outstanding senior debt of the SIVs, and the continued reduction of liquidity in the SIV related asset-backed commercial paper** and

---

[37]      In fact, no "applicable accounting rule" had permitted off-balance sheet treatment of these investments.

310

medium-term note markets. These markets are the traditional funding sources for the SIVs. **Citi's actions today are designed to support the current ratings of the SIVs' senior debt and to allow the SIVs to continue to pursue their current orderly asset reduction plan. As a result of this commitment, Citi will consolidate the SIVs' assets and liabilities onto its balance sheet under applicable accounting rules**.

(Citigroup, *Citi Commits Support Facility for Citi-Advised SIVs*, December 13, 2007)

683.     Amazingly, Citigroup still insisted on its limited risk exposure:

Several key factors further contributed to Citi's decision to make this commitment:

·       The SIVs continue to successfully pursue alternative funding strategies, primarily asset reductions, to meet maturing debt obligations. The SIV assets (net of cash and cash equivalents) have been reduced from $87 billion in August 2007 to $49 billion currently, while maintaining the overall high credit quality of the portfolio. **Citi expects orderly asset reductions will be sufficient to meet liquidity requirements through the end of 2008, which currently total $35 billion. Consequently, Citi expects little or no funding requirement from the facility**.

·       As assets continue to be sold, Citi's risk exposure, and the capital ratio impact from consolidation, will be reduced accordingly.

·       **Given the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited**. Approximately 54% of the SIV assets are rated triple-A and 43% double-A by Moody's, with no direct exposure to sub-prime assets and immaterial indirect sub-prime exposure of $51 million. **In addition, the junior notes, which have a current market value of $2.5 billion, are in the first loss position**.

·       Taking into account this commitment, Citi still expects to return to its targeted capital ratios by the end of the second quarter of 2008. Based on September 30, 2007 capital ratio disclosures and applying the current asset levels in the SIVs, the estimated impact of this action would have been approximately 16 basis point decline in the Tier 1 capital ratio and approximately 12 basis point decline in the

311

TCE/RWMA ratio.

"Our team has made great progress managing the SIVs in a very difficult environment. After considering a full range of funding options, this commitment is the best outcome for Citi and the SIVs," said Vikram Pandit, Citi's Chief Executive Officer.

**The terms of this committed facility will be finalized in early 2008 and will reflect market terms**.

(Citigroup, *Citi Commits Support Facility for Citi-Advised SIVs*, December 13, 2007)

684.    At all times through December 14, 2007 Citigroup fundamentally misrepresented its SIVs as off-balance sheet entities when the reality was that Citigroup was and always had been "on the hook" for their risks, assets and liabilities.  By falsely insisting that matters were otherwise, Citigroup understated its assets by $100 billion, understated its liabilities by a like amount, overstated its capital ratios (because Citigroup did not hold any capital against those assets' risks), and under-provisioned its loss reserves (because Citigroup established none against those liabilities' risks).

### 3.    Citigroup SIV Exposures Had Been Concealed, Omitted and Misrepresented

685.    The term "structured investment vehicle" did not appear even once in any Form 10-Q filed by Citigroup throughout 2004, 2005, 2006 and the first 10 months of 2007.  Only in hindsight is it possible to understand that Citigroup's SIVs were included in a broader class of off-balance sheet instruments labeled as "investment related transactions" in the financial statement footnote section titled "Securitization and Variable Interest Entities" of each such filing.  The sole disclosure was that such  "investment related transactions" entities existed, unconsolidated, with "$X" billion of assets (in this instance, taken from Citigroup's August 3, 2007 Form 10-Q):

... the following table represents the total assets of unconsolidated

VIEs where the Company has significant involvement:

| In billions of dollars | June 30, 2007 | December 31, 2006 |
|---|---|---|
| CDO-type transactions | 74.7 | 52.1 |
| **Investment-related transactions** | **134.4** | **122.1** |
| Trust preferred securities | 10.3 | 9.8 |
| Mortgage-related transactions | 5.0 | 2.7 |
| Structured finance and other | 37.4 | 41.1 |
| Total assets of significant unconsolidated VIEs | 261.8 | 227.8 |

(Form 10-Q, August 3, 2007, p. 67)

686.    Citigroup's Form 10-K disclosures with respect to SIVs differed not at all in

substance.  In addition to the "investment related transactions" disclosures made in the Forms 10-Q,

the Forms 10-K provided another table that distinguished between "investment funds" and

"structured investment vehicles", providing subtotal dollar figures for each, which when added up

roughly matched the "investment related transactions".

687.    Just as with CDOs, Citigroup's disclosures with respect to SIVs were

minimal, misleading, offered no "meaningful and consistent information regarding [Citigroup's]

involvement in various VIE structures", and failed utterly to provide any "data for an independent

assessment of the potential risks of the Company's involvement in various VIEs and asset classes"

(Citigroup, Form 10-K, February 22, 2008, at p. 86).  Indeed, based on the disclosures provided by

Citigroup in each of its class period SEC filings prior to November 2007, it appeared that SIVs

presented no risk at all.

688.   The SIV situation was Enron redux:

**Changes enacted after Enron's collapse were supposed to prevent companies from burying risks in off-balance-sheet vehicles. One lesson of Enron was that the idea that companies could make profits without taking any risk proved to be as ridiculous as it sounds**.  Regulators made a great show of slamming closed that loophole. But as the current situation makes clear, they not only didn't close it all the way, but the new rules in some ways made it even harder for investors to figure out what was going on. That is causing headaches for investors in banks, especially the biggest institutions such as Citigroup...  **All the banks had to do was structure the vehicles so that the risk of loss associated with them was ostensibly transferred to other parties. Then the vehicles could stay off a bank's balance sheet. That allowed banks to make bigger profits without having to tie up capital on their balance sheet. Never mind that the banks created, ran and garnered fees from the vehicles**...

**But the bailout of some of these vehicles shows that banks, and in turn their shareholders, did shoulder a lot of the risk connected to some of these vehicles and essentially controlled them. This belies the "whole legal fiction of separateness" as allowed by accounting rules, said Christopher Whalen, managing director of Institutional Risk Analytics, a Los Angeles research and risk-management systems firm. "This is the Enron disease**, we have not killed it," he added. Enron structured transactions to be within the letter, if not the spirit, of accounting rules in a bid to keep the deals off its books and out of view of investors. No one is saying, of course, that the big banks are literally shams like Enron....

Banks use SIVs and conduits to issue short-dated commercial paper and medium-term notes, investing the proceeds in assets such as credit-card debt and mortgage securities. The vehicles profit by capturing the difference, or spread, between the notes they sell and their investments. Their sponsor banks then garner these profits in the form of fees they charge the vehicles. **The lack of disclosure to investors about SIVs and conduits, along with the risks they pose, is "significant enough that getting a real feel for what the potential impact could be is difficult," said Craig Emrick, senior accounting analyst with Moody's Corp**.

314

**Citigroup, for example, has nearly $160 billion in SIVs and conduits, but its shareholders wouldn't get a clear view of this from reading the bank's balance sheet. Instead, footnotes only disclose that the bank provides "liquidity facilities" to conduits that had, as of June 30, $77 billion in assets and liabilities. "Generally, the company has no ownership interest in the conduits," the bank's second-quarter filing, the latest available, states. The Citigroup filing makes no mention of SIVs**. In a letter to investors in August, Citigroup disclosed that it had about $100 billion in SIV assets, although that has since declined to about $80 billion... Banks typically agree to acquire the assets of their affiliated conduits if they can't roll over their IOUs. But they only backstop a portion of SIV assets. That might make it seem like the banks have some liability, and indeed some have had to step in. But backstops aren't a sign of ownership under accounting rules, though...

**In fact, most off-balance-sheet vehicles, conduits and SIVs included, don't have "owners" in the traditional sense. Rather they are like corporate zombies and are typically set up in offshore tax havens. Because of this, accounting-rule makers trying to clamp down on off-balance-sheet vehicles decided to look at who shares in the risks and rewards of a structure, rather than who owns it, when assessing control. But banks found they could structure vehicles so that other parties would have to shoulder losses. That allowed them to pass the risks test and keep the vehicles off their books**.

(Wall Street Journal,  *Risks Sparking Bailout Were Still in Shadows By Post-Enron Rules*, October 15, 2007)

689.    As SIVs began collapsing during July and August 2007, Citigroup caused each

of its seven SIVs to issue, for the first time, public disclosures concerning their assets, values,

leverage, and status.  The report issued for Centauri, Citigroup's largest SIV, is reproduced below:

06 September 2007
CENTAURI CORPORATION
August 2007, Portfolio Commentary for Centauri

In this period of unprecedented volatility in the ABCP market, we thought it appropriate to provide an expanded commentary including a reminder of the mechanics of Centauri's structural protection

315

mechanisms.

Portfolio

The credit quality of the portfolio remains very strong, with no downgraded structured finance assets in the portfolio. The very small direct exposure to the US sub prime sector continues to fall as the underlying deals prepay. Exposure is now less than US$ 106 million (0.46% of total exposures). As mentioned in last month's report, Centauri has exposure to three sub prime deals. The holdings are 2005 vintage and are super senior positions, i.e. they have a subordinate tranche rated AAA/Aaa. The weighted average life of each of these positions is less than one year.

**Exposure to the ABS CDO sector is negligible. We stopped buying ABS CDO deals for any of the SIV portfolios in 2004, due to concerns about the correlation of the underlying products**. The only exposure in Centauri is a 2004 vintage deal, which is a super senior position . The deal is deleveraging and represents less than US$ 40 million exposure (0.17% of total exposures).

All of the exposures in the US RMBS bucket have credit enhancement in excess of the minimum threshold for AAA /Aaa. There are some deals which are AAA /Aaa rated with an additional wrap but the majority are super senior tranches (i.e. the tranche subordinate to Centauri's exposure is also AAA / Aaa rated).

In terms of other potential headline sectors, we highlight that all US CMBS exposure is super senior. Centauri has no exposure to CPDOs, levered super seniors or single tranche synthetic CDOs. Indeed, it should be apparent that in the tight credit spread market of recent years we have focused on higher quality assets in the belief that we were not being appropriately rewarded for moving down the credit curve.

In response to a number of investor queries, the table below shows the top 10 exposures in Centauri:

| Guarantor | % of Total Exposures |
|---|---|
| UBS AG | 3.01 |
| Royal Bank of Scotland | 2.99 |
| Citigroup | 2.26 |

| | |
|---|---|
| Barclays Bank | 2.24 |
| Gracechurch (Barclay's UK Prime Credit Card Trust) | 2.15 |
| Bank of America | 2.14 |
| HBOS | 2.08 |
| BNP Paribas | 2.00 |
| ABN Amro | 1.69 |
| Societe Generale | 1.64 |
| Total | 22.2 |

The top 10 exposures include a geographically diverse group of bank names. It should be noted that some of these exposures relate to the breakable deposit agreements (committed liquidity) and the over night placement of excess cash balances.

Leverage

We note that although leverage is reported as 15.65 times on page one, this figure includes overnight cash and breakable deposits. When these short term exposures are excluded, Centauri's amended portfolio leverage is only 13.84 times.

SIV Structure

In light of some recent misguided market commentaries on SIVs we thought it would be useful to remind debt investors of the key structural protection features that an SIV provides.

Capital

An SIV, unlike some other structures, has a substantial amount of capital, which is subordinated to holders of the Aaa/AAA A-1+/P-1 rated senior debt. **Following the recent deterioration in credit market conditions, the Net Asset Value (NAV) of Centauri's capital at the end of August was 84.2%, a drop of around 19% from its highs earlier this year**. It is worth highlighting that a further market deterioration of over 4 times the move that we have already seen would be required for senior debt investors to realise a loss.

Earnings generation is an important part of the structure. Centauri's most recent coupon on capital of 6.684% together with its paid performance fees of 1.7% represent in excess of 0.54% of senior debt. Such earnings would enable the portfolio to withstand a 54 basis

317

point change in its average cost of funds (approximately Libor), and a much greater increase in its marginal cost of funding, without even reducing the capital coupon to zero.

Defeasance Process

Defeasance involves the orderly sale of the portfolio to repay senior debt as it falls due.  The debt profile of Centauri currently has an average life of 10.2 months with material amounts of debt outstanding for more than twice that period of time.   Should Defeasance be triggered it would involve the orderly sale of the portfolio over a period in excess of 20.3 months as opposed to an immediate fire sale as some press speculation seems to suggest.

**High Quality portfolio**

Over recent years, the tight credit spread environment drove us to reduce risk by pursuing the following strategies in return for a minimal give up in yield:

   o Protecting the more volatile sectors (US RMBS, CMBS and arbitrage CDOs) well beyond the rating agency's requirements for AAA
   o **Avoiding what we perceived as the unduly risky areas of sub prime and CDOs of ABS**

This strategy has led to a portfolio that remains robust in this market environment and has no downgraded structured finance assets and no assets on our internal credit watch lists.

Independent Revaluation

The valuation of the portfolio is conducted by our Independent Control unit, which has a separate reporting line to Finance and Operations within Citigroup, and all valuations must come from third parties.

Impact of the current market

The dislocation we are seeing in the ABCP markets is completely unprecedented and predictably we have received a number of questions from investors. We thought it would be useful to comment on a number of topics that we have recently discussed.

318

General market liquidity was disrupted in August, but in spite of all the challenges experienced during the month Centauri issued US$ 810 million CP with a weighted average tenor of 90 days in the USCP and Euro CP markets. Furthermore, in the interests of prudence, Centauri sold just over US$ 1.8 billion of assets across financials and structured finance. Finally, we have agreed with the rating agencies the terms under which Centauri can use repos as an alternative source of funding.

We recognise that the SIV sector is currently suffering from negative headlines. This is a source of considerable frustration for us, as much of the commentary is ill informed and fails to distinguish between different types of vehicle. **We believe that the SIV model remains sound and hope that this month's report provides a clear explanation of the strengths of the structure**.

690.    The September 6, 2007 statements were false and misleading because *inter alia* their insistence: (a) that the SIVs' assets were of high quality; and (b) that the SIVs' "model remains sound".  In fact, as Citigroup would later reveal, (a) 40% of its SIVs' assets were structured finance securities, including substantial amounts of RMBS and CDOs (albeit ones that had long avoided subprime); (b) investors no longer wanted to purchase securities collateralized by such structured finance assets; (c) as a result and as detailed above, the SIV business model was not sound, but breaking down; and (d) Citigroup itself so understood, and was simultaneously and secretly then engaged in organizing a government-sponsored bail-out of the SIVs.

691.    The proposed bail-out, which came to be known as the Master Liquidity Enhancement Conduit or ("MLEC"), would in effect create a single  "Super SIV" to purchase the unwanted structured finance assets held by extant SIVs.

692.    The MLEC proposal was first publicly reported on October 13, 2007 by the Wall Street Journal:

… In a far-reaching response to the global credit crisis, Citigroup Inc.

319

and other big banks are discussing a plan to pool together and financially back as much as $100 billion in shaky mortgage securities and other investments. The banks met three weeks ago in Washington at the Treasury Department, which convened the talks and is playing a central advisory role, people familiar with the situation said. The meeting was hosted by Treasury's undersecretary for domestic finance, Robert Steel, a former Goldman Sachs Group Inc. official and the top domestic finance adviser to Treasury Secretary Henry Paulson... .There have been several meetings since the initial Sunday meeting, both at Treasury and in New York.

**The new fund is designed to stave off what Citigroup and others see as a threat to the financial markets world-wide: the danger that dozens of huge bank-affiliated funds will be forced to unload billions of dollars in mortgage-backed securities and other assets, driving down their prices in a fire sale. That could force big write-offs by banks, brokerages and hedge funds that own similar investments and would have to mark them down to the new, lower market prices**... In recent weeks, investors have grown concerned about the size of bank-affiliated funds that have invested huge sums in securities tied to shaky U.S. subprime mortgages and other assets. **Citigroup... has drawn special scrutiny because it is the largest player in this market. Citigroup has nearly $100 billion in seven affiliated structured investment vehicles, or SIVs**.

. . . For Citigroup Chief Executive Charles Prince, solving the bank's SIV is the latest fire that he needs to put out... **SIVs are purposely kept off the balance sheets of the banks to which they are affiliated. One reason for this is that banks want to keep down the amount of assets on their balance sheets to reduce the amount of capital that regulations require them to keep. Because SIVs are off the balance sheet, it is difficult for investors to size up the financial risks they pose**.

(Wall Street Journal, *Big Banks Push $100 Billion Plan To Avert Crunch --- Fund Seeks to Prevent Mortgage-Debt Selloff; Advice From Treasury*, October 13, 2007)

693. As the Wall Street Journal further reported, Citigroup – given that it operated

$100 billion of SIVs – was the driving force in the MLEC proposal:

**Citigroup took the lead in pushing for the rescue plan. Large**

320

**sums of SIV debt were coming due in November. And increasingly debt analysts were forecasting a tough future for SIVs. A Citigroup research report, issued two days before the banks and Treasury met for the first time, noted, "SIVs now find themselves in the eye of the storm."**... At a critical meeting convened by Treasury on Sunday, Sept. 16, Anthony Ryan, Treasury's assistant secretary for financial markets, asked the bankers about their outlook. The response was that assets could be sold, but in a process that would bring disorder to the markets... Banks would face huge losses if their affiliated funds were forced to unload billions of dollars in mortgage-backed securities and other assets because it would drive down prices and lead to big write-offs at the new, lower market prices...

**Citigroup has drawn special scrutiny. The bank and its London office run seven affiliates, or SIVs, that would be able to sell assets to the superconduit. Bringing assets onto its balance sheet would be a big problem for Citigroup because it would be required to set aside reserves to cover the assets. The banking titan operates with a capital ratio that is thinner than peers**...

(Wall Street Journal, *Rescue Readied By Banks Is Bet To Spur Market*, October 15, 2007)

694.    The MLEC was roundly panned as a bailout of Citigroup, as unworkable, and as yet a further continuation of the shell game schemes pursuant to which losses were not recognized but merely reshuffled.  If the MLEC were to purchase the worst SIV assets, then no one would finance the MLEC.  So the MLEC would purchase only the better SIV assets, and purportedly only at their current market values.  Yet: (a) that would still leave the SIVs with their worst assets, which at some point would have to be sold or written down, thus still leaving the SIVs with those losses; and (b) even were the MLEC to purchase the better assets at current market values, the SIVs would still incur just the same losses as they would by selling those assets into the general market, so nothing was gained.

695.    Therefore, the only way for the MLEC to absolve SIVs for their losses was

to purchase SIVs assets at higher-than-market prices.  "MLEC seems designed not just to avoid fire sales but also to prevent price discovery" concluded Bernard Connolly, chief global strategist at AIG's Banque AIG unit in London: "It stinks, as does the Treasury's sponsorship of the scheme".

696.    On or about October 18, 2007, Citigroup announced that its SIVs had succeeded in selling off $20 billion of assets and in securing their funding needs through the end of 2007 (i.e., repayment of maturing debt).  The head of Citigroup's Alternative Investments division, John Havens, stated that Citigroup's SIVs had in the past week or so been able to sell "many billions of dollars" of short-term commercial paper "to top-tier-name institutions" (Wall Street Journal, *Citi's SIVs: Staving Off a Fire Sale --- Bank Secures Funding To Last to Year's End; Different Case in Europe*, October 19, 2007).

697.    This was false and misleading.  In fact, the principal buyer of Citigroup's SIVs' debt was Citigroup itself, as Citigroup would reveal on November 5, 2007.  Non-Citigroup investors for Citigroup SIVs were effectively nonexistent.

698.    On Oct. 19, 2007 Citigroup issued a one-page fact sheet about its seven SIVs, and represented therein that  it "has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs".

699.    This was false and misleading, because Citigroup was evidently obligated even without a contract to provide just such liquidity facilities and guarantees.  In fact, Citigroup was *already* providing the very liquidity that it purported not to be bound to provide.  By September 30, 2007, Citigroup had repurchased $3.3 billion of its SIVs' debt.  During October and the first week of November 2007, Citigroup repurchased a further $4.3 billion of such debt, so that, as Citigroup revealed on November 5, 2007, it had already taken on $7.6 billion of its SIVs' debt.

700.    On November 5, 2007, Citigroup disclosed that it provided "$10 billion of committed liquidity" to its SIVs to be used to repurchase maturing debt, and that $7.6 billion of such committed funding had already been used.  Citigroup simultaneously, and nonsensically, represented that: (1) it was under no contractual obligation to support its SIVs, and that (2) it would take no steps that would require their consolidation on Citigroup's own balance sheet.  These were both false and misleading, for reasons already stated (and evident on the face of the fact that Citigroup was risking $10 billion to save its SIVs).

701.    Citigroup also disclosed in its November 5, 2007 Form 10-Q, for the first time, the material data that it had previously omitted and that better allowed for independent analysis of the SIVs' risks.  This took the form of summary disclosures of the SIVs' assets and the credit ratings of those assets.  58% of the SIVs' assets consisted of financial institutions' debt (12% triple-A rated, 44% double-A rated, and 2% single-A rated). 42% of the SIVs' assets, however, consisted of various structured finance securities, of which (a) 24% consisted of mortgage-backed securities (11% non-U.S. RMBS, 7% U.S. RMBS, 6% CMBS), (b) a further 8% consisted of various CDOs, CLOs and CBOs, and (c) the remaining 10% consisted of securitizations backed by student loans and credit card debt.

702.    On December 13, 2007, after continuing deterioration of the SIVs' assets and net asset values, and in the face of imminent rating agency downgrades of the SIVs' tens of billions of dollars of senior debt, Citigroup announced an end to the fiction of "separateness", bailed out its SIVs in order to shield senior debt investors from loss, and conceded consolidation.

703.    This bail out would be accomplished through an unspecified and unquantified "support facility".

323

704.    Yet Citigroup misrepresented the risk and its exposure to it.  First, Citigroup represented that "[g]iven the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited".  Second, Citigroup added that its SIV exposure would be protected by the SIVs' outstanding "junior notes, which have a current market value of $2.5 billion, [and which] are in the first loss position".  The first $2.5 billion of SIV losses would be borne by such junior note holders, the remainder by Citigroup.  The reasonable import of these statements was that $2.5 billion was likely to buffer Citigroup from having to incur actual and significant loss.  The statement was materially misleading under the totality of its circumstances.

705.    Stock price reactions were muted, in the absence of any quantification of the costs/extent of Citigroup's proposed "support facility" and in the presence of Citigroup's representations that not much support would be needed.

706.    On February 12, 2008, Citigroup revealed the size and nature of its SIV support facility.  Essentially, Citigroup – in order to protect senior SIV noteholders from loss – would provide a "support facility" of $3.5 billion that would function as a "mezzanine" tranche for the SIVs.  SIV losses would first be absorbed by the $2.5 billion of junior capital notes, and then, if losses exceeded that $2.5 billion, by Citigroup's new $3.5 billion support facility (rather than by holders of SIV's senior notes).  As Citigroup explained in its February 22, 2008 Form 10-K:

> On February 12, 2008, Citigroup finalized the terms of the support facility, which takes the form of a commitment to provide mezzanine capital to the SIV vehicles in the event the market value of their capital notes approaches zero. The facility is senior to the junior notes but junior to the commercial paper and medium-term notes.

> (Citigroup, Form 10-K, February 22, 2008, p. 94)

707.    On April 15, 2008, Citigroup announced $212 million of writedowns against

324

its SIV assets; on October 16, 2008, a further $2 billion of SIV asset writedowns.  Also during

October 2008, Citigroup increased its financing commitment by a further $1 billion.

708.    On November 19, 2008, Citigroup shut down its SIVs, paid off the remaining

SIV senior note holders in full, assumed the SIVs' remaining $17.4 billion of assets directly, and

recorded a further $1.1 billion in writedowns.  In response, Citigroup's shares entered "free fall",

nosediving 23% from $8.36 per share to $6.40 per share in one day:

> Citi's Slide Deepens as Investors Bail Out – Shares Drop 23% as SIV Move, Analyst's Warning Spook Market
>
> Anxious investors pushed Citigroup Inc. shares into a deeper nosedive, putting even more pressure on Chief Executive Vikram Pandit to shore up confidence in the struggling bank.
>
> Wednesday's stock-price plunge of 23% was the steepest percentage decline ever for Citigroup
>
> *****
>
> Investors were rattled by the New York company's announcement that it will buy the last $17.4 billion in assets held by its structured investment vehicles, which were among the first casualties when the credit crunch hit last year. Citigroup will take a $1.1 billion write-down to reflect the assets' eroded values.
>
> (Wall Street Journal, *Citi's Slide Deepens as Investors Bail Out – Shares Drop 23% as SIV Move, Analyst's Warning Spook Market*, November 20, 2008)

709.    Citigroup's shares lost nearly half of their remaining value in the next two

days, falling to $4.71 per share on November 20, 2008 and to $3.77 per share on November 21,

2008.

710.    On November 24, 2008, the U.S. government stepped in to save Citigroup

from the death spiral Citigroup's own assets had created.   The government agreed to absorb all

losses generated by $300 billion of Citigroup's worst structured finance assets in excess of the first

$29 billion – thus, finally, limiting Citigroup's seemingly limitless losses.

## V.   CITIGROUP / CITIMORTGAGE'S MORTGAGE UNDERWRITING AND MORTGAGE PORTFOLIO

711.    As alleged below, Citigroup/Citimortgage's reckless and deficient mortgage underwriting: (1) caused substantial losses in Citimortgage's own mortgage portfolio, and further (2) negatively impacted the performance of Citigroup's RMBS and CDO positions.

### A.   CITIGROUP, DURING THE CLASS PERIOD, HARMFULLY AND INCREASINGLY EXPANDED ITS AMASSMENT OF TOXIC HOME LOANS WHICH WERE GENERATED BY LAX OR NON-CONTROLLED UNDERWRITING AND AS TO WHICH IT, ON A SYSTEMIC BASIS, LACKADAISICALLY ENFORCED ITS RIGHTS

#### 1.    General Background

712.    Beginning in 2005, Citigroup, under the auspices of CitiMortgage, its residential mortgage production arm, aggressively expanded its subprime and Alt-A loan production. These loans originated by CitiMortgage were woefully deficient in terms of their underwriting and eventual performance.  These loans suffered from severe infirmities that eventually led to significant defaults and losses that infiltrated Citigroup's RMBS and CDO securitizations, leaving Citigroup stuck with many orphaned RMBS and CDO positions that were effectively of little or no market value.

713.    Starting in 2005, Citigroup increasingly relied on the correspondent lender channel to build and sustain its market share growth and position as the 4th largest mortgage originator.[38]  Citigroup also increasingly relied upon its correspondent channel to generate loan

---

[38]  Correspondent channel loans are obtained through mortgage brokers, mortgage bankers, financial institutions, and homebuilders who sell previously funded mortgage loans to Citigroup at a previously negotiated price.

production for itself and the securitization pools it was supplying.  The value of Citigroup's portfolio of correspondent channel loans ballooned from approximately $69 billion in 2005, to $88 billion in 2006, and to $94 billion in 2007.

714.    These loans were permeated with fraud and early payment defaults that steadily rose beginning in the first quarter of 2006. The performance of these loans was disastrous, causing significant losses as reflected below.[39]  For a period of time, Citigroup was able to play "hot potato" with these poor quality correspondent channel loans, quickly selling them off through the securitization market before the borrowers defaulted.  However, Citigroup's ability to pass off these "hot potato" loans declined beginning in the fourth quarter of 2006 as the subprime market began to collapse.

715.    Citigroup's warehouse lending division, First Collateral Services ("First Collateral" or "FCS") similarly experienced a dramatic rise in stale loans beginning in the second quarter of 2006.  FCS executives and CitiMortgage executives were painfully aware of stale loan problems that FCS was experiencing generally and specifically with respect to its single largest customer, Alliance Bancorp.  Senior management at FCS deliberately delayed taking impairment charges in the third quarter of 2006 with respect to the Alliance loan portfolio, contributing to FCS's and CitiMortgage's effective cover-up relating to the severity of the subprime losses that Citigroup was experiencing in 2006.

716.    Although Citigroup publicly touted throughout the Class Period its growing success based on its expansion into the risky subprime market, Citigroup failed to timely disclose

---

[39]    Moreover, CitiMortgage's portfolio was heavily weighted to second-lien home equity positions, which frequently included cash out refinancings and, accordingly, were particularly prone to borrower deceit and delinquency.

the disastrous effects of these risky loans on Citigroup when the other shoe dropped, *i.e.*, when the *theoretical* credit risks of its high-risk subprime loans became *actual impairments* to the value of the loans beginning in 2006. As fully described below, Citigroup was aware of the massive problems with its mortgage portfolio during 2006, evidenced by an exponential increase in loans that quickly defaulted, among other problems. However, these losses and defaults were concealed through much of 2006 and 2007. Corresponding loss reserves were not increased and related charges were not taken until beginning in late 2007. Beginning in October 2007, Citigroup first began to disclose its increased losses relating to these consumer mortgage loans and these disclosures contributed to the dramatic decline in Citigroup's stock price.

> **2. Citigroup's Massive Illusory Growth in Mortgage Market Share from 2005 to 2007 Was Only Achieved by the Company's Deliberate Expansion into the Subprime Market and Reliance on Risky Correspondent Channel Loans; Unbeknownst to the Public, as Early as Mid-2006, Citigroup Was Aware of Significant, Actual Impairments to the Value of These Risky Loans**
>
> > **a. In Late Summer of 2005, Citigroup Began Consolidating Its Mortgage Operations, Readying Itself to Expand Its Mortgage Origination Business and Become One of the Largest Mortgage Originators in the U.S.**

717. Prior to August of 2005, three different and distinct entities were involved with Citigroup's mortgage originations: CitiMortgage,[40] CitiFinancial Mortgage,[41] and Citi Home

---

[40] CitiMortgage, headquartered in O'Fallon, Missouri, was involved with Citigroup's premium prime loan origination, including traditional conventional, conforming loans and prime jumbo loans. CitiMortgage also housed Citigroup's warehouse lending unit, the former First Collateral Services, Inc., which was acquired by Citigroup in 2000, when it bought Associates First Capital Corp. ("Associates"), a Dallas-based finance company.

[41] CitiFinancial Mortgage, headquartered in Dallas, Texas, was involved with Citigroup's subprime business.

328

Equity.[42] Each entity had its own executive team, sales team, origination and servicing platforms, and each reported to different executives within Citigroup.

718.   In September 2005, Steven Freiberg ("Freiberg"), who headed Citigroup's Global Consumer Group, announced that Citigroup's three formerly-separate mortgage businesses - CitiMortgage, CitiFinancial Mortgage, and Citi Home Equity - would be merged with the combined entity retaining the CitiMortgage name.

719.   Citigroup consolidated its mortgage operations beginning in 2005 in order to expand into the subprime market. Beginning in 2005 and throughout 2006 Citigroup furiously expanded its subprime mortgage originations.  By 2006, Citigroup was the fourth largest overall mortgage originator, with $132.92 billion of originations in the first 9 months of 2006. *Mortgage Banking Magazine*, "CitiMortgage On the Move," December 2006.  According to a February 8, 2007 Bear Stearns report on subprime mortgage exposure among the big banks, mortgages to borrowers with subprime credit made up $40 billion of Citigroup's 2006 Q3 production alone, and represented 25% of Citigroup's total $160.9 billion mortgage portfolio.  CitiMortgage's loan volume also continued to grow 17% from 2006 to 2007.

720.   As spelled out in a March 3, 2008 confidential presentation entitled "The Subprime Crisis: An Overview," Citigroup admitted that "the late-2006, early-2007 subprime originations are generally regarded as the poorest credits."  Citigroup further stated that "70+% of 2005-2006 subprime origination (sic) loans were '2-28' or '3-27' ARMs with low 'teaser' rates. This

---

[42]   Citi Home Equity was based in O'Fallon, Missouri, and was involved with Citigroup's second mortgages and home-equity lines. Citi Home Equity was launched in 1999 after the merger of Citicorp and Travelers Group Inc. to take advantage of what was believed to be a huge potential for home-equity lending.

evidence contradicts Citigroup's Class Period statements touting the quality of its subprime loan portfolio.  Examples of these false statements include Freiberg's November 15, 2006 statements at the Merrill Lynch Banking and Financial Services Investor Conference presentation, where he misrepresented Citigroup's first mortgage portfolio as having a "high quality customer profile (LTV and FICO), consistent over time."  Other examples are Freiberg's September 12, 2007 statements at the Lehman Brothers conference that CitiMortgage's "subprime portfolio...actually looks very good" and is "actually doing quite well."

> **b.** **Citigroup Also Expanded Its Offering of Other High Risk Loans Such as High Loan-to-Value HELOC Loans that, Unbeknownst to the Public, Became Seriously Impaired by No Later Than Mid-2007**

721.    Citigroup expanded into very risky loans such as high loan-to-value ("high-LTV") home equity lines of credit ("HELOCs").  Citigroup had long known or reasonably should have known both that its risk-management protocol with respect to its home equity line of business, and quality of assets in that portfolio were materially deficient.  What follows are allegations respecting the development of this line of business, the associated lack of controls and indifference to associated risks, and pertinent material misrepresentations and omissions together with their loss causation.[43]  While Citigroup publicly touted its massive growth during the Class Period attributable to these risky loans, Citigroup knowingly failed to disclose, at least as early as the middle of 2006, the ramifications to Citigroup's bottom line of these risky loans *actually* becoming impaired, which

---

[43]    According to the *New York Times* (11/23/08), in early 2008, Federal Reserve examiners presented Citigroup with, "a scathing review of its risk-management practices."  In response, Citigroup created a 25 page, single-spaced memorandum providing for a sweeping overhaul of the bank's risk management (*ibid*).

later led to material, improperly delayed charges.[44]

722.    Citigroup's HELOC originations grew from $800 million in 1999 to about $48 billion in 2006. Most of the HELOCs that contributed to Citi Home Equity's growth were purchased from other originators.

723.    Citigroup not only held large volume of HELOCs, but a majority of these HELOCs were particularly risky given their high LTV ratio.  As of December, 2007, Citigroup held approximately $62 billion in HELOCs, of which approximately 52%, or $32.3 billion, had average LTVs over 80%.  About $22 billion in Citigroup's HELOCs had average LTVs over 90%.

724.    Evidence shows that Citigroup knew no later than Q2 2007 (but did not disclose publicly)  that many of its own HELOCs were substantially impaired, by as much as 50%.  Confidential witness testimony, as well as documents that have emerged in the bankruptcy proceedings of Alliance Bancorp, as described more fully below, confirm that Citigroup itself recognized that the true value of these significantly risky HELOCs were as low as 50% of their book value.  Citigroup, by its own admission, thus knew no later than Q2 2007 that its HELOC holdings could be impaired by at least $2-$4 billion, or perhaps more.  As described more fully below, Citigroup's deliberate failure to timely write down its assets and properly set loan loss reserves rendered their Class Period financial statements materially false and misleading.

725.    Complementing its rapid expansion of subprime loans and high-LTV HELOCs, Citigroup's origination of risky Alt-A, and first and second mortgage loans all experienced

---

[44]  For example, according to a January 16, 2008 *The Times* of London article discussing Citigroup's January 15, 2008 press release, Citigroup took "a ***$3.31 billion net charge*** for bad consumer loans in America for the fourth quarter [of 2007], ***compared to only $127 million the year before***.  A Citigroup spokesman said: 'The increase in credit costs primarily reflected a weakening of leading credit indicators, including ***increased delinquencies on first and second mortgages***....'"

tremendous growth during 2006. By CitiMortgage head Bill Beckmann's own estimate, Alt-A loans grew from nothing to 20-25% of CitiMortgage's overall business in 2006. CitiMortgage's Alt-A loans were largely originated through the wholesale channel.  While Alt-As represented only 4% of wholesale originations in 2005, by September 2006, Alt-As accounted for 32% of wholesale originations.

726.    In 2006, CitiMortgage also experienced huge growth in its second mortgages. As shown by the chart below, in 2005, CitiMortgage originated $36.6 billion in second mortgages, while in the first nine months of 2006, CitiMortgage had already originated $51.5 billion in second mortgages.  This data is shown in the chart below:

| Servicing Portfolio (2002 - 2006) | | | | | |
|---|---|---|---|---|---|
| ($ billions) | Year-End 2002 | Year-End 2003 | Year-End 2004 | Year-End 2005 | YTD 2006* |
| **Owned Portfolio** | | | | | |
| First Mortgage | $88.4 | $91.3 | $109.9 | $116.5 | $120.0 |
| Second Mortgage | $6.3 | $10.6 | $20.2 | $36.6 | $51.5 |
| **Total Mortgage** | **$94.7** | **$101.9** | **$130.1** | **$153.1** | **$171.5** |
| **Total Servicing Portfolio** | | | | | |
| First Mortgage | $244.0 | $240.8 | $390.7 | $397.7 | $458.0 |
| Second Mortgage | $6.3 | $10.6 | $20.2 | $36.6 | $51.5 |
| **Total Mortgage** | **$250.3** | **$251.4** | **$410.9** | **$434.3** | **$509.5** |
| *First nine Months Source: CitiMortgage Inc. | | | | | |

"CitiMortgage on the Move," *Mortgage Banking* Magazine, December 2006.

727.    However, as disclosed in Citigroup's 2007 10-K, Citigroup had significant

exposure to high loan-to-value ("LTV") loans in its second mortgage portfolio. LTV is defined as the loan to value ratio, that is, the ratio of the loan amount to the value of the underlying collateral. The greater the ratio, the riskier the loan and potential loss severity. As explained in Meredith Whitney's February 25, 2008 Oppenheimer analyst report, Citigroup had significant exposure to high-LTV HELOCs, with over $22 billion in its home equity line-of-credit ("HELOC") holdings with LTVS over 90% ($32 billion in HELOCs with LTVs over 80%). Report at 5, 7. Indeed, over 50% of Citigroup's second mortgage portfolio had an average LTV of over 80%. Report at 7.

728. As the theoretical risks associated with these loans transformed into *actual* impairments at least as early as the middle of 2006, Citigroup knew, but failed to disclose and account for the effect of such actual impairments to the Company's bottom line.

> **c.    Citigroup Increasingly Relied on Loans Generated by Its Correspondent Channel to Build and Sustain Mortgage Origination Market Share Growth, and Consistent with the Elevated Risk Inherent in These Loans, Citigroup's Correspondent Loans, Unbeknownst to the Public, Became Significantly Impaired in as Early as 2006**

729. During this period in 2005-2006 in which Citigroup built significant mortgage market share, Citigroup's correspondent channel loan originations grew tremendously. Unbeknownst to the public, Citigroup became aware, at least as early as mid-2006, that a substantial percentage of its billions of dollars of correspondent loans were impaired, often afflicted with early payment defaults, or at times, out-and-out fraud.

730. Starting in 2005, Citigroup increasingly relied on the correspondent channel. In 2005, correspondent channel loans amounted to $69 billion. In 2006, correspondent channel loans amounted to $88.657 billion. In 2007, correspondent channel loans amounted to $94.211 billion.

In 2007, approximately 47% of Citigroup's first mortgages and approximately 31% of its home equity portfolio were originated through correspondent channels. Additionally, approximately 59% of Citigroup's second mortgages were originated through third party channels.

731.    Correspondent channel loans, however, were riskier and more prone to default than loans originated through more traditional channels. As disclosed in its 2007 Form 10-K, Citigroup's correspondent channel loans had exhibited higher 90+ Days Past Due ("90+DPD") delinquencies than loans originated through retail channels, as illustrated in the following chart:

First Mortgages: December 31, 2007

| CHANNEL in billions of dollars | FIRST MORTGAGES | CHANNEL % TOTAL | 90+ DPD | FIRST MORTGAGES FICO<620 |
|---|---|---|---|---|
| RETAIL | $52.7 | 35.1% | 1.41% | $10.6 |
| BROKER | $27.0 | 18.0% | 1.53% | $1.7 |
| CORRESPONDENT | $70.3 | 46.9% | 4.09% | $10.8 |
| TOTAL | $150.0 | 100% | 2.69% | $23.1 |

Note: $150 billion portfolio excludes Canada & Puerto Rico, First Collateral Services, deferred fees/costs and loans held for sale, and includes Smith Barney ($8 billion) and loans sold with recourse. Excluding Government insured loans, 9O+DPD for the First mortgage portfolio is 1.99%.

Second Mortgages: December 31, 2007

| CHANNEL in billions of dollars | SECOND MORTGAGES | CHANNEL % TOTAL | 90+ DPD | SECOND MORTGAGES LTV>90% |
|---|---|---|---|---|
| RETAIL | $26.1 | 41.4% | 0.38% | $2.5 |
| BROKER | $17.7 | 28.1% | 1.71% | $4.8 |
| CORRESPONDENT | $19.2 | 30.5% | 2.03% | $13.6 |

| TOTAL | $63.0 | 100% | 1.26% | $20.9 |
|-------|-------|------|-------|-------|

Note: Second mortgage 9O+DPD rate calculated by OTS methodology.
[Tables excerpted from CitiGroup's 2007 Form 10-K.]

732.    Citigroup's heavy reliance on the correspondent channel exposed Citigroup to substantial risk.  According to Meredith Whitney's February 25, 2008 Oppenheimer analyst report, approximately 31% of Citigroup's HELOCs were originated through correspondent channels which, because of the poor quality of correspondent channel loans, could "represent roughly a $2.3 billion charge on its home equity portfolio alone.  Report at 6.

733.    A striking, specific example of Citigroup's accumulation of shoddy HELOCs through correspondent lenders is fully detailed below in the context of Citigroup's increasing and repeated business with Silver State, a  correspondent lender that specifically attempted to sell to Citigroup poor-quality HELOCs.

> **d.    Citigroup, Unbeknownst to the Public, Also Added to Its Heightened Risk Exposure of Poor Quality Loans by Loosening Its Lending Standards**

734.    At the same time Citigroup was expanding its subprime lending, it was also loosening its lending criteria.  In direct conflict with Citigroup's public statements to the contrary, CitiMortgage lending matrices provide concrete, specific examples of Citigroup's *loosening* of its lending standards from 2006 through mid-2007.

735.    For example, a June 15, 2006 CitiMortgage lending matrix, which was not publicly disclosed,[45] states in relevant part, "No More Stated Adjustor on Combo Fixed Seconds"

---

[45] Lending matrices were distributed to mortgage brokers and correspondent lenders for the purposes of marketing the availability of certain types of loan products.

and "[n]o documentation level adjustment for all COMBO HELOCs and Fixed Seconds."  This eliminated the 0.50 rate increase to second fixed-rate stated income loans that was required according to lending matrices from April and May 2006.  The matrix shows a clear loosening of criteria because the elimination of the 0.50 rate increase would not reflect the increased risk that a stated income loan would have as opposed to a full doc loan.

736.    Moreover, in its August 10, 2006 lending matrix, which also was not publicly disclosed, CitiMortgage began offering products such as the Jumbo Stated Income Stated Asset (SISA) loans which allowed up to $1,000,000 on stated income or stated asset documentation. These loans allowed Citigroup to give larger loans to risky individuals without an increase in corresponding safeguards such as higher minimum FICO scores or higher documentation requirements. Previously, Citigroup had required full documentation for an 80/20 loan for $1,000,000 according to its May 18, 2006 lending matrix. By 2007, Citigroup had $58 billion in no documentation, stated income loans.

737.    An October 12, 2006 CitiMortgage lending matrix, which also was not publicly disclosed, allowed borrowers with a minimum 680 FICO score to take out second loans for up to $150,000, which would allow for a maximum loan of $750,000 under an 80/20 combined loan. The previous maximum loan under the Citi Combo program was $500,000 for someone with a 680 FICO score according to the May 18, 2006 lending matrix.  The maximum loan increase meant that CitiMortgage would be responsible for the heightened risk of increased loan exposure without a corresponding change in criteria to reflect this increased risk.  Furthermore, Citi recklessly promoted that it did not have require seasoning[46] on cash out refinancing loans (including already stated

---

[46]    Taking cash out on a home refinance is another factor that adds to the riskiness of a loan. To cut against the risk of cash out refinances, one restriction often imposed by lenders requires a length of time, generally at least 12 months, between when the borrower purchased the home and

income no asset loans).  *See* Citi Home Equity Broker Rate Sheet, Effective Nov. 13, 2006 ("No Seasoning for Cash Out!").

738.    The loosening of lending standards also occurred in the Citi Home Equity division.  For example, a broker rate sheet dated August 7, 2006 (not otherwise disclosed to the public), states in relevant part: "No longer need to adjust rate for documentation type[.] Same AMAZING rate for Full Doc and Stated." This meant that brokers could give loans at the same rate to borrowers applying on a stated income basis as they give to borrowers who supply full documentation.

739.    In the third quarter of 2007, Citigroup began to rein in its lax lending practices.  Through an internal bulletin dated August 8, 2007, CitiMortgage discontinued the following products:  NIVA (no-income/verified assets), NINA (no income/no asset), CRA Stated Income, Expanded Lending First Lien Stated Income, and Expanded Lending Second Lien.  In the same internal bulletin, CitiMortgage also raised the documentation requirements for SISAs (stated income/stated asset) and SIVAs (stated income/verified asset).

740.    As fully discussed below, Citigroup's loosening of underwriting guidelines up to the third quarter of 2007 directly contradicts Freiberg's September 12, 2007 statement that "for the last...12 to 15 months, we have been tightening criteria."

---

when the borrower sought to acquire a cash out refinancing.  This restriction is referred to as "seasoning" in the mortgage industry.

3. **Citigroup's Own Filings in Lawsuits Against its Multiple Correspondent and Warehouse Lenders Evidences its Class Period Knowledge of the Widespread Fraud and Delinquencies Plaguing the Subprime Loan Market**

a. **Citigroup, During the Class Period, Experienced A Multitude of Various Dramatic Problems Involving Many of its Correspondent Channel Loan Originators**

741.   CitiGroup encountered an epidemic of underwriting problems in its correspondent channel severely reducing the realizable value of its mortgage assets.  Ultimately, in 2007 and 2008, CMI filed in excess of two dozen lawsuits against its correspondent lenders.  Filings in these lawsuits reflect Citigroup's knowledge of the substantial problems besetting the subprime market by no later than mid-2006 and Citigroup's knowledge of its impaired loans, which Citigroup failed to write down and account for in a timely fashion.

i. **Citigroup Recklessly Failed to Implement Meaningful Underwriting Standards and Recklessly Failed to Conduct Quality Control Audits or Reviews of the Correspondent Loans It Was Buying, Contributing to the Vast and Publicly Undisclosed Accumulation of Actually Impaired Loans**

742.   Mortgage fraud was a fundamental risk against which Citigroup should have been diligently guarding.[47]  Citigroup was significantly exposed to the risk of mortgage fraud, as it dramatically expanded its offering of high risk loan vehicles into the risky subprime market in 2006 at a time when mortgage fraud was peaking.  *See* Robert S. England, "Anatomy of a Meltdown,"

---

[47]   *See, e.g., Mortgage Loan Fraud An Industry Assessment based upon Suspicious Activity Report Analysis,* written by the Financial Crimes Enforcement Network Regulatory Policy and Program Division, November 2006, *available at* http://www.fincen.gov/MortgageLoanFraud.pdf; *see also The Detection, Investigation, and Deterrence of Mortgage Loan Fraud Involving Third Parties: A White Paper ("The Detection White Paper"),* produced by the Oct. 27, 2003 FFIEC Fraud Investigations Symposium (issued February 2005) at p. 35, *available at* http://www.ffiec.gov/exam/3P_Mtg_Fraud_wp_oct04.pdf.

Mortgage Banking, October 2007 (MARI study found that mortgage fraud in 2006 "exceeded previous industry highs").  That Citigroup increasingly relied on risky loans originated through its unreliable correspondent channel further exposed Citigroup to the danger of particular mortgage originators generating large volumes of fraudulent and/or otherwise riskier mortgages.  *See id.* (according to Moody's, loan losses varied widely among different originators; variances in estimated loan losses for 2006 vintage loans of as much as 20% were assigned solely based on the identity of the mortgage originator).

743.    Citigroup's complete lack of oversight regarding the correspondent channel is confirmed by CW 1, a CitiMortgage employee with substantial quality control expertise, who was involved in an operations role in the correspondent channel. CW 1 worked at CitiMortgage for approximately ten years and was laid off in the spring of 2008. CW 1 confirms that CitiMortgage performed virtually little, if any, due diligence with respect to loans produced in this channel. "We assumed they [correspondent lenders] were doing what they said they were doing." CW 1 indicated that if a borrower or correspondent lender was not being truthful, CitiMortgage would never have known it because CitiMortgage rarely inspected whether individual loans complied with the correspondent guidelines, including checking for owner occupancy fraud.

744.    CW 1 reflected that CitiMortgage bent over backwards for its correspondent lenders. CitiMortgage was trying to get correspondent business and tried to entice them to sell their loans to CitiMortgage. CitiMortgage was competing with other mortgage purchasers for these correspondent loans, and these correspondent lenders could go to any comparable lender. CW 1 felt that CitiMortgage treated their correspondent lenders in a special fashion in terms of giving such

correspondence latitude with respect to the submission of loans at CitiMortgage.[48]

745.   Citigroup had developed a pattern of delaying for up to two years before initiating lawsuits against its correspondent lenders for the repurchase of defective loans.  Delay of litigation allowed Citigroup to delay writing down the assets that were the subjects of the litigation.  A sample of lawsuits against correspondent lenders described above and others that were not filed until over a year, and often nearly two years, after the date Citigroup first demanded repurchase, is reflected below:

| CitiMortage Case | Months Between Repurchase Demand & Filing (approx.) | Date First Demanded Repurchase | Date Lawsuit Filed |
|---|---|---|---|
| v. Michigan Mutual | 22 | 7/26/2006 | 5/05/2008 |
| v. Lakeland Regional Mortgage Co. | 21 | 2/07/2006 | 11/06/2007 |
| v. County Trust Mortgage Bankers | 21 | 2/23/2006 | 11/26/2007 |
| v. Certified Home Loans | 18 | 6/7/2006 | 12/4/2007 |
| v. The Mortgage Depot | 16 | 7/19/2006 | 11/16/2007 |
| v. Home Loan Corporation | 14 | 5/17/2007 | 7/14/2008 |
| v. Terwin Advisors | 12 | 10/17/2006 | 10/23/2007 |

746.   If Citigroup had immediately filed suit, it would have been forced to immediately concede asset impairment and make an appropriate balance sheet and income statement adjustments corresponding to the erosion of loan quality and values.  The pattern of Citigroup's

---

[48]   CW 1 was shocked by the lack of expertise and industry knowledge of the "auditors" at CitiMortgage. CW 1 ascertained such lack of knowledge in January 2007, after CW 1 made a presentation to CitiMortgage auditors. CW 1 said, "It was almost as if the blind was leading the blind."

delay in filing many of these lawsuits after the third quarter of 2007 coincides with when Citigroup

began taking massive charges related to its impaired mortgage portfolio.

> ii.     **Unbeknownst to the Public, As Early As Mid-2006, Citigroup's Mortgages Were Increasingly Experiencing First and Early Payment Defaults – Strong Indicators of Borrower Fraud – As Evidenced in Citigroup's Actions Filed Against Certain Correspondent Lenders**

747.     During the Class Period, Citigroup amassed significant amounts of deficient

loans, primarily through correspondent lenders, that, unbeknownst to the public, were in early or

even first payment default.  Mortgage companies use early payment defaults ("EPD") by delinquent

borrowers as a proxy for fraud.[49]  Citigroup failed to properly disclose or account for mortgages in

early payment default. Citigroup's belated recognition of these impairments contributed to the

billions of dollars in improperly delayed charges.

748.     First payment default can be a telling indicator of double-selling, equity

skimming and/or straw borrowers.  The presence of early payment defaults should be taken as a red

flag that brokers/correspondents are not underwriting in a careful manner and may be potentially

falsifying information themselves.   Therefore, one of the easiest mechanisms to track the

performance and credibility of brokers is to monitor first payment and early payment default.

749.     CitiMortgage failed to implement even the most basic internal controls to

---

[49]     *See* Strategic Decision Support, *Mortgage Fraud:  What is it?  How much is it costing you?  How can costs be minimized?,* May 2, 2005, *available at* http://events.mortgagebankers.org/Secondary2005/Secondary/images/img/MBA%20Fraud%20Panel%20Presentation%20by%20Pat%20Schwinn.PDF.  Simply put, "the shorter the time period from origination to default, the more likely it was caused by fraud." *Id.* at 6.  *See also* Testimony before the United States House of Representatives Subcommittee on Housing and Community Opportunity by William Matthews, *available at* http://financialservices.house.gov/media/pdf/100704wm.pdf, regarding early payment defaults.

monitor early payment defaults.  For example, a sampling of CitiMortgage's Missouri litigation

reveals a disastrous concentration of first and early payment defaults as reflected in the chart below[50]:

| Correspondent | No. of First Payment Default Loans | Date First Demanded Repurchase | Date Lawsuit Filed |
|---|---|---|---|
| Certified Home Loans | 3 | 6/22/2006 | 12/04/2007 |
| First Greensboro Home Equity | 2 | 2/19/2007 | 11/16/2007 |
| Golden Empire Mortgage | 5 | 8/29/2007 | 3/28/2008 |
| Home Loan Corporation | 4 | 5/17/2007 | 7/14/2008 |
| Maxim Mortgage Corp | 4 | 7/20/2007 | 5/28/2008 |
| Meridias Capital Inc | 2 | 3/7/2007 | 11/08/2007 |
| Plaza Home Mortgage | 4 | 1/4/2007 | 4/18/2008 |
| Realty Mortgage Corp | 2 | 2/19/2007 | 12/04/2007 |
| Secured Bankers Mortgage | 8 | 6/7/2007 | 11/26/2007 |
| South Pacific Financial Co | 1 | 1/8/2007 | 4/14/2008 |
| The Mortgage Store Financial | 2 | 7/10/2007 | 4/04/2008 |

750.   The above chart confirms that CitiMortgage began demanding that

correspondents repurchase loans relating to early payment default in a dramatic fashion during the

first quarter of 2007.  Because of the time lag inherent in CitiMortgage's monitoring process, it is

apparent that these defaults began to dramatically escalate in either the third or fourth quarter of

2006.  Citigroup was aware, no later than 2006, that these early payment defaulted loans were

---

[50]   The reflected charts are not exhaustive examinations of each of the dozens of lawsuits filed by CitiMortgage against its various correspondent lenders and mortgage brokers, but are illustrative of the serious mortgage underwriting and origination problems that CitiMortgage was experiencing.

impaired, and that its continued purchase of early defaulting loans from recidivist correspondent lenders degraded increasingly large amounts of Citigroup's portfolio.  Citigroup's delay in initiating these lawsuits also kept the EPD impairments to its loan portfolio out of the public eye.

> **iii.** **Citigroup Failed to Implement Basic Compliance Procedures to Detect and Prevent Owner Occupancy Fraud or Misrepresentation**

751.    Citigroup experienced monumental problems with owner occupancy misrepresentations.  Borrowers are more likely to claim owner occupancy because originators usually offer better terms if they know someone will be using the house as a primary residence.

752.    According to CitiMortgage's lending manual, correspondent lenders were *supposed to* check for various forms of mortgage fraud, including owner occupancy fraud.  However, CitiMortgage never verified that this occurred. Moreover, a sample of CitiMortgage's broker litigation reveals rampant owner occupancy misrepresentations. Reflected below is a chart showing some examples of owner occupancy problems reflected in complaints filed by CitiMortgage:

| Correspondent | # of Fraudulent Loans | Date First Demanded Repurchase | Date Lawsuit Filed |
| --- | --- | --- | --- |
| Advanced Mortgage Professionals | 7 | N/A | 1/24/2008 |
| ANM Funding | 15 | 8/27/2007 | 11/30/2007 |
| Certified Home Loans | 12 | 6/7/2006 | 12/04/2007 |
| Plaza Home Mortgage | 4 | 6/18/2007 | 4/18/2008 |
| Terwin Advisors | 14 | 1/3/2007 | 10/23/2007 |

753.    As CitiMortgage experienced problems with owner occupancy fraud in high concentrations between 2006 and 2007. CitiMortgage could have easily diminished these numbers

by enforcing the common policy of requiring a borrower to provide proof of sale for his/her former primary residence. CMI's Correspondent Manual contained specific provisions relating to correspondent lenders' screening for owner occupancy fraud, which CMI failed to monitor.

### iv.   Citigroup Recklessly Purchased Loans That Failed to Comply with Fannie Mae Underwriting Guidelines

754.   CitiMortgage regularly purchased loans originated by correspondents that failed to comply with Fannie Mae underwriting guidelines. CitiMortgage should have independently examined the subject loan files in connection with their prepurchase quality control procedures to assure that the subject loans conformed with Fannie Mae underwriting guidelines.

755.   Reflected below are some specific examples of loans that CitiMortgage was stuck with after the subject loans were rejected by Fannie Mae:

| Correspondent | Number of Fraudulent Loans | Date First Demanded Repurchase | Date Lawsuit Filed |
|---|---|---|---|
| Certified Home Loans | 12 | 6/22/2006 | 12/04/2007 |
| Michigan Mutual | 3 | 5/10/2007 | 5/15/2008 |
| Shore Financial Services | 1 | 6/28/2007 | 11/09/2007 |
| The Mortgage Depot | 2 | 8/10/2006 | 11/16/2008 |

756.   CitiMortgage's failure to adhere to basic Fannie Mae guidelines exemplify the significant underwriting problems it was experiencing.

### v.   Citigroup's Representative Action Against Silver State

757.   A striking display of Defendants' deceitful conduct towards investors regarding their abject failure to adhere to and monitor compliance with their stated loan underwriting criteria emerges from CitiMortgage, Inc. ("CMI")'s troubled dealings with Silver State Mortgage

("Silver State" or "SSM"), a seller of loan pools into the secondary market. CMI belatedly instituted an action against SSM on August 29, 2007 in the United States District Court for the Eastern District of Missouri (case number 4:07-cv-01533-JCH.). Silver State was a specific example of a corrupt correspondent lender pushing poor-quality HELOCs onto Citigroup, contributing to Citigroup's holding of tens of billions of dollars of poor-quality HELOCs that ultimately became impaired by billions of dollars. Furthermore, Silver State loans were among the many loans Citigroup used as collateral to create its CDOs, being fully aware that many of these loans were severely deficient.

758. The complaint in the Silver State action seeks no less than approximately $10 million in damages arising from SSM's sale of at least 48 blatantly defective loans to CMI during the several years preceding the action. In essence, CMI charged SSM with breaching its contractual obligation to sell only those loans that met the underwriting criteria embodied in the agreements between the parties and in CMI's Correspondent Manual.

759. The bulk of these defective loans was well known to CMI months, if not more than a year, before the commencement of the action. Based on CMI's own judicial statements and exhibits contained in its filings in the action, Defendants faced sufficient "red flags" to enforce its rights against SSM – as well as to justify ceasing to do business altogether with SSM – long before they instituted the action.

760. According to the agreements between CitiMortgage and Silver State, CitiMortgage retained the rights to demand repurchase of defective loans as well as to terminate the agreements if Silver State breached any material representation or warranty of poor-quality or under-performing loans sold by Silver State to CitiMortgage. Yet, CitiMortgage continued to conduct business with the shoddiest of mortgage originators – such as Silver State – who were in default and

345

breaches of their agreements with CitiMortgage.

761.    The only logical inference from CMI's lackadaisical conduct is that CMI purposely delayed enforcing its rights in a desperate bid to avoid having to timely take embarrassing writedowns and to then be obligated to disclose them - which ultimately occurred in Q3 2007.

762.    CMI attached to its pleading a December 28, 2006 e-mail thread reflecting SSM's commitment, *inter alia*, to repurchase by January 31, 2007 several loans which had been delinquent for 6 - 10 months. Despite these delinquencies, SSM was assured that upon the completion of these repurchases (and the payment of a minor recapture fee), SSM would renew their business relationship as before.  Specifically, CMI employees indicated in emails that CMI would have SSM "reinstated and live again."

763.    SSM, however, reneged on its late 2006 commitment to repurchase these loans.  CMI let SSM get away with that breach for many months thereafter.[51]  On July 18, 2007, CMI's attorneys sent a pre-lawsuit demand letter to SSM (which was filed as an exhibit to CMI's motion for a default judgment) ("July 18, 2007 letter").  The July 18, 2007 letter catalogued many additional defective loans and provided a spreadsheet detailing them.  Many of these loans originated as far back as the summer and fall of 2005 while none originated later than December 15, 2006. Besides belatedly raising again 34 nonperforming loans as to which CMI had "previously sought cure and/or repurchase," this July 18, 2007 letter specified for the first time several loan accounts

---

[51]    Astonishingly, CMI sat on its rights to ensure satisfaction with the loan pools sold by SSM long after it had become aware of SSM's suspect loan pipeline and SSM had abruptly been shut down on February 14, 2007.   According to a February 15, 2007 article in the *Las Vegas Business Press*, entitled "Silver State Mortgage Closes," "Scott Bice, the [Nevada] state mortgage division's commissioner, said too many defaulted loans caused Silver State's warehouse bank, Washington Mutual, to close the business down and seize its assets."

that were "First Payment Defaults" (*i.e.* they were blatantly delinquent from the outset).

764.   Despite CMI's troubled history with its SSM loan pool and its awareness of SSM's rapidly unfolding disintegration,   CMI waited until July 2007 to formally stand on its rights against the then-defunct company and did not commence litigation until that August.

765.   Citigroup even went one step further and utilized loans originated by Silver State as part of the base collateral for some of its CDOs, for example, its CMLTI Series 2006-AR7, CMLTI 2007-AR7, and CMLTI Series 2007-6.

766.   As detailed above, Citigroup was aware that a significant portion of Silver State's loans were deficient as early as 2006.   Indeed, the imminent degradation in these CMOs' values – known to Citigroup but not to the public – came to fruition, as on October 31, 2007, Fitch subsequently downgraded the ratings on several of the tranches of the CMLTI Series 2006-AR7 CMO, and on January 23, 2008, downgraded several subordinated tranches of the CMLTI 2007-AR7 and 2007-6 CMOs.[52]

### vi.   Citigroup's Representative Action Against Certified Home Loans of Florida

767.   Defendants, through Citigroup's CMI unit, knowingly, or at least recklessly, confronted another blatant debacle of junk loan pools purveyed to them by a correspondent lender

---

[52]   Silver State and Accredited are only some examples of Citigroup's knowledge of the impaired loans forming the base collateral for its CDOs.   Citigroup inescapably was aware of the significant risk exposure attending its large, undisclosed subprime CDO holdings.   Yet another example includes loans (many of which were deficient) originated by another corrupt correspondent lender, Quick Loan Funding (headed by a controversial character named Daniel Sadek), which were securitized into three Citigroup-sponsored CMOs, namely CMLTI 2006-HE1, -HE2, and -HE3.   On July 27, 2007, Standard and Poor's rating agency downgraded the mezzanine tranches of the CMLTI 2006-HE and -HE2 CMOs, and on October 19, 2007, downgraded the mezzanine tranches of the CMLTI-HE3 as well.

called Certified Home Loans of Florida, Inc. ("Certified").  On or about December 4, 2007, CMI sued Certified in Missouri State court over fraudulent and/or otherwise defective loans that Certified had resold to it since as far back as 2005. On that basis, CMI's petition sought "in excess of $7,150,000.00 in damages" emanating from "at least twenty-four (24) problem loans."  CMI filed the suit in the Circuit Court of St. Louis County and it bears the case no. is 07SL-CC01100.

768.    Analogous to the Silver State fiasco, CMI accused Certified of selling it loans, in violation of the parties' agreement, that suffered from a toxic slew of lies and defects.

769.    As was the case with Silver State, CMI retained the rights against Certified to demand repurchase of defective loans as well as to terminate the agreements if Certified breached certain representations and warranties made in their agreements.  Yet, similar to its dealings with Silver State, CMI did not exercise its contractual rights on a timely basis.

770.    Court filings related to the Certified loans that CMI purchased reveal fake purchase contracts; fake loan applications; fake verifications of the amounts on deposit in their banking accounts; fake documentation pretending that deposits had been made to purchase the subject properties; fake employment and income data; and fake title insurance commitment papers.

771.    Moreover, on or about January 12, 2006, the Inspector General's Office of the Department of Housing and Urban Development issued an Audit Report ("Certified Audit") reflecting poorly on Certified's legitimacy and desirability as a business partner for CMI.  The Certified Audit is available online at <http://www.hud.gov/offices/oig/reports/files/ig641003pdf >. The Certified Audit took Certified to task over the way that it "improperly underwrote 14 of the 17 loans reviewed" to the detriment of the Federal Housing Administration ("FHA")'s insurance fund. The Inspector general called for Certified to reimburse or indemnify the FHA in a total amount close

348

to $1.4 million, to undertake remedial measures in ensuring quality control over its underwriting

activities and to be punished with monetary penalties.

772.    The Certified Audit examined Certified loans that had all closed as far back

as 2003 except for one that had closed in 2002 and one in 2004.   It concluded that:

> Certified [had] approved the loans based on inaccurate employment,
> income, and gift information and other deficiencies. The loans were
> improperly approved because Certified did not exercise due care in
> originating and underwriting loans, primarily by not clarifying
> inconsistencies in the loan files or adequately following up to verify
> borrower income and employment histories.

773.    By contrast – and despite the egregious fabrications behind the loans,

originated in 2005, which CMI had purchased from Certified and Certified's shady status as revealed

by the January 2006 Certified Audit – CMI's petition expressly concedes that CMI failed to demand

that Certified repurchase the subject loans until no earlier than June 2006 and, in one instance, as late

as December 2006.  While the Agreement between CMI and Certified gave Certified as little as ten

days, and no more than sixty days, to fulfill its repurchase obligation, CMI failed to commence

litigation against Certified until no earlier than December 4, 2007.  Defendants covered up and failed

to disclose to the investing public their irresponsible conduct and dereliction of their duties in this

regard.[53]

---

[53]    CMI experienced an avalanche of first payment and early payment defaults in its
correspondent loan pool during 2006 and 2007.  One striking example of this side of the loan
delinquency catastrophe emerges from CMI's lawsuit against another correspondent mortgage
reseller named IMPAC Funding Corporation ("IMPAC") in California state court.  CMI filed the
action, bearing the case number 07-CC-11612 in Orange County Superior Court on November 7,
2007.

### vii.    Citigroup's Representative Action Against Accredited Home Lenders

774.    On March 15, 2007, Citigroup engaged in an atypical transaction in an attempt to salvage its subprime position, purchasing over $2.7 billion in mortgage loans on March 15, 2007 from Accredited Home Lenders ("Accredited").  Citigroup immediately became aware, without disclosing publicly, that a substantial portion of these loans were severely impaired, thus dictating that Citigroup should have taken a charge relating to the impaired assets before Q3 and Q4 2007, as discussed fully below.  However, as late as November 5, 2007, Citigroup's CFO Gary Crittenden, as will be detailed below, insisted that these loans were "performing loans" and would not be cause for any "significant markdowns" in Q4 2007.

775.    On March 15, 2007, Citigroup Global Markets Realty ("CGMR") purchased from Accredited Home Lenders ("Accredited") a pool of approximately $2.769 billion of mortgage loans.[54]   During this time, Accredited was in dire straits, having delayed the filing of its 10-K, and having seen its stock plunge over 50% on March 13, 2007. CGMR's Complaint for fraud filed in this District, *CGMR v. Accredited*, S.D.N.Y., 08CV3545 RJH ("*Accredited* Complaint"), alleges that because Accredited was required to sell loans quickly in order to raise cash, Citigroup was unable to perform any pre-closing due diligence on the loans.

776.    On March 15, 2007, Accredited issued a press release announcing that it:

> reached an agreement to sell substantially all of its loans held for sale
> that are currently funded out of its warehouse and repurchase credit
> facilities, asset-backed commercial paper facility, and its equity.  The

---

[54]    Citigroup had a substantial business relationship with Accredited prior to the rescue transaction in March of 2007.  For example, Citigroup Global Markets Realty sponsored an RMBS called Citigroup Mortgage Loan Trust 2007-AHL1, which consisted of loans originated by Accredited Home Lenders.

$2.7 billion of loans held for sale will be sold at a substantial discount in order to alleviate recent pressures from margin calls.

777.    The press release did not disclose that Citigroup was the actual purchaser of the $2.7 billion loan pool.[55]   Citigroup, however, paid Accredited 91.68% of the unpaid principal balance for each mortgage loan shown in a data file.  An additional 150 basis points or 1.5% of the overall unpaid principal balance of the mortgage loan pool was held back.

778.    Accredited sold Citigroup loans that in many cases were suffering from fundamental deficiencies, including, but not limited to, the following:

a.    Over 100 of the loans were in reality already Real Estate Owned Property at the time of sale;

b.    Numerous mortgage loans were involved in expensive borrower litigation;

c.    Over 100 of the mortgage loans were non-existent at the time of closing;

d.    Over 200 loans were substituted without Citigroup's explicit approval;

e.    Some of the loans were third liens instead of the second liens they were purported to be at the time of sale.

*Accredited* Complaint at 7-17.

779.    Of the approximately 15,000 loans that Citigroup purchased, more than 6,733 of the loans were "impaired by missing, incorrect, or defective documentation." *Accredited*

---

[55]    Indeed, Citigroup represented in the Supplement, dated June 6, 2007 to its Citigroup Mortgage Loan Trust 2007-AHL3 Prospectus dated May 16, 2007 that there was no "material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business" or was other than "would be obtained in an arm's length transaction with an unrelated third party, between (a) any of the sponsor, the depositor and the trust and (b) any of the servicer, the trust administrator, the trustee or the originator." AHL3 Prospectus Supplement, June 6, 2007, at 22.

351

Complaint at 14.  Citigroup further alleged that many of the mortgage loans were "in fact sales of an inferior asset which did not fit the loan characteristics called for by the terms of the Agreements." *Accredited* Complaint at 15.  Indeed, Citigroup alleged that certain loans appeared to be "the product of a complete fraud" supported by fraudulent appraisals.  *Accredited* Complaint at 23.  These loans were subject to rescission due to fraudulent origination and purported forgery of loan documents. Further, Citigroup alleged that "given the sheer number of loan deficiencies, and in particular, documents showing fraud in the origination of loans, [Accredited] knew or should have known of all of the material infirmities connected with the Subject Assets..." *Accredited* Complaint at 52.

780.     Citigroup's recklessness is made the more obvious because it had recently almost been "left holding the bag" by New Century Financial ("New Century"), Accredited's much larger competitor in the subprime loan origination market.  In calendar year 2006, New Century was ranked second in that market sector (with approximately $51.6 billion in originations) as compared to Accredited, which was ranked fifteenth (with approximately $15.8 billion in originations).  Not ten days prior to the Accredited transaction, on March 6, 2007, Citigroup had demanded that New Century satisfy an $80.3 million margin call and that New Century repurchase over $700 million in loans that had been financed through Citigroup's line of credit.  *The New York Times*, March 13, 2007, "Lender Faces Credit Crisis with Banks."[56]

781.     Yet, undeterred by the New Century calamity and the unmistakable "red flags"

---

[56]   In early 2007, New Century had begun to experience enormous financial strain.  On February 7, 2007, it announced that it would restate its financial statements for the first three quarters of 2006.  On February 19, 2007, Citigroup had acquired a 5.1% ownership interest in New Century securities on behalf of individual and institutional clients.  On February 28, 2007, the U.S. Attorney's Office for the Central District of California began an investigation into securities trading at New Century.  All of these events predated Citigroup's March 15, 2007 transaction with Accredited.

that it raised about the quality of the loans originated in the subprime sector, Citigroup quickly and recklessly purchased $2.7 billion in loans from New Century's peer Accredited without conducting meaningful due diligence.

782.    Citigroup's claims that the Accredited mortgages were subject to a significant number and amount of early payment defaults evidence Citigroup's knowledge of the deficiencies no later than June 2007.  By definition, early payment defaults refer to delinquent payment in the first 90 days.  Thus, Citigroup would have been aware of the early payment default problems in the Accredited pool by no later than the end of the second quarter of 2007 (March 15, 2007 + 90 days delinquent = mid-June 2007).

783.    Nevertheless, as late as Citigroup's November 5, 2007 Business Update Call, CFO Gary Crittenden made the following statement falsely touting the quality of the acquired Accredited loans:

> There is also $4.2 billion of subprime loans.  **These are loans that were purchased at appropriate prices during the last six months and reflect appropriate discounts.  They are performing loans.**  The asset values already reflected significant discounts when we bought them.  These are largely hedged.  They are actively managed. And we didn't in the third quarter nor do we anticipate in the fourth quarter that there will be significant markdowns against that $4.2 billion.

*Business Update Call Transcript* at 3.

784.    Crittenden's statement that these loans were "performing" loans was false and misleading when made.  As reflected herein and as acknowledged by Citigroup in its own pleadings subject to Rule 11 requirements, the Accredited portfolio was riddled with serious – and in many instances incurable –  material deficiencies.

353

b. **Citigroup Was Alerted, As Early As Mid-2006, of the Disastrous Performance of Stale Loans Sitting in the Warehouse Facilities of First Collateral Services, Citigroup's Warehouse Lender**

785.     Citigroup eventually disclosed in its January 15, 2008 Fourth Quarter Earnings Review that the company was sitting on a "$1.5 billion commercial loans portfolio" from First Collateral Services ("FCS"), its warehouse lender. FCS's litigation with effectively defunct lenders relating to FCS's warehouse lines reveal that Citigroup  was sitting on an abundance of stale and unmarketable loans by the second quarter of 2006, which dramatically escalated thereafter.  Former employees of FCS have confirmed the foregoing.  The value of these loans were quickly eroding, which should have caused Citigroup to increase loan loss provisions to reflect this negative change in circumstances.  Furthermore, as reflected in the bankruptcy filings of FCS's largest customer, Alliance, FCS and Citigroup were aware in mid-2007 of the impairment to the value of many of its mortgage loans, including a 50% impairment to risky HELOCs generated by correspondent lenders.

i. **First Collateral's Warehouse Lending Business**

786.     FCS, a Citigroup subsidiary that reported directly to CitiMortgage, is a lending institution that provides warehouse lines of credit for residential mortgages.  FCS provides warehouse lines to more than 400 customers, and its total commitments exceed $4.5 billion.

787.     One form of financing that FCS provides to mortgage brokers is a short-term, revolving credit facility called a "mortgage warehouse," which is a line of credit used by mortgage companies to fund loans to borrowers that are secured by a mortgage interest in the borrower's house.  Mortgage warehouse loans contain strict provisions for the advances and usage of the funds. The funds are to be used solely for a broker's mortgage loans, and the advances are dependent upon the presentment and security of valid mortgage loans.

354

788.    Under a standard mortgage warehouse agreement, the mortgage broker locates the individual purchaser of the home, drafts the mortgage documents, and closes the loan.  The warehouse bank funds the mortgage using the warehouse line of credit, and typically requires the mortgage broker to pay back the loan within thirty days of the advance.  At closing, a mortgage banking company buys the loan. The loan is subsequently purchased by an investor company or a correspondent lender (also known as a "permanent" lender), who administers the loan. The mortgage company uses the proceeds of the sales of its mortgage loans, in large part, to repay the loans it received from the warehouse lender.

789.    Loans generated under FCS-supported warehouse facilities were frequently sold to Citigroup-controlled entities such as CitiMortgage and CitiFinancial:

> Brad Knapp, the president of First Collateral Services Inc., said his Concord, Calif., warehousing unit of CitiMortgage is able to "deliver the loan information on a loan sale much simpler and more efficiently by keeping it in-house," so warehousing makes it easier to sell to CitiMortgage...

"Disclosure Lending as a Sales Tool for Correspondent Loans" *American Banker*, October 26, 2006.

790.    With respect to warehouse facilities, the mortgage broker is supposed to ensure that the mortgage loan meets all banking and lending requirements and obtains the permanent lender's approval for the loan. Based upon the broker's representations and the loan documentation it provided, the warehouse lender advances funds to the mortgage broker, and then sells the note and mortgage to the permanent lender under a bailee letter.

791.    As a mortgage warehouse lender, FCS is exposed to credit risks if a counterparty associated with the mortgage activities, including the broker or correspondent lenders, fails to meet its obligations.  Accordingly,  FCS  monitors counterparties' actions on a regular basis,

355

including by performing analyses of their financial stability. FCS also employs internal auditors who review all aspects of FCS's mortgage banking operations.

### ii. First Collateral's Accumulation of Stale Loans Were a Key Indicator of Problems and Significant Deterioration in the Mortgage Market

792.    The presence of stale loans in a warehouse facility is symptomatic of potentially serious problems with the underlying loans.  First, the stale loans indicated either that the loans were not documented properly, that the investor who had ostensibly committed to purchase the loans decided that the loans were not sellable, or that the investor documentation committing to purchase the loan was a sham.  Accordingly, stale loans become unmarketable in the secondary market without new documentation.

793.    A confidential internal document, titled "First Collateral 2005 Credit Program, February 22 and March 3, 2005" ("FCS 2005 Credit Program"), discussed stale loans as a "key indicator" and stated that FCS monitored advances by stale loans on a month-by-month basis and strove to keep advances secured by stale loans to under 5% of outstandings.  CW 2, an FCS former Senior Credit Officer who was employed there from October 2005 until October 2007, supplied this document which appears to have been presented by FCS to senior Citigroup executives on or about March 3, 2005.  The facsimile cover sheets attached before the document bear variously the stamps, signatures and/or "approved" notations of Arthur E. Deffaa, the Managing Director of Risk Management For Citi Global Commercial Market; Simon Williams, "Exec. Vice President 399 Park/2nd Floor [Citigroup's New York City headquarters]" and Nancy I Shanik, "Senior Credit Officer Global Commercial Markets."

794.    FCS's warehousing agreements typically contained a standard provision

356

requiring a borrower to pay FCS all loans within the "Permissible Warehouse Period." FCS typically defined the Permissible Warehouse Period as forty-five (45) days. *See In re MGIC Capital Corp. (First Collateral Services, Inc. v. MGIC Capital Corp., et al.)*, No. 6:08-bk-12386-PC (Bankr. C.D. Cal. May 15, 2008); *First Collateral Services v. Prajna*, No. 3:2008cv00408 (W.D.Ky. Aug. 5, 2008).[57]

795.    As of December 31, 2004, barely any loans remained in FCS' warehouses for more than 90 days over the designated warehouse period.  Indeed, only 0.11% remained in the warehouse for more than 91 to 120 days above the designated period, 0.09% between 121 and 180 days, and only 0.11% remained in the warehouse more than 180 days above the designated warehouse period.  FCS also kept track of the average stale percentage by customer size.  As of October 28, 2005, the average percentage of stale loans ranged between 2.4% and 4.04%.  Moreover, the average number of days in the warehouse ranged between 15 and 26 days.

796.    As of March 31, 2006, FCS had only $58 million of its $2.271 billion outstanding or 2.55% unsold more than 31 days after the approved warehouse period.  According to CW 3, a senior executive in FCS's credit and compliance department from before the inception of the Class Period until March 2006, FCS held a weekly conference call where typically Brad Knapp (FCS's CEO) ("Knapp"), Sue Cerri, Fred Jackson, Lee Torgin, Phyllis Orby would report to Citigroup management, including David C. Bushnell, Senior Risk Officer ("Bushnell"). In these

---

[57]  As the FCS 2005 Credit Program explains:

 FCS approves a maximum warehouse period, usually 45 days but up to 90 days for some larger accounts that sell loans in pools. Mortgage collateral that secures advances that are outstanding beyond the approved period is termed 'stale.' Advances secured by stale loans are a key indicator of portfolio performance. *Id.* at 3.

meetings that lasted all morning, Citi was informed of the average age of loans, the number of loans in the warehouse, and the value of the loans in the warehouse. Written reports were also generated and provided to Knapp and Bushnell. Brad Knapp, in addition, reported directly to Jeff Walker, the director of correspondent loans at CitiMortgage.

797.   Despite the foregoing concern for stale loans, FCS routinely permitted its customers not to repay the loans on a timely basis and failed to call in defaults, as is revealed in FCS's own court filings in proceedings involving Alliance Bancorp, FCS's single largest warehouse customer.

798.   An examination of internal spreadsheets of data relating to loans that were filed in *In re Alliance Bancorp,* USBC District of Delaware Case No. 07-010942 CSS, shows the depth and severity of the problems of which Citigroup was aware.   By the third quarter of 2006, approximately 11% of the Alliance loans were sitting in FCS's warehouse for over 90 days. This percentage skyrocketed further to 25% by the fourth quarter of 2006, and exceeded 40% for each of the first and second quarters of 2007.

799.   Many of these loans sitting in warehouse were of the riskiest types, including a substantial number of second lien positions, cash-out refinancings, and loans with high LTVs frequently approaching 95% for first liens. Moreover, it appears that Alliance's warehouse facility was subject to the exceptional risk of piggy-back mortgages. Certain mortgages were granted to individuals with FICO scores below 600; CW 4, a Senior Vice President who reported directly to CEO Brad Knapp and who worked at FCS from long before the Class period  until November 2007, recalled stale loans sitting in warehouse that carried borrower FICO scores of approximately 480.

800.     FCS was concerned about collateral that was not marketable at par.  CW 5, an FCS credit manager throughout the Class Period who reported to its Chief Risk Officer, indicated that damaged stale loans were of such concern that they were discussed at weekly meetings involving Citigroup representatives and FCS's senior management, during which the possibility of writing off such loans was discussed.

801.     By July of 2007, FCS was estimating that a number of these loans were worth as little as 0-16% of the outstanding amount left on these individual loans.  Indeed, CW 2 indicated that by this point FCS knew that there was no market for the sale of subprime-related loan products; investors had already begun trying to collect from customers for violations of representations and warranties but were receiving less than "20 cents to the dollar" for some of the products such as piggyback loans and second mortgages.  Collectively, with respect to Alliance, as of July, 2007 FCS's collateral value was approximately $55.8 million on an outstanding amount of $66.1 million, or a collateral deficiency of $10.3 million or approximately 15%.[58]

802.     On or about July 24, 2007, FCS filed a motion for relief from the automatic stay in Alliance's Delaware bankruptcy case. Jo Anne Holbert, an FCS Vice-President ("Holbert"), filed a supporting affidavit demonstrating FCS was aware of the dramatic diminution in the value of mortgage product, especially with respect to second lien and home equity loan products. According to Holbert's affidavit,  FCS valued the Pledged Loans of Alliance Bancorp as follows:

a.     All loans that have been sold but for which First Collateral has not been paid or for which it received only partial payment are valued at $0.00.

---

[58]   The deficiency percentage is actually greater than this figure given that FCS listed 15 loans with an outstanding amount of $1 when their collateral value was purportedly higher based on a review of their spreadsheets.

b.      Based upon a bid from Asset Management to purchase loans
        that are already delinquent, First Collateral values those loans
        at 16% of face value.

c.      The value of the remaining loans is based upon the following
        model:

| Lien Position/Loan Type | FICO SCORE | VALUE COMPARED TO THE ORIGINAL PRINCIPAL LOAN AMOUNT |
|---|---|---|
| First Lien Refinance or Purchase | > 680 | 92% |
| First Lien Refinance or Purchase | < 680 | 88% |
| Second Lien Refinance or Purchase | > 680 | 88% |
| Second Lien Refinance or Purchase | < 680 | 78% |
| Home Equity Loans | Not Relevant | 50% |

d.      Any loan that is more than ninety days old is subject to an
        additional 20% reduction in its asset value.

803.    According to CW 6, an FCS Assistant Vice-President who was employed
there from January 2003 until October 2007, Alliance left FCS with $70 million in Alt-A paper.
According to CW 6, FCS was having difficulty servicing the loans, and Maurine O'Brien was
brought in to sell the loans on the "scratch and dent" market.  According to CW 6, FCS was only
able to obtain 40 cents on the dollar for these Alliance loans that were sitting in FCS' warehouses.

804.    According to CW 5, FCS deliberately delayed taking action against Alliance
and instead kept Alliance's stale loans in warehouse for up to nine months or more in fear of
bankrupting Alliance and jeopardizing future Alliance-generated business.  Indeed, CW 5 indicated
that FCS chose to effectively ignore investor return notes in general, similarly fearing that they may
bankrupt the customer and cut off future business.

805.    Citigroup should have disclosed to the public the severe loan impairments in

360

FCS's warehouse.  Instead, Citigroup concealed the problems at FCS until it later revealed, in its

January 15, 2008 Fourth Quarter Earnings Review, its exposure to a $1.5 billion FCS portfolio.

**B.**     **CITIGROUP   KNOWINGLY   ISSUED   FALSE   AND   MISLEADING STATEMENTS REGARDING THE QUALITY OF ITS MORTGAGE LOAN PORTFOLIO**

**1.**     **Citigroup, Notwithstanding its Knowledge That Significant Portions of its Portfolio Were Greatly Becoming Impaired, Issued Numerous False Statements Touting its Loan Portfolio Quality as Well as its Overall Financial Success, Misleading Investors into Believing That Citigroup's Purported Financial Growth from 2005-2007 Was Based Firmly in the Origination of Sound Mortgages**

**a.**     **July 31, 2006 *American Banker* Magazine Article**

806.     In the July 31, 2006 *American Banker* magazine article, "New CitiMortgage

Primed for Nonprime," Bill Beckmann, President and Chief Operating Officer of CitiMortgage,

explained at length to American Banker that the Company was going to offer subprime loans only

to high-quality borrowers who had an ability to repay the loan, and that the Company's various

mortgage lending arms would screen for risk:

> Mr. Beckmann called the rollout of interest-only nonprime ARMs 'entirely consistent' with the past statements [bragging about Citigroup refraining from offering alternative products such as interest-only and no documentation loans, to subprime borrowers]. . . . And, he stressed, 'we're not going to make a loan on an affordability basis. We're going to make a loan because we believe it's right for a customer because we think they can pay it back.'

> Citi has talked with regulators to ensure they are comfortable with what it is doing, he said, particularly in light of pending interagency guidance on exotic products, and it does not plan to start making option ARMs, which allow for negative amortization.

> Mr. Beckmann said Citi is also considering the risks in nonprime in other ways.

807.   The foregoing statement was materially false and misleading when made for at least three reasons:

(a)   While leading investors to believe that Citigroup was engaged in somewhat conservative lending practices based on each borrower's ability to "pay it back," Citigroup failed to disclose that the Company was increasingly moving away from retail production toward relying on correspondent channels for loan production, with correspondent channel loans constituting $69 billion, $88 billion and $92 billion of Citigroup's mortgage portfolio in 2005, 2006 and 2007, respectively.  As demonstrated above, loans originated by these correspondent channels regularly involved borrowers with questionable abilities to pay back their mortgages;

(b)   Citigroup was aware that it was accumulating mortgages for which the borrowers were already displaying an inability to "pay it back."  At least as early as mid-2006, Citigroup was increasingly saddled with defective correspondent channel loans in early payment default, as specifically evidenced in Citigroup's repeated dealings with Silver State and Certified, which led to Citigroup demanding loan repurchases from its shoddy correspondent lenders; and

(c)   By mid-2006, Citigroup's warehouse lending division, FCS, was increasingly saddled with defective, stale loans.  According to CW 2, FCS valued these stale loans as low as "twenty cents on the dollar."

> **b.   November 15, 2006 Merrill Lynch Banking and Financial Services Investor Conference Presentation**

808.   In a November 15, 2006 Merrill Lynch Banking and Financial Services Investor Conference presentation, Freiberg misrepresented the quality of Citigroup's loans, referring to their first mortgage portfolio as having a "high quality customer profile (LTV and FICO),

consistent over time."

809.   The foregoing statement was false and misleading for at least two reasons;

(a)   While touting the quality of its borrowers, Citigroup failed to disclose that it was increasingly relying on correspondent channels for loan production.  As demonstrated above, Citigroup increasingly relied on correspondent channels for loan production, involving borrowers with questionable abilities to pay back their mortgages.  Citigroup later confirmed that over $70 billion of its first mortgages, or 47% of its entire first mortgage portfolio, was originated through correspondent channels.  Citigroup 2007 Form 10-K at 52, and;

(b)   At least as early as mid-2006, Citigroup realized that its borrowers were *not* of the highest quality, let alone of a consistently high quality over time, as it became increasingly saddled with defective correspondent channel loans in early payment default, as specifically evidenced in Citigroup's repeated dealings with Silver State and Certified, which led to Citigroup demanding loan repurchases from its shoddy correspondent lenders.  Furthermore, by mid-2006, Citigroup's warehouse lending division, FCS, was increasingly saddled with defective, stale loans.

### c.   December 2006 *Mortgage Banking* Magazine Article ("CitiMortgage on the Move")

810.   Citigroup also misrepresented the quality of the Company's HELOCs in a December 2006 *Mortgage Banking* Magazine article titled "CitiMortgage on the Move":

> Despite its growth, Citi Home Equity has also been cautious in treading into some credits and products. For example, it does not offer second-lien mortgages behind negative amortization first mortgages. The average FICO Equity is a healthy 733, making it primarily a prime business. [Citi Home Equity's acting president and CEO Tom] Shillen expects Citi Home Equity to explore other credits as it continues to expand the business.

363

811.    The foregoing statement was materially false and misleading when made for at least three reasons:

(a)    Citigroup was anything but "cautious" in issuing HELOCs, as a majority of its HELOCs had very high LTV ratios, leading indicators of loans' riskiness;

(b)    While touting the "healthy 733" average FICO scores behind these HELOCs, Citigroup's own warehouse lending division, FCS, admitted subsequently that many of its HELOCs were so severely impaired – by 50% – that the underlying borrowers' FICO scores were *irrelevant* in valuing the HELOCs;

(c)    Citigroup misled investors by touting the quality of its HELOCs while failing to disclose that it was loosening its HELOC lending criteria.

812.    In the same December 2006 *Mortgage Banking Magazine* article, "CitiMortgage On the Move," Beckmann touted the company's growth and loan quality:  "We are growing at double-digit rates in an industry that is contracting a bit. And the thing I'm probably the most proud of [is], we're not giving away the shop to grow. To the contrary:  By the public data we can see, we're outperforming the industry in terms of profits per loan."

813.    The foregoing statement was materially false and misleading when made for at least three reasons:

(a)    While leading the public to believe that Citigroup's subprime mortgage business was succeeding wildly at "double-digit rates" despite contrary trends in the subprime market at large, the truth was that Citigroup was expanding its market share by underwriting high risk loans that many competitors were refusing to underwrite.  As demonstrated above, Citigroup increasingly relied on correspondent channels for loan production, which were the "lowest of the low quality channels"

regularly involving borrowers with questionable abilities to pay back their mortgages.

(b)   At least as early as mid-2006, Citigroup was increasingly saddled with defective correspondent channel loans in early payment default, as specifically evidenced in Citigroup's repeated dealings with Silver State and Certified, which led to Citigroup demanding loan repurchases from its shoddy correspondent lenders.  Furthermore, by mid-2006, Citigroup's warehouse lending division, FCS, was increasingly saddled with defective, stale loans; and

(c)   Third, the statement was materially false and misleading as Citigroup's touted growth rate and revenues were inflated by the Company's delay in recognizing known and probable impairments to its mortgage portfolio, as evidenced in the Company's deliberate delay in pursuing litigation arising from defective loans.

814.   Beckmann also explained to *Mortgage Banking Magazine* that the newly-merged CitiMortgage was in an excellent position regarding bulk loan purchases: "There are loans that maybe we wouldn't feel comfortable with [putting] in our portfolio, but the Street is happy with. So, we'll have one bid for a customer and we'll parse the loans, some to portfolio and some to CGM, which will package it and sell to the Street." Beckmann further explained how CGM's ability to portfolio and sell loans improved Citigroup's position in making offers for large bulk purchases:

> In the past, "a correspondent might show us a pool of $100 million and we'd say, 'We'll take $70 million,'" Beckmann says. Then, however, "Someone else might be willing to take $90 million," leaving Citigroup at a potential disadvantage in acquiring the bulk purchase.
>
> "Now, Citi can bid more robustly and not get stuck with the kicks-the loans we didn't want to take, but that someone else might feel happy with," says Beckmann. "So, now we have a combined strength of what we're happy to put in our portfolio at CitiMortgage and what Capital Markets Group is willing to purchase," he says.

*Mortgage Banking Magazine*, "On the Move," December 2006.

815.    The foregoing statement was false and misleading because it gave investors the impression that Citigroup was able to pass off bad mortgages to the secondary market.  However, Citigroup was increasingly saddled with stale loans in its warehouse, and was also accumulating – *not* reselling – a host of deficient mortgages bought from its correspondent channels.  Indeed, Citigroup was sitting on deficient loans, after demanding repurchase, and waiting several months before initiating lawsuits, mostly in or after November 2007.  The Missouri litigations referenced above reveal that Citigroup was put on notice of early payment default on series of loans during the second half of 2006.

### d.    Sept. 12, 2007 Lehman Conference Brothers Financial Services Conference

816.    On September 12, 2007, Freiberg gave a presentation at the Lehman Brothers Financial Services Conference (the "Sept. 12, 2007 Lehman Conference") and answered questions from several analysts.[59]  During the conference, Freiberg made many false misrepresentations and omissions, including, but not limited to:

(a)    his touting the purported "grow[th]" in CitiFinancial's value caused by its plunging deeper into subprime lending:

> If you look at CitiFinancial, and this again, this is the consumer finance company, it is a subprime lender. It's essentially - about half its portfolio is unsecured, about half its portfolio is secured, and that business is growing at a very nice clip. It was growing again in the low single digits on an organic basis if we look back 1.5 - 2 years ago. It's now growing its asset base 9 or 10%, maybe a little bit higher on

---

[59]    On September 7, 2007, Defendants disseminated a press release announcing that Citigroup would be making a presentation at the September 12, 2007 Lehman Brothers Financial Services Conference.

a consistent basis. <u>It's a good leading indicator of basically future value</u>.

[Tr. at 3];

    (b)    his boasting that CitiFinancial's subprime business was "actually doing quite well":

. . . you can look at essentially at CitiFinancial over the last several years and what you see is that it basically was trending between plus or minus couple of percentage points of growth and that would be organic growth because we weren't really acquiring during that period of time. And if you look over the last three or four quarters, there is a sustained improvement and growth in revenue, and we would expect this to be again highly sustainable trend . . .

So very good business for us. And for those of you who have kind of read the presentation that we put up, what's interesting about this business, I think, has a lot to do along with our history, our competency, but also the business model, it is very much a face to face, I am in my store and get to know your type model that <u>our delinquencies in this business today are actually at the same level or maybe even a little bit lower than they were a year ago, and this is effectively almost exclusively in subprime lending business,</u> and again half real estate, half non-secured. So the characteristic here would have been, god, how is it doing, this is almost $40 billion worth of the lending, <u>it's actually doing quite well</u>.

[Tr. at 4-5];

    (c)    his stressing that  Citigroup's mortgage lending was primarily conducted on a

face-to-face basis, and proclaiming that subprime was a "terrific" category:

But again, what's important about these portfolios for Citi because you can see essentially the difference between the industry, which used to be in the 270s is now basically pierced the 4002, on its way to 5% or 500 basis points past due, is that the model we run, again, it's a face-to-face model. <u>We underwrite every nickel of this paper</u>. Early stage collections happen in our branches. It's essentially almost exclusively fixed paper. It's not variable, it's not teaser, it's not exotic. And so, what you can take away is that the <u>subprime is a terrific category</u>. You can do extremely well, but you can't basically go off the farm and do things that basically make not a great deal of sense.

367

I thought it was an interesting chart for this group because it's squarely in that category and we've been in this business for a long period of time. And when you would expect stress, we haven't really seen it."

[Tr. at 7];

(d)  his exaggerations about the subprime portfolio's "very good" performance:

And then the other extreme, which again is the pleasant surprise, when you think there would be a fire which is in our subprime portfolio, it actually looks very good. But then that's a testament to the Fed's model segment propped within.

[Tr. at 10];

(e)  his assurances of Citigroup's strong leadership and tightened lending criteria in its

mortgage businesses:

We have got very good leadership in these businesses. And so for the last, I would say, 12 to 15 months, we have been tightening criteria, we have been isolating whether [it's] channel, whether [it's] product or whether it is basically policy and/or criteria.

[Tr. at 8];

(f)  his underscoring of Citigroup's purportedly careful application of "conscious and

cautious" lending criteria and its correspondingly low representation in risky high-LTV and subprime

second mortgage loans:

If you look at the top left first mortgage, the first mortgage portfolio, the matrix really is loan to value and FICO score as an indicator at least to credit quality as well as how much risk or how much exposure have you taken to the underlying asset. So obviously, what you would like to do is have basically low - you would like to basically have your loan to value being low and your FICO score being high. And if you look at our first mortgage business, largely speaking, that's how it distributes. And if you were going to basically isolate a row and a category on where you would be most exposed, it would be clearly the LTV greater than 90, which is the bottom row

cascading out across essentially the - cascading out across the FICO range. And you can see though that we have relatively speaking low representation within those ranges. <u>But again, we are in a category where you make or lose money on the tail, so you always have to be conscious and cautious of that</u>.

On the second mortgage side, <u>what you can see is that we tended not to be a lender of basically subprime second mortgage</u>.

[Tr. at 7]; and

(g)     his extolling of Citigroup's strong home equity loan performance compared to that of the industry at large:

if you go to bottom left which is home equity and I will show you more detail in a moment, you can see both for Citi and the industry, <u>we maintain good position relative to the industry</u>, but we used to be at ten basis points at [90] past, and now we are at 45 basis points at 90 past due and the industry has basically moved up into the 80s. And I would say, we talk about subprime, but that bottom left is predominantly prime. And so there is still stress in the system well beyond the subprime.

[Tr. at 7].

817.    The foregoing statements from the Sept. 12, 2007 Lehman Conference were materially false and misleading when made for multiple reasons:

(a)     Contrary to Freiberg's statements, Citigroup's expansion of its subprime business did not lead to true growth; its subprime business, in truth, truly was not doing "quite well" and was not a "terrific category"; its subprime portfolio, in truth, did not look "very good"; its leadership, in truth, was not acting responsibly nor did it truly apply "tightening" lending criteria with respect to its subprime business; it did not, in truth, carefully apply  "conscious and cautious" lending criteria nor exhibit a correspondingly low representation in risky high-LTV and subprime second mortgage loans, and; it, in truth, did not enjoy a strong performance in its home equity loan segment compared

369

to that of the industry at large;

(b)　　Citigroup failed to disclose that it was increasingly moving away from the face-to-face retail production, contrary to Freiberg's statement, and toward relying primarily on correspondent channels for loan production.  Citigroup was not underwriting "every nickel of this paper"; Citigroup's numerous litigation involving deficient loans demonstrates that Citigroup was barely reviewing its loans. As demonstrated above, Citigroup increasingly relied on correspondent channels for loan production amounting to $94 billion by 2007.  As a leading analyst observed, these sources represented the "lowest of the low quality channels"as they regularly involved borrowers with questionable abilities to pay back their mortgages;

(c)　　Citigroup's touted growth rate and revenues were inflated by the Company's delay in recognizing known and probable impairments to its mortgage portfolio, as evidenced in the Company's deliberate delay in enforcing its rights and pursuing litigation arising from blatantly defective loans.  As described above, Citigroup, at least as early as mid-2006, was increasingly saddled with defective correspondent channel loans in the form of first payment defaults, early payment defaults, owner-occupancy fraud, Fannie Mae rejections and a slew of other fundamental underwriting problems.  This pleading provides above, among other examples,  Citigroup's repeated disastrous dealings with such correspondent lenders as Silver State and Certified, which led to Citigroup belatedly and halfheartedly demanding loan repurchases from its shoddy correspondent lenders and, eventually, belatedly, and frequently, futilely suing them;

(d)　　Similarly, Citigroup recklessly purchased $2.7 billion in loans from Accredited on March 15, 2007, with a substantial number of these loans immediately demonstrating impairment and deficiencies, including early payment defaults.  Even after attempting to securitize these loans

370

into an RMBS, Citigroup was stuck with over $800 million in these Accredited loans, as well as some of the RMBS securities for which Citigroup could not find a willing buyer.

(e)    Additionally, by mid-2006, Citigroup's warehouse lending division, FCS, was increasingly saddled with defective, stale loans.  According to CW 2, FCS valued these stale loans as low as "twenty cents on the dollar."

(f)    Citigroup had not applied "conscious and cautious" lending criteria and did not enjoy a correspondingly low representation in risky high-LTV and subprime second mortgage loans.  To the contrary, Citigroup, unbeknownst to the public, had been loosening its lending criteria the second and third quarters of 2007 without making cost adjustments to compensate for the increased risks.  As set forth above, CitiMortgage's June 15, 2006 lending matrix eliminated a 0.50 rate increase to second fixed-rate stated income loans that was required previously according to CitiMortgage lending matrices from April and May 2006; an August 10, 2006 lending matrix reflects riskier loan offerings, such as SISA loans, without requiring a risk-compensating rate increase; an October 12, 2006 lending matrix loosened limits on second loans, changing the maximum loan amount on risky 80/20 loans from $500,000 to $750,000; and a July 13, 2006 CitiMortgage broker rate sheet loosened lending standards by no longer adding an adjustment rate to factor in for the added risks in no doc and stated income loans); and

(g)    Citigroup misled investors as to its "good position" in HELOCs by failing to disclose that a majority of its HELOCs had very high LTV ratios, leading indicators of loans' riskiness.  Second, Citigroup's own warehouse lending division, FCS, admitted in July 2007 that many of its HELOCs were severely impaired, by 50%, regardless of the underlying FICO scores.  Citigroup misled investors by touting the strength of its position in HELOCS while failing to disclose that it

371

had loosened its HELOC lending criteria.

2.   **Citigroup Issued Materially False and Misleading Financial Statements That, in Violation of Gaap, Inflated Earnings by Materially Understating its Loan Loss Reserves and Failing to Disclose Material Weaknesses in Internal Controls over its Loan Underwriting Practices and Procedures**

a.   **General Accounting Principles Relating to Loan Loss Reserves**

818.   Citigroup, in reporting its financial results during the Class Period, made numerous false statements of material fact and omitted to state material facts necessary to make its reported financial position and results not misleading. As set forth below, Defendants published financial statements and information that violated generally accepted accounting principles ("GAAP") and SEC Regulations prohibiting false and misleading public disclosures.

819.   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices. The SEC has the statutory authority to promulgate GAAP for public companies, and has delegated that authority to the Financial Standards Accounting Board ("FASB"). The SEC requires public companies to prepare their financial statements in accordance with GAAP. As set forth in SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. SEC Regulation S-X (17 C.F.R. § 210.10-01(a)(5)) also requires that interim financial statements comply with GAAP and "shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading."

820.   As set forth below, longstanding and fundamental GAAP precepts required

372

Citigroup and the Officer Defendants to establish a reserve for probable credit losses in the Company's portfolio. Citigroup referred to this loss reserve as its Allowance for Loan Losses ("Allowance").

821.    Citigroup repeatedly represented that it accounted for its Allowance for its portfolio of home mortgage loans in accordance with GAAP, and, in particular, Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS 5"). SFAS 5, which was issued over thirty years ago and has been applicable to every annual and interim financial statement every public company has issued for every fiscal year beginning after July 1, 1978, states:

> An estimated loss for loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.
> ***
> Disclosure of the nature of an accrual made . . . and in some circumstances the amount accrued, may be necessary for the financial statements not to be misleading.

822.    In the context of lending, Statement of Financial Accounting Standards No. 114," Accounting By Creditors for Impairment of a Loan" ("SFAS 114"), which was issued in May 1993 - over fifteen years ago - provides a definition of "impairment" for individual loans under GAAP that is also instructive for pooled loans: "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."

373

823. Further, the American Institute of Certified Public Accountants' (AICPA) *Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies* (the "AICPA Guide"), which was originally issued in 2004 and updated in 2007, instructs that although SFAS 5 indicates that losses should be recognized only once the events causing the losses have occurred, there is an important caveat flowing from that rule: "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

824. These fundamental GAAP provisions underpin the "Expanded Guidance for Subprime Lending Programs," issued by the Agencies in 2001, which several years before the beginning of the Class Period provided guidance specific to reserving for subprime loans:

> The [Allowance] required for subprime loans should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months. The board of directors and management are expected to ensure that the institution's process for determining an adequate level for the [Allowance] is based on a comprehensive and adequately documented analysis of all significant factors. The consideration of factors should include historical loss experience, ratio analysis, peer group analysis, and other quantitative analysis, as a basis for the reasonableness of the [Allowance]. To the extent that the historical net charge-off rate is used to estimate expected credit losses, it should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience. The allowance should represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision.

825. The SEC also provides direct guidance on the proper accounting for loan losses. SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and

Documentation Issues" ("SAB 102"), which was issued in July 2001, also several years before the Officer Defendants' improper activities at issue here, states in pertinent part: "It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process." Therefore, pursuant to SAB 102, a loan loss allowance methodology generally should "[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] be based on current and reliable data[.]"

### b.  Citigroup's Violations of the Relevant Accounting Standards

826.  In addition to the trends evident in the rising rate of loans in default, fraudulent correspondent and warehouse loans, and net charge-offs, the defendants were aware that the credit quality of the Company's mortgage loan portfolio was rapidly deteriorating as a result of, among other things, the Company's loosened underwriting standards and the failure to employ accurate models for valuation purposes, which among other things, did not account for a downturn in the housing and credit markets.

827.  The insufficiency of the defendants' provisioning for loan losses was partially disclosed on October 1, 2007, when defendants "pre-announced" 2007 third quarter earnings in a release entitled, "Citi Expects Substantial Decline in Third Quarter Net Income."  Therein, defendants reported, in part:

> "Our expected third quarter results are a clear disappointment.  The decline in income was driven primarily by weak performance in fixed income credit market activities, write-downs in leveraged loan

375

commitments, and increases in consumer credit costs," said Charles Prince, Chairman and CEO of Citi.[60]

828.    In an October 1, 2007 "recorded message," Defendant Crittenden revealed that "we took significant write-downs in the value of mortgage-backed securities in the warehouses' and CDOs [and] "[t]he fourth driver was significant reserve builds in our Global Consumer businesses . . ."   Defendant Crittenden revealed the components of the expected massive sub-prime related write-downs for the 2007 third quarter, by far the largest of which was the dramatic and sudden increase in loan loss reserves: staggering $2.6 billion increase to credit costs, one-fourth of which was due to "higher net credit losses" and three-quarters "driven by higher charges to increase loan loss reserves" (or approximately $1.95 billion).

829.    As later reported in the October 15, 2007 "revised" results of operations, the total provision for credit losses for the 2007 third quarter was $4.8 billion, almost twice that for the two immediately preceding quarters combined.   Indeed, despite defendants' awareness of the credit and market risks involved in increased sub-prime lending activities, defendants reported fairly constant credit losses for the first three quarters of 2006, with modest increases thereto until the 2007 third quarter, where the provision almost doubled and then almost doubled again for the fourth quarter of 2007:

---

[60]    In the same release, the Company reported that in part the decline in earnings was "[a]n increase in credit costs of approximately $2.6 billion pre-tax . . . due to continued deterioration in the credit environment . . . Approximately one-fourth of the increase in credit costs was due to higher net credit losses and approximately three-fourths was due to higher charges to increase loan loss reserves."

| Provision In Billions of Dollars for Quarter Ended: | First | Second | Third | Fourth |
|---|---|---|---|---|
| 2006: | $ 1.4 | $ 1.4 | $ 1.8 | $ 2.1 |
| 2007: | $ 2.7 | $ 2.5 | $ 4.8 | $ 7.4 |

[Source: 2006 and 2007 Forms 10-K and 10-Q].

830.    Moreover, prior to 2006, Citigroup generally kept its ratio of allowance (*i.e.*, reserves) for loan losses to total loans, net of unearned income, well above 2%.  Not until shortly before 2006, *i.e.*, by the fourth quarter of the year ended December 31, 2005, did Citigroup begin to drop this ratio to below 2%, i.e., at 1.68%.    When asked by analysts why the reserves were declining, defendants repeatedly and falsely reassured the market that credit risks were under control.

| In Billions of Dollars at the Quarter End: | First | Second | Third | Fourth |
|---|---|---|---|---|
| 2006: Loans, net of unearned income: | $ 605.3 | $ 637.1 | $ 655.4 | $ 679.2 |
| Allowance for loan losses: | 9.5 | 9.1 | 9.0 | 8.9 |
| % of Allowance to Total Loans, net: | 1.57% | 1.43% | 1.37% | 1.31% |
| 2007: Loans, net of unearned income: | $ 693.3 | $742.9 | $774.0 | $ 778.0 |
| Allowance for loan losses: | 9.5 | 10.3 | 12.7 | 16.1 |
| % of Allowance to Total  Loans, net: | 1.37% | 1.39% | 1.64% | 2.07 |

[Source: 2006 and 2007 Forms 10-K and 10-Q].

831.    Thus, not until the fourth quarter of 2007, did Citigroup tacitly admit, by way of massively increasing its allowance to total loan ratio back above pre- and early class period highs, that the Company was woefully under-reserved during the Class Period.  Because of the Company's diminished underwriting standards and risky sub-prime mortgages, Citigroup should have increased its reserves during the Class Period to well above the pre- and early class period levels of 2% of net

loan balances to take account of the lower credit quality of its home loan portfolio, including the shaky conduit and mortgage brokers, it was now dealing with.   Thus, the following tables set forth extremely conservative assumptions:

| In Billions of Dollars for the Quarter Ended: | First | Second | Third | Fourth |
|---|---|---|---|---|
| 2006: Loans, net of unearned income: | $ 605.3 | $ 637.1 | $ 655.4 | $679.2 |
| Allowance at 2%: | 12.1 | 12.7 | 13.1 | 13.6 |
| Allowance as Reported: | 9.5 | 9.1 | 9.0 | 8.9 |
| Minimum Understated Amount: | $2.6 | $3.6 | $ 4.1 | $4.7 |
| 2007: Loans, net of unearned income: | $ 693.3 | $742.9 | $774.0 | $ 778.0 |
| Allowance at 2%: | 13.9 | 14.9 | 15.5 | 15.6 |
| Allowance as Reported: | 9.5 | 10.3 | 12.7 | 16.1 |
| Minimum Understated Amount: | $ 4.4 | $4.6 | $2.8 | ($0.5) |

832.    The Company's purported control environment failed to ensure that the financial statements issued during the Class Period were reliable or in compliance with applicable laws.  The Company's ineffective internal controls over financial reporting allowed the Company to ignore the growing trend of delinquent loans when modeling for its loan loss allowance.

833.    On April 17, 2006,  defendants conducted an earnings conference call with financial analysts covering Citigroup.  Defendant Krawcheck made it clear at the conference that Citigroup deliberately decided to increase the Company's mortgage business "accessing channels around Citigroup that were not accessed" before:

> [Defendant] Krawcheck:  ...The fact that mortgage has been growing is no accident or it's not something that we've done, gee, we can't grow cards, let's grow mortgages.  This is – it's mortgages, it's home

378

equity, it's investments that have been made in the business.  It's accessing distribution channels around Citigroup that were not accessed as effectively in the past.  I'll make one comment.  Do note that it's really the variable mortgages that we hold on the books.  We sell off the fixed mortgages by and large.  So, the growth in mortgages has absolutely been something that we have driven.

[Apr. 17, 2006 Bloomberg Tr. at 9].

834.    Moreover, defendants' statements in SEC filings concerning Citigroup's procedures over the "Allowance for Loan Losses" for consumer loans were also false.  For example, defendants stated:

> For consumer loans . . . each portfolio of smaller-balance, homogeneous loans – including consumer mortgage, installment, revolving credit, and most other consumer loans – is collectively evaluated for impairment.  The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio based upon various analyses.  These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions. . . .an evaluation of overall credit quality; the credit process, including lending policies and procedures . . .

[2006 10-K at 111].

835.    The foregoing statement was false and misleading when made, as defendants knew or were reckless in not knowing that the allowance methodology for consumer lending, particularly in the subprime and Alt-A mortgage areas, did not consider "current trends and conditions," as Citigroup did not model for downturns in the housing market and there were material inadequacies in internal controls over "the credit process, including lending policies and procedures."

836.    In defendant Prince's opening remarks at an April 16, 2007 conference, he falsely portrayed Citigroup as being "very diligent in managing our credit exposures," among other things:

> Our fourth big job this year is to manage through the credit cycle. We're a bank; we're in the risk business.  We're not immune to credit cycles. We're not immune to credit deterioration, and we're managing this side of our business very carefully in light of that external environment.  I feel good about the composition of our portfolios, not only in the corporate and sovereign area but especially in the U.S. mortgage area where we have avoided the riskier products at some cost to revenues in prior years, and I think we're seeing that play out in the results we have on the credit side.  Gary will take you through the details of that in a moment including the increase in the reserves to stay ahead of the trends we see in the credit environment, but I assure you that we remain very diligent in managing our credit exposures.

[Bloomberg April 16, 2007 Tr. at 2].

837.    The preceding statements made by defendant Prince at the April 16, 2007 analyst conference call were false and misleading when made for at least the following reasons: (a) defendants had no good faith or reasonable basis to state that "we're managing this side of the business very carefully," given the material weaknesses in internal controls at FCS and elsewhere within the Company over origination and securitization of mortgage loans; (b) Citigroup did not "avoid" "riskier mortgage products" and indeed was saddled with CDOs, RMS and "non-prime" mortgages that were virtually valueless given the fraud in origination of the mortgages and lack of credit worthiness of the borrowers; and (c) the "increase in reserves" was not to "stay ahead of the trends," but a feeble effort to play catch-up, as even with the slight increase in reserves, Citigroup was under-reserved by almost $4.4 billion as of March 31, 2007.

838.    Defendants conceded that some of the credit reserves were the function of "subjective" management determination and not just the "pocket protector" "Ph.D.s" doing:

> Guy Moszkowitz [analyst, Merrill Lynch]:   ...Could you tell us a little bit about what went into the changing that sort of more subjective view of the future and how that impacted your decision to add reserves?
>
> [Defendant] Crittenden:   We always have some – obviously some management discretion with regards to the credit reserves that we establish, and in particular we thought it was prudent as you think about the very early buckets of receivables portfolios that really haven't been around long enough to season to show any type of the loss, it would make sense for us to try and anticipate what losses would be embedded in those portfolios when they mature.  The mortgage portfolio in particular is a portfolio that had grown rapidly over the course of the last year, and we thought it was a sensible thing for us to reflect that rapid growth and to ensure that we had taken reserves against early buckets before there was any sign of credit deterioration there, so I think our general feeling about the portfolio is actually very good.

Tr. at 7.

839.    At an October 15, 2007 conference, defendants begrudgingly conceded that reserve methodology could be improved and that they were "frankly surpris[ed]" by how poor the "quarter's performance" was. [2007-10-15 Bloomberg Tr. at 2 quoting defendant Prince]; *see also Id.*, at 17 (defendant Prince: "In terms of risk management, obviously we wish that our risk management models had predicted what had happened here.  In fairness they included it but only at the wide margins of what we thought was possible.").

840.    Finally, defendants found themselves responding to concerns about Citigroup's reserve methodology, defendants although admitting some fault, attempted to justify the methods employed.

Betsy Braseck [analyst, Morgan Stanley]:   Couple of questions.  One was [the change] on the reserve methodology.

[Defendant] Crittenden:   We didn't need any type of regulatory approval here and there was actually no methodology change.  What we did during the quarter was refine our estimate process.   We started this back in the second quarter, and we have been working across our entire consumer portfolio to try and identify behavioral changes which at the end of the day will result in a loss that is embedded in our portfolio today.

[Bloomberg Tr. at 10].

841.    Defendant Crittenden then went onto "explain" that purportedly one of the factors not taken into consideration by Citigroup's loss reserve models was a relatively basic one, *i.e.*, it did not consider the scenario where a mortgagor begins to make late payments.  *Id.*

842.    Other analysts essentially questioned defendants' credibility.  *E.g.*, Tr. at 16 (Ron Mandle, analyst with GIG: "And then the second, on the loan loss reserve, you mentioned you saw credit deterioration in September and I guess in a way I'm wondering why didn't you build the reserve more than you did, given that you basically said you're going to build it more in the fourth quarter?").

843.    As the foregoing recitation demonstrates, Citigroup clearly failed to comply with relevant accounting procedures with respect to loan loss reserves and as such materially understated its reserves and correspondingly materially overstated its earnings during the Class Period.

382

3.   **As Citigroup Knowingly Used its Own Deficient Loans as the Base Collateral for its Initial Rmbs Securitizations, Citigroup's Failure to Disclose its Massive Retention of Virtually Worthless Rmbs and Cdo Securities Was a Knowing, Fraudulent Omission**

844.   "RMBS" refers to residential mortgage-backed securities.   Many of Citigroup's deficient and impaired loans formed the collateral base of its RMBSs and those RMBSs, in turn, formed the asset base for certain Citigroup CDOs.   Beginning no later than mid-2006 Citigroup had been aware, or but for its reckless indifference would have been aware, that the growing amount of CDO and RMBS securities, which it created and were often held through the class period, carried a substantial risk of devaluation because Citigroup knew that the base of the chain of those securities was itself corrupted.   Citigroup's own poor quality loans were already defaulting, permeated with borrower fraud, and were otherwise impaired (or would imminently become impaired), as detailed above.

845.   For example, Citigroup unsuccessfully attempted to pass off problem loans acquired from Accredited by securitizing those loans.   As described more fully above, Citigroup was stuck with nearly a billion dollars in problematic loans it had hastily purchased from Accredited in March 2007.   Citigroup immediately commenced the process of dumping a substantial portion of these loans on unsuspecting investors who purchased Citigroup Mortgage Loan Trust 2007-AHL2 ("AHL2") and Citigroup Mortgage Loan Trust 2007-AHL3 ("AHL3").   AHL2 which consisted of 4,792 mortgage loans on real properties with an aggregate principal balance of approximately $951,478,465.   AHL2 closed on or about May 31, 2007.   AHL3 which consisted of 4,872 mortgage loans on real properties with an aggregate principal balance of approximately $928,707,995.   AHL3

closed on or about June 29, 2007.  These securitizations allowed Citigroup to essentially remove off of its balance sheet nearly $2 billion in problem loans acquired from Accredited.

846.    With respect to AHL3, CGMR (the "Sponsor") made certain representations and warranties with respect to each mortgage loan as of the closing date.  "Upon discovery of a breach of such representations and warranties that materially and adversely affects the interests of the certificateholders, the sponsor will be obligated to cure such breach, or otherwise repurchase or replace such mortgage loan."  Prospectus at 11.  The Prospectus further states that residential mortgage loan originators had recently experienced serious financial difficulties resulting "in part from declining markets for mortgage loans as well as from claims for repurchases of mortgage loans previously sold under provisions that require repurchase in the event of early payment defaults, or for material breaches of representations and warranties made on the mortgage loans, such as fraud claims."  *Id*. at 13.  The Prospectus further touted the underwriting standards that Accredited was purportedly utilizing.  *Id*. at 30-31.

847.    Citigroup was able to place a portion, but not all, of the Accredited loans in the AHL2 and AHL3.  It appears that Citigroup was stuck with in excess of $819.9 million of Accredited loans on its books.[61]  Plaintiffs allege on information and belief that these loans were stuck on Citigroup's balance sheet as of the end of the third quarter of 2007.  Indeed, Citigroup itself appears to have been stuck with substantial AHL3 positions that it was unable to sell at the time of the RMBS transaction in June of 2007.  The Bonifacius Limited Offering Circular dated October 19,

---

[61] As mentioned above, Citigroup purchased $2.7 billion of loans from Accredited. Approximately $819.9 of the principal balance of that purchase was not included in the $951.4 million AHL2 and $928.7 million AHL3 CMOs. Of that $819.9 million in excess Accredited loans, $34.2 million are listed in the Accredited Complaint.

2007, reflects that Citigroup placed in the Bonifacius placement $3.5 million of CMLTI 2007-AHL3 M4 Subprime RMBS and $5.347 million of CMLTI2007-AHL3 M5 Subprime RMBS.

848.   These Accredited loans were but one example of Citigroup's knowledge that the very CDOs it created and held large interests in were built on a fundamentally shaky base of shoddy mortgages as collateral.   Other examples included Citigroup's deficient loans that were originated by Silver State and securitized into Citigroup's CMLTI Series 2006-AR7, CMLTI 2007-AR7 and CMLTI Series 2007-6 CMOs. Fitch subsequently downgraded several of the CMLTI Series 2007-6 tranches on October 31, 2007, and downgraded several of the subordinated tranches of CMLTI 2007-AR7 and 2007-6 from BB to C (the CMLTI 2006-HE1, -HE2 and -HE3 CMOs were securitized by Citigroup and included poor loans originated by Quick Loan Funding; the ratings for the mezzanine tranches in these CMOs were subsequently downgraded by Standard and Poor's on July 12, 2007 (CMLTI 2006-HE1 and -HE2) and on October 19, 2007 (CMLTI 2006-HE3)).

### 4.   Citigroup's 2008 Reform of its Lending Practices Confirm That Their Loan Underwriting Was Fundamentally Flawed and Materially Risky

849.   In calendar year 2007, while the subprime meltdown was accelerating, Citigroup, through CMI, achieved the ranking as the second-highest correspondent channel lender, as ranked by the National Mortgage News.  However, during 2008, when the public storm over the slippery underwriting practices engaged in by the large financial institutions such as Citigroup hit a crescendo, Defendants' public statements did not fully and truly inform the public of the magnitude of the crisis.  At the same time, however, Defendants were left with no choice but to rein in those risky and reckless underwriting practices – and face the dire financial consequences that they so

desperately had been trying to avoid.  The fact that Defendants reformed these practices is proof positive of their material risk, risk that was not disclosed to investors until it was too late.

850.    Citigroup, according to a February 4, 2008 *National Mortgage News* article, announced its decision "to close its warehouse lending division, First Collateral Services," whose disastrous experience with stale loans was described above in detail.  The completion of the closure was expected to take place during 3Q 2008.

851.    In addition, Citigroup, according to a March 10, 2008 *National Mortgage News* article, announced that it would be reducing its on-balance-sheet mortgage holdings by $45 billion over the next year or 20% of its total portfolio."  It also announced that it would "no longer buy mortgages in bulk packages."  It further announced its elimination of "'higher-risk products' including 2/28 and 3/27 ARMS"; its cessation of funding of "investor properties on three- and four-unit rentals," and; established a minimum borrower FICO score of 580.  According to a March 12, 2008 *Wall Street Journal* article, "Citigroup has slashed the number of home-equity loans originated through brokers by 90%."

852.    Later that month, CMI, according to an internal memorandum cited in a March 31, 2008 *National Mortgage News* article, "told its brokers that it will stop table funding standalone seconds and all combo products."  Not surprisingly, in the first quarter of 2008, CMI experienced a 25% volume reduction in residential loan originations from the same period in 2007. For the third quarter of 2008, CMI's corresponding drop was 45%.  This was in a business, that until recently, Citigroup had represented to be a source of earnings growth.

853.    Citigroup effectively admitted during its May 9, 2008 Investor and Analyst Day presentation that the Company was beginning to significantly limit its risky loan practices –

including Citigroup's reliance on third-party mortgage originations and the utilization of loosened underwriting standards – which had severely eroded the quality of its residential mortgage portfolio. According to the presentation transcript, Brian Leach, Citigroup's Chief Risk Officer, stated as follows:

> ...We have a residential first and second mortgage portfolio in our US Consumer Business of approximately $220 billion. Gary spoke about this in some detail on the first quarter earnings call as well.
>
> From a risk standpoint, we have made significant changes in our origination strategy and standards, including stopping third-party originations in second mortgages and significantly tightening our underwriting standards across first and second mortgages, for example, lowering maximum loan to value ratios.
>
> These changes are improving the quality of new business we are booking. We are also proactively managing those portions of portfolio that we are most concerned with and we continue to augment our collections and resources and programs to work with our customers.

854.    In June 2008, Citigroup announced that Bill Beckmann, who had been president of CMI during its ramp up of subprime loan exposure, would be stepping down for family reasons.

### 5.    Citigroup Suffers Severe Credit Losses in 2008 as a Result of its Risky Lending Practices, Necessitating an Unprecedented $301 Billion Federal Bailout

855.    Citigroup incurred a $488 million net credit loss attributable to its residential mortgage portfolio in the fourth quarter of 2007.  This was merely the tip of the iceberg.  Throughout 2008, with respect to its North American residential mortgage portfolio, Citigroup recognized net credit losses of $887 million for the first quarter of 2008, $1.092 billion for the second quarter of 2008, $1.405 billion for the third quarter of 2008, and $1.671 billion for the fourth quarter of 2008.

856.     Citigroup's skyrocketing net credit losses on its residential mortgages was a direct materialization of the previously undisclosed risk that the poor-quality loans in Citigroup's mortgage portfolio would become impaired, evidenced by the ballooning dollar-volume of Citigroup's mortgages that became delinquent (90+ days past due).  While only $2.426 billion in residential mortgages were 90+ DPD during Q1 2007, that figure spiked to $4.848 billion for the fourth quarter of 2007 and continued to rise throughout 2008: $5.654 billion for Q1 2008; $6.460 billion for Q2 2008; $7.778 billion for Q3 2008; and $9.341 billion for Q4 2008.

857.     The accelerating rate at which borrowers became delinquent, particularly in Citigroup's riskiest loans (first mortgages with borrower FICO scores under 620, and second mortgages with loan-to-value ratios over 90%), contributed to the rapid deterioration in Citigroup's mortgage loan portfolio, leading to Citigroup's massive credit losses as reflected in the chart below:

**Citigroup Consumer Banking (North America) – Residential Real Estate Lending**

| (in $ billions) | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
|---|---|---|---|---|---|
| Average Loans | $219.5 | $219.9 | $215.3 | $205.2 | $200.5 |
| End-of-Period Loans | $218.6 | $217.6 | $207.0 | $202.0 | $197.4 |
| Net Credit Losses (NCL) | $0.489 | $0.877 | $1.092 | $1.405 | $1.671 |
| NCL as % of Avg. Loans | 0.88% | 1.62% | 2.04% | 2.72% | 3.32% |
| Loans 90+ DPD | $4.849 | $5.654 | $6.460 | $7.778 | $9.341 |
| Loans 90+ DPD as % of End-of-Period Loans | 2.22% | 2.60% | 3.12% | 3.85% | 4.73% |
| First Mortgages 90+ DPD (%) | 2.54% | 3.02% | 3.69% | 4.61% | 5.71% |
| First Mortgages (FICO<620) 90+ DPD (%) | 7.83% | 7.85% | 8.51% | 9.79% | 11.77% |
| Second Mortgages 90+ DPD (%) | 1.38% | 1.45% | 1.75% | 2.03% | 2.41% |
| Second Mortgages (LTV≥90) 90+ DPD (%) | 2.48% | 4.00% | 3.58% | 3.16% | 4.69% |

858.    Citigroup's write-downs were enormous.  According to *The New York Times*, Oct. 17, 2008, "the write-downs on mortgages and other loans have eaten away 60 percent of all the profits made by [Citigroup] during the boom years."

859.    Citigroup was forced to massively build up its loan loss reserves in 2008.  As Citigroup suffered the aforementioned credit losses during 2008, the Company was simultaneously forced to build significant loan loss reserves due to its poor mortgage loan portfolio.

a)    On April 28, 2008, during the Company's first quarter 2008 analyst conference call, Crittenden admitted that "losses for the entire mortgage portfolio have increased substantially since September 2007."  Crittenden, in response to analyst concerns, further stated "we have chosen to take very significant reserves there," while opaquely admitting that loan losses could be even more severe and that as a result "we are going to monitor that."

b)    On July 18, 2008, during the Company's second quarter 2008 analyst conference call, Crittenden indicated that "[a]pproximately 54% of $1.4 billion of the total build [in loan loss reserves] was in the North America residential real estate portfolio to reflect our estimate of the losses inherent in the portfolio...."  Crittenden expressed concern regarding the Company's mounting credit costs.  "Credit cost in our consumer business may continue to rise through the year....  You have seen us build reserves and if trends continue such that the rate at which delinquent customers go to write-off increases, we believe that consumer credit costs could have a meaningful impact on our results for the remainder of the year."   Responding to analyst concerns over Citigroup's most problematic loans, Crittenden admitted that "correspondent and

389

broker channels have tended to be of lower quality" and together with low-documentation loans "have tended to be the areas where we have had the biggest losses."

c)     On October 16, 2008, during the Company's third quarter 2008 analyst conference call, Crittenden elaborated that "[i]n North American residential real estate, net credit losses were higher by $1.1 billion over last year... [and] there has been an increase in losses and delinquencies across the mortgage portfolios in North America." Citigroup increased its loan loss reserves by $3.9 billion, approximately $1.3 billion of which "was in North American residential real estate to reflect an increase in our estimates of the losses inherent in that portfolio."

d)     On January 16, 2009, during the Company's fourth quarter 2008 analyst conference call, Crittenden revealed that $2 billion of Citigroup's "loan loss reserve build was in the North American residential real estate portfolio and in North American cards." Crittenden further revealed the extent that Citigroup would suffer from credit losses: "Credit costs will remain a headwind during 2009. First on consumer credit we have said that based on our current assumption and scenario planning estimates as we go into the first half of 2009 we expect [net credit losses] for our consumer portfolios to be $1 to $2 billion higher each quarter when compared to the [net credit losses] in the third quarter of 2008. We believe that they will be at the higher end of this range."

860.     Citigroup's mounting financial woes in 2008 were the direct result of its fraudulent conduct alleged herein.  According to a Deutsche Bank analyst quoted in *The New York*

*Times*, Nov. 22, 2008, "[a] lot of the issues facing Citigroup **are not new issues, they have simply grown greater in severity**."

861.    The extent of the risk inherent in Citigroup's mortgage portfolio was confirmed by the November 23, 2008 bailout of Citigroup by the U.S. Government.  Under the terms of the bailout's loss-sharing arrangement, the government agreed to guarantee approximately $301 billion in assets.  As later revealed in a January 16, 2009 earnings presentation by the Company, more than half of the $301 billion of covered assets were Citigroup consumer mortgages: $98.9 billion in first mortgages, $55.2 billion in second mortgages, and another $22.4 billion in unfunded second mortgage commitments.

## VI.    LEVERAGED LOANS

862.    At the same time that Citigroup was misrepresenting and concealing the extent of its CDO and SIV exposure, the Company was undertaking a parallel scheme to conceal its growing investments in the increasingly risky secondary market for leveraged loans.  This market, like the subprime mortgage market, was driven by investor demand for the higher yield of risky lending.  Citigroup, however, had the added motivation to finance these loans because the Company's investment bankers earned exorbitant fees from arranging these loans, structuring their securitization, and advising on the corporate deals they financed.  Additionally, on information and belief, Citigroup was able to book substantial immediate gains on a large portion of its risky loans by keeping those liabilities on its books but purchasing insurance on their risk of default and by accounting for the purchased insurance contracts no differently than an actual sale of the underlying loans.

391

863.    The article "What went wrong" in the May 19, 2008 issue of *The Economist* describes Citigroup's leveraged loan business as accurately as it does the Company's use of CDO and SIVs:

> But something changed in 2001, when the dotcom bubble burst. America's GDP growth since then has been weaker than in any cycle since the 1950s, barring the double-dip recovery in 1980-81. Stephen King and Ian Morris of HSBC point out that growth in consumer spending, total investment and exports in this cycle has been correspondingly feeble.
>
> Yet, like Wile E. Coyote running over the edge of a cliff, financial services kept on going. A service industry that, in effect, exists to help people write, trade and manage financial claims on future cashflows raced ahead of the real economy, even as the ground beneath it fell away.
>
> The industry has defied gravity by using debt, securitisation and proprietary trading to boost fee income and profits. . . .
>
> This process has turned investment banks into debt machines that trade heavily on their own accounts.

864.    Such was the case with Citigroup's leveraged loan business, and Defendants defrauded purchasers of its shares by failing to disclose and falsely representing these essential facts. Citigroup hid from shareholders the fact that the exceptional profits generated during the early to mid 2000s from its leveraged loan business, like its businesses dependent on CDOs and SIVs, came with a price-assuming exceptional levels of risk. And not only did Citigroup fail to disclose meaningful facts about the engine of its leveraged-loan business model, the Company continued to trumpet its risk management policies throughout the Class Period.

A.    **Background on Leveraged Loans and CLOs**

865.    Leveraged loans are syndicated commercial loans arranged by banks to companies in need of capital.  However, because the companies that utilize leveraged loans typically carry high debt-to-equity ratios, leveraged loans are defined by their lower, speculative-grade credit ratings and correspondingly higher yields.  For this reason, leveraged loans have historically included maintenance covenants requiring minimum coverage ratios of cash flow-to-interest and cash flow-to-debt service.  These protections historically distinguished leveraged loans from competing forms of finance, such as high-yield bonds.  As a secondary market for these loans has developed, leveraged loans have increasingly supplanted the role of high-yield bonds as instruments for financing mergers and acquisitions (M&A), leveraged buyouts (LBO), recapitalizations, and restructurings.

866.    Just as a CDO securitizes asset-backed securities, a Collateralized Loan Obligation (CLO) gathers leveraged loans from 100 or so companies into a special purpose vehicle (SPV).  The CLO then issues debt securities against these loans' future payments of interest and principal.  These securities typically comprise three tranches: a senior tranche, a mezzanine tranche, and a junior, or "equity" tranche.  Typically, the senior tranche is rated AAA, the mezzanine tranche is rated BBB, and much of the underlying risk is shifted to the higher-yield junior tranche.  As the underlying loans are repaid, these payments are allocated first to the senior-most tranche, and then the remaining funds descend, like a "waterfall," to the junior, or subordinated tranches.

867.    During the Class Period, the world economy experienced a boom in M&A and LBO deals that greatly increased demand for leveraged loans.  For example, in 2005, leveraged lending reached a 15-year record volume of $172 billion, nearly 80 percent of which was financed

393

by leveraged loans.  By 2006, the leveraged loan market had reached $266 billion.  Just as the housing boom was fueled by CDOs, the LBO boom was fueled by leveraged loans - made possible by CLOs.

868.  Financing M&A and LBO deals is a lucrative business.  By arranging leveraged loans for its corporate clients, an investment bank earns underwriting fees, not only from the financing and advising of the LBOs themselves, but also from working on the additional equity and bond issuances they were awarded in exchange.  Thus, in 2007, 47 percent of fees paid to investment banks by private equity firms were generated from structuring leveraged loan deals.

869.  Driven by these factors, Citigroup sought to become a major participant in the leveraged loan market.  In 2004, according to a FinanceGates.com article Citigroup "worked on about one-third of the estimated $61 billion of leveraged buyouts worldwide" including "five of the six largest transactions."  June 7, 2004, "Citigroup Passes Goldman as Advisor to Buyout Firms."  By 2006, Citigroup was the fourth largest syndicator of merger and acquisition (M&A) financing and the fifth largest syndicator of LBO financing.

870.  From 2000 to 2007, increased institutional investor demand for higher yielding CLOs led to narrowing bid-ask spreads.  In this environment, borrowers commanded lower interest rates, encouraging lenders to pursue less secured lending.  During this period, three popular variations of loans that lacked these traditional safeguards were covenant-light, second-lien loans, and payment-in-kind loans.  Covenant-light loans are leveraged loans that lack traditional maintenance covenants that trigger default when borrowers fail to maintain key cash flow to debt-equity ratios.  These loans carry higher risks associated with default and recovery in the case of default.  Second-lien loans are leveraged loans secured by collateral that already secures a

previously outstanding loan. This removes the historical advantage of leveraged loans: having a first place among creditors in the event of a default. Payment-in-kind, or PIK, loans allow the borrower to issue additional notes in lieu of repaying principal and interest, similarly to the negative amortization and interest only mortgage loans made in recent years.

871.    Together, covenant-light, second-lien loans, and PIK loans comprised a new, riskier breed of loans designed for a market flush with credit. As noted by Reuters LPC's Meredith Coffee in the Loan Syndication and Trading Association ("LSTA") 2007 Loan Market Chronicle:[62]

> "Despite climbing leverage, falling spreads, lightening collateral, seconding of liens - and general opprobrium - it appears that burgeoning of LBOs might not be the credit storm it's generally anticipated to be." 2007 Leveraged Loan Chronicle [pg. 58]

872.    By 2008, the leveraged loan industry was beginning to discuss these trends. As discussed by Fitch Ratings's William H. May, Elizabeth R. Nugent, and Jill Zelter in the 2008 Loan Market Chronicle:

> "Risk in the leveraged loan markets had been building due to declining structural protections and other aggressive features of new deals coming to market. The abundance of loans initiated for shareholder-friendly activities, such as leveraged buyouts (LBOs), as well as covenant-light and second-lien loans, was a part of this trend." 2008 Leveraged Loan Chronicle [pg. 81]

Likewise:

---

[62]    The Loan Market Chronicle is a yearly publication by the LSTA, which is a large industry organization focused on leveraged loans and other forms of corporate debt that counts Citigroup as one of its members. Throughout the majority of the Class Period, Citigroup's Jonathan D. Calder ("Calder")-its Managing Director, Head of Loan Sales and Trading, Americas, Global Fixed Income Credit Markets-was a director and officer of LSTA. In 2004, Calder was a LSTA director, and in 2005, he was named an officer of the organization as a Vice Chair. In 2007, he assumed the role of Chair of the Board of Directors. At the beginning of 2008, Calder is an "outgoing officer" of the organization according to the 2008 Loan Market Chronicle.

"As loan issuance surged in 2006 and early 2007, increasingly aggressive structures came to market.  Average rating quality declined and the covenant protection on new deals fell dramatically." *Id*. [p. 82]

873.    These poor structural protections and risk pricing were:

"the result of the borrower-friendly issuance patterns of the past several years, which have left a stock of loans outstanding with a higher risk profile and less structural protections than has existed in the leveraged loan market historically. *Id*. [p. 85]

874.    CLOs were significant purchasers of these risky loans:

"CLOs were absorbing all of the attendant risk factors - such as weaker structural protections - that accompanied these assets." *Id*. [p. 84]

875.    However, these developments were unknown to investors.  In fact, the deals had become so complex that many institutional investors lacked "sufficient knowledge or expertise to second guess the rating agencies and come to their own independent credit judgment, the way they do for typical corporate credits." *Id*. [p.65-66]  As one commentator noted, "Transparency has largely disappeared in large segments of the securitized market." *Id*.

B.    **Citigroup's leveraged-loan and CLO machine**

876.    Banks have not typically operated CLOs.  Their traditional role has been to help clients create them, earn a fee and then exit the deal.  However, Citigroup dramatically changed this format by investing in its own CLOs.  By purchasing its own product, Citigroup was able to create artificial demand for a product whose creation generated Citigroup enormous fees.  Because a transparent market was not conducive to such a scheme, Citigroup accomplished its purchases through an off-balance sheet entity called a Variable Interest Entity (VIE), which Citigroup did not disclose until it had already experienced substantial losses.  Also, through negative basis trades,

396

Citigroup also created instant revenue by inflating its balance sheet without disclosing the nature and extent of these trades or the associated risks.  CLOs allowed Citigroup to create the demand for its ever-riskier, fee-generating leveraged loans without disclosing any meaningful information to its shareholders about the nature and extent of the artificial market for its financial products or the risks associated with its modus operandi.

### C.   CLOs ramp up demand for leveraged loans

877.   According to an February 9, 2008 article in the Wall Street Journal titled *Credit Jitters Hit Leveraged Loans*, during the height of the credit boom, CLOs accounted for 60 percent of the demand for leveraged-loan debt.  As explained in a July 24, 2007 Bloomberg article titled *KKR, Homeowners Face Funding Drain as CDO Sales Slow (Update2)*, "'CLOs have been instrumental in funding the surge in LBOs and pushing down loan spreads . . . They provide constant institutional demand for leveraged loans'" (quoting industry expert Gunnar Stangl of Dresdner Kleinwort, a unit of Allianz SE, Europe's biggest insurer).  And as of July 2007 when the market for leveraged loans was collapsing, Citigroup was the biggest underwriter of CLOs, managing $16.6 billion of sales.  By underwriting CLOs that artificially elevated the demand for the highly leveraged loans the Company issued, Citigroup stood on both sides of a huge market and reaped fees on one end of the deal as it booked free money on the other through negative basis trades.  The nature of this business was never disclosed to shareholders throughout the years of the credit boom when Citigroup's stock price soared on investor expectation.

### D.   Negative basis trades increase gains/risks

878.   As explained in the February 6, 2008 Financial Times article titled *New Danger Appears on the Monoline Horizon*, negative basis trades allowed both banks (and monolines)

to book apparently "free money."  After purchasing insurance on a CLO tranche, Citigroup would book the difference in the cost of the insurance and the payments of the loan for the entire life of the loan immediately as if the loan had been sold.  Largely because of these negative basis trades, the Financial Times Alphaville Blog estimated in February 2008 that around 90 percent of CLO AAA-rated tranches are held by banks.  As the largest underwriter of CLOs, Citigroup undoubtedly booked substantial gains on its CLOs' AAA-rated tranches-the nature and amount of these gains were never disclosed to shareholders, nor was the fact that the Company depended on the solvency of the loan insurer to avoid having to write down the value of the loan or CLO tranche.

E.    **Synthetics, CLO collateral baskets, and market value deals fuel the fire, increase the risks**

879.    In early 2007, Ratul Roy and Eduar Trampolsky of Citigroup co-authored an article in the leveraged loan industry's trade publication, the LSTA Loan Market Chronicle.  This article, titled *CLOs*, explains how CLO issuers/underwriters, following the lead of their CDO-underwriting colleagues down the hall, turned to synthetic securitization structures, CLO collateral baskets, market value deals and other creative means to inflate a softening market for leveraged loans and CLOs.

880.    Written sometime in late 2006 or early 2007, the article describes CLOs' new use of synthetic structuring in 2006 as follows:

> Synthetics are making a bigger mark, as bank lenders use improving swap documentation to buy protection from tranche investors.  There is also a greater awareness from CLO investors of relative value opportunities available outside long-only senior secured loan pools.  Interest in CLO buckets within CLOs, shorting poorly perceived names, and investing in hedge-fund style credit opportunity funds all point towards this trend.

Ratul Roy and Eduard Trampolsky, *CLOs*, LSTA Loan Market Chronicle 2007, at p. 41.

881. On the significance of developing synthetic markets to prevent the softening of the overall market, Roy and Trampolsky wrote as follows:

> At a certain point widening collateral spreads (which often follow rising loan leverage, as we see in the current markets) may influence CLO spreads to move out, but it is difficult to be precise about the timing. The developing synthetic markets, though, based either on CLO tranches or on loans, offer some opportunities to fashion trades around such views.

*Id.*, p. 41.

882. Based, in part, on the use of synthetics, Citigroup expected 2007 to be a bumper year beyond imagine for CLO issuance of $112 billion, an increase of 25 percent over 2006. This 25 percent increase would be on top of a record number of deals and volume in 2006.

883. Of course, fueling the CLO and leveraged loan money machine required taking on greater risk as increasing numbers of increasingly risky leveraged loans were taken through the CLO pipeline, were stacked on Citigroup's books after being booked as gains through negative basis trades, were placed in closely associated VIEs, and as the CLO assembly line required Citigroup to issue bridge loans to facilitate deals quickly enough to begin the next one in line.

884. The Roy- Trampolsky article demonstrates the prevailing sentiment at Citigroup at the time about issuing the next risky leveraged loan and absorbing it with a CLO in discussing collateral baskets in CLOs: "Tight loan spreads have prompted managers to explore creative ways to increase the spreads of CLO collateral pools." In explaining the increasing emphasis on market-value deals, the authors state that "[a]mong the appealing features of these [market-value] deals is increased flexibility in collateral selection." They go on to explain that these

creative ways: "With loan spreads near historical lows, we expect more deals with significant allocation for tranches from other CLOs as well as deals with other non-conforming buckets, such as second-lien and middle market [i.e., less credit-worthy] loans." *Id.*, p. 42.

885.    At the same time that Citigroup was making increasingly risky loans to finance M&A and LBO transactions involving less credit-worthy companies, and secured by increasingly subordinated liens, it was meanwhile securitizing these loans into CLOs, and retaining the riskiest tranches for itself.  As Roy and Trampolsky explain:

> "Through 2006, financing-driven CLOs [e.g., CLOs to finance M&As and LBOs] accounted for approximately 15 percent of the sector activity.  In these trades the manager retains junior tranches of the deal, usually the equity and double B rated tranches.

*Id.*, p. 43.

886.    Thus, while Citigroup was telling investors that it sold a majority of its exposures to the market, its own leveraged loan professionals were explaining to their industry peers that it was the riskiest tranches that Citigroup retained in order to sell the senior investment-grade tranches to the market.

887.    An article by Standard & Poor's Steve Miller in the same 2007 issue of the LSTA Loan Market Chronicle describes the conditions of the market at the beginning of 2007 as follows:

> While all of this was enough to frighten market participants, fear was not the operative emotion of 2006. Rather, in the eternal struggle between fear and greed, greed has got fear on the ropes. Thus, arrangers are underwriting unprecedented amounts. Accounts are raising money hand over fist. And private equity firms are gobbling up ever-bigger properties in an effort to put massive buyout funds to work.

* * *

400

> Certainly, there is a flood of new-issue volume in the offing, what
> with the forward calendar soaring to $116 billion at yearend. On the
> demand side of the ledger, as well, there's no shortage of cash
> pouring into the market via CLO issuance and crossover investment.

Steve Miller, *A Review of the US and Second Lien Loan Market - 2006: A Year for the Record Books*, LSTA Loan Market Chronicle 2007, at pp. 31-32.

888.    Ultimately, Citigroup's greed would cost its shareholders dearly.

**F.    Citigroup's false statements and omissions concerning its leveraged loan commitments**

889.    During much of the Class Period, Citigroup never disclosed its huge leveraged loan commitments and the large liabilities it had amassed on its balance sheet.

890.    In fact, the first indication that Citigroup investors received concerning leveraged loans and Citigroup's massive liabilities was during Citigroup's second quarter 2007 conference call, held on July 20, 2007, during which Defendant Crittenden revealed that leveraged lending accounted for 5 percent of the Investment Bank's revenues in 2006.  In response to an analyst question, Crittenden further stated that "although [leveraged lending] is an important business for us, it is not a huge business for us in the overall scheme of things."  This statement would be proven false less than three months later when Citigroup revealed that its leveraged lending business was suffering massive losses and would result in billions of dollars of write-downs.

891.    In the midst of these increasing concerns over the risks in the leveraged loan market, Citigroup told its investors that it managed the risks of its syndicated leveraged loans conservatively.  For instance, in Citigroup's April 29, 2004 earning conference call, the Company assured investors:

> "Corporate loans . . . again, that's an area where we don't actually
> focus on growing that part of our business. . . . So that's not part of
> our growth strategy if you will."

892.     In Citigroup's July 15, 2004 earnings conference call, the Company reiterated this assurance:

> "And corporate loans again, is an area where we tend to not look for
> a lot of growth in that business."

893.     These statements were misleading.  In reality, Citigroup was aggressively increasing its exposure to its CLOs by retaining these securities on its balance sheets at no cost through zero loss trades, as well as in off-balance sheet facilities.  Additionally, Citigroup engaged in negative basis trades with the billions of dollars of CLO exposure remaining on the Company's balance sheet.  These trades allowed Citigroup to book immediate gain for the entire term of loans by purchasing insurance on their default and, thereby, treat the purchase of insurance as a sale of the loans when, in fact, those loans (or rather, those CLO tranches) never left Citigroup's books.  The nature and extent of Citigroup's negative-basis-trade accounting for CLO tranches was never disclosed to shareholders despite the fact that industry experts have recently estimated that one-half to 90 percent of triple-A CLO tranches were booked as gains through negative basis trades.  In addition to the high fees for CLO creation, the ability to create instant gain through these trades was a powerful incentive for Citigroup to issue ever riskier leveraged loans.  While revenue from fees and negative-basis trades inflated Citigroup's earnings on leveraged loans and CLOs, Citigroup kept its shareholders unaware of the artificial source of the gains or the inherent risks in continuing to operate its ephemeral money-making machine.

894.    As explained in more detail elsewhere in this Complaint, throughout the Class Period, Citigroup regularly filed annual and quarterly reports with the SEC that contained financial statements and associated explanatory notes that were materially false and misleading.  With respect to Citigroup's leveraged-loan and CLO holdings and business in particular, these financial statements overstated the value of the Company's leveraged-loan and CLO holdings, understated the likelihood of additional write-downs of those holdings' value, and failed to fully and truthfully disclose the self-propagating, increasingly risky nature of Citigroup's leveraged-loan and CLO business and the extent of Company's exposure to losses from its leveraged-loan and CLO holdings and business.

### G.    Citigroup's write-downs

895.    Citigroup finally disclosed the extent of its leveraged loan portfolio on October 1, 2007 in conjunction with announcing billions of dollars of write-downs.  In its October 1, 2007 8-K the Company revealed that it was writing-down $1.4 billion of its "highly leveraged finance commitments" and that "these commitments totaled $69 billion at the end of the second quarter and $57 billion at the end of the third quarter."  This was the first of many announcements concerning Citigroup's massive leveraged loan exposure.  According to Bloomberg, following this disclosure, "Citigroup shares rose 2.3 percent after Chief Executive Officer Charles Prince said earnings will return to 'normal' in the fourth quarter."  Prince stated the following in a Citigroup Press Release issued on October 1, 2007:

> "Our expected third quarter results are a clear disappointment. The decline in income was driven primarily by weak performance in fixed income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs," said Charles Prince, Chairman and CEO of Citi.

403

"Our fixed income trading business has a long history of earnings power and success, as shown in this year's record first half results. In September, this business performed at more normalized levels and we see this quarter's overall poor trading performance as an aberration. While we cannot predict market conditions or other unforeseeable events that may affect our businesses, we expect to return to a normal earnings environment in the fourth quarter," said Prince.

The following accounts for a significant portion of the expected decline in third quarter results:

* * *

"Despite unusually poor results in certain businesses this quarter, Citi continues to execute its growth strategy and generate momentum across many of its franchises. Citi's international franchise continues to expand rapidly. Globally, revenues in equity underwriting, advisory, and transaction services are growing at a healthy double-digit pace, and customer volumes in the consumer business continue to show good growth. In Wealth Management, Citi's ability to serve client needs through the market dislocations is generating solid results. The structural expense initiatives announced in early April 2007 are on track and delivering the cost savings projected," said Prince.

896.    As explained in more detail elsewhere in this Complaint, these statements were materially false and misleading.  With respect to Citigroup's leveraged-loan and CLO holdings and business, this statement again overstated the value of Citigroup's leveraged-loan and CLO holdings, understated the likelihood of additional write-downs of those holdings' value, and failed to fully and truthfully disclose the self-propagating, increasingly risky nature of Citigroup's leveraged-loan and CLO business over the past fifteen quarters, how previous financial statements had included inflated values for Citigroup's leveraged-loan and CLO holdings, and the extent of the Company's exposure to losses from its leveraged-loan and CLO holdings and business.

897.   In the Company's third quarter 2007 Form 10-Q, filed November 5, 2007, the Company reported that:

> During the third quarter of 2007, Citigroup recorded write-downs of approximately $1.352 billion pre-tax, net of underwriting fees, on funded and unfunded highly-leveraged finance commitments in the Securities and Banking business.  Of this amount, approximately $901 million related to debt underwriting activities and $451 million related to lending activities.  Write-downs were recorded on all highly leveraged finance commitments where there was value impairment, regardless of the expected funding date.

898.   In addition, the Company revealed that it faced "total exposure of $57 billion as of September 30, 2007 ($19 billion for funded and $38 billion for unfunded commitments)." Following this disclosure, Citigroup's shares fell from $35.90 on November 5, 2007 to $35.08 on November 6, 2007 and as low as $33.41 by November 7, 2007.  Again, on January 15, 2008, Citigroup announced in a Form 8-K further write-downs on its leveraged loan portfolio of $205 million.  Following this disclosure, Citigroup shares fell from a closing price of $29.06 on January 14, 2008 to $26.94 on January 15, 2008 and closed as low as $24.45 on January 18, 2008.

899.   On February 22, 2008 Citigroup filed its Form 10-K for 2007, reiterating total write-downs in the third and fourth quarters of over $1.5 billion pre-tax and stating that the Company still retained "exposure of $43 billion as of December 31, 2007 ($22 billion for funded and $21 billion for unfunded commitments)."  Following this disclosure Citigroup shares fell from $25.12 on February 22, 2008 to $24.74 on February 25, 2008, the next trading day.

900.   On April 18, 2008, in a Form 8-K, the Company announced an additional $3.1 billion write-down on its leveraged loan portfolio.  Citigroup provided more information in its first quarter 2008 Form 10-Q, filed May 2, 2008, which revealed that the Company's continued "exposure

405

to highly leveraged financings totaled $38 billion at March 31, 2008 ($21 billion in funded and $17 billion in unfunded commitments)."

901.    On July 18, 2008, in a Form 8-K, the Company announced further write-downs of $585 million on its highly leveraged loan commitments, which was later reduced to $428 million (net of underwriting fees) as reported in the Company's second quarter Form 10-Q filed on August 1, 2008.

902.    Finally, on October 16, 2008, Citigroup reported further write-downs of $561 million in a Form 8-K.  The Company then reported in its third quarter Form 10-Q, filed on October 31, 2008, "write-downs of $792 million (net of underwriting fees) on funded and unfunded highly leveraged finance commitments."  The Company reported that it still faced "exposure to highly leveraged financings totaling $23 billion at September 30, 2008 ($10 billion in funded and $13 billion in unfunded commitments)."

903.    As a result of Citigroup's material omissions as to the nature and extent of its leveraged loan exposures, investors during the Class Period purchased shares unaware of these significant risks.  Not until after Citigroup finally admitted that its leveraged loan portfolio was significantly impaired was it disclosed to the investing public that Citigroup had tens of billions of dollars in potential leveraged loan exposure.  Since the Company's first disclosure in October 2007 these previously undisclosed liabilities have resulted in write-downs totaling over $5 billion and have contributed to the massive market capitalization losses suffered by the Company and the billions in shareholder wealth that has been erased.

904.    Even following these disclosures, Citigroup continues to inaccurately value these assets. Despite its admission that it held $43 billion of leveraged loan exposure on its books

at the end of 2007 (compared to $26 billion and $23 billion at JP Morgan and Lehman Brothers, respectively), more than any other bank (*see e.g.*,  Wall Street Journal, *Leveraged Loans Inflict More Pain on Banks Globally --- Analysts Predict About $15 Billion In Write-Downs*, Feb. 19, 2008; Wall Street Journal's Deal Journal blog, *Leveraged Loans: The Hangover Wasn't Worth the Buzz*, Feb. 19, 2008), Citigroup is still attempting to avoid necessary write-downs by engaging in sham transactions.

905.    In April 2008, Citigroup announced that it was selling $12 billion, or one-quarter, of their remaining leveraged loan portfolio for 90 cents on the dollar to a group of private equity firms.  Not only would this sale allow Citigroup to minimize future write-downs, using the 90 cents on the dollar price as a floor for valuing the Company's remaining portfolio, but Citigroup would provide the private equity firms with an indemnity on the first 20 percent of any future losses on the loan portfolio, and provide the private equity firms a loan in order to purchase the troubled loan portfolio.  Factoring in the indemnification shows that the true value of these assets has dropped precipitously and Citigroup has yet to acknowledge this fact with appropriate write-downs.

## VII.  AUCTION RATE SECURITIES

906.    Even as Citigroup was forced to write down billions in subprime assets it had recklessly accumulated, the Company was engaging in the same misguided strategy with another esoteric financial instrument, the auction rate security, or ARS.  For years, Citigroup earned millions in fees for underwriting these securities that it had marketed to clients as a highly liquid alternative to cash investments.  As demand for ARS declined in late 2007, threatening to render the securities illiquid, Citigroup stepped in to support the market and, without any disclosure to its shareholders,

purchased billions in ARS.  The Company simultaneously underwrote billions more in ARS that would inevitably require the same market support.  The practice was unsustainable, and on February 11, 2008 Citigroup decided it could no longer support the market.  Auction rate securities were no longer liquid, could not be sold on the market at face value and Citigroup was left holding billions of dollars worth of the ARS it purchased in attempting to support the market, with many of the Company's irate clients holding billions more.  Internal Citigroup communications made public for the first time in December 2008 confirm that the Company was well aware of the ARS market's deterioration months before the February 2008 collapse.

907.    ARS are long term obligations, similar to bonds, with variable interest rates that reset through auctions held as frequently as once a week.  The issuer of an ARS, such as a company or municipality, selects a broker-dealer like Citigroup to underwrite the offering and manage the rate-setting auction process. Potential investors will then bid the lowest interest rate at which they are willing to purchase the ARS.  The auction clears at the lowest rate bid that is sufficient to cover all of the securities for sale and that rate applies to all of the securities until the next auction.  If there are not enough bids to cover the securities for sale, then the auction fails, the current holders are left in possession of the ARS and the interest is set at a predetermined "maximum rate" that may be higher or lower than the market rate for securities of similar credit quality and duration.

908.    Citigroup received fees from ARS issuers for underwriting and remarketing ARS that were higher fees for other short-term instruments.

909.    Citigroup marketed ARS to its clients as an investment that, according to its practices and procedures, "[f]rom an investor's perspective, . . . are generally viewed as alternative

to money market funds."  Citigroup's association of ARS with money market alternatives was misleading because of the illiquidity risks associated with ARS.

910.    In order to keep the liquidity of ARS on par with competing cash investments, it was Citigroup's practice to submit supporting bids in all auctions for which it was lead broker-dealer so that the auctions would not fail.  If there were insufficient bids to clear the market, then the Company would purchase for its inventory the amount of ARS necessary to prevent a failed auction and then attempt to sell the inventory between auctions or at the next auction.

911.    Citigroup did not disclose the extent to which the liquidity of ARS depended upon Citigroup bidding in the auctions.  Even if the market had been informed that there were liquidity risks associated with ARS, the market did not know that the liquidity risk, to a significant degree, depended upon Citigroup's continued willingness and ability to support the auctions.

912.    Citigroup consistently supported its ARS auctions, and, consequently had never had a failed auction since it began marketing ARS in the 1980s.  Historically, Citigroup's inventory from supporting auctions ranged from approximately $1 to $2 billion, this amount of ARS inventory being within the balance sheet limit that Citigroup set as the amount of capital resources available to the ARS trading desk.

### A.    Citigroup Continues to Issue and Accumulate ARS Even as the ARS Market Threatens to Collapse

913.    By August 2007, the mortgage credit crisis had created significant balance sheet stress for Citigroup.  This affected Citigroup's ability to purchase additional assets, including ARS.  At the same time, the ARS market was deteriorating.  In mid-August, an internal Citigroup email, first made public in December 2008, stated that "there are definitely cracks forming in the

market.  Inventories are starting to creep higher in the market and failed auction frequency is at an all time high."

914.    As Citigroup increasingly had to purchase ARS inventory to prevent failed auctions, the dollar amount of the Company's ARS holdings reached the internal limit that Citigroup had set for its ARS inventory.

915.    ARS trading desk management realized that without an increase to Citigroup's ARS inventory limit, the auctions would fail.  The balance sheet limit for ARS was increased a number of times throughout the fall of 2007 and the beginning of 2008, as Citigroup continued to support the auctions.  The limit was raised from approximately $4 billion to more than $10 billion by February 2008 when Citigroup decided to stop supporting the auctions.

916.    As early as August 2007, Citigroup recognized that the amount of available ARS exceeded demand, but Citigroup continued to increase the amount of ARS that Citigroup underwrote and marketed, thereby contributing to the inventory and balance sheet problems that threatened its ability to support the auctions.  Citigroup investment bankers wanted to continue bringing new ARS to market, to earn fees and maintain their position vis-a-vis bankers at other broker-dealers.  Not until early November 2007 did Citigroup wind down the issuance of new ARS.

917.    As the fall of 2007 passed and the likelihood of failed auctions increased, Citigroup did not disclose the growing liquidity risk to its ARS customers nor did the Company disclose the increasing size of its ARS holdings to Citigroup investors.

**B.    The ARS Market Collapses and Citigroup Is Left Holding the Bag**

918.    Beginning on February 11, 2008 Citigroup stopped supporting its ARS auctions.  The failed auctions, and the resulting market freeze, left Citigroup, and its customers, holding billions of dollars of illiquid ARS.

919.    Because thousands of ARS investors could no longer liquidate their ARS, the SEC, the New York Attorney General, and various state authorities promptly commenced investigations into Citigroup's sale of ARS to its brokerage clients, who also instituted their own actions against Citigroup.

**C.    Citigroup Fails to Timely Disclose its Massive and Risky ARS Exposures**

920.    Despite the Company's massive exposure to ARS, Citigroup's Form 10-Q for the third quarter of 2007 and its Form 10-K for 2007, failed to disclose that the Company had accumulated billions of dollars in ARS during the third and fourth quarters of 2007, amounting to $10 billion by February 2008, or that these ARS were illiquid and severely impaired.

**D.    The Magnitude of Citigroup's ARS Holdings is Disclosed**

921.    On April 18, 2008, Citigroup startled the market by disclosing in its earnings release for the first quarter of 2008 that it possessed $10 billion of illiquid ARS as of mid-February 2008, and held a current inventory of $8 billion.

922.    At the same time that the Company first disclosed its exposure to ARS, it further stunned investors by disclosing that its ARS portfolio was already impaired by $1.5 billion (an 18.75% impairment), and thus, the Company had written down its ARS portfolio to $6.5 billion and taken a corresponding $1.5 billion charge to its income.  Analysts noted that the Company had never before disclosed its ARS exposure.  For example, on April 18, 2008 Credit Suisse issued a

report stating that the Company's "newly disclosed . . . $6.5B auction rate securities exposure[]" was "[w]orthy of note."

923.    In August 7, 2008 Citigroup reached a settlement with the New York State Attorney General and the SEC pursuant to which it agreed to repurchase an additional $7.3 billion of ARS from its clients because the ARS market was completely illiquid and there were no other buyers for those securities.  The settlement resulted in Citigroup taking $612 million in writedowns on the value of these newly acquired ARS and a further $100 million in fines paid to various regulatory agencies.

924.    The day the settlement was announced, Citigroup shares suffered a 6.2% price decline from the previous close of $19.70 to $18.43.

**E.    The Market Learns that Citigroup's ARS Assets Were Materially Overvalued**

925.    Even after disclosing its ARS exposure, the Company continued to materially misstate the value of those securities and their impact on its capital adequacy.  Indeed, according to Citigroup's third quarter 2008 10-Q, net ARS writedowns during the previous year totaled only $2 billion, including $612 million in the settlement related ARS writedowns.  Recent events have revealed that these writedowns were simply not enough to provide an accurate valuation of these assets.

926.    On November 17, 2008, Citigroup held a "Town Hall" meeting for its employees.  At this meeting, Citigroup made an announcement that signaled to investors that the Company's ARS portfolio was materially impaired – so impaired, in fact, that Citigroup had effectively given up attempting to attribute any value to them.  Specifically, the Company announced that it would cease valuing $80 billion of various assets at their market price by removing these

412

assets from the Company's trading portfolio and reclassify them as "held to maturity," "held for sale," or "held for investment."  Citigroup hoped that this re-categorization of $80 billion in assets would allow the Company to avoid taking large write-downs on those exposures each quarter.

927.    Although the Company did not disclose the composition of these recategorized assets, several analysts including the Wall Street Journal's Deal Journal site expressed the belief that Citigroup included ARS within the $80 billion.

928.    The Company's decision to avoid additional write-downs on this $80 billion of impaired assets, including ARS, shocked the market because it was an admission that these assets had either no value, or such little value Citigroup could not afford to absorb the write-downs it would have to take if it properly valued its assets.

929.    Not until November 17, 2008, did the market discover that the ARS assets were so materially overstated that they demanded reclassification.

930.    This news, in combination with other negative disclosures made during the November 17, 2008 "Town Hall Meeting" ignited a dramatic sell-off in Citigroup stock from an open of $9.64 per share that day to a close of $3.77 per share by week's end, a decline of 61%.

931.    The market's logic was proven correct when on November 23, 2008, Citigroup announced that it had reached an agreement with the U.S. Government to rescue the Company from its imminent demise with a bailout package.  Pursuant to the terms of that agreement, the Government agreed to guarantee $306 billion of the Company's riskiest assets.

932.    A November 24, 2008 Financial Times article identified ARS as part of the "portfolio of risky assets" to be guaranteed by the government.  The same day, a report by

413

Oppenheimer stated that, although it was "unclear" which assets were included in the $306 billion guarantee, the Company's "risky exposures" included its ARS assets.

933.   That Citigroup was compelled to seek government guarantees of its ARS assets in order to avoid insolvency further established that the value of its ARS were materially overstated.

934.   The extent of Citigroup's losses stemming from its ARS activities continue to be revealed.  For instance, institutional ARS investors who were not included in Citigroup's $7.3 billion repurchase of ARS from its retail customers under the SEC settlement are seeking recompense for their injuries.  On February 4, 2009, for example, American Eagle Outfitters, Inc. filed suit against Citigroup for the more than $258 million in Citigroup sponsored ARS that it now holds and cannot sell.

### F.   Citigroup Knew That Its ARS Assets Were Growing and Becoming Riskier

935.   To the Company's shareholders, the fact that Citigroup was left holding billions in ARS seemed to be an unfortunate, unforeseen consequence of the general credit crisis. What the market did not learn until recently was that Citigroup was aware as early as August 2007 that the ARS market was deteriorating, a full nine months before the Company saw fit to alert investors to the ballooning size of its ARS holdings.

936.   Although Citigroup was in settlement negotiations with the SEC and the New York State Attorney General in August 2008 concerning its liability for client losses in the ARS market, it was not until December 11, 2008 when the SEC filed a complaint against Citigroup that the market learned the extent of Citigroup's prior knowledge.  The SEC Complaint cited internal emails evidencing that high-level Citigroup management possessed scienter regarding the shakiness

of the ARS market, the unsustainable buildup of ARS in its own inventory and the impairment to its reputation and assets that would result from the inevitable collapse of the ARS market.

937.    As alleged in the SEC complaint, in mid-August 2007, an internal email stated that "there are definitely cracks forming in the market.  Inventories are starting to creep higher in the market and failed auction frequency is at an all time high."

938.    On August 16, 2007 senior Citigroup management was informed in an email that "[w]e need to discuss the current state of the auction rate market, its impact on our balance sheet and the effect of our actions on our clients . . . our actions will have broad-reaching implications to all of our constituents, the market and our franchise."

939.    Citigroup was aware that it was nearing its limit on how much support it could offer the ARS market by purchasing the securities.  As the SEC complaint discloses, numerous emails as early as August 30, 2007 were written encouraging ARS traders to "do whatever is necessary" to offload ARS into the market.  Citigroup raised the commission to its Financial Advisors for selling ARS to clients and offered its customers various discounts and promotions.

940.    By December of 2007, the SEC complaint alleges, Citigroup was planning to allow certain ARS markets to fail.  As one email states, the "remainder of the market with formulaic maximum rates will not be supported and will fail."  Allowing certain markets to fail necessarily meant risking the failure of the entire market as another internal document states, "if one segment of the ARS market experiences fails, there is a high probability that investors will lose confidence in all sectors and asset types funded in the ARS market."

941.    These and other emails cited in the SEC complaint establish that senior Citigroup management was aware of the risks involved in the ARS market in which the Company

415

was accumulating over $10 billion in inventory.  This information was not disclosed publicly until the filing of the SEC complaint on December 11, 2008.

## VIII.  ALT-A RMBS

942.    Even after Citigroup belatedly admitted the amount of its direct exposure to tranches of subprime-backed CDOs, it failed to disclose the magnitude of closely related direct exposure to $22 billion in risky Alt-A RMBS.  These Alt-A securities were largely originated by Citigroup in 2006 or later – a time in which "Alt-A" loans were widely recognized to have been made with poor mortgage underwriting standards.  These exposures were not disclosed by Citigroup until its April 18, 2008 earnings announcement, simultaneously with $1 billion in writedowns on the assets.  Writedowns continued to dribble out during the rest of 2008, eventually totaling $3.8 billion in losses on an asset class which shareholders had not even known existed as recently as one year earlier.

943.    Yet even while recognizing these staggering losses, Citigroup continued to misrepresent the value of its Alt-A RMBS assets.  The existence of these toxic assets on the Company's balance sheet, along with its overvalued mortgage, leveraged loan and ARS portfolios necessitated the November 23, 2008 government bailout.  Even then, investors did not know that more than $11.4 billion of Citigroup's Alt-A RMBS assets were so impaired that a true reckoning of their value would threaten to render Citigroup insolvent, without the government's intervention. This fact was only revealed to investors on January 16, 2009 when Citigroup finally issued a breakdown of the $301 billion in federal guarantees on its assets.

## A.       A Description of Alt-A RMBS

944.    Alt-A RMBS are residential mortgage backed securities backed with "Alternative A" class mortgages.  As explained in greater detail above in Section I.A., in an RMBS securitization, the underwriter assembles a pool of mortgages – typically, 3,000-4,000 mortgages having an aggregate value of approximately $1 billion, which generate a stream of monthly payments of principal and interest. Second, the underwriter transfers these assets to a special purpose entity, whose sole purpose is to receive these assets and issue securities backed by them.  Third, the underwriter *structures* the securitization (hence, "structured finance") by creating  a set of *tranched* securities representing differently-prioritized claims to cashflows generated by the pooled assets.

945.    Alternative-A mortgages are generally considered to be higher quality collateral than subprime mortgages but not as safe as prime mortgages.  Alt-A borrowers tend to have better credit scores and stronger finances than sub-prime borrowers, but riskier payment terms were more prevalent in Alt-A mortgages.  Such terms included interest only or negative amortization mortgages, and less rigorous income and asset documentation, including the now infamous "stated income" or "liar loans" in which borrowers did not need to verify their income and assets.  Citigroup has adopted the following definition of Alt-A in its earnings presentations:

> Alt-A is defined . . . as non-agency residential mortgage-backed securities (RMBS) where the underlying collateral has weighted average FICO scores between 680 and 720 or, for FICO scores greater than 720, RMBS where ≤30% of the underlying collateral is comprised of full documentation loans.

## B.       The Risks Posed By ALT-A RMBS

946.    Although Alt-A mortgages were considered marginally less risky than subprime mortages, Alt-A RMBS could be even riskier than their subprime counterparts.

417

947.    Because expected losses from Alt-A mortgages were less than subprime mortgages, less tranche subordination was required in Alt-A securitizations. Alt-A BBB tranches were therefore even closer to the bottom, protected by a "first loss" tranche totaling only 1.8% of the entire securitization. Should underlying asset losses exceed that 1.8% of "first loss" protection, the BBB tranches would start suffering principal losses. Again, as these tranches were themselves quite thin (the three BBB tranches totaled only a further 1.2% of the securitization), they did not provide all that much protection for the more senior tranches above them. In Alt-A securitizations, the single-A rated tranches were protected against only 3% of underlying asset losses (i.e., the 1.8% first loss tranche and the 1.2% of more subordinate BBB tranches). This compares with the protection of 4.5% of underlying asset losses in subprime securitizations. The double-A tranches against loss level of only 4.7% (compared with 8.8% in subprime), etc. For a graphic representation of Alt-A and subprime RMBS structures refer to pages 32-33, above.

948.    During the Class Period, the Alt-A mortgage securitization market was facing the same stresses as those found in the subprime market. It was no secret that Alt-A mortgages were defaulting at alarming rates and as a result, Alt-A RMBS were becoming increasingly risky assets to hold.

C.    **The Market Learns of Accelerating Losses in Alt-A RMBS**

949.    As early as September 19, 2007, Moody's was warning in a special report entitled "Early Defaults Rise In Mortgage Securitizations: Updated Data Show Continued Deterioration" that "patterns of credit performance deterioration are evident in all three major mortgage markets — subprime, Alt-A, and prime". Specifically, the 12-month default rate for Alt-A mortgages originated in the second quarter 2006 stood at 1.89%, nearly four times the .5% historical

average.  The report concluded "delinquency rates have also deteriorated progressively with each recent quarter's cohort of securitizations, an indication that losses on the most recent securitizations are likely to continue growing in the near term compared with earlier securitizations."

950.    On November 27, 2007, Moody's issued a Rating Actions Update summarizing its rating actions taken on 2005 and 2006 Alt-A RMBS.  As the update stated, "A total of 222 [Alt- A RMBS] issued in 2005 and 1,247 [Alt-A RMBS] issued in 2006 were downgraded and/or placed under review for possible downgrade as a result of the review, based on higher than anticipated rates of delinquency . . ."

951.    A January 17, 2008 review of 2007 vintage Alt-A securities resulted in 760 downgrades ($3.5 bil), of which 36 ($236 mil) remained on review for possible downgrade, as well as an additional 387 securities ($8.0 bil) also placed on review for possible downgrade.

952.    Moody's continued to reiterate its warnings on the weakness of Alt-A mortgages, stating in its 2008 first quarter mortgage market update that "[m]any of the same factors that adversely affected the performance of recent subprime pools, including weaker collateral, declining home values, higher mortgage rates, and reduced credit availability to lenders, have also impacted the Alt-A sector".   In particular the update noted that, "delinquencies have risen dramatically between 2005 and 2006 pools and again between 2006 and 2007 pools [of Alt-A mortgages]".

953.    By June 4, 2008, 24% of Alt-A RMBS by dollar volume had experienced a negative rating action.

954.    Besides the well publicized Alt-A RMBS rating downgrades by Moody's and other ratings agencies, Citigroup, because its business involved the origination and securitization of

419

Alt-A mortgages, was in a uniquely advantageous position to observe the deteriorating performance of these assets well before they became public knowledge.

### D.    Citigroup Fails to Disclose Its Massive Alt-A RMBS Holdings

955.    Despite the public's and Citigroup's own knowledge that Alt-A mortgage related assets were becoming increasingly risky, Citigroup failed to disclose to its investors that it was accumulating materially large volumes of Alt-A RMBS.  These RMBS were originated by Citigroup primarily during 2006 and 2007, as was eventually revealed in an October 16, 2008 earnings presentation by the Company.

956.    Gary Crittenden, Citigroup CFO claimed on January 22, 2008, in the following exchange taken from the Company's fourth quarter 2007 earnings conference call, that Citigroup's Alt-A mortgage assets did not pose a "substantial risk", because of the size of its Alt-A holdings was not significant:

ANALYST:  Have you disclosed the size of what your Alt-A portfolio would be? And then could you just tell us what your cumulative loss assumptions are on both the high LTV firsts and high LTV seconds?

CRITTENDEN:  So on the Alt-A, we haven't split that out as a separate category. If it were a category that we anticipated that would be a substantial risk, I would have put it on the list of risks that I stepped down through at the end of the conversation. So we don't -- given the size of the position and the risk associated with it, we would not put it in the category that went on that list of other issues that I had enumerated.

*** 

ANALYST: I think people would be interested in a follow-up -- I know I am -- on the Alt-A side. It's good news it is not in your substantial risk bucket. Is that a function of size or you just don't think that area is going to have the same deterioration we have seen in other credit buckets?

CRITTENDEN: It is a function of size.

957.     Crittenden's statement that Citigroup's Alt-A exposures were to small to merit disclosure was patently false.  Citigroup was holding approximately $22 billion in Alt-A RMBS at the time of Crittenden's statement.

### E.     Citigroup Finally Reveals $22 Billion in Alt-A RMBS Exposure But  Materially Understates the Extent of Losses Stemming From These Assets

958.     Although these unprecedented amounts of Alt-A assets were acquired in 2006 and 2007, it was not until April 18, 2008 that Citigroup disclosed that it had possessed $22 billion in Alt-A RMBS exposure as of December 31, 2007, and $18.3 billion as of March 31, 2008.  Simultaneously, Citigroup disclosed $1 billion of write-downs "net of hedges, on Alt-A mortgages."  A Credit Suisse analyst report that day  identified the Alt-A RMBS exposure as "newly disclosed."

959.     In truth, the $1 billion write-down on a $22 billion Alt-A portfolio materially understated the amount by which the value of Citigroup's Alt-A RMBS assets had fallen.  Other financial institutions were admitting to much higher losses on their Alt-A assets.  As one analyst stated in Citigroup's first quarter 2008 conference call, "when you compare [the $1 billion] to other industry participants who have taken things down to 70 cents on the dollar, it just seems like it's a little light."

960.     Citigroup marked down its Alt-A RMBS portfolio a further $.3 billion in its July 18, 2008 second quarter earnings announcement.  Again, this markdown was woefully inadequate to properly account for the true value of these assets.

961.     In its October 16, 2008 earnings presentation for the third quarter, Citigroup disclosed a further $1.2 billion in write-downs on the same portfolio of Alt-A RMBS assets.  By this point Citigroup was valuing its Alt-A portfolio at approximately $.66 on the dollar.  Even this valuation materially overstated the worth of the Company's Alt-A assets.  By comparison, Lehman

Brother had announced in September 2008 that it was marking its Alt-A investments down to $.39 on the dollar. Morgan Stanley had slashed its Alt-A holdings to 35 cents on the dollar, while Goldman Sachs was at 50 cents on the dollar.  As one September 15, 2008 Wall Street Journal article observed, adopting Lehman's valuation of Alt-A securities alone would land Citigroup with an extra $7 billion in writedowns.

### F.   Citigroup's $80 Billion Accounting Gambit Hints at the True Extent of the Company's Alt-A RMBS Losses; Stock Losses Result

962.   Recent events have revealed that Citigroup's writedowns for the first three quarters of 2008 was insufficient to reflect an accurate valuation of its Alt-A RMBS assets.

963.   On November 17, 2008, Citigroup held a "Town Hall" meeting for its employees.  At this meeting, Citigroup made an announcement that signaled to investors that the Company's Alt-A portfolio was materially impaired – so impaired, in fact, that Citigroup had effectively given up attempting to attribute any value to them.  Specifically, the Company announced that it would cease valuing $80 billion of various assets at their market price by removing these assets from the Company's trading portfolio and reclassify them as "held to maturity," "held for sale," or "held for investment."  Citigroup hoped that this re-categorization of $80 billion in assets would allow the Company to avoid taking large write-downs on those exposures each quarter.

964.   Although the Company did not disclose the composition of these recategorized assets, several analysts including the Wall Street Journal's Deal Journal site expressed the belief that Citigroup included RMBS within the $80 billion.  This belief was eventually confirmed by Citigroup in its January 16, 2009 earnings presentation in which it revealed that it had

422

reclassified its Alt-A RMBS, so that more than 91% or $11.5 billion, were considered to be "held to maturity" and no longer subject to being marked to market.

965.     The Company's decision to avoid additional write-downs on these impaired assets shocked the market because it was an admission that these assets had either no value, or such little value that Citigroup could not afford to absorb the write-downs it would have to take if it properly valued its assets.  Not until the November 17, 2008 "Town Hall Meeting", was the market alerted that the Alt-A RMBS assets were so materially overstated that they demanded reclassification.

966.     This news, in combination with other negative disclosures made during the "Town Hall Meeting" ignited a dramatic sell-off in Citigroup stock from an open of $9.64 per share that day to a close of $3.77 per share by week's end, a decline of 61%.

G.     **The November 23, 2008 Government Bailout Confirms the Market's Dire Assessment of Citigroup's Alt-A RMBS Valuations**

967.     The market's logic was proven correct when on November 23, 2008, Citigroup announced that it had reached an agreement with the U.S. Government to rescue the Company from imminent liquidation with a bailout package.  Pursuant to the terms of that agreement, the Government agreed to guarantee $306 billion of the Company's riskiest assets.

968.     A November 24, 2008 Financial Times article identified residential mortgages as part of the "portfolio of risky assets" to be guaranteed by the government.  The same day, a report by Oppenheimer stated that, although it was "unclear" which assets were included in the $306 billion guarantee, the Company's "risky exposures" included its RMBS assets.

423

969.   That Citigroup was compelled to seek government guarantees of its Alt-A RMBS in order to avoid insolvency further establishes that the value of its assets were materially overstated.

970.   The extent of Citigroup's losses stemming from its Alt-A activities continued to be revealed.  On January 16, 2009, Citigroup announced its fourth quarter 2008 earnings, which included a $1.3 billion writedown on its Alt-A RMBS assets.  The same day, Citigroup disclosed that the November 23, 2008 government bailout included a guarantee of $11.4 billion of the Company's Alt-A RMBS assets.  It was not until the January 16, 2009 disclosures that investors were informed with certainty that the Alt-A RMBS assets were so impaired as to require a federal guarantee.  The rumors and conjecture, spawned by the Town Hall Meeting, that had driven down Citigroup's stock price by 61% in a single week, had been proven accurate.

## IX.   SOLVENCY

971.   Beginning in late 2007, Defendants embarked on a strategy to assure the investing public of the viability of Citigroup's financial condition.  Thus, Defendants repeatedly reassured the market that Citigroup was adequately capitalized.  In addition, Citigroup publicly represented that the fact that write-downs for these assets were declining demonstrated the strength of Citigroup's financial condition.  These statements were false, as Defendants knew, or were reckless in not knowing, that mounting losses associated with Citigroup's assets, including its CDOs, SIVs, RMBS, ARS and CLOs, described above, were overwhelming the value of Citigroup's remaining assets, making Citigroup insolvent or on the verge of insolvency.

972.   By the end of 2007, the Company's exposure to hundreds of billions of dollars of severely impaired CDOs, mortgages, SIV assets, and ARS left Citigroup's long-term viability in

424

serious question, since the Company could not absorb the necessary write-downs and losses from all of these deteriorating assets without putting its solvency in doubt. After defendant Pandit's appointment as Citigroup's CEO in December 2007, he consistently emphasized that the Company's financial condition was good, that it was adequately capitalized and that there was no need to "break up" the Company.

973.    After recording write-downs in its Securities and Banking division of $17.04 billion in the fourth quarter of 2007, Citigroup reported decreasing write-downs over the next three quarters: (a) $12.46 billion in the first quarter of 2008, (b) $7.14 billion in the second quarter of 2008, and (c) $4.42 billion in the third quarter of 2008.

974.    These write-downs failed to reflect the true value of the Company's remaining assets or reveal the actual impact of these "toxic assets" on the Company's financial condition. In fact, because the write-downs actually decreased in size compared to the prior period—and the Company even reported gains on certain of these assets—this signaled to investors that the quality of these assets was improving, and any adverse impact on the Citigroup's financial condition was subsiding. For example, the Company's CDO write-downs dramatically decreased from $16.5 billion in the fourth quarter of 2007 to $5.9 billion in the first quarter of 2008 to $3.4 billion in the second quarter of 2008 and, finally, to $0.4 billion in the third quarter of 2008.

975.    On January 15, 2008, Citigroup announced a net loss for the fourth quarter of 2007 of $9.8 billion, including $18.1 billion of pre-tax write-downs on sub-prime related direct exposures.  Defendant Pandit stated that, "Our financial results this quarter are clearly unacceptable." However, Pandit went on to assure shareholders by saying that, "We have begun to take actions to

ensure that Citi is well positioned to compete and win across our franchises while effectively keeping a tight control over our business risks. We are taking several steps to strengthen our capital base ...."

976.   On February 22, 2008, Citigroup filed its Annual Report on Form 10-K for fiscal 2007, which was signed by Defendants Pandit and Crittenden.  The Form 10-K reported total assets of $2.19 trillion on Citigroup's balance sheet as of December 31, 2007.

977.   Despite Citigroup's fourth quarter pre-tax write-downs of $18.1 billion and Pandit's assurances to the contrary, Citigroup's total assets of $2.19 trillion and overall financial condition as of December 31, 2007 remained materially overstated.  The overstatement of its assets caused Citigroup's earnings and capital to be overstated thus materially misrepresenting its financial condition as of December 31, 2007.

978.   On April 18, 2008, Citigroup announced a net loss for the first quarter of 2008 of $5.1 billion, including $6.0 billion of pre-tax write-downs on sub-prime related direct exposures. Defendant Pandit  assured shareholders that, "We have taken decisive and significant actions to strengthen our balance sheet ...."

979.   An April 28, 2008 article in *BusinessWeek, "Where Pandit is Taking Citi,"* described Pandit as having made up his mind that Citigroup would remain intact, rejecting calls for a breakup.  The article quoted Pandit as saying, "You couldn't design a better footprint or get a better set of assets if you had to build a bank from scratch . . . . This is clearly the right model." *BusinessWeek* also described Pandit as having been aware "from the outset" that he needed to overhaul the bank's oversight and, accordingly, have built a new risk management team, staffed with outsiders, including many from his former employer, Morgan Stanley.

426

980.    On May 2, 2008, Citigroup filed its March 31, 2008 quarterly financial statements on Form 10-Q, which was signed by Defendants Crittenden and Gerspach.  Citigroup reported total assets of $2.20 trillion on its balance sheet as of March 31, 2008.

981.    Despite Citigroup's first quarter pre-tax write-downs of $6.0 billion and Pandit's assurances to the contrary, Citigroup's total assets of $2.20 trillion and overall financial condition as of March 31, 2008 remained materially overstated.  The overstatement of its assets caused Citigroup's earnings and capital to be overstated thus materially misrepresenting its financial condition as of March 31, 2008.

982.    On July 18, 2008, Citigroup announced a net loss for the second quarter of 2008 of $2.5 billion, including $7.2 billion of pre-tax write-downs from its Securities and Banking division.  Defendant Pandit again assured shareholders that, "As part of our efforts to improve capital and balance sheet efficiency, we reduced legacy assets substantially during the quarter."

983.    While the write-downs were decreasing in size, the Company continued to assure investors that its liabilities were similarly decreasing, and therefore that the Company's capital position was improving. In fact, in the Company's July 18, 2008 earnings release, Defendant Pandit underscored that "[w]e continue to demonstrate strength in our core franchise" because, among other reasons, "write-downs in our Securities and Banking business [which included the Company's CDOs and SIVs] decreased by 42%."  Pandit also touted that Citigroup had "reduced legacy assets substantially."  The earnings release further assured investors that the Company's "Tier 1 Capital ratio increased to 8.7% substantially above 6% benchmark for "well-capitalized status."

984.    Similarly, on September 21, 2008, *The New York Times* quoted defendant Pandit, as saying "we are a pillar of strength in the markets,"  and reported that funds from

427

competitors' coffers had flowed in to Citigroup.  "That's a great place to be', [Pandit said], smiling."  With respect to calls to break up Citigroup, Pandit told the *Times* that a stand-alone Citigroup investment bank might not have survived.  (*The New York Times*, "Citigroup Above the Fray", September 21, 2008.)

985.    On August 1, 2008, Citigroup filed its June 30, 2008 quarterly financial statements on Form 10-Q, which was signed by Defendants Crittenden and Gerspach.  Citigroup reported total assets of $2.10 trillion on its balance sheet as of June 30, 2008, and the second quarter pre-tax write-down of $7.2 billion announced earlier.

986.    Despite Citigroup's second quarter pre-tax write-downs of $7.2 billion and Defendant Pandit's continued assurances to the contrary, Citigroup's total assets of $2.10 trillion and overall financial condition as of June 30, 2008 remained materially overstated.  The overstatement of its assets caused Citigroup's earnings and capital to be overstated thus materially misrepresenting its financial condition as of June 30, 2008.

987.    Despite the above described assurances, the Company's capital adequacy was in serious jeopardy.  Shortly thereafter, on October 14, 2008, Citigroup received a $25 billion capital infusion from the U.S. Government through TARP, which was the maximum amount that the Company could have received under TARP's terms.

988.    After receiving that $25 billion, the Company continued to misrepresent its exposure to the severely impaired assets described herein and their impact on its capital adequacy.

989.    On October 16, 2008, Citigroup announced a net loss for the third quarter of 2008 of $2.8 billion, including $4.4 billion of pre-tax write-downs from its Securities and Banking

division.  Defendant Pandit once again assured shareholders that, "We end the quarter with a very strong Tier 1 ratio of 8.2% and a loan loss reserve of $25 billion."

990.    On October 31, 2008, Citigroup filed its September 31, 2008 quarterly financial statements on Form 10-Q, which was signed by Defendants Crittenden and Gerspach. Citigroup reported total assets of $2.05 trillion on its balance sheet as of September 30, 2008.

991.    Despite Citigroup's third quarter pre-tax write-downs of $4.4 billion and Defendant Pandit's continued assurances to the contrary, Citigroup's total assets of $2.05 trillion and overall financial condition as of September 30, 2008 remained materially overstated.  The overstatement of its assets caused Citigroup's earnings and capital to be overstated thus materially misrepresenting its financial condition as of September 30, 2008.

992.    As late as November 2008, Citigroup continued to insist that its financial position was strong and that it had ample capital to withstand any mortgage-related losses. On November 17, 2008, Citigroup held a "Town Hall" meeting for its employees. At that meeting – and despite the fact that Citigroup was just six days away from requiring a $326 billion bailout to prevent its collapse – the Company repeatedly assured investors that its capital position was strong. Specifically, Defendant Pandit stated that Citigroup had "significantly reduced our risky assets while putting the company in a very strong capital position," and was "very well positioned from a capital standpoint to weather future potential challenges."

993.    At this same meeting, however, Citigroup made another announcement that indicated that the Company's CDOs, mortgage portfolio, SIV assets, and ARS were materially impaired – so impaired, in fact, that Citigroup had effectively given up attempting to attribute any value to them. Specifically, the Company announced that it would cease valuing $80 billion of assets

429

at their market price each reporting period by removing these assets from the Company's trading portfolio and reclassify them as "held to maturity," "held for sale," or "held for investment." By doing so, Citigroup hoped that this re-categorization of $80 billion in assets would allow the Company to avoid taking large write-downs on those exposures at each quarter, like the write-downs noted above.

994.    Although the Company did not disclose the precise composition of these recategorized assets, analysts concluded that the "risky" assets included within the $80 billion consisted of Citigroup's CDOs, SIV assets, RMBS, and ARS. For example, Buckingham issued a November 17, 2008 report noting that the Company's exposure to "risky assets" included CDOs, other "mortgage assets," and SIV assets. Similarly, *The Wall Street Journal's* Deal Journal site reported that the $80 billion included CDOs, RMBS, and ARS.

995.    The Company's decision to avoid additional write-downs on this $80 billion of impaired assets shocked the market because it was an admission that these assets had either no value, or such little value Citigroup could not afford to absorb the write-downs it would have to take if it properly valued its assets. Indeed, in response to the Company's November 17 disclosure, investors immediately began to realize that the Company was essentially insolvent.  For example, on November 18, 2008 Ladenburg Thalmann issued a report noting that investors "do not trust the company's balance sheet," and that there existed a "belief that the bank's securities holdings are overstated." On November 19, 2008, *Dow Jones* reported that investors had begun to "question the survival prospects of the U.S. banking giant." Likewise, on November 20, 2008, *The Wall Street Journal* reported that "[t]he market is losing confidence in Citigroup" because of the "balance sheet maneuver" of reclassifying the $80 billion in troubled assets:

**The market is losing confidence in Citigroup. In the wake of some planned balance-sheet maneuvers, it isn't tough to see why. . . .** Largely overlooked in the presentation materials release to investors was a disclosure that this quarter the firm would reclassify about $80 billion in assets. Those assets wouldn't have to be marked to market prices. Or they could be held in a way that keeps such losses from hitting earnings. **That has unnerved investors, since such holdings include risky holdings such as collateralized debt obligations – structured securities that have already led to billions in write-downs.**

996.    Citigroup acted quickly to dispel any fears in the market.  A November 21, 2008 article in *The Wall Street Journal,* entitled "Citi Weighs Options, Including Firm's Sale," reported that on the evening of November 20, 2008 a Citigroup spokeswoman issued a statement saying "*'Citi has a very strong capital and liquidity position'* and is 'focused on executing our strategy,' which includes cutting expenses and selling assets."

997.    Immediately following the Company's disclosures at the Town Hall meeting, reports began to emerge that Citigroup executives were considering breaking the Company apart and selling its various business units, or merging with a competitor. However, distrust of the Company's solvency prevented any deal, according to a November 21, 2008 article by *Dow Jones*.  That article reported that Citigroup could not find a merger partner because "of wariness about what toxic assets remain on Citi's books. Nor would other banks be willing to trust Citi's claims about the strength of its balance sheet."

998.    With Citigroup on the brink of collapse, additional reports began emerging that the U.S. Government would have to provide the Company with huge amounts of capital just to prevent its liquidation. On November 22, 2008, *The New York Times* reported that analysts had concluded that the Company had "two remaining options: a federally forced merger or nationalization."

431

999.    Also on November 22, 2008, *The Wall Street Journal* reported that "Citigroup officials have been talking in recent days to Treasury Department and Federal Reserve officials, and those discussions are expected to continue through the weekend." That same article also reported that on Friday, November 21st during a conference call with Citigroup executives, Defendant Pandit was still professing Citigroup's financial strength and imploring his executives to, "Make sure [our customers and clients] understand that we are one of the best counterparties in the world based on our capital, based on our liquidity." In a separate article, *The New York Times* further reported that Citigroup required "a new financial lifeline" from the Government.

1000.   As investors began to realize that Citigroup was close to insolvent, the price of the Citigroup common stock fell precipitously from a close of $9.52 per share on November 14, 2008 to a close of $3.75 per share on November 21, 2008, on volume of 1 billion shares traded that day. This drop represented a decline of over 60% in the value of Citigroup common stock. Between November 17 and 21, several of the preferred securities lost more than 60% of their value.

1001.   On November 23, 2008, investors' worst fears about the Company's true financial condition were confirmed. On that day, the Company announced that it had reached an agreement with the U.S. Government to rescue Citigroup from imminent liquidation with a $326 billion bailout package—the largest in history. Pursuant to the terms of that agreement, the Government agreed to guarantee $306 billion of the Company's mortgage-related assets. Although Citigroup agreed to absorb the first $29 billion of losses, with the Government agreeing to absorb 90% of the remaining losses, the Company lacked even the capital to fund its portion of the agreement. As a result, pursuant to the agreement, the Government infused Citigroup with $20 billion of new capital that it immediately required to survive. The Company's financial position was

432

so dire that the Government arranged the bailout over a weekend, and announced it on a Sunday—indicating that without immediate guarantees and cash infusions totaling $326 billion, the Company would have been liquidated as early as Monday, November 24.

1002.    According to the Term Sheet that generally described the Government bailout, the $306 billion of assets consisted principally of the Company's "loans and securities backed by residential real estate," such as its CDOs, RMBS, residential mortgage loans, and the mortgage-related assets that formerly were contained within its SIVs. Indeed, a November 24, 2008 report by Fox-Pitt noted that the Government bailout "appear[ed] to include" $305 billion in "real estate-related 'problem assets,'" and excluded "non-residential consumer" assets and the Company's "corporate loan portfolio." Further, a November 24, 2008 report by Oppenheimer stated that, although it was "unclear" which assets were included in the $306 billion guarantee, the Company's "risky exposures" included its CDOs, RMBS, SIV assets, and ARS.

1003.    As *The Wall Street Journal* reported on November 24, 2008, the Company's claims of capital adequacy—which were made as late as November 20—  flatly contradicted the reality of the Company's insolvency due to its exposure to the toxic assets described above:

> The federal government agreed Sunday night to rescue Citigroup Inc. by helping to absorb potentially hundreds of billions of dollars in losses on toxic assets on its balance sheet and injecting fresh capital into the troubled financial giant. . . . **Even as they assured employees and investors last week that the company was on sound financial footing, Citigroup executives and directors knew they needed to do something fast to stabilize their company.**

And, as described above, Citigroup had been secretly meeting with the Federal Reserve and Treasury Department, even as they reassured the market about Citigroup' supposedly strong financial condition.

1004.   Thus, Citigroup and Pandit knew, or were reckless in not knowing, that their representations, described above, made through the date of the November 23, 2008 Government bailout, were false, as significant uncertainty remained about Citigroup's financial condition. Indeed, the Company's exposure to impaired mortgage-related assets remained so large that, according to *The Wall Street Journal* article, "it's not clear whether [the bailout] will be enough to stabilize Citigroup."

1005.   On December 4, 2008, Jonathan Weil writing for Bloomberg News continued to question Citigroup's valuation of  its assets,  "Now that Citigroup Inc. has secured yet another taxpayer bailout, where are the writedowns?" Mr. Weil further wrote that, "You don't have to be that smart to figure out there's still a lot of rot on Citigroup's $2.1 trillion balance sheet.  If there wasn't, the New York-based lender wouldn't have needed last week's government rescue, which included a new $20 billion investment by the Treasury Department, plus a guarantee covering about $306 billion of the bank's assets against most losses."

1006.   The Government bailout, despite its staggering size, was insufficient to stabilize the Company. On January 12 and 13, 2009, *The Wall Street Journal* reported that Citigroup would likely report a loss of "at least $10 billion" for the fourth quarter of 2008. In order to fund these continuing losses, *The Wall Street Journal* reported, Citigroup had embarked on a "drastic plan to shed a host of businesses" and sell them off, thereby dismantling the world's largest bank. Moreover, Citigroup's mortgage-related assets were so severely impaired that the Company was seeking to form an entirely separate entity – the so-called "bad bank" – to assume those toxic assets and liabilities, so that they could no longer damage Citigroup.

1007.   On January 14, 2009, BusinessWeek reported that, "All of Citi's recent posturing may be obfuscating the real issue: the bank's portfolio of toxic assets, which is becoming increasingly troublesome."   Furthermore, "according to some estimates, the toxic assets on the books-consumer, corporate, and leveraged loans-could stand at $150 billion.  'The hole in the balance sheet is the problem,' say a senior executive at a financial firm that specializes in fixed-income."

1008.   Before the market opened on January 16, 2009, Citigroup disclosed in its fourth quarter 2008 earnings announcement that, "The loss sharing program with the U.S. Government, closed on January 15, 2009, reduces risk and lowers the regulatory capital requirement on $301 billion of covered assets."

1009.   In the same release, Citigroup disclosed that, "During the quarter, Citi issued $45 billion of preferred stock and warrants to the U.S. Treasury as part of the TARP.  The Tier 1 capital ratio was approximately 11.8%."

1010.   Citigroup's January 16, 2009 statements disclosed for the first time in its fourth quarter 2008 earnings review presentation the specific assets covered by the U.S. Government's $301 billion guarantee:

(a)     $191.6 billion of the guarantee covered consumer loans consisting of $98.9 billion of first mortgages, $55.2 billion of second mortgages, $16.2 billion of retail auto loans, and $21.3 billion of other consumer loans.

(b)     $25.8 billion of the guarantee covered corporate loans consisting of $12.4 billion of CRE loans, $2.3 billion of leveraged finance loans, and $11.1 billion of other corporate loans.

(c)     $31.9 billion of the guarantee covered securities consisting of $11.4 billion pf Alt-A, $6.4 billion of SIVs, $2.1 billion of CRE, and $12.0 billion of other securities.

(d)    $51.5 billion of the guarantee covered unfunded lending commitments consisting of $22.4 billion of 2nd mortgages, $5.2 billion of other consumer loans, $0.2 billion of leveraged finance, $5.4 billion of CRE, and $18.3 billion of other commitments.

1011.   As the market began to realize in December of 2008 and January of 2009 that Citigroup's total assets were not fairly valued and, therefore, remained materially overstated the price of Citigroup's common stock began a continuous decline from a close of $7.46 on January 6, 2009 to $3.83 on January 15, 2009, a drop of almost 50%.

1012.   After the true composition of the U.S. Government guarantee was dislcosed Citigroup's stock closed at its low of $2.80 on January 20, 2009 dropping an additional 27% from the close of January 15, 2009.

## X.    DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

### A.    Overview of GAAP Violations

1013.   Citigroup issued annual and quarterly financial statements during the Class Period that violated Generally Accepted Accounting Principles (GAAP).

1014.   Citigroup's annual financial statements for 2004, 2005, 2006 and 2007, filed on Form 10-K,  and quarterly financial statements for March 31, 2004 through September 30, 2008, filed on Form 10-Q, violated GAAP by:

a.    Failing to disclose a concentration of credit risk from CDOs, loans and financing transactions with direct subprime exposure;

b.    Failing to consolidate its Commercial Paper CDOs on its balance sheet;

c.    Overstating the fair value of its CDOs with direct subprime exposure;

d.    Failing to consolidate its SIVs on its balance sheet; and

436

e.     Overstating the fair value of its total assets.

**B.     GAAP Background**

1015.   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP are the official standards authorized by the SEC and promulgated in part by the Financial Accounting Standards Board (FASB) and the American Institute of Certified Public Accountants (AICPA). GAAP consists of a hierarchy of authoritative literature. The highest authority include the FASB Statements of Financial Accounting Standards (FAS), followed by, among other pronouncements, FASB Interpretations (FIN) and FASB Staff Positions (FSP).

1016.   SEC Regulation S-X states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure (17 C.F.R. § 210.4-01(a)(1)).  Regulation S-X requires that quarterly financial statements must also comply with GAAP, with the exception that quarterly financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements (17 C.F.R. § 210.10-01(a)).

**C.     Citigroup Failed to Disclose a Concentration of Credit Risk From CDOs, Loans and Financing Transactions With Direct Subprime Exposure**

1017.   Citigroup failed to disclose that it had a concentration of credit risk from CDOs, loans and financing transactions with direct subprime exposure in its annual and quarterly financial statements for 2004, 2005 and 2006, and in its quarterly financial statements for March 31, 2007 and June 30, 2007, in violation of GAAP.

1018.   Citigroup was required by GAAP to disclose all significant concentrations of credit risk from CDOs, loans and financing transactions with direct subprime exposure.

1019.   FAS 107, *Disclosures about Fair Value of Financial Instruments*, ¶15A required Citigroup to disclose "all significant concentrations of credit risk from *all* financial instruments, whether from an individual counterparty or groups of counterparties."

1020.   FAS 107, ¶15A states that, "*Group concentrations* of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions."

1021.   FAS 107, ¶15A states that, "The following shall be disclosed about each significant concentration:

a.      Information about the (shared) activity, region, or economic characteristic that identifies the concentration.

b.      The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity

c.      The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments

438

d.      The entity's policy of entering into master netting arrangements to mitigate the credit risk of financial instruments, information about the arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk.

1022.   FSP SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk*, ¶7 states that, "The terms of certain loan products may increase a reporting entity's exposure to credit risk and thereby may result in a *concentration of credit risk* as that term is used in FAS 107, either as an individual product type or as a group of products with similar features."

1023.   FSP SOP 94-6-1, ¶¶2-6 give examples of loan terms that may increase credit risk such as negative amortization, high loan-to-value ratio, option ARMs, interest-only loans, and other loan terms that fall under the general category of subprime.

1024.   FSP SOP 94-6-1, ¶7 provides the following examples of shared characteristics which may give rise to significant concentrations of credit risk: borrowers subject to significant payment increases, loans with terms that permit negative amortization and loans with high loan-to-value ratios.

1025.   On November 4, 2007, Citigroup disclosed for the first time that it had $54.6 billion of direct subprime exposures, consisting of $42.9 billion of CDO super senior exposures, $2.7 billion of CDO warehousing and unsold tranches of CDOs, $4.2 billion of subprime loans purchased for sale or securitization, and $4.8 billion of financing transactions secured by subprime.[63]

---

[63] Citigroup's total gross exposure to CDOs was $56.1 billion.  In addition to the $42.9 billion of CDO super senior exposures and $2.7 billion of CDO warehousing and unsold tranches of CDOs, Citigroup had $10.5 billion of exposure to Hedged CDOs.

1026.   The $42.9 billion of CDO super senior exposures included $24.9 billion of Commercial Paper CDOs that Citigroup failed to consolidate on its balance sheet (see below), $9.5 billion of High Grade CDOs, $8.3 billion of Mezzanine CDOs, and $0.2 billion of CDOs-squared.

1027.   Citigroup's CDOs with direct subprime exposure had been issued as far back as 2003 but remained undisclosed, with some kept off balance sheet, until November 4, 2007.

1028.   Citigroup knew, or was reckless in not knowing, that its CDOs, loans and financing transactions with direct subprime exposure gave rise to a concentration of credit risk that required disclosure by GAAP.

1029.   Citigroup was required by FAS 107 and FSP SOP 94-6-1 to disclose its concentration of credit risk from CDOs, loans and financing transactions with direct subprime exposure because these financial instruments were primarily backed by subprime RMBS collateral consisting of loans with terms such as negative amortization, high loan-to-value ratio, option ARMs, and interest-only that increased Citigroup's exposure to credit risk.  The counterparties (subprime borrowers) to these loans had similar economic characteristics such as being subject to significant payment increases, negative amortization and high loan-to-value ratios that would cause their ability to meet the terms of these loans to be similarly affected by changes in economic conditions.

1030.   Plaintiffs' investigation has revealed that Citigroup held, at a minimum, the following **undisclosed** concentrations of credit risk from CDOs, loans and financing transactions with direct subprime exposure during the Class Period:

a.      $14.2 billion as of December 31, 2004;

b.      $23.4 billion as of December 31, 2005;

c.      $36.3 billion as of December 31, 2006;

440

d.      $39.4 billion as of March 31, 2007; and

e.      $39.7 billion as of June 30, 2007.

1031.   Accordingly, Citigroup's failure to disclose the above concentration of credit risk from CDOs, loans and financing transactions with direct subprime exposure, as required by FAS 107 and FSP SOP 94-6-1, violated GAAP.

**D.      Citigroup Failed to Consolidate its Commercial Paper CDOs**

1032.   Citigroup failed to consolidate its Commercial Paper CDOs on its annual and quarterly financial statements for 2004, 2005 and 2006, and on its quarterly financial statements for March 31, 2007, June 30, 2007 and September 30, 2007, in violation of GAAP.

1033.   Citigroup was required by GAAP to consolidate its Commercial Paper CDOs on its balance sheet.

1034.   Citigroup's Commercial Paper CDOs are Variable Interest Entities (VIEs) subject to the consolidation rules set forth in FIN 46(R), *Consolidation of Variable Interest Entities* (See Citigroup's 2007 Form 10-K).  A Variable Interest Entity is a new term defined by the FASB in FIN46(R) to include entities that have previously been referred to as special-purpose entities (SPEs) that are to be evaluated for consolidation under GAAP.

1035.   FIN 46(R), ¶2(a) states that a "variable interest entity refers to an entity subject to consolidation according to the provisions of this Interpretation."

1036.   FIN 46(R), ¶14 states that "an enterprise shall consolidate a variable interest entity if that enterprise has a variable interest ... that will absorb a majority of the entity's expected losses ...."

441

1037.   On November 5, 2007, during a conference call to analysts, Citigroup disclosed for the first time that in order to facilitate the issuance of $24.9 billion of Commercial Paper CDOs, Citigroup wrote put options or "liquidity puts" protecting the holders of the put options from any losses the Commercial Paper CDOs would incur.  Citigroup's CFO, Gary Crittenden, stated that "This was essentially a funding mechanism that was used as we structured CDOs up until I believe the end of 2005.  So we would sell a structured CDO to a customer.  We would provide a liquidity put, essentially, to that customer ... and this was all backed by sub-prime collateral ...."

1038.   Citigroup disclosed in its 2007 Form 10-K that, "in certain CDO transactions underwritten by the Company during 2003-2006, the senior funding of the CDOs was in the form of short-term commercial paper. In order to facilitate the issuance of commercial paper by the CDO, the Company wrote a put option ("liquidity puts") to the CDO to benefit the commercial paper investors, which was accounted for as a derivative. The total notional amount of these written liquidity puts was approximately $25 billion."

1039.   FIN 46(R), ¶B10 states that "written put options ... are variable interests if they protect holders of other interests from suffering losses." And, "to the extent the ... written put options ... will be called on to perform in the event expected losses occur, those arrangements are variable interests ...."

1040.   Citigroup's $13.3 billion of total write-downs of its Commercial Paper CDOs from the fourth quarter of 2007 through the fourth quarter of 2008, representing a 57% reduction in face value, clearly demonstrates that Citigroup had been at risk for majority of the Commercial Paper CDOs expected losses when it issued the liquidity puts.

1041.   Citigroup knew, or was reckless in not knowing, that the liquidity puts placed it at risk for the majority of the expected losses of the Commercial Paper CDOs thereby requiring consolidation by GAAP.

1042.   Citigroup's was required by FIN 46(R) to consolidate its Commercial Paper CDOs on its balance sheet because the liquidity puts that it wrote on the CDOs placed Citigroup at risk to absorb a  majority of the Commercial Paper CDOs expected losses ( *See also* Section III *infra)*.

1043.   Plaintiffs' investigation has revealed that Citigroup held the following amounts of **unconsolidated** Commercial Paper CDOs during the Class Period:

a.   $13.3 billion as of December 31, 2004;

b.   $20.4 billion as of December 31, 2005;

c.   $24.9 billion as of December 31, 2006;

d.   $24.9 billion as of March 31, 2007;

e.   $24.9 billion as of June 30, 2007; and

f.   $24.9 billion as of September 30, 2007.

1044.   Accordingly, Citigroup's failure to consolidate its Commercial Paper CDOs on its balance sheet, as required by FIN 46(R), violated GAAP.

**E.   Citigroup Overstated The Fair Value of its CDOs With Direct Subprime Exposure**

1045.   Citigroup overstated the fair value of its CDOs with direct subprime exposures on its quarterly financial statements for March 31, 2007, June 30, 2007 and September 30, 2007.

443

1046.   Citigroup was required by GAAP to write-down the fair value of its CDOs with direct subprime exposure and include the write-drowns in earnings.

1047.   FAS 157, *Fair Value Measurements*, ¶5 defines fair value as "the price that would be received to sell an asset ... in an orderly transaction between market participants ...."

1048.   FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶13 states that "unrealized holding gains and losses for trading securities shall be included in earnings."

1049.   FAS 157, ¶21 explains that "in this Statement, inputs refer broadly to the assumptions that market participants would use in pricing the asset or liability, including assumptions about risk, for example, the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique. Inputs may be observable or unobservable:

a.      Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity.

b.      Unobservable inputs are inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances.

1050.   FAS 157, ¶21 makes clear that, "Valuation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs."

1051.   FAS 157, ¶22 "prioritizes the inputs to valuation techniques used to measure fair value into three broad levels. The fair value hierarchy gives the highest priority to quoted prices

444

(unadjusted) in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3)."

1052.   FAS 157 defines the levels as follows: Level 1 inputs are quoted prices in active markets for identical assets or liabilities (FAS 157 ¶24);  Level 2 inputs are inputs, other than quoted prices, that are observable for the asset or liability, either directly or indirectly (FAS 157 ¶28); and Level 3 inputs are unobservable inputs for the asset or liability (FAS 157 ¶30).

1053.   FAS 157, ¶28 states that "Level 2 inputs include the following: a) Quoted prices for similar assets or liabilities in active markets; b) Quoted prices for identical or similar assets or liabilities in markets that are not active...; c) Inputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates); and d) Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs)."

1054.   Citigroup adopted FAS 157 effective January 1, 2007.

1055.   Citigroup's 2007 Form 10-K stated that "the Company accounts for its CDO super senior subprime direct exposures and the underlying securities on a fair-value basis with all changes in fair value recorded in earnings."

1056.   Citigroup disclosed in its 2007 Form 10-K that its CDOs with subprime exposure were not subject to valuation based on observable transactions; were Level 3 assets subject to valuation based on significant unobservable inputs; and were classified in Level 3 of the fair-value hierarchy throughout 2007.

1057.   The TABX index for Mezzanine CDOs was a higher level (Level 2) input that was a readily available observable input of the fair market value of Citigroup's Mezzanine CDOs, specifically, and Citigroup's CDOs with subprime exposure, generally.

1058.   Citigroup was required by FAS 157 to value its Mezzanine CDOs using the Level 2 observable TABX index instead of the unobservable Level 3 inputs it was actually using.

1059.   Citigroup knew, or was reckless in not knowing, that the decline in the TABX index required the fair value of its Mezzanine CDOs to be written-down (with the write-down included in earnings) by GAAP.

1060.   Citigroup was required by FAS 157 and FAS 115 to write down the fair value of its Mezzanine CDOs because it was required to maximize the use of the TABX index, an **observable** higher Level 2 input, which had declined substantially in value and minimize the use of the unobservable Level 3 inputs that it was using to value its Mezzanine CDOs at par (*See also* Section III *infra)*.

1061.   Citigroup held $8.3 billion of undisclosed Mezzanine CDOs on its books at **par value** as of March 31, 2007, June 30, 2007, and September 30, 2007.

1062.   During 2007, the TABX index for Mezzanine CDOs suffered substantial declines to approximately:

a.      85% of par as of March 31, 2007, or a 15% drop in value;

b.      69% of par as of June 30, 2007, or a 31% drop in value; and

c.      33% of par as of September 30, 2007, or a 67% drop in value.

1063.   Citigroup was required by FAS 157 to write down the fair value of its $8.3 billion of Mezzanine CDOs by approximately:

a.     15% or $1.2 billion as of March 31, 2007;

b.     31% or $2.6 billion as of June 30, 2007; and

c.     67% or $5.6 billion as of September 30, 2007.

1064.   Citigroup was required to included the write-downs of the Mezzanine CDOs in pre-tax income pursuant to FAS 115 ¶13.

1065.   The write-downs required by GAAP of the Mezzanine CDOs would have reduced Citigroup's reported pre-tax income to:

a.     $5.7 billion for March 31, 2007 from the $6.9 billion it reported;

b.     $13.4 billion for June 30, 2007 from the $16.0 billion it reported; and

c.     $13.1 billion for September 30, 2007 from the $18.7 billion it reported.

1066.   Citigroup's failure to write-down its Mezzanine CDOs as required by GAAP materially overstated its pre-tax income by:

a.     $1.2 billion, or 21%, for the three months ended March 31, 2007;

b.     $2.6 billion, or 19%, for the six months ended June 30, 2007; and

c.     $5.6 billion, or 43%, for the nine months ended September 30, 2007.

1067.   Citigroup belatedly wrote-down the $8.3 billion face value of its Mezzanine CDOs by 63%, or $5.2 billion, in the fourth quarter of 2007–approximately the same percentage, 67%, that the TABX had declined for the first three quarters of 2007.

1068.   Accordingly, Citigroup's failure to write-down the fair value of its Mezzanine CDOs as of March 31, 2007, June 30, 2007, and September 30, 2007, as required by FAS 157, and to include the write-downs in pre-tax income, as required by FAS 115, violated GAAP.

1069.   Furthermore, Citigroup was required by FAS 157 to write down the fair value of its Commercial Paper CDOs, High Grade CDOs, CDOs Squared, and Warehoused/unsold CDOs as of March 31, 2007,  June 30, 2007 and September 30, 2007, and was required by FAS 115 to included the write-downs in pre-tax income.

1070.   Citigroup knew, or was reckless in not knowing, that the decline in the TABX index required the fair value of its Commercial Paper CDOs, High Grade CDOs, CDOs Squared, and Warehoused/unsold CDOs as of March 31, 2007,  June 30, 2007 and September 30, 2007 to be written-down (with the write-downs included in earnings) by GAAP.

1071.   Citigroup was required by FAS 157 and FAS 115 to write down the fair value of its Commercial Paper CDOs, High Grade CDOs, CDOs Squared, and Warehoused/unsold CDOs as of March 31, 2007,  June 30, 2007 and September 30, 2007 because it was required to maximize the use of the TABX index, an **observable** higher Level 2 input, that had declined substantially in value and minimize the use of the unobservable Level 3 inputs that it was using to value its CDOs at par  (*See also* Section III *infra)*.

1072.   As of March 31, 2007,  June 30, 2007 and September 30, 2007 Citigroup held $24.9 billion of Commercial Paper CDOs, $6.2 billion High Grade CDOs, $0.2 billion of CDOs Squared, and $2.7 billion of Warehoused/unsold CDOs undisclosed on its books at **par value**.

1073.   Accordingly, Citigroup's failure to write-down the fair value of its Commercial Paper CDOs, High Grade CDOs, CDOs Squared, and Warehoused/unsold CDOs as of March 31, 2007,  June 30, 2007 and September 30, 2007, as required by FAS 157, and to include the write-downs in pre-tax income, as required by FAS 115, violated GAAP.

448

### F.     Citigroup Failed to Consolidate its SIVs on its Balance Sheet

1074.     Citigroup failed to consolidate its sponsored SIVs on its annual and quarterly financial statements for 2004, 2005 and 2006, and on its quarterly financial statements for March 31, 2007, June 30, 2007 and September 30, 2007.

1075.     Citigroup was required by GAAP to consolidate its SIVs on its balance sheet.

1076.     Citigroup's SIVs are Variable Interest Entities (VIEs) subject to the consolidation rules set forth in FIN 46(R) (See Citigroup's 2007 Form 10-K).  A Variable Interest Entity is a new term defined by the FASB in FIN46(R) to include entities that have previously been referred to as special-purpose entities (SPEs) that are to be evaluated for consolidation under GAAP.

1077.     FASB Staff Position FIN 46(R)-5, *Implicit Variable Interest under FASB Interpretation No. 46* (revised December 2003), ¶6 states that one example of an implicit variable interest is "an implicit agreement to replace impaired assets held by a variable interest entity that protects holders of other interests in the entity from suffering losses."

1078.     FSP FIN 46(R)-5 also states that the determination as to whether a Company is effectively guaranteeing all or a portion of an investment or would be expected to make funds available and, therefore, an implicit variable interest exists, should take into consideration all the relevant facts and circumstances. Those facts and circumstances include whether there is an economic incentive for the Company to act as a guarantor or to make funds available.

1079.     Citigroup, whether or not legally required, had an "implicit guarantee" to provide support to its sponsored SIVs as defined in FSP FIN 46(R)-5.

1080.   On December 13, 2007, on Form 8-K, Citigroup reported that "it has committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the City-advised Structured Investments Vehicles ('SIVs')."

1081.   Citigroup's 2007 Form 10-K stated that "on December 13, 2007, Citigroup announced its decision to commit, not legally required, to provide a support facility that would resolve uncertainties regarding senior debt repayment facing the Citi-advised Structured Investment Vehicles (SIVs). As a result of the Company's commitment, Citigroup included the SIVs' assets and liabilities in its Consolidated Balance Sheet as of December 31, 2007."

1082.   Citigroup's $3.3 billion of total write-downs of its SIVs during 2008 clearly demonstrates that Citigroup had an implicit agreement to act as guarantor to the SIVs investors and keep them from suffering losses.

1083.   Although, Citigroup claimed not to be legally required to provide support to its SIVs it acted is if it did by consolidating the SIVs on its balance sheet in the fourth quarter of 2007.  This implicit guarantee to its SIVs placed Citigroup at risk for a majority of the losses of the SIVs.   Citigroup provided an  implicit guarantee to its SIVs because it had an economic incentive, loss of business reputation, to act as guarantor and make funds available to support the SIVs.

1084.   Citigroup knew, or was reckless in not knowing, that this implicit guarantee placed it at risk for the majority of the losses of its SIVs thereby requiring consolidation of the SIVs on Citigroup's balance sheet by GAAP.

1085.   Citigroup's was required by FIN 46(R) and FSP FIN 46(R)-5  to consolidate its SIVs on its balance sheet because the implicit guarantee Citigroup provided to its SIVs placed Citigroup at risk for a majority of the losses of the SIVs (*See also* Section IV *infra)*.

450

1086.   Citigroup had the following amounts of **unconsolidated** SIVs during the Class Period:

a.      $51 billion as of December 31, 2004;

b.      $56 billion as of December 31, 2005;

c.      $80 billion as of December 31, 2006;

d.      ~ $100 billion as of March 31, 2007;

e.      ~ $100 billion as of June 30, 2007; and

f.      $87 billion as of September 30, 2007.

1087.   Accordingly, Citigroup's failure to consolidate its SIVs on its balance sheet, as required by FIN 46(R) and FSP FIN 46(R)-5, violated GAAP.

**G.    Citigroup Overstated the Fair Value of its Total Assets and Stockholders' Equity**

1088.   Citigroup overstated the fair value of its total assets on its annual financial statements for 2007 and on its quarterly financial statements for March 31, 2008, June 30, 2008 and September 30, 2008.

1089.   Citigroup was required by GAAP to write-down the fair value of its total assets and include the write-drowns in earnings.

1090.   FAS 157, *Fair Value Measurements*, ¶5 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

451

1091.   FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶13 states that "unrealized holding gains and losses for trading securities shall be included in earnings."

1092.   On November 4, 2007, Citigroup disclosed for the first time that it had $54.6 billion of direct subprime exposures in its Securities and Banking division.

1093.   Over the next four quarters, Citigroup took a total of $40.9 billion of write-downs in its Securities and Banking division as follows:

a.      $17.0 billion for the fourth quarter of 2007;

b.      $12.4 billion for the first quarter of 2008;

c.      $7.1 billion for the second quarter of 2008; and

d.      $4.4 billion for the third quarter of 2008.

1094.   The write-downs were on a variety of Citigroup's assets, including sub-prime related direct exposures, monoline credit value adjustments, highly leveraged finance commitments, Alt-A mortgages, auction rate securities, commercial real estate, and SIVs.

1095.   Despite these massive write-downs, Citigroup's total assets remained overstated.

1096.   Citigroup's total assets on its balance sheet were:

a.      $2.19 trillion as of December 31, 2007;

b.      $2.20 trillion as of March 31, 2008;

c.      $2.10 trillion as of June 30, 2008; and

d.      $2.05 trillion as of September 30, 2008.

452

1097.    Citigroup knew, or was reckless in not knowing, that despite the massive write-downs it already had taken the fair value of its total assets remained overstated and, therefore, required further write-downs (with the write-downs included in earnings) by GAAP.

1098.    Citigroup was required by FAS 157 and FAS 115 to write down the fair value of its total assets because it failed to maximize observable higher Level 2 inputs over the unobservable lower Level 3 inputs that it was using to value its total assets.

1099.    Throughout 2008, Vikram Pandit, Citigroup's CEO, repeatedly made statements assuring that Citigroup's balance sheet and capital base were strong.

1100.    Despite these assurances, on October 28, 2008, Citigroup raised $25 billion of capital as part of the U.S. Department of the Treasury's Troubled Asset Relief Program.

1101.    On November 17, 2008, at a town hall meeting designed to allay the mounting fears that Citigroup was on the brink of collapse, Mr. Pandit stated that, "We have significantly reduced our risky assets while putting the company in a very strong capital position."

1102.    On November 24, 2008, Citigroup announced that it was receiving a second bailout from the U.S. Government.  This time Citigroup was to receive an astounding $326 billion from the U.S. Treasury, Federal Reserve, and FDIC consisting of $20 billion in capital and $306 billion in asset guarantees.  The guarantees were for the very same assets that Citigroup claimed just a week before were fairly valued.

1103.    The $326 billion U.S. Government bailout of Citigroup clearly demonstrates that Citigroup was not in a strong capital position, as Mr. Pandit claimed just a week before, but that its assets were in fact materially overstated.

453

1104.   On December 4, 2008, Jonathan Weil writing for Bloomberg News asked in his column the question that everyone was asking,  "Now that Citigroup Inc. has secured yet another taxpayer bailout, where are the writedowns?"  Mr. Weil, with incredulity, points out the obvious that "You don't have to be that smart to figure out there's still a lot of rot on Citigroup's $2.1 trillion balance sheet.  If there wasn't, the New York-based lender wouldn't have needed last week's government rescue, which included a new $20 billion investment by the Treasury Department, plus a guarantee covering about $306 billion of the bank's assets against most losses."

1105.   As late as mid January 2009, analysts, the business press and investors expressed uncertainty about Citigroup's self-proclaimed financial strength.  On January 14, 2009, Business Week reported that, "All of City's recent posturing may be obfuscating the real issue: the bank's portfolio of toxic assets, which is becoming increasingly troublesome.  Furthermore, "According to some estimates, the toxic assets on the books-consumer, corporate, and leveraged loans-could stand at $150 billion.  'The hole in the balance sheet is the problem,' said a senior executive at a financial firm that specializes in fixed-income."

1106.   Accordingly, Citigroup's refusal to come clean and write-down the fair value of its total assets on its annual financial statements for 2007 and on its quarterly financial statements for March 31, 2008, June 30, 2008 and September 30, 2008 including sub-prime related direct exposures, monoline credit value adjustments, highly leveraged finance commitments, Alt-A mortgages, auction rate securities, commercial real estate, and SIVs to their true market value, as required by FAS 157 and FAS 115, violated GAAP.

## XI.   SCIENTER: CITIGROUP'S OWN ACTIONS FURTHER DEMONSTRATE CITIGROUP'S SCIENTER

1107.   It is not reasonable to assume that Citigroup was isolated from either the general understandings detailed above with respect to subprime CDOs (Section II.D, *supra*) or from the private turmoil then sweeping throughout the CDO industry (Section II.E, *supra*).   And, as demonstrated below, Citigroup in no way stood out: it too recognized that subprime CDOs had become a disaster, and like others in the industry but more so schemed to conceal its CDO exposure.

### A.   *Ab Initio*: As A Structurer of RMBS and CDO Securitizations, Citigroup Knew Exactly The Assumptions Used to Structure These Instruments, and Thus Knew, as the Boom Ended, that Its CDOs Would Go Bust

1108.   Citigroup, as underwriter/arranger of RMBS and CDOs, was responsible for structuring such securities into tranches based on modeling the expected loss of the underlying collateral.   To most of the outside world, this modeling functioned as a "black box".   But Citigroup, precisely because it itself made these securities, directed the workings of this modeling.   The "expected loss" output by this modeling was highly dependent on two assumptions: the "housing price appreciation" scenario used to model mortgage performance; and the degree of correlation among CDO assets.

1109.   Citigroup, at all times through at least the end of 2006, used optimistic housing price assumptions in constructing its RMBS and CDOs – that housing prices would rise 6% per year.   Such assumptions generated very low expected losses, which in turn determined the tranche structure of the securitization (because each rated tranche was required to be removed by a certain degree, appropriate to its credit rating, from that loss).   Irrespective of whether this assumption was warranted to begin with, by mid-/late 2006 it no longer matched the real world.

Citigroup had set up its CDOs so that they could work only under boom conditions – but conditions had reversed, and housing prices were actually declining.  In fact, as Citigroup's own analyses show, CDOs would be devastated at all levels even if housing prices did not actually decline, but just failed to appreciate.

1110.   Therefore, Citigroup knew – better than almost anyone else – that its CDOs had not been built to withstand the conditions that became operative in late 2006 and early 2007, and that under such conditions losses would deeply impair even CDOs' super senior tranches.  Citigroup knew that "expected losses" under real-world conditions of late 2006 and early 2007 would be far higher than the expected losses that Citigroup had modeled – and thus that securitization structures were now invalid, together with their credit ratings.  Concretely: a BBB tranche that had garnered its credit rating on the basis of a low expected loss was now, given that expected losses would clearly be much higher, no longer a BBB risk, but rather possessed a much higher risk and should have possessed a much lower credit rating.

1111.   Exactly the same applied with respect to CDO asset correlations.  Irrespective of whether the low correlation assumptions used to structure the CDOs were ever with basis, by early 2007 at the latest it was evident that subprime mortgages were highly correlated assets exposed to exactly the same risks.

**B.**     **Late 2006 and Early 2007:  Citigroup's Collaboration with BSAM and the BSAM Funds Demonstrate Citigroup's Awareness that CDO Risks were Increasing and CDO Values were Decreasing**

1112.   Throughout the class period, Citigroup cooperated with BSAM and the BSAM Funds in a variety of CDO operations.  The nature of their collaborative activities during late 2006 and 2007 – alleged in detail in the "Schemes" section of this complaint at Section III.A– strongly

evidence that Citigroup: (1) by late 2006, was encountering substantial difficulties in selling junior CDO tranches; and (2) by late 2006, recognized that junior CDO tranches would soon become worthless.

1113.   Already by late 2006, Citigroup was encountering substantial difficulty in placing and selling the junior tranches of the CDOs it arranged and underwrote.  Citigroup's solution to the absence of real buyers was the creation of fake, related-party buyers, primarily in the form of new CDOs created by Citigroup to purchase the detritus of the old CDOs created by Citigroup.

1114.   The Tallships CDO, underwritten by Citigroup and managed by BSAM, was one such new CDO particularly replete with related party transactions.  *See* Section III.A.2.a.  During 2006 and early 2007, BSAM, together with Citigroup, collaborated on two further CDO-related activities – the Parapet CDO-cubed, and the proposed IPO of Everquest Financial – clearly designed to offload certain of BSAM's and Citigroup's riskiest CDO exposures.  *Id.*

C.   **January 2007: Citigroup Recognizes that the Subprime Mortgages Originated During 2006 Are the "Worst Vintage in Subprime History"**

1115.   On January 26, 2007, Citigroup's Fixed Income division issued a research report titled *Explaining 2006:  Worst Vintage in Subprime History*.  Citigroup's January 26, 2007 conclusion and explanation mirror the allegations here as to the reasons for poor subprime mortgage performance.   These 2006 vintage subprime mortgages were the primary collateral underlying Citigroup's CDOs at issue here.

D.   **February 2007: Citigroup's Purchase of Risk Insurance Reflects Scienter**

1116.   Citigroup's new policy of purchasing insurance in CDO's also reflects scienter. Prior to February 2007, Citigroup had retained super seniors without hedges.  Beginning in or about

457

February 2007, that practice changed.  Aware of the greater risks associated with these instruments,

Citigroup began to purchase "insurance" on both its super seniors, as well as other parts of CDO's.

**E.      February 2007:  Citigroup's Foraois Scheme Evidences Citigroup's Awareness of its Exposure to $25 Billion of Commercial Paper CDO Super Seniors**

1117.   Citigroup, largely during 2004 and 2005, "sold" $25 billion of super senior

tranches with a full price money back guarantee.  As detailed in the "Scheme" allegations at Section

III.A.1, this guarantee would become operative in the event that the quality of the collateral backing

these super seniors (i.e., subprime mortgages) deteriorated.  In late 2006 and early 2007, the

collateral quality indeed deteriorated, and Citigroup was obligated to repurchase at full price $25

billion of Commercial Paper CDOs at the very moment they were losing their full price.  Citigroup

first revealed these long-standing guarantees, and the $25 billion of super senior exposure, in

November 2007.  Citigroup represented then that its repurchase of the super seniors had occurred

during the "summer" of 2007.

1118.   Evidence, however, indicates that Citigroup was: (1) aware of and concerned

about these exposures no later than early February 2007; and (2) employed further schemes designed

to create the appearance that such exposure did not exist.

1119.   One of the Commercial Paper CDOs at issue was Citigroup's Grenadier

Funding CDO, with a $1.32 billion super senior tranche.  No later than February 9, 2007, Citigroup

set up a special purpose entity named Foraois Funding Ltd.  Its purpose, as an April 17, 2007

offering prospectus reveals, was to serve as the conduit for a transaction known as "Leveraged Super

Senior" trade.  In this particular transaction, Citigroup and Foraois entered into a credit default swap

on February 9, 2007 for the above-mentioned $1.32 billion Grenadier Funding super senior tranche.

Pursuant to this credit default swap, Citigroup paid Foraois a protection premium in exchange for swapping off the credit risk of the Grenadier Funding super senior.  In essence, Citigroup was reversing its prior role with respect to the Commercial Paper CDOs.  Before, Citigroup had been paid to assume their risk.  Now, Citigroup had created an alter-corporate entity called Foraois.  By so doing, Citigroup could ostensibly pay its alter-ego to appear to assume the credit risk.  Among other things, the February 9, 2007 credit default swap and the April 17, 2007 Foraois prospectus strongly indicate that Citigroup was aware of impending liability for and losses from Commercial Paper super seniors no later than February 2007.

1120.   Citigroup's Foraois scheme is alleged in detail in the "Scheme" section at Section III.A.1.a.  As there explained, in order for Foraois to have credibility as counterparty for $1.32 billion of credit risk it was assuming, Foraois needed funding.  This funding was provided through Foraois' sale of tranched securities collateralized by the insurance payments Foraois was receiving from Citigroup. This funding depended most crucially on the sale of $92 million of junior Foraois tranches, which stood first in line for any losses.  Who bought these tranches?  Other CDOs set up by Citigroup.

**F.    March 2007:  Citigroup's Quantitative Credit Strategy and Analysis Group's Report Demonstrates Citigroup's Understanding and Awareness that Even Super Senior CDO Tranches Were Already Impaired and Were at Risk of Severe Downgrades and Losses**

1121.   In late March 2007, Citigroup's quantitative credit strategy and analysis group issued a report (the "March 2007 Report") concluding that recent subprime mortgage performance put *senior* CDO tranches at uniquely severe risk, and recommending that investors sell their senior tranches or hedge their risk through credit default swaps.

1122.   The March 2007 Report was spurred by two recent events in the subprime mortgage market: (1) data evidencing unprecedentedly poor performance of recent subprime mortgages; and (2) falling prices for RMBS and CDO tranches, including the ABX and TABX indices.  The March 2007 Report observed that many RMBS and CDO tranches were now being sold at a discount, and that the secondary market for such instruments was starting to come undone (a wide divergence between bid and offer prices).

1123.   The thesis of the March 2007 Report was twofold and correct on each count. First, the March 2007 Report concluded that the *senior* tranches of subprime-backed CDOs were uniquely exposed to severe risk as a result of subprime mortgage performance, and uniquely susceptible to severe credit ratings downgrades.  Second, the March 2007 Report stated these senior tranche CDO risks had not yet been fully "priced in" by the market:

> Sub-prime has been one of the main focal points of the recent sell-off... But we reckon **the effect on CDOs of ABS may be more interesting than that on sub-prime itself – and considerably less priced in**.  (March 2007 Report)

1124.   The uniquely severe risks faced by senior CDO tranches, the March 2007 report, explained, were a result of the fact that ABS CDOs were collateralized primarily by mezzanine tranches of subprime RMBS (i.e., the BBB tranches).  While any individual RMBS tranche was somewhat diversified – insofar as it contained subprime mortgages from multiple geographic regions – the pile-up of such tranches as the asset base for CDOs actually meant that CDO assets were *not* diversified, but rather all largely the same:

As we see it, this creates a classic "ball in bowl"[64] phenomenon, in which **either no ABS tranches get downgraded, or a great many do** (March 2007 Report)

1125.   As long as asset performance is uncorrelated, losses will be random (some here, some there) and the senior tranches will be fine (because of the credit protection provided by subordinate tranches).   High asset correlation is effectively the only thing that can threaten to cause losses severe enough to reach super senior tranche levels.   Thus, the value of senior CDO tranches is affected far more sharply than other tranches by high asset correlation.   Because of such Achilles heel exposure:

> **Translated into the CDO space, widespread downgrades [on the underlying ABS tranches] would, relatively speaking, be far worse for senior tranches than for junior ones**.   (March 2007 Report)

1126.   The March 2007 Report's investment recommendation?   That investors in senior CDO tranches (1) sell them, or (2) hedge their risk through purchasing credit default swap protection.

---

[64]      Citigroup's credit analysts used the metaphor of a "ball in a bowl" to illuminate the specific nature of CDO risk.   If one gives a little push to a ball in bowl, it still stays in the bowl; but one gives a substantially harder push, the ball falls out of the bowl completely.   The "little push" scenario is how the CDO acts under normal conditions; the credit protection provided by more subordinate tranches absorbs such "pushes".   Thus, under normal conditions, a CDO tranche has more stable credit quality than regular debt securities – e.g., bonds – that don't have any similar bolster against initial losses.

G.     **March 2007:   Citigroup's March 2007 Credit Conference in Monaco Demonstrates Its Awareness of Subprime's Risks, Their Correlated Concentration in CDOs, and the Likelihood of Loss for Those Exposed to those Risks**

1127.   In early March 2007, Citigroup held an annual credit conference in Monaco. Subprime concerns dominated many of the conference sessions.   Many investors were only beginning to learn that CDOs had exposed them to subprime mortgage assets.  As Citigroup's head credit strategist Matt King informed them, ABS CDOs did not merely expose them to subprime, but exposed them to subprime *through extremely concentrated and highly correlated underlying subprime collateral*.  As Mr. King informed, because of the high concentration of subprime RMBS in CDOs, and because of the high correlation of those assets, the risk of CDO losses extended to even super senior tranche levels.

1128.   As the Wall Street Journal reported on March 9, 2007 as to the Monaco proceedings:

> This resort town, famous for its high-roller gambling tables, seems far from the disastrous bets made in the U.S. subprime-mortgage business. But at Citigroup Inc.'s annual credit conference here, speakers and attendees say the turndown in the U.S. subprime market is turning up in investors' portfolios where they don't expect it, reflecting the increasingly connected global markets. Investors are realizing they may own more exposure to subprime-mortgage-loan pools than they thought. That exposure is surfacing because of the way fixed-income investments can be layered. Banks sell asset-backed securities, known as ABS, backed by mortgages to investors. The ABS can ultimately end up in complex structures called collateralized debt obligations, or CDOs. Institutional investors invest in CDOs, sometimes not realizing they have subprime mortgages in them.
>
> "There are European investors, who until a few weeks ago did not know an awful lot about what subprime was, who are realizing that they actually have exposure through some of their CDOs," said

462

Citigroup credit strategist Hans Lorenzen. "I've spoken to one investor who said that their portfolio had exposure to subprime and they just knew that it had some American ABS exposure. They hadn't gone through enough detail" of their investment to realize they owned loans to Americans with spotty credit records. **Talk of subprime mortgages dominated several conference sessions. While some investors believe the impact of the subprime sector on debt performance long term will be minimal, "as far as the near-term risk of further market correction is concerned, it's at the top of the list" of worries, said Matt King, head of credit strategy for Citigroup.**

**Individual ABS portfolios typically are diversified across U.S. regions. But when they are combined into a CDO, the risk of losses is increased for even relatively senior note holders because many of the original ABS portfolios will have been affected by mortgage defaults. "That actually makes the [asset-backed] securities themselves less diversified from one another when they go into the CDOs," Mr. King said. "The CDO of ABS market, like every other market, has been reaching for spread . . . and as a result, a significant proportion of the ABS which has gone into CDOs . . . has been of the subprime variety."**

While some big banks, namely Britain's HSBC Holdings PLC, have set aside money to cover their losses from the subprime market, there is concern that the turndown could spread to others. **"In some places like HSBC, you have seen massive provisioning for losses," Mr. King said. "And to be honest, that makes us deeply suspicious"** of banks **"with exposures in that space who have not declared anything like the same degree of provisioning."**

(Wall Street Journal, *Subprime Surprise for Europeans*, March 9, 2007)

1129.   These last words from Citigroup's credit strategy chief Mr King – "that makes us deeply suspicious [of banks] with exposures in that space who have not declared anything like the same degree of provisioning" – were, though unbeknownst publicly at the time, a direct condemnation of Citigroup, by Citigroup. Citigroup had among the world's largest exposures to subprime – both through its massive, undisclosed CDO holdings of approximately $57 billion and

463

through its on-balance sheet portfolio of $60 billion of subprime mortgages.  Citigroup had not enacted any provisioning at all for its CDO exposures and had not written them down – precisely so as not to reveal what it was holding.  And, rather than increasing its provisioning for its on-balance sheet portfolio of subprime mortgages, Citigroup continued to release reserves during early 2007 – leaving Citigroup massively under-reserved and necessitating subsequent and enormous quarterly loan loss provisioning charges ever since.

**H.   March 2007:  Citigroup's Collateral Demands on New Century Financial, and Citigroup's Withdrawal of its Warehouse Credit Line, Demonstrate Citigroup's Awareness of the Devaluation of Subprime Mortgage Assets**

1130.   As already detailed (Section II.C.3 *supra*), during the first two weeks of March 2007 Citigroup sparked New Century Financial's plunge into bankruptcy by being the first of its warehouse lenders to make large collateral demands and to seek to withdraw its warehouse credit line.  These actions were undertaken because Citigroup understood that New Century's subprime mortgages had become substantially devalued.   They were no longer worth the amount of the funds used to originate them.  The devaluation of the mortgages was the result of awareness that such mortgages were at elevated risk of default and that such mortgages would result in substantial principal losses.

1131.   Similar mortgages served as the primary collateral ultimately underlying Citigroup's $57 billion of ABS CDO exposure.  And to reiterate, the CDOs were not collateralized by directly by the mortgages themselves, but – more precisely – by the lower-tranched risks of those mortgages.  Small performance deteriorations in the underlying mortgages would, and did, suffice to erase most of a CDO's value.  Were principal losses in underlying subprime mortgage pools to rise from approximately 6% to approximately 10%, Mezzanine CDO losses would rise to 100%.

Exactly the same considerations that led Citigroup to recognize that its capital was at risk in one instance (the warehouse line of credit to New Century Financial), and that led Citigroup to take action to protect that capital (collateral demands and withdrawal of its credit line), applied all the more so with respect to Citigroup's CDOs.

1132.   Citigroup withdrew credit from New Century Financial, and demanded provision of further collateral payments, because Citigroup recognized that the subprime mortgages securing Citigroup's provision of credit were at imminent risk of substantial principal loss.  That same imminent risk of principal loss applied in far more severe form in the case of Citigroup's CDOs.

1133.   Where Citigroup took action with respect to New Century Financial, it evaded and avoided similar action with respect to CDOs.  Although Citigroup's CDO exposure to subprime devaluation was far larger and far more severe, Citigroup made no public mention of such CDO exposure and turned a blind eye to then-evident CDO value impairment.

I.  **April 2007:  Citigroup's Insertion of New, Detailed Subprime "Risk Factors" in Citigroup's CDO Prospectuses Demonstrates Citigroup's Awareness of The Exact Subprime Risks for CDOs At Issue Here**

1134.   Beginning no later than April 2007, Citigroup modified the prospectuses of the CDOs it arranged and underwrote to include a new subsection – generally titled "Recent Development in the RMBS Market" – disclosing the very subprime risks at issue here.  An example is provided below.

1135.   Citigroup authored these prospectuses, and, as the (undisclosed) largest investor in the securities issued pursuant to these prospectuses, Citigroup effectively put itself on notice of these very risks and their implications for investments in CDOs.

1136.   The detailed warnings that Citigroup began to provide no later than April 2007 included:

(a)      disclosing that subprime mortgage performance had already deteriorated and would deteriorate further ("Recently, delinquencies, defaults and losses on residential mortgage loans have increased and may continue to increase, which may affect the performance of RMBS Securities");

(b)      disclosing that subprime mortgages were highly susceptible to payment shock-induced default ("Market interest rates have been increasing and accordingly, with respect to adjustable rate mortgage loans and hybrid mortgage loans that have or will enter their adjustable-rate period, borrowers are likely to experience increases in their monthly payments and become increasingly likely to default on their payment obligations");

(c)      disclosing that recent housing price declines would substantially increase the loss severity upon default of subprime mortgages in particular ("These economic trends have been accompanied by a recent downward trend or stabilization of property values after a sustained period of increase in property values. Because subprime mortgage loans generally have higher loan-to-value ratios, recoveries on defaulted mortgage loans are more likely not to result in payment in full of amounts owed under such mortgage loans, resulting in higher net losses than would have been the case had property values remained the same or increased. A decline in property values will particularly impact recoveries on second lien mortgage loans that may be included in the mortgage pools backing Sub-Prime RMBS");

(d)      disclosing that the recent extinction of subprime originators and the recent regulatory crackdown on subprime origination practices would make refinancing of extant

466

subprime mortgages difficult ("Recently, a number of originators and servicers of mortgage loans have experienced serious financial difficulties and, in some cases, have entered bankruptcy proceedings. As a result of federal investigations, U.S. financial regulators have recently indicated that they may propose new guidelines for the subprime mortgage industry. Further regulation could make it more difficult for borrowers with the weakest credit histories to finance new mortgages or refinance existing mortgages");

       (e)     that the bankruptcy and financial difficulties being experienced by subprime originators would limit their ability to honor EPD repurchase demands, meaning that such EPD mortgages would remain in the collateral pools and further worsen RMBS performance ("The inability of the originator to repurchase such mortgage loans in the event of early payment defaults and other loan representation breaches may also affect the performance of RMBS Securities backed by those mortgage loans"); and

       (f)     that the above-mentioned "adverse changes" could work to reduce the cash flow generated by the CDO's underlying collateral, to decrease the market value of such collateral, and to affect the credit ratings of such collateral ("These adverse changes in market conditions may reduce the cashflow which the Issuer receives from RMBS Securities and CDO Securities held by the Issuer... , decrease the market value of such RMBS Securities and CDO Securities and increase the incidence and severity of credit events...").

       1137.  In sum, the detailed warnings that Citigroup began to insert into its CDO prospectuses no later than April 2007 captured the very essence of the risks that Citigroup was concealing in respect of what it owned and that drove the impairment and substantial destruction of CDO value:  (1) housing price declines; (2) deteriorating mortgage performance; (3) rates resetting

to payment shock levels; (4) the inability to escape such payment shock through refinancing (no longer available due to originator extinction and regulatory crackdown) or through profitable sale (no longer available because housing prices were declining).

1138.   Below is an example of the new "Recent Development in the RMBS Market" disclosures that Citigroup began to add to its CDO prospectuses no later than April 2007:

Recent Development in the RMBS Market. **Recently, delinquencies, defaults and losses on residential mortgage loans have increased and may continue to increase, which may affect the performance of RMBS Securities, in particular Sub-Prime RMBS which are backed by subprime mortgage loans**. Subprime mortgage loans are generally made to borrowers with lower credit scores. Accordingly, **mortgage loans backing Sub-Prime RMBS are more sensitive to economic factors that could affect the ability of borrowers to pay their obligations under the mortgage loans backing these securities. Market interest rates have been increasing and accordingly, with respect to adjustable rate mortgage loans and hybrid mortgage loans that have or will enter their adjustable-rate period, borrowers are likely to experience increases in their monthly payments and become increasingly likely to default on their payment obligations**. Discovery of fraudulent mortgage loan applications in connection with rising default rates with respect to subprime mortgage loans may indicate that the risks with respect to these mortgage loans are particularly acute at this time. Such risks may result in further increases in default rates by subprime borrowers as it becomes more difficult for them to obtain refinancing.

**These economic trends have been accompanied by a recent downward trend or stabilization of property values after a sustained period of increase in property values. Because subprime mortgage loans generally have higher loan-to-value ratios, recoveries on defaulted mortgage loans are more likely not to result in payment in full of amounts owed under such mortgage loans, resulting in higher net losses than would have been the case had property values remained the same or increased. A decline in property values will particularly impact recoveries on second lien mortgage loans that may be included in the mortgage pools backing Sub-Prime RMBS**.

Structural features of RMBS Securities may contribute to the impact of increased delinquencies and defaults and lower recoveries on the underlying mortgage pool. In particular, there may be a decline in the interest rate payable under those RMBS Securities structured to limit interest payable to investors based on a weighted average coupon cap. Mortgage loans bearing interest at a higher rate will have a greater tendency to default than those with lower mortgage rates. Such defaults will reduce the weighted average coupon of the underlying mortgage loans and accordingly the interest rate payable to investors in the related RMBS Security. In addition, delinquencies, defaults and lower recoveries on underlying mortgage loans will reduce interest and principal actually paid to investors to less than the amounts owed to investors in accordance with the terms of their RMBS Securities. RMBS Securities may not be structured with significant or any overcollateralization, so performance will be sensitive to delays or reductions in payments, particularly in the case of subordinated tranches of RMBS Securities. To the extent that RMBS Securities provide for writedowns of principal, interest will cease to accrue on the portion of principal of an RMBS Security that has been written down.

* * *

**Recently, a number of originators and servicers of mortgage loans have experienced serious financial difficulties and, in some cases, have entered bankruptcy proceedings. As a result of federal investigations, U.S. financial regulators have recently indicated that they may propose new guidelines for the subprime mortgage industry. Further regulation could make it more difficult for borrowers with the weakest credit histories to finance new mortgages or refinance existing mortgages**. The difficulties faced by originators and servicers of mortgage loans have resulted in part from declining markets for their mortgage loans as well as from claims for repurchases of mortgage loans previously sold under provisions that require repurchase in the event of early payment defaults or for breaches of representations regarding loan quality. Such financial difficulties may have a negative effect on the ability of servicers to pursue collection on mortgage loans that are experiencing increased delinquencies and defaults and to maximize recoveries on sale of underlying properties following foreclosure. **The inability of the originator to repurchase such mortgage loans in the event of early payment defaults and other loan representation breaches**

469

**may also affect the performance of RMBS Securities backed by those mortgage loans**.

\* \* \*

**These adverse changes in market conditions may reduce the cashflow which the Issuer receives from RMBS Securities and CDO Securities held by the Issuer** (or Defeased CDS or Collateralized CLNs that reference RMBS Securities and CDO Securities), **decrease the market value of such RMBS Securities and CDO Securities and increase the incidence and severity of credit events** under Defeased CDS or Collateralized CLNs. In addition, interest rate spreads for Sub-Prime RMBS have widened and are more volatile when compared to the recent past due to these adverse changes in market conditions. If interest rate spreads for RMBS Securities widen further after the Closing Date, the market value of such Collateral is likely to decline and, in the case of a substantial spread widening, could decline by a substantial amount. If interest rate spreads for RMBS Securities tighten after the Closing Date, the Issuer may not be able to satisfy the requirements in the Indenture to reinvest in new RMBS Securities and the payments that the Issuer may receive from any new RMBS Securities may be less than the amount that the Issuer would have received under the portfolio of RMBS Securities on the Closing Date.

(Prospectus, *Armitage ABS CDO*, April 12, 2007, pp. 19-20)

1139.   These facts, factors and risks were obviously no secret by April 2007, and Citigroup's CDO prospectuses displayed its awareness of them. What was secret was the extent to which Citigroup was at risk.  By the end of March 2007, market participants had observed these facts and had put them together into a coherent understanding of what was happening and what would happen next. Citigroup's omissions and misrepresentations assured that its problems, however, were not part of that understanding.

470

**J.      July 2007: The Introduction of Daily Risk Exposure Sessions Reflects *Scienter***

1140.   Daily risk exposure sessions beginning in July 2007 also reflect scienter.  As risk increased, in July 2007 Defendant Rubin began to hold daily meetings regarding Citigroup's CDO exposures.  (Fortune, *Robert Rubin on the Job He Never Wanted*, November 26, 2007)

1141.   That Citigroup's CDO exposure recognized as a state of emergency at the highest executive levels by July 2007 – involving daily meetings including Defendants Prince, Rubin, and Crittenden – was also confirmed by Defendants Rubin and Crittenden, in an April 27, 2008 New York Times article:

> **In early 2007, Citigroup belatedly began trimming its staggering exposure to the crumbling market for mortgage-backed securities. Though just footsteps from Mr. Prince's office, Mr. Rubin said he was unaware of the specific problems posed by that stockpile until last July. That was when Mr. Prince first convened daily risk-management meetings for Citigroup's highest-ranking executives**. Mr. Rubin either attended those meetings with Mr. Prince or called in from the road for briefings. Participants at the meetings said Mr. Rubin helped shape the firm's response to the mortgage crisis. Mr. Prince was not available for comment.  ''Bob was the elder statesman,'' says Gary L. Crittenden, Citigroup's chief financial officer. ''He could reflect on his experiences at Goldman and the Treasury and provide advice about how a prior situation paralleled the current situation.'
>
> . . . **Among all of the time bombs lurking in Citigroup's portfolio, a particularly risky type of mortgage investment that carried a feature known as a liquidity put has drawn attention**. Analysts say losses from those products could ultimately cost the bank tens of billions of dollars, and Mr. Rubin drew attention in Fortune magazine for not knowing more about that exposure. ''Liquidity puts are a footnote to a $2.2 trillion balance sheet,'' he responds. **''No regulators saw it, to the best of my knowledge. No analysts saw it. No accountants saw it.'' Citigroup's investors were unaware of them, too. The bank did not fully break out the liquidity puts as a matter of risk until November 2007**.

(New York Times, *Where Was the Wise Man*, April 27, 2008)

1142.   Also attending these daily meetings were Citigroup's Chief Operations Officer, Defendant Druskin, and the co-heads of Citigroup's investment banking operations, Thomas Maheras and Michael Klien.  *See* New York Times, *The Man in Citi's Hot Seat*, October 7, 2007.

**K.     July 2007:  Citigroup's Role in the July 2007 Collapse of the Basis Capital Hedge Funds Evidences Citigroup's Awareness of the Collapse in Value of CDOs**

1143.   Citigroup's actions in connection with the collapse of hedge funds managed by Basis Capital (the "Basis Capital Funds") evidence Citigroup's understanding of the substantial devaluation of CDOs.  Citigroup was one of several creditors of the Basis Capital Funds: Citigroup had lent money to the Basis Capital Funds, with which the Basis Capital Funds purchased investment assets (here, CDOs).  In mid-July 2007, Citigroup and other creditors made margin calls on the Basis Capital Funds.  They did so precisely because they recognized that the CDO assets securing the credit they had extended had declined in value: the assets were worth substantially less than the money initially lent for their purchase.  Citigroup, as detailed below, began trying to sell the Basis Capital Funds' assets in order to recover its funds.  By mid-August, Basis Capital admitted that investors in the Basis Capital Funds would likely suffer losses exceeding 80%, and at the end of August the Basis Capital Funds were placed in bankruptcy and liquidation.

1144.   In mid-July 2007, the Basis Capital Funds collapsed after (1) having invested in CDOs[65], (2) having suffered severe losses as a result, (3) having received margin calls from its

---

[65]     Basis Capital insisted that its mortgage-backed investments were "fundamentally sound collateral" and had been hit by brokers marking the value of the assets to market "indiscriminately".  But Basis had recently bought "heavily discounted" collateralized debt obligations (CDOs), including A-rated CDO securities that were trading at more than 700 basis points above the benchmark London Interbank Offered Rate (Libor)  (Marketwatch, *Basis Fund*

Wall Street creditors, including Citigroup, and (4) having experienced a flood of investor redemption

demands:

> One of Australia's largest and most prominent hedge funds is in crisis
> after its investments related to U.S. mortgages went sour… Two
> Basis funds invested in instruments related to U.S. subprime
> mortgages posted steep losses last month, prompting Basis to restrict
> investor withdrawals. The firm has appointed accounting firm Grant
> Thornton LLP to help it restructure as creditors press for repayment
> of loans. **Citigroup Inc. and J.P. Morgan earlier this week moved
> to sell some Basis assets, including subprime-related bonds used
> as collateral for loans, according to people familiar with the
> matter**... As the news of the near-collapse of two Bear hedge funds
> spread, [] investors demanded to know their managers' levels of
> subprime exposure and some sought to get their money back. When
> Basis investors sought to withdraw their funds, the firm was unable
> to quickly sell enough assets, some of which were illiquid or trading
> at big discounts, to cover those redemption demands...

> (Wall Street Journal, *Australian Fund Catches U.S.'s Subprime Flu*,
> July 20, 2007)

> 1145.   Citigroup and JP Morgan, among the creditors of the Basis Capital Hedge

Funds, began attempting to sell the Basis Capital Funds' assets:

Citigroup and JPMorgan Chase are hastily selling some of the assets of troubled Australian hedge

fund Basis Capital, the Wall Street Journal reported on Wednesday.

> The assets were among a long list of subprime-related bonds being
> sold by Wall Street firms in an effort to contain losses amidst turmoil
> in structured credit markets.

> On Monday, Basis Capital suspended withdrawals from its flagship
> fund, days after informing investors that the investment house had
> been swept up in the U.S. sub-prime mortgage crisis.

---

*Misses Margin Calls, Research Firm Says*,  July 19, 2007).

"The current situation in structured credit markets is currently extremely uncertain which has resulted in difficulty valuing the underlying investments of the funds. For that reason, we have decided to suspend applications and redemptions," said the firm's Managing Director Stuart Fowler, in a brief statement.

The Basis Yield Fund, with net assets of A$341 million ($296 million) in net assets, fell by just under 13.7 percent and Basis Aust-Rim Fund, with A$316 million in net assets, fell by 9.2 percent in June, according to a report by the Australian Financial Review.

(Reuters, *Citigroup, JP Morgan sell Basis Capital Assets*: Report, July 18, 2007)

1146.   In mid-August 2007, Basis Capital admitted that Basis Capital Funds' investors' losses would exceed 80%:

Basis Capital Fund Management sent out a letter Tuesday to notify investors that one of its hedge funds might have lost over 80% of its value as a result of the blowup in the U.S. subprime mortgage market, according to Bloomberg News. The Sydney-based company is under pressure from its margin creditor to sell assets.
(Forbes, *Asian Losses On U.S. Subprime Spook Investors*, August 15, 2007)

1147.   At the end of August, Basis Capital placed the Basis Capital Funds' into liquidation and bankruptcy.

1148.   Citigroup's actions with respect to the Basis Capital Funds evidence Citigroup's understanding not merely that CDOs were declining in value, but that such declines were very steep.

L.  **Citigroup's Firing of its CDO, Investment Banking and Risk Management Executives Further Supports an Inference of Scienter**

1149.   In the wake of Citigroup's CDO disaster, scores of corporate executives, investment banking and CDO executives, and risk management executives were fired – all further supporting an inference of scienter.

1150.   After Citigroup admitted on October 1, 2007 that its earnings for the third quarter of 2007 would fall by approximately 60% as a result of trading losses, writedowns, and reserve provisioning charges, Defendant Prince ordered a review to assess executives' culpability for Citigroup's position:

> Chuck Prince, Citigroup's chief executive, has ordered a review of the $3.3bn of losses and writedowns in its investment bank in the third quarter before deciding on whether heads should roll.
>
> Insiders say the review could affect the future leadership of Citi's investment bank and even Mr Prince's eventual succession.
>
> Citi's markets and banking business is headed by Michael Klein and Tom Maheras, both of whom are seen as potential chief executives. Colleagues say that Mr Prince is actively involved in the investigation, which could lead to personnel changes.
>
> "You don't make decisions about people until you are equipped to make those judgments," a top executive said.
>
> (Financial Times, *Prince's review of Citi losses could see heads roll*, October 3, 2007)

1151.   A number of high-level firings and resignations ensued in short order.

1152.   On October 12, 2007, it emerged that Citigroup had fired Randy Barker, the co-head of fixed income trading, and Mr. Barker's immediate superior, Thomas Maheras, the co-

head of Citigroup's investment banking operations (with responsibility for capital markets and

trading), had resigned:

> ... Meanwhile, Thomas Maheras, who has been co-head of investment banking with responsibility for capital markets and trading, is leaving the company. Mr. Maheras, a 23-year veteran of the bank, also had been considered a potential successor to Mr. Prince and is highly regarded in the ranks of Citigroup... Also leaving Citigroup will be Randy Barker, one of Citigroup's co-heads of fixed-income trading, who reported to Mr. Maheras. Mr. Barker's departure is a result of a poor third-quarter performance handed in by that division, which racked up about $600 million in losses, according to a person familiar with the matter...

> (Wall Street Journal, *Citigroup CEO Shakes Up Ranks --- Prince Taps Pandit to Run Merged Investments Unit; Veteran Maheras Depart*, October 12, 2007)

1153.   On November 1, 2007, it was disclosed that Citigroup had fired Michael

Raynes, head of Citigroup's structured credit operations, and Nestor Dominguez, co-head of

Citigroup's CDO operations.  (Wall Street Journal, *Citigroup Senior Traders Leave Amid Fallout

From Quarter*, November 1, 2007).

1154.   On November 4, 2007, Defendant Prince resigned from his positions as CEO

and Chairman of Citigroup, explaining in an official statement that:

> given the size of the recent losses in our mortgage-backed-securities business, the only honorable course for me to take as chief executive officer is to step down.

1155.   On November 14, 2007, it was reported that Citigroup had "reassigned" its

most senior fixed income executives – Chad Leat, US head of credit, and Mark Watson, Mr. Leat's

European counterpart.  Mr. Leat would be moved away from operations to "a senior role focusing

on key clients and transactions globally"; Mr. Watson's new brief was unspecified.

1156.   On November 16, 2007, it was announced that Citigroup's Chief Risk Officer David Bushnell would "retire" and that he would be replaced immediately by Jorge Bermudez (who himself retired three months later and was replaced by Brian Leach). (Bloomberg, *Citigroup Replaces Bushnell as Chief Risk Officer (Update1)*, November 16, 2007).

1157.   Several weeks prior to Citigroup's October 1, 2007 pre-announcement of depressed third quarter earnings in part due to subprime-related losses, Citigroup stripped Defendant Kaden, Citigroup's Chief Administrative Officer, of his administrative duties.  Those duties included risk management oversight; Bushnell reported to Defendant Kaden.

1158.   In mid-December 2007, Citigroup fired 30 CDO bankers, nearly one-third of its CDO staff.  (Bloomberg, *Citigroup Fires CDO Bankers After Mortgage Losses (Update2)*, December 19, 2007).

**M.   The Accounts Provided by Confidential Witnesses Further Demonstrate Scienter**

1159.   Interviews with confidential witnesses confirm the core allegations set forth in this Complaint. CW 7 joined Citigroup's Global Equity Derivatives group in June 2007 as Vice President of Product Control of Fixed Income. In this capacity, CW 7 reported to director Tom Layton, who reported to Defendant Crittenden. CW 7 confirmed that there were no written procedures for pricing derivatives and no scientific method was being applied to pricing of CDOs. Indeed, CW 7 stated that "traders were just throwing out numbers and the [CDO] values were overinflated," leaving CW 7 with a "big cleanup job." CW 7 also confirmed that meetings were held in June 2007 two to three times a week to address pricing issues and writedowns. Tom Layton took the minutes of these meetings, and would then discuss them with Defendant Crittenden. Defendant

Crittenden would then issue "mandates" by email based on the information contained in these meetings to everyone who attended the meetings, as well as to Defendant Bushnell, Citigroup's Senior Risk Officer.  CW 7 also confirmed that Citigroup chose to keep super senior tranches of CDOs that they underwrote because if the company chose to sell the paper, it would be forced to sell it at a loss. CW 7 stated that the risk management people and Mike Silvestro, a Vice President who ran product control and accountants, decided what stayed in the warehouse. Additionally, CW 7 confirmed that Tom Layton was fully aware of what was in the warehouse and that Layton would discuss in meetings Citi's exposure because of the super senior warehoused tranches, as well as what Citi was trying to get rid of. CW 7 also confirmed that Layton stated that he was talking directly with Defendant Crittenden about the exposure and the tranches.

### N.    Citigroup's  ATD Acquisition Supports An Inference of Scienter

1160.   Initially, ATD shareholders expected that the number of Citigroup shares to be paid to them was to have been fixed at closing.  However, beginning on or about June 10, 2007, Citigroup repeatedly insisted that the number of shares be fixed upon execution of the deal contract, rather than upon closing, expected to occur over two months later.  As a consequence, the June 30, 2007 contract provided that the number of shares would in fact be established then, not at closing, which occurred October 2007.

1161.   Citigroup's insistence that shares be fixed at point of contract rather than closing, reflects scienter.  When it insisted on setting the number of Citigroup shares in the ATD acquisition at signing of the agreement, Citigroup was well aware of the risks associated with CDO's, and their deflationary impact on the price of Citigroup shares.  Had the ATD contract provided that

478

the number of shares be established at closing, ATD shareholders would have received significantly more Citigroup shares than they did receive.

O. **Motive: The Particular Acuity of the "Operating Leverage" Problem for Citigroup and Defendants, and Defendants' Turn to CDOs As the Purported Solution to Their Problem**

1162.   Prior to the class period, Citigroup, under its former CEO and Chairman Sanford Weill, had grown at a tremendous pace primarily through nonstop acquisitions to become what executives and analysts termed a "financial supermarket" – a diversified financial services company combining under one roof (1) consumer banking operations, (2) commercial banking operations, (3) investment banking operations, (4) brokerage operations, and (5) asset/wealth management operations.  (Citigroup also then possessed substantial (6) insurance operations, but sold those off early in the class period).

1. **Citigroup's Two Tasks: Improve Controls and Generate Operating Leverage**

1163.   At class period inception, Citigroup was faced with two broad dynamics: (1) a debate about the benefits (or lack thereof) of Citigroup's supermarket model; and (2) a substantial focus on regulatory compliance and controls, after Citigroup repeatedly appeared at the center of a string of financial scandals.[66]  The latter had the effect of concentrating market focus on the former

---

[66]     Among the more prominent (a) issuing analyst research reports oriented to gaining investment banking business/fees rather than to expressing the actual (privately-held) views of the analyst; (b) devising, structuring and implementing – for substantial fees –  byzantine off-balance sheet entities that allowed companies (most prominently, Enron and Parmalat) to make billions of dollars of liabilities disappear (prior to those companies' sudden plunges into bankruptcy); and (c) several high-profile cases of market manipulation and insider trading, again driven by the unchecked imperative to produce and report trading gains.

because, in early 2005, federal regulators took the extraordinary step of barring Citigroup from

conducting further acquisitions until it improved its internal controls and compliance:

> The Federal Reserve barred Citigroup Inc. from major acquisitions
> until the company fixes regulatory problems that have gotten the
> financial-services giant in trouble around the world, raising the stakes
> for Chief Executive Charles Prince in his drive to overhaul the bank's
> ethics. Fed watchers characterized the order as a significant rebuke to
> the world's largest financial-services firm, which long has prided
> itself on its acquisition prowess...
>
> (Wall Street Journal, *Fed Ties the Hands of Citigroup --- No Major
> Acquisitions Allowed Until Its Problems Are Fixed*, March 18, 2005)

1164.   Now that Citigroup was precluded from its favorite means of growth (growth

by acquisition), Citigroup would of necessity be evaluated – and valued – by the results and

performance it could generate through organic, or internal, growth.  In sum, Citigroup's supermarket

model would be put to the acid test.

1165.   In this context, both the market's and Citigroup's own judgments concerning

Citigroup crystallized around one particular metric known as "operating leverage".  Operating

leverage referred generally to the concept of "levering" added value from operations.  Its concrete

measure was the degree to which revenue growth outstripped expense growth.  A firm that was

managing to grow revenues faster than expenses was effectively "getting out" more than it was

"putting in", thus "leveraging" its operations.   The intuitive meaning: that a company's operations

are producing "added value" through investing "x" and producing "x+3".

1166.   Because it was the primary yardstick used by the market to evaluate and value

Citigroup, operating leverage became Citigroup's primary concern as well.  Producing operating

leverage – or revenue growth that outstripped that of expenses –  became Defendants' mandate,

motive, and mantra (as detailed below, discussed during virtually every single Citigroup conference call during the class period).  Defendants' jobs came, as detailed below, to depend on their ability to manifest operating leverage at Citigroup.

1167.   Thus, crystallizing in 2004-2005, Citigroup was faced with two primary tasks: (1) generating operating leverage; and (2) improving internal controls and regulatory compliance. Defendants secretly sacrificed the latter in their attempt to generate the former.

1168.   Defendant Prince, Citigroup's former General Counsel under the architect of Citigroup's growth-by-acquisition strategy, Mr. Weill, had replaced Mr Weill as CEO with the implicit mandate of resolving Citigroup's regulatory and compliance issues.  Beginning in February 2005, that implicit mandate was transformed, accompanied by a blaze of publicity, into an explicit directive.  Defendant Prince vowed that his primary task would be to reform Citigroup, to improve internal controls with respect to compliance, auditing and risk-management, and instill within Citigroup – at all levels, including its most-senior executives – accountability for such issues.  A sample of the contemporary press reports indicates the essence:

> Citigroup Inc. Chief Executive Charles Prince unveiled to employees a "five-point plan" for beefing up the company's ethics, formalizing initiatives he has been discussing since last fall. In an interview yesterday, Mr. Prince said the plan, **which emphasizes staff training and fortified internal controls, grew out of a need for the world's largest financial-services firm to better balance its "delivering-the-numbers" culture with a longer-term attention to reputation**... [Mr Prince] unveiled plans for strengthening controls throughout the company to "minimize mistakes, and to ensure that when mistakes occur, they are handled appropriately." All managers will be required to participate in "compliance training," and **more resources will be earmarked for compliance and audit. "Unsatisfactory results" on risk-control assessments, audits, or regulatory exams "will be reviewed personally with Chuck Prince**

and **[President and Chief Operating Officer] Bob Willumstad**," the plan said.  (Wall Street Journal, February 17, 2005)

*****

Prince says he will focus half his time on company ethics... Prince says he has found his purpose... He wants to be the chief executive officer who brings a new culture of ethics to Citigroup. And yesterday, his campaign started in earnest.   He predicts it will consume at least half of his executive time and energy in the next few years. "This is job one," Mr. Prince said in an hour-long interview last week. "If I don't own this, I don't think it will succeed."  (Wall Street Journal, March 2, 2005)

*****

Citigroup named New York lawyer Lewis B. Kaden as vice chairman and chief administrative officer...  **given Mr. Kaden's expertise in business ethics, it will probably be viewed externally as an effort to bolster Mr. Prince's campaign to restore Citigroup's reputation after several years of scandals and embarrassments**. Mr. Kaden, currently a partner at Davis Polk & Wardwell, will **have responsibility for many of Citigroup's nonrevenue-generating units, including risk and compliance, business practices, government affairs, operations and technology, and mergers-and-acquisitions execution. He will be filling a slot that has been vacant for about two years** and was once occupied by Mr. Prince, who also is a lawyer...one of a handful of executives reporting directly to Mr. Prince, and he will be on the firm's management committee... (Wall Street Journal, *Citigroup Taps for Senior Post An Expert in Business Ethics --- Picking Kaden May Appear To Be Part of Effort to Mend The Company's Reputation*, June 16, 2005 )

*****

... People inside and outside the firm are asking: **What is going on at Citigroup? The answer, in brief, is that it's being remade. Charles O**. **Prince, the lawyer who took over two years ago as Mr. Weill's handpicked successor, has replaced his mentor's intent focus on fast growth, acquisitions and year-to-year earnings gains with a longer-term perspective: shoring up the firm's reputation and regulatory relations with a new concentration on internal controls and ethics**... Citigroup had no choice but to change Mr.

482

Weill's modus operandi of continually extending its reach and devouring competitors... in an unusual rebuke, the Federal Reserve in March barred Citigroup from making major acquisitions until it gets its regulatory and ethical house in order... The result: a sprawling multinational colossus is now drawing inward, focusing on internal controls while curbing the expansionary thrust that long defined it. (Wall Street Journal, *Course Correction -- Behind Citigroup Departures: A Culture Shift by CEO Prince --- His New Focus on Controls, More-Bureaucratic Style Spur Exits at Top Level --- Adding Lawyers in High Places*, August 24, 2005)

1169.   Simultaneously, operating leverage was an issue of unique acuity for Citigroup.   Citigroup's primary competitors – JP Morgan, Bank of America, etc. – were already producing operating leverage.   Citigroup was not.   The pressure to attain operating leverage was one particular to Citigroup and, upon thorough review of the record, one whose centrality for Citigroup and its executives is difficult to overstate.   To a unique degree, Citigroup's market valuation hung on it, as did Citigroup's executives' jobs.   As the Wall Street Journal reported on July 26, 2006:

AT THE START of 2005, Citigroup Inc. Chief Executive Charles Prince made controlling expenses inside the global bank he took over 18 months earlier one of his top priorities. **Mr. Prince pledged to investors that in addition to repairing the bank's tarnished image after a series of embarrassing missteps, revenue growth would outpace increases in expenses. "Since I became CEO, I have said repeatedly that positive operating leverage is the hallmark of a good business, a well-run business," Mr. Prince told analysts in January 2005. Mr. Prince, who also is Citigroup's chairman, has struggled to keep his vow, and one result is that Citigroup's stock has continued to struggle** while competitors in the U.S. such as Bank of America Corp. and J.P. Morgan Chase & Co. watch their fortunes rise along with their share prices.

"For investors, this is a big deal because [Mr. Prince] has promised them positive operating leverage," said Joseph Dickerson, a London bank analyst who follows the company for Atlantic Equities. "He has to deliver it."...   **the outside pressure is mounting on the management team Mr. Prince assembled last fall to re-engineer Citigroup. This group must demonstrate that they can**

483

**"organically" increase revenue faster than they are spending investors' money to expand the business from within**...
*****

For the first time ever, Bank of America, a largely U.S. commercial bank, reported earning higher net income than Citigroup, the financial conglomerate based in New York and with operations in more than 100 countries. For the year, Citigroup's stock remains in negative territory, down more than 2%. By comparison, Bank of America's stock is up about 10% and J.P. Morgan's share price is about 12% higher for the year, while the Dow Jones Bank Index is up more than 5%... Citigroup's net revenue is up 6%, while operating expenses are up an average of more than 16% since the beginning of 2005. The numbers are just as stark since October 2003, the month Mr. Prince took over as chief executive from his mentor, Sanford I. Weill. In the 11 quarters since Mr. Prince took the helm, net revenue is up an average of 8.6%, while operating expenses have increased an average of 20%...

**As Mr. Prince sees it, Citigroup has a revenue-growth problem, not an expense-growth problem**, as some shareholders and analysts view it. Mr. Prince acknowledges Citigroup's overall revenue needs to improve, specifically in its U.S. Consumer business, which includes credit cards, consumer lending and the bank's branch network. The U.S. Consumer business posted revenue of $7.6 billion in the second quarter, up 1% from the same quarter a year earlier. "It's not about expenses; it is about a lack of revenue growth in a third of our businesses," Mr. Prince said, referring to the U.S. Consumer division. "You can not grow the whole company if a third of your business is showing negative revenue growth. We have to fix U.S. Consumer."..

**Several analysts and investors say time is running out on Mr. Prince and his team to prove they are pursuing the right strategy. A consensus is building that Mr. Prince and his team must have concrete investment results to show investors by year's end or face calls for a shake-up.** "It's clear J.P. Morgan's management team and Bank of America's management team are executing very well on their strategies," said Michael Holton, manager of the $400 million T. Rowe Price Financial Services Fund, a holder of nearly 350,000 shares of Citigroup stock. "Citigroup's management team has yet to prove they can execute on their operational strategy. The onus is on Citigroup's management team to show that their investments can actually drive shareholder value."

484

(Wall Street Journal, *Citigroup Chief Holds to Growth Amid Cry for Cuts --- Stock Suffers as Others' Shine, And Holders Begin to Squirm; The Prince and Mr. Prince*, July 26, 2006)

1170.   A visceral sense of the pressure Defendants felt to produce operating leverage at Citigroup is evidenced in almost every single one of Citigroup's conference calls during the class period, where operating leverage is presented, questioned, analyzed and/or promised.  Nearly every Citigroup quarterly conference call between 2004 and mid-2007 featured the issue, and the tone between analysts and Citigroup executives is often combative.  The former demand explanations for why operating leverage has not yet been produced, the latter attempt to explain its absence and promise its presence in the near future.

1171.   A paradigmatic example:  Defendant Prince's comments during Citigroup's December 14, 2006 annual Analyst Day:

> **PRINCE:  Now let me spend a minute on a topic I get asked about frequently, and that's operating leverage. We didn't get it this year, and that was a big disappointment to me.**
>
> **All of you know how I feel about operating leverage. All of you know I stood up here -- right over there last year -- and I talked about the importance of operating leverage and I cannot tell you how frustrating it is, quarter-by-quarter, analyst meeting by analyst meeting, to have to explain why we didn't get it.**
>
> It's not about waving a magic wand. It's about driving -- day by day by day -- the efficiency and effectiveness of the place.
>
> **I never believed that we would have the shortfall in revenue that we had this year. And we cannot have that again**.
>
> And at the same time, we're going to drive the initiative that Bobby is leading in a much more robust way than we've had before to get at structural, big changes -- not incremental, but big structural changes

485

to make it a leaner and thinner and faster organization than we've had before.

**Now, all of you have thrown back in my face the words I used last year about operating leverage. And sometimes you just have to eat that. And I've had to do that this year. I'm giving up predicting operating leverage.**

**But I will tell you that the budget that we have submitted to the Board of Directors and the budget that my colleagues have signed up for provides for positive operating leverage next year for the company and for each of the major businesses.**

(Citigroup, Citigroup Analyst Day Transcript, December 14, 2006)

1172.   A primary source of the operating leverage difficulty was Citigroup's large Global Consumer division, and more specifically the US Consumer division, which had suffered from universally-acknowledged disinvestment under Mr Weill, and which required substantial investment (back office, infrastructure and technology, expanded branch network) to produce improved returns in the future.  Global Consumer was producing the opposite of operating leverage: slow revenue growth, faster expense growth, and constant promises that such expense growth would lay the groundwork for better revenue in future years.

> **2.      Defendants' Solution to Their Operating Leverage Problem: Release Risk Controls on Citigroup's Investment Bank Division, Expand CDO Operations, and Thereby Generate the Revenue Needed for Operating Leverage**

1173.   Therefore, caught between a rock (the market demand that Citigroup and its executives produce operating leverage) and a hard place (the "drag" produced by Global Consumer), Defendants sought to solve their dilemma by turning to Citigroup's Corporate and Investment Banking ("CIB") division, and to Citigroup's Alternative Investments ("CAI") division, for salvation.   Specifically, seeing little hope for substantial revenue gains from US Consumer

operations, Defendants sought to procure sharp revenue gains from CIB and CAI in amounts sufficient to create the appearance of operating leverage for the Company as a whole.

1174.   During 2005, Defendants Prince, Rubin and Maheras, together with Maheras's second-in-command Randy Barker, conducted a review of Citigroup's fixed income operations, in order to consider and identify those areas that could provide Citigroup with substantial revenue growth.  As Defendant Rubin informed Business Week:

> Question: "I want to get a sense of what you're involved with at Citi"
>
> Answer: "Sure.  I'll give you a few examples.  We did two [in-depth] reviews [of our businesses] at the end of last year... one in fixed income, the other in the consumer business.  I was part of both of those.  It was Chuck and me a few others...."

(Business Week, *Red Flags from Bob Rubin*, December 19, 2005)

1175.   The primary area they identified as a source of quick and fast growth for Citigroup was CDOs.  Defendants Prince and Rubin authorized CIB, headed by Defendant Maheras and Randy Barker, to dramatically expand Citigroup's CDO operations and thus obtain the desired growth:

> In 2004 and 2005, senior executives at the bank, including Robert E. Rubin, Citi's influential director, urged it to become more actively involved with in-vogue areas like structured credit, pools of securities backed by different assets, and commodities. The buildup in CDOs began at this time, several reporting layers beneath Mr. Maheras. By 2006, Citigroup had become the second-leading underwriter of CDOs.

(New York Times, *What's $34 Billion on Wall Street*, January 27, 2008)

1176.   In directing Citigroup to expand its CDO operations, Defendants Prince and Rubin explicitly authorized Citigroup's fixed income division to take on the increased risks these instruments presented:

> A look at some of Citigroup's recent endeavors offers a window onto Mr. Rubin's role at the bank. **Early in 2005, Citigroup's board asked the C.E.O., Mr. Prince, and several top lieutenants to develop a growth strategy for its fixed-income business. Mr. Rubin peppered colleagues with questions as they formulated the plan, according to current and former Citigroup employees**. With Citigroup falling behind Wall Street rivals like Morgan Stanley and Goldman Sachs, **Mr. Rubin pushed for the bank to increase its activity in high-growth areas like structured credit. He also encouraged Mr. Prince to raise the bank's tolerance for risk, provided it also upgraded oversight. Then, according to current and former employees, he helped sell the proposal to his fellow directors**.
> (New York Times, *Where Was the Wise Man*, April 27, 2008)

1177.   Though Defendant Rubin may have understood the risks of CDOs, he at all times refused to take operating responsibility within Citigroup (until forced by Citigroup's November 2007 crisis and Defendant Prince's resignation to temporarily do so until a new CEO could be found):

> Although Mr. Rubin regularly points out that he didn't directly oversee any of Citigroup's businesses, bankers inside the company say that he didn't need such authority to wield tremendous influence. ''He is like the Wizard of Oz behind Citigroup, he is the guy pulling on all the strings,'' said one Citigroup banker who was not authorized to speak publicly about the situation. ''He certainly was the guy deferred to on key strategic decisions and certain key business decisions vis-a-vis risk.'' ''When you have responsibility with no accountability, that is a very dangerous thing on Wall Street,'' this banker added... (*Id.*)

1178.   Defendant Prince did not have Defendant Rubin's understanding of CDOs'

risks.  Defendant Prince's main understanding of CDOs was that they would help him to achieve

operating leverage, and thus preserve his endangered position as Citigroup CEO:

> ...in late 2002, Mr. Prince, who had been Mr. Weill's longtime legal counsel, was put in charge of Citigroup's corporate and investment bank.

> According to a former Citigroup executive, Mr. Prince started putting pressure on Mr. Maheras and others to increase earnings in the bank's trading operations, particularly in the creation of collateralized debt obligations, or C.D.O.'s — securities that packaged mortgages and other forms of debt into bundles for resale to investors.

> Because C.D.O.'s included so many forms of bundled debt, gauging their risk was particularly tricky; some parts of the bundle could be sound, while others were vulnerable to default.

> "Chuck Prince going down to the corporate investment bank in late 2002 was the start of that process," a former Citigroup executive said of the bank's big C.D.O. push. "Chuck was totally new to the job. He didn't know a C.D.O. from a grocery list, so he looked for someone for advice and support. That person was Rubin. And Rubin had always been an advocate of being more aggressive in the capital markets arena. He would say, 'You have to take more risk if you want to earn more.' "

> It appeared to be a good time for building up Citigroup's C.D.O. business. As the housing market around the country took flight, the C.D.O. market also grew apace as more and more mortgages were pooled together into newfangled securities.

> From 2003 to 2005, Citigroup more than tripled its issuing of C.D.O.'s, to more than $20 billion from $6.28 billion, and Mr. Maheras, Mr. Barker and others on the C.D.O. team helped transform Citigroup into one of the industry's biggest players. Firms issuing the C.D.O.'s generated fees of 0.4 percent to 2.5 percent of the amount sold — meaning Citigroup made up to $500 million in fees from the business in 2005 alone.

(New York Times, *The Reckoning: Citigroup Saw No Red Flags Even as It Made Bolder Bets*, November 23, 2008)

1179.   Citigroup's booming CDO operations directly benefitted Defendants Prince and Maheras and Randy Barker: Defendant Prince, by helping in the quest for operating leverage; Defendant Maheras and Randy Barker, by serving as the basis for doubled and tripled bonuses amounting to $15-$30 million per year.  After federal regulators banned Citigroup from growth by acquisition due to its control and compliance shortcomings, Defendants redoubled Citigroup's expansion of its CDO operations:

> Even as Citigroup's C.D.O. stake was expanding, its top executives wanted more profits from that business. Yet they were not running a bank that was up to all the challenges it faced, including properly overseeing billions of dollars' worth of exotic products, according to Citigroup insiders and regulators who later criticized the bank.
>
> *****
>
> Problems with trading and banking oversight at Citigroup became so dire that the Federal Reserve took the unusual step of telling the bank it could make no more acquisitions until it put its house in order.
>
> In 2005, stung by regulatory rebukes and **unable to follow Mr. Weill's penchant for expanding Citigroup's holdings through rapid-fire takeovers, Mr. Prince and his board of directors decided to push even more aggressively into trading and other business that would allow Citigroup to continue expanding the bank internally**.
>
> *****
>
> In 2005, as Citigroup began its effort to expand from within, Mr. Rubin peppered his colleagues with questions as they formulated the plan. According to current and former colleagues, he believed that Citigroup was falling behind rivals like Morgan Stanley and Goldman, and he pushed to bulk up the bank's high-growth fixed-income trading, including the C.D.O. business.

490

Former colleagues said Mr. Rubin also encouraged Mr. Prince to broaden the bank's appetite for risk, provided that it also upgraded oversight — though the Federal Reserve later would conclude that the bank's oversight remained inadequate.

Once the strategy was outlined, Mr. Rubin helped Mr. Prince gain the board's confidence that it would work.

**After that, the bank moved even more aggressively into C.D.O.'s. It added to its trading operations and snagged crucial people from competitors. Bonuses doubled and tripled for C.D.O. traders. Mr. Barker drew pay totaling $15 million to $20 million a year, according to former colleagues, and Mr. Maheras became one of Citigroup's most highly compensated employees, earning as much as $30 million at the peak** — far more than top executives like Mr. Bushnell in the risk-management department.

(New York Times, *The Reckoning: Citigroup Saw No Red Flags Even as It Made Bolder Bets*, November 23, 2008)

1180.   Citigroup dramatically expanded its CDO operations during 2004 and 2005, and continued to do so during 2006.  In April 2006, Citigroup hired Michael Raynes, who had headed Deutsche Bank's CDO operations, to head Citigroup's. (Bloomberg, Citigroup *Hires Deutsche Bank's Raynes to Run Structured Credit*, April 12, 2006).  In July 2006, Citigroup hired further Deutsche Bank senior bankers, Mickey Bhatia and Michael Jinn, to further boost Citigroup's structured credit and CDO operations (Wall Street Journal, *Citigroup Beefs Up Credit-Derivatives Operation*, July 17, 2006).

1181.   Citigroup's CDO revenues rose accordingly, and served as principal source of revenue growth for Citigroup's fixed income division, which itself served as a principal source of revenue growth for the Company overall.

### P.    Motive: Insider Sales

1182.   As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or recklessly disregarded that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated in and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities law.

1183.   In addition to their conscious misbehavior, each of the Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein.  Each was a senior executive officer and/or director of Citigroup and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts.  The Individual Defendants were privy to confidential financial information concerning the Company's business, financial condition and future business outlook, and had access to material, nonpublic information concerning the Company's true financial condition.  As a result, each of the Individual Defendants could falsify the information that reached the public about the Company's business and performance.  With respect to non-forward looking statements and/or omissions, the Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  During the Class Period, the Individual Defendants were motivated to engage in the fraudulent practices detailed herein, resulting in the artificial inflation of the Company's stock, so that Individual Defendants could sell their personally held shares at artificially inflated prices.  Notwithstanding

their duty not to sell Citigroup common stock under these circumstances, or to disclose the non-public, inside information prior to selling their stock, each of the Individual Defendants sold Citigroup stock at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

1184.   The Individual Defendants's sales of Citigroup common stock during the Class Period were unusual in timing and/or amount.  These Class Period sales were also suspicious in that they were inconsistent with prior trading practices and made at times calculated to maximize the personal benefits from undisclosed inside information.

1185.   During the Class Period, the Individual Defendants sold approximately 2,999,509 shares of Citigroup stock at artificially inflated prices for proceeds of approximately $150,032,137, as follows:

**Defendant Bushnell**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/6/2004 | 19,194 | $49.79 | $955,669.26 |
| 1/12/2004 | 1,720 | $49.69 | $85,466.80 |
| 1/16/2004 | 3,692 | $49.395 | $182,366.34 |
| 1/22/2004 | 3,941 | $50.36 | $198,468.76 |
| 1/23/2004 | 7,629 | $50.69 | $386,714.01 |
| 2/12/2004 | 19,000 | $49.60 | $942,400.00 |
| 3/2/2004 | 3,937 | $50.46 | $198,661.02 |
| 3/31/2004 | 6,547 | $51.94 | $340,051.18 |
| 7/12/2004 | 1,719 | $45.04 | $77,423.76 |
| 1/12/2005 | 1,820 | $47.95 | $87,269.00 |

| | | | |
|---|---|---|---|
| 2/7/2005 | 6,486 | $49.78 | $322,873.08 |
| 2/14/2005 | 6,146.6 | $49.25 | $302,720.05 |
| 7/12/2005 | 2,216 | $46.06 | $102,068.96 |
| 8/5/2005 | 4,200 | $43.64 | $183,288.00 |
| 1/12/2006 | 1,744.1 | $48.99 | $85,443.459 |
| 1/20/2006 | 5,315.9 | $46.52 | $247,295.668 |
| 2/13/2006 | 9,989.9 | $45.74 | $456,938.026 |
| 2/27/2006 | 2,006 | $46.78 | $93,840.68 |
| 2/27/2006 | 10,912 | $47.01 | $512,973.12 |
| 2/28/2006 | 13,716 | $46.78 | $641,634.48 |
| 5/1/2006 | 6,495 | $49.95 | $324,425.25 |
| 5/8/2006 | 8,056 | $50.37 | $405,780.72 |
| 8/15/2006 | 1,100 | $48.39 | $53,229.00 |
| 10/05/2006 | 23,320 | $51.03 | $1,190,019.60 |
| 12/12/2006 | 7,110 | $52.88 | $375,976.80 |
| 12/19/2006 | 8,789 | $55.44 | $487,262.16 |
| 12/28/2006 | 7,153 | $56.41 | $403,500.73 |
| 1/22/2007 | 25,528.5 | $54.55 | $1,392,579.675 |
| 2/27/2007 | 6,584 | $52.68 | $346,845.12 |
| 2/27/2007 | 6,940 | $52.10 | $361,574.00 |
| 7/23/2007 | 11,809 | $50.73 | $599,070.57 |
| **Total** | **244,816** | | **$12,343,829.278** |

**Defendant Druskin**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/6/2004 | 49,757 | $49.79 | $2,477,401.03 |

| | | | |
|---|---|---|---|
| 1/12/2004 | 2,742 | $49.69 | $136,249.98 |
| 1/16/2004 | 11,274 | $49.395 | $556,879.23 |
| 1/21/2004 | 6,000 | $50.28 | $301,680.00 |
| 1/23/2004 | 23,840 | $50.69 | $1,208,449.60 |
| 3/31/2004 | 39,281 | $51.94 | $2,040,255.14 |
| 4/2/2004 | 69,033 | $52.29 | $3,609,735.57 |
| 4/16/2004 | 1,400 | $50.24 | $70,336.00 |
| 7/12/2004 | 2,742 | $45.04 | $123,499.68 |
| 7/16/2004 | 1,300 | $43.99 | $57,187.00 |
| 1/12/2005 | 2,831 | $47.95 | $135,746.45 |
| 2/7/2005 | 16,863 | $49.78 | $839,440.14 |
| 2/14/2005 | 16,490.7 | $49.25 | $812,166.975 |
| 7/12/2005 | 3,533 | $46.06 | $162,729.98 |
| 7/19/2005 | 1,000 | $44.47 | $44,470.00 |
| 7/19/2005 | 5,000 | $44.48 | $222,400.00 |
| 11/18/2005 | 23,728 | $47.94 | $1,137,520.32 |
| 1/12/2006 | 2,764.5 | $48.99 | $135,432.855 |
| 1/20/2006 | 8,697.6 | $46.52 | $404,612.352 |
| 1/25/2006 | 4,200 | $46.29 | $194,418.00 |
| 2/13/2006 | 19,855.4 | $45.74 | $908,185.996 |
| 4/24/2006 | 5,744 | $47.87 | $274,965.28 |
| 5/1/2006 | 16,887 | $49.95 | $843,505.65 |
| 10/5/2006 | 72,874 | $51.03 | $3,718,760.22 |
| 10/25/2006 | 15,000 | $50.55 | $758,250.00 |
| 12/28/2006 | 98,573 | $56.41 | $5,560,502.93 |

| 1/22/2007 | 43,639.5 | $54.55 | $2,380,534.725 |
| 1/29/2007 | 20,000 | $54.02 | $1,080,400.00 |
| 4/18/2007 | 10,000 | $53.07 | $530,700.00 |
| 7/13/2007 | 23,885 | $52.84 | $1,262,083.40 |
| **Total** | **618,934.70** | | **$31,988,498.503** |

**Defendant Freiberg**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|------|------------------------|-------------|-----------------|
| 1/20/2006 | 4,974.6 | $46.52 | $231,418.392 |
| 2/13/2006 | 10,530.89 | $45.74 | $481,682.909 |
| 5/01/2006 | 10,342 | $49.95 | $516,582.90 |
| 10/05/2006 | 34,808 | $51.03 | $1,776,252.24 |
| 11/17/2006 | 34,390 | $50.66 | $1,742,197.40 |
| 12/15/2006 | 2,068 | $53.11 | $109,831.48 |
| 1/22/2007 | 21,162.1 | $54.55 | $1,154,392.555 |
| 7/20/2007 | 11,591 | $51.13 | $592,647.83 |
| 1/22/2008 | 13,185.7 | $24.2 | $319,093.94 |
| **Total** | **143,052.29** | | **$6,924,099.65** |

**Defendant Gerspach**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|------|------------------------|-------------|-----------------|
| 4/28/2005 | 6,047 | $47.05 | $284,511.35 |
| 7/12/2005 | 145.7 | $46.06 | $6,710.94 |
| 10/27/2005 | 6,171 | $45.65 | $281,706.15 |

| 11/28/2005 | 7,311 | $49.52 | $362,040.72 |
| 1/12/2006 | 129.3 | $48.99 | $6,334.41 |
| 1/20/2006 | 1,212.1 | $46.52 | $56,386.89 |
| 2/13/2006 | 1,602.75 | $45.74 | $73,309.79 |
| 5/1/2006 | 22,929 | $49.95 | $1,145,303.55 |
| 10/06/2006 | 10,447 | $50.99 | $532,692.53 |
| 12/12/2006 | 9,246 | $52.88 | $488,928.48 |
| 12/28/2006 | 8,873 | $56.41 | $500,525.93 |
| 1/22/2007 | 4,574.3 | $54.55 | $249,528.07 |
| 4/17/2007 | 19,128 | $52.93 | $1,012,455.04 |
| 1/22/2008 | 3,953.9 | $24.20 | $95,684.38 |
| **Total** | **101,770.05** | | **$5,096,108.22** |

**Defendant Klein**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 7/17/2007 | 19,282 | $52.19 | $1,006,327.58 |
| **Total** | **19,282** | | **$1,006,327.58** |

**Defendant Krawcheck**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/20/2006 | 8,674.4 | $46.52 | $403,533.09 |
| 2/13/2006 | 9,959.31 | $45.74 | $455,538.84 |
| 1/22/2007 | 50,339.1 | $54.55 | $2,745,997.91 |
| 1/22/2008 | 25,463.6 | $24.20 | $616,219.12 |

| Total | 94,436 | | $4,221,288.95 |
|---|---|---|---|

**Defendant Maheras**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 7/13/2007 | 23,964 | $52.84 | $1,266,257.76 |
| Total | 23,964 | | $1,266,257.76 |

**Defendant Prince**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/12/2004 | 3,564.9 | $49.69 | $177,139.88 |
| 1/16/2004 | 9,023 | $49.40 | $455,736.20 |
| 1/22/2004 | 15,172 | $50.36 | $764,061.92 |
| 1/23/2004 | 38,492 | $50.69 | $1,951,159.48 |
| 3/31/2004 | 54,330 | $51.94 | $2,821,900.20 |
| 7/12/2004 | 3,495.9 | $45.04 | $157,455.34 |
| 1/12/2005 | 3,558.9 | $47.95 | $170,649.26 |
| 2/14/2005 | 13,944 | $49.25 | $686,742.00 |
| 7/12/2005 | 4,381.9 | $46.06 | $201,830.31 |
| 11/30/2005 | 68,510 | $49.09 | $877,646.32 |
| 1/12/2006 | 3,412.3 | $48.99 | $167,168.58 |
| 1/20/2006 | 18,867.2 | $46.52 | $877,702.14 |
| 2/13/2006 | 18,145.31 | $45.74 | $829,966.48 |
| 10/5/2006 | 116,924 | $51.03 | $5,966,631.72 |
| 1/22/2007 | 81,087.8 | $54.55 | $4,423,339.49 |

| 4/17/2007 | 13,419 | $52.93 | $710,267.67 |
| 5/17/2007 | 13,395 | $54.91 | $735,519.45 |
| 7/13/2007 | 38,342 | $52.84 | $2,025,991.28 |
| **Total** | **518,065** | | **$26,476,417.30** |

**Defendant Rubin**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/16/2004 | 38,674 | $49.40 | $1,910,302.23 |
| 2/14/2005 | 55,040 | $49.25 | $2,710,720.00 |
| 12/19/2005 | 161,389 | $49.37 | $7,967,774.93 |
| 1/20/2006 | 14,365.7 | $46.52 | $668,292.36 |
| 2/13/2006 | 72,579.23 | $45.74 | $3,319,773.98 |
| 6/19/2006 | 196,624 | $48.36 | $9,508,736.64 |
| 1/22/2007 | 77,500 | $55.05 | $4,266,375.00 |
| 1/22/2008 | 9,009.05 | $24.20 | $218,019.01 |
| **Total** | **625,181** | | **$30,569,994.15** |

**Defendant Thomson**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/16/2004 | 5,692 | $49.40 | $281,184.80 |
| 1/20/2004 | 17,199 | $49.50 | $851,350.50 |
| 1/28/2004 | 125,904 | $50.07 | $6,304,013.28 |
| 1/30/2004 | 25,652 | $49.48 | $1,267,776.56 |
| 7/20/2004 | 23,742 | $43.99 | $1,044,410.58 |

| 7/28/2004 | 22,662 | $43.90 | $994,861.80 |
| 7/16/2004 | 10,706 | $44.21 | $473,312.26 |
| 2/14/2005 | 9,940.8 | $49.25 | $489,584.40 |
| 1/20/2006 | 5,962.1 | $46.52 | $277,356.89 |
| 2/13/2006 | 14,410.07 | $45.74 | $659,116.60 |
| 10/5/2006 | 96,686 | $51.03 | $4,933,886.58 |
| 12/12/2006 | 49,519 | $52.88 | $2,618.564.72 |
| 12/15/2006 | 9,698 | $53.11 | $515,060.78 |
| 12/18/2006 | 10,831 | $54.07 | $585,632.17 |
| 12/19/2006 | 79,734 | $55.44 | $4,420,452.96 |
| **Total** | **508,338** | | **$25,718,049.28** |

**Defendant Volk**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 9/20/2005 | 28,342 | $45.45 | $1,288,143.90 |
| 1/20/2006 | 7,108 | $46.52 | $330,664.16 |
| 9/20/2006 | 27,396 | $49.89 | $1,366,786.44 |
| 1/22/2007 | 16,347 | $54.55 | $891,728.85 |
| 1/22/2008 | 22,477 | $24.20 | $543,943.40 |
| **Total** | **101,670** | | **$4,421,266.75** |

500

## XII.   LOSS CAUSATION

1186.   Defendants' misrepresentations, omissions and schemes alleged above functioned to conceal from plaintiffs, the class and the market: (a) Citigroup's holdings of and guarantees of in excess of $57 billion of subprime CDOs that it itself had underwritten; (b) the ongoing, substantial impairment and devaluation throughout 2007 and 2008 of those as-yet-disclosed holdings; (c) the risks of those holdings; (d) Citigroup's exposure to further billions of mortgage-related losses from mortgages held by Citigroup in its own loan portfolio; (e) the existence, nature and extent of Citigroup's exposure to its seven sponsored SIVs, which during the summer of 2007 totaled a further $100 billion of assets and liabilities; (f) the degree of impairment and loss suffered by Citigroup's leveraged loan portfolio and commitments; (g) the existence and extent of Citigroup's exposure to ARS which totaled $10 billion as of Mid-February 2008 (h) the substantial devaluation of its ARS assets; (i) the existence and extent of Citigroup's Alt-A RMBS assets, which totaled $22 billion during the fourth quarter of 2007; (j) the substantial devaluation of those Alt-A assets; (k) the strong likelihood that Citigroup would be rendered insolvent or otherwise unable to continue as a going concern due to insufficient capital because of the above mentioned concealed exposures to risky, overstated assets.

1187.   As a result, Citigroup's stock price continued to trade at artificially inflated prices of between $45 per share and $53 per share through early October 2007.

1188.   As the truth became known and Citigroup's true state of affairs was revealed, each revelation necessitated re-evaluation, and each disclosure removed a portion of the artificial inflation that had previously inhered in Citigroup's share prices.  Plaintiffs and the class suffered the resulting damages.

1189.   Citigroup began to reveal the existence and extent of its long-concealed exposures through a series of partial disclosures beginning October 1, 2007 and extending, ultimately, through the present day. Citigroup's share price declined in lockstep with these disclosures, falling from above $47 per share in October 2007 to $24.40 per share by January 22, 2008, several days after the Company announced its results (and writedowns) for the fourth quarter of 2007.

1190.   On October 1, 2007, Citigroup issued a press release warning that net income for the just-ended third quarter of 2007 would decline 60% from year-ago levels.   The reasons Citigroup cited for this decline were: (1) a $1.4 billion writedown of leveraged loan commitments; (2) a $1.3 billion writedown of (a) subprime RMBS warehoused for CDO securitizations, (b) CDO positions, and (c) leveraged loans warehoused for CLO securitizations; (3) $600 million of losses from "fixed income credit trading"; and (4) a $2.6 billion loan loss provisioning charge against Citigroup's consumer loan portfolio:

> Citi Expects Substantial Decline in Third Quarter Net Income
>
> - Citigroup Inc. announced today that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment are expected to have an adverse impact on third quarter financial results. Citi currently estimates that it will report a decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third quarter results.
>
> "Our expected third quarter results are a clear disappointment. The decline in income was driven primarily by weak performance in fixed income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs," said Charles Prince, Chairman and CEO of Citi.
>
> "Our fixed income trading business has a long history of earnings power and success, as shown in this year's record first half results. In

September, this business performed at more normalized levels and we see this quarter's overall poor trading performance as an aberration. While we cannot predict market conditions or other unforeseeable events that may affect our businesses, we expect to return to a normal earnings environment in the fourth quarter," said Prince.

The following accounts for a significant portion of the expected decline in third quarter results:

**Securities and Banking**

Revenue reductions from:
Write-downs of approximately $1.4 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments. These commitments totaled $69 billion at the end of the second quarter, and $57 billion at the end of the third quarter. Write-downs were recorded on all highly leveraged finance commitments where there was value impairment, regardless of the expected funding date.

Losses of approximately $1.3 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

Losses of approximately $600 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

These revenue reductions were partially offset by lower expenses in Securities and Banking.

**Global Consumer**
An increase in credit costs of approximately $2.6 billion pre-tax versus the prior-year quarter due to continued deterioration in the credit environment, organic portfolio growth, and acquisitions. Approximately one-fourth of the increase in credit costs was due to higher net credit losses and approximately three-fourths was due to higher charges to increase loan loss reserves.

1191.   Citigroup's October 1, 2007 disclosures, though the first admission of CDO losses, leveraged loan losses, and mortgage portfolio losses, were still false and misleading.  Though the October 1, 2007 disclosures purported to disclose the effects of Citigroup's positions in various products (mortgages, leveraged loans, CDOs), they still concealed – notably, in the case of CDOs – the size of the CDO position that had produced the purported effects.  Citigroup's CDO position was, by then, $57 billion – and no one outside Citigroup had any inkling of this fact.  Thus, no one outside Citigroup was able to understand that Citigroup's $1.3 billion writedown (covering warehoused subprime RMBS and leveraged loans, as well as CDO positions) was a mere fraction of the actual impairment then existing on Citigroup's $57 billion of CDOs.  Accordingly, Citigroup's stock continued to trade at artficially inflated levels even after the aforementioned partial disclosures.

1192.   In fact, precisely because of Citigroup's concealment of this position, the market concluded from Citigroup's October 1, 2007 disclosures the exact opposite of the truth.  Citigroup's shares immediately rose $1.05 per share, or 2.3%, to $47.72 on October 1, 2007, because the market understood Citigroup's October 1, 2007 writedowns to represent a "kitchen sink" moment – in which a company gets rid of all of its bad news and losses at once by "throwing out everything, including the kitchen sink".  This conclusion was supported inter alia by Defendant Prince's October 1, 2007 representations that the third quarter results were an "aberration" and that Citigroup would "return to a normal earnings environment" in the fourth quarter of 2007.  As Bloomberg reported on October 1, 2007:

> UBS AG and Citigroup Inc., the biggest banks in Europe and the U.S., rose in stock market trading on investor optimism that their reports today on fixed income losses may represent the low point in earnings.

*****

504

... analysts said Citigroup is marking down values to reflect the worst possible outcome, a tactic some liken to renovations in which everything including the kitchen sink is thrown out.

"There looks to be a degree of "kitchen sinking" going on here with Citi calling the result and "aberration", Corinne Cunningham, a credit analyst at Royal Bank of Scotland Group Plc in London, wrote in a note to investors.
(Bloomberg, UBS, Citigroup Rise on Speculation Worst May Be Over (Update 1), October 1, 2007)

*****

... Citigroup shares rose 2.3% after Chief Executive Officer Charles Prince said earnings will return to "normal" in the fourth quarter...

"It's critical to put Citibank's financial strength into perspective", said David Katz, who helps oversee $1.6 billion including Citigroup shares as chief investment officer at Matrix Asset Advisors in New York.  "They did say they were expecting to return to normal operating profitability in the fourth quarter"...

*****

"This does not indicate a change in the long-term prospects for the bank", Standard & Poor's said in a statement.  "We expect fourth quarter earnings to be considerably stronger"

(Bloomberg, Citigroup Says Profit Dropped 60% on Credit Losses (Update 6), October 1, 2007)

1193.   Had the market known that Citigroup's subprime CDO exposure then stood at $57 billion, it would have been clear that Citigroup's October 1, 2007 disclosures did not mark a "kitchen sink" moment, and that Citigroup's $1.3 billion writedown (only part of which related to Citigroup's CDO positions) was rather a "drop in the bucket" moment.  The value of Citigroup's $57 billion of CDOs had, long ago, disintegrated by far more than $1.3 billion.

1194.   On October 3, 2007, Citigroup announced that it had completed its acquisition of ATD.

1195.   During the next two weeks, until October 12, 2007, Citigroup's shares continued to rise further, and maintained their artificially inflated value, closing on October 12, 2007 at $47.87 per share.

1196.   On or about October 11, 2007, Citigroup fired Randy Barker, one of Citigroup's co-heads of fixed income trading, and Thomas Maheras – the co-head of Citigroup's investment banking operations, with responsibility for capital markets and trading – resigned.

1197.   On the morning of October 15, 2007, Citigroup announced its financial results for the third quarter of 2007 via press release, conference call, and presentation and supplementary data materials filed as exhibits to a Form 8-K filed with the SEC.  The results announced on October 15, 2007 were substantially in line with those disclosed on October 1, 2007 with two exceptions: (1) the October 1, 2007 $1.3 billion loss on mortgages and loans warehoused for CDOs and CLOs, and on CDO positions, grew by $300 million dollars, or 23%, to a $1.6 billion loss; and (2) the $2.6 billion provisioning charge for the Consumer loan portfolio grew by $250 million, or 10%, to $2.85 billion.

1198.   Still, during Citigroup's October 15, 2007 conference call, Defendants continued to misrepresent and conceal Citigroup's true subprime CDO exposure.  For example, Defendant Crittenden, in discussing the $1.6 billion writedown, stated that Citigroup's subprime exposure had been reduced to less than $13 billion:

> Second, $1.6 billion from write-downs in mortgage-backed securities which were warehoused for future CDO or CLO securitizations as well as on CDO positions. Our subprime exposure related to these

positions was $24 billion at the beginning of the year, $13 billion at the end of the second quarter, and declined slightly during the third quarter...

1199.   That amount, however, was $55 billion too low, as Citigroup's November 2007 and January 2008 disclosures would make clear. The October 15, 2007 "total" included – as would only later be made clear– only: (1) the subprime loans that Citigroup had purchased for securitization; (2) the warehouse of subprime RMBS pending securitization into CDOs; and (3) unsold junior tranches of CDOs.  Together, as was made clear, in November 2007, these amounted to approximately $13 billion.  Excluded were a further $55 billion of super senior tranches of subprime CDOs.  As detailed below: on November 4, 2007, Citigroup disclosed for the first time that it was holding $43 billion of such subprime CDO super seniors; and on January 15, 2008, Citigroup disclosed a further $12 billion of such holdings.

1200.   However, during the October 15, 2007 conference call, Citigroup disclosed for the first time that its fundamental financial condition – its capitalization –  was deteriorating. Specifically, Citigroup's Tier 1 Capital ration had fallen to 7.4%, below Citigroup's internal "red line" minimum of 7.5%, and far below the 8.6% ratio enjoyed one year earlier.   As Defendant Crittenden mentioned, part of this capitalization deterioration had resulted from "additional assets, such as... commercial paper which came onto our balance sheet":

> ... all of our capital ratios have declined... As we have said before, we target to keep our Tier 1 capital ratio above 7.5% and the TCE -- total common equity -- to risk-weighted managed asset ratio above the 6.5% level. Both the Tier 1 capital ratio and the TCE to risk-weighted managed assets ratio reflect the impact of acquisitions and additional assets, such as certain leveraged loans and commercial paper which came onto our balance sheet during the quarter...

507

1201.   The mysterious "commercial paper" referred to by Defendant Crittenden included: (1) up to $25 billion of subprime-backed Commercial Paper CDO super senior tranches that Citigroup was forced to repurchase as a result of its undisclosed "liquidity puts"; and (2) $7-$10 billion of undisclosed "liquidity facilities" which Citigroup was extending to its troubled SIVs.  This was not known, outside Citigroup, at the time.  Indeed, the "mystery" of this commercial paper led analysts to ask for more information on October 15, 2007, which Defendants flatly refused to provide:

> RON MANDLE: **In terms of asset-backed commercial paper and other disruptions in the quarter, I was wondering how much your balance sheet might have gone up in the quarter because those disruptions of that sort.**
>
> GARY CRITTENDEN: **Well, we didn't split it out specifically during the quarter.** You can get a little bit of a flavor for it, obviously, by kind of going through the piece parts of what happened. But we haven't specifically identified the balance sheet increase associated with dislocations.
>
> **RON MANDLE: Would you give us some guidance in that regard?**
>
> **GARY CRITTENDEN: You know, we hadn't -- I don't think so.**

1202.   In the wake of October 15, 2007's larger losses, deteriorating capitalization and mystery commercial paper Citigroup shares fell immediately and materially.  On October 15, 2007, Citigroup shares declined $1.63 per share or 3.4%, falling from $47.87 per share on Friday October 12, 2007 to close on October 15, 2007 at $46.24.  By October 19, 2007 – the Friday after Citigroup's Monday October 15 disclosures – Citigroup shares slid further, closing at $42.36 per share, a decline of $5.51 per share, or 11.5% for the week.

508

1203.   On October 31, 2007, CIBC World Markets analyst Meredith Whitney, taking a closer look at Citigroup's capitalization after Citigroup's October 15, 2007 disclosures, concluded that Citigroup's numbers did not add up.   Citigroup, Whitney concluded, was dangerously undercapitalized, and would become more so as a result of its liability for its SIVs (a liability which Citigroup then represented not to exist).   Moreover, Whitney claimed, mortgage-related losses stemming from Citigroup's $180 billion portfolio of U.S. mortgage loans would be substantially greater than Citigroup had yet admitted to, and would limit Citigroup's ability to regenerate its capitalization through retained earnings.   So, Whitney concluded, Citigroup needed to raise capital and/or to cut its dividend in order to come up with $30 billion necessary to restore Citigroup's capitalization.   Whitney downgraded Citigroup to a "sector underperformer" and stated that Citigroup's true value implied a stock price in the "mid 30s".   *See* CIBC World Markets [Meredith Whitney], Citigroup, Is Citigroup's Dividend Safe? Downgrading Stock Due to Capital Concerns, (October 31, 2007).   Simultaneously, two other analysts reached like negative conclusions concerning Citigroup: Morgan Stanley downgraded Citigroup to "sell" and Credit Suisse analyst Susan Roth Katzke downgraded Citigroup to "hold".

1204.   Simultaneously, rumors began roiling the markets that Citigroup was on the verge of reporting losses much greater than previously disclosed. See Wall Street Journal, Citigroup CEO Plans to Resign As Losses Grow --- Bank's Board to Meet With Prince on Sunday; SEC Queries Accounting, November 3, 2007 ("Rumors of [] write-downs at Citigroup roiled markets as the week progressed. Investors sent the stock market sharply down on Thursday...").

1205.   Whitney's October 31, 2007 analysis, together with rumored large losses, led the market to see Citigroup in a new light: (1) undercapitalized to begin with, (2) further burdened

509

by hundreds of billions of dollars of assets whose deterioration it had yet to admit and liability for which it falsely disclaimed, (3) with no solution except substantial recapitalization and dividend cuts. Citigroup's shares declined immediately and materially in response, falling $3.39 per share, or 8.1%, to close on November 1, 2007 at $38.51 per share (down from $41.90 per share on October 31, 2007).

1206.   On November 1, 2007, Citigroup fired two of its most senior CDO executives: Michael Raynes, Citigroup's head of structured credit, and Nestor Dominguez, Citigroup's co-head of CDOs.

1207.   On November 2, 2007, Citigroup shares declined further, from $38.51 to $37.73, as it was reported: (1) that the SEC was investigating Citigroup's accounting; (2) that Citigroup's Board of Directors would hold an "emergency" meeting during the November 3-4, 2007 weekend; and (3) that Defendant Prince would resign.  (Bloomberg, November 2, 2007).  The Wall Street Journal reported exactly the same the next day, Saturday November 3, 2007:

> Citigroup Inc. Chief Executive Charles Prince is planning to resign at a board meeting on Sunday, according to people familiar with the situation, as the bank faces big new losses from distressed mortgage assets.

> *****

> The SEC is reviewing how Citigroup accounted for certain off-balance-sheet transactions that are at the heart of a banking-industry rescue plan, according to people familiar with the matter. The review is looking at whether Citigroup appropriately accounted for $80 billion in structured investment vehicles, or SIVs, these people said. SIVs are off-balance-sheet entities that have invested heavily in mortgage-backed securities. A plan pushed by Citigroup and other banks would set up a new "superconduit" to buy assets from SIVs.

*****

Rumors of [ ]write-downs at Citigroup roiled markets as the week progressed. Investors sent the stock market sharply down on Thursday, a day after a quarter-percentage-point interest-rate cut by the Federal Reserve that was intended to buoy markets.

*****

The mess involving subprime mortgages to borrowers with poor credit has hit Citigroup hard. On Oct. 15, Mr. Prince acknowledged that the bank's risk-management operations had fallen short, and it reported that its third-quarter earnings dropped 57% from the year-earlier level. Mr. Prince shook up the leadership of Citigroup's investment bank, installing newcomer Vikram Pandit at the top. The move led to the departure of several senior traders.

The board is expected to discuss whether Citigroup should update the amount of write-downs that it has taken on certain securities to reflect their deteriorating value, according to people familiar with the matter.

The issue has generated intense discussion in the bank's senior ranks in recent days and could potentially result in a significant addition to the $3.55 billion hit to third-quarter earnings that Citigroup announced just three weeks ago. The company is expected to file a quarterly report with the SEC next week.

*****

Some investors say Citigroup should engage in asset sales, reduce the size of its balance sheet and give more details about its mortgage exposure. In recent days, Wall Street has worried that financial institutions such as Citigroup may have bad news that hasn't yet been revealed. "I don't think Citi is broken," said Ted Wolff, an executive at Solaris Asset Management, a New York investment manager that has more than $1.5 billion in assets and would consider buying the stock if it gets somewhat cheaper. "The real issue is what's on the balance sheet."

(Wall Street Journal, *Citigroup CEO Plans to Resign As Losses Grow --- Bank's Board to Meet With Prince on Sunday; SEC Queries Accounting,* November 3, 2007)

1208.  On Sunday November 4, 2007, Citigroup issued a press release disclosing,

(1) for the first time, holdings of $43 billion of super senior tranches of subprime CDOs (which,

511

together with the previously-disclosed $12 billion of "warehouse" exposures, constituted $55 billion of "sub-prime related direct exposures"); (2) the simultaneous writedown by $8-$11 billion of those just-disclosed exposures; and (3) a loan loss reserve provisioning charge of $2.24 billion to increase Citigroup's loan loss reserves, primarily for its mortgage loan portfolio:

> Citigroup Inc. announced today significant declines since September 30, 2007 in the fair value of the approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business. Citi estimates that, at the present time, the reduction in revenues attributable to these declines ranges from approximately $8 billion to $11 billion (representing a decline of approximately $5 billion to $7 billion in net income on an after-tax basis).

> These declines in the fair value of Citi's sub-prime related direct exposures followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter. The impact on Citi's financial results for the fourth quarter from changes in the fair value of these exposures will depend on future market developments and could differ materially from the range above.

> Citi also announced that, while significant uncertainty continues to prevail in financial markets, it expects, taking into account maintaining its current dividend level, that its capital ratios will return within the range of targeted levels by the end of the second quarter of 2008. Accordingly, Citi has no plans to reduce its current dividend level.

> **The $55 billion in U.S. sub-prime direct exposure in S&B as of September 30, 2007 consisted of (a) approximately $11.7 billion of sub-prime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs).**

> Lending and Structuring Exposures
> Citi's approximately $11.7 billion of sub-prime related exposures in the lending and structuring business as of September 30, 2007 compares to approximately $13 billion of sub-prime related

512

exposures in the lending and structuring business at the end of the second quarter and approximately $24 billion at the beginning of the year. **The $11.7 billion of sub-prime related exposures includes approximately $2.7 billion of CDO warehouse inventory and unsold tranches of ABS CDOs, approximately $4.2 billion of actively managed sub-prime loans purchased for resale or securitization at a discount to par primarily in the last six months, and approximately $4.8 billion of financing transactions with customers secured by sub-prime collateral.** These amounts represent fair value determined based on observable transactions and other market data. Following the downgrades and market developments referred to above, the fair value of the CDO warehouse inventory and unsold tranches of ABS CDOs has declined significantly, while the declines in the fair value of the other sub-prime related exposures in the lending and structuring business have not been significant.

ABS CDO Super Senior Exposures

**Citi's $43 billion in ABS CDO super senior exposures as of September 30, 2007 is backed primarily by sub-prime RMBS collateral. These exposures include approximately $25 billion in commercial paper principally secured by super senior tranches of high grade ABS CDOs and approximately $18 billion of super senior tranches of ABS CDOs, consisting of approximately $10 billion of high grade ABS CDOs, approximately $8 billion of mezzanine ABS CDOs and approximately $0.2 billion of ABS CDO-squared transactions**.

Although the principal collateral underlying these super senior tranches is U.S. sub-prime RMBS, as noted above, these exposures represent the most senior tranches of the capital structure of the ABS CDOs. These super senior tranches are not subject to valuation based on observable market transactions. Accordingly, fair value of these super senior exposures is based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value. The rating agency downgrades and market developments referred to above have led to changes in the appropriate discount rates applicable to these super senior tranches, which have resulted in significant declines in the estimates of the fair value of S&B super senior exposures.

(Citigroup, *Citi's Sub-Prime Related Exposure in Securities and Banking*, November 4, 2007)

1209.   Citigroup's November 4, 2007 disclosures were still false and misleading for many reasons, among the more prominent being that Citigroup's CDO exposures were greater than adverted (by a further $12 billion) as was the impairment in their value (triple the $8-$11 billion announced).

1210.   Additionally, during Citigroup's November 5, 2007 conference call, Defendants sought to downplay Citigroup's additional $4.2 billion of subprime mortgage exposure by misrepresenting the quality of those mortgages:

> CRITTENDEN: There is also $4.2 billion of subprime loans.  **These are loans that were purchased at appropriate prices during the last six months and reflect appropriate discounts.  They are performing loans.**  The asset values already reflected significant discounts when we bought them.  These are largely hedged.  They are actively managed.  And we didn't in the third quarter nor do we anticipate in the fourth quarter that there will be significant markdowns against that $4.2 billion.

1211.   This statement was materially false and misleading.  A substantial portion of these loans were associated with Accredited, and suffered from an alarming rate of delinquency. (*see* Section V, *supra*).

1212.   Though there was more bad news to come, the November 4, 2007 news was bad enough: $43 billion of subprime CDOs whose existence had never before been revealed – whose existence had, in fact, been affirmatively concealed – and $8-$11 billion in writedowns for such previously-concealed exposures.  Market re-evaluation of Citigroup was swift, severe and sustained: Citigroup shares, which closed on November 2, 2007 at $37.73, fell $1.83 per share on November 5, 2007, the next trading day, to close at $35.90.  By November 8, 2007, shares had fallen to $32.90. Disclosure of the existence of these instruments and their impairment (though each was still

514

understated) led the market to remove $4.83 per share from Citigroup's share price, or 12.8% of Citigroup's shares' value.

1213.   Likewise, disclosure of these instruments and their impairment  led each of the credit rating agencies to cut Citigroup's credit ratings.

1214.   Separately, Citigroup's November 4, 2007 representations (together with like representations during a November 5, 2007 conference call) that the decline in the value of these instruments had occurred entirely during October 2007 ("significant declines since September 30, 2007 in the fair value of the approximately $55 billion in U.S. sub-prime related direct exposures... These declines in the fair value of Citi's sub-prime related direct exposures followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter...") were patently false.

1215.   The impairment of these instruments had in fact been severe by February 2007 and grew ever more so in the intervening seven months prior to October 2007.  In truth: (1) Citigroup had throughout 2007 turned a blind eye to current, relevant and directly-observable indices tracking these instruments' worth; (2) had misvalued its (undisclosed) CDO holdings by purporting to rely on credit ratings that Citigroup itself, no later than April 2007, had warned could not be relied upon; and (3) had been employing valuation methodologies for its CDOs that directly contradicted Citigroup's own longstanding statements on appropriate and accurate CDO valuation.

1216.   Immediately after Citigroup's November 4, 2007 disclosures, the market expressed concern that Citigroup's explanations failed to ring true:

> Citigroup Inc. says it isn't sure how much its subprime-related assets
> have fallen in value this quarter. Maybe it's $8 billion. Maybe it's $11

billion. **On one point, though, Citigroup isn't budging: It says none of these declines began until after last quarter ended.**

**The news from the nation's biggest bank evokes memories of the scene from the 1984 hit comedy ``Beverly Hills Cop'' where Eddie Murphy's character, detective Axel Foley, hands a valet the keys to his beat-up Chevy Nova at a pricey country club he'd never visited before. ``Can you put this in a good spot? `Cause all of this $#@& happened the last time I parked here,'' Foley said, straight-faced.**

**It's as if we're supposed to believe that all this stuff at Citigroup happened after September ended,** notwithstanding the $8.4 billion of bad subprime mortgage stuff at Merrill Lynch & Co. that happened before September ended. And we're also supposed to believe Citigroup's brass didn't have a clue any sooner.

In its Nov. 4 press release, issued the same day Citigroup's Charles Prince resigned as chief executive officer, the company said: ``These declines in the fair value of Citi's subprime related direct exposures followed a series of rating agency downgrades of subprime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter.''

In other words: We did nothing wrong. There is no reason to question the $2.21 billion of net income Citigroup reported for the third quarter, down a mere 60 percent from a year earlier. (Citigroup also lowered its third-quarter earnings from the $2.38 billion it originally announced Oct. 15.) Fairly presented in all material respects, the saying goes.

As Citigroup's chief financial officer, Gary Crittenden, said yesterday during a conference call with analysts, the declines were ``driven by some events that have happened during the month of October.'' **To believe Citigroup, until the rating companies' post-Sept. 30 downgrades, the subprime holdings in its securities-and-banking business were still worth $55 billion, as reflected on the company's latest balance sheet.**

*****

... the line that Citigroup has served up for investors is that it's the rating companies' doing. Forget the year-long wave of articles

516

chronicling how far behind Moody's Investors Service and Standard & Poor's were in downgrading all the AAA- rated toxic waste that Citigroup and other banks gorged on during the subprime-mortgage binge.

**Never mind that the downgrades came long after the values of so many of these collateralized-debt obligations and other Wall Street exotica had plunged.** And put aside the publicity about all the government investigations that began last quarter -- the ones probing the degree to which the rating firms were either out to lunch or too close to the companies that paid them to size up their deals.

No, Citigroup's faith in the rating companies' abilities appears to have been so unshaken that it waited until Moody's and S&P spoke before determining that its subprime holdings had tumbled by an additional $8 billion to $11 billion. For all the armies of employees at Citigroup whose job it is to monitor these assets' values, Citigroup outsourced a large chunk of its critical-thinking skills to the numbers jockeys at the rating companies. And that's putting a positive spin on it.

What about all those fancy mathematical models that Citigroup used to calculate the values of these holdings, in the absence of quoted market prices?

It turns out the models depended to a large degree on inputs reflecting what the rating companies say, or more precisely, what the rating firms had gotten around to saying as of Sept. 30. These, recall, are the same ratings concerns that say they aren't liable for their errors or misjudgments -- like the one about housing prices rising forever -- because they merely write opinions protected by the First Amendment.

Sure, it's true the so-called ABX indexes, used to bet on defaults on underlying subprime bonds, did decline sharply last month, after Moody's and S&P downgraded or cut the ratings on tens of billions of dollars of CDOs tied to subprime mortgage securities. The values for lots of subprime junk fell last month, too. So we all can agree that the values of Citigroup's holdings declined significantly in October. But does it really make sense that none of the $8 billion to $11 billion slide began before Sept. 30?

(Bloomberg, *Citigroup's Subprime Explanation Defies Belief*, November 6, 2007)

517

1217.   One primary disconnect between Citigroup's November 4, 2007 disclosures and the truth was the fact that indices tracking the market value of subprime CDOs evidenced substantially greater impairment than the $8-11 billion stated by Citigroup.  Analysts and experts suspected this disconnect – and, as detailed above, queried Defendant Crittenden on it during Citigroup's November 5, 2007 conference call (Section III.C.5, *supra*).  Defendant Crittenden denied the disconnect existed (*Id.*).  But, in truth, it did.  "The math on this announcement just doesn't add up", concluded CIBC analyst Whitney in a November 5, 2007 report (Citigroup May Fall to 'Low 30s' CIBC's Whitney Says, November 5, 2007).  "We wouldn't be surprised if additional write-downs were forthcoming", concluded Goldman Sachs analyst William Tanona in a November 5, 2007 note to investors.  Sanford C. Bernstein analyst Howard Mason estimated that Citigroup's CDO-related losses could be $16 billion – or twice as much as Citigroup had indicated.

1218.   Moreover, Citigroup's November 4 and November 5, 2007 disclosures included only "direct" subprime CDO super senior exposures of $43 billion, while omitting to disclose a further $10.5 billion of super seniors whose risks had been purportedly swapped off to the Monolines.  When directly queried about Citigroup's exposure to the Monolines on November 5, 2007, Defendant Crittenden admitted that "all that I have talked about today are direct exposures and there is obviously potentially secondary and tertiary exposures that potentially could exist for the Company that are not part of what we talked about today".  Defendant Crittenden flatly refused to explain or quantify these "secondary or tertiary disclosures".  The issue was a material one, as it had long been evident, since at least May 2007, that the Monolines could not make good on the insurance they supposedly provided.  Their inability to pay meant that the risks had not actually been transferred, as the Wall Street Journal reported on November 7, 2007:

> Could the financial health of some of Wall Street's biggest banks rest at least partly on ... an obscure corner of the financial markets: bond insurers like ACA Capital and Ambac Financial. These firms sell insurance that lets Wall Street hedge exposure to exotic mortgage-related securities known as CDOs using another security, the credit-default swap...
>
> ... Lehman Brothers analyst Roger Freeman highlighted the issue Monday... The **doomsday scenario: Any ratings downgrades on CDOs that ACA has insured increases the likelihood the insurer will be forced to post collateral for defaulted bonds. That, in turn, could ultimately cause the insurer to default -- and if that were to happen, the hedges it provides would lose their value. "Should this happen, exposures that have essentially been removed from [Wall Street] balance sheets would come back on and have to be marked to current market prices**," Mr. Freeman wrote...
>
> (Wall Street Journal, *Will Wall Street Get Hedges Cut?*, November 7, 2007)

1219.   In the end, Citigroup's November 4 and 5, 2007 disclosures did not "close the book" on the issue, but rather only opened Citigroup's books part-way, and left much uncertain, doubtful, and still-unseen:

> ... the company also warned that it faces an unnamed risk from certain "secondary and tertiary" exposures in the credit markets.  The current losses are related to "direct exposures" only.  The company refused to say how large the secondary and tertiary exposures could be... The hour long call unnerved Citigroup investors and the broader market... some investors believe Citi could be forced to take more writedowns... "We estimate that Citi has written down about one quarter of its CDO exposure, which might not be enough", says Deutsche Bank analyst Mayo. "Information risk is huge because we don't know where the $55 billion of exposure has been written down"
>
> (Business Week, *Citi's Leadership Challenge*, November 6, 2007)

1220.   Finally, defendants' representations on November 4 and November 5, 2007 that Citigroup could and would maintain its current dividend were false, given that Citigroup's capitalization was already thin and that its losses were still far greater than admitted.

1221.   In addition to all the above, in its Form 10-Q filed with the SEC on November 5, 2007, Citigroup provided self-contradicting disclosure, concerning the nature of its relationship with and liabilities for its SIVs.   First, Citigroup insisted that "Citigroup has no contractual obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs".   Second, Citigroup disclosed that it had nevertheless provided a $10 billion liquidity commitment to the SIVs despite having no contractual obligation to do so:   "the Company has provided liquidity to the SIVs at arm's-length commercial terms totaling $10 billion of committed liquidity, $7.6 billion of which has been drawn as of October 31, 2007." Third, despite having taken upon itself this $10 billion SIV burden, Citigroup represented that "Citigroup will not take actions that will require the Company to consolidate the SIVs".

1222.   On December 13, 2007, Citigroup ended the fiction that it was not liable for the SIVs it sponsored, announced that it had "committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investment Vehicles", and admitted that "[a]s a result of this commitment, Citi will consolidate the SIVs' assets and liabilities onto its balance sheet" (Citigroup, *Citi Commits Support Facility for Citi-Advised SIVs*, Dec. 13, 2007).   As a result of this added $49 billion in SIV assets and liabilities, Citigroup admitted that its capitalization would be further eroded.   As a result, the market further revalued Citigroup shares, which fell on December 13, 2007 from $31.47 to $31.01 per share, on

December 14, 2007 to $30.70 per share, and by December 20, 2007 – one week later – to $29.89 per share.  However, this "support facility" remained unspecified and unquantified until much later.

1223.   On January 8, 2008, Merrill Lynch analyst Guy Moszkowski issued a report concluding that Citigroup's CDO writedowns would be $16 billion, double Citigroup's November 4, 2007 representation.  Citigroup shares fell from $28.26 (their closing price on January 7, 2008) to $27.14.

1224.   On January 15, 2008, Citigroup announced its financial results for the fourth quarter of 2007 – the worst loss in the Company's 196-year history –  via press release, conference call and Form 8-K filed with the SEC (attaching presentation and supplementary data materials).  Citigroup's had lost $9.83 billion for the fourth quarter of 2007, driven by (1)  CDO writedowns twice as large as adverted on November 4 and 5, 2007, and (2) immense charges to provision loan loss reserves, primarily for Citigroup's mortgage loan portfolio.  Citigroup's January 15, 2008 disclosures included: (1) CDO writedowns of $18 billion; (2) the existence of a further $10.5 billion of subprime CDO super seniors for which Citigroup had secured purported "hedges", primarily with the Monolines; (3) a  $7.5 billion loan loss reserve provisioning charge, including (a) a  "$4.1 billion increase in credit costs in U.S. Consumer primarily related to higher current and estimated losses on consumer loans", and (b) $535 million of losses from Citigroup's investment banking subprime warehouse exposures; (4) a 40% cut to Citigroup's dividend; and (5) a plan to raise $14.5 billion in capital through securities offerings.   Material portions of both the CDO-related writedowns and the loan loss reserve provisioning had been fraudulently delayed for nearly a year, and belatedly recognized the risks that had materialized long ago.

521

1225.   These disclosures only partially corrected Citigroup's November 4 and 5, 2007 disclosures, which had failed to disclose the full extent of Citigroup's subprime CDO holdings, the full extent of their impairment and devaluation, the extent of the losses inherent in Citigroup's mortgage loan portfolio, and, connectedly, the full extent of Citigroup's capitalization crisis.  Both Citigroup's CDOs and its mortgage loan portfolio were impaired to a degree materially greater than disclosed on January 15, 2008.

1226.   Again, market re-evaluation of Citigroup in light of this new information was swift, severe and sustained.  Citigroup shares, which had closed trading on January 14, 2008 at $29.06 per share, fell $2.12 per share on January 15, 2008 to close at $26.94, by January 18, 2008, shares had fallen to $24.45 for a total four day drop of $4.61 per share, or 15.9% of Citigroup's remaining value.  In addition, Citigroup's credit ratings were cut by Standard & Poors to AA- with a "negative outlook", meaning that further downgrades were possible.

1227.   As Citigroup brought its CDO valuation methods in line to include observable realities such as the ABX indexes, Citigroup was forced to write down its CDOs further in April and July of 2008.  Citigroup shares, weighed down by its CDO exposures, continued their declines.

1228.   On February 12, 2008, Citigroup revealed the size and nature of its SIV support facility.  Essentially, Citigroup – in order to protect senior SIV noteholders from loss – would provide a "support facility" of $3.5 billion that would function as a "mezzanine" tranche for the SIVs.  SIV losses would first be absorbed by the $2.5 billion of junior capital notes, and then, if losses exceeded that $2.5 billion, by Citigroup's new $3.5 billion support facility (rather than by holders of SIV's senior notes).  On April 15, 2008, Citigroup announced $212 million of writedowns

against its SIV assets; on October 16, 2008, a further $2 billion of SIV asset writedowns. Also during October 2008, Citigroup increased its financing commitment by a further $1 billion.

1229.   On April 18, 2008 Citigroup announced a net loss for the first quarter of 2008 of $5.1 billion, including $6.0 billion in subprime related writedowns, $1.5 billion in ARS writedowns, $1 billion in Alt-A RMBS writedowns and $3.1 billion in leveraged loan writedowns. The earnings announcement also included the previously undisclosed existence of $22 billion in Alt-A RMBS exposures, $10 billion in ARS exposures, and $43.2 billion in leveraged loans and commitments on Citigroup's balance sheet.

1230.   Despite these alarming disclosures, Citigroup's shares actually rose $1.08 per share to close at $25.11, the day of the earnings announcement. This only illustrates that Citigroup was continuing to understate the risks associated with these assets. On the eve of the earnings announcement, defendant Pandit boasted that "[y]ou couldn't . . . get a better set of assets if you had to build a bank from scratch." The market's reaction was further muted by the fact that the writedown paled in comparison to the $18 billion written down in the fourth quarter of 2007. According to an April 18, 2008 Business Week article, "many investors had been bracing for even more dismal results."

1231.   Citigroup's share price drifted lower after the initial relief provided by the first quarter 2008 results, falling from a high of $26.81 on April 28, 2008 to a low of $14.56 per share on July 15, 2008.

1232.   On July 18, 2008 Citigroup shares were re-inflated by the Company's announcement of its earnings for the second quarter of 2008. Shares rose from the previous day's close of $17.97 to a close of $19.35 that day on the news that the Company reported a smaller-than

estimated loss on fewer mortgage-bond writedowns.  This only illustrates that Citigroup continued to overvalue its risky subprime, Alt-A, ARS and leverage loan assets.  Analysts such as Credit Suisse Group's Susan Katzke predicted on June 24, 2008 that the company would have to take $10 billion in writedowns for the quarter, as opposed to the approximately $7.2 billion in writedowns actually reported.  Defendant Pandit trumpeted the fact that the pace of Citigroup's writedown of its troubled assets appeared to be slowing, claiming that "[w]ritedowns in our Securities and Banking business [which included the Company's CDO's and SIVs] decreased by 42%" and that the Company had "reduced legacy assets substantially."

1233.  Citigroup's share price fluctuated within a narrow range between the announcement of its second and third quarter 2008 financial results.  The Company's share price received a short-lived bounce on September 30, 2008 on the news that Citigroup would acquire Wachovia with the help of government aid and financial guarantees until October 3, 2008 when the deal fell apart in the face of a superior bid from Wells Fargo.  The market quickly came to suspect that the government endorsed the Wachovia deal as much to shore up Citigroup's balance sheet as it was to save Wachovia.  As Sanford Bernstein senior analyst John McDonald stated, "We believe the FDIC's role in the Citi-WB transaction might have been as much about helping Citi as it was about helping save the WB franchise."  Fear of further hidden losses on Citigroup's balance sheet pushed  share prices down from an October 2, 2008 close of $22.50 to a low of $12.93 on October 9, 2008 – a phenomenal 42% decline across five trading days.

1234.  These declines were staunched by the extraordinary action of the U.S. Government in distributing a $25 billion capital infusion to Citigroup under the TARP program – the maximum allowed by law.  That day, share prices temporarily returned to a high of $18.62.

1235.   The TARP related price gains evaporated two days later with Citigroup's October 16, 2008 announcement of its third quarter 2008 earnings.   The Company announced a net loss of $2.8 billion including $4.9 billion in writedowns and credit losses.   Losses included $1.7 billion in CDO related writedowns, $2 billion related to SIVs, $1.2 billion in Alt-A RMBS and $600 million in relation to the ARS settlement with the SEC.

1236.   In addition to these losses, Citigroup's balance sheet included a $6 billion increase in "accumulated other comprehensive loss" in stockholders' equity.   "Accumulated other comprehensive loss" measures a loss in a business that has yet to be realized, suggesting that Citigroup would be taking further writedowns in the future.

1237.   In response to Citigroup's third quarter 2008 results, the Company's share price fell for the next seven out of eight days, from a close of $16.23 on October 15, 2008 to a close of $11.73 on October 27, 2008, a decline of over 27%.   The market was beginning to worry that continued asset writedowns were putting pressure on Citigroup's capital.   Goldman Sachs analysts downgraded Citigroup to "sell" on October 21, 2008 citing its risky assets, low capital and predicted losses.

1238.   As rumors swirled about Citigroup's ability to continue as a going concern in its current form, the stock price entered free-fall, dropping from $14.68 on November 4, 2008 to a $9.45 on November 14, 2008.

1239.   Defendants rushed to quell the rumors.   On November 17, 2008, Citigroup held a "Town Hall" meeting.   At that meeting the Company repeatedly assured investors that its capital position was strong.   But Citigroup made another announcement that suggested that the Company's CDOs, mortgage portfolio, SIV assets, and ARS were materially impaired.  Specifically,

the Company announced that it would cease valuing $80 billion of assets at their market price each reporting period by removing these assets from the Company's trading portfolio and reclassify them as "held to maturity," "held for sale," or "held for investment." By doing so, Citigroup hoped that this re-categorization of $80 billion in assets would allow the Company to avoid taking large write-downs on those exposures at each quarter, like the write-downs noted above.

1240.   The Company's decision to avoid additional write-downs on this $80 billion of impaired assets shocked the market because it was an admission that these assets had either no value, or such little value Citigroup could not afford to absorb the write-downs it would have to take if it properly valued its assets. Indeed, in response to the Company's November 17 disclosure, investors immediately began to realize that the Company was essentially insolvent.  For example, on November 18, 2008 Ladenburg Thalmann issued a report noting that investors "do not trust the company's balance sheet," and that there existed a "belief that the bank's securities holdings are overstated." On November 19, 2008, *Dow Jones* reported that investors had begun to "question the survival prospects of the U.S. banking giant." Likewise, on November 20, 2008, *The Wall Street Journal* reported that "[t]he market is losing confidence in Citigroup" because of the "balance sheet maneuver" of reclassifying the $80 billion in troubled assets:

> **The market is losing confidence in Citigroup. In the wake of some planned balance-sheet maneuvers, it isn't tough to see why**. . . . Largely overlooked in the presentation materials release to investors was a disclosure that this quarter the firm would reclassify about $80 billion in assets. Those assets wouldn't have to be marked to market prices. Or they could be held in a way that keeps such losses from hitting earnings. **That has unnerved investors, since such holdings include risky holdings such as collateralized debt obligations – structured securities that have already led to billions in write-downs.**

1241.   On November 19, 2008, Citigroup shut down its SIVs, paid off the remaining SIV senior note holders in full, assumed the SIVs' remaining $17.4 billion of assets directly, and recorded a further $1.1 billion in writedowns.  In response, Citigroup's shares entered "free fall", nosediving 23% from $8.36 per share to $6.40 per share in one day:

> Citi's Slide Deepens as Investors Bail Out – Shares Drop 23% as SIV Move, Analyst's Warning Spook Market
>
> Anxious investors pushed Citigroup Inc. shares into a deeper nosedive, putting even more pressure on Chief Executive Vikram Pandit to shore up confidence in the struggling bank.
>
> Wednesday's stock-price plunge of 23% was the steepest percentage decline ever for Citigroup
>
> *****
>
> Investors were rattled by the New York company's announcement that it will buy the last $17.4 billion in assets held by its structured investment vehicles, which were among the first casualties when the credit crunch hit last year. Citigroup will take a $1.1 billion write-down to reflect the assets' eroded values.
>
> (Wall Street Journal, *Citi's Slide Deepens as Investors Bail Out – Shares Drop 23% as SIV Move, Analyst's Warning Spook Market*, November 20, 2008)

1242.   In the wake of the "Town Hall" fiasco and the SIV bailout, Citigroup's shares lost 60% of their remaining value, falling to $3.77 per share on November 21, 2008.  Citigroup's likely insolvency was averted only by an 11th hour multi-hundred billion dollar government rescue.

1243.   The November 23, 2008 $326 billion bailout by the U.S. Government temporarily buoyed Citigroup's share price, which would rise to a high of $8.54 at the close of December 9, 2008.

1244.   Even this bailout was not enough to quiet the market's fears concerning Citigroup's capital position.  Moody's downgraded Citigroup debt two grades on December 18, 2008, based on "worsening" asset quality and likely further declines in its tangible capital base.

1245.   Citigroup stock continued to tumble on the January 9, 2009 news that Citigroup planned to spin off its Smith Barney brokerage unit in order to raise funds.  This was the culmination of months of speculation that Citigroup could not continue as it was then structured, as a "financial supermarket".  This was despite Pandit's insistence that Citigroup would remain intact, rejecting calls for a breakup.  As a January 14, 2009 Wall Street Journal article explained:

> Not even immolating itself in the current subprime disaster could prompt the bank's latest manager, Vikram Pandit, to rethink the strategy of aimless imperial size. Ironically, it took the federal government, bailing out Citi with nearly $300 billion in taxpayer cash and guarantees, to create a constituent finally big enough to breathe the suggestion "change" and have it heard, which is what happened this week.

Share price fell 21.8% from the previous day's close of $7.16 to close at $5.60 two trading days later, January 12, 2009.  The market understood that Citigroup's financial situation must have been dire indeed in order to inspire Pandit's about face on the issue of a break-up.

1246.   Shares declined an astounding 23% on January 14, 2009 and another 15% on January 15, 2008 following reports that Citigroup would unveil a plan to sell off a number of its businesses in order to shore up its balance sheet.

1247.   On January 16, 2009 Citigroup announced an $8.3 billion net loss for the fourth quarter of 2008, the second worst loss in Company history, and much greater than the $4.1 billion loss projected by analysts.  The losses included writedowns of approximately $5.6 billion in

CDOs, $1.1 billion in SIVs, $1.3 billion in Alt-A RMBS, $600 million in leveraged loans and $300 million in ARS assets.

1248.    Citigroup also confirmed the anticipated breakup of the Company into Citicorp, which would hold the corporation's core operating segments, and Citi Holdings, which would contain its troubled assets and peripheral businesses.

1249.    Citigroup's share price cratered following the January 16, 2009 earnings announcement, to settle at close of $2.80 the following trading day.

1250.    On October 1, 2007, Citigroup's shareprice stood at $47.72, following the Company's first announcement of modest subprime related writedowns which only served to conceal the truly massive exposures to be disclosed and losses left to be taken on its balance sheet.  By January 20, 2009, after more than $50 billion in various asset writedowns which continue to threaten the Company's very existence as a going concern, the share price stood at $2.80.  This represents a 94% drop in Citigroup shares, almost entirely attributable to the understatement of exposures to risky assets and overstatement of the value of these assets by defendants during the class period.

1251.    On February 20, 2009 Citigroup's share price closed at $1.94.  In the words of a Reuters news article published that day, "Citigroup Inc shares plummeted for a sixth straight day on Friday, hammered by fears that the U.S. government could nationalize the bank[], wiping out shareholders."

## CAUSES OF ACTION

### COUNT I:
### Violation of § 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder

1252.   Plaintiffs incorporate by reference and reallege all preceding paragraphs as fully set forth herein.  This claim is asserted against all Defendants.

1253.   During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges to make materially false and misleading statements and omissions of material fact to: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Citigroup common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Citigroup common stock artificially inflated prices that did not reflect their true value.  As the Defendants gradually disclosed the truth, the trading price of Citigroup common stock fell precipitously.  In furtherance of their unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

1254.   Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon the purchasers of Citigroup common stock and which caused Citigroup common stock to trade at artificially high market prices during the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).  All Defendants are sued as primary participants in the wrongful conduct alleged herein.

1255.  The Individual Defendants were privy to and participated in the creation, development and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and other Defendants' dissemination of information to the investing public they either knew, or recklessly disregarded, was materially false and misleading.

1256.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly, or recklessly, and for the purpose and effect of concealing the truth with respect to Citigroup's operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its common  stock.

1257.  The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Citigroup's common stock during the Class Period.  In ignorance of the fact that the market prices of Citigroup's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, and on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class purchased Citigroup's common stock during the Class period at artificially high prices.  As the truth eventually emerged, the price of Citigroup's common stock fell.

1258.   At the end of the material misrepresentations and omissions alleged herein, Plaintiffs and other members of the Class were ignorant to their falsity, and believed them to be true. Had Plaintiffs and other members of the Class and the marketplace known the truth with respect to the business, operations, performance and prospects of Citigroup, which was concealed by Defendants, Plaintiffs and other members of the Class would not have purchased Citigroup's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

1259.   By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

1260.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II:

### Violation of § 20(a) of The Exchange Act

1261.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Claim is asserted against each of the Individual Defendants.

1262.   During the Class Period, each of the Individual Defendants was a senior executive officer and/or director of Citigroup and was privy to confidential and proprietary information concerning Citigroup and its business, operations, performance and prospect s, including its compliance with applicable federal, state and local laws and regulations.  Because of their high-level positions with Citigroup, the Individual Defendants had regular access to non-public information about its business, operations, performance and prospects through access to internal

corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the Company's BOD, and committees thereof, and reports and other information provided to them in connection therewith.

1263.   Each of the Individual Defendants acted as a controlling person of Citigroup within the meaning of § 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiffs allege were materially false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filing and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

1264.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

1265.   As set forth above, Citigroup and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

533

other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of itself the Class, pray for relief and judgment including:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding Plaintiffs and the Class their costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: February 20, 2009

### KIRBY McINERNEY LLP


By:  _____
Roger W. Kirby, Esq.
Ira M. Press, Esq.
Peter S. Linden, Esq.
Henry Telias, Esq.
Edward M. Varga III, Esq.
825 Third Avenue, 16th Floor
New York, NY 10022
Tel.: (212) 371-6600
Fax.: (212) 751-2540

*Interim Lead Counsel for Plaintiffs*
*and for Interim Lead Plaintiffs The*
*ATD Group*


James Allen, Sr., Esq.
ALLEN BROTHERS, P.L.L.C.
400 Monroe, Suite 220
Detroit, MI   48226
Tel.: (313) 962-7777
Fax.: (313) 962-0581

Kenneth Gold, Esq.
439 Griffith Street
Saugatuck, MI 49453
Tel.: (248) 310-9870

535

Lionel Glancy, Esq.
Andrew Sohrn, Esq.
GLANCY BINKOW & GOLDBERG
LLP
1801 Ave. of the Stars, Suite 311
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax.: (310) 201-9160

Ann K. Ritter, Esq.
MOTLEY RICE
P.O. Box 1792
Mt. Pleasant, SC 29465
Tel.: 843-216-9166
Fax.: 843-216-9450

Alan L. Kovacs, Esq.
LAW OFFICE OF ALAN L. KOVACS
2001 Beacon St., Suite 106
Boston, MA 02135
Tel.: (617) 964-1177
Fax.: (617) 332-1223

Kenneth A. Elan, Esq.
LAW OFFICE OF KENNETH A. ELAN
217 Broadway, Suite 606
New York, NY 10007
Tel.: (212) 619-0261
Fax.: (212) 385-2707

*Counsel for Plaintiffs*