UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE CITIGROUP INC.
SECURITIES LITIGATION

MASTER FILE
07 Civ. 9901 (SHS)

### REPLY MEMORANDUM OF LAW IN FURTHER
### SUPPORT OF DEFENDANTS' MOTION TO DISMISS
### THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
Brad S. Karp
Richard A. Rosen
Susanna M. Buergel
Karen R. King

1285 Avenue of the Americas
New York, New York 10019-6064
Tel.  (212) 373-3000

*Attorneys for Defendants Citigroup Inc.,
Charles Prince, Robert Rubin, Lewis Kaden,
Sallie L. Krawcheck, Gary Crittenden,
Steven Freiberg, Robert Druskin, Todd S.
Thomson, Thomas G. Maheras, Michael
Stuart Klein, David C. Bushnell, John S.
Gerspach, Stephen R. Volk, and Vikram
Pandit*

WACHTELL, LIPTON, ROSEN & KATZ
Lawrence B. Pedowitz
Jonathan M. Moses
John F. Lynch

51 West 52nd Street
New York, New York 10019
Tel:  (212) 403-1000

*Attorneys for Defendant Citigroup Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT......................................................................................................3

I.      CLAIMS RELATING TO THE PRE-2007
        TIME PERIOD SHOULD BE DISMISSED..................................................3

II.     PLAINTIFFS FAIL TO PLEAD SECURITIES FRAUD
        REGARDING CITIGROUP'S CDO DISCLOSURES ........................................4

        A.      The Complaint Should Be Dismissed for Failure to Plead Scienter......................5

                1.      Plaintiffs' Allegations Regarding "Market Consensus"
                        in "Early 2007" Are Not Supported by the Public Record
                        and Do Not Give Rise to a  Strong Inference that
                        Defendants *Knew* the Company's CDO Investments Were Toxic ............5

                2.      Plaintiffs' Allegations Regarding Citigroup's CDO Business
                        Do Not Give Rise to a Strong Inference that Defendants
                        *Knew* CDO Investments Were Toxic in Early 2007 .................................7

                3.      The More Cogent and Compelling Inference Is that Defendants,
                        like Most Market Participants, Believed that Super-Senior
                        CDO Positions Were Unlikely to Experience Losses ...............................9

                4.      Defendants' Reasonable Belief that There Was No Duty
                        to Disclose Details of Citigroup's CDO Positions Negates
                        Any Inference of Scienter .......................................................................9

                5.      Plaintiffs Fail to Plead Scienter as to Any Individual Defendant
                        and Therefore May Not Impute Scienter to Citigroup ...........................10

        B.      Plaintiffs Fail to Plead an Actionable
                Misstatement or Omission Regarding CDOs ......................................................12

                1.      Citigroup's CDO Disclosures Were Accurate .........................................12

                2.      Citigroup Had No Duty to Disclose Additional
                        Information Regarding its CDO Exposure ...............................................13

                3.      The Complaint Fails to Plead a Violation of
                        GAAP Regarding Citigroup's CDO Disclosures.....................................15

                4.      Plaintiffs' Allegations Relating to the
                        November 2007 Disclosures Fail............................................................16

                5.      Plaintiffs Fail to Plead an Actionable
                        Misstatement or Omission by Any Individual Defendant ........................17

        C.      Plaintiffs Fail to Plead Loss Causation ............................................................18

                1.      Plaintiffs Fail to Distinguish Between
                        Losses Attributable to the Alleged Fraud
                        and Losses Caused by Market Events .....................................................19

i

2.      Losses *Prior* to November 4, 2007 Are Not Recoverable .......................20

3.      Putative Class Members Who Purchased Citigroup Stock *After* November 4, 2007 Cannot Recover Their Losses .............................................20

III.    PLAINTIFFS FAIL TO PLEAD SECURITIES FRAUD REGARDING OTHER BUSINESS ACTIVITIES OR INVESTMENTS .............................................................................21

    A.     SIVs .........................................................................................21

    B.     Auction Rate Securities ........................................................23

    C.     Alt-A RMBS ...........................................................................24

    D.     Mortgage Origination ...........................................................26

    E.     Leveraged Lending ...............................................................27

    F.     Solvency .................................................................................28

CONCLUSION ..................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*380544 Canada Inc.* v. *Aspen Tech., Inc.*,
544 F. Supp. 2d 199 (S.D.N.Y. 2008)................................................................... 11

*In re Allied Capital Corp. Securities Litigation*,
02 Civ. 3812 (GEL), 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ..................................... 25

*In re Alstom SA Securities Litigation*,
454 F. Supp. 2d 187 (S.D.N.Y. 2006)................................................................... 27

*In re AOL Time Warner, Inc. Securities Litigation*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007)................................................................... 20

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................... 11

*In re Bayou Hedge Fund Litigation*,
534 F. Supp. 2d 405 (S.D.N.Y. 2007)..................................................................... 5

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)..................................................................................... 19

*In re Centerline Holdings Co. Securities Litigation*,
08 Civ. 505 (SAS), 2009 WL 86850 (S.D.N.Y. Jan. 12, 2009) ........................................ 10

*City of Sterling Heights Police & Fire Ret. Sys.* v. *Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)................................................................... 19

*In re Countrywide Fin. Corp. Securities Litigation*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008).............................................................. 11, 19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .............................................................................. 5

*In re eSpeed Securities Litigation*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006).............................................................. 11, 18

*In re Federated Dep't Stores, Inc. Securities Litigation*,
00 Civ. 6362 (RCC), 2004 WL 444559 (S.D.N.Y. Mar. 11, 2004)...................................... 11

*In re Fortune Sys. Securities Litigation*,
680 F. Supp. 1360 (N.D. Cal. 1987) .................................................................... 20

*Good Hill Partners L.P.* v. *WM Asset Holdings Corp.*,
583 F. Supp. 2d 517 (S.D.N.Y. 2008).................................................................... 16

*Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*, 04 Civ. 3318 (LAP), 2005 WL
    736217 (S.D.N.Y. Mar. 30, 2005) ........................................................................... 22

*Harborview Master Fund, LP* v. *Lightpath Tech., Inc.*,
    07 Civ. 9228 (NRB), 2009 WL 249391 (S.D.N.Y. Jan. 30, 2009) ........................... 26

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ............................................................................... 9, 10

*Lapin* v. *Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ..................................................................... 10

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................................. 19, 29

*Leykin* v. *AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006) ..................................................................... 19

*In re Medtronic Inc., Securities Litigation*,
    07 Civ. 4564 (RHK/AJB), 2009 WL 649688 (D. Minn. Mar. 10, 2009) ................. 10

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, Nos. 02 MDL 1484, 02 Civ.
    9690, 2008 WL 2324111 (S.D.N.Y. June 4, 2008) ................................................. 19

*Montoya* v. *Mamma.com Inc.*,
    05 Civ. 2313 (HB), 2006 WL 770573 (S.D.N.Y. Mar. 28, 2006) ........................... 19

*In re Morgan Stanley & Van Kampen Mut. Fund Securities Litigation*,
    03 Civ. 8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) .......................... 10

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................................................. 11

*Novaks* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................................... 28

*In re Pfizer, Inc. Securities Litigation*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008) ..................................................................... 26

*In re Pfizer Inc. Securities Litigation*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008) ..................................................................... 17

*Podany* v. *Robertson Stephens, Inc.*,
    350 F. Supp. 2d 375 (S.D.N.Y. 2004) ..................................................................... 13

*Pollio* v. *MF Global, Ltd.*,
    08 Civ. 6858 (JSR), 2009 WL 921133 (S.D.N.Y. Apr. 7, 2009) ........................... 26

*In re PXRE Group, Ltd., Securities Litigation*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ....................................................................... 5

*In re RAIT Fin. Trust Securities Litigation*,
   07 Civ. 03148 (LDD), 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ...................................11

*In re Rhodia S.A. Securities Litigation*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007).......................................................................... 18, 19

*S.E.C.* v. *First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) .............................................................................................10

*In re Salomon Analyst Level 3 Litigation*,
   373 F. Supp. 2d 248 (S.D.N.Y. 2005)................................................................................15

*In re SCOR Holding (Switzerland) AG Litigation*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)................................................................................20

*Steed Fin. LDC* v. *Nomura Sec. Int'l Inc.*,
   00 Civ. 8058 (NRB), 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ..................................10

*Steinberg* v. *Sherman*,
   07 Civ. 1001 (WHP), 2008 WL 2156726 (S.D.N.Y. May 8, 2008) .....................................18

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................................................................18

*Teachers' Ret. Sys. of La.* v. *Hunter*,
   477 F.3d 162 (4th Cir. 2007) .............................................................................................18

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008) .................................................................................... 8, 10, 12

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) ............................................................................................. 1, 2, 5

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................................28

## OTHER AUTHORITIES

Gary L. Gastineau & Mark P. Kritzman,
   *Dictionary of Financial Risk Management* (1996) .............................................................14

