UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC. SECURITIES LITIGATION | Master File No. 07 Civ. 9901 (SHS) |

## NOTICE OF FILING

PLEASE TAKE NOTICE, that on December 29, 2009, the undersigned caused the attached letter (with exhibit) to be submitted, with a copy to defendants' counsel, to the Honorable Sidney H. Stein in the above-captioned action.

Dated:   December 30, 2009

                                        KIRBY McINERNEY LLP


                                        By:       /s/
                                            Ira M. Press
                                            Peter S. Linden
                                        825 Third Avenue, 16th floor
                                        New York, NY 10022
                                        Tel: (212) 371-6600
                                        Fax: (212) 751-2540

                                        Counsel for Interim Lead Plaintiffs

# KIRBY McINERNEY LLP

825 Third Avenue
New York, NY 10022
212.371.6600

Fax. 212.751.2540
WWW.KMLLP.COM

**BY HAND**

December 29, 2009

Hon. Sidney H. Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

      Re:    *Citigroup, Inc. Securities Litigation*, No. 07 Civ. 9901 (SHS)
             Our File No. 744.01

Dear Judge Stein:

      We represent the Interim Lead Plaintiffs in the above-referenced lawsuit. We write to alert the Court to assertions recently made by Citigroup in another CDO-related action – *Ambac Credit Products, LLC, v. Citigroup Inc.*, Index No. 09-602387 (Sup. Ct. N.Y. County) (the "*Ambac* Action")[1] - that directly contradict the two central arguments Citigroup advanced in its motion to dismiss here. Citigroup's own assertions as to these matters in the *Ambac* action *support* plaintiffs' arguments in this action. Citigroup cannot be correct in espousing diametrically-opposed assertions simultaneously. It is Citigroup's assertions here that are incorrect.

---

      [1]      The *Ambac* Action concerns a $3 billion CDO that Citigroup created in 2007 named Ridgeway Court Funding II ("Ridgeway II"), whose $2 billion super senior tranche risk Citigroup transferred to Ambac. Attached hereto are excerpts from Citigroup's brief submitted in support of its motion to dismiss in the *Ambac* Action (Citigroup MTD Brief in *Ambac* Action) (Exhibit A).

      The Complaint in this action contains specific allegations as to Ridgeway II (¶¶ 190, 200, 466, 468, 481, 485, 487, 488) and to what Citigroup meant to accomplish through it and other like CDOs that Citigroup created in 2007 whose super senior tranche risks were likewise offloaded to Ambac (¶¶ 116, 120, 125, 190-204, 489-492).

KIRBY McINERNEY LLP

Hon. Sidney H. Stein
December 29, 2009
Page 2

### A. "Reliance" on Credit Ratings: Here, Defendants Insist They Relied on Credit Ratings and Were Unaware of Any CDO-Related Risks; There, Citigroup Insists Ambac Could Not Have Relied on Credit Ratings and Was Informed and Aware of Extant, Specific CDO-Related Risks

Here, Defendants argue innocence primarily by insisting that they relied on CDO credit ratings. Defendants disclaim any awareness of CDO risk (and thus seek to contest plaintiffs' allegations of falsity and scienter) until CDO credit ratings were downgraded in October 2007. *See* Defendants' March 13, 2009 brief in support of motion to dismiss at 24, 37-41.

In the *Ambac* Action, Citigroup argues the exact opposite. Citigroup there asserts (Citigroup MTD Brief in *Ambac* action at pp. 15-16) that Ambac could not have relied on CDO credit ratings because it was warned – in CDO offering materials *authored by Citigroup itself* – of specific reasons why those very credit ratings could not be relied on. Citigroup's recent words in the *Ambac* Action (quoting Citigroup's vintage-2007 words in Ridgeway II's Offering Circular sent to prospective CDO purchasers):

> [T]he Marketing Materials warned that ratings assigned to the collateral in Ridgeway II may understate the true risks of the collateral:
>
> \* \* \*
>
> Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value; therefore, ratings may not fully reflect the true risks of an investment. Also, **rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates**. . . . Rating agencies' assumptions for Asset Backed Securities and for structures employed as part of this transaction have not been tested in all conceivable credit environments. If any such assumptions prove to be incorrect over a period of time, the performance of the Notes could be adversely affected.

