# KIRBY McINERNEY LLP

825 Third Avenue
New York, NY 10022
212.371.6600

Fax. 212.751.2540
WWW.KMLLP.COM

**BY HAND**

April 22, 2010

The Honorable Sidney H. Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

      Re:   *In re Citigroup Inc. Securities Litigation*, No. 07 Civ. 9901 (SHS)
              Our File No. 744.01

Dear Judge Stein:

      We represent lead plaintiffs in the above-referenced action. We write to bring to the Court's attention new evidence[1] recently made public by the Financial Crisis Inquiry Commission (the "FCIC")[2] that provides further and powerful confirmation of many allegations of the Consolidated Amended Consolidated Class Action Complaint dated February 9, 2009 (the "Complaint").

      In Part I below ("Testimony"), we show that Citigroup executives' recent testimony before the FCIC confirms plaintiffs' core allegation that Citigroup was aware of subprime risk generally – and CDO risk specifically – no later than late 2006. Despite such awareness, Citigroup knowingly misrepresented and concealed its exposures to such risk at all times through at least November 2007 – even after it understood its CDO exposures to constitute a "severe concentration risk" by October

---

[1] Attached hereto are: excerpts of the transcript of the FCIC's April 7, 2010 hearing (third panel of witnesses) (Exhibit A); excerpts of the transcript of the FCIC's April 8, 2010 hearing (first panel of witnesses) (Exhibit B); the written testimony of Richard Bowen, III to the FCIC (Exhibit C); and excerpts of the transcript of the FCIC's April 7, 2010 hearing (second panel of witnesses) (Exhibit D).

[2] The FCIC began an investigation of Citigroup as part of its statutory mission to determine "the causes ... of the current financial and economic crisis." Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 5(a) (May 20, 2009). The FCIC interviewed Citigroup executives with direct responsibility for Citigroup's mortgage and CDO operations, reviewed internal Citigroup documents concerning those operations, and held a series of hearings on April 7-8, 2010 during which Citigroup's senior officers and executives gave sworn testimony on those topics.

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 2

2006. We also show that the testimony of Richard Bowen, III, Senior Vice President and Business Chief Underwriter for Correspondent Lending in Citigroup's Consumer Lending Group since early 2006, corroborates the Complaint's allegations that Citigroup made material misrepresentations about the quality of its correspondent mortgage portfolio and its subprime mortgage exposures. Mr. Bowen's testimony also establishes the materiality of such misrepresentations. Finally, Mr. Bowen's first-hand testimony demonstrates conclusively that Citigroup knew, as early as 2006, of the existence and huge magnitude of the risks associated with its acquisitions of tens of billions of dollars of mortgages that violated Citigroup's own underwriting and acquisition guidelines.

In Part II below ("Documents), we show that internal Citigroup documents unearthed by the FCIC demonstrate that Citigroup knowingly misrepresented its CDO exposures: (1) *ab initio*, through its use of a "liquidity put" structure explicitly designed to allow Citigroup to hide its exposure and mask its inadequate capitalization in light of that (concealed) exposure; (2) no later than October 2006, when Citigroup understood its CDO exposures to constitute a severe risk concentration; and (3) until at least November 2007, despite a continuous series of "red flags" as to CDO risk throughout early- and mid-2007 identified by Citigroup's own Chief Risk Officer.

Knowing misrepresentation is rarely more stark than here: the recently-revealed evidence confirms that *on the very same day* that Citigroup publicly reassured its investors that its total subprime exposures amounted to only $13 billion, internal presentations to Citigroup's Board of Directors informed them that these exposures were *$55 billion* (the difference between the public and private disclosures being Citigroup's undisclosed $43 billion of CDO super senior tranches).

We do not here address Citigroup executives' self-serving testimony that they remained unaware of any risk posed by Citigroup's super senior CDO exposures until August/September 2007. They advanced to the FCIC the same arguments proffered as defenses here. The FCIC did not find these arguments credible or defensible.[3]

---

[3]    For example, FCIC Chairman Angelides observed – contra Citigroup witnesses' insistence that super senior CDO tranches were only imperiled by severe housing price declines – that super senior CDO tranches suffered catastrophic impairment as a result of mild housing price declines. *See* Ex. A at 39-40. The Complaint makes the very same point *using Citigroup's own contemporary analyses from March/April 2007* (¶¶ 372-75, 394-96, 1121-29 and 1134-39). Likewise, though Citigroup executives stated to the FCIC and this Court that they relied on super senior triple-A credit ratings to think such instruments impervious to any risk prior to late 2007, FCIC member Georgiou found such reliance and such ratings unbelievable. *See* Ex. A at 22-23, Ex. B at 20-21. The Complaint asserts the same (¶¶1108-1111), for the same reasons (¶¶ 156-70; 86-100) and many others (¶¶ 372-75, 629-36, 1116-29, 1134-39; *see also* ¶¶ 206-406). Not the least of which being that Citigroup itself warned the purchasers of its CDOs (the largest of whom was

