UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                                    :        09 md 2070 (SHS)
                                                    :
                                                    :        OPINION & ORDER
IN RE CITIGROUP INC. SECURITIES                     :        This document relates to:
LITIGATION                                          :        07 Civ. 9901 (SHS)
                                                    :        07 Civ. 10258 (SHS)
                                                    :        08 Civ. 135 (SHS)
                                                    :        08 Civ. 136 (SHS)
--------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

I.    BACKGROUND ................................................................................................4

     A. Parties ..................................................................................................4

     B. Financial Instruments ...........................................................................6

          1. Subprime and Alt-A Mortgages ......................................................6

          2. Residential-Mortgage-Backed Securities.........................................7

          3. Collateralized Debt Obligations ......................................................8

          4. Structured Investment Vehicles ......................................................9

          5. Leveraged Loans and Collateralized Loan Obligations................10

          6. Auction Rate Securities..................................................................11

     C. CDO Allegations.................................................................................11

          1. Pre-November 4, 2007 Statements .................................................12

               a.   Alleged Misleading Statements and Omissions about the Extent of Citigroup's
                    CDO Exposure ...................................................................12

                    i.   Citigroup Discloses the Value of Its "CDO-Type Transactions" .....................12

                    ii.  Citigroup Discloses Its "Maximum Exposure to Loss" from VIEs .................13

                    iii. Citigroup Discloses an "Ownership Interest" in "Certain VIEs" .....................14

                    iv.  Citigroup States that It Has "Limited Continuing Involvement" with CDOs ... 15

               b.   Alleged Misleading Statements about the Nature of CDO Exposure...................16

                    i.   Citigroup States that Securitizations Reduce Its "Credit Exposure" ................16

                    ii.  Citigroup Presents Its "CDO-Type Transactions" as Distinct from Its
                         "Mortgage-Related Transactions" .......................................................17

                    iii. Citigroup Maintains its CDOs Contained Diverse Assets to Diversify Risk..... 19

               c.   Alleged CDO-Related Accounting Violations.......................................................19

                    i.   Reporting CDO Exposure ...............................................................19

ii.  Consolidating Commercial Paper CDOs .......................................................... 20

iii. Valuing CDO Holdings .................................................................................... 21

2. November 4, 2007 and Later Statements ...................................................................23

3. Allegations of Fraudulent Intent with Respect to CDO-Related Misstatements and Omissions ....................................................................................................................24

a.   Citigroup Underwrote the CDOs It Owned ........................................................24

b.   The Market Believed that CDOs Were at Risk....................................................25

c.   Citigroup Analysts Express Concern About Subprime Mortgages and CDOs......26

d.   Citigroup Creates CDOs to Buy Unwanted CDOs .............................................27

e.   Citigroup Creates a Special Entity to Assume the Risks of Liquidity Puts ..........27

f.    Citigroup Makes Collateral Demands on Mortgage Originators .........................28

g.   Citigroup's CDO Prospectuses Warn of Risks ...................................................28

h.   Citigroup Purchases Insurance for Its CDO Holdings .......................................29

i.    Citigroup Executives Hold Daily Risk Exposure Sessions..................................29

j.    Citigroup Makes a Margin Call on Basis Capital Funds ....................................29

D. Alt-A RMBS Allegations .....................................................................................30

E. SIV Allegations ...................................................................................................30

F. Mortgage Allegations ..........................................................................................32

1. Alleged Mortgage-Related Misstatements.................................................................33

2. Alleged Mortgage-Related GAAP Violations ...........................................................34

3. Allegations of Fraudulent Intent with Respect to Mortgage-Related Misstatements and Omissions ....................................................................................................................34

G. ARS Allegations ..................................................................................................35

H. Leveraged Loan and CLO Allegations ................................................................35

I.  Solvency Allegations ...........................................................................................36

II.   DISCUSSION ...............................................................................................................36

1. Standard of Review ...................................................................................................37

2. Section 10(b) Claims .................................................................................................38

a.   Misstatements or Omissions of Material Fact ....................................................38

b.   Scienter Standard ..............................................................................................39

c.   Loss Causation Standard ...................................................................................41

3. Section 20(a) Claims .................................................................................................41

B. CDO Allegations .................................................................................................42

1. Pre-November 4, 2007 Statements ............................................................................42

a.   Alleged misstatements and omissions ................................................................42

b.   Materiality and Loss Causation ........................................................................45

        c.  Scienter ...................................................................................45

          i.  Citigroup ...................................................................... 45

         ii.  Individual Defendants ................................................... 49

     2. November 4, 2007 and Later Statements ..................................51

        a.  Alleged Misstatements and Omissions ............................51

        b.  Scienter ..........................................................................52

C. Alt-A RMBS Allegations...................................................................54

   1. Alleged Misstatements and Omissions Concerning the Extent of Citigroup's Alt-A RMBS Exposure ................................................................................55

   2. Alleged Misstatements and Omissions after the April 18, 2008 Disclosure of Citigroup's Alt-A RMBS Holdings ...................................................................56

D. SIV Allegations .................................................................................57

   1. Citigroup's SIV Exposure ..........................................................57

   2. SIV-Related GAAP Violations ....................................................58

   3. Other Misstatements .................................................................58

E. Mortgage Allegations .......................................................................59

   1. Mortgage-Related Misstatements and Omissions.......................59

   2. Mortgage-Related GAAP Violations ..........................................61

F. ARS Allegations ...............................................................................61

G. Leveraged Loan and CLO Allegations ..............................................63

H. Solvency Allegations ........................................................................65

I.  Control Person Liability....................................................................66

III.   CONCLUSION ......................................................................................68

Plaintiffs bring these consolidated securities fraud actions on behalf of a proposed class of investors in Citigroup, Inc., against the company and fourteen of its officials alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Their claims span an array of Citigroup's business – from the mortgages it sold to consumers to the mortgage-backed securities it sold to institutional investors – but sound a similar note: Citigroup allegedly knowingly understated the risks it faced and overstated the value of the assets it possessed.  In this way, plaintiffs claim, Citigroup materially misled investors about the company's financial health and caused them to suffer damages when the truth about Citigroup's assets was finally

revealed.

Defendants move to dismiss plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing primarily that plaintiffs' complaint fails to satisfy the heightened pleading standards applicable in securities fraud actions.

The Court finds that plaintiffs have stated a claim to relief only with respect to alleged misstatements and omissions occurring between February 2007 and April 2008 concerning Citigroup's collateralized debt obligation holdings.  Plaintiffs' remaining allegations do not adequately state a claim for relief.  Accordingly, for the reasons set forth below, defendants' motion is granted in part and denied in part.

## I.   BACKGROUND

The Amended Consolidated Class Action Complaint ("Complaint"), filed on February 20, 2009, is 536 pages long, contains 1,265 paragraphs and weighs six pounds.  The following facts are extracted from that tome and are presumed to be true for the purposes of this motion.

A.   Parties

Plaintiffs are current or former Citigroup shareholders.  Plaintiffs claim they purchased Citigroup common stock on the open market for a price that was inflated by defendants' alleged fraud.  (Compl. ¶¶ 21-27.)  Plaintiffs purport to represent all persons who purchased Citigroup common stock between January 1, 2004 and January 15, 2009.  (*Id.* at 1.)

Citigroup is itself named as a defendant.  Incorporated in Delaware with its principal place of business in New York, Citigroup is a financial services holding company operating in more than 100 countries.  It employs over 300,000 people.  (*Id.* ¶ 28.)

Plaintiffs also bring this action against several current and former directors and officers of Citigroup.  The Complaint describes the individual defendants as follows:

- *Charles Prince* was Citigroup's Chief Executive Officer ("CEO") from 2003 to 2007 and Chairman of Citigroup's Board of Directors from 2006 to 2007.  Plaintiffs allege that Prince was "forced to resign" on November 5, 2007 as a result of substantial losses Citigroup reported.  (*Id.* ¶¶ 33, 1154.)

- *Robert Rubin* served as a Citigroup director beginning in 1999 and was named Chairman of the Board of Directors after Prince's departure.  (*Id.* ¶ 36.)

- *Lewis Kaden*, starting in 2005, was Citigroup's Chief Administrative Officer ("CAO"), responsible for "audit and risk review" at Citigroup.  (*Id.* ¶ 37.)

- *Sallie L. Krawcheck* was Citigroup's Chief Financial Officer ("CFO") from 2004 to 2007.  (*Id.* ¶ 38.)

- *Gary Crittenden* replaced Krawcheck as CFO in March 2007.  (*Id.* ¶ 41.)

- *Steven Freiberg* was the Chairman and CEO of Citigroup's Global Consumer Group and his responsibilities included consumer lending in the mortgage area. (*Id.* ¶ 43.)

- *Robert Druskin* was Citigroup's Chief Operating Officer from 2006 to 2007 and previously held other officer positions.  (*Id.* ¶ 44.)

- *Todd S. Thomson* was Citigroup's CFO prior to 2004 and was the CEO of a Citigroup division between 2004 and 2007.  (*Id.* ¶ 46.)

- *Thomas G. Maheras* held various officer positions with different Citigroup divisions, including the division responsible for Citigroup's collateralized debt obligation holdings.  (*Id.* ¶ 48.)

- *Michael Stuart Klein*, like Maheras, held various officer positions with different Citigroup divisions, including the division responsible for Citigroup's collateralized debt obligation holdings.  (*Id.* ¶ 50.)

- *David C. Bushnell* was Citigroup's Senior Risk Officer from 2003 to 2007 and served as CAO for two months in 2007.  (*Id.* ¶ 52.)

- *John C. Gerspach* served as Citigroup's Chief Accounting Officer and Controller beginning in March 2005.  (*Id.* ¶ 54.)

- *Stephen R. Volk* held various officer positions at Citigroup.  (*Id.* ¶ 57.)

- *Vikram Pandit* became Citigroup's CEO following Prince's departure.  He previously was the CEO of a Citigroup division.  (*Id.* ¶ 59.)

Plaintiffs allege that many of the individual defendants sold large amounts of stock during the class period. (*Id.* ¶¶ 33-61.) Plaintiffs also allege that several individual defendants "signed and certified the accuracy of" of Citigroup's SEC filings. (*Id.* ¶¶ 35, 40, 42, 46, 55, 60.)

B. Financial Instruments

The theory of plaintiffs' case is that defendants materially misled them about the risks Citigroup was exposed to via various financial instruments, including CDOs, SIVs, Alt-A RMBS, CLOs and ARS. Understanding the allegations in this action requires understanding the nature of this gallimaufry of financial instruments. They are described in the Complaint as follows.

1. *Subprime and Alt-A Mortgages*

A "conforming" mortgage is a mortgage that meets certain requirements designed to reduce the risk of default and to mitigate losses in the event of default. These include requiring the borrower to meet minimum standards of creditworthiness, to document his or her income and to make a down payment of at least 20% of the value of the home. In a conforming mortgage, the borrower's debt-to-income ratio does not exceed 35%. If the loan's interest rate is adjustable over time (for example, if the interest rate starts low but later increases), the borrower's debt-to-income ratio must be gauged at the "fully indexed" rate, which is the highest interest rate the loan will reach. (*Id.* ¶ 221.)

In the mid-2000s, banks increasingly issued "nonconforming" mortgages that departed from the requirements listed above. (*Id.* ¶ 222). They issued mortgages to borrowers who were less creditworthy. (*Id.* ¶ 231(a).) They did not verify borrower income. (*Id.* ¶ 231(f).) They accepted lower down payments or eliminated the down-payment requirement altogether. This practice increased the loan-to-value ("LTV") ratio – the ratio of the loan amount to the home's value – which enhanced the risk of default and the size of the loss upon default. (*Id.* ¶ 231(b).)

Banks issued mortgages when mortgage payments exceeded 35% of the borrower's income.  (*Id.* ¶ 231(c).)  In the case of "hybrid adjustable rate mortgages" or "hybrid ARMs," which featured a low teaser rate that lasted for two or three years that then ballooned higher, banks failed to measure debt-to-income ratios at the fully indexed rate.  (*Id.* ¶¶ 231(d), (e).)

These nonconforming mortgages included both "subprime" mortgages, which carried the highest risk of default, and "alternative A class" ("Alt-A") mortgages, which were riskier than conforming mortgages but not as risky as subprime mortgages.  (*Id.* ¶ 945.)

### 2. *Residential-Mortgage-Backed Securities*

Residential-mortgage-backed securities ("RMBS") are a type of asset-backed security.  In RMBS, an underwriter buys a large quantity of residential mortgages – typically three to four thousand individual mortgages – and transfers the mortgages to a special purpose corporate entity.  The entity's sole purpose is to receive those mortgages and issue securities – RMBS – that are collateralized by the mortgages the entity owns.  An investor buys an RMBS and, over time, receives payments from the entity based on a "coupon" or interest rate.  As homeowners make payments on their mortgages, the special purpose entity receives the income from the borrowers' payments and uses it to pay its investors, the RMBS owners.  Thus, the entity's ability to continue making payments to the RMBS investor depends on the entity's continuing receipt of mortgage payments from the homeowners.  If the mortgages are not paid, the entity's income stream decreases, undermining the entity's ability to pay the RMBS investors.  (*Id.* ¶¶ 74-82.)

The risk of loss is not shared equally among all RMBS investors.  Instead, the RMBS are divided into different "tranches" that carry different risks.  The junior-most tranche absorbs the first losses until that tranche is completely wiped out, and is therefore the riskiest investment.  Then the second-junior-most tranche begins to suffer losses.  The senior-most tranche suffers

losses only when all the other tranches have been eliminated.  (*Id.* ¶ 78.)  For example, if the junior-most tranche represents 4% of the RMBS securitization, and if mortgage defaults cause the securitization to lose four percent of its cash flow, then the junior-most tranche will suffer a complete loss.  The other tranches, however, will suffer no loss whatsoever.  The junior tranches thus protect the senior tranches by absorbing losses as mortgages default.  (*Id.* ¶ 82.)  Each RMBS tranche is assigned a credit rating (triple-A, double-A, single-A, triple-B, double-B, etc.) with the more senior, i.e. safer, tranches receiving higher ratings.  (*Id.* ¶ 83.)  The most senior RMBS tranche bears an AAA credit rating.  (*Id.* at 32-33.)  Tranches between the junior- and senior-most tranches are known as "mezzanine" tranches.  (*Id.* ¶ 95.)

### 3. Collateralized Debt Obligations

Like RMBS, collateralized debt obligations ("CDOs") are a form of asset-backed security.  (*Id.* ¶ 74.)  An underwriter creates a CDO by purchasing a pool of assets and transferring those assets to a special purpose entity.  The entity then issues debt securities whose interest payments are backed by the income stream generated by the entity's assets.  Although RMBS and CDOs are similar in many ways, RMBS securitizations purchase mortgages and issue securities backed by those mortgages, whereas many CDOs purchase *other securities* – RMBS, for example – and issue securities backed by those.  (*Id.* ¶ 88.)

