**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **IN RE CITIGROUP**<br>**SECURITIES LITIGATION** | **No. 07 Civ. 9901 (SHS)** |
| | **ECF Case** |

---

<u>**DECLARATION OF GEOFFREY P. MILLER**</u>

I, GEOFFREY P. MILLER, declare under penalty of perjury as follows:

1.      I am over 18 years of age, I am competent to make this declaration, and I have personal knowledge of the matters and facts recited herein.

<u>**Scope of Retention**</u>

2.      I have been retained to analyze: (a) whether the $590 million cash settlement represents good value for the class, and (b) whether the requested attorneys' fee award is consistent with awards in similar cases.

<u>**Qualifications**</u>

3.      A copy of my resume is attached as Appendix A.  I am the Stuyvesant P. Comfort Professor of Law at the New York University Law School.  I am a *magna cum laude* graduate of Princeton University and a 1978 graduate of the Columbia Law School where I was Editor-in-Chief of the Law Review.  I served as a law clerk to the Honorable Carl McGowan of the United States Court of Appeals for the District of Columbia Circuit and to the Honorable Byron R. White, Associate Justice of the United States Supreme Court.  I was an attorney-adviser at the Office of Legal Counsel in the United States Department of Justice from 1980-1982.  After

1

practicing civil litigation with a Washington D.C. law firm, I joined the faculty of the University of Chicago Law School in 1983, where I served as Kirkland & Ellis Professor and Associate Dean.  I moved to New York University in 1995.

4.     I am a founder, board member and former co-president of the Society for Empirical Legal Studies, an organization of professors in the fields of law, economics, sociology, psychology, business, and political science whose work examines the statistical and empirical bases of legal rules.  I am a 2011 inductee into the American Academy of Arts and Sciences and one of HeinOnline Law Journal Library's top-100 most cited authors all time.[1]  A recent empirical study of scholarly influence lists me as one of the top 50 most relevant law professors in the United States.[2]

5.     I have written extensively over the years on issues relating to attorneys' fees, particularly in class action cases.  My articles with Professor Macey on class action litigation have been cited as authority by courts across the United States.[3]  My empirical studies on class

---

[1] See http://www.heinonline.org/HOL/MostCitedAuthors?collection=journals.

[2] John Yoo & James Cleith Phillips, The Cite Stuff: Inventing a Better Law Faculty Relevance Measure, UC Berkeley Public Law Research Paper No. 2140944 (September 3, 2012), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2140944.

[3] *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012); *Louisiana Mun. Police Emps' Ret. Sys. v. Pyott*,46 A.3d 313 (Del. Ch. 2012); *Forsythe v. ESC Fund Mgmt. Co.*, 2012 WL 1655538 (Del. Ch. Apr. 3, 2012); *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, (7th Cir. 2011); *In re Sauer-Danfoss Inc. S'holders Litigation*, 2011 WL 2519210 (Del. Ch. Feb. 16, 2011); *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289 (7th Cir. 2010); *Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010); *In re Revlon, Inc. Shareholders Litigation*, 990 A.2d 940 (Del. Ch. 2010); *Lubin v. Farmers Grp., Inc.*, No. 03-03-00374-CV, 2009 WL 3682602 (Tex. App. Nov. 6, 2009); *Westgate Ford Truck Sales, Inc. v. Ford Motor Co*., No. 86596, 2007 WL 2269471 (Ohio App. Aug. 9, 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007); *Amalgamated Bank v. Yost*, No. Civ.A.04-0972, 2005 WL 226117 (E.D. Pa. Jan. 31, 2005); *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003); *Fruchter v. Florida Progress Corp.*, No. 99-6167CI-20, 2002 WL 1558220, (Fl. App. Mar. 20, 2002); *In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d 778 (E.D. Va. 2001); *In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001); *Scardelletti v. Debarr*, 265 F.3d 195 (4th Cir. 2001); *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71 (S.D.N.Y. 2000); *Lealao v. Beneficial Cal., Inc.*, No. A08599282, Cal. App. 4th 19, 97 Cal. Rptr. 2d 797 (Cal Ct. App. July 10, 2000); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000); *Davis v. Carl Cannon Chevrolet-Olds,*

action cases, co-authored with Professor Theodore Eisenberg of Cornell University, have also

been cited by courts around the country and are a leading authority on that topic.[4]

---

*Inc.*, 182 F.3d 792 (11th Cir. 1999); *In re Baan Co. Sec. Litig.*, 186 F.R.D. 214 (D.D.C. 1999); *In re Quantum Health Resources, Inc. Sec. Litig.*, 962 F. Supp. 1254 (C.D. Cal. 1997); *Strong v. BellSouth Telecomm., Inc.*, 173 F.R.D. 167 (W.D. La. 1997); *Howard v. Globe Life Ins. Co.*, 973 F. Supp. 1412 (N.D. Fla. 1996); *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348 (7th Cir. 1996); *In re Asbestos Litigation*, 90 F.3d 963 (5th Cir. 1996); *General Motors Corp. v. Bloyed*, 916 S.W.2d 949 (Tex. 1996); *Brundidge v. Glendale Fed. Bank, F.S.B.*, 168 Ill.2d 235, 659 N.E.2d 909, 213 Ill.Dec. 563 (Ill. 1995); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995); *BTZ, Inc. v. Great N. Nekoosa Corp.*, 47 F.3d 463 (1st Cir. 1995); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993); *In re Oracle Sec. Litig.*, 829 F. Supp. 1176 (N.D. Cal. 1993); *Gottlieb v. Wiles*, 150 F.R.D. 174 (D. Colo. 1993); *Durr v. Intercounty Title Co. of Ill.*, 826 F. Supp. 259 (N.D. Ill. 1993); *QAD Inc. v. ALN Assocs., Inc.*, 807 F. Supp. 465 (N.D. Ill. 1992); *Wesley v. General Motors Acceptance Corp.*, No. 91 C 3368, 1992 WL 57948 (N.D. Ill. Mar. 20, 1992); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471 (N.D. Cal. 1992); *Davis v. Coopers & Lybrand*, 1991 WL 154460 (N.D. Ill. July 30, 1991).

[4] *See In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011); *Allapattah Servs., Inc. v. Exxon Corp.*, 362 F.3d 739, 760 (11th Cir. 2004) (Judges Tjoflat and Birch, dissenting from denial of *en banc* review); *In re Amaranth Natural Gas Commodities Litig.*, No. 07-6377, 2012 U.S. Dist. LEXIS 82599, at *7 n.12 (S.D.N.Y. June 11, 2012); *Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-686, 2012 U.S. Dist. LEXIS 79418, at *5 n.12 (S.D.N.Y. June 7, 2012); *Lane v. Page*, No. 06-1071, 2012 U.S. Dist. LEXIS 74273, at *161 (D.N.M. May 22, 2012); *Silverman v. Motorola, Inc.*, No. 07-4507, 2012 U.S. Dist. LEXIS 63477, at *15 (N.D. Ill. May 7, 2012); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, MDL No. 09-2046, 2012 U.S. Dist. LEXIS 37326, at *94, *116 (S.D. Tex. Mar. 20, 2012) ("The tables included in the [Eisenberg and Miller] study are good indicators of what the market would pay for class counsel's services because the tables show what attorneys have been paid in similar cases, and thus what class counsel could have expected when they decided to invest their resources in this case."); *Walsh v. Popular, Inc.*, No. 09-1552, 2012 U.S. Dist. LEXIS 32991, at *24 (D.P.R. Mar. 12, 2012); *Am. Int'l Group, Inc. v. Ace Ina Holdings, Inc.*, No. 07-2898, 2012 U.S. Dist. LEXIS 25265, at *59 (N.D. Ill. Feb. 28, 2012); *Ebbert v. Nassau County*, No. 05-5445, 2011 U.S. Dist. LEXIS 150080, at *41 (E.D.N.Y. Dec. 22, 2011); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1336 n.4 (S.D. Fla. 2011); *Latorraca v. Centennial Techs., Inc.*, 834 F. Supp. 2d 25, 28 (D. Mass. 2011); *In re Ky. Grilled Chicken Coupon Mktg. & Sales Litig.*, 280 F.R.D. 364, 383 (N.D. Ill. 2011); *Pavlik v. FDIC*, No. 10-816, 2011 U.S. Dist. LEXIS 126016, at *11 (N.D. Ill. Nov. 1, 2011); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 461 (D.P.R. 2011); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 652 (E.D. La. 2010); *Velez v. Novartis Pharms. Corp.*, No. 04-09194, 2010 U.S. Dist. LEXIS 125945, at *60-61 (S.D.N.Y. Nov. 30, 2010); *Braud v. Transport Serv. Co. of Illinois*, No. 05-1898, 2010 U.S. Dist. LEXIS 93433, at *27-30 (E.D. La. Aug. 17, 2010); *In re Lawnmower Engine Horsepower Mktg. & Sales Prac. Litig.*, 733 F. Supp. 2d 997, 1013 (E.D. Wis. 2010); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 675 (N.D. Tex. 2010); *Fiala v. Metro. Life Ins. Co.*, 899 N.Y.S.2d 531, 541 (N.Y. Sup. Ct. 2010); *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010); *In re Marsh Erisa Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010); *Strawn v. Farmers Ins. Co.*, 226 P.3d 86, 99 (Or. Ct. App. 2010); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 403 n.35 (S.D.N.Y. 2009); *In re Trans Union Corp. Privacy Litig.*, No. 00-4729, 2009 U.S. Dist. LEXIS 116934, at *22-25, *39 (N.D. Ill. Dec. 9, 2009); *Loudermilk Serv., Inc. v. Marathon Petroleum Co. LLC*, 623 F. Supp. 2d 713, 724 (S.D. W.Va. 2009) ("Because the Eisenberg and Miller study was a far more comprehensive analysis of similar cases than this Court could hope to achieve in a reasonable time, the Court accepts their results as a benchmark on which to judge a reasonable fee in this case."); *Rodriguez v. West Publ'g Co.*, 563 F.3d 948, 958 (9th Cir. 2009); *In re OCA, Inc. Sec. and Deriv. Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *63-66 (E.D. La. Mar. 2, 2009); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 800 (S.D. Tex. 2008); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d

6.     I have participated extensively in class action litigation, both as an attorney and later as an expert consultant and expert witness on issues such as class counsel fees and the value of settlements.  I recently served as expert legal consultant to British Petroleum in connection with the settlement of claims arising out of the Deepwater Horizon oil spill incident.

7.     I am also an expert in the field of banking law and regulation.  My casebook, *The Law of Banking and Financial Institutions* (co-authored with Richard Scott Carnell and Jonathan R. Macey), now in its fourth edition, is widely recognized as a leading authority in the field.  I am the author of several other books and many research articles on the topic of financial institution regulation, including a book on the financial crisis, *Risk, Trust, and Moral Hazard in Financial Markets*.  I have been a visiting scholar at the Bank of Japan and the Federal Reserve Bank of Chicago, and am a member of the board of directors and the audit, ALCO, compensation and risk committees of State Farm Bank, a federally-chartered thrift institution with nearly $15 billion in assets.

8.     I am being compensated for my services in this matter on an hourly basis at my usual billing rate of $750 per hour.

