**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP SECURITIES LITIGATION | No. 07 Civ. 9901 (SHS) |
| | **ECF Case** |

# DECLARATION OF JOHN C. COFFEE, JR.

**Dated:  December 6, 2012**

JOHN C. COFFEE, JR., under penalty of perjury, declares as follows:

## I. INTRODUCTION

1.      I submit this Declaration in support of the motion of Kirby McInerney, LLP, lead counsel for plaintiffs in this action ("Lead Counsel"), for an award of attorneys' fees and reimbursement of expenses.  At the outset, I should acknowledge that my writings over nearly thirty years have frequently been critical of the performance of plaintiff's attorneys in class actions, and especially in securities class actions.  See, e.g., John C. Coffee Jr., Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534 (2006).  But even a critic must recognize that there are exceptions to any generalization, and this case stands out as a distinctive and exemplary exception.

2.      This settlement is distinguished by two unique features:  (1) it may be the largest securities class action settlement (or is at least one of the largest) in which the recovery is exclusively from a single corporate entity and is based solely on intentional fraud under Rule 10b-5 (and not on a negligence-based cause of action brought either under the Securities Act of 1933 or pursuant to the federal proxy rules of the Securities Exchange Act of 1934), and (2) it was not preceded by either a public enforcement proceeding (i.e., a criminal action or an SEC enforcement action[1]) or an accounting restatement.  Finally, it appears to be the third largest recovery growing out of the 2008 financial crisis and the 18th largest securities class action settlement overall.  The size of securities class action settlements has been declining since the era of the Enron, WorldCom, Tyco and Adelphia settlements, and this case stands out as a notable

---

[1] I am advised by Lead Counsel that the SEC did not commence an enforcement action in this case until July 2010, which was well after the briefing on the motion to dismiss had been completed.

exception.  That such a high recovery has been negotiated without class counsel riding on

the "coattails" of a public enforcement action or an accounting restatement underscores

that the class has done remarkably well in this case.  That level of success deserves

considerable weight in the fee award determination.

3.     Other factors also merit careful consideration. First, this action was settled

in the face of high risk and serious legal obstacles.  Plaintiffs' central claim that Citigroup

should have written down its portfolio of "super senior" tranches of CDOs as of the

beginning of the class period demands precision in accounting decisions and was

vulnerable to the response that a role for judgment and discretion is allowable in making

such decisions.  Indeed, Citigroup responded that, until the credit rating firms' October

2007 downgrades, it did not recognize how imperiled its "super senior" tranches were

and thus lacked scienter.  Of course, I cannot speak to whether this defense is justified by

the actual facts, but objectively this defense posed a serious litigation obstacle.  Further,

Citigroup could hope to portray itself as a victim of a world-wide economic collapse,

rather than as a perpetrator of a fraud.  Finally, the developing state of the law in the

Second Circuit on the line between statements and "opinions" with regard to accounting

disclosures (in particular in light of the Second Circuit's recent decisions in Fait v.

Regions Fin. Corp., 665 F.3d 105 (2d Cir. 2011) and City of Omaha v. CBS Corp., 679

F.3d 64 (2d Cir. 2012)[2], as later discussed) has moved adversely to plaintiffs' interests

and exposed plaintiffs to a considerable risk that they would be unable to prove scienter.

Second, the case was aggressively and fully litigated by experienced and highly

---

[2] Although Fait addressed liability under Sections 11 and 12 of the Securities Act of 1933, it
implies that certain "opinions" as to accounting issues are essentially judgments, which, even if
erroneous, do not necessarily establish scienter, unless both made in bad faith and objectively
false.

competent counsel on both sides and the settlement was based on the specific recommendation of a mediator who was an experienced judge.  Third, the class members appear to be more than satisfied, and no serious objection to the settlement or the fee award has been filed.[3]  Because many of these factors have been discussed at length in the Memoranda submitted by Lead Counsel, I will try to avoid replowing the same ground that they have already ably covered.

4.      Instead, this declaration will focus on (i) the empirical evidence on fee awards in similar class actions, (ii) the level of success in this case, (iii) the unique absence of a prior public enforcement proceeding, and (iv) the factor of risk.  To be sure, knowing what the average or median fee award has been does not necessarily tell the court what the optimal or appropriate fee award should be.  Empirical data seldom resolves normative issues.  But such information does provide a starting point and a baseline.  Thus, Part III of this declaration will cover the recent studies of class action settlements and fee awards in securities class actions, with particular emphasis on comparably large class actions.  Part IV will then turn to the relative success of plaintiff's counsel by examining the contemporary evidence on the ratio between settlement size and investor losses.  Part V will next examine the special feature in this case that plaintiffs did not free ride on the coattails of a public enforcement action.  Part VI will address the issue of risk and seek to assess the actual risks in this case.  Part VII will discuss the role of a lodestar cross check and review the risk multipliers used in other

---

[3] To date, only two objections have been filed, each by individual investors who purchased 100 shares and 73 shares, respectively. Because the deadline for objections is not until December 21, 2012, I anticipate that other objections may be filed and understand that Lead Counsel will respond in their reply papers, which are to be filed with the Court on January 4, 2013.

large class actions.  Part VIII will review the criteria for settlement approval as they apply to this case, and Part IX will set forth my conclusions.

## II.  BACKGROUND AND QUALIFICATIONS

5.      I am the Adolf A. Berle Professor of Law at Columbia University Law School, where I have taught since 1980, and am a member of the Bars of the State of New York and the District of Columbia.  I am also a Fellow of the American Academy of Arts and Sciences, a Life Fellow of the American Bar Foundation, and a member of, and former Reporter for, the American Law Institute.  I have also been a Visiting Professor of Law at Harvard Law School, Stanford Law School, the University of Virginia Law School, and the University of Michigan Law School.  I began my academic career teaching at Georgetown University Law School from 1976 to 1980.  Prior to that, I practiced law with the firm of Cravath, Swaine & Moore in New York City from 1970 to 1976.  I am a 1969 graduate of Yale Law School.

6.      As a law professor, one of my principal academic interests has been class action litigation (with a special focus on the management of the large class action and the incentive structure that the law creates to reward the successful plaintiff's attorney).  Although my academic interest in class actions does not make me more able than any other competent attorney to cite relevant precedent to this Court, my research has placed me in a position to call to this Court's attention recent empirical evidence concerning class action litigation and attorney fee awards.  This data has relevance because it supplies a frame of reference enabling this Court to compare the requested fee against relevant benchmarks and an appropriate sample of related cases.  Thus, rather than

duplicating class counsel's legal memorandum, I will focus instead on recent empirical studies regarding the typical recovery and fee award in class action litigation.

