**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP INC.<br>SECURITIES LITIGATION | No. 07 Civ. 9901 (SHS)<br><br>**ECF CASE** |

**JOINT DECLARATION OF IRA M. PRESS AND PETER S. LINDEN**
**IN SUPPORT OF (i) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION**
**AND (ii) PLAINTIFFS' COUNSEL'S MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ........................................................................ 2

II.    PROSECUTION OF THE ACTION ............................................................... 11

       A.    The Appointment of Lead Plaintiffs and Lead Counsel and the Filing
             of the Complaint ................................................................................... 11

       B.    The Extensive and Independent Investigation Conducted by Lead Counsel........ 13

       C.    Defendants' Motion To Dismiss And The Emergence Of Facts In
             The Course Of The Government Proceedings Corroborating Plaintiffs'
             Allegations ............................................................................................. 19

       D.    The Denial Of Defendants' Motion To Dismiss.................................... 22

       E.    Discovery ............................................................................................... 23

             1.    Document Discovery ................................................................. 24
             2.    Depositions ............................................................................... 27
             3.    The Parties' Meet-And-Confer Negotiations And Plaintiffs'
                   Motion To Compel Discovery ................................................. 30

       F.    Plaintiffs' Motion For Class Certification And Class Discovery ......... 31

       G.    Lead Counsel's Retention And Use of Experts ..................................... 33

       H.    The Mediation ........................................................................................ 34

III.   THE NOTICE TO THE CLASS MEMBERS SATISFIES THE REQUIREMENTS
       OF RULE 23, DUE PROCESS, AND THE COURT'S PRELIMINARY
       APPROVAL ORDER ........................................................................................ 36

IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE .......... 38

V.     THE PLAN OF ALLOCATION IS FAIR AND SHOULD BE APPROVED... 48

VI.    APPLICATION FOR ATTORNEYS' FEES AND EXPENSES.................... 49

       A.    The Requested Award of Attorneys' Fees ............................................ 49

             1.    Summary ................................................................................... 49
             2.    Time and Labor Expended By Counsel ................................... 53
             3.    Magnitude and Complexities of the Litigation ........................ 55
             4.    The Risks of the Litigation ...................................................... 57
             5.    Quality of the Representation .................................................. 60
             6.    Requested Fee In Relation To The Settlement ........................ 61
             7.    Public Policy Considerations ................................................... 64
             8.    Objections To The Fee Request ............................................... 65

       B.    The Requested Reimbursement of Litigation Expenses ....................... 66

VII.   CONCLUSION.................................................................................................. 68

i

**IRA M. PRESS** and **PETER S. LINDEN**, being duly sworn, depose and say:

1.      We are members of the firm of Kirby McInerney LLP, Court-appointed lead counsel ("Lead Counsel") in this Action.[1]   We respectfully submit this joint declaration in support of (i) Plaintiffs' Motion For Final Approval Of Class Action Settlement And Approval Of Plan Of Allocation and (ii) Plaintiffs' Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses.[2]   We have personal knowledge of all material matters related to the Action based upon our active supervision and participation in the prosecution of this Action since its inception.  Unless otherwise indicated, the statements in this declaration are made based on our personal knowledge.

2.      The Court, having overseen these proceedings for nearly five years, is familiar with the case and its complex legal and factual issues.  Accordingly, this declaration does not seek to detail each and every event that occurred during the Action.  Rather, it provides highlights of the events leading to the Settlement and the basis upon which Plaintiffs and Lead Counsel recommend its approval.

3.      This declaration describes: (a) the efforts undertaken by Lead Counsel, and the additional firms performing work at the direction of Lead Counsel, to prosecute the Action (¶¶28-100); (b) the Notice to the members of the Settlement Class (¶¶101-108); (c) the

---

[1] All capitalized terms not otherwise defined shall have the meaning set forth in the Stipulation and Agreement of Settlement, dated August 28, 2012, as amended (the "Stipulation"), and filed with the Court on August 29, 2012 (Dkt. No. 155-1), and as modified by the Court's September 28, 2012 order further amending the preliminary approval order (Dkt. No. 159).

[2] Plaintiffs include: (i) Court-appointed Lead Plaintiffs Jonathan Butler, M. David Diamond, David K. Whitcomb and Henrietta C. Whitcomb; and (ii) co-plaintiffs John A. Baden III, Warren Pinchuck, Anthony Sedutto, Edward Claus, Carol Weil, Joseph DiBenedetto, and the Tennessee Consolidated Retirement Systems and the Public Employees' Retirement Association of
*(footnote continued on next page)*

Settlement and the risks that Plaintiffs and Lead Counsel considered in determining that the Settlement provides an outstanding recovery for the Class (¶¶109-131); (d) the proposed Plan of Allocation for the Settlement (¶¶132-136); and (e) the fee and expense application by Lead Counsel (¶¶137-194).

## I.   PRELIMINARY STATEMENT

4.     Plaintiffs have achieved an outstanding result on behalf of the Settlement Class (the "Class").[3]  Following almost four and half years of hard-fought litigation before this Court and two days of intensive, arms'-length negotiation in mediation sessions before a retired federal judge, the Honorable Layne Phillips ("Judge Phillips" or the "Mediator"), the Citigroup Defendants ("Defendants") agreed to pay $590 million in cash to resolve the claims brought against them in this litigation by Plaintiffs on behalf of themselves and the Class.   The Settlement reflects a reasoned compromise based on Plaintiffs' and Lead Counsel's knowledge of the strengths and weaknesses of the case gained, as detailed below, through extensive litigation.  The Settlement Amount was paid into an escrow account on September 13, 2012, and has been invested for the benefit of the Class.  The Settlement confers a guaranteed, immediate and substantial benefit to the Class and avoids the risks and expense of continued litigation.

---

Colorado.

[3] The Settlement Class, as certified in the Court's September 28, 2012 Order Further Amending the Order Preliminarily Approving Proposed Settlement and Providing for Notice, consists of all persons who purchased or otherwise acquired common stock issued by Citigroup during the period between February 26, 2007 and April 18, 2008, inclusive, or their successor in interest, and who were damaged thereby.  Certain persons and entities are excluded from the Class as set forth in the September 28th order.  Also excluded from the Class are any persons who exclude themselves by filing a timely and valid request for exclusion in accordance with the requirements set forth in the Notice.  The basis for class certification is set forth in Plaintiffs' Memorandum of Law in Support of Unopposed Motion for (I) Preliminary Approval of Settlement, (II) Certification of the Settlement Class for Purposes of the Settlement and (III) Approval of Notice to the Settlement Class, filed August 29, 2012 (Dkt. No. 154), which is incorporated herein by

*(footnote continued on next page)*

5.      The Settlement represents the culmination of Lead Counsel's vigorous prosecution of this case.  Among other things, Lead Counsel: (i) conducted a comprehensive, intensive, original, and independent investigation prior to filing the consolidated amended complaint (the "Complaint"); (ii) prepared and filed the consolidated complaint and the amended consolidated complaint, both of which exceeded 500 pages in length; (iii) prepared and filed a 75-page brief in opposition to Defendants' motion to dismiss, as well as nine substantive additional letter briefs regarding legal and factual developments during the pendency of the motion; (iv) propounded and served extensive discovery on Defendants and 27 third-parties; (v) reviewed and analyzed approximately 40 million pages of documents produced by Citigroup and third-parties;  (vi) retained three testifying experts and three additional consulting experts in areas regarding specialized knowledge; (vii) prepared for and took the depositions of 33 former or current employees and executives of Citigroup; (viii) fully litigated a motion for class certification which included taking the deposition of Defendants' expert, defending three depositions of Plaintiffs' experts, and defending 16 depositions of proposed class representatives and/or their employees; (ix) engaged in extensive meet-and-confer negotiations with Defendants to resolve numerous discovery disagreements; (x) fully litigated a motion to compel discovery; (xi) prepared and submitted for mediation ten volumes of material comprising 700 exhibits and 254 pages of narrative and analysis; (xii) participated in extensive and intensive arms'-length negotiation under the auspices of Judge Phillips, including two days of face-to-face mediation sessions; (xiii) negotiated the terms of the Stipulation; and (xiv) prepared papers in support of preliminary approval of the Settlement.

6.      It is noteworthy that this decidedly is not a case where the plaintiffs simply "rode

reference.

the coattails" of the government, relying on facts unearthed by an official investigation.  Nor is this a case where the plaintiffs had ready access to evidence in the form of an internal investigation or financial restatement.  Nor were plaintiffs able to rely on any whistleblower or confidential witness who stepped forward.  Additionally, this is not a case involving any claims under the Securities Act of 1933 (the "Securities Act") or any other statute or rule pursuant to which evidence of *scienter* – the *bête noir* of securities plaintiffs – is not required.

7.      Rather, the claims in this case are asserted exclusively under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and thus are subject to the exacting *scienter* standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Moreover, Plaintiffs had no access to any ready source of facts, but were forced to, and did, base their allegations and theories on their own comprehensive, original and independent investigation – conducted by Lead Counsel more than a year ***ahead of*** any regulatory action regarding the matters at issue.

8.      Indeed, at the time Lead Counsel prepared the Complaint, the subject matter of this lawsuit – pools of subprime mortgage backed securities ("RMBS") known as collateralized debt obligations ("CDOs") – was a highly obscure province of experts and insiders.  There was scant information relating to CDOs anywhere in the public domain.  The media had yet to publish any exposés.  No information was available from regulators.

9.      Lead Counsel scoured numerous obscure and difficult-to-access industry, foreign, and academic sources, compiling more than six hundred megabytes of information and data (the equivalent of approximately 300,000 pages) which Lead Counsel thoroughly analyzed, data-mined, and synthesized in order to piece together the pertinent facts.  Plaintiffs' initial and amended complaints, prepared based upon this investigation, were the product of sheer

4

determination, long hours of arduous work and novel investigative techniques on the part of Lead Counsel.

10.     Plaintiffs' amended consolidated complaint, filed on February 24, 2009, based on Lead Counsel's analysis of Citigroup's CDO operations, alleged in great detail, *inter alia*, that from January 1, 2004 through January 15, 2009, Citigroup had knowingly misrepresented Citigroup's exposure to CDOs and failed to take timely write-downs in connection with such instruments.

11.     Government regulators commenced their proceedings well after Lead Counsel filed the Complaint.

12.     In April 2010, *fourteen months* after Plaintiffs filed their Complaint and eleven months after Defendants' motion to dismiss had been fully briefed, the Financial Crisis Inquiry Commission ("FCIC") investigated Citigroup.  The FCIC examined six present and former Citigroup executives regarding, *inter alia*, Citigroup's CDO dealings and exposures leading up to the financial crisis.

13.     Then, in July 2010, *seventeen months* after Plaintiffs filed their Complaint and fourteen months after Defendants' motion to dismiss had been fully briefed, the Securities and Exchange Commission ("SEC") filed a civil enforcement action against Citigroup and two of its executives.  The action charged Citigroup with making misleading statements regarding Citigroup's CDO exposures between mid-July and October 2007.  In stark contrast to Plaintiffs, as detailed below, the SEC determined that the evidence did not support allegations of *scienter* against Citigroup and pled only "non-*scienter* fraud" claims under Section 17 of the Securities Act.  The SEC simultaneously announced a $75 million settlement of its charges.

14.     The FCIC hearings and SEC enforcement action brought to light facts

corroborating the substance of core allegations of Plaintiffs' Complaint, as set forth in more detail below. *See infra* ¶¶ 53-57. These facts provided further support for Plaintiffs' allegations that Citigroup had misrepresented its CDO exposure and, moreover, that Citigroup possessed information contradicting its public statements. Indeed, facts disclosed by the FCIC and SEC attested to the accuracy of certain factual allegations in Plaintiffs' Complaint – pled more than a year and half earlier based on Lead Counsel's independent investigation – down to minute details, including, *e.g.*, the size of Citigroup's CDO exposure at given times during the Class Period.

15.     In addition to investigation and pleadings that preceded any disclosure of the results of the government investigations, Plaintiffs led the way for other litigants seeking to advance similar claims against Citigroup before this Court, including derivative claimants (*In Re: Citigroup Inc. S'holder Deriv. Litig.*, No. 1:07-cv-09841 (SHS) (S.D.N.Y.)), ERISA plaintiffs (*In re Citigroup ERISA Litig.*, No. 07 CIV. 9790, 2009 WL 2762708 (S.D.N.Y.)), class members and other investors asserting individual claims (*International Fund Mgmt. S.A. v. Citigroup Inc.*, No. 09-cv-8755 (SHS) (S.D.N.Y.), and *Brecher v. Citigroup Inc.*, No. 09 CIV. 7359 SHS, 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011)), and even investors in Citigroup CDOs (*Epirus Capital Mgmt., LLC v. Citigroup Inc.*, No. 09 CIV. 2594 (SHS) (S.D.N.Y.)). Plaintiffs in this Action were the first to file an operative consolidated complaint and, hence, had to rely on their own, original investigation. Subsequent complaints filed by other claimants substantially copied or relied upon Plaintiffs' material allegations.

16.     Lead Counsel's enterprise and initiative related not only to their investigation, but continued throughout the litigation. As further detailed below, Lead Counsel's discovery efforts included review of millions of pages of documents never requested by the SEC and deposition of

numerous witnesses not examined by the SEC.  Moreover, as noted, Plaintiffs asserted claims exclusively under §10(b), while the SEC alleged only "non-*scienter* fraud" claims under Section 17 of the Securities Act.

17.     The results of Lead Counsel's singular initiative, tenacity, and resolve speak for themselves.  Lead Counsel succeeded in negotiating a Settlement for the Class of $590 million, far in excess of the $75 million obtained by the SEC.

18.     As detailed below, we believe the Settlement is (i) the largest recovery *ever* in any CDO-related litigation, (ii) the third-largest recovery in any case stemming from the subprime crisis, and (iii) the 18th largest securities class action recovery under the PSLRA, putting it in the top 1.5% of all PSLRA settlements and likely in the top 1% of securities class action settlements of all time.  As further discussed below, 16 of the 17 larger PSLRA settlements (including both of the larger subprime crisis-related actions) stemmed from cases that involved either non-fraud claims and/or earnings restatements – factors which made them easier to prosecute and resolve successfully than this case.  Moreover, most of those settlements included contributions from multiple corporate defendants as well.

