Exhibit B



NERA
ECONOMIC CONSULTING

24 July 2012



# Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review

## Settlements bigger, but fewer

By Dr. Renzo Comolli, Dr. Ron Miller, Dr. John Montgomery, and Svetlana Starykh

Insight in Economics™

# The pace of "standard" filings and the total value of potential claims are rising compared with the last three years.



# Recent Trends in Securities Class Action Litigation:
# 2012 Mid-Year Review
## Settlements bigger, but fewer

By Dr. Renzo Comolli, Dr. Ron Miller, Dr. John Montgomery, and Svetlana Starykh

24 July 2012

### Mid-2012 Highlights in Filings

- Filings on track to be as high or higher than in any of the last three years

- Merger objection suits continue to be a large proportion of filings

- No new filings with accounting codefendants

### New Analysis of Motions

- Of the cases that settled, 90% had a motion to dismiss filed and 42% had motion for class certification filed

- Settlements amounts depend on the litigation stage at which settlement is reached

### Mid-2012 Highlights in Settlements

- Settlement pace slowing down markedly

- Average settlement amounts rebound to levels close to the all-time high

## Introduction and Summary[1]

Securities class actions filed in Federal court have continued to be filed at their historical pace so far in 2012, but their composition has changed significantly. Last year, a wave of filings against Chinese companies, often involving reverse mergers, made the news. This year, those cases have greatly decreased in number. Merger objection cases continue to be a major portion of total filings, as they have since 2010.

The targets of litigation have been changing. Financial sector firms' share of filings in 2012 is smaller than it has been since 2005 while filings in the technology and health care sectors have risen. Accounting firms had frequently been named as codefendants in securities class actions in the past and had figured prominently in some of the largest settlements. However, since 2010 there have been relatively few accounting firms named and so far this year there have been none at all.

While filings have continued at their typical rate, settlements have not kept pace. The rate of settlements this year is on track to make 2012 the slowest year for settlement activity since 1999 and many of the settlements that have been reached do not include monetary compensation for investors.

Although the number of cases settled this year is low, the cases that have settled are relatively big ones. The average settlement value is more than double last year's level and higher than the recent historical average.

We also report newly-compiled statistics on the settlement value by status of the motions filed in those cases. Among other things, we find that most settlements occur after a motion to dismiss has been filed but before a motion for class certification has been decided.

## Trends in Filings[2]

### Rate of Filings

Federal filings of securities class actions are keeping up with the average pace since the passage of the Private Securities Litigation Reform Act (PSLRA) in 1995. In the first half of this year, 116 such actions were filed. At this pace, there will be 232 class actions filed in 2012 as a whole; for comparison, on average, 217 class actions were filed annually, between 1996 and 2011.[3] Although the number of class actions since 1996 has fluctuated from year to year, the longer-term average has remained substantially stable over time. See Figure 1.

Figure 1.   **Federal Filings**
January 1996 – June 2012



In contrast, the number of companies listed in the US has decreased markedly, by about 43% since 1996. Thus, the average company listed in the US is significantly more likely to be the target of a securities class action now than it was in 1996. See Figure 2.

Figure 2.  **Federal Filings and Number of Companies Listed in United States**
January 1996 – June 2012



Note: Number of companies listed in US is from Meridian Securities Markets.

## Filings by Type

Filings for the first half of 2012 included 26 merger objection cases and 83 cases alleging the violation of at least one of the following: Section 10b of the Securities and Exchange Act (including Rule 10b-5), Section 11, or Section 12 of the Securities Act. Credit crisis cases are becoming rarer as the events of 2008 fade into the past.[4] Only four credit crisis-related cases have been filed so far in 2012. See Figures 3 and 4.

Figure 3.  **Federal Filings by Type of Case**
January 2005 – June 2012



### Merger objection cases

There continued to be a relatively large number of merger and acquisition objection cases (merger objection cases) in recent years. Merger objection cases first represented an important component of federal filings in 2010, when they amounted to 31% of filings. These cases are brought on behalf of shareholders of a target company in a merger or acquisition, and typically rest on allegations that the directors of the target company breached their fiduciary duty to shareholders either by accepting a price for the shares that was too low or by providing insufficient disclosures about the value of the deal. These cases differ in many ways from the more traditional securities class actions, including legal aspects, dismissal rates, settlement amounts, and the speed with which they are typically resolved. Some of these differences are discussed below.

The merger objection cases differ in another important way from other recent waves of securities litigation such as IPO laddering, options backdating, credit crisis-related cases, and Chinese reverse mergers. To generalize, these earlier waves of litigation originated with particular actions, or alleged actions, of issuers that ended soon after the litigation began, either because of the litigation itself or because of the end of the underlying issue. Because of that quick end to the source of the litigation issue, a defined pool of companies that could be sued was created and the wave ended naturally when the pool was exhausted. Not so for the merger objection cases, where the litigated issues could potentially relate to any merger or acquisition. As such, the merger objection cases may continue indefinitely, in the absence of substantial changes in the legal environment, their number fluctuating with market cycles in M&A activity.

The decline in the number of companies listed in the US, discussed above, may be contributing to the shift towards less traditional types of securities class actions, such as merger objection cases. The reduction in traditional targets may give plaintiffs' firms an incentive to innovate in the kinds of cases that they bring.

It is also worth noting that the merger objection cases depicted in figure 3 are only the federal securities class action cases. Many more merger objection cases are filed in state courts or as derivative actions. In fact, almost three times as many deals have been the target of state class actions as have been subject to federal securities class actions.[5]

### Rule 10b-5, Section 11, and Section 12

Class actions alleging violations of Rule 10b-5, Section 11, and/or Section 12 historically have represented a large majority of federal securities class actions filed and are sometimes viewed as the "standard" type of securities class action.[6] Figure 4 depicts such cases for the period 2005 to today. These "standard" filings peaked in 2008 with the credit crisis. So far this year, 83 such securities class actions have been filed. If filings continue at this pace, by the end of the year, 166 class actions will have been filed—more than in any of the last three years, but well below the 2008 peak.

