Exhibit C

# CORNERSTONE RESEARCH
ECONOMIC AND FINANCIAL CONSULTING AND EXPERT TESTIMONY



# Securities Class Action Settlements

## 2011 Review and Analysis

Ellen M. Ryan
Laura E. Simmons

For more than twenty-five years, Cornerstone Research staff have provided economic and financial analysis in all phases of commercial litigation and regulatory proceedings.

We work with a broad network of testifying experts, including faculty and industry practitioners, in a distinctive collaboration. Our staff consultants contribute expertise in economics, finance, accounting, and marketing, as well as business acumen, familiarity with the litigation process, and a commitment to produce outstanding results. The experts with whom we work bring the specialized expertise of researchers or practitioners required to meet the demands of each assignment.

Cornerstone Research has more than four hundred staff and offices in Boston, Los Angeles, Menlo Park, New York, San Francisco, and Washington.

## TABLE OF CONTENTS

Introduction .............................................................................................................................................1

   Figure 1: Total Settlement Dollars.........................................................................................1

Cases Settled in 2011 ...........................................................................................................................2

   Figure 2: Settlement Summary Statistics ............................................................................2

   Figure 3: Timing of Top 100 Post–Reform Act Settlements .............................................3

   Figure 4: Cumulative Distribution of Settlement Amounts ...............................................4

   Figure 5: Duration from Filing Date to Settlement Hearing Date .....................................5

Settlements and Damages Estimates ....................................................................................................6

   Figure 6: Median and Average "Estimated Damages" .......................................................6

   Figure 7: Median Settlements as a Percentage of "Estimated Damages" by Damages Ranges.................7

   Figure 8: Median Settlements as a Percentage of DDL by DDL Range.............................8

Analysis of Settlement Characteristics .................................................................................................9

   Figure 9: Median Settlements as a Percentage of "Estimated Damages" and Accounting Allegations .....9

   Figure 10: Median Settlements as a Percentage of "Estimated Damages" and Third-Party Defendants..10

   Figure 11: Settlements by Nature of Claim ......................................................................11

   Figure 12: Median Settlement Amounts and Public Pensions ..........................................12

   Figure 13: Median Settlements and Derivative Actions ...................................................13

   Figure 14: Median Settlements and SEC Actions.............................................................14

*Dura* Considerations..........................................................................................................................15

   Figure 15: Tiered Estimated Damages ..............................................................................15

The State of Credit-Crisis Class Actions ...........................................................................................16

   Figure 16: Credit-Crisis-Related Settlements Comparative Characteristics ....................16

Settlements by Plaintiff Counsel, Jurisdiction, and Industry ............................................................17

   Figure 17: Plaintiff Law Firms by Percentage of Settled Cases ......................................17

   Figure 18: Settlements by Federal Court Circuit ..............................................................18

   Figure 19: Settlements by Industry Sector .......................................................................18

Cornerstone Research's Settlement Prediction Analysis....................................................................19

Concluding Remarks ..........................................................................................................................20

Research Sample .................................................................................................................................21

Data Sources.......................................................................................................................................21

Endnotes .............................................................................................................................................22

About the Authors ..............................................................................................................................24

Reports like this one are purposely brief, often summarizing published works or other research by Cornerstone Research staff and affiliated experts. The views expressed herein are solely those of the authors, who are responsible for the contents of this report, and do not necessarily represent the views of Cornerstone Research.

## INTRODUCTION

In 2011, there were 65 court-approved securities class action settlements involving $1.4 billion in total settlement funds—the lowest number of approved settlements and corresponding total settlement dollars in more than 10 years. The number of settlements approved in 2011 decreased by almost 25 percent compared with 2010 and was more than 35 percent below the average for the preceding 10 years. Further, the total dollar value of settlements declined by 58 percent, from $3.2 billion in 2010 to $1.4 billion in 2011. The change in the number of settlements from 2010 to 2011 is one of the two largest year-over-year declines (settlements in 2006 were also nearly 25 percent lower than the number of settlements in 2005) and, combined with a year-over-year decrease in settlements in 2010, the first time there has been a decline in the number of settled cases for two consecutive years. The 2011 total settlement value of $1.4 billion is more than 50 percent below the next lowest value ($2.8 billion in 2002) for any of the years in the period from 2002 to 2010.[1]

**FIGURE 1: TOTAL SETTLEMENT DOLLARS
2002–2011**

*Dollars in Millions*



Settlement dollars adjusted for inflation; 2011 dollar equivalent figures used.

