Exhibit N

## COMPENDIUM OF UNPUBLISHED OPINIONS

- *In re Dynegy Inc. Sec. Litig.*, No. 02 Civ. 1571, (S.D. Tex. July 7, 2005)

- *In re HealthSouth Corp. Stockholder Litig.*, No. 03 Civ. 1500, (N.D. Ala. Feb. 12, 2008)

- *In re Lehman Brothers Sec. & ERISA Litig.*, No. 09-md-2017-LAK-GWG, (S.D.N.Y. June 29, 2012)

- *In re Raytheon Co. Sec. Litig.*, No. 99-12142, (D. Mass. Dec. 6, 2004)

- *In re Royal Ahold N.V. Sec. & ERISA Litig.*, No. 03-MD-1539, (D. Md. Nov. 2, 2006)

- *S.E.C. v. Citigroup Inc.*, No. 10-cv-1277-ESH, (D.D.C. Oct. 8, 2010)

- *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-MD-1335, (D. N.H. Dec. 19, 2007)

United States Courts
Southern District of Texas
ENTERED

JUL 0 8 2005

Michael N. Milby, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re DYNEGY, INC. SECURITIES LITIGATION | § § § | Master File No. H-02-1571 |
| | § | CLASS ACTION |
| This Document Relates To: | § § | |
| ALL ACTIONS. | § § § | |

**ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

THIS MATTER having come before the Court on the application of counsel for the Lead Plaintiff for an award of attorneys' fees and reimbursement of expenses incurred in the Litigation; the Court, having considered all papers filed and proceedings conducted herein, having found the settlement of this Litigation with the Defendants to be fair, reasonable and adequate and otherwise being fully informed in the premises and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.      This Court has jurisdiction over the subject matter of this application and all matters relating thereto, including all Members of the Class who have not timely and validly requested exclusion.

2.      Counsel for the Lead Plaintiff are entitled to a fee paid out of the common fund created for the benefit of the Class. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79, 100 S. Ct. 745 (1980). In class action suits where a fund is recovered and fees are awarded therefrom by the court, the Supreme Court has indicated that computing fees as a percentage of the common fund recovered is the proper approach. *Blum v. Stenson*, 465 U.S. 886, 900 n.16, 104 S. Ct. 1541 (1984).

3.      Lead Plaintiff's counsel have moved for an award of attorneys' fees in the amount of 8.7257% of the Settlement Amount (after deduction of reimbursable expenses in the amount of $3.2 million). This is the fee percentage negotiated by the Court-appointed Lead Plaintiff with Lead Counsel prior to their appointment by the Court pursuant to 15 U.S.C. §78u-4(a)(6) of the PSLRA .

4.      This Court adopts the percentage-of-recovery method of awarding fees in this case, and concludes that the percentage of the benefit is the proper method for awarding attorneys' fees in this case.

5.      The Court hereby awards attorneys' fees of $35,151,482 in cash and 1,533,872 shares of Dynegy common stock from the Settlement Amount, plus interest on the cash portion of the award at the same rate as earned on the Settlement Amount. These amounts represent the percentage

fee award negotiated between the Court-appointed Lead Plaintiff and Lead Counsel at this level of recovery.

6.     Said fees shall be allocated among counsel for Lead Plaintiff by Lead Counsel in a manner which, in its good faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of the Litigation.

7.     The Court hereby awards reimbursement of expenses in an aggregate amount of $3,200,000.

8.     The awarded attorneys' fees and expenses shall be paid to Lead Plaintiff's counsel from the Settlement Amount, subject to the terms, conditions and obligations of the Stipulations of Settlement dated as of March 10 and May 2, 2005.

9.     Pursuant to 15 U.S.C. §78u-4(a)(4), The Regents of the University of California is reimbursed its expenses incurred in serving as Lead Plaintiff in the amount of $305,753.

Dated:  **July 7**  , 2005

SO ORDERED:

Honorable Sim Lake
United States District Judge

S \Settlement\Dynegy.Set\ORD FEES 00022309.doc

- 2 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing [PROPOSED] ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES document has been served by sending a copy via electronic mail to www.dynseclit.com on June 30, 2005 pursuant to the Court's service orders.

MO MALONEY

FILED

2008 Feb-12 PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ALABAMA

# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION | ) ) ) ) | Consolidated Case No. CV-03-BE-1500-S |
|  | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | |
| *In re HealthSouth Corporation Stockholder Litigation*, Consolidated Case No. CV-03-BE-1501-S | ) ) ) ) | |

## ORDER AWARDING ATTORNEYS' FEES AND EXPENSES TO STOCKHOLDER PLAINTIFFS' LEAD COUNSEL

On February 7, 2008, the court held a hearing on various motions in this case, including "Motion for Award of Attorneys' Fees and Expenses" (doc. 1055) filed by Stockholder Plaintiffs' Lead Counsel, which requests an award of attorneys' fees plus expenses incurred through January 11, 2007. Having considered all papers filed, including the objections filed by Jan G. Smith and William W. Smith (doc. 1009), and proceedings conducted, and having previously found on January 11, 2007 that the partial settlement of the Federal Actions was fair, reasonable and adequate, the court GRANTS the motion and ORDERS as follows:

1.     All of the capitalized terms used herein shall have the same meanings as set forth in the Stipulation of Partial Settlement filed on September 26, 2006 (the "Stipulation").

2.     This court has jurisdiction over the subject matter of the application and all matters relating to it, including all Class Members.

3.     The court finds that a percentage of the fund approach is the appropriate method for awarding attorneys' fees in the Federal Actions.  *See Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991).  Further, the court finds that a percentage fee award of 17.5% of Stockholder Class recovery is reasonable for the reasons stated in this order.

4.     The court finds that the fee percentage awarded is presumptively reasonable because it was negotiated with properly-selected and court-appointed Lead Plaintiffs relatively early in the case.

5.     The court notes that Stockholder Lead Plaintiffs Central States SE and SW Areas Pension, New Mexico State Investment Council and the Educational Retirement Board of New Mexico endorse the percentage requested by counsel, and the State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, the State Employees' Retirement System, the Michigan State Police Retirement System, and the Michigan Judges Retirement System have deferred to the court to determine the appropriate percentage to be awarded.

6.     The court finds that a percentage fee of 17.5% is reasonable when compared to percentage awards in cases of similar size and complexity filed under the PSLRA.

7.     The court finds that counsel representing the Stockholder Class (excluding Additional Counsel for the Merger Subclasses) committed over 58,000 hours over an eight year period in the litigation of this case with a resulting lodestar of approximately $26 million in fees.  Stockholder Plaintiffs' Lead Counsel have worked countless additional hours since January 11, 2007 to this point, including working out arrangements with the SEC for inclusion of $100,000,000.00 in allocation to the Class Members, for which they seek no compensation.

8.     The court finds that counsel for the Stockholder Class took this case on a contingent fee basis assuming the risk of no payment for their work beginning in 1998 – before the rest of the world became aware of the egregious accounting fraud at HealthSouth.

9.     The court finds that counsel for the Stockholder Class showed considerable skill in handling the complex legal and factual issues presented during the course of the litigation against the Settling Defendants.

10.    The court finds that counsel for the Stockholder Class were instrumental in obtaining an excellent settlement despite the challenges presented

by HealthSouth's financial position and HealthSouth's insurance carriers' position throughout the settlement process.

11.     The court finds that the Stockholder Class reaction supports approval of the fee application, the court having received only one objection out of the 460,635 notices mailed to Class Members.

12.     The court has reviewed and considered the objection submitted by Jan G. Smith and William W. Smith (doc. 1009).  The objectors presented no reason why the court should reject the fee structure negotiated by the Lead Plaintiffs that is in line with fees in similar cases.  Therefore, the court finds the objection to be without merit and OVERRULES the objection.

13.     The court awards Stockholder Plaintiffs' Lead Counsel attorneys' fees of 17.5% of the Stockholder Class portion of the Settlement Fund.  These fees shall be paid in *cash, stock and warrants in the same proportion* that the aggregate Net Settlement Fund is distributed to Authorized Claimants.  The awarded attorneys' fees shall be paid from the Settlement Fund immediately after a determination has been made regarding distribution of the Settlement Fund to Authorized Claimants. These fees shall be allocated to other counsel by Stockholder Plaintiffs' Lead Counsel in a manner that, in their good faith judgment, reflects each counsel's contribution to the institution, prosecution and resolution of this portion of the Federal Actions.

14.     The court awards Stockholder Plaintiffs Lead Counsel expenses in an aggregate amount of $3,112,985.37 to be paid from the cash portion of the Settlement Fund.  Immediately after the date this Order is executed, the awarded expenses shall be paid from the Settlement Fund in accordance with the terms, conditions, and obligations set forth in the Stipulation.

DONE and ORDERED this 12th day of February, 2008.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION

This document applies to:                                    09 MD 2017 (LAK)

