**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE CITIGROUP INC.
SECURITIES LITIGATION

No. 07 Civ. 9901 (SHS)

---

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF FA CAP LEAD PLAINTIFFS' OBJECTION**
**TO THE PROPOSED SETTLEMENT AND PLAN OF ALLOCATION**

JEFFREY G. SMITH
MARK C. RIFKIN
MATTHEW M. GUINEY
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
270 Madison Ave.
New York, New York 10016
Tel:  212-545-4600
Fax: 212-545-4653

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ............................................................................................. ii

I.     INTRODUCTION ...................................................................................................1

II.    PROCEDURAL HISTORY ....................................................................................3

III.   THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED ...........................11

       A.    The Securities Action Plaintiffs Lacked The
             Authority To Settle The FA CAP Claims.................................................12

       B.    The Securities Action Plaintiffs Did Not Adequately
             Represent The FA CAP Participants' Claims.........................................14

       C.    As A Consequence of The Disregard of Two Court
             Orders and Inadequate Representation, The Proposed
             Settlement Is Unfair to FA CAP Participants........................................17

             1.    The Proposed Settlement is Unfair Because it
                   Provides No Remuneration for the Release of Claims..............................17

             2.    The Proposed Settlement is Unfair Because it Does
                   Not Adequately Value FA CAP Participants' Claims................................22

IV.    INTENT TO BE HEARD.................................................................................25

V.     CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 591 (1997) ..................................................................................................... 15

*In re American Express Financial Advisors Securities Litigation,*
   672 F.3d 113 (2d Cir. 2011) ............................................................................... 12, 15

*In re Auction Houses Antitrust Litigation,*
   00 Civ. 0648, 2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. Feb. 22, 2001) ................................ 18, 19

*Bellevue Drug Co. v. CaremarksPCS*
*(In re Pharm. Benefit Managers Antitrust Litigation),*
   582 F.3d 432 (3d Cir. 2009) ............................................................................................ 13

*Brecher v. Citigroup Inc.,*
   09 Civ. 7359 (SHS),
   2011 U.S. Dist. LEXIS 131104 (S.D.N.Y. Nov. 14, 2011) ................................................. 10, 21

*In re Community Bank of Northern Virginia,*
   622 F.3d 275 (3d Cir. 2010) ............................................................................................ 15

*Davis v. J.P. Morgan Chase & Co.,*
   827 F. Supp. 2d 172 (W.D.N.Y. 2011) ............................................................................... 12

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) ............................................................................................ 15

*In re General Motors Corp. Pick-Up Truck*
*Fuel Tank Products Liability Litigation,*
   55 F.3d 768 (3d Cir. 1995) .............................................................................................. 11

*General Telephone Co. v. Falcon,*
   457 U.S. 147 (1982) ...................................................................................................... 11

*Great Neck Capital Appreciation Investment Partnership, L.P. v.*
*PricewaterhouseCoopers, LLP,*
   212 F.R.D. 400 (E.D. Wis. 2002) ..................................................................................... 20

*Literary Works in Electronic Databases Copyright Litigation v.*
*Thomson Corp.,*
   654 F.3d (2d Cir. 2011) ............................................................................................ 12, 15

*National Super Spuds, Inc. v. New York Mercantile Exchange,*
 660 F.2d 9 (2d Cir. 1981) ..................................................................................*passim*

*Parker v. Time Warner Entertainment Co., L.P.,*
 239 F.R.D. 318 (E.D.N.Y. 2007)................................................................................18

*Percere v. Empire Blue Cross and Blue Shield,*
 194 F.R.D. 66 (E.D.N.Y. 2000)................................................................................11

*Petruzzi's, Inc. v. Darling-Delaware Co.,*
 880 F. Supp. 292 (M.D. Pa. 1995)............................................................................20

*Randall v. Loftsgaarden,*
 478 U.S. 647 (1986) ................................................................................................23

*Reynolds v. Beneficial National Bank,*
 288 F.3d 277 (7th Cir. 2002) ....................................................................................20

*SEC v. Zandford,*
 535 U.S. 813 (2002) ................................................................................................21

*Zomber v. Christies, Inc. (In re Auction Houses Antitrust Litigation),*
 42 Fed. App'x 511 (2d Cir. 2002) ..............................................................................19

## STATUTES & RULES

15 U.S.C. § 77l ........................................................................................................23

15 U.S.C. § 77l(a) (Securities Act)
 §12 ..........................................................................................................................23
 § 12(a)(2) ..............................................................................................4, 6, 22, 26

15 U.S.C. § 78j(b) (Securities Exchange Act of 1934) (the "Exchange Act")
 § 10b ......................................................................................................*passim*

Federal Rules of Civil Procedure
 23(a)........................................................................................................................11
 23(a)(4)....................................................................................................................15
 23(b)........................................................................................................................11
 23(e)........................................................................................................................11
 59(e)..........................................................................................................................5

SEC Rule 10b-5, 17 C.F.R. ¶ 240.10b-5 ....................................................................4

## **OTHER AUTHORITIES**

4 Newberg on Class Actions § 11.27 (4th ed. 2006) ..................................................................... 11

Lead Plaintiffs Daniel Brecher, Scott Short, Jennifer Murphy, Chad Taylor, Paul Koch and Mark Oelfke (collectively, the "FA CAP Lead Plaintiffs") respectfully object to the proposed settlement and plan of allocation (the "Proposed Settlement") in the above captioned class action (the "Securities Action").[1]

## I.     INTRODUCTION

The FA CAP Lead Plaintiffs are participants in the Voluntary FA Capital Accumulation Program ("FA CAP") of Citigroup Inc., and its subsidiary, Citigroup Global Markets, Inc. d/b/a Smith Barney (collectively "Citigroup" or "Company").  In 2009, the FA CAP Lead Plaintiffs were appointed as lead plaintiffs in the action styled *Brecher v. Citigroup, et al.*, 09-7359 (S.D.N.Y. 2009) (the "FA CAP Action"), which asserts claims on behalf of thousands of FA CAP participants concerning their purchases of hundreds of thousands of shares of Citigroup stock at inflated prices during the Class Period in 2007 and 2008.[2]

Despite their best efforts to resolve this objection amicably with counsel for both plaintiffs and defendants in the Securities Action (collectively, the "Settling Parties"), the FA CAP Lead Plaintiffs are reluctantly compelled to object to the Proposed Settlement for three related reasons. *First*, the Securities Action plaintiffs and their counsel were not authorized to settle the FA CAP Lead Plaintiffs' claims asserted on behalf of the FA CAP participants in the FA CAP Action.  In fact, two separate orders explicitly divided the responsibilities of counsel

---

[1] Attached to the accompanying declaration of Matthew M. Guiney in Opposition to the Proposed Settlement ("Guiney Declaration") as Exhibits A – E are documents sufficient to prove the FA CAP Lead Plaintiffs' membership in the Settlement Class, including the number of shares of Citigroup common stock they purchased or otherwise acquired during the Class Period, as well as sales of such stock during the Class Period or thereafter through the close of trading on July 17, 2008, along with the dates and prices of each such purchase or other acquisition and sale or other disposition.

[2] The FA CAP Lead Plaintiffs' counsel were appointed as lead counsel in the FA CAP Action in the same Order appointing lead plaintiffs.

representing the two groups of plaintiffs in the FA CAP Action and the Securities Action and authorized lead counsel for the FA CAP Lead Plaintiffs as *solely* responsible for prosecuting and settling the claims of FA CAP participants. *Second*, the Securities Action plaintiffs and their counsel had no interest in protecting the FA CAP participants' rights and, in fact, had little or no understanding of how the FA CAP operated or how many shares FA CAP participants acquired during the Class Period. Consequently, the Securities Action lead plaintiffs and their counsel are inadequate representatives for the FA CAP participants' rights. *Third*, as a consequence of their disregard for the orders appointing separate lead counsel in the FA CAP Action and their inadequate representation of the FA CAP participants, the Proposed Settlement purports to release certain FA CAP participants' claims in exchange for *zero consideration* and does not fairly or adequately value the released claims of *all* FA CAP participants. For these fundamental reasons, the motion to approve the Proposed Settlement must be denied.

To be sure, the FA CAP Lead Plaintiffs recognize that the Proposed Settlement provides a substantial aggregate recovery for Citigroup's common stock purchasers. However, the same cannot be said for the FA CAP participants because the Settling Parties did not consider the $329 million of FA CAP contributions made during the Securities Action Class Period, and because the Proposed Settlement provides for *no consideration* for claims associated with $115 million of such contributions. FA CAP Lead Plaintiffs' counsel contacted counsel for the Settling Parties on numerous occasions in an effort to resolve these issues *before* notice of the Proposed Settlement was sent to Class members and again *before* filing this objection. Because the Settling Parties refused to take the necessary steps to ensure the fairness of the Proposed Settlement to the FA CAP participants, the FA CAP Lead Plaintiffs and their counsel are left

with no choice but to fulfill their duties as the Court-appointed representatives for the FA CAP participants and object to the Proposed Settlement.

## II.    PROCEDURAL HISTORY

On March 24, 2009, FA CAP Lead Plaintiffs Brecher and Short filed a class action in the United States District Court for the Southern District of California on behalf of all FA CAP participants whose shares of Citigroup stock – which they acquired through the FA CAP with their hard-earned wages and their valuable service to the Company – were rendered virtually worthless following Citigroup's disclosures concerning its enormous liability for collateralized debt obligations ("CDOs") collateralized mortgage obligations ("CMOs") and structured investment vehicles ("SIVs"), its questionable solvency, and other related issues.  On July 27, 2009, Honorable M. James Lorenz, United States District Judge for the Southern District of California, appointed the FA CAP Lead Plaintiffs as lead plaintiffs and approved the selection of their counsel to serve as lead counsel in the FA CAP Action.  A true and correct copy of Judge Lorenz's Order (the "FA CAP Order") is attached as Exhibit F to the Guiney Declaration.

On August 7, 2009, the Judicial Panel on Multidistrict Litigation transferred the FA CAP Action to this Court as related to the Securities Action.  A true and correct copy of the Panel's Order is attached as Exhibit G to the Guiney Declaration.  The FA CAP Action was coordinated, but *not* consolidated, with the Securities Action.  Following transfer by the Panel, the FA CAP Lead Plaintiffs filed an amended complaint on October 8, 2009. *See* FA CAP Action Dkt. No. 7. The FA CAP amended complaint asserted claims under the federal securities laws as well as related Minnesota and California state law claims against Citigroup and various other named defendants.  In particular, the FA CAP Lead Plaintiffs alleged that Citigroup violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a), by issuing materially false and misleading statements about Citigroup's financial and operating condition and prospects, including the

3

Company's exposure to huge losses on subprime mortgage-backed derivatives, CDOs, and mortgage-backed security originations. These false and misleading statements were disseminated to FA CAP participants in various prospectuses for restricted or deferred shares of Citigroup common stock ("CAP Shares") or a stock option ("CAP Option" and, collectively with CAP Shares, the "CAP Securities") through the Company's FA CAP.

The FA CAP amended complaint also asserted claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. ¶ 240.10b-5, promulgated thereunder, alleging that Citigroup filed or made materially false and misleading public statements during the Class Period. Like the FA CAP participants' Section 12(a) claims, the Section 10(b) claims arose out of intentionally false and misleading statements concerning Citigroup's exposure to subprime risk in conjunction with the Company's CDOs, CMOs, and SIV investments. *See id.*

Defendants moved to dismiss the FA CAP amended complaint on November 23, 2009, and the Court granted the motion on June 7, 2011. FA CAP Action Dkt. Nos. 12-15, 21.[3] Pursuant to Federal Rule of Civil Procedure 59(e), the FA CAP Lead Plaintiffs petitioned the Court for permission to file a second amended pleading under Federal Rule of Civil Procedure 15(a) to address the pleading insufficiencies identified in the June 7th Order. On November 14, 2011, the Court vacated its prior judgment of dismissal and granted in part and denied in part the FA CAP Lead Plaintiffs' request for leave to amend. FA CAP Action Dkt. No. 30. The Court rejected the Company's argument that the FA CAP plaintiffs had not pled actual reliance and were not entitled to the fraud-on-the-market presumption of reliance because the FA CAP

---

[3] The Judgment was entered on June 13, 2011.

participants "purchased their securities at prices derived from closing stock market prices." *Id.* at 9. The Court concluded that such purchases were "susceptible to misrepresentations which distort[ed] the market price" of Citigroup stock. *Id.* The Court additionally held that the FA CAP participants' amended complaint could not "exceed the [February 2007 through April 2008] *scope* of the [claims] sustained in the Securities [Action]." *Id.* (emphasis added). The Court did not expressly prohibit the FA CAP Lead Plaintiffs from asserting any Section 10(b) claims with respect to any particular FA CAP award. On November 23, 2011, the FA CAP Lead Plaintiffs filed a conformed and amended complaint. FA CAP Action Dkt. No. 32.[4]

Discovery in the FA CAP Action commenced shortly thereafter.[5] On December 22, 2011, the parties in the FA CAP Action stipulated that they "would make all reasonable efforts to coordinate discovery in this action with the Securities Action and the Bond Action." FA CAP Action Dkt. No. 37. During the ensuing months, the parties to the FA CAP Action conducted substantial discovery. The Company produced approximately 40 million pages of documents to lead counsel in the FA CAP Action between January and May 2012 (including numerous FA CAP-specific documents). KPMG LLP, the Company's auditor, produced over 300,000 pages of documents in response to the FA CAP Lead Plaintiffs' subpoena. Lead counsel in the FA CAP Action attended more than twenty depositions between February and August 2012. In addition to coordinating common discovery with the Securities Action, the parties to the FA CAP Action

---

[4] Nevertheless, the Company moved to dismiss the complaint again on December 21, 2011. The renewed motion to dismiss was vigorously opposed on January 23, 2012, where FA CAP Lead Plaintiffs argued that Citigroup's "wasteful attempt to re-litigate the November Order" should be swiftly rejected to allow the FA CAP Action "to proceed on the merits along with the related Securities Litigation and Bond Litigation." FA CAP Dkt. No. 39, p. 6. Citigroup's renewed motion to dismiss is *sub judice*.

[5] Citigroup agreed to provide the FA CAP Action plaintiffs the discovery provided to plaintiffs in the Securities Action. The close of fact discovery is four months after the Court's decision on Citigroup's second motion to dismiss the FA CAP Action's Section 12(a)(2) claims. FA CAP Dkt. No. 37.

also conducted substantial FA CAP-specific discovery, including: (i) a comprehensive Rule 30(b)(6) deposition concerning the mechanics and administration of the FA CAP; (ii) production of thousands of pages of FA CAP Lead Plaintiff-specific discovery in response to the Company's FA CAP-specific discovery requests; and (iii) depositions of each of the FA CAP Lead Plaintiffs in May and August 2012 in New York City and San Diego, California. The Company also produced a detailed spreadsheet setting forth the timing and dollar amount of each of the more than 30,000 FA CAP awards made to the FA CAP participants during the relevant period. Finally, the FA CAP Lead Plaintiffs retained an expert to quantify damages under various legal theories. Plaintiffs' counsel in the Securities Action did not participate in or receive any of the FA CAP-related discovery in the FA CAP Action.

The FA CAP-specific discovery conducted in the FA CAP Action gave lead counsel in that action a thorough understanding of the FA CAP, including its mechanics and the value of the FA CAP participants' contributions to the plan during the Class Period. Specifically, Citigroup issues an annual prospectus for the FA CAP and eligible participants are entitled to enroll in the program and make an irrevocable, prospective election to have a portion of their wages paid in the form of restricted or deferred Citigroup stock. Participants elect to contribute a specific dollar amount to the FA CAP, but do not know the number of shares they will receive because the share price is not set until the award date. FA CAP shares are awarded twice a year, traditionally on the first business day of the year and the first business day in July. The price per share is equal to the average of the closing prices of Citigroup common stock on the last trading day of each of the six months prior to the award date, and is fully paid in cash and by the FA CAP participants' ongoing employment services. Although FA CAP shares are awarded only twice per year, participants make cash contributions each month by a pre-tax withholding from

6

their monthly wages.  Each monthly paycheck specifically identifies the amount paid for the FA CAP shares.[6]   Broadly speaking, it is as if the FA CAP participants buy one-sixth of their FA CAP shares each month at the closing price on the last day of the month.

Three separate FA CAP awards incorporated inflated Citigroup share prices ***and*** were paid for by FA CAP participants ***during*** the Class Period that is subject to the Proposed Settlement:

(i)  The July 1, 2007 FA CAP award was based on Citigroup's month-end trading price as of January 31, February 28, March 30, April 30, May 31 and June 29, 2007 (including the period from February 26, 2007, to June 29, 2007 during the Class Period). In the first award period, FA CAP participants directed $104,631,614 in compensation to the plan.  At the end of that period, Citigroup awarded approximately 264,664 shares to nearly 5,000 FA CAP participants at a grant price of $527.12 per share on July 1, 2007.[7]

(ii)  The January 1, 2008 FA CAP award was based on Citigroup's month-end trading price as of July 31, August 31, September 28, October 31, November 30 and December 31, 2007 (falling entirely within the Class Period).   In the second award period, FA CAP participants directed $109,231,331 in compensation to the plan.  At the

---

[6] During the 30(b)(6) deposition of Citigroup's designated representative in the FA CAP Action, Citigroup conceded that: (i) FA CAP contributions are deducted monthly from each FA CAP participant's monthly pay; and (ii) the amount of the monthly FA CAP contribution is separately stated as the employee's "pre-tax allocation" in his or her monthly pay stub.  The pay stubs for the FA CAP Lead Plaintiffs confirm that this was done throughout the Class Period.

[7] The grant price and share grant total reflect Citigroup's 10 to 1 reverse stock split.  The grant price is the non-discounted price and does not include the 25% discount afforded to all FA CAP participants for premium shares.

end of that period, Citigroup awarded approximately 357,023 shares to nearly 5,000 FA CAP participants at a grant price of $407.93 per share on January 1, 2008.

(iii)   The July 1, 2008 FA CAP award was based on Citigroup's month-end trading price as of January 31, February 29, March 31, April 30, May 30, and June 30, 2008 (including the period from January 1, 2008, to April 18, 2008 within the Class Period).   In the third award period, FA CAP participants directed $114,978,148 in compensation to the plan.   At the end of that period, Citigroup awarded approximately 670,314 shares to nearly 5,000 FA CAP participants at a grant price of $228.70 per share on July 1, 2008.

On August 29, 2012, the parties to the Securities Action announced their agreement to settle that action – which also had the effect of settling the FA CAP Action – for a total of $590 million.   The parties filed a motion for preliminary approval and, later that same day, the Court entered an Order preliminarily approving the Proposed Settlement.   Securities Action Dkt. Nos. 153 - 56.   Under the terms of the Proposed Settlement, Citigroup is to pay $590 million in exchange for a release of all claims asserted against it in connection with investments in Citigroup stock between February 26, 2007, and April 18, 2008, relating to, *inter alia*, disclosures concerning Citigroup's subprime-related assets.   If the Proposed Settlement is approved by the Court, the settlement fund (after payment of attorneys' fees and expenses) will be distributed pursuant to a plan of allocation devised by lead counsel in the Securities Action. Securities Action Dkt. No. 160, p. 12.   In pertinent part, the plan of allocation divides the Class Period into six segments and assigns an "Artificial Inflation Per Share" to the Citigroup shares

during those particular times.  Specifically:

| Purchase/Acquisition or Sale Date Range | Artificial Inflation Per Share |
|---|---|
| 2/26/07 – 11/04/07 | $4.94 |
| 11/5/07 | $3.38 |
| 11/6/07 – 11/18/07 | $1.72 |
| 11/19/07 – 1/14/08 | $1.15 |
| 1/15/08 | $0.71 |
| 1/16/08 – 4/18/08 | $0.10 |

The settlement notice purported to advise FA CAP participants that participating in the settlement would "release any claims you may have in the [FA CAP Action] in connection with shares that you purchased or otherwise acquired during the Class Period."    Securities Action Dkt. No. 160, p. 14.

Immediately after the Proposed Settlement was announced, counsel for the FA CAP Lead Plaintiffs contacted counsel for the Settling Parties in the Securities Action to clarify whether FA CAP participants were included in the Proposed Settlement and to confirm the scope of the proposed release.[8]    Counsel for the FA CAP Lead Plaintiffs quickly determined that the July 2008 FA CAP share award may not be entitled to participate in the Proposed Settlement even though it: (i) incorporated inflated month-end stock prices *during* the Class Period, as set forth in the proposed plan of allocation (specifically, the January 31, February 29, and March 31, 2008 month-end stock prices); (ii) was paid for *during* the Class Period; and (iii) is consequently plainly within "the scope of the claims sustained in [the] Securities [Action]." *Brecher v. Citigroup Inc.*, 09 Civ. 7359 (SHS), 2011 U.S. Dist. LEXIS 131104, at ** 19-20 (S.D.N.Y. Nov. 14, 2011).  FA CAP Lead Plaintiffs' counsel explained their view to each of the Settling Parties

---

[8] None of the parties to the Securities Action Proposed Settlement ever contacted the FA CAP Action lead counsel prior to the announcement of the Proposed Settlement.

that the claims associated with the July 2008 FA CAP award are either: (i) released by and entitled to participate in the Securities Action settlement; or (ii) not released by the Securities Action settlement and entitled to continued litigation.

By early December 2012, counsel for the Settling Parties had confirmed their position that FA CAP participants' claims associated with inflated Citigroup stock between January 1, 2008 and April 18, 2008 may not participate in the Proposed Settlement. Counsel for the defendants in the Securities Action argued that the July 2008 FA CAP award claims were dismissed pursuant to the Court's November 14, 2011, Order and, consequently, the July 2008 FA CAP participants are not entitled to participate in the Proposed Settlement or to continued litigation. Counsel for the plaintiffs in the Securities Action simply argued that such claims were not entitled to participate in the Proposed Settlement.

Prior to the dissemination of notice of the Proposed Settlement, FA CAP Lead Plaintiffs' counsel urged counsel for the plaintiffs in the Securities Action to amend the notice and the plan of allocation to allow those July 2008 FA CAP award recipients to participate in the Proposed Settlement, explaining that any contrary outcome would result in no remuneration for those FA CAP participants in receipt of Citigroup shares that were paid for during the Class Period at prices that were inflated during the Class Period. Plaintiffs' counsel in the Securities Action declined to amend the notice or plan of allocation. The FA CAP Lead Plaintiffs were, consequently, forced to file this objection to the Proposed Settlement to fulfill their duties as Court-appointed lead plaintiffs in the FA CAP Action.[9]

---

[9] Any argument that the FA CAP Lead Plaintiffs could have opted out of the Proposed Settlement is without merit. Opt-out rights do not excuse or mitigate the Court's obligation to ensure that a class settlement is fair. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d (continued...)

## III.   THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED

Under Federal Rule of Civil Procedure 23(e), the Court may approve a proposed settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e).[10]   When, as here, the Court is asked to certify a class and approve its settlement in a single proceeding, the requirements of Rule 23(a), which are intended to protect the rights of absent class members, "demand undiluted, even heightened, attention." *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 259 (2d Cir. 2011) (*citing Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).   Most importantly, the Court's consideration of a proposed settlement is binary: it must either approve or reject the settlement as proposed.   If the Court concludes that there a proposed settlement is deficient, it must reject the entire settlement outright, and may not "delete, modify, or substitute certain provisions." *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 176 (W.D.N.Y. 2011).

_____

(…continued)

768, 809 (3d Cir. 1995) ("At all events, the right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class.").   Indeed, if opt-out rights could transform an unfair settlement into a fair one, there would be no need for the Court to independently evaluate the settlement's fairness.   "Lack of objection by the great majority of claimants means little when the point of objection is limited to a few whose interests are being sacrificed for the benefit of the majority." *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981).

[10] When, as here, judicial approval of a proposed settlement is sought ***prior*** to class certification, the Court must determine whether a class can be certified pursuant to Fed. R. Civ. P. 23(a) and 23(b).   "A class settlement cannot technically be approved unless, by definition, a class is upheld." 4 Newberg on Class Actions § 11.27 (4th ed. 2006).   The Court must conduct a "rigorous analysis" and "be persuaded that the prerequisites of Rule 23(a) have been met." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982); *see also Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y. 2000).   The class action requirements embodied in Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation.

For all the reasons discussed fully below, the Proposed Settlement must be rejected because: (i) the Securities Action plaintiffs and their counsel lacked the authority to settle the claims alleged in the FA CAP Action; (ii) the Securities Action plaintiffs and their counsel did not adequately represent the FA CAP participants' interests; and (iii) the Proposed Settlement is unfair because it purports to release certain FA CAP participants' claims in exchange for no consideration and does not fairly or adequately value the claims of all the FA CAP participants.

### A.   The Securities Action Plaintiffs Lacked The Authority To Settle The FA CAP Claims

The Securities Action plaintiffs and their counsel plainly lacked the authority to settle the claims alleged in the FA CAP Action.  Consequently, and on this basis alone, the motion to approve the Proposed Settlement should be denied.  In the Second Circuit, "[i]t is elementary that a settlement agreement cannot release claims that the parties were **not authorized to release**." *In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011) (emphasis added) (*citing Super Spuds*, 660 F.2d at 19).  However, that is precisely what the Securities Action plaintiffs and their counsel seek here.

On September 24, 2008, this Court entered Case Management Order No. 1 ("CMO No. 1") in the Securities Action.  Securities Action Dkt. No. 65.  CMO No. 1 established a master docket and created administrative procedures to address subsequently filed or transferred actions concerning Citigroup's subprime exposure.  In pertinent part, CMO No. 1 established the following protocol: "when a case that arises out of the same operative facts [. . .] is hereinafter filed in or transferred to this Court, it **shall be** referred by counsel to the Court for a determination as to whether that action should be consolidated with the Consolidated Action" in order to "avoid duplication and inefficiency [. . .] in the litigation." *Id.* (emphasis added).

More than three years ago, in July 2009, Judge Lorenz entered the FA CAP Order, which appointed the FA CAP Lead Plaintiffs in the FA CAP Action to represent "all persons whose earned wages were used to acquire [CAP Shares]" during the Class Period. FA CAP Action Dkt. No. 28 (S.D. Cal. 09-606). The FA CAP Order also appointed the FA CAP Lead Plaintiffs' counsel to serve as Lead Counsel for the FA CAP participants. *Id.* Among other responsibilities given to them, the FA CAP Order expressly authorized the FA CAP Lead Counsel "to conduct all settlement negotiations with counsel for defendants." *Id.* Importantly, to protect the interests of FA CAP participants, the FA CAP Order expressly provided that "***no settlement negotiations shall be conducted without the approval of [FA CAP] Lead Counsel***." *Id.* (emphasis added)

The FA CAP Action was subsequently transferred to the Southern District of New York and assigned "to the Honorable Sidney H. Stein for coordinated or consolidated pretrial proceedings."[11] *See* Guiney Declaration, Exhibit G. Despite the clear mandate of CMO No. 1 entered in the Securities Action, counsel in that action ***never*** referred the FA CAP Action to this Court to determine whether the FA CAP Action should be consolidated with the Securities Action. Instead, counsel in the FA CAP Action voluntarily coordinated discovery with counsel in the Securities Action and vigorously prosecuted the FA CAP Action on behalf of the FA CAP participants for more than three years. Prior to entering into the Proposed Settlement, plaintiffs' counsel in the Securities Action ***never*** claimed or asserted any interest in or authority over the FA CAP Action or the claims asserted in the FA CAP Action, and they never sought to modify

---

[11] The FA CAP Order undoubtedly remained in place as a consequence of the transfer: "[T]here is nothing in the rules adopted by the Joint Panel on Multidistrict Litigation that authorizes a transferee judge to vacate or modify the order of a transferor judge. Moreover, we do not believe that Congress intended that a 'Return to Go' card would be dealt to parties involved in MDL transfers." *Bellevue Drug Co. v. CaremarksPCS (In re Pharm. Benefit Managers Antitrust Litig.)*, 582 F.3d 432, 441 (3d Cir. 2009).

or amend the terms of the FA CAP Order in any manner.[12]  As importantly, plaintiffs' counsel in the Securities Action never disputed or challenged FA CAP Lead Counsel's authority to prosecute the FA CAP Action on their own.

Despite the clear mandate of the FA CAP Order, which gave FA CAP Lead Counsel exclusive authority to negotiate any settlement of the claims asserted in the FA CAP Action, the parties to the Securities Action conducted settlement negotiations concerning the FA CAP Action claims *without any participation or input from FA CAP Lead Counsel*.[13]  The Securities Action plaintiffs and their counsel plainly had no authority to negotiate any settlement or settle the FA CAP Action claims.  Their deliberate disregard of two Orders requires that the Proposed Settlement, which purports to settle claims that the Securities Action plaintiffs and their counsel were *not authorized to settle*, must be rejected.  *In re Am. Express*, 672 F.3d at 135.

### B.   The Securities Action Plaintiffs Did Not Adequately Represent The FA CAP Participants' Claims

It is well-established that a class representative must have "the ability and the incentive to represent the claims of the class vigorously." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (citation omitted).  "Th[e] justification for permitting the representatives to sue on behalf of the class has no application to claims of class members in which the representatives

---

[12] If lead counsel in the Securities Action wanted the authority to settle the FA CAP claims, they could have sought the Court's determination at any time after the cases were coordinated.  This is precisely what happened in the associated *Citigroup Bond Litigation*, where lead counsel in that case sought and obtained an order *consolidating* certain potentially related actions with the *Citigroup Bond Litigation*. Dkt. No. 5, 09-cv-3669.  Attached to the Guiney Declaration as Exhibit H.  In ordering that all of those related cases be consolidated, the Court rejected an argument that preferred stock purchasers needed separate representation, finding that "nothing of significance suggests that current lead plaintiff and lead counsel are incapable of representing the interest of preferred stock purchasers." *Id.*  Lead counsel in the Securities Action *never* sought such a determination here.

[13] Citigroup's counsel cannot claim ignorance of the FA CAP Order because the *same counsel* represents Citigroup in both the FA CAP Action and the Securities Action.

have no interest and which . . . they are willing to throw to the winds in order to settle their own claims." *Super Spuds*, 660 F.2d at 17 n.6.  That is precisely what the Securities Action plaintiffs and their counsel did here.

Similarly, in determining whether the adequacy requirement of Rule 23(a)(4) is satisfied, an important factor is whether the representatives "have an interest in vigorously pursuing the claims of the class," *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.")  *See also Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 259. Here, the Securities Action plaintiffs had no interest in vigorously pursuing the FA CAP participants' claims because they did not receive FA CAP shares and, in fact, they did not even inform themselves about the FA CAP plan or understand the mechanics of the plan itself.

Specifically, shortly after the Proposed Settlement was announced, FA CAP Lead Counsel contacted lead counsel in the Securities Action to discuss the scope of the settlement's release provisions.   On the morning of September 19, 2012, for example, during a teleconference, lead counsel in the Securities Action were completely unaware of the FA CAP plan, its scope and the mechanics associated with the award of FA CAP shares.  During that call, FA CAP Lead Counsel described: (i) the rules associated with first participating in the FA CAP; (ii) the method of determining FA CAP share award prices; (iii) the award dates and how those dates relate to the Class Period in both the FA CAP Action and the Securities Action.  Lead counsel in the Securities Action asked a series of follow-up questions, further confirming their need to better understand the mechanics of the FA CAP – all of which took place *after* they had negotiated the Proposed Settlement, which purports to release the FA CAP Action claims.

Numerous additional follow-up conference calls took place between counsel for the two groups of lead plaintiffs concerning the details and mechanics of the FA CAP plan – again, long *after* lead counsel in the Securities Action had negotiated the Proposed Settlement.[14]

The Securities Action plaintiffs' motion for final approval of the Proposed Settlement confirms their ignorance of the FA CAP and that the FA CAP was not considered when lead counsel in the Securities Action negotiated the Proposed Settlement. It comes as no surprise that lead counsel in the Securities Action – who were not authorized to litigate the FA CAP claims, did not litigate those claims, and were not authorized to negotiate any settlement of them – were unaware of the unique facts about the FA CAP. They never received, for example, detailed discovery concerning the number of FA CAP shares awarded, the value of the FA CAP awards, or the grant price of the FA CAP shares affected by the inflated prices during the Class Period. In fact, that discovery was not even provided to the FA CAP Lead Counsel until May 4, 2012 – weeks *after* the parties to the Securities Action purportedly had agreed to the Proposed Settlement.[15] Consequently, it is abundantly clear that the Securities Action plaintiffs and their

---

[14] To the extent that the FA CAP Lead Plaintiffs' objection raises any factual issues that Citigroup or the Securities Action plaintiffs dispute, the FA CAP Lead Plaintiffs long ago served focused discovery requests upon both parties concerning, among other things, what information (if any) Citigroup provided to the Securities Action plaintiffs regarding to the FA CAP Lead Plaintiffs' claims and what analysis (if any) the Securities Action plaintiffs undertook of the FA CAP Plan or the FA CAP Lead Plaintiffs' claims. Both Citigroup and the Securities Action plaintiffs objected to the discovery requests and refused to produce the requested information. If the Securities Action plaintiffs' response to the FA CAP Lead Plaintiffs' objection disputes any of these factual issues, the FA CAP Lead Plaintiffs request that the parties to the Securities Action be compelled to produce the pertinent information and reserve their right to move to compel that discovery from the Settling Parties.

[15] The information was not readily available to Citigroup, according to Citigroup's counsel, and was laboriously collected and presented only after significant efforts. The information was produced pursuant to a confidentiality agreement. Consequently, FA CAP Lead Plaintiffs' counsel does not believe that the Securities Action plaintiffs ever received such information.

counsel did not consider, or even understand, the FA CAP when they negotiated and agreed to the Proposed Settlement.[16]

The motion papers recently filed by the Securities Action plaintiffs *acknowledge* that two of the most important factors in considering whether the Proposed Settlement should be approved are that they and their counsel (i) were "extremely knowledgeable of the relevant issues" and (ii) had "obtained sufficient information through discovery to properly evaluate their case and to assess the adequacy of any settlement proposal." *See* Securities Action Dkt. No. 169, p. 12-13.  While that may be so with respect to the Securities Action itself, the Securities Action plaintiffs and their counsel most certainly were *not* knowledgeable and had obtained *no* information about the FA CAP prior to agreeing to the Proposed Settlement.  Thus, by their own argument, the Securities Action plaintiffs and their counsel demonstrate why the Proposed Settlement cannot be approved.

### C.   As A Consequence of The Disregard of Two Court Orders and Inadequate Representation, The Proposed Settlement Is Unfair to FA CAP Participants

#### 1.   The Proposed Settlement is Unfair Because it Provides No Remuneration for the Release of Claims

Because the Securities Action plaintiffs and their counsel did not have either the authority or adequacy to represent the interests of the FA CAP participants, the Proposed Settlement releases certain FA CAP claims for no consideration.  Several seminal Second Circuit decisions

---

[16] Citigroup's counsel apparently did not consider the FA CAP Action in connection with the Proposed Settlement either: although the stipulation of settlement in the Securities Action was signed on August 28, 2012 (and agreed to many months earlier), Citigroup chose to depose four of the six named plaintiffs in the FA CAP Action on August 29 and 30 in San Diego, California, explaining that the depositions went forward because defendants had "not considered" the ramifications of the Securities Action settlement on the FA CAP Action at that time.

hold that a proposed class action settlement cannot be approved when it provides "settlement awards only to certain class members while requiring a release from others who will obtain no benefit at all." *Parker v. Time Warner Entm't Co., L.P.*, 239 F.R.D. 318, 337 (E.D.N.Y. 2007). Indeed, "a total lack of value exchanged for a release of claims is a strong indicator that a settlement is unfair, at least with respect to those disadvantaged members of the class." *Id.*

In both *Super Spuds* and *In re Auction Houses Antitrust Litigation*, marginalized groups did not receive any benefit in exchange for the releases contemplated, and the proposed settlements were rejected as a consequence. *Super Spuds* involved the settlement of a class action on behalf of all persons who liquidated long positions in Maine potato futures contracts between April 13 and May 7, 1976, during which time prices had allegedly been artificially depressed by various individuals and entities trading on the New York Mercantile Exchange. *Super Spuds*, 660 F.2d at 11. The District Court approved the settlement over the objection of a class member who held contracts liquidated during the class period as well as contracts only liquidated after the class period. Claims for both contracts were released by the settlement, but only the liquidated contracts would recover any share of the settlement proceeds. The Second Circuit reversed the District Court's approval on the basis that the settlement required some class members to release claims for which they would ***receive no compensation*** – exactly the situation present here. *Id. at* 19. In doing so, the Second Circuit expressly rejected the settlement proponents' argument that, despite the uncompensated release of claims based on unliquidated contracts of a small number of class members, the settlement was fair to the class as a whole. As the Court of Appeals held, "an advantage to the class, no matter how great, simply ***cannot be bought by the uncompensated sacrifice of claims of members, whether few or many***, which were not within the description of claims assertable by the class." *Id.*

18

In *Auction Houses*, the plaintiffs filed a class action against auction houses that allegedly conspired to fix domestic auction terms. Shortly before the parties reached a settlement in that case, new class actions were filed over foreign auctions affected by the same alleged conspiracy. Thereafter, the parties to the first class action reached a settlement that purported to release all claims that could be brought in United States courts or in foreign courts under American law. Class members with foreign auction claims were required to release their right to bring those claims in United States courts or pursuant to American law, even though no part of the settlement fund was allocated to compensate those class members for giving up those rights. Because the proposed settlement would preclude American law claims involving foreign auctions but provided no compensation for such a release, the District Court refused to approve the settlement. *In re Auction Houses Antitrust Litig.*, 00 Civ. 0648, 2001 U.S. Dist. LEXIS 1713, at * 18 (S.D.N.Y. Feb. 22, 2001). The District Court reasoned that a class could not settle its claims by sacrificing other claims of class members. *Id.* at *12 (quotation marks omitted). The Second Circuit affirmed the District Court's decision, holding that the proposed settlement could not be approved because it represented an "***uncompensated sacrifice of claims of [class] members***." *Zomber v. Christies, Inc. (In re Auction Houses Antitrust Litig.)*, 42 Fed. App'x 511, 519 (2d Cir. 2002) (emphasis added). As the Second Circuit held, "[t]hat the impairment may be slight is of no moment, as we cannot say that it is valueless (indeed, it obviously has value to the Auction Houses that argue so stenuously [sic] for approval of it), yet it is exacted without any compensation whatsoever. This is precisely what *Super Spuds* proscribes" (*id.*), and it is precisely what the Proposed Settlement purports to do here.[17]

---

[17] Other courts similarly have held that a settlement cannot be approved where it allocates nothing to (continued...)

Were it approved, the Proposed Settlement would release the FA CAP claims associated with artificially inflated Citigroup shares between January 1, 2008 and April 18, 2008. However, certain FA CAP shares that were purchased at such inflated prices and paid for during the Class Period (*i.e.*, the shares delivered in the July 2008 FA CAP award) – will not be permitted to participate in the settlement. That is, the claims associated with FA CAP shares awarded on July 1, 2008, that were paid for during the Class Period at prices that were inflated during the Class Period will be released by the Proposed Settlement for ***no consideration whatsoever***. Those uncompensated claims will have been sacrificed if the Proposed Settlement were approved. The Proposed Settlement must be rejected as unfair to those Settlement Class members, just as the proposed settlements in both *Super Spuds* and *Auction Houses* were rejected.

Counsel for the defendants in the Securities Action have taken the position that the FA CAP Lead Plaintiffs were expressly prohibited from asserting any Section 10(b) claims for acquisitions of Citigroup shares after April 2008 by the Court's Order granting in part the FA CAP Lead Plaintiffs' motion for leave to file the Second Amended Complaint. Counsel for plaintiffs in the Securities Action simply contend that the Proposed Settlement releases claims associated with inflated Citigroup shares incorporated in the July 2008 FA CAP award because:

---

(…continued)

meritorious claims released thereunder: *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285-86 (7th Cir. 2002) (denying approval of class settlement where claims against one of the defendants would be released for no consideration); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, LLP*, 212 F.R.D. 400, 406 (E.D. Wis. 2002) (settlement "appeared to be unfair" where it required objector to release nonclass claims as part of class settlement); *Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 300 (M.D. Pa. 1995) ("There simply is no justification for requiring [members of one class segment] to release their claims without any consideration being provided for their release.").

(i) the scope of the claims in the FA CAP Action are the same as those in the Securities Action; and (ii) the Securities Action settlement releases all claims in that action.

These arguments are without merit for two main reasons. *First*, as set forth above, the July 2008 FA CAP award incorporates inflated month-end stock prices *during* the Securities Action Class Period, in accordance with the proposed plan of allocation (*i.e.*, the artificially inflated month-end prices on January 31, February 29, and March 31, 2008). In addition, those shares were paid for by FA CAP participants *during* the Class Period through payroll deductions in January, February, and March 2008. Thus, the July 2008 FA CAP shares are plainly within "the scope of the claims sustained in [the] Securities [Action]." *Brecher*, 2011 U.S. Dist. LEXIS 131104, at ** 19-20. Consequently, such claims are either: (i) released by and entitled to participate in the Securities Action settlement; or (ii) not released by the Securities Action settlement and entitled to continued litigation. Any contrary argument results in the release or dismissal of claims for *no remuneration* and leads to the absurd result that recipients of the July 2008 FA CAP award would have no right to recovery despite their purchase of admittedly inflated Citigroup shares during the Class Period.[18]

*Second*, although the July 2008 FA CAP award shares were delivered after the end of the Class Period, the award date is akin to a settlement date, rather than a trade date.[19] To be sure, FA CAP participants purchased the shares *during* the Class Period at inflated Class Period prices as set forth in the Proposed Settlement's plan of allocation. And those shares unquestionably

---

[18] Indeed, the very purpose of the Securities Action's plan of allocation is to "equitably distribute the Settlement proceeds to the Settlement Class Members who suffered economic losses as a result of the alleged violations of the federal securities laws [. . .]" Securities Action Dkt. No. 160, p. 12.

[19] The Supreme Court observed that Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813 (2002).

Securities Action did not possess Section 12 claims, did not allege any Section 12 claims, and are not releasing any Section 12 claims. In short, although the FA CAP Lead Plaintiffs' Section 12 claims undoubtedly have value, they will be released for no additional consideration as a consequence of the Proposed Settlement.[23] Moreover, Section 12 of the Securities Act provides a statutory damages remedy that is formulaic and eliminates any of the uncertainties associated with calculating damages on the Securities Action plaintiffs' Section 10(b) claims. *See* 15 U.S.C. § 77l; *Randall v. Loftsgaarden*, 478 U.S. 647, 55-56 (1986).

*Second*, the Proposed Settlement unfairly settles and releases the FA CAP participants' claims as a mere afterthought to the settlement of billions of dollars of claims alleged in the Securities Action. It is widely known that settlement value declines significantly as the aggregate value of a claim rises. As the Securities Action plaintiffs' expert noted, "as the level of damages increases, the percentage that the settlement will bear to those damages will normally decline because of solvency constraints on the defendant. To sum up, settlement value as a percentage of investor losses tends to decline as investor losses increase." Securities Action Dkt. No. 167, p. 13 (Coffee Decl. at ¶ 20); *See also* Miller Decl. at ¶ 28 (Securities Action Dkt. No. 166). In arguing that the Proposed Settlement compares favorably to other recent settlements of similarly large class actions, plaintiffs' counsel offered a recent study by the National Economic Research Associates ("NERA") which "found that for class actions that claimed investor losses between $5 and $10 billion, the mean recovery was [only] 2.2% and the median recovery was [only] 1%." Securities Action Dkt. No. 167.

---

[23] Pending Securities Act claims undoubtedly have value. In fact, the Securities Action plaintiffs referred to such claims as "tailwinds" and repeatedly noted how settlements involving such claims are traditionally greater than Section 10(b) settlements because Securities Act claimants need not establish scienter and do not bear the burden of proving loss causation. Securities Action Dkt. No. 169, pp. 19-20.

The chart below, which is also included in Professor Coffee's declaration in support of the Proposed Settlement, vividly illustrates the diminishing settlement value of larger cases:



**Settlement Value as a Percentage of Investor Losses, by Level of Investor Losses (January 1996 to June 2011)**

Here, had the FA CAP Lead Plaintiffs and their counsel been permitted to fulfill their Court-appointed duties to litigate and negotiate to settle their own claims, the settlement value of those claims, standing alone, would have been far greater than they became by virtue of being swept into the Proposed Settlement as an afterthought.[24]  Because the FA CAP claims are smaller than the aggregate value of all the claims included within the Proposed Settlement, the settlement value of those stand-alone claims and the percentage recovery for FA CAP participants almost certainly would have been much larger.

---

[24] By way of example only, when investor losses are between $0 and $20 million, the average settlement is approximately 40% of investor losses and the median settlement is 17%.  Securities Action Dkt. No. 167, p. 14.  When investor losses are between $5 billion and $10 billion, the average settlement is just 2.2% of investor losses and the median settlement is just 1%.  *Id.*

## IV.    INTENT TO BE HEARD

The undersigned counsel intend to appear on behalf of the FA CAP Lead Plaintiffs at the Fairness Hearing scheduled for January 15, 2013 at 11:00 a.m. and request to be heard at that time.

## V.    CONCLUSION

For all of the foregoing reasons, the FA CAP Lead Plaintiffs respectfully submit that the Proposed Settlement should not be approved.

Dated: New York, New York
       December 21, 2012

                              ___/s/ Matthew M. Guiney_____
                              JEFFREY G. SMITH
                              smith@whafh.com
                              MARK C. RIFKIN
                              rifkin@whafh.com
                              MATTHEW M. GUINEY
                              guiney@whafh.com
                              **WOLF HALDENSTEIN ADLER**
                              **FREEMAN & HERZ LLP**
                              270 Madison Ave.
                              New York, New York 10016
                              Tel:  212-545-4600
                              Fax: 212-545-4653

                              VICTOR E. STEWART (VS-4309)
                              FRED T. ISQUITH, JR. (FI-1064)
                              **LOVELL STEWART HALEBIAN**
                                  **JACOBSON LLP**
                              61 Broadway, Suite 501
                              New York, New York 10006
                              Tel: 212-608-1900
                              Fax: 212-719-4775

JAMES F. CLAPP
jclapp@sdlaw.com
**DOSTART CLAPP GORDON &**
    **COVENEY, LLP**
4370 La Jolla Village Drive, Suite 970
San Diego, California  92122-1253
Tel: 858-623-4200
Fax: 858-623-4299

EDWARD J. WYNNE
ewynne@wynnelawfirm.com
**WYNNE LAW FIRM**
100 Drakes Landing Road, Ste. 275
Greenbrae, CA 94904
Tel:  415-461-6400
Fax: 415-461-3900

JACOB H. ZAMANSKY
jake@zamansky.com
EDWARD H. GLENN, JReglenn@zamansky.com
KEVIN D. GALBRAITH
kevin@zamansky.com
**ZAMANSKY & ASSOCIATES LLC**
50 Broadway, 32nd Floor
New York, New York 10004
Tel: 212-742-1414
Fax: 212-742-1177

*Attorneys for Objectors Daniel Brecher, Scott*
*Short, Jennifer Murphy, Chad Taylor, Mark Oelfke*
*and Paul Koch*