# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

IN RE CITIGROUP INC.
SECURITIES LITIGATION

Case No: 07 Civ. 9901 (SHS)



## DECLARATION OF THEODORE H. FRANK
## IN SUPPORT OF OBJECTION

Theodore H. Frank

11307 Bulova Lane
Fairfax, VA 22030

1718 M Street NW, No. 236
Washington, DC 20036

Phone: (703) 203-3848
Email: tedfrank@gmail.com

*In pro per*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-27-12

## DECLARATION OF THEODORE H. FRANK
## IN SUPPORT OF OBJECTION

I, Theodore H. Frank, declare as follows:

1.　　I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.　　I am an attorney and an elected member of the American Law Institute. So while I bring this objection *pro se* (as I received notice too late to retain Southern District of New York counsel during the holiday season), I do not request any special treatment as a *pro se*.

### I Am a Member of the Class

3.　　I am a member of the class. I purchased 500 shares of Citigroup stock for my Charles Schwab account for $13,979.95 on January 10, 2008. I sold the stock for $12,386.27 on April 21, 2008. These were the only transactions I made in Citigroup stock in 2008. True and correct copies of contemporaneous confirmation emails sent by Charles Schwab to me to confirm these transactions are attached as Exhibits 1 and 2.

### The Notice Is Inexcusably Late

4.　　I learned of the settlement for the first time when I received mailed notice of the settlement on the evening of December 12, 2012; I had not remembered that I owned Citibank stock briefly in 2008, and did not determine I was a member of the class until December 14, 2012. Because I do not live in New York City, the December 21, 2012, deadline for objecting requires me to FedEx any documents by December 20th to ensure their delivery. Because I cannot retain counsel on such short notice, I am filing *pro se*. Because I am filing *pro se*, I am at the mercy of the Southern District of New York's clerk to file on December 21 papers they receive on December 21, though it is likely that the office is short-staffed. December 12, 2012, I note, is also six days after the December 6, 2012, opt-out date.

5. On March 19, 2008, Citigroup sent me electronic notice of an April 22, 2008, shareholder meeting, and April 21, 2008, deadline for proxy voting. A true and correct copy of this notice is attached as Exhibit 3.

6. From the March 19, 2008 notice, we can deduce that Citibank finds it possible to send electronic notice to shareholders 33 days in advance of a deadline. The parties chose not to take steps to do so in this particular case.

7. Class counsel admits that the settlement administrator did not send individualized notice to customers of Charles Schwab until December 7, 2012, two weeks before the objection deadline. *See* Exhibit 14. Class counsel asserts that this notice is acceptable under Second Circuit law requiring the "best practicable" notice because they asked Charles Schwab for a list of class members in October, and Schwab did not provide the list until December 3. *Id.* (citing cases). By their own admission, however, the settlement administrator only followed up twice with Schwab between October and December. *Id.*

8. In every case where I have received notice of a pending securities class action or shareholder derivative settlement, Schwab has taken several weeks to provide a list of names, resulting in notice shortly before or even after the objection deadline. *E.g., Robert F. Booth Trust v. Crowley*, No. 09 C 5314 (N.D. Ill. Jul. 9, 2010) (continuing fairness hearing and permitting new briefing in response to my objection to late notice filed after objection deadline) (attached as Exhibit 16).

9. In every case where I have represented a shareholder objecting to a class-action or shareholder derivative settlement, I have seen other shareholders who hold stock through brokers be provided late notice. *E.g., In re Johnson & Johnson Shareholder Deriv. Lit.*, No. 10-cv-2033 (D.N.J. Sep. 25, 2012) (continuing fairness hearing and permitting new briefing in response to objections to late notice filed after objection deadline) (attached as Exhibit 17).

10. Class counsel and defense counsel are experienced securities litigators that have settled other securities class actions; the settlement administrator Garden City Group is a richly compensated settlement administrator that has experience providing notice to dozens of securities

class actions. The parties and the settlement administrator thus knew or should have known that waiting until October to ask brokers to provide a list of shareholders would mean that many shareholders would not receive notice in time to meaningfully object by December 21.

11.     We can thus infer that the parties and the settlement administrator intended the predictable consequences of their actions: class members would receive late individualized notice.

12.     On information and belief, Charles Schwab is actually better than the average broker about responding to requests from settlement administrators to provide a list of shareholders; many other shareholders will receive notice after I will, and perhaps after December 21.

13.     In my correspondence with class counsel and defense counsel, counsel does not deny that it and Garden City Group had this knowledge. To the extent that the parties or the Garden City Group seek to claim otherwise, I reserve the right to conduct discovery on their prior settlement notice experience.

## Class Members Are Being Deterred From Objecting

14.     Until December 17, 2012, the settlement website omitted important information, such as the fee petition and supporting papers. On December 14, 2012, I contacted the toll-free number on my notice to attempt to ask if I could obtain a copy of the fee petition. In response, the claims administrator who answered the phone, who identified herself only as "Mona," told me that information about the fee request was not on the website because it was "not part of the settlement." To the best of my recollection, Mona also tried to tell me that I could not object to the fee request for the same reason. While my experience with class action settlements meant that I was not misled by Mona's assertions, there is no telling how many class members unfamiliar with Rule 23 procedures have contacted the settlement administrator and were affirmatively misled, and never checked the website again.

15.     I also asked Mona about the scope of the release on pages 6 and 7 of the eight-page claim form. She informed me that the release meant that if I filed a claim form, I could not object to the settlement. I would like to file a claim form for my share of the settlement proceeds, but have

not yet done so so that I can bring these matters to the attention of the Court. Class counsel has since claimed that the release will not preclude me from objecting to or appealing an approval of an excessive fee request, but I wish for this to be stated on the record at a fairness hearing before I file a claim form.

## My Objection Is Prejudiced by the Late Notice

16.     On December 16, 2012, I emailed the eight attorneys listed on the class notice, noted the lateness of the notice I received, and asked for a stipulation to extend the deadline for objections. A true and correct copy of this email is attached as Exhibit 4. Class counsel refused. A true and correct copy of a December 17, 2012, letter from Ira Press refusing to do so is attached as Exhibit 14.

17.     I therefore object to the late notice, which has prejudiced me.

18.     I attach the remainder of the correspondence so that there is no question that class counsel has refused to answer reasonable questions, provide a reasonable extension, or provide a reasonable explanation for why they did not adequately plan for the logistics of providing the individualized notice that the Second Circuit requires. A true and correct copy of an email I sent on December 18, 2012 (minus attachments that are already attached to this declaration), is attached as Exhibit 15. A true and correct copy of an email sent to me by Ira Press on December 18, 2012, is attached as Exhibit 18. A true and correct copy of a second email I sent to Ira Press on December 18, 2012, is attached as Exhibit 19. As of the early morning of December 20, 2012, class counsel has not responded to this last communication.

19.     I would have liked to retain an expert witness to testify about the reasonableness of the fee request. Each of the law professors I contacted responded that they could not turn around an expert report in three business days.

20.     I have not had time to fully scrutinize the reports of Professors Coffee and Miller, but in the small fraction I did analyze, I found multiple omissions and false premises and errors. I would have been able to make a more full rebuttal had I been given reasonable notice. I requested

the opportunity to depose Professors Coffee and Miller. *See* Exhibit 4. Class counsel refused. I have been prejudiced by the inability to use deposition testimony to impeach the expert reports of Professors Coffee and Miller before the objection deadline. I will be unfairly prejudiced if the Court grants any weight to these expert reports.

21. Preliminary investigations into the lodestar request suggest that Kirby McInerney is claiming millions of dollars of lodestar for temporary attorneys who were not employed by Kirby McInerney, but provided by a third-party document review agency as contract attorneys. Class counsel has failed to respond to my three requests for this information. *See* Exhibits 4, 15, and 19. Had I more time to develop my objection, I could have conducted discovery and investigation to determine the extent to which the lodestar request has been exaggerated. I have been prejudiced by the lack of time to conduct such discovery or investigation.

22. Had I had reasonable time to draft an objection, I would have been able to present declarations from credible witnesses that, in the last few years, the overwhelming majority of paying clients refuse to pay upcharges for temporary contract attorneys doing first-tier document review and that law firms bill paying clients such work at cost or even below cost. (While I have approached several attorneys who have such personal knowledge, all either have conflicts that preclude them from testifying or fear retaliation from clients or the trial bar; the shortness of time to draft an objection and supporting information, combined with the holiday season, has precluded me from expanding my search.) If the Court chooses not to credit and adopt my expert testimony on the subject, I will have been prejudiced by the lack of time to procure such declarations. I reserve the right to supplement the record with declarations from such witnesses. I reserve the right to conduct discovery on Citigroup to determine what they paid for first-tier document review in this case and to supplement the record with declarations from such witnesses.

23. I have been prejudiced by the late notice because I have not had time to investigate the fee petitions of the other firms in the case, which may contain similar exaggerations. Given that the Kirby McInerney fee petition contains major exaggerations, it is likely that scrutiny of the

expense documentation would be similarly interesting, but I have not been able to give the petition that scrutiny, and my objection has been prejudiced as a result.

24.     Class counsel has claimed an entitlement to a 1.89 multiplier because of the "risk" of bringing the class action. I would have like to have investigated through discovery or public court records the degree to which Kirby McInerney is actually at risk of not recovering a multiplier of its lodestar, but have not had time to do so. I have been prejudiced by the lack of time to conduct such an investigation to develop additional facts in support of my objection to the multiplier.

25.     The settlement contains an extraordinary release waiving claims against class counsel, who has not provided any consideration for the release. I do not recall ever seeing such a broad release in a settlement I have participated in or objected to. This seems objectionable to me and a breach of fiduciary duty, but because of the late notice, I have not had time to research the question. I have been prejudiced by not being able to raise what may be a potentially meritorious issue by the objection deadline.

### There Is Evidence of Contract Attorneys Being Billed as Kirby McInerney Associates

26.     Despite the late notice and class counsel's refusal to provide information about this subject, I have been able to uncover a great deal of evidence that class counsel has misled the Court in its fee petition by representing that temporary contract attorneys doing low-skill work are actually full-fledged attorneys doing highly-skilled legal work for Kirby McInerney.

27.     In paragraph 141 of the joint declaration of Ira M. Press and Peter S. Linden (Docket No. 171), they write that Exhibit E (Docket No. 171-5) "is a firm resume for Lead Counsel and Lead Counsel's lodestar report that sets forth the identity and level of each Lead Counsel attorney and paraprofessional who worked on this litigation, their current billing rates, year of graduation from law school, and the number of hours each devoted to this litigation." But many of the names listed do not have resumes associated with them, and do not appear to be now or ever have been "Lead Counsel attorneys." Rather, online resumes for attorneys with the names of people listed in Exhibit E indicate that they are temporary contract attorneys.

28.     For example, class counsel is requesting $550/hour (or over $1000/hour after a 1.89 multiplier) for the work of Kumudini Uswatte-Aratchi, but attach no resume for her. According to the New York State Unified Court System, Kumudini Uswatte-Aratchi works for Access Staffing in New York, NY, a contract-attorney staffing firm. A true and correct copy of a printout of the NY State Unified Court System web page for Ms. Uswatte-Aratchi as it existed on December 16 is attached as Exhibit 5.

29.     Class counsel attributes a lodestar of $235,875.00 to the work of India Autry, and are thus requesting over $445,000 for her work. Ms. Autry's public LinkedIn page describes her as an "attorney, personal shopper, actress, and commercial model," with her current position as a "lipstick & style counselor." A true and correct copy of the first page of a printout of the first page of that LinkedIn webpage is attached as Exhibit 6. A webpage for the "Law Office of India K. Autry" does not mention Kirby McInerney and only mentions performing "freelance attorney services." A true and correct copy of the first page of a printout of that webpage as it existed on December 16 is attached as Exhibit 7.

30.     There is no firm resume for Michael Balducci, for whom class counsel attributes a lodestar of $1,715,862.50, and is thus seeking over $3.1 million dollars for his work at a rate of over $1000/hour. According to Mr. Balducci's Avvo profile, he was a real estate attorney with Stroock Stroock & Lavan; it does not list any experience with Kirby McInerney. This fact, combined with the fact that the NY State Unified Court System does not list a current employer for Mr. Balducci, strongly suggests that he was working for Kirby McInerney only as a temporary contract attorney. A true and correct copy of the printout of Mr. Balducci's Avvo webpage as it existed on December 16 is attached as Exhibit 8.

31.     Class counsel states that Nelson De La Cruz graduated in 1998, attributes a lodestar of $558,562.50 to him, and are thus seeking over $1 million for his work at a rate of nearly $900/hour. There is no firm resume presented for him. The only Nelson De La Cruz licensed to practice in New York state graduated Pace University Law School in 2009, according to the New York State Unified Court System. A true and correct copy of a printout of the NY State Unified

Court System web page for Mr. De La Cruz as it existed on December 16 is attached as Exhibit 9. On information and belief, Mr. De La Cruz worked as a contract attorney.

32. Class counsel attributes $1,438,387.50 of lodestar to Eileen Dimitry, and are thus seeking over $2.7 million at over $1000/hour for her work. No firm resume is presented for Ms. Dimitry. Ms. Dimitry's public LinkedIn page describes her as a contract attorney at Hudson. A true and correct copy of the first page of a printout of that LinkedIn page as it existed on December 17 is attached as Exhibit 10.

33. Class counsel attributes $764,393.75 of lodestar to Riley Fenner, and are thus seeking over $1.4 million at over $900/hour for his work. Mr. Fenner's public LinkedIn page describes him as a contract attorney at Hudson Legal. A true and correct copy of the first page of a printout of that LinkedIn page as it existed on December 16 is attached as Exhibit 11.

34. Hudson Legal, an arm of the publicly traded Hudson Global, Inc., describes itself as "a global full-service discovery firm offering end-to-end e-Discovery solutions and managed review services."

35. There are clearly many more such examples of undisclosed contract attorneys, but because I have been prejudiced by the late notice of the class action settlement, and because class counsel has refused to voluntarily provide this information to me, I have not had time to fully research the extent of the failure to disclose. On information and belief, however, the overwhelming majority of "other attorneys" listed in Exhibit E are contract attorneys.

**The Economics of and Appropriate Lodestar for Document Review**

36. I have specialized knowledge and experience in the area of law-firm billing practices and economics, and ask the court to recognize me as an expert in this area.

37. I graduated law school in 1994, and clerked for a federal judge for a year. I worked with large law firms mostly on behalf of corporate clients from 1995 to 2005. From 2005 to 2009, I was a fellow with the American Enterprise Institute and the first head of the AEI Legal Center for the Public Interest; from 2010 to the present, I have been an adjunct fellow with the Manhattan

Institute Center for Legal Policy. Both of these latter jobs involved the study of public policy with respect to the civil justice system. I have consulted with four presidential campaigns about civil justice policy at their request.

38.     In the course of these jobs, I became familiar with the expenses of litigation; supervised teams of associates, contract, and staff attorneys engaged in document discovery; engaged in conversations with general counsels of Fortune 500 companies and "BigLaw" firm litigation partners about billing practices, changes in the field of civil litigation, and changes in the relationship between law firms and clients; spoken on panels about discovery issues, class actions, and class action fee requests; and have testified before a congressional House Subcommittee about the expenses of securities litigation. The National Association of Legal Fee Analysis Attorney Fee Practice Group, a 501(c)(6) association that holds itself out as a "practice group of qualified attorney fee experts, fee dispute arbitrators, and legal bill auditors," has repeatedly invited me to join. A true and correct copy of one such invitation is attached as Exhibit 13. (I have not accepted the invitation, because I already have more opportunities for legal work than I have time to handle.) Class counsel's correspondence to me explicitly acknowledges my "experience in this area (through your work with the American Enterprise Institute and the Center for Class Action Fairness)". *See* Exhibit 14 at 1.

39.     Class counsel asks the court to assign a lodestar rates between $350/hour and $550/hour for work done by contract attorneys doing first-tier document review of forty million documents. In my opinion, based on my experience in this area, my conversations with law firm partners and in-house counsel, and my review of the literature (discussed below), a proper lodestar rate for such work, consistent with the market rate paid by paying clients doing this volume of work, is between $50 and $65/hour. Neither Professor Coffee's nor Professor Miller's expert reports offers an opinion on this issue.

40.     In the early and mid-1990s, it was common for law firms to assign document review to junior attorneys and bill this work to clients. When I was a junior associate, one litigation partner gave a talk to junior attorneys and emphasized that it was important for attorneys on a team to "touch every document." But such attorneys were being paid $70,000 to $100,000 a year, and the

rates charged to clients for such work were substantially lower than they are now. I was one of the attorneys who prepared *in camera* briefing and exhibits requesting an award of attorneys' fees in the Fourth Circuit case of *In re General Motors Corp.*, 110 F.3d 1003 (1997). Associates from two leading defense law firms, including myself, were billed at rates of $140/hour to $195/hour. (I do not recall which, if any, were the time entries for my work in that case.)

41.     In the late 1990s, the Internet started to change things in two ways. First, the increasing use of email meant that the volume of document discovery multiplied dramatically. Second, competition from startup Internet companies and the law firms that serviced them for legal talent resulted in a dramatic increase in salaries at the large law firms that most corporate clients used: starting salaries (including lockstep bonuses) at top firms nearly doubled from $80,000 to $145,000 by 2000. Law firms increased their billing rates in response, as well as their demands on time by associates.

42.     By the 2000s, both junior associates and law-firm corporate clients balked at the increased burdens of document discovery. Attorneys from top law schools found the work demoralizing and an impediment to career advancement; corporate clients did not want to pay the top-dollar associate rates of $250/hour to $350/hour for document review. Moreover, many young attorneys did not want to work the 60-hour weeks that law-firm billing requirements necessitated. Furthermore, it was physically impossible for an attorney to "touch every document"; attorneys had to rely upon first-tier review to identify a substantially smaller subset of second-tier documents for substantive scrutiny by higher-ranking attorneys.

43.     The solution to these problems at many firms was to create a caste of non-partnership-track "staff attorneys," who would be assigned the less intellectually demanding first-tier document-review work in exchange for a more regular schedule and lower pay. Even senior staff attorneys with ten years of legal experience were paid salaries of around $65,000, and billed to clients at lower rates around $150/hour, usually less than for top paralegals. *See generally, e.g., Young v. Covington & Burling, LLP*, 689 F. Supp. 2d 69, 73-74 (D.D.C. 2010).

44.     As law firm associate salaries and billing rates increased throughout the 2000s, corporate clients increasingly refused to allow law firms to use associates and associate billing rates for document discovery. More document-discovery work was shifted from partnership-track associates to staff attorneys and temporary contract attorneys.

45.     To accommodate fluctuations in demand, much document discovery work was outsourced to temporary contract attorneys provided by third-party vendors. The contract attorneys are paid about $35/hour, while the vendors bill about $50 to $65/hour. *See, e.g.,* Lester Brickman, *Lawyer Barons* 378-87 (Cambridge U. Press 2011); *id.* at 501-06; Arin Greenwood, "Attorney at Blah," *Washington City Paper* (November 8, 2007); David A. Steiger, "The rise of global legal sourcing," 19 *ABA Business Law Today* No. 2 (Nov./Dec. 2009). It is my understanding that the New York market in 2012 pays slightly more, approximately $40 to $45/hour. But this is just for subjective coding; objective coding did not require an attorney, and paid half as much, even in New York, even when performed by attorneys.

46.     Ethics requirements required that law firms disclose to clients when work was being delegated to third parties, and limited the degree to which law firms could treat this outsourced work as a profit center. The ABA Standing Committee on Ethics ruled that "In the absence of an agreement with the client authorizing a greater charge, the lawyer may bill the client only its actual cost plus a reasonable allocation of associated overhead, such as the amount the lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract." Furthermore, "The analysis is no different for other outsourced legal services, except that the overhead costs associated with the provision of such services may be minimal or nonexistent if and to the extent that the outsourced work is performed off-site without the need for infrastructural support. If that is true, the outsourced services should be billed at cost, plus a reasonable allocation of the cost of supervising those services if not otherwise covered by the fees being charged for legal services." A true and correct copy of ABA Formal Opinion 08-451 is attached as Exhibit 12.

47.     With the Great Recession of 2008, and with the increased use of smartphones and larger and larger e-discovery requirements, even these discounted rates proved to be too expensive

for corporate clients. Many corporate clients required law firms to bill temporary document review as a pass-through cost, or hired the third-party vendors directly; and even there, they negotiate volume discounts and rebates. *See, e.g.*, Gina Passarella, "New Hiring System Keeps Contract Attorneys Away From Law Firms," *Legal Intelligencer* (Jul. 12, 2010) (quoting, *inter alia*, "Penny Burke, director of business development for Hudson Legal's Pittsburgh office" about off-site document review billed directly to corporate clients). In the words of Aon Chief Counsel of Litigation and author Mark Herrmann, "Document review, which was historically an important profit center for large law firms, has moved permanently into the hands of third-party vendors." "Inside Straight: Why Vendors Win The Document Review Work," *Above the Law* (Aug. 25, 2011).

48.     Still other corporate clients put even tighter constraints. For example, one Fortune 500 company's retention agreements with big law firms defending it in class actions and mass tort cases permitted those law firms to do first-tier document review however it wished—but the client would only pay a flat rate of $50/hour for such review.

49.     Thus, first-tier review in document discovery is no longer a profit center for law firms. The market rate for first-tier document review is *not* the same market rate for a real-estate attorney with twelve years of experience. No paying client would tolerate paying $350/hour, much less $550/hour, much less $1039.50/hour, for first-tier document review; third-party vendors can do first-tier document review more efficiently, cheaper, and with a substantially lower error rate. *See* Herrmann, *supra*; Steiger, *supra*. Plaintiffs claim they reviewed forty million documents. In this litigation, Citigroup surely engaged in a more comprehensive review of even more documents, given the need to withhold nonresponsive and privileged documents from discovery. Yet it is improbable that Citigroup paid as much as $100/hour for document review; the likely rate Citigroup paid will be closer to $50 to $65/hour.

50.     If the document review was performed offsite, the only overhead Kirby McInerney faced was the expense of supervisory attorney time—which is already reflected in the billing rates of the associates who supervised the contract attorneys.

51. Even if the first-tier document review was performed onsite or by actual Kirby McInerney attorneys, the class should not face a lodestar twice as much—much less eleven to seventeen times as much—as what the typical market rate paying clients insist upon for work of similar or (in the case of Citigroup's concurrent document review) identical complexity. The exaggeration is even worse if Kirby McInerney was using attorneys to perform "objective coding" that could be performed by a clerical worker for less than $25/hour.

52. There are a number of district court cases that permit class counsel to charge full attorney rates times a multiplier for contract attorneys doing document review. None of these cases consider both ABA Opinion 08-451 and the change in the legal marketplace after the Great Recession; none of these cases considered the factual evidence of what paying clients in the marketplace pay for first-tier document review, or distinguished between the largely administrative task of first-tier document review and the more legally substantive task of document review of pre-screened documents in preparation for depositions or trial.

53. Class counsel's (and the experts') claim that they are only seeking a multiplier of 1.89 is based on the false premise that an unemployed real-estate lawyer doing first-tier securities litigation document review as a temporary contract attorney has a market rate of $550/hour. If that were true, the temporary contract attorneys would not be working as temporary contract attorneys for $35/hour; an employer able to bill them out for $550/hour on the marketplace would offer a substantially higher wage if the temporary contract attorney was exercising a non-fungible skill, rather than relatively low-skilled work that a recent law graduate focusing on her modeling career could do as well as an experienced alumnus of Stroock.

54. In reality, class counsel is seeking a multiplier as high as 20.79 for some of these attorneys—and that is only if I generously assume that class counsel was not "upselling" by using attorneys to perform purely clerical "objective coding." The request violates ABA Opinion 08-451; the misleading nature of the fee-request declaration and the refusal of class counsel to disclose the nature of the arrangements is a breach of its fiduciary duty to the class.

55. If the class representatives failed to negotiate with class counsel a rate for first-tier document review and objective coding a rate similar to that what is paid in the marketplace by paying clients, they are in breach of their fiduciary duties to the class by failing to put the class's interests ahead of their attorneys' interests, and decertification would be appropriate under Rule 23(a)(4).

## Securities Litigation Risk

56. In its 2011 annual report on securities litigation, Cornerstone Research studied all PSLRA cases resolved between 1996 and 2011. The report is available at http://securities.stanford.edu/clearinghouse_research/2011_YIR/Cornerstone_Research_Filings_2 011_YIR.pdf. The sample of 2,415 resolved cases excluded cases involving IPO Allocation, filings over Analysts, and filings against Mutual Funds. The statistics below come from that report.

57. There were 2,415 PSLRA cases resolved between 1996 and 2011. 217 were voluntarily dismissed.

58. Of the remaining 2,198 PSLRA cases, 764 were resolved on a motion to dismiss; 188 were resolved on summary judgment; and 1246 were settled (390 before the motion to dismiss was decided). Thus, of securities complaints brought and not voluntarily dismissed, 56.7% settled. That corresponds to a 1.76 risk multiplier.

59. But the risk calculus changes dramatically once a case survives a motion to dismiss. Of the 1,044 PSLRA cases where a district court denied a motion to dismiss, 856 settled. That is 82.0% of such cases, and corresponds to a 1.22 risk multiplier.

60. This is important, because the vast majority of commitment of legal time is made *after* a motion to dismiss is denied. Before the motion to dismiss, the legal expenses consist of the relatively small pre-complaint investigation, drafting of a complaint, litigation over lead counsel selection, and briefing and arguing the to the motion to dismiss. The much greater expense of reviewing forty million documents (and, more importantly, reviewing the much smaller subset of useful documents), preparing for and taking depositions, and litigating discovery disputes and

motions for summary judgment, comes only after the hurdle of surviving the motion to dismiss, the riskiest part of a PSLRA case.

61.    These statistics actually overstate the risk in this case in two ways.

62.    First, the statistics are artificially biased because they include cases filed in 2010 and 2011 and quickly dismissed. Most of those pending cases—not included in the statistics because they are not yet resolved—will eventually settle. The longer a case lasts, the more likely it is to settle.

63.    Second, Second Circuit law is relatively favorable for PSLRA cases. While 82.0% of cases nationwide settle after a motion to dismiss is denied, 169 out of 202 cases in the Second Circuit (or 83.7%) settled after a motion to dismiss is denied. That corresponds to a risk multiplier of 1.195.

64.    Even using the riskier nationwide numbers, if we conservatively assume that law firms spend five times as many hours on cases where motions to dismiss have already been denied than on cases that did not make it past the dismissal stage (the ratio is in fact substantially larger), a law firm that received a 1.89 multiplier in every case that it settled would average substantially above 1. See Table 1 below:

### Table 1

| Category | % of cases | % of hours | Multiplier |
|---|---|---|---|
| Settled before ruling on motion to dismiss | 17.7% | 6.1% | 1.89 |
| Dismissed on 12(b)(6) | 34.8% | 12.0% | 0 |
| Settled after motion to dismiss | 38.9% | 67.2% | 1.89 |
| Dismissed on summary judgment | 8.6% | 14.7% | 0 |
| **TOTAL** | 100% | 100% | 1.38 |

65.    If class counsel disputes these figures, they should be required to disclose their billing records for class actions resolved over the last five years, breaking out the hours spent before and after resolution of the motion to dismiss and breaking out the hours billed on first-tier document review. I am quite confident that they demonstrate an average hourly multiplier

substantially greater than one, even including the cases lost without any recovery. It is likely higher than the 1.38 I conservatively estimate here—especially given that the multipliers realized are artificially deflated by the artificial inflation of contract-attorney billing rates in the lodestar calculation.

66.     Class counsel also asserts a multiplier is appropriate to account for the time-value of money, because they will not be paid until years later for hours worked in 2007. But class counsel's lodestar is based on their most recent market rate for billing (and, in the case of attorneys performing first-tier document review, a substantial multiplier of the actual market rates); billing rates have increased faster than inflation. It might be appropriate for there to be a multiplier of Year 2007 lodestar hours billed at the 2007 hourly rate, but to multiply Year 2007 lodestar hours billed at the 2012 hourly rate is double-counting the multiplier.

67.     Thus, a 1.89 multiplier is at least 46% larger than necessary to ensure that a firm has the incentives to engage in securities litigation. A 1.76 multiplier for hours spent before the motion to dismiss is decided and a 1.22 multiplier for hours spent after the motion to dismiss is decided is more than sufficient to incentivize class counsel to engage in securities litigation and ensure that they average lodestar rates, as demonstrated by Table 2 below:

**Table 2**

| Category | % of cases | % of hours | Multiplier |
|---|---|---|---|
| Settled before ruling on motion to dismiss | 17.7% | 6.1% | 1.76 |
| Dismissed on 12(b)(6) | 34.8% | 12.0% | 0 |
| Settled after motion to dismiss – pre-ruling hours | 38.9% | 13.4% | 1.76 |
| Settled after motion to dismiss – post-ruling hours | | 53.7% | 1.22 |
| Dismissed on summary judgment | 8.6% | 14.7% | 0 |
| **TOTAL** | 100% | 100%* | 1.00 |

*totals differ because of rounding

### The Merits of the Litigation

68.     Class counsel's experts assert that, because the maximum damages are $6,300 million, a $590 million settlement—$0.09 on the dollar—is "success," with Professor Coffee identifying in particular the risk of bankruptcy precluding full collection. This seems to be boilerplate unrelated to this particular case rather than a thoughtful opinion.

69.     For example, had Professor Coffee examined the deep-pocket defendant, he would see that Citigroup had a market capitalization of over $110 billion as of the date of his report, and annual after-tax profits in 2010 and 2011 were $10.95 billion and $11.1 billion respectively. This year, it was one of five banks participating in a $25 billion robosigning settlement, yet its stock price has increased 50% from $26.31 to $39.45. There was no risk of defendant bankruptcy here.

70.     Post-financial crisis, post-TARP, and post-Occupy Wall Street, it is hard to imagine a more unpopular defendant than a too-big-to-fail bailed-out bank accused of contributing to the mortgage crisis and Great Recession—especially in a lawsuit involving the complex financial instruments of collateralized debt obligations and residential mortgage-backed securities that were the centerpiece of the financial crisis. A months-long Manhattan jury trial, where the few members of the jury pool most likely to be sympathetic to Citigroup will be able to plead financial hardship because of career obligations, presents particular risks for the defendant. It is hard to imagine skilled prudent defense counsel telling his or her client, no matter how confident he or she is about the merits of the case, that there is a greater than 90% chance of prevailing at a jury trial.

71.     Thus, other financial-crisis cases have resulted in enormous settlements. *In re Bank of America Securities Lit.*, No. 09-MDL-2058 (S.D.N.Y.), which alleges $10 billion to $15 billion in damages from the failure to disclose similar liabilities relating to the merger with Merrill Lynch, with Paul Weiss also acting as defense counsel, is settling for $2.425 billion, or $0.16 to $0.24 on the dollar. *See* Peter Lattman, "Investors' Billion-Dollar Fraud Fighter," *New York Times Dealbook* (Oct. 8, 2012) (quoting both me and defense counsel Brad S. Karp).

72.     The Associated Press reported during the trading day of August 29, 2012, that Citigroup had settled this case for $590 million. Though the S&P 500 and other bank stocks such as

Bank of America declined in the market that day, Citigroup stock increased 2.0% from $29.34 to $29.91, a $1.67 billion increase in market value. The marketplace apparently thought much more about the value of this case than class counsel did.

73.     I am not making an argument that class counsel has settled on the cheap; if class counsel claims that the risks of the case meant that the best settlement possible was nine cents on the dollar, so be it. But a case with a solvent and unpopular defendant that is settling for nine cents on the dollar is a nuisance settlement, even if it is for $590 million. Class counsel is entitled to compensation for the very tangible results they have achieved for the class, but they are not entitled to a windfall fee as if they had fully compensated the class when they agree to a nuisance settlement. If they are that unconfident about the merits of the case, it suggests that there is a real injustice that it was brought at all.

74.     Though class counsel in *Bank of America* recovered four times as much for investors as counsel here, they are requesting only $150 million—again putting the lie to the claim that an 18% fee is required to incentivize class counsel to participate in financial-crisis litigation.

## This Objection Is Brought In Good Faith

75.     I run the non-profit Center for Class Action Fairness. Through this organization, I have objected as an attorney, shareholder, or a class member to many settlements. It has been my experience that many class counsel respond to these objections by calling me a "professional objector," and then attempts to tar me with precedents describing court disapproval of professional objectors.

76.     "Professional objector" is a legal term with a specific definition: a "for-profit objector that attempts to hold up settlements in the hopes of negotiating a *quid pro quo* payment for himself to withdraw his objection or appeal." While many "professional objectors" are accused of bringing bad-faith objections solely to extract extortionate settlements from class counsel by the threat of delay, this is not the business model of the Center for Class Action Fairness, which is funded solely by charitable donations and court-awarded attorneys' fees. Neither the Center nor I

has ever agreed to a *quid pro quo* settlement of an objection. As I bring this objection *pro se*, I would be ineligible for attorneys' fees for my own time in the case.

77.     A non-profit public-interest objector may be "professional" and may be an "objector," but is not a "professional objector" as that term is used in the law. *See* Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litigation Report (Aug. 12, 2011) (distinguishing the Center for Class Action Fairness from "professional objectors"); Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n. 150 (public interest groups are not "professional objectors"). Indeed, I have criticized such "professional objectors" on multiple occasions. Brenda Kearney, "The Deal Breakers: A look at professional class objectors in Maryland," *The Daily Record* (May 23, 2010) (quoting me as an outside expert); Ted Frank, "The problem of self-dealing by class counsel," *Point of Law* (Manhattan Institute Center for Legal Policy, Apr. 17, 2012).

78.     The difference between a "professional objector" and a public-interest objector is a material one. As the federal rules are currently set up, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. *See* "Self-Dealing," *supra*. In contrast, a public-interest objector such as myself has to triage dozens of requests for *pro bono* representation, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a meritless objection.

79.     Such "professional objectors" can file boilerplate objections on short notice because their business model is to bring as many objections as possible. I do not file boilerplate objections; this objection raises arguments that have not previously been made in any of my other cases. One of the ways that I have been prejudiced in the late notice is that my brief in this case is of lower quality than briefs I usually file. I apologize in advance to the Court for any resulting typos or poor phrasing. Further, in order to comply with my Rule 11 obligations (even as a *pro se*), I did not raise certain arguments that were likely to be meritorious, but where I did not have time to fully investigate precedent.

80.     Because I only object to especially bad settlements and attorney-fee requests, I have a good track record of success in cases I bring. *E.g., Robert F. Booth Trust v. Crowley,* 687 F.3d 314 (7th Cir. 2012); *Dewey v. Volkswagen AG,* 681 F.3d 170 (3d Cir. 2012); *Nachshin v. AOL, LLC,* 663 F.3d 1034 (9th Cir. 2011); *In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935 (9th Cir. 2011); *In re Classmates.com Consol. Lit.,* 2012 U.S. Dist. LEXIS 83480 (W.D. Wash. June 15, 2012).

81.     I am not bringing this objection for a personal payout: I wish to win on the merits for the benefit of the shareholder class as a whole. But if this Court has any question whether I am bringing this objection in good faith, I am willing to stipulate to an injunction prohibiting me from settling my objection in exchange for a cash payment.

82.     On information and belief, many class counsel subscribe to a service that proposes arguments to be used against objectors. On information and belief, this service falsely characterizes me as someone who opposes all class actions. (I believe this because the false allegation has been made against me in multiple settlements using identical language.) I believe in the appropriateness of the class action mechanism to aggregate litigation, do not oppose all class actions, and simply oppose the abuse of the class action mechanism to benefit class counsel at the expense of their putative clients and the public at large.

### Request for *Pro Se* ECF Status

83.     I am a member in good standing of the State of California Bar (Cal. SBN 196332) where I was admitted on August 4, 1998; the District of Columbia Bar (BN 450318), where I was admitted on April 1, 1996; and the State of Illinois Bar (Ill. SBN 06224948), where I was admitted on November 10, 1994.

84.     In federal court, I am a member in good standing of the Southern District of California, in which I was admitted August 21, 1998; the Northern District of California, in which I was admitted October 16, 1998; the Central District of California, in which I was admitted May 25, 1999; the District Court of the District of Columbia, where I was admitted July 1, 2002; and the Eastern District of Wisconsin, where I was admitted May 27, 2010.

85.     I am a member in good standing in the United States Court of Appeals for the Ninth Circuit, where I was admitted January 8, 1999; the United States Court of Appeals for the Tenth Circuit, where I was admitted June 1, 1999; the United States Court of Appeals for the Federal Circuit, where I was admitted August 11, 1999; the United States Court of Appeals for the Seventh Circuit, where I was admitted March 1, 2002; the United States Court of Appeals for the Third Circuit, where I was admitted May 5, 2010; the United States Court of Appeals for the D.C. Circuit, where I was admitted August 31, 2011; the United States Court of Appeals for the Second Circuit, where I was admitted September 9, 2011; and the United States Court of Appeals for the Sixth Circuit, where I was admitted October 6, 2011.

86.     These are every court of which I am a member of the bar. No disciplinary proceedings are pending against me in any jurisdiction and no discipline has previously been imposed on me in any jurisdiction.

87.     I am familiar with ECF procedures, and request an order permitting me to request an ECF *pro se* password so that I may electronically file any future documents for the convenience of the parties and the Court.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 20, 2012, in Fairfax, Virginia.

Theodore H. Frank

# Exhibit 1


by Google

## Schwab eConfirms account ending in 882

**Schwab Alerts** <SchwabAlerts.AccountActivity@schwab.com>      Fri, Jan 11, 2008 at 2:44 AM
Reply-To: "Charles Schwab & Co., Inc." <online.service@schwab.com>
To: TFRANK@gmail.com

Charles Schwab & Co., Inc.
Email Alert

eConfirms

View Your Trade Confirmations Online - Visit eDocuments at http://www.schwab.com/eDocuments

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The following email(s) contain your trade confirmation
for 1/10/2008

Account ending in 882
================================================================
Security Description: CIRCUIT CITY STORES INC-
             CIRCUIT CITY GROUP

| | | | |
|---|---|---|---|
| Action: | BOUGHT | Security No./CUSIP: | 172737-10-8 |
| Symbol: | CC | Trade Date: | 1/10/08 |
| Type: | Margin | Settle Date: | 1/15/08 |

================================================================

| | | | |
|---|---|---|---|
| Quantity: | 1,000 | Commission: | $9.95 |
| Price: | $4.01 | | |
| Principal: | $4,010.00 | Total Amount: | $4,019.95 |

Additional Information For The Above Trade(s)

- Unless you have already instructed us differently, we will: hold this security in your account.
- Executed Over The Counter
- Unsolicited trade
- Capacity code A

###

Account ending in 882
================================================================
Security Description: CITIGROUP INC

| | | | |
|---|---|---|---|
| Action: | BOUGHT | Security No./CUSIP: | 172967-10-1 |
| Symbol: | C | Trade Date: | 1/10/08 |
| Type: | Margin | Settle Date: | 1/15/08 |

=================================================================

| | | | |
|---|---|---|---|
| Quantity: | 500 | Commission: | $9.95 |
| Price: | $27.94 | | |
| Principal: | $13,970.00 | Total Amount: | $13,979.95 |

Additional Information For The Above Trade(s)

- Unless you have already instructed us differently, we will: hold this security in your account.
- Executed Over The Counter
- Unsolicited trade
- Capacity code A

###

Account ending in 882
=================================================================
Security Description: HOME DEPOT INC

| | | | |
|---|---|---|---|
| Action: | BOUGHT | Security No./CUSIP: | 437076-10-2 |
| Symbol: | HD | Trade Date: | 1/10/08 |
| Type: | Margin | Settle Date: | 1/15/08 |

=================================================================

| | | | |
|---|---|---|---|
| Quantity: | 500 | Commission: | $9.95 |
| Price: | $25.156 | | |
| Principal: | $12,578.00 | Total Amount: | $12,587.95 |

Additional Information For The Above Trade(s)

- Unless you have already instructed us differently, we will: hold this security in your account.
- Executed Over The Counter
- Unsolicited trade
- Capacity code A

###

Account ending in 882
=================================================================
Security Description: TECUMSEH PRODUCTS CL A

| | | | |
|---|---|---|---|
| Action: | BOUGHT | Security No./CUSIP: | 878895-20-0 |
| Symbol: | TECUA | Trade Date: | 1/10/08 |
| Type: | Margin | Settle Date: | 1/15/08 |

=================================================================

| | | | |
|---|---|---|---|
| Quantity: | 100 | Commission: | $1.00 |
| Price: | $22.63 | | |
| Principal: | $2,263.00 | Total Amount: | $2,264.00 |
| Quantity: | 300 | Commission: | $2.99 |

| | | | |
|---|---|---|---|
| Price: | $22.60 | | |
| Principal: | $6,780.00 | Total Amount: | $6,782.99 |

| | | | |
|---|---|---|---|
| Quantity: | 500 | Commission: | $4.96 |
| Price: | $22.60 | | |
| Principal: | $11,300.00 | Total Amount: | $11,304.96 |

| | | | |
|---|---|---|---|
| Quantity: | 100 | Commission: | $1.00 |
| Price: | $22.59 | | |
| Principal: | $2,259.00 | Total Amount: | $2,260.00 |

Totals For Above

| | | | |
|---|---|---|---|
| Quantity: | 1,000 | Total Charges and/or Interest: | $9.95 |
| Principal: | $22,602.00 | Grand Total: | $22,611.95 |

Additional Information For The Above Trade(s)

- Unless you have already instructed us differently, we will: hold this security in your account.
- Executed Over The Counter
- Unsolicited trade
- Capacity code A

###

To view, print, or download the terms and conditions
of your transaction, please click on the following or go to the
web page:

http://pce.schwab.com/public/schwab/non_navigable/marketing/email/econfirms/trade_confirmations_sa.html

We've improved eConfirms. We now provide electronic versions of Certificate of Deposit (CD) disclosures and
Exchange Traded Funds (ETF) prospectus when required with your eConfirms.

If you no longer wish to receive eConfirms, you can unsubscribe by logging in to www.Schwab.com then go to
Brokerage Accounts, select eDocuments, and click on Delivery Preferences.
You may contact a Client Services team member at 1-800-435-4000. For Schwab Institutional clients, please
contact your Investment Advisor or Alliance Service team at 1-800-515-2157.

You may request duplicate paper confirmations by contacting
Schwab at 1-800-435-4000.

Capacity Code Descriptions for Above Trade(s)

A:          Schwab acted as your agent.

Charles Schwab & Co., Inc.
Headquarters: The Schwab Building

101 Montgomery Street, San Francisco, CA  94104

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thank you for investing with Charles Schwab.

To read about Schwab's privacy policy go to http://www.schwab.com/privacy

To unsubscribe from eConfirms or modify your Email Alert
customization options, log in using the link below or copy and
paste it into your browser's address window and and select Paperless Services:

https://investing.schwab.com/trading/start?SANC=EAMyAlerts

_____

Notice: All email sent to or from the Charles Schwab corporate
email system may be retained, monitored and/or reviewed by
Schwab personnel. (2006-5952)

(c) 2008 Charles Schwab & Co., Inc.  All rights reserved.
Member SIPC.

# Exhibit 2



## Schwab eConfirms account ending in 882

**Schwab Alerts** <SchwabAlerts.AccountActivity@schwab.com>      Tue, Apr 22, 2008 at 3:13 AM
Reply-To: "Charles Schwab & Co., Inc." <online.service@schwab.com>
To: TFRANK@gmail.com

Charles Schwab & Co., Inc.
Email Alert

eConfirms

View Your Trade Confirmations Online - Visit eDocuments at http://www.schwab.com/eDocuments

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The following email(s) contain your trade confirmation
for 4/21/2008

Account ending in 882
==============================================================
Security Description: CITIGROUP INC

| Action: | SOLD | Security No./CUSIP: | 172967-10-1 |
|---|---|---|---|
| Symbol: | C | Trade Date: | 4/21/08 |
| Type: | Margin | Settle Date: | 4/24/08 |

==============================================================

| Quantity: | 300 | Exch Proc Fee**: | $.05 |
|---|---|---|---|
| Price: | $24.791 | Commission: | $5.37 |
| Principal: | $7,437.30 | Total Amount: | $7,431.88 |

| Quantity: | 200 | Exch Proc Fee**: | $.03 |
|---|---|---|---|
| Price: | $24.79 | Commission: | $3.58 |
| Principal: | $4,958.00 | Total Amount: | $4,954.39 |

Totals For Above

| Quantity: | 500 | Total Charges and/or Interest: | $9.03 |
|---|---|---|---|
| Principal: | $12,395.30 | Grand Total: | $12,386.27 |

Additional Information For The Above Trade(s)

- Unless you have already instructed us differently, we will: hold proceeds in account pending further instructions.
- Executed Over The Counter
- Unsolicited trade
- ** Exch Proc Fee: This fee offsets processing costs incurred by Schwab for the exchange of securities -

including those relating to assessments on broker-dealers by an exchange or other SRO - for equity, option, or other covered security sell transactions.

- Capacity code A

###

Account ending in 882

=================================================================
Security Description: LEGG MASON INC

| Action: | BOUGHT Security No./CUSIP: 524901-10-5 |
|---|---|
| Symbol: | LM Trade Date: 4/21/08 |
| Type: | Margin Settle Date: 4/24/08 |

=================================================================

| Quantity: | 25 Commission: | $1.79 |
|---|---|---|
| Price: | $58.47 | |
| Principal: | $1,461.75 Total Amount: | $1,463.54 |

| Quantity: | 100 Commission: | $7.16 |
|---|---|---|
| Price: | $58.47 | |
| Principal: | $5,847.00 Total Amount: | $5,854.16 |

Totals For Above

| Quantity: | 125 Total Charges and/or Interest: | $8.95 |
|---|---|---|
| Principal: | $7,308.75 Grand Total: $7,317.70 | |

Additional Information For The Above Trade(s)

- Unless you have already instructed us differently, we will: hold this security in your account.
- Executed Over The Counter
- Unsolicited trade
- Capacity code A

###

To view, print, or download the terms and conditions
of your transaction, please click on the following or go to the
web page:

http://pce.schwab.com/public/schwab/non_navigable/marketing/email/econfirms/trade_confirmations_sa.html

If you no longer wish to receive eConfirms, you can unsubscribe by logging in to www.Schwab.com then go to Brokerage Accounts, select eDocuments, and click on Delivery Preferences.
You may contact a Client Services team member at 1-800-435-4000. For Schwab Institutional clients, please contact your Investment Advisor or Alliance Service team at 1-800-515-2157.

You may request duplicate paper confirmations by contacting

Schwab at 1-800-435-4000.


Capacity Code Descriptions for Above Trade(s)

A:          Schwab acted as your agent.

Charles Schwab & Co., Inc.
Headquarters: The Schwab Building
101 Montgomery Street, San Francisco, CA  94104


*****************************************************************

Thank you for investing with Charles Schwab.

To read about Schwab's privacy policy go to http://www.schwab.com/privacy

To unsubscribe from eConfirms or modify your Email Alert
customization options, log in using the link below or copy and
paste it into your browser's address window and and select Paperless Services:

https://investing.schwab.com/trading/start?SANC=EAMyAlerts


————————————————————————————————

Notice: All email sent to or from the Charles Schwab corporate
email system may be retained, monitored and/or reviewed by
Schwab personnel. (2006-5952)

(c) 2008 Charles Schwab & Co., Inc.  All rights reserved.
Member SIPC.

# Exhibit 3



# CITIGROUP INC. Annual Meeting

**CHARLES SCHWAB & CO., INC.** <id@proxyvote.com>          Wed, Mar 19, 2008 at 5:02 AM
Reply-To: "Charles Schwab & Co., Inc." <registrar@proxyvote.com>
To: TFRANK@gmail.com

CHARLES SCHWAB & CO., INC.
Email Alert

Electronic Delivery

========================================================================

You have elected to receive shareholder communications and
submit voting instructions via the Internet. This email
notification contains information specific to your holding in
the security identified below with CHARLES SCHWAB & CO., INC.
Please read the instructions carefully before proceeding.

Important Notice Regarding the Availability of Proxy Materials
for the Shareholder Meeting

2008 CITIGROUP INC. Annual Meeting  of Stockholders
MEETING DATE: April 22, 2008
For Holders as of: February 25, 2008

CUSIP NUMBER: 172967101

ACCOUNT NUMBER: #####882

You can enter your voting instructions and view the
shareholder material at the following Web site:

https://www.proxyvote.com/0828515376453

Note: If your email software supports it, just click on the link above.
If that does not work, copy and paste the entire link into the Address
box on your Internet browser.

Internet voting is accepted up to 11:59 p.m. (ET) the day before
the meeting/cut off date.

If the documents are in a PDF format, you'll need the Adobe
Acrobat Reader. If you don't have Adobe Acrobat Reader, you
can download it from the address below:

http://www.adobe.com/products/acrobat/readstep2.html

The relevant supporting documentation can also be found at the

NaN

following Internet site(s):

Proxy Statement
http://www.citigroup.com/citigroup/corporategovernance/ar.htm

Annual Report
http://www.citigroup.com/citigroup/corporategovernance/ar.htm

Thank you for investing with Charles Schwab & Co., Inc.

_____

To unsubscribe or modify your Email Alert customization options, log in
using the link below or copy and paste it into your browser's adddress
window:

https://investing.schwab.com/trading/start?SANC=EAMyAlerts

_____

There are no charges for this service. There may be costs associated with
electronic access, such as usage charges from Internet access providers
and telephone companies, which must be borne by the stockholder.

Please do not reply to this email - it is automatically generated and will
not be delivered to a valid Schwab address. For inquiries about your
subscription to this service or other questions, please email
webtrading@schwab.com or call 1-800-435-4000.

Please REPLY to this email with any comments or questions about
ProxyVote.com (Include the original text and Subject Line of this
message for identification purposes). Please do not send an email
to id@proxyvote.

(c)2007 Charles Schwab & Co., Inc. All right reserved.
Member SIPC(2003-7160)

Distribution by Broadridge Financial Solutions, Inc.

# Exhibit 4

 GMail
by Google

Ted Frank <tfrank@gmail.com>

---

## In re Citigroup Inc. Securities Litigation, No. 07 Civ. 9901 (S.D.N.Y.)

**Ted Frank** <tfrank@gmail.com>                                      Sun, Dec 16, 2012 at 3:41 PM
To: "Peter S. Linden (Citigroup class counsel)" <plinden@kmllp.com>, "Ira M. Press (Citigroup class counsel)"
<ipress@kmllp.com>, "Andrew McNeela (Citigroup class counsel)" <amcneela@kmllp.com>, "Brad S. Karp
(Citigroup defense counsel)" <bkarp@paulweiss.com>, "Richard A. Rosen (Citigroup defense counsel)"
<rrosen@paulweiss.com>, "Susanna M. Buergel (Citigroup defense counsel)" <sbuergel@paulweiss.com>, "Jane B.
O'Brien (Citigroup defense counsel)" <jobrien@paulweiss.com>, "Asad Kudiya (Citigroup defense counsel)"
<akudiya@paulweiss.com>
Cc: Melissa Holyoak <melissaholyoak@gmail.com>, Adam Schulman <shuyande24@gmail.com>

Colleagues,

I am a member of the class and intend to object.

I received mailed notice (Claim Number 02963988 and Control Number 0761320731) on
December 12, 2012, and was able to confirm my class membership on December 14, 2012, after
reviewing my tax records. The logistics of the December 21, 2012 deadline combined with
existing obligations to clients (a) effectively require me to complete any written objections by
December 20, 2012; and (b) preclude me from finding SDNY-admitted counsel or an attorney-
fee expert witness on such short notice during the holiday season. Previously, Citigroup was able
to send me electronic notice of shareholder meetings and proxy votes 33 days in advance. I am
forced to conclude that the timing of the mailing was designed to deter objections.

Please advise before close of business December 17, 2012, if you will be willing to stipulate to an
extension of the objection deadline to January 14, 2012 (33 days after December 12).

I would also like to depose Professors Coffee and Miller about their expert reports, preferably on
the same day in half-day depositions sufficiently in advance of the fairness hearing. Please advise
when this might happen.

The fee application identifies millions of dollars of lodestar attributed to Kirby McInerney
attorneys who do not appear to ever have been with Kirby McInerney. A check of several of
their resumes online suggests that they are contract attorneys who work solely on temporary
jobs doing document review. Please identify which of the "Other Attorneys" were attorneys
directly employed by Kirby McInerney, and which were independent contractors employed by
third parties, and who those third parties are.

Neither the notice nor the motion for preliminary approval nor the Layn Phillips Declaration
provides any substantive information about *Brecher*. If there is something in the docket of *this*

case that quantifies the value of the *Brecher* claims, I am happy to consider it.

I note that when I called the Garden City Group on December 14, 2012, to ask for a copy of the fee petition and supporting papers, which are mysteriously absent from the settlement website, the original scripted response of the person answering the phone told me that I could not object to the fees and did not need the fee petition because "it is not part of the settlement." Of course, I know better than that and was eventually able to get a truthful (if unhelpful) response after substantial time on hold, but please (a) provide the script that the Garden City Group is using to answer frequently asked questions such as that one; and (b) indicate what corrective steps are being taken to ensure that class members less familiar with Rule 23 will not be misled like this in the future.

The same claims administrator informed me that, because of the release language in the claim form, I could not both object to the settlement and file a claim form. If this is accurate, it is quite illegal. If it is not accurate, it is yet another problem of Garden City Group providing misleading information to deter objections. Please advise what the position of the parties is on this issue, and what, if anything, will be done to correct it.

If there is a particular attorney I should be in communication with on these questions, please let me know so I need not disturb all eight of you.

Yours,

Theodore H. Frank
tfrank@gmail.com
(703) 203-3848

# Exhibit 5

**Welcome**

**Attorney Search**

**Resources**

**Attorney Registration**

**E-Courts**

**Contact Us**

COURTS

LITIGANTS

ATTORNEYS

JURORS

JUDGES

CAREERS

SEARCH

# COURTS

## *Attorney Detail*

### as of 12/16/2012

**Registration Number:**          2997732

KUMUDINI US WATTE-ARATCHI
ACCESS STAFFING
360 LEXINGTON AVE FL 8
NEW YORK, NY 10017-6559
United States
(New York County)
(646) 307-8937

| | |
|---|---|
| **E-mail Address:** | |
| **Year Admitted in NY:** | 1999 |
| **Appellate Division Department of Admission:** | 2 |
| **Law School:** | BROOKLYN LAW SCHOOL |
| **Registration Status:** | Currently registered |
| **Next Registration:** | May 2013 |

The Detail Report above contains information that has been provided by the attorney listed, with the exception of REGISTRATION STATUS, which is generated from the OCA database. Every effort is made to insure the information in the database is accurate and up-to-date.

The good standing of an attorney and/or any information regarding disciplinary actions must be confirmed with the appropriate Appellate Division Department. Information on how to contact the **Appellate Divisions** of the Supreme Court in New York is available at www.nycourts.gov/courts.

If the name of the attorney you are searching for does not appear, please try again with a different spelling. In addition, please be advised that attorneys listed in this database are listed by the name that corresponds to their name in the Appellate Division Admissions file. There are attorneys who currently use a name that differs from the name under which they were admitted. If you need additional information, please contact the NYS Office of Court Administration, Attorney Registration Unit at 212-428-2800.

www.NYCOURTS.gov

# Exhibit 6

Account Type: Basic | Upgrade

Ted Frank      **Add Connections**

Home   Profile   Contacts   Groups   Jobs   Inbox   Companies   News   More

| People | Search... | Advanced |

# India K. Autry                    3rd

**Attorney, Personal Shopper, Actress & Commercial Model**
United States | Law Practice

Current    Lipstick & Style Counselor, Law, Freelance
Previous   Subprime Shakeout, Hill & Moin LLP, U.S. Department of
           Justice
Education  New York University School of Law

| Connect | Send InMail | ▼ |

**414**
connections

Full profiles for 3rd-degree connections are available
only to premium account holders.

| Upgrade your account » |

HOW YOU'RE CONNECTED

  You

Dean Reuter

David Lat

  Brad Bondi

**21 more connections can
introduce you to someone who
knows India K.
Get introduced ▸**

India K. Autry

INDIA K.'S NETWORK              Company ▾

● New York University (4)



PEOPLE ALSO VIEWED

**Ray Montgomery**

# Exhibit 7



# Law Office of India Autry

Serving your legal needs

Office Philosophy

About India Autry

Contact the Law Office

India Autry, Esq.
licensed to practice law in New York

India Autry brings Big Law experience and education to bear on your legal needs. India held an associate position at a Manhattan law firm, Hill & Moin LLP, where she successfully advocated on behalf of clients inside and outside the courtroom; she was a summer associate at a national law firm, Sutherland, Asbill & Brennan LLP; and she clerked for the Miami-Dade County Attorney's Office. She has performed freelance attorney services for some of the largest firms and corporations in New York, including Davis Polk & Wardell; Sullivan & Cromwell; Skadden, Arps, Slate, Meagher & Flom; and Comcast.

Ms. Autry is a graduate of New York University School of Law where she was a scholar, staff editor for the Journal of Law & Business and a student advocate for the U.S. Attorney's Office, Southern District.

Ms. Autry is located in Manhattan, and she also acts, models and consults as a beauty advisor and personal shopper.

# Exhibit 8


Sign in with: f 🐦 8+ in | Sign in | Register | Are you a Lawyer?

**LEGAL**    **HEALTH**

| LAWYERS | Lawyer's name -OR- Practice area | Fairfax, VA | GO |

Research Legal Advice      Ask a Lawyer      Find a Lawyer      Review Your Lawyer

Home > Real Estate Attorneys > New York > New York > Michael S. Balducci

# Michael S. Balducci   – Is this you? Claim and update your profile for free.



**6.3**
▪▪▪▪▪▪▪▫▫▫
**Good**

| Experience | ● ● ● ○ ○ |
| Industry Recognition | ● ○ ○ ○ ○ |
| Professional Conduct | ● ● ● ● ● |

What is the Avvo Rating?

| Save | Lawyer's website | Send to a friend |

**Client Reviews**
Not yet reviewed
Current or former client?
Write a review

No professional misconduct found.

**Related Lawyer Searches**

New York County Real Estate lawyers
New York Real Estate lawyers
New York Real Estate lawyers

---

## Overview

**Practice Areas**



100% Real Estate

**Contact Information**

**Stroock & Stroock & Lavan**
180 Maiden Lane Floor 17
New York, NY 10038
View map | Edit this address

**Cassin Cassin & Joseph LLP**
711 Third Avenue
20th Floor
New York, NY 10017
View map | Edit this address

Visit lawyer's website

---

## References

**Client Reviews**

How would you rate this lawyer?
If you're a current or former client, share your thoughts (anonymously, if you prefer). Would you recommend this lawyer to other clients?

Review this lawyer

**Peer Endorsements**

Endorse a fellow lawyer, get more visits to your profile
In addition to providing a simple way to express your gratitude to fellow lawyers, any time you add an endorsement to a peer's profile, a link to your profile will appear on it.

Endorse this lawyer

---

## Résumé

**License**

13 years since Michael S. Balducci was first licensed to practice law.

| State | License status | Year acquired | Last updated by Avvo |
|---|---|---|---|
| New York | Currently registered | 2000 | 05/21/2011 |

We have not found any instances of professional misconduct for this lawyer.

**Education**

| School | Major | Degree | Graduated |
|---|---|---|---|
| Oklahoma City University School of Law | Law | JD - Juris Doctor | 1998 |
| Wake Forest University | | BS - Bachelor of Science | 1995 |

### Michael S. Balducci - Is this your profile?

✔ Claiming your profile is free and easy.

✔ Highlight your practice areas, work experience, speaking engagements, awards, and more.

✔ Showcase your expertise and selected case histories.

Claim your profile for free



**Expert Advice When You Need It Most**

**Avvo Legal**
Ask a Lawyer
Find a Lawyer
Free Legal Advice
Review a Lawyer

**For Professionals**
For Lawyers
Claim Your Profile
For Law Firms

**Company Info**
About Us
Jobs
Avvo Blog
Support
Partner With Us
Naked Law Blog

© 2012 Avvo, Inc. All Rights Reserved      | Mobile View  | Terms of Use  | Privacy Policy  | Community Guidelines

FOLLOW US ON 

# Exhibit 9

New York State Unified Court System

# COURTS

## Welcome

## Attorney Search

## Resources

## Attorney Registration

## E-Courts

## Contact Us

COURTS

LITIGANTS

ATTORNEYS

JURORS

JUDGES

CAREERS

SEARCH

## *Attorney Detail*

### as of 12/16/2012

| | |
|---|---|
| **Registration Number:** | 4770004 |

**NELSON DE LA CRUZ**

NELSON DE LA CRUZ ATTORNEY-AT-LAW

208 E. 51ST STREET, SUITE 258

NEW YORK, NY 10022-6557

United States

(New York County)

(347) 734-1361

| | |
|---|---|
| **E-mail Address:** | NELSON_DE_LA_CRUZ@HOTMAIL.COM |
| **Year Admitted in NY:** | 2009 |
| **Appellate Division Department of Admission:** | 1 |
| **Law School:** | PACE UNIVERSITY SCHOOL OF LAW |
| **Registration Status:** | Currently registered |
| **Next Registration:** | Nov 2013 |

The Detail Report above contains information that has been provided by the attorney listed, with the exception of REGISTRATION STATUS, which is generated from the OCA database. Every effort is made to insure the information in the database is accurate and up-to-date.

The good standing of an attorney and/or any information regarding disciplinary actions must be confirmed with the appropriate Appellate Division Department. Information on how to contact the **Appellate Divisions** of the Supreme Court in New York is available at www.nycourts.gov/courts.

If the name of the attorney you are searching for does not appear, please try again with a different spelling. In addition, please be advised that attorneys listed in this database are listed by the name that corresponds to their name in the Appellate Division Admissions file. There are attorneys who currently use a name that differs from the name under which they were admitted. If you need additional information, please contact the NYS Office of Court Administration, Attorney Registration Unit at 212-428-2800.

# Exhibit 10

Account Type: Basic | Upgrade

Ted Frank ·    **Add Connections**

Home    Profile    Contacts    Groups    Jobs    Inbox    Companies    News    More

[ People ]  Search...                                              Advanced

# Eileen Dimitry                                          3rd

Contract Attorney at Hudson

Greater New York City Area | Legal Services

Previous     T-Mobile, Inc.
Education    SUNY Buffalo School of Law

[ **Connect** ]    [ **Send InMail** | ▼ ]

**54**
connections

---

Full profiles for 3rd-degree connections are available
only to premium account holders.

[ **Upgrade your account »** ]

## PEOPLE SIMILAR TO EILEEN



**Jeffrey Sheroff**  3rd
Contract Attorney at Beacon Hill Staffing Gr...
**Connect**

## HOW YOU'RE CONNECTED

 You

   David Lat

   David Cohn

   Patricia Paul

1 more connection can
introduce you to someone who
knows Eileen
Get introduced ▸



   Eileen Dimitry

## EILEEN'S NETWORK                    Company ▾

● Hudson (3)

# Exhibit 11

Account Type: Basic | Upgrade

70

Ted Frank **Add Connections**

Home Profile Contacts Groups Jobs Inbox Companies News More

People | Search... Advanced

# Riley Fenner

3rd

Attorney at Riley L. Fenner, Attorney at Law

Union, Maine | Law Practice

| | |
|---|---|
| Current | Riley L. Fenner, Attorney at Law, Hudson Legal |
| Previous | United States Court of Appeals for the Second Circuit, United States Court of Appeals for the Fourth Circuit, United States Court of Appeals for the Eleventh Circuit |
| Education | Tulane University Law School |

**Connect** **Send InMail**

**251** connections

**Full profiles for 3rd-degree connections are available only to premium account holders.**

**Upgrade your account »**

PEOPLE SIMILAR TO RILEY

**Lindy Hayes**

Attorney at Lindy C. Hayes, esquire

**Connect**

HOW YOU'RE CONNECTED

You

David Lat

Teresa Schiller

Ilya Somin

14 more connections can introduce you to someone who knows Riley

Get introduced ▸

Riley Fenner

RILEY'S NETWORK **Company ▾**

- Hamilton College (3)

# Exhibit 12

# AMERICAN BAR ASSOCIATION
STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY

**Formal Opinion 08-451**                                      **August 5, 2008**
**Lawyer's Obligations When Outsourcing**
**Legal and Nonlegal Support Services**

> *A lawyer may outsource legal or nonlegal support services provided the lawyer remains ultimately responsible for rendering competent legal services to the client under Model Rule 1.1. In complying with her Rule 1.1 obligations, a lawyer who engages lawyers or nonlawyers to provide outsourced legal or nonlegal services is required to comply with Rules 5.1 and 5.3. She should make reasonable efforts to ensure that the conduct of the lawyers or nonlawyers to whom tasks are outsourced is compatible with her own professional obligations as a lawyer with "direct supervisory authority" over them.*
>
> *In addition, appropriate disclosures should be made to the client regarding the use of lawyers or nonlawyers outside of the lawyer's firm, and client consent should be obtained if those lawyers or nonlawyers will be receiving information protected by Rule 1.6. The fees charged must be reasonable and otherwise in compliance with Rule 1.5, and the outsourcing lawyer must avoid assisting the unauthorized practice of law under Rule 5.5.[1]*

Many lawyers engage other lawyers or nonlawyers, as independent contractors, directly or through intermediaries, on a temporary or an ongoing basis, to provide various legal and nonlegal support services. Outsourced tasks range from the use of a local photocopy shop for the reproduction of documents, to the retention of a document management company for the creation and maintenance of a database for complex litigation, to the use of a third-party vendor to provide and maintain a law firm's computer system, to the hiring of a legal research service to prepare a 50-state survey of the law on an issue of importance to a client, or even to the engagement of a group of foreign lawyers to draft patent applications or develop legal strategies and

---

1. This opinion is based on the Model Rules of Professional Conduct as amended by the ABA House of Delegates through February 2008. The laws, court rules, regulations, rules of professional conduct, and opinions promulgated in individual jurisdictions are controlling.

---

AMERICAN BAR ASSOCIATION STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY
321 N. Clark Street, Chicago, Illinois 60610-4714 Telephone (312)988-5300

CHAIR: Steven C. Krane, New York, NY ❑ T. Maxfield Bahner, Chattanooga, TN ❑ Amie L. Clifford, Columbia, SC ❑ Edwin L. Felter, Jr., Denver, CO ❑ Terrence M. Franklin, Los Angeles, CA ❑ Susan R. Martyn, Toledo, OH ❑ Robert H. Mundheim, New York, NY ❑ Arden J. Olson, Eugene, OR ❑ Mary Robinson, Downers Grove, IL ❑ Sylvia E. Stevens, Lake Oswego, OR ❑

CENTER FOR PROFESSIONAL RESPONSIBILITY: George A. Kuhlman, Ethics Counsel; Eileen B. Libby, Associate Ethics Counsel

© 2008 by the American Bar Association. All rights reserved.

prepare motion papers in U.S. litigation.

The outsourcing trend is a salutary one for our globalized economy. Labor costs vary greatly across the United States and throughout the rest of the world. Outsourcing affords lawyers the ability to reduce their costs and often the cost to the client to the extent that the individuals or entities providing the outsourced services can do so at lower rates than the lawyer's own staff. In addition, the availability of lawyers and nonlawyers to perform discrete tasks may, in some circumstances, allow for the provision of labor-intensive legal services by lawyers who do not otherwise maintain the needed human resources on an ongoing basis. A small firm might not regularly employ the lawyers and legal assistants required to handle a large, discovery-intensive litigation effectively. Outsourcing, however, can enable that firm to represent a client in such a matter effectively and efficiently, by engaging additional lawyers to conduct depositions or to review and analyze documents, together with a temporary staff of legal assistants to provide infrastructural support.

There is nothing unethical about a lawyer outsourcing legal and nonlegal services, provided the outsourcing lawyer renders legal services to the client with the "legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation," as required by Rule 1.1. Comment [1] to Rule 1.1 further counsels:

In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complex-ity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the prepa-ration and study the lawyer is able to give the matter and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question.

There is no unique blueprint for the provision of competent legal services. Different lawyers may perform the same tasks through different means, all with the necessary "legal knowledge, skill, thoroughness and preparation." One lawyer may choose to do all of the work herself. Another may delegate tasks to a team of subordinate lawyers and nonlegal staff. Others may decide to outsource tasks to independent service providers that are not within their direct control. Rule 1.1 does not require that tasks be accomplished in any special way. The rule requires only that the lawyer who is responsible to the client satisfies her obligation to render legal services competently.

However, Rules 5.1 and 5.3 impose additional obligations on lawyers who have "direct supervisory authority" over other lawyers and nonlawyers. Rule 5.1(b) states that "[a] lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct." Correlatively, Rule 5.3(b) requires lawyers who employ, retain, or associate with nonlawyers to "make reason-able efforts to ensure that the person's conduct is compatible with the profes-sional obligations of the lawyer." These provisions apply regardless of

whether the other lawyer or the nonlawyer is directly affiliated with the supervising lawyer's firm.[2]

The challenge for an outsourcing lawyer is, therefore, to ensure that tasks are delegated to individuals who are competent to perform them, and then to oversee the execution of the project adequately and appropriately. When delegating tasks to lawyers in remote locations, the physical separation between the outsourcing lawyer and those performing the work can be thousands of miles, with a time difference of several hours further complicating direct contact. Electronic communication can close this gap somewhat, but may not be sufficient to allow the lawyer to monitor the work of the lawyers and nonlawyers working for her in an effective manner.

At a minimum, a lawyer outsourcing services for ultimate provision to a client should consider conducting reference checks and investigating the background of the lawyer or nonlawyer providing the services as well as any nonlawyer intermediary involved, such as a placement agency or service provider. The lawyer also might consider interviewing the principal lawyers, if any, involved in the project, among other things assessing their educational background. When dealing with an intermediary, the lawyer may wish to inquire into its hiring practices to evaluate the quality and character of the employees likely to have access to client information. Depending on the sensitivity of the information being provided to the service provider, the lawyer should consider investigating the security of the provider's premises, computer network, and perhaps even its recycling and refuse disposal procedures. In some instances, it may be prudent to pay a personal visit to the intermediary's facility, regardless of its location or the difficulty of travel, to get a firsthand sense of its operation and the professionalism of the lawyers and nonlawyers it is procuring.

When engaging lawyers trained in a foreign country, the outsourcing lawyer first should assess whether the system of legal education under which the lawyers were trained is comparable to that in the United States. In some nations, people can call themselves "lawyers" with only a minimal level of training. Also, the professional regulatory system should be evaluated to determine whether members of the nation's legal profession have been inculcated with core ethical principles similar to those in the United States, and whether the nation's disciplinary enforcement system is effective in policing

2. Although Comment [1] to Rule 5.1 states that "[p]aragraph (b) applies to lawyers who have supervisory authority over the work of other lawyers *in a firm*" (emphasis supplied), we do not believe that the drafters of the Model Rules intended to restrict the application of Rule 5.1(b) to the supervision of lawyers within "firms" as defined in Rule 1.0(c). A contrary interpretation would lead to the anomalous result that lawyers who outsource have a lower standard of care when supervising outsourced lawyers than they have with respect to lawyers within their own firm. As discussed below, the contrary is true in many respects.

its lawyers. The lack of rigorous training or effective lawyer discipline does not mean that individuals from that nation cannot be engaged to work on a particular project. What it does mean is that, in such circumstances, it will be more important than ever for the outsourcing lawyer to scrutinize the work done by the foreign lawyers – perhaps viewing them as nonlawyers – before relying upon their work in rendering legal services to the client.

Consideration also should be given to the legal landscape of the nation to which the services are being outsourced, particularly the extent that personal property, including documents, may be susceptible to seizure in judicial or administrative proceedings notwithstanding claims of client confidentiality. Similarly, the judicial system of the country in question should be evaluated to assess the risk of loss of client information or disruption of the project in the event that a dispute arises between the service provider and the lawyer and the courts do not provide prompt and effective remedies to avert prejudice to the client.

There are several additional considerations that must be taken into account under the Model Rules. First, at the outset, it may be necessary for the lawyer to provide information concerning the outsourcing relationship to the client, and perhaps to obtain the client's informed consent to the engagement of lawyers or nonlawyers who are not directly associated with the lawyer or law firm that the client retained. In Formal Opinion 88-356,[3] we opined that when a lawyer engaged the services of a temporary lawyer, a form of outsourcing, an obligation to advise the client of that fact and to seek the client's consent would arise if the temporary lawyer was to perform independent work for the client without the close supervision of the hiring lawyer or another lawyer associated with her firm. Relying on Rule 1.2(a), requiring lawyers to consult with clients as to the means by which the clients' objectives are to be pursued, Rule 1.4, relating to client communication, and Rule 7.5(d), prohibiting lawyers from implying that they practice in a partnership or other organization when that is not the fact, we concluded that clients are entitled to know who or what entity is representing them, and thus could veto the lawyer's use of a temporary lawyer.

Relatedly, the lawyer may not make affirmative misrepresentations to the client regarding the status of lawyers and nonlawyers who are not in the lawyer's employ under Rule 7.1, requiring truthfulness in communications regarding lawyer services, and Rule 8.4(c), prohibiting dishonesty, fraud, deceit, or misrepresentation.

We recognize that Formal Opinion 88-356 held that the client ordinarily is not entitled to notice that its legal work is being performed by a temporary lawyer. We stated that "[c]lient consent to the involvement of firm personnel and the disclosure to those personnel of confidential information necessary to

---

3. ABA Comm. on Ethics and Prof'l Responsibility Formal Op. 88-356 (Dec. 16, 1988) (Temporary Lawyers).

the representation is inherent in the act of retaining the firm." However, that statement was predicated on the assumption that the relationship between the firm and the temporary lawyer involved a high degree of supervision and control, so that the temporary lawyer would be tantamount to an employee, subject to discipline or even firing for misconduct. That ordinarily will not be the case in an outsourcing relationship, particularly in a relationship involving outsourcing through an intermediary that itself has the employment relationship with the lawyers or nonlawyers in question.

Thus, where the relationship between the firm and the individuals performing the services is attenuated, as in a typical outsourcing relationship, no information protected by Rule 1.6 may be revealed without the client's informed consent. The implied authorization of Rule 1.6(a) and its Comment [5] thereto to share confidential information within a firm does not extend to outside entities or to individuals over whom the firm lacks effective supervision and control.

Also, the outsourcing lawyer should be mindful of the obligation to "act competently to safeguard information relating to the representation of a client against inadvertent or unauthorized disclosure by the lawyer or other persons who are participating in the representation of the client or who are subject to the lawyer's supervision."[4] This requires the lawyer to recognize and minimize the risk that any outside service provider may inadvertently – or perhaps even advertently – reveal client confidential information to adverse parties or to others who are not entitled to access.[5] Written confidentiality agreements are, therefore, strongly advisable in outsourcing relationships. Likewise, to minimize the risk of potentially wrongful disclosure, the outsourcing lawyer should verify that the outside service provider does not also do work for adversaries of their clients on the same or substantially related matters; in such an instance, the outsourcing lawyer could choose another provider.

Second, the fees charged by the outsourcing lawyer must be reasonable and otherwise comply with the requirements of Rule 1.5. In Formal Opinion No. 00-420,[6] we concluded that a law firm that engaged a contract lawyer could add a surcharge to the cost paid by the billing lawyer provided the total charge represented a reasonable fee for the services provided to the client. This is not substantively different from the manner in which a conventional law firm bills for the services of its lawyers. The firm pays a lawyer a salary, provides him with employment benefits, incurs office space and other overhead costs to support him, and also earns a profit from his services; the client generally is not informed of the details of the financial relationship between

---

4. Rule 1.6, cmt. 16.

5. Cf. ABA Comm. on Ethics and Prof'l Responsibility Formal Op. 95-398 (Oct. 27, 1995) (Access of Nonlawyers to a Lawyer's Data Base).

6. ABA Comm. on Ethics and Prof'l Responsibility Formal Op. 00-420 (Nov. 29, 2000) (Surcharge to Client for Use of a Contract Lawyer).

the law firm and the lawyer. Likewise, the lawyer is not obligated to inform the client how much the firm is paying a contract lawyer; the restraint is the overarching requirement that the fee charged for the services not be unreasonable. If the firm decides to pass those costs through to the client as a disbursement, however, no markup is permitted. In the absence of an agreement with the client authorizing a greater charge, the lawyer may bill the client only its actual cost plus a reasonable allocation of associated overhead, such as the amount the lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract.[7] The analysis is no different for other outsourced legal services, except that the overhead costs associated with the provision of such services may be minimal or nonexistent if and to the extent that the outsourced work is performed off-site without the need for infrastructural support. If that is true, the outsourced services should be billed at cost, plus a reasonable allocation of the cost of supervising those services if not otherwise covered by the fees being charged for legal services.

Finally, the outsourcing lawyer must be mindful of the admonition of Rule 5.5(a) to avoid assisting others to "practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction...." This Committee lacks the authority to express an opinion as to whether the provision of legal services by any particular lawyer, nonlawyer, or intermediary constitutes the unauthorized practice of law. Ordinarily, an individual who is not admitted to practice law in a particular jurisdiction may work for a lawyer who is so admitted, provided that the lawyer remains responsible for the work being performed and that the individual is not held out as being a duly admitted lawyer. We note only that if the activities of a lawyer, nonlawyer, or intermediary employed in an outsourcing capacity are held to be the unauthorized practice of law, and the outsourcing lawyer facilitated that violation of law by action or inaction, the outsourcing lawyer will have violated Rule 5.5(a).

---

7. See ABA Comm. on Ethics and Prof'l Responsibility Formal Op. 93-379 (Dec. 6, 1993) (Billing for Professional Fees, Disbursements and Other Expenses).

# Exhibit 13



Ted Frank <tfrank@gmail.com>

# You've Been Nominated to The Attorney Fee Practice Group

**NALFA** <info@thenalfa.org>
Reply-To: info@thenalfa.org
To: tfrank@gmail.com

Mon, Jun 25, 2012 at 5:05 PM

If you are having trouble viewing this email, CLICK HERE



**The National Association of Legal Fee Analysis**
"Specializing in Attorney Fees and Legal Billing"

## You've Been Nominated To The Attorney Fee Practice Group



You've been nominated to the Attorney Fee Practice Group. The Attorney Fee Practice Group is a practice group of qualified attorney fee experts, fee dispute arbitrators, and legal bill auditors.

**Attorney Fee Practice Group Benefits:**

**New Client Referrals:** As an A.M. Best's Recommended Expert Service Provider, law firms turn to NALFA on a range of attorney fee and legal billing matters. We refer law firms and others to members of our Attorney Fee Practice Group, and in certain cases, recommend specific members.

**Member-to-Member Referral Program:** Members of our Attorney Fee Practice Group can turn to one another when a conflict arises. Our members can exchange attorney fee and legal billing cases with one another and refer clients to one another when a ethical, business, or scheduling conflict arises.

**Cetificate of Qualification:** Upon membership, members of the Attorney Fee Practice Group will receive a professional certificate that bears their name (or company's name) for display purposes. This certificate of qualification shows clients that you are a member of good standing and have met the standards of excellence for selection to the Attorney Fee Practice Group.

**Updates on Attorney Fee & Legal Billing Jurisprudence:** NALFA members will receive periodic updates on the latest developments on attorney fee and legal billing jurisprudence. These e-mail updates summarize important attorney fee and legal billing cases in both state and federal courts from across the U.S. and include both published and unpublished court decisions.

**Customized Profile Page in On-Line Membership Directory:** NALFA members will be provided their own profile page in our on-line membership directory. Member profile pages list professional qualifications and experience on attorney fee and legal billing matters. Members can customize their profile page to include hyperlinks, white papers, articles, and news. This on-line directory also allow potential cleints to contact you directly on attorney fee and legal billing matters.

**Promote News in NALFA's Attorney Fees Blog:** NALFA members can promote news in our Attorney Fees Blog, the only national blog specifically devoted to attorney fee and legal billing news. Members can take advantage of reaching a national audience by posting news, articles, and announcements in <u>NALFA's Attorney Fees Blog</u>, a heavily trafficked site and a great source for attorney fee and legal billing news.

**Professional Development:** Our CLE programs are the perfect opportunity to build on your knowledge base of attorney fee and legal billing issues. By attending our CLE programs, members benefit professionally with the very latest case law and devlopments on attorney fee and legal billing jurisprudence.

**Speaking & Publishing Opportunties:** Members are invited to participate in our CLE programs as sponsors and panelists. By particpating in our CLE programs, members not only help develop program content, but also help shape the growing body of attorney fee and legal billing jurisprudence.

**Neworking Opportunities:** Our members build lasting relationships with fellow members, colleagues, peers, and clients by networking at our events. Networking with other fee and billing experts, consultants, and clients is an excellent way to build new lines of business and expand your area of expertise.

**Marketing Project Opportunities:** NALFA can work directly with members on special marketing projects. We can market your practice and promote your area of expertise. Through our e-mail database, members can reach a desired audience to promote news or make special announcements.

The National Association of Legal Fee Analysis (NALFA) is a 501(c)(6) professional association for the attorney fee and legal billing community. Our members provide a range of services on attorney fee and legal billing matters.

Members of NALFA's Attorney Fee Practice Group are qualified attorney fee experts, fee dispute arbitrators, and legal bill auditors. Our fee experts are retained by some of the nation's top law firms to provide expert reports and opinions on the reasonableness of attorney fees in large, complex cases. Our fee dispute arbitrators help settle and resolve high-stakes fee disputes between parties. For more information visit www.thenalfa.org

**Forward email**

✉ **SafeUnsubscribe**


Trusted Email from
**Constant Contact®**
Try it FREE today.

This email was sent to tfrank@gmail.com by info@thenalfa.org |
Update Profile/Email Address | Instant removal with SafeUnsubscribe™ | Privacy Policy.

NALFA | 35 East Wacker Drive | 9th Floor | Chicago | IL | 60601

# Exhibit 14

# KIRBY McINERNEY LLP

825 Third Avenue
New York, NY 10022
212.371.6600
Fax. 212.751.2540
WWW.KMLLP.COM
Of counsel
  Roger W. Kirby
  Alice McInerney

**VIA EMAIL AND FIRST CLASS MAIL**

December 17, 2012

Theodore H. Frank, Esq.
11307 Bulova Lane
Fairfax, Virginia 22030-5509

      Re:  <u>Citigroup, Inc. Securities Litigation, No. 07-Civ-9901 (SDNY)</u>

Dear Mr. Frank:

We are plaintiffs' lead counsel in this action. We write in response to your email of Sunday, December 16, 2012.

You advise that you received the class action notice on December 12, 2012, and you are "forced to conclude that the timing of the mailing was designed to deter objections." We assure you that we and the Claims Administrator, Garden City Group ("GCG"), took reasonable efforts to ensure that the notice was furnished to the class well in advance of the deadlines for actions by class members. GCG advises us that, consistent with the Court's order, notices were mailed on or before October 10, 2012 to all record holders whose names GCG received from defendants. As you no doubt know given your experience in this area (through your work with the American Enterprise Institute and the Center for Class Action Fairness), many beneficial owners of traded securities do not appear on the record holders lists because their shares are held in street name by their broker or other nominee. GCG therefore asked brokers who were listed as record holders to promptly: (a) forward the notice to the beneficial owners, or (b) provide GCG with contact information for those beneficial holders.

It appears that your Citigroup shares are held in street name by your broker, Charles Schwab. Accordingly, GCG did not have your contact information when the notices were initially mailed in early October. However, GCG advises that it mailed the notice to Charles Schwab on October 10, 2012. Moreover, when it received no responsive information from Schwab, GCG followed up with Schwab on October 17 and then again on November 16, 2012. Charles Schwab did not respond to GCG with a list of names and addresses of beneficial owners until December 3, 2012. By

the end of that week, GCG mailed out the notices to all persons that were named on the list it obtained from Charles Schwab.

We are not amenable to extending to January 14, 2013, the deadline for you to object. January 14 is after the Court-ordered deadline for the parties to respond to objections, and in fact is the day before the settlement fairness hearing. While the delay on the part of your broker was unfortunate, courts have held that such delays generally do not warrant extension of the deadlines where reasonable efforts were taken to provide notice to the class. *See In re Merrill Lynch Tyco Research Securities Litigation*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008) (rejecting an objection by a class member who complained that he did not receive his notice until two weeks after the deadline for filing objections and exclusion requests); *see also Gruen v. International House of Pancakes*, 513 F.2d 114, 121 (8th Cir.), *cert. denied*, 423 U.S. 864 (1975) (mailing notice to last known address to class members constitutionally adequate even where one third of class members were not reached by mailing); *In re Lloyds Am. Trust Fund Litig.*, 2002 WL 3163577, at *17-18 (S.D.N.Y. Nov. 26, 2002) (rejecting challenges to settlement by class members who claimed that they never received the notice of pendency). Moreover, the publication of summary notice, as approved by the Court, provided further notification of the pendency of this settlement.

We are also not willing to stipulate to your request to depose Professors Coffee and Miller. Courts generally look with disfavor on attempts to take discovery in connection with objections to a class action. *See Malchman v. Davis*, 761 F.2d 893, 897-98 (2d Cir. 1985); *see also WalMart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 120 (2d Cir. 2005); *Dupler v. Costco Wholesale Corp.*, 705 F.Supp.2d 231, 246 (E.D.N.Y. 2010).

Your email suggests that some of the attorneys who assisted in this prosecution of the case were hired on a contract basis specifically for this project. As one would expect in an action that included approximately 40 million pages of document production, some attorneys were hired on a project basis. In recent years, courts have repeatedly recognized that the use of contract lawyers is often a necessary and acceptable element of large scale, highly complex securities class actions. *See In re AOL Time Warner Shareholder Derivative Litig.*, 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 782-83 (S.D. Tex. 2008); *In re WorldCom Inc. Securities Litig.*, 2004 WL 259140, at *21 n.48 (S.D.N.Y. Nov. 12, 2004).

You note that the settlement papers do not provide any substantive information about the *Brecher* action. This is because we do not represent

**Kirby McInerney LLP**
Mr. Theodore H. Frank, Esq.
December 17, 2012
Page 3

any of the parties to that action, though certain members of that putative class are also members of the Settlement Class here. The class notice clearly states that class members who obtained their Citigroup shares through Citigroup's capital accumulation program might be members of the proposed class in *Brecher*. Counsel to the parties to that action would be in a better position than we would be to assess the viability or the value of the claims asserted in *Brecher*.

As to your suggestion that the fee petition and the supporting papers were "mysteriously absent from the settlement website," allow us to clear up the mystery. The settlement website was launched in October, approximately two months before the final approval papers were filed. Therefore, the final approval papers could not have been put on the website at the time. Those papers have now been posted on our firm website as well as the settlement website. In any event, it appears from your email that you were able to obtain copies of those publicly-filed papers from PACER.

To the best of our knowledge, the script that Garden City Group is using to answer frequently asked questions does not include any representations about whether an objection precludes a class member from filing a claim form. However, we note that the notice itself quite clearly provides, (on page 2) that, "If you do not exclude yourself from the settlement Class, it is likely in your interest to submit a claim form." It then continues by stating, "If you exclude yourself from the settlement Class, you will not be able to receive any payment from the settlement fund." Moreover, the notice states ( on page 11) that, "Any Settlement Class Member who does not request exclusion may object to any aspect of the Settlement, the proposed Plan of Allocation or Lead Counsel's request for an award of attorneys' fees and reimbursement of Litigation Expenses." Nowhere does the notice say that filing an objection disqualifies a settlement class member from submitting a claim in the settlement. In your email you state that you are a member of the Class (although you have not provided information concerning the dates of your Citigroup trades). If in fact you are a member of the Class, you are entitled to file an objection in the manner set forth in the notice, and such filing will not preclude you from submitting a claim.

Finally, you asked whether there was a particular attorney with whom you can communicate further about these issues. The persons to speak with at Kirby McInerney would be myself and Peter Linden.

I hope this answers your questions.

Very yours truly,

Ira M. Press

Cc:   Peter S. Linden, Esq. (via email)
      Andrew McNeela, Esq. (via email)
      Beverly Tse-Mirza, Esq. (via email)
      Brad Karp, Esq. (via email)
      Richard Rosen, Esq. (via email)
      Susanna Buergel, Esq. (via email)
      Jane O'Brien (via email)
      Asad Kudiya, Esq. (via email)

# Exhibit 15



Ted Frank <tfrank@gmail.com>

---

## In re Citigroup Inc. Securities Litigation, No. 07 Civ. 9901 (S.D.N.Y.)

---

**Ted Frank** <tfrank@gmail.com>                                      Tue, Dec 18, 2012 at 11:59 AM
To: Ira Press <ipress@kmllp.com>
Cc: "Peter S. Linden (Citigroup class counsel)" <plinden@kmllp.com>, "Brad S. Karp (Citigroup defense counsel)"
<bkarp@paulweiss.com>, "Richard A. Rosen (Citigroup defense counsel)" <rrosen@paulweiss.com>, "Susanna M.
Buergel (Citigroup defense counsel)" <sbuergel@paulweiss.com>, "Jane B. O'Brien (Citigroup defense counsel)"
<jobrien@paulweiss.com>, "Asad Kudiya (Citigroup defense counsel)" <akudiya@paulweiss.com>, Melissa Holyoak
<melissaholyoak@gmail.com>, Adam Schulman <shuyande24@gmail.com>

Mr. Press,

I write in response to your letter of the evening of December 17, 2012.

I am a member of the class. I purchased 500 shares of Citigroup stock for my Charles
Schwab account for $13,979.95 on January 10, 2008. I sold the stock for $12,386.27 on April
21, 2008. These were the only transactions I made in Citigroup stock in 2008. True and
correct copies of contemporaneous confirmation emails sent by Charles Schwab to me to
confirm these transactions are attached.

The notice states that the "average recovery per share" would be $0.19. I judge by my
purchase date and the allocation plan, however, that my Recognized Loss per share would
be below average and recovery would be proportionally lower. Please advise the estimated
recovery per share for shares purchased between November 19, 2007, and January 14, 2008.

If you are refusing to stipulate to a continuance of the objection deadline because it would
be too close to the fairness hearing date, I am happy to support a motion to move your
deadlines and the fairness hearing date as well; the January 15, 2012, date is inconvenient for
me.

If you are refusing to stipulate to a continuance of the objection deadline and fairness
hearing date because you are claiming that Garden City Group did not know that it would
take 54 days to receive a list of names from Charles Schwab, I will need to depose a Garden
City Group representative to learn what they claim the typical response time from brokers
is. In my experience--and as the cases you cite hint at--brokers always take several weeks to
provide that list of names. (In my experience, courts always extend the objection deadline
when class members complain about those delays.) It is certain that Garden City Group and
the parties knew or should have known that waiting until October 3 to request names from
brokers such as Charles Schwab would mean that class members would not receive timely
individual notice, and the delay is therefore neither reasonable nor the result of the "best

practicable" notice, the relevant standard in the Second Circuit. The cases you cite to the contrary (1) fail to consider the knowledge of the parties and assume that the delays were out of the ordinary and (2) predate *Hecht v. United Collection Bureau*, 691 F.3d 218 (2d Cir. 2012)--a precedent that will be of great interest to Citigroup and its counsel if it turns out that it is not entitled to a release because of the constitutionally inadequate notice and the failure to grant a reasonable continuance, and is exposed to a second class action on the same grounds.

Your letter to me fails to address a question I raised in my December 16 email. I did not complain that objecting "precludes [me] from filing a claim form." I complained that filing a claim form might preclude objections because of the impermissibly broad language of the release--a release for which class counsel has provided no consideration. The claims administrator is telling class members that signing the claims form precludes objecting because of the release. What is your position about the scope of the release?

You also dodge another one of my requests. I did not say that you were not permitted to hire contract attorneys. I said that you failed to disclose who the contract attorneys were. Please identify which of the "Other Attorneys" were attorneys directly employed by Kirby McInerney, and which were independent contractors employed by third parties, and who those third parties are.

Separately, I would like to obtain a single piece of non-public data from Citigroup. I request that one of the Paul Weiss attorneys contact me to determine whether I could obtain a very short declaration for the record in lieu of unnecessarily expensive litigation over my entitlement to a fifteen-minute deposition.

Please respond by close of business today.

Theodore H. Frank

---

**2 attachments**

 **citigroup.frank exhibit 1 purchase 1-10-2008.pdf**
730K

**citigroup.frank exhibit 2 sale 4-21-2008.pdf**
589K

# Exhibit 16

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 4.0.3
### Eastern Division

Robert F. Booth Trust

                  Plaintiff,

v.

William C Crowley, et al.

                  Defendant.

Case No.: 1:09–cv–05314
Honorable Ronald A. Guzman

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, July 9, 2010:

      MINUTE entry before Honorable Ronald A. Guzman: Fairness and motion hearing held on 7/9/2010. Plaintiff's Motion for settlement [97] and Motion for attorneys fees [100] are entered and continued for hearing and fairness hearing on 8/27/2010 at 10:30 A.M. The parties are ordered to submit briefs and/or records, as stated in open court, by 7/23/2010. Briefs to be submitted in camera. Mailed notice by judge's staff. (srb,)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# Exhibit 17

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE JOHNSON & JOHNSON      :
DERIVATIVE LITIGATION,       :     Civil Action No. 10-2033 (FLW)
                         :
                         :        **AMENDED**
                         :         **ORDER**
                         :

       This matter having been opened <u>sua sponte</u> by the Court; it appearing that, on July 11, 2012, Plaintiffs moved for preliminary approval of settlement in the instant suit against Nominal Defendant Johnson & Johnson ("Defendant"); it appearing that the Court granted that motion on July 16, 2012, issuing an order directing that all objections to the settlement be filed by September 14, 2012 and, further, scheduling the settlement approval hearing for September 28, 2012; it appearing that the Court's Order also directed Plaintiffs' counsel to mail a notice containing these deadlines to all J&J shareholders; it appearing that the Court has recently received letters from three shareholders—Stephen R. Lindemood, Gerald Walpin, and Merton S. Rothman— who each complained that they did not receive notice by mail of the objection due date until after that due date had passed, in addition, Plaintiffs' counsel forwarded to the Court an email complaint by another shareholder—Ed Schnitzer—indicating that he received late notice of his right to object; it appearing that the Court held a conference call with the parties on today's date, September 24, 2012, to discuss the late notice issue, and the Court was made aware, during that call, that some institutional investors who had received notice in July or August requested that J&J mail the individual investors

directly, and that mailing did not take place until early September; it appearing, therefore, that the four above-mentioned individual shareholders (Lindemood, Walpin, Rothman, and Schnitzer) may have been in the group of early September mailings; it appearing that, in light of the complaints of late notice, the Court deems it appropriate to grant Lindemood, Walpin, Rothman, Schnitzer, and any other shareholder who received late notice additional time to file objections and, consequently, deems it necessary to adjourn the settlement approval hearing date in accordance with the schedule set forth below; it further appearing that the Court issued an Order dated September 24, 2012 that contained a typographical error that is corrected in this Amended Order; and for good cause shown:

IT IS on this 25th day of September, 2012,

ORDERED that any objection by Lindemood, Walpin, Rothman, Schnitzer, and any other shareholder who received late notice shall be filed by October 5, 2012; and it is further

ORDERED that any response by Plaintiffs to the objections shall be filed by October 11, 2012; and it is further

ORDERED that the settlement approval hearing previously scheduled for September 28, 2012 is hereby ADJOURNED to October 18, 2012 at 10 a.m.; and it is further

ORDERED that Plaintiffs and/or Defendant shall serve a copy of this Order on Lindemood, Walpin, Rothman, and Schnitzer within two (2) days of the date of this Order; and it is further

2

ORDERED that Plaintiffs and/or Defendant shall publish notice in the Wall Street Journal and U.S.A. Today newspapers, as well as on the J&J settlement website.

/s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

3

# Exhibit 18



---

## In re Citigroup Inc. Securities Litigation, No. 07 Civ. 9901 (S.D.N.Y.)

---

**Ira Press** <ipress@kmllp.com>                                                Tue, Dec 18, 2012 at 7:05 PM
To: Ted Frank <tfrank@gmail.com>
Cc: "Peter S. Linden (Citigroup class counsel)" <plinden@kmllp.com>, "Brad S. Karp (Citigroup defense counsel)" <bkarp@paulweiss.com>,
"Richard A. Rosen (Citigroup defense counsel)" <rrosen@paulweiss.com>, "Susanna M. Buergel (Citigroup defense counsel)"
<sbuergel@paulweiss.com>, "Jane B. O'Brien (Citigroup defense counsel)" <jobrien@paulweiss.com>, "Asad Kudiya (Citigroup defense
counsel)" <akudiya@paulweiss.com>, Melissa Holyoak <melissaholyoak@gmail.com>, Adam Schulman <shuyande24@gmail.com>

Mr. Frank:

Thank you for providing information regarding your transactions in Citigroup common stock. Assuming the accuracy of the data you
provided, your recognized loss under the plan of allocation is $575.

Your recognized loss might very well be below the classwide average. This would not be surprising, considering that you made your
purchases after three of the class period corrective disclosures totaling $3.79 of the total maximum per share recognized loss of $4.94.

In any event, the notice expressly states that the estimated average class member recovery set forth therein assumes 100% class
participation in the settlement. Because actual participation is almost always less than 100%, the average actual recovery for valid
participating class members is likely to be higher than the figure set forth in the notice. However, it is not possible to determine the actual
recovery by class members without knowing the total number of valid claims – a figure that is unknowable at this time.

We do not believe that your request to postpone the fairness hearing is practical or justified based on the circumstances described in your
correspondence. Notice, which included the date for the fairness hearing, has already been published in the Wall Street Journal and PR
Newswire, and mailed to over 2 million potential class members. In addition, the hearing date was mentioned in numerous newspaper and
other media reports about the settlement. To our knowledge, you are the only person to have requested an extension of the hearing date.
Moreover, even crediting your chronology, there is no reason why a practiced class action objector such as yourself cannot submit an
objection by Friday, December 21, 2012.

Furthermore, we do not see how the *Hecht* opinion impacts the issue of the notice's sufficiency here. The court's opinion in *Hecht* turned
on the legal sufficiency of a "single published notice in a single publication." 691 F. 3d at 224-25. By contrast, the notice here was
published in a leading newspaper, on wire services, and, more importantly, was mailed to more than two million potential class members.
Reports about the settlement also appeared in scores of media outlets.

Finally, we do not agree with your theory that signing the claims form "might preclude objections," since any release in the claims form is
not enforceable until after the Court approves the settlement. As for your assertion "that the claims administrator is telling class members
that signing the claims form precludes objecting because of the release," we reiterate that this instruction is not part of the Garden City
Group's script.

Yours very truly

Ira Press


Ted Frank wrote:
[Quoted text hidden]

--
Ira M. Press
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor

New York, NY 10022
Tel: 212.371.6600
www.kmllp.com

CONFIDENTIALITY NOTICE: This e-mail message and any associated attachments are private communication and may
contain confidential, legally privileged information meant solely for the intended recipient. If you are not the
intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any
action in reliance on the contents of this transmission is strictly prohibited. If you have received this e-mail
in error, please notify the sender immediately and do not disclose its contents, use it for any purpose, or
store/copy the information in any medium. Thank you.

# Exhibit 19



Ted Frank <tfrank@gmail.com>

## In re Citigroup Inc. Securities Litigation, No. 07 Civ. 9901 (S.D.N.Y.)

**Ted Frank** <tfrank@gmail.com>                                                        Tue, Dec 18, 2012 at 8:09 PM
To: Ira Press <ipress@kmllp.com>
Cc: "Peter S. Linden (Citigroup class counsel)" <plinden@kmllp.com>, "Brad S. Karp (Citigroup defense counsel)"
<bkarp@paulweiss.com>, "Richard A. Rosen (Citigroup defense counsel)" <rrosen@paulweiss.com>, "Susanna M.
Buergel (Citigroup defense counsel)" <sbuergel@paulweiss.com>, "Jane B. O'Brien (Citigroup defense counsel)"
<jobrien@paulweiss.com>, "Asad Kudiya (Citigroup defense counsel)" <akudiya@paulweiss.com>, Melissa Holyoak
<melissaholyoak@gmail.com>, Adam Schulman <shuyande24@gmail.com>

Mr. Press,

1. You still have not identified the contract attorneys that were listed as "Kirby McInerney" attorneys in your
lodestar request. For a third time, I ask that you please identify which of the "Other Attorneys" were attorneys
directly employed by Kirby McInerney, and which were independent contractors employed by third parties, and
who those third parties are. If you are refusing to do so, please clearly state so.

2. *Hecht* is not limited to cases where notice runs in one newspaper; it stands for the proposition that notice is
constitutionally required to be the "best practicable." You do not deny that you and Garden City Group had or
should have had knowledge that brokers routinely take nearly two months to provide mailing information, so your
failure to request the brokers to provide that information before October shows intentionally constitutionally
inadequate failure to provide *reasonable* individualized notice, much less to provide the "best practicable" notice.
Your out-of-circuit and district-court cites do not override the Second Circuit law of *Hecht* or *In re Franklin
National Bank Sec. Lit.* You have no reason to be concerned about the effect of an invalid release on Citigroup or
Paul Weiss's legal malpractice insurer, but it would surprise me if prudent defense counsel were not.

3. The deadline is not December 21; because I am not physically in New York, I would need to FedEx materials
on December 20 to ensure that they are received by December 21. Because I am already at fifteen exhibits for
my declaration, that logistically means being finished with my objection in the next 36 hours. Because I do not
write boilerplate objections and because I have pre-existing obligations to other clients who gave me more than
five business days notice, I would be prejudiced. I am further prejudiced because both of the potential expert
witnesses I contacted have stated they could not research and complete a rebuttal expert report by December
19. I am further prejudiced because you are improperly resisting discovery into the fee petition by citing cases
regarding the rights of objectors to conduct discovery into the merits. I am further prejudiced because you refuse
to answer reasonable questions about information absent from your fee petition. You can agree to a new
schedule now consistent with constitutional notice obligations, or go through the expense of multiple fairness
hearings when a court corrects the error.

Theodore H. Frank
[Quoted text hidden]

fedex.com 1.800.GoFedEx 1.800.463.3339

# FedEx Express

NEW Package
US Airbill

8015 2056 5597

**1 From**

Date 12/2/2011

Sender's Name Adam Schulman Phone 610 457-0853

Company Center For Class Action Fairness

Address 515 18th SHS

City Arlington State VA ZIP 22202

**2 Your Internal Billing Reference**

**3 To**

Recipient's Name Clerk of the Court Phone

Company US District Court Southern District of New York

Address 500 Pearl St.

City New York State NY ZIP 1007-1312

8015 2056 5597

**4 Express Package Service**

Next Business Day
2 or 3 Business Days

☑ FedEx First Overnight
☐ FedEx Priority Overnight
☐ FedEx Standard Overnight

**5 Packaging**

☐ FedEx Envelope
☑ FedEx Pak
☐ FedEx Box
☐ FedEx Tube
☐ Other

**6 Special Handling and Delivery Signature Options**

☐ SATURDAY Delivery

☑ No

**7 Payment** Bill to:

☐ Sender
☐ Recipient
☐ Third Party
☐ Credit Card
☐ Cash/Check

644

Dept./Floor No.

HOLD Weekday
HOLD Saturday

Total Packages   Total Weight

Dept./Floor No.

ORIGIN ID: A49SA

UNITED STATES US
CLERK OF THE COURT
CLERK, U.S. DISTRICT COURT S.D
500 PEARL ST

TO CLERK OF THE COURT
CLERK, U.S. DISTRICT COURT S.D
500 PEARL ST

SHIP DATE: 20DEC12
ACTWGT: 1.1 LB
CAD: / DY712122
DIMS: 00X00 IN
BILL SENDER

Nothy

tigroup
stion
9901 (SHS)

Dr No: 0200