Int'l Monetary Fund, *Global Fin. Stability Report* (Apr. 2008),
   http://www.imf.org/External/Pubs/FT/GFSR/2008/01/pdf/text.pdf......................................14

SEC Rel. No. 33-7386, 62 F.R. 6044 (Feb. 10, 1997)...............................................................14

Defendants Citigroup Inc. ("Citigroup" or the "Company"), Charles Prince, Robert Rubin, Lewis Kaden, Sallie L. Krawcheck, Gary Crittenden, Steven Freiberg, Robert Druskin, Todd S. Thomson, Thomas G. Maheras, Michael Stuart Klein, David C. Bushnell, John S. Gerspach, Stephen R. Volk and Vikram Pandit (together, "defendants"), respectfully submit this reply memorandum of law in further support of their motion to dismiss the Amended Consolidated Class Action Complaint (the "complaint") in its entirety and with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Under the heightened pleading standards of Rule 9(b) and the PSLRA, plaintiffs must demonstrate a "strong inference" of scienter—an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504–05 (2007). By any standard—"compelling" or otherwise— plaintiffs have not and cannot show that defendants *knew* that Citigroup's holdings of super-senior tranches of CDOs were substantially impaired and that defendants therefore violated the securities laws by failing to disclose that fact before October 2007. In their opposition brief, plaintiffs continue to rely on general events in the housing market and declines in certain indices for other securities as proof of a "market consensus" in "early 2007" that super-senior CDO positions were "toxic." (*See, e.g.*, Pls. Mem. 1, 8, 11, 14–15.) This purported evidence, however, and the story told by plaintiffs more generally, is contradicted by the undisputed contemporaneous public record: during the relevant period, super-senior positions were above AAA-rated tranches, were protected from losses by the subordinated junior tranches, and were qualitatively different from the RMBS tracked by the ABX and TABX indices cited by plaintiffs.

As noted, public documents clearly demonstrate that, prior to October 2007, market participants and regulators alike viewed the general housing market downturn to be contained and

therefore unlikely to impact super-senior tranches of CDOs.  For these reasons, prior to October 2007, *not a single financial institution* had reported losses on super-senior CDO positions.

Plaintiffs' ultimate strategy, reflected throughout their opposition papers, is to try to hold defendants legally responsible for failing to predict what government regulators, legislators, securities analysts, and the financial markets and industry more generally could not foresee:  the most precipitous collapse of the housing and credit markets since the Great Depression.  To this end, plaintiffs embroider their papers with pejorative phrases to imply sinister activity on the part of Citigroup—such as by dubbing Citigroup's CDO structuring activities a "Ponzi scheme."  But at its core, plaintiffs' entire case hinges on persuading this Court to deem fraud by hindsight—and the second guessing of business practices and complex accounting judgments—actionable under the federal securities laws.

Perhaps recognizing the infirmity of their legal theory, plaintiffs point to the significant losses the Company has taken—like nearly every other financial institution worldwide—as evidence that defendants must have known that the positions the Company held, and continued to accumulate, posed significant risk.  Here again, however, the securities laws thwart plaintiffs' efforts.  The federal securities laws do not allow hindsight-driven and irrational inferences to substitute for specific allegations demonstrating that the Company's disclosures were knowingly false at the time they were made and reflecting a "strong inference" of scienter—again, an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 127 S. Ct. at 2504–05.  The only rational inference to be drawn from defendants' conduct is that they, like the overwhelming majority of participants in the financial markets, were stunned by the events that unfolded beginning in October 2007 and that Citigroup has suffered unexpected and severe losses as a result.  (*See infra* Section II.A.)

Plaintiffs' other arguments about alleged misstatements or omissions—regarding CDOs, mortgage origination, SIVs, leveraged lending, ARS, Alt-A RMBS, and solvency—

2

similarly suffer fundamental flaws.  Most significantly, try as they do to manufacture one, plaintiffs cannot point to a duty to detail a company's holdings in specific assets merely because investors are interested in or, in hindsight, *would have* been interested in, the information.  The accounting rules on which plaintiffs rely do not, in fact, require that level of detail.  To the extent plaintiffs try to identify specific false statements, they read sentences out of context and strain to interpret words other than by their plain meaning.  (*See infra* Section II.B.)

Plaintiffs also have not met, and cannot satisfy, the loss causation pleading requirement because they make no attempt to distinguish losses caused by the alleged misconduct from losses caused by market events.  Plaintiffs even seek to recover for losses *before* disclosure of the alleged fraud—losses that cannot possibly be attributed to the alleged misconduct.  (*See infra* Section II.C.)

Where, as here, plaintiffs' allegations of scienter are based on illogical inferences, conclusory assertions, and demonstrably false assumptions, they cannot meet the heightened pleading standard mandated by Federal Rule of Civil Procedure 9(b) and the PSLRA.  In addition, plaintiffs fail adequately to plead an actionable omission or misstatement, or loss causation.  Accordingly, the complaint should be dismissed in its entirety and with prejudice.

## ARGUMENT

### I.
### CLAIMS RELATING TO THE PRE-2007
### TIME PERIOD SHOULD BE DISMISSED

Because plaintiffs' theory is based entirely on events in 2007, there is no basis in the complaint for beginning the class period in 2004.  Plaintiffs offer virtually no allegation relating to events in 2004, 2005 or 2006, and make no serious attempt to identify specific statements that were false or misleading in those years,[1] or to plead with particularity facts giving

---

[1]    At most, during the period from 2004 to 2006, plaintiffs take issue with general statements characterizing Citigroup's mortgage origination and leveraged lending business.  None of these statements are actionable.  (*See infra* Sections III.D, III.E.)

rise to a strong inference that defendants knew but failed to disclose material information about any product or business in that time period.  Indeed, plaintiffs devote no more than three short paragraphs in their brief to their allegations concerning this time period.  (Pls. Mem. 66–67.)

At most, plaintiffs repeat the allegations in the complaint that Citigroup "decided in 2004 to expand Citi's CDO operations" (Pls. Mem. 63), "created $28 billion of Commercial Paper CDOs" (*id.* at 66), and "accumulated … $25 billion of its 'net' super senior exposures" (*id.* at 18).  These allegations merely describe some of Citigroup's business activities in CDOs—activities that were disclosed in Citigroup's public filings over the years.  (Defs. Mem. 22–23.)  The fact that these particular activities ultimately led to losses under extreme market conditions in late 2007 and 2008 does not make the business decisions fraudulent.  To the extent plaintiffs allege that Citigroup's CDO-related activities were ill-advised, they are asserting a claim of mismanagement that is not actionable under the securities laws.  (Defs. Mem. 15–21, 63.)

Because the complaint fails to plead any element of a securities fraud claim with respect to the 2004–2006 time period, the Court should dismiss with prejudice plaintiffs' claims as to matters before 2007.

## II.
### PLAINTIFFS FAIL TO PLEAD SECURITIES FRAUD REGARDING CITIGROUP'S CDO DISCLOSURES

The vast majority of the 534-page complaint, as well as plaintiffs' opposition brief, is devoted to defendants' purported failure to disclose the details of Citigroup's CDO holdings prior to November 2007.  But volume is no substitute for substance.  Plaintiffs fail to state a claim for securities fraud relating to Citigroup's CDO disclosures because:  (i) plaintiffs' scienter allegations are economically irrational and implausible; (ii) plaintiffs fail adequately to plead that Citigroup's CDO-related disclosures were inaccurate or that defendants had a duty to disclose additional details regarding Citigroup's CDO holdings; and (iii) plaintiffs fail to separate, even

roughly, losses caused by the alleged fraud and losses caused by the unprecedented general market meltdown.

## A.    The Complaint Should Be Dismissed for Failure to Plead Scienter

Despite devoting 21 pages (479–500) of their complaint to motive and opportunity allegations, plaintiffs now have abandoned those claims, asserting that "scienter can be plead absent motive." (Pls. Mem. 39.) However, plaintiffs' failure to plead motive and opportunity weakens any inference of scienter and the "strength of [their] circumstantial allegations must be correspondingly greater." *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198–99 (2d Cir. 2009) (internal quotations omitted); s*ee also In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009) (same). That is, in light of their concession that they have failed to allege motive and opportunity, plaintiffs must plead a strong inference of scienter based on allegations of "facts approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of the facts." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (internal quotations omitted).

In assessing a motion to dismiss, the Court also must weigh the plausibility of competing inferences to determine whether plaintiffs have alleged an inference of scienter that is cogent and "at least as" compelling as defendants' competing inference. *See Tellabs*, 127 S. Ct. at 2504–05. Plaintiffs' allegations here fall far short.

### 1.    Plaintiffs' Allegations Regarding "Market Consensus" in "Early 2007" Are Not Supported by the Public Record and Do Not Give Rise to a Strong Inference that Defendants *Knew* the Company's CDO Investments Were Toxic

Plaintiffs allege repeatedly throughout the complaint and their opposition brief that there was a "market consensus" in "early 2007" that CDO positions, including the super-senior tranches, were "toxic," and that therefore defendants must have known that Citigroup's super-

senior positions were severely impaired.  (*See, e.g.*, Pls. Mem. 7, 14–15; ¶¶ 1, 306, 391.)[2]  This

contention is demonstrably false and the public reports on which plaintiffs rely do *not* establish

that super-senior positions were viewed as risky prior to October 2007.

        As plaintiffs themselves take pains to explain, the "super-senior" tranche of a CDO

stands above all of the other, subordinated tranches.  (¶ 90.)  By virtue of the priority-of-payment

"waterfall," the super-senior tranche is protected from loss by the junior tranches.  (¶¶ 78–79.)

The higher the tranche on the waterfall, the higher the rating to reflect the corresponding lower risk

(and, of course, lower yield).  (*Id.*)  Due to their position above even the AAA-rated senior

tranches, super-senior positions were regarded as *above*-AAA rated.  (Defs. Mem. 8.)

Conveniently ignored by plaintiffs, prior to October 2007, AAA-rated CDO tranches had virtually

never suffered impairment.  (*Id.* at 37–38 & n.33.)

        Perhaps recognizing these problems with their theory, plaintiffs ignore public

information regarding super-senior positions and instead argue that declines in certain ABX and

TABX sub-indices for low-rated subprime RMBS[3] in early 2007 prove that the highest-rated CDO

tranches were impaired at that time.  (Pls. Mem. 2, 16–17.)  Fundamentally, the use of an RMBS

index to value super-senior CDO positions ignores the effect of subordination and the credit

enhancements inherent to the CDO structure.[4]  (Defs. Mem. 29–30.)  Moreover, as discussed in

defendants' opening brief, the sub-indices cited by plaintiffs are irrelevant:  first, they were not

comparable to Citigroup's CDO holdings; second, they were not designed to serve as a valuation

tool; and, finally, they did not track actual CDO market transactions and thus properly were not

---

[2]    Citations in the form of "¶ __" refer to paragraphs in the complaint.  Citations in the form of "Ex. __" refer to exhibits attached to the Declaration of Richard A. Rosen, dated March 12, 2009 (Exhibits 1 through 32), or the Declaration of Richard A. Rosen, dated May 13, 2009 (Exhibits 33 through 42).

[3]    The ABX and TABX indices consist of separate sub-indices that track a discrete, small pool of subprime RMBS for each of the following rating categories:  AAA, AA, A, BBB, and BBB-.  (*See* Defs. Mem. 29–30.)

[4]    Thus, the fact that some of Citigroup's CDO holdings were backed in part by BBB and single-A rated RMBS does not indicate that a BBB or single-A RMBS index is a proper valuation tool for the super-senior tranche of those CDOs.  Moreover, plaintiffs provide no factual basis for the proposition that Citigroup should have ignored pricing from actual CDO transactions in favor of an index tracking RMBS.

viewed at the time as a valid reference point.  (*See* Defs. Mem. 30 & n.30.)  In any event, even if it had been appropriate in 2007 to use such indices to infer information about CDO positions, the index for highly rated subprime securities—the AAA ABX sub-index—traded essentially at par prior to July 2007, and continued to trade close to par until *October 2007*.  (Ex. 33.)

In fact, public reports actually show that market participants and regulators alike believed that super-senior positions were unlikely to suffer losses and were protected from the general subprime market decline.  (Defs. Mem. 3–5.)  Indeed, *not a single financial institution* reported suffering any losses on super-senior CDO positions prior to October 2007.  (*See* Defs. Mem. 12–13.)  Plaintiffs' explanation for this—that *all* the major financial institutions were simultaneously committing securities fraud—is implausible.  (*See* Pls. Mem. 40.)  The only cogent and compelling inference is that the market did *not* consider super-senior positions at significant risk or as being impaired until late 2007, when an unprecedented market crisis paralyzed the nation's economy.

### 2. Plaintiffs' Allegations Regarding Citigroup's CDO Business Do Not Give Rise to a Strong Inference that Defendants *Knew* CDO Investments Were Toxic in Early 2007

Plaintiffs also contend that defendants "actually knew" of the "massive risk" from Citigroup's CDO exposure because, among the assets Citigroup structured into CDOs, Citigroup included some junior tranches it held in other CDOs.  (Pls. Mem. 7, 21–22, 40–41.)  Plaintiffs call this a "Ponzi scheme" (¶¶ 15, 114, 122, 192, 486, 575), but do not show how the alleged practice—which was commonplace in structured finance—was in any way wrong or suspect.  The more logical inference is that the Company was employing a legitimate business strategy to reduce its exposure to junior CDO tranches by restructuring these assets into new CDOs, selling the lower-rated (but higher-yielding) tranches of the new CDOs to investors with an appetite for the higher risk, and retaining the super-senior tranches.  Although Citigroup still retained some

exposure to the original junior tranche through the retention of the super-senior tranches in the new CDO, the overwhelming majority of the risk was sold to investors with greater risk tolerance.

Plaintiffs also point to Citigroup's purchase of insurance on a portion of the super-senior tranches from CDOs it structured in early 2007 as evidence that defendants *knew* the super-senior tranches were problematic.  (*See* Pls. Mem. 20.)  This allegation proves too much.  If the *mere purchase* of insurance gives rise to a strong inference of scienter, any officer or director of a financial institution that acquired directors' and officers' liability insurance could be presumed to be liable for securities fraud.  In any event, plaintiffs have not alleged that the cost of insuring these tranches was so expensive—insurance price being indicative of risk—that the defendants had reason to believe that the super-senior tranches were considered to present significant risk.[5]

Plaintiffs' reliance on a March 2007 research report by Citigroup's European Quantitative Credit Strategy & Analysis group as evidence of scienter also fails.  (*See* Pls. Mem. 41–42.)  Contrary to plaintiffs' assertion (*see* Pls. Mem. 41), nothing in the report suggests that losses on super-senior CDO tranches were likely or imminent.  (Ex. 6.)  In any event, the mere fact that a few employees at Citigroup (an institution with more than 300,000 employees during the relevant time period) expressed an opinion in an analyst report does not indicate that defendants knew of, much less shared, that opinion.  In fact, plaintiffs do not even allege that the report was reviewed by senior management involved in Citigroup's disclosures.  *See Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (rejecting inference of scienter where plaintiffs did not allege that senior management had access to reports reflecting impairment in company's mortgage portfolio).

---

[5]    For the same reason, the allegation that Citigroup bought protection on $1.3 billion of its super-senior CDO portfolio through a credit default swap agreement in February 2007 with Foraois is not indicative of defendants' knowledge of risks to Citigroup's super-senior holdings.  (Pls. Mem. 3, 10; ¶¶ 436–47.)

**3.      The More Cogent and Compelling Inference Is that Defendants, like Most
Market Participants, Believed that Super-Senior CDO Positions Were Unlikely
to Experience Losses**

Ultimately, plaintiffs' theory of scienter is neither cogent nor compelling because it
simply is economically irrational.  If defendants actually *knew* in early 2007 that Citigroup's CDO
assets were "toxic" and destined to suffer significant losses, the logical course would have been to
sell the assets in the market, or to hedge all of Citigroup's positions directly or by shorting the
CDO market.  However, plaintiffs themselves acknowledge that defendants did the exact
opposite—they *increased* Citigroup's CDO exposure by approximately $20 billion between
October 2006 and August 2007.  (Pls. Mem. 20.)  Where, as here, "plaintiff's view of the facts
defies economic reason, … [it] does not yield a reasonable inference of fraudulent intent."  *Kalnit*
v. *Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001) (internal quotations omitted).

Indeed, plaintiffs themselves allege that, throughout most of 2007, Citigroup's "risk
managers … ***believed that the risk presented by these triple-A securities was so remote that they
didn't even need to include in risk analysis at all***."  (*See* ¶ 504.)  Plaintiffs' assertion that
defendants *knew* of "massive risks" associated with Citigroup's CDO holdings is therefore
inconsistent with their own allegations.

**4.      Defendants' Reasonable Belief that There Was No Duty to Disclose
Details of Citigroup's CDO Positions Negates Any Inference of Scienter**

Plaintiffs contend that scienter may be inferred because Citigroup failed to disclose
the details of its CDO exposure in purported violation of FAS 107.  (Pls. Mem. 36.)  However, as
demonstrated below, and in defendants' opening brief, no inference of scienter can be drawn
because plaintiffs have not adequately pleaded that Citigroup had a duty to disclose its CDO
holdings prior to November 4, 2007 (when it quantified those holdings in its disclosures and
announced losses in connection with recent market events).  (*See* Defs. Mem. 25; *infra* II.B.2.)

Even if this Court were ultimately to conclude that Citigroup had a duty to disclose
its CDO exposures in greater detail pursuant to FAS 107 (or otherwise), defendants' reasonable

9

belief that Citigroup had no duty to disclose prior to October 2007 negates any inference of scienter.  *See Kalnit*, 264 F.3d at 143 ("[Where the complaint] does not present facts indicating *a clear duty to disclose*, plaintiffs' scienter allegations do not provide strong evidence of conscious misbehavior or recklessness." (emphasis added)); *In re Centerline Holdings Co. Secs. Litig.*, 08 Civ. 505 (SAS), 2009 WL 86850, at *5 (S.D.N.Y. Jan. 12, 2009) (finding no inference of scienter, "when it [was] arguable that [defendants] did not have a duty to disclose [certain] information before they actually did"); *In re Morgan Stanley & Van Kampen Mut. Fund Secs. Litig.*, 2006 WL 1008138, at *11 (finding lack of scienter because "defendants could reasonably believe that the law did not require disclosure").

5.    **Plaintiffs Fail to Plead Scienter as to Any Individual Defendant and Therefore May Not Impute Scienter to Citigroup[6]**

Plaintiffs incorrectly suggest that they can establish scienter as to the Company without raising the required inference "with regard to a specific individual defendant."  (Pls. Mem. 39.)  The Second Circuit, however, has stated clearly that to "survive a Rule 12(b)(6) motion under the PSLRA ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Dynex Capital, Inc.*, 531 F.3d at 195.[7]

---

[6]    Plaintiffs' Section 20(a) "control person" claims fail because they fail to plead a primary violation.  Moreover, far from being "unsettled" (Pls. Mem. 74), the weight of authority in the Second Circuit requires plaintiffs to plead facts showing culpable participation by each individual defendant.  *See, e.g.*, *S.E.C.* v. *First Jersey Sec.*, *Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (requiring plaintiff, to plead a section 20(a) claim, to show that the "controlling person was ... a culpable participant in the fraud perpetrated by the controlled person" (internal quotations omitted)); *Lapin* v. *Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 246–49 (S.D.N.Y. 2006) (reviewing Second Circuit cases on standard for culpable participation and finding that plaintiff, to plead culpable participation, must meet the same stringent pleading standards as pleading scienter under Section 10(b)); *Steed Fin. LDC* v. *Nomura Sec. Int'l Inc.*, 00 Civ. 8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) (finding that the "culpable participation element is subject to the heightened pleading requirements of the PSLRA").

[7]    The only exception to this general rule—not applicable here—is where a purportedly fraudulent statement is "so flagrant" that it supports an inference of corporate scienter "even when the knowledge of individual officers and directors cannot be determined."  *In re Medtronic Inc.*, *Sec. Litig.*, 07 Civ. 4564 (RHK/AJB), 2009 WL 649688, *16 (D. Minn. Mar. 10, 2009) (citing *Makor Issues & Rights Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008); *Dynex*, 531 F.3d at 195)).  Here, plaintiffs have not pointed to any such "flagrant" statement.

Plaintiffs rely on the so-called "core operations" theory to argue that individual defendants, by virtue of their positions in the company, must have known about purported problems with the Company's CDO positions because the CDO business was a "core" business to Citigroup.  (Pls. Mem. 62–63.)  However, courts in this Circuit have questioned the continuing applicability of the "core operations" theory in the post-PSLRA era.  *See In re eSpeed Sec. Litig.*, 457 F. Supp. 2d 266, 294 n.209 (S.D.N.Y. 2006) (observing that plaintiffs' authority, which relied on the core operations theory, "precedes the PSLRA by six years, and post-PSLRA decisions in other Circuits have cast doubt on whether scienter can be pleaded in this manner").

In any event, even if the "core operations" theory were applicable, the CDO business at Citigroup could not, by any measure, be considered a "core operation" of Citigroup.  It generated less than 2% of revenues from Citigroup's investment bank (itself just one part of Citigroup's business) (*see* Ex. 7 at 18), and CDO assets constituted only about 2% of Citigroup's total assets (*see id*. at 47).[8]  *See In re Federated Dep't Stores, Inc. Sec. Litig.*, 00 Civ. 6362 (RCC), 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (rejecting core operations theory as to business that comprised 10% of company's total assets).

Plaintiffs also have failed to plead facts showing that the truth was reasonably available to each individual plaintiff, but "ignored."  *See 380544 Canada Inc.* v. *Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 225 (S.D.N.Y. 2008); *In re Atlas Air Worldwide Holdings*, *Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (requiring plaintiffs, when using the core operations theory, also to plead that there were "contradictory facts of critical importance to the company [that] either were apparent, or should have been apparent").

---

[8]    The cases cited by plaintiffs each involve businesses that represent a substantial portion of the company's revenue.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1190 (C.D. Cal. 2008) (finding that mortgage-related operations to be a core operation because it was where Countrywide "received over 90% of its revenue"); *In re New Century*, 588 F. Supp. 2d 1206, 1229 (C.D. Cal. 2008) (finding that plaintiffs sufficiently plead scienter where, *inter alia*, there was an "alleged pervasive company-wide practice of issuing loans" at mortgage lending company); *In re RAIT Fin. Trust Sec. Litig.*, 07 Civ. 03148 (LDD), 2008 WL 5378164, at *13 (E.D. Pa. Dec. 22, 2008) (finding that credit underwriting was a core operation of the corporation where it was admitted as such in the company's public filings).

Because plaintiffs fail to plead scienter adequately with respect to any individual defendant, their claim against the Company must be dismissed.  *See Dynex Capital, Inc.*, 531 F.3d at 196–97 (rejecting allegation of scienter against corporate defendant where plaintiff had failed to adequately plead scienter against any individual defendant).

**B.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission Regarding CDOs**

**1.    Citigroup's CDO Disclosures Were Accurate**

Plaintiffs continue to assert incorrectly that Citigroup did not disclose the existence of its CDO exposure prior to November 2007.  (*See* Pls. Mem. 2; ¶ 581.)  Citigroup's disclosures since 2004 have described explicitly CDOs as a type of variable interest entity ("VIE") and have disclosed Citigroup's maximum exposure to VIEs.  (*See, e.g.*, ¶¶ 547, 569, 1034; Defs. Mem. 22–23.)  For example, Citigroup disclosed in its second quarter 10-Q for 2007 that "the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $117 billion … at June 30, 2007."  (Ex. 7 at 67.)  Citigroup also disclosed that it (i) "may … provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs"; and (ii) "may also have an ownership interest in certain VIEs." (*See* Defs. Mem. 22–23.)  As discussed in greater detail in the next subsection, Citigroup had no duty to break out the details of its exposure to each type of VIE.

Rather than identify a specific false statement, plaintiffs instead take issue with the format or word choice of certain CDO disclosures.  None of plaintiffs' arguments has merit.

- Plaintiffs contend that it was misleading to claim that CDOs "were assembled to diversify asset risk."  (Pls. Mem. 27.)  However, a CDO is backed by a pool of assets (which typically includes subprime RMBS and *other assets*).  This pool of assets is— by definition—diversified as compared to the individual assets themselves.  (*See* Defs. Mem. 34.)

- Plaintiffs take issue with the statements that Citigroup "may … provide liquidity facilities" or "may … have an ownership interest" in VIEs on the ground that such statements are "hypothetical." (Pls. Mem. 27–28.)  However, the use of the word "may" in this context does not render a sentence "hypothetical."  The statements at issue refer

to all VIEs.  It is a true statement that Citigroup "may" provide liquidity and "may" retain an ownership interest *depending on the type of VIE*.  (*See* Defs. Mem. 23 n.17.)

• Plaintiffs contend that it was misleading for Citigroup to disclose the total value of assets in the CDOs with which it had involvement, but not the specific amount of Citigroup's exposure to those CDOs.  (Pls. Mem. 29.)  However, Citigroup's disclosures were required by and in compliance with FIN 46-R, which governs VIEs, and plaintiffs do not allege otherwise.  As discussed in the next subsection, there is no duty to separately itemize the Company's exposure to CDOs.

• Plaintiffs suggest that Citigroup's separate discussion of "CDO-type transactions" and "Mortgage-related transactions" in the VIE section of the disclosures was misleading because it implied Citigroup's CDO business did not involve mortgages.  (Pls. Mem. 30–31.)  However, as plaintiffs themselves emphasize throughout the complaint, it was "straightforward" and "widely understood" in the market that CDOs contained subprime RMBS.  (¶ 212; *see also* ¶¶ 100; 206–20.)

• Plaintiffs allege that Citigroup's statement that it had "limited continuing involvement" in VIEs was misleading given Citigroup's significant CDO holdings.  (Pls. Mem. 27–29).  However, the statement was accurate—Citigroup had "limited continuing involvement" because it neither exercised operational control nor had an equity interest in the CDOs structured.  (*See* Defs. Mem. 34.)  Moreover, investors could not have construed "limited continuing involvement" to mean "limited exposure" to VIEs because Citigroup explicitly disclosed that it had a "*maximum exposure*" to unconsolidated VIEs of *$117 billion* in the second quarter of 2007.  (Ex. 7 at 67.)

Rhetoric and creative language interpretation do not support a claim of fraud.  *See Podany* v. *Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 381 (S.D.N.Y. 2004) ("[f]raud may not be alleged based on a tortured reading" of documents.).  Tellingly, while plaintiffs accuse Citigroup of fraudulently misleading the market about the extent of its exposure to CDOs (and to super-senior positions in particular), they have not identified any statement in which Citigroup suggested that it had sold off the super-senior tranches of its CDOs.  In fact, the VIE section of Citigroup's disclosures told precisely the opposite story—it made clear that Citigroup's exposure was increasing over time.  (Defs. Mem. 22–23.)

2. **Citigroup Had No Duty to Disclose Additional Information Regarding its CDO Exposure**

As discussed in defendants' opening brief, Citigroup had no duty to disclose additional information regarding its CDO exposure.  (Defs. Mem. 24–27.)  The only basis offered

by plaintiffs for a purported duty to disclose the details of its CDO holdings is FAS 107, which requires disclosure of "significant concentrations of credit risk." However, "credit risk" is "the possibility that a loss may occur from the failure of another party to perform according to the terms of a contract." FAS 105 ¶ 7.[9] CDOs do not have exposure to the credit risk of any counterparty. Moreover, CDOs do not present a significant *concentration* of credit risk because they pool together securities backed by thousands of underlying loans with different counterparties.[10]

CDOs are subject to risks in the *market at large* because their value depends on changes in the market price for those instruments. *See id.* (defining "market risk" as "the possibility that future changes in market prices may make a financial instrument less valuable"). Plaintiffs themselves *repeatedly* allege that there was a market for CDOs that fluctuated in price. (*See* ¶¶ 7, 334, 341, 342, 396 (referring to the "CDO market")); *see also* SEC Rel. No. 33-7386, 62 F.R. 6044, 6048 (Feb. 10, 1997) (noting that "market risk is inherent in derivative and non-derivative instruments, including … mortgage-backed securities … and other debt obligations"). Plaintiffs also implicitly acknowledge that CDOs were subject to market risk because they argue that Citigroup should have valued its CDOs by reference to the ABX and TABX—two *market*-based indices. (*See, e.g.,* ¶ 218 ("These indexes were, in sum, directly relevant, directly observable *market indicators* of CDO value.").) Citigroup—as discussed on the October 15, 2007 conference call—plainly viewed CDOs as subject to market risk because it assigned its "*market* risk" teams to these positions rather than its "credit risk" teams. (¶ 510.) Certainly, plaintiffs have

---

[9]   Gary L. Gastineau & Mark P. Kritzman, *Dictionary of Financial Risk Management* 78–79 (1996) (defining "credit risk" as "exposure to loss as a result of a default on a swap, debt or other counterparty instrument").

[10]   In any event, plaintiffs have not alleged adequately that Citigroup's CDO holdings constituted a *significant* concentration of credit risk. As plaintiffs acknowledge, Citigroup's CDO holdings consisted largely of super-senior tranches of CDOs, which were structured to provide protection from defaults in the underlying collateral. (¶ 91.) While these holdings ultimately were backed (in part) by mortgage-backed securities, which in turn were backed (in part) by subprime mortgages, plaintiffs do not allege that FAS 107 requires indirect exposures to such assets to be treated as significant credit risks. *See, e.g.,* Int'l Monetary Fund, *Global Fin. Stability Report* 59 (Apr. 2008) ("Under normal circumstances, the most senior [RMBS] tranches should be very secure against credit risk."), http://www.imf.org/External/Pubs/FT/GFSR/2008/01/pdf/text.pdf. Ultimately, the decision whether there was a "concentration" of credit risk and whether this concentration of credit risk was "significant" enough to require disclosure is a judgment call for management.

not suggested that it was industry practice to view CDOs as subject to "credit risk" and thus to disclose pursuant to FAS 107 the details of CDO positions prior to late 2007.

Citigroup was therefore not required to disclose this exposure under FAS 107.  *See* FAS 107 ¶ 15C (an entity is "encouraged, *but not required*, to disclose quantitative information about the *market risks* of financial instruments" (emphasis added)).  Accordingly, the omission of such information is not actionable.  (*See* Defs. Mem. & 26 n.22.)

### 3. The Complaint Fails to Plead a Violation of GAAP Regarding Citigroup's CDO Disclosures

Plaintiffs also allege that Citigroup's CDO disclosures violated GAAP because Citigroup overvalued its CDO holdings between March 2007 and April 2008 (*see* Pls. Mem. 32– 35), and should have consolidated $25 billion of commercial paper CDO exposure onto its balance sheet prior to the fourth quarter of 2007 (*see* Pls. Mem. 37–38).  As a preliminary matter, allegations of GAAP violations alone are insufficient to state a claim for securities fraud.  (*See* Defs. Mem. 27.)  In any event, plaintiffs' allegations fail to plead a violation of GAAP.

*First*, as discussed above, the argument that certain ABX and TABX sub-indices— which pertain to portfolios of low-rated tranches of subprime *RMBS*—should have been used to value Citigroup's super-senior *CDO* portfolio in early 2007 is fundamentally flawed (*see supra* Section II.A.1), and makes no sense because, as plaintiffs acknowledge, there were market transactions and thus *market prices* on these particular instruments in early 2007.  (¶ 192.)  The fact that Citigroup (and other banks) *now* use market indices in combination with other metrics to value these securities (*see* Pls. Mem. 33–35)—because there are no market prices available—does not indicate that the indices should have been used in early 2007.

To the extent plaintiffs take issue with the valuation of CDO holdings after the market became illiquid, they are merely second guessing judgment calls by management.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251–52 (S.D.N.Y. 2005) ("[F]inancial

valuation models … can only fairly be characterized as subjective opinions."); *see also Good Hill Partners L.P.* v. *WM Asset Holdings Corp.*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) (finding that "graphs and tables" setting forth loss scenarios cannot "serve as a basis for actionable misstatements because they are opinions and not objective facts"). Indeed, Citigroup explicitly warned investors that "[i]n certain illiquid markets, judgmental estimates of value may be required." (*See, e.g.*, Ex. 3 at 56; Ex. 4 at 58; *see also* Ex. 16 at 38.) Plaintiffs' hindsight *opinion* on how Citigroup should have valued its assets is, at best, a mismanagement claim that is not actionable under the securities laws. (*See* Defs. Mem. 29–30.)

       *Second*, plaintiffs fail to allege adequately that Citigroup's balance sheet was misstated due to its failure to consolidate its Commercial Paper CDOs onto the balance sheet prior to late 2007. Consolidation of a CDO is only appropriate under FIN 46-R when the entity anticipates that it will suffer the majority of the losses of the CDO structure. (*See* Defs. Mem. 28.) Plaintiffs have not adequately pleaded that Citigroup anticipated suffering the majority of losses from its exposure to super-senior tranches of commercial paper CDOs prior to late 2007, when it ultimately consolidated these positions after severe rating agency downgrades in October 2007. (*See id.*)

### 4.    Plaintiffs' Allegations Relating to the November 2007 Disclosures Fail

       On November 4, 2007, Citigroup announced estimated fourth quarter subprime-related write-downs of $8 billion to $11 billion (mostly from its $43 billion of super-senior CDO exposure) as a result of unprecedented October rating agency downgrades on large numbers of AAA tranches of subprime RMBS and CDOs. (*See* Defs. Mem. 31.) Plaintiffs allege that this disclosure was misleading because it referred to the Company's super-senior exposure as $43 billion when the Company had an additional $10.5 billion of super-senior exposure that it had hedged with counterparties. (Pls. Mem. 34–35.)

As explained in defendants' moving brief, and uncontested by plaintiffs, this allegation is flatly contradicted by the Company's contemporaneous disclosures.  On Citigroup's November 5, 2007 analyst call, the Company's Chief Financial Officer, Gary Crittenden, expressly stated that the $43 billion represented Citigroup's "*net*" super-senior "exposure" and that the Company had hedges against that exposure that "*would add to a larger number than the $43 billion*."  (Ex. 34 at 9–10 (emphasis added).)  Gary Crittenden also explained on that call that there was additional exposure to monoline insurers:

> [W]e haven't quantified what that exposure is.  They obviously are important counterparties for us in a number of different instruments … [W]e, like I would assume virtually everyone else that is a significant financial institution have counterparty exposure to the monoline[s].

(¶ 186.)  Accordingly, plaintiffs fail to allege any actionable misstatement with respect to the November disclosure because Citigroup plainly informed the market that it had some additional hedged super-senior exposure.

### 5.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission by Any Individual Defendant

As discussed in defendants' opening brief, plaintiffs have failed to identify *any* specific misstatement by the vast majority of the individual defendants, much less specific conduct by, or knowledge on the part of, any individual defendant to support a claim of conscious misbehavior or recklessness.  (*See* Defs. Mem. 41–42 & n.39.)   Instead, plaintiffs try to circumvent the pleading requirements by relying on the "group pleading doctrine."  They fail in that attempt, however, because they do not allege—as the doctrine requires—that each individual defendant had "direct involvement in the everyday business of the company."  *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 637–38 (S.D.N.Y. 2008) (internal quotations omitted).

The CDO business—the focus of plaintiffs' claims—represented only a small fraction within one of Citigroup's many business areas (investment banking).  (*See supra* Section

I.A.4.)  None of the individual defendants is alleged to have had direct, every day involvement in the CDO business.[11]  Additionally, defendants Rubin, Kaden, Druskin and Freiberg, for example, are not alleged to have been involved in the every day operations of any Citigroup business. Moreover, Defendant Krawcheck is not alleged to have been involved with any of Citigroup's SEC filings or press releases following Citigroup's 2006 Form 10-K (¶ 40); Defendant Pandit only joined the company in 2007 and became CEO in December 2007 (¶ 59); Defendant Prince left the company on November 5, 2007; and Defendants Maheras and Bushnell left the company in October and December 2007, respectively (¶¶ 48, 52).  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 267 (S.D.N.Y. 2008) (finding that plaintiffs could not group plead as to one individual defendant because he did not possess requisite "insider status").[12]

## C.      Plaintiffs Fail to Plead Loss Causation

The complaint also should be dismissed for failure to plead loss causation with respect to CDO disclosures.  "[T]he Supreme Court has left open the question of whether Rule 9(b)'s heightened pleading requirement applies to allegations of loss causation."  *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 544 (S.D.N.Y. 2007); *accord In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 295 (S.D.N.Y. 2006) (noting that the appropriate pleading standard for loss causation "is an issue left open by *Dura* and not squarely addressed by the Second Circuit").  However, courts are clear that, whether Rule 8(a) or 9(b) applies, plaintiffs must plead loss causation with "sufficient specificity to enable the court to evaluate whether the necessary causal link exists."  *Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) (citing *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).  Plaintiffs must allege "something

---

[11]    While defendants Maheras and Klein are alleged to have been involved with the investment banking area of the company, they are not alleged to have had every day involvement with the CDO business.  (¶¶ 48, 50.)  In any event, they are not alleged to have *any* involvement in the consumer banking are of the Company, which handles mortgage origination.

[12]    Furthermore, allegations of oral misstatements cannot extend to all individual defendants because the group pleading doctrine applies only to a "group-published document[]."  *See Steinberg* v. *Sherman*, 07 Civ. 1001 (WHP), 2008 WL 2156726, at *4 (S.D.N.Y. May 8, 2008).

beyond the mere possibility of loss causation." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007) (citing *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 347 (2005)).

### 1. Plaintiffs Fail to Distinguish Between Losses Attributable to the Alleged Fraud and Losses Caused by Market Events

The failure to distinguish between losses caused by the alleged misconduct and losses caused by market events is ground for dismissal of a Section 10(b) claim. *See Lentell*, 396 F.3d at 174 ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors … a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." (internal quotations omitted)); *In re Rhodia*, 531 F. Supp. 2d at 548 (dismissing Section 10(b) claim where "market forces other than the alleged misconduct at least contributed to, if not entirely caused, the fall in [defendant's] stock prices"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 02 MDL 1484, 02 Civ. 9690, 2008 WL 2324111, at *8 (S.D.N.Y. June 4, 2008) (refusing to permit plaintiffs to amend their complaint because the proposed amended complaint contained "no allegations to show that the steep decline was caused by the alleged fraud, rather than by the collapse of the market for Internet-based securities"); *Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) ("[Plaintiffs] do[] not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse.").[13]

---

[13] The cases cited by plaintiffs (Pls. Mem. 70 n.93), do not say otherwise.  In those cases, the plaintiff actually met its burden by pleading facts showing that its loss was caused by the alleged misstatements and not the intervening events.  *See, e.g., Montoya* v. *Mamma.com Inc.*, 05 Civ. 2313 (HB), 2006 WL 770573, at *6–8 (S.D.N.Y. Mar. 28, 2006) (denying motion to dismiss because plaintiff plead facts which, if proven, would show that plaintiffs' loss was caused by the alleged misstatements as opposed to the takeover rumors); *City of Sterling Heights Police & Fire Ret. Sys.* v. *Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (denying motion to dismiss only because plaintiffs pleaded specific facts that the loss in share value was the result of the allegedly fraudulent concealment and not the result of a continuing downward trend in the share price).  Plaintiffs' reliance on *In re Countrywide*, 588 F. Supp. 2d at 1170–73, is puzzling.  The cited portion of *Countrywide* discusses a Section 11 claim, for which loss causation is not an element, but rather, an affirmative defense.  *Id.*

Plaintiffs' argument that Citigroup stock fell more precipitously than the S&P 500 Financials Index as a whole (Pls. Mem. 70–71), does not absolve them from the obligation to plead specific loss caused by the alleged misconduct.  During the turbulent months in the fourth quarter of 2007, Citigroup's stock movement was very similar to many of its competitors—other large banking institutions.  Citigroup's stock price fell by 38% from October 1, 2007 to December 31, 2007.  (Ex. 35.)  By comparison, Washington Mutual's stock price dropped by 62% during that period (Ex. 36) and Merrill Lynch's stock price dropped by 28% during that period (Ex. 37).  Certainly, it cannot be a surprise that large financial institutions were hit harder and earlier than other sectors of the market when the financial crisis first unfolded.

### 2.    Losses *Prior* to November 4, 2007 Are Not Recoverable

Because plaintiffs identify November 4, 2007 as the date Citigroup "first disclosed $45.7 billion in CDO holdings and their purported $8–$11 billion impairment" (Pls. Mem. 68),[14] losses prior to November 4, 2007 are unrecoverable.  *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 679 (S.D.N.Y. 2007) (dismissing Section 10(b) claim on loss causation grounds because alleged losses occurred before corrective disclosure).

### 3.    Putative Class Members Who Purchased Citigroup Stock *After* November 4, 2007 Cannot Recover Their Losses

Likewise, investors who purchased Citigroup stock *after* November 4, 2007 cannot recover for losses from risks they knowingly assumed.[15]  *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 583 (S.D.N.Y. 2008) ("It is appropriate to end the class period when the market was 'cured,' – *i.e.*, 'when the full truth has been disclosed to the market and the natural market forces have had a reasonable period of time to receive, digest and reflect the bad

---

[14]    (*See also* ¶¶ 6, 73, 101, 117, 120, 131, 134, 141, 148, 174, 181, 184, 408, 421, 531, 537, 539, 558, 571, 581, 590, 613–15, 1025, 1027, 1092,1117, 1199,1208–09; Pls. Mem. 2, 18 n.14, 24, 25, 28 n 24, 30.)

[15]    Putative class members who held onto Citigroup stock after November 4, 2007 may not recover for losses after that date because they had a duty to mitigate damages once they had notice of the purported fraud.  *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370–71 (N.D. Cal. 1987) (stating that to allow recovery for losses after plaintiffs had notice of possible fraud would award plaintiffs "for being unreasonable and for failing to mitigate their damages").

news in the market price of the security.'" (quoting *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 378 (S.D.N.Y. 2000))).  Because the market was fully informed of Citigroup's exposure to CDO assets as of November 4, 2007, further declines to Citigroup's stock price due to market conditions are not attributable to the alleged fraud.[16]

**III.**

**PLAINTIFFS FAIL TO PLEAD SECURITIES FRAUD
REGARDING OTHER BUSINESS ACTIVITIES OR INVESTMENTS**

Plaintiffs' claims regarding Citigroup's non-CDO business activities are nothing more than afterthoughts in the complaint and in plaintiffs' opposition brief.  Plaintiffs' allegations regarding these products and businesses fail to plead each element of a securities fraud claim and should be dismissed.

**A.     SIVs**

Plaintiffs do not—and cannot—dispute that Citigroup regularly and expressly disclosed its involvement with SIVs, and the total assets owned by those SIVs in each of its annual filings from 2003 to 2007.  (Ex. 38 at 92; Ex. 39 at 104; Ex. 40 at 131; Ex. 41 at 146.) Furthermore, Citigroup expressly disclosed in October and November 2007 that—despite not being contractually obligated to do so—it had and would continue to provide liquidity support to these SIVs.  (Ex. 11; ¶ 676.)

Instead, plaintiffs resort to baldly asserting that Citigroup's ongoing liquidity support of the SIVs and its consolidation of SIV assets onto its balance sheet in December 2007 somehow proves false Citigroup's statements in October and November 2007 that the provision of support was not pursuant to a contractual obligation.  (Pls. Mem. 47; ¶¶ 1080–82.)  However, Citigroup plainly told investors about its practice of providing liquidity support to the SIVs, and that it, in fact, continued to provide such support as market events unfolded.  (*See* Ex. 11; ¶¶ 676,

---

[16]    Indeed, the November 4, 2007 disclosure specifically stated that: "The fair value of S&B sub-prime related exposures depends on market conditions and assumptions that are subject to change over time. … [T]he fair value of these exposures at the end of the fourth quarter will depend on future market developments.  (Ex. 13 at 1.)

21

683, 684.)  Thus, the market understood Citigroup's involvement with SIVs and the attendant liquidity risks, as reflected by discussions of these issues in articles in major newspapers such as the *New York Times* and *Wall Street Journal*.  (¶¶ 672–75.)  As a result, any claim arising out of Citigroup's statement that it was not *contractually obligated* to provide liquidity support should be dismissed.

In support of the separate allegation that, in September 2007, Citigroup misrepresented SIVs to contain "high quality" assets, plaintiffs proffer nothing more than Citigroup's November 5, 2007 disclosure that approximately "40% of SIV assets were structured finance securities including RMBS and CDOs." (¶ 690; Pls. Mem. 48.)  However, as the complaint itself concedes, the RMBS and CDOs that were owned by the SIVs were "ones that had long avoided subprime."  (¶ 690.)  As such, plaintiffs have failed to allege that the SIVs assets were not of "high quality" at the time the purported misstatement was made.

Finally, plaintiffs' assertion that Centauri (one of Citigroup's SIVs) falsely reported on September 6, 2007 that the SIV model "remains sound" is conclusory.  (¶ 689; Pls. Mem. 48.) Plaintiffs plead no facts suggesting that such a belief was unreasonably held as of September 6, 2007, or otherwise establishing that this statement was inaccurate when made.  *See Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*, 04 Civ. 3318 (LAP), 2005 WL 736217, at *4 (S.D.N.Y. Mar. 30, 2005) (dismissing allegations where plaintiff did not allege "specific facts giving rise to a strong inference that any challenged statement was *knowingly* false when made" (emphasis added)).

In any event, plaintiffs have failed to plead either scienter or loss causation with respect to the alleged misstatements regarding SIVs.  With respect to scienter, plaintiffs do not contest that the complaint lacks any particularized scienter allegation regarding SIVs.  With respect to loss causation, Citigroup had disclosed *already* in October 2007 that it had and would continue to provide support to the SIVs.  (Ex. 11.)  As such, Citigroup's announcement on

December 13, 2007, following a wave of rating agency downgrades, that it would support the SIVs, was not a corrective disclosure.[17]

## B.    Auction Rate Securities

Plaintiffs' allegations about Citigroup's involvement in the ARS business likewise fail to state a claim.  Citigroup's disclosures plainly informed customers that it "*routinely*" supported auctions, that it was "not obligated to make a market in the ARS, and that it may discontinue trading in the ARS without notice for any reason at any time."[18]  Plaintiffs plead no factual basis for the assertion that Citigroup improperly classified ARS as trading assets.  (Pls. Mem. 49.)

Plaintiffs' remaining argument—that Citigroup should have taken ARS write-downs before the first quarter of 2008—is simply a claim of fraud by hindsight.[19]  As explained in Citigroup's first quarter 10-Q of 2008, Citigroup had valued its ARS based on observable market prices prior to the auction failures in February 2008.  (Ex. 42 at 97.)  As Citigroup disclosed, these observations "generally resulted in valuations at par."  (*Id.*)  Plaintiffs have not alleged any material decline in the market prices of ARS prior to February 2008.  As such, there is no factual support in the complaint for the assertion that Citigroup should have written down these assets earlier than February 2008.

Following the auction failures in February 2008—*i.e.*, in the absence of market observables—Citigroup moved to valuing its ARS based on valuation models.  (*Id.*)  As a result, Citigroup announced write-downs of $1.5 billion on its ARS inventory in its first quarter 2008 10Q

---

[17]    Notably, plaintiffs no longer take issue with Citigroup's February and April 2008 disclosures (alleged in ¶¶ 1228, 1229), presumably because those disclosures were followed by *increases* in Citigroup's stock price.  (*See* Pls. Mem. 68–69.)

[18]    *See* https://www.smithbarney.com/products_services/fixed_income/auction_rate_securities.

[19]    This is particularly true with respect to plaintiffs' reliance on Citigroup's November 2008 announcements that (i) its ARS assets would be reclassified as held-to-maturity assets; and (ii) the United States government would provide a guarantee on $306 billion in assets.  (Pls. Mem. 50; ¶¶ 925–34.)  Events in late 2008 have nothing to do with the valuation of ARS in 2007 and early 2008.

filing—the very same quarter the first auctions failed.  (Ex. 42 at 15.)  Because certain ARS remained illiquid, Citigroup estimated the value of those securities "using internal valuation techniques that incorporate the specific characteristics of the assets underlying the ARS and take into account the current illiquidity in the market."  (*Id.* at 97; *see also* Ex. 43 at 195.)  The fact that Citigroup announced in November 2008 that certain ARS assets from the Company's trading portfolio would be reclassified as "held to maturity" does not, contrary to plaintiffs' arguments (Pls. Mem. 50), show that the value of its ARS portfolio had been overstated in prior periods.

Plaintiffs' allegations that internal emails at Citigroup acknowledge a weakening ARS market in August 2007 are insufficient to plead scienter.  Such generalized discussions do not support the inference that defendants *knew* auctions would fail in February 2008 or that Citigroup's valuation of ARS using *market prices* was inflated.  Plaintiffs make no scienter allegations at all with respect to the post-February 2008 period.

Finally, plaintiffs do not contest that they have failed to plead loss causation with respect to ARS.  (*See* Pls. Mem. 68–69.)  As set forth in defendants' opening brief, immediately following Citigroup's purported "corrective disclosure" on April 18, 2008 regarding ARS, the price per share of Citigroup's stock increased 4%.  By the subsequent week, it had increased an additional 6%.  (Defs. Mem. 71.)

## C.     Alt-A RMBS

Plaintiffs have failed to identify a duty to disclose Citigroup's Alt-A RMBS position prior to April 18, 2008.  Plaintiffs' suggestion that Citigroup's disclosures regarding its subprime CDO exposure somehow gave rise to a duty to disclose its Alt-A RMBS position is meritless.  (¶ 942.)  Alt-A RMBS are distinctly different securities than CDOs—they are collateralized by different types of mortgage assets than CDOs and consequently have vastly different risk profiles.  Moreover, nothing in Citigroup's CDO-related disclosures could possibly have misled investors into believing that Citigroup did not have Alt-A RMBS elsewhere on its

balance sheet, because Citigroup made clear in its November 4, 2007 disclosure regarding its CDO exposure that it "also has trading positions, both long and short, in U.S. sub-prime residential mortgage backed securities (RMBS) and related products … that are not included in these figures [regarding CDOs]."  (Ex. 12 at 9 n.2.)

But in any event, plaintiffs have failed to identify a specific actionable misstatement or omission regarding Alt-A RMBS, as the PSLRA requires.  Indeed, plaintiffs concede that the *sole* purported misstatement regarding Alt-A RMBS—during the January 15, 2008 earnings call— was actually a discussion of Citigroup's Alt-A whole loan position, which, once again, is a different asset class.  (Pls. Mem. 51 & n.55; Defs. Mem 60.)

Plaintiffs' claim that Citigroup failed to timely write down its Alt-A RMBS portfolio is likewise without merit.  Plaintiffs' primary argument in support of this claim is that other market participants had booked more significant write-downs on *their* Alt-A RMBS portfolios.  (¶ 961.)  However, plaintiffs allege *no facts* to suggest that Citigroup's Alt-A RMBS portfolio was equivalent in quality, vintage, or in any other respect to the portfolios held by Lehman Brothers, Morgan Stanley, or Goldman Sachs.[20]  To the extent plaintiffs point to Citigroup's later decision to reclassify certain Alt-A RMBS securities as "held to maturity," or the government's TARP investment in November 2008, as support for the proposition that Citigroup's prior Alt-A RMBS write-downs were understated, they are again improperly alleging fraud by hindsight.

In any event, plaintiffs do not contest that the complaint is devoid of particularized allegations of scienter with respect to Citigroup's Alt-A RMBS portfolio.

---

[20]   In *In re Allied Capital Corp. Securities Litigation*, 02 Civ. 3812 (GEL), 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003), the plaintiffs alleged that defendants had overvalued their investments in violation of GAAP.  In support of this allegation, the plaintiffs noted that another institution had valued its investment differently.  In granting the defendants' motion to dismiss, the court noted that the plaintiffs had failed to "explain how the two investments were comparable, or what facts would lead to the conclusion that [the other company's] valuation was the correct one.  That some other company reached a different valuation provides no reason to believe that its valuation was correct and [defendants'] wrong."  *Id.* at *4.  The same is true here.

Finally, plaintiffs also have not pleaded loss causation.  Because plaintiffs fail to identify a prior misstatement, Citigroup's April 18, 2008 and July 18, 2008 write-downs on Alt-A RMBS cannot constitute corrective disclosures.  Moreover, Citigroup's price per share actually increased following each of these disclosures.  (*See* Defs. Mem. 71; Pls. Mem. 70–71.)

## D.    Mortgage Origination

Plaintiffs do not identify any specific misstatement about Citigroup's mortgage origination business.  Instead, they continue to take issue with general statements of optimism like: "we're not giving away the shop to grow" (¶ 812), or "our subprime portfolio … actually looks very good" (¶ 816(d); *see also* Pls. Mem. 52–53).[21]  However, plaintiffs fail to allege any fact showing that these statements were inaccurate when made.  *See Pollio*, 2009 WL 921133, at *3 (dismissing Section 10(b) claim for, *inter alia*, failure "to allege with any specificity the reason or reasons why any of defendants' statements were false or misleading").  Nor have they alleged that any defendant had knowledge of any purported inaccuracy.  Conclusory assertions that defendants had access to information contradicting their public statements are insufficient.  *See In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 636–37 (S.D.N.Y. 2008) ("If the facts alleged in the Complaint are insufficient to support Plaintiffs' belief that false or misleading statements were made, those facts cannot support an inference that Defendants knew or should have known their statements were false or misleading when Defendants made them." (internal citations omitted)).

Plaintiffs' scienter allegations regarding Citigroup's mortgage origination business are simply inadequate.  Contrary to plaintiffs' arguments, lawsuits brought by Citigroup alleging

---

[21]    Courts routinely reject these sorts of statements as not actionable.  *See, e.g.*, *Pollio* v. *MF Global, Ltd.*, 08 Civ. 6858 (JSR), 2009 WL 921133, at *4 (S.D.N.Y. Apr. 7, 2009) (rejecting as not actionable "generalized expressions of puffery and optimism" such as "the franchise is performing well", "we have emerged as a stronger company than ever before", and "business is in new and robust health"); *Harborview Master Fund, LP* v. *Lightpath Tech., Inc.*, 07 Civ. 9228 (NRB), 2009 WL 249391, at *9 (S.D.N.Y. Jan. 30, 2009) ("The Second Circuit has made clear that 'general announcements' that a company is optimistic about earnings and expects a product to perform well 'cannot constitute actionable statements under the securities laws' because they would not mislead a reasonable investor." (citing *San Leandro Emergency Med. Group Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).

impairment to $17 million in correspondent channel loans—one one-hundredth of one percent of Citigroup's first mortgage portfolio—cannot plausibly constitute a "red flag."[22]  Vague assertions that these two suits are "representative" of others (Pls. Mem. 54–55), do not release plaintiffs from the heightened pleading standard.

Likewise, plaintiffs assert that a November 5, 2007 statement that $4.2 billion in subprime loans purchased within the prior six months were "performing" was false or misleading because Citigroup filed a complaint in April 2008 alleging that certain loans acquired from Accredited in March 2007 were "non-performing."  (¶¶ 774–784.)  However, plaintiffs have not alleged that defendants knew on November 5, 2007—six months prior to the filing of the Accredited complaint—that there were material problems with loans purchased from Accredited. (*See id.*)  In any event, plaintiffs do not allege that the subprime loans described on November 5, 2007 actually included the $2.7 billion in loans purchased from Accredited.

Finally, plaintiffs do not contest that they have made no loss causation allegation regarding Citigroup's mortgage origination disclosures.  (Pls. Mem. 70–71.)  For this reason alone, any claims arising out of such disclosures must be dismissed. [23]

### E.    Leveraged Lending

The sole claim relating to leveraged lending arises out of two statements made in *2004* in which the Company stated that corporate loans were not a focus of Citigroup's growth strategy.  (¶¶ 891–92.)  Plaintiffs allege that these claims were false and misleading because they falsely portrayed a conservative investment practice in the area of corporate loans and misrepresented Citigroup's growth in the leveraged lending business.  (¶ 893; Pls. Mem. 56–57.)

---

[22]   *In re Alstom SA Securities Litigation*, 454 F. Supp. 2d 187 (S.D.N.Y. 2006), cited by plaintiffs, is readily distinguishable from the instant case.  In *In re Alstom*, the court found that plaintiffs had pleaded a "red flag" by alleging that senior management at the parent company had been alerted to the fraud by its subsidiary and the parent's own disclosures suggested that it had concluded that a fraud at the subsidiary required an earnings restatement.  *Id.* at 200–01.

[23]   In addition, as discussed in defendants' opening brief (Defs. Mem. 49), and not contested by plaintiffs, allegations regarding Citigroup's First Collateral Services ("FCS") portfolio are inapposite to any allegation of false or misleading statement, and cannot support an inference of scienter.

As an initial matter, plaintiffs fail to allege that the statements were not true at the time they were made, or that Citigroup was in fact "focused" on growing its corporate loan business.  Indeed, plaintiffs do not dispute that Citigroup's leveraged lending commitment was "not a huge business for us in the overall scheme of things"—less than 3% of Citigroup's $2 trillion in balance sheet assets at the time.  (¶ 890.)[24]  Moreover, these statements say *nothing* about Citigroup's management of its corporate lending risk.

Finally, plaintiffs fail to plead either scienter or loss causation with respect to leveraged lending.  There is not a single allegation that any purported misstatement or omission was knowingly made.  And after October 1, 2007, when Citigroup disclosed its total leveraged lending exposure—the very information alleged to be fraudulently withheld—Citigroup's stock price rose.  (Defs. Mem. 70; ¶ 895, 1190–91.)

## F.    Solvency

Plaintiffs allege that, beginning in late 2007, Citigroup made statements regarding its solvency that were false and misleading because Citigroup was "forced to obtain two capital infusions from the government *in October and November 2008*."  (Pls. Mem. 58 (emphasis added); *see* ¶¶ 987, 1001.)  Allegations based on hindsight fail to state a claim for fraud.

In any event, Citigroup's significant write-downs and exposure to "risky assets" were fully disclosed by late 2007 and early 2008, and plaintiffs do not allege otherwise.  Accordingly, unlike in the cases cited by plaintiffs, the market was provided full information regarding Citigroup's actual financial condition.  *Cf. In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 166–68 (S.D.N.Y. 2003) (defendants made repeated assurances that company's financial situation was sound, without disclosing billions of dollars in losses and write-downs); *Novaks* v. *Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (defendants made assurances regarding its

---

[24]   In any event, the amount of Citigroup's outstanding corporate loans was explicitly disclosed throughout the class period.  Citigroup's annual reports provided a line item for Citigroup's net corporate loans outstanding.  (*See* Ex. 39 at 101; Ex. 40 at 4, 60; Ex. 41 at 4, 61; Ex. 44 at 145.)

inventory but did not disclose that certain of its inventory was worthless). The fact that Citigroup reclassified certain assets from trading to "held to maturity" in November 2008 does not—contrary to plaintiffs' assertion—suggest that these assets had no value. This reclassification is entirely consistent with the stated belief that the assets were affected by the current financial crisis but were fundamentally sound and would regain value. (Ex. 45 at 12.)

In addition, plaintiffs have failed to plead scienter or loss causation with respect to any purported misstatement relating to Citigroup's solvency. As discussed in defendants' opening brief, plaintiffs' sweeping allegation that all of Citigroup's statements were recklessly or knowingly false because of "significant uncertainty" regarding its financial condition is not sufficiently particularized to plead scienter. Indeed, since late 2007, the entire financial market has been subject to significant uncertainty. Likewise, the vague allegation that "rumors" regarding Citigroup's ability to continue as a going concern caused declines in stock value (Pls. Mem. 68–69), does not suffice to establish that the market was reacting to a purported "corrective disclosure" as opposed to the continued deterioration of the financial markets. *See Lentell*, 396 F.3d at 177.

## CONCLUSION

For the reasons set forth above and in their opening brief, defendants respectfully request that the Court dismiss the complaint in its entirety and with prejudice.

Dated: New York, New York
          May 13, 2009

Respectfully submitted,

/s/ Richard A. Rosen

Brad S. Karp (bkarp@paulweiss.com)
Richard A. Rosen (rrosen@paulweiss.com)
Susanna M. Buergel (sbuergel@paulweiss.com)
Karen R. King (kking@paulweiss.com)

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.  (212) 373-3000

*Attorneys for Defendants Citigroup Inc., Charles Prince, Robert Rubin, Lewis Kaden, Sallie L. Krawcheck, Gary Crittenden, Steven Freiberg, Robert Druskin, Todd S. Thomson, Thomas G. Maheras, Michael Stuart Klein, David C. Bushnell, John S. Gerspach, Stephen R. Volk, and Vikram Pandit*

WACHTELL, LIPTON, ROSEN & KATZ
Lawrence B. Pedowitz
Jonathan M. Moses
John F. Lynch

51 West 52nd Street
New York, New York 10019
Tel:  (212) 403-1000

*Attorneys for Defendant Citigroup Inc.*

30