KIRBY McINERNEY LLP

Hon. Sidney H. Stein
December 29, 2009
Page 3

(Citigroup MTD Brief in *Ambac* Action at 15-16) (emphasis in original, citations omitted)

It is impossible to reconcile (1) Citigroup's insistence here that it relied entirely on CDO credit ratings through October 2007, with (2) Citigroup's insistence there that such reliance was impossible *in light of Citigroup-authored warnings concerning the unreliability of credit ratings in general and of how recent mortgage-market developments could adversely affect CDOs' market value and credit risk.*[2] Put more bluntly, it is impossible to credit Citigroup's stance here given what Citigroup itself insists that Citigroup itself stated at the time.

### B. The ABX Index: Here, Defendants Insist the ABX Says Nothing At All as To CDO Value; There, Citigroup Uses the ABX as an Indicator of CDO Value

The Complaint here alleged that Citigroup materially misstated its financial results through the first three quarters of 2007 by misvaluing its (still undisclosed) CDOs at full value rather than at impaired values then evidenced by declining ABX prices (¶¶ 218, 308-316, 325, 396, 515, 521, 594-639, 1045-1073, 1122; Plaintiffs' Opp. to MTD. Br. at 2-3, 16-17, 33-34, 36, 39, 44).

Here, Defendants insisted that the ABX said nothing of relevance, interest or validity to CDO value (Def. MTD Br. at 29-30, 37), and thus did not serve as evidence of either falsity (overstated CDO valuations and financial results) or scienter (Defendants' awareness of CDO impairment).

Defendants reverse themselves in the *Ambac* Action. There, Citigroup itself used the ABX as an indicator of CDO fair value (Citigroup MTD Brief in *Ambac* at 21-22). Amazingly, Citigroup there describes the ABX just as plaintiffs did here: arguing that the opposing party's subjective security valuations were contradicted by "observable, contemporaneous market data – specifically the ABX, a widely recognized set of indices" (*Id.* at 21).

Citigroup's characterization of the ABX in the *Ambac* Action as a "widely recognized" source of "observable, contemporaneous market data" speaking to the value of CDOs reveals Citigroup's protestations here to be false posturing (as plaintiffs here anyway demonstrated – *see* Plaintiffs' Opp. to MTD. Br. at 2-3, 14-17, 33-34).

---

[2] The *Ambac* Action momentarily aside, plaintiffs made this exact point in opposing Defendants' motion to dismiss (*see* Plaintiffs April 24, 2009 Opp. To MTD at 43).

KIRBY McINERNEY LLP

Hon. Sidney H. Stein
December 29, 2009
Page 4

In sum, defendants' own arguments in the *Ambac* action provide material support for plaintiffs' allegations of falsity and scienter in the action before this Court.

Respectfully submitted,

Ira M. Press

Enclosure

cc:   Brad Karp, Esq. (via email w/encl.)
      Richard Rosen, Esq. (via email w/encl.)
      Susanna Buergel, Esq. (via email w/encl.)
      Lawrence B. Pedowitz, Esq. (via email w/encl.)
      Steven Singer, Esq. (via email w/encl.)

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

AMBAC CREDIT PRODUCTS, LLC,

        Plaintiff,

        v.

CITIGROUP INC., CITIGROUP GLOBAL MARKETS LTD., and CREDIT SUISSE ALTERNATIVE CAPITAL, INC.,

        Defendants.

Index No. 09-602387
Part 60
(Fried, J.)

---

## MEMORANDUM OF LAW IN SUPPORT OF CITIGROUP INC. AND CITIGROUP GLOBAL MARKETS LTD.'S <u>MOTION TO DISMISS THE COMPLAINT</u>

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Brad S. Karp
Claudia Hammerman
Susanna M. Buergel
Michael N. Berger

1285 Avenue of the Americas
New York, New York 10019-6064
Tel. (212) 373-3000

*Attorneys for Defendants Citigroup Inc. and Citigroup Global Markets Ltd.*

there is no "central source for relevant data or standardized method for measuring default and recovery rates" for the collateral. (Ex. 5 at v, 43 (Offering Circular).)

Ambac was also provided detailed and specific information about the nature of the collateral in Ridgeway II. For instance, the Termsheet indicated that Ridgeway II would include approximately $3 billion of underlying securities – primarily tranches of CDOs (34.8%), subprime RMBS (25.8%), and midprime RMBS (26.2%). (Ex. 6 at 1.) The Termsheet included a spreadsheet detailing each of the underlying collateral securities, and listing its unique identifying CUSIP,[11] the type of security (*e.g.*, subprime RMBS, midprime RMBS, etc.), the face amount of the security, and the rating on the security.[12] (*Id.* at 2.)

Comprehensive warnings about the risks associated with this collateral were provided in the Marketing Materials. Among other risks, the Offering Circular explicitly warned of recent stress in the residential mortgage market, especially in subprime, that could affect the value of the RMBS and CDO securities in the portfolio and cause losses:

> Recent Developments in the RMBS Market. . . . Recently, delinquencies, **defaults and losses on residential mortgage loans have increased and may continue to increase, which may affect the performance of RMBS securities, in particular Sub-Prime RMBS** which are backed by subprime mortgage loans. . . . **These adverse changes in market conditions may** reduce the cashflow which the Issuer receives from Eligible Collateral Debt Securities held by the Issuer, **decrease the market value of such RMBS Securities and CDO Securities and increase the incidence and severity of credit events under CDS Assets.**

(Ex. 5 at 41, 43 (emphasis added).) In addition, the Marketing Materials warned that ratings assigned to the collateral in Ridgeway II may understate the true risks of the collateral:

> Credit Ratings. Credit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality. A **credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating**

---

[11] CUSIP stands for Committee on Uniform Securities Identification Procedures. Every security bears a unique CUSIP number. *See* U.S. Securities & Exchange Comm'n, CUSIP Number, http://www.sec.gov/answers/cusip.htm.

[12] As Ambac notes, at this point, 90% of the collateral for Ridgeway II had been acquired. (¶ 48.)

> agency .... Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value; therefore, ratings may not fully reflect the true risks of an investment. Also, **rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates.** ... Rating agencies' assumptions for Asset Backed Securities and for structures employed as part of this transaction have not been tested in all conceivable credit environments. If any such assumptions prove to be incorrect over a period of time, the performance of the Notes could be adversely affected.

(Ex. 5 at 40 (emphasis added), *see also* Ex. 15 at 37.)

The Offering Circular also warned of "potential conflicts of interest," including that Ridgeway II may include assets "originally acquired by Citi ... in connection with its underwriting" of other securitizations. (Ex. 5 at 44, 45.) However, the Offering Circular stated that assets would only be purchased from Citi "to the extent [CSAC] determines that such purchases are consistent with the investment guidelines and objectives" of the CDO and that, in all events, purchases from any third party would be "at fair market value" and "otherwise on an 'arm's length basis.'" (*Id.* at 44–45, 50.)

Investors were explicitly advised "to conduct an independent investigation of the risks posed by an investment in the Notes," including "mak[ing] their own assessment of the likelihood of defaults, the rate thereof and the level of recoveries upon such defaults." (*Id.* at v, 32.) The Marketing Materials stated that representatives of CGMI "will be available to answer questions" concerning Ridgeway II and the underlying collateral and will "make available such other information as investors may reasonably request." (*Id.* at v.) Investors were warned, however, that "[n]o person is authorized to give any information or to make any representation not contained in this Offering Circular and, if given or made, such information or representation must not be relied upon." (*Id.* at v.)

WL 1949071, at *4 (Sup. Ct. N.Y. County Sept. 1, 2004) (granting motion to dismiss where plaintiff "fail[ed] to plead in sufficient detail how the [purported] representations [were] false"); *see also Logan Advisors v. Patriarch Partners, LLC*, 63 A.D.3d 440, 443 (1st Dep't 2009) (rejecting claim that defendant improperly valued CDO assets where plaintiff "points to no evidence that the values assigned" by defendants were improper nor "provides any proof as to what the fair market value . . . should have been").

In fact, Ambac's naked assertion as to the "true value" of the Ridgeway II collateral is flatly contradicted by observable, contemporaneous market data – specifically the ABX, a widely recognized set of indices that track the value of RMBS based on the year of issuance (*e.g.*, first half of 2006, second half of 2006, etc.) and the rating of the security (*e.g.*, A, AA, etc.). Some simple math illustrates the point: Ambac asserts that a "reasonable mark-to-market" value (or "mark") on the entire portfolio was only 79% of the face amount as of May 31, 2007 and that a subset of this portfolio – Citigroup CDO Securities – had a reasonable mark-to-market value of only 70%. (¶¶ 76–77.) CDOs comprised 35% of the collateral pool, while RMBS securities comprised essentially the entire 65% balance. Assuming that all the CDO securities in the collateral pool deteriorated in line with the Citigroup CDO Securities (*i.e.*, 70% of face, according to Ambac), Ambac's average-weighted mark on the remaining RMBS collateral in Ridgeway II would be approximately 84%.[14] But this purported average mark on RMBS, however, bears no relationship to the contemporaneous ABX valuations of such assets – or any other observable, public market data.

---

[14] The following formula illustrates the calculation: Average Portfolio Deterioration = (Deterioration on CDOs * Percentage of CDOs in Portfolio) + (Deterioration on RMBS * Percentage of RMBS in Portfolio). Here, Ambac asserts that the Average Portfolio Deterioration was 79% and that the Citigroup CDO deterioration was 70%. Assuming that 70% applies to all the CDOs in the portfolio, the calculation is: (.79 = [ (.70 * .35) + (X% * .65) ]. X in this formula is 84%. Of course, if Ambac contends that the non-Citigroup CDO Securities in Ridgeway II suffered less deterioration than the Citigroup CDO Securities, this would imply an even lower average mark-to-market value for the RMBS in Ridgeway II, rendering Ambac's allegations even more at odds with observable market data.

Specifically, values reported as of May 31, 2007 on the ABX closely track the RMBS collateral marks provided to Ambac in June 2007. The comparison is illustrated on Exhibit 21, which shows the marks provided by CSAC on each of the underlying RMBS assets in Ridgeway II as compared to the mark for each of those assets based on the corresponding ABX index. Notably, the CSAC marks are remarkably similar to the corresponding ABX marks; indeed, the weighted-average mark provided by CSAC for the RMBS in Ridgeway II is approximately 99% compared to a weighted-average ABX mark of approximately 98% for the corresponding RMBS collateral.[15] Not only does this data support the accuracy of the marks provided by CSAC, but it clearly demonstrates that Ambac's allegations, which correspond to an alleged 84% mark (or lower) for the RMBS securities, lack any factual basis. Because the publicly available ABX information "flatly contradicts" Ambac's assertion regarding the collateral marks, this claim should be dismissed. *See Morganthow & Latham v. Bank of N.Y. Co., Inc.*, 305 A.D.2d 74, 75, 82 (1st Dep't 2003).[16]

In any event, "opinions of value . . . do not constitute actionable fraud." *Elghanian v. Harvey*, 249 A.D.2d 206, 206 (1st Dep't 1998); *see also Zanani v. Savad*, 217 A.D.2d 696, 696 (2d Dep't 1995) (noting that a "mere estimate" is not actionable). The values provided by CSAC constituted nothing more than an *estimate* of the market value for these securities. Such expressions of opinion as to valuation are not actionable as fraud. *See Longo v. Butler Equities II, LP*, 278 A.D.2d 97, 97 (1st Dep't 2000) (alleged statements regarding value of target company were mere expressions of opinion that could not constitute fraud); *In re Salomon*

---

[15] It is not surprising that the ABX market data is consistent with the marks provided by CSAC. Indeed, the Indenture (the governing document for the CDO) required CSAC to provide marks based on market data (where available). (Ex. 22 at 33 (Indenture).)

[16] Ambac itself has noted that there was a strong "correlation" between the Ridgeway II portfolio and the ABX indices. (*See, e.g.*, ¶ 81, 98, 104.) Indeed, Ambac complains that this "correlation" somehow violated the eligibility criteria for the portfolio which prohibited the purchase of any "Index Security." (¶¶ 98, 104.) But Ambac does not (and cannot) allege that the Ridgeway II collateral included a single Index Security.