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 3

## I. TESTIMONY

### A. Defendants' Admission that Citigroup's Large CDO Exposures *Specifically* Caused Citigroup To Suffer *Uniquely* Large Losses that, Absent Citigroup's Uniquely Large Federal Rescues, Would Have Toppled Citigroup

A quick preliminary matter. In their testimony to the FCIC, Citigroup's senior executives affirmed in plain language that Citigroup's CDO exposures, *particularly*, set Citigroup's troubles apart from other financial institutions and were responsible for bringing the institution to its knees:

> PRINCE: "Citi's writedowns on these specific securities totaled some $30 billion over a period of six quarters, and I believe it is fair to say that *this factor alone made a substantial part of the difference between Citi's ultimate problems and those of other banks.*" (Ex. B at 2-3) (emphasis added)

> \*\*\*\*\*

> RUBIN: "In my view, there were two primary causes of the problems. First, Citi, like other financial institutions, suffered large losses due to the financial crisis... the losses in Citi's businesses, *other than CDOs*, were roughly comparable to peer firms. Second, Citi suffered *distinctively* high losses as a result of its retention of so-called super-senior tranches of CDOs.
> \*\*\*\*\*
> Ultimately, Citi took $30 billion dollars in losses on its super-senior CDO positions. *These losses were a substantial cause of the bank's financial problems, and led to the assistance of the United States government.*" (Ex. B at 4-5) (emphasis added)

These common sense admissions to the FCIC concede two elements of plaintiffs' claims: materiality and loss causation (and thus defuse all of defendants' arguments here on these issues). Likewise, they dispose of defendants' ingenuous argument that plaintiffs' complaint arises not from anything Citigroup-specific but rather from an "unprecedented market meltdown" in which Citigroup merely happened to find itself. Finally, they discredit defendants' attempts to argue that Citigroup's fundamental financial condition and solvency were not misrepresented.

---

Citigroup itself) *not to rely* on those very ratings (¶ 632).


KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 4

> B. **Citigroup Executives' Testimony Confirms Plaintiffs' Core Allegations that Citigroup was Awake to CDO Risk No Later than Late 2006 (and Thereafter Acted and Schemed to Conceal Its CDO Exposures)**
>
>> 1. **Citigroup Knew Of Materializing Subprime Mortgage Risk No Later than Late 2006 and Was Anticipating Real Estate Price Declines for 2007 and Thereafter**

Citigroup executives' testimony to the FCIC establishes that Citigroup was fully awake to subprime risk and to continued housing price declines no later than late 2006, and establishes (as further discussed in Section I.B.2 immediately below) beyond any possible dispute Citigroup's awareness these factors would reach CDOs:

> MAHERAS: "We were negative on subprime, as a matter. We were, from the earliest part of '07 and the end of '06, we were, in most of our business areas, reducing our risk around subprime... We weren't sitting there twiddling our thumbs and assuming that housing could never go down. We had in our base case that housing was going down during '07 and would likely continue." (Ex. A at 14)

This admission dovetails exactly with the timeline established by the factual allegations in the Complaint. By January 2007, Defendant Prince himself was on record as to the imminent losses that those with subprime exposure would suffer (¶¶ 507-08), and Citigroup published a research report detailing exactly how and why nonprime mortgages originated during 2006 (the ultimate collateral ultimately underlying Citigroup's CDOs) were the "worst vintage in subprime history" (¶¶ 321, 1115). Of course, these conclusions were in no way extraordinary, but rather widespread throughout the market and financial press at the time (¶¶ 243-305).

Because of what housing price declines implied for super senior CDO risk and value (¶¶ 372-75), that Citigroup was predicting continued housing price declines no later than late 2006 is perhaps determinative in establishing both falsity and scienter. *Internal Citigroup analysis from April 2007 shows that super senior CDO tranches would suffer substantial impairment should housing prices merely fail to appreciate, and near-total impairment should housing prices actually decline* (¶¶ 372-75).[4] The Complaint explains exactly why.[5] Given that Citigroup was predicting housing price

---

[4] This analysis is not an outlier: it duplicated others performed at the same time and/or before within Citigroup (¶¶ 394-96, 1121-29) and without (¶¶ 306-48, 361-71, 396-406).

[5] In a nutshell, *see* ¶¶ 86, 100, 156-170, 353-96; details at ¶¶ 76-100, 156-70, 308-09, 328, 335-42, 349-96, 1108-11, 1121-29, 1134-39. *See also* MTD Opp. Br. at 11-14, 39-44.

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 5

declines no later than late 2006, and given that Citigroup understood the devastating implications of such declines for super senior CDO tranches no later than April 2007, Citigroup's CDO-related misrepresentations, misleading statements and omissions (¶¶ 496-97, 535-639) – which discussed CDOs while giving no hint of any such CDO exposures at all, let alone more than $43 billion of it – are actionable from at least that time onwards.

> 2. **Citigroup Understood During the Class Period That Such Risk Would Reach Junior CDO Tranches And, So Knowing, Took "Significant Steps" to Reduce Citigroup's Junior CDO Exposures**

Mutually-reinforcing testimony provided by Citigroup executives in charge of Citigroup's CDO operations (Mr. Dominguez), CDO risk management (Mr. Barnes), and Citigroup's Markets & Banking division (Defendant Maheras) establishes beyond any doubt that Citigroup was fully aware, long before any public disclosure, that junior CDO tranches *held by Citigroup*[6] were at risk due to the above-mentioned factors (subprime mortgage risk and declining housing prices):

> MAHERAS: "When issues arose in early 2007 regarding the more junior CDO tranches we held. . ." (Ex. A at 5)

> MAHERAS: "My focus on the CDO business increased when we began to see deterioration in the subprime market and related financial fall-out in early 2007. This is when the lower-rated CDO securities started to decline in value when we took 6significant steps to reduce our exposure to these riskier CDO positions." (*Id.* at 6)

> DOMINGUEZ: We had already seen it [*i.e.*, "the dramatic decline in the underlying subprime markets"] feed into the lower-rated tranches, you know, earlier that summer and late that spring." (*Id.* at 10)

> MAHERAS: "after having appropriately recognized that the housing, as an asset class, was coming down some, appropriately recognized and acted accordingly by reducing our risk in the junior areas – the risky areas, those areas that were perceived to be risky or that could have some risk. We were actively engaged and successful at reducing risks all over the firm." (*Id.* at 15)

> BARNES: "the other thing is, while we saw the market deteriorate, the business was actually very proactive at reducing some of the lower order risks, some of the first order risks. So in terms of getting rid of the more junior tranches. . ." (*Id.* at 31-32)

---

[6] These more-recently created junior tranches (¶¶ 154-55) joined Citigroup's $25 billion of liquidity put CDO exposures accumulated largely during 2004 and 2005 (¶¶ 128, 131-41).

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 6

>MAHERAS: "I can assure you that the managers of the structured credit business [] were actively focused on subprime risks, and actively focused on risk reduction in the area, and were effectuating that, again, and where they saw the risk. And that was happening actively" (*Id.* at 32)

Behind the anodyne terminology – "significant steps" to reduce junior CDO tranche exposures; "acted accordingly by reducing our risk in the junior areas. . . actively engaged and successful"; "the business was actually very proactive at reducing some of the lower order risks. . . getting rid of the more junior tranches" – lies a truly extraordinary reality, documented in great factual detail (¶¶ 465–88; *see also* ¶¶ 96-98, 102-206, 353-59, 436-64), which this testimony entirely confirms. The FCIC did not probe what these "significant steps" were by which Citigroup was "very proactive at. . . getting rid of the more junior tranches", but these matters are the very ones detailed in the Complaint.

The testimony puts beyond dispute plaintiffs' most striking allegations: the CDO repackaging schemes that occupied most of Citigroup's CDO output from late 2006 onwards, by which Citigroup sought to conceal and/or offload such junior CDO tranche exposures by creating new CDOs collateralized by the junior tranche detritus of the old CDOs (¶¶ 96-98, 111-16, 122-30, 154-55, 177-82, 190-205, 356-59, 465-88). This testimony confirms the Complaint's allegations that Citigroup experienced a CDO emergency by late 2006 with respect to billions of dollars of junior CDO tranches that it had recently created but now found itself unable to sell (¶¶ 122-30, 154-55). As these tranches were first in line for materializing subprime losses, investors no longer wished to purchase them – exactly the same reasons behind Citigroup's evident and now-admitted wish to be rid of them (*Id.* and quoted testimony above). Citigroup's ingenious solution: to create new CDOs to serve as buyers for the old CDO junior tranches, new CDOs abnormally structured so as to allow them to purchase far more of this specific collateral (junior tranches of other CDOs) than normal (¶¶ 96-98, 111-16, 122-30, 154-55, 177-82, 190-205, 356-59, 465-88), so as to better enable Citigroup's "proactive" efforts to "reduc[e] risk in the junior areas" by "getting rid of the more junior tranches" (Ex. A at 31-32). Of course, these new CDOs, collateralized by the old, only disguised or deferred the problem, producing in turn a new round of CDO junior tranches (which Citigroup rolled into yet newer CDOs) and a new super senior CDO exposure (which tumbled silently into Citigroup's ever-growing hoard) (¶¶ 111-16, 124-30, 174-82, 475-88).

The net effect of such repackagings, however, was a misleading change of label (the new super senior now had a triple-A rating) while retaining the same troubling exposure underneath (the triple-A super senior was collateralized by lower-rated CDO junior tranches) (MTD Opp. at 22-24). Citigroup executives' self-serving testimony that they believed such super senior, triple-A rated CDO tranches to be safe is hard to credit (*see* fn. 3, *supra*), given that Citigroup itself generated these

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 7

super senior tranches in CDOs it itself designed as waste-disposal units for assets it knew to be at imminent risk of material loss (junior CDO tranches).

      C.     **The FCIC Concluded, as Plaintiffs Established, That Citigroup Was Unable to Sell Its Super Senior Tranches, and Found This Inability To Constitute a Strong "Red Flag" That Citigroup's Valuation of Them Was Overstated**

Plaintiffs here have alleged, conclusively and in detail, that Citigroup was unable to sell the super senior tranches of its subprime-backed CDOs (¶¶ 99-101, 120-21). FCIC Chairman Angelides concluded the same:

> ANGELIDES: "I think we understand the fact that you really couldn't sell these super senior tranches. . ."[7]

From this fact, Chairman Angelides reached the same logical conclusion that plaintiffs here did (¶¶ 527-31) – given Citigroup's near-total inability to sell these securities, Citigroup's valuation of them at 100% of par value was simply not credible:

> ANGELIDES: "If I have a home I think is worth $200,000 but there's no market for it and no one will pay me $200,000, it's not worth $200,000. So I guess I would ask, and maybe if you have a quick answer, how the heck did you keep them at par and keep them there so long?
> *****
> . . . I think I want to probe this, because I want to understand whether [] these things were booked at levels that just weren't reflective of reality. (Ex. A at 42)

      D.     **Mr. Bowen's FCIC Testimony Confirms and Strengthens Plaintiffs' Allegations of Citigroup's Misrepresentation of its Mortgage Operations and Exposures**

The FCIC testimony of Richard M. Bowen, III[8] also corroborates and strengthens the Complaint's allegations that defendants misrepresented Citigroup's mortgage lending operations,

---

    [7]    Ex. A at 41. Although certain Citigroup witnesses misleadingly testified that super seniors were sold (*Id.* at 41), they were actually referring to hedging transactions in which Citigroup *paid* other entities (notably, monolines) to assume the credit risk of the super seniors (*Id.* at 41-42). In these transactions, Citigroup did not sell a par value $1 billion super senior for $1 billion, but rather paid a bond insurer a fee in exchange for provision of credit default insurance.

    [8]    Beginning in early 2006, Bowen was Business Chief Underwriter for Correspondent Lending in the Consumer Lending Group, overseeing $90 billion annually of residential mortgage production. Ex. C at 1.

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 8

exposures and loan loss reserves. Bowen's first-hand testimony bolsters the Complaint's allegations in every respect: showing that what Citigroup said it was doing (maintaining underwriting standards) was far different from what it in fact was doing (abandoning those standards), showing that the sums at issue and the degree of divergence were very large, and showing that Citigroup executives and officers were repeatedly apprised throughout 2006 and 2007 of these facts and the risks they engendered.

> 1. **Mr. Bowen's Testimony Strongly Confirms the Complaint's Allegations Concerning Citigroup's Misrepresentation of its Mortgage Correspondent Channel Operations, Standards, and Exposures**

Beginning in 2006, Bowen discovered that Citigroup had abandoned its underwriting policies in connection with correspondent channel loans. "During 2006 and 2007, [Bowen] witnessed business practices which made a *mockery of Citi credit policy. . . I warned my business unit management repeatedly during 2006 and 2007 about the risk issues I identified*." Ex. D at 7 (emphasis added). Bowen's testimony is consistent with the Complaint's allegations that Citi increasingly relied on tens of billions of dollars of shoddy correspondent channel loans obtained only by an undisclosed loosening of underwriting guidelines (¶¶ 715-733, 844-45, 855-60, 958), and was confirmed by two internal Citigroup investigations (Ex. C at 13, 15, 19).

For example, while Citigroup's purported standards for purchasing pools of subprime mortgages called for underwriting review demonstrating that at least 90% of the mortgages were underwritten to Citigroup standards (Ex. C at 9), Bowen discovered that during 2006 and continuing in early 2007 this standard was abandoned. The correspondent channel Chief Risk Officer reversed a large number of underwriting decisions on mortgage loans from "turn down" to "approved", resulting in multiple purchases of multi-hundred million dollar subprime mortgage pools despite their failure to meet Citigroup's credit/underwriting standards. *See* Ex. C at 2 (entire subprime mortgage pools, "many over $300 million, were purchased even though the minimum credit-policy-required-criteria was not met."), at 9-10 (in one $300 million pool, 260 of 716 underwriting decisions overridden from "turn down" to "approve"; another $320 million pool purchased with approval rate of 72% of the loans despite Citi policy requiring minimum approval rate of 90%).

Bowen repeatedly brought these matters, risks and breakdowns to the attention of more senior Citigroup executives during 2006 and 2007. *See* Ex. C at 2 (Bowen "specifically objected to the purchase of many identified pools" and "issued many warnings to management concerning these practices"), at 13 (Bowen's repeated warnings to Citigroup executives concerning these events), and at Exhibit 1a (November 3, 2007 email to Defendants Rubin, Bushnell and Crittenden detailing these practices, policy violations, control breakdowns, and repeated but ignored warnings). Indeed, Bowen's November 3, 2007 e-mail indicates that Crittenden's November 5, 2007 representation that

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 9

$4.2 billion of recently-purchased subprime loans were "performing loans" was knowingly, or at least recklessly, false and misleading when made. *See* ¶783; Ex. C at Exhibit 1.[9]

### 2. Mr. Bowen's Testimony, Implicating Billions of Dollars of Mortgage Exposures, Establishes Materiality of Citigroup's Misrepresentations Concerning its Mortgage Standards, Portfolio, and Loss Reserves

Bowen, who annually oversaw the underwriting for over $90 billion in correspondent mortgages, explained that Citigroup's underwriting practices "exposed Citi to substantial risk of loss." Ex. C at 2. *See also* Ex. C at Exhibit 1 (November 3, 2007 e-mail to Rubin, Bushnell, and Crittenden notes the "breakdowns of internal controls and resulting significant but possibly unrecognized financial losses").

Bowen stated that during 2006 and 2007, Citigroup purchased pools of subprime mortgages aggregating to *$10 billion* from large mortgage companies with significant numbers of files identified as "exceptions," meaning "higher risk and substantially outside of [Citigroup's] credit policy criteria." Ex. C at Exhibit 1a. Simultaneously, Citigroup accumulated tens of billions of dollars of prime mortgages through its correspondent channels despite pervasive defects in these mortgages: by mid-2006 *over 60%* of the correspondent channel prime mortgages purchased were defective, and "defective mortgages increased during 2007 *to over 80% of production*." Ex. C at 2 (emphasis added); *see also id.* at 5-8. Approximately 40% of Citigroup's entire retained mortgage portfolio was generated through these very correspondent channels (¶¶ 730-32, citing Citigroup's 2007 Form 10-K). Bowen warned management beginning in June 2006 and continuing throughout 2007 of the "risks to the shareholders posed by the increasing defective rate of mortgages purchased and sold through the correspondent delegated channel." *Id.* at 7; *see also* at 2, 8.[10]

---

[9] According to Bowen, Citigroup further abandoned its own purported standards by: relinquishing its prior practice of underwriting according to Citigroup guidelines and instead underwriting according to correspondent loan sellers' more lax guidelines (Ex. C at 10); purchasing previously-rejected mortgage pools (*Id.* at 10-11); and increased use of contract underwriters with dubious familiarity of and/or commitment to proper underwriting guidelines (*Id.* at 11-13).

[10] Although Citigroup sold most prime correspondent channel mortgages to other investors (*e.g.*, Fannie Mae), because Citigroup provided representations and warranties that such mortgages met stated standards, those investors "could force Citi to repurchase many billions of dollars of these defective assets" (Ex. C at 1 and Exhibit 1). These defective mortgages indeed proved twice as likely to default (Ex. C at 17) and were indeed put back to Citigroup in large volumes (*Id.* at 6), generating the very "risks of loss to Citigroup shareholders" (*Id.* at 13-14) that Bowen had repeatedly warned of.

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 10

This testimony directly contradicts Defendants' assertion in their motion to dismiss that the impact of such correspondent channel loans were "decidedly immaterial," confirming that the litigations referenced in the Complaint were, as alleged, *representative* of Citigroup's significant, overarching problem with its mortgage portfolio.

## II.    DOCUMENTS

During the course of its April 7 and 8, 2010 hearings, the FCIC referred to multiple internal Citigroup documents – never before disclosed – that further confirm plaintiffs' allegations of falsity and scienter. We discuss five relevant documents below.

### A.    The 2002 Minutes of Citigroup's Capital Markets Approval Committee Approving Citigroup's Use of Liquidity Puts To Allow Citigroup to Bypass Capital Requirements

Citigroup introduced a largely unknown term – "liquidity puts" – into public consciousness in November 2007 when it revealed that $25 billion of its $43 billion of super senior CDO tranche exposure, none of which had before been disclosed, existed as a result of these liquidity puts. The Complaint described these liquidity puts (essentially, full-price money-back guarantees) in detail, identified almost all of the CDO exposures to which they were attached, explained how Citigroup used them to create the false appearance that these CDO tranches had been sold and their risks transferred when in fact the exposure and the risk remained, and showed how Citigroup falsely reported financial benefits from it all while hiding the financial drawbacks/risks (¶¶ 131-47, 408-47, 1032-44).

During the April 8, 2010 FCIC hearing, the FCIC introduced an internal Citigroup document that sheds yet further light on these liquidity puts and that establishes Citigroup's nefarious intent in developing and employing them. *See* Ex. B at 32 [Murren]. The document in question is the minutes from a 2002 meeting of Citigroup's Capital Markets Approval Committee ("CMAC") – the committee that operated within Citigroup to assess and approve new products – in which CMAC reviewed and approved the liquidity put CDO structure (*Id.*). The document reveals that the liquidity put structure was approved precisely because, through intricate off-balance sheet accounting mechanisms, it allowed Citigroup to avoid otherwise applicable capital requirements and use only one tenth of the capital it would otherwise have to.[11] This document was further confirmed by FCIC interviews of Citigroup executives[12] and of regulators.[13]

---

[11]    *See* Ex. B at 32 [Murren] and 35 [Georgiou]; Ex. A at 26-27 [Georgiou].

[12]    *See* Ex. A at 26-27 (Georgiou: "they allowed liquidity puts on asset-backed commercial paper tranches to get a 10 percent risk rating, resulting in a capital charge of eight-tenths

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 11

      The FCIC's discoveries deepen understanding of what Citigroup was doing with these CDOs and why it was doing it. In addition to the other benefits derived from structuring its CDOs with liquidity puts (¶¶ 408-31), Citigroup enhanced its purported return on capital – but only by freakishly minimizing the denominator (capital) through regulatory loopholes, as opposed to actually enlarging the numerator (return). This regulatory capital "arbitrage" – which allowed Citigroup to falsely enhance its reported results of operations while posting inadequate capital in light of its disguised exposures (¶¶ 587-93) – contributed directly to Citigroup's near-collapse resulting from inadequate capitalization (¶¶ 971-1012).

      These facts therefore help establish Citigroup's *ab initio* scienter, as its CDOs were *intentionally designed* to allow Citigroup to misrepresent both its risk and its returns, and to cut by 90% the capital that Citigroup would otherwise be required to hold given the exposures it retained. Scienter with respect to these CDOs is not merely a matter of nefarious intent, however. Consistently, the Complaint also makes clear that scienter with these CDOs was a matter of *ab initio* knowledge: their very structure meant that Citigroup was accepting risk exposures for returns lower than demanded by the market (¶¶ 427-32) – in and of itself a red flag.[14] This willingness to accept lower-than-market returns for risk now makes perfect sense in light of Citigroup's structural manipulations that allowed it post much-lower-than-market capital against this risk.

      Finally, as discussed immediately below, scienter with respect to these exposures is further supported two further documents: (1) late-2004 regulatory warnings to Citigroup concerning its CDO risk management; and (2) an October 2006 Citigroup memorandum warning of the "severe concentration risk" posed by these $25 billion of liquidity put super senior CDO exposures.

---

of a percent, basically, on liquidity puts. One of the Citi executives to whom we spoke said that Citi made a decision to support the growing CDO business with its own capital because the regulatory capital associated with holding the supersenior triple-A tranches was close to zero").

[13]     *See* Ex. A at 24 (Georgiou: "Capital arbitrage, very important, in that people move things off balance sheet so that you don't have to hold capital against them or you hold them in your trading desk where one of the Fed employees that we interviewed said that if you hold the trading assets, the capital requirements are so low on those that you're basically holding 750 or 800 to 1 leverage on them.").

[14]     FCIC Chairman Angelides made essentially the same point, though much more simply: "If you're having to offer buyers a put back to you, that should be a big red flag". *See Citigroup 'Liquidity Puts' Draw Scrutiny From Crisis Inquiry*, Bloomberg News, April 13, 2010, available at http://www.bloomberg.com/apps/news?pid=20601087&sid=aZELabu4NReI&pos=1.

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 12

### B. The March 29, 2004 Regulatory Report Criticizing Citigroup's CDO Risk Management

During the FCIC's April 8, 2010 hearing, FCIC member Holtz-Eakin revealed that one of Citigroup's regulators, the OCC, after completing an examination of Citigroup's fixed-income derivatives operations on March 29, 2004 (including Citigroup's CDO group), issued a report to Citigroup six months later (i.e., approximately September/October 2004) in which it informed Citigroup that "the quality of risk management is less than satisfactory" (Ex. B at 26). The OCC concluded, specifically with respect to CDOs, that Citigroup's super senior tranche positions continued to pose risk management challenges. (*Id.*).

### C. The October 2006 Memo Warning of the "Severe Concentration Risk" Posed by Citigroup's $25 Billion of Liquidity Put CDO Exposures

The Complaint alleged that Citigroup's subprime CDO exposures – which, given plaintiffs' identification of each of Citigroup's CDOs, plaintiffs can calculate with a fair degree of precision for any given date during the class period – constituted a material concentration of credit risk (¶¶ 281-82), and that Citigroup's failure to disclose this material concentration of credit risk until November 2007 constituted a violation of GAAP (¶¶ 1017-1031).

An internal Citigroup document from October 2006 establishes that, notwithstanding Defendants' arguments in this litigation, Citigroup at the time understood its CDO exposures to constitute a material concentration of credit risk. That memo specifically warned of the "severe concentration risk" posed by Citigroup's $25 billion of subprime CDO super senior exposures via the "liquidity puts" that Citigroup employed to "sell" them (while simultaneously obligating Citigroup to repurchase them at full price). *See* Ex. A at 42-43. When FCIC Chairman Angelides asked about this memorandum, the executive in charge of Citigroup's CDO operations not only remembered it, but further recalled that the memo was distributed widely within Citigroup and provoked "a lot of discussion".[15]

This internal October 2006 memorandum does not merely evidence that Citigroup violated GAAP by internally recognizing but not publicly disclosing its material concentration of credit risk. More consequentially, it provides further evidence of Citigroup's violation of the federal securities laws. *It suggests that no later than late 2006 – and contra other self-serving testimony that Defendants provided to the FCIC– Citigroup was: (1) not merely aware of the existence of this massive $25 billion CDO exposure; but (2) was aware that it posed a material risk.*

---

[15] *See* Ex. A at 43 (Dominguez: "That working paper engendered a lot of discussion, reexamination of how we were treating it. There were many more people involved that were on that distribution list").

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 13

This document fits – exactly – in the timeline that emerges from the Complaint, based on close examination of Citigroup's own deeds: namely, that Citigroup awakened to CDO risk no later than late 2006, which is when its various CDO repackaging schemes first started (¶¶ 122-130, 182, 448-88). It also comports with the Citigroup executives' testimony to the FCIC that they first started to be aware of subprime and CDO risks in late 2006 (*see* Section I, *supra*).

> D. **The October 15, 2007 Presentations to the Board of Directors and to the Board's Corporate Audit and Risk Management Committee Starkly Dramatizes Citigroup's Material Omission of its CDO Exposures and Material Misrepresentation of it Subprime Exposures**

The essence of plaintiffs' allegations with respect to CDOs was that by late 2006 and ever increasingly thereafter, CDO risks were widely known – both within Citigroup and throughout the market – and the only matter not publicly known was who was holding those CDOs (¶¶212-20, 306-07). Indeed, given Citigroup's misleading disclosures concerning its CDO operations (¶¶ 535-639) and Citigroup's calming misrepresentations in July and October 2007 that its total subprime exposures were only $13 billion (¶¶ 1198-99), it was not clear until November 2007 that Citigroup had *any* CDO exposure at all, let alone approximately $57 billion of it.

During the April 8, 2010 FCIC hearing, FCIC Chairman Angelides introduced an internal Citigroup document that throws into sharp relief the disparity between the direct subprime exposures Citigroup knew itself to be housing ($55 billion) and the subprime exposures it chose to publicly disclose ($13 billion) (*see* Ex. B at 9, 37). As Chairman Angelides pointed out, on October 15, 2007 – the very day Citigroup publicly represented its subprime exposures to be $13 billion – an internal presentation made to Citigroup's Board showed Citigroup's true subprime exposure to be *more than four times greater than the figure publicly-disclosed* (*Id.*):

> ANGELIDES: But then here's what I want to ask you about. Apparently you became aware mid-September. October 1st, you announce, but you are announcing your exposure as 13 billion. But here's what happens, at least according to records I've seen...
>
> It appears that on October 15th two things happened. The first is that there is a call with analysts in which Mr. Crittenden tells analysts and the public that Citigroup has a $13 billion subprime exposure. However, on the same day, a presentation is made to the corporate audit and risk management committee and then to the board of directors, and as part of that, there's a presentation on risk management and it says, quote, "the total subprime exposure in markets and banking was $13 billion, with an additional $16 billion in direct super-senior and $27 billion in liquidity and (par ?) puts."

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 14

> So on the same day that the public's being informed it's $13 billion, the board and the audit committee are being told that this has up to, frankly, more than $50 billion -- I believe 55 (billion dollars) is the total math here, roughly -- at which point on November 3rd you have an emergency board of directors and on November 4th you announce the $55 billion exposure, and Mr. Prince, I believe that's the day in which you announced your resignation.
>
> I guess what I want to ask is, why is there an announcement made to the public that it's 13 billion at the same time that the board and the risk and audit committee are being told that it's substantially more? (Ex. B at 9)
>
> \*\*\*\*\*
>
> And even at the end, investors are being informed that you have $13 billion exposure when in fact the audit risk committee and the board of which you're a member is being told $55 billion on the same day.

(Ex. B at 37)

**Material misrepresentation made with scienter simply cannot get any more stark than this**: on the very same day, Citigroup told investors that subprime exposures were only $13 billion but informed Board members internally that actual subprime exposures were $55 billion. And even though this material disparity between public/private disclosure is evidenced by this document as of October 2007, the preceding document -- the October 2006 memorandum concerning the "severe concentration risk" posed by Citigroup's undisclosed $25 billion of liquidity put super senior exposures -- establishes that knowing, material disparity between external and internal disclosure of both exposures and risk began at least one year earlier.

    E.    **The October 30, 2007 Presentation to Citigroup's Board of Directors by Citigroup's Chief Risk Officer Further Supports Scienter Via its Identification of the Very "Red Flags" Pled in the Complaint**

FCIC Chairman Angelides confronted Defendant Prince with an October 30, 2007 presentation made to Citigroup's Board of Directors by Defendant Bushnell, concerning Citigroup's subprime risks (five days later, Citigroup revealed its $43 billion plus CDO exposure for the first time). Chairman Angelides' point was simple: the October 30, 2007 presentation included a "timeline of key events in the subprime market" that seemingly should have warned Citigroup of the risks posed by its own, and massive, subprime CDO exposures at many points prior to late 2007:

> ANGELIDES: "When all these things happened, why didn't the potential of problems rise to the top in the wake of these major announcements? Why didn't it bubble up?" (Ex. B at 6)

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 15

     Chairman Angelides' inference is exactly that supported by the Complaint's factual allegations. Many of the warning signs included by Defendant Bushnell in his presentation to the Board were events that plaintiffs specifically mention in their Complaint, including: HSBC's staggering admission of $10.6 billion in subprime mortgage losses in February 2007 (¶¶ 300, 322-23, 398, 1128); the Bear Stearns CDO hedge fund collapse in June 2007 (¶¶ 401-06, 602-03);[16] and initial yet-still-woefully-belated credit rating downgrades in July 2007 (¶ 515). Plaintiffs demonstrated how *these specific events* caused substantial devaluation of market prices for subprime instruments such as RMBS and CDOs in February 2007 and June 2007 as market participants became aware of materializing risks (¶¶ 322-23, 398, 602-03). Indeed, the Complaint demonstrates *that Citigroup itself took notice of these very events while continuing to mislead the market*: none other than *Citigroup's chief credit strategist Matt King concluded, in the wake of HSBC's February admission of $10 billion in subprime losses, that CDOs were at substantial risk of correlated subprime losses and that exposed banks were hiding their exposures and losses* (¶¶ 1128; 394-96).[17] The great but then-unknown irony in Mr King's too-true comments, of course, is that no bank hid so much for so long as did Citigroup.

     In fact, the Complaint identified many more "red flags" than mentioned by Chairman Angelides in his summation of Citigroup's October 30, 2007 Board presentation (¶¶ 1107-1161; 206-396), *including numerous red flags that Citigroup itself waved* (¶¶ 372-75, 394-96, 507-11, 1115, 1121-43).

     The cumulative evidence just further strengthens FCIC Chairman Angelides' concluding disbelief of Citigroup's claims of innocent ignorance of CDO risk:

> . . . *I'm particularly struck by how much the two of you did not know about how much was -- what was going on within your organization.* At the end of the day, you were the head guys. You were the chairman and the CEO. You were the chairman of the executive committee, and not, I might add, Mr. Rubin, a garden variety board member. You were in the suite of executive offices.
>
> And if you look at the record -- you know, Mr. Holtz-Eakin did point out there are a number of regulatory reports on the table. Mr. Bowen, who was here yesterday, had

---

[16]    Although the FCIC did not mention it, Citigroup was intimately connected with the Bear Stearns hedge funds (*see also* ¶¶ 449-64 and 1112-14 – detailing the collaboration between Citigroup and the Bear Stearns hedge funds in several CDO repackaging schemes).

[17]    Citigroup CDO executives testified that they closely monitored "our own internal RMBS research or mortgage research department, our CDO and CLO research group" (Ex. A at 31).

KIRBY McINERNEY LLP

The Honorable Sidney H. Stein
April 22, 2010
Page 16

>sent information up not, by the way, about a piddling business, but a $50 billion-a-year business in which mortgages were being bought and then sold in which there appeared to be very substantial compliance issues.
>
>We've discussed the fact that Citigroup had $11 billion of warehouse lines out to subprime originators which you as management were not aware of. Mr. Holtz-Eakin referenced the senior supervisor's report which did catalogue a number of significant issues. *And even today, I think it's clear from the record that even after HSBC had its problems and Bear Stearns, there were not the highest-level decisions about how to handle subprime. That didn't come until September and October.*
>
>*And it just seems to me that at the end of the day, the two of you in charge of this organization did not seem to have a grip on what was happening. . .*
>
><div align="center">*****</div>
>
>And I guess -- I don't know that you can have it two ways. **You were either were pulling the levers or asleep at the switch.** And I think this is about -- as we try to recover from this calamity, I'm not so sure apologies are important as assessment of responsibility, because that's the way in which you begin to move forward. ***And perhaps instead of asking you what did you know and when did you know it, maybe I should be asking you what didn't you know and why didn't you know it.***

Ex. B at 36-37 (emphasis added)

<div align="right">Respectfully submitted,

*Ira M. Press*
Ira M. Press</div>

cc:  Richard A. Rosen, Esq. (via email)
     Brad Karp, Esq. (via email)
     Susanna Buergel, Esq. (via email)
     Lawrence B. Pedowitz, Esq. (via email)
     Steven Singer, Esq. (via email)