RMBS and CDOs have different tranche structures.  In an RMBS securitization, the senior-most tranche is the AAA-rated tranche.  In contrast, CDOs split the AAA tranche into a junior AAA tranche and a "super senior" AAA tranche.   This super senior tranche is the last to suffer losses, insulated by the junior AAA tranche and all the tranches below that.  Since it is insulated by a tranche with an AAA rating (the junior AAA tranche), the super senior's credit rating is considered better than AAA.  Because of this enhanced credit protection, the super senior tranche involves less risk and thus pays a lower interest rate.  The money the CDO

securitization saves by offering a lower yield to the super senior tranche is used to pay higher yields to the junior tranches.  In a sense, yield is taken from the super senior tranche and added to the junior tranches.  Because the super senior tranche is substantially larger than the junior tranches, a small yield decrease for the super senior tranche results in a substantial yield increase for the smaller junior tranches.  (*Id.* ¶¶ 90-93.)

### 4.  *Structured Investment Vehicles*

A structured investment vehicle ("SIV") is much like a CDO or RMBS securitization. The SIV is a special purpose corporate entity that invests in different kinds of long-term assets – for example, an SIV might invest in corporate bonds or RMBS.  To finance its investments, the SIV issues securities in several tranches, with junior tranches absorbing the first losses and thus protecting more senior tranches.  (*Id.* ¶¶ 645-48.)

SIVs finance their investments mostly by means of short-term securities: commercial paper and medium-term notes.  (*Id.* ¶ 647.)  As a result, an SIV earns profits through a form of arbitrage.  The SIV invests in long-term securities with a certain yield.  It finances those long-term securities with short-term debt securities that carry a lower yield.  The SIV makes a profit that is equal to the difference between the higher "incoming" yield the SIV earns from its long-term assets and the lower "outgoing" yield the SIV must pay on its commercial paper and medium-term notes.  Some of that "profit" goes to an equity tranche, and the rest of the profit is paid in the form of fees to the SIV's manager – here, Citigroup.  (*Id.* ¶ 649.)  In this way, a small "equity" investment in the SIV's junior tranches can be used to leverage substantial arbitrage gains resulting from the existence of large senior tranches of short-term debt.  (*Id.* ¶¶ 650-53.)

Using short-term debt to purchase long-term assets creates "liquidity risk," a risk caused by the fact that an SIV must continually "roll-over" its short-term funding.  (*Id.* ¶ 655.)  An SIV's long-term assets generate income streams that are sufficient to pay the interest on the

SIV's short-term debt.  But when the short-term debt comes due – that is, when the SIV must return the principal of the commercial paper and medium-term notes – the SIV must issue *new* short-term debt to pay off the maturing short-term debt.  This is called "rolling over" short-term debt.  If an SIV were unable to roll-over its short-term debt, it would be forced to sell its long-term assets to pay its maturing short-term debt.  (*Id.* ¶¶ 655-56.)

Losses stemming from liquidity risk can be substantial.  If an SIV's long-term assets decline in value, the SIV will no longer be as safe an investment, and investors will become reluctant to purchase the SIV's short-term debt.  The SIV will have to sell its long-term assets to meet the amount due on any short-term debt that is not rolled over.  Because the assets have declined in value, however, the SIV will take losses on its asset sales.  Thus, when the SIV's long-term assets lose value, the SIV is often forced to sell the assets immediately at a loss.  A decline in asset value has the potential to cause the entire SIV to collapse.  (*Id.* ¶ 656.)

SIVs typically employ two mechanisms in response to liquidity risk.  First, SIV covenants often stipulate that, if the value of the SIV's assets falls so far that the SIV cannot meet its short-term-debt obligations, the SIV is declared in "defeasance" and must immediately liquidate its assets to pay senior debt investors.  (*Id.* ¶ 659.)  Second, SIVs often obtain "liquidity backstops" from banks, where the banks will purchase a limited amount of short-term debt from the SIV.  Liquidity backstops allow SIVs to ensure that a limited amount of short-term financing will always be available.  (*Id.* ¶ 658.)

### 5.   *Leveraged Loans and Collateralized Loan Obligations*

Leveraged loans are loans that banks arrange for companies, often in anticipation of mergers and acquisitions, leveraged buyouts, recapitalizations, or restructurings.  Leveraged loans are typically made to companies with high debt-to-equity ratios, and thus leveraged loans garner a low credit rating and a high yield.  In the mid-2000s, the market for leveraged loans

boomed, and banks began arranging leveraged loans that were riskier than the leveraged loans arranged in the past.  (*Id.* ¶¶ 865, 867, 870-74.)

Collateralized loan obligations (CLOs) are much like CDOs, except CLOs are collateralized primarily by corporate debt.  In the mid-2000s, CLOs were increasingly collateralized by riskier leveraged loans.  (*Id.* ¶¶ 866, 874.)

### 6. *Auction Rate Securities*

Auction rate securities (ARS) are long term obligations, similar to bonds, with variable interest rates that reset through periodic auctions held as frequently as once a week.  The issuer of an ARS, such as a company or municipality, selects a broker-dealer such as Citigroup to underwrite the offering and manage the auction process by which rates are set.  Potential investors then bid the lowest interest rate at which they are willing to purchase ARS.  The auction clears at the lowest rate bid that is sufficient to cover all of the securities for sale and that rate then applies to all of the securities until the next auction.  If there are not enough bids to cover the securities for sale, the auction fails and the current holders are left in possession of the ARS.  The interest rate is set at a predetermined "maximum rate" that may be higher or lower than the market rate for securities of similar credit quality and duration.  (*Id.* ¶ 907.)

### C. CDO Allegations

Plaintiffs allege that Citigroup made numerous material misstatements and omissions regarding its CDOs.  Plaintiffs' principal grievance is that Citigroup did not disclose that it held tens of billions of dollars of super-senior CDOs until November 4, 2007.  As described in greater detail below, plaintiffs allege that the market knew, at least by late 2006 or early 2007, that CDOs faced a substantial risk of losses.  Although the market knew that Citigroup had underwritten billions of dollars of CDOs, the market did not know who had purchased the CDOs that Citigroup had underwritten.  In plaintiffs' view, defendants intentionally hid the truth:

namely that billions of dollars of CDOs had not been purchased at all but had, instead, been retained by Citigroup.  Plaintiffs further allege that defendants affirmatively misled investors by disclosing facts about Citigroup's CDO operations that were either half-truths or affirmatively misleading.

First, plaintiffs claim that defendants failed to give a full and truthful account of the extent of Citigroup's CDO exposure.  Second, plaintiffs allege that defendants made misleading statements that failed to convey the subprime-related risks inherent in its CDO portfolio. Finally, plaintiffs take issue with Citigroup's accounting practices, claiming that the company's SEC filings violated accounting rules – and were thus misleading – because they failed to report Citigroup's CDO exposure and failed to value Citigroup's CDO holdings accurately.

     1.  *Pre-November 4, 2007 Statements*

        a.  Alleged Misleading Statements and Omissions about the Extent of Citigroup's CDO Exposure

Citigroup's SEC filings did make certain disclosures related to Citigroup's exposure to losses from its CDO holdings, but plaintiffs claim that those disclosures were misleading and incomplete because they provided scant details about Citigroup's CDO operations and never disclosed the extent of Citigroup's massive CDO holdings.  To put it simply, plaintiffs allege that defendants "concealed and misrepresented the simple and very material fact that Citi had $45+ billion of CDO exposure."  (Pls.' Mem. at 25.)  The following alleged misstatements and omissions are all variations on this theme.

          i.  Citigroup Discloses the Value of Its "CDO-Type Transactions"

Citigroup did report the total value of the CDOs it had underwritten.  For example, in Citigroup's August 3, 2007 Form 10-Q, Citigroup reported that it had underwritten "CDO-type

transactions" whose assets totaled $74.4 billion.[1]  (Compl. ¶ 545 (quoting Citigroup's Form 10-Q, at 63-67 (Aug. 3, 2007).)  Plaintiffs claim that that disclosure was inadequate because it revealed only the size of Citigroup's *underwriting* activities, not the size of Citigroup's *holdings of* – and thus *exposure to* – the CDOs Citigroup underwrote.  (*Id.* ¶¶ 560-62.)  In other words, disclosing that Citigroup underwrote CDOs worth $74.4 billion did not, in plaintiffs' view, give any indication that it was Citigroup who owned a large quantity of the CDOs that Citigroup had underwritten.

   ii.  Citigroup Discloses Its "Maximum Exposure to Loss" from VIEs

   Citigroup considered its CDOs to be "variable interest entities" ("VIEs").  In total, Citigroup underwrote over $200 billion of investments that it considered VIEs.  For example, in its August 3, 2007 Form 10-Q, Citigroup reported that it had underwritten $134.3 billion of VIEs involving "investment-related transactions," $37.4 billion of VIEs involving "structured finance," $10.3 billion of VIEs involving "trust preferred securities," as well as $74.4 billion of VIEs involving "CDO-type transactions."  (*Id.* ¶ 545 (quoting Citigroup's Form 10-Q, at 63-67 (Aug. 3, 2007).)  The Form 10-Q then reported Citigroup's "maximum exposure to loss" in connection with all its VIEs:

> Although actual losses are not expected to be material, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $117 billion and $109 billion at June 30, 2007 and December 31, 2006, respectively.  For this purpose, maximum exposure is considered to be the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amount of credit default swaps and certain total return swaps, and the amount invested where Citigroup has an ownership interest in the VIEs.

(*Id.*)

---

[1] The Complaint summarily cites Citigroup's Form 10-Q dated August 3, 2007, but plaintiffs assert that "[s]ubstantially identical disclosures" were made in each of Citigroup's SEC filings between May 4, 2004 and February 23, 2007.  (*Id.* ¶ 541 n.33.)

Plaintiffs believe that that statement was misleading because it did not disclose Citigroup's exposure to *CDOs*, as opposed to Citigroup's exposure to other variable interest entities, and thus investors were given no indication that Citigroup had massive exposure to CDO losses.  Plaintiffs also maintain that the disclosure was inadequate because it provided no details about the nature of Citigroup's exposure – in particular, it did not disclose that Citigroup actually *owned* billions of dollars of CDOs and had through liquidity puts agreed to purchase back from investors $25 billion worth of commercial paper CDOs in the event the  underlying collateral deteriorated.

### iii.  Citigroup Discloses an "Ownership Interest" in "Certain VIEs"

Citigroup further disclosed that it "may" have an "ownership interest" in VIEs and "may" provide certain services to its VIEs.  Citigroup's August 3, 2007 Form 10-Q stated:

> The Company may provide various products and services to the VIEs.  It may provide liquidity facilities, may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, may be the investment manager, and may also have an ownership interest or other investment in certain VIEs.  In general, the investors in the obligations of consolidated VIEs have recourse only to the assets of the VIEs and do not have recourse to the Company, except where the Company has provided a guarantee to the investors or is the counterparty to a derivative transaction involving the VIE.

(*Id.* ¶ 545 (quoting Citigroup's Form 10-Q, at 63-67 (Aug. 3, 2007).)  Plaintiffs claim that that disclosure was misleading for two reasons.  First, disclosing that Citigroup "may have an ownership interest or other investment in certain VIEs" was disingenuous in light of Citigroup's massive CDO holdings.  In plaintiffs' view, the statement downplayed Citigroup's ownership of VIEs and failed to specify whether Citigroup's ownership interest was in "CDO-type" VIEs, "investment-related" VIEs, "structured finance" VIEs, or some other type of VIE.  (*Id.* ¶ 569.)  Second, the statement expressed Citigroup's exposure to CDOs in conditional, conjectural, or – as plaintiffs put it – "hypothetical" terms.  (*Id.* ¶ 565.)  Saying that Citigroup "*may*" own VIEs

was, according to plaintiffs, deceptive in light of the fact that Citigroup *did*, in fact, own billions of dollars of CDOs.  And saying that Citigroup "*may* provide liquidity facilities" and "commercial paper backstop lines of credit" was, as plaintiffs see it, misleading when Citigroup *had*, in fact, guaranteed that it would repurchase $25 billion of commercial paper super-senior CDOs.  (*Id.* ¶¶ 565-69.)

        iv. Citigroup States that It Has "Limited Continuing Involvement" with
             CDOs

Citigroup's SEC filings stated that Citigroup had only "limited continuing involvement" with its CDOs.  Citigroup consolidated some of its VIEs on its balance sheet (*id.* ¶ 545), but, as discussed below, Citigroup did not consolidate other VIEs, including its CDOs.  Explaining its decision not to consolidate certain VIEs, Citigroup's August 3, 2007 Form 10-Q stated:

> The Company typically receives fees for structuring and/or distributing the securities sold to investors. . . . A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may provide other financial services and/or products to the VIEs for market-rate fees.  These may include the provision of liquidity or contingent liquidity facilities; interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE.  The Company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.

(*Id.* ¶ 545 (quoting Citigroup's Form 10-Q, at 63-67 (Aug. 3, 2007).)  That disclosure was misleading, plaintiffs claim, because it implied that Citigroup maintained only trivial ties to its CDOs after the underwriting process was complete.  In plaintiffs' view, the assertion that Citigroup had "limited continuing involvement" with its VIEs was deceptive in light of the fact that Citigroup actually *owned* tens of billions of dollars of its own CDOs.  It was also allegedly deceptive in light of the fact that Citigroup had, through liquidity puts, agreed to purchase back

from investors tens of billions of dollars of commercial paper CDOs.  As plaintiffs see it,

Citigroup's "continuing involvement" in its CDOs was far from "limited."  (*Id.* ¶ 558.)

### b.   Alleged Misleading Statements about the Nature of CDO Exposure

In addition to withholding information about the extent of Citigroup's CDO holdings – or

making only inadequate disclosures about those holdings – plaintiffs also allege that Citigroup's

SEC filings affirmatively misled investors about the nature of the CDOs themselves: namely that

defendants failed to convey in their statements the subprime related risks inherent in Citigroup's

CDO portfolio.

### i.   Citigroup States that Securitizations Reduce Its "Credit Exposure"

Citigroup's SEC filings made the following statement regarding Citigroup's

securitization of mortgages:

> *Mortgages and Other Assets*
>
> The Company provides a wide range of mortgage and other loan products
> to its customers.  In addition to providing a source of liquidity and less expensive
> funding, securitizing these assets also reduces the Company's credit exposure to
> the borrowers.

(*Id.* ¶ 543 (quoting Citigroup's Form 10-Q, at 42 (Aug. 3, 2007).)  The SEC filings also made the

following statement:

> The Company primarily securitizes credit card receivables and mortgages.
> . . . The Company's mortgage loan securitizations are primarily non-recourse,
> thereby effectively transferring the risk of future credit losses to the purchaser of
> the securities issued by the trust.

(*Id.* ¶ 545 (quoting Citigroup's Form 10-Q, at 63-67 (Aug. 3, 2007).)

Plaintiffs claim that those statements were misleading because they suggested that

Citigroup had, through securitization, reduced its exposure to losses from residential mortgage

defaults.  Plaintiffs maintain that, even if Citigroup had created RMBS from the mortgages it had

originated, Citigroup then created CDOs of those and other RMBS and retained substantial CDO

holdings.  Thus, in plaintiffs' view, Citigroup's claim that securitization "reduces the Company's credit exposure to borrowers" was misleading in light of the fact that Citigroup's CDO operations exposed the company to billions of dollars of risk from mortgage defaults.  Moreover, plaintiffs contend that Citigroup's claim that "loan securitizations . . . effectively transfer[] the risk of future credit losses to the purchaser of the securities" was misleading because Citigroup did not disclose that *Citigroup itself* was effectively "the purchaser" of billions of dollars of securities backed by loans.

> ii.  Citigroup Presents Its "CDO-Type Transactions" as Distinct from Its "Mortgage-Related Transactions"

Plaintiffs further allege that Citigroup's SEC filings misled investors about the extent to which Citigroup's CDO were backed by subprime mortgages.  Plaintiffs claim that Citigroup's SEC filings were misleading because they presented Citigroup's underwriting of CDOs as distinct from Citigroup's securitizing of mortgages, giving a false impression that Citigroup's CDOs were backed by assets unrelated to mortgages.  (*Id.* ¶¶ 550-53.)

In a section titled "Off-Balance Sheet Arrangements," Citigroup's August 3, 2007 Form 10-Q stated:

> *Mortgages and Other Assets*
>
> The Company provides a wide range of mortgage and other loan products to its customers. . . . The Company recognized gains related to the securitization of mortgages and other assets . . . .

(*Id.* ¶ 543 (quoting Citigroup's Form 10-Q, at 42 (Aug. 3, 2007).)  A later passage from the same section stated:

> *Creation of Other Investment and Financing Products*
>
> The Company packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage collateralized debt obligations (CDOs) and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

(*Id.*)  Those statements were misleading, plaintiffs claim, because they placed Citigroup's "gains related to the securitization of mortgages" under a different heading from Citigroup's "new security offerings, including . . . CDOs."  That, in plaintiffs view, falsely implied that Citigroup's CDOs did not involve assets tied to subprime mortgages.

In another section of the Form 10-Q, entitled "Securitizations and Variable Interest Entities," Citigroup disclosed the total assets of the CDOs it had underwritten in a table reporting the total value of Citigroup's VIEs:

> [T]he following table represents the total assets of unconsolidated VIEs where the Company has significant involvement:

| In billions of dollars | June 30, 2007 | December 31, 2006 |
|---|---|---|
| *CDO-type transactions* | 74.4 | 52.1 |
| Investment-related transactions | 134.4 | 122.1 |
| Trust preferred securities | 10.3 | 9.8 |
| *Mortgage-related transactions* | 5.0 | 2.7 |
| Structured finance and other | 37.4 | 41.1 |
| Total assets of significant unconsolidated VIEs | 261.8 | 227.8 |

(*Id.* ¶ 545 (quoting Citigroup's Form 10-Q, at 63-67 (Aug. 3, 2007) (emphasis added).)
Plaintiffs claim that that disclosure misled investors by presenting Citigroup's "CDO-type transactions" as distinct from Citigroup's "mortgage-related transactions," when, in reality, nearly all of Citigroup's CDOs were collateralized primarily by subprime and Alt-A mortgages.
(*Id.* ¶ 548.)  Put differently, plaintiffs' claim is that Citigroup's CDOs were, in essence,

"mortgage-related transactions," and so to place them in a different category was to imply that they were backed by assets unrelated to mortgages – an implication that was manifestly false.

### iii. Citigroup Maintains its CDOs Contained Diverse Assets to Diversify Risk

Plaintiffs allege that Citigroup represented that its CDOs were assembled to diversify risk. Specifically, in portions of Citigroup's SEC filings describing CDOs, it stated, "Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset." (*Id.* ¶ 554.) This description was misleading, plaintiffs contend, because CDOs "were not based on diversified assets, but on a singular investment in subprime mortgages." (*Id.* ¶ 555.)

### c. Alleged CDO-Related Accounting Violations

Plaintiffs contend that Citigroup violated "Generally Accepted Accounting Principles" ("GAAP") by failing to disclose its CDO exposure and take write downs for its CDO holdings before November 2007. The failure to adhere to GAAP, plaintiffs claim, made many of Citigroup's SEC filings false and misleading.

### i. Reporting CDO Exposure

Plaintiffs claim that Citigroup's SEC filings were false because they failed to disclose Citigroup's exposure to credit risk in its CDO holdings pursuant to Financial Accounting Standards Board, Summary of Statement No. 107 ("SFAS 107"). Paragraph 15A of SFAS 107 provides:

> [A]n entity shall disclose all significant concentrations of credit risk arising from all financial instruments, whether from an individual counterparty or groups of counterparties. Group concentrations of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions.

(*Id.* ¶¶ 1019-20.)[2]  Financial Accounting Services Board Staff Position, Statement of Position 94-6-1 ("FSP SOP 94-6-1"), further provides that the "terms of certain loan products" – including many of the terms of subprime mortgages – "may increase a reporting entity's exposure to credit risk and thereby may result in a concentration of credit risk as that term is used in [S]FAS 107, either as an individual product type or as a group of products with similar features."  (*Id.* ¶¶ 1022-24 (quoting FSP SOP 94-6-1).)  Plaintiffs contend that SFAS 107 and FSP SOP 94-6-1 required Citigroup to disclose its CDO exposure because Citigroup's CDO holdings were "significant concentrations of credit risk."

### ii.  Consolidating Commercial Paper CDOs

Plaintiffs allege that Citigroup violated GAAP by failing to consolidate its commercial paper CDOs on its balance sheet.  Citigroup considered its CDOs to be VIEs governed by Financial Accounting Standards Board, Interpretation No. 46(R) ("FIN 46(R)").  Citigroup asserted in its SEC filings that FIN 46(R) did not require consolidation of certain VIEs, including CDOs.

Plaintiffs argue that Citigroup's SEC filings were false because Citigroup failed to consolidate its commercial paper CDOs onto its balance sheet.  Paragraph B10 of FIN 46(R) provides that "written put options . . . are variable interests if they protect holders of other interests from suffering losses."  (Compl. ¶ 1039.)  Plaintiffs claim that Citigroup's liquidity puts

---

[2] SFAS 107 then provides that several disclosures must be made for "each significant concentration."  Those disclosures include:

> The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity.

(*Id.* ¶ 1021 (quoting SFAS 107¶ 15A).)

for super-senior CDOs were "variable interests" because they protected the holders of the CDOs from suffering losses.

Paragraph 14 of FIN 46(R) provides that an "enterprise," such as Citigroup, "shall consolidate a [VIE] if that enterprise has a variable interest . . . that will absorb a majority of the [VIE]'s expected losses." (*Id.* ¶ 1036.)  Plaintiffs claim that Citigroup should have consolidated its commercial paper CDOs because Citigroup's liquidity puts were variable interests that would have absorbed a majority of the expected losses of the CDOs.  (*Id.* ¶¶ 1032-43.)

### iii.  Valuing CDO Holdings

Plaintiffs claim Citigroup, over a period stretching from March 2007 to April 2008, consistently over-valued its CDO holdings.

Citigroup first took a writedown on its CDO holdings on November 4, 2007.  Plaintiffs contend that Citigroup's SEC filings should have reported a CDO-related writedown well before.  The company stated that it "account[ed] for its CDO super senior subprime direct exposures and the underlying securities on a fair-value basis with all changes in fair value recorded in earnings." (*Id.* ¶ 1055 (quoting Citigroup's 2007 Form 10-K).)  Plaintiffs allege that from through September 30, 2007, Citigroup valued its CDO holdings at par.  (*Id.* ¶ 594)  They contend that had Citigroup actually undertaken a "fair value" assessment of its CDO holdings, it should have begun taking periodic writedowns on its impaired CDO holdings in March 2007.  (*Id.* ¶¶ 600, 604, 608.)  The failure to take these writedowns allegedly resulted in inflated revenue and income statements in Citigroup's periodic SEC filings.  For example, "Had Citigroup valued its Mezzanine CDO[3] super senior holdings at fair value as of March 31, 2007, it

---

[3] According to the complaint, Citigroup's Mezzanine CDOs invested primarily in the higher-risk RMBS junior tranches.  "In essence, they were a subprime RMBS BBB tranche writ large.  These CDOs' extreme asset concentration in nonprime RMBS BBB tranches meant, ab initio, that a relatively small rise in underlying mortgage pool losses – sufficient to wipe out the thin, close-to-the-bottom BBB- and BBB

would have had to take a writedown of $1.2 billion.  This would have reduced Citigroup's reported revenues by $1.2 billion and pre-tax income by $1.2 billion." (*Id.* ¶ 600)

Plaintiffs support that argument by citing Financial Accounting Standards Board, Statement of Position 157 ("FAS 157"), which defines "fair value" as "the price that would be received to sell an asset . . . in an orderly transaction between market participants."  (*Id.* ¶ 1047 (quoting FAS 157 ¶ 5.)  FAS 157 sets forth "inputs" that companies should use to arrive at a "fair value" calculation.  (*Id.* ¶ 1049.)  "Level 1" inputs are the most favored, as they include quoted prices in active markets for identical assets or liabilities.  (*Id.* ¶ 1051-52 (citing FAS 157 ¶¶ 22, 24).)  "Level 2" inputs are second-best; they include:

> a. Quoted prices for similar assets or liabilities in active markets;
>
> b. Quoted prices for identical or similar assets or liabilities in markets that are not active . . . ;
>
> c. Inputs other than quoted prices that are observable for the asset or liability . . . ; and
>
> d. Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs).

(*Id.* ¶ 1053 (quoting FAS 157 ¶ 28).)  "Level 3" inputs are the least favored means of calculating fair value, as they involve unobservable inputs.  (*Id.* ¶ 1051-52.)

Plaintiffs claim that Citigroup's falsely calculated the fair value of Citigroup's CDO holdings because Citigroup valued those holdings by means of Level 3 inputs – "credit ratings and other valuation methodologies" (Defs.' Mem. at 29) – rather than readily available Level 2 inputs.  In particular, plaintiffs claim that Citigroup should have taken writedowns on its CDO holdings in reaction to precipitous drops in the "TABX," a widely used index that tracked the price of mezzanine CDOs.  (Compl. ¶ 1057; *see also id.* ¶ 309.)  Plaintiffs allege that, while

---

tranches – would simultaneously destroy most of the collateral value of a Mezzanine CDO." (Compl. ¶ 95.)

Citigroup valued its CDO holdings at par – or full value – until November 2007, the TABX was at 85% of par in March 2007, 69% of par in June 2007, and 33% of par in September 2007. In plaintiffs' view, Citigroup was required to use the TABX – a Level 2 input – to take a writedown on its CDO holdings far before November 4, 2007.

Defendants respond that the TABX index – as well as the related ABX index – were not designed to measure the entire market for RMBS and CDOs, and thus the indexes did not provide a suitable valuation tool for Citigroup's CDOs. In addition, defendants argue the ABX and TABX indexes were inapplicable because they tracked only BBB-rated and A-rated RMBS and CDOs, and many of Citigroup's holdings were higher-rated super-senior CDOs. (Defs.' Mem. at 28-31.)

### 2. November 4, 2007 and Later Statements

According to the Complaint, Citigroup on November 4, 2007 disclosed a net exposure to super-senior CDO tranches in the amount of $43 billion and estimated a writedown of $8 to $11 billion on those assets. (Compl. ¶ 615). Plaintiffs allege that the $43 billion figure was misleading. It did not include $10.5 billion worth of holdings that Citigroup had hedged by swapping the risk off to certain insurers. But according to plaintiffs, this insurance was effectively meaningless because the insurers could not honor it. (*Id.* ¶ 185). The omission of these holdings from Citigroup's November 4 disclosure created the false impression that these hedged CDOs would not expose Citigroup to further losses. (*Id.*) Plaintiffs further allege that the writedowns Citigroup took on its CDOs on November 4 and thereafter were materially misleading because they did not reflect the actual value of those assets. (*Id.* ¶¶ 613-26)

3.   *Allegations of Fraudulent Intent with Respect to CDO-Related Misstatements and Omissions*

Plaintiffs also allege that defendants acted with fraudulent intent when they purportedly made material misstatements and omissions regarding CDOs.  Plaintiffs contend that defendants knew that Citigroup's CDOs were risky investments and would suffer substantial losses if nationwide housing prices declined.  Plaintiffs also allege that defendants knew that, once housing prices declined and the subprime mortgage market collapsed, Citigroup should have written down the value of its CDO holdings – even if the CDOs' credit ratings had not yet been downgraded.  Plaintiffs allege the following facts in support of their allegations that the defendants acted with fraudulent intent.

a.   Citigroup Underwrote the CDOs It Owned

Plaintiffs allege that defendants knew that Citigroup's CDO holdings were at risk of substantial losses by virtue of the fact that Citigroup had underwritten the very CDOs it owned.  That is, Citigroup had selected assets for the CDOs and created the financial models to value them.  As a result, plaintiffs allege that defendants knew that the CDOs involved concentrated, correlated risk and would suffer substantial losses if nationwide housing prices declined.

In particular, plaintiffs allege that Citigroup calculated the "expected loss" of its CDO tranches by assuming that housing prices would rise six percent per year.  As a substantial player in the subprime mortgage market, moreover, Citigroup allegedly knew that subprime mortgages were viable only if housing priced continued to rise.  Thus, according to plaintiffs, Citigroup knew that its CDOs – even the super-senior tranches – would suffer considerable losses if nationwide housing prices fell.  (*Id.* ¶¶ 1108-11.)

Plaintiffs point to Citigroup's mezzanine CDOs as an especially salient example of Citigroup's understanding that its CDOs were risky investments.  Plaintiffs contend that, as

underwriter for its mezzanine CDOs, Citigroup knew (1) that a nationwide fall in housing prices would cause an increased percentage of subprime mortgages to default; (2) that a high default rate would quickly wipe out the BB-rated junior tranches of all subprime-backed RMBS; (3) that once junior RMBS tranches were wiped out, the mezzanine RMBS tranches would begin to suffer losses; and (4) that once mezzanine RMBS tranches were impaired, even the super-senior tranches of Citigroup's mezzanine CDOs would suffer losses, as the mezzanine CDOs were collateralized almost *entirely* of mezzanine RMBS.

In other words, plaintiffs allege that Citigroup designed its AAA-rated mezzanine CDO tranches to be far riskier investments than their ratings reflected. Indeed, Citigroup must have known, plaintiffs contend, that its AAA-rated mezzanine CDO tranches were not much safer than BBB-rated mezzanine RMBS tranches, for if a nationwide housing decline wiped out all mezzanine RMBS tranches, AAA-rated mezzanine CDO super-senior tranches would likewise fail.

### b.   The Market Believed that CDOs Were at Risk

Plaintiffs also allege that defendants knew that Citigroup's CDO holdings were at risk of substantial losses because there was a consensus in the market, at least by March 2007, that CDOs were at risk. Plaintiffs allege that, beginning in October 2006, the market began to suspect that CDOs were vulnerable. Plaintiffs base that allegation on the following facts:

- Financial analysts from late 2006 noted that subprime mortgages were defaulting at high rates and concluded, as a result, that RMBS and CDOs were likely to begin to take losses. (*Id.* ¶¶ 315, 317-19, 321.)

- Two indices – the ABX, which tracked the price of subprime RMBS, and the TABX, which tracked the price of mezzanine CDO tranches – began to decline. (*Id.* ¶¶ 309, 322.)

- Newspaper articles reported on a possible decline in RMBS and CDO values. (*Id.* ¶¶ 312, 316, 323.)

Then, from March 2007 onward, plaintiffs allege that there was a "market consensus" that CDOs would suffer losses.  (*Id.* ¶ 308.)  Plaintiffs base that allegation on the conclusions of several financial analysts, many times reported in national newspapers, that "even investment grade rated CDOs [would] experience significant losses" (*id.* ¶ 327), that the "scenario where the BBB[-rated RMBS tranches] blow up [was] a reasonably possible scenario" (*id.* ¶ 328), that the credit ratings of CDO tranches were suspect (*id.* ¶ 329), that there was the possibility of "severe" credit downgrades on CDOs (*id.* ¶ 331), and that there had, in fact, already been "massive losses in the CDO market" (*id.* ¶ 337).  In addition, plaintiffs allege that the ABX and TABX indices fell substantially in February and March 2007.  (*Id.* ¶ 309.)

Thus, plaintiffs allege that defendants knew that Citigroup's disclosures were false and misleading because, at least after March 2007, there was a consensus that CDOs were vulnerable.  Indeed, plaintiffs allege that defendants intentionally misled the market, which was keenly interested in learning which companies were exposed to CDO-related risk.  According to plaintiffs, many in the market assumed that CDO underwriters had sold their CDOs to outside investors, thereby divesting themselves of any attendant risk.  (*Id.* ¶¶ 338, 343-48.)  Defendants encouraged that misconception, plaintiffs claim, by failing to disclose Citigroup's allegedly massive CDO holdings.

c.   Citigroup Analysts Express Concern About Subprime Mortgages and CDOs

In addition, plaintiffs cite three statements by Citigroup analysts showing, in plaintiffs' view, that Citigroup understood the weaknesses in the subprime mortgage market and Citigroup's CDO holdings:

- A report by Citigroup's "Fixed Income" division, issued in January 2007, concluded that the subprime mortgages originated in 2006 were the "worst vintage in subprime history."  (*Id.* ¶ 1115.)

- A report by Citigroup's "Quantitative Credit Strategy and Analysis Group," issued in March 2007, concluded that recent troubles in the subprime mortgage market were capable of causing widespread credit rating downgrades and resulting in losses even to senior CDO tranches. (*Id.* ¶¶ 1121-25 ("Translated into the CDO space, widespread downgrades [on the underlying ABS tranches] would, relatively speaking, be far worse for the senior tranches than for junior ones.").) The report recommended that investors either sell their senior CDO tranches or hedge their risks through credit default swaps. (*Id.* ¶ 1126.)

- At a Citigroup-sponsored conference in March 2007, Citigroup's "head of credit strategy" stated that the as for the "'near-term risk of further [subprime] market correction is concerned, it's at the top of the list' of worries." He went on to say that, in response to declines in the subprime market, some banks have engaged in a "'massive provisioning for losses.'" "'And to be honest,'" he said, "'that makes us deeply suspicious' of banks 'with exposures in that space who have not declared anything like the same degree of provisioning.'" (*Id.* ¶ 1128 (quoting *Subprime Surprise for Europeans*, Wall. St. J., Mar. 9, 2007).)

### d. Citigroup Creates CDOs to Buy Unwanted CDOs

Plaintiffs allege that, in late 2006 and early 2007, Citigroup found it increasingly difficult to find buyers for its CDOs. According to plaintiffs, Citigroup created new CDOs and used those CDOs to purchase unwanted tranches of old CDOs. That, in plaintiffs' view, shows that both (1) Citigroup realized that its CDOs were overly risky and overvalued and (2) Citigroup intended to create the appearance of CDO sales when, in reality, Citigroup was simply transferring assets between Citigroup-controlled entities. (*Id.* ¶¶ 448-80, 1112-14.)

### e. Citigroup Creates a Special Entity to Assume the Risks of Liquidity Puts

As discussed above, Citigroup sold $25 billion of CDO super-senior tranches with liquidity puts in which Citigroup agreed to purchase back the CDOs from investors at full value. In addition, plaintiffs allege that, in February 2007, Citigroup created a special purpose entity called "Foraois Funding Ltd." for the purpose of engaging in a "credit default swap" involving part of Citigroup's liquidity puts. That is, Citigroup created Foraois and then paid Foraois a fee in order to assume Citigroup's liabilities on $1.32 billion of Citigroup's liquidity puts. To finance the Foraois entity, Foraois issued debt securities that were, in part, purchased by a

Citigroup-underwritten CDO.  Plaintiffs claim that the Foraois transaction shows that Citigroup was attempting to hide or dispose of its liability for liquidity puts, demonstrating Citigroup's awareness that the liquidity puts would lead to substantial losses.  (*Id.* ¶¶ 436-47, 1117-20.)

### f.   Citigroup Makes Collateral Demands on Mortgage Originators

Citigroup and other banks had an arrangement with subprime mortgage originators in which Citigroup would extend so-called "warehouse lines of credit."  The originators would make loans to borrowers using the warehouse credit, and then Citigroup would purchase the loans from the originator, resetting the credit line.

According to plaintiffs, in March 2007, Citigroup and other banks began pulling out of the warehouse credit arrangements by making large collateral demands on the originators.  In particular, plaintiffs allege that Citigroup's collateral demands caused New Century Financial, one of the nation's largest subprime mortgage originators, to file for bankruptcy protection.  Citigroup's collateral demands, plaintiffs claim, demonstrate Citigroup's awareness of the weakness of the subprime mortgage market.  (*Id.* ¶¶ 304-05, 1130-33.)

### g.   Citigroup's CDO Prospectuses Warn of Risks

Plaintiffs allege that, beginning in April 2007, Citigroup CDO prospectuses disclosed certain risk factors, including that:

- Defaults on subprime mortgages had increased, which had the possibility of "affect[ing] the performance of RMBS Securities."

- Adjustable-rate subprime mortgages were especially susceptible to default.

- A decline in housing prices had the possibility of leading to greater subprime mortgage defaults.

- Subprime mortgage originators had recently gone bankrupt, and the federal government had recently promulgated new rules for subprime mortgages, which had made it possible that subprime borrowers would have difficulty refinancing.

(*Id.* ¶ 1136.)  All of those risk factors, the prospectuses explained, could "reduce the cash flow which the [CDO] receives from RMBS Securities or CDO Securities held by the [CDO]" and "decrease the market value of such RMBS Securities and CDO Securities and increase the incidence and severity of credit events."  (*Id.* ¶¶ 1134-36.)

Plaintiffs allege that the new language in Citigroup's CDO prospectuses demonstrates that Citigroup understood that its CDOs faced substantial risks from the collapse of the subprime mortgage market.

### h.   Citigroup Purchases Insurance for Its CDO Holdings

Plaintiffs allege that, beginning in February 2007, Citigroup began to purchase insurance for its super-senior CDO holdings.  That, in plaintiffs' view, shows that Citigroup understood that its super-senior CDO holdings faced a substantial risk of losses.  (*Id.* ¶ 1116.)

### i.   Citigroup Executives Hold Daily Risk Exposure Sessions

Plaintiffs allege that, according to news reports, defendant Rubin began in July 2007 to hold daily meetings regarding Citigroup's CDO exposures.  (*Id.* ¶¶ 1140-42.)  That, in plaintiffs' view, demonstrates that Citigroup understood that its CDO holdings faced massive losses.

### j.   Citigroup Makes a Margin Call on Basis Capital Funds

Citigroup had lent money to several hedge funds called the Basis Capital Funds. Plaintiffs allege that, in mid-July 2007, Citigroup began making margin calls on Basis Capital on the understanding that a large portion of the collateral that Basis Capital had put up for the loans – CDOs tied to subprime mortgages – had declined in value and no longer provided sufficient security.  That, in plaintiffs' view, shows that Citigroup understood that CDOs had, in general, become devalued.  (*Id.* ¶¶ 1143-48.)

D.  Alt-A RMBS Allegations

Plaintiffs allege that Citigroup's misled investors by failing to disclose Citigroup's Alt-A RMBS exposure and, once revealed, by failing to value those assets properly.

First, plaintiffs assert that Citigroup should have disclosed its Alt-A RMBS exposure prior to April 18, 2008, because plaintiffs claim that the market knew beginning in late 2007 that Alt-A RMBS holdings were impaired.  (*Id.* ¶¶ 949-55.)  Citigroup, plaintiffs claim, knew the risks facing Alt-A RMBS even better than the market because Citigroup, as the underwriter of the securities, "was in a uniquely advantageous position to observe the deteriorating performance of these assets before they became public knowledge."  (*Id.* ¶ 954.)

Plaintiffs further allege that defendant Crittenden misled investors about the scope of Citigroup's Alt-A RMBS exposure in a January 22, 2008 earnings conference call.  Crittenden stated that he did not "anticipate" that Citigroup's "Alt-A portfolio" would pose "a substantial risk."  An analyst asked, "Is that a function of size or you just don't think that area is going to have the same deterioration we have seen in other credit buckets?"  Crittenden responded, "It is a function of size."  (*Id.* ¶ 956.)  Plaintiffs claim that Crittenden's statement was misleading because, in fact, Citigroup's Alt-A RMBS holdings were massive – approximately $22 billion at the time of Crittenden's statement.  (*Id.* ¶ 957.)

Finally, plaintiffs allege that, even when Citigroup announced its Alt-A RMBS exposure, Citigroup overvalued its Alt-A RMBS holdings.  Plaintiffs claim that when Citigroup wrote down its Alt-A RMBS holdings to 66 cents on the dollar, other banks had written down their Alt-A RMBS holdings to between 35 and 50 cents on the dollar.  (*Id.* ¶ 961.)

E.  SIV Allegations

Plaintiffs' SIV allegations can be grouped into three categories.

First, plaintiffs contend that Citigroup misled investors by failing to disclose the SIV exposure it had on account of its "implicit guarantee" to provide liquidity support for its SIVs in the event they began to fail. According to plaintiffs, Citigroup's SIVs had sold $100 billion of securities to Citigroup customers, marketing them as safe investments. If the SIVs ever failed, Citigroup's reputation among its customers would be severely tarnished. To prevent that, plaintiffs claim that Citigroup implicitly guaranteed to provide liquidity backstops to its SIVs if they ever were to approach failure. (*Id.* ¶ 666.) Indeed, in December 2007, when Citigroup announced that it would bail out its SIVs with extensive liquidity backstops, Citigroup representatives allegedly stated that Citigroup's actions were an effort to prevent reputational damage. (*See id.* ¶ 680.) Although Citigroup insisted that it had no *contractual* obligation to bail out its SIVs, plaintiffs claim that the obligation nevertheless existed and the failure to disclose it was materially misleading.

Second, plaintiffs contend that Citigroup's failure to consolidate its SIVs on its balance sheet prior to December 2007 was intended to knowingly mislead investors. In conjunction with the announcement of its SIV bailout in December 2007, Citigroup said that, for the first time, it would consolidate the SIVs on its balance sheet. (Compl. ¶ 682.) Plaintiffs claim that Citigroup should have consolidated its SIVs long before then and, as a result, that Citigroup's SEC filings prior to December 2007 were false and misleading.

Citigroup had classified its SIVs, like its CDOs, as VIEs governed by FIN-46(R). As discussed above, FIN-46(R) requires an enterprise to consolidate a VIE "if that enterprise has a variable interest . . . that will absorb a majority of the [VIE]'s expected losses." (*Id.* ¶ 1036.) Plaintiffs claim that Citigroup had a variable interest in its SIVs because Citigroup had *implicitly* agreed, prior to the end of 2007, to provide liquidity backstops to the VIEs. Financial Accounting Standards Board, Staff Position No. FIN 46(R)-5 ("FSP FIN 46(R)-5")

acknowledges that enterprises can have "implicit variable interests" and provides as an example "an implicit agreement to replace impaired assets held by a variable interest entity that protects holders of other interests in the entity from suffering losses."  (*Id.* ¶ 1077 (quoting FSP FIN 46(R)-5, ¶ 6).)  Plaintiffs allege that Citigroup's implicit guarantee to provide liquidity backstops to its SIVs was, effectively, an agreement to "replace impaired assets," and that the implicit agreement was meant to protect the SIV investors – Citigroup's customers – who were "holders of other interests in the entity."  (*Id.*)   Thus, although Citigroup had considered its SIVs to be "nonrecourse" – and thus not assets to be consolidated on Citigroup's balance sheet – plaintiffs allege that Citigroup always knew that it would have to bailout out its SIVs, which, in plaintiffs' view, amounted to an implicit variable interest pursuant to FSP FIN 46(R)-5, ¶ 6.  Citigroup's failure to consolidate its SIVs prior to December 2007 allegedly misled investors by concealing this liability.

Third, plaintiffs claim Citigroup made material misstatements to investors even after it revealed it would provide liquidity support for its SIVs by stating that Citigroup's credit exposure on account of its SIVs was "substantially limited" due to the "high credit quality of the SIV assets."  (*Id.* ¶ 683.)  Such statements were materially misleading, plaintiffs allege, because Citigroup no longer had "limited involvement" because it had already begun providing liquidity support and because the assets underlying the SIVs were not, in fact, high quality.

F.   Mortgage Allegations

Plaintiffs allege that defendants made numerous material misstatements and omissions related to Citigroup's mortgage holdings.  Plaintiffs also allege that Citigroup's financial statements violated GAAP by improperly accounting for Citigroup's mortgage holdings.

### 1.  Alleged Mortgage-Related Misstatements

Plaintiffs allege that defendants misled investors by representing that Citigroup did not have exposure to risky mortgages that borrowers could not pay back.  The following statements are illustrative of the basis of plaintiffs' claims:

- Bill Beckmann, COO of CitiMortgage, said in a 2006 magazine article: "[W]e're not going to make a loan on an affordability basis.  We're going to make a loan because we believe it's right for a customer because we think they can pay it back."  (*Id.* ¶ 806.)

- Defendant Freiberg said at an investor conference in 2006 that Citigroup's portfolio of first mortgages had a "high quality consumer profile (LTV and FICO), consistent over time."  (*Id.* ¶ 808.)

- Citigroup represented in a 2006 magazine article that it "does not offer second-lien mortgages behind negative amortization first mortgages" and that its "average FICO Equity is a healthy 733, making it primarily a prime business."  (*Id.* ¶ 810.)

- Freiberg said at a 2007 investor conference that "for the last, I would say, 12 to 15 months, we have been tightening criteria, we have been isolating whether [it's] channel, whether [it's] product or whether it is basically policy and/or criteria."  (*Id.* ¶ 816.)

- Defendant Prince said in a 2007 investor conference: "I feel good about the composition of our portfolios, not only in the corporate and sovereign area but especially in the U.S. mortgage area where we have avoided the riskier products at some cost to revenues in prior years."  (*Id.* ¶ 836.)

Those statements, and others like them, were false or misleading, plaintiffs allege, because Citigroup's mortgage holdings were not safe mortgages that borrowers could repay.  According to plaintiffs, Citigroup's mortgage holdings were riddled with fraudulent and nonconforming mortgages of various types.  (*See id.* ¶¶ 807, 809, 811, 813, 815, 817.)  In addition, plaintiffs contend these misstatements were misleading because they discussed the standards that Citigroup used in its retail mortgage operations without disclosing the comparatively lax controls

that Citigroup exerted over its correspondent channel mortgage operations.[4]  Through the correspondent channels, plaintiffs assert, Citigroup purchased scores of risky, nonconforming mortgages, and thus information about the correspondent channels was necessary, in plaintiffs' view, to make defendants' statements about Citigroup's mortgage business accurate.

### 2. Alleged Mortgage-Related GAAP Violations

Plaintiffs allege that Citigroup violated GAAP by failing to report a sufficient "loan loss allowance" on Citigroup's financial statements.  Several GAAP rules require mortgage originators to report a loan loss allowance that, for subprime mortgages, "should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months."  (*Id.* ¶ 824.)  Citigroup did not, plaintiffs claim, properly account for the extent of fraudulent and worthless loans in Citigroup's mortgage holdings.  (*Id.* ¶¶ 826-43.) As a result, Citigroup allegedly reported a loan loss allowance that was significantly lower than what GAAP required.

### 3. Allegations of Fraudulent Intent with Respect to Mortgage-Related Misstatements and Omissions

To show that defendants acted with fraudulent intent in making the mortgage-related statements addressed above, plaintiffs cite essentially two grounds on which defendants allegedly *knew* that Citigroup's mortgage portfolio contained fraudulent and risky mortgages and was overvalued in Citigroup's financial statements.

First, plaintiffs cite the testimony of confidential witnesses – as well as confidential internal Citigroup documents – that show, in plaintiffs' view, that Citigroup knew that its mortgage holdings were significantly impaired.  (*See, e.g.*, *id.* ¶¶ 724, 743, 793, 796, 799-800.)

---

[4] Correspondent channel loans are obtained through mortgage brokers, mortgage bankers, financial institutions, and homebuilders who sold previously funded mortgage loans to Citigroup at a previously negotiated price.  (*Id.* at ¶ 713 n.38.)

Plaintiffs allege that "Citigroup management" was regularly informed of the status of Citigroup's mortgage holdings. (*Id.* ¶ 796.)

Second, plaintiffs allege that Citigroup knew that its mortgage holdings contained fraudulent and risky loans because Citigroup sued various mortgage originators in its correspondent channels. According to plaintiffs, Citigroup's court filings show that Citigroup was aware that the mortgages it had purchased from its correspondent channels contained fraudulent and impaired mortgages. (*Id.* ¶¶ 757-84.)

### G.  ARS Allegations

According to plaintiffs, internal company emails demonstrate that, beginning in August 2007, Citigroup knew that the ARS market was impaired and that these assets were at risk. (*Id.* ¶¶ 938-41.) Plaintiffs allege that Citigroup, armed with this knowledge, misled investors in certain 2007 SEC filings by failing to disclose Citigroup's billions of dollars of ARS holdings and the growing risks these securities faced. (*Id.* ¶ 920.) Citigroup disclosed the extent of its ARS holdings in April 2008, but, according to plaintiffs, materially misstated their value at that time and for months thereafter. (*Id.* ¶ 925.)

### H.  Leveraged Loan and CLO Allegations

Plaintiffs cite an April 2004 conference call in which the "Company" stated: "Corporate loans . . . again, that's an area where we don't actually focus on growing that part of our business. . . . So that's not part of our growth strategy if you will." (*Id.* ¶ 891.) Plaintiffs also cite a July 2004 conference call in which the "Company" reiterated that "corporate loans" did not present "an area" where Citigroup intended to "look for a lot of growth." (*Id.* ¶ 892.) Plaintiffs claim that those statements were misleading because they made it seem as if Citigroup's leveraged loan and CLO investments were conservative. In reality, plaintiffs assert that

Citigroup's leveraged loan and CLO operations were risky and speculative, leading to the losses described above.  (*Id.* ¶ 893.)

Plaintiffs also allege that Citigroup's financial statements contained material omissions because they did not disclose Citigroup's leveraged loan and CLO exposures.  (*Id.* ¶ 894.) Plaintiffs further claim that, even when Citigroup did announce its leveraged loan and CLO exposures and losses, Citigroup's announcements still overvalued Citigroup's holdings and presented those holdings as less risky than they actually were.  (*Id.* ¶¶ 896-905.)

I.   Solvency Allegations

Plaintiffs allege that, from December 2007 through November 2008, Citigroup and defendant Pandit misled investors about the company's financial health in two ways: by overstating the strength of Citigroup's financial condition, (*Id.* ¶¶ 972-986, 991-92, 996), and by overstating the value of Citigroup's assets in its quarterly and annual filings, (*Id.* ¶¶ 974, 977, 981, 986, 991, 1088–86).

## II. DISCUSSION

Plaintiffs assert two causes of action.  Count One alleges that all defendants committed securities fraud by violating Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  Count Two alleges that the individual defendants are liable for securities fraud as controlling persons pursuant to Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).  Defendants have moved pursuant to Rule 12(b)(6) to dismiss the Complaint for failure to state a claim upon which relief may be granted.

A.  Legal Standards

    *1.  Standard of Review*

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006).  A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).

A complaint alleging securities fraud is subject to two heightened pleading standards. First, the complaint must satisfy Rule 9(b), which requires that it "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *see ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

To state a claim for securities fraud pursuant to Section 10(b) and Rule 10b-5, a complaint must allege that a defendant "(1) made misstatements or omissions of material fact;

(2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which

plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re*

*Int'l Bus. Machs. Corporate Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998).

Here, defendants principally maintain that the Complaint should be dismissed because it

fails to allege actionable misstatements or omissions and because it inadequately alleges that

defendants acted with scienter.

### 2. *Section 10(b) Claims*

#### a. Misstatements or Omissions of Material Fact

A plaintiff may bring a claim pursuant to Section 10(b) and Rule 10b-5 based on either

affirmative misstatements or omissions of material fact. "A securities fraud complaint based on

misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent." *ATSI Commc'ns.*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d

300, 306 (2d Cir. 2000)). A securities fraud complaint based on omissions must allege that "the

corporation is subject to a duty to disclose the omitted facts." *In re Optionable Sec. Litig.*, 577 F.

Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267

(2d Cir. 1993)). A corporation is "not required to disclose a fact merely because a reasonable

investor would very much like to know that fact." *Id.* (quoting *In re Time Warner*, 9 F.3d at

267). Nevertheless, a "duty to disclose 'arises when disclosure is necessary to make prior

statements not misleading.'" *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 525 (S.D.N.Y. 2009)

(quoting *In re Time Warner*, 9 F.3d at 268).

The alleged misstatement or omission must have been material. "At the pleading stage, a

plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission

that a reasonable investor would have considered significant in making investment decisions."

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Ganino*, 228 F.3d at 162).

### b.   Scienter Standard

A complaint asserting a claim pursuant to Section 10(b) and Rule 10b-5 also must allege that the defendant acted with scienter.  On a motion to dismiss, the court must "consider the complaint in its entirety," inquiring "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. . . . A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 323-24.

A complaint may establish a strong inference of scienter in a Section 10(b) or Rule 10b-5 action by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns.*, 493 F.3d at 99.

To allege a "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefitted in some concrete and personal way from the purported fraud."  *Novak*, 216 F.3d at 307-08.  "Motives that are common to most corporate officers, such as the

desire for the corporation to appear profitable and the desire to keep stock prices high to increase

officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA & Local*

*134*, 553 F.3d at 198.  Motive to commit fraud can be shown, however, "when corporate insiders

allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.*

　"Where motive is not apparent, it is still possible to plead scienter by identifying

circumstances indicating conscious behavior by the defendant, though the strength of the

circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131,

142 (2d Cir. 2001).  "Intentional misconduct is easily identified since it encompasses deliberate

illegal behavior . . . ." *Novak*, 216 F.3d at 308.  Strong circumstantial evidence of reckless

conduct also gives rise to an inference of scienter, so long as the complaint alleges "conduct

which is highly unreasonable and which represents an extreme departure from the standards of

ordinary care to the extent that the danger was either known to the defendant or so obvious that

the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (quoting *Honeyman v. Hoyt*

*(In Re Carter-Wallace, Inc. Secs. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)).  "'[S]ecurities fraud

claims typically have sufficed to state a claim based on recklessness when they have specifically

alleged defendants' knowledge of facts or access to information contradicting their public

statements.'" *Id.* (quoting *Novak*, 216 F.3d at 308).

To plead scienter when the defendant is a corporation, "the pleaded facts must create a

strong inference that someone whose intent could be imputed to the corporation acted with the

requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531

F.3d 190, 195 (2d Cir. 2008).  "In most cases, the most straightforward way to raise such an

inference for a corporate defendant will be to plead it for an individual defendant." *Id.*

However, "it is possible to raise the required inference with regard to a corporate defendant

without doing so with regard to a specific individual defendant." *Id.*

### c. Loss Causation Standard

Loss causation need not be pled with particularity.  A short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure is sufficient.  *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007).  To establish loss causation, the loss must be foreseeable and the loss must be caused by the "materialization of the concealed risk." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).  "'[A] plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)).  Thus, the Second Circuit has made clear that in order "[t]o plead loss causation, the complaint[] must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell*, 396 F.3d at 175.

### 3.  Section 20(a) Claims

Section 20(a) of the Securities Exchange Act creates a cause of action against defendants alleged to have been "control persons" of those engaged in the primary securities fraud.  The section provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To withstand a motion to dismiss, a plaintiff must "allege facts showing (1) 'a primary violation by the controlled person,' (2) 'control of the primary violator by the targeted

41

defendant,' and (3) that the 'controlling person was in some meaningful sense a culpable participant in the fraud perpetrated.'" *In re Beacon Assocs. Litig.*, No. 09 Civ. 777, 2010 WL 3895582, at *17 (S.D.N.Y. Oct. 5, 2010) (quoting *ATSI Commc'ns,* 493 F.3d at 108). "Control" is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2. Primary liability by the controlling person – as opposed to the controlled person – is "not a necessary predicate to a section 20(a) claim, which is typically used to sue defendants who do not have primary liability." *Catton v. Def. Tech. Sys.*, 457 F. Supp. 2d 374, 382 (S.D.N.Y. 2006).

B. CDO Allegations

Plaintiffs allege that defendants misled investors about Citigroup's CDO exposure throughout the class period. Prior to November 4, 2007, defendants allegedly misrepresented the existence of any CDO exposures and, between February 2007 and November 2007, the value of Citigroup's CDO holdings. Even after Citigroup disclosed $43 billion in CDO exposure on November 4, 2007, plaintiffs claim that defendants continued to understate the full extent of Citigroup's CDO exposure and overstate the CDOs' value.

1. *Pre-November 4, 2007 Statements*

a. Alleged misstatements and omissions

Plaintiffs identify three classes of actionable misstatements or omissions in Citigroup's statements pre-November 4, 2007.

First, Citigroup made allegedly incomplete and misleading disclosures about the extent of its CDO holdings. For example, CDOs are a type of VIE, and Citigroup stated in SEC filings that it "may also have an ownership interest or other investment in certain VIEs" and had a "limited continuing involvement" with its VIEs. (Compl. ¶ 545.) These statements were

42

allegedly misleading because at the time they were made Citigroup actually owned a substantial amount of CDOs directly, and had other exposure due to the liquidity puts it provided on billions of dollars of CDOs it sold. (*Id.* ¶¶ 565-74.)  In a similar vein is plaintiffs' claim that Citigroup violated GAAP by failing to consolidate its Commercial Paper CDOs. (*Id.* ¶¶ 1032-43.)  In so doing, plaintiffs argue, Citigroup misled investors about its exposure to these particular CDOs. (*Id.* ¶ 106.)  Simply put, plaintiffs identify a set of statements that gave the impression that Citigroup had minimal, if any, exposure to CDOs when, in fact, it had more than $50 billion in exposure.

Defendants argue that the failure to disclose the extent of Citigroup's CDO holdings is not actionable because there was no duty to disclose.  However, disclosure of Citigroup's CDO holdings was necessary to prevent other statements—such as the boilerplate statement that the company *may* have such exposure—from being false or misleading. *See Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (there is a duty to disclose information when such disclosure is necessary to make other statements not materially false or misleading).  Defendants also contend that the information on Citigroup's CDO holdings was publicly available, and therefore the market knew the truth about its holdings.  This argument, however, raises a factual question and thus provides no reason at this early stage to dismiss plaintiffs' claims. *See Ganino*, 228 F.3d at 167; *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010).

A second set of Citigroup misstatements and omissions concern the relationship of Citigroup's CDO holdings to the subprime mortgage market.  For instance, plaintiffs allege that Citigroup's SEC filings separated its "CDO-type transactions" from its "Mortgage-related transactions." (Compl. ¶ 545.)  Similarly, plaintiffs allege that Citigroup's exposure to subprime mortgages by way of its CDOs "gave rise to a concentration of credit risk" that Citigroup

concealed in violation of GAAP.[5]  (*Id.* ¶ 1028.)  These misstatements and omissions allegedly

gave the impression that Citigroup's CDO holdings were insulated from the subprime mortgage

market.  But the Complaint alleges in detail that the deterioration of the subprime market put

Citigroup's CDO holdings directly at risk.  Accordingly, the Court finds that plaintiffs' have

adequately pled that these statements and omissions concerning Citigroup's subprime exposure

via its CDOs were misleading.

        Finally, plaintiffs allege that Citigroup overstated the value of its CDO holdings between

February 2007 and October 2007.  Throughout that period, Citigroup valued its CDOs at par—an

allegedly inaccurate valuation.  Plaintiffs allege that two specialized indices, the ABX and

TABX, were "directly observable indicators of the value" of certain RMBS and CDO tranches.

(*Id.* ¶ 597.)  These indices displayed consistent declines throughout 2007.  Plaintiffs contend that

the decline in these indices indicated a clear decline in the value of Citigroup's CDOs over the

same period, making defendants' consistent valuation of these assets at par during this time

period false.  (*Id.* ¶¶ 600, 604, 608.)  Defendants object to plaintiffs' valuation methodology and

counter that the ABX and TABX indices are not appropriate barometers of the value of

Citigroup's CDOs.  (Defs.' Mem. at 28-31.)  These arguments amount to factual disputes that

this Court cannot resolve on a motion to dismiss.  Accepting the Complaint's factual allegations

as true, plaintiffs have adequately pled that Citigroup's CDO valuations were false between

February 2007 and October 2007.

---

[5] Defendants' argument that the GAAP provisions concerning credit risk did not apply to its CDO
holdings, (Defs.' Mem. at 25), raises a factual issue concerning GAAP compliance "that cannot be
resolved on a motion to dismiss."  *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241,
273 (S.D.N.Y. 2010).

b. Materiality and Loss Causation

Plaintiffs have alleged adequately that information concerning Citigroup's CDO exposure was highly material to the market's valuation of Citigroup stock, and the market's reaction in the wake of Citigroup's disclosure suggests plaintiffs are correct. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 676 (6th Cir. 2005). Thus, the Court finds that plaintiffs have adequately identified specific statements or omissions that they allege were materially misleading, and identified who made them, when they were made, and why they were allegedly misleading. (Compl. ¶¶ 545-79.)

The alleged misstatements were made in connection with the purchase or sale of a security, and plaintiffs have adequately pled that they relied on the alleged misstatements and suffered an economic loss as a result of that reliance. (*Id.* ¶¶ 1186-1205.) Further, they have adequately pled loss causation. Plaintiffs have identified several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and plaintiffs have also alleged that the value of their securities declined following the corrective disclosures. (*Id.*) Plaintiffs' allegations are sufficient at this early stage of the litigation. *See In re Initial Pub. Offering*, 544 F. Supp. at 289. Whether the alleged omissions and false statements actually caused plaintiffs' losses cannot be determined at this stage of the litigation.

c. Scienter

i. Citigroup

According to plaintiffs, the cumulative effect of all the alleged misstatements and omissions made through October 2007 is that defendants concealed from investors the scope of the risks that the subprime meltdown posed for Citigroup by way of the company's CDO exposure. Plaintiffs can sustain a claim of securities fraud if they can plead particularized facts giving rise to a strong inference that one or more of defendants was at least reckless in

45

misleading investors in this way.  Plaintiffs have met this burden.  The Court finds that plaintiffs have alleged particularized facts supporting a strong inference that, from February 2007, "someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex*, 531 F.3d at 195.

Specifically, plaintiffs have adequately pled facts that, if true, would support a finding of reckless conduct—"'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *City of Livonia Emps. Ret. Sys. v. Wyeth*, No. 07 Civ. 10329, 2010 WL 3910265, at *6 (S.D.N.Y. Sept. 29, 2010) (quoting *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d at 39).  Their allegations support a strong inference that someone whose intent is attributable to Citigroup was, at the least, reckless in failing to recognize the risks associated with Citigroup's CDO exposure.

First, the Complaint details a number of actions Citigroup took that indicate awareness of CDO risk.  For instance, between February 2007 and June 2007, Citigroup "to a greater extent than ever before," hedged away the risks associated with the super senior CDO tranches it retained by purchasing insurance (in the form of credit default swaps) on them.  (Compl. ¶ 191.) Contemporaneously, Citigroup set up a special purpose entity and paid that entity a fee to assume the credit risks associated with certain super senior Commercial Paper CDO tranches.  (*Id.* ¶¶ 1117-20.)  In April 2007, Citigroup changed its CDO prospectuses to reflect the increased risks resulting from the deterioration in the subprime mortgage market.  (*Id.* ¶¶ 1136, 1138.)  In the summer of 2007, Citigroup executives held "daily meetings regarding Citigroup's CDO exposures."  (*Id.* ¶ 1140.)

Second, plaintiffs plead in detail how Citigroup, as the underwriter of the CDOs it held, knew the inputs and assumptions that went into creating these assets and thus was in the best

position to recognize the threats they faced as the subprime mortgage market deteriorated.  (*Id.* ¶¶ 349-96.)  Further, the Complaint alleges how other CDO underwriters in "early and mid-2007" became aware of the risks facing CDOs.  (*Id.* ¶¶ 397-406.)

Third, plaintiffs plead facts illustrating that people within Citigroup were foreseeing an upcoming CDO meltdown.  A March 2007 report from Citigroup's quantitative credit strategy and analysis group allegedly described the risks the subprime meltdown posed to the holders of CDO super senior tranches.  (*Id.* ¶¶ 1121-26.)  Additionally, during a March 2007 investor conference in Monaco, Matt King, a Citigroup credit strategist, explained the risks facing senior CDO tranches and stated that he was "deeply suspicious" of banks that had not declared that they were making provisions for potential losses resulting from subprime exposure.  (*Id.* ¶ 1128.)

Plaintiffs' allegations support a strong inference that Citigroup officials were at least reckless in not appreciating, by February 2007, the risks CDOs posed to the company.  That other CDO underwriters and various Citigroup analysts were aware of the risks support that position.  The actions Citigroup took indicate that the company in fact saw the risks and, in consequence, maneuvered to avoid them.  Defendants would have the court infer that Citigroup could not have been aware of the risks to CDOs and that the "severity and speed" of the downturn in the CDO market occurring in October 2007 "was a surprise to market participants." (Defs.' Mem. at 38.)  But plaintiffs have alleged, with supporting facts, that other CDO underwriters were aware of the significant potential of an impending collapse well before October 2007.  Citigroup's own actions evince the same awareness.  "[A]ccepting the whole factual picture painted by the complaint," the Court finds in its "practical judgment" that "it is at least as likely as not" that someone whose intent could be imputed to Citigroup acted with scienter.  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 775 (2d Cir. 2010).

Defendants contend that none of Citigroup's actions suggest "any knowledge on Citigroup's part that losses would be suffered." (Defs.' Mem. at 40.) This argument erroneously presupposes that plaintiffs must show that defendants were clairvoyant. Defendants could have been reckless in failing to disclose this information even absent knowledge that the CDO holdings would certainly suffer losses. Plaintiffs have alleged adequate facts to support a strong inference that that is just what occurred at Citigroup. Their claims concern a series of statements denying or diminishing Citigroup's CDO-exposure and the risks associated with it. These statements are inconsistent with the actions Citigroup was allegedly undertaking between February 2007 and October 2007. According to the Complaint, Citigroup was taking significant steps internally to address increasing risk in its CDO portfolio but at the same time it was continuing to mislead investors about the significant risk those assets posed. This incongruity between word and deed establishes a strong inference of scienter. *See Dynex*, 531 F.3d at 195-96 ("Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008))).

Defendants, however, are correct to point out that plaintiffs have failed to raise an inference of scienter prior to February 2007. The Complaint is devoid of any factual allegations that could give rise to an inference of scienter for years 2004 and 2005 and most of 2006. Indeed, plaintiffs write that the "theses of this action are that: (1) surely between late 2006 and early 2007, Citi and *everybody* had become aware that CDOs implicated nonprime mortgage risks and losses; and (2) beginning in October 2006, Citi's own actions demonstrate that Citi was ahead of the curve in grasping this reality. By February 2007, CDO risk was well-understood

48

within Citi and without." (Pls.' Mem. at 1 (citations omitted).) With respect to the period between October 2006 to February 2007, plaintiffs' allegations at best could only support an inference of recklessness with respect to the risks posed by *junior* CDO tranches. The Court finds that that is inadequate to demonstrate scienter because plaintiffs' allegations concern Citigroup's accumulation of $55 billion in *super senior* CDO tranches. (Compl. ¶ 101.) Citigroup's actions do not demonstrate a strong inference of awareness of the risks posed to super senior tranches until February 2007. Absent a strong inference of scienter for the period predating February 2007, plaintiffs cannot maintain their claims pertaining to that period. *See Defer LP v. Raymond James Fin., Inc.*, No. 08 Civ 3449, 2010 WL 3452387, at *5 (S.D.N.Y. Sept. 2, 2010). Accordingly, those claims are dismissed.

ii.   Individual Defendants

For plaintiffs to state a claim against the individual defendants, they must plead scienter adequately for each. For defendants Krawcheck, Thomson, Pandit, Gerspach, Volk, Kaden and Freiberg, there are insufficient particularized allegations that they had knowledge of Citigroup's CDO operations, so there can be no finding of scienter as to these individuals. The CDO-related claims against them must be dismissed.

That leaves defendants Prince, Crittenden, Druskin, Maheras, Klein, Bushnell and Rubin. The Complaint alleges that all of these defendants attended meetings in the summer of 2007 that addressed Citigroup's CDO exposure. (Compl. ¶¶ 504, 1140-42.) Although plaintiffs do not allege with specificity the matters discussed at these meetings, their mere existence is indicative of scienter: That defendants engaged in meetings concerning Citigroup's CDO risks is inconsistent with the company's public statements downplaying or concealing that risk. *See Freudenberg v. E*Trade Financial Corp.*, No. 07 Civ. 8538, 2010 WL 1904314, at *24 (S.D.N.Y. May 11, 2010) ("[M]eetings, where the problems at issue were directly discussed with

Defendants, evidence scienter."); *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387

(E.D.N.Y. 2009).  Accordingly, the court finds that plaintiffs have adequately alleged a strong

inference of scienter for defendants Prince, Crittenden, Druskin, Maheras, Klein, Bushnell and

Rubin.

     But to be liable for securities fraud, these defendants must also be responsible for the

Citigroup's misleading statements and omissions.  Most of the misleading statements at issue

here were contained in Citigroup's SEC filings—collectively authored documents to which the

group pleading doctrine applies.  *See In re American Intern. Group, Inc. 2008 Sec. Litig.*, No. 08

Civ. 4772, 2010 WL 3768146, at *14 (S.D.N.Y. Sept. 27, 2010).  This doctrine permits plaintiffs

> for pleading purposes only, to rely on a presumption that . . . press releases, or
> other group-published information, are the collective work of those individuals
> with direct involvement in the everyday business of the company. This allows
> plaintiffs, to a limited extent, to circumvent the general pleading rule that
> fraudulent statements must be linked directly to the party accused of the
> fraudulent intent.

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *23

(S.D.N.Y. Sept. 28, 2010) (internal quotation marks omitted).  "'In order to invoke the group

pleading doctrine against a particular defendant the complaint must allege facts indicating that

the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity

issuing the statement.'"  *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118, 2010 WL

3341636, at *19 (S.D.N.Y. Aug. 18, 2010) (quoting *In re Alstom SA*, 406 F. Supp. 2d 433, 448

(S.D.N.Y. 2005)).  Here, the Complaint alleges that defendants Prince, Crittenden, Druskin,

Maheras, Klein and Bushnell, corporate insiders all, were involved in the preparation of

Citigroup's SEC filings during the relevant time period or were otherwise deeply involved in

Citigroup's day-to-day activities.  (Compl. ¶¶ 35, 42, 44, 48, 50, 52.)  These allegations are

sufficient for the claims against these defendants to proceed.  Although defendant Rubin was an

outside director during the relevant period for these statements, plaintiffs have pled that he wielded significant influence within the company and that he convened the meetings in the summer of 2007 that considered the company's CDO exposure.  (*Id.* ¶¶ 1140, 1177.)  These allegations are adequate at this stage of the litigation to sustain a claim against Rubin.  *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 446 F. Supp. 2d 163, 180 (S.D.N.Y. 2006) ("[O]utside directors . . . can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, . . . [they] have access to information more akin to a corporate insider." (internal quotation marks omitted)).  Accordingly, plaintiffs have adequately stated Section 10(b) claims arising from alleged CDO-related misstatements and omissions in the pre-November 4, 2007 period against defendants Prince, Crittenden, Druskin, Maheras, Klein, Bushnell and Rubin.

   2.   *November 4, 2007 and Later Statements*

      a.   Alleged Misstatements and Omissions

On November 4, 2007, Citigroup disclosed that it held $43 billion of super senior CDO tranches simultaneously with the fact of their writedown by an expected $8-$11 billion.  (Compl. ¶ 101.)  Plaintiffs allege that these disclosures were misleading in two ways.

First, plaintiffs contend that Citigroup failed to disclose the full extent of its CDO exposure by omitting from its announcement the existence of $10.5 billion in hedged CDOs – CDOs for which Citigroup had purchased insurance.  (*Id.* ¶ 490.)  As plaintiffs allege, Citigroup's disclosure of the $43 billion figure suggested that that was the full extent of Citigroup's CDO exposure.  But, according to the Complaint, Citigroup itself acknowledged that it had indirect exposure to CDO losses, yet it declined to "explain or quantify" this risk.  (*Id.* ¶ 1218.)  Given these allegations, the Court finds that the omission of $10.5 billion in hedged CDOs from Citigroup's November 2007 disclosure is actionable; plaintiffs have adequately

alleged that this information was necessary to eliminate the misleading impression concerning the full extent of Citigroup's CDO exposure.

Second, plaintiffs claim that Citigroup's November 2007 disclosure estimated inadequate writedowns on its CDOs, thereby overstating their value. According to the Complaint, Citigroup did not accurately value its CDOs until April 2008. (*Id.* ¶¶ 624-39.) Plaintiffs allege that Citigroup's valuations were false because they did not reflect the decline in CDO value as reflected in the ABX and TABX indices. (*Id.* ¶ 621.) As in the case of plaintiffs' pre-November, 4, 2007 valuation claims, the Court finds that these allegations of falsity are sufficient. *See supra* Section II.B.1.a. Plaintiffs have also adequately pled materiality, *see supra* Section II.B.1.b, and loss causation, (Compl. ¶¶ 1212, 1226), for these statements.

b. Scienter

The Court finds that plaintiffs have adequately pled scienter for their claims concerning alleged CDO-related misstatements on and after November 4, 2007. Specifically, the Court concludes that the Complaint adequately establishes a strong inference that defendant Crittenden was at least reckless with respect to these statements.

For the omission of the $10.5 billion in hedged CDO exposures, the Complaint supports an inference that Crittenden was either aware of the risk that Citigroup's insurers would not be able to honor their commitments, or was reckless in failing to recognize that risk. To begin with, Crittenden, according to the Complaint, acknowledged in a November 5, 2007 conference call that Citigroup had indirect exposures to CDO losses in response to an analyst's question about CDO insurers. (*Id.* ¶ 186.) To be sure, the mere recognition of exposure in the event Citigroup's insurers could not honor their commitments does not support an inference that any defendant knew or was reckless in not knowing that the insurers would be unlikely to honor their commitments. *See Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435, 2010 WL 3825722,

at *9 (S.D.N.Y. Sept. 29, 2010).  But Crittenden's statement was not made in a vacuum.

According to the Complaint, Crittenden had attended meetings concerning the risks associated

with Citigroup's CDOs in the summer of 2007.  (Compl. ¶¶ 1140-41.)  In the November 5

conference call, Crittenden allegedly described the significant impairments super senior tranches

had suffered over the previous month.  (*Id.* ¶ 615.)  The conference call itself accompanied

Citigroup's disclosure of tens of billions of dollars in CDO holdings and billions of dollars in

writedowns for those holdings.  The question an analyst asked during the November 5 call about

CDO exposure via insurers reflected a concern in the ability of insurers to honor their

commitments, as did other contemporary market reports.  (*Id.* ¶¶ 186, 1218.)  These facts, if

true, create an inference that Crittenden was aware of the potential likelihood of insurer default

or at the least was reckless in failing to recognize it.  Indeed, that other market observers were

contemporaneously concerned with this risk supports this inference, which is strong and at least

as compelling as the competing inference that defendants were simply unaware of and could not

have been aware of the likelihood of insurer default.  Accordingly, plaintiffs have met their

burden to plead scienter.

      Crittenden's alleged statements on November 5, 2007 also give rise to a strong inference

that he acted with scienter with respect to Citigroup's supposedly false CDO valuations.  In

response to analysts' questions concerning a discrepancy between Citigroup's valuations and

certain declines in the ABX and TABX indices, defendant Crittenden acknowledged his

familiarity with these indices but contended that their relevance to CDO values was limited.  (*Id.*

¶ 615, 619.)  Plaintiffs contend that Crittenden's statements demonstrate scienter because, though

aware of the ABX and TABX indices, he falsely or recklessly denied their relevance to CDO

valuation.  (*Id.* ¶ 619.)  Two facts further support this inference.  First, Crittenden allegedly could

not explain why declines in the TABX index were not a leading indicator of CDO value when

pressed to do so by analysts.  (*Id.* ¶ 620.)  Second, Citigroup subsequently changed its valuation methodology to incorporate the ABX index, (*id.* ¶ 624), which supports an inference of scienter. *Cf. In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009)  (although the restatement of financial information is not alone enough to allege scienter, such restatements may support an inference of scienter when paired with other allegations of knowledge or recklessness).  The facts also support the inference that Crittenden simply was not convinced of the alleged connection between the ABX and TABX indices and CDO values.  This nonfraudulent inference is not more compelling than an inference of scienter, and thus the Court finds that plaintiffs have met their burden.

Because plaintiffs have adequately pled that defendant Crittenden acted with scienter, they have adequately pled scienter for defendant Citigroup as well.  *See Dynex*, 531 F.3d at 190. However, plaintiffs fail to allege any facts creating a strong inference of scienter for any individual defendant other than Crittenden.  Thus, their claims against these defendants concerning the November 4, 2007 and later statements must be dismissed.

In sum, plaintiffs have adequately pled securities fraud claims against defendants Citigroup, Prince, Crittenden, Druskin, Maheras, Klein, Bushnell and Rubin for alleged misstatements and omissions relating to Citigroup's CDO exposure during the period from February 2007 through November 3, 2007.  They also adequately pled securities fraud claims against defendants Citigroup and Crittenden for the period of November 4, 2007 to April 2008. Plaintiffs' other CDO-related claims are dismissed.

## C.  Alt-A RMBS Allegations

Plaintiffs have failed to plead sufficient facts to demonstrate that any of the defendants made an actionable misstatement or omission regarding Citigroup's Alt-A RMBS exposure.

1. *Alleged Misstatements and Omissions Concerning the Extent of Citigroup's Alt-A RMBS Exposure*

Plaintiffs allege defendant Crittenden misled investors by stating that Citigroup's Alt-A mortgage assets did not pose a "substantial risk" because the size of the holdings was not significant.  In a January 22, 2008 earnings call, Crittenden said that Citigroup had not classified its Alt-A holdings as posing a "substantial risk" because of the "size of the position and the risk associated."  When pressed further, Crittenden clarified that this determination was primarily based on the "size" of the holdings and less so on the risks associated with the holdings.  (Compl. ¶ 956.)  Plaintiffs contend this statement was materially misleading because Citigroup held $22 billion in Alt-A RMBS at the time it was made.  (*Id.* ¶ 957.)

If Crittenden's statement had actually been about Citigroup's Alt-A RMBS holdings, plaintiffs might have point.  But as plaintiffs concede, the analysts' questions and Crittenden's responses concerned Citigroup's exposure to "individual Alt-A *mortgages*, not Alt-A *RMBS*." (Pls.' Mem. at 51, n.55 (emphasis added).)  A reasonable investor could not have understood Crittenden to be describing Citigroup's exposure to Alt-A RMBS in a discussion concerning Citigroup's consumer mortgage portfolio, a wholly different asset class.  Accordingly, plaintiffs fail to allege that Crittenden's statement was misleading.  *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, No. 08 Civ. 1958, 2010 WL 3860397, at *14 (S.D.N.Y. Oct. 4, 2010) (plaintiffs did not allege that a statement was misleading when, viewed in context, it did not concern the risks plaintiffs claimed had been concealed); *see also In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 94 (2d Cir. 2010) (unpublished summary order) (plaintiffs' efforts to characterize certain statements as misleading "fails when the statements are reviewed in their entirety and in the context of the questions from analysts to which they were

responsive"); *Furher v. Ericsson LM Telephone Co.*, 363 F. App'x 763, 764 (2d Cir. 2009) (unpublished summary order) (same).

Plaintiffs also fail to establish an actionable omission concerning Citigroup's Alt-A RMBS holdings. They allege that Citigroup should have disclosed its $22 billion Alt-A RMBS position prior to April 18, 2008. Fatal to this claim is plaintiffs' failure to allege the existence of a duty to disclose this information. Crittenden's January 28 statements did not give rise to such a duty, for, as just explained, his statements were not misleading. Plaintiffs identify no other allegedly misleading statements that would prompt a need for disclosure. In the absence of an identifiable duty to disclose, plaintiffs cannot sustain a securities fraud claim on alleged omissions concerning Citigroup's exposure to Alt-A RMBS.

In any event, plaintiffs have not pled specific facts that, if proved, raise the necessary strong inference of scienter concerning Crittenden's January 28 statements or Citigroup's failure to disclose its Alt-A RMBS holdings prior to April 2008.

2.   *Alleged Misstatements and Omissions after the April 18, 2008 Disclosure of Citigroup's Alt-A RMBS Holdings*

On April 18, 2008, Citigroup disclosed its Alt-A RMBS holdings. (Compl. ¶ 958.) Plaintiffs allege that Citigroup thereupon engaged in a series of allegedly inadequate writedowns throughout 2008 that materially misstated the value of these assets. This claim fails.

First, plaintiffs do not allege adequate facts establishing the inadequacy of the writedowns. Plaintiffs' primary argument in support of this claim is that other market participants booked more significant writedowns on their Alt-A RMBS portfolios. Plaintiffs, however, allege no facts to suggest that Citigroup's Alt-A RMBS portfolio was equivalent in quality or vintage, or that it was otherwise comparable to the portfolios held by the other market participants that took more significant writedowns. The mere allegation that some other

company reached a different valuation is too vague to support the inference that Citigroup's

valuation was incorrect.  *In re Allied Capital Corp. Sec. Litig*, No. 02 Civ. 3812, 2003 WL

1964184, at *4 (S.D.N.Y. Apr. 25, 2003); *cf. Epirus Capital Mgmt., LLC v. Citigroup, Inc.*, No.

09 Civ. 2594, 2010 WL 1779348, at *6 (S.D.N.Y. Apr. 28, 2010) (a decline in value of

plaintiff's equity investment did not indicate that the investment was initially overvalued or

improperly valued).

In addition, plaintiffs' Complaint is devoid of particularized allegations of scienter with

respect to the valuations ascribed to Citigroup's Alt-A RMBS portfolio.  Accordingly, plaintiffs'

claims with respect to Citigroup's Alt-A RMBS holdings are dismissed.

### D.  SIV Allegations

Plaintiffs allege that defendants made material omissions and misstatements about

Citigroup's involvement with SIVs by (i) failing to disclose the extent of its involvement with

SIVs until December 2007; (ii) failing to consolidate Citigroup's SIVs on its balance sheet in a

timely manner in violation of GAAP; and (iii) improperly characterizing its SIV assets as "high

quality" and representing that Citigroup had limited involvement with its SIVs.  (Compl. ¶¶ 666-

67, 680, 682-84, 698-704.)

#### 1.  *Citigroup's SIV Exposure*

Plaintiffs claim that Citigroup misled investors by failing to disclose its SIV exposure,

principally complaining of an October 2007 statement that Citigroup had "no contractual

obligation to provide liquidity facilities or guarantees to any of the Citi-advised SIVs."  (*Id.*

¶ 698.)  This and other statements concerning Citigroup's SIV exposure were allegedly

misleading because of Citigroup's "implicit guarantee" to provide liquidity support to its SIVs.

But plaintiffs have not adequately alleged the existence of this implicit guarantee.  As plaintiffs

put it, "[w]hat matters is that Citi regarded itself obliged" to shore up SIV liquidity.  (Pls.' Mem.

at 47).  To substantiate this conclusion, plaintiffs allege that Citigroup eventually provided

billions in liquidity support to its SIVs to protect its reputation in the marketplace.  But the fact

that Citigroup subsequently decided to provide liquidity support is insufficient to support an

inference that Citigroup believed all along that it would be obligated to provide such support.

Bald assertions to the effect that Citigroup "always had recognized obligations imposed on it by

the marketplace" also come up short.  (Compl. ¶ 677.)  Such "'naked assertion[s]' devoid of

'further factual enhancement'" are insufficient to state a claim to relief.  *Iqbal*, 129 S. Ct. at 1949

(quoting *Twombly*, 550 U.S. at 557) (alteration in original).

### 2.  *SIV-Related GAAP Violations*

The failure to allege adequately the existence of an implicit guarantee dooms plaintiffs'

claims of supposed GAAP violations related to Citigroup's SIVs.  Plaintiffs' theory is that

Citigroup was required to consolidate its SIVs on its balance sheet prior to the fourth quarter of

2007 because of its implicit guarantee to support its SIVs.  (Compl. ¶ 1074-87.)  Given the

Court's conclusion that plaintiffs have not pled sufficient facts to support the existence of an

implicit guarantee, it follows that plaintiffs have not adequately made out a GAAP violation.

Accordingly, plaintiffs' SIV-related GAAP claim is dismissed.

### 3.  *Other Misstatements*

Plaintiffs' remaining allegation concerns Citigroup's statement that its SIVs contained

"high quality assets" and that its involvement with its SIVs was therefore "limited."  Plaintiffs

contend this was false and misleading because Citigroup's provision of liquidity support to its

SIVs refuted the claim that their assets remained "high quality."   Plaintiffs' claim fails because

plaintiffs have not set forth sufficient facts indicating that the assets were not of high quality at

the time Citigroup made that statement.  *See Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir.

2004) ("[P]laintiffs must do more than say that the statements . . . were false and misleading;

they must demonstrate with specificity why and how that is so.").  Plaintiffs' attempt to

demonstrate falsity with the conclusory allegation that 40% of the SIV assets were structured

finance securities.  (Compl. ¶ 690.)  Plaintiffs offer no specific allegations why these securities,

which plaintiffs concede "had long avoided subprime," (*id.*), were not of high quality.

Moreover, plaintiffs have not adequately alleged that defendants knew or were reckless in not

knowing that the SIV assets were not of high quality at the time the statement was made, and

thus these claims fail to establish any inference of scienter.  *Cf. Footbridge*, 2010 WL 3790810,

at *19 (finding failure to plead scienter in the absence of allegations that defendants knew the

assets involved in particular securitizations were impaired).  Plaintiffs' claims concerning the

quality of the SIV portfolio are dismissed.

     E.   Mortgage Allegations

     Plaintiffs allege that defendants misrepresented Citigroup's mortgage lending business by

mischaracterizing (1) the quality of the portfolio; (2) Citigroup's underwriting practices; and (3)

the growth of Citigroup's subprime mortgage portfolio.  Plaintiffs also allege that Citigroup's

financial disclosures contained material misstatements because defendants failed to reserve

adequately for loan losses in violation of GAAP.

     *1.   Mortgage-Related Misstatements and Omissions*

     Plaintiffs' claims of misleading statements and omissions regarding the extent of

exposure due to Citigroup's mortgage business cannot proceed because plaintiffs fail to plead

facts giving rise to a compelling inference of scienter.

     Plaintiffs identify certain lawsuits against correspondent channel lenders as red flags that

indicated that Citigroup's mortgage portfolio was seriously impaired.  (Compl. ¶¶ 747-782.)

Assuming arguendo that these suits qualify as red flags as plaintiffs claim, red flags are only

suggestive of fraud "to those who were or should have been aware of them."  *In re Refco, Inc.*

*Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).  In other words, plaintiffs must allege that

the defendants were or should have been aware of these red flags.  *See id.*  Plaintiffs do not make

any allegations that those responsible for the mortgage-related misstatements and omissions

complained of knew or had reason to know about these lawsuits.  Accordingly, plaintiffs' red-

flag theory does not give rise to a strong inference of scienter.  *See id.* at 651.

Plaintiffs also seek to establish scienter through the testimony of certain unnamed

confidential witnesses.  For example, plaintiffs cite the testimony of a confidential witness, a

former CitiMortgage employee, explaining that CitiMortgage performed little due diligence with

respect to loans produced in correspondent channels.  (Compl. ¶ 743.)  This witness indicated

that CitiMortgage assumed that the correspondent lenders were doing their jobs and that if a

borrower or correspondent lender was not being truthful with CitiMortgage, CitiMortgage never

would have known because it rarely inspected whether individual loans complied with the

correspondent guidelines.  (*Id.*)  Fatal to plaintiffs' claims, however, is that they do not allege

with specificity that any of the confidential witnesses relied upon in the Complaint presented

information to the individual defendants.[6]  Plaintiffs cannot rely on assertions that the

information presented by confidential witnesses was known or common knowledge within the

company; these assertions are too vague and conclusory to support a finding that defendants

knew they were making false statements or made those statements with reckless disregard for

their truth or falsity.  *See In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533, 2008 WL

4501928, at *7-8 (S.D.N.Y. Sept. 26, 2008); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307,

---

[6] According to one of plaintiffs' confidential witnesses, defendant Bushnell attended weekly meetings that
ended in March 2006 during which the performance of certain loans was discussed.  (Compl. ¶ 796).  This
allegation is unavailing.  Not only is it vague, but it does not support plaintiffs' theory of scienter, which
is that Citigroup became aware of significant impairments in its mortgage portfolio in mid-2006.  (*See,
e.g.*, Pls.' Mem. at 52, 54; Compl. ¶ 729 ("Unbeknownst to the public, Citigroup became aware, at least
as early as mid-2006, that a substantial percentage of its billions of dollars of correspondent loans were
impaired, often afflicted with early payment defaults, or at times, out-and-out fraud.")).

1333 (S.D. Fla. 2004).  As a result, plaintiffs' claim that Citigroup or any individual defendant

acted with the requisite scienter is not at least as compelling as an opposing inference of

nonfraudulent intent.  *Tellabs*, 551 U.S. at 523-24.  Plaintiffs' claims of misstatements and

omissions concerning Citigroup's mortgage business are dismissed.

### 2.  *Mortgage-Related GAAP Violations*

Plaintiffs also claim that Citigroup violated GAAP when it failed to reserve adequately

for loan losses in violation of GAAP.  Plaintiffs' GAAP violation claim is based on the theory

that Citigroup knew it would incur substantial losses relating to its mortgage business, but it

understated its loan loss reserves to preserve appearances of a sound mortgage business.

(Compl. ¶¶ 826-43.)  This claim fails because plaintiffs have not alleged any evidence of

fraudulent intent on Citigroup's part in connection with its mortgage-related accounting

statements.  Therefore, plaintiffs' mortgage-related GAAP claim is dismissed.

### F.  ARS Allegations

Plaintiffs allege that Citigroup's failure to disclose information about its ARS business

and holdings was materially misleading.  (*Id.* ¶¶ 911, 917, 920).  To support such a claim,

plaintiffs must allege that Citigroup either had a duty to disclose that information or that failing

to disclose that information would render other statements made on behalf of Citigroup

misleading.  They have failed to do so.  They have not alleged facts demonstrating that Citigroup

had a duty to disclose more detailed information than it provided regarding its ARS holdings.

Moreover, plaintiffs have not alleged in their Complaint that the failure to disclose the ARS-

related information rendered any existing disclosures by Citigroup misleading.  Absent a need

for disclosure, plaintiffs' claims concerning Citigroup's ARS-related omissions cannot proceed.

*See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006)

("Absent identification of some duty to disclose [or] specific allegations as to how [defendants']

existing disclosure was rendered false, plaintiffs fail to state a claim upon which relief may be granted.").

Plaintiffs also fail to plead adequately the claim that Citigroup materially misstated the value of its ARS holdings after April 2008.  Instead of pleading facts to show that Citigroup's 2008 disclosures were inaccurate at the time they were made, plaintiffs rely on subsequent writedowns to argue that prior disclosures were misleading.  Courts have routinely rejected such fraud by hindsight pleadings.  *See Novak*, 216 F.3d at 309 (stating that the Second Circuit has "refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight'" (quoting *Stevelman v. Alias Research Inc*., 174 F.3d 79, 85 (2d Cir. 1999)); *Epirus Capital Mgmt.*, 2010 WL 1779348, at *5 (same).

In any event, plaintiffs have alleged insufficient facts to indicate that defendants acted with scienter in making these purportedly misleading misstatements and omissions.  Plaintiffs argue that Citigroup knew the ARS market would become illiquid because it was planning to allow certain ARS auctions to fail.  However, the Citigroup e-mails cited by plaintiffs merely show Citigroup's concern about (1) the turbulence in the credit markets starting in August 2007; (2) the decrease in demand for certain ARS; and (3) the increase in ARS inventory on its books as a result of its continued support of the auctions.  (Compl. ¶¶ 936-40.)  The emails are descriptive in nature and do not mention Citigroup's intentions to let auctions fail.  They do not support an inference that either Citigroup knew ARS auctions would fail in 2008 or that Citigroup's subsequent valuations of its ARS assets were inaccurate.  Plaintiffs' claim that the e-mails indicate that Citigroup acted with the requisite scienter is not at least as compelling as an opposing inference of nonfraudulent intent.  *Tellabs*, 551 U.S. at 523-24.  Accordingly, plaintiffs' claims with respect to Citigroup's ARS are dismissed.

G.  Leveraged Loan and CLO Allegations

Plaintiffs' allegations concerning Citigroup's leveraged loan and CLO business mirror their allegations about Citigroup's ARS business.  So too do the reasons why these claims must be dismissed.

Plaintiffs claim that defendants misled investors by failing to disclose the "risky nature of Citigroup's leveraged-loan and CLO business and the extent of [the] Company's exposure to losses." (Compl. ¶ 894.)  But as with their ARS claims, plaintiffs do not allege any facts indicating that Citigroup had a duty to disclose this information.  Unlike with their ARS allegations, however, plaintiffs attempt to identify statements that are rendered false in the absence of a more thorough accounting of Citigroup's leveraged-loan and CLO business.  Their attempts fail.

Plaintiffs hone in on a pair of 2004 statements by Citigroup officials describing corporate loans as "not part of our growth strategy" and "an area where we tend to not look for a lot of growth." (*Id.* ¶¶ 891, 892.)  Plaintiffs contend that these "repeated representations about Citi's risk management policies . . . required Citi to tell the entire truth" about its leveraged-loan activities.  (Pls.' Mem. at 56-57.)  This argument suffers from at least one glaring defect: these statements do not concern risk management in the corporate loan business whatsoever.  Plaintiffs cannot manufacture misrepresentations by imposing a reading on these statements that they cannot possibly bear.

Plaintiffs also argue that Citigroup was obligated to divulge more information about its leveraged-loan business in order to correct the misimpression resulting from defendant Crittenden's July 2007 statement that Citigroup's leveraged lending commitments were "not a huge business for [Citigroup] in the overall scheme of things."  Plaintiffs have not alleged why this statement was, in fact, false or misleading at the time Crittenden made it.  According to the

Complaint, Citigroup's leveraged-loan portfolio was approximately $57 billion as of September 30, 2007 (Compl. ¶ 898), and plaintiffs do not dispute that this amounted to only approximately three percent of Citigroup's $2 trillion in balance sheet assets  (*See* Rosen Decl., Ex. 7 at 47). Relative to the rest of its portfolio, the leveraged loan commitments were a small percentage of Citigroup's assets.  Plaintiffs have not pled sufficient facts to warrant a contrary conclusion.  *See Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074, 2003 WL 21058251, at *4-5 (S.D.N.Y. May 9, 2003) ("Plaintiffs who charge that a statement of opinion . . . is materially misleading, must allege with particularity provable facts to demonstrate that the statement of opinion is both objectively and subjectively false." (internal quotation marks omitted)).

Since plaintiffs do not allege a duty Citigroup contravened in failing to disclose more information about its leveraged loan business or identify any statements that were rendered misleading as a result of this omission, plaintiffs have not stated a viable claim with respect to the alleged omission of more detailed disclosures about Citigroup's CLOs and leveraged loans.

Plaintiffs also fail to plead adequately the claim that Citigroup continued to materially misstate the value of its leveraged-loan and CLO commitments after it announced the initial writedowns for those commitments.  Instead of pleading facts to show that Citigroup's initial writedowns were inaccurate at the time they were made, plaintiffs rely on subsequent writedowns to argue that prior disclosures were misleading.  This fraud by hindsight pleading is no different from plaintiffs' defective allegations concerning ARS allegations.  Accordingly, these claims concerning the valuation of Citigroup's CLO and leveraged-loan holdings must be dismissed.  *See Footbridge*, 2010 WL 3790810, at *19 ("Allegations of fraud by hindsight are insufficient as a matter of law.").

Finally, plaintiffs also have failed to allege sufficient facts indicating that any of the purported misstatements or omissions discussed above were made either knowingly or

recklessly.  As a result, plaintiffs' claim that Citigroup acted with the requisite scienter is not at least as compelling as an opposing inference of nonfraudulent intent.  *Tellabs*, 551 U.S. at 523-24.  Thus, even if they had alleged an actionable misstatement or omission, plaintiffs' claims with respect to Citigroup's leveraged-loan and CLO practices would need to be dismissed.

### H.  Solvency Allegations

Plaintiffs bring two sets of claims alleging that Citigroup overstated its overall financial health between December 2007 and November 2008.  The first set is predicated on allegations that Citigroup repeatedly overstated its total assets in SEC filings for the fiscal year 2007 and for the first three quarters of 2008.  (Compl. ¶¶ 977, 981, 986, 991.)  To demonstrate the falsity of these statements, plaintiffs rely on the fact that Citigroup obtained capital infusions from the government in October and November 2008 and removed $80 billion in assets from its trading portfolio so it did not have to value them at their market price.  (*Id.* ¶¶ 987, 993, 1001, 1100-02.) This hindsight pleading does not indicate that Citigroup's prior statements of total asset value were false at the time made or that these statements were made with scienter.  Therefore these claims are dismissed.

The second set of claims concerns defendant Pandit's statements about Citigroup's overall health and capital status.  The following examples are illustrative of Pandit's statements:

- January 15, 2008, Pandit said, "We have begun to take actions to ensure that Citi is well positioned to compete and win across our franchises while effectively keeping a tight control over our business risks. We are taking several steps to strengthen our capital base . . . ."  (Compl. ¶ 975.)

- April 22, 2008: "You couldn't design a better footprint or get a better set of assets if you had to build a bank from scratch . . . . This is clearly the right model."  (Compl. ¶ 979.)

- July 18, 2008: "[w]e continue to demonstrate strength in our core franchise."  (Compl. ¶ 983.)

- September 21, 2008: "we are a pillar of strength in the markets" and "That's a great place to be."  (Compl. ¶ 984.)

These are expressions of "puffery and corporate optimism" that "do not give rise to securities violations." *Rombach*, 355 F.3d at 174; *see Abbey v. 3F Therapeutics, Inc.*, No. 06 Civ. 409, 2009 WL 4333819, at *8-9 (S.D.N.Y. Dec. 2, 2009) ("Statements that are no more than opinions or predictions of future performance generally are not sufficient to maintain a federal securities fraud cause of action."). Such statements of optimism or predictions about future performance are actionable only "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corporate Sec. Litig.*, 163 F.3d at 107 (citations omitted). These conditions do not apply in this case, as plaintiffs have not adequately alleged that these statements were supported by untrue facts or that the opinions embodied in these statements were not reasonably held.

I.  Control Person Liability

To maintain a claim for control person liability pursuant to Section 20(a), a plaintiff must "allege facts showing (1) 'a primary violation by the controlled person,' (2) 'control of the primary violator by the targeted defendant,' and (3) that the 'controlling person was in some meaningful sense a culpable participant in the fraud perpetrated.'" *In re Beacon Assocs. Litig.*, 2010 WL 3895582, at *17 (quoting *ATSI Commc'ns*, 493 F.3d at 108); *see, e.g.*, *In re Fannie Mae 2008 Sec. Litig.*, No. 08 Civ. 7831, 2010 WL 3825713, at *24 (S.D.N.Y. Sept. 30, 2010); *In re Am. Int'l Grp., Inc., 2008 Sec. Litig.*, No. 08 Civ. 4772, 2010 WL 3768146, at *18 (S.D.N.Y. Sept. 27, 2010); *In re SLM Corp. Sec. Litig.*, No. 08 Civ. 1029, 2010 WL 3783749, at *13 (S.D.N.Y. Sept. 24, 2010); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002). *But see In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 439 (S.D.N.Y. 2006) (plaintiffs need not allege culpable participation to state a Section 20(a) claim). The only primary violations for which plaintiffs have stated a viable claim to relief are

those related to Citigroup's CDO holdings over the February 2007 to April 2008 period.  Thus, plaintiffs can succeed on a claim for control person liability only against those defendants who functioned as control persons and who culpably participated in the alleged fraud during the relevant time frame.

The individual defendants do not contest their control person status.  Instead, they argue that plaintiffs fail to allege culpable participation.  (Defs.' Mem. at 74.)  Allegations sufficient to plead scienter for the purposes of primary liability pursuant to Section 10(b) "necessarily satisfy" the culpable participation pleading requirement for Section 20(a) claims.  *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004); *see, e.g.*, *In re Am. Int'l Grp., Inc., 2008 Sec. Litig.*, 2010 WL 3768146, at *19; *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 308 (S.D.N.Y. 2008); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008).  The Court has concluded that plaintiffs' allegations are sufficient to establish scienter for individuals Prince, Crittenden, Druskin, Maheras, Klein, Bushnell and Rubin with respect to the pre-November 4, 2007 CDO claims.  *See supra* Section II.B.1.c.ii.  The Court has also concluded that plaintiffs adequately pled scienter for defendant Crittenden with respect to the November 4, 2007 to April 2008 CDO claims.  *See supra* Section II.B.2.b.  Because these same allegations suffice to plead culpable participation for the purposes of Section 20(a) liability, plaintiffs have adequately stated control person liability claims against defendants Prince, Crittenden, Druskin, Maheras, Klein, Bushnell and Rubin.

As to the remaining individual defendants, plaintiffs have failed to plead particularized facts that give rise to a strong inference of their culpable participation in the alleged fraud.  This failure prevents plaintiffs' control person liability claims against these defendants from going forward.  *See, e.g.*, *In re SLM Corp. Sec. Litig.*, 2010 WL 3783749, at*13; *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 308;  *In re Refco, Inc., Sec. Litig.*, 503 F. Supp. 2d at

660-61; *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 247; *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at \*7 ("[T]he PSLRA requires a strong inference of culpable participation.")  Accordingly, the Section 20(a) claims against defendants Kaden, Krawcheck, Freiberg, Thomson, Gerspach, Volk and Pandit are dismissed.

### III.CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is **DENIED** with respect to 1) the Section 10(b) claims against Citigroup and the Section 10(b) and 20(a) claims against Prince, Crittenden, Druskin, Maheras, Klein, Bushnell and Rubin for the alleged misstatements and omissions relating to Citigroup's CDO exposure during the period from February 2007 through November 3, 2007; 2) the Section 10(b) claims against Citigroup and the Section 10(b) and 20(a) claims against Crittenden for the alleged CDO-related misstatements and omissions occurring in the period from November 4, 2007 to April 2008.  Defendants' motion to dismiss the remainder of plaintiffs' claims is **GRANTED**.


Dated: New York, New York
       November 9, 2010

SO ORDERED:

Sidney H. Stein, U.S.D.J.