---

752, 755 n.2 (S.D. Ohio 2007); *In re Tyco Int'l., Ltd. Multidist. Litig.*, 535 F. Supp. 2d 249, 269 (D.N.H. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853, 862-64, 866, 870 (E.D. La. 2007) ("[T]he Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude"); *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 n.6 (S.D.N.Y. 2007); *Fireside Bank v. Superior Court*, 155 P.3d 268, 281 n.7 (Cal. 2007); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38, 42 (D.N.H. 2006); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1209, 1211 (S.D. Fla. 2006); *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 629-32 (E.D. La. 2006); *Hicks v. Morgan  Stanley*, No. 01-10071, 2005 U.S. Dist. LEXIS 24890, at *25 (S.D.N.Y. Oct. 24, 2005); *In re Lupron Mktg. and Sales Prac. Litig.*, No. 01-10861, 2005 U.S. Dist. LEXIS 17456, at *18 (D. Mass. Aug. 17, 2005); *In re HPL Techs., Inc. Sec. Litig.*, 366 F.Supp.2d 912, 914 (N.D. Cal. 2005); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 80-81 (D. Mass. 2005); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 286 (D. Mass. 2004).

## Materials Relied Upon

9.      In the course of my research as part of my engagement, I have reviewed an extensive compilation of materials from this case, including the documents described in Appendix B to this declaration.  I also discussed the matter with plaintiffs' counsel and reviewed a substantial number of statistical reports and analyses surveying class action legal fee awards, set forth in Appendix C to this declaration.

## Summary of Opinions

10.      Based on my analysis of the foregoing materials and studies, it is my opinion that:

(a)      The $590 million cash payment provides excellent value for the class, especially given the significant risks presented.

(b)      The requested fee award of 16.5% of the settlement amount is within the ordinary range for percentage fee awards in the Second Circuit and elsewhere.  The hours reported by plaintiffs' counsel are in line with what would be expected in a case of this size and complexity. The rates charged by counsel are commensurate with those charged by attorneys with similar expertise and qualifications in New York and around the country.   A lodestar multiplier is necessary in order to properly compensate counsel and to incentivize attorneys to bring similar cases in the future.  The requested multiplier of 1.89 is consistent with, and in fact below, the average for multipliers awarded in comparable cases.

## The Litigation and Proposed Settlement

11.      This is one of many lawsuits arising out of the subprime mortgage crisis and subsequent collapse of financial markets in the United States and abroad.  Unlike many other cases, however, this lawsuit has generated a truly outstanding result for the class, despite the

presence of significant factual and legal obstacles and concerted opposition from some of the finest class action defense counsel in the country.

12.    The complaint alleged, in substance, that Citigroup and several of its senior officials ("Defendants") engaged in material misrepresentations or omissions in connection with Citigroup's holdings of mortgages, mortgage-backed securities, and collateralized debt obligation ("CDO") instruments.  The complaint alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a).

13.    Defendants moved to dismiss, arguing that the complaint failed to satisfy the pleading requirements of the Private Securities Litigation Reform Act.  On November 9, 2010, this Court issued an opinion dismissing certain claims but denying Defendants' motion with respect to claims related to Defendants' CDO disclosures: § 10(b) claims against Citigroup for the period February 2007 through April 2008, and § 20(a) claims against certain individual Defendants limited to the period of their potential liability.

14.    Thereafter plaintiffs filed a motion for class certification and commenced intensive discovery, leading to the disclosure of nearly 40 million pages of documents and depositions of more than 30 defense witnesses.  Plaintiffs' counsel also defended numerous depositions conducted by Defendants' counsel.

15.    To facilitate settlement negotiations, the parties retained Layn Phillips, a former federal judge and a highly-regarded mediator in complex cases.  With Judge Phillips' assistance, they reached the $590 million cash settlement now before the Court.

## Reasonableness of the Class Relief

16.    I understand that an expert's role is limited and that the ultimate decision rests with the Court.  The following is intended to provide information which may be useful to the

Court in its deliberations, based on my long experience with class action settlements as well as my analysis of empirical studies and data regarding results in similar cases.

17.     The reasonableness of the proposed class relief is determined under the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).[5]  The first *Grinnell* factor – the complexity, expense, and likely duration of continued litigation – is grounded in the longstanding federal policy of favoring private settlement of litigation.  Settlements conserve on social resources that would otherwise be expended on costly trials and appeals.  They also reduce the risk of litigation for all parties: plaintiffs receive assurance of compensation without having to await an uncertain result at trial; and defendants receive assurances that the amount they must pay to obtain a release of claims is limited to the amount agreed on in the settlement.

18.     With nearly 40 million pages of documents already produced in discovery with the possibility of more to come, massive numbers of depositions, the need for multiple experts to testify on issues such as causation and damages, potential disputes over admissibility of evidence, the likelihood of an extended trial, the near-certainty of appeals, and the possibility of continuing litigation post-appeal – all in the context of one of the most traumatic periods in American financial history – the prospect of continuing litigation in this case is daunting, to say the least.  The proposed settlement would avoid these very significant private and social costs.

19.     The second *Grinnell* factor – the reaction of the class – draws information about the value of the settlement from the behavior of persons most affected by it, namely the class

---

[5] The *Grinnell* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

members whose claims will be released in exchange for the settlement consideration.  I am informed by plaintiffs' counsel that over 2.1 million settlement notices were mailed to class members and that as of 11 a.m. (Eastern) December 6, 2012 only two objections had been filed, representing an objection rate of less than .006% based on current information (the period for objection expires on December 21).    Similarly, as of 11 a.m. (eastern) December 6, 2012, approximately 130 exclusion requests had been filed.  A substantial number of the exclusion requests received were from shareholders who had commenced their own proceedings or appeared in existing actions against Citigroup, prior to the settlement of this action, or were from shareholders who have not provided any indication that they are part of the Class.  Like the miniscule objection rate, the low level of opt-outs received to date indicates a lack of concerted dissatisfaction to the settlement on the part of those most impacted by its provisions.

20.     The third *Grinnell* factor considers the stage of the proceedings and the amount of discovery completed.  This factor tests whether, at the time of settlement, the plaintiffs' attorneys had developed sufficient information about the case to ensure that the class receives fair and reasonable consideration.  The third *Grinnell* factor also ensures that the Court will have an adequate basis on which to evaluate the reasonableness of the settlement at the time of the final fairness hearing.

21.     Even before Lead Plaintiffs' complaint was filed, plaintiffs' counsel did an astounding amount of research.  The class action complaint is a *tour de force* – an extraordinarily detailed, carefully documented, well-informed, and sophisticated indictment of Defendants' alleged misrepresentations and omissions regarding Citigroup's mortgage and structured finance investments.   The massive amounts of discovery, detailed above, provided much more information.  This Court's ruling on the motion to dismiss clarified the legal and factual issues in

the case, ruling some claims out but recognizing that claims related to Citigroup's CDO exposures were sufficiently supported to warrant further litigation. Judge Phillips, one of the nation's best-known mediators in complex cases, was able to provide a further expert perspective, unbiased by allegiance to either side. There can be no substantial doubt that, at the time of the settlement agreement, plaintiffs' counsel had more than sufficient information on which to draw in determining that the mediator's proposal represented fair and reasonable compensation for the class claims.

22.     The fourth *Grinnell* factor – the risks of establishing liability – recognizes that settlements are inevitably compromises based on estimates of the amount of the judgment that the parties anticipate receiving or paying at trial. Any such estimate must take account of the risks associated with the outcome. For example, a bet that pays off $1 if the coin flips to "heads" and $0 if the flip is "tails" is not worth $1. The value of the bet must be discounted by the probability that it will not pay off – in this example, 50%. In exactly the same manner, the value of litigation, from the standpoint of the plaintiffs, must be discounted by the probability that it will not succeed.

23.     The present litigation presented significant risks of non-success:

(a)   Unlike many securities class actions, this case did not follow in the wake of a government prosecution or settlement. Plaintiffs' counsel had to conduct extensive independent research and faced the prospect, at trial, of proving each and every element of securities fraud against each of the Defendants.

(b)   Plaintiffs had to establish (among other things) that Defendants had engaged in misrepresentations or omissions of material fact. Defendants would no doubt argue that they adequately and properly disclosed the nature of their CDO holdings and the risks embedded in

them.[6]

(c)  To prevail on fraud claims, plaintiffs would have had to establish that the Defendants acted with *scienter* – that they intended to deceive the market or were reckless with respect to truth or falsity.  Although plaintiffs presented circumstantial facts at the motion to dismiss stage that tended to indicate that Defendants deliberately concealed the losses in Citigroup's CDO portfolio, and would have offered more evidence at trial based on discovery, Defendants would doubtless have argued that there was no "smoking gun" definitively establishing that any of them intended to deceive. Defendants would also have advanced a variety of benign reasons to explain away plaintiffs' evidence – including, perhaps, the argument that no one could have fully understood and appreciated the implications of the extreme turmoil in the world's financial markets.  Defendants would probably have further argued that the valuations they placed on Citigroup's CDO portfolio, while inaccurate in retrospect, nevertheless represented a good faith application of models and estimation techniques that were widely accepted in the industry, approved by the regulators, and shown to be reasonably accurate in prior years.

(d)  Plaintiffs would have faced the burden of establishing damages – the fifth *Grinnell* factor.  Although Citigroup stock tumbled precipitously during the class period, it would have been challenging to establish how much of these losses were the result of the misconduct alleged in this case.  The class period encompasses one of the gravest financial crises in American history.  Nearly all financial institutions lost value during this period.  Citigroup, in particular, was engaged in many activities aside from its CDO investments which also suffered during the

---

[6]  I am aware of similar CDO-related cases that were dismissed such as *In re UBS Sec. Litig.*, No. 07 Civ. 11225, 2011 WL 4059356 (S.D.N.Y. Sept. 13, 2011), *In re Barclays Bank PLC Sec. Litig.*, No. 09-cv-1989, 2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) *reconsideration denied*, 2011 WL 2150477 (S.D.N.Y. May 31, 2011), and *In re Societe Generale Sec. Litig.*, No. 08 Civ. 2495(RMB), 2010 WL 3910286, at *1 (S.D.N.Y. Sept. 29, 2010).

financial turmoil.  Defendants would almost certainly have argued that any losses in stock value during the class period were due to general economic conditions and that such losses could not be pinned on misrepresentations or omissions pertaining to Citigroup's CDO portfolio.

(e)  Plaintiffs would have needed to obtain certification of the class and to maintain that certification through the point of trial – the sixth *Grinnell* factor.  In my opinion this class was clearly certifiable.  The common issues relating to materiality, misrepresentation, loss causation and scienter predominate over any issues pertinent to individual plaintiffs.    Plaintiffs believed and argued that the fraud on the market reliance presumption would apply because Citigroup's stock clearly traded on an efficient market and the alleged false and misleading statements were made publicly.    Defendants, however, challenged class certification on the grounds that controlling Second Circuit authority, specifically *In re Salomon Analyst Metromedia Litigation*, 544 F.3d 474 (2d Cir. 2008), requires plaintiffs to prove the materiality of the alleged misrepresentations as a prerequisite for obtaining the fraud on the market presumption. Defendants further argued that plaintiffs could not prove that Citigroup's Super Senior CDO exposure was material throughout the class period, because that risk was considered by the market to be remote until shortly before Citigroup's initial disclosure of the exposure. Defendants further argued that plaintiffs could not prove that any significant Citigroup stock price declines after Citigroup's initial disclosure of the exposure were reactions to further Super Senior CDO-related disclosures.  Plaintiffs maintained that pursuant to the Supreme Court's decision in *Erica P. John Fund, Inc. v. Halliburton*, 131 S. Ct. 2179 (2011), materiality need not be proven in order to obtain the fraud on the market reliance presumption, and that insofar as materiality need be proven, Defendants' own statements as well as the market reaction to certain

Citigroup class period disclosures establish materiality.[7]  Nevertheless, plaintiffs faced a very real risk that the Court would agree with Defendants' view concerning plaintiffs' burden of proof at the class certification stage and/or whether plaintiffs met the appropriate burden.[8]

(f)  Even though many financial institutions experienced devastating losses in share value during the financial crisis, litigation arising out of those events has generated a surprisingly low success rate.  A 2011 survey by the National Economic Research Associates found that of 245 crisis-related federal securities class actions, 79 had been dismissed and only 23 resulted in settlements.[9]  The relatively low level of success in crisis-related class actions is a measure of the risk counsel faced going into the present litigation.

24.      The seventh *Grinnell* factor – the ability of the defendants to withstand a greater judgment – asks whether a settlement, if smaller than might otherwise be expected, can be explained on the basis of a defendant's precarious financial condition.  In my opinion, this factor is not relevant in the present case because the settlement is more than adequate when judged against results in similar cases.  I am also confident that Citigroup is presently able to pay a larger judgment, if one could have been obtained.

---

[7]  On November 5, 2012, the Supreme Court heard argument in *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 11-1085, a case that addresses whether plaintiffs in securities fraud actions must prove materiality at the class certification stage.

[8]  Defendants also argued at length in opposing class certification that, based on *Wal-Mart*, plaintiffs would not be able to prove commonality, that all of their claims involve a common contention whose "truth or falsity will resolve an issue . . . central to the validity" of each one. 131 S. Ct. at 2551.  Specifically, defendants challenged the commonality of two disputed issues: "the nature of Citi's CDO-related disclosures" and "the 'total mix' of available information — into which those disclosures were disseminated." (Def. Br. at 41-42). Although plaintiffs were confident that they would be able to overcome these arguments given existing case law and the common issues that plaintiffs did assert, it posed another risk that plaintiffs faced on class certification.

[9]  Jordan Milev, Robert Patton, and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review: Filings on the Rise but Settlement Amounts Decline; Ratio of Settlement to Investor Losses is at Record Low*, NERA, p. 15 (2011), http://www.nera.com/nera-files/PUB_Mid-Year_Trends_0711(3).pdf (the "NERA Report").

25.     I would note, however, that Citigroup's financial condition has not been healthy in recent years.  The company came close to failing during the financial crisis and accepted $45 billion in capital investments from the government together with insurance on $306 billion of troubled assets.  Although Citigroup has returned to profitability, its condition remains fragile in light of continuing threats to the world's financial stability including sovereign distress in Europe and America's budget deficit.  There can be no assurance that had this litigation continued Citigroup would be able to withstand a larger judgment in the future – or even a judgment as large as the $590 million obtained here for the benefit of the class.

26.     The comparison with "best possible recovery" – the eighth *Grinnell* factor – invites the Court to consider how much the plaintiffs would have recovered if they prevailed on all of their claims and if the court or jury awarded all the damages they could reasonably demand.  The factor of the best possible recovery is not intended to be a benchmark against which a settlement should be judged, since it is not discounted for the risk of the litigation and other factors affecting the settlement.  This factor is rather an analytical step in the process of assessing whether the recovery represents good value for the class.

27.     A starting place for comparing the present settlement with the best possible recovery is simply the size of the settlement fund.  The consideration agreed to in the present case – more than half a billion dollars – is one of the largest class action settlements in recent years and ranks among the few dozen largest settlements in American history and in the top 20 securities class action settlements ever.

28.     In addition to considering the absolute size of the settlement, the eighth *Grinnell* factor invites the Court to compare the settlement with the maximum possible recovery.  A recent study by Cornerstone Research compared settlement amounts with "estimated damages" –

a proxy for the idea of the best possible recovery.  For cases with estimated damages of $5 billion or more, the median recovery for 1996-2010 was 1% of estimated damages; the median recovery for 2011 was only .4% of estimated damages.[10]  A study by the National Economic Research Associates ("NERA") confirms these results.[11]  It found that recoveries in securities class action settlements were a small percentage of investor losses, and that the percentage of recovery to loss decreased as the size of the cases increased. The NERA study found that for investor losses between $5 and $10 billion, the mean recovery was 2.2% and the median recovery was 1%; for investor losses of $10 billion or more, the mean recovery was 2.3% and the median was 0.7%.  I am informed that plaintiffs' experts provisionally estimated the class-wide damages in the present case at $6.3 billion.  Taking this estimate as a measure of the best possible recovery and applying the median recovery of 1% for investor losses between $5 and $10 billion, this settlement would have recovered only $63 million.  Thus, the $590 million recovery obtained here is more than 9 times the median figure.

29.     The final *Grinnell* factor asks whether the class recovery is within a range of reason in light of the risks.  This factor, in essence, requires the Court and the parties to summarize and complete the inquiry mandated by the other factors in order to assess whether the recovery obtained in the settlement is within the range of reason.  Based on the analysis set forth above, I have no doubt that the $590 million recovery in the present case is eminently reasonable and in fact represents an excellent value for the class.

---

[10] *See* Ellen M. Ryan and Laura E. Simmons, *Securities Class Action Settlements: 2011 Review and Analysis*, Cornerstone Research (2012), *available at* http://securities.stanford.edu/Settlements/REVIEW_1995-2011/Settlements_Through_12_2011.pdf at 7.

[11] *See* NERA Report p.29 fig. 32.

## The Fee Request

30.     I now turn to an analysis of plaintiffs' attorneys' fee request.  I am informed that counsel will seek an award of $97,350,000, equal to a lodestar multiplier of approximately 1.89 or 16.5% of the $590 million cash recovery for the class, plus expenses of approximately $3 million.

31.     Standards for fee awards in this Court were clarified by the Second Circuit's decision in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).  *Goldberger* endorses two methodologies to evaluate fee requests in class action settlements: the percentage-of-recovery method, which compares the fee request with the total benefit recovered for the class, and the lodestar method, which determines counsel's reasonable hours and hourly rate and adjusts this figure by a "multiplier" to account for special features of the litigation, most importantly the risk assumed by class counsel.  I will review counsel's fee request using both methodologies.

32.     Due to the economies of scale, as settlement amounts rise into the mega settlement range (hundreds of millions of dollars and above), counsel's lodestar does not rise commensurably.  Accordingly, a review of the fee awards in the largest PSLRA mega settlement confirms that as the settlement amounts rise into the mega settlement range, the analysis of counsel's lodestar multiplier can play an increasingly important role (relative to fee percentage) when assessing the reasonableness of a fee request.  *See, e.g.*, *Lehman Bros., Inc. Securities & ERISA Litig.*, No. 09-MD-2017 (LAK), slip op. at 3 (S.D.N.Y. June 29, 2012) (finding that reviewing counsel's lodestar was more appropriate when awarding a fee in a $516 million settlement).

**Lodestar Method**

33.     Accordingly, I begin the analysis of the fee request under the lodestar method. Counsel's fee request of $97,350,000 is equal to a lodestar multiplier of 1.89.  The lodestar analysis proceeds in three steps: (a) determining the reasonable number of hours; (b) determining the reasonable hourly rate; and (c) determining the lodestar multiplier.

**Hours**

34.     I am informed by counsel that plaintiffs' firms expended 115,342.33 hours in conducting this litigation, consisting of 18,827.70 hours of partner time, 73,052.80 hours of other attorneys' time, and 23,461.83 hours of law clerk, paralegal, senior analyst time, and other professional support staff.  While I have not attempted to audit counsel's hours at the level of evaluating the appropriate time or staffing levels for particular tasks, I have considered the reported hours in light of the circumstances of this case and in comparison with other class action settlements.

35.     As this Court is aware, counsel performed an impressive amount of preliminary investigation.  Notwithstanding the fact that at the time they prepared their complaint they lacked access to the information that discovery would have revealed, counsel utilized the resources at hand to compile a massive compendium of detailed facts relevant to key issues in the case.  Once discovery commenced, in the wake of this Court's ruling on the motion to dismiss, counsel acquired and analyzed nearly 40 million pages of documents and conducted more than 30 depositions.  Throughout this litigation, counsel needed to deal with complex issues regarding the structured finance industry (including CDO securities which, in effect, are securities backed by assets which themselves are asset-backed securities); arcane standards for financial reporting on financial instruments; methodologies for modeling and valuing asset-backed securities; the

application of financial event studies in unstable markets; and the impact on the litigation of the greatest financial crisis since the Great Depression.  In all these activities, counsel confronted an adversary represented by some of the most capable securities litigation defense counsel in the country.   The excellent recovery obtained for the class testifies to the value of the hours expended in these efforts.

36.     The case was, in my judgment, economically and efficiently litigated.  Unlike many large-scale securities class actions, this case did not involve large numbers of law firms with batteries of attorneys.  The "leading oar" of the plaintiffs' team was the Kirby McInerney firm, as Lead Counsel, with contributions from Entwistle & Cappucci, LLP, Glancy Binkow & Goldberg LLP, Motley Rice, Allen Brothers, P.L.L.C., Law Office of Ken Elan, Law Office of Alan Kovacs, and Kenneth Gold.  Lead Counsel undertook the overwhelming majority of the legal work and payment of expenses in this action.  Lead Counsel also organized and oversaw the work of the other plaintiffs' counsel to ensure that legal work was performed in an efficient and non-duplicative manner.  Lead Counsel assigned specific legal work to these other firms that included document review, drafting sections of certain briefs, and legal or factual research. During the course of the litigation, Lead Counsel reviewed the quality of the work and ensured that the work was being performed efficiently.  Lead Counsel also regularly monitored the time and expenses expended by these counsel. Because Kirby McInerney served as sole lead counsel, it was able to control and distribute work assignments without distractions, power struggles, and overlap of effort that sometimes plague team representation in class action cases.

37.     I understand that more junior attorneys were assigned less sophisticated projects, while more senior attorneys performed work commensurate with their greater sophistication and experience.  Further, the ratio of hours expended by attorneys with different levels of experience

was in line with best practices, with the bulk of the time and effort, devoted to more routine tasks, being expended by less experienced attorneys with lower billing rates. For example, at the Kirby McInerney firm, 12,882.75 hours were expended by partners and senior counsel and 55,794.25 hours were expended by more junior attorneys – a ratio of approximately 5:1 of junior attorneys to partner/senior counsel time. This ratio reflects an appropriate allocation of responsibility with a view towards litigating this case in an efficient and effective manner.

## **Hourly Rates**

38.    I now turn to an evaluation of the appropriate hourly rates. These rates are determined, under the lodestar analysis, by comparing counsel's rates with those of attorneys in the relevant market who possess similar background, experience and qualifications.[12] In my judgment the relevant market is the market for trial attorneys practicing in the field of complex financial litigation. Given the nature of the present litigation – a nationwide class action against one of the world's largest financial institutions and its senior officers – the appropriate geographic market is nationwide in scope.[13]

---

[12] The courts generally use the current billing rates of the attorneys prevailing in "the relevant marketplace, *i.e.*, 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Missouri v. Jenkins*, 491 U.S. 274, 286 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11).

[13] If a narrower scope is appropriate, it would be the market for attorneys practicing financial litigation in New York City.

39.     Plaintiffs report hourly rates ranging from $800/hour for Roger Kirby, Kirby McInerney's senior partner with 40 years' experience in law practice, to $600/hour for junior partners. Aside from Mr. Kirby, the next highest-billing partner charged at $700/hour. Other attorney rates range from $600/hour for senior attorneys to $325/hour for junior attorneys. Senior analysts are billed at $295/hour; law clerks are billed at $200/hour; and paralegals and clerks are billed at rates ranging from $65 to $175 per hour.

40.     A variety of sources of information are available to evaluate the reasonableness of these rates. In federal bankruptcy litigation – which resembles in sophistication and complexity the sort of large-scale financial litigation at issue in the present case – rates for representation can sometimes be obtained from a review of public case filings. The following table, compiled from publicly available sources, illustrates typical billing rates of defense-side firms as reported in bankruptcy cases:

**Table 1: Bankruptcy Fees**

| Case Name | Defense Firm | Citation | Non-Partner Attorneys' Fee Range | Partners' Fee Range |
|---|---|---|---|---|
| In re Houghton Mifflin Harcourt Publ'g Co., et al., Debtors, No. 12-12171 (REG) | Paul, Weiss, Rifkind, Wharton & Garrison LLP | (Bankr. S.D.N.Y.) (May 2012) (Dkt. No. 55) | $425 - $760 | $895 - $1,120 |
| In re Lightsquared Inc., Debtors, No. 12-12080 (SCC) | Milbank, Tweed, Hadley & McCloy LLP | (Bankr. S.D.N.Y.) (July 2012) (Dkt. No. 206) | $470 - $750 | $950 - $1,140 |
| In re Eastman Kodak Co., Debtors, No. 12-10202 (ALG) | Milbank, Tweed, Hadley & McCloy LLP | (Bankr. S.D.N.Y.) (June 2012) (Dkt. No. 1492) | $470 - $795 | $825 - $1,140 |
| In re 785 Partners LLC, Debtor, No. 11-13702 (SMB) | Proskauer Rose LLP | (Bankr. S.D.N.Y.) (May 2012) (Dkt. No. 189) | $295 - $700 | $779 - $1,050 |
| In re Dynegy Holdings, LLC, et al., Debtors, No. 11-38111 (CGM) | Sidley Austin LLP | (Bank. S.D.N.Y.) (Apr. 2012) (Dkt. No. 578) | $340 - $950 | $625 - $1,050 |
| In re Ambac Fin. Group, Inc., | Wachtell, Lipton, | (Bankr. S.D.N.Y.) | $500 - $600 | $975 |

| Debtor, No. 10-15973 (SCC) | Rosen & Katz | (Nov. 2011) (Dkt. No. 701) | | |
| In re Great Atlantic & Pacific Tea Co., Inc., et al., Debtors, No. 10-24549 (RDD) | Kirkland & Ellis LLP | (Bankr. S.D.N.Y.) (May 2011) (Dkt. No. 1566) | $340 - $995 | $580 - $995 |
| In re CIT Group Inc. and CIT Group Funding Co. of Delaware LLC, Debtors, No. 09-16565 (ALG) | Sullivan & Cromwell, LLP | (Bankr. S.D.N.Y.) (Jan. 2010) (Dkt. No. 229) | $305 - $950 | $850 - $965 |

41.     The results of these cases are confirmed by survey data.   According to a December 2009 report, the rates for senior bankruptcy lawyers at the firms that regularly represent defendants in securities class actions and shareholder litigation had already topped $1,000 per hour three years ago.[14]   The following firms, which include New York firms that often represent defendants in securities class actions of this type, were as follows:

### Table 2: Bankruptcy Fee Survey Data

| FIRM | MEDIAN PARTNER RATE* | # PARTNERS FILING |
|---|---|---|
| Simpson Thacher | $980 | 30 |
| Cleary Gottlieb | $960 | 47 |
| Shearman & Sterling | $950 | 17 |
| Davis Polk | $948 | 14 |
| Skadden | $945 | 38 |
| Paul Weiss | $925 | 24 |
| Cadwalader | $900 | 29 |
| Milbank | $900 | 55 |
| Weil Gotshal | $843 | 142 |
| Gibson Dunn | $840 | 29 |
| Latham & Watkins | $830 | 57 |
| White & Case | $825 | 21 |
| Paul Hastings | $810 | 46 |

---

[14]   Amy Kolz, Bankruptcy Rates Top $1,000 Mark In 2008-09, The Am. Law Daily (Dec. 12, 2009), *available at* http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1202436371636 (last visited Nov. 28, 2012).

42.     On the plaintiffs' side, comparable billing rates can be gleaned from a review of reported class action settlements.  These data are shown in the following table:

**Table 3: Plaintiffs' Class Action Attorney Billing Rates**

| Case Name | Plaintiff Firm | Citation | Non-Partner Attorneys' Fee Range | Partners' Fee Range |
|---|---|---|---|---|
| In re Bear Stearns Companies, Inc. Securities, Derivative and ERISA Litig., No. 08-cv-2793 (RWS) | Labaton Sucharow LLP | (S.D.N.Y.) (Aug. 2012) (Dkt. No. 302-5) | $275 - $700 | $725 - $975 |
| In re Wachovia Equity Securities Litigation, No. 08 Civ. 6171 (RJS) | Kirby McInerney LLP | (S.D.N.Y.) (Apr. 2012) (Dkt. No. 106-5) | $280 - $625 | $600 - $800 |
| In re Lehman Brothers Securities and Erisa Litigation, No. 1:08-cv-05523 (LAK)(GWG) | Bernstein Litowitz & Grossman LLP | (S.D.N.Y) (Mar. 2012) (Dkt. No. 343-12) | $310 - $675 | $650 - $975 |
| In re Lehman Brothers Securities and Erisa Litigation, No. 1:08-cv-05523 (LAK)(GWG) | Labaton Sucharow | (S.D.N.Y) (Mar. 2012) (Dkt. No. 343-17) | $275 - $650 | $750 - $975 |
| Rubin v. MF Global, Ltd., et al., No. 08 Civ. 2233 (VM) | Cohen Milstein Sellers & Toll PLLC | (S.D.N.Y.) (Nov. 2011) (Dkt. No. 198) | $230 - $615 | $700 - $795 |
| In re Wachovia Preferred Sec. and Bond/Notes Litigation, No. 09 Civ. 6351 (RJS) | Bernstein Litowitz Berger & Grossman LLP | (S.D.N.Y.) (Oct. 2011) (Dkt. No. 148-7) | $340 - $675 | $650 - $975 |
| In re Wachovia Preferred Sec. and Bond/Notes Litigation, No. 09 Civ. 6351 (RJS) | Robbins Geller Rudman & Dowd LLP | (S.D.N.Y.) (Oct. 2011) (Dkt. No. 148-9) | $265 - $640 | $565 - $775 |
| Cornwell et al. v. Credit Suisse Group et al., No. 08 Civ. 03758 (VM) | Robbins Geller Rudman & Dowd LLP | (S.D.N.Y.) (July 2011) (Dkt. No. 117) | $360 - $670 | $565 - $795 |
| Lapin v. Goldman Sachs & Co., No. 04 Civ. 2236 (RJS) | Kirby McInerney LLP | (S.D.N.Y.) (Nov. 2010) (Dkt No. 129) | $275 - $625 | $600 - $900 |

| | | | | |
|---|---|---|---|---|
| In re MBIA, Inc., Sec. Litigation, No. 08 Civ. 0264 (KMK) | Bernstein Litowitz Berger & Grossman LLP | (S.D.N.Y.) (Dec. 2011) (Dkt. No. 92) | $375 - $675 | $700 - $975 |
| In re Refco, Inc. Securities Litigation, No. 05 Civ. 08626 (JSR) | Grant & Eisenhofer P.A. | (S.D.N.Y.) (Sept. 2010) (Dkt. No. 738-5) | $250 - $620 | $650 - $845 |
| Stumpf v. Garvey, et al. (In re Tycom Ltd. Sec. Litigation.), No. 03 Civ. 03540 (GEB) | Wolf Popper LLP | (D.N.J.) (Aug. 2010) (Dkt. No. 145) | $345 - $485 | $620 - $750 |
| In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation, No. 07-cv-09633 (LBS)(AJP)(DFE) | Kaplan Fox & Kilsheimer LLP | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-4) | $255 - $500 | $550 - $775 |
| In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation, No. 07-cv-09633(LBS)(AJP)(DFE) | Berger & Montague, P.C. | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-6) | $295 - $440 | $460 - $725 |
| In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation, No. 07-cv-09633(LBS)(AJP)(DFE) | Pomerantz Haudek Grossman & Gross LLP | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-7) | $385 - $550 | $525 - $830 |
| In re Merrill Lynch & Co. Inc., Securities, Derivatives and ERISA Litigation, No. 07-cv-09633(LBS)(AJP)(DFE) | Murray, Frank Sailer LLP | (S.D.N.Y.) (Jun. 2009) (Dkt. No. 246-8) | $350 - $550 | $675 - $750 |
| In re Telik, Inc. Securities Litigation, No. 07 Civ. 04819 (CM) | Bernstein Liebhard & Lifshitz, LLP | (S.D.N.Y.) (Aug. 2008) (Dkt. No. 72) | $350 - $550 | $700 - $750 |

## **Multiplier**

43.     I now turn to an evaluation of an appropriate risk multiplier.  Using counsel's

lodestar of $51,438,451.15, the multiplier associated with the fee request of $97,350,000 is 1.89.

The question is whether this multiplier is appropriate under the circumstances.

44.     To begin with, it is obvious that a multiplier is required if counsel are to have adequate incentives to bring litigation of this sort.  Otherwise the substantial risks associated with cases such as the present litigation would deter counsel from bringing lawsuits in the first place.  The question is what the multiplier should be.

45.     A review of decided cases reveals that multipliers of 2 or greater are commonly awarded in class action litigation including specifically, securities class actions that settle for similar amounts as the settlement in this action.  The following table sets forth a sample of cases where courts have awarded multipliers of 2 or greater:

**Table 4: Sample of Cases with Multipliers Greater than Two**

| Case | Multiplier |
|---|:---:|
| Steinver v. Am. Broadcasting Co., Inc., 248 F. App'x 780, 783 (9th Cir. 2007) | **6.85** |
| Craft v. County of San Bernardino, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) | **5.2** |
| Buccellato v. AT&T Operations, Inc., No. C10-00463-LHK, 2011 U.S. Dist. LEXIS 85699, at *3-5 (N.D. Cal. June 30, 2011) | **4.3** |
| Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) | **4.65** |
| In re Interpublic Secs., No. Civ. 6527 (DLC), 2004 U.S. Dist. LEXIS 21429, at *34 (S.D.N.Y. Oct. 26, 2004) | **3.96** |
| In re Bisys Sec. Litig., No. 04 Civ. 3840 (JSR), 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) | **2.99** |
| In re Comverse Tech., Inc., Sec. Litig., 2010 WL 2653354, at *5 (E.D.N.Y. June | **2.8** |

| | |
|---|---|
| 24 2010) | |
| Cornwell v. Credit Suisse Group., No. 08 Civ. 03758 (VM), slip op. at 4 (S.D.N.Y. July 18, 2011) | **4.7** |
| Wal-Mart Stores, Inc. v. Visa USA, Inc., 396 F.3d 96, 123 (2d Cir. 2005) | **3.5** |
| Weiss v. Mercedes-Benz of N. Am., Inc., 899 F. Supp. 1297 (D.N.J. May 11, 1995), *aff'd*, 1995 U.S. App. LEXIS (3d Cir. 1995) | **9.3** |
| Perera v. Chiron Corp., Civ. No. 95-20725-SW (N.D. Cal. 1999) | **9.14** |
| Cosgrove v. Sullivan, 759 F. Supp. 166 (S.D.N.Y. 1991) | **8.84** |
| In re Buspirone Antitrust Litig., No. 01-md-1413 (JGK) (S.D.N.Y. Apr. 17, 2003) | **8.46** |
| Newman v. Carabiner Int'l, Inc., 99-cv-2271 (S.D.N.Y. Oct 19, 2001) | **7.7** |
| In re 3COM Sec. Litig., No. C-97-21083 (N.D. Cal. Mar. 9, 2001) | **6.67** |
| In re Triangle Indus. Sec. Litig., [1991-1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,528 (Del Ch. 1991) | **6.6** |
| In re RJR Nabisco, Inc. Sec. Litig., [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,984 at 94,267 (S.D.N.Y. 1992) | **6.0** |
| Roberts v. Texaco, 979 F. Supp. 185 (S.D.N.Y. 1997) | **5.5** |
| Lemmer v. Golden Books, 98 Civ. 5748 (S.D.N.Y. Oct. 12, 1999) | **5.38** |

| | |
|---|---|
| Feerer v. Amoco Prod. Co., Civ. No. 95-0012 JC/WWD, 1998 U.S. Dist. LEXIS 22248 (D.N.M. May 28, 1998) | **4-5** |
| Willson v. New York Life. Ins. Co., No. 94-127804, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup. Ct. Feb 1, 1996) | **4.6** |
| Rabin v. Concord Assets Group, Inc., No. 89 CIV 6130 (LBS), 1991 U.S. Dist. LEXIS 18273, [1991-92 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,471 (S.D.N.Y. 1991) | **4.4** |
| In re Rite-Aid Corp. Sec. Litig. ("Rite Aid II"), 269 F. Supp. 2d 603 (E.D. Pa. 2003) | **4.07** |
| In re NASDAQ Mkt.-Makers Antitrust Litig., 187 F.R.D. 465 (S.D.N.Y. 1998) | **3.97** |
| In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109 (D.N.J. 2002) | **4.3** |
| In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | **4.0** |
| In re Enron Corp. Sec., Deriv., & ERISA Litig., 586 F. Supp. 2d 732 (S.D. Tex.. 2008) | **5.2** |

46.     The foregoing cases demonstrate that substantial multipliers are common in federal class action settlements.  They reflect a more general recognition that the range of reason includes multipliers well above two.  *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("multipliers of between 3 and 4.5 have become common"); *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 U.S. Dist. LEXIS 57918, at *56  n.7 (S.D.N.Y. 2007) ("multipliers of nearly 5 have been deemed 'common' by courts in this District."); *In re Telik, Inc., Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("multiples of over 4 are routinely awarded by courts, including this Court"); *In re Bisys Sec. Litig.*, No. 04 Civ. 3840 (JSR), 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) (multiplier of 2.99 "falls well within the parameters set in this district and elsewhere"); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 U.S. Dist. LEXIS 10532, at *50 (S.D.N.Y. June 2, 2004) (average multiplier was 4.35); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (multiplier of 4.65 was "well within the range awarded by courts in this Circuit and courts throughout the country"); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (multipliers of 3 to 4.5 are commonly observed).

47.     There is also the factor of case size to consider.  It turns out that there is a pronounced positive relationship between multiplier and the recovery received by the class: multipliers grow larger as settlement size increases.  The relationship between multiplier and recovery is set forth in the following table, from Eisenberg and Miller's 2008 study:[15]

---

[15] Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010).

**Table 5: Multipliers by Class Recovery, 1993-2008**

| Range of class recovery (millions) decile | Mean | Median | Standard deviation | N |
|---|---|---|---|---|
| Recovery <=1.1 | 0.88 | 0.74 | 0.45 | 33 |
| Recovery >1.1 <=2.8 | 0.95 | 0.77 | 0.67 | 40 |
| Recovery >2.8 <=5.3 | 1.44 | 1.25 | 0.74 | 32 |
| Recovery >5.3 <=8.7 | 1.59 | 1.25 | 1.32 | 34 |
| Recovery >8.7 <=14.3 | 1.49 | 1.45 | 0.87 | 37 |
| Recovery >14.3<=22.8 | 1.68 | 1.51 | 0.85 | 38 |
| Recovery >22.8 <=38.3 | 1.83 | 1.44 | 1.44 | 33 |
| Recovery >38.3 <=69.6 | 1.98 | 1.75 | 1.00 | 38 |
| Recovery >69.6 <=175.5 | 2.70 | 2.09 | 2.43 | 43 |
| Recovery >175.5 | 3.18 | 2.60 | 1.99 | 40 |

Sources: Westlaw, LexisNexis, PACER.

As shown in this table, for cases such as the present litigation with recoveries in excess of $175.5 million, the mean multiplier was 3.18 and the median was 2.60.

48.     The following table provides case specific information on multipliers in class action settlements from the past ten years with recoveries of $450 million or more in which the lodestar multiplier could be determined:

**Table 6:  Lodestar Multipliers in Mega Cases**

| Case | Recovery | Multiplier |
|---|---|---|
| In re Enron Corp. Sec. Litig., No. 01-cv-03624 (S.D. Tex. 2010) | $7,227,390,000 | **5.2** |
| In re WorldCom, Inc. Sec. Litig., No. 02-cv-03288 (S.D.N.Y 2005) | $6,133,000,000 (combined) | **2.5 (blended average)** |
| In re Tyco Int'l, Ltd. Sec. Litig., No. 02-md-01335 (D.N.H. 2007) | $3,200,000,000 | **2.7** |
| In re Nortel Networks Corp. Sec. Litig., No. 01-cv-01855 (S.D.N.Y 2006) | $1,142,775,308 | **2.1** |
| In re Royal Ahold, N.V. Sec. & ERISA Litig., No. 03-md-01539 (D. | $1,100,000,000 | **2.6** |

| | | |
|---|---|---|
| Md. 2006) | | |
| In re Nortel Networks Corp. Sec. Litig., ("Nortell II), No. 04-cv-02115 (S.D.N.Y. 2006) | $1,074,265,298 | **4.8** |
| In re UnitedHealth Group, Inc. PSLRA Litig., No. 06-cv-01691 (D. Minn. 2009) | $925,500,000 | **6.5** |
| In re American Int'l Group, Inc. Sec. Litig., No. 04-cv-08141 (S.D.N.Y. 2011) | $822,500,000 (combined) | **0.95 (blended average)** |
| In re HealthSouth Corp. Stockholder Litig., No. 03-cv-1500 (N.D. Ala. 2010) | $804,500,000 (combined) | **1.2 (blended average)** |
| Carlson v. Xerox Corp., No. 00-cv-01621 (D. Conn. 2009) | $750,000,000 | **1.3** |
| In re Wachovia Preferred Sec. and Bond/Notes Litig., No. 09-cv-06351 (S.D.N.Y. 2011) | $627,000,000 | **2.3** |
| In re Lucent Techs., Inc., Sec. Litig., No. 00-cv-00621 (D.N.J. 2003) | $608,350,000 (combined) | **2.1 (blended average)** |
| In re Countrywide Fin. Corp. Sec. Litig., No. 07-cv-05295 (C.D. Cal. 2011) | $601,500,000 | **.67** |
| In re Cardinal Health, Inc. Sec. Litig., No. 04-cv-00575 (S.D. Ohio 2007) | $600,000,000 | **5.9** |
| In re IPO Sec. Litig., No. 21-mc-00092 (S.D.N.Y. 2009) | $586,000,000 | **0.61** |
| In re Lehman Brothers Sec. & ERISA Litig., No. 08-cv-5523 (S.D.N.Y. 2011) | $516,218,000 | **1.5** |
| In re BankAmerica Corp. Sec. Litig., No. 99-md-01264 (E.D. Mo. 2002) | $490,000,000[16] | **3 (blended average)** |
| In re Merrill Lynch & Co., Inc. Sec., Deriv. & ERISA Litig., No. 07-cv-09633 (S.D.N.Y. 2009) | $475,000,000 | **2.3** |
| In re Dynegy, Inc. Sec. Litig., No. 02-cv-01571 (S.D. Tex. 2005) | $474,050,000 | **4.0** |
| In re Raytheon Co. Sec. Litig., No. 99-cv-12142 (D. Mass. 2004) | $460,000,000 | **3.1** |

[16] The $490 million settlement represents a combined settlement on behalf of the BankAmerica Classes and the NationsBank Classes.

| In re Waste Mgmt. Inc. Sec. Litig., No. 99-cv-02183 (S.D. Tex. 2003) | $457,000,000 | **5.3** |
|---|---|---|
| In re Adelphia Commc'n. Corp. Sec. & Deriv. Litig., No. 03-md-01529 (S.D.N.Y. 2011) | $455,000,000 | **2.9** |

As demonstrated by this table, although there is variability in multiplier awards in mega cases, the pronounced trend is for multipliers in mega cases to exceed the average multiplier awarded in the general run of cases. The average multiplier of the cases listed in this table is 2.89.

### Percentage Method

49. I now turn to the percentage fee analysis. I first provide general information about percentage fees, then address the fact that this settlement falls in the category of "mega" class action settlements, and finally discuss a number of additional considerations.

### General Considerations

50. A 1996 study by the National Economic Research Associates examined average and median fee awards for settled securities fraud cases (although completed in the 1990s, this study is fully consistent with more recent studies described below). As shown in Table 7, average awards fell within a narrow range, from a low of 30.73% in the Fifth Circuit to a high of 32.78% in the Fourth Circuit. The average fee in the Second Circuit was 31.48%.

**Table 7: Plaintiffs' Attorneys Fees by Federal Circuit: NERA Data**

| Circuit | Number of Settlements | Settlements as a Percentage of Total | Total Value of Settlements | Total Attorney Fees | Average Attorney Fee as a Percentage of Settlement |
|---|---|---|---|---|---|
| | | (Percent) | ----------------(Dollars)--------------- | | (Percent) |
| D.C. | 2 | 0.46 | 6,750,000 | 2,200,000 | 31.67 |
| First | 26 | 6.00 | 82,633,902 | 25,677,884 | 30.99 |
| Second | 69 | 15.94 | 440,285,121 | 139,037,770 | 31.48 |
| Third | 58 | 13.39 | 423,292,596 | 132,738,442 | 32.00 |
| Fourth | 12 | 2.77 | 75,325,000 | 23,716,667 | 32.78 |
| Fifth | 26 | 6.00 | 262,720,500 | 81,420,017 | 30.73 |
| Sixth | 13 | 3.00 | 120,875,000 | 36,921,000 | 31.00 |
| Seventh | 18 | 4.16 | 149,933,784 | 48,375,833 | 31.83 |
| Eighth | 12 | 2.77 | 52,175,000 | 17,640,500 | 32.47 |
| Ninth | 155 | 35.80 | 1,379,894,030 | 450,725,681 | 32.57 |
| Tenth | 13 | 3.00 | 203,650,000 | 62,038,333 | 32.13 |
| Eleventh | 29 | 6.70 | 168,352,500 | 49,998,375 | 29.92 |
| Total | 433 | 100.00% | $3,365,887,433 | $1,070,490,502 | 31.84% |

**Source:  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 12b (1996).**

51.    Researchers affiliated with NERA updated the 1996 study in 1999.  The 1999 NERA update shows that, exclusive of expenses, attorneys' fee awards in securities class actions cluster at between 31-33% of the common fund recovery.  The following table shows this in the

bottom row:

**Table 8: Fee Awards in Settled Securities Class Actions 1991-1999: NERA Data**

|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Jun-99 |
|---|---|---|---|---|---|---|---|---|---|
| Number of Settlements | 48 | 79 | 90 | 101 | 104 | 104 | 98 | 80 | 29 |
| Average Settlement (millions) | $6.3 | $9.9 | $8.3 | $6.1 | $10.7 | $7.0 | $7.9 | $11.0 | $6.0 |
| Median Settlement (millions) | $3.7 | $5.0 | $4.4 | $3.6 | $4.8 | $4.1 | $3.2 | $5.8 | $4.3 |
| Average Fee as a Percentage of Average Settlement | 33% | 27% | 24% | 34% | 33% | 31% | 32% | 31% | 33% |

**Source:  Todd S. Foster, Denise N. Martin, Vinita M. Juneja, Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA, Figure 12 (June 1999).**

52.    A 1996 Federal Judicial Center study examined all class actions terminated in four federal district courts between July 1, 1992 and June 30, 1994.  Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 4 (1996).  Median fee awards ranged from 27% to 30%, and most awards were between 20% and 40% of the monetary settlement.  As shown in the following table, fee awards clustered at around 30 percent in all types of class action litigation in the four

federal district courts:

### Table 9: Percentage Fees in Four Federal District Courts



Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class

*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

**Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 151 (1996).**

53.    A large-scale study on fees is found in the March-April 2003 edition of *Class Action Reports* (CAR), which contains data on cases extending back to 1974.  The following table reports the CAR data broken down by type of case:

**Table 10:  Fee-Award Percent Summary by Case Category**

| *Category* | *Mean* | *Median* | *Std. Dev.* | *Number* |
|---|---|---|---|---|
| **Class Action Reports Data (*CAR*), 1993–2002** | | | | |
| Antitrust | 26.8 | 28.4 | 7.1 | 31 |
| Consumer | 24.3 | 25.0 | 8.5 | 48 |
| Civil rights | 23.5 | 25.5 | 11.0 | 4 |
| Derivative | 33.3 | 33.3 | — | 1 |
| Employment | 25.5 | 25.7 | 7.6 | 17 |
| Environmental | 30.5 | 30.5 | 7.8 | 2 |
| Government regulation | 29.7 | 29.7 | — | 1 |
| Labor/wage/pension | 22.9 | 26.4 | 10.6 | 30 |
| Mass tort | 17.6 | 17.0 | 6.9 | 8 |
| Securities | 27.9 | 30.0 | 7.4 | 483 |
| Taxpayer | 3.5 | 3.5 | — | 1 |
| Utilities | 20.3 | 20.3 | 1.7 | 2 |
| Social welfare/entitlements | 16.9 | 16.9 | 4.4 | 2 |
| Total | 27.0 | 30.0 | 7.9 | 630 |

**Sources: Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 *Journal of Empirical Legal Studies* 51 analyzing data from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 *Class Action Rep.* 169 (2003).**

The median fee across the range of cases in the study was 30.0%.

54.    The probative value of the foregoing studies is confirmed by recent, comprehensive analyses of class action attorneys' fees.  Eisenberg and Miller studied fees in all published class action settlements between 1993 and 2008.  They found that the mean fee in securities law class actions across the entire data set was 23%.[17]  Fitzpatrick examined all federal class action settlements in 2006-2007.  He found that the mean attorneys' fee for securities class action cases was 24.7% and the median fee was 25.0%.[18]  Of particular relevance to the present case, Eisenberg, Miller and Perino found that fee awards in securities class actions in the Second Circuit did not change significantly in the wake of the decision in *Goldberger*.[19]  These authors found that the mean and median fees in securities cases decided across all circuits in the years prior to 2000 were 27.63% and 30%, while the mean and median award in the years 2000-2007 were 26.06% and 26.94%. In the second circuit, the mean fee award post-*Goldberger* was 26.0% and the median award was 27.2%.

### "Mega" Cases

55.    Fee percentages in "mega" cases with very large class recoveries, are more variable than those observed for smaller recoveries, and also sometimes display a "scaling" effect – lower fee percentages for higher recoveries – that reflects economies of scale that can be realized in large cases.  Nevertheless, even in mega cases fee awards of 20% or higher are often

---

[17] Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010).

[18] Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811, 835 (2010).

[19] See Theodore Eisenberg, Geoffrey Miller & Michael Perino, Empirical Research on Decision-Making in the Federal Courts: A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions After Goldberger v. Integrated Resources, Inc., 29 Wash. U. J.L. & Pol'y 5 (2009)

observed.

56.      The National Economic Research Associates study referenced above broke down fee percentages in securities class actions by size of the recovery.  The results of that study are reported in the following table:

**Table 11: Fee Awards in Settled Securities Class Actions 1991-1996: NERA Data**

| Settlement Range (millions) | Number of Settlements | Total Value of Settlements | Total Attorney Fees | Average Attorney Fees as a Percentage of Settlement | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|---|---|
| $0.00-$0.99 | 37 | $24,696,750 | $7,617,600 | 30.38% | 30.00% |
| $1.00-$1.99 | 66 | $96,506,502 | $30,642,005 | 31.88% | 33.33% |
| $2.00-$9.99 | 245 | $1,184,141,901 | $381,149,262 | 32.11% | 33.33% |
| $10.00-$49.99 | 76 | $1,488,892,280 | $471,161,635 | 31.72% | 33.15% |
| $50+ | 9 | $571,650,000 | $179,920,000 | 31.48% | 30.00% |
| Total | 433 | $3,365,887,433 | $1,070,490,502 | 31.84% | 33.33% |

**Source:  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 9 (1996)**

Overall, the mean fee in the NERA study was 31.84% and the median fee was 33.33%.  For class recoveries of $50 million or more, the mean fee was 31.48% and the median fee was 30.00% – slightly less than the overall results, but not markedly so.

57.      Fitzpatrick's study, examining a sample including several very large cases, found that for recoveries in excess of $72.5 million, the mean percentage fee was 18.4% and the median fee was 19.0%.  Again, while a scaling effect is evident, the fees awarded in the very

large cases in Fitzpatrick's sample were not dramatically lower than those awarded in the more

usual class action settlement:

**Table 12: Mean, median, and standard deviation of fee awards by
settlement size in 2006-2007 federal class action settlements using the
percentage-of-the settlement method with or without lodestar crosscheck**

| Settlement Size (in millions) | Mean | Median | Standard Deviation |
|---|---|---|---|
| [$0 to $0.75] (n = 45) | 28.8% | 29.6% | 6.1% |
| ($0.75 to $1.75] (n=44) | 28.7% | 30.0% | 6.2% |
| ($1.75 to $2.85] (n = 45) | 26.5% | 29.3% | 7.9% |
| ($2.85 to $4.45] (n = 45) | 26.0% | 27.5% | 6.3% |
| ($4.45 to $7.0] (n = 44) | 27.4% | 29.7% | 5.1% |
| ($7.0 to $10.0] (n = 43) | 26.4% | 28.0% | 6.6% |
| ($10.0 to $15.2] (n = 45) | 24.8% | 25.0% | 6.4% |
| ($15.2 to $30.0] (n = 46) | 24.4% | 25.0% | 7.5% |
| ($30.0 to $72.5] (n = 42) | 22.3% | 24.9% | 8.4% |
| ($72.5 to $6600] (n = 45) | 18.4% | 19.0% | 7.9% |

Sources: Westlaw, PACER, district court clerks' offices.

58.    I have reviewed PSLRA securities class action settlements in the range of $550-

$800 million.  Given the size of the current settlement, I believe that this range provides a basis

to evaluate the reasonableness of the current settlement.  My analysis is set forth below:

**Table 13: Fee Awards of PSLRA Cases That Settled Between $550-$800 Million**

| Case Name | Settlement Amount (in millions) | Fee Award | Percentage of Fee Award | Lodestar Multiplier |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Carlson v. Xerox Corp., 596 F. Supp. 2d 400, 414 (D. Conn. 2009) | $750 | $120 million | 16% | 1.25 |
| In re Wachovia Preferred Sec. and Bond/Notes Litig., No. 09-cv-06351 (RJS), slip op. at 6 (S.D.N.Y. Dec. 30 2011) | $627 | $75,240,000 | 12% | 2.3 |
| In re Lucent Techs., Inc., Sec. Litig., 327 F. Supp. 2d 426, 443-44, 450, 453-54, 457-58, 462 (D.N.J. 2003) | $608.35[20] | $102,477,500 (combined) | 17% (blended average) | 2.14 (blended average) |
| In re Countrywide Fin. Corp. Sec. Litig., No. 07-cv-05295, Dkt. No. 1062, slip op. at 4 (C.D. Cal. Mar. 4, 2011) | $601.5 | $46,495,950 | 7.73% | .67 |
| In re Cardinal Health, Inc. Sec. Litig., 528 F. Supp. 2d 752, 770 (S.D. Ohio 2007) | $600 | $108 million | 18% | 5.9 |
| In re IPO Sec. Litig., 671 F. Supp. 2d 467, 514-16 (S.D.N.Y. 2009) | $586 | $170,084,950 | 33.3% | 0.5 |

The average fee percentage of these cases is 17.34% and the average lodestar multiplier is 2.13 – both are higher than the fee requested here.  A request here consistent with the aforementioned average fee percentage would be more than $102 million, and a request consistent with the average lodestar multiple would be more than $109 million.  The fee request is millions of dollars below these averages.

---

[20] In the *Lucent* case, the $608.35 million global settlement comprises several actions including, among others, the securities, ERISA and derivative cases.  The securities case, which settled for $517 million, was the largest recovery of these combined cases.

## Other Considerations

59.     A number of additional considerations bear on the analysis of a reasonable fee percentage.  One of the most important is the riskiness of the case.  Awarding a higher fee for higher risk is simply common sense: doing so both rewards counsel for excellent success and also incentivizes them to undertake socially valuable litigation in the future.

60.     Empirical work confirms that risk is positively associated with fee awards. Eisenberg and Miller find in a survey of all published class action settlements between 1993 and 2008 that high-risk cases generated higher fees than low-risk cases in 80% of the case categories they examined.[21]  Regression analysis revealed that high-risk cases were significantly associated with higher fee awards as a percentage of the recovery in every specification of the model.

61.     As noted above, this matter was fraught with risk.  Acting on a purely contingent basis, plaintiffs' counsel took on a massive and complex case presenting multiple legal and factual challenges (including proving liability, damages, scienter, materiality, loss causation, and falsity), making claims of serious misconduct against a sophisticated entity and its senior officers, at a time when the organization itself was fighting for its financial survival.

62.     In addition to assessing the risk of the case, courts may consider the quality of the representation when evaluating a proper percentage fee.  This Court has had ample opportunity to observe the quality of representation in this case, most notably in connection with its ruling on the motion to dismiss.  Counsel's success in withstanding the motion, in the face of opposition from extremely able defense counsel, is a testament to the skill and diligence they displayed throughout this litigation.  I can personally testify that these are some of the finest class action

---

[21] Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 265 Table 8 (2010).

attorneys I have encountered in nearly thirty years of involvement in this area of the law.

63.     Another factor bearing on the percentage fee is the results obtained.  As discussed above, this is a remarkable settlement generating more than half a billion dollars for the class. The $590 million cash payment represents more than 9 times the median recovery for class damages between $5 and $10 billion – an outstanding result that far exceeds the percentage of maximum damages obtained in comparable cases.

## Conclusions

64.     The settlement now before the Court is large in absolute terms – $590 million.  It recovers over 9 times the 1% median recovery for investor losses between $5 and $10 billion, an outstanding result when compared with securities cases of similar dimension.   It is the product of vigorous, arm's-length litigation by highly capable attorneys who undertook enormous risk to prosecute the case on an entirely contingent basis.  In light of these and other considerations set forth above, it is my opinion that this settlement provides excellent value to the class.

65.     The requested lodestar multiplier of 1.89 is consistent with multipliers awarded in class actions generally and is substantially lower than multipliers typically awarded in mega cases.  Counsel's hours were in line with what would be expected in a hotly contested case with hundreds of millions of dollars at stake.   The litigation was conducted efficiently, with an appropriate distribution of work among senior and junior attorneys and other professionals. Counsel's hourly rates are in line with rates reported by attorneys in practicing complex financial litigation in New York and around the country.  The requested fee of 16.5% of the settlement fund is consistent with percentage fees approved in this Court and around the country.  Whether evaluated under the lodestar or percentage approach, it is my opinion that the requested fee is within the range of reason when judged by results in similar cases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 6th day of December, at New York, New York.

_____
Geoffrey P. Miller

Appendix A: Resume

## GEOFFREY P. MILLER

New York University Law School
40 Washington Square South Suite 411G
New York, New York 10012
(212) 998-6329 (office)
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

Work Experience

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-present)
  Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007-2009)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)

Visiting Lecturer, University of Frankfurt, 2013 (invited)
Faculty Member, Study Center Gerzensee, Switzerland, Spring 2012
Visiting Lecturer, University of Genoa Department of Law, 2011
Visiting Scholar, European University Institute, Florence Italy, Fall/Winter 2010
Visiting Chair on Private Actors and Globalisation, Hague Institute for the Internationalisation
        of Law, Fall/Winter 2010
Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
        Fall 2009
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
        Summer 2009
Faculty Member, NYU-NUS in Singapore, 2009, 2011, 2013 (invited)
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
        Spring 2009, Summer 2010
Visiting Scholar, University of Minnesota Law School, Spring 2008

Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
        Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010
Visiting Professor, Columbia Law School, Fall 2001
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;
        Spring 2009
Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
        2004, 2005, 2007, 2008, 2009, 2010, 2011, 2012, 2013 (invited)
Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
        Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009, Spring 2010
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Professor, New York University Law School, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
     New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

Corporate Service

Member of the Board of Directors, State Farm Bank (2010) – board and committee service for
nontraditional thrift institution with $15 billion in assets.

Education

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

<u>Publications</u>

<u>Books</u>

The Governance of International Banking (co-authored with Fabrizio Cafaggi, with Tiago Andreotti, Maciej Borowicz, Agnieszka Janczuk, Eugenia Macchiavello and Paolo Saguato) (Edward Elgar, forthcoming)

Ways of a King: Legal and Political Ideas in the Bible (Vandenhoeck & Ruprecht 2011)

Trust, Risk, and Moral Hazard in Financial Markets (Il Mulino 2011)

The Origins of the Necessary and Proper Clause (with Gary Lawson, Robert Natelson, and Guy Seidman) (Cambridge University Press 2010)

The Economics of Ancient Law (editor) (Edward Elgar 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Banking and Financial Institutions"

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

Articles

Civil Procedure

An Information-Forcing Approach to the Motion to Dismiss (manuscript) (with Samuel Issacharoff)

Group Litigation in the Enforcement of Tort Law, in Jennifer Arlen, ed., The Economics of Torts (forthcoming)

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact:  Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after *Tellabs*, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (2009) (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

<u>Legal Ethics/Legal Profession</u>

The English vs. the American Rule on Attorneys Fees: An Empirical Study of Attorney Fee Clauses in Publicly-Held Companies' Contracts (manuscript 2010) (with Theodore Eisenberg)

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

Corporate, Contract and Securities Law

A Modest Proposal for Fixing Delaware's Broken Duty of Care, 2010 Columbia Business Law Review 319 (2010)

Un-manifested Harm in Business-to-Business Cases, 167 Journal of Theoretical and Institutional Economics 80-93 (2011)

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in 55 Rivista Delle Societá 680 (2010)

Bargains Bicoastal: New Light on Contract Theory, 31 Cardozo Law Review 1475 (2010)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

Constitutional Law

Confederacy, in The Encyclopedia of Political Thought (Wiley-Blackwell) (forthcoming)

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

Financial Institutions

Financial Private Regulation and Enforcement (manuscript, 2010)

Intellectual Hazard and the Design of Financial Stability Regulation, in University of St. Gallen Series in Law and Economics, Peter Nobel, ed. (Zurich: Schulthess, 2010) (with Gerald Rosenfeld)

Intellectual Hazard: How Conceptual Biases in Complex Organizations Contributed to the Crisis of 2008, 33 Harvard Journal of Law & Public Policy 807 (2010) (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law  (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund, Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds., Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin

America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito.  El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

<u>Legal History</u>

The Corporate Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

Jurisprudence

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

<u>Ancient Law</u>

Taxation, in Oxford Encyclopedia of the Bible and Law (Oxford University Press) (forthcoming)

Logos and Narrative, NYU School of Law, Public Law Research Paper No. 10-78 (2010)

Monarchy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-76 (2010)

Nationhood and Law in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-57 (2010)

Revelation and Legitimacy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-52 (2010)

The Book of Judges: The Hebrew Bible's Federalist Papers, NYU School of Law, Public Law Research Paper No. 10-66 (2010)

Consent of the Governed in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-56 (2010)

Nomadism, Dependency, Slavery and Nationhood: Comparative Politics in the Book of Exodus, NYU School of Law, Public Law Research Paper No. 10-49 (2010)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

The Dark Age:  How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Sovereignty and Conquest in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-61 (2010)

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East  113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

## Law and Society

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

<u>Other</u>:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

<u>Book Reviews</u>

Defusing the Banks' Financial Time Bomb, BusinessWeek (Mar. 11, 2010) (review of Robert Pozen, Too Big to Save?  How to Fix the U.S. Financial System

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

<u>Major Lectures</u>

Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Fresco Chair Lectures in Law and Finance, June 2010)

A Simple Theory of Takeover Regulation in the United States and Europe; Intellectual Hazard (Commerzebank Lectures, University of Frankfurt, May 2010)

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

<u>Journal Referee Reports</u>

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization
Review of Law and Economics

<u>Conferences Organized</u>

Fifth Annual NYU Global Economic Policy Forum (New York, New York, November 12, 2012) (co-organizer)

Tackling Systemic Risk: 2nd Annual Law & Banking/Finance Conference (Zurich, Switzerland, April 20-21 2012) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Judicial Dialogue on Mass Litigation, Florence Italy, October 15-16, 2010 (co-organizer of conference co-sponsored by NYU Law School, the American Law Institute, and the European University Institute)

Banking and Finance: 1st Annual Law and Banking/Finance Conference (Florence, Italy, April 15-16, 2011) (co-organizer with Prof. Gerard Hertig, ETH Zurich)

Finlawmetrics 2010: Central Banking, Regulation & Supervision after the Financial Crisis  (co-sponsor and member of steering committee)

Finlawmetrics 2009: After The Big Bang:  Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (co-sponsor and member of steering committee)

NYU Global Economic Policy Forum 2009: The Future of Regulation and Capital Markets (November 5, 2009) (co-organized with Professor Alan Rechtschaffen and with the NYU Law School Alumni Association)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors.  Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007).  Major conference (425 participants) exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007).  Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard.  Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006).  Major conference exploring all aspects of the empirical study of law.  Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997.  This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996).  This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions.  Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996).  This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and scholars from a variety of

disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995).  This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995).  This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994).  This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

<u>Professional Memberships and Positions</u>

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law
    Schools (1995)
Member of the Board of Directors, American Law and Economics Association
    (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and
    Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,
     Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
    Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
    of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

<u>Courses</u>

Legal Profession (1985-93; 1996-98; 2003-2007; 2013 (scheduled))
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008; 2012)
Seminar on Separation of Powers (1985, 1987)
Civil Procedure (1983-84; 2004-2005; 2011)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010; 2012)
Law and Business of Banking (2012; with Gerald Rosenfeld)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008; 2009; 2010; 2011; 2012)
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Italy, 2010)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009, 2010; 2011; 2012
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)
Banking Regulation in Crisis (University of Frankfurt, Germany, 2010)
Banking: Law and Economics Issues after the Financial Crisis (Study Center Gerzensee, 2012)

<u>Litigation and Alternative Dispute Resolution</u>

Brief and Reply Brief for Plaintiff-Appellant, <u>Glancy v. Taubman Centers, Inc</u>. No. 03-1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., <u>In Re: Visa Check/Mastermoney Antitrust Litigation</u>, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued <u>Moran v. Household Finance Corp</u>. (the "Poison Pill" case) in the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts.  Conducted depositions and other pretrial discovery.  (1982-1983)

Briefed and argued <u>Hodges v. Metts</u>, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of <u>American Psychological Association v. Birch Tree Press, et al</u>. (U.S. District Court, Washington, D.C. 1983).

<u>Deposit Insurance for Thailand</u>.  Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

<u>Schatz v. Blanchard</u>.  Neutral arbitrator in a commercial arbitration (2000)

<u>Expert Witness Testimony (past five years)</u>

<u>Lasker v. Kanas (North Fork Bancorporation Litigation)</u>, Index No. 06/103557, Supreme Court of the State of New York, County of New York (2007) (affidavit on fees)

<u>John Hancock Life Insurance Co. v. Goldman, Sachs & Co.</u>, No. 01-10729-RWZ, United States District Court, District of Massachusetts (2007) (declaration on fees)

<u>Comes v. Microsoft Corp.</u>, No. CL8211, Iowa District Court for Polk County (2007) (affidavit on merits relief and affidavit on fees)

<u>Figueroa v. Sharper Image Co</u>., Case No.: 05-21251, United States District Court, Southern District of Florida (2007) (declaration and testimony on coupon relief).

<u>Love v. Blue Cross & Blue Shield Association, et al.</u>, No. 03-21296-CIV-MORENO/SIMONTON, United States District Court, Southern District of Florida (2007) (declaration in opposition to settlement)

<u>Feuerabend v. UST, Inc.</u>, Case No. 02-CV-7124, Wisconsin Circuit Court for Milwaukee County (2007) (affidavit on fees and settlement; testimony at fairness hearing)

<u>White v. Experian Information Solutions, Inc.</u>, Case No. 05-cv-1070, United States District Court for the Central District of California (2007) (declaration on fairness of settlement and fee award)

<u>In re Trans Union Corp. Privacy Litigation</u>, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

<u>Hoffman v. American Express</u>, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

<u>In re Pet Foods Products Liability Litigation</u>, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (2008) (declaration on attorneys' fees)

Hensley v. Computer Sciences Corp., No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

Chivers v. State Farm Fire & Casualty Co., NO.: CV-2004-294-3, Circuit Court of Miller County, Arkansas (2008) (affidavit on certification)

EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009); second supplemental declaration (2010)

Tucker v. Scrushy, et al., Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

In Re: 2007 Wildfire Class Litigation, Master Case No.  2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

In re: Columbia Hospital for Women Medical Center, Inc., Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

In re Vioxx Products Liability Litigation, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

State of Missouri v. SBC Communications, Inc., No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

Alexander v. Nationwide Mutual Insurance Co., No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

Peterman v. North American Company for Life and Health Insurance, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (2009) (declaration on fees)

Holman v. Student Loan Xpress, Inc., Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (2009) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase, No. 09-00686 (Southern District of New York) (2010) (declaration on class certification)

Polion v. Wal-Mart Stores, Inc., No. 01-03645 (Superior Court of Massachusetts, Commonwealth of Massachusetts) (2010) (declaration on fees; supplemental declaration on fees and motion to strike counsel)

In re MoneyGram International, Inc. Securities Litigation, No. 08-883 (DSD/JJG), United States District Court, District of Minnesota (2010) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-00686 (SAS) (DF), United States District Court for the Southern District of New York (2010) (declaration and deposition on certification)

Coffey v. Freeport-McMoran Copper & Gold, Inc., No. CJ-2008-68, District Court of Kay County, State of Oklahoma (2010) (affidavit on certification)

In Re Puerto Rican Cabotage Antitrust Litigation MDL Docket No. 3:08-md-1960 (DRD), United States District Court for the District of Puerto Rico (2010) (declaration on fees)

In re XTO Energy Shareholder Class Action Litigation, No. 352-242403-09, District Court of Tarrant County, Texas, 352nd Judicial District (2010) (affidavit on fees)

The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon, Civil Action No. 09-Cv-06273, Southern District of New York (2011) (declaration on certification)

Iorio v. Asset Marketing Systems, Inc., Case No.: 05-CV-0633-JLS (CAB), Southern District of California (2011) (declaration in fees)

Villaflor v. Equifax Information Services, LLC, Case No.: 3:09-cv-00329-MMC, Northern District of California (2011) (declaration on fees)

Feely v. Allstate Insurance Company, Case No. CV-2004-294-3A, Circuit Court of Miller County, Arkansas (2011) (affidavit on settlement and fees)

Keegan v. American Honda Motor Co., Inc., Case Number:  2:10-cv-09508-MMM-AJW, United States District Court for the Central District of California (2011) (declaration on certification)

Compusource Oklahoma v. BNY Mellon, N.A., Case No: CIV 08-469-KEW, United States District Court for the Eastern District of Oklahoma (2011) (declaration on certification)

ABN Amro Bank v. Dinallo, Index No.: 601846/09 (New York State Supreme Court) (declaration and deposition on corporate restructuring/administrative law issue)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of America case; declaration and supplemental declaration on fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of Oklahoma case; declaration on fairness of settlement and fees)

In re Cell Therapeutics Inc. Securities Litigation, Master Docket No. C10-414 MJP, United States District Court for the Western District of Washington (2012) (declaration on fees)

In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL NO. 2179, Eastern District of Louisiana (2012) (declarations on economic and medical benefits class settlements)

Freudenberg v. eTrade Financial Corporation, Case No.: 07-CV-8538, United States District Court for the Southern District of New York (2012) (declaration on fees)

LaCour v. Whitney Bank, Case No. 8:11-cv-1896-VMC-MAP (United States District Court for the Middle District of Florida (2012) (declaration on settlement and fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Union Bank case; declaration on fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of the West case; declaration on fairness of settlement and fees)

## Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

Languages

Reading knowledge of Spanish, French, and Italian.

Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, l989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (l989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?,  1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 26l (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases l99 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program l987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson:  Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson:  Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors:  Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case:  Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case:  Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case:  What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen:  Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)

## Appendix B: Case Materials Reviewed

A.      Plaintiffs' Amended Consolidated Class Action Complaint dated February 20, 2009 and filed with the Court on February 24, 2009 [Dkt. No. 74]

B.      *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010) (opinion on the motion to dismiss)

C.      Plaintiffs' Memorandum of Law in Support of Unopposed Motion for (I) Preliminary Approval of Settlement, (II) Certification of the Settlement Class for Purposes of the Settlement and (III) Approval of Notice to the Settlement Class, dated and filed with the Court on August 29, 2012 [Dkt. No. 154]

D.      Stipulation and Agreement of Settlement and exhibits thereto filed with the Court on August 29, 2012 [Dkt. No. 155-1]

E.      The Court's Order Further Amending the Order Preliminarily Approving Proposed Settlement and Providing for Notice dated September 28, 2012 [Dkt. No. 159]

F.      Amendment to Stipulation and Agreement of Settlement dated October 18, 2012

G.      Notice of (I) Pendency of Class Action; (II) Proposed Settlement and Plan of Allocation; (III) Settlement Fairness Hearing; and (IV) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses

H.      Firm résumés of plaintiffs' counsel

I.      Institutional Shareholders Services, Inc's "Top 100 Settlements Quarterly Report"

J.      Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification dated  and filed with the Court on July 15, 2011 [Dkt. No. 104]

K.      Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification dated and filed with the Court on October 19, 2011 [Dkt. No. 109]

L.      Plaintiffs' Reply Memorandum of Law in Further Support of their Motion for Class Certification dated and filed with the Court on January 20, 2012 [Dkt. No. 144]

M.      Defendants' Sur-Reply Memorandum of Law in Further Opposition to Plaintiffs' Motion for Class Certification dated and filed with the Court on January 27, 2012 [Dkt. No. 147]

N.      Fee awards of securities class action cases that settled for $400 million and above

O.      Comparable billing rates of plaintiff and defense firms filed in court filings

## Appendix C: Surveys and Analyses Reviewed

A.      Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811 (2010)

B.      Theodore Eisenberg & Geoffrey Miller, "Attorney Fees and Expenses in Class Action Settlements: 1993-2008," 7 Journal of Empirical Studies 248-281 (2010) ("Eisenberg & Miller 2010")

C.      Theodore Eisenberg & Geoffrey Miller, "Attorneys' Fees in Class Action Settlements: An Empirical Study," 1 Journal of Empirical Legal Studies 27 (2004)

D.      Theodore Eisenberg, Geoffrey Miller & Michael Perino, A New Look at Judicial Impact: Attorneys' Fees in Securities Class Action After *Goldberger v. Integrated Resources, Inc.*, 29 Washington University Journal of Law & Policy 5 (2009)

E.      Logan, Stuart J., Moshman, Jack & Moore, Beverly C., Jr., Attorney Fee Awards In Common Fund Class Actions, 24 Class Action Rep. 167 (2003)

F.      Kolz, Amy, "Bankruptcy Rates Top $1,000 Mark In 2008-09." Weblog. The Am Law Daily.          12      Dec      2009,       available       at http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1202436371636

G.      National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog.   The   National   Law   Journal.   19   Dec   2011,   available   at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202535946626

H.      National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog.   The   National   Law   Journal.   6   Dec   2010,   available   at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202475713526&slreturn=1

I.      National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog.   The   National   Law   Journal.   7   Dec   2009,   available   at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202436068099

J.      National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog.   The   National   Law   Journal.   8   Dec   2008,   available   at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202436055916&hbxlogin=1

K.      National Law Journal, "A Nationwide Sampling of Law Firm Billing Rates." Weblog.   The   National   Law   Journal.   10   Dec   2007,   available   at http://www.law.com/jsp/nlj/PubArticlePrinterFriendlyNLJ.jsp?id=1197021870294

L.      Richard M. Phillips & Gilbert C Miller, The Private Securities Litigation Reform Act of 1995: Rebalancing Litigation Risks and Rewards for Class Action Plaintiffs, Defendants and Lawyers, 51 BUS. LAW. 1009, 1029 & n.131 (1996)

M.      Bower, Ward. Pricing Legal Services. Report to Legal Management. Newtown Square: Altman Weil, Inc., 2004, available at www.altmanweil.com/.../ce653539-fd49-4cfa-a6fe-2c68136304c3_document.pdf

N.      Brennan, William. New Survey Focuses on Law Firm Economics.  Report to Legal Management. Newtown Square: Altman Weil, Inc., 2008, available at www.altmanweil.com/.../41ff6ad2-da67-406e-9999-ca2aaae63539_document.pdf

O.      Ellen M. Ryan & Laura E. Simmons, Securities Class Action Settlements: 2009 Review and Analysis (Cornerstone Research 2010)

P.      Ellen M. Ryan & Laura E. Simmons, Securities Class Action Settlements – 2011 Review and Analysis, (Cornerstone Research, 2012), available at http://www.cornerstone.com/files/Publication/a0e54ba8-2830-4c00-9481 108208ec4ed8/Presentation/PublicationAttachment/f03e4174-ec8a-4eb3-ba22-19bd5162f09e/Cornerstone_Research_Settlements_2011_Analysis.pdf

Q.      Thomas E. Willging, Laura L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts; Final Report to the Advisory Committee on Civil Rules 69 (Federal Judicial Center 1996)

R.      Elaine Buckberg, Todd Foster, and Stephanie Plancich, Recent Trends in Securities Class Action Litigation: 2003 Early Update (NERA Feb. 2004), available at http://www.nera.com/extImage/NERA_Recent_Trends_2003_Early_Update.pdf_

S.      Jordan Milev et al., Recent Trends in Securities Class Action Settlements – 2011 Year-End Review, available at http://www.nera.com/nera-files/PUB_Trends_Year-End_1211_final.pdf

T.      Alex Vorro, Law Firm Billing Rates Steadily Climbing Despite Down Economy, Inside Counsel, Apr. 17, 2012, available at http://www.insidecounsel.com/2012/04/17/law-firm-billing-rates-steadily-climbing-despite-d

U.      Ronald I. Miller, Ph.D., Todd Foster, Elaine Buckberg, Ph.D., Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlement, Is Stabilization Ahead? (NERA Apr. 2006)

V.      Valeo Attorney Hourly Rates and Fees Database, 2010, available at http://www.valeopartners.com/reports.html