       7.      I have on a number of occasions testified before Congressional committees with regard to the federal securities laws and class actions, have appeared as a witness before the Advisory Committee on the Civil Rules of the United States Judicial Conference, and regularly appear as a panelist at symposia and institutes on the topics of securities law and class actions.  For the past seventeen years, I have been the opening lecturer at the annual ABA National Institute on Class Actions, and my annual survey of class action developments for this Institute is regularly published by the Bureau of National Affairs ("BNA").  During 1995, I served as an adviser to the White House's Office of General Counsel with regard to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which chiefly seeks to regulate securities class actions.  More recently, I advised the staff of the Senate Finance Committee with respect to the drafting of both the Sarbanes-Oxley Act in 2002 and the Dodd-Frank Act in 2010, and I testified before Senate and House Committees last year and this year with respect to the JOBS Act and other proposed legislation.

       8.      In addition, I have authored the following articles on class actions (which I cite in part to indicate that I am not contradicting prior positions or inventing a novel argument that I would not endorse apart from the facts of this case): John C. Coffee Jr., Litigation Governance:  Taking Accountability Seriously, 110 Colum. L. Rev. 288 (2010); John C. Coffee Jr., Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534 (2006); John C. Coffee Jr., Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter

Is Not Working, 42 Md. L. Rev. 215 (1983); John C. Coffee Jr., The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation, 48 Law & Contemp. Probs. 5 (Summer 1985); John C. Coffee Jr., Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669 (1986); John C. Coffee Jr., The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987), John C. Coffee Jr., and Donald E. Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposed Legislative Reform, 81 Colum. L. Rev. 261 (1981); John C. Coffee Jr., Rethinking the Class Action: A Policy Primer on Reform, 62 Ind. L. Rev. 625 (1987); John C. Coffee Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995), John C. Coffee Jr., The Future of the Private Securities Litigation Reform Act: or Why the Fat Lady Has Not Yet Sung, 51 Bus. Law. 975 (1996); John C. Coffee Jr., Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370 (2000). Some of these articles have been cited and relied upon by other federal courts, including the U.S. Supreme Court, in well-known decisions dealing with class actions and attorney fee awards. See, e.g., Ortiz v. Fibreboard Corp., 119 S. Ct. 2295, 2317 n.28 (1999); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 621 (1997).

9.      My work in the area of class actions and representative litigation also includes service (for over a dozen years) as a Reporter for the American Law Institute in connection with its effort to codify the common law rules of corporate law and fiduciary duties in a Restatement-like volume. See A.L.I., PRINCIPLES OF CORPORATE GOVERNANCE: Analysis and Recommendations (1992). I served as the Reporter for

Litigation Remedies, and this project specifically recommended standards for plaintiff's attorney fee awards in direct and derivative shareholder actions.  In connection with serving as Reporter for the American Law Institute, I have studied fee award procedures, met with many of the leading attorneys in the class and derivative action field, and have participated in numerous seminars, panels, and informal conferences with judges who have faced similar issues to those involved in this case.

10.     I have also served as an expert witness in a number of the largest class actions, including Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997); In re Enron Corp. Securities, Derivative & "ERISA" Litig., 586 F. Supp. 2d 732 (S.D. Tex. 2008); In re Visa Check/MasterMoney Antitrust Litig., 297 F. Supp. 2d 503 (E.D.N.Y. 2003); In re AOL Time Warner Inc. Sec. & "ERISA" Litig., No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006); In re Royal Ahold Sec. & "ERISA" Litig., 461 F. Supp. 2d 383 (D. Md. 2006); In re NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465 (S.D.N.Y. 1998); In re Sumitomo Copper Litig., 74 F.Supp. 2d 393 (S.D.N.Y. 1999); In re Cendant Corp. Sec. Litig., 182 F.R.D. 144 (D.N.J. 1998); In re Cendant Corp. Sec. Litig., 109 F.Supp. 2d 235 (D.N.J. 2000), aff'd 264 F.3d 201 (3d Cir. 2001); In re Lucent Tech. Inc. Sec. Litig., 327 F. Supp. 2d 426 (D.N.J. 2004); In re Waste Management, Inc. Sec. Litig., No. 97C7709 (N.D. Ill. 1999); In re Lease Oil Antitrust Litig. (No. II), 186 F.R.D. 403 (S.D. Tex. 1999); Shaw v. Toshiba America Info. Sys., 91 F.Supp. 2d 942 (E.D. Tex. 2000); and In re Diet Drugs Products Liability Litigation, MDL Docket No. 1203 (E.D. Pa. 2000).

11.     I am being compensated for my services in this matter at my usual hourly rate (which is $900 per hour).

### III.  THE EMPIRICAL DATA

12.     To gain an overall perspective on fee awards, it is useful to start with some historical data.  According to the National Economic Research Associates ("NERA"), a well-known and respected economics consulting firm, attorney fee awards in securities class actions long averaged roughly 32% of the settlement.  See Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, Recent Trends III: What Explains Settlements in Shareholder Class Actions?  (NERA, June 1995) (hereinafter "NERA Study").  Using data from 656 shareholder class actions that were settled, dismissed or resolved by a jury verdict between January 1991 and December 1994, the NERA Study specifically found:

> "Regardless of case size, fees average approximately
> 32 percent of the settlement."  (NERA Study at 7).

13.     Given the relevance of this conclusion, a closer look at their data seems warranted, and an abbreviated version of Table 5 from this study is thus set forth below:

### Table 1

### Plaintiff's Attorney Fees

| Settlement Range | Number of Settlements | Average Attorneys Fee as a Percentage | Median Attorney Fee as a Percentage |
|---|---|---|---|
| $0.00-$0.99 Mil | 27 | 30.31% | 30.00% |
| $1.00-$1.99 Mil | 45 | 31.99% | 33.33% |
| $2.00-$9.99 Mil | 162 | 31.99% | 33.33% |
| $10.00-$49.99 Mil | 53 | 31.36% | 32.00% |

| | | | |
|---|---|---|---|
| $50 + Million | 2 | 31.67% | 31.67% |
| **Total or Average:** | **289** | **31.71%** | **33.33%** |

14.     Although once accurate, the foregoing data may no longer reflect current practice and needs to be supplemented.  Fee awards as a percentage of the recovery appear to have declined over the last decade, probably for two distinct reasons:  (1) the PSLRA gave effective control over the securities class action to those institutional investors willing to serve as lead plaintiffs, and public pension funds in particular have exercised a restraining oversight over fee awards, and (2) fee awards have long been a declining percentage of the recovery, and the magnitude of securities class action settlements has soared over the last decade, with the result that the nine largest securities class action settlements are today all in excess of one billion dollars.[4]

15.     Today, attorney fee awards remain in the vicinity of 25% of the recovery (near where they were in earlier decades), until the recovery approaches approximately $500 million.  Once into this vicinity, fee awards begin to decline on a percentage basis. This is shown by the 2011 NERA Study, which finds fee awards in securities class actions to amount to 27.3% in cases where the settlement is between $25 million and $100 million, 22.2% in cases where the settlement is between $100 million and $500 million, and 8.3% in cases where the settlement is above $500 million.[5]

16.     The problem with such a statistical overview is that it ignores exactly the context of this case.  This is because the class recovery in the instant case ($590 million) falls on the seam between the last two categories discussed above:  i.e., the $100 to $500

---

[4] See Institutional Shareholder Services, Securities Class Action Services, "The SCAS 100 for Q1 2012," at p. 3.
[5] See Dr. Jordan Miley, Robert Patton and Syetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review" (NERA 2011) at p. 27 (Figure 29).

million category (where the median fee award is 22.2%); and the above $500 million

category (where the median fee award is 8.3%).  That last category extends from $500

million to the $7.2 billion settlement in the Enron case and the $6.15 billion settlement in

WorldCom class action.  Any category that extends from $500 million to $7.2 billion

inherently overaggregates, and thus the median fee award for such an overbroad category

can be misleading.

17.     Thus, in my opinion, it is more useful (and certainly more informative) to

look at the fee awards in cases that straddle the $590 million recovery in this case.  The

following table sets forth the settlement, fee award and lodestar multiplier in securities

class actions since 2000 in which the settlement ranged from $490 million to $690

million (which is a $100 million band around the $590 million settlement in this case).[6]

| Case Name | Settlement Amount | Fee Award | Fee Award As A Percentage of the Settlement | Lodestar Multiplier |
|---|---|---|---|---|
| 1. In re Wachovia Preferred Secs. & Bond/Notes Litig., 2011 U.S. Dist. LEXIS 155622 (S.D.N.Y. Dec. 30, 2011) | $627 million | $75.24 million | 12% | 2.3 |
| 2. In re Lucent Techs. Inc. Sec. Litig., 327 F. Supp. 2d 426, No. 00-cv-621 (D.N.J. July 19, 2004) | $608,350,000 (combined on behalf of the securities, ERISA, noteholders, debt holders and derivative classes) | $102,477,000 | 16.8% (average of the five cases) | 2.14 (average of the five cases) |
| 3. In re Countrywide Fin. Corp. Sec. Litig., No. 07-cv-05295 (C.D. Cal. March 4, 2011) | $601.5 million | $46.50 million | 7.7% | .67 |

_____

[6] This more focused table has been updated from that in Carlson v. Xerox Corp., 596 F. Supp. 2d 400, at 405-06 (D. Conn. 2009).

| | | | | |
|---|---|---|---|---|
| 4. <u>In re Cardinal Health, Inc. Sec. Litig.</u>, 528 F. Supp. 2d 752, 2007 U.S. Dist. LEXIS 95127 (S.D. Ohio Dec. 31, 2007) | $600 million | $108 million | 18% | 5.9 |
| 5. <u>In re Initial Pub. Offering Sec. Litig.</u>, 671 F. Supp. 2d 467, 516 (S.D.N.Y. Oct. 5, 2009) | $586 million | $170.1 million | 33.30% | 0.5 |
| 6. <u>In re Lehman Brothers Sec. and ERLSA Litig.</u>, No. 09-md-2017, slip op. at 3 (S.D.N.Y. June 29, 2012) | $516,218,000 | $56,729,265 | 11% | 1.5 |
| 7. <u>In re Bank America Corp. Sec. Litig.</u>, 228 F. Supp. 2d 1061 (E.D. Mo. 2002) | $490 million (combined on behalf of the BankAmerica classes and NationsBank classes) | $86.40 million | 18% | 3 (average of the two cases) |

18.     In the foregoing seven cases that straddle the $590 million settlement in this case, a fee award that in percentage terms was equal to, or in excess of, that here requested was awarded in four cases, and a lower fee was awarded in three cases. Further, the average fee percentage in these seven cases (treating each case equally) was 16.69%, and the average lodestar multiplier was 2.29. The requested fee award (16.5%) is slightly below this average, while the lodestar multiplier in this case is significantly lower. If we look at the two cases closest to this recovery, (i.e., <u>Cardinal</u> and <u>In re IPO Sec. Litig.</u>), their fee percentages are 18% and 33.3%, respectively. On this basis, I would conclude that the proposed 16.5% fee award in this case is consistent with the recent practice in comparable cases and does not exceed those norms. Immediately, I must emphasize that this consistency does not prove that the proposed fee award is therefore appropriate or reasonable for this case. That is a normative question. My initial point is only that, in terms of the empirical evidence on comparable fee awards, the

proposed fee award seems within the mainstream of fee awards in recent comparable securities class actions.

### IV.  **RELATIVE SUCCESS: Measuring Class Counsel's Contribution**

19.     A large recovery does not, of itself, prove that class counsel has been particularly successful.  Conceivably, class counsel could have settled for a trivial recovery in terms of the potential damages.  On the other hand, when very large damages are sought, defendants are subject to inevitable solvency constraints.  In addition, defendants might prefer to file for bankruptcy (or at least threaten to do so) than to pay astronomic damages.  As a result, the best relative measure of class counsel's success is the percentage of the maximum recoverable damages that the settlement achieved.  But here, it must also be recognized that, as the level of damages increases, the percentage that the settlement will bear to those damages will normally decline because of solvency constraints on the defendant.  To sum up, settlement value as a percentage of investor losses tends to decline as investor losses increase.

20.     This pattern is clearly shown in the diagram set forth below from the NERA 2011 Mid-Year Review of securities class actions:[7]

---

[7] Id. at p. 29 (Figure 32).





Settlement Value as a Percentage of Investor Losses, by Level of Investor Losses (January 1996 to June 2011)

As this study shows, when investor losses are between $5 billion and $10 billion, the average settlement is approximately 2.2% of investor losses and the median settlement is 1%.  Similar data has been published by Cornerstone Research, another well-recognized economic consulting firm, which found that the median settlement as a percentage of "estimated damages" was 1% in those cases where the estimated damages were in excess of $5 billion (as here).[8]  Even if we looked instead at the next lower estimated damages range (i.e., $1 billion to $5 billion) in the Cornerstone study, the percentage rises only from 1% to 1.1%.  In short, this relationship is stable.

---

[8] See Ellen M. Ryan and Laura E. Simmons, Securities Class Action Settlements:  2011 Review and Analysis at p. 7.  This percentage was based on settlements between 1996 and 2010.  If only 2011 settlements are used, the percentage falls to 0.4%.

21.     Against this backdrop, the actual settlement in this case appears extremely favorable to the investor class.  Here, I am advised that plaintiffs' damages expert computed the maximum recoverable damages at $6.3 billion.  Although such estimates are not infallible, damages experts have no incentive to understate damages; rather, their incentive is to estimate damages generously for plaintiffs.  But any overstatement of damages would make the recovery ratio appear less impressive.  As a result, even if the damages experts overstated (which I do not assume), that possibility only makes the recovery here more impressive.  More specifically, based on $6.3 billion estimated damages, the recovery in this case at the median settlement rate would have been $63 million (or 1% of $6.3 billion).  Instead, it was $590 million—or over 9 times that projected figure.  Put differently, if we look to the NERA data, this settlement appears to be more than four times their average recovery and more than nine times their median recovery.[9]  If we instead look to the Cornerstone study, this settlement is more than nine times the median settlement in their study.[10]  In short, whatever the study used, this settlement is much superior to comparable settlements and so merits a correspondingly superior fee award.

## V.  <u>THE ABSENCE OF A PRIOR PUBLIC ENFORCEMENT PROCEEDING</u>

22.     One other factor truly stands out about this case and underscores Lead Counsel's achievement.  If one examines a list that Institutional Shareholder Services

---

[9] That is, the above NERA chart shows the median recovery to be 1% and the average recovery to be 2.2% of estimated damages.

[10] The Cornerstone study found the median settlement to be 1% of "estimated damages" in cases over $5 billion and 1.1% in cases between $1 billion and $5 billion.  See Ryan and Simmons, supra note 8, at p. 7.

published in 2010 of the fifteen largest securities class action settlements,[11] one finds a predictable common denominator:  in each of them, the private settlement was preceded by one or more public enforcement actions (often several and sometimes a highly publicized criminal indictment).  Such public enforcement actions both signal to the court that the case has merit, generate unfavorable publicity (and a hostile public reaction) that may make it virtually impossible for defense counsel to mount an effective defense or take the risk of a jury trial, and benefit private follow-up cases by developing facts and evidence.  As discussed below, no such benefit was received in this case, where the SEC's action was not commenced until after the briefing had been completed on the motion to dismiss in this case.  The following table summarizes this pattern of prior enforcement actions preceding major class action settlements.

Top 15 Securities Class Action Settlements

1.  In re Enron Corp. Sec., Derivative & "ERISA" Litig., 586 F. Supp. 2d 732 (S.D. Tex. 2008)[12]

    The SEC brought charges against the company and certain executives in October 2002; the investigation was ongoing before that, as Andrew Fastow had to be compelled to comply with a subpoena in December 2001. Settlements against various executives began in 2007; Ken Lay and Jeff Skilling were convicted by a jury of fraud and conspiracy in May 2006.  The class actions settled at various dates, but primarily in 2006.

2.  In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 353-59 (S.D.N.Y. 2005)[13]

---

[11] There are different lists of the fifteen largest securities class action settlements, but nothing of importance follows from the choice of which list is used.  I have here largely used the Institutional Shareholder Service list.  See I.S.S., "Securities Class Action Services:  The SCAS 100 for Q2 2010."  This list is, however, slightly out of date.

[12] The information set forth in the text is based upon the following sources:
http://www.sec.gov/spotlight/enron.htm
http://www.justice.gov/enron/
http://www.justice.gov/opa/pr/2003/May/03_crm_268.htm
http://www.sec.gov/news/press/2003-32.htm

The SEC charged the company and executives in June 2002.  Civil settlements were approved by Judge Rakoff in July 2003.  WorldCom's chief executive officer was indicted and convicted, and its chief financial officer plead guilty.  WorldCom, itself, entered into a Non-Prosecution Agreement with the United States Attorney for the Southern District of New York in 2005.

3.  <u>In re Cendant Corp. Securities Litig.</u>, 109 F. Supp. 2d 285 (D.N.J. August 16, 2000) (original decision awarding 8.275%), rev'd by 264 F.3d 201 (3d Cir. 2001), decision on remand, 243 F. Supp. 2d 166 (D.N.J. Feb. 5, 2003).[14]

The SEC brought an administrative action as well as civil actions in June 2000 against Cendant and its top executives for fraud.  Further civil enforcement actions were brought in February 2001.  Criminal prosecutions of individual officers were later filed, but the convictions followed the civil settlement.

4.  <u>In re Tyco Int'l, Ltd. Multidistrict Litig.</u>, 535 F. Supp. 2d 249, 265-74 (D.N.H. 2007)[15]

The SEC brought action against the chief executive officer (Dennis Kozlowski) and two others in September 2002.  Kozlowski was sentenced to up to 25 years in September 2005; also convicted was former chief financial officer Mark Swartz and another financial vice president.  The SEC filed a civil injunctive action on April 17, 2006.

5.  <u>In re AOL Time Warner Inc. Sec. & ERISA Litig.</u>, No. 02 Civ. 5575 (SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006)[16]

---

[13] The information set forth in the text is based upon the following sources:
http://www.sec.gov/spotlight/worldcom.htm
http://www.sec.gov/litigation/litreleases/lr17588.htm
http://www.sec.gov/litigation/litreleases/lr17594.htm
[14] The information set forth in the text is based upon the following sources:
http://www.sec.gov/litigation/litreleases/lr16910.htm
http://www.sec.gov/news/press/2000-80.txt
http://www.sec.gov/litigation/admin/34-42933.htm
[15] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2002-177.htm
http://www.sec.gov/litigation/litreleases/lr17896.htm
http://www.sec.gov/litigation/litreleases/2006/lr19657.htm
http://money.cnn.com/2005/09/19/news/newsmakers/kozlowski_sentence/
[16] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2005-38.htm
http://www.sec.gov/litigation/litreleases/2011/lr22109.htm
http://sec.gov/litigation/litreleases/2008/lr20586.htm
http://www.washingtonpost.com/wp-dyn/articles/A53801-2005Mar21.html
http://www.theregister.co.uk/2005/03/22/aol_sec/

The SEC charged and announced a settlement with Time Warner, Inc. (which came to $308 million) in March 2005. The Department of Justice also settled with AOL Time Warner pursuant to a deferred prosecution agreement in 2008 for $150 million.

6.   In re Nortel Networks Corp. Sec. Litig., No. 01-CV-1855 (RMB), Dkt. No. 194 (S.D.N.Y. Jan. 29, 2007), aff'd, In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129, 134 (2d Cir. 2008) (Nortel I)[17]

The investigation began in April of 2004. In October 2007, Nortel settled with the SEC for $35 million in civil penalties, plus ongoing reporting.

7.   In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 387 (D. Md. 2006)[18]

The SEC charged the company and certain top executives in October 2004; Royal Ahold settled in October 2004. Nine more executives were charged with insider trading in January 2005; seven more executives were charged in November 2005. The United States Attorney for the Southern District of new York also entered into a non-prosecution agreement with Royal Ahold in 2006.

8.   In re Nortel Networks Corp. Sec. Litig.,No. 05-MD-1659 (LAP), slip op. at 10 (S.D.N.Y. Dec. 20, 2006) (Nortel II)[19]

---

[17] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2007/2007-39.htm
http://www.sec.gov/litigation/litreleases/2007/lr20333.htm
http://www.sec.gov/litigation/litreleases/2007/lr20275.htm
http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100229708
http://www.engadget.com/2007/06/08/sec-to-fine-nortel-up-to-100-million-for-shadyaccounting/
http://tech.mit.edu/V124/N17/17_long_4.17w.html
[18] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2004-144.htm
http://www.sec.gov/news/press/2005-157.htm
http://www.sec.gov/litigation/litreleases/lr18929.htm
http://www.washingtonpost.com/wp-dyn/articles/A30807-2004Oct13.html
www.sec.gov/litigation/complaints/comp18929-1.pdf
http://www.sec.gov/news/speech/spch011305lct.htm
http://www.sec.gov/litigation/litreleases/2009/lr21168.htm
http://www.sec.gov/litigation/litreleases/lr19034.htm
http://www.sec.gov/litigation/litreleases/lr19454.htm
[19] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2007/2007-39.htm
http://www.sec.gov/litigation/litreleases/2007/lr20333.htm
http://www.sec.gov/litigation/litreleases/2007/lr20275.htm
http://www2.nortel.com/go/news_detail.jsp?cat_id=-8055&oid=100229708
http://www.engadget.com/2007/06/08/sec-to-fine-nortel-up-to-100-million-for-shadyaccounting/

The investigation began in April of 2004.  In 2007, Nortel settled with the SEC for $35 million in civil penalties, plus other reforms.

9.  <u>In re McKesson HBOC, Inc. Sec. Litig.</u>, 2006 U.S. Dist. LEXIS 97646, No. 99-CV-20743, Dkt. No. 1444, slip op. at 1 (N.D.Cal. Feb. 24, 2006); <u>In re McKesson HBOC, Inc. Sec. Litig.</u>, No. 99-CV-20743, Dkt. No. 1560, slip op. at 1 (N.D.Cal. Apr. 13, 2007); <u>In re McKesson HBOC, Inc. Sec. Litig.</u>, No. 99-CV-20743, Dkt. No. 1727, slip op. at 1 (N.D.Cal. Jan. 18, 2008)[20]

The SEC announced the filing of charges against two senior executives in October, 2000; six other executives were charged in another SEC complaint, which was filed in September, 2001.  The former general counsel was permanently enjoined from committing future violations of the securities laws, barred from acting as an officer or director of a public company for five years and ordered to pay a civil penalty of $60,000.  In separate actions, the U.S. Attorney for the Northern District of California indicted two of the company's officers.

10. <u>In re UnitedHealth Group Inc. PSLRA Litig.</u>, 643 F. Supp. 2d 1094 (D. Minn. 2009)[21]

The SEC filed and settled its actions in December 2007 and 2008.  One officer (General Counsel David J. Lubben) paid a $575,000 civil penalty and consented to a five year officer and director bar.  The SEC's enforcement action culminated in 2007 with the imposition of a $468 million penalty against William McGuire, the former chief executive officer and Chairman, which amount represents the largest civil penalty imposed against an individual in an options backdating case.

11. <u>In re HealthSouth Corp. Stockholder Litig.</u>, No. 03-cv-1500, Dkt. No. 1112 (N.D. Ala. Feb. 12, 2008), Dkt. No. 1617 at 1 (N.D. Ala. June 12, 2009); Dkt. No. 1721 (N.D. Ala. July 26, 2010)[22]

---

http://tech.mit.edu/V124/N17/17_long_4.17w.html

[20] The information set forth in the text is based upon the following sources:

http://www.sec.gov/litigation/litreleases/lr16743.htm

http://www.sec.gov/litigation/litreleases/2010/lr21444.htm

http://www.sec.gov/litigation/litreleases/lr17189.htm

http://www.sec.gov/litigation/litreleases/lr18170.htm

[21] The information set forth in the text is based upon the following sources:

http://www.sec.gov/news/press/2008/2008-302.htm

http://www.sec.gov/news/press/2007/2007-255.htm

http://www.sec.gov/litigation/litreleases/2008/lr20836.htm

http://www.sec.gov/litigation/litreleases/2007/lr20387.htm

[22] The information set forth in the text is based upon the following sources:

http://www.sec.gov/news/press/2003-34.htm

http://www.sec.gov/litigation/complaints/comphealths.htm

The SEC charged the company and its chief executive officer in March, 2003. CEO Scrushy settled with the SEC in April, 2007, and was later convicted on unrelated bribery charges in June 2007.  The SEC announced its settlement in July, 2010.  HealthSouth paid $100 million to settle the SEC charges that it had inflated its earnings.

12. <u>Carlson v. Xerox Corp.</u>, No. 00-CV-0910, 596 F. Supp. 2d 400 (D. Conn. Jan. 14, 2009)[23]

The SEC filed its suit in April 2002.  Management settled in June 2003. KPMG settled in April, 2005.  Six individual defendants agreed to pay over $22 million in penalties, disgorgement and interest, and in addition to forfeit certain deferred bonuses.  Xerox paid a $10 million penalty.

13. <u>In re Lucent Tech., Inc., Sec. Litig.</u>, No. 00-cv-621 (D.N.J. Jul. 19, 2004)[24]

The SEC settled its action in May, 2004.  Lucent paid a penalty of $25 million; a number of senior officers paid civil penalties, and three officers agreed to be barred from serving as an officer and director of a public company.

14. <u>In re Countrywide Fin. Corp. Sec. Litig.</u>, No. 07-cv-05295 (C.D. Cal. March 4, 2011) (slip op.)[25]

---

http://www.sec.gov/news/digest/dig031903.txt
http://www.sec.gov/litigation/litreleases/lr18044.htm
http://www.sec.gov/litigation/litreleases/2007/lr20084.htm
http://www.sec.gov/news/press/2010/2010-132.htm
[23] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/headlines/xeroxsettles.htm
http://www.sec.gov/litigation/complaints/complr17465.htm
http://www.sec.gov/news/press/2003-70.htm
http://www.sec.gov/news/press/2003-16.htm
http://www.sec.gov/litigation/litreleases/lr17465.htm
http://www.sec.gov/litigation/litreleases/lr18174.htm
http://www.sec.gov/news/press/2002-52.txt
[24] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2004-67.htm
http://www.sec.gov/litigation/litreleases/lr18715.htm
http://www.sec.gov/litigation/litreleases/lr19437.htm
[25] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2009/2009-129.htm
http://www.sec.gov/news/press/2010/2010-197.htm
www.sec.gov/litigation/complaints/2009/comp21068.pdf
http://www.mortgagenewsdaily.com/10182007_Mozilo_Investigation.asp

The SEC investigation began in October 2007; the SEC charged three Countrywide executives in June 2009.  Ex-CEO Angelo Mozilo settled in October 2010, paying the what has been reported to have been the largest civil penalty ever imposed against a public company's senior executive as of that time, plus disgorgement and a permanent bar from serving as an officer or director of a public company.

15. In re Cardinal Health, Inc. Sec. Litig., No. 04-575, 2007 U.S. Dist. LEXIS 95127 (S.D. Ohio Dec. 31, 2007; Nov. 14, 2007)[26]

The SEC filed a civil action against the company in July 2007, and against its executives in May 2009.  Cardinal Health paid a $35 million civil penalty and three senior officers paid civil penalties and agreed to bars against their serving as officer or director of any public company for varying periods.

23.    Since the time of the foregoing list, there have been at least two additional class action settlements (other than this one) that appear to belong on this list:  (1) In re Am. Intl Group Inc. Sec. Litig., 2012 U.S. Dist. LEXIS 13784 (S.D.N.Y. Feb. 2, 2012) (a $725 million class action settlement); and (2) In re Wachovia Preferred Secs. & Bond/Notes Litig., 2011 U.S. Dist. LEXIS 155622 (S.D.N.Y. Dec. 30, 2011) (a $627 million class action settlement).  The AIG case is unique in that the SEC had earlier imposed a $800 million penalty on AIG for accounting misstatements in 2006, which still constitutes the largest SEC penalty on record; also, AIG's CEO, Hank Greenberg, paid $15 million to settle related SEC charges.  Ultimately, AIG, almost as much as Lehman, was the iconic symbol of the 2008 crisis.  In the case of Wachovia, it was the subject of an SEC enforcement action, which resulted in a $46 million settlement with the SEC on December 8, 2011.  See NERA, "SEC Settlement Trends 1H12 Update" (June 27, 2012) at p. 5.  In fairness, the Wachovia class action probably is similar to this case in that

---

[26] The information set forth in the text is based upon the following sources:
http://www.sec.gov/news/press/2007/2007-147.htm
http://www.sec.gov/litigation/litreleases/2007/lr20212.htm
http://www.sec.gov/litigation/litreleases/2009/lr21058.htm

public enforcement did not play a significant role in aiding the private enforcers, but both cases thus stand out as exceptions to the general rule.[27]

24.     In marked contrast to the foregoing cases, the SEC here only brought an enforcement action against Citigroup a full seventeen months after the complaint in this case was filed and also after the conclusion of the briefing on the critical motion to dismiss.  Furthermore, the SEC's allegations only related to a portion of the class period, and the SEC relied exclusively on a non-scienter based theory.  It may also be revealing that this Court's opinion on the motion to dismiss did not mention the SEC's action.  No United States Attorney has brought any related proceeding.  As a result, plaintiffs' attorneys in this case received little benefit from public enforcement actions and could not "free ride" on them.  Nor did the SEC's action with respect to Citigroup generate any significant reputational damage or adverse publicity that benefitted the private plaintiffs.  Indeed, because the District Court refused to accept the settlement (and the case remains on appeal),[28] the message the public saw was that the SEC had entered into an apparently weak settlement.  At a minimum, the SEC's delay and failure to assert a scienter-based cause of action against Citigroup sent at least an implicit signal that the SEC was not aware of fraudulent conduct in the company's financial reporting.  Hence, Lead Counsel faced a significantly greater uphill battle in securing a settlement in this case than in cases where it could point to an early public enforcement action.  A number of Southern and Eastern District decisions have recognized that an enhanced fee award is justified when the plaintiff does not in effect "free ride" on the efforts of prior governmental

---

[27] It is also worth noting that the Wachovia class action settlement was based on a non-scienter theory.  Plaintiffs' claims in that case did not require plaintiffs to prove loss causation or scienter, and there were multiple corporate defendants.  Thus, Lead Counsel faced higher risk in this case.
[28] See SEC v. Citigroup Capital Markets, Inc., 827 F. Supp. 2d (S.D.N.Y. 2011), stay granted, 673 F.3d 158 (2d Cir. 2012).

enforcement proceeding, but rather proves the violation on its own.  See, e.g., In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 523-24 (E.D.N.Y. 2003); In re Gulf Oil/Cities Service Tender Offer Litig., 142 F.R.D. 588, 597 (S.D.N.Y. 1992). This is essentially a similar such case.

25.     Accounting restatements are also a common denominator in the vast majority of large securities class action settlements.  One recent study finds that, in fourteen out of the fifteen largest class actions listed above, a restatement was announced of the defendant issuer's financial statements.[29] Although restatements do not by themselves prove fraud, they greatly simplify plaintiff's counsel's burden by showing that a conceded error was made in the issuer's financial reporting.  Once again, this case proceeded without the benefit of any such assistance.

## VI.  RISK LEVEL

26.     This was not a Section 11 case, but a Rule 10b-5 action in which plaintiffs needed to prove scienter.  The SEC's willingness to settle its action under Section 17 of the Securities Act of 1933, which generally does not require proof of scienter, lended little, if any, support to plaintiffs in this case and may have even suggested to some that the evidence of scienter was thin.  Moreover, at the time plaintiffs filed this class action, there was serious doubt that they could plead with particularity facts giving rise to a strong inference of fraud (as required by Section 21D(b)(2) of the Securities Exchange Act).  A basic distinction must be drawn here:  this is not a case about Citigroup selling toxic CDOs to others.  In such cases, scienter is easier to infer.  Rather, this is a case about Citigroup holding onto a high risk portfolio and not disclosing the risk to its

---

[29] See ISS, Securities Class Action Services:  The SCAS 100 for Q2 2010, at p. 27 (listing largest restatements and listing fourteen of the fifteen class actions on this list).

shareholders.  In such a case, it is at least as plausible to believe that Citigroup did not fully appreciate the risks it was subject to (and thus lacked scienter).  In short, plaintiffs face a much more uphill battle to establish scienter in such a case.

27.     In <u>City of Omaha v. CBS Corp.</u>, 679 F.3d 64 (2d Cir. 2012), the Second Circuit has recently shown how difficult it is to allege successfully that defendant delayed fraudulently in writing down assets on its balance sheet.  There, plaintiffs claimed that CBS overvalued certain assets in early to mid-2008 and had conducted an interim impairment test ahead of schedule, but failed to disclose the results of this test (which in their view should have been disclosed "no later than June 30, 2008."  *Id.* at 66).  The Second Circuit concluded (as it had similarly found in <u>Fait v. Regions Fin. Corp.</u>, 655 F.3d 105, 108,110 (2d Cir. 2011), that defendants' statements about the value of its goodwill "'did not involve misstatements or omissions of material fact, but rather misstatements regarding . . . . opinion.'"  *Id.* at 67.  Thus, the plaintiffs had to "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them" to plead a material misstatement or omission."  *Id.*  It added that this principle applied the same whether the case was based on Sections 11 and 12 of the Securities Act of 1933 or Sections 10(a) and 20(b) of the 1934 Act.  *Id.* at 68.  Although distinctions can be drawn and I reach no conclusion on the ultimate merits, it is particularly difficult to plead and prove that defendants' failure to write down assets was motivated by fraud.  In short, Lead Counsel faced in my judgment much greater risk than in this case than in most securities class actions.

28.     I am further advised that this case was brought on a wholly contingent fee basis, without any guarantee of even reimbursement of out-of-pocket expenses.  That

may be standard in most securities class actions, but in this case the expenses and lodestar were substantially above average.  Lead Counsel advises me that the professional staff (which includes attorneys, paralegals, law clerks, analysts and administrative support staff) who worked on this case totaled 188, and that Lead Counsel expanded the number of their employees expressly to handle this case.  Overall, the total lodestar exceeded $51.4 million and total expenses came approximately to $3 million in out-of-pocket cases.  In short, the investment and risk here far exceeded that in the typical securities class action.

## VII.  THE LODESTAR CROSS-CHECK

29.     The Second Circuit today recommends the use of a lodestar cross-check. See, e.g., Goldberger v. Integrated Resources, 209 F.3d 43, 50 (2d Cir. 2000).  The purpose of this cross check is to assure that plaintiff's counsel is not receiving a windfall under the percentage of the recovery method.  Such a windfall might result, for example, if counsel had piggybacked on the efforts of a public enforcer and achieved a quick settlement in the immediate wake of a public enforcement action.  Here, however, I am informed that the cumulative lodestar of the plaintiffs' attorneys in this action, computed at their normal hourly rates, came to $51,438,451.15.  If we divide this lodestar amount into the requested fee award of approximately $97,350,000, the resulting lodestar multiplier is 1.89, which, as next discussed, is well below the historic average risk multiplier.

30.     There is relatively little comprehensive data regarding the lodestar multiplier in large class action litigation (because most reported decisions simply do not indicate the multiplier, as they do not apply a lodestar cross-check).  However, a study by

Logan, Moshman, and Moore found that in cases in which the recovery exceeded $100 million, the average multiplier was 4.50.[30] The following table shows that multipliers above 3.5 have become relatively common over the last two decades:

## Table 5: Recent Multipliers

| Case | Multiplier |
|------|:----------:|
| Weiss v. Mercedes-Benz of North America, Inc., 899 F. Supp. 1297 (D.N.J. 1995), aff'd, 1995 U.S. App. LEXIS (3d Cir. 1995) | 9.3 |
| Perera v. Chiron Corp., No. 95-20725-SW (N.D. Cal. 1996) | 9.14 |
| Cosgrove v. Sullivan, 759 F. Supp. 166 (S.D.N.Y. 1991) | 8.84 |
| In re Buspirone Antitrust Litig., No. 01-CV-7951 (JGK), MDL Docket No. 1413 (S.D.N.Y. Apr. 17, 2003) | 8.46 |
| Newman v. Carabiner Int'l, Inc., No. 99 Civ. 2271 (S.D.N.Y. Oct 19, 2001) | 7.7 |
| In re Rite-Aid Corp. Sec. Litig. ("Rite Aid II"), 362 F. Supp. 2d 587 (E.D. Pa. 2005) | 6.96 |
| In re Cendant Corp. Litig., 243 F. Supp. 166 (D.N.J. 2003) | 6.875 |
| In re 3COM Corp. Sec. Litig., No. C-97-21083 (N.D. Cal. Mar. 9, 1999) | 6.67 |
| In re Triangle Industries Sec. Litig., No. 10466, 1991 Del. Ch. LEXIS 203 (Del. Ch. Dec. 19, 1991) | 6.6 |
| In re RJR Nabisco, Inc. Sec. Litig., MDL No. 818, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) | 6.0 |
| In re Cardinal Health, Inc. Sec. Litig., 528 F. Supp. 2d 752 (S.D. Ohio 2007) | 5.9 |
| Roberts v. Texaco, 979 F. Supp. 185 (S.D.N.Y. 1997) | 5.5 |
| Lemmer v. Golden Books, No. 98 Civ. 5748 (S.D.N.Y. Oct. 12, 1999) | 5.38 |
| In re Waste Management Sec. Litig., No. 99-2183, Dkt. No. 248 (S.D. Tex. April 29, 2002) | 5.296 |

---

[30] See Logan, Moshman & Moore, Jr., "Attorney Fee Awards in Common Fund Class Actions," 24 Class Action Reports 169 (2003).

| | |
|---|---|
| In re Enron Corp. Sec., Deriv. & ERISA Litig., 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) | **5.2** |
| Feerer v. Amoco Production Co., No. 95-0012, 1998 U.S. Dist. LEXIS 22248 (D.N.M. May 28, 1998) | **4-5** |
| In re Nortel Networks Corp. Sec. Litig., No. 05-MD-1659 (LAP), Dkt. No. 77 (S.D.N.Y. Dec. 26, 2006) | **4.773** |
| Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358 (S.D.N.Y. 2002) | **4.65** |
| Willson v. New York Life. Ins. Co., No. 94-127804, 1995 N.Y. Misc. LEXIS 652 (N.Y. Sup. Ct. Nov. 8, 1995) | **4.6** |
| In re Rite-Aid Corp. Sec. Litig. ("Rite Aid I"), 146 F. Supp. 2d 706 (E.D. Pa. 2001) | **"4.5 to 8.5"** |
| Rabin v. Concord Assets Group, Inc., No. 89 Civ. 6130 (LBS) 1991 U.S. Dist. LEXIS 18273, [1991-92 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,471 (S.D.N.Y. Dec. 19, 1991) | **4.4** |
| In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109 (D.N.J. 2002) | **4.3** |
| In re Dynegy Inc. Sec. Litig., Master File A-02-1571, Dkt. No. 686 (S.D. Tex. July 7, 2005) | **4.07** |
| In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | **4.04** |
| In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465 (S.D.N.Y. 1998) | **3.97** |
| In re AOL Time Warner, Inc., SEC & ERISA Litig., No. 02-Civ. 5575 (SWK), 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | **3.69** |

31.     Beyond the above cases, some of which award particularly high multipliers, there has been more general recognition in the Southern District that multipliers in the range of 3 to 4.5 have become relatively "common."  See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 123 (2d Cir. 2005); In re NASDAQ Market-Makers Anti-Trust Litig., 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding a 3.97 multiplier and finding fee multipliers of 3 to 4.5 to be "common"); In re Sumitomo Copper Litig., 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (awarding a 27.5% fee on a

$134.6 million commodities fraud settlement and similarly finding a 3 to 4.5 multiplier to be common); Maley v. Del Global Technologies Corp., 186 F. Supp. 2d 358, 368-69 (S.D.N.Y. 2002) (finding a multiplier of 4.65 to be within the standard range in the Second Circuit); Johnson v. Brennan, 2011 U.S. Dist. LEXIS 105775, at *58-*59 (S.D.N.Y. Sept. 16, 2011) (finding that "courts regularly award lodestar multipliers from two to six times lodestar").

32.     At the same time, however, I feel obligated to call to this Court's attention the view, expressed by a few Southern District courts, that lodestar multipliers have declined since the time of the Second Circuit's decision in Goldberger v. Integrated Resources, 209 F.3d 43 (2d Cir. 2000).  The decision that most clearly articulates this view is Hall v. Children's Place Retail Stores, Inc., 669 F. Supp. 2d 399 (S.D.N.Y. 2009), which states:

> "A review of other, more recent cases reveals a trend toward awarding more modest fees.  Courts appear to be finding that an award of one-third of the settlement fund is not always justified where that percentage amounts to a lodestar multiplier of substantially more than 2.0."  Id. at 403 (citing cases).

It is possible that the Hall court overstates in its generalization, and contrary precedents exist.[31]  Indeed, virtually all the Southern District decisions referencing Hall have involved cases settling for less than $100 million (a very different context).[32]  Still, it is

---

[31] See, e.g., In re Adelphia Commc'ns Corp. Sec. & Der. Litig., No. 03-MDL 1529, 2006 U.S. Dist. LEXIS 84621 (S.D.N.Y. Nov. 16, 2006) (21.4% fee award on a $455 million settlement accompanied by a 2.89 multiplier); In re Converse Tech. Inc. Sec. Litig., No. 06-1825 (E.D.N.Y. June 25, 2010) (21% fee award on $255 million settlement accompanied by a 2.78 multiplier); In re Bisys Sec. Litig., 2007 U.S. Dist. LEXIS 51087 (S.D.N.Y. July 4, 2007) (30% fee award accompanied by a 2.99 multiplier).

[32] The only exception that I have found to this generalization that Hall has been followed in cases under $100 million (in settlement size) is In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110, 128 (S.D.N.Y. 2009) (reducing a 25% fee request to a 15% fee and using a 1.62 multiplier to do so).

important not to overread what the <u>Hall</u> court is actually saying.  It is most opposed to a higher than average percentage fee award being justified by a high multiplier.  I certainly agree:  a fee award of 33% of the recovery should not be justified by a high multiplier.  But in this case the percentage sought is half that:  only 16.5%.  It would overextend the <u>Hall</u> court's reasoning to insist that the multiplier must always remain low, even when the percentage of the recovery is at an average or below average level.  Still, this is an issue that can be deferred until another day because the lodestar multiplier here is below 2 and thus fully consistent with <u>Hall</u>.

33.     Several decisions in this Circuit have recently noted that "the trend in the Second Circuit thus has been to express the attorneys' fees as a percentage of the recovery, rather than to use the lodestar method to arrive at a reasonable fee . . ." See <u>Chin v. RCN Corporation</u>, 2010 U.S. Dist. LEXIS 96302 at *14 (S.D.N.Y. Sept. 8, 2010); <u>Foti v. NCO Financial Systems, Inc.</u>, 2008 U.S. Dist. LEXIS 16511 at *19 (S.D.N.Y. Feb. 20, 2008).  Thus, although it would generally make sense to reduce a percentage-based fee that is itself high when the lodestar multiplier would also be higher than the average[33] (and that is the appropriate use of the lodestar cross-check), the multiplier should not alone be controlling, because this would effectively end the use of the percentage of the recovery fee award (which remains the dominant methodology in the Second Circuit).

## VIII.  <u>SETTLEMENT APPROVAL</u>

34.     Brevity on my part is here justified, as this Court is fully familiar with the criteria for settlement approval in the Second Circuit.  Generally, courts break their

---

[33] In determining what is the "average" risk multiplier, the leading study remains Logan, Moshman and Moore, supra note 30, which found 4.5 to be the average when the settlement exceeded $100 million.

settlement evaluation inquiry into two components:  procedural fairness and substantive

fairness.  A proposed settlement is procedurally fair when it is reached through "arm's

length negotiations between experienced capable counsel after meaningful discovery."

See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005).  Here,

the record shows extensive negotiations between the parties, who are obviously highly

experienced, but the truly distinctive fact about this case is that the settlement was the

result of both sides accepting an experienced mediator's proposed settlement.  Not only

does that resolve any fear or suspicion of collusion, but it also supplies convincing

evidence of substantive fairness as well.  Typically, mediators learn facts about the

strengths and weaknesses of both sides that are not apparent to the court.  Hence, a

mediator's proposed settlement is better informed and more likely to reflect the actual

litigation merits than any other figure that might be derived from empirical data or

regressions.  As a result, absent extraordinary circumstances, a settlement that adopts the

mediator's recommendation should be viewed as inherently fair, adequate and

reasonable.

35.     The mediator in this case was Layn R. Phillips, a retired federal judge who

has presided over "more than 140 federal trials," has "mediated hundreds of disputes" in

private practice, and has been "appointed as a Special Master by numerous federal

courts."[34]  His description of the settlement negotiations as "hard fought and at arm's

length at all times"[35] leaves no uncertainty or open question that this Court need resolve.

36.     In determining substantive fairness, a court in the Second Circuit must

review the factors articulated in City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d

---

[34] See "Declaration of Former United States District Court Judge Layn R. Phillips Regarding
Approval of Settlement," dated November 19, 2012, at p. 2
[35] Id.

Cir. 1974).  This Court likely knows these factors by heart, and Lead Counsel will review each of them in their own filings.  Thus, I will focus only on the last of these factors— "the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation."  Here, the proof is in the pudding.  According to both NERA's and Cornerstone's research, this case should have settled for roughly 1% of its estimated $6.3 billion in damages (or $63 million).  Instead, it settled for $590 million—or more than nine times that amount.  Given that high risk was faced in this case, such an exemplary recovery should be dispositive of the issue of substantive fairness.

## IX.  <u>CONCLUSION</u>

37.     I recognize that an expert's role is limited and that the ultimate decision necessarily remains with the Court.  Still, the uncontested facts in this case strongly suggest that a 16.5% fee award is well justified, for at last four independent reasons. First, the requested award is consistent with the more recent practice in large cases in the comparable recovery range:  Second, this is the unique case in which both the fee award percentage and the lodestar multiplier are below average.  In many large class actions, the fee award as a percentage of the recovery will appear low (because fee awards are typically a declining percentage of the recovery, as the recovery grows), but the lodestar multiplier in such cases may be quite high.  Here, the fee award percentage is consistent with the standard practice in similar cases, and the lodestar multiplier (1.89) is well below the norm.  Third, this very large recovery was obtained without any assistance or benefit from any governmental enforcement proceeding or accounting restatement.  That alone merits special judicial recognition.  Finally, this was a case involving substantial risk,

including serious obstacles to the proof of scienter.  Lead Counsel undertook this case with full recognition of the dangers it faced.  Victory did not come easily, as this case has now been fought for over five years.  Ultimately, an exemplary recovery justifies a fee that is at least comparable with the normal recovery rate, and that is all that is being requested here.

I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

John C. Coffee, Jr.

December 6, 2012