19.     The Settlement is also excellent considering how other securities class actions arising out of the subprime crisis have fared.  First and most relevant, after events in 2007 revealed many financial institutions to have been harboring multi-billion dollar CDO exposures and losses, a wave of similar securities class action proceedings sought to advance claims against such institutions in connection with alleged misrepresentation of such CDO exposures.  As noted, the $590 million recovery achieved here is the largest recovery in any of these actions – or, indeed, in any CDO-related action ever.  Second, the Settlement is the third largest subprime crisis-related securities class action settlement.  The two larger subprime crisis settlements

involved simpler facts (mortgage rather than CDO exposures), multiple corporate settling parties and included claims under the Securities Act (which do not require proof of fraudulent intent or loss causation), unlike this Action which involved a single corporate settling party, Citigroup, and exclusively *scienter*-based claims under §10(b) of the Exchange Act, which also require proof of loss causation.  Numerous securities class actions arising out of the financial crisis – including many that, like this case, involved allegations of understated exposures to subprime securities – have simply been dismissed, as detailed *infra* ¶¶ 124-127.

20.     In endorsing the Settlement, Plaintiffs and Lead Counsel are joined by Judge Phillips.  Judge Phillips received detailed submissions from the parties consisting largely of confidential discovery materials.  Based on these materials and his extensive experience as a judge and mediator, Judge Phillips authorized the parties to state in the Class Notice that in Judge Phillip's opinion:

> the proposed Settlement is the result of vigorous arm's length negotiation by both sides.  I believe, based on my extensive discussions with the Parties and the information made available to me both before and during the mediation, that the Settlement was negotiated in good faith and that the Settlement is fair and reasonable.

Judge Phillips now further attests to the Settlement's reasonableness.  *See* concurrently-filed Declaration of Former United States District Court Judge Layn Phillips Regarding Approval of Settlement, dated November 19, 2012.

21.     Additionally, the reaction of the Class to the Settlement to date has been overwhelmingly positive, providing powerful evidence of its fairness.  As discussed in more detail below, Plaintiffs sent notices to more than 2.1 million Class members.   There have been two objections to the Settlement to date (the deadline to file objections is December 21, 2012). Pursuant to Order of the Court, we plan to address all timely objections in a submission which

will be filed on January 4, 2013.  As of December 6, 2012, there have also been 135 requests for exclusion received by the Court-appointed Claims Administrator.  This number represents just .006% of the notices that have been mailed.  Moreover, several of these requests have come from persons or entities who had already filed individual lawsuits against Citigroup or joined existing proceedings, prior to the settlement herein, and a material share of the remainder have come from persons whose submissions did not list any purported class period purchases.

22.     For their extensive efforts in the face of enormous risks, Lead Counsel, on behalf of all Plaintiffs' counsel, apply for an award of attorneys' fees and reimbursement of expenses (the "Fee and Expense Application").  Specifically, Lead Counsel request approval of an attorneys' fee of 16.5% of the Settlement Amount and reimbursement of litigation expenses in the amount of $2,842,841.59 to be paid from the Settlement Amount.

23.     The requested fee is well within the range of reasonable fees approved by courts in this District and around the country, and is amply supported by each of the relevant factors set forth in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  The reasonableness of the fee request is confirmed with a lodestar cross-check resulting in a multiplier of 1.89, which is well within the range of multipliers awarded in securities class action settlements of similar size in this Circuit.  In fact, the fee percentage requested here is below the average for PSLRA settlements in the $550 million - $800 million range, and the requested fee represents a multiplier that is also below the average for PSLRA settlements in the aforementioned ranged.

24.     Based on the result achieved for the Settlement Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation, Lead Counsel submit that the fee requested is justified and should be approved.  It can truly be said that the excellent result in this case was a product of Lead Counsel's singular efforts.  Counsel

should be rewarded for their effectiveness in obtaining the results achieved for the Class.

25.     In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  To prepare the Plan of Allocation and to apportion the Settlement Amount among purchasers of the Citigroup securities, Lead Counsel consulted with experts in the areas of economics and damages.  The Plan allocates different Recognized Losses to Class Members based on Class Period purchase and sale dates, and the timing of those transactions in relation to corrective disclosures that our experts believe give rise to recoverable damages in this Action.  Pursuant to the Plan of Allocation, the Settlement Amount plus interest accrued (after deduction of Court-approved expenses and attorneys' fees) will be distributed on a pro rata basis to members of the Settlement Class who timely submit Claim Forms that are approved for payment by the Court.

26.     For all of the reasons detailed herein, including the outstanding results obtained in the face of the significant litigation risks, we respectfully submit that the Settlement and the Plan of Allocation are each "fair, reasonable and adequate" in all respects, and that the Court should therefore approve them pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.  For similar reasons, as well as for the additional reasons set forth below, we respectfully submit that Lead Counsel's requests for an award of attorneys' fees equal to 16.5% of the Settlement Amount and reimbursement of litigation expenses in the amount of $2,842,841.59 plus accrued interest, are also fair and reasonable, and should also be approved.

27.     Plaintiffs retained John C. Coffee, Jr., the Adolfe A. Berle Professor of Law at Columbia University Law School, and Geoffrey P. Miller, Stuyvesant P. Comfort Professor of Law Director, Center for Financial Institutions at New York University Law School, both widely-recognized experts in securities litigation, to opine on the Settlement and Plaintiffs'

Counsels' fee request.  As set forth in their accompanying declarations, each, after extensive analysis, found that the Settlement was fair, reasonable, and adequate, and that the requested fee was eminently fair.  *See* concurrently-filed Declarations of John C. Coffee, Jr. ("Coffee Decl.") and Geoffrey P. Miller ("Miller Decl.").  The expenses for which counsel seek reimbursement do not include expenditures related to these experts' opinions on the reasonableness of counsel's fee request.

## II.   PROSECUTION OF THE ACTION

### A.   The Appointment of Lead Plaintiffs and Lead Counsel and the Filing of the Complaint

28.    On November 8, 2007, a putative class action captioned *Saltzman v. Citigroup, Inc.*, No. 07 Civ. 9901 (SHS), was filed in this Court alleging violations of §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), against Citigroup and certain of its officers and directors.  Pursuant to the PSLRA, several putative class members moved for appointment as lead plaintiffs and approval of lead counsel. By Order dated August 19, 2008, the Court appointed Jonathan Butler, M. David Diamond, David K. Whitcomb and Henrietta C. Whitcomb (the "ATD Group") as Interim Lead Plaintiffs, and the law firm of Kirby McInerney LLP as Interim Lead Counsel.  *See* Dkt. No. 59.[4]  Thereafter, Lead Counsel negotiated a comprehensive case management order setting forth a litigation schedule and requiring preservation of Citigroup documents, which the Court entered on September 24, 2008.

29.    On December 1, 2008, Lead Plaintiffs filed their 498-page consolidated class action complaint.  On February 24, 2009, Lead Plaintiffs filed their amended consolidated complaint, which became the operative complaint in this action (the "Complaint"), on behalf of a

---

[4] In the same Order, the Court consolidated several affiliated actions, and assigned 07 Civ. 9901
*(footnote continued on next page)*

putative class of all persons who acquired Citigroup common stock from January 1, 2004 through January 15, 2009 inclusive.  The Complaint asserted claims under §§10(b) and 20(a) of the Exchange Act against Citigroup and certain individual defendants.[5]

30.     As the Court is well aware, Plaintiffs' Complaint was 536 pages in length and contained 1,265 paragraphs.

31.     The gravamen of the allegations that survived the motion to dismiss related to misrepresentations and omissions with respect to Citigroup's exposure to CDOs during the Class Period.  Plaintiffs alleged that: (i) prior to November 4, 2007, Defendants wrongfully concealed that Citigroup held tens of billions of dollars of so-called "super senior" tranches of CDOs backed by subprime RMBS; (ii) after revealing in excess of $40 billion of "direct" super senior exposures on November 4, 2007, Defendants omitted to disclose a further $10 billion of "indirect" super senior exposures until January 15, 2008; and (iii) Defendants failed to take timely write-downs on such CDO exposures throughout the Class Period.[6]

32.     Plaintiffs further alleged that a strong inference of *scienter* was raised by a series of alleged facts, including that Citigroup: (i) had itself structured, underwritten and issued the CDOs underlying its retained super-senior CDO positions; (ii) after near-invariably retaining exposure to the super senior tranches of its CDOs between 2003 and 2006, *switched* its fundamental orientation to super senior exposure and risk no later than February 2007,  and

---

as the Lead Case. *See* Dkt. No. 59.

[5] The Complaint named the following individual defendants: Charles Prince, Gary Crittenden, Robert Druskin, Thomas Maheras, Michael Klein, David Bushnell, Robert Rubin, Lewis Kaden, Sallie Krawcheck, Steven Freiberg, Todd S. Thompson, John Gerspach, Stephen Volk, and Vikram Pandit.

[6] The Complaint additionally pled misrepresentations and omissions concerning Citigroup's exposure to structured investment vehicles, Alt-A RMBS, mortgages, Auction Rate Securities, leveraged loans and Collateralized Loan Obligations, and concerning Citigroup's solvency.

thereafter began a concerted effort to *offload* its super senior tranche exposures, including (a) by purchasing credit protection from monoline insurers on Citigroup's super senior tranches, and (b) creating new special purpose vehicles to which Citigroup could offload further of its super senior exposures; (iii) as the CDO market collapsed in late 2006 and 2007, had engaged in "CDO recycling" operations in which unsold inventory of older Citigroup CDOs was sold to newer Citigroup CDOs; and (iv) according to reports in *The New York Times*, began in the Summer of 2007 to hold risk exposure meetings attended by top Citigroup executives concerning, *inter alia*, CDOs. Moreover, Plaintiffs alleged that Citigroup's own analysts had issued reports during the Class Period stating that the subprime meltdown would devastate the value of subprime RMBS-backed CDOs – the very instruments to which Citigroup was, unbeknownst to investors, exposed.

**B.      The Extensive and Independent Investigation Conducted by Lead Counsel**

33.      Plaintiffs had no access to any ready source of facts, but were forced to, and did, base their allegations and theories in this case on Lead Counsel's own comprehensive, original, and independent investigation.

34.      At the time Lead Counsel prepared the Complaint, there was scant information relating to CDOs anywhere in the public domain.  Nothing identified the CDOs to which Citigroup was exposed, revealed how or when Citigroup accumulated such exposure, analyzed the extent to which Citigroup's CDOs contained subprime RMBS, determined how or why even relatively low levels of RMBS losses would cause Citigroup's CDOs to suffer huge losses, or gave any hint as to when, or how, Citigroup's top executives first learned of this hazard.  The traditional sources of information used by plaintiffs' lawyers to prepare pleadings – media coverage, SEC filings, and governmental reports – shed no light on these matters.  For years,

CDOs had been held off-balance sheet and out of sight of analysts and investors.

35. To be sure, Citigroup had admitted its aggregate CDO exposure by the end of the Class Period. Nevertheless, even Citigroup's SEC filings continued to lack particulars. No information was forthcoming from regulators, who had yet to take action. The pertinent details that Lead Counsel would require to plead a complaint adequate to survive a motion to dismiss were simply unavailable.

36. Accordingly, Lead Counsel scoured numerous obscure and difficult-to-access sources, including, *inter alia*: specialized banking and mortgage industry databases and publications; academic and scholarly research; filings with regulators in foreign countries, including, *e.g.*, the Irish Financial Services Regulatory Authority where CDO issuers frequently lodged their prospectuses to qualify for sales to overseas investors; SEC and court filings by competitors and CDO counterparties of Citigroup; reports and data issued by rating agencies; RMBS and CDO "deal-flow" data circulated within the industry; presentations delivered by Citigroup and other participants in the CDO industry at conferences and symposia; and research issued by Citigroup and other financial institutions to their clients. All told, Lead Counsel compiled more than six hundred megabytes (approximately 300,000 printed pages) of information and data.

37. Lead Counsel thoroughly analyzed, data-mined, sifted-through, synthesized, and derived inferences from this data. As a result, Lead Counsel was able to reconstruct the record of Citigroup's CDO operations between 2003 and 2007, and, specifically, to identify substantially all of the more than 60 ABS CDOs underwritten and issued by Citigroup from 2003 to 2007, as well as ascertain the tranche structures of each of those CDOs. As detailed below, this allowed Lead Counsel to master the chain of events that led to Citigroup's accumulation of

tens of billions of dollars in CDO exposure.  Lead Counsel thereby developed a detailed understanding of what Citigroup knew and/or had to have known, and when.

38.     Through their analysis, Lead Counsel believed that it had obtained a basis to allege a material, previously-undisclosed fact: that Citigroup's Class Period super senior CDO exposures consisted of super senior tranches of CDOs that Citigroup itself created, and concluded that Citigroup had by and large retained exposure to the super senior tranches of all the CDOs it had created (at least until late 2006 or early 2007).

39.     Lead Counsel believed that this factual allegation could support Plaintiffs' claims that Citigroup's Class Period statements concerning CDOs were false or misleading.  For example, Citigroup represented in its SEC filings that it underwrote and issued CDOs merely to distribute them to investors and earn fees by doing so, and that Citigroup had "limited continuing involvement" with its CDOs following their issuance.  It appeared to Lead Counsel that, perhaps contrary to such public representations, Citigroup had consistently retained the super senior tranches of its CDO offerings – and, unbeknownst to investors, had continued to hold such exposure during the Class Period.

40.     Citigroup's retention of the super-senior tranches from its own CDO deals had additional significant implications for Lead Counsel's investigation.  It meant that Lead Counsel believed that they had a basis to allege, for any given day in the Class Period, exactly which CDO super senior tranches Citigroup held, the exact amount of each of those super senior tranche holdings, and the specific collateral (such as subprime RMBS) underlying each of those CDOs.  This provided Lead Counsel with a level of particularity in its allegations (at any given date, the aggregate super senior exposure and the specific CDOs making up that exposure) unmatched in any similar litigation concerning CDO exposures. Relatedly, Lead Counsel

believed that it was able to identify and explain the $25 billion of super senior exposures arising from "liquidity puts," and demonstrate how, by virtue of the "liquidity put" structure, Citigroup was able to conceal such CDO exposures off balance sheet during the Class Period.

41.     Lead Counsel's investigation into and reconstruction of Citigroup's CDO operations yielded an additional discovery that led Lead Counsel to believe that Citigroup had experienced a "change of heart" with respect to super senior exposures and risk in early 2007, and that that change could provide new support for *scienter* claims.  Specifically, Lead Counsel found evidence concerning exactly which super senior CDO tranches had been insured by certain monoline insurers, such as Ambac, and found that, with respect to Citigroup CDOs, super senior insurance appeared to be concentrated in 2006- and especially 2007-vintage CDOs.  This led Lead Counsel to believe and plead that: (1) from 2003 to early 2007, Citigroup had consistently increased its long exposure to super senior CDO tranches with little evident interest in establishing offsetting hedges, but (2) in early 2007, Citigroup appeared to reverse course and embarked on a burst of activity to offload and/or hedge as much super senior exposure as possible, primarily by purchasing super-senior linked credit insurance from monoline insurers such as Ambac.

42.     Additionally, Lead Counsel discovered and deciphered an obscure, complex, structured transaction through which, Lead Counsel believed, Citigroup sought the same end (offloading super senior exposure) by different means:  the so-called "Leveraged Super Senior" or "LSS" vehicle Foraois Funding, Ltd. ("Foraois").  Although this evidence was only partial, Lead Counsel believed that it supported their allegations that in early 2007 Citigroup fundamentally changed its super senior stance and behavior – from retaining it all to disposing as much of it as possible – and that this change provided support for *scienter* claims.

43.     Additionally, Lead Counsel also discovered evidence that Lead Counsel believed supported allegations that Citigroup had been engaged during the Class Period in a deceptive practice which later became known as CDO "recycling."  Specifically, Lead Counsel discovered that, beginning in or about late 2006 and increasing thereafter, tranches of older Citigroup CDOs began appeared as collateral holdings in newer Citigroup CDOs.  This led Lead Counsel to believe, and plead, that both the wider market and Citigroup were becoming cognizant of CDO risk, at least with respect to junior CDO tranches, by late 2006 -- which, Lead Counsel believed, could further support an inference of *scienter* in this Action.  Specifically, Lead Counsel alleged that as materializing subprime risk drove "real money" CDO purchasers to exit the market in late 2006 and 2007, Citigroup began taking tranches of subprime CDOs that it held in inventory – because Citigroup was unable to sell them – and packaging them into new Citigroup CDOs. Lead Counsel alleged that such activities did not actually reduce Citigroup's CDO exposure, but instead enabled a misleading change of label (the unsold junior tranches were incorporated into new super senior exposures).

44.     Lastly, Lead Counsel embarked on a largely self-taught effort to understand CDOs from top to bottom, so as to be able to understand exactly what they were and why the losses on such instruments, even at super senior tranche levels, had been so severe.  To understand CDOs, Lead Counsel had to understand their primary collateral, subprime RMBS, and to understand subprime RMBS, Lead Counsel had to understand *their* primary collateral, subprime mortgages.  As the Court is aware, hundreds of paragraphs in the Complaint were devoted to tracing the structured chain of risk – and the real-time materialization of that risk in late 2006 and early 2007 – from subprime mortgages in the pools collateralizing RMBS securitizations to the resulting RMBS tranches, and from the RMBS tranches in the pools

collateralizing CDOs to the resulting CDO tranches.   No other complaint in the wave of securities fraud class litigation against institutions with CDO exposures attempted or achieved anything even remotely similar.

45.     Lead Counsel's hard-won understanding of the details provided Lead Counsel objective basis to allege a fact largely obscured by the tremendous complexity of these inter-related instruments:  as CDOs were collateralized primarily by the lower, thinner tranches of subprime RMBS, a relatively small rise in subprime mortgage losses generally could suffice to cause these lower subprime RMBS tranches to experience correlated, total losses, which in turn would cause most of CDO collateral to become worthless and thus impart substantial and/or near-total losses to even the super senior tranches of CDOs.   On the basis of this extensive investigation, Lead Counsel believed that it had obtained an independent and objective understanding of exactly what CDOs were and exactly what put them at risk when.    This enabled Lead Counsel to plead in detailed fashion how what seemed the initial disarray in mortgage markets in early 2007, affecting only the lower-rated RMBS tranches, was in fact an objective indicator of super senior CDO tranche risk at the same time.

46.     These and other facts uncovered through Lead Counsel's investigation made up the core of Plaintiffs' Complaint, including Plaintiffs' critical *scienter* allegations.  Lead Counsel pled that Citigroup's retention of the super seniors and concealment of exposure in off-balance sheet "liquidity puts," *inter alia*, rendered Citigroup's Class Period statements false.  Lead Counsel also pled that Citigroup's retention of super seniors from its own deals, its efforts to offload super senior exposures in early 2007, and its resort to CDO "recycling," *inter alia*, raised a strong inference of *scienter*.

C. **Defendants' Motion To Dismiss And The Emergence Of Facts In The Course Of The Government Proceedings Corroborating Plaintiffs' Allegations**

47. On March 13, 2009, the Defendants filed a 75-page brief in support of their motion to dismiss the Complaint together with a supporting affidavit which attached 32 exhibits.

48. Defendants argued that the Complaint did not allege securities fraud, but simply complained of "failed risk management and poor business decisions" concerning a line of business (*i.e.*, CDO underwriting) that happened to prove vulnerable to an "unprecedented and unanticipated" credit crisis. According to Defendants, the Complaint did not allege falsity because Citigroup had no duty to disclose the details of its CDO exposure prior to October 2007, when those matters suddenly (but no sooner) became material due to "unprecedented rating agency downgrades." Defendants insisted that neither Citigroup nor the rating agencies nor anyone else was aware of any risk to the most senior CDO tranches, the super seniors, until AAA RMBS tranches suffered sharp price declines and the rating agencies first began downgrading highly-rated tranches in October 2007. Defendants also argued that Plaintiffs could not meet the heightened PSLRA standard for pleading *scienter* because they could not establish Defendants' clairvoyance in knowing in advance of the "impending market catastrophe that neither market participants nor regulators were able to foresee." *See* Defs.' Mem. of Law in Supp. of their Mot. to Dismiss the Am. Consolidated Class Action Compl., Dkt. No. 77, at 2, 16, 24 (filed Mar. 13, 2009).

49. On April 24, 2009, Plaintiffs filed an opposition brief of 75 pages accompanied by a supporting declaration with 16 exhibits. Plaintiffs argued that the Complaint adequately alleged that Defendants knowingly and/or recklessly concealed Citigroup's CDO exposure and materially overstated the value of Citigroup's CDOs during the Class Period. Plaintiffs also argued that a strong inference of *scienter* was raised by, *inter alia*, Citigroup's retention of super

19

seniors it created, its scheme to "recycle" unsold CDO tranches, and its attempts to offload super senior exposures (through, *e.g.,* its monoline and Leveraged Super Senior deals) in early 2007. Additionally, Plaintiffs established that Defendants' contention that no CDO impairment risks existed or were evident prior to October 2007 was based on the contrivance that similarly-rated RMBS and CDO tranches were equivalent – a fallacy rejected by analysts, including ones who worked for Citigroup. *See* Pls.' Mem. Of Law In Opp'n to Defs.' Mot. to Dismiss the Am. Consolidated Class Action Compl., Dkt. No 79, at 7-44 (filed Apr. 24, 2009). Plaintiffs showed that what put super senior CDO tranches at risk was not danger to similarly highly-rated (*i.e.*, AAA) *RMBS* tranches, but rather danger to the *lower-rated* RMBS tranches that collateralized CDOs.

50.    On May 13, 2009, Defendants filed a 30-page reply brief, accompanied by a supporting declaration with 13 additional exhibits.

51.    While the motion to dismiss was *sub judice,* among other pertinent developments, the FCIC held its hearings regarding Citigroup in April 2010. Additionally, the SEC commenced its enforcement action with respect to Citigroup's CDO disclosures on July 29, 2010.

52.    Lead Counsel actively monitored these and other developments. The parties submitted 19 supplemental letter briefs (nine submitted by Lead Counsel and ten by Defendants) on these matters to the Court.

53.    The FCIC hearings and SEC enforcement action brought to light facts corroborating the substance of core allegations of Plaintiffs' Complaint. As Lead Counsel indicated in their letter to the Court dated April 22, 2010, the testimony of the six Citigroup witnesses at the FCIC hearings substantiated Plaintiffs' allegations, *inter alia*, that (i) Citigroup's CDO exposure in fact derived from the retention of super seniors from its own CDOs, including

via off-balance sheet liquidity puts; (ii) certain Citigroup executives were aware of CDO risk by early 2007 and then began concerted efforts to offload such exposures, and (iii) Citigroup's enormous CDO exposures caused Citigroup's near collapse.

54.     Facts revealed in the SEC enforcement action likewise reinforced certain allegations in Plaintiffs' Complaint.  As Lead Counsel indicated in their letter to the Court dated August 12, 2010, the SEC action confirmed the essence of the Complaint – namely, that Citigroup had misrepresented its subprime exposure by failing to disclose tens of billions of dollars in super senior tranches of subprime CDOs.  Specifically, the SEC alleged that, *inter alia*, Citigroup executives repeatedly informed senior management (including certain of the Individual Defendants named in this case) of the details concerning Citigroup's CDO exposure.  For example, in April 2007 and again in July 2007, senior management received written presentations regarding CDO exposures, including super senior tranches.  Facts revealed by the SEC also suggested that certain individuals within Citigroup deliberated whether to disclose Citigroup's $43 billion in super senior CDOs prior to November 4, 2007, but decided to withhold the information despite acknowledging that it had the potential to mislead investors.  The facts revealed by the SEC also corroborated Plaintiffs' CDO "recycling" allegations.

55.     While the SEC's disclosures provided further support to Plaintiffs' allegations, it should be noted that the SEC alleged only "non-*scienter* fraud" claims under Section 17 of the Securities Act.  In comparison, Plaintiffs here pled and prosecuted – and secured the $590 million proposed Settlement based on – §10(b) claims which require proof of intentional fraud. On August 16, 2010, in seeking approval from Judge Ellen Segal Huvelle of the United States District Court for the District of Columbia for its $75 million settlement, the SEC explained its decision not to plead §10(b) claims by asserting that allegations of *scienter* were simply not

supported by the facts.[7]

56.     Furthermore, the SEC claims applied only to the period between mid-July 2007 and mid-October 2007.  This was narrower than the Class Period alleged in Plaintiffs' Complaint (*i.e.*, January 2004 to January 2009), and narrower than the truncated Class Period sustained by this Court on the motion to dismiss in this case (*i.e.*, February 2007 to April 2008), as detailed below.  The SEC did not include claims relating to the pre-July 2007 periods, such as those advanced by Plaintiffs in this Action on the basis of Citigroup's alleged attempts to offload super senior risk to monolines and through LSS.

57.     Accordingly, Plaintiffs could not and did not "ride the coattails" of the SEC action when Plaintiffs pled, prosecuted, and settled the claims herein.

**D.     The Denial Of Defendants' Motion To Dismiss**

58.     By Order dated November 9, 2010, the Court denied Defendants' motion to dismiss in substantial part.  Specifically, the Court sustained virtually all of Plaintiffs' claims arising from the misstatement and omission of Citigroup's CDO exposure.  With respect to the period February 2007 through November 3, 2007, the Court sustained Plaintiffs' §10(b) claims against Citigroup and §§ 10(b) and 20(a) claims against Messrs. Prince, Crittenden, Druskin, Maheras, Klein, Bushnell, and Rubin.  With respect to the period November 4, 2007 to April 2008, the Court sustained Plaintiffs' § 10(b) claims against Citigroup and §§ 10(b) and 20(a) claims against Mr. Crittenden.  *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 249

---

[7] *See* Tr. of Status Hr'g, *SEC v. Citigroup Inc.*, No. 1:10-cv-01277 (ESH), at 7 (D.D.C. filed Aug. 20, 2010) (ECF No. 13) ("[W]e brought the claims that we felt were supported by the facts in the record in accordance with the legal standard."); *id.* at 8 ("[O]ur factual record did not support bringing that claim [i.e., violation of 10b-5]; it more appropriately supported bringing the causing claim, which is a nonscienter claim that we brought against them in the administrative proceeding"); *id.* at 61 ("We do believe it's fraud. It's just nonscienter fraud.").

(S.D.N.Y. 2010).  The Court dismissed the remaining claims and defendants in the Complaint.[8]

59.     The CDO claims sustained by the Court rested in particular on the Court's finding that *scienter* with respect to such claims had been adequately pled.  Specifically, the Court's opinion suggested that the Court found particularly persuasive the facts that Lead Counsel's investigation had allowed them to discover, including: (i) Citigroup's early-2007 reversal of its stance with respect to super senior risk, and concerted efforts to offload such risk thereafter to monolines or through LSS; (ii) the fact that Citigroup's CDO exposures arose from CDOs Citigroup itself had created and structured, and thus was best placed to understand exactly the precise threats they faced; and (iii) reports authored by Citigroup's own analysts in early 2007 explaining how current RMBS risks threatened CDOs, even at senior tranche levels.  *In re Citigroup*, 753 F. Supp. 2d at 236-38.  Notably, the Court's decision relied exclusively on the allegations of the Complaint without mentioning the corroborative evidence that emerged from the FCIC and SEC proceedings.

60.     On January 24, 2011, Defendants filed their answer.

**E.     Discovery**

61.     The PSLRA discovery stay was lifted on entry of the order denying the motion to dismiss.  Immediately thereafter, Lead Counsel initiated the parties' Rule 26(f) conference, preparing and circulating a draft discovery and case management plan.  In or about February 2011, Counsel for the parties discussed the plan and additional case management issues, including a proposed schedule.  Lead Counsel met telephonically with defense counsel on

---

[8]The Court dismissed claims that Citigroup misrepresented its exposure with respect to structured investment vehicles, Alt-A RMBS, mortgage lending, Auction Rate Securities, leveraged loans and Collateralized Loan Obligations, and Citigroup's solvency. In connection therewith, the Court also dismissed all allegations asserted on behalf of investors in Citigroup

(*footnote continued on next page*)

several occasions to negotiate and finalize the discovery plan.

62.     On December 14, 2010, the parties filed their Joint Rule 26(f) Discovery Plan Report with the Court.   On December 23, 2010, the Court issued a Scheduling Order providing that discovery could begin immediately in this Action.

63.     Promptly thereafter, Plaintiffs negotiated and entered into a confidentiality stipulation which was approved by the Court, and commenced extensive discovery.

### 1.     Document Discovery

64.     Plaintiffs' Counsel's conduct of document discovery in this case represented a massive undertaking.  Reflecting the highly technical nature of the information sought, Lead Counsel prepared and served a first set of document requests on Defendants that was 59 pages long, including almost 70 requests and more than 20 pages of definitions.  Lead Counsel also served three additional sets of document requests on Defendants through the course of the Action.

65.     Additionally, Lead Counsel served subpoenas on 27 non-parties, including, *inter alia*: (i) KPMG, Citigroup's auditor; (ii) certain former Citigroup executives who were no longer under Citigroup's control; (iii) collateral managers of CDOs underwritten by Citigroup; (iv) monoline insurers and financial institutions that engaged in swap and other CDO-related transactions with Citigroup; (v) securities analysts that followed Citigroup stock; and (vi) outside consulting firms and pricing services engaged or used by Citigroup in connection with valuing its CDOs.

66.     Lead Counsel also submitted requests for pertinent documents to the SEC under the United States Freedom of Information Act.  Lead Counsel appealed the SEC's decision to

---

stock between May 2008 and January 15, 2009 and from January 2004 until February 2007.

withhold certain documents based on the exemption for information compiled for law enforcement purposes.

67.    The discovery sought and obtained by Lead Counsel far exceeded the scope of the government investigations.  Lead Counsel secured Citigroup's agreement to use a wider range of keyword search terms than required by the SEC in identifying responsive documents.  Lead Counsel also secured Citigroup's agreement to produce documents from numerous relevant custodians and business units not covered by the SEC or FCIC subpoenas.  Additionally, Lead Counsel sought and obtained discovery of documents authored as early as July 2005 and as late as July 2008, a time period much broader than that investigated by the SEC.  As a result, Plaintiffs' Counsel obtained, reviewed, and analyzed millions of pages of documents never produced to regulators.

68.    All told, Plaintiffs obtained, reviewed, and analyzed approximately 35 million pages of documents from Citigroup and approximately five million pages from 19 third-parties, for a total of approximately 40 million pages.

69.    Given the size of the assembled productions, it was incumbent upon Lead Counsel to institute an efficient, streamlined, and effective document review process in preparation for depositions, settlement negotiations, and possible trial of the Action.  Toward this end, Lead Counsel employed a review team of 35 highly qualified attorneys over the course of the litigation to review documents.  Most of the review attorneys had either relevant experience with reviewing complex transactional documents or subject matter expertise gained through transactional experience at top law firms or large financial institutions.  Plaintiffs' review team worked for over one year solely on the document review in the Action.

70.    Lead Counsel extensively trained the members of the review team prior to

commencing the review.  Lead Counsel prepared and provided to the review team members a package of relevant background materials including, *inter alia*, the Complaint and other key pleadings, an explanation of terms, a chronology of significant events, descriptions of Citigroup's internal organization, and a synopsis of the issues.  Lead Counsel also trained the review team in the use of the electronic database review system.

71.     Throughout the review process, Lead Counsel held periodic meetings with the members of the review team to identify and target issues as they emerged and to ensure continuing education of the review attorneys.  Moreover, Lead Counsel consistently monitored the work product of the review attorneys.  Lead Counsel met as a group and individually with the review attorneys to provide constructive feedback on their work, assure continuity and consistency, discuss recently identified helpful documents, gain deeper understanding of the documentary record, and solicit ideas for improvements to the review process.  Lead Counsel also regularly circulated key documents together with contextual explanations for all members of the team to discuss.

72.     Lead Counsel also organized the review process to build and preserve expertise among review attorneys and thereby maximize efficiency.  Certain reviewers received additional training in discrete, complex topics.  Additionally, review attorneys were asked to work in groups focused on specific issues.  Review attorneys thereby developed not only subject matter expertise but familiarity with the operational groupings and chains of reporting within Citigroup. Review attorneys also prepared extensive written witness reports for Lead Counsel to prepare for depositions.  The reports exhaustively analyzed the key documents relating to each witness and the role of the witness in the events at issue.

73.     Lead Counsel's pre-Complaint investigation also enabled Lead Counsel to focus

on documents of heightened interest immediately upon receiving Defendants' production.

74. Given the volume of documents and the complexity of the issues, the document review process was an extraordinary accomplishment. By virtue of Lead Counsel's efforts, the process was streamlined and efficient. Furthermore, the process was critical to Lead Counsel's understanding of the case and ability to prepare for and take depositions, draft their class certification papers, and prepare their extensive mediation submissions. The review process would also have been critical to Lead Counsel's preparation for any summary judgment motions or trial, had they occurred in this matter.

### 2. Depositions

75. Plaintiffs' Counsel deposed or defended approximately 50 witnesses in this matter. These depositions included 33 former or current executives or employees of Citigroup whom Lead Counsel examined after extensive preparation. The depositions that Plaintiffs' Counsel conducted of the Citigroup witnesses, totaling more than 11,000 pages of testimony, included the following:

| Deponent | Deposition Date(s) | Pages of testimony |
|---|---|---|
| Assistant Treasurer, Citigroup Markets and Banking ("CMB") | 7/29/2011 | 249 |
| Treasurer, CMB (2007) and Head, Investor Relations (2008) | 9/12/2011 | 237 |
| Chief Operating Officer, CMB Risk Management | 9/15/2011 | 252 |
| Investor Relations, CMB | 9/21/2011 | 284 |
| Investor Relations, CMB | 9/27/2011 | 310 |

| | | |
|---|---|---|
| Head, European Credit Products, CMB Risk Management | 10/6/2011 | 331 |
| Co-Head, Global CDOs | 10/13/2011 | 298 |
| Co-Head, CMB Risk Management (credit focus) | 10/31/2011 | 327 |
| Business Unit Manager, CMB | 11/3/2011 | 398 |
| Head, Europe, Middle East, and Africa Risk Management | 11/11/2011 | 392 |
| Head, Credit Products, CMB Risk Management | 11/30/2011 | 389 |
| Co-Head, Fixed Income Currencies & Commodities ("FICC") | 12/15/2011 | 381 |
| Chief Financial Officer, FICC | 2/16/2012 | 308 |
| Head, Global Structured Credit Products ("GSCP") (August 2006-October 2007) | 2/22/2012 | 381 |
| Head, Subprime Products Group (November 2007 onwards) | 2/22/2012 | 345 |
| Co-Head, CMB Risk Management (market risk focus) | 2/28/2012 | 360 |
| Director and Chair of Audit and Risk Committee of Citigroup's Board of Directors | 2/28/2012 | 115 |
| Head, CMB Equity Markets (through September 2007); co-CEO, CMB (after September 2007) | 2/29/2012 | 311 |
| Controller, CMB | 3/8/2012 | 378 |

| | | |
|---|---|---|
| Head, GSCP Credit Correlation (since October 2006); Head, GSCP ABS Correlation (starting June 2007) | 3/9/2012 | 299 |
| CDO Trading, GSCP, Super Senior Book | 3/14/2012 | 418 |
| Pricing Group Head, CMB | 3/28/2012 | 312 |
| Co-Head, Global CDOs | 3/30/2012 | 349 |
| Chief Risk Officer of Citigroup, Inc. (until November 2007) | 4/4/2012-4/5/2012 | 709 |
| Co-Head, FICC | 4/10/2012 | 378 |
| Head of Accounting Policy, CMB | 4/12/2012 | 328 |
| Director and Chair of Corporate Governance committee; member of Executive Committee and Personnel and Compensation Committees  of Citigroup's Board of Directors | 4/19/2012 | 117 |
| Head, Investor Relations (2007) | 4/23/2012-4/24/2012 | 772 |
| Chief Operating Officer, Citigroup, Inc. | 4/25/2012 | 355 |
| Co-Head, CMB (banking) | 4/30/2012 | 337 |
| Controller, CMB (until June 2007); Chief Financial Officer, CMB (from July 2007 onwards) | 5/3/2012 | 390 |
| Head of Financial Reporting, Citigroup, Inc. | 5/9/2012 | 257 |

| Head, Parent Company Balance Sheet Management (until September 2007); Head, Portfolio Management (thereafter), Citigroup Inc. | 3/15/2012 | 234 |
|---|---|---|

76.     The foregoing depositions included 22 witnesses never examined in any of the related regulatory proceedings.

77.     Furthermore, at the time the parties reached the Settlement, there were still over two months remaining before the discovery cutoff set by the Court.  The depositions of numerous additional witnesses were scheduled and/or anticipated.

78.     After each deposition, Lead Counsel thoroughly reviewed and analyzed the transcript, summarized the testimony, compiled important exhibits, and assembled the evidence for use at other depositions, on summary judgment, and at trial.

79.     Throughout the deposition process, whenever possible, Lead Counsel coordinated and worked with  plaintiffs' counsel in the related proceeding *In re Citigroup Inc. Bond Litig.*, No. 08 Civ. 9522 (SHS) (S.D.N.Y.), to maximize efficiency and avoid duplication.

### 3.     The Parties' Meet-And-Confer Negotiations And Plaintiffs' Motion To Compel Discovery

80.     The parties wrangled over the appropriate scope of discovery continuously from entry of the order denying the motion to dismiss to the end of the mediation.  The parties held numerous   meet-and-confer   negotiations,   and   exchanged   extensive   discovery-related correspondence.  Lead Counsel prepared and sent Defendants twelve separate letters totaling 98 single-spaced pages advocating their positions on discovery.  Through these negotiations, the parties resolved numerous discovery disagreements.

81.     On October 20, 2011, Plaintiffs filed a motion to compel with respect to certain unresolved discovery matters, supported by an 18-page brief and a declaration annexing 18

exhibits. Specifically, Plaintiffs sought documents from custodians and business units involved in underwriting RMBS and residential mortgages, *i.e.*, not directly involved with CDOs. Plaintiffs additionally sought documents from outside the Class Period relating to, *inter alia*, Citigroup's amassing and subsequent capping of its $25 billion liquidity put exposure, and movements in Citigroup's stock price.

82. On December 5, 2011, Defendants filed opposition papers. Thereafter, the parties engaged in extensive additional meet-and-confer negotiations to resolve the issues on Plaintiffs' motion. Through these negotiations, Plaintiffs secured Defendants' agreement to produce the bulk of the materials sought. On December 21, 2011, Plaintiffs filed a 10-page reply as to matters which remained outstanding.

83. Plaintiffs' motion to compel as to such outstanding matters was *sub judice* at the time the parties reached the proposed Settlement.

**F. Plaintiffs' Motion For Class Certification And Class Discovery**

84. Plaintiffs moved for class certification on July 15, 2011, requesting certification pursuant to Fed. R. Civ. P. 23 of a class consisting of:

> All persons who acquired Citigroup common stock from February 2007 through April 2008 (the "Class Period") or their successors in interest, and who thereby suffered damages. Excluded from the Class are the Defendants named herein, members of the immediate families of the Defendants, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded person.

85. Plaintiffs requested the appointment as class representatives of: Lead Plaintiffs Jonathan Butler, M. David Diamond, David K. Whitcomb and Henrietta C. Whitcomb; and co-plaintiffs John A. Baden III, Warren Pinchuck, Anthony Sedutto, Edward Claus, Carol Weil, the

Tennessee Consolidated Retirement Systems and the Public Employees' Retirement Association of Colorado.  Additionally, Plaintiffs requested the appointment of Lead Counsel as Lead Class Counsel.

86.     Lead Counsel prepared and filed a 21-page supporting brief. Lead Counsel additionally filed the declaration of Plaintiffs' expert, Professor Gregg A. Jarrell, a tenured Professor of Economics and Finance at the University of Rochester's William E. Simon Graduate School of Business Administration.  Professor Jarrell's declaration concerned market efficiency for Citigroup common stock.

87.     Lead Counsel assisted the proposed class representatives and Professor Jarrell in responding to written discovery propounded by Defendants.  Lead Counsel also assisted the proposed class representatives in searching for and producing thousands of pages of responsive documents to Defendants.  Lead Counsel, together with Additional Settlement Class Counsel, also defended the proposed class representatives (and certain of their employees) at their depositions taken by Defendants.  Lead Counsel also defended Professor Jarrell at his deposition taken by Defendants.  In all, Lead Counsel defended 16 depositions.

88.     Defendants filed their opposition papers on October 19, 2011.  Defendants challenged the adequacy and typicality of the proposed class representatives.  Defendants also maintained that class certification should be denied on the ground that Plaintiffs could not demonstrate the elements of materiality and loss causation.  In support, Defendants filed the declaration of their expert, Professor Allen Ferrell, the Greenfield Professor of Securities Law at Harvard Law School.  Professor Ferrell set forth his opinion, on the basis of certain studies and data, that super senior CDO tranches were not understood to be at risk prior to October 2007, and thus, prior to October 2007, were considered immaterial by the market.

89.     Lead Counsel deposed Professor Ferrell on November 11, 2011.

90.     On November 18, 2011, Lead Counsel filed extensive reply papers consisting of: (i) a 31-page reply brief, (ii) a rebuttal declaration of Professor Jarrell, (iii) the declaration of Plaintiffs' additional expert, Joseph R. Mason, Professor of Finance and the Hermann Moyse, Jr./ Louisiana Bankers Association Endowed Chair of Banking at the E.J. Ourso College of Business, Louisiana State University, Senior Fellow at the Wharton School, and Academic Affiliate at AlixPartners, LLP; and (iv) a 47-page declaration of Lead Counsel attaching as exhibits 143 documents including numerous documents produced by Defendants in discovery.

91.     Professor Mason's declaration concerned the materiality of Citigroup's CDO exposure during the Class Period.  Professor Mason had published a paper in February 2007 explaining that CDOs were then at heightened risk due to the deterioration of subprime RMBS; his declaration in this case elaborated on this earlier work.  On December 8, 2011, the Court granted Defendants permission to take additional expert discovery and file sur-reply papers. Lead Counsel defended Professor Jarrell at his second deposition, taken by Defendants on January 4, 2012.  Lead Counsel also defended Professor Mason at his deposition, taken by Defendants on January 17, 2012.

92.     Defendants submitted sur-reply papers on January 27, 2012.  Lead Counsel prepared and filed a five-page letter brief in response on February 3, 2012.  The Court scheduled oral argument for February 9, 2012.  The parties agreed to adjourn the argument in order to engage in the mediation that resulted in the proposed Settlement.

**G.     Lead Counsel's Retention And Use of Experts**

93.     Lead Counsel on behalf of the Class retained three testifying experts in areas regarding specialized knowledge to assist in the prosecution of this matter.  Specifically, Lead

Counsel retained Professors Jarrell and Mason in connection with Plaintiffs' motion for Class Certification, as indicated above.  Professor Jarrell testified regarding the efficiency of the market for Citigroup stock and the materiality of the alleged misrepresentations and omissions, based on a statistical analysis of Citigroup's stock price.  Professor Mason testified regarding the materiality of Citigroup's CDO exposure during the Class Period.  Lead Counsel worked extensively with both Professor Jarrell and Professor Mason.

94.     Given the complexity and scope of the financial disclosure issues in the Action, it was imperative that Plaintiffs also retain a testifying expert on financial disclosure and accounting. Plaintiffs retained Harris Devor, CPA, of Schechtman Marks Devor PC, to serve in this capacity.  Although the litigation did not reach the stage at which Mr. Devor would have been required to submit to discovery, Lead Counsel consulted extensively with Mr. Devor in evaluating and analyzing the issues in the case and the documents produced by Citigroup and its auditor, KPMG.  The consultations with Mr. Devor aided Lead Counsel in propounding discovery to Defendants and third parties such as Citigroup's auditor, and in preparing for depositions.

95.     Lead Counsel on behalf of the Class additionally retained three consulting experts in areas regarding specialized knowledge to assist in the prosecution of this matter.  Specifically, the consulting experts aided Lead Counsel in analyzing issues relating to damages, CDO valuation, and loss causation.

### H.     The Mediation

96.     During the pendency of Plaintiffs' motion for class certification, the parties agreed to mediation and retained Judge Phillips to assist them in exploring a negotiated resolution.  The parties held arms'-length negotiations under the auspices of Judge Phillips

beginning in February 2012, including two face-to-face meetings in March and April, 2012.

97.     Judge Phillips requested that the parties submit mediation briefs in advance of the mediation.  Lead Counsel prepared and submitted extensive papers, including 10 compendia, each devoted to a discrete issue, consisting of 254 pages of narrative and analysis and attaching 700 exhibits.  These materials essentially set forth Plaintiffs' proof with respect to each element of Plaintiffs' claims as well as rebuttals to Defendants' anticipated arguments.  Plaintiffs intended these extensive materials to not only inform Judge Phillips of the basis for Plaintiffs' settlement demands, but to demonstrate to Defendants (and their insurers) that Lead Counsel were truly in command of the evidence and prepared for summary judgment and trial.  Plaintiffs believe that their voluminous submissions had the intended effect.

98.     After additional negotiations through Judge Phillips, on April 25, 2012, Judge Phillips made a mediator's proposal to settle the Action for $590 million, subject to the execution of a formal stipulation and the Court's approval.  On May 8, 2012, the parties accepted the mediator's proposal.

99.     Shortly thereafter, Lead Counsel informed the Court of the proposed Settlement. Over the course of the next several months, the parties engaged in additional negotiations regarding the full terms of the Stipulation and related settlement documents.  On August 28, 2012, the Parties entered into the Stipulation setting forth the terms and conditions of the proposed Settlement. On August 29, 2012, the Court entered an Order Preliminarily Approving Proposed Settlement and Providing for Notice, which preliminarily approved the Settlement, authorized the Notice be sent to potential Settlement Class Members, and scheduled the Settlement Hearing to consider whether to grant final approval of the Settlement. *See* Dkt. No.

156.[9]  Pursuant to the Court's August 29, 2012 Order, the Action was also certified as a class action with the consent of the Defendants for settlement purposes only.[10]

100.    The Settlement Amount was deposited into an escrow account on September 13, 2012, and has been invested for the benefit of the Class.

## III.    THE NOTICE TO THE CLASS MEMBERS SATISFIES THE REQUIREMENTS OF RULE 23, DUE PROCESS, AND THE COURT'S PRELIMINARY APPROVAL ORDER

101.    The Court's orders on preliminary approval required that notice be disseminated to the Class, set December 6, 2012 as the deadline for Class Members to request exclusion from the Class, set December 21, 2012 as the deadline for Class Members to submit objections to the Settlement, the Plan of Allocation or the Fee and Expense Application, and set a final approval hearing date of January 15, 2013.

102.    Pursuant to the Court's preliminary approval orders, Lead Counsel instructed GCG, the Court-approved Claims Administrator for the Settlement, to begin disseminating copies of the Notice and Claim Form by mail, to publish the Summary Notice in accordance with the Preliminary Approval Order, and to set up a telephone response system for handling inquiries from potential Class Members.  The Notice contains a thorough description of the Settlement, the proposed Plan of Allocation and Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation or the Fee and Expense Application, or exclude themselves

---

[9] On September 6, 2012, the Court issued an order amending certain dates regarding, *inter alia*, deadlines for objections and exclusion requests in the Court's August 29, 2012 preliminary order.  *See* Ex. P.

[10] On September 28, 2012, the Court entered an order further amending the Preliminary Approval Order with respect to the definition of the Class and the form of the Class Notice and Proof of Claim and Release to be provided to the Class.  *See* Dkt. No. 159.  The parties jointly requested the amended order, which involved alterations not material to the overall Settlement. The Court's August 29, September 6 and September 28 orders on preliminary approval are attached hereto as Exhibits O, P and Q.

from the Class. The Notice informs Class Members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount that will not exceed 17% of the $590 million Settlement Fund, and for reimbursement of litigation expenses in the approximate amount of $3,750,000, which may include the reasonable costs and expenses of Lead Plaintiffs directly related to their representation of the Class.

103.   The Notice fairly apprises Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.

104.   To disseminate the Notice, GCG obtained the names and addresses of potential Class Members from a listing provided by Citigroup and from banks, brokers and other nominees pursuant to the Preliminary Approval Order.  *See* Affidavit of Stephen J. Cirami Regarding (A) Premailing Administrative Activity; (B) Mailing of the Notice and Claim Form; (C) Publication of the Summary Notice; (D) Implementation of Toll Free Hotline and Website; and (E) Requests for Exclusion ("Cirami Aff.") attached hereto as Exhibit A at ¶¶ 8-10.

105.   On October 10, 2012, GCG disseminated 347,326 copies of the Notice and Claim Form (the "Notice Packet") by first-class mail.  *See id.* at ¶ 8. As of December 6, 2012, GCG had disseminated more than 2.15 million Notice Packets to potential Class Members.  *Id.* at ¶ 15.

106.   On October 23, 2012, in accordance with the Preliminary Approval Order, GCG caused the Summary Notice to the published once in the national edition of *The Wall Street Journal* and to be transmitted once over the PR Newswire.  *See id.* at ¶ 16.

107.   In order to provide Class Members with information concerning the Settlement, as well as downloadable copies of the Notice, Claim Form, and Stipulation, GCG also established a

dedicated website, http://www.citigroupsecuritiessettlement.com,. *See id.* at ¶¶ 4, 18.

108.    Lead Counsel has also established a team of paralegals and attorneys to handle inquiries about the Settlement from Settlement Class Members.  As of the date of this Joint Declaration, the team has handled 377 calls from claimants and provided written communications to 29 claimants inquiring about the Settlement.  Furthermore, working with Lead Counsel, GCG established and maintains a telephone call center for Settlement Class Members to call and obtain information about the Settlement, request a Notice package, and/or seek assistance from a live operator.  The toll free line assigned to this case is 1-877-600-6533.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

109.    Plaintiffs believe they could well have prevailed on the merits of their claims against Defendants. Defendants were just as adamant that Plaintiffs would fail. Having considered the foregoing, and evaluating Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed $590 million Settlement is fair, reasonable and adequate, and in the best interests of the Class.  Indeed, Lead Counsel submit that the Settlement is exceptional under all the circumstances.   At minimum, the Settlement appropriately balances the risks, costs, and delay inherent in complex cases, falls within the range of reasonableness, and warrants approval.

110.    Lead Counsel's endorsement of the Settlement is informed by the thorough understanding of the strengths and weaknesses of the claims and defenses in the Action gained through their extensive and rigorous prosecution of this matter, as described above.   Lead Counsel additionally considered: (i) the cash benefit to Class Members under the terms of the Stipulation; (ii) the difficulties and risks involved in proving the allegations of the Complaint;

(iii) the difficulties and risks involved in proving the complex claims, such as the materiality and falsity of the alleged misstatements and omissions, and whether the alleged fraud caused the Class' losses; (iv) the probability that Defendants would move for summary judgment at the close of discovery; (v) the attendant risks of litigation, especially in a complex action such as this, including the ability to maintain class status through to judgment; (vi) the delays inherent in such litigation, including appeals; and (vii) the uncertainty in Plaintiffs' theory of damages, even assuming that Plaintiffs could establish Defendants' liability.

111.    Securities class actions are by their nature legally and factually complex and difficult. This case was exceedingly so.  The financial instruments at the heart of this lawsuit – CDOs – are among the most complex and esoteric securities ever created.    Defendants also raised a host of complex factual and legal challenges increasing the uncertainty of a favorable outcome absent settlement.

112.    For example, Defendants maintained that the global financial crisis was the actual cause of all (if not most) of the losses suffered by Class.  Specifically, Defendants argued that the complained-of decline in Citigroup's stock price did not result from any corrective disclosures of alleged misrepresentations or omissions.  Instead, according to Defendants, the decline stemmed from "confounding" factors – market, industry, and other non-case-related events – at a time of unprecedented turmoil in the securities markets and the banking industry in particular.

113.    Defendants also maintained that Citigroup's Class Period CDO disclosures satisfied all applicable financial disclosure standards and were not false or misleading. According to Defendants, Citigroup was not obligated to disclose detailed line-item information about its super senior CDOs.

114.    Defendants also maintained that Citigroup's management did not know – and

could not have known – of the heightened risks presented by Citigroup's CDO exposure until the rating agencies' downgrades in October 2007.  Until such time, Defendants argued, Citigroup's senior management in good faith and reasonably believed that any risks associated with Citigroup's CDOs were remote.   Additionally, according to Defendants, Citigroup's management selected a pricing model for the CDOs in good faith because they believed the model appropriately reflected those instruments' value and not because the model minimized write-downs.  Defendants also were expected to argue that Citigroup's management was entitled to rely on the accuracy of Citigroup's financial statements as audited by KPMG.

115.    Although Plaintiffs and Lead Counsel were confident that they would have been able to support their claims with sufficient and admissible proof, litigating Defendants' anticipated motion for summary judgment and presenting the claims to a jury would have involved enormous time, expense, complexity and risk.  Trial would have involved dozens of witnesses and hundreds of exhibits.  Resolution of the expert issues alone could have required substantial *Daubert* hearings as well as lengthy pre-trial hearings.  The cost of experts over the course of the litigation would have risen well into the millions of dollars. Additionally, Plaintiffs faced the possibility that the Court would not grant (or would severely curtail) class certification.

116.    Plaintiffs also faced the possibility that the Court would grant Defendants summary judgment with respect to some or all of Plaintiffs' claims.  Whether Plaintiffs were able to establish numerous elements of proof – including materiality, damages, loss causation, and falsity – would likely have come down to inherently unpredictable and hotly disputed "battles of the experts."  Even if liability were established on summary judgment or at a trial of the Action, there was a real risk that, after a trial of the Action, the Class would have recovered an amount less than the Settlement Amount – or even nothing at all.  Moreover, jury reactions to Plaintiffs'

evidence (and the Defendants' responses thereto) on the types of complex issues in this case are inherently difficult to predict. Plaintiffs expected the entire trial to take several months. Moreover, whatever the outcome of trial, appeal certainly would have been taken to the Second Circuit and perhaps even to the United States Supreme Court.

117. All of the foregoing would have extended the case, thus delaying the ability of the Class to recover for years, if at all, while being extremely expensive for the parties. It would likely take additional years before the Action was finally resolved, absent a settlement.

118. In agreeing to the terms of the Settlement, Plaintiffs and Lead Class Counsel weighed the foregoing risks, expense, and delay, against the magnitude of the benefits – the $590 million Settlement. In light of such risks, expense, and delay, Plaintiffs and Lead Counsel believe that this Settlement represents a truly outstanding and exceptional recovery.

119. First, as noted, the $590 million recovery here is the largest recovery obtained in any of the numerous cases concerning alleged misrepresentation of CDO exposures – and, indeed, the largest recovery in any CDO-related action ever. By contrast, recently, similar claims with respect to UBS' CDO exposures (which were of similar size as Citigroup's) were dismissed with prejudice and without any recovery at all. *See In re UBS Sec. Litig.*, No. 07 CIV. 11225 (RJS), 2011 WL 4059356, at *1 (S.D.N.Y. Sept. 13, 2011). *See* ¶125. *Infra*.

120. Second, the Settlement is among the largest securities class action settlements ever, no matter the specific allegations. This Settlement is the 18th largest PSLRA settlement of all time, putting it in the top 1.5% of all PSLRA settlements and in the top 1% of securities class action settlements of all time. While that is quite impressive, the Settlement is more impressive still upon closer comparison to the 17 PSRLA cases that settled for larger amounts. *See* Ex. M.

121. Specifically, the top nine PSLRA settlements were reached more than five years

ago.  Due to the decisions in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 552 U.S.

148 (2008), *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), and *Janus Capital

Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) – and to a lesser extent due to the

decisions in *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010),

*Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784 (2010), and *Hubbard v. BankAtlantic Bancorp,

Inc.*, 688 F.3d 713 (11th Cir. 2012) – such mega-settlements ($1 billion or more), always a rarity,

are even less common today than they were several years ago.[11]   Many of these top nine

settlements would simply be unattainable in the current legal environment.  For example, the

multi-billion dollar bank settlements in *Enron*, *see, e.g.*, *In re Corp. Sec., Deriv. & "ERISA"

Litig.*, MDL No. 1446, 2008 WL 4178151 (S.D. Tex. Sept 8, 2008), would have been impossible

under *Stoneridge*, which restricted secondary-actor liability under §10(b). The $1.1 billion

settlement in *Royal Ahold N.V. Securities & ERISA Litigation*, 437 F.Supp.2d 467 (D. Md. 2006)

would not have occurred under *Morrison*, which would have deprived much of the *Royal Ahold*

class of standing.

122.    Moreover, 16 of the 17 larger PSLRA settlements stemmed from cases that

involved either claims under the Securities Act (which carry no requirement to plead or establish

*scienter*) or other non-*scienter* claims and/or an earnings restatement (*i.e.*, an admission of both

falsity and materiality) – factors which made them easier to prosecute than this case.  Moreover,

most of those settlements also involved contributions from more than one corporate defendant

(which increases potential recovery sources). *See* Ex. M.  No such factors are present here.

---

[11] As the Court is aware, these decisions severely curbed the ability of plaintiffs to prosecute
securities class actions.  *Stoneridge* and *Janus* limited the types of defendants that can be sued
for securities fraud, *Morrison* limited which plaintiffs have standing, and *Omnicom*, *Merck*, and
*BankAtlantic*, among other cases, limited the damages that successful plaintiffs can recover.

123.    The Settlement also represents an excellent result considering how other securities class actions arising out of the subprime crisis have fared.  As far as Lead Counsel is aware, the Settlement is the third-largest subprime crisis-related securities class action settlement.  The two larger settlements – *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09 Civ. 6351 (RJS) (S.D.N.Y.), and *In re Countrywide Financial Corp. Securities Litigation*, No. CV 07-05295 (MRP) (MAN) (C.D. Cal.), which settled for $627 million and $600 million, respectively – involved multiple corporate settling parties and included non-*scienter* Securities Act claims, unlike this action, which involved a single corporate settling party, Citigroup, and was based exclusively on *scienter*-based claims under the Exchange Act.  Additionally, both *Wachovia Preferred* and *Countrywide* turned on much simpler instruments (subprime mortgages) and factual determinations (the quality of such mortgages); while this Action, turning on CDOs, involved far more complex instruments requiring exponentially more complex factual determinations (such as the time that the super senior tranches of CDOs were understood to be at risk, and the valuation of such tranches).

124.    Furthermore, numerous securities actions arising out of the subprime crisis – many involving allegations similar to those here – have simply failed.

125.    First, many suits alleging misrepresentation and/or omission of CDO exposures were dismissed, notwithstanding the often-large size of the CDO exposures (generally exceeding $10 billion, and in some instances rivaling Citigroup's $40 billion + CDO exposure) and/or the often severe consequences of those exposures (in addition to multi-billion dollar losses, in many cases institutional failure and/or government bailouts).  *See*, *e.g.*, *UBS*, 2011 WL 4059356, at * 1 (CDO exposure exceeding $50 billion); *In re Royal Bank of Scotland Group PLC Sec. Litig.*, No. 09 CIV. 300 (DAB), 2012 WL 3826261, at *1 (S.D.N.Y. Sept. 4 , 2012) (CDO exposure

exceeding $20 billion; government bailout required); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 269 (S.D.N.Y. 2010), *reconsideration denied*, No. 09 MD 2058 (PKC), 2010 WL 4237304 (S.D.N.Y. Oct. 8, 2010) (CDO exposure exceeding $20 billion; government bailout required); *In re Security Capital Assurance Ltd. Sec. Litig.*, No. 07 Civ. 11086 (DAB), 729 F. Supp. 2d 569 (S.D.N.Y. 2010) (granting motion to dismiss with leave to replead) and 2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011) (dismissing with prejudice) (CDO exposure exceeding $16 billion; institution seized by regulators); *Blackmoss Invs. Inc. v. ACA Capital Holdings Inc.*, No. 07 Civ. 10528 (RWS), 2010 WL 148617, at *1 (S.D.N.Y. Jan. 14, 2010) (CDO exposure exceeding $12 billion; institution seized by regulators); *In re Deutsche Bank AG Sec. Litig.*, No. 09 Civ. 1714 (DAB), 2012 WL 3297730, at *1 (S.D.N.Y. Aug. 10, 2012), *on reconsideration*, No. 09 Civ. 1714 (DAB) 2011 WL 3664407 (S.D.N.Y. Aug. 19, 2011) (CDO exposure exceeding $10 billion); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 290 (S.D.N.Y. 2010) (CDO exposure exceeding $10 billion); *In re Barclays Bank PLC Sec. Litig.*, No . 09 CIV. 1989 (PAC), 2011 WL 31548, at *1 (S.D.N.Y. Jan. 5, 2011) (CDO exposures of ~$10 billion), *reconsideration denied*, 2011 WL 2150477 (S.D.N.Y. May 31, 2011); *In re Societe Generale Sec. Litig.*, No. 08 Civ. 2495(RMB), 2010 WL 3910286, at *1 (S.D.N.Y. Sept. 29, 2010) (CDO exposure of ~$10 billion); *Copeland v. Fortis*, 685 F. Supp. 2d 498, 499 (S.D.N.Y. 2010), *clarified on denial of reconsideration*, No. 08 CIV. 9060 (DC), 2010 WL 2102454 (S.D.N.Y. May 20, 2010) (CDO exposure exceeding $6 billion; government bailout required); *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 182 (S.D.N.Y. 2010) (CDO exposures of ~$1 billion).

126.    Second, more broadly, many suits stemming from the subprime crisis but

involving less complex exposures (*e.g.*, direct mortgage exposures rather than exposures to complexly-structured CDOs), were likewise dismissed. *See, e.g.*, *Kuriakose v. Federal Home Loan Mortg. Corp.*, No. 08 Civ. 7281 (JFK), 2012 WL 4364344 (Sept. 24, 2012) (multi-hundred billion dollar mortgage and RMBS exposure); *Fulton Cnty. Emp's' Ret. Sys. v. MGIC Investment Corp.*, No. 08-C-0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010), *aff'd*, 675 F. 3d 1047 (7th Cir. 2012) (mortgage and RMBS exposure); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-61542-CIV., 2011 WL 1585605 at *1 (S.D. Fla. Apr. 25, 2011), *aff'd*, *Hubbard v BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (commercial real estate exposure); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 341 (S.D.N.Y. 2011) (mortgage exposure); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 503 (S.D.N.Y. 2011) (student loan exposures); *Waterford Twp. Gen. Emp's Ret. Sys. v. SunTrust Banks Inc.*, No. 09-CV-617 (TWT), 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) (mortgage exposure); *In re Radian Sec. Litig.*, No. 07-3375, 2010 WL 1767195, at *1 (E.D. Pa. Apr. 30, 2010) (mortgage and RMBS exposure); *In re Homebanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336 (N.D. Ga. 2010) (mortgage exposure); *Waterford Twp. Gen. Emp's Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *1 (S.D. Fla. Mar. 30, 2010) (mortgage exposure); *New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, No. 2:07-cv-5756-JHN-FFMx, 2010 WL 1473265, at *1 (C.D. Cal. Mar. 29, 2010), *aff'd*, 460 F. App'x 642 (9th Cir. 2011) (subprime mortgage exposure); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW-RZx, 2009 WL 2767670, at *1 (C.D. Cal. Aug. 21, 2009) (mortgage exposure); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 952 (S.D. Ohio 2009) (subprime mortgage exposure); *In re 2007 Novastar Fin., Inc., Sec. Litig.*, No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008), *aff'd*, 579 F. 3d 878 (8th Cir. 2009) (subprime mortgage exposure); *In re IMPAC Mortg. Holdings, Inc. Sec.*

*Litig.*, 554 F. Supp. 2d 1083, 1086 (C.D. Cal. 2008) (mortgage exposure).

127.    The recent dismissal of two of the aforementioned high-profile securities class actions arising out of the financial crisis highlights the merits of the Settlement.  Each case involved claims similar to those here.  In *UBS*, the plaintiffs alleged that UBS misrepresented and omitted information concerning its CDO exposure from August 2002 and February 2009, *i.e.*, claims nearly identical to those pled by Plaintiffs against Citigroup.  2011 WL 4059356, at *1.  The Court dismissed the claims in *UBS* with prejudice.  The same fate met the claims in *Kuriakose*, the securities class action relating to Freddie Mac. 2012 WL 43 643 44, at *1. There, the plaintiffs alleged, *inter alia*, that Freddie Mac misrepresented the quality of its mortgage/RMBS exposures between late 2007 and September 2008.[12]

128.    The Settlement also compares favorably with the results of related litigation against Citigroup arising from the same underlying facts.  First, as indicated above, the SEC, which alleged only "non-*scienter* fraud" claims under Section 17 of the Securities Act as to Citigroup's CDO exposures, recovered $75 million in its settlement with Citigroup – a fraction of Plaintiffs' $590 million recovery.  Second, the Abu Dhabi Investment Authority ("Abu Dhabi") prosecuted an arbitration against Citigroup alleging fraud in connection with a $7.5 billion investment that Abu Dhabi made in Citigroup in November 2007.  The arbitration panel ruled in favor of Citigroup and against Abu Dhabi on all claims:  Abu Dhabi recovered nothing. Third, derivative and ERISA actions against Citigroup arising from the same subject matter as this Action (Citigroup's CDO exposures) were each dismissed.  *See In re Citigroup Inc. S'holder*

---

[12]    Even more broadly, the recovery here is impressive in light of the fact that more than 40% of all securities class actions do not survive dismissal and the majority of the securities class actions that make it through trial result in verdicts for defendants.  *See* Ex. B (2012 NERA Report titled "Recent Trends in Securities Class-Action Litigation: 2012 Mid-Year Review" (*footnote continued on next page*)

*Deriv. Litig.*, 788 F. Supp. 2d 211 (S.D.N.Y. 2011); *In re Citigroup ERISA Litig.*, 2009 WL 2762708 (S.D.N.Y. Aug 31, 2009), *aff'd*, 662 F.3d 128 (2d Cir. 2011), *cert. denied sub nom Gray v. Citigroup, Inc.*, No. 11-1531, 2012 WL 2375361 (U.S. Oct. 15, 2012).

129.     In sum, the Settlement achieved in this Action compares quite favorably when compared against, *inter alia*:  (1) all securities class actions turning on alleged misrepresentation of CDO exposures; (2) all securities class actions arising from the broader subprime crisis; (3) all securities class actions in their entirety, no matter the specific facts; and (4) all parallel litigation against Citigroup arising from the same facts.  By every one of these measures, the Settlement is literally top-notch.

130.     The Settlement results in a substantial and tangible present recovery, without the attendant risk and delay of trial and appeals, as well as the associated expense.  Plaintiffs' and Lead Counsel's endorsement of the Settlement is fully informed given the advanced stage of the case and the extensive discovery that has been taken.  Continuing to litigate against Defendants would mean a sharp and certain rise in litigation costs without any corresponding certainty for a sharp (or any) rise in recovery.  On the contrary, continuing litigation could result in a lesser recovery or in no recovery at all.  And even were the ultimate outcome favorable to Plaintiffs, at best, years of further delay would be virtually guaranteed.

131.     Given the complexity of the difficult issues presented by the Action, the impossibility of predicting their resolution, the substantial and guaranteed further expenditures of time and money and Court resources were this case to proceed against the Defendants with no certainty of ultimately producing a recovery equal to or better than that achieved now by the Settlement, Plaintiffs submit that the Settlement is fair, reasonable, adequate, in the best interests

---

dated July 24, 2012 ("NERA Report") at 21, 37.

of the Class, and should be approved.

## V. THE PLAN OF ALLOCATION IS FAIR AND SHOULD BE APPROVED

132. Pursuant to the Preliminary Approval Order, and as explained in the Notice, all Class Members wishing to participate in the settlement are to file a valid Proof of Claim on or before February 7, 2013.

133. As set forth in the Notice of Pendency, all Class Members who file valid Proof of Claim forms will receive a distribution of the Net Settlement Fund, after deduction of fees and expenses approved by the Court and taxes incurred on interest income earned by the Settlement Fund. The distribution will be made in accordance with the Plan of Allocation set forth and described in detail in the Notice.

134. The Plan of Allocation was prepared by Plaintiffs and Lead Class Counsel in close consultation with Plaintiffs' damages experts. The Plan of Allocation reflects Plaintiffs' damages experts' analyses under the demanding standards set forth in the relevant case law regarding loss causation. This included a review of publicly available information regarding Citigroup and statistical analysis of the price movements of Citigroup stock and the price performance of relevant market and industry indices. The Plan of Allocation reflects the allegations in the Complaint that Defendants made materially untrue and misleading statements and omissions resulting in violations of Sections 10(b) and 20(a) of the Exchange Act, and opinions of Plaintiffs' experts on the damages that were caused by specific disclosures relating to Defendants' alleged misleading statements. The objective of the Plan of Allocation is to equitably distribute the Settlement proceeds to the Settlement Class Members who suffered economic losses as a result of the alleged violations of the federal securities laws, as opposed to losses caused by market or industry factors or factors unrelated to the alleged violations of law.

135.     The Plan of Allocation is consistent with Plaintiffs' allegations, and Plaintiffs' expert's finding that on certain disclosure dates, Citigroup disclosed information that allegedly corrected previous alleged misrepresentations and omissions, causing statistically significant declines in Citigroup's stock price (net of factors unrelated to the alleged misrepresentations and omissions).   An Authorized Claimant's Recognized Loss will be based upon the particular disclosure date(s) on which the Claimant held Citigroup stock for those shares purchased during the Class Period.  The Recognized Loss formula is not intended to be an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement.  The Recognized Loss formula is simply the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants.

136.     Plaintiffs and Lead Counsel respectfully submit that the Plan of Allocation is fair reasonable and adequate, and should be approved by the Court.

## VI.     APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

### A.     The Requested Award of Attorneys' Fees

#### 1.     Summary

137.     The Notice mailed to the members of the Class stated that Lead Counsel would apply for award of attorneys' fees on behalf of themselves and Additional Settlement Class Counsel (collectively, "Plaintiffs' Counsel") not to exceed 17% of the $590 million Settlement Fund, as well as reimbursement of expenses incurred and advanced by Plaintiffs' Counsel in prosecuting this litigation not to exceed $3.75 million.

138.     Lead Counsel, on behalf of all Plaintiffs' Counsel,  is applying for fees of 16.5% of the Settlement Fund, and is seeking reimbursement of out-of-pocket litigation expenses of $2,842,841.59.

139. The accompanying Declarations of John C. Coffee, Jr., the Adolf A. Berle Professor of Law at Columbia University Law School, and Geoffrey P. Miller, Stuyvesant P. Comfort Professor of Law and Director, Center for Financial Institutions at New York University Law School, both widely-recognized experts in securities litigation, attest to the reasonableness of the fee request.

140. In prosecuting this Action over the course of nearly five years, Plaintiffs' Counsel (*i.e.*, both Lead Counsel and Additional Settlement Class Counsel), expended 115,342.33 hours resulting in a lodestar of more than $51.4 million. This amount excludes all time incurred in connection with this application for an award of fees and expenses. The total requested fee, therefore, yields a 1.89 multiplier with respect to Plaintiffs' Counsel's lodestar.

141. Of the foregoing totals, Lead Counsel expended 87,898.75 hours resulting in a lodestar of more than $39.1 million. Attached as Exhibit E is a firm resume for Lead Counsel and Lead Counsel's lodestar report that sets forth the identity and level of each Lead Counsel attorney and paraprofessional who worked on this litigation, their current billing rates, year of graduation from law school, and the number of hours each devoted to this litigation. This lodestar report was prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel, which are available at the request of the Court.

142. The chart set forth in Exhibit E also details the expenses Lead Counsel incurred and underwrote during this period of $2,545,393.88, all of which was at risk in this litigation. This amount includes the fees and expenses of experts and independent service providers, whose services Lead Counsel required to successfully prosecute and resolve this case against the Defendants. Lead Counsel also incurred significant expenses for electronic storage, photocopying, imaging and electronic management of tens of millions of pages of documents,

and online factual and legal research.  These expenses are a necessary part of litigation of this magnitude and scale and were essential to enable Lead Counsel to achieve the results now before the Court – the $590 million Settlement.  The expenses incurred in this Action are reflected in the books and records of Lead Counsel. These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred.   The time expended in preparing Lead Counsel's application for fees and reimbursement of expenses has not been included in this request.

143.    With regard to work performed and expenses incurred by Additional Settlement Class Counsel at the direction of Lead Counsel, we have attached (as Exhibits F, G, H, I, J, K and L) declarations from Additional Settlement Class Counsel in support of an award of attorneys' fees and reimbursement of litigation expenses.  Included with each firm's declaration is a firm resumé, a schedule summarizing the lodestar of each firm, as well as the expenses incurred by category.  As set forth in the individual firm declarations, the lodestar summaries were prepared from contemporaneous daily time records regularly prepared and maintained by Additional Settlement Class Counsel, which are available at the request of the Court.

144.    Exhibit D summarizes the collective lodestar of all Plaintiffs' counsel, which shows that these firms have collectively expended 115,342.33 hours resulting in a collective lodestar of more than $ 51.4 million.  *Id*.

145.    At all times, Lead Counsel supervised and monitored the work provided by all of the lawyers on this Action working under Lead Counsel's supervision.  While we personally devoted substantial time to this case, other experienced attorneys at our firm undertook particular tasks appropriate to their levels of expertise, skill and experience, and junior attorneys and paralegals worked on matters appropriate to their experience levels.  Throughout the Action,

Lead Counsel also allocated work assignments to Additional Settlement Class Counsel to avoid unnecessary duplication of effort. The biographies for attorneys who devoted substantial time to the prosecution of the action for Lead Counsel are included in their firm resumes, which are attached at Exhibits E - L.

146. The rates billed by Plaintiffs' Counsel (ranging from $275 to $850 per hour) are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude. *See* Miller Decl. at ¶¶ 38-42 and Tables 1-3 therein. Similar billing rates have been approved by other courts in this Circuit, as set forth in the accompanying memorandum of law.

147. Lead Counsel submits that the requested award of fees is fair and reasonable based upon the significant risk of the litigation and the quality of representation by Plaintiffs' Counsel in achieving the exceptional Settlement before the Court. Indeed, as discussed in the accompanying memorandum of law, courts regularly award fee requests with larger lodestar multipliers and that represent larger percentage fees in securities fraud class actions that settle in the range of the Settlement here. In fact, the request here is below the average percentage and the average lodestar multipliers for cases that settle for comparable sums. *See* Miller Decl. at ¶ 58; Coffee Decl. at ¶ 18. Lead Counsel submit that this case would merit a fee award at the very "top end" of the customary fee award scale, given the exceptional recovery that has been achieved by Lead Counsel's singular efforts in the face of significant risks.

148. As detailed in the accompanying memorandum of law and in the Declarations of Professors Coffee and Miller, standard practice in the Second Circuit is to award fees on a percentage of recovery and/or lodestar basis following consideration of six factors set forth in *Goldberger v. Integrated Res.*, 209 F.3d 43, 50 (2d Cir. 2000). Each is discussed separately below.

## 2.      Time and Labor Expended By Counsel

149.     As indicated above, in prosecuting this Litigation over the course of more than five years, Plaintiffs' Counsel collectively expended 115,342.33 hours resulting in a total lodestar of more than $51.4 million.  Plaintiffs' Counsel also collectively underwrote expenses of $2,842,841.59 during this period.  The prosecution of the Action included, among other things, as detailed above:

a.      Conducting a comprehensive, extensive, original, and independent factual investigation prior to filing the Complaint;

b.      Drafting and filing the consolidated complaint and the consolidated amended complaint, each of which exceeded 500 pages;

c.      Researching and briefing the opposition to Defendants' motion to dismiss, as well as preparing and submitting numerous supplemental letter briefs regarding pertinent factual and legal developments during the pendency of the motion;

d.      Preparing and serving extensive written discovery on Defendants and third-parties;

e.      Reviewing and analyzing approximately 40 million pages of documents produced by Defendants and third-parties;

f.      Overseeing, training and managing a team of approximately 35 attorneys to  review and analyze the documents that were produced by Defendants and third-parties;

g.      Taking the depositions of 33 former or current employees or executives of Citigroup;

h.      Defending 16 class-related depositions;

i.      Retaining and working extensively with three testifying experts and three additional consulting experts;

j.      Deposing Defendants' expert and defending three depositions of Plaintiffs' experts;

k.      Researching and briefing Plaintiffs' motion for class certification;

l.      Preparing extensive confidential mediation submissions, which included ten compendia consisting of 700 exhibits and 254 pages of narrative and analysis;

m.      Participating in extensive and intensive arms'-length negotiations under the auspices of Judge Phillips,  including two days of face-to-face mediation sessions, which resulted in the parties reaching the proposed Settlement;

n.      Preparing and submitting the settlement agreement and supporting documents, including notices, publication notices, and proposed preliminary and final approval order;

o.      Supervising the Court-appointed Claims Administrator in all administration proceedings to date, including effectuation of Notice to the Class, publication of the Summary Notice, establishment of the Notice website, responding to class member inquiries and requests for assistance regarding proofs of claim, and ongoing collection and processing of Class Members' claim forms; and,

p.      Consulting with Plaintiffs' damages experts in devising the Plan of Allocation;

150.    The efforts expended by Plaintiffs' Counsel were extensive, time-consuming, challenging, and undertaken in the face of substantial risks.   Lead Counsel believes the persistence and the quality of those efforts were responsible for the superior result achieved in this case.

151.    Moreover, throughout the case, as indicated above, Lead Counsel has made every effort to operate as efficiently as possible and to avoid unnecessary duplication.  At all times Lead Counsel carefully supervised and monitored the work assigned to Additional Settlement Class Counsel to ensure that the work quality was consistent and non-duplicative.   The significant time and effort devoted to this case by all of Plaintiffs' Counsel, and their commitment to the efficient management of the litigation, support approval of the requested award.

### 3.      Magnitude and Complexities of the Litigation

152.    Securities class actions are notoriously complex and on occasion involve matters of such magnitude they are of public concern. This litigation especially so.

153.    As indicated above, the gravamen of the Complaint is that during the Class Period, Citigroup – one of the largest and most important financial institutions in the world – wrongfully concealed and failed to take timely write-downs in connection with tens of billions of dollars in exposure to exotic financial instruments called CDOs.   Citigroup's senior-most executives later attributed Citigroup's subsequent near-collapse to its CDO exposures. These matters prompted an investigation by the FCIC and an enforcement action by the SEC.

154.    The magnitude and complexity of the matters at issue in this litigation may be illustrated by considering just one of many challenges facing Plaintiffs:   CDO valuation. Establishing the value of super senior CDO tranches – which Plaintiffs would have had to do to in order to prevail on their claims that Citigroup's alleged omissions and valuations of its super senior exposures amounted to actionable securities fraud – was a task that rivaled in complexity and scope any matters that Lead Counsel had previously confronted.   CDOs were ultimately dependent on the performance of their underlying collateral (largely RMBS), with the RMBS dependent upon the performance of their underlying mortgages.   The sheer amounts of mortgages involved were staggering: in fact, as illustrated below, valuing Citigroup's CDOs meant valuing and projecting the performance of a substantial portion of the nation's entire mortgage debt.  As Citigroup's own analysts pointed out, in a typical CDO collateralized by 150 different RMBS tranches, each of the 150 underlying RMBS might itself be backed by a pool of 5,000 different mortgages, meaning that each CDO rested on the performance of 750,000 mortgages.  However, as many of Citigroup's CDOs were collateralized substantially by other

CDO tranches, the complexity was magnified exponentially.   For example, in a CDO collateralized by 100 RMBS tranches and 50 CDO tranches (each of which in turn was collateralized by 150 RMBS tranches), the number of underlying RMBS tranches grew to more than 7,600 (100 RMBS tranches *plus* (i) 150 RMBS tranches underlying (ii) *each* of the 50 CDOs), while the number of mortgages exceeded 35 *million* (including (i) 5,000 mortgages in each of 100 different RMBS tranches (500,000 mortgages); and (ii) 750,000 mortgages underlying *each* of 50 different CDO tranches (37.5 million mortgages)).   Citigroup retained exposure to dozens of such CDOs.  Modeling the performance of Citigroup's CDOs – which thus would have required modeling the performance of hundreds of other CDOs, thousands of RMBS tranches and tens of millions of mortgages – was a task more complex than any Lead Counsel had faced in decades of prior litigation.

155.    It is difficult to imagine a litigation of greater complexity or magnitude.

156.    The complexity and magnitude of the litigation are also highlighted by the extensive efforts undertaken by Plaintiffs' Counsel detailed above.  These efforts included, *inter alia*, (i) preparing and filing of a Complaint exceeding 500 pages in length; (ii) preparing and filing a 75-page brief in opposition to the motion to dismiss; (iii) reviewing and analyzing 40 million pages of documents; (iv) taking or defending 50 depositions; (v) engaging and working with three testifying expert witnesses and three additional consulting expert witnesses; and (vi) preparing and submitting a mediation submission that included ten compendia consisting of 700 exhibits and 254 pages of additional narrative and analysis.

157.    The complexity and magnitude of the litigation are additionally demonstrated by the Settlement itself.   As indicated above, the Settlement is believed to be (i) the largest settlement in any CDO-related action ever; (ii) the 18th largest under the PSLRA, putting it in

the top 1.5% of all PSLRA settlements and likely in the top 1% of securities class action settlements of all time; and (iii) the third-largest settlement of a PSLRA case arising from the subprime crisis.

158.    There is no question that had the Settlement not been reached, the factual and legal questions at issue would continue to be the subject of lengthy, complex and highly adversarial litigation. Numerous issues would be involved in proving liability, damages, materiality, loss causation, and falsity, as set forth above.  These issues further confirm the magnitude of the challenge faced by Lead Counsel.

### 4.        The Risks of the Litigation

159.    To say that Lead Counsel faced risks that were merely substantial understates the matter. As noted above, the Action was undertaken on a wholly contingent basis.  From the beginning, Lead Counsel understood that they were embarking on a complex and expensive litigation with no guarantee of compensation for the investment of time, money and effort that the case would require.   It was unclear whether Plaintiffs would overcome Defendants' anticipated motions to dismiss – much less survive summary judgment or *Daubert* motions, or prevail at trial or on any post-trial appeals.

160.    Defendants, represented by a top-tier defense firm, aggressively defended this case.  There were serious doubts as to whether Plaintiffs could establish *any* of the elements of securities fraud at trial.  As indicated above, Defendants argued that the complained-of decline in Citigroup's stock price did not result from any corrective disclosures of alleged misrepresentations or omissions, but from "confounding" factors – market, industry, and other non-case-related events – at a time of unprecedented turmoil in the securities markets and the banking industry in particular.   Defendants maintained that Plaintiffs accordingly could not

establish the elements of materiality or loss causation.

161.    Defendants also maintained that Citigroup's Class Period CDO disclosures satisfied all applicable financial disclosure standards and were not false or misleading. Defendants also maintained that Citigroup's senior management did not know – and could not have known of – the heightened risks presented by Citigroup's CDO exposure until the rating agencies' October 2007 downgrades.  Until such time, Defendants argued, Citigroup's senior management in good faith and reasonably believed that any risks associated with Citigroup's CDOs were remote.  As such, Defendants argued that Plaintiffs could not establish the elements of materiality, falsity or *scienter*.

162.    Presenting these issues to a jury would have involved enormous risk.  At their depositions, Defendants' witnesses were well prepared and of strong demeanor.  Resolution of the financial disclosure, damages, materiality, and loss causation issues alone would have required extensive analysis from experts and the adjudication of *Daubert* motions, and ultimately would have required a jury to assess the competing expert positions at trial.  Presenting these issues to a jury would have involved enormous time, expense and complexity.

163.    Indeed, according to the 2012 NERA Report, more than 40% of all securities class actions are dismissed on dismissal or summary judgment motions before trial.  Ex. B at 21. Moreover, since the passage of the PSLRA, nearly 50% of the cases that survived summary dismissal and proceeded through trial resulted in victory for defendants.  *Id.* at 37.

164.    The risks of this litigation are highlighted by the failure of Abu Dhabi's arbitration, the dismissal of the related derivative and ERISA actions against Citigroup, and the dismissal of numerous securities class actions arising out of the financial crisis, as noted above, ¶¶ 124-28, *supra*.

165.    The government's trial record with respect to CDO-related claims further highlights the inherent risk and difficulties in proving liability.  In 2009, two former Bear Stearns fund managers were acquitted of criminal charges brought by the U.S. Department of Justice after the jury rejected prosecutors' arguments that the two men committed fraud by misrepresenting their hedge funds' exposures and the value of the CDOs in the funds.  *U.S. v. Cioffi and Tannin*, No. 08-CR-415 (E.D.N.Y. 2009).  Similarly, in July 2012, a former Citigroup Inc. manager was found not liable of civil charges brought by the SEC relating to alleged misrepresentations made in connection with a $1 billion Citigroup CDO transaction in 2007.  *SEC v. Stoker*, No. 11-cv-7387 (S.D.N.Y. 2011).

166.    In light of such risks, success was far from assured.  The Class faced numerous potential obstacles to securing a recovery absent the Settlement.  Many issues would have come down to an inherently unpredictable "battle of the experts."  There was substantial risk of a jury verdict for Defendants, or of judgment for Plaintiffs and an appellate reversal, any of which would have left the Class and Lead Counsel without any payment whatsoever.

167.    Lead Counsel's financial investment in the litigation was great – and wholly at risk.  Lead Counsel understood that they were embarking on a complex, risk-laden, expensive and lengthy litigation with no guarantee of ever being reimbursed, let alone compensated, for the investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel obligated themselves to ensure that sufficient dollars and attorney resources were dedicated to the prosecution of this litigation.

168.    Frequently, plaintiffs' counsel take contingent cases such as this and, after expending hundreds of thousands of hours and many millions of dollars out of pocket, receive nothing.  The risk of non-payment in complex cases such as this one is real.  Even if one

succeeds or is *en route* to success, there could be changes in the law or unexpected evidence. The statistics and other historical information set forth above belie any suggestion that a large fee is guaranteed by virtue of the commencement of a class action.  It takes hard and diligent work by skilled counsel to develop facts and theories that will succeed at trial or persuade defendants to enter into serious settlement negotiations.

169.    Securities class action lawsuits are also exceedingly expensive to litigate successfully.  Outsiders often focus on the gross fees awarded but ignore that those fees are used to fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal, state, and local authorities, and, when reduced to a bottom line, are far less imposing to plaintiffs' law firms than the gross fee awarded appears.

170.    When Lead Counsel undertook to act for Lead Plaintiffs and the Class, we were aware that the only way we could be compensated was to achieve a successful result.  The Settlement represents a very successful one.  Investment of these resources limited Lead Counsel's ability to staff other matters and to accept new profit-generating matters.  Risks and consequences of these kinds weigh in favor of higher compensation.  The Class recovery is not only successful, especially in light of the risks of this complex and unusual litigation, but demonstrably and quite concretely an excellent result.

### 5.    Quality of the Representation

171.    Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. Our experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them. We believe that our reputations as attorneys who will zealously carry a meritorious case through the trial and appellate levels, as well as our demonstrated ability to vigorously develop the

evidence in this case, placed us in a strong position in settlement negotiations with Defendants.

172.   Here, through exercise of tenacity, insight, and sheer effort, Lead Counsel was able to obtain a recovery in the top 1.5% of all PSLRA settlements of all time, and the highest recovery ever in any CDO-related action.   It is respectfully submitted that the Settlement represents a very impressive performance on behalf of the Class, as indicated in the accompanying materials from Professors Coffee and Miller.

173.   The quality of opposing counsel is also significant in considering the quality of services rendered by plaintiffs' counsel.   Plaintiffs here were opposed in this case by very skilled and highly-respected counsel.   Defendants were represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, which is among the top-tier defense firms in the country, with scores of attorneys in their litigation departments alone.   This prominent defense firm spared no effort or expense in the defense of their clients.   Throughout the Action, Defendants' counsel litigated aggressively, unfailingly and always skillfully zeroing in on the weakest elements of Plaintiffs' positions. Furthermore, in litigating against Citigroup, Lead Counsel faced an opponent with no meaningful limit on the resources it could mount to defend.

### 6.    Requested Fee In Relation To The Settlement

174.   As discussed in Lead Counsel's Fee Memorandum, the requested 16.5% fee, representing a multiplier of 1.89 times Plaintiffs' Counsel's lodestar, is well within the range of the fees typically awarded in securities class actions in this Circuit, and is below the multipliers often awarded in this Circuit in securities class actions with multi-hundred million dollar recoveries. In fact, the requested fee falls at the low end of the range of practice and precedent in securities class actions, where the average fee award was roughly 32% of the settlement (*see* Coffee Decl. at ¶ 12) and the multiplier was often more than 3 times lodestar in comparable

securities class action cases.  *See* Coffee Decl. ¶ 30.

175.    Comparison to other securities mega-settlements (settlements in the hundreds of millions of dollars or more) confirms the reasonableness of the fee request.    As the accompanying brief states, courts look at percentage of recovery and lodestar multipliers when assessing the reasonableness of a fee application by class counsel.  A review of securities mega-settlements demonstrates that the higher the settlement amount, the more relevant the lodestar multiplier is to the analysis.  This is a result of economies of scale. The lodestar required to prosecute an action that settles for $900 million is generally not 6 times the lodestar needed to prosecute actions that settle for $150 million.  Thus, if fee percentages were the same for both cases, the lodestar multiplier in the $900 million case would often be unreasonably high.  Therefore fee percentages in  securities class actions that settle for more than $800 million are generally lower  than they are in smaller settlements – even smaller settlements that are still in the "mega-settlement" category, but the lodestar multipliers are almost uniformly well above the 1.89 lodestar multiplier that counsel seeks here, and they are often 4x lodestar or more. *See In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (approving multiplier of 5.2); *In re Worldcom, Inc. Sec. Litig.*, No. 02 Cv. 3288 (DLC), 2005 WL 2319118 (S.D.N.Y. Sep 21, 2005) (multiplier of 4); *In re Tyco Intern., Ltd. Multidist. Litig.*, 535 F. Supp. 2d 249 (D.N.H. Dec. 19, 2007) (multiplier of 2.697); *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129 (2d Cir.  2008) (multiplier of 2.04); *In re Nortel Networks Corp. Sec. Litig.*, No. 04-cv-2115 (LAP), slip op at 10 (S.D.N.Y. Dec. 26, 2006) (approving multiplier of 4.78); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F.Supp.2d 383 (D. Md. Nov. 02, 2006) (multiplier of 2.569); *In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009) (awarding multiplier of 6.5).  By contrast, the fee request here represents a

multiplier below 2.

176.    In PSLRA class actions that settle in the range of $550 million to $800 million (a fair point of comparison to this Settlement), courts routinely award fees of 17% or more and/or lodestar multipliers of 2 or more.  *See In re HealthSouth Corp. Stockholder Litig.*, No. 03-cv-1500, Dkt. No. 1112, *slip op*. at 2 (N.D. Ala. Feb. 12, 2008) (awarding fee equal 17.5% and 3 multiplier in case involving $445 million recovery); *In re Wachovia Preferred Sec. & Bond/Notes Litig*., No. 09 Civ. 6351, 2012 WL 2589230, at *3 (S.D.N.Y. Jan. 3, 2012) (awarding fee equal to 2.3 multiplier in case involving $627 million recovery); *In re Lucent Techs., Inc. Sec. Litig*., 327 F. Supp. 2d 426, 442 (D.N.J. 2004) (awarding fee equal to 17% on $517 million recovery); *In re Cardinal Health, Inc. Sec. Litig*., 528 F. Supp. 2d 752, 767-70 (S.D. Ohio 2007) (awarding fee equal to 18% and 5.9 multiplier in case involving recovery of $600 million); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515-16 (S.D.N.Y. 2009) (awarding fee of 33.3% of $586 million settlement fund).

177.    Our research shows that the average fee percentage for cases in this range is 17% and the average multiplier is 2.13.  Thus, our fee request is below the average fee award for PSLRA cases of this size by either measure (lodestar multiplier or percentage of recovery).

178.    In fact, we are not aware of a single PSLRA case that settled for more than $400 million where the court rejected a fee request that was less than 17% and that featured a multiplier of less than 2 times lodestar.

179.    Thus, the lodestar cross-check confirms the reasonableness of the fee request.

180.    We respectfully submit that a percentage-based award at the very top end of the percentage fee range would be fully justified by the extraordinary results achieved by counsel in this Action.  At minimum, we respectfully submit that Lead Counsel have earned a fee award

that is comfortably within that range and below the average.

### 7.    Public Policy Considerations

181.    Public policy considerations were well-stated by the Honorable Denise Cote in her opinion in *In re WorldCom, Inc. Securities Litigation*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005), where she held:

> Public policy also supports the approval of this fee request. The size of the recovery achieved for the class . . . could not have been achieved without the unwavering commitment of Lead Counsel to this litigation.  Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment.  If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class.  In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives. After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation. While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain.

182.    The same applies here.  As indicated above, Lead Counsel led the way through their dynamism.  Lead Counsel conducted their own comprehensive, original, and independent investigation and filed their 536-page Complaint at a time when there was virtually no detailed information about the matters at issue in the public domain.  No complaint before or since, in any other action turning on CDO exposures, even attempted, let alone achieved, what Lead Counsel did unaided here.  As the Court's published opinion in this Action makes clear, the unique work performed by Lead Counsel – distinguishing the pleadings in this case from those in all other CDO exposures cases – was directly responsible for maintaining the viability of Plaintiffs' claims.  Lead Counsel's investigation predated by more than a year the disclosure of any relevant

information by regulators.  When government regulators finally went public with the results of their investigation, the facts corroborated the substance of core allegations of Plaintiffs' Complaint.  Additionally, Lead Counsel pled and prosecuted more extensive claims, took broader discovery, and obtained a far larger settlement than the government.  *See* ¶¶ 33-46, 51-57 and 61-95, *supra*.

183.   It can truly be said that the excellent result in this case was a product of Lead Counsel's initiative and tenacity.  Counsel should be rewarded for their singular effectiveness in obtaining the results achieved for the Class.

### 8.   Objections To The Fee Request

184.   As set forth above, more than 2.1 million Notice Packets have been mailed to potential members of the Class.  *See* Ex. A (Cirami Aff.) at ¶ 15.  In addition, the Summary Notice was published in the national edition of the national edition of *The Wall Street Journal* and transmitted over the PR Newswire. *See id.* at ¶ 16. The Notices explain the Settlement and Lead Counsel's anticipated fee request, which has subsequently been reduced.

185.   To date, the parties have received two objections to the Fee and Expense Application, both from class members who purchased 100 shares of Citigroup stock or fewer. Moreover, the deadline for Class Members file objections is not until December 21, 2012. Pursuant to Court order, we plan to address all timely-filed objections in a submission that will be filed on January 4, 2013.

186.   In sum, given the complexity and magnitude of the Action, the responsibility undertaken by Lead Counsel, the difficulty of proof on liability and damages, the experience of Lead Counsel and defense counsel, and the contingent nature of Plaintiffs' Counsel's agreement to prosecute this Action, Lead Counsel respectfully submit that the requested attorneys' fees are

reasonable and should be approved.

**B.    The Requested Reimbursement of Litigation Expenses**

187.    Lead Counsel are also requesting reimbursement of the out-of-pocket expenses necessarily incurred and advanced by Plaintiffs' Counsel in the prosecution of the litigation in the amount of $2,842,841.59.  Exhibits E - L contain charts summarizing these amounts by firm and category; Exhibit D is a schedule of expenses incurred by firm and in the aggregate.

188.    The expenses incurred by Plaintiffs' Counsel were necessary and appropriate for the prosecution of this Action.  These expenses include charges for payments to experts and consultants; computer research devoted to the case; costs incurred in travel; charges for photocopying; telephone, postal and express mail charges; and similar case-related costs.  Charts reflecting all expenses by category for which reimbursement is sought are attached hereto as Exhibits E-L.  Courts have typically found that such expenses are reimbursable from a fund recovered by counsel for the benefit of the class.

189.    Included in the amount of expenses is $1,345,527.83 paid or payable to Plaintiffs' experts and consultants.  This encompasses over 47.33% of Plaintiffs' Counsel's total expenses. As detailed above, Lead Plaintiffs worked extensively with experts.  Experts were utilized on such issues as damages, accounting, financial disclosure, and CDOs.  Plaintiffs' experts assisted Lead Counsel in discovery, motion practice, and mediation.  Plaintiffs' damages expert also assisted Lead Counsel in the preparation of the Plan of Allocation.  Lead Counsel believes that the expert expenses were a necessary, if not critical component in Plaintiffs' success.  As noted previously, the fees of Professors Coffee and Miller relating to their opinions on the reasonableness of our fee request are not included in this figure.

190.    In addition, Lead Counsel obtained, reviewed and analyzed almost 40 million

66

pages of documents from Citigroup and numerous non-parties.   In order to effectively and efficiently review and analyze the documents, a document management system was necessary. Lead Counsel retained Precision Discovery to host the database.   Plaintiffs' document database and outside copying costs represent an additional substantial expense incurred by Lead Counsel on behalf of the Class.   A total of $997,981.85 of the expenses, or approximately 35% of total expenses, relate to these efforts.   Ex. E.

191.   Plaintiffs' Counsel also incurred $48,500 for mediator fees.

192.   The expenses for which reimbursement is sought by Lead Counsel do not include the expenses of the Claims Administrator associated with providing Court-ordered notice to the Class and administering claims.   Those amounts will be separately requested on behalf of the Claims Administrator, after the settlement administration is complete.

193.   From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.   Lead Counsel also understood that, even assuming that the case was ultimately successful, an award of expenses would not compensate them for the lost use of the funds advanced to prosecute this Action.   Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.   Lead Counsel carefully reviewed each of the expenses to ensure that they accurately reflect costs necessarily incurred in obtaining the Settlement.

194.   As the Notice indicates, approval of the Settlement and Plan of Allocation is separate from the approval of Lead Counsel's application for an award of fees and expenses. Any determination with respect to Lead Counsel's application for an award of fees and expenses will not affect the Settlement, if approved.

## VII. CONCLUSION

For the reasons set forth above and in the accompanying memoranda, Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable and adequate and should be approved; and that the application for an award of attorneys' fees and reimbursement of expenses is also fair and reasonable, and should be granted.

I declare under the penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed this 7th day of December 2012, in New York, New York.

_____
Ira M. Press

I declare under the penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed this 7th day of December 2012, in New York, New York.

_____
Peter S. Linden

# LIST OF EXHIBITS

A.   Affidavit of Stephen J. Cirami Regarding (A) Premailing Administrative Activity; (B) Mailing of the Notice and Claim Form; (C) Publication of the Summary Notice; (D) Implementation of Toll Free Hotline and Website; and (E) Requests for Exclusion, dated December 7, 2012

B.   A 2012 report by the National Economic Research Associates entitled "Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review," dated July 24, 2012 ("NERA Report")

C.   A 2012 report by Cornerstone Research entitled "Securities Class Action Settlements: 2011 Review and Analysis" ("Cornerstone Report")

D.   Schedule of Plaintiffs' Counsel's Lodestar and Expenses

E.   Kirby McInerney LLP lodestar report, expense report, and firm résumé

F.   Declaration of Andrew J. Entwistle Filed on Behalf of Entwistle & Cappucci LLC In Support of the Application for Award of Attorneys' Fees and Reimbursement of Expenses, dated December 7, 2012

G.   Declaration of Lionel Z. Glancy Filed on Behalf of Glancy Binkow & Goldberg LLP In Support of the Application for Award of Attorneys' Fees and Reimbursement of Expenses, dated December 7, 2012

H.   Declaration of William H. Narwold Filed on Behalf of Motley Rice LLC In Support of the Application for Award of Attorneys' Fees and Reimbursement of Expenses, dated November 20, 2012

I.   Declaration of Kenneth A. Elan Filed on Behalf of Kenneth A. Elan, Esq. In Support of the Application for Award of Attorneys' Fees and Reimbursement of Expenses, dated November 13, 2012

J.   Declaration of Alan L. Kovacs, Esq. Filed on Behalf of Law Office of Alan L. Kovacs In Support of the Application for Award of Attorneys' Fees and Reimbursement of Expenses dated December 6, 2012

K.   Declaration of Kenneth H. Gold Filed on Behalf of Kenneth H. Gold In Support of the Application for Award of Attorneys' Fees and Reimbursement of Expenses, dated December 5, 2012

L.   Declaration of John M. Allen Filed on Behalf of Allen Brothers Attorneys and Counsellors PLLC In Support of the Application for Award of Attorneys' Fees and Reimbursement of Expenses dated, December 4, 2012

M.      Chart detailing the top 17 securities class-action settlements under the PSLRA

N.      Compendium of Unpublished Opinions

O.      Court's Order Preliminarily Approving the Proposed Settlement and Providing for Notice dated August 29, 2012

P.      Court's Order Amending the Order Preliminarily Approving the Proposed Settlement and Providing for Notice dated September 6, 2012

Q.      Court's Order Further Amending the Order Preliminarily Approving the Proposed Settlement and Providing for Notice dated September 28, 2012