Figure 4.   **Federal Filings Alleging Violation of Any of: Rule 10b-5, Section 11, or Section 12**
By Filing Year; January 2005 – June 2012



New filings in 2012 also represent a larger total dollar volume of potential claims than in the last few years. We gauge potential claims with NERA's investor losses measure. This is a proxy for the aggregate amount that investors lost from buying the defendant's stock during the class period relative to investing in the broader market; it is also a rough proxy for the size of plaintiffs' potential claims. Aggregate investor losses are simply total investor losses across all cases for which investor losses are computed.[7] At their current rate of accumulation, aggregate investor losses by the end of 2012 would be larger than those in any of the previous three years. See Figure 5. Aggregate investor losses are up not only because the number of cases has grown but also because investor losses for a typical case has grown. The median investor losses in the first six months of 2012 have been more than twice the median investor losses in 2010 or 2011. See Figure 6.

Figure 5.   **Aggregate Investor Losses for Federal Filings with Alleged Violations of Rule 10b-5, Section 11, or Section 12**
By Filing Year; January 2005 – June 2012



Figure 6. **Median Investor Losses for Federal Filings with Alleged Violations of Rule 10b-5, Section 11, or Section 12**
By Filing Year; January 2005 – June 2012



### Filings by Issuer's Country of Domicile[8]

Last year, the big story for securities class action filings was the wave of cases involving Chinese companies listed in the US. This wave of litigation also has been referred to as the "Chinese reverse merger litigation" because of the way many such companies were listed in the US.[9]

This year, the number of these cases has dropped dramatically. Only 10 cases against Chinese companies listed in the US have been filed so far in 2012, less than half of the 2011 filing rate. See Figure 7. The reduced pace of filings against Chinese companies has at least two potential explanations. First, requirements for listing in the US through the reverse merger process have been tightened.[10] Second, the flurry of filings against Chinese companies may have made US listings less attractive for Chinese companies, because of increased potential legal costs.

Figure 7.  **Number of Federal Filings Against Chinese Companies**
January 2008 – June 2012



The number of cases filed against all foreign-domiciled companies is decreasing too, due to the decrease in filings against Chinese companies. See Figure 8. With the fall in filings against Chinese issuers, the rate of securities class actions filings against foreign companies listed in the US has now reverted to a level only slightly above the rate for US companies. In the first half of 2012, the proportion of securities class actions involving foreign companies was approximately the same as the proportion of foreign companies among issuers. See Figure 9.

Figure 8. **Filings by Company Domicile and Year**
January 2008 – June 2012



Note: Companies with principal executive offices in China are included in the totals for Asia.

Figure 9. **Foreign Domiciled Companies: Share of Filings and Share of All Companies Listed in United States**
January 2008 – June 2012



Note: Companies with principal executive offices in China are included in the counts of foreign companies.
Listings data are from Meridian Securities Markets. 2008 – 2011 data are as of respective year end, 2012 data are as of April.

## Filings by Circuit

Filings remain concentrated in two circuits: the Second (encompassing New York, Connecticut, and Vermont), and the Ninth (including California, Washington, and certain other Western states and territories). However, in the first half of 2012 the balance between these two circuits was substantially different from that in previous years.

During the first half of this year, filings in the Second Circuit have been made at a higher pace than in any recent year except 2008. Filings in the Ninth Circuit, by contrast, have decreased substantially. At their current pace, there will be only 30 filings in the Ninth Circuit this year, which would be the lowest total since the passage of the PSLRA in 1995. See Figure 10.

Figure 10.   **Federal Filings by Circuit and Year**
January 2008 – June 2012



## Filings by Sector

In 2008 and 2009, with the fallout from the credit crisis, filings of securities class actions against companies in the financial sector reached a peak, amounting to nearly half of all securities class actions. The share of filings against companies in the financial sector has declined since then. The decline continued in the first half of this year, in which financial companies represented only 11% of issuers subject to securities class actions. See Figure 11. These figures refer to companies named as primary defendants; companies in the financial sector also have been named as codefendants. Including codefendants, the fraction of cases involving a financial company is 19%, the lowest percentage since at least 2005. See Figure 12.

Figure 11.  **Filings by Sector and Year**
January 2008 – June 2012



Note: This analysis is based on the FactSet Research Systems, Inc. economic sector classification.
Some of the FactSet economic sectors are combined for presentation.

Figure 12. **Federal Cases in which Financial Institutions Are Named Defendants**
January 2005 – June 2012



The share of securities class actions with a defendant in the electronic technology and technology services or health technology and services industries has continued to increase, reaching 22% and 23%, respectively. The share of securities class action filings against issuers in the energy and non-energy minerals sector also has grown.

*Accounting codefendants are becoming rare*

Historically, a substantial fraction of securities class actions included an accounting firm as a codefendant. Over 2005-2009, 12% of cases had accounting codefendants; during 2010-2011, that percentage fell to 4%. So far this year, not a single newly filed federal securities class action has included an accounting codefendant. See Figure 13.

This dramatic change may be the result of changes in the legal environment. The Supreme Court's 2011 decision in *Janus* limited the ability of plaintiffs to sue parties not directly responsible for misstatements. Commentators have noted that, as a result of this decision, auditors may be liable only for statements made in their audit opinion.[11] Further, this decision comes after the Court's 2008 decision in *Stoneridge* limiting scheme liability. The cumulative effect appears to have made accounting firms relatively unattractive targets for securities class action litigation.

Despite the virtual disappearance of accounting codefendants, accounting allegations against any defendant are still a common feature in newly filed cases; in 2012, 26% of securities class action filings included allegations of accounting violations. See portion labeled "Accounting" in Figure 14.

Figure 13.   **Percentage of Federal Filings in Which an Accounting Firm is a Codefendant**
January 2005 – June 2012



## Allegations

NERA reviews complaints in securities class action filings to evaluate trends in the types of allegations that are made. Figure 14 contains the percentages of filings with allegations in different categories.[12]

So far in 2012, allegations related to product defects and operational shortcomings (other than financial) have been the most prevalent, having been made in almost 45% of complaints. Allegations related to earnings guidance, breach of fiduciary duty (typical in the merger objection cases), and accounting were each made in more than a quarter of the complaints filed.

Figure 14.   **Allegations in Federal Filings**
January 2008 – June 2012



The fraction of securities class actions alleging violations of Rule 10b-5 that also allege insider sales has continued to decrease in 2012 and has reached a new low since we started tracking these data in 2005.[13] Only 14% of the class actions alleging violations of Rule 10b-5 have alleged insider sales in the first half of 2012. See Figure 15.

Figure 15.   **Percentage of Federal Filings Alleging Violations of Rule 10b-5 with Insider Sales Allegations**
By Filing Year; January 2005 – June 2012



## Time to File

For Rule 10b-5 cases, we define "time to file" as the time from the end of the alleged class period to the date of filing of the first complaint. The average time to file has been decreasing since 2009. In the first half of 2012, it took 107 days, on average, for a complaint to be filed. This is down from a high of 224 days in 2009 and from 120 days in 2011. See Figure 16.

The median time to file was 49 days in the first half of 2012, meaning that half of the complaints were filed within 49 days. Unlike the average time to file, the median time to file is longer than in 2011, when it was only 27 days.

Figure 16. **Time to File**
Filings Alleging Violation of Rule 10b-5
January 2007 – June 2012





This analysis excludes cases where the alleged class period could not be unambiguously determined.

## Analysis of Motions

In an important addition to NERA's analysis of class actions, we have now collected data on motions and their resolutions, for federal securities class actions filed and settled in 2000 or later.[14] Specifically, we have collected data on motions to dismiss, motions for class certification, and motions for summary judgment. These data allow new insight into the process of the litigation of securities class actions and the relation between developments in litigation and the settlement that is ultimately reached. In this section we report on our first analysis based on the status of motions.

Motions to dismiss had at least been filed in the vast majority—nearly 90%—of the cases that settled: the remaining cases settled before any such motion had been filed. In almost 22% of cases where a motion to dismiss had been filed, settlement was reached before the court reached a decision on the motion.

Next we turn to the resolutions of the motion to dismiss. The most frequent decision on the motion to dismiss was a partial grant/partial denial, at 35% of cases filed, followed by complete denial for 28% of cases. A motion to dismiss was granted in 10% of cases that ultimately settled.[15] It is important to note that our data on resolutions are based on the status of the case at the time of settlement—for example, some cases that have been dismissed still reach settlement. These dismissals were likely either without prejudice or under appeal at the time of settlement; had these cases not settled, there was a chance the cases would be refiled or the dismissals would be reversed. As a result of our focus on settled cases, our data do not include the many cases which terminated with a dismissal, without a settlement. See Figure 17 for more details.

Figure 17.   **Filing and Resolutions of Motions to Dismiss**
Cases Filed and Settled January 2000 – June 2012



Most cases that settle do so before a motion for class certification is filed—58% of settled cases fall into this category. Of the settled cases for which a motion for class certification had been filed, 46% settled before the motion was resolved. A further 45% of the cases with a class certification motion end up with a certified class. See Figure 18 for more details.

Figure 18. **Filing and Resolutions of Motions for Class Certification**
Cases Filed and Settled January 2000 – June 2012



While most cases reach settlement before any decision on class certification, the cases that reach this point provide a measure of the overall speed of the legal process. For those cases in which the motion of class certification was eventually decided, the decision came within three years of the original file date of the complaint for almost three quarters of the cases. See Figure 19. It is possible that, with the Supreme Court having granted *certiorari* in *Amgen*, the speed with which a decision on the motion of class certification is reached will slow down, at least until *Amgen* is decided.

Figure 19. **Time From Complaint Filing to Class Certification Decision**
Cases Filed and Settled January 2000 – June 2012



Motions for summary judgment had been filed by defendants in only 11% of the cases that ultimately settled. See Figure 20 for details on the outcomes when cases settled after defendants filed such a motion. A very small number of motions for summary judgment were filed by plaintiffs.

Figure 20.  **Filing and Resolutions of Defendants' Motions for Summary Judgment**
Cases Filed and Settled January 2000 – June 2012



Unsurprisingly, the status of motions at the time of settlements affects typical settlement values. For example, for cases settled 2008 through 2012, the median settlement value is $9.1 million. For cases in which a class was certified at the time of settlement, the median settlement is $16.5 million, over the same period. In general, however, the relationship between settlement values and motion status at the time of settlement is complicated. Strategic considerations for both parties to the litigation can have an important influence on the stage at which a settlement occurs. Different kinds of cases are likely to settle at different points in the process, making simple comparisons across all cases difficult. Despite this difficulty, NERA research has found that there are statistically robust relationships between motion status and ultimate settlement values, when other case characteristics are taken into account. It is beyond the scope of this paper to provide details on this research.

## Trends in Case Resolutions

The typical securities class action takes several years to reach a final resolution, and some take a decade or more. Only a small fraction of securities class actions go to trial (see below), while the large majority of them are settled or dismissed.[16]

To analyze resolutions, we focus on annual "cohorts" of cases filed in different years. The 2001 cohort is the most recent one for which all cases have been resolved. For that cohort, 35% of cases were ultimately dismissed and 65% ultimately settled. For the next five annual cohorts, spanning the years 2002-2006, more than 94% of cases have been resolved. Results for these more recent cohorts indicate that the dismissal rate may be increasing. Indeed, for each annual cohort from 2003 to 2006, the dismissal rate has been 43% or more. These figures will ultimately change somewhat, because some cases are not yet resolved and other cases that have been dismissed may see reversals on appeal or be filed again (for cases dismissed without prejudice). Nonetheless, the evidence so far suggests that these more recent annual cohorts will ultimately see a higher dismissal rate than had been seen in earlier years. See Figure 21.

A larger proportion of cases in the 2007-2012 cohorts await resolution. It is too early to know the exact dismissal rate for cases filed in these recent years. That said, the preliminary data, as shown in the chart, suggest a continuing higher dismissal rate.

Figure 21.   **Status of Cases as Percentage of Federal Filings**
By Filing Year; January 2000 – June 2012



Note: Analysis excludes IPO laddering, merger objection cases, and verdicts. Dismissals may include dismissals without prejudice and dismissals under appeal.

An alternate way to look at dismissal rates is to examine the percentage of cases dismissed by year of resolution, rather than year of filing as above. Between 2000 and the first half of 2012, dismissed cases have been between 37% and 55% of the cases resolved. That percentage is 48%-55% in 2009-2012, subject to the same disclaimers about dismissals without prejudice and possible appeals. See Figure 22.

Figure 22.  **Status of Cases as Percentage of Federal Filings**
By Year of Resolution; January 2000 – June 2012



Note: Analysis excludes IPO laddering, merger objection cases, and verdicts. Dismissals may include dismissals without prejudice and dismissals under appeal.

The preceding discussion of case resolutions does not include the resolution of merger objection cases. Merger objection cases usually resolve quickly. Merger objections that are filed as federal securities class actions tend to be voluntarily dismissed relatively often because plaintiffs often elect to participate in the settlement of a parallel action filed in state court. Of the merger objection cases filed as federal securities class actions since the beginning of 2010, 6% settled, 34% were voluntarily dismissed because of the settlement in a parallel state action, 21% were dismissed, and 39% were pending as of June 30, 2012.

## Trends in Settlements

### Number of Settlements[17]

Settlements have been proceeding at an unusually slow pace so far this year. If the current pace continues for the whole year, settlement activity will be at its lowest level since 1999, with only 98 cases settled.

The overall number of settlements did not show a significant slowdown in 2011: there were 123 settlements in 2011, which is in line with the historical average. However, closer examination reveals that settlement activity had already started changing dramatically last year. A large portion of the 2011 settlements involved merger objection cases. Settlements are one more respect in which merger objection cases differ from other securities class actions. Merger objection cases have typically settled only for additional disclosures to investors and fees to plaintiffs' lawyers, with neither monetary compensation to investors nor changes to the terms of merger. Over 2010-2012, 89% of merger objection cases have fallen into this category. If we exclude such merger objection cases, the number of settlements in 2011 was the lowest since the passage of PSLRA in 1995.

In the first six months of 2012, only 31 settlements yielded monetary compensation to investors. If settlements were to continue at this pace for the rest of the year, then by the end of 2012 there would be even fewer such settlements than in 2011, setting a new post-PSLRA low record. See Figure 23.

Figure 23.   **Number of Settlements**
By Settlement Year; January 1996 – June 2012



Note: Analysis excludes IPO laddering cases and settlements without details. Merger objection settlements with payment to class or changes to terms of the merger are included in other settlements.

### Settlement Amounts

The average value of a settlement in the first half of 2012 was $71 million, a sharp rise from the average value of $46 million over the period 2005-2011.[18] See Figure 24. However, a handful of the very largest settlements often influences the annual average settlement. For the first six months of 2012, the average settlement value has been substantially increased by the $1.01 billion settlement in *In Re American International Group, Inc. Securities Litigation* ("AIG settlement"). The AIG settlement is composed of four tranches, three of which had been previously approved and the fourth of which was approved this year.

Figure 24.   **Average Settlement Value**
January 1996 – June 2012



Note: Settlements include 309 IPO laddering cases in 2009. Settlements exclude merger objection cases.

Figure 25 contains average settlements excluding those above $1 billion and the IPO laddering cases. Under these restrictions (which exclude the AIG settlement), this year's average settlement amount is $41 million, rebounding from last year's $31 million to levels close to the record levels of 2009 and 2010.

Another way to look at the typical settlement value is to examine median settlements: medians are more robust to extreme observations than are averages.[19] The median settlement amount in the first six months of 2012 was $7.9 million, approximately the same as in 2011 and consistent with pre-credit crisis levels. See Figure 26.

So far this year, there have been four "mega-settlements" over $100 million—a record high 14% of all settlements. Most settlements, however, are much more modest than the mega-settlements that dominate the news. Of cases that settled in the first half of this year, 52% have settled for less than $10 million. That percentage is in line with historical observations since at least 2005 (apart from 2010). See Figure 27.

Figure 25.  **Average Settlement Value, Excluding Settlements over $1 Billion**
January 1996 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.  For list of excluded settlements over $1 billion see Table 1.

Figure 26.   **Median Settlement Value**
January 1996 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.

Figure 27.   **Distribution of Settlement Values**
January 2008 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.

Table 1 presents the top 10 securities class action settlements of all time. The AIG settlement already appeared on our list last year, but reached final approval this year with the approval of the fourth tranche. The AIG settlement is one of only two settlements on the list after 2008; the other is Enron, which only completely settled in 2010, though both cases are based on much older events.

Table 1.   **Top 10 Securities Class Action Settlements (As of June 30, 2012)**

| Ranking | Company | Settlement Year | Total Settlement Year Value ($MM) | Settlements with Co-Defendants, if Any, that Were | | | |
| | | | | Financial Institutions | | Accounting Firms | |
| | | | | Value ($MM) | Percent | Value ($MM) | Percent |
|---|---|---|---|---|---|---|---|
| 1 | Enron Corp.[1] | 2010 | $7,242 | $6,903 | 95% | $73 | 1% |
| 2 | WorldCom, Inc.[2] | 2005 | $6,158 | $6,004 | 98% | $65 | 1% |
| 3 | Cendant Corp.[3] | 2000 | $3,692 | $342 | 9% | $467 | 13% |
| 4 | Tyco International, Ltd. | 2007 | $3,200 | $0 | 0% | $225 | 7% |
| 5 | AOL Time Warner Inc. | 2006 | $2,650 | $0 | 0% | $100 | 4% |
| 6 | Nortel Networks (I) | 2006 | $1,143 | $0 | 0% | $0 | 0% |
| 7 | Royal Ahold, NV | 2006 | $1,100 | $0 | 0% | $0 | 0% |
| 8 | Nortel Networks (II) | 2006 | $1,074 | $0 | 0% | $0 | 0% |
| 9 | McKesson HBOC Inc. | 2008 | $1,043 | $10 | 1% | $73 | 7% |
| 10 | American International Group, Inc. | 2012 | $1,010 | $0 | 0% | $98 | 10% |
| **Total** | | | **$28,311** | **$13,259** | **47%** | **$1,099** | **4%** |

Notes: For this summary table only, tentative and partial settlements are included for comparison, and "Settlement Year" in this table represents the year in which the last settlement—whether partial or final—had the first fairness hearing. For partial tentative settlements "Settlement Year" is the year in which this settlement was announced.

[1]   The fairness hearing for the last tentative partial settlement, with Goldman Sachs, was held on February 4, 2010.

[2]   The settlement value incorporates a $1.6 million settlement in the MCI WorldCom TARGETS case.

[3]   The settlement value incorporates a $374 million settlement amount in the Cendant PRIDES I and PRIDES II cases. Settlement in the Cendant PRIDES I case was a non-cash settlement valued at $341.5 million. The settlement value also incorporates 50% of December 29, 2007 separate settlement of claims of Cendant and certain former HFS officers against E&Y. Under the terms of the Cendant Settlement, the Class is entitled to 50% of Cendant's net recovery from E&Y. The additional recovery to the class is $131,750,000.

The aggregate amount of settlements approved in the first six months of this year exceeds $2 billion. See Figure 28. This amount includes just over $1 billion for the AIG settlement. If settlements were to continue at the current pace for the rest of the year, aggregate settlements by year end would be substantially higher than last year. This result, though, is largely driven by the AIG settlement; if we exclude AIG and extrapolate only the other settlements to the end of the year, then by year end the aggregate settlements could be as low as last year. In large part, the low aggregate settlement value to date this year reflects the small number of settlements as documented at the beginning of this section.

Figure 28. **Aggregate Settlement Value**
By Settlement Year; January 1996 – June 2012



Note: Settlements exclude Merger Objection cases. Excluding the 2010 Enron settlement, aggregate settlement value for that year was $4.3 billion.

## Investor Losses versus Settlements

Historically, "investor losses" have been a powerful predictor of settlement size. As noted above, NERA's investor losses variable is a proxy for the aggregate amount that investors lost from buying the defendant's stock rather than investing in the broader market during the alleged class period. Investor losses can explain more than half of the variance in the settlement values in our database.[20]

In general, settlement sizes grow as investor losses grow, but the relationship is not linear. In particular, settlement size tends to rise less than proportionately, so small cases typically settle for a higher fraction of investor losses (i.e., more cents on the dollar) than larger cases. For example, cases with investor losses below $20 million on average settle for 37.3% of investor losses, while cases with investor losses over $10 billion settle for an average of 2.2% percent of investor losses. See Figure 29.

Figure 29. **Settlement Value as a Percentage of Investor Losses**
By Level of Investor Losses; January 1996 – June 2012



Note that the investor losses variable is not a measure of damages since *any* stock that underperforms the S&P 500 would have "investor losses" over the period of underperformance; rather it is a rough proxy for the relative size of investors' potential claims. Thus, our findings on the ratio of settlement to investor losses should not be interpreted as the share of damages recovered in settlement but rather as the recovery compared to a rough measure of the "size" of the case.

Median investor losses for settled cases have been steadily increasing since the passage of the PSLRA, from $64 million for settlements in 1996 to $497 million in 2011. They appear to have skyrocketed in the first half of 2012, exceeding $1 billion. However, this figure is based on a relatively small number of settlements and as such may not represent a trend that will continue for the rest of the year. The median ratio of settlement to investor losses has reached a new post-PSLRA low at 1.2%, but that is unsurprising given that investor losses are high and (as explained above) settlements typically grow less than proportionally to investor losses. See Figure 30.

Figure 30. **Median Investor Losses and Median Ratio of Settlement to Investor Losses**
By Settlement Year; January 1996 – June 2012



Note: Settlements exclude IPO laddering and merger objection cases.

## Plaintiffs' Attorneys' Fees and Expenses

The settlement values that we report include plaintiffs' attorneys' fees and expenses in addition to the amounts ultimately paid to the class. In Figure 31, fees and expenses as a proportion of settlement value for settlements finalized from 1996 through June 2012, excluding merger objection cases, are shown. Typically, the proportion of a settlement taken by fees and expenses declines as the settlement size rises. For settlements below $5 million, for example, median plaintiffs' attorneys' fees are 33% of the settlement amount; while for settlements of over $500 million, median fees fall to 11%. Median plaintiff expense ratios fall over this settlement value range as well, as seen in Figure 31.

Figure 31.   **Median Plaintiffs' Attorneys' Fees and Expenses, by Size of Settlement**
January 1996 – June 2012



We have also analyzed trends in plaintiffs' attorneys' fees over time. Median fees for all settlements other than merger objections cases during the first half of this year have represented 20% of the settlement value—a small decrease since last year. See Figure 32. The general downward time trend in the fee percentage is explained, at least in part, by the fact that cases have been getting bigger over time, and that, as documented above, bigger cases typically have lower fee percentages.

Figure 32.  **Median Plaintiffs' Attorneys' Fees, by Year**
For Settlement Values Greater Than or Equal to $25M; January 1996 – June 2012



Note: Analysis excludes merger objection cases.

We report the fees for merger objection cases separately. For the merger objection cases that settled at the federal level since 2005 with no payment to investors, plaintiffs' attorneys' fees have been below $1 million in 68% of the cases. See Figure 33. For the merger objection cases that were voluntarily dismissed because a parallel state action settled, plaintiffs' attorneys' fees in the parallel state action have been below $1 million in 71% of the cases.

Figure 33.  **Distribution of Plaintiffs' Attorneys' Fees and Expenses in Merger Objection Settlements**
With No Payment to Investors; January 2005 – June 2012



Note: Cases filed and settled January 2005 - June 2012.  For merger objections voluntarily dismissed at federal level, attorneys' fees and expenses refer to the settlement in the parallel state merger objection case, when such settlement exists.

Aggregate plaintiffs' attorneys' fees and expenses for all federal settlements have been $414 million in the first six months of this year. See Figure 34. If fees and expenses were to continue at this pace, they would be noticeably higher than last year, but still the second lowest since 2004. Fees and expenses for the first six months of this year include $143 million for the AIG settlement. If the AIG fees and expenses are excluded, and if the remainder were to continue at the same pace for the rest of the year, aggregate fees and expenses for 2012 would end up being similar to the aggregate level for 2011.

Figure 34.   **Aggregate Plaintiffs' Attorneys Fees and Expenses**
January 1996 – June 2012



These fees are calculated for federal securities class actions only. As such, they do not include fees and expenses for merger objection cases filed in state court or as derivative actions, which may be lucrative for plaintiffs' law firms. One example is *In Re Southern Peru Copper,* a case in Delaware Chancery Court that yielded a well-publicized award of $285 million to plaintiffs' attorneys.

### Characteristics of Settled Cases

One of the policy goals of the PSLRA was to increase the participation of institutions as lead plaintiffs in securities class actions, and in that respect it has been a success. The proportion of settled cases with an institutional lead plaintiff rose sharply between 1996 and 2010, as did the fraction of such settlements in which the institutional lead plaintiff was a public pension plan, *peaking* at 71% and 40%, respectively. The trend of increasing institutional participation appears to have leveled off in the last two or three years. The fraction of lead plaintiffs that are public pension plans has remained at or near 40% since 2009. During the first half of 2012, the total fraction of institutional lead plaintiffs has been 65%—a little below the 2009 and 2010 levels. See Figure 35.

NERA's research on factors explaining the amounts for which cases have settled historically finds that, on average, institutional lead plaintiff participation is associated with larger settlements.

Figure 35.  **Percentage of Settlements with an Institutional Lead Plaintiff**
Cases Filed and Settled; January 1996 – June 2012



A "blow-up" provision typically permits a settlement to be invalidated if more than a certain proportion of the class opts out. These provisions have become an increasingly common feature of settlement agreements in recent years. In 2012, the proportion of settlements with such provisions increased to 40% of all settlements, continuing an upward trend. See Figure 36.

Figure 36.   **Percentage of Settlements with a "Blow-Up" Provision**
**(Settlements with Available Settlement Notice)**
Cases Filed and Settled; January 1996 – June 2012



"Tag-along" derivative actions associated with securities class actions have been proliferating over the last ten years. Over the period 2007-2010, more than 60% of securities class actions had parallel derivative suits. This year and last, the trend toward such derivative actions appears to have reversed. In 2012, the proportion of cases with a parallel derivative action (among those that settled) has declined to 50%. See Figure 37.

Figure 37.   **Percentage of Settled Cases with a Parallel Derivative Action**
Cases Filed and Settled; January 1996 – June 2012



Note: We excluded cases filed and settled in 1996 because there was only one case and it had a derivative action.

## Trials

Few securities class actions proceed to trial, though those that do tend to attract a great deal of attention. Fewer still get all the way to a verdict. So it is not surprising that there have been no trials or verdicts so far in 2012 that we know of. Since the passage of the PSLRA in late 1995, there have been only 30 securities class action trials, as compared to a total of over 3,909 filings. Figure 38 summarized the status of cases that have gone to trial and Table 2 provides details.

Figure 38. **Status of 30 Securities Class Actions That Went to Trial After PSLRA**
As of June 30, 2012



Table 2.   **Thirty Securities Class Actions That Went to Trial after PSLRA**

| Case<br>(1) | Federal Circuit<br>(2) | File Year<br>(3) | Trial Year[1]<br>(4) |
|---|---|---|---|
| **I. Verdict for Defendants (11)** | | | |
| 1   American Mutual Funds (Fee Litigation)[2] | 9 | 2004 | 2009 |
| 2   American Pacific Corp.[3] | 9 | 1993 | 1997 |
| 3   BankAtlantic Bancorp, Inc.[4] | 11 | 2007 | 2011 |
| 4   Biogen Inc. | 1 | 1994 | 1998 |
| 5   Everex Systems Inc.[5] | 9 | 1992 | 2002 |
| 6   Garment Capitol Associates | 2 | 1996 | 2000 |
| 7   Health Management, Inc. | 2 | 1996 | 1999 |
| 8   JDS Uniphase Corp. | 9 | 2002 | 2007 |
| 9   NAI Technologies, Inc. | 2 | 1994 | 1996 |
| 10  Thane International, Inc.[6] | 9 | 2003 | 2009 |
| 11  Tricord Systems, Inc. | 8 | 1994 | 1997 |
| **II. Verdict for Plaintiffs (7)** | | | |
| 1   Apollo Group, Inc.[7] | 9 | 2004 | 2010 |
| 2   Claghorn / Scorpion Technologies, Inc. | 9 | 1998 | 2002 |
| 3   Computer Associates International, Inc. | 2 | 1991 | 2000 |
| 4   Helionetics, Inc. | 9 | 1994 | 2000 |
| 5   Homestore.com, Inc.[8] | 9 | 2001 | 2011 |
| 6   Real Estate Associates, LP | 9 | 1998 | 2002 |
| 7   U.S. Banknote Corp.[9] | 2 | 1994 | 1997 |
| **III. Mixed Verdict (5)** | | | |
| 1   Clarent Corp.[10] | 9 | 2001 | 2005 |
| 2   Digitran Systems, Inc.[11] | 10 | 1993 | 1996 |
| 3   ICN Pharmaceuticals, Inc.[12] | 2 | 1987 | 1996 |
| 4   Household International, Inc.[13] | 7 | 2002 | 2009 |
| 5   Vivendi Universal, S.A.[14] | 2 | 2002 | 2010 |
| **IV. Settled During Trial[15] (6)** | | | |
| 1   AT&T | 3 | 2000 | 2004 |
| 2   First Union National Bank / First Union Securities / Cypres Funds | 11 | 2000 | 2003 |
| 3   Globalstar Telecommunications, Ltd. | 2 | 2001 | 2005 |
| 4   Heartland High-Yield / Short Duration High Yield Municipal Bond Funds | 7 | 2000 | 2005 |
| 5   WorldCom | 2 | 2002 | 2005 |
| 6   Safety-Kleen Corp. (Bondholders Litigation)[16] | 4 | 2000 | 2005 |
| **V. Default Judgment (1)** | | | |
| 1   Equisure Inc.[17] | 8 | 1997 | 1998 |

Notes: Until otherwise noted, all these cases went to a jury trial. Data are from case dockets. Cases within each group presented in alphabetical order.

**Table 2 Notes Continued:**

[1] Trial Year shows the year in which the trial began or, when there are relevant post-trial developments (such as a ruling on an appeal or a re-trial), the most recent such development.

[2] Judgment for defendants entered 12/28/09 after a 7/28/09-8/7/09 bench trial.

[3] On 11/27/95 the US District Court granted in part the Company's motion for summary judgment ruling that the Company had not violated the federal securities laws in relation to disclosure concerning the Company's agreements with Thiokol. The remaining claims, which related to allegedly misleading or inadequate disclosures regarding Halotron, were the subject of a jury trial that began in December 1995 and ended on 1/17/96. The jury reached a unanimous verdict that neither the Company nor its directors and officers made misleading or inadequate statements regarding Halotron. Verdict was appealed, but on 6/5/97 affirmed by the 9th Circuit Court of Appeals.

[4] On 11/18/10 the jury returned a verdict in the plaintiffs' favor, finding seven of the statements to have been false, and awarding damages of $2.41 per share. On 4/25/11 the jury verdict was set aside by the court in a post-trial ruling. Judge opinion granted the defendants' motion for judgment as a matter of law and indicated that she will enter judgment in defendants' favor following remaining procedural issues.

[5] 1998 verdict for defendants was reversed and remanded by the 9th Circuit Court of Appeals; 2002 retrial again yielded a verdict for defendants.

[6] On 6/10/05 bench trial verdict dismissed the case. Thereafter, plaintiffs filed a notice of appeal from the trial verdict in favor of the defendants. On 11/26/07, the US Court of Appeals of the 9th Circuit issued an Opinion reversing and remanding the action back to District Court with instructions to enter judgment in favor of the plaintiffs, to address loss causation, and to conduct further proceedings consistent with this opinion. On 12/5/08 the defendants filed a Motion for Judgment On Loss Causation and a Motion for Judgment On Lack Of Control Person Liability And Good Faith Defenses. On 3/17/09, the Court granted the defendants' Motion for Judgment On Loss Causation but denied the Motion for Judgment On Lack Of Control Person Liability And Good Faith Defenses. Final Judgment on behalf of the defendants was entered on 3/25/09.

[7] On 1/16/08 a federal jury found Apollo Group Inc. and certain former officers liable for securities fraud and ordered them to pay approximately $280 million to shareholders. On 8/8/08 the District Court overturned the jury verdict; Federal Judge James A. Teilborg's order vacated the judgment and entered judgment in defendants' favor. Following the dismissal, a notice of appeal was filed on 8/29/08. On 6/23/10 the United States Court of Appeals for the 9th Circuit reversed the District Court's post-trial ruling and remanded the case with instructions that the District Court enter judgment in accordance with the jury's verdict.

[8] On 1/25/11, a civil jury trial commenced against the sole remaining defendant in the case – Stuart H. Wolff, the company's former Chairman and CEO. On 2/24/11 a Central District of California rendered a verdict on behalf of plaintiffs. The jury found that the defendant, Stuart H. Wolff, had violated the federal securities laws in connection with a series of statements the company made in 2001. All other defendants had previously settled or been dismissed.

[9] Judge subsequently vacated the jury verdict and approved a settlement.

[10] Chairman of Clarent liable; Ernst & Young not liable.

[11] A 9/30/96-10/24/96 jury trial resulted in a mixed verdict, with liability for Digitran Systems, Inc. and its former president, but not liable verdict for other individual defendants and the auditor, Grant Thornton.

[12] Hung jury.

[13] The jury found in favor of the defendants with respect to 23 of the alleged misstatements, but in favor of the plaintiffs with respect to 17 other statements.

[14] The trial started 10/5/09. On 1/29/10 the jury returned a verdict against the company on all 57 of the plaintiffs' claims. However, the jury also found that the two individual defendants, (former CEO Jean-Marie Messier and former CFO Guillaume Hannezo) were not liable.

[15] At least one defendant settled after the trial began, but prior to judgment.

[16] Some director-defendants settled during the trial. Default judgment against CEO and CFO who failed to show up for trial.

[17] Default judgment against Equisure Inc. which failed to show up for trial.

## Notes

1   This edition of NERA's research on recent trends in shareholder class action litigation expands on previous work by our colleagues Lucy Allen, Elaine Buckberg, Frederick C. Dunbar, Todd Foster, Vinita M. Juneja, Denise Neumann Martin, Jordan Milev, Robert Patton, Stephanie Plancich, and David I. Tabak. We gratefully acknowledge their contribution to previous editions as well as this current version. The authors also thank Lucy Allen for helpful comments on this version. In addition, we thank Carlos Soto, Nicole Roman, and other researchers in NERA's Securities and Finance Practice for their valuable assistance with this paper. These individuals receive credit for improving this paper; all errors and omissions are ours. Data for this report are collected from multiple sources, including complaints, case dockets, RiskMetrics Group/Securities Class Action Services (SCAS), Dow Jones Factiva, Bloomberg Finance L.P., FactSet Research Systems, Inc., SEC filings, and the public press.

2   NERA tracks class actions filed in federal court and involving alleged violations of the federal securities laws. If multiple such actions are filed against the same defendant, are related to the same allegations, and are in the same circuit, we treat them as a single filing. However, multiple actions filed in different circuits are treated as separate filings. If cases filed in different circuits are consolidated, we revise our count to reflect that consolidation. Therefore, our count for a particular year may change over time. Different assumptions for consolidating filings would likely lead to counts that are directionally similar but may, in certain circumstances, lead observers to draw a different conclusion about short-term trends in filings.

3   This average excludes the IPO laddering cases.

4   We have classified cases as credit crisis-related based on the allegations in the complaint. The category includes cases with allegations related to subprime mortgages, mortgage-backed securities, and auction rate securities, as well as some other cases alleged to involve the credit crisis. Our categorization is intended to provide a useful picture of trends in litigation but is not based on detailed analysis of any particular case.

5   This figure refers to deals announced between 2010 and 2011 for $100 million or more, completed by February 29, 2012, with a US public company as target, and challenged by December 31, 2011. Data from a proprietary NERA database.

6   The merger objection cases form the largest group of federal securities class actions not involving such alleged violations.

7   We do not compute investor losses for all cases included in this publication. For instance, class actions in which buyers of common stock are not alleged to have been damaged are not included.

8   Our normal approach to geographical classification is to use the country of domicile for the issuing company. Many of the defendant Chinese companies, however, obtained their US listing through a reverse merger and, consequently, report a US domicile. For this reason, we have also tracked companies with their principal executive offices in China.

9   Approximately 63% of the Chinese companies targeted by a securities class action in the period 2010-2012 were listed in the US through reverse mergers.

10  See, for example, Xueqing Linda Ji and Hunter Qiu, "Weighing Reverse Mergers for Private Chinese Cos," *Law360*, June 25, 2012.

11  See, for example, Gwyn Quillen and Amy June, "Clarifying Accountants' Secondary Liability," *Law360*, August 8, 2011.

12  In earlier editions of NERA's "Recent Trends in Securities Class Action Litigation," we displayed this information differently. The percentage corresponding to each category is now computed as the number of complaints making an allegation in that category as a percentage of the total number of complaints filed; in earlier editions, it was computed as a percentage of the total number of allegations in any category. In other words, we have changed the denominator from total number of allegations to total number of cases. The change in methodology can lead to different results because complaints often make multiple allegations.

13  We have updated this analysis so that the fraction is computed only over cases alleging violation of Rule 10b-5.

14  Cases for which investor losses cannot be calculated are excluded. The largest excluded groups are the IPO laddering cases and the merger objection cases.

15  Thus, it is not that only 10% of cases are dismissed; it is that 10% of settled cases in which a motion to dismiss had been filed, had been dismissed at the time of settlement.

16  The dismissed category includes several outcomes: cases with granted motion to dismiss granted, denied motion for class certification, granted motion for summary judgment filed by defendant, and cases that were voluntarily dismissed. Motions to dismiss that are only partially granted are not included in the dismissed category.

17  Unless otherwise noted, tentative settlements (those yet to receive court approval) and partial settlements (those covering some but not all non-dismissed defendants) are not included in our settlement statistics. We define "Settlement Year" as the year of the first court hearing related to the fairness of the entire settlement or the last partial settlement.

18  Because merger objection cases typically settle for no monetary compensation to investors, we exclude all merger objection settlements from the analysis of settlement values.

19  The median settlement value for a year is the level that half of all settlements that year exceeded and half fell below.

20  Technically, the investor losses variable explains more than half of the variance in the logarithm of settlement size. Investor losses over the class period are measured relative to the S&P 500, using a proportional decay trading model to estimate the number of affected shares of common stock. We measure investor losses only if the proposed class period is at least two days. Our sample includes more than 1,000 post-PSLRA settlements.

## About NERA

NERA Economic Consulting (**www.nera.com**) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For half a century, NERA's economists have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real world industry experience to bear on issues arising from competition, regulation, public policy, strategy, finance, and litigation.

NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. With its main office in New York City, NERA serves clients from more than 20 offices across North America, Europe, and Asia Pacific.

## Contacts

For further information, please contact:

**Dr. Renzo Comolli**
Senior Consultant
+1 212 345 6025
renzo.comolli@nera.com

**Dr. Ron Miller**
Vice President
+1 212 345 3141
ronald.miller@nera.com

**Dr. John Montgomery**
Senior Vice President
+1 212 345 5411
john.montgomery@nera.com

**Svetlana Starykh**
Senior Consultant
+1 212 345 8931
svetlana.starykh@nera.com

*The opinions expressed herein do not necessarily represent the views of NERA Economic Consulting or any other NERA consultant.*



Visit **www.nera.com** to learn
more about our practice areas
and global offices.

© Copyright 2012
National Economic Research
Associates, Inc.

All rights reserved.
Printed in the USA.