In this report, we explore causes for the declines noted above and discuss additional observations related to securities class action settlements. These settlements are identified based on a review of case activity collected by RiskMetric Group's Securities Class Action Services (SCAS).[2] In our study, the designated settlement year corresponds to the year in which the hearing to approve the settlement was held.[3] Cases involving multiple settlements are reflected in the year of the most recent partial settlement, provided certain conditions are met.[4]

## CASES SETTLED IN 2011

The median settlement amount for the 65 cases with court-approved settlements decreased substantially in 2011 to $5.8 million, an almost 50 percent decline from the $11.3 million median in 2010, and represents the lowest median settlement amount among all post–Reform Act years.[5]

The average reported settlement amount also decreased from $36.3 million in 2010 to $21.0 million in 2011 and remains substantially below the average of $55.2 million for all post–Reform Act settlements through 2010. Excluding the top three post–Reform Act settlements illustrated in Figure 1 (WorldCom, Enron, and Tyco) from this analysis, the average settlement amount of $21.0 million in 2011 is still well below the historical average of $39.9 million for cases settled from 1996 through 2010 and is the lowest average settlement amount in the last decade.

**FIGURE 2: SETTLEMENT SUMMARY STATISTICS**

*Dollars in Millions*

|  | 2011 | Settlements through 2010 |
|---|---|---|
| Minimum | $0.6 | $0.1 |
| Median | $5.8 | $8.1 |
| Average | $21.0 | $55.2 |
| Maximum | $208.5 | $8,070.0 |
| Total Amount | $1,362.0 | $66,712.6 |

Settlement dollars adjusted for inflation; 2011 dollar equivalent figures used. Excluding the top three settlements illustrated in Figure 1, the average and total settlement amounts through 2010 are $36.5 million and $44,008.9 million, respectively.

The decline in the average settlement amount in 2011 is due in part to a decline in very large settlements. For the fourth consecutive year, no single securities class action settlement exceeded $1 billion. Additionally, the average settlement amount for "mega-settlements" (settlements of $100 million or more) declined more than 27 percent from 2010 to 2011. In 2011, there were three mega-settlements in our study.

In fact, mega-settlements accounted for only 40 percent of total settlement dollars in 2011—the lowest proportion since 2001. In contrast, over the past five years, mega-settlements have accounted for an average of 71 percent of settlement dollars. As shown in Figure 3, only four settlements in 2011 ranked in the top 100 of post–Reform Act settlements and none ranked in the top 25.[6]

**FIGURE 3: TIMING OF TOP 100 POST–REFORM ACT SETTLEMENTS**



Settlement dollars adjusted for inflation; 2011 dollar equivalent figures used.

Despite the publicity that often accompanies mega-settlements, more than half of post–Reform Act cases have settled for less than $10 million (see Figure 4). Approximately 80 percent of post–Reform Act cases have settled for less than $25 million, and only 7 percent of cases have settled for $100 million or higher.

### FIGURE 4: CUMULATIVE DISTRIBUTION OF SETTLEMENT AMOUNTS 1996–2011

*Dollars in Millions*



Settlement dollars adjusted for inflation; 2011 dollar equivalent figures used.

A review of publicly available settlement materials indicates that in 2011, nearly 80 percent of settlements with identifiable contributions from Directors and Officers (D&O) insurance proceeds were funded 100 percent by such policies, compared with approximately 60 percent in 2010. This apparent increase in the proportion of settlement amounts covered by D&O insurance may be a function of the lower overall settlement amounts in 2011 and an increase in the level of D&O coverage carried by firms.[7]

In 2011, the concentration of settlements occurring within three to four years of the case-filing date increased to more than 40 percent, compared with approximately 20 percent for cases settled during the last five years. Compared with prior years, fewer cases were settled in either less than three years or more than four years in 2011.

**FIGURE 5: DURATION FROM FILING DATE TO SETTLEMENT HEARING DATE**



Median = 3.5 years                          Median = 3.4 years

## SETTLEMENTS AND DAMAGES ESTIMATES

For purposes of our research, we use a highly simplified approach to calculate "estimated damages," which is based on a modified version of a calculation method historically used by plaintiffs in securities class actions.[8] We make no attempt to link these simplified calculations of shareholder losses to the allegations included in the associated court pleadings. Accordingly, we do not intend for any damages estimates presented in this report to be indicative of actual economic damages borne by shareholders. Various models and alternative calculations could be used to assess defendants' potential exposure in securities class actions, but our application of a consistent method allows us to identify and examine certain trends in "estimated damages."[9]

Median "estimated damages" decreased in 2011 by more than 40 percent from the median reported for cases settled in 2010. Since "estimated damages" are the most important factor in determining settlement amounts, the decrease in "estimated damages" in 2011 likely had a major contribution to the decline in settlement amounts compared with 2010.

**FIGURE 6: MEDIAN AND AVERAGE "ESTIMATED DAMAGES"**
**2002–2011**

*Dollars in Millions*



"Estimated damages" are adjusted for inflation based on class-end dates.

Average "estimated damages" for 2011 are the lowest since 2002. This is consistent with the lower average settlement amounts that we observe for the year-over-year comparison as well as the longer-term comparison. A shorter average class period length in 2011 also may have contributed to the lower damages. In 2011, the average class period length for settled cases was 1.3 years, 32 percent shorter than the average class period length for the prior five years and the lowest average for any single year during that period. In addition to the shorter-than-average class period length, we observe that the median reported trading volume during the alleged class period for cases settled in 2011—many of which had class periods that included intervals of low market volatility—was more than 30 percent lower than the median reported trading volume in 2010. Lower reported trading volume would also contribute to lower damages.

As we have described in prior reports, settlements generally increase as "estimated damages" increase; however, settlements as a percentage of "estimated damages" typically decrease as damages increase (see Figure 6). This is particularly true for very large cases. In 2011, settlements followed this general pattern.

### FIGURE 7: MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES" BY DAMAGES RANGES

*Dollars in Millions*



Overall, in 2011, median settlements as a percentage of "estimated damages" were substantially lower compared to the median for prior post–Reform Act years. This is surprising given that "estimated damages" in 2011 were low and the typical pattern is that settlements decrease as a percent of "estimated damages" when "estimated damages" increase. The overall lower median settlements as a percentage of "estimated damages" in 2011 were primarily driven by cases with "estimated damages" less than $500 million.

Disclosure Dollar Loss (DDL) is another simplified measure of shareholder losses. DDL is calculated as the decline in the market capitalization of the defendant firm from the trading day immediately preceding the end of the class period to the trading day immediately following the end of the class period.[10] As in the case of "estimated damages," we do not attempt to link DDL to the allegations included in the associated court pleadings. This measure also does not capture additional stock price declines during the alleged class period that may affect certain purchasers' potential damages claims. Thus, as this measure does not isolate movements in the defendant's stock price that are related to case allegations, it is not intended to represent an estimate of damages. The DDL calculation also does not apply a model of investors' share-trading behavior to estimate the number of shares damaged.

The median DDL associated with settled cases in 2011 decreased to $111 million, representing a 45 percent year-over-year decline and a 23 percent decline compared with the median for the preceding five years. With settlements as a percentage of DDL declining as DDL increases, the relationship between settlements and DDL is similar to that between settlements and "estimated damages."

### FIGURE 8: MEDIAN SETTLEMENTS AS A PERCENTAGE OF DDL BY DDL RANGE
*Dollars in Millions*



## ANALYSIS OF SETTLEMENT CHARACTERISTICS

In addition to "estimated damages" and DDL, there are a number of important determinants of settlement outcomes, which we have identified from among more than 60 variables that we collect and analyze as part of our research. In this section, we provide information regarding several of these factors.

Accounting allegations play a central role in many securities class actions. However, among settlements in 2011, allegations related to violations of generally accepted accounting principles (GAAP) were included in only about 45 percent of settled cases compared with nearly 70 percent of settled cases in 2010 and 68 percent for the prior five years. Settlements that included instances of a restatement (or announcement of a possible restatement) of financials also declined substantially, from more than 40 percent for cases from 2006 to 2010 (and more than 45 percent for cases in 2010) to just under 25 percent in 2011. As others have suggested, declines in restatements and other accounting issues in recent years may be a function of improved corporate governance following the passage of the Sarbanes-Oxley Act of 2002.[11]

While cases involving restatements of financial statements have settled for higher percentages of "estimated damages" compared with cases that do not involve restatements, cases in which the issuer defendant acknowledged the presence of accounting irregularities, specifically intentional misstatements or omissions in financial statements, have settled for even higher amounts (see Figure 9). Simply stated, cases for which accounting fraud has been acknowledged settle for higher amounts compared with accounting restatement cases.

FIGURE 9: MEDIAN SETTLEMENTS AS A PERCENTAGE OF
"ESTIMATED DAMAGES" AND ACCOUNTING ALLEGATIONS
1996–2011



Similarly, the presence of third-party defendants is associated with higher settlements as a percentage of "estimated damages." Third parties provide an additional source of funds. The inclusion of third-party defendants also is closely related to the type of allegations involved in the case. While outside auditors historically were named in approximately 30 percent of cases involving restatements of financial statements, they were named in less than 10 percent of financial restatement cases in 2011. As shown in Figure 9, cases in which an outside auditor was named as a defendant have settled for relatively higher percentages of "estimated damages" when compared with the set of all cases not involving auditor defendants.

The presence of underwriter defendants is highly correlated with the inclusion of Section 11 claims. The percentage of total settlements involving underwriters matched the all-time high of 26 percent reached in 2010. As 60 percent of those cases that settled in 2011 had filing dates in 2007 and 2008, this continued high level can be attributed to the large number of case filings involving Section 11 claims and underwriter defendants during those years.[12] The percentage of underwriter defendants also remained high among cases filed in 2009; thus, we expect that underwriter defendants will continue to be a significant factor among settlements in the near future as these cases reach the settlement stage.

### FIGURE 10: MEDIAN SETTLEMENTS AS A PERCENTAGE OF "ESTIMATED DAMAGES" AND THIRD-PARTY DEFENDANTS 1996–2011




There are 68 cases in our research sample that did not involve Rule 10b-5 claims (i.e., involved *only* Section 11 and/or 12(a)(2) claims). Nearly 50 percent of these were settled in the past three years. Further, 2011 is the first year in which we observe that more than 20 percent of settled cases did not involve Rule 10b-5 claims.

The median settlement amount of $3.3 million for these cases is lower than the median settlement amount for cases involving Rule 10b-5 claims, while median settlements as a percentage of "estimated damages" are higher at 7.4 percent. "Estimated damages" tend to be smaller for cases involving only Section 11 claims, and thereby we would expect these cases to have higher median settlement as a percentage of "estimated damages" than cases with Rule 10b-5 claims only.

**FIGURE 11: SETTLEMENTS BY NATURE OF CLAIM**

*Dollars in Millions*

|  | Number of Cases | Median Settlement | Median Settlement as a Percentage of "Estimated Damages" |
|---|---|---|---|
| Section 11 and/or 12(a)(2) Only Claims | 68 | $3.3 | 7.4% |
| Both Rule 10b-5 and Section 11 and/or 12(a)(2) Claims | 228 | $10.8 | 3.6% |
| Rule 10b-5 Only Claims | 960 | $6.8 | 3.0% |
| **All Post–Reform Act Settlements** | **1,256** | **$7.0** | **3.3%** |

Institutional investors continue to play an active role as lead plaintiffs in post–Reform Act class actions. In 2011, institutions served as lead plaintiffs in nearly 60 percent of settlements—a decrease from their involvement in 2010 settlements but still above the 10-year average of nearly 45 percent. Among the various types of institutional investor lead plaintiffs, the most common are public pensions and unions. Further, unions and public pensions have increased their presence as lead plaintiffs considerably since the early part of the past decade.

### FIGURE 12: MEDIAN SETTLEMENT AMOUNTS AND PUBLIC PENSIONS 2002–2011

*Dollars in Millions*



Settlement dollars adjusted for inflation; 2011 dollar equivalent figures used.

We find that the presence of public pensions as lead plaintiffs is associated with significantly higher settlement amounts.[13] This observation could be explained by these relatively sophisticated investors choosing to participate in stronger cases. In addition, public pensions tend to be involved in larger cases in which they, as the plaintiffs, may have the potential for higher-magnitude claims against the defendants. In fact, since 2002, median "estimated damages" in settlements involving public pensions as lead plaintiffs are nearly five times the size of median "estimated damages" in class actions not involving public pensions. Additionally, statistical analysis of the association between settlement amounts and participation of public pensions as lead plaintiffs shows that even when controlling for "estimated damages" (a proxy for case size) and other observable factors that affect settlements, the presence of a public pension as a lead plaintiff is still associated with a statistically significant increase in settlement size.[14] A list of control variables considered when testing the effect of public pensions serving as lead plaintiffs can be found on page 19.

The number of settled cases involving the filing of a companion derivative action decreased in 2011 compared with 2010. Slightly less than 40 percent of cases settled in 2011 were accompanied by a derivative action filing compared with more than 45 percent of cases settled in 2010. The 2011 percentage is still higher than the post–Reform Act average of approximately 30 percent. Although settlement of a derivative action does not necessarily result in a cash payment,[15] settlement amounts for class actions that are accompanied by derivative actions are significantly higher than those for cases without companion derivative actions (this is true whether or not the settlement of the derivative action coincides with the settlement of the underlying class action or occurs at a different time).

When considered as a percentage of "estimated damages," settlements for cases with accompanying derivative actions are lower than settlements for cases with no identifiable derivative action. This lower percentage likely reflects the larger "estimated damages" that are associated with these cases. In fact, the median "estimated damages" for cases involving derivative actions is more than twice that for cases without an accompanying derivative action.

Accompanying derivative actions were filed in the state of Delaware for 11 percent of settled cases. We observe a threefold increase in median "estimated damages" associated with this group of cases than cases with accompanying derivative actions filed in other states. Consistent with the higher median "estimated damages," our data indicate that a case with a companion derivative action filed in Delaware is associated with higher settlement amounts when compared with a case with a companion derivative action filed elsewhere.

**FIGURE 13: MEDIAN SETTLEMENTS AND DERIVATIVE ACTIONS 1996–2011**

*Dollars in Millions*



Using a regression analysis to control for "estimated damages" and other observable factors that influence securities class action settlements, we find that cases involving companion derivative actions are associated with significantly higher settlement amounts. In addition to their correlation with higher "estimated damages," class actions accompanied by derivative actions tend to be associated with other

factors discussed in this report, including accounting allegations, related actions brought by the Securities and Exchange Commission (SEC), and public pensions as lead plaintiffs—all of which are important determinants of settlement amounts. Due to these confounding factors, it is particularly important to analyze the relation between companion derivative actions and class action settlement amounts in a multivariate context (i.e., allowing multiple variables to be considered simultaneously).

Cases that involve SEC actions are associated with significantly higher settlements and continue to exhibit higher settlements as a percentage of "estimated damages." The percentage of settled cases that involved the remedy of a corresponding SEC action (evidenced by the filing of a litigation release or administrative proceeding) prior to the settlement of the class action was less than 10 percent in 2011 compared with 30 percent in 2010. However, SEC enforcement activity has continued at a strong pace in the last few years, including the largest number of enforcement actions filed in 2011 than in any prior year.[16] Accordingly, we would expect the percentage of class action settlements with corresponding SEC actions to increase in the next few years as these cases are resolved.

**FIGURE 14: MEDIAN SETTLEMENTS AND SEC ACTIONS
1996–2011**

*Dollars in Millions*



### *DURA* CONSIDERATIONS

As discussed in <u>Securities Class Action Settlements—2009 Review and Analysis</u>, the landmark decision in 2005 by the U.S. Supreme Court in *Dura Pharmaceuticals v. Broudo* (*Dura*) determined that plaintiffs must show a causal link between alleged misrepresentations and the subsequent actual losses suffered by plaintiffs. *Dura* has had considerable influence on securities class action damages calculations. As a result of the decision, damages cannot be attributed to shares sold before information regarding the alleged fraud reaches the market. Accordingly, we began to analyze cases filed subsequent to 2005 by testing a variable that is based on the stock-price drops on alleged corrective disclosure dates and which creates a single or tiered value line (depending on the number of disclosure dates), hereafter referred to as tiered estimated damages.

      While the tiered estimated damages variable has not yet surpassed our traditional measure of "estimated damages" as a predictor of settlement outcomes, it is highly correlated with settlement amounts based on cases settled through 2011. We plan to continue our analysis of this variable in the future, as we expect that it may eventually surpass our traditional measure of "estimated damages."

### FIGURE 15: TIERED ESTIMATED DAMAGES

*Dollars in Millions*

## THE STATE OF CREDIT-CRISIS CLASS ACTIONS

While filings of cases related to the credit crisis declined in 2011, settlements of these cases increased. Overall, these cases continue to settle at a slower rate than traditional cases. Of the more than 200 credit-crisis cases filed, approximately 30 have settled to date.[17] Twenty-three of these settlements are included in our sample, 10 of which had settlement hearing dates during 2011.[18] See *Securities Class Action Filings— 2011 Year in Review* (*2011 Filings Report*) for further discussion regarding filings trends associated with these cases.

Figure 14 presents a summary comparison of credit-crisis and non-credit-crisis case characteristics for settled cases.[19] Since most settlements of credit-crisis cases have occurred during the 2009 to 2011 time frame, our comparison group comprises non-credit-crisis cases settled during this same period. As shown, credit-crisis cases have settled for substantially higher dollar amounts but lower percentages of "estimated damages" compared with non-credit-crisis cases. While the frequency of credit-crisis settlements accompanied by SEC actions is slightly lower than other types of cases, the percentage of settlements involving contributions from third-party codefendants is significantly higher. In addition, while the percentage of credit-crisis cases involving GAAP violations is significantly higher than other types of cases, the percentage of credit-crisis cases involving financial restatements is significantly lower. This is likely due to credit-crisis cases often involving allegations related to the allowance for loan losses. As an estimate account, changes in the allowance for loan losses are generally reflected prospectively, rather than requiring restatement.

### FIGURE 16: CREDIT-CRISIS-RELATED SETTLEMENTS COMPARATIVE CHARACTERISTICS 2009–2011

*Dollars in Millions*

| | Settlement Amount | | Settlements as a Percentage of "Estimated Damages" | | Percentage of Cases That Include | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Median | Average | Median | Average | Corresponding SEC Action | Related Derivative Action | Contribution from Codefendant(s) | GAAP Violations | Financial Restatement |
| Credit-Crisis Related | $31.3 | $85.2 | 2.0% | 3.0% | 17% | 48% | 22% | 74% | 17% |
| Non-Credit-Crisis Related | $8.0 | $27.4 | 2.6% | 4.7% | 22% | 42% | 6% | 62% | 42% |

## SETTLEMENTS BY PLAINTIFF COUNSEL, JURISDICTION, AND INDUSTRY

The list of firms most frequently involved with securities class action settlements as lead or colead plaintiff counsel has remained the same during the past few years. The law firm of Robbins Geller Rudman & Dowd (Robbins Geller) was the most active firm for the period from 2010 to 2011, involved in almost 35 percent of settled cases. As reported in the *2011 Filings Report*, Robbins Geller was also the most active firm in terms of case filings in recent years, suggesting that this firm is likely to continue to maintain the largest market share for settlements in future years.

Overall, in the last two years, we have observed an increased concentration of plaintiff law firms serving as lead or colead counsel as three firms accounted for more than 50 percent of all settled cases during 2010 and 2011.

**FIGURE 17: PLAINTIFF LAW FIRMS BY PERCENTAGE OF SETTLED CASES
2010–2011**

| Plaintiff Law Firm | Percent of Settled Cases | Median Settlements as a Percentage of "Estimated Damages" |
|---|---|---|
| Robbins Geller Rudman & Dowd | 35% | 2.7% |
| Labaton Sucharow | 13% | 3.2% |
| Bernstein Litowitz Berger & Grossmann | 10% | 3.1% |

The Second and Ninth Circuits continue to dominate in terms of securities class action activity, and based on recent case filing history, we expect this to continue.[20] Although these circuits consistently represent the top two in settlement volume, their relative activity levels reflect concentrations of cases by industry sector (i.e., technology firms in the Ninth Circuit and financial-sector firms in the Second Circuit). Accordingly, the large number of cases settled in the Second Circuit in 2011 reflects the prevalence of litigation against financial institutions in recent years.

### FIGURE 18: SETTLEMENTS BY FEDERAL COURT CIRCUIT
*Dollars in Millions*

| Circuit | Number of Cases | | Median Settlements | |
|---|---|---|---|---|
| | 2011 | 1996–2010 | 2011 | 1996–2010 |
| First | 3 | 71 | $10.5 | $6.0 |
| Second | 27 | 212 | 4.0 | 9.0 |
| Third | 3 | 119 | 8.9 | 7.0 |
| Fourth | 4 | 40 | 3.0 | 7.3 |
| Fifth | 2 | 96 | 3.3 | 6.0 |
| Sixth | 0 | 61 | – | 12.7 |
| Seventh | 9 | 55 | 7.4 | 7.5 |
| Eighth | 1 | 40 | 5.8 | 8.5 |
| Ninth | 12 | 312 | 8.2 | 7.0 |
| Tenth | 1 | 48 | 8.5 | 7.2 |
| Eleventh | 3 | 112 | 12.5 | 4.4 |
| **All Federal Cases** | **65** | **1,166** | **$5.8** | **$8.1** |

Settlement dollars adjusted for inflation; 2011 dollar equivalent figures used.

While the technology and financial industry sectors historically have ranked as the top two in number of cases among all post–Reform Act settlements, median settlements and "estimated damages" are highest among the financial and pharmaceuticals sectors. Moreover, when controlling for other variables that influence settlement outcomes, industry sector is not a significant determinant of settlement amounts.

### FIGURE 19: SETTLEMENTS BY INDUSTRY SECTOR
### 1996–2011
*Dollars in Millions*

| Industry | Median Settlements | Median "Estimated Damages" | Median Settlements as a Percentage of "Estimated Damages" |
|---|---|---|---|
| Financial | $12.8 | $514.1 | 3.4% |
| Telecommunications | $8.4 | $372.6 | 2.3% |
| Pharmaceuticals | $8.0 | $416.9 | 2.3% |
| Healthcare | $6.3 | $212.1 | 3.5% |
| Technology | $5.9 | $211.2 | 3.0% |
| Retail | $5.8 | $183.2 | 4.3% |

## CORNERSTONE RESEARCH'S SETTLEMENT PREDICTION ANALYSIS

Features of securities cases that may affect settlement outcomes are often correlated, as noted in this report. Regression analysis makes it possible to examine the effects of these factors simultaneously. Accordingly, as part of our ongoing research on securities class action settlements, we applied regression analysis to study factors associated with settlement outcomes. Analysis performed on our sample of post–Reform Act cases settled through December 2011 reveals that the variables that are important determinants of settlement amounts include the following.[21, 22]

- Simplified "estimated damages"
- DDL
- Most recently reported total assets of the defendant firm
- Number of entries on the lead case docket
- Indicator of the year in which the settlement occurred
- Indicator of whether intentional misstatements or omissions in financial statements were reported by the issuer
- Indicator of whether there was a corresponding SEC action against the issuer or whether other defendants are involved
- Indicator of whether an auditor is a named codefendant
- Indicator of whether an underwriter is a named codefendant
- Indicator of whether a companion derivative action is filed
- Indicator of whether a public pension is a lead plaintiff
- Indicator of whether noncash components, such as common stock or warrants, make up a portion of the settlement fund
- Indicator of whether securities other than common stock are alleged to be damaged

Settlements are higher when "estimated damages," DDL, defendant asset size, or number of docket entries are higher. Settlements are also higher in cases involving intentional misstatements or omissions in financial statements reported by the issuer, a corresponding SEC action, an accountant named as codefendant, an underwriter named as codefendant, a corresponding derivative action, a public pension involved as lead plaintiff, a noncash component to the settlement, or securities other than common stock alleged to be damaged. Settlements are lower if the settlement occurred in 2004 or later.

Our clients have found our regression analysis to be a useful tool in estimating expected settlement amounts for securities class actions. While our primary approach is designed toward understanding and predicting the total settlement amount, we also have the ability to estimate the probabilities associated with reaching alternative settlement levels. These probabilities can be a useful analysis for our clients in considering the different layers of insurance coverage available and likelihood of contributing to the settlement fund. Regression analysis can also be used to explore hypothetical scenarios, including but not limited to the effects on settlement amounts given the presence or absence of particular factors that we have found to significantly affect settlement outcomes.

## CONCLUDING REMARKS

In 2011, the number of cases approved for settlement represented a record low over the last decade. We attribute this decline in settlements largely to the drop in filings of traditional securities class actions that began in 2006 (see *2011 Filings Report*).[23] During the period from 2007 through 2009, the lower rate of traditional case filings was partially offset by cases brought in conjunction with the credit crisis. However, as previously mentioned, credit-crisis cases have tended to take longer to settle than traditional cases. These factors reduced the number of settlements approved in 2011.

The 10-year-low median and average settlement amounts observed for 2011 are driven in part by lower "estimated damages." However, since settlements as a percentage of "estimated damages" also declined in 2011, other factors further contributed to the reduced settlement values. Substantial declines in the number of settled cases involving accounting-related allegations, overlapping SEC actions, and companion derivative actions occurred during 2011. Since these factors tend to be associated with higher settlement amounts, the reduction in cases with these characteristics may explain the lower 2011 settlement values.

Looking ahead, it is difficult to project future settlement trends. We typically look to characteristics of cases recently filed to anticipate settlement trends in upcoming years. Shareholder losses (as measured by DDL) for cases filed over the last few years have fluctuated substantially, suggesting no clear trend for the size of future settlements. However, considering that the $725 million partial settlement approved in February 2012 in the *American International Group, Inc., Securities Litigation* matter exceeds 50 percent of the total value of 2011 settlements, it appears likely that the total dollar amount for settlements will return to more typical levels in 2012.

## RESEARCH SAMPLE

Our database is limited to cases alleging fraudulent inflation in the price of a corporation's common stock (i.e., excluding cases with alleged classes comprising only bondholders, preferred stockholders, etc., and cases alleging fraudulent depression in price). Our sample is also limited to cases alleging Rule 10b-5, Section 11, and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. These criteria are imposed to ensure data availability and to provide a relatively homogeneous set of cases in terms of the nature of the allegations. Our current sample includes 1,273 securities class actions filed after passage of the Reform Act [1995] and settled from 1996 through 2011.

## DATA SOURCES

In addition to SCAS, data sources include Dow Jones Factiva, Bloomberg, the University of Chicago Booth Center for Research in Security Prices (CRSP), Standard & Poor's Compustat, court filings and dockets, SEC registrant filings, SEC litigation releases and administrative proceedings, LexisNexis, and public press.

## ENDNOTES

[1]   Settlement amounts are based on agreed-upon amounts at the time of settlement, including the disclosed value of any noncash components. Figures do not reflect attorneys' fees, additional amounts that may be paid to the class from related derivative, SEC, or other regulatory settlements, or amounts that may have been settled by opt-out investors. Contingency settlement amounts are also not included in the settlement total.

[2]   Available on a subscription basis.

[3]   Movements of partial settlements between years can cause differences in amounts reported for prior years from those presented in earlier reports.

[4]   Our categorization is based on the timing of the settlement approval. If a new partial settlement equals or exceeds 50 percent of the then-current settlement fund amount, the entirety of the settlement amount is recategorized to reflect the settlement hearing date of the most recent partial settlement. If a subsequent partial settlement is less than 50 percent of the then-current total, the partial settlement is added to the total settlement amount, but the settlement hearing date is not changed.

[5]   Excluding 1996, the first year following passage of the Reform Act, in which there was only one settlement that met our sample criteria.

[6]   Based on our sample inclusion criteria, as previously described on page 1.

[7]   Towers Watson's latest study on D&O insurance trends reported that more than 25 percent of public companies increased their coverage, while only 5 percent of public firms decreased their coverage. See Towers Watson, "Directors and Officers Liability Survey 2011 Summary of Results," March 2012, http://www.towerswatson.com/assets/pdf/6532/Towers-Watson-Directors-and-Officers-Liability-2011-Survey.pdf.

[8]   Our simplified "estimated damages" model is applied to common stock only. For all cases involving Rule 10b-5 claims, damages are determined from a market-adjusted backward value line. For cases involving only Section 11 and/or 12(a)(2) claims, damages are determined from a model that caps the purchase price at the offering price. Volume reduction assumptions are based on the location of the exchange on which the issuer's common stock traded. Finally, no adjustments for institutions, insiders, or short sellers are made to the float.

[9]   We excluded 16 settlements out of the 1,273 cases in our sample from calculations involving "estimated damages" due to stock data availability issues. The WorldCom settlement was also excluded from these calculations because most of the settlements in that matter related to liability associated with bond offerings (and our research does not compute damages related to securities other than common stock).

[10]   DDL is calculated for the class-ending disclosure that resulted in the first filed complaint.

[11]   The D&O Diary, "Restatements Decline—Again," Kevin LaCroix, March, 10, 2010, http://www.dandodiary.com/2010/03/articles/corporate-governance/restatements-decline-again/.

[12]   Securities Class Action Filings—2011 Year in Review, Stanford Law School Securities Class Action Clearinghouse in cooperation with Cornerstone Research, 2012.

[13]   The extraordinarily high median settlement amount for public-pension-led settlements in 2006 was driven by six separate settlements in excess of $1 billion.

[14]   This regression analysis may not control for the potential endogeneity in the choice by public pension plans to participate in a class action.

[15]   Derivative cases are often resolved with changes made to the issuer's corporate governance practices, accompanied by little or no cash payment; this continues to be true despite the increase in corporate controls introduced after the passage of the Sarbanes-Oxley Act of 2002. For purposes of the analyses in this report, a derivative action—generally a case filed against officers and directors on behalf of the issuer corporation—must have allegations similar to the class action in nature and time period to be considered an accompanying action.

[16]   U.S. Securities and Exchange Commission, FY 2011 Performance and Accountability Report, p. 2, http://www.sec.gov/about/secpar/secpar2011.pdf.

[17]   Sources for the categorization of "credit crisis" include the Stanford Law School Securities Class Action Clearinghouse in cooperation with Cornerstone Research and the D&O Diary (www.dandodiary.com).

[18]   The remaining credit-crisis cases settled do not meet our sample criterion of requiring common stock as part of the class.

[19]   In considering these comparisons, we caution that it is possible that the characteristics of credit-crisis cases that have settled to date could potentially differ from those of the remaining group of cases yet to be settled.

[20] *Securities Class Action Filings—2011 Year in Review,* Stanford Law School Securities Class Action Clearinghouse in cooperation with Cornerstone Research, 2012.

[21] Our settlement database includes publicly available and measurable information about settled cases. Nonpublic or nonmeasurable factors, such as relative case merits or the limits of available insurance, are not reflected in the model to the extent that such factors are not correlated with the variables that are accessible to us (that is, publicly available and measurable factors).

[22] Due to the presence of a small number of extreme observations in the data, we apply logarithmic transformations to settlement amounts, estimated damages, DDL, the defendant's total assets, and the number of docket entries.

[23] Traditional securities class actions are considered to be those alleging fraudulent activity during a specified period, i.e., excluding cases focused on merger and acquisition transactions, Ponzi schemes, and credit-crisis cases.

## ABOUT THE AUTHORS

### Ellen M. Ryan

M.B.A., American Graduate School of International Management
B.A., Saint Mary's College

617.927.3027
eryan@cornerstone.com

Ellen Ryan is a manager in the securities practice in Cornerstone Research's Boston office. She has consulted on economic and financial issues in a variety of cases, including securities class action lawsuits, financial institution breach of contract matters, and antitrust litigation. Ms. Ryan also has worked with testifying witnesses in corporate governance and breach of fiduciary duty matters. Prior to joining Cornerstone Research, Ms. Ryan worked for Salomon Brothers in New York and Tokyo. Currently Ms. Ryan focuses on post–Reform Act settlement research as well as general practice area business and research.

### Laura E. Simmons

Ph.D., University of North Carolina at Chapel Hill
M.B.A., University of Houston
B.B.A., University of Texas at Austin

202.912.8998
lsimmons@cornerstone.com

Laura Simmons is an assistant professor in the Mason School of Business at the College of William & Mary and a senior advisor at Cornerstone Research. She is a certified public accountant and has over seventeen years of experience in accounting practice and economic and financial consulting. Her consulting experience has focused on damage and liability issues in securities litigation, as well as accounting issues arising in a variety of complex commercial litigation matters. She has served as a testifying expert in cases involving accounting analyses, securities case damages, and research on securities lawsuits.

Dr. Simmons's research on pre– and post–Reform Act securities litigation settlements has been published in a number of reports and is frequently cited in the public press and legal journals. She has spoken at various conferences and appeared as a guest on CNBC addressing the topic of securities case settlements. Dr. Simmons was a consultant at Cornerstone Research for over ten years, most recently as a principal. From 1986 to 1991, she was an accountant with Price Waterhouse.

The authors acknowledge the research efforts and significant contributions of their colleagues at Cornerstone Research. Please direct any questions and requests for additional information to the settlement database administrator at settlement.database@cornerstone.com. The authors request that you reference Cornerstone Research in any reprint of the charts and tables included in this study and include a link to the report: www.cornerstone.com/securities_settlements_2011_pdf.

Additional information about our research and analysis in securities class action filings and settlements can be found at www.cornerstone.com/securities.

**Boston**
617.927.3000

**Los Angeles**
213.553.2500

**Menlo Park**
650.853.1660

**New York**
212.605.5000

**San Francisco**
415.229.8100

**Washington**
202.912.8900

www.cornerstone.com

© 2012 by Cornerstone Research, Inc.
All Rights Reserved. Cornerstone
Research is a registered service mark
of Cornerstone Research, Inc. C logo
and design is a registered trademark of
Cornerstone Research, Inc.