*In re Lehman Brothers Equity/Debt Securities*
*Litigation*, 08 Civ. 5523 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────────┐
│ USDS SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____            │
│ DATE FILED:  6/29/12             │
└─────────────────────────────────┘
```

**PRETRIAL ORDER NO. 35**
(Attorneys' Fees and Expenses)

LEWIS A. KAPLAN, *District Judge.*

This securities class action was settled for an aggregate of $516,218,000 of which $90 million will be paid on behalf of the director and officer defendants and the balance on behalf of underwriter defendants. Lead Counsel apply for attorneys' fees of 16 percent of the recovery, which is $82,594,880, plus reimbursement of expenses. The proposed fees would be approximately 2.18 times the lodestar (the product of the hours expended and hourly rates) of $37,819,510, which reflects 91,876 hours devoted to the litigation.

In passing on this application, the Court applies the factors referred to in *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 42 (2d Cir. 2000). It notes that plaintiffs seek an award in terms of a percentage of the recovery. But use of that methodology, while certainly permissible, is not mandatory, the lodestar approach being appropriate also. *McDaniel v. County of Schenectady,* 595 F.3d 411, 417 (2d Cir. 2010). So there is no need for any academic debate on the relative merits of these approaches, both in light of *McDaniel* and because the result would be the same here whichever were applied. Thus, the fact that the Court opts to express its rationale principally in terms of the lodestar approach ultimately is not material.

Some of the *Golberger* factors warrant only minimal discussion. First, this was a big and complicated action. Second, the Court respects the performance of plaintiffs accomplished counsel. They did a great deal of work.[1] Third, despite the facts that virtually all securities class

---

[1]

Although one might wonder whether all of the 91,876 hours used in computing the lodestar all were efficiently and usefully devoted to the matter, the Court assumes for present purposes that they were. This is supported by the fact that the bankruptcy examiner, whose work is discussed below, devoted 111,000 hours to his investigation. Transcript, Apr. 12, 2012 ("Tr."), at 47-48. While his mission and that of plaintiffs' counsel were different, and

actions that survive motions to dismiss are settled and that the lawyers who bring those cases are paid fees, there often is a risk of dismissal on the pleadings, and that was so here during the early stages of the case. Finally, it bears note that class counsel usually are compensated only many months or years after much of the work is done and overhead costs borne. On the other hand, there are some factors that cut in favor of an award lower than the nearly $83 million requested – which would amount to an average of almost $900 per hour for each of the 91,876 hours claimed.

First, plaintiffs' counsel here had the benefit of the quite extraordinary report of the examiner appointed by the Bankruptcy Court in the Lehman bankruptcy. It was that report that revealed the facts regarding Lehman's use of and accounting for Repo 105s, which became the most important part of plaintiffs' case.[2] Indeed, the second amended complaint, which antedated the examiner's report, did not even mention that subject while the third amended complaint ("TAC") relied heavily upon it – as did the Court in denying in significant respects defendants' motions to dismiss the TAC.[3] Thus, plaintiffs took great and good advantage of the examiner's report, which became a roadmap for the most significant part of their case.[4] They were right to do so. But the fact remains that this very significant factor in the denial of much of the motions to dismiss and, doubtless, in the price defendants eventually paid to settle was the product of the examiner's efforts. And just to be quite clear, this implies no criticism of plaintiffs' counsel, who lacked the examiner's access to the evidence. But it does bear on the amount of compensation appropriately paid to plaintiffs' counsel, particularly any amount above the lodestar.

Second, while the Court acknowledges that plaintiffs' counsel faced risks in this case, those should not be overstated.

Third, the objective in compensating common fund counsel is subject to the overriding requirement of reasonableness. Lead Counsel here claim that the settlement represents recovery of 13 percent of the theoretical maximum allowable statutory damages of $3.3 billion and a significantly larger percentage of reasonably recoverable damages.[5] But there is no contention that the class members as a result of these settlements will recover even a third of their reasonably

---

while he had access to far more evidence than did plaintiffs' counsel, the comparison tends to corroborate the order of magnitude of the plaintiffs' effort and therefore of the Court's assumption.

[2]

See *In re Lehman Bros. Secur. and ERISA Litig.,* 799 F. Supp.2d 258 (S.D.N.Y. 2011).

[3]

See *id.*

[4]

Lead Counsel candidly acknowledged that the examiner's report provided plaintiffs with important information they had not had earlier, particular with respect to Repo 105s. *See* Tr., Apr. 12, 2012, at 6-7.

[5]

*Id.* at 9-10.

recoverable damages. Yet counsel seek to recovery 2.18 times the reasonable value of their services measured by their hourly rates and the number of hours devoted to the task. Moreover, even acknowledging that class counsel, under existing law, almost always receive a greater proportion of their lodestar fee measures than the class members receive of their losses, the Court in good conscience is bound to question a legal fee of over $80 million, which would compensate the attorneys at a rate of more than $900 per hour. We live in hard times. A fee in excess of $82 million, reflecting about 2.18 times the notional reasonable value of the services rendered, even granting that some premium over the lodestar is appropriate, simply seems too much.

All of this said, the Court is frank to say that there is no magic to setting a fee in this case. There is no figure that is right or wrong. But it seems to the undersigned that a lodestar multiplier of 1.5 is appropriate in light of all of the circumstances, given the legal standards that govern this determination. The expenses sought are appropriate.

Accordingly, the motion for attorneys fees and expenses [09 MD 2017 DI 805, 08 Civ. 5523 DI 341] is granted to the extent that the Court awards attorneys' fees in the aggregate amount of $56,729,265[6] plus expenses in the amount of $1,619,669.27, to be paid *pro rata* out of the two separate settlement funds.

SO ORDERED.

Dated:     June 29, 2012

Lewis A. Kaplan
United States District Judge

---

[6]

For those keeping score in terms of the percentage of the recovery, this represents 10.99 percent of the aggregate amount of the settlements.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE RAYTHEON COMPANY
SECURITIES LITIGATION

    Civil Action No.
    99-12142-PBS

THIS DOCUMENT RELATES TO:
ALL ACTIONS

## [PROPOSED] ORDER AND FINAL JUDGMENT

On the 6th day of December, 2004, a hearing was held before this Court to determine: (1)

whether the terms and conditions of the Stipulation and Agreement of Settlement dated August

17, 2004 (the "Stipulation") are fair, reasonable and adequate for the settlement of all claims

asserted by Lead Plaintiff and the Class against the Raytheon Defendants and

PricewaterhouseCoopers LLP ("PwC") in the Complaint now pending in this Court under the

above caption, including the release of the Defendants and the Released Parties, and should be

approved; (2) whether judgment should be entered dismissing the Complaint on the merits and

with prejudice in favor of the Defendants and as against all persons or entities who are members

of the Class herein who have not requested exclusion therefrom; (3) whether to approve the Plan

of Allocation as a fair and reasonable method to allocate the settlement proceeds among the

members of the Class; and (4) whether and in what amount to award Plaintiffs' Counsel fees and

reimbursement of expenses. The Court having considered all matters submitted to it at the

hearing and otherwise; and it appearing that a notice of the hearing substantially in the form

approved by the Court was mailed to all persons or entities reasonably identifiable, who

purchased the Class A and/or Class B common stock of Raytheon Company ("Raytheon") during

the period from October 7, 1998 through October 12, 1999, inclusive (the "Class Period"), as

shown by the records of Raytheon's transfer agent and the records compiled by the Notice

Administrator in connection with its previous mailing of the Notice of Pendency, at the

respective addresses set forth in such records, except those persons or entities excluded from the

definition of the Class or who previously excluded themselves from the Class, and that a

summary notice of the hearing substantially in the form approved by the Court was published in

the national edition of The Wall Street Journal pursuant to the specifications of the Court; and

the Court having considered and determined the fairness and reasonableness of the award of

attorneys' fees and expenses requested; and all capitalized terms used herein having the

meanings as set forth and defined in the Stipulation.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.     The Court has jurisdiction over the subject matter of the Action, the Lead

Plaintiff, all Class Members, and the Defendants.

2.     The Court finds that the prerequisites for a class action under Federal Rules of

Civil Procedure 23 (a) and (b)(3) have been satisfied in that:  (a) the number of Class Members is

so numerous that joinder of all members thereof is impracticable; (b) there are questions of law

and fact common to the Class; (c) the claims of the Class Representatives are typical of the

claims of the Class they seek to represent; (d) the Class Representatives have and will fairly and

adequately represent the interests of the Class; (e) the questions of law and fact common to the

members of the Class predominate over any questions affecting only individual members of the

Class; and (f) a class action is superior to other available methods for the fair and efficient

adjudication of the controversy.

3.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure and for the purposes

of the Settlements this Court hereby finally certifies this action as a class action on behalf of all

persons or entities who purchased Class A and/or Class B common stock of Raytheon Company during the period from October 7, 1998 through October 12, 1999, inclusive, and who were allegedly damaged thereby. Excluded from the Class are the Defendants, all of the officers, directors, and partners thereof, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which any of the foregoing have or had a controlling interest. Also excluded from the Class are the persons and/or entities who previously excluded themselves from the Class in accordance with the requirements set forth in the Notice of Pendency, as listed on Exhibit 1 annexed hereto. Also excluded from the Class with respect to the PwC Settlement are the persons and/or entities listed on Exhibit 2 annexed hereto, provided, and only to the extent that, such persons and/or entities, if any, otherwise would be members of the Class. The Settlement Notice directed persons requesting exclusion to state the "date(s), price(s), and number(s) of shares of all purchase and sales of Raytheon Class A and/or Class B common stock during the Class Period." As reflected in Exhibit 2, the entities represented by State Street Bank and which requested exclusion have indicated that they had no Class Period purchases of Raytheon Class A and/or Class B common stock. The six individuals requesting exclusion have not demonstrated that they would otherwise be members of the Class, although as noted in Exhibit 2, upon inquiry by counsel they generally indicated that they have limited if any class period purchases.

4.       Notice of the Proposed Settlements was given to all Class Members who could be identified with reasonable effort. The form and method of notifying the Class of the terms and conditions of the proposed Settlements met the requirements of Rule 23 of the Federal Rules of Civil Procedure, Section 21D(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. 78u-4(a)(7) as amended by the Private Securities Litigation Reform Act of 1995, due process, and

any other applicable law, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

5.    The Settlements are approved as fair, reasonable and adequate to the Class Members, and the Class Members and the parties are directed to consummate the Settlements in accordance with the terms and provisions of the Stipulation.

6.    The Settlement Warrants are to be issued in exchange for bona fide outstanding claims; all parties to whom it is proposed to issue such securities have had the right to appear at the hearing on the fairness of the Settlement; and the Settlement Warrants are therefore unrestricted and freely tradable exempted securities pursuant to Section 3(a)(10) of the Securities Act of 1933, 15 U.S.C. § 77c(a)(10).

7.    The Complaint, which the Court finds was filed on a good faith basis in accordance with the Private Securities Litigation Reform Act and Rule 11 of the Federal Rules of Civil Procedure based upon all publicly available information, is hereby dismissed with prejudice and without costs.

8.    Members of the Class and the successors and assigns of any of them, are hereby permanently barred and enjoined from instituting, commencing or prosecuting, either directly or in any other capacity, the Settled Claims against the Released Parties.  "Settled Claims" means any and all claims, debts, demands, rights or causes of action or liabilities whatsoever (including, but not limited to, any claims for damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses, liability or relief whatsoever), whether based on federal, state, local, statutory or common law or any other law, rule or regulation, whether fixed or contingent, accrued or un-accrued, liquidated or un-liquidated, foreseen or not foreseen, raised or not raised,

4

matured or un-matured, at law or in equity, whether direct, class or individual in nature,
including both known claims and Unknown Claims, (i) that have been asserted in the Action by
the Class Members or any of them against any of the Released Parties, or (ii) that could have
been asserted in any forum by the Class Members or any of them against any of the Released
Parties which (a) arise out of, relate in any way to, or are based upon the allegations,
transactions, facts, matters or occurrences, representations or omissions involved, set forth, or
referred to in the Complaint or Action, and relate to the purchase, sale, or holding of shares of
Class A and/or Class B common stock of Raytheon Company during the Class Period, or (b) that
arise out of or relate in any way to the defense or settlement of the Action (except for claims to
enforce the Settlement). "Released Parties" means the Released Raytheon Parties, the Released
Individual Defendant Parties and the Released PwC Parties. "Released Individual Defendant
Parties" means any and all of the Individual Defendants, and their past, present, or future
partners, agents, attorneys, employees, heirs, successors in interest or assigns, administrators,
executors and personal representatives, and shall include any insurer who contributes to or
reimburses Raytheon and/ or the Individual Defendants for a portion of its or their contribution
to the Raytheon Settlement and who receives a release from the Individual Defendants in
connection with the Settlement. Released Individual Defendant Parties does not mean or include
the Released Raytheon Parties or the Released PwC Parties. "Released Raytheon Parties" means
Raytheon and any and all of its past, present and future, direct and indirect subsidiaries, parents,
affiliates, successors and predecessors, and each of their respective officers, directors, agents,
employees, assigns, partners, principals, divisions, representatives, affiliates, attorneys, advisors,
investment advisors, accountants and any person, firm, trust, corporation, officer, director or
other individual or entity in which Raytheon has a controlling interest or which is related to or

affiliated with Raytheon, and shall include any insurer who contributes to or reimburses
Raytheon for a portion of its contribution to the Raytheon Settlement and who receives a release
from Raytheon in connection with the Settlement. Released Raytheon Parties does not mean or
include the Released Individual Defendant Parties or the Released PwC Parties. "Released PwC
Parties" means PricewaterhouseCoopers LLP and all of its past, present and future parent
entities, direct and indirect subsidiaries, affiliates, predecessors (including, without limitation,
Coopers & Lybrand, L.L.P. and Price Waterhouse LLP) and successors, and each of their
respective past, present and future directors, officers, partners, principals, employees, agents,
representatives, affiliates, advisers, investment advisers, insurers, servants, accountants attorneys
and any person, firm, trust, corporation, officer, director or other individual or entity in which
PwC has or had a controlling interest or which is or was related to or affiliated with PwC, and
their respective representatives, heirs, successors in interest and assigns. Released PwC Parties
does not mean or include the Released Individual Defendant Parties or the Released Raytheon
Parties. The Settled Claims are hereby compromised, settled, released, discharged and dismissed
as against the Released Parties on the merits and with prejudice by virtue of the proceedings
herein and this Order and Final Judgment.

9.     The Defendants and the successors and assigns of any of them, are hereby
permanently barred and enjoined from instituting, commencing or prosecuting, either directly or
in any other capacity, the "Settled Defendants' Claims" against Alan G. Hevesi, Comptroller of
the State of New York, NYSCRF, the New York State and Local Retirement Systems, and the
past, present, or future officers and employees of any of the foregoing and their predecessors,
successors and assigns, and the heirs, administrators, executors and personal representatives of
each (the "Released Lead Plaintiff Parties") or any of the Class Members or their attorneys.

6

"Settled Defendants' Claims" means the Settled Raytheon Defendants' Claims and the Settled

PwC Defendants' Claims. "Settled Raytheon Defendants' Claims" means any and all claims,

rights or causes of action or liabilities whatsoever, whether based on federal, state, local,

statutory or common law or any other law, rule or regulation, including both known claims and

Unknown Claims, that have been or could have been asserted in the Action or any forum by the

Released Raytheon Parties and the Released Individual Defendant Parties, or any of them,

against any of the Released Lead Plaintiff Parties, any Class Members or their attorneys, which

arise out of or relate in any way to the institution, prosecution, or settlement of the Action

(except for claims to enforce the Settlement). "Settled PwC Defendants' Claims" means any and

all claims, rights or causes of action or liabilities whatsoever, whether based on federal, state,

local, statutory or common law or any other law, rule or regulation, including both known claims

and Unknown Claims, that have been or could have been asserted in the Action or any forum by

the Released PwC Parties or any of them against any of the Released Lead Plaintiff Parties, any

Class Members or their attorneys, which arise out of or relate in any way to the institution,

prosecution, or settlement of the Action (except for claims to enforce the Settlement). The

Settled Defendants' Claims of all the Released Parties are hereby compromised, settled, released,

discharged and dismissed on the merits and with prejudice by virtue of the proceedings herein

and this Order and Final Judgment.

10. "Barred Claims" means any claim(s) for contribution, indemnity, equitable

indemnity, reimbursement, or any other claim, however denominated, by which the claimant

seeks to recover losses based upon, arising out of, relating to, or in connection with, the Settled

Claims of the Class or any Class Member, whether arising under state, federal or common law

(hereinafter, the "Barred Claims"). The Court hereby permanently bars and enjoins all Barred

7

Claims (a) against the Released Parties; (b) by the Released Parties against any person or entity other than a person or entity (excluding Released Parties) whose liability has been extinguished by Settlement, except that nothing in this Order shall affect any of the Released Parties' rights with respect to their respective insurance carriers.

11.     Neither this Order and Final Judgment, the Stipulation, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein shall be:

(a)     offered or received in any legal proceeding against any of the Defendants as evidence of or construed as or deemed to be evidence of any presumption, concession, or admission by any of the Defendants with respect to the truth of any fact alleged by any of the plaintiffs or the validity of any claim that has been or could have been asserted in the Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Action or in any litigation, or of any liability, negligence, fault, or wrongdoing of any of the Defendants;

(b)     offered or received in any legal proceeding against any of the Defendants as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by any Defendant;

(c)     offered or received in any legal proceeding against any of the Defendants as evidence of a presumption, concession or admission with respect to any liability, negligence, fault or wrongdoing, or in any way referred to for any other reason as against any of the Defendants, in any other civil, criminal or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Stipulation; provided,

however, that if this Stipulation is approved by the Court, Defendants may refer to it to effectuate the liability protection granted them hereunder;

      (d)    construed in any legal proceeding against any of the Defendants as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial; or

      (e)    construed as or received in evidence in any legal proceeding as an admission, concession or presumption against any of the Released Lead Plaintiff Parties or any of the Class Members that any of their claims are without merit, or that any defenses asserted by the Defendants have any merit, or that damages recoverable under the Complaint would not have exceeded the Gross Settlement Funds.

12.    The Plan of Allocation is approved as fair and reasonable, and Plaintiff's Lead Counsel and the Claims Administrator are directed to administer the Stipulation in accordance with its terms and provisions.

13.    The Court finds that all parties and their counsel have complied with each requirement of Rule 11 of the Federal Rules of Civil Procedure as to all proceedings herein.

14.    Plaintiff's Lead Counsel are hereby awarded ___9___ % [9% requested] of the Gross Cash Settlement Funds and the Settlement Warrants in fees, which sums the Court finds to *reasonable expenses to be determined* be fair and reasonable, and $_____ [$6,992,407.22 requested] from the Gross Cash Settlement Funds in reimbursement of expenses, which expenses shall be paid to Plaintiff's Lead Counsel from the Gross Cash Settlement Funds with interest from the date such Settlement Fund was funded to the date of payment at the same net rate that the Gross Cash Settlement Funds

earn. The award of attorneys' fees shall be allocated among Plaintiffs' Counsel in a fashion which, in the opinion of Plaintiff's Lead Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions in the prosecution of the Action.

15.     In making this award of attorneys' fees and reimbursement of expenses to be paid from the Gross Settlement Funds, the Court has considered and found that:

(a)     the settlements have created funds of $260 million in cash that is already on deposit, plus interest thereon, and $200 million in warrants, that thousands of Class Members who submit acceptable Proofs of Claim will benefit from the Settlement created by Plaintiff's Lead Counsel;

(b)     Over 180,000 copies of the Settlement Notice were disseminated to putative Class Members indicating that Plaintiff's Lead Counsel were moving for attorneys' fees in the amount of nine percent (9%) of each of the Gross Cash Settlement Funds and Gross Settlement Warrants, and for reimbursement of expenses in an amount not to exceed $8.25 million, and only two objections were filed against the terms of the proposed Settlement or the fees and expenses requested by Plaintiffs' Counsel contained in the Settlement Notice;

(c)     Plaintiff's Lead Counsel have conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy;

(d)     The action involves complex factual and legal issues and was actively prosecuted and defended over five years and, in the absence of a settlement, would involve further lengthy proceedings with uncertain resolution of the complex factual and legal issues;

(e)    Had Plaintiff's Lead Counsel not achieved the Settlement there would remain a significant risk that Lead Plaintiff and the Class may have recovered less or nothing from the Defendants; and

(f)    The amount of attorneys' fees awarded and expenses reimbursed from the Settlement proceeds are fair and reasonable in comparison with awards in similar cases.

16.    Lead Plaintiff is hereby awarded from the Gross Cash Settlement Funds the sum of $ 2, 6 6 4. 8 7 [$2,664.87 requested] for reimbursement of its reasonable costs and expenses directly relating to its representation of the Class, plus interest on such expenses (at the same net interest rate as is earned on the Gross Cash Settlement Funds from the date the Gross Cash Settlement Funds are deposited into escrow to the date of payment).

17.    Exclusive jurisdiction is hereby retained over the parties and the Class Members for all matters relating to this Action, including the administration, interpretation, effectuation or enforcement of the Stipulation and this Order and Final Judgment, and including any application for fees and expenses incurred in connection with administering and distributing the settlement proceeds to the members of the Class.

18.    Without further order of the Court, the parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

19.    There is no just reason for delay in the entry of this Order and Final Judgment and immediate entry by the Clerk of the Court is expressly directed pursuant to Rule 54 (b) of the Federal Rules of Civil Procedure.

Dated:       Boston, Massachusetts

11

_12 / 6_ , 2004

Honorable Patti B. Saris
United States District Judge

# EXHIBIT 1

## List of Persons and Entities Excluded from the Class in the
## In re Raytheon Company Securities Litigation

The following persons and entities properly excluded themselves from the Class in response to the Notice of Pendency in the In re Raytheon Company Securities Litigation:

| EXCLUSION REQUESTS RECEIVED IN RESPONSE TO THE NOTICE OF PENDENCY | |
|---|---|
| Elizabeth F. Summerkind<br>675 Clubland Circle<br>Congers, GA 30094 | John A. & Catherine I. Campbell<br>14 Greenwich Road<br>Edison, NJ 08820 |
| Mitchell J. Alga, Executor<br>P.O. Box 153<br>Kilmarnock, VA 22482 | Deborah Davis<br>20259 Keystone St.<br>Detroit, MI 48234 |
| James C. McConnell<br>P.O. Box 35<br>Hatfield, MA 01038 | Wilma & James Sell<br>24971 Carnoustie Ct., SE<br>Bonita Springs, FL 34135 |
| Marie M. Caulfield<br>17052 Dolphin Drive<br>N. Redington Beach, FL 33708 | Donnabell & James Parrett<br>417 West 7th St.<br>Peru, IN 46970 |
| James & Betty Diltz<br>312 Timberhill Court<br>Knoxville, TN 37922 | Elizabeth Rollinger<br>7340 Gronow<br>Center Line, MI 48015 |

*EXCLUSION REQUESTS RECEIVED IN RESPONSE TO THE NOTICE OF PENDENCY*

| | |
|---|---|
| Barry R. McNaughton<br>63 Ontario Street<br>St. Catharine, Ontario, Canada | Charlotte A. Maher<br>Apt. S-417<br>202 N. Atlantic Ave.<br>Cocoa Beach, FL 32931 |
| Louis Laroche<br>P.O. Box 1832<br>Orleans, MA 02653 | Dana Edwards for Emma Starin<br>453 S. Ringold St.<br>Janesville, WI 53545 |
| Don E. and Betty A. Haymann<br>11 Exeter Lane<br>Belleville, IL 62226 | Barbara Simmons MacFarlane<br>5100 Chevy Chase Pkwy. NW<br>Washington, DC 20008 |
| Florence Whittemore<br>431 North Road<br>Yarmouth, ME 04096 | Jimmy and Betty A. Greene<br>33343 Lake Bend Ct.<br>Leesburg, FL 34788 |
| George A. Anderson<br>2970 St. Johns Avenue, Unit 8D<br>Jacksonville, FL 32205 | Franklin D. & Cynthia Austin<br>5 Sunrise Terrace<br>Springfield, VT 05156 |
| James C. & Jean R. Wilson | Florence L. Knight<br>300 East Golden Oaks Drive<br>Green Barrel City, TX 75156 |
| Faye H. Peevey | Mrs. Bess Boodley<br>46 Stratton Ct.<br>Roobbinsville, NJ 08691 |

| EXCLUSION REQUESTS RECEIVED IN RESPONSE TO THE NOTICE OF PENDENCY | |
|---|---|
| C. Robert Spellman<br>64229 E. Orangewood Ln.<br>Tucson, AZ 85739 | Ethel A. Goldberg<br>3063 Guildford "D"<br>Boca Raton, FL 33434 |
| Norman Jarnecke<br>1721 N. Seminary<br>Woodstock, IL 60098 | Martin I. Hart<br>275 Via Pucon<br>Palm Desert, CA 92260 |
| E. Thomas Pappert<br>4750 Ardmore Drive<br>Bloomfield Hills, MI 48302 | Thomas A. Reed<br>4614 Wendover St.<br>Wichita Falls, TX 76309 |
| Mary Ann Tulla<br>Garden Hills<br>BA-9 Hastings St.<br>Guagnolio, PR 00966 | Charles K. Miles<br>5816 SW Sterling Lane<br>Topeka, KS 66604 |
| Dorothy S. Evans<br>44 Carrolwood Circle<br>Ormond Beach, FL 32174 | Lee H. Henkel, Jr.<br>780 Johnson Ferry Rd., 6th Fl.<br>Atlanta, GA 30342 |
| Wolfgang A. & Catherine Jonek<br>59248 Conifer Ct.<br>Washington Twp., MI 48094 | Murray J. Smidt<br>5518 Lincoln Road<br>Martinsville, IN 46151 |
| Marianna McLoughlin<br>1708 Moreno Place<br>Lady Lake, FL 32159 | Betty H. Johnson<br>154 Brentwood Dr., NE<br>Thomson, GA 30824 |

15

| EXCLUSION REQUESTS RECEIVED IN RESPONSE TO THE NOTICE OF PENDENCY | |
|---|---|
| Margaret R. Kell<br>14914 Elmont Dr.<br>Houston, TX 77095 | John S. Graham<br>350 Paseo De Playa, #124<br>Ventura, CA 93001 |
| Betty J. & William Powell<br>229 Tamarack Ave.<br>Naperville, IL 60540 | John S. & Monique M. Mackasey<br>13627 Smokey Hollow Place<br>Carmel, IN 46033 |
| Joseph W. Mandel<br>5845 Morris Rd.<br>Marcy, NY 13403 | Judy A. Leonhart<br>P.O. Box 8<br>Yoder, CO 80864 |
| Waldo A. Barron<br>2518 S. 91st E. Place<br>Tulsa, OK 74129 | Virginia L. Black<br>5316 53rd Avenue E M-17<br>Bradenton, FL 34203-5611 |
| Semon Friesell<br>167 North Dr.<br>Pittsburgh, PA 15238 | Patricia A. Ficht<br>6429 W. 85th Street<br>Burbank, IL 60459 |
| Jose & Phyllis Vidal<br>2693 La Casita Ave.<br>Las Vegas, NV 89120 | Bill and Judy Miner<br>Rt. 1 Box 92<br>Comfort, TX 78013 |
| Marilyn Frifel<br>44 N. Vail Ave., #209<br>Arlington Hts., IL 60005 | Marjorie E. Harwell<br>8820 Jennie Lee Lane<br>Dallas, TX 75227 |

## EXCLUSION REQUESTS RECEIVED IN RESPONSE TO THE NOTICE OF PENDENCY

| | |
|---|---|
| Edna Mourning<br>38072 Alta Dr.<br>Fremont, CA 94536 | John & Loretta A. Broeckelmann<br>2413 Oakmont Court<br>High Ridge, MO 63049 |
| William Canham<br>4836 Agnes Avenue<br>N. Hollywood, CA 91607 | Angeline Maiatico<br>Sewell, NJ |
| David R. Wilkinson<br>1 Lakeside Drive, Unit #15<br>St. Catharine, Ontario, Canada | Hunter Motel & Restaurant<br>8100 Louisdale Rd.<br>Newington, VA 22122 |
| Sheila C. Thompson<br>P.O. Box 6148<br>Traverse City, MI 49696 | Diana Purcell<br>11720 Birch Glen Court<br>San Diego, CA 92131 |
| Robert M. Kerwin<br>10530 Santo Marco Court<br>Las Vegas, NV 89135 | Christopher Mosier<br>P.O. Box 171<br>Deming, NM 88031 |
| Nedra S. Mosley<br>1734 Malvern Rd.<br>Jackson, MI 49203 | Mario Cassetta<br>7A Jeff Dr.<br>Etobicoke, Ontario M9C 1J5 Canada |
| Shirley V. Granzow<br>2078 Scotch Fr.<br>Holland, WI 49423 | Martha B. Hartmann<br>Northview<br>1322 Swartz Road<br>Woodstock, VA 22664 |

*EXCLUSION REQUESTS RECEIVED IN RESPONSE TO THE NOTICE OF PENDENCY*

| | |
|---|---|
| Eric B. Leighton<br>129 Bennington Road<br>Akron, OH 44313 | Chester Ivan Utley<br>3832 West 134th Place<br>Hawthorne, CA 90250 |
| Alton L. & Nancy C. Lightsey<br>4207 Blue Heron Lane<br>Evans, GA 30809 | Matthew M. & Sara S. Wilcox |
| Donald A. Kissell<br>7019 Reed Ct.<br>Arvada, CO 80003 | William A. & Teresa Richardson<br>40 Baily Road<br>Yeodon, PA 19050 |
| Russell L. & Mary N. Johnson<br>9732 Morningside Loop, #4<br>Anchorage, AK 99515 | Jerry L. & Phyllis C. Hardy<br>516 N. Meridian St.<br>Greentown, IN 46936 |
| Julia T. Ascher<br>2960 Bethel Church Rd.<br>Bethel Park, PA 15102 | Stephen Boryzki<br>15204 Dickens St., #5<br>Sherman Oaks, CA 91403 |
| Michael J. Fealy<br>1800 County Road 310<br>Beeville, TX 78102 | Charles M. Orsinger<br>2206 Camelback Dr.<br>San Antonio, TX 78209 |
| Constance M. Emmens<br>1284-90th Street<br>Niagara Falls, NY 14304 | Howard and Joyce Wood<br>P.O. Box 18<br>Bonne Terre, MO 63628 |
| Helen Lois Downing<br>2449 Virgo Dr.<br>Colorado Springs, CO 80906 | Barbara Festoff<br>18 No. Cambridge<br>Ventnor, NJ 08406 |

| EXCLUSION REQUESTS RECEIVED IN RESPONSE TO THE NOTICE OF PENDENCY | |
|---|---|
| Rosamond P. Sullivan<br>620 Koko Isle Circle<br>Honolulu, HI 96825 | Edgar L. Kneaves<br>19501 Conser<br>Stilwell, KS 66085 |
| Margaret Burke<br>820-5 Sage Creek Lane<br>Fayetteville, NC 28305 | Gayle E. Plummer<br>14427 S.E. Topaz<br>Milwaukie, OR 97267 |
| Corwin L. Cambray<br>15 Beacon Hill Drive<br>St. Catharine, Ontario L2T2X6 Canada | Walter S. Downs<br>8213 Fort Hunt Road<br>Alexandria, VA 22308 |
| Joseph J. O'Hare, Jr.<br>1527 Forest Villa Ln.<br>McLean, VA 22101 | Mary L. Covington<br>2601 Waverly Drive<br>Newport Beach, CA 92663 |
| La Salle Academy<br>612 Academy Avenue<br>Providence, RI 02908 | |

# EXHIBIT 2

### List of Persons and Entities Excluded from the Class as to the PwC Settlement
### in the In re Raytheon Company Securities Litigation

The following persons and entities, and only the following persons and entities, have submitted requests for exclusion from the Class as to the PwC Settlement:

| | |
|---|---|
| **1.**<br><br>**Chester Iven Utley**<br>**Pace Ira**<br>**3832 W. 134ᵗʰ Place**<br>**Hawthorne, California 90250-6106**<br><br>(Mr. Utley purchased 15 shares of Raytheon for $1,035.00 on 08/12/99 and sold 15 shares for $476.23 on 11/19/99.) | **2.**<br><br>**Marjorie Harwell**<br>**CGM IRA Rollover Custodian**<br>**PM Account**<br>**8820 Jennie Lee Ln**<br>**Dallas, Texas 75227-8329**<br><br>(Ms. Harwell did not know the details of her transactions in Raytheon and did not want to be bothered.) |
| **3.**<br><br>**Paul Frederick Caruso**<br>**360 S. Clover Ave.**<br>**San Jose, California 95128**<br><br>(Indicated that his transactions were small, usually not more than 100 shares.) | **4.**<br><br>**Philip R. Girard**<br>**SSB IRA Custodian**<br>**FS/Oppenheimer Capital-Equity**<br>**1512 W. Eastbrook Dr.**<br>**Mequon, Wisconsin 53092-2971**<br><br>(Mr. Girard stated that he wasn't sure about numbers, prices or dates of Raytheon transactions, but said it was a "minor amount," in the hundreds, not thousands of dollars.) |

| | |
|---|---|
| **5.**<br><br>Katherine Ann Thompson<br>SSB IRA Custodian<br>SBAM Growth/Value<br>120 Dill St. SE<br>Huntsville, Alabama  35801-1803<br><br>(Ms. Thompson was not sure about numbers, prices or dates, but identified a ballpark figure of $1,000 or less in transactions.) | **6.**<br><br>Carrie G. Lutz<br>3211 Shoreview Dr.<br>Highland Village, Texas  75077<br><br>(Ms. Lutz purchased 116 shares of Raytheon Class A common stock on February 1, 1999 for $55.75 per share, received additional shares through dividends.  Ms. Lutz sold 56 shares on September 17, 1999 for $2,972.96 and sold another 112 shares on October 13, 1999 for $2,491.94.) |
| **7.**<br><br>DIRECTV Non-Bargaining Employees<br>Thrift and Savings Plan<br>DIRECTV Savings Plus Plan<br>c/o John Scott Feely<br>State Street Bank and Trust Company<br>As Trustee for the DIRECTV Plans<br>One Heritage Drive<br>North Quincy, Massachusetts  02171<br><br>(Claims no Class Period purchases of<br>   Raytheon Class A and/or Class B common<br>   stock. ) | **8.**<br><br>General Motors Savings Stock Purchase<br>   Plan<br>General Motors Personal Savings Plan<br>Delphi Savings Stock Purchase Plan<br>Delphi Personal Savings Plan<br>Saturn Individual Savings Plan<br>c/o John Scott Feely<br>State Street Bank and Trust Company<br>As Trustee for the GM SSPP, GM PSP,<br>DPH SSPP, DPH PSP, Saturn ISP<br>One Heritage Drive<br>North Quincy, Massachusetts  02171<br><br>(Claims no Class Period purchases of<br>   Raytheon Class A and/or Class B<br>   common stock.) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE ROYAL AHOLD N.V.          :     CIVIL NO. 03-MD-1539
SECURITIES & ERISA LITIGATION   :
                                :     ALL SECURITIES ACTIONS
                         ...o0o...

## MEMORANDUM

On June 16, 2006, following a hearing, lead plaintiffs' motion for final approval of class

certification, settlement, and plan of allocation was granted.  All objections as to those issues

were denied.[1]  Lead plaintiffs' motion for approval of lead counsel's application for attorneys'

fees, and the objections directed only to fees, were reserved for further consideration.

As reflected in the June 16, 2006 Order, lead plaintiffs obtained a $1.1 billion cash

settlement in their securities fraud suit against Royal Ahold ("Ahold") and related defendants.[2]

They seek attorneys' fees of $163,309,836.20, or 15% of the total minus certain expenses (Fee

Application Fund).  This would be a 3.21 multiplier of the lodestar.  Whether this amount is

reasonable depends on the application of various principles outlined in the Private Securities

Litigation Reform Act ("PSLRA") and relevant case law.  For the reasons stated below, the court

will award a fee of $130,647,868.95, which is 12% of the Fee Application Fund and represents a

2.57 multiplier of the lodestar.  Expenses in the full amount requested of $3,267,758.76 also will

be awarded.[3]

---

[1] *See* Final Judgment and Order of Dismissal in all Securities Actions (docket entry no.
765).

[2] The settlement did not include Deloitte & Touche U.S. or Deloitte & Touche
Netherlands.  A full discussion of the litigation is contained in prior published opinions, *see In re
Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F.Supp.2d 334 (D. Md. 2004); 384 F.Supp.2d 838
(D. Md. 2005).

[3] The requested amount of expenses has not been challenged.

The PSLRA limits any award of attorneys' fees and expenses to "a reasonable percentage" of any recovery.[4]  The Act does not, however, prescribe a method of calculating the award or set any specific percentage that must be applied.  While the Fourth Circuit has not yet definitively addressed the issue, other district judges in this circuit have suggested a flexible analysis that uses the percentage of recovery method but applies the lodestar method as a cross-check, recognizing that "both are useful tools for trial courts to use to inform and calibrate a judgment as to a fair and reasonable PSLRA fee award."  *See In re Microstrategy, Inc., Sec. Litig.*, 172 F.Supp.2d 778, 787 (E.D. Va. 2001); *cf. Goldenberg v. Marriott Corp.*, 33 F.Supp.2d 434, 439 n.6 (D.Md. 1998).  This approach is followed by the Second Circuit.  *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *In re WorldCom Sec. Litig.*, 388 F.Supp.2d 319, 355 (S.D.N.Y. 2005).  As the court noted in *WorldCom,* "where the lodestar fee is used 'as a mere cross-check' to the percentage method of determining reasonable attorneys' fees, 'the hours documented by counsel need not be exhaustively scrutinized by the district court.'"  388 F.Supp.2d at 355 (quoting *Goldberger*, 209 F.3d at 50).

Under both methods, there are numerous factors that may be considered in determining a reasonable fee.  The Fourth Circuit adopted a 12-factor test in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).[5]  The terms of a retainer agreement negotiated, as it was in

---

[4] *See* 15 U.S.C. § 78u-4(a)(6).

[5] The factors include:

(1) time and labor expended;
(2) novelty and difficulty of the questions raised;
(3) skill required to properly perform the legal services;
(4) attorney's opportunity costs in pressing the litigation;
(5) customary fee for like work;

this case, between lead counsel and a sophisticated institutional investor designated as lead

plaintiff deserve some deference, *see In re WorldCom, Sec. Litig.*, 388 F.Supp.2d at 356; *In re*

*Cendant Corp. Litig.*, 264 F.3d 201, 282 (3rd Cir. 2001), although such terms are not dispositive,

*see Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123-24 (2d Cir. 2005).  Another

important principle is that the percentage awarded ordinarily should decrease as the amount of

the recovery rises, particularly in "mega-fund" cases where the recovery is above $100 million.

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001).

In this case, counsels' lodestar figure is $50,858,606.25, representing 147,896.05 hours

expended at various hourly rates.[6]  The retainer agreement permitted counsel to request 20% of

the settlement amount, but that was voluntarily reduced to the 15% now sought.  Counsel also

agreed not to request a fee on any interest the settlement fund earns, and not to seek fees for the

time spent after May 11, 2006, in effectuating the settlement, including distribution of the fund

to the class.  *Cf. In re Worldcom Sec. Litig.*, 388 F.Supp.2d at 354 n.50.

Objections to the attorneys' fees request were filed by John Pentz, Esq., purportedly on

behalf of plaintiff Linda Tsai (docket entry no. 722); and by United States Trust Company,

---

    (6) attorney's expectations at the outset of litigation;
    (7) time limitations imposed by the client or circumstances;
    (8) amount in controversy and results obtained;
    (9) experience, reputation, and ability of the attorney;
    (10) undesirability of the case within the legal community in which the suit arose;
    (11) nature and length of the professional relationship between the attorney and client;
    (12) fee awards in similar cases.

    [6] These hourly  rates, while somewhat high for this district, are within a reasonable range
for the national firms that prosecuted the case; *see In re Microstrategy, Inc., Sec. Litig.*, 172
F.Supp.2d at 788.  Moreover, by agreement with lead plaintiff COPERA, hourly rates were
capped at $595 even for partners who ordinarily bill at a higher rate.  C*f. In re WorldCom, Sec.
Litig.*, 388 F.Supp.2d at 354 n.50 (capping rates at 2004 levels).

National Association ("U.S. Trust") (docket entry no. 741).

Pentz is a professional and generally unsuccessful objector who apparently attached himself to Tsai; Tsai was represented by different counsel at the early stages of this litigation.[7] Her initial objections to the settlement, filed on March 29, 2006, complained that Ahold should pay more money to <u>all</u> class members, but did not mention the attorneys' fee request. The later objection, filed by Pentz on May 3, 2006, complained that <u>U.S.</u> investors should have received a greater share of the settlement[8] and that the attorneys' fee should be limited to the greater of 7.5% or a 2.3 multiplier of the lodestar. Pentz did not challenge the lodestar figure calculated by plaintiffs' counsel and provided no coherent explanation for his contention that the fee is excessive. In summary, the Pentz/Tsai objection was not well reasoned and was not helpful.

U.S. Trust, engaged as an independent fiduciary for the ERISA plans, did not object to the settlement amount or allocation but did urge a reduction in the amount of attorneys' fees. Its objection is based on a comparison of percentage awards in what U.S. Trust identifies as the ten largest securities class action settlements in the last few years. U.S. Trust contends that as settlement amounts increase, percentage fee recovery decreases, and that in all cases involving settlements of $1 billion or more (with one possible exception), the awards have been less than 10%.

Plaintiffs' counsel, responding to both sets of objections, selects a somewhat different range of comparative awards and emphasizes the need to review the particular facts of this

---

[7] Tsai unsuccessfully sought to be designated lead plaintiff; at that time, she was represented by Schiffrin & Barroway, LLP.

[8] The Tsai & Pentz objections to the settlement amount and allocation already have been denied.

litigation, relying heavily on the affidavits of Columbia University Law School Professor John

C. Coffee, Jr.  I have carefully reviewed the charts of actual awards provided by both lead

plaintiffs and U.S. Trust but will not repeat them here.  I agree with plaintiffs that the range of

comparable settlements should include some below $1 billion as well as those few that

substantially exceed $1 billion.[9]  Strictly on a percentage comparison approach, a 12% fee award

appears to me a reasonable percentage of the class recovery.

Application of the *Barber* factors, some of which already have been addressed, also

supports an award of this magnitude.  On the one hand, settlement was achieved well before trial,

presumably aided by significant concessions about the fraud at U.S. Food Service and the

existence of "side letters" related to the joint venture consolidation.  While some of the legal

issues were familiar, others were more difficult and, at least as to subject-matter jurisdiction,

novel in this Circuit.  While the case was not "undesirable," lead counsel was required to and did

devote exceptional resources to the prosecution, facing some risk of non-recovery as the fee was

entirely contingent under the retainer agreement with COPERA, and Royal Ahold's financial

position was unclear.  The global aspect of the case raised additional practical and legal

complexities, as did the parallel criminal proceedings in another district.  The settlement

obtained is among the largest cash settlements ever in a securities class action case and

represents an estimated 40% recovery of possible provable damages.  The notice process appears

to have been very successful not only in reaching but also in eliciting claims from a substantial

percentage of those eligible for recovery.  Finally, plaintiffs' counsel were vigorous and

---

[9] I note that in *WorldCom,* a $3.55 billion subset of the total settlement resulted in attorneys' fees which reflected a percentage award of only 5.5%, but a lodestar multiplier of 4.0. 388 F.Supp.2d at 353-54.

extremely competent in their litigation against equally well-qualified defense firms.  When the

*Barber* factors are considered, together with the lodestar fee that has not been challenged, the

2.57 multiplier represented by a 12% percentage award is reasonable and fully justified.[10]

Accordingly, while the U.S. Trust objection was helpful in contributing to the discussion

of the percentage recovery approach, I do not agree with its apparent suggestion that 10% should

be the upper limit for any recovery over $1 billion.

A separate order stating the award follows.


  November 2, 2006                                      /s/
            Date                                         Catherine C. Blake
                                                        United States District Judge

---

[10] *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 742 (finding lodestar multiplier of
1.35 to 2.99 common in megafunds over $100 million); *In re Microstrategy, Inc., Sec. Litig.*, 172
F.Supp.2d at 790 (2.6 multiplier).

6

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

**OCT 08 2010**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

SECURITIES AND EXCHANGE
COMMISSION,
100 F Street, N.E.
Washington, D.C. 20549,

                        **Plaintiff,**

           **v.**

CITIGROUP INC.,

                        **Defendant.**

Civil Action No.
**10-cv-1277-ESH**

## FINAL JUDGMENT AS TO DEFENDANT CITIGROUP INC.

The Securities and Exchange Commission having filed a Complaint and

Defendant Citigroup Inc. ("Defendant") having entered a general appearance; consented

to the Court's jurisdiction over Defendant and the subject matter of this action; consented

to entry of this Final Judgment as to Defendant Citigroup Inc. ("Final Judgment") without

admitting or denying the allegations of the Complaint (except as to jurisdiction); waived

findings of fact and conclusions of law; and waived any right to appeal from this Final

Judgment:

**I.**

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that

Defendant and Defendant's agents, servants, employees, attorneys, and all persons in

active concert or participation with them who receive actual notice of this Final Judgment

by personal service or otherwise are permanently restrained and enjoined from violating

Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)]

in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 13(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] by (A) failing timely to file with the Commission any report or document required to be filed with the Commission pursuant to Section 13(a) of the Exchange Act or Exchange Act Rule 13a-11, (B) filing any such report or document that is inaccurate, (C) failing to include any information required to be included in such report or document, or (D) failing to include, in addition to the information required to be included in such report or document, such further material information as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

## III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $1.00, representing losses avoided as a result of

the conduct alleged in the Complaint, and a civil penalty in the amount of $75,000,000.00 pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3), (5) [15 U.S.C. § 78u(d)(3), (5)] of the Exchange Act. Defendant shall satisfy this obligation by paying $75,000,001.00 within 14 days after entry of this Final Judgment to the Clerk of this Court, together with a cover letter identifying Citigroup as a defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made pursuant to this Final Judgment. Defendant shall simultaneously transmit photocopies of such payment and letter to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Defendant. Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28 USC § 1961.

The Clerk shall deposit the funds into an interest bearing account with the Court Registry Investment System ("CRIS") or any other type of interest bearing account that is utilized by the Court. These funds, together with any interest and income earned thereon (collectively, the "Fund"), shall be held in the interest bearing account until further order of the Court. In accordance with 28 U.S.C. § 1914 and the guidelines set by the Director of the Administrative Office of the United States Courts, the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Fund a fee equal to ten percent of the income earned on the Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States.

The Commission will by motion propose a plan to distribute the Fund subject to the Court's approval. Such a plan will provide that the Fund shall be distributed pursuant

to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. Amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

The costs associated with the plan of distribution to be approved by the Court shall not be paid out of the money Defendant pays in disgorgement and penalty pursuant to this Final Judgment. The costs of distributing the money paid in disgorgement and penalty instead shall be paid separately by Defendant.

## IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Amended

Consent of Defendant Citigroup Inc. is incorporated herein with the same force and effect

as if fully set forth herein, and that Defendant shall comply with all of the undertakings

and agreements set forth therein, including, but not limited to, the following:

A.    For a period of three (3) years from the date of the entry of the Final

Judgment, Defendant agrees to comply with the following undertakings

related to its policies, practices, and procedures concerning the disclosure

of Defendant's earnings and other information related to Defendant's

financial performance in quarterly press releases ("Disclosure Policies,

Practices, and Procedures"):

1.    Defendant will maintain its Disclosure Committee and the

Disclosure Committee's Charter and Disclosure Controls and

Procedures governing the processes and responsibilities around

Defendant's public reporting.  The Disclosure Committee annually

will review the Disclosure Committee Charter and Disclosure

Controls and Procedures, and any recommended changes will be

made with oversight by Defendant's Chief Executive Officer and

Chief Financial Officer;

2.    Defendant will maintain an Earnings Subcommittee of its

Disclosure Committee -- comprised of Defendant's Head of

Investor Relations; Controller and Chief Accounting Officer; and

General Counsel, Capital Markets and Corporate Reporting – to

5

oversee the preparation and review of Defendant's quarterly earnings press releases;

3.     Prior to the release of Defendant's quarterly earnings information, each of the individuals identified below involved in the preparation and/or review of that information shall sign and date a Statement of Accountability that includes the following representation:

> Further, we have reviewed the earnings press release, earnings presentation/analyst deck and CFO script and, as of the date hereof, such documents do not contain any untrue statements of material fact, or omit to state a material fact necessary to make the statements made therein not misleading with respect to Citi.

The individuals required to sign a Statement of Accountability include (a) the chief executive officer and chief financial officer, or individuals holding equivalent positions, of each of Defendant's business segments; (b) representatives of Defendant's Finance organization, including the Controller and representatives of the Financial Planning and Analysis, Tax, and Treasury departments; (c) Defendant's Chief Administrative Officer; (d) Defendant's Vice Chairmen; and (e) representatives of Defendant's Investor Relations, Legal, Compliance, Audit & Risk Review, Public Affairs, and Risk departments;

4.     On a quarterly basis, Defendant's Disclosure Committee shall execute a certification addressed to Defendant's Chief Executive Officer and Chief Financial Officer regarding the effectiveness of Defendant's disclosure controls and procedures as of the end of

6

each quarterly period;

5.    If Defendant wishes to make a material change to its then-existing Disclosure Policies, Practices, and Procedures, Defendant will retain, pay for, and enter into an agreement with an independent consultant ("Independent Consultant") not unacceptable to Securities and Exchange Commission ("Commission") staff to make certain determinations with respect to any such proposed material change to Defendant's then-existing Disclosure Policies, Practices, and Procedures. Defendant may not make a material change to its then-existing Disclosure Policies, Practices, and Procedures without the written approval of the Independent Consultant. The agreement with the Independent Consultant will include the following provisions:

a.    Defendant, prior to the implementation of the proposed material change(s), (i) will provide written notice of the proposed change(s) to the Independent Consultant, (ii) will provide the Independent Consultant with a complete description of the proposed change(s) and the reasons for the change(s), and (iii) thereafter promptly will provide such additional information about the change(s) as the Independent Consultant requests;

b.    The Independent Consultant will evaluate the proposed material change to determine the impact of the change on

Defendant's then-existing Disclosure Policies, Practices, and Procedures;

i.     If the Independent Consultant determines that the proposed change enhances or otherwise does not reduce the effectiveness of Defendant's then-existing Disclosure Policies, Practices, and Procedures, the Independent Consultant will provide Defendant with a written notice of this determination and that Defendant may implement the proposed change.  The Independent Consultant concurrently will provide the Commission's Director of the Division of Enforcement with a copy of such written notice; and

ii.    If the Independent Consultant determines that a proposed change would make Defendant's then-existing Disclosure Policies, Practices, and Procedures less effective, the Independent Consultant will provide Defendant with a written notice of this determination and the reasons for the determination.  The Independent Consultant concurrently will provide the Commission's Director of the Division of Enforcement with a copy of such written notice.  Following the receipt of the

notice from the Independent Consultant, Defendant may propose a change to its then-existing Disclosure Policies, Practices, and Procedures to address the reasons for the Independent Consultant's determination;

c.      The Independent Consultant shall have the right to request that Defendant provide the Independent Consultant with such documents and other information as the Independent Consultant determines are necessary for the performance of the Independent Consultant's responsibilities.  Defendant promptly shall provide such information to the Independent Consultant;

d.      The Independent Consultant shall keep the original of all requests for changes to Defendant's Disclosure Policies, Practices, and Procedures; a copy of all notices of determinations and the reasons for those determinations that the Independent Consultant provides to Defendant; and such other documents as the Independent Consultant makes or receives in connection with the performance of his or her responsibilities.  The Independent Consultant shall retain these documents at least until the later of six (6) years from the date of entry of the Final Judgment or three (3) years following the conclusion of the Independent Consultant's

responsibilities for making determinations with respect to proposed changes to Defendant's Disclosure Policies, Practices, and Procedures;

e.      The Independent Consultant shall provide Commission staff with such documents and other information related to the Independent Consultant's responsibilities as the Commission staff requests. The Independent Consultant's relationship with Defendant shall not be treated as one between an attorney and client. The Independent Consultant will not assert the attorney-client privilege, the protection of the work-product doctrine, or any privilege as a ground for not providing any information requested by Commission staff; and

f.      For the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Defendant, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. In addition, the Independent Consultant will require that any firm with which the Independent Consultant is affiliated or of which the Independent Consultant is a member, and any person engaged to assist

10

the Independent Consultant in performance of the
Independent Consultant's duties under the Final Judgment
shall not, without prior written consent of the
Commission's Director of the Division of Enforcement,
enter into any employment, consultant, attorney-client,
auditing or other professional relationship with Defendant,
or any of its present or former affiliates, directors, officers,
employees, or agents acting in their capacity as such for the
period of the engagement and for a period of two years
after the engagement; and

B.    Defendant shall certify, in writing, compliance with the undertakings set
forth above.  The certification shall identify the undertakings, provide
written evidence of compliance in the form of a narrative, and be
supported by exhibits sufficient to demonstrate compliance.  The
Commission staff may make reasonable requests for further evidence of
compliance, and Defendant agrees to provide such evidence.  Defendant
shall submit the certification and supporting material to the Commission's
Director of the Division of Enforcement, with a copy to the Office of
Chief Counsel of the Enforcement Division, no later than sixty (60) days
from the date of the completion of the undertakings.

**V.**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court

shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final

Judgment.

Dated: _October 8_, 2010

_Ellen S Huck_

UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>**In Re: Tyco International, Ltd.
Multidistrict Litigation**</u>

Case No. 02-md-1335-PB
**ALL CASES**
Opinion No. 2007 DNH 156


<u>**MEMORANDUM AND ORDER**</u>

Lead Plaintiffs[1] brought this class action against Tyco
International, Ltd. ("Tyco"), its former auditor,
PricewaterhouseCoopers, LLP ("PwC"), and five individual
defendants: former Tyco Chief Executive Officer L. Dennis
Kozlowski, former Chief Financial Officer Mark H. Swartz, former
General Counsel Mark A. Belnick, and former directors Frank L.
Walsh and Michael A. Ashcroft (collectively the "Individual Tyco
Defendants"). They successfully negotiated a proposed settlement
with Tyco and PwC, and now petition for final approval of the
proposed settlement. The law firms representing Lead Plaintiffs

---

[1] Lead Plaintiffs are the Plumbers and Pipefitters National
Pension Fund ("Plumbers"), United Association General Officers
Pension Plan ("UAGO"), United Association Local Union Officers &
Employees Pension Fund ("UALOE"), Teachers' Retirement System of
Louisiana ("TRSL"), and the Louisiana State Employees' Retirement
System ("LASERS").

("Co-Lead Counsel") have also applied for an award of attorneys' fees and reimbursement of expenses incurred in connection with the prosecution and settlement of this action. For the reasons discussed herein, I approve both motions.

## I. BACKGROUND

I describe below only those facts and events necessary to place this settlement in context. The full extent of the alleged problems at Tyco during the relevant time period are described in detail in my orders certifying the class and disposing of defendants' motions to dismiss. See generally In re Tyco Int'l, Ltd. Multidistrict Litig., 236 F.R.D. 62 (D.N.H. 2006); In re Tyco Int'l, Ltd. Multidistrict Litig., No. MDL-02-1335-B, 2004 WL 2348315 (D.N.H. Oct. 14, 2004). In brief, plaintiffs allege that during the class period of December 13, 1999, through June 7, 2002, defendants misrepresented the value of multiple companies that Tyco acquired and misreported Tyco's own financial condition in ways that artificially inflated the value of Tyco stock. These fraudulent accounting practices, plaintiffs allege, enabled the Individual Tyco Defendants to reap enormous profits by looting the company through a combination of unreported bonuses,

-2-

forgiven loans, excessive fees, and insider trading. The looting, in turn, allegedly fostered a coverup by means of continued accounting fraud, materially false and misleading statements, and the omission of material information in various registration statements to cover up the misconduct, all of which further violated the federal securities laws. Meanwhile, PwC allegedly failed to conduct its audits of Tyco's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") and falsely certified that Tyco's financial statements were fairly presented in accordance with Generally Accepted Accounting Principles ("GAAP").

## A.    **Consolidated Complaint**

Lead Plaintiffs filed their Consolidated Class Action Complaint making the allegations described above on January 28, 2003. They did so about a year after this court dismissed a previous lawsuit against Tyco making similar allegations regarding the inflation of Tyco stock during the period from October 1, 1998, through December 8, 1999. See generally In re Tyco Int'l, Ltd. Sec. Litig., 185 F. Supp. 2d 102 (D.N.H. 2002) ("Tyco I") (granting Tyco's motion to dismiss the original action).

-3-

**B.  <u>Motion to Dismiss</u>**

In 2004, Tyco and PwC filed motions to dismiss, adopting a "divide and conquer" strategy that treated the looting allegations and fraudulent accounting allegations as two separate, unrelated schemes.  As to the looting allegations, defendants argued that the looting and attendant misconduct was mere self-dealing by the individual defendants at Tyco's expense, that it was not undertaken "in connection with" the purchase of a sale or security, that the scienter of the individual defendants could not be attributed to Tyco, and that Tyco was not required to disclose the looting.  As to the accounting fraud allegations, defendants argued that the allegations were not pled in sufficient detail to survive a motion to dismiss -- particularly with respect to loss causation.  On October 14, 2004, after careful consideration, I denied the bulk of defendants' motions to dismiss, allowing plaintiffs to proceed on their theory that the looting and the accounting fraud were interconnected.

In July 2005, after the Supreme Court clarified the requirements for establishing loss causation in securities fraud actions, <u>see</u> <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336 (2005), defendants moved to revisit the motions to dismiss on the

-4-

question of loss causation.  Under <u>Dura</u>, defendants argued,

plaintiffs' theory of loss causation (that revelations of looting

by the corporate principals caused investors to conclude that

they could no longer credit the company's denials of accounting

misconduct) was no longer sufficient.  I denied this motion.[2]

## C.  **Class Certification**

Plaintiffs moved to certify the class on January 14, 2005.

Among Tyco's objections to certification was a novel "equity

conflict" argument regarding the class members who presently hold

a greater share of Tyco's stock than they did during the class

period.  Tyco argued that these "equity holders" stood to lose

more as shareholders than they had to gain as class members

because any payment by Tyco to the class would correspondingly

reduce the value of their present holdings.  Thus, argued Tyco,

the interest of equity holders in protecting their present

holdings conflicted with the interest of Lead Plaintiffs in

recovering damages, and should therefore defeat class

certification.  I denied this motion because the equity holders

---

[2] PwC also filed a motion for summary judgment on loss
causation.  After briefing and oral argument, I denied this
motion.  PwC then filed a motion for certification of an
interlocutory appeal of this ruling, which had not yet been
resolved when PwC agreed to settle.

(even though they had an interest in preventing others from recovering) nevertheless had a strong interest in recovering on their own claims against Tyco and, more fundamentally, because this potential harm to a subgroup of the class should not bar the remaining class members from being able to proceed as a class. Tyco then filed an unsuccessful appeal of my class certification order in the Court of Appeals for the First Circuit. See In re Tyco Int'l, Ltd. Sec. Litig., No. 06-8022 (1st Cir. Sept. 22, 2006).

**D.  Discovery and Other Motion Practice**

It would be difficult to overstate the volume of discovery in this case.  Co-Lead Counsel propounded over 700 requests for admission, documents requests, and interrogatories; participated in over 220 depositions in New York, Florida, Massachusetts, and New Hampshire; and reviewed some 82.5 million pages of documents produced by defendants.  This volume of discovery was necessitated by the breadth of plaintiffs' allegations, which spanned more than one hundred different allegedly fraudulent corporate acquisitions by Tyco.  Moreover, because of the complexity of the alleged fraud, Co-Lead Counsel needed to retain expert consultants and forensic accountants to assist them in

interpreting the information they obtained through discovery.

This discovery process was paired with aggressive, skillfully argued, and unusually challenging motion practice. Defense counsel matched the tenacity of Co-Lead Counsel, missing no opportunity to raise nonfrivolous objections or file nonfrivolous appeals of adverse decisions. This motion practice frequently explored complex, cutting-edge issues in which the state of the law changed even as this case was being litigated. In particular, the parties heavily litigated loss causation when the law in this area was in a state of flux. Plaintiffs' theory of the case requires the fact finder to draw a causal connection between the revelations of apparent corporate looting by Tyco's principals (amounts that were only a small portion of Tyco's corporate profits) and the precipitous decline in Tyco stocks. This theory is novel and exposed plaintiffs to a nontrivial risk of dismissal at the 12(b)(6) stage.

**E.** **Settlement Negotiations**

On January 13, 2004, Judge Donald E. Ziegler, retired U.S. District Judge for the Western District of Pennsylvania, assisted with an initial mediation attempt between Lead Plaintiffs and Tyco. That mediation failed because of the tremendous gap

between Lead Plaintiffs' request for multibillion-dollar damages and Tyco's desire to settle for mere nuisance damages.

Starting in the fall of 2005, Lead Plaintiffs and Tyco agreed to a new mediator and a new mediation process. The new mediator was Judge Stanley Sporkin, retired U.S. District Judge for the District of Columbia and former Director of the Enforcement Division of the Securities and Exchange Commission ("SEC").[3] After some initial failures to bridge the gap, Judge Sporkin adopted a new mediation strategy, appointing Eugene R. Sullivan, former chief judge of the U.S. Court of Appeals (Armed Forces), as "advocate" for Tyco and Marvin E. Jacob, certified mediator in the U.S. Bankruptcy and District Courts for the Southern District of New York and a former Associate Regional Administrator for the New York Regional Office of the SEC, as "advocate" for plaintiffs.

The parties engaged in multiple mediation sessions under this new mediation setup, some lasting multiple days. In March 2007, after several relatively small moves by each side over time, Judge Sporkin made another serious push to resolve the

_____

[3] Judge Sporkin has numerous other qualifications that are not necessary to recite here. He has received numerous awards and honors during his long and distinguished career in government service. His expertise in this area is widely acknowledged.

case, working with each side in an effort to bring the decision-makers to the bargaining table.  Although the March 2007 mediation did not immediately result in a settlement agreement, both sides continued discussions until May 15, 2007, when they reached an agreement in principle to settle the claims for $2.975 billion in cash.

Lead Plaintiffs then used their agreement with Tyco in new negotiations with PwC mediated by Judge Nicholas Politan, retired U.S. District Judge for the District of New Jersey.  In June of 2007, Lead Plaintiffs and PwC reached an agreement in principle to settle for the sum of $225 million.

## F.   Damages Calculations

During the settlement negotiations, Dr. Mark E. Zmijewski[4] prepared a report for plaintiffs estimating the damages suffered by the class.  I describe his report in some detail because it is relevant to my analysis of the settlement.

Dr. Zmijewski used an event study methodology to quantify "abnormal" stock and bond movements that could support

---

[4] Dr. Zmijewski is the Leon Carroll Marshall Professor of Accounting and Deputy Dean at the University of Chicago Graduate School of Business.  He formerly served as Executive Director of the Center for Research in Securities Prices at the University of Chicago Graduate School of Business.

plaintiffs' argument for loss causation and measure how and when Tyco's equities and bonds were trading at artificially inflated prices.  He first disaggregated marketwide inflationary effects from firm-specific effects, and then determined whether the firm-specific effects on each trading day were statistically significant.

Based on plaintiffs' theory of the case, which posited that both revelations of accounting fraud and revelations of corporate looting could qualify as corrective disclosures, Dr. Zmijewski identified eight corrective disclosure dates[5]: January 3, 2002; January 23, 2002; January 29, 2002; April 25, 2002; May 28, 2002; June 3, 2002; June 6, 2002; and June 7, 2002.  He then weighted each corrective disclosure based on an estimate of the degree to which other confounding factors (e.g., lowered earnings forecasts, reported losses, or other stock-deflating news announced on the same day as doubts about Tyco's accounting procedures) influenced the market on the day of the disclosure. Dr. Zmijewski then identified inflation-creating dates, i.e., those dates on which Tyco's stock rose and defendants' alleged

---

[5] A corrective disclosure date is one on which information that defendants allegedly withheld fraudulently from the market became known to the market and the stock price experienced a corresponding, statistically significant downward movement.

fraud resulted in the disclosure of false information.  Using the corrective disclosure and inflation-creating dates, Dr. Zmijewski calculated inflation per share on a daily basis for the entire class period.  He did this by assuming that the stock price was "clean" or uninflated at the end of the class period and then working backward day by day to the beginning of the class period.

Dr. Zmijewski used the same methodology, with adjustments to reflect the differing availability of data, for estimating bond inflation.  There were two broad types of Tyco debt instruments traded during the class period: coupon debt (consisting of thirty-two instruments) and zero-coupon debt (consisting of two instruments).  Because the price series for most Tyco bonds were missing some information, Dr. Zmijewski selected one bond from each of these two groups that had the most complete price series and used this to conduct the event study.  To properly account for the difference in price level for some of the bonds, he measured the inflation in constant percentage terms.  Dr. Zmijewski then used the same corrective disclosure/inflation-creating date method to calculate inflation on a daily basis, with the added adjustment of capping the percentage inflation of the bonds so that bond inflation did not exceed stock inflation.

-11-

He treated one bond -- the Tyco Liquid Yield Option Note -- separately from the others, because this instrument tracked Tyco's stock price rather than debt prices.

Dr. Zmijewski then used the stock and bond inflation estimates to calculate aggregate damages. He calculated stock inflation damages according to two different models: an institutional model and an individual model. The institutional model relied on quarterly holdings information and estimated damages from each institution. Based on the assumption that gains from a particular share within an institution should not be netted against losses on other shares or opening balances at the beginning of the class period, Dr. Zmijewski estimated total institutional equity damages of $7.1 billion. The individual model relied on the "actual trader model," using empirical trading data from brokerage accounts of individual traders to predict individual trader behavior. By combining the total non-institutional trading volume on each day with his trader behavior model, Dr. Zmijewski was able to simulate the trading pattern that occurred. This simulation yielded an estimate of $3.7 billion in equity damages for individual stock traders. For bonds, he multiplied the face value of the debt issued times the

-12-

inflation at the time of issuance, yielding aggregate bond damages of $905 million. Combining the institutional and individual equity damages with the bond damages yielded total measurable aggregate damages of $11.73 billion.

Dr. Zmijewski also calculated an alternative, far more conservative damages model based only on Tyco's earning restatements, which he speculated would be similar to defendants' preferred damages model.[6] The earning restatements model merely looked at the difference between Tyco's actual stock price and Tyco's stock price had its financials been reported accurately, without estimating damages caused by interaction between accounting fraud, management looting, and loss of investor confidence in the company. Accordingly, the earning restatements model yielded the far smaller estimate of $2.7 billion in equity damages, or $8.1 billion less than the $10.8 billion in equity damages produced by the event study model.

## G.  <u>Settlement Terms</u>

As agreed upon by the parties, the proposed settlement

---

[6] Had the case proceeded to trial, defendants represent that they would have offered expert witnesses to show that the class suffered no damages or only minimal damages. Defendants' brief in support of final approval of this settlement did not, however, provide specific alternative calculations.

provides for the payment by Tyco of $2.975 billion in cash, plus interest, and the payment by PwC of $225 million in cash, plus interest. Tyco's payment will be the largest cash payment ever made by a corporate defendant in the history of securities litigation. PwC's payment will be the second-largest auditor settlement in securities class action history. In all, the proposed settlement is the third largest securities class action recovery in history, behind only <u>Enron</u> and <u>WorldCom</u>.

The proposed settlement also provides for the assignment to Tyco of the class's claims against the Individual Tyco Defendants Kozlowski, Swartz, and Walsh (none of whom are part of the settlement). In return for this assignment, Tyco agreed that 50% of any net recovery against those individuals, both on its own claims and on the class's assigned claims, will be transferred to the settlement fund.

**H.    Plan of Allocation**

The settlement fund has already been paid into escrow accounts at a number of major banks. Under the proposed plan of allocation, the settlement funds (less administrative and notice costs, taxes and related expenses, and attorneys' fees and expenses, but plus the interest earned by the fund) will be

distributed to class members who submit timely, valid Proof of
Claim forms.  The Garden City Group ("GCG"), a claims
administrator retained by Co-Lead Counsel, will calculate each
claimant's share according to the information on the Proof of
Claim forms, apportioning each recovery according to Dr.
Zmijewski's damages calculations.

Co-Lead Counsel retained two additional independent experts,
R. Alan Miller[7] and Dr. Kenneth D. Gartrell[8], to opine on the
reasonableness and fairness of the plan of allocation.  Mr.
Miller and Dr. Gartrell both opined that the Plan is reasonable
and fair from the perspective of investors who acquired Tyco
stock during the class period.

**I.**   **Notice to the Class**

After contacting nominee purchasers (i.e. banks, brokers,

---

[7] Mr. Miller is President of the Philadelphia Investment
Banking Company ("PIBC"), which he co-founded in 1983.  Among
other things, PIBC frequently performs evaluations of businesses
and securities for investors.  Mr. Miller regularly testifies as
an expert witness on securities-related issues.

[8] Dr. Gartrell is a financial economist and economic
consultant.  He formerly served as a Managing Director at LECG,
LLC, an international economic consulting firm, was the founding
partner of Ken Gartrell & Company, and was a Principal in the
economic consulting firms of The Brattle Group and Putnam, Hayes
& Bartlett.

and other purchasers of record who bought and sold Tyco securities on behalf of others) to identify the beneficial owners on whose behalf the nominees acted, GCG (the claims administrator retained by Co-Lead Counsel) mailed some 2.4 million claim packets containing the Notice of Proposed Settlement to class members and their nominees.  For claim packets that were returned undelivered, GCG followed up by periodically searching for the recipients' new addresses and re-mailing the packets until the packets were successfully delivered.

In addition to the mailed claim packets, GCG published summary notices in USA Today, The New York Times, The Wall Street Journal, The Financial Times, South Florida Sun-Sentinel, Palm Beach Post, Chicago Times, The Union Leader (Manchester, NH), and over the PR Newswire.  GCG also set up a website and toll-free telephone hotline to assist class members in submitting their claims and provide answers to their questions regarding the settlement.

**J.**   **Reaction of the Class to the Notice**

Proof of Claim forms are due by December 28, 2007, so the Proof of Claim numbers are not final.  Keeping that in mind, out of the 2.4 million copies of the Notice mailed to potential class

-16-

members, GCG had received 74,655 Proof of Claim forms as of
October 12, 2007, and 288 requests for exclusion from the class
as of the September 28, 2007 deadline for exclusion.

The court has received twenty-eight objections to the
proposed settlement. Of these, four are from institutional
investors and the remainder are from individual investors, a
handful of whom are not actually members of the class. These
objections are described and discussed individually in the
analysis section below.

## K.  **Fairness Hearing**

The Fairness Hearing took place on November 2, 2007. Co-
Lead Counsel appeared, as did counsel for additional plaintiffs.
Counsel for Tyco, PwC, Belnick, and Ashcroft were also present.
Counsel for two objectors, the Commonwealth of Pennsylvania State
Employees' Retirement System and Public School Employees'
Retirement System ("SERS/PSERS") and U.S. Trust, requested and
were given the opportunity to be heard.


## II.  **ANALYSIS**

## A.  **Adequacy of Notice**

The Federal Rules of Civil Procedure require, upon

-17-

certification of the class, that "the best notice that is practicable under the circumstances" be given, "including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Federal Rules of Civil Procedure further require, upon the successful negotiation of a proposed settlement, that notice be given "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The Due Process Clause requires that notice be "reasonably calculated to reach potential class members." In re Compact Disc Minimum Advertised Price Antitrust Litig., 216 F.R.D. 197, 203 (D. Me. 2003); see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 174 (1974); Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315 (1950). Additionally, the Private Securities Litigation Reform Act ("PSLRA") requires that the notice of settlement provide statements of plaintiff recovery, potential outcome of the case, attorneys' fees or costs, identification of plaintiffs' representatives, and the reasons for settlement. 15 U.S.C. § 78u-4(a)(7).

In this case, Co-Lead Counsel and GCG jointly developed an effective notice program. As detailed above, the notice program

-18-

involved pre-mailing contacts with nominee purchasers, repeated efforts at mailing the claim packets to class members, publication notice in eight national and regional newspapers, and a website and toll-free telephone hotline.

This notice program compares favorably with the notice programs in other securities cases. See In re Cabletron Sys., Inc. Sec. Litig., 239 F.R.D. 30, 35-36 (D.N.H. 2006) (approving a notice program that distributed notice packets to individual investors and nominees, published a summary notice in one national newspaper, and provided a toll-free telephone hotline); see also In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 332-33 (S.D.N.Y. 2005) (approving a notice program that distributed notice packets to potential class members and published summary notices in two national newspapers and over two wire services). Accordingly, I find that Co-Lead Counsel's notice program met or exceeded all relevant requirements. To the extent that any objectors have claimed that the notice program was not adequate, I overrule their objections. I further find that the contents of the notice packets were acceptable and met all relevant requirements.

**B.** **Adequacy of the Settlement**

Under Rule 23(e) of the Federal Rules of Civil Procedure, I may approve this class action settlement only if I conduct a fairness hearing and find that the terms of the settlement are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In the First Circuit, this requires a wide-ranging review of the overall reasonableness of the settlement that relies on neither a fixed checklist of factors nor any specific litmus test. See In re Lupron Mktg. & Sales Practices Litig., 228 F.R.D. 75, 93 (D. Mass. 2005) ("[T]he First Circuit has not established a formal protocol for assessing the fairness of a settlement."); Compact Disc, 216 F.R.D. at 206 ("There is no single test in the First Circuit for determining the fairness, reasonableness and adequacy of a proposed class action settlement."); Bussie v. Allmerica Fin. Corp., 50 F. Supp. 2d 59, 72 (D. Mass. 1999) ("This fairness determination is not based on a single inflexible litmus test but, instead, reflects its studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation.").

Although the district court must carefully scrutinize the settlement, there is a presumption in favor of the settlement if

-20-

the parties negotiated it at arms-length, after conducting
meaningful discovery.  City P'ship Co. v. Atl. Acquisition Ltd.
P'ship, 100 F.3d 1041, 1043 (1st Cir. 1996); Nilsen v. York Cty.,
382 F. Supp. 2d 206, 212 (D. Me. 2005); Compact Disc, 216 F.R.D.
at 207.  Moreover, public policy generally favors settlement --
particularly in class actions as massive as the case at bar.  See
WorldCom, 388 F. Supp. 2d at 337.

    Some courts have relied on the Second Circuit's Grinnell
factors to determine the fairness of a settlement:

> (1) the complexity, expense and likely duration of the
> litigation; (2) the reaction of the class to the
> settlement; (3) the stage of the proceedings and the
> amount of discovery completed; (4) the risks of
> establishing liability; (5) the risks of establishing
> damages; (6) the risks of maintaining the class action
> through the trial; (7) the ability of the defendants to
> withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the
> best possible recovery; (9) the range of reasonableness
> of the settlement fund to a possible recovery in light
> of all the attendant risks of litigation.

City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir.
1974) (internal citations omitted); see also In re Cendant Corp.
Litig., 264 F.3d 201, 232 (3d Cir. 2001) (Cendant I) (applying
the Grinnell factors, as is required in the Third Circuit);
WorldCom, 388 F. Supp. 2d at 337 (applying the Grinnell factors,
as is required in the Second Circuit); Lupron, 228 F.R.D. at 93

-21-

(applying the Grinnell factors as a matter of preference).

In Compact Disc, the District of Maine recently used a modified version of the Grinnell factors:

> (1) comparison of the proposed settlement with the likely result of litigation; (2) reaction of the class to the settlement; (3) stage of the litigation and the amount of discovery completed; (4) quality of counsel; (5) conduct of the negotiations; and (6) prospects of the case, including risk, complexity, expense and duration.

Compact Disc, 216 F.R.D. at 206.

Although I have the discretion to use the Grinnell list of factors verbatim, I find that a more concise list of the considerations at play, modeled on those used in Compact Disc, best fits the facts of this case. Accordingly, I discuss the following considerations in turn: (1) risk, complexity, expense and duration of the case; (2) comparison of the proposed settlement with the likely result of continued litigation; (3) reaction of the class to the settlement; (4) stage of the litigation and the amount of discovery completed; and (5) quality of counsel and conduct during litigation and settlement negotiations.

### 1. **Risk, Complexity, Expense, and Duration of the Case**

It is difficult to overstate the complexity of this case.

As the depth and breadth of discovery suggests, the facts were not easy to ascertain.  Plaintiffs had to scrutinize documents from more than one hundred different corporate acquisitions by Tyco to identify whether those acquisitions involved fraudulent accounting, how the transactions were audited by PwC, and what measures defendants may have taken to cover up the fraudulent accounting.

This was not just a complex case, however.  It was also a risky case for both sides, in large part because of an uncertain legal environment.  Plaintiffs' theory of the case put them at the cutting edge of a rapidly changing area of the law.  In particular, the still-developing law of loss causation in securities cases created significant risk and uncertainty for plaintiffs.  According to plaintiffs' theory, the misstatements by Tyco and PwC proximately caused investors' losses, as shown by drops in Tyco's stock prices following the eight corrective disclosures.  None of those disclosures, however, involved a specific admission of fraud by Tyco or PwC.  Instead, the disclosures mostly related to the integrity of Tyco's management.  Although I denied defendants' motion to dismiss and PwC's motion for summary judgment, I did so only after careful consideration

-23-

and extensive briefing.  Moreover, the law remains in flux and it
is by no means certain that plaintiffs would have prevailed if
they had taken the case to trial and attempted to defend any
favorable verdict on appeal.

This case involved a greater risk of non-recovery than other
multibillion-dollar securities class action settlements.
WorldCom involved a number of complex issues, but the fraud was
so extensive that there were many targets to pick off, providing
funds for continued litigation.  Cendant was, as the Third
Circuit observed, a "simple case in terms of liability with
respect to Cendant, and the case was settled at a very early
stage, after little formal discovery," which made the risks of
non-recovery negligible.  Cendant I, 264 F.3d at 286.  In AOL
Time Warner, the risks were "above-average" and loss causation
was a similarly unsettled issue, but the chain of causation
involved fewer logical leaps and was therefore easier to prove
than in this case.  See In re AOL Time Warner, Inc. Sec. &
"ERISA" Litig., No. 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS
78101, at *47-*48 (S.D.N.Y. Sept. 28, 2006).  Reflecting these
risks and complexities, the parties on both sides necessarily
incurred considerable expense in litigating the case.

-24-

Counsel for both Tyco and PwC made it clear by their words and deeds during the course of the litigation that they intended to vigorously contest plaintiffs' claims. Defendants selected several of the country's most skilled advocates as their representatives and those advocates responded by uncovering and effectively advancing every non-frivolous legal argument that could conceivably be presented on their clients' behalf. In short, the case took nearly five years to resolve because it was factually complex, turned on several novel and difficult legal issues, and was aggressively and effectively litigated by defendants who were determined to spare no expense in protecting their interests.

If the case survived summary judgment and went to trial, plaintiffs would face additional risk, uncertainty, and delay. Proving loss causation would be complex and difficult. Moreover, even if the jury agreed to impose liability, the trial would likely involve a confusing "battle of the experts" over damages. If, faced with conflicting expert testimony, the jury chose to embrace the most conservative estimate of damages, then the ultimate award might turn out to be less than the proposed settlement. Defendants would appeal any adverse verdicts and

those appeals would further delay the resolution of the case.  In
a case as complex as this one, any appeal would present the
plaintiffs with a substantial risk of reversal.

In addition to being risky and complex, this was a lengthy
and expensive undertaking for Co-Lead Counsel.  Over the past
five years, Co-Lead Counsel have put in more than 488,000 hours
of attorney time at a market value of over $172 million.  They
have also incurred more than $29 million in yet-to-be-reimbursed
expenses.  Continued litigation would drive costs even higher.
Thus, risk, complexity, expense, and duration all weigh in favor
of approving the proposed settlement.

### 2.    Comparison of the Proposed Settlement with the Likely Result of Continued Litigation

Assuming that all eligible shareholders file claims and that
Dr. Zmijewski's event study model accurately characterizes the
damages to the class, the proposed settlement represents
approximately 27% of the alleged damages to the class.  In light
of the substantial risk, uncertainty, and delay associated with
proceeding to summary judgment and trial, the $3.2 billion
settlement amount is an outstanding recovery for the class.

### 3.    Reaction of the Class to the Settlement

The reaction of the class to the settlement has been almost

entirely positive.  None of the institutional investors have objected to the size of the settlement; indeed, even the institutional investors who objected to other aspects of the settlement at the Fairness Hearing lauded this as an excellent recovery for the class.

Only a small number of individual investors have argued that the settlement should be larger.  As discussed in more detail below, however, these objections are based on calculations that overstate the provable damages to the class and are without merit.

4.  **Stage of the Litigation and the Amount of Discovery Completed**

This settlement came after extensive discovery and motion practice.  As stated above, plaintiffs reviewed 82.5 million pages of documents and conducted over 220 depositions.  At this stage, they have most of the crucial facts in their possession, making them well-positioned to understand the merits of their case.  Had the parties not agreed on this settlement, the next steps would be summary judgment and (assuming that plaintiffs survived summary judgment) trial.

5.   **Quality of Counsel and Conduct During**
     **Litigation and Settlement Negotiations**

This settlement was the product of arms-length negotiations
by highly skilled and diligent counsel on both sides, and Lead
Plaintiffs ably discharged their responsibilities to monitor Co-
Lead Counsel and ensure that Co-Lead Counsel acted in the best
interests of the class.  As Judge Sporkin observed in his
statement summarizing the settlement negotiations, "the advocacy
on both sides of the case was outstanding," and both sides were
prepared to try the case if settlement talks failed.  Moreover,
Judge Sporkin was impressed by "the deep involvement of the class
representatives in overseeing the prosecution of the case, and
with their commitment to that obligation."  I concur with Judge
Sporkin's assessments on both points.

In summary, I find that the settlement is fair, reasonable,
and adequate.

C.   **Reasonableness of the Plan of Allocation**

Like the settlement itself, the plan of allocation must be
fair, reasonable, and adequate.  WorldCom, 388 F. Supp. 2d at
344.  Co-Lead Counsel have established that the plan of
allocation, which compensates class members according to the
nature and timing of their Tyco securities transactions, has a

-28-

reasonable basis.  It is calculated according to Dr. Zmijewski's model, and was reviewed by experts R. Alan Miller and Dr. Kenneth D. Gartrell, who concluded both that the underlying methodology was sound and that the distribution plan was fair and reasonable. The fact that these independent experts evaluated the plan of allocation and agreed that it was fair weighs strongly in its favor.

The plan of allocation also deals appropriately with the issue of what to do with excess funds.  The plan calls for the continued re-distribution of unclaimed funds to class members according to their pro rata shares, until the costs of such re-distributions make it economically unfeasible to continue doing so.  If and when that point is reached, then the balance of the fund will be subject to a *cy pres* remedy designated by Co-Lead Counsel with the consent of Tyco and PwC.  This approach is consistent with the latest draft of the American Law Institute's Principles of the Law of Aggregate Litigation.  <u>See</u> American Law Institute, <u>Principles of the Law of Aggregate Litigation</u>, Discussion Draft No. 2, § 3.07 (Apr. 6, 2007) (recommending that a *cy pres* approach be used only if individual distributions of the surplus to class members are not economically viable or

individual class members cannot easily be identified).  Although
the settlement agreement does not specifically require that I
approve the chosen beneficiary of any *cy pres* remedy, Co-Lead
Counsel have assured me that they will submit the planned remedy
for my review should a *cy pres* remedy become necessary, and I
will require them to obtain my approval before proceeding with
any such plan.

Based on the foregoing, I find that the plan of allocation
is fair and reasonable.

**D.**    **Objections to the Settlement and Plan of Allocation**

None of the institutional investors have objected to either
the size of the settlement or the allocation plan.  Some
individuals, however, have raised objections.  I discuss these
below.

Some objectors agreed to withdraw their objections after Co-
Lead Counsel offered to compensate them for their services to the
class from any attorneys' fees award.  If I approve these
objectors' stipulations of withdrawal, it is because the final
resolution is fair to the class, without regard to any
compensation the objectors may receive.  Nevertheless, Co-Lead
Counsel remain free to pay such compensation from the fee award

if they so choose, and I need not approve such compensation for
it to take place.

### 1. <u>Objections to the Terms of the Proposed Settlement</u>

Chris Andrews (Doc. No. 1108) objected to the settlement
because he disagreed with certain strategic decisions made by Co-
Lead Counsel, who had retained Andrews as a consultant to
investigate certain factual matters.  Andrews has since resolved
this dispute with Co-Lead Counsel and has stipulated to the
withdrawal of his objection.  Had Andrews pursued this objection,
I would have overruled it, so I approve his stipulated
withdrawal.

James Hill (Doc. No. 1130) objected to the settlement
because it could be interpreted to release claims against the
Boston Stock Exchange arising from alleged stock market
manipulation of Tyco securities traded on that exchange.  In
response to Hill's concerns, Co-Lead Counsel clarified the terms
of the release and Hill withdrew his objection.  I approve his
stipulated withdrawal.

Peter and Rita Carfagna and Barry Friedman (Doc. No. 1121)
objected to the 50/50 split between the class and Tyco for
successful prosecution by Tyco of any officer assigned claims.

After Co-Lead Counsel clarified the strategic reasons for this
decision (namely, the split serves the interests of the class
because Tyco has more information regarding the fraud perpetrated
by the officer defendants than plaintiffs, and it would be
difficult for plaintiffs to collect judgments on the officers'
assets), the Carfagnas and Friedman withdrew their objection.  I
approve their stipulated withdrawal.

James Hayes (Docs. No. 1134 and 1169) argues that the
recovery is inadequate because, he alleges, Tyco's stock was
artificially inflated by $51 per share at its peak, not the $8.29
per share calculated by Dr. Zmijewski.  Hayes' calculation is
overly simplistic; although it does adjust for the overall
decline in the market, it fails to account for other confounding
factors such as the Tyco split plan, Tyco's credit problems, and
poor performance by Tyco subsidiaries.  Hayes' estimate therefore
does not conform to the stringent requirements that plaintiffs
would have had to meet to establish loss causation.  See Dura,
544 U.S. at 346.  Because Hayes' calculation overestimates the
provable damages and his objection generally fails to cast doubt
on Dr. Zmijewski's event study methodology, I overrule his
objection.

-32-

Richard and Maryann Wronko (Doc. No. 1132) argue that the recovery is inadequate because it does not fully capture the decrease in value of their Tyco stock and does not include the "likely punitive damages that would have been awarded." The Wronkos' calculation of likely compensatory damages, however, grossly overestimates the potential recovery because it does not account for any possible confounding factors. See Dura, 544 U.S. at 346. Their argument as to punitive damages is problematic because punitive damages are not available for violations of the Securities Exchange Act of 1934. See 15 U.S.C. § 78bb(a) ("no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of"); Manchester Mfg. Acquisitions, Inc. v. Sears, Roebuck & Co., 802 F. Supp. 595, 605 (D.N.H. 1992). The Wronkos also make two unrelated objections.[9] These objections also have no merit. I therefore overrule the Wronkos' objections.

---

[9] Specifically, the Wronkos object to the fact that they received the Notice of Proposed Settlement only one week before the deadline for objections, and also that the settlement's termination options give PwC more favorable treatment than Tyco if PwC chooses to withdraw from the settlement.

2.   **Objections to the Class Period**

Joel Douglas (Doc. No. 1105), Richard Dayton (Doc. No. 1115), David Kaiser (Doc. No. 1109), Susan Schaffer (Doc. No. 1138), Marvin and Sonia Greenbaum (Doc. No. 1136), and M.A. Hartley (Doc. No. 1141) objected to the class period, arguing that it should start earlier, end later, and/or include holder claimants.  After Co-Lead Counsel explained the basis for the existing class period, all but Kaiser and Hartley withdrew their objections.  Kaiser offers no principled reason for modifying the class period, and his proposal to include holder claimants in the class has no legal merit.  See Dura, 544 U.S. at 346 (describing the requirements for establishing loss causation); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737-38 (1975) (denying standing to holder claimants in private federal securities actions).  I therefore overrule his objection.  Hartley's objection was untimely and, for the same reasons as Kaiser's, has no legal merit.  I therefore overrule Hartley's objection as well.  Had Douglas, Dayton, Schaffer, and the Greenbaums pursued their objections, I would have overruled them, so I approve their stipulated withdrawals.

### 3.   <u>Objections to the Plan of Allocation</u>

Robert and Patricia Weinberg (Doc. No. 1110) objected to the *cy pres* provisions of the settlement because these provisions do not call for input by members of the class.  The Weinbergs withdrew their objection after Co-Lead Counsel agreed to consult with Mr. Weinberg regarding what charitable organizations should receive *cy pres* funds.  Weinberg, who is a leader and prominent member of the District of Columbia bar, is well-positioned to offer useful advice to Co-Lead Counsel on this issue.  Moreover, because any proposed plan for the distribution of *cy pres* funds must be submitted to me for approval, there is an additional layer of review protecting the interests of the class if such a distribution becomes necessary.  I therefore approve the Weinbergs' stipulated withdrawal.

John Nemfakos (Doc. No. 1137) objects to the different treatment of call options and put options.[10]  He also objects to the provision limiting losses from option trading to 1% of the total settlement amount.  I overrule both objections.  Call

---

[10] A call option is a right to purchase a security at a price and date certain in the future.  A put option gives the buyer the right to <u>sell</u> the security to the counter-party at a price and date certain in the future.

options are discounted relative to put options because the
purchase of a call option includes a time premium -- a wasting
asset that will evaporate even if the stock price remains steady.
The limitation of losses from option trading is because these
derivative securities suffer from much greater volatility than
stocks and bonds, making it more difficult to establish loss
causation.

### 4.   <u>Miscellaneous Objections</u>

H. Paul Block and Bernice Block (Doc. No. 1156), who assert
that they held previously-acquired Tyco stock during the class
period but made no transactions during the class period, have
filed a late objection to the settlement.  Although their
objection is untimely, I consider it on the merits.  Based on
their initial premise that the Securities Litigation Uniform
Standards Act ("SLUSA") forces <u>federal</u> law claims to be pre-
empted by <u>state</u> law claims, they argue that: (1) holder claimants
-- although not included as class members -- should have standing
to object to the proposed settlement; (2) SLUSA should extinguish
the federal claims and allow the state claims to move forward;
and (3) the proposed settlement should be declared invalid.
Their arguments rest on a faulty foundation, however, because

-36-

their concept of preemption is backward.  SLUSA preempts a broad range of <u>state</u> law class-action claims in favor of <u>federal</u> law claims.  As the Supreme Court recently held in <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit</u>, 547 U.S. 71 (2006), SLUSA does so even when extinguishing those state claims would deny any remedy at all to certain classes of plaintiffs.  <u>See</u> <u>id.</u> at 82–89.  For holder claimants like the Blocks, who have no remedy under federal law, this is a harsh result, but the law is clear on this point.  <u>See</u> <u>Blue Chip Stamps</u>, 421 U.S. at 737–38 (denying standing to holder claimants in private federal securities actions).  Because all three of the Blocks' arguments rely on their incorrect understanding of preemption, none of them have merit.  I therefore overrule their objection.

Frank DeCiancio (Doc. No. 1176) filed a late objection to the settlement, asserting that Co-Lead Counsel's calculations of Tyco stock inflation appear illogical.  His concerns are adequately addressed by Dr. Zmijewski's detailed description of how he made his damage calculations.  Accordingly, I overrule DeCiancio's objection.

**E.   <u>Attorneys' Fees and Expenses</u>**

An attorney who recovers a common fund for the benefit of

others is entitled to "a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). By assessing attorneys' fees and litigation expenses against a common fund, the court spreads these costs proportionately among those benefitted by the suit. Id. Moreover, providing adequate compensation encourages capable plaintiffs' attorneys to aggressively litigate complex, risky cases like this one rather than settling lower and earlier than would be in the best interests of the class members they represent. See In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801-02 (3d Cir. 1995) (discussing the theoretical foundations for fee awards in class action cases). In this case, Co-Lead Counsel, after negotiations with Lead Plaintiffs, have requested attorneys' fees amounting to 14.5% of the settlement fund. They also seek reimbursement for $28,938,412.74 in expenses. I address the fees and the expenses separately, and conclude that both merit approval.

    1.  **Fees**

In line with PSLRA cases in other circuits and past common fund cases in this circuit, I use the percentage of fund ("POF")

method[11] with a lodestar[12] cross-check to evaluate the fee request. In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 305-06 (3d Cir. 2005); United States v. 8.0 Acres of Land, 197 F.3d 24, 33 (1st Cir. 1999); In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 307-08 (1st Cir. 1995). The POF method is appropriate in common fund cases because it "rewards counsel for success and penalizes it [counsel] for failure." GMC Pick-Up Truck, 55 F.3d at 821. Using a lodestar cross-check ensures that the fees are also reasonable in light of the actual amount of work performed. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002).

> (a)  POF Method

A district court in the First Circuit has "extremely broad" latitude to determine an appropriate fee award under the POF method. Thirteen Appeals, 56 F.3d at 309. Unlike the Second and Third Circuits, the First Circuit does not require courts to

---

[11] Under the POF method, the fee award is calculated as a reasonable percentage of the settlement amount. In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995).

[12] The lodestar ordinarily is calculated by multiplying the number of hours reasonably incurred by the reasonable hourly rate for the services rendered. Gisbrecht v. Barnhart, 535 U.S. 789, 802 (2002).

examine a fixed laundry list of factors.  See id. at 307-09.  Cf.
Rite Aid, 396 F.3d at 301; Goldberger v. Integrated Res., Inc.,
209 F.3d 43, 47 (2d Cir. 2000).  I therefore draw loosely on the
factors employed by the Second and Third Circuits that are most
relevant to my analysis.  In particular, I consider: (1) fee
awards in similar cases, (2) the complexity, duration, and risk
involved in the litigation, (3) the manner in which the fee
request was negotiated between Co-Lead Counsel and Lead
Plaintiffs, (4) the reaction of the class, and (5) public policy
considerations.  Based on the totality of these factors, I
conclude that the requested 14.5% award is reasonable and
appropriate.

### (i)  Comparison to Other Cases

Co-Lead Counsel argue that I should compare their fee
request with the fees that were awarded in connection with the
sixteen post-PSLRA securities fraud cases with settlements at or
above $400 million.  These cases, listed according to the size of
the recovery for the class, are:  WorldCom ($6.13 billion),
Cendant ($2.19 billion), AOL Time Warner, ($2.65 billion), Nortel
I ($1.14 billion), Royal Ahold ($1.09 billion), Nortel II ($1.04
billion), McKesson ($960 million), Lucent ($517 million),

Bankamerica ($485 million), Dynegy ($474 million), Raytheon ($460
million), Waste Management II ($457 million), Adelphia ($455
million), Global Crossing ($448 million), Freddie Mac ($410
million), and Qwest ($400 million).[13]

Two objectors -- SERS/PSERS and U.S. Trust -- appeared at
the Fairness Hearing and argued that I should limit my
comparative analysis to a subset of cases in which the

---

[13] See generally In re Nortel Networks Corp. Sec. Litig.,
No. 01-CV-1855 (RMB) (S.D.N.Y. Jan. 29, 2007) (order and final
judgment) (Nortel I); In re Nortel Networks Corp. Sec. Litig.,
No. 05-MD-1659 (LAP) (S.D.N.Y. Dec. 26, 2006) (order and final
judgment) (Nortel II); In re Adelphia Communs. Corp. Secs. &
Derivative Litig., No. 03 MDL 1529 (LMM), 2006 U.S. Dist. LEXIS
84621 (S.D.N.Y. Nov. 16, 2006); In re Royal Ahold N.V. Sec. &
ERISA Litig., 461 F. Supp. 2d 383 (D. Md. 2006); Ohio Pub.
Employees Ret. Sys. v. Freddie Mac, No. 03-CV-4261 (JES)
(S.D.N.Y. Oct. 26, 2006) (order and judgment); AOL Time Warner,
2006 U.S. Dist. LEXIS 78101; In re Qwest Communs. Int'l, Inc.
Sec. Litig., No. 01-cv-01451-REB-CBS, 2006 U.S. Dist. LEXIS 71267
(D. Colo. Sept. 28, 2006); In re McKesson HBOC, Inc., Sec.
Litig., No. 99-CV-20743 RMW (PVT) (N.D. Ca. Feb. 24, 2006) (order
awarding attorney's fees and reimbursement of expenses);
WorldCom, 388 F. Supp. 2d 319; In re Dynegy, Inc. Sec. Litig.,
No. H-02-1571 (S.D. Tex. Jul. 08, 2005) (order awarding
attorneys' fees and reimbursement of expenses); In re Raytheon,
No. 99-12142-PBS (D. Mass. Dec. 6, 2004) (order and final
judgment); In re Global Crossing Sec. & ERISA Litig., 225 F.R.D.
436 (S.D.N.Y. 2004); In re Lucent Techs., Inc. Sec. Litig., 327
F. Supp. 2d 426 (D.N.J. 2004); In re Cendant Corp. Sec. Litig.,
243 F. Supp. 2d 166 (D.N.J. 2003) (Cendant II); In re Bankamerica
Corp. Sec. Litig., 228 F. Supp. 2d 1061 (E.D. Mo. 2002); In re
Waste Mgmt., Inc. Sec. Litig., No. H-99-2183 (S.D. Tex. May 10,
2002) (findings of fact and conclusions of law) (Waste Mgmt. II).

settlements exceeded $1 billion.  These "super mega-fund" cases are:  <u>WorldCom</u>, <u>Cendant</u>, <u>AOL Time Warner</u>, <u>Nortel I</u>, <u>Royal Ahold</u>, and <u>Nortel II</u>.  The objectors contend that the comparison set should be limited to such cases because super mega-fund cases are a distinct subclass in which the size of the recovery is explained more by the size of the class than the work expended by counsel.  As a result, the objectors argue, super mega-fund cases -- Tyco included -- require comparatively lower POF awards to fairly compensate counsel than will be required in cases with smaller settlements.

A comparison of Table 1 with Table 2 explains why this argument is potentially significant.  Table 1, which lists the POF awards for the top securities fraud settlements in descending order, reveals that the POF award requested in this case is in line with the POF awards for the other cases in the class (seventh out of seventeen).  In contrast, Table 2, which lists the POF awards only in super mega-fund cases, suggests that this case is an outlier when it is compared only with the other cases in the subclass (first out of seven).  Thus, it is important to determine whether the objectors are correct in contending that I should limit my comparative analysis to super mega-fund cases.

**Table 1**

| Case Name | POF |
|---|---|
| Adelphia | 21.40% |
| Freddie Mac | 20.00% |
| Bankamerica | 17.83% |
| Lucent | 17.00% |
| Global Crossing | 16.18% |
| Qwest | 15.00% |
| *Tyco (proposed)* | *14.50%* |
| Royal Ahold | 12.00% |
| Raytheon | 9.00% |
| Dynegy | 8.73% |
| Nortel II | 8.00% |
| Waste Mgmt. II | 7.93% |
| McKesson | 7.79% |
| AOL Time Warner | 5.57% |
| WorldCom | 5.48% |
| Nortel I | 3.00% |
| Cendant | 1.73% |

**Table 2**

| Case Name | POF |
|---|---:|
| *Tyco (proposed)* | *14.50%* |
| Royal Ahold | 12.00% |
| Nortel II | 8.00% |
| AOL Time Warner | 5.57% |
| WorldCom | 5.48% |
| Nortel I | 3.00% |
| Cendant | 1.73% |

The objectors' contention that super mega-fund cases warrant lower POF awards than smaller cases because they require proportionally less work may well be true as a general matter. See generally In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 339 (3d Cir. 1998) ("the basis for this inverse relationship [between the settlement amount and the appropriate POF] is the belief that in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel" (internal quotations omitted)). However, the generalization on which the objectors' argument depends does not hold in this case. The best measure of the effort required to produce a particular

result in a given case is the lodestar. In this case, the lodestar expressed as a percentage of the settlement amount is 5.38%. As Appendix 1 demonstrates, this "lodestar percentage" is substantially higher than the lodestar percentages for all but one of the super mega-fund cases and it is much more closely aligned with the lodestar percentages in the larger set of cases that Co-Lead Counsel have proposed for comparison purposes. In other words, whether or not super mega-fund cases generally require proportionally less effort than smaller cases, the generalization is not true in this case. Accordingly, the record does not support the objectors' contention that the proposed POF award should be compared only with the POF awards in super mega-fund cases.[14]

In summary, I agree with Co-Lead Counsel that the appropriate set of securities fraud settlements to use for comparison purposes is a set of the sixteen largest settlements

---

[14] Neither Co-Lead Counsel nor the objectors argue that I should compare the POF award requested in this case with POF awards in the still-larger class of all securities fraud settlements. While I could perform such an analysis, it is unlikely that it would produce significant new information. If anything, expanding the set of comparable cases to include all securities fraud settlements would tend to favor Co-Lead Counsel more, not less, because POF awards are typically higher in the group of substantially smaller settlements that would be added to the comparison set. See Prudential, 148 F.3d at 339.

rather than a subset of only super mega-fund cases.  When I compare the proposed POF award with the POF awards in this set of cases, the proposed POF award does not stand out as unusual.[15]

### (ii)  Complexity, Duration, and Risk

I have already described the factual and legal complexity of this case in explaining why I approved the settlement.  The same considerations apply here.  This was an enormously complex case, and counsel assumed substantial risk in pursuing it.  The number of mergers and acquisitions that were scrutinized and the novelty and difficulty of the legal issues that were presented leave this case with few comparable precedents.  Moreover, it is unsurprising that the case took five years to resolve given its difficulty and the fact that plaintiffs were opposed by determined and well-funded adversaries who were represented by highly skilled counsel.

---

[15]  I do not attach undue significance to this factor.
Settlement size is at best a crude indicator of comparability.
Each case, regardless of its size, presents its own set of
challenges.  The work required to resolve the case, the risk of
an adverse result, and the quality of the outcome will all vary
from case to case.  Whether the proposed POF award is reasonable
ultimately will depend on an assessment of these largely
subjective factors.  See Rite Aid, 396 F.3d at 303 (cautioning
against "overly formulaic approaches in assessing and determining
the amounts and reasonableness of attorneys' fees").

-46-

It is noteworthy that three different plaintiffs' firms --
entities that generally would not work together unless they found
it absolutely necessary -- had to work cooperatively, spreading
the risk among themselves so that they would have the collective
resources required to carry this case through to completion. Co-
Lead Counsel, it must be remembered, took this case on a wholly
contingent basis. Had they lost on summary judgment or fallen
short of establishing liability at trial, they would have lost
the tens of millions of dollars in expenses and all of the
attorney time that they collectively invested in the case. The
$172 million lodestar that Co-Lead Counsel gambled on this case
was more than twice as big as in WorldCom ($83 million lodestar),
more than four times as big as in AOL Time Warner ($40 million
lodestar), and more than twenty-one times as big as in Cendant
($8 million lodestar). It would be inappropriate for me to
ignore these differences in evaluating the risk that Co-Lead
Counsel assumed in taking on this case.

It is also important to bear in mind that the sheer amount
of discovery in this case was staggering. The document
production alone -- 82.5 million pages -- dwarfs every other
major securities class action. In comparison, AOL Time Warner

-47-

involved a mere 15.5 million pages of document production.  <u>See</u>
<u>AOL Time Warner</u>, 2006 U.S. Dist. LEXIS 78101, at *9. Indeed, Co-
Lead Counsel had to review, catalog, and analyze so many
documents that, partway through the discovery process, they were
forced to hire a technology firm to develop more advanced
computerized metrics for sorting through the production.

Accordingly, the unusual complexity, duration, and risk
involved in this case are all factors that weigh in favor of the
proposed fee award.

### (iii)  Negotiation of Fee Request

The 14.5% fee request was not unilaterally selected by Co-
Lead Counsel.  Instead, at the direction of Lead Plaintiffs, Co-
Lead Counsel retained two retired judges –– Judge Abner J. Mikva
(retired Chief Judge of the Court of Appeals for the D.C.
Circuit, former White House Counsel, and former Member of
Congress) and Judge Alfred M. Wolin (retired U.S. District Judge
for the District of New Jersey) –– to evaluate Co-Lead Counsel's
proposed fee request.  Judges Mikva and Wolin carefully
considered Lead Plaintiffs' allegations, the duration and
procedural history of the case, the amount of completed
discovery, the hours spent and expenses incurred by Co-Lead

Counsel, and the legal issues at play in the case. Based on their evaluation of this information, Judges Mikva and Wolin concluded that a 14.5% fee would be reasonable. Lead Plaintiffs agreed with this recommendation, Co-Lead Counsel assented to it, and the recommendation became the fee proposal now before me.

This deliberative process is, so far as I know, unique. It is, however, an innovation that is consistent with the spirit of the PSLRA. Under the PSLRA's scheme, the court relies on properly-selected lead plaintiffs to act as agents for the class. See Cendant I, 264 F.3d at 282 (in cases governed by the PSLRA, "lead plaintiff is in the best position, under the PSLRA's scheme, to determine (at least initially) what its lead counsel's fee should be"). The fact that the 14.5% recommendation stems from such a process weighs strongly in favor of its reasonableness.

### (iv) Reaction of the Class

Only a tiny percentage of the class has objected to the proposed fee request. Of the 2.4 million Notice recipients, only eleven raised objections, and only four of those objections were filed by institutions. The eleven objections were almost all based on more generalized concerns about the magnitude of the

fees and do not require further analysis.  To the extent that they raise more specific issues, the objections lack merit, as is discussed in more detail below.  Thus, the reaction of the class weighs in favor of approval.

### (v) Public Policy Considerations

As I have noted, POF awards generally decrease as the amount of the recovery increases.  See Rite Aid, 396 F.3d at 302; Prudential, 148 F.3d at 339.  This is because the magnitude of the recovery in many instances is due principally to the size of the class and "has no direct relationship to the efforts of counsel."  Prudential, 148 F.3d at 339 (internal quotations omitted); see also Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27, 64 (2004) (study of class action fees from 1993 to 2002, finding that as a general rule, the fee percent decreases as client recovery increases, and attributing this pattern to the economies of scale that result from aggregating smaller claims into a single larger action).  Other factors may also weigh in favor of a reduced POF award in a particular case.  For example, if a settlement is induced by groundwork laid by state regulators and other government

-50-

entities, rather than the efforts of plaintiffs' counsel, it would be appropriate to reduce the percentage award as the recovery increases. See Prudential, 148 F.3d at 338, 342. Similarly, where a case settles at an early stage, before plaintiffs' counsel have expended hundreds of thousands of hours of work on discovery and motion practice, it is appropriate to reduce the percentage award accordingly. See Cendant II, 243 F. Supp. 2d at 172 (where the case was "a simple case in terms of liability" and settled "at a very early stage, after little formal discovery," fee awarded was 1.73% POF with a 6.875 lodestar multiplier).

In this case, countervailing public policy considerations weigh against any reduction of the POF award. This was an extraordinarily complex and hard-fought case. Co-Lead Counsel put massive resources and effort into the case for five long years, accumulating nearly $29 million in yet-to-be-reimbursed expenses and expending more than 488,000 billable hours (constituting a lodestar of over $172 million) on a wholly contingent basis. But for Co-Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. Because Co-

-51-

Lead Counsel's continued, dogged effort over the past five years
is a major reason for the magnitude of the recovery, and because
this case could not have reached a similarly satisfactory
resolution earlier, public policy favors granting counsel an
award reflecting that effort.

Without a fee that reflects the risk and effort involved in
this litigation, future plaintiffs' attorneys might hesitate to
be similarly aggressive and persistent when faced with a
similarly complicated, risky case and similarly intransigent
defendants.  See WorldCom, 388 F. Supp. 2d at 359 ("In order to
attract well-qualified plaintiffs' counsel who are able to take a
case to trial, and who defendants understand are able and willing
to do so, it is necessary to provide appropriate financial
incentives.").  Of course, not every case needs to proceed as far
as this one did to reach a good result for the class.  See, e.g.,
Cendant II, 243 F. Supp. 2d at 173 ("Lead Counsel's efforts to
settle this matter at a relatively early stage has proved to be
prescient . . . . waiting to reach settlement might have resulted
in many years of delay in the class members' recovery.").  But
for cases like this one, in which a satisfactory settlement only
became possible after years of hard-fought motion practice and

-52-

searching discovery, it would be against public policy for me to set an unreasonably low POF award that would encourage future plaintiffs' attorneys to settle too early and too low. Additionally, approving this fee award is unlikely to open the floodgates to ever-higher levels of attorney compensation. Few cases will involve the combination of incredible legal and factual complexity, high risk, massive lodestar, and multi-billion-dollar recovery that characterized this case. Accordingly, I find that it would be inappropriate to artificially reduce the percentage award based on the size of the recovery alone.

(b) Lodestar Cross-Check

Several circuit courts have encouraged district judges to use the lodestar method as a cross-check on proposed POF awards. See, e.g., Rite Aid, 396 F.3d at 305; Vizcaino, 290 F.3d at 1043; Goldberger, 209 F.3d at 43. When the lodestar is used in this way, the focus is not on the "necessity and reasonableness of every hour" of the lodestar, but on the broader question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys. See Thirteen Appeals, 56 F.3d at 307. Such a results-oriented focus "lessens the

possibility of collateral disputes [regarding time records] that might transform the fee proceeding into a second major litigation." Id.

In the present case, the lodestar cross-check confirms that the proposed POF award is reasonable. First, I am satisfied that the time charges and hourly rates that were reported in Co-Lead Counsel's fee application are reasonable. I reach this conclusion based on: (1) Co-Lead Counsel's detailed submissions; (2) my familiarity with the work that the case required; (3) the fact that the institutional objectors pointedly declined to challenge either counsels' hourly rates or the time expended (except for certain very specific objections that I resolve below); and (4) Co-Lead Counsel's representation at the Fairness Hearing, which was not contradicted by defense counsel, that Tyco's counsel's lodestar was equal to or higher than Co-Lead Counsel's lodestar.

Second, taking the lodestar amount as an accurate indication of the work that was reasonably required to produce the settlement, the resulting lodestar multiplier[16] of 2.697

---

[16] In the context in which I use the term in this case, lodestar multiplier is calculated by dividing the fee award by the lodestar amount. In re AT&T Corp. Secs. Litig., 455 F.3d 160, 164 (3d Cir. 2006).

-54-

appropriately compensates counsel for the risk that they assumed in litigating the case. As Table 3 indicates, the lodestar multiplier in this case is among the lowest of the lodestar multipliers for the top securities fraud settlements (twelfth of seventeen). Because, as I have explained, the risk of an adverse result in this case was higher here than in many of the other large securities fraud cases, the relatively low lodestar multiplier in this case is a good indication that the proposed award is not excessive.

**Table 3**

| Case Name | Lodestar Multiplier |
|---|---|
| Cendant | 6.875 |
| Waste Mgmt. II | 5.296 |
| Nortel II | 4.773 |
| Lucent | 4.341 |
| Dynegy | 4.070 |
| WorldCom | 4.040 |
| AOL Time Warner | 3.690 |
| Qwest | 3.235 |
| Raytheon | 3.146 |
| Bankamerica | 3.000 |
| Adelphia | 2.890 |

| | |
|---|---|
| *Tyco (proposed)* | *2.697* |
| Royal Ahold | 2.569 |
| Global Crossing | 2.566 |
| McKesson | 2.400 |
| Freddie Mac | 2.319 |
| Nortel I | 2.058 |

Finally, the proposed POF award also appears to be reasonable when cross-checked against the lodestar percentage.[17] As the scatter plot depicted in Appendix 2 illustrates, there is a strong positive correlation between lodestar percentage and the POF award for the top securities fraud settlements. Assuming that within this comparison set, counsel faced comparable risks and obtained comparably favorable results, cases that fall close to the regression line depicted on the scatter plot have typical fee awards relative to their peers. Because the proposed POF in this case falls below the regression line, the result obtained was outstanding, and the risk that counsel assumed in litigating

---

[17] I have found no other reported decision that cross-checks a proposed POF award against the lodestar percentage. In cases where lodestar data is available, however, this type of cross-check is potentially useful because the lodestar percentage is an important factor in analyzing the reasonableness of the award and it is strongly correlated with the POF awards in the largest securities fraud cases.

the case was at least as great as the risk faced by counsel in
the comparable cases, this cross-check also suggests that the
proposed fee award is reasonable.

### 2. Objections to Fees

#### (a) Institutional Objectors

SERS/PSERS and U.S. Trust, joined by the Public Employee
Retirement System of Idaho and the West Virginia Investment
Management Board, were the only institutional objectors to the
fee award. Although the institutional objectors are uniformly
pleased with the proposed settlement, they object to the size of
the fee award. In addition to their objections to the comparison
set of settlements supplied by Co-Lead Counsel, the objectors
raise generalized concerns about the danger that a 14.5% award in
this case will create a new trend toward ever-higher compensation
for plaintiffs' attorneys. This is a legitimate concern --
particularly for institutional investors who are likely to be
class members in other securities class actions in the future.
Nevertheless, as I have described above, the unusual complexity,
great legal uncertainty, high risks, massive but justifiable
lodestar, high amount of work done in relation to the recovery
for the class, and historic magnitude of the recovery in this

-57-

case put it in a category of its own.  Accordingly, the risks that this fee award would drive attorney compensation ever higher in future cases are minimal.

SERS/PSERS also argues that the time spent on the state cases and on seeking Lead Plaintiff and Lead Counsel status should not be counted toward the lodestar because these activities did not benefit the class.  This objection lacks merit.  First, both activities were of at least some benefit to the fund.  See Bankamerica, 228 F. Supp. 2d at 1068 (stating that, to recover fees from a common fund, "attorneys must demonstrate that their services were of some benefit to the fund or enhanced the adversarial process." (quoting Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1156 (8th Cir. 1999))).  In particular, the state actions provided additional settlement leverage that Co-Lead Counsel used to negotiate a higher overall recovery from Tyco.  The time spent recruiting Lead Plaintiffs also assisted the class because, as Judge Sporkin observed, the Lead Plaintiffs ultimately selected were knowledgeable institutional investors who worked diligently to ensure that Co-Lead Counsel proceeded efficiently and with maximum benefit to the class as a whole.  In any event, the time spent on these two sets of activities

-58-

collectively comprise less than 2% of the lodestar, making them
inconsequential for purposes of the lodestar cross-check.

SERS/PSERS argues that the work done by contract attorneys
should be treated as an expense to be reimbursed, rather than
being included in the lodestar.  This objection lacks merit.  The
lodestar calculation is intended not to reflect the costs
incurred by the firm, but to approximate how much the firm would
bill a paying client.  An attorney, regardless of whether she is
an associate with steady employment or a contract attorney whose
job ends upon completion of a particular document review project,
is still an attorney.  It is therefore appropriate to bill a
contract attorney's time at market rates and count these time
charges toward the lodestar.  See Sandoval v. Apfel, 86 F. Supp.
2d 601, 609–11 (N.D. Tex. 2000) (holding that under a fee-
shifting statute, the fees of contract attorneys and paralegals
are compensable at market rates as part of the attorneys' fees,
not just as overhead expenses of the firm); see also Missouri v.
Jenkins, 491 U.S. 274, 286–88 (1989) (using the same reasoning to
conclude that market-rate billing of paralegal hours should count
toward an attorney fee award).

Alternatively, SERS/PSERS argues that the lodestar contributions of contract attorneys were excessive, in that much of the work done by contract attorneys should have been performed by lower-billing paralegals. First, as the Supreme Court has noted, there are many types of work that lie "in a gray area of tasks that might appropriately be performed either by an attorney or a paralegal." Jenkins, 491 U.S. at 288 n.10. Depending on the particular circumstances, it may or may not be cost-efficient to preclude attorneys from doing such work, particularly if it is intermingled with work that only an attorney can perform. Second and more importantly, even if I assumed that all of the contract attorney work done on behalf of Milberg Weiss LLP and Schiffrin Barroway Topaz & Kessler LLP (the two heaviest users of contract attorneys in this case) should have been billed at legal assistant rates,[18] this would reduce the overall lodestar by only about 12.5%, shifting the lodestar multiplier from 2.697 to 3.083. This minor change would not make any practical difference in the lodestar cross-check. See Rite Aid, 396 F.3d at 306 ("The lodestar cross-check calculation need entail neither mathematical

---

[18] Based on my review of the firms' lodestar calculations, legal assistants are billed at about two-thirds of the average rate for contract attorneys.

precision nor bean-counting."); <u>Thirteen Appeals</u>, 56 F.3d at 307
(the lodestar cross-check does not demand that the judge
"determine the necessity and reasonableness of every hour
expended").  Accordingly, the objection lacks merit.

        (b)  <u>Individual Objectors</u>

Chris Andrews (Doc. No. 1108), Carfagnas/Friedman (Doc. No.
1121), Lynne Sell (Doc. No. 1126), Vondell Tyler and Ernest J.
Browne (Doc. No. 1133), Rinis Travel Service, Inc. (Doc. No
1136), and the Weinbergs (Doc. No. 1110) objected to the fee
award based on generalized concerns that the fees were too high.
Some also sought assurances that Co-Lead Counsel would continue
to be involved as necessary after the settlement is concluded.
All of these objections were withdrawn after Co-Lead Counsel
provided further assurances to the objectors and informed the
objectors of the reduction in the fee request from the 17.5% fee
described in the Notice of Proposed Settlement to the 14.5% fee
that is now being sought.  In light of these assurances, I find
that there is no need to address these withdrawn objections
further.

Charles L. Glass is the only individual objector to the fee
award who has not withdrawn his objection.  His objection

consists entirely of generalized concerns about the magnitude of the award that are addressed by my discussion above. I therefore overrule his objection.

### (c) Allegations by Phillip Crawford

Phillip Crawford, Jr. has made numerous allegations in many separate letters addressed to this Court (Docs. No. 1161, 1163, 1165, 1166, 1167, 1168, and 1175). Although not a class member, Crawford was a contract attorney employed by Peak Counsel, which conducted document review for Milberg Weiss LLP, one of the three firms that acted as Co-Lead Counsel in this case. Most of his allegations are either clearly irrelevant or clearly incorrect, and need not be addressed. Crawford's two remaining allegations are: first, that the fee award is inappropriate because Milberg Weiss allegedly failed to police overbilling by its contract attorneys, and second, that some of the work done by contract attorneys could have been performed by non-lawyers and therefore should have been billed at a lower rate.

Neither allegation has merit. Regarding Crawford's first allegation, Milberg Weiss has submitted affidavits from the relevant personnel at their firm. Together, these affidavits establish that Milberg Weiss conducted a thorough investigation

of Crawford's allegations of overbilling by contract attorneys, removed from their fee application all time billed by both Crawford and the one contract attorney whose records were apparently inconsistent, and instituted appropriate procedures to police the billing of contract attorneys. These affidavits satisfy me that Milberg Weiss took all reasonable measures to ensure that their fee application accurately reflected the work put into the case. As for Crawford's second allegation, it fails for the same reason as SERS/PSERS's similar objection, <u>supra</u>. Even if true, his second allegation would not decrease the lodestar enough to call into question the appropriateness of either the lodestar multiplier or the lodestar percentage cross-check.

In summary, none of the objections made to the proposed fee award cause me to question my determination that the proposed award is reasonable.

### 3.  **Expenses**

Co-Lead Counsel have requested reimbursement of $28,938,412.74 in expenses. In the exhibits to their fee and expense request, Co-Lead Counsel have provided detailed breakdowns of their expenses. They have also provided summary

tables, breaking the expenses down by category. They are not seeking reimbursement for computer research charges, overtime, secretarial services, rental space related to document review, supplies, press releases, or certain other miscellaneous expenses. I find that Co-Lead Counsel have provided sufficient documentation of their expenses and that, in light of the legitimate needs arising from the size and complexity of this case, the expense request is reasonable. See In Re San Juan Dupont Plaza Hotel Fire Litig., 111 F.3d 220, 233-38 (1st Cir. 1997). Accordingly, I approve reimbursement of the requested amount.

### 4. Objections to Expenses

Three class members objected to the expense request. Andrews (Doc. No. 1108) objected mainly based on his belief that the case should have been settled earlier and higher, before Co-Lead Counsel incurred significant expenses. Carfagnas/Friedman (Doc. No. 1121) objected to the reimbursement of certain categories of expenses. Rinis Travel (Doc. No. 1135) objected to the lack of detail in the initial expense request. All of these objections have since been withdrawn. Moreover, to the extent these objections may have had merit, they were mooted by Co-Lead

Counsel's decision not to pursue reimbursement for certain expenses and their provision of a detailed, well-organized breakdown of expenses in their fee and expense request.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, I:

(1) Overrule the objections to the proposed settlement, plan of allocation, and award of attorney's fees and expenses;

(2) Approve the Settlement Agreement (consisting of the terms and conditions of the Stipulation of Settlement dated July 6, 2007, including Amendment No. 1 as filed with the Court on July 12, 2007 and Amendment No. 2 as filed with the Court on October 24, 2007) and the plan of allocation; and

(3) Approve attorneys' fees of 14.5% of the settlement, plus reimbursement of $28,938,412.74 in expenses.

A more detailed final judgment will issue along with this Memorandum and Order.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

December 19, 2007

cc: Counsel of Record

-65-

## APPENDIX A

### Lodestar Percentages for <u>Tyco</u> and the
### Previous Top Securities Class Action Settlements



**APPENDIX B**

**Lodestar Percentage vs. POF for <u>Tyco</u> and the
Previous Top Securities Class Action Settlements\***



\* The regression line in the above plot was calculated according
to the previous top sixteen securities settlements, not including
<u>Tyco</u>.  This regression line has a coefficient of determination
($R^2$) of 0.8768, indicating that the data is well-fitted to the
line.  The Pearson's correlation coefficient ® for lodestar
percentage and POF (again, for the previous top sixteen
securities settlements, not including <u>Tyco</u>) is 0.936, indicating
that the two variables are strongly correlated with one another.