**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE CITIGROUP
SECURITIES LITIGATION

Master File No. 07 Civ. 9901 (SHS)

**ECF Case**

---

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THE PROPOSED SETTLEMENT AND REQUEST FOR
ATTORNEYS' FEES, AND IN RESPONSE TO ALL OBJECTIONS
TO THE PROPOSED SETTLEMENT AND THE FEE REQUEST**

KIRBY McINERNEY, LLP
Ira M. Press
Peter S. Linden
Andrew McNeela
Mark A. Strauss
Beverly Tse Mirza
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Lead Counsel for Plaintiffs*

*Additional Plaintiffs' counsel on
signature page*

Dated:   January 18, 2013

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 4

I.    MR. FRANK'S OBJECTION IS MERITLESS AND SHOULD BE DENIED ............... 4

    A.    Mr. Frank Cannot Serve as His Own Expert and, In Any Event, Is Not Qualified to Testify as an Expert on the Subjects on Which He Purports to Opine ................. 4

    B.    Mr. Frank's Objection to the Notice Program is Meritless, and, In Any Event, Moot ....................................................................................... 7

        1.    The Notice Program Was the Best Practicable ................................. 7

        2.    The Notice Program Followed Court-Approved Protocols ............................. 8

    C.    The Scope of the Notice's Releases Is Unremarkable ................................ 9

    D.    The Fee Request Is Reasonable When Viewed as a Percentage of the  Recovery . 10

    E.    Counsel's Lodestar Properly Includes All Attorneys' Work In This Action ......... 12

    F.    The Requested Lodestar Multiplier Cross-Check is Reasonable ........................... 18

    G.    The Settlement Represents a Significant Recovery ................................ 21

    H.    Mr. Frank's Discovery Request Is Improper ...................................... 24

        1.    Standard Governing Objector's Requests for Discovery ............................. 24

        2.    Mr. Frank Has Not Demonstrated that There Is Any Additional Information this Court Requires to Assess the Fairness of the Settlement ........................ 25

II.    THE FA CAP OBJECTION IS MERITLESS ................................................. 27

    A.    The Settlement Does Not Release Any Claims Relating to the July 2008 Share Awards ................................................................................................. 28

    B.    The Plan of Allocation is Not Unfair to FA CAP Members ................................ 29

    C.    Class Counsel Had Full Authority to Enter Into This Settlement ......................... 30

III.    THE REMAINING OBJECTIONS LACK MERIT ....................................... 31

    A.    The Objections of Andersen, James, Shattuck and Wright to the Fairness of the Settlement Should be Denied ........................................................... 32

    B.    The Objections to the Fee Application Should be Rejected ................................ 33

CONCLUSION..................................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*In re Air Crash Disaster at Detroit Metro. Airport on Aug. 16, 1987*,
   737 F. Supp. 427 (E.D. Mich. 1989)........................................................................... 6

*In re Alliance Pharm. Corp. Sec. Litig.*,
   279 F. Supp. 2d 171 (S.D.N.Y. 2003)...................................................................... 29

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................................................. 25

*In re American Exp. Fin. Advisors Sec. Litig.*,
   672 F.3d 113 (2d. Cir. 2011).................................................................................... 31

*Anwar v. Fairfield Greenwich Ltd.*,
   No. 11 Civ. 813, 2012 WL 1981505 (S.D.N.Y. June 1, 2012).............................. 20

*In re AOL Time Warner S'holder Deriv. Litig.*,
   No. 02 Civ. 6302, 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ........................ 15, 16

*At Home Corp. v. Cox Comm'cns, Inc.*,
   446 F.3d 403 (2d Cir. 2006).................................................................................... 29

*In re Auction Houses Antitrust Litig.*,
   No. 00 Civ. 0648, 2001 US Dist. LEXIS 1713 (S.D.N.Y. Feb. 22, 2001) ............ 28

*In re BankAmerica Corp. Sec. Litig.*,
   228 F. Supp. 2d 1061 (E.D. Mo. 2002),.................................................................. 12

*In re BankAtlantic Bancorp. Inc. Sec. Litig.*,
   No. 07 Civ. 61542, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011).......................... 32

*Banyai v. Mazur*,
   No. 00 Civ. 9806 (SHS), 2007 WL 927583 (S.D.N.Y. Mar. 27, 2007) ................... 1

*In re Bear Stearns Company, Inc. Sec. Deriv. and ERISA Litig.*,
   No. 08 MD 1963, 2012 WL 5465381 (S.D.N.Y. Nov. 9, 2012).............................. 33

*Benhabib v. Hughs Elecs. Corp.*,
   No. 04 Civ. 0095, 2006 WL 5014569 (C.D. Cal. Sept. 6, 2006)............................. 5

*Board of Trustees of AFTRA Ret. Fund v. JP Morgan Chase Bank, N.A.*,
   No. 08 Civ. 686, 2012 WL 2064907 (S.D.N.Y. June 7, 2012).............................. 20

*Borgognone v. Trump Plaza*,
   No. 98 Civ. 6139, 2000 WL 341135 (E.D.N.Y. Mar. 9, 2000) ............................... 6

*Brecher v. Citigroup, Inc.*,
   No. 09 civ 7359 (SHS), 2011 WL 5525353 (S.D.N.Y. Nov. 14, 2011) ................. 30

*Carlson v. Xerox Corp.*,
   596 F. Supp. 2d 400 (D. Conn. 2009)..................................................................... 17

*In re Cendant Corp. Litig.*,
  264 F. 3d 201 (3d Cir. 2001)...................................................................... 30

*In re Charles Schwab Corp. Sec. Litig.*,
  No. 08 Civ. 1510, 2011 WL 1481424 (N.D. Cal. Apr. 19, 2011) ......... 20

*Charron v. Pinnacle Group N.Y. LLC*,
  874 F. Supp. 2d 179 (S.D.N.Y. 2012).................................................... 27

*Cobell v. Salazar*,
  679 F.3d 909 (D.C. Cir. 2012) ............................................................... 12

*In re Comverse Tech. Inc. Sec. Litig.*,
  No. 06 Civ. 1825, 2010 WL 2653354 (E.D.N.Y. June 24, 2010).......... 20

*Conde v. Velsicol Chem. Corp.*,
  804 F. Supp. 972 (S.D. Ohio 1992) ......................................................... 6

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)....................................................................... 1

*Dean v. China Agritech, Inc.*,
  No. 11 Civ. 0331, 2011 WL 5148598 (C.D. Cal. Oct. 27, 2011) .......... 29

*DeJulius v. New England Health Care Emps. Pension Fund*,
  429 F.3d 935 (10th Cir. 2005) .................................................................. 9

*In re Dell, Inc. Sec. Litig.*,
  No. 06 Civ. 726, 2010 WL 2371834 (W.D. Tex. June 11, 2010)........... 20

*Dupler v. Costco Wholesale Corp.*,
  705 F. Supp. 2d 231 (E.D.N.Y. 2010) ............................................... 7, 25

*In re Enron Corp.*,
  341 B.R. 141 (Bankr. S.D.N.Y. 2006).................................................... 29

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  586 F. Supp. 2d 732 (S.D. Tex. 2008) .............................................. 15, 16

*Epstein v. Wittig*,
  No. 03 Civ. 4081, 2005 WL 3276390 (D. Kan. Dec. 2, 2005) ............. 25

*Falkowski v. Imation Corp.*,
  309 F.3d 1123 (9th Cir. 2002) ................................................................ 28

*Fidel v. Farley*,
  534 F.3d 508 (6th Cir. 2008) .................................................................... 9

*In re Franklin Nat'l Bank Sec. Litig.*,
  574 F.2d 662 (2d Cir. 1978)...................................................................... 9

*In re Gen. Tire & Rubber Co. Sec. Litig.*,
  726 F.2d 1075 (6th Cir. 1984).................................................................. 24

*Goldberg v. Kelly*,
  397 U.S. 254 (1970)................................................................................. 26

*Goldberger v. Integrated Res., Inc.,*
    209 F.3d 43 (2d Cir. 2000)................................................................................... 34, 35

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, LLP,*
    212 F.R.D. 400 (E.D. Wis. 2002) ......................................................................... 28

*Gudmundsson v. United States,*
    665 F. Supp. 2d 227 (W.D.N.Y. 2009) ................................................................. 29

*Hemphill v. San Diego Ass'n of Realtors,*
    225 F.R.D. 616 (S.D. Cal. 2004) ..................................................................... 24, 25

*In re Intel Corp. Deriv. Litig.,*
    No. 09 Civ. 867, 2010 WL 2955178 (D. Del. July 22, 2010).................................. 8

*International Brotherhood of Elec. Workers Local 697 v. Int'l Game Tech., Inc.,*
    No. 09 Civ. 0419, 2012 WL 5199742  (D. Nev. Oct. 19, 2012)............................. 20

*International Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. General
    Motors Corp.,*
    497 F.3d 615 (6th Cir. 2007) ................................................................................. 24

*Kranis v. Scott,*
    178 F. Supp. 2d 330 (E.D.N.Y. 2002) .................................................................... 5

*Lonardo v. Travelers Indem. Co.,*
    706 F. Supp. 2d 766 (N.D. Ohio 2010).................................................................... 5

*Malchman v. Davis,*
    761 F.2d 893 (2d Cir. 1985)................................................................................... 25

*In re Marsh & McLennan, Cos. Inc. Sec. Litig.,*
    No. 04 Civ. 08144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)......................... 9

*Mills v. Polar Molecular Corp.,*
    12 F.3d 1170 (2d Cir. 1993)................................................................................... 28

*National Super Spuds, Inc. v. New York Mercantile Exchange,*
    660 F.2d 9 (2d Cir. 1981) ...................................................................................... 28

*In re Nortel Networks Corp Sec. Litig.,*
    539 F3d 129 (2d Cir. 2008).................................................................................... 34

*Perdue v. Kenney A.,*
    130 S.Ct. 1662 (2010)............................................................................................ 20

*Petruzzi's, Inc. v. Darling-Delaware Co.,*
    880 F. Supp. 292 (M.D. Pa. 1995) ........................................................................ 28

*Rademacher v. McDonnell Douglas Corp., et al.,*
    917 F.2d 24 (6th Cir. 1990) .................................................................................... 6

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir.  2002) ................................................................................ 28

*Silber v. Mabon,*
    18 F. 3d 1449 (9th Cir. 1994) .................................................................................. 9

*Sobel v Hertz Corp.*,
  No. 06 Civ. 545, 2011 WL 2559565 (D. Nev. June 27, 2011) ............................................... 21

*Strom v. United States*,
  641 F.3d 1051 (9th Cir. 2011) ...................................................................................... 29

*TBK Partners Ltd., v. Western Union Corp.*,
  675 F.2d 456 (2d Cir. 2000).......................................................................................... 31

*In re The Mills Corp. Sec. Litig.*,
  265 F.R.D. 246 (E.D. Va. 2009) .................................................................................... 17

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir.1993) .............................................................................................. 9

*In re Tyco International, Ltd. Multidistrict Litig.*,
  535 F. Supp. 2d 249 (D.N.H. 2007)............................................................................... 16

*Union Asset Management Holding A.G. v. Dell, Inc.*,
  669 F.3d 632 (5th Cir. 2012) ......................................................................................... 30

*United States v. Kelley*,
  6 F. Supp. 2d 1168 (D. Kan. 1998)................................................................................... 6

*In re UnitedHealth Group Inc. PSLRA Litig.*,
  643 F. Supp. 2d 1094 (D. Minn. 2009).......................................................................... 17

*Viterbo v. Dow Chem. Co.*,
  826 F.2d 420 (5th Cir. 1987) ........................................................................................... 6

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ....................................................................................... 26

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)............................................................................ 35

*In re Wachovia Preferred Sec. & Bond/Notes Litig.*,
  No. 09 Civ. 6351, 2012 WL 2589230 (S.D.N.Y. Jan. 3, 2012)...................................... 20

*In re Wachovia Equity Sec. Litig.*,
  No. 08 Civ. 6171, 2012 U.S. Dist. LEXIS 97910 (S.D.N.Y. June 8, 2012) ..................... 34

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005)...................................................................................... 25, 31

*Weigner v. The City of New York*,
  852 F.2d 646 (2d Cir. 1988)............................................................................................ 7

*In re WorldCom Inc. Sec. Litig.*,
  No. 02 Civ. 3288, 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) ................................... 17

*Yoder v. Orthomolecular Nutrition Inst., Inc.*,
  751 F.2d 555 (2d Cir. 1985)........................................................................................... 28

*Zhag v. Honeywell, Int'l, Inc.*,
  No. 06 Civ. 1181, 2008 WL 2699398 (D. Ariz. June 30, 2008)........................................ 5

**Other Authorities**

2 NEWBERG ON CLASS ACTIONS, § 11:57 (4th ed. 2002) ............................................. 24

ABA Comm. on Ethics & Prof. Responsibility, Formal Op. 00-420 (Nov. 29, 2000) ........... 16-18

ABA Comm. on Ethics & Prof. Responsibility, Formal Op. 08-451 (Aug. 5, 2008) ............. 17-18

*Manual for Complex Litigation*, § 21.643, Role of Objectors in Settlement (4th ed. 2004) ........ 25

Nera, *Recent Trends in Securities Class Action Litigation:  2012 Mid-Year Review*
    (July 24, 2012) ..................................................................................................... 19

**Rules**

15 U.S.C. § 78u-4(a)(6) ........................................................................................ 20

Fed. R. Civ. P. 23(c)(2)(B) ...................................................................................... 7

Fed. R. Civ. P. 23, Advisory Committee Notes to 2003 Amendments, at subdivision (h)(2) ....... 26

## INTRODUCTION

The reaction to the Settlement has been overwhelmingly positive to date.  Of more than 2 million Notices sent to possible Class Members, there have been only 9 objections from Class Members, plus 4 objections from persons who are not Class Members or have provided no evidence of being members of the Class.[1]  The small number of objections weighs in favor of approval of the Settlement and fee application.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001); *Banyai v. Mazur*, No. 00 Civ. 9806 (SHS), 2007 WL 927583, at *9 (S.D.N.Y. Mar. 27, 2007).  None of the objections address the data provided in Plaintiffs' opening papers demonstrating that when compared to other settlements, especially subprime and collateralized debt obligation ("CDO") settlements, this Settlement is outstanding.  Nor do the objections address the fact that the fee requested is in line with or less than fees regularly requested and awarded in similar cases.

The lengthiest objection is that of Theodore Frank, a serial objector who heads the misnomered Center for Class Action Fairness ("CCAF").[2]  Mr. Frank's objection is long on speculation and innuendo and short on facts and law.  Given these inadequacies, Mr. Frank seeks to have himself recognized as a "billing expert," though his credentials do not support

---

[1]  All capitalized terms not otherwise defined shall carry the meaning set forth in the Stipulation and Agreement of Settlement, dated August 28, 2012, as amended (the "Stipulation"), and filed with the Court on August 29, 2012 [Dkt. No. 155-1], and as modified by the Court's September 28, 2012 Order Further Amending the Order Preliminary Approving Proposed Settlement and Providing for Notice [Dkt. No. 159].

[2]  Mr. Frank, individually or through CCAF, objected to at least 25 other class action or derivative settlements since 2009, and it appears that Mr. Frank's objection here is supported by the resources and attorneys of the CCAF.  *See* Reply Declaration of Ira M. Press and Peter S. Linden in Further Support of (i) Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation and (ii) Plaintiffs' Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Reply Decl.") ¶¶ 13-14; *see also* exhibit 4 to the Reply Decl. (article discussing Mr. Frank and the CCAF).  Unless otherwise noted, citations to "Ex. __" are to the exhibits annexed to the Reply Decl.

"expertise".  In truth, he is a biased crusader against class actions.  Mr. Frank's application should be rejected as should his substantive objections.

First, Mr. Frank argues that, due to delays by brokerage firms in submitting their lists of customers to the Claims Administrator, the Court-approved Notice did not provide these customers enough time to opt out of, or object to, the Settlement.  This objection has been mooted by this Court's January 2, 2013 Order, which, for reasons unrelated to Mr. Frank's complaint, extended the relevant deadlines for those and certain other Class Members.  Regardless, the notice program initially undertaken comports with all standards of due process and is consistent with notice programs that courts have repeatedly approved over almost two decades of securities litigation.

Mr. Frank's attacks on Plaintiffs' fee request for including contract attorneys and billing for their time are divorced from the facts and well-established law.  Contrary to Mr. Frank's speculation, these attorneys were selected based on their qualifications and included persons with extensive experience in matters of this nature.  Mr. Frank ignores the data Plaintiffs presented showing that the rates charged are in line with attorneys with similar experience.  Moreover, to our knowledge, every court that has examined the issue of billing rates for project-specific attorneys in PSLRA settlements has approved a fee based upon market rate billing.  Mr. Frank's sole response is that those judges had been "snookered."

Mr. Frank takes exception to Plaintiffs' experts' reliance on comparable cases that have settled in similar ranges to this case, asserting that the experts have manipulated the range of cases reviewed.  In truth, it is Mr. Frank who cherry picks data.  However, even if Mr. Frank's proposed sample of comparable class settlements were accepted, the fee request here is well

within the range of accepted fee requests in those settlements both in terms of percentage and as a lodestar multiplier.

Mr. Frank's suggestion that Plaintiffs' claim was not seriously at risk after the Court's ruling on the motion to dismiss demonstrates a startling disconnect with the obstacles of prosecuting this Action and the realities of securities fraud litigation in general.  Numerous fraud actions against Citigroup and other banks for misrepresentations relating to CDOs or other subprime exposures failed to garner any monetary benefit for their clients.  Moreover, class certification, loss causation, *Daubert* challenges, summary judgment and trial all posed significant risks for plaintiffs going forward.  Plaintiffs could not simply lay down and await a large recovery, as Mr. Frank suggests.  Only through hard-fought litigation, including exhaustive discovery and motion practice, were plaintiffs able to obtain the result achieved here.

Mr. Frank's claim that the result here represents nothing more than "nuisance" value is ludicrous.  The $590 million settlement here is the largest settlement ever in CDO-related litigation, the third largest subprime settlement and one of the largest PSLRA securities class settlements ever.

We preliminarily address the other objectors.

Plaintiffs in another action before this Court, *Brecher v. Citigroup*, No. 09 Civ. 7359, (S.D.N.Y. Nov. 14, 2011) (hereinafter, "FA CAP Objectors"), whose pleading largely copies the pleading in this Action, complain that the Settlement improperly releases claims relating to Citigroup common stock that they acquired three months after the close of the Class Period. Their premise is wrong.  Such claims are expressly *not* included in the Settlement Class here and, thus, are not released.  The FA CAP Objectors also assert that the Plan of Allocation does not properly value their section 12 claims, although case law clearly allows Plaintiffs to do so and

despite this Court's dismissal of most of the section 12 claims.  In any event, the objection rings hollow: though FA CAP participants acquired Citigroup stock at a 25% discount, they are being compensated on par with other Class Members.  Finally, they assert that Lead Counsel did not have authority to settle their claims.  But the Case Management Order in this case expressly authorized Lead Counsel here to settle claims arising from the purchase or sale of Citigroup common stock during the Class Period.  Moreover, the Notice expressly advised members of the putative class in *Brecher* that they had the right to opt out of this Class if they wanted to pursue their claims in the *Brecher* action.

The other objectors proffer conclusory challenges which are not based on the facts of this case or apposite contrary authority.

In sum, none of the objections presents a meaningful challenge to the adequacy of the settlement or the propriety of the fees requested.

## ARGUMENT

## I.   MR. FRANK'S OBJECTION IS MERITLESS AND SHOULD BE DENIED

### A.   Mr. Frank Cannot Serve as His Own Expert and, In Any Event, Is Not Qualified to Testify as an Expert on the Subjects on Which He Purports to Opine

Because the vast majority of Mr. Frank's objection is based upon nothing more than his "say-so," Mr. Frank asks the Court to elevate his opinions to the status of expert testimony.  *See* Frank Decl. ¶ 36.[3]  The Court should deny Mr. Frank's request to act as both objector and his own expert witness, and strike all portions of his brief and declaration in which he purports to advance expert testimony.  *See id.* at ¶¶ 36-74.

---

[3]  References herein to "Frank Decl." are to the December 20, 2012 Declaration of Theodore H. Frank in Support of Objection [Dkt. No. 182], and "Frank Br." refers to the Objection of Theodore H. Frank dated December 20, 2012 [Dkt. No. 181].

4

Mr. Frank does not bother to address the prejudice and inherent conflict of interest that arise when a litigant purports to serve as his own expert witness.[4]

Putting such issues aside, Mr. Frank simply does not possess the qualifications necessary to serve as an expert on the subjects in question.  *See* Fed. R. Evid. 702.  Mr. Frank does not identify a single court that has qualified him as an expert on customary billing practices relating to large scale document reviews.  This is unsurprising, since the bases for Mr. Frank's expertise consist of nothing more than the fact that he had been an associate at a large law firm, spoke on panels about general "discovery issues," and spoke to colleagues about general billing practices.  *See* Frank Decl. ¶¶ 37-38.  Mr. Frank does not state that:  (i) he had any responsibility for overseeing his previous employer's billing practices; (ii) any of his undisclosed conversations with "general counsels to Fortune 500 companies and 'BigLaw' firm litigation partners" related to billing for large scale document reviews; or (iii) any of his prior policy work or testimony dealt with that precise issue.  Nor does Mr. Frank describe what, if any, methodology underlies his opinion.  Hearsay, anecdotes and *ipse dixit* do not qualify one as an expert.

Rather, it is clear that Mr. Frank is not an objective expert, but a self-appointed advocate crusading against, *inter alia*, fee awards to class counsel.  That Mr. Frank, and the CCAF, view the objection process as a means to advance their ideological agenda has not gone unnoticed by the courts.[5]  *See, e.g.*, *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 773, 785 (N.D.

---

[4]  *Zhag v. Honeywell, Int'l, Inc.*, No. 06 Civ. 1181, 2008 WL 2699398, at *1 (D. Ariz. June 30, 2008) (permitting plaintiff to act "in the role of both 'plaintiff and advocate' would be 'unduly prejudicial, misleading, and confusing.") (quoting *Kranis v. Scott*, 178 F. Supp. 2d 330, 333-34 (E.D.N.Y. 2002); *Benhabib v. Hughs Elecs. Corp.*, No. 04 Civ. 0095, 2006 WL 5014569, at *2 (C.D. Cal. Sept. 6, 2006) ("permitting plaintiff to serve as an expert in his own case would be unfairly prejudicial . . . because plaintiff's 'expert' opinions are merely his own assessment of the facts, and are not 'the product of reliable principals and methods' applied to the facts of the case").

[5]  In fact, CCAF appears to be providing the labor and support for Mr. Frank's objection here.  *See* Reply Decl. at ¶ 14, filed concurrently herewith.  Prior to forming the CCAF in 2009, Mr. Frank worked at the "right-leaning think

(*footnote continued on next page*)

Ohio 2010) (describing Mr. Frank's arguments on behalf of objector as "long on ideology and short on law") (internal marks omitted); *see also id.* at 785 ("Mr. Frank filed a supplemental brief in which he conceded that the Court could grant Class Counsel's Fee petition under applicable Sixth Circuit authority, but nonetheless continued to press [the] objections in an effort to persuade the Court to adopt his own proposals with respect to the proper analysis of fee petitions in class action cases.").  Indeed, since 2009, Mr. Frank and/or his Center have filed at least 25 objections to class action settlements.  *See* Reply Decl. ¶ 13; Ex. 3.

Mr. Frank, of course, is free to object to the settlement and advance his own agenda.  He is not free, however, to offer his own testimony "dressed up and sanctified as the opinion of an expert."  *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (affirming exclusion of expert testimony).  Rather, where, as here, a purported "'expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading,'" and should be excluded.  *Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 984 (S.D. Ohio 1992) (quoting *Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 25-26 (E.D. Tex. 1986)).[6]  Accordingly, the Court should exclude Mr. Frank's proposed expert testimony in its entirety.

---

tank, the American Enterprise Institute," (*see* Ex. 5 (Ashby Jones, *A Litigator Fights Class-Action Suits*, the Wall St. J., Oct. 31, 2011)), and was also associated with the conservative Manhattan Enterprise Institute.

[6]  *See also In re Air Crash Disaster at Detroit Metro. Airport on Aug. 16, 1987*, 737 F. Supp. 427, 430 (E.D. Mich. 1989) (experts disqualified because they had preconceived notions before litigation commenced), *aff'd sub nom. Rademacher v. McDonnell Douglas Corp., et al.*, 917 F.2d 24 (6th Cir. 1990); *Borgognone v. Trump Plaza*, No. 98 Civ. 6139, 2000 WL 341135, at *4, 5 (E.D.N.Y. Mar. 9, 2000) (excluding "partisan advocacy on behalf of plaintiff's cause" and holding that expert could not testify "to facts of which he has no knowledge and which appear to issue from little more than cavalier speculation"); *United States v. Kelley*, 6 F. Supp. 2d 1168, 1185 (D. Kan. 1998) (precluding co-founder of *High Times* Magazine from testifying as a defense witness in prosecution for possession of marijuana with intent to distribute, and noting that the proposed expert's "self-created advocacy role can be just cause for taking more care in determining his qualifications").

**B.    Mr. Frank's Objection to the Notice Program is Meritless, and, In Any Event, Moot**

**1.    The Notice Program Was the Best Practicable**

Rule 23(c)(2) of the Federal Rules of Civil Procedure does not require perfect notice, but only "the best notice *that is practicable under the circumstances*."  Fed. R. Civ. P. 23(c)(2)(B) (emphasis added).  Similarly, to satisfy due process "not every class member need receive actual notice [of the class settlement], as long as class counsel 'acted reasonably in selecting means likely to inform persons affected.'"  *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 248-49 (E.D.N.Y. 2010) (citation and quotation omitted); *Weigner v. The City of New York*, 852 F.2d 646, 649 (2d Cir. 1988) ("[t]he proper inquiry is whether [class counsel] acted reasonably in selecting means likely to inform persons affected, not whether each [class member] actually received notice.").

Here, the notice program easily satisfied these standards.  The Claims Administrator mailed settlement notices to over 2.2 million persons, published a summary notice in *The Wall Street Journal* and over *PR Newswire*, and set up a toll free number and a web site through which class members could obtain a copy of the Notice.[7]  When an error in the record holder list was discovered after the objection deadline, the parties promptly notified the Court and requested an extension of the deadlines set forth in the Notice.  *See* Dkt. No. 183, Order, dated January 2, 2013 ("Jan. 2, 2013 Order").

---

[7]    In addition, lead counsel issued a press release advising class members on how to obtain the Notice and information regarding the Settlement, and the Settlement itself received widespread news coverage.  *See, e.g.*, Jessica Silver-Greenberg, *Citigroup Settles Lawsuit Over Subprime Securities*, N. Y. Times, Aug. 30, 2012, at B4; Suzanne Kapner, *Citi to Settle Suit for $590 million*, Wall St. J., Aug. 30, 2012, at C1; Jonathan Stempel, *Citigroup settles shareholder CDO lawsuit for $590 million*, Reuters, Aug. 30, 2012; Patricia Hurtado & Donald Griffin, *Citigroup Settles Investors' CDO Suit for $590 million*, Bloomberg, Aug. 29, 2012.

The parties also advised the Court that certain brokerage firms had not timely provided the Claims Administrator with names of the beneficial owners for whom they purchased Citigroup stock. As a result, the Court extended the time for these class members to opt out, object, or file proofs of claim. In short, class counsel went to great lengths to ensure that the class received the best notice practicable.[8]

### 2.    The Notice Program Followed Court-Approved Protocols

Mr. Frank asserts that notice here was not the "best practicable" because he first received the Notice on December 12, 2012. Any such complaint has been mooted by the Court's Jan. 2, 2013 Order, extending the deadlines for persons such as Mr. Frank.

Regardless, Mr. Frank's objection is meritless. Mr. Frank received late notice due to his brokerage firm's delay, not any error of the parties or the Court-appointed Claims Administrator, Garden City Group, Inc. ("GCG"). *See* Jan. 2, 2013 Order; Reply Decl. ¶¶ 16-17.[9] In fact, the procedures employed here were standard practice, which developed from the combined efforts – spanning decades of securities class litigation – of plaintiffs, defendants, courts and objectors, all of whom were keenly interested in ensuring adequate notice. That protocol satisfies Rule 23 and due process, regardless of whether or not "'some individual shareholders [such as Mr. Frank] got adequate notice,'" because "'the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement.'" *In re Intel Corp. Deriv. Litig.*, No. 09

---

[8]  The foregoing belies Mr. Frank's unsupported speculation of a nefarious conspiracy among the parties and the Claims Administrator to deprive certain class members of timely notice. *See* Frank Br. 6.

[9]  The facts make this clear:  (1) Mr. Frank owned Citigroup shares registered in the "street name" of his broker, Charles Schwab; (2) GCG mailed notices to Charles Schwab (on October 10, 2012) and other like brokers listed as record holders, requesting that they forward notice to beneficial owners, or provide GCG with contact information for such beneficial owners; (3) GCG, in the absence of responsive information from Schwab, thereafter followed up twice with Schwab; (4) Schwab finally provided GCG with a list of beneficial owners on December 3, 2012; and (5) within five days of receipt of such information, GCG mailed individualized notice to such beneficial owners, including Mr. Frank. *See* Reply Decl. ¶¶ 16-17.

Civ. 867, 2010 WL 2955178, at *2 (D. Del. July 22, 2010) (quoting *Fidel v. Farley*, 534 F.3d

508, 514 (6th Cir. 2008)).[10]   As the court noted in *In re Marsh & McLennan, Cos. Inc. Sec.*

*Litig.*, No. 04 Civ. 08144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009):

> That certain objectors' brokers failed to comply with the Preliminary Approval
> Order and forward their clients the necessary paperwork in a timely fashion is no
> fault of Lead Counsel.  *That is the risk a shareholder takes in registering his or
> her securities in street name.* Moreover, notice provided to the class members'
> nominees – *i.e.*, the brokerage houses – has been deemed sufficient even if
> brokerage houses failed to timely forward the notice to the beneficial owners.

*Id.* at *24 (citations and quotations omitted, emphasis added).

Indeed, every court of appeals to have addressed untimely notice owing to the delay of

broker/dealers has held that such notice still meets both due process and Rule 23.[11]   *In re*

*Franklin Nat'l Bank Sec. Litig.*, 574 F.2d 662 (2d Cir. 1978), does not counsel otherwise.  *See*

Frank Br. 5.  *Franklin* merely clarified that the costs of notifying beneficial owners should not be

borne by the broker dealers.  574 F.2d at 672.

## C.      The Scope of the Notice's Releases Is Unremarkable

Mr. Frank also complains about the scope of a purported "extraordinary release waiving

claims against class counsel."   Frank Decl. ¶ 25.   Although Mr. Frank does not specify the

precise provision at issue, it appears that he is referring to the waiver of claims concerning the

---

[10]  Here, the time from initial Notice mailing until the first deadline for class members to act (57 days) was *larger* than the time allotted in many other PSLRA settlements.  Reply Decl. ¶¶ 166-67.

[11]  *See, e.g.*, *Fidel*, 534 F.3d at 513-15 (affirming finding of adequate notice even where "approximately 20%" of class members received untimely notice due to broker failure to identify beneficial owners, noting that "in each case in which a court has confronted this issue, notice provided to the class members' nominees – *i.e.*, the brokerage houses – has been deemed sufficient even if brokerage houses failed to timely forward the notice to the beneficial owners") (citing cases); *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 936, 945-47 (10th Cir. 2005) (finding notice sufficient where two beneficial owners received notice of class settlement two weeks after deadline for filing objections); *Silber v. Mabon*, 18 F. 3d 1449, 1453-54 (9th Cir. 1994) (finding notice adequate where approximately 17% of the class received notice *after* the opt-out deadline as a result of late response of brokerage house); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir.1993) (concluding notice was sufficient where notice was mailed to beneficial owners *after* deadline for filing objections).

administration of the Settlement Fund.  *See* Notice at ¶ 45 attached as Ex. 1; Stipulation at ¶ 22. Far from extraordinary, however, such language is commonly utilized, without judicial criticism, in numerous other settlements.  *See* Reply Decl. ¶¶ 168-69.[12]

> ### D.      The Fee Request Is Reasonable When Viewed as a Percentage of the Recovery

As Plaintiffs demonstrated in their opening papers, the requested 16.5% fee is reasonable when compared to awards in similarly-sized securities class actions: it is below both (i) the 16.69% average fee awarded in all securities class actions in the $490-$690 million range; and (ii) the 17.34% average fee awarded in all securities class action settlements in the $550-$800 million range.  *See* Coffee Decl. ¶¶ 17-18; Miller Decl. ¶ 58.[13]

Nonetheless, Mr. Frank complains that the fee request is improper because the PSLRA purportedly requires that fee awards be calculated as a percentage of the settlement fund net of any expenses:  meaning that the fee award should be measured from the $590 million settlement fund net of counsel's expenses and notice and administration costs.  Frank Br. 7.  Mr. Frank's criticism, even if credited, would not impact the calculation of Plaintiffs' requested fee in any meaningful way, and should be rejected.

Contra Mr. Frank, the majority of courts in comparable securities class actions evaluate fee requests and award fees considered as a percentage of the gross, rather than net, settlement fund.  S*ee* Reply Decl. ¶¶ 37-38.  Indeed, were the court-awarded fees in such cases to be

---

[12]  Mr. Frank also asserts, in passing, that one of the Claims Administrator's representatives informed him that the release language precluded him from simultaneously objecting and filing a claim in this Action.  *See* Frank Decl. ¶ 15.  Mr. Frank's alleged individual (and apparently unique) experience aside, the Notice clearly explains that there is no restriction on a class member objecting and simultaneously filing a proof of claim.  *See* Notice at 2, 11.

[13]   References herein to "Coffee Decl." and "Miller Decl." are to the December 6, 2012 Declaration of John C. Coffee, Jr. [Dkt. No. 167], and   the December 6, 2012 Declaration of Geoffrey P. Miller [Dkt. No. 166], respectively.

recalculated as a percentage of the net settlement fund, the fee percentage awards in these cases would rise (further demonstrating the reasonableness of the fee requested here).

More fundamentally, the distinction Mr. Frank seeks would not alter this Court's calculus in any material way. Were requested fees calculated on a net basis, after subtraction of expenses and estimated Notice costs from the settlement fund, they would amount to 16.81%, versus 16.5% on a gross basis. Reply Decl. ¶ 40. For the Court's purposes – namely, evaluating whether the requested fee is reasonable – the difference between 16.5% and 16.81% vanishes into irrelevance. Moreover, Mr. Frank's distinction has no bearing whatsoever on the Court's lodestar crosscheck, as the 1.89 multiplier is *a priori* unaffected by net/gross distinctions and remains well below the average for comparable cases.

Mr. Frank also complains that Professor Miller's sample of comparable cases (securities cases that settled in the $550 million to $800 million range) is inaccurate because it excludes two cases that settled below $550 million:  namely, *In re Lehman Brothers Securities & ERISA Litigation*, No. 09 MD 2017 (S.D.N.Y. June 29, 2012) (Ex. 12), where the fee award was 11% (but 1.5 times lodestar), and *In re Merrill Lynch & Co., Inc. Sec., Deriv. & ERISA Litig.*, No. 07 Civ. 9633 (S.D.N.Y. 2009), where the fee award was 7.815%.[14]  *See* Frank Br. 9.[15]

While Mr. Frank baselessly accuses Professor Miller of "cherry pick[ing] his data artificially," Frank Br. 9, Mr. Frank commits the very error he decries. Specifically, Mr. Frank neglects to mention that if the bottom end of the survey range were reduced from $550 million to

---

[14]  Mr. Frank ignores that the main reason the *Lehman* court granted a lower fee percentage is because, unlike here, class counsel achieved their results largely on the coattails of a bankruptcy examiner's prior investigation and findings. *See* Ex. 12, at *2.

[15]  Mr. Frank does not take exception with the sample of comparable PSLRA settlements used by Professor Coffee in his declaration – the cases that settled within $100 million of this case in either direction. *See* Coffee Decl. ¶ 17. The average fee percentage in those cases was 16.69% (with an average lodestar multiplier of 2.29). *Id.* at ¶ 18.

$475 million, as it would have to be in order to include the *Merrill Lynch* settlement, the sample would also have to add *In re BankAmerica Corp. Sec. Litig.*, 228 F. Supp. 2d 1061, 1064-66 (E.D. Mo. 2002), a $490 million settlement in which the court awarded a 17.64% fee (a lodestar multiplier of 3.0).   Moreover, while Mr. Frank is intent on expanding the bottom end of the range, one could just as easily expand the top end of the range to $820 million – which would capture the 17.18% fee in *In re HealthSouth Corp. Stockholder Litigation*, No. 03 Civ. 1500 (N.D. Ala.).  *See* Ex. 11.

At bottom, all Mr. Frank has shown is that, while the range of similarly-sized PSLRA settlements can be tweaked slightly in one direction or another, the average fee awards in any fair sample will be somewhere between 15% and 17.18%.   Thus, the fee request here is reasonable when compared to any fair sample of comparable securities settlements.

Lastly, Mr. Frank's criticism that Professors Coffee and Miller should have included *In re Bank of America Sec. Litig.*, No. 09 MDL 2058 (S.D.N.Y.) and *Cobell v. Salazar*, 679 F.3d 909 (D.C. Cir. 2012) in their surveys simply ignores the specifics of those cases as well as the scope of the surveys he purports to criticize.  Professors Coffee and Miller made it clear that they were comparing the settlement here *to other federal securities class action settlements of similar dollar amounts.  See* Coffee Decl. ¶ 17; Miller Decl. ¶ 58.  Not only are the settlement amounts in *Bank of America* and *Cobell* ($2.45 billion and $1.51 billion, respectively) outside of the range of similar cases, the *Bank of America* settlement has yet to be approved by the Court (*see also infra* at 23), and *Cobell* is not even a securities action.

### E.    Counsel's Lodestar Properly Includes All Attorneys' Work In This Action

Plaintiffs' opening papers submitted extensive data demonstrating the reasonableness of both: (i) the requested 1.89 lodestar multiplier relative to similar cases, *see* Coffee Decl. ¶ 30;

Miller Decl. ¶¶ 45-48; and (ii) the attorneys' hourly rates relative to rates charged by comparable counsel, *see* Miller Decl. ¶¶ 38-42.  Frank does not dispute this data, but instead challenges counsel's lodestar because it includes attorneys who were hired specifically to assist with discovery and other tasks in this Action (the "project attorneys"), *see* Frank Br. 11-14.  Frank is wrong on the facts and the law.[16]

To the facts, Frank denigrates the project attorneys' qualifications and the work (he imagines) they performed.

First, without any basis, Frank insists that the project attorneys' work was "ministerial" (*id*. at 1), "trivial and relatively unskilled first-pass document review" (*id*. at 11), "low-skill work" (*ibid*.), "low skilled" (*id*. at 12 and 13), and "unskilled drudgework" (*id*. at 13). Similarly without basis, Frank muses that "it is entirely possible" that the project attorneys were not even doing "low skilled attorney work" but instead "doing purely clerical 'objective coding' work that should not be performed by an attorney at all."  Frank Br. 12.

But in fact, no objective coding was performed (Reply Decl. ¶¶ 82-84), and Frank's remaining preconceptions are at odds with the project attorneys' actual work, detailed in the Reply Declaration (*see* Reply Decl. ¶¶ 85-151) and summarized below.

Second, Frank resorts to "hit and run" *ad hominem* attacks on a handful of the project attorneys while ignoring their credentials and relevant experience.  For example, Frank belittles project attorney India Autry as being a "personal shopper, actress and commercial model" as

---

[16]  Mr. Frank also intimates that Plaintiffs attempted to conceal the fact that they retained temporary attorneys to assist with the prosecution of this case.  *See* Frank Br. 11.  But this is not true.  The December 7, 2012 Joint Declaration of Ira M. Press and Peter S. Linden in Support of (i) Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation and (ii) Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses [Dkt. No. 171] ("Joint Decl.") stated that Plaintiffs hired additional counsel specifically to assist with this Action.  *See* Joint Decl. ¶ 69.  Moreover, even a cursory review of the attorneys listed in class counsel's fee application and the firm resume submitted in support thereof shows that there were non-permanent attorneys who worked on this case.  *See id.* at Ex. E.

well as a "lipstick & style counselor," *see* Frank Br. 11; Frank Decl. Ex. 6, while conveniently

omitting that Ms. Autry's experience includes project attorney work for major law firms such as

Davis Polk & Wardwell, Sullivan & Cromwell, and Skadden Arps.  *See* Frank Decl. Ex. 7.[17]

Notwithstanding Frank's slurs, the facts are that many of the project attorneys graduated

from the nation's best law schools (Reply Decl. ¶ 69); were previously employed by the nation's

best law firms as associates (*id.*, ¶ 70) or on a project-specific basis (*id.*, ¶¶ 71-72); possessed

relevant prior legal experience, including in complex securities litigation and in discovery work

generally (*id.*, ¶¶ 71-72, 74-75) as well as specific experience with the highly complex,

subprime-backed structured finance instruments at the center of this litigation (*id.*, ¶¶ 74-76); and

possessed additional relevant experience, qualifications and skills (including prior employment

in the securities industry, advanced degrees in finance or business, and accounting backgrounds)

(*id.*, ¶¶ 73, 77).[18]

Kirby McInerney then provided the project attorneys with extensive further training (*see*

Joint Decl. ¶¶ 69-72; Reply Decl. ¶¶ 49, 101, 106, 119-27, 148-49) in order to prepare them for

the unusually complex documents and issues that they would confront (Reply Decl. ¶¶ 119-27,

147-51); monitored and supervised their work closely (*id.*, ¶¶ 126, 128-29); entrusted them with

work of extremely high importance and sophistication, including (a) substantive review, analysis

and evaluation of the voluminous production (approximately 40 million pages) critical to

---

[17]  The same selective reading of Mr. Frank's biography would justify describing him as a high-stakes gambler, considering that he financed an entrant in the 2004 World Series of Poker and made stock bets that speculated about certain Supreme Court rulings.  *See* Ex. 5.  Such a characterization would ignore Mr. Frank's accomplishments as an attorney.

[18]  Frank also accuses Plaintiffs' counsel of misrepresenting project attorney Nelson DeLaCruz's year of graduation as being 1998, when Frank claims it was 2009.  *See* Frank Decl. ¶ 31.  Frank, however, is unable to corroborate his slander for the simple reason that Mr. DeLaCruz, in fact, graduated from law school in 1998, as Plaintiffs reported. *See* Joint Decl. Ex. E; *see also* Reply Decl. ¶¶ 157-58.

gathering evidence of *scienter*, falsity and materiality, and (b) assisting senior attorneys in preparing for the depositions of dozens of Citigroup executives and senior officers (*id.*, ¶¶ 130-46) – work which Frank himself describes as "legally substantive" (Frank Decl. ¶ 52).  Kirby McInerney believes they performed this work extremely well, and operated at a superior level of understanding with respect to the factual and legal issues here.  Reply Decl. ¶¶ 96-127, 130-51.

Mr. Frank also misstates the law.  Courts have repeatedly recognized that massive, complex securities class actions demand the assistance of additional attorneys who are hired for that particular purpose.  *See, e.g.*, *In re AOL Time Warner S'holder Deriv. Litig.*, No. 02 Civ. 6302, 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010) ("[c]ontracted personnel are now a feature in the legal community"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 782 (S.D. Tex. 2008) ("[T]he hiring of a contract or temporary attorney is a common practice in law firms today.").

All of the authority we have seen supports the practice of billing project attorneys at the market rate for comparable in-house attorneys in calculating fee awards.  These courts also have expressly rejected Mr. Frank's argument that project attorney fees should be considered an overhead expense, recognizing that: (i) project attorneys are functionally indistinguishable from associate attorneys, whose billing rates are not merely a function of salary and overhead; and (ii) counsel's risk in recouping its project attorneys' costs was no more certain that its recoupment of associate salaries. [19]

---

[19]  Mr. Frank asserts, without authority, that defense side law firms do not bill project attorneys out at regular attorney market rates.  Frank Br. 13-14.  Plaintiffs' understanding is that this assertion is incorrect.  Even if true, however, a defense firm does not carry the financial risk of project attorneys it has hired.  In contrast, plaintiff firms carry this risk whether for project attorneys or firm associates.  Reply Decl. ¶¶ 45-46.

For example, in *In re AOL Time Warner*, the court rejected an objector's argument that counsel was not entitled to charge a mark-up for the contract attorneys, noting:

> Law firms are not eleemosynary institutions.  Economic rationale dictates that the fees that they charge to their clients should be higher than the amount paid to their timekeeping personnel.  The court should no more attempt to determine a correct spread between the contract attorneys' cost and his or her hourly rate than it should pass judgment on the deferential between a regular associate's hourly rate and his or her salary.

2010 WL 363113, at *26 (citing ABA Comm. on Ethics & Prof. Responsibility, Formal Op. 00-420 (Nov. 29, 2000)); *see also id.* ("counsel's recoupments risk in employing contract attorneys was no less uncertain than that relating to the salaries paid to their regular employees.").[20]

Similarly, in *In re Enron Corp.*, the court rejected an objector's challenge to contract attorney use and rates, noting that:  (i) "economics is the principal reason for the emergence of lawyer 'temping' because it permits a firm to service client needs during typically busy periods by engaging an experienced attorney without incurring the expense of hiring a permanent employee" and (ii) "it is not uncommon for an employing law firm to pay a temporary lawyer at one rate and charge that lawyer for services to the client at a higher rate that covers overhead and contribution to firm profits."  586 F. Supp. 2d at 783 (internal citations omitted).

Likewise, in *In re Tyco International, Ltd. Multidistrict Litigation*, 535 F. Supp. 2d 249 (D.N.H. 2007), the court reasoned:

> [Objectors] argue[] that the work done by contract attorneys should be treated as an expense to be reimbursed, rather than being included in the lodestar.  This objection lacks merit.  The lodestar calculation is intended not to reflect the costs incurred by the firm, but to approximate how much the firm would bill a paying client.  *An attorney, regardless of whether she is an associate with steady*

---

[20]  That court also rejected the objector's argument that the work performed by contract attorneys "was more clerical than legal," 2010 WL 363113, at *25, where, as here, "[c]ounsel report[ed] that the contract attorneys here were not mere clerks but exercised judgment typically reserved for lawyers, under the supervision of the firms' regular attorneys," *id.*

> *employment or a contract attorney whose job ends upon the completion of a particular document review project, is still an attorney. It is therefore appropriate to bill a contract attorney's time at market rates* and count these time charges toward the lodestar.

*Id.* at 272-73 (emphasis added); *see also Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 410 (D. Conn. 2009) ("the court concludes that it is not objectionable . . . to apply a multiplier to a lodestar that includes work performed by contract attorneys, even though the profit margin for the firms employing them was greater than the profit margin the firms would have had for work done by full-time employees"); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264-65 (E.D. Va. 2009) ("[T]he court has absolutely no trouble finding that contract attorneys should be billed at market versus cost. They are part of the team brought in to benefit the Class. Their contributions are of a similar nature to the attorneys who are in the firms retained by plaintiffs, and they should be compensated in that manner.").[21]

Understanding that the law is squarely against him, Mr. Frank attempts to discredit these cases on the ground that they did not consider ABA Formal Opinion 08-451, which Mr. Frank contends requires "outsourced legal services" to be billed at cost. Frank Br. 12. Putting aside that Mr. Frank is unable to cite a single case supporting his interpretation of ABA Formal Opinion 08-451, the very authorities he cites undermine his position. *See* Frank Br. 13. Specifically, in *Carlson*, 596 F. Supp. 2d at 409, the court analyzed Formal Opinion Nos. 08-451 and 00-420 (which Mr. Frank neglects to mention), and concluded that they permit a law firm to

---

[21] *See also In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1105 (D. Minn. 2009) ("Objections to the use of paralegals and contract lawyers are rejected, as these participants provided an efficient and appropriate method of staffing cases,…."); *In re WorldCom Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 WL 2591402, at *21 n.48 (S.D.N.Y. Nov. 12, 2004) ("The extensive use of contract attorneys was justified by the need to review over ten million pages of documents and was a far more efficient way of proceeding than giving the task to more highly compensated counsel."). Courts also allowed inclusion of project attorneys in the lodestar and awarded multipliers thereon in numerous other PSLRA cases where the issue was not specifically addressed in an opinion. *See* Reply Decl. ¶ 58 n.9.

bill a contract attorney to a client as fees rather than costs, where, as here, the law firm supervised the contract attorney's work or adopted such work as its own.

Additionally, Mr. Frank misleadingly elides key portions of ABA Op. No. 08-451, in order to make it appear that the purported limitation on including a markup for contract attorneys applies here, when it plainly does not.  *See* Frank Br. 12.  Specifically, after expressly noting that a firm is allowed to include a markup when the firm bills the contract attorney as part of the firm's fees, *see* ABA Op. No. 08-451, at 5 (citing ABA Op. No. 00-420), the Opinion provides "[i]f the firm decides to pass those costs through to the client as a disbursement, however, no markup is permitted," *id.* at 6 (emphasis added).  Thus, the limitations Mr. Frank cites refer only to disbursements, and have no application where, as here, Lead Counsel's project attorneys are included in its fees.  *See id.* at 5-6.

### F.      The Requested Lodestar Multiplier Cross-Check is Reasonable

In their opening papers, Plaintiffs demonstrated that the requested lodestar multiplier of 1.89 is reasonable when compared to fee awards in similarly-sized securities class action settlements.  *See* Fee Br. 7.[22]  Mr. Frank does not address any of this data, nor does he attempt to introduce his own data of lodestar multipliers awarded to counsel in comparable cases.

Instead, Mr. Frank argues that counsel's out-of-pocket expenditures totaling millions of dollars and their tens of thousands of attorney hours were not seriously at risk in the prosecution of this Action.  *See* Frank Br. 14-18.  Mr. Frank's argument ignores the reality of a securities class action prosecution.

---

[22]   References herein to "Fee Br." are to the December 7, 2012 Memorandum of Law in Support of Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses [Dkt. No. 170].

As previously noted, the risk of dismissal in securities class actions in general is nearly 50%. *See* Joint Decl. ¶ 163. Consistently, numerous CDO and other subprime crisis cases have been dismissed. *Id.* at ¶¶ 125-27. Furthermore, the risk of loss is in excess of 40% at the point of trial. *Id.* at ¶ 163. Tellingly, several other actions involving Citigroup's CDO exposure have resulted in victories for Citigroup. *Id.* at ¶¶ 128, 165. As such, Mr. Frank's conclusion that securities class actions, including this case, are a "risk free" venture rings hollow.

Mr. Frank's blackjack analogy – and, specifically, his dubious assertion that "once [plaintiffs] survive a motion to dismiss, the odds are better than 4:1 in their favor, *see* Frank Br. 15 – is contradicted by the relevant data. For example, the recent NERA report titled *Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review* (July 24, 2012) notes that, post-dismissal, nearly 14% of decisions on class certification in PSLRA cases deny certification. Moreover, approximately 20% of the decisions on summary judgment dismiss the actions entirely and another 37.5% of the summary judgment decisions grant partial dismissal. *See* Reply Decl. ¶ 30. That report also confirms that more than 40% of the PSLRA cases that reached the trial verdict stage resulted in complete victories for the defense. *See id.* at ¶ 31.

Nor is Mr. Frank's "risk" argument supported by his observation that the amount of time dedicated to prosecuting a securities fraud class action increases following the denial of a motion to dismiss. *See* Frank Br. 15. Putting aside that the PSLRA stay bars discovery until a motion to dismiss is decided, Mr. Frank's observation "proves" nothing more than the obvious truism that once discovery commences in cases of this magnitude, plaintiffs' counsel need to devote substantial resources to producing and reviewing documents, taking and defending depositions,

19

and dealing with expert discovery.  *See* Joint Decl. ¶¶ 64-95.[23]  Even assuming *arguendo* that the appropriate multiplier should decline following denial of the motion to dismiss, Mr. Frank's argument would still lack merit.  After all, 25 of the 29 PSLRA class actions that settled in excess of $400 million had progressed beyond the motion to dismiss and into discovery prior to settlement, and the average lodestar multiplier in those cases was 3.89.  *See* Reply Decl. ¶ 35; Ex. 11.

Finally, there is no merit to Mr. Frank's suggestion that, in the wake of *Perdue v. Kenney A.*, 130 S.Ct. 1662, 1669 (2010), lodestar multipliers are no longer appropriate for class counsel in securities actions.  *Perdue* was not a common fund action, let alone one governed by the PSLRA, which expressly authorizes awarding a percentage of the recovery as an attorneys' fee.  *See* 15 U.S.C. § 78u-4(a)(6).  Accordingly, subsequent to *Perdue*, numerous courts in the Second Circuit and throughout the federal system have continued to award lodestar multipliers to class counsel in PSLRA and other securities-related class actions.[24]

---

[23]  Mr. Frank's *ipse dixit* that settlement in a securities fraud action is a *fait accompli* post-dismissal suffers from a fundamental misunderstanding of cause and effect.  No serious objector could contend that sophisticated financial institutions, represented by top-notch defense firms, would settle, or settle for as much, if plaintiffs' counsel did not aggressively pursue discovery to support the pleading, and instead put the case on auto-pilot.

[24]  *See, e.g., Board of Trustees of AFTRA Ret. Fund v. JP Morgan Chase Bank, N.A.*, No. 08 Civ. 686, 2012 WL 2064907, at *2 (S.D.N.Y. June 7, 2012); (multiplier of 2.86); *Anwar v. Fairfield Greenwich Ltd.*, No. 11 Civ. 813, 2012 WL 1981505, at *3 (S.D.N.Y. June 1, 2012), (multiplier of 2.42); *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 Civ. 6351, 2012 WL 2589230, at *3 (S.D.N.Y. Jan. 3, 2012) (multiplier of 2.3); *International Brotherhood of Elec. Workers Local 697 v. Int'l Game Tech., Inc.*, No. 09 Civ. 0419, 2012 WL 5199742 at *4 (D. Nev. Oct. 19, 2012) (2.02 multiplier); *In re Charles Schwab Corp. Sec. Litig.*, No. 08 Civ. 1510, 2011 WL 1481424, at *8 (N.D. Cal. Apr. 19, 2011) (2.68 multiplier); *In re Comverse Tech. Inc. Sec. Litig.*, No. 06 Civ. 1825, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) (2.78 multiplier); *In re Dell, Inc. Sec. Litig.*, No. 06 Civ. 726, 2010 WL 2371834, at *15, 19 (W.D. Tex. June 11, 2010) (2.5 multiplier).

### G.        The Settlement Represents a Significant Recovery

Mr. Frank objects to the fee request on the ground that the $590 million cash settlement is not a success, but rather an "unexceptional nuisance settlement" for which no lodestar multiplier is merited.  Frank Br. 18-20.  This objection is nonsense.

The sole authority Mr. Frank cites for this part of his objection, *Sobel v Hertz Corp.*, No. 06 Civ. 545, 2011 WL 2559565 (D. Nev. June 27, 2011), is so inapt that it undermines Mr. Frank's argument.   In *Sobel*, the court refused to approve a "strictly [] coupon settlement" without "any provision for cash payments to the Settlement Class" (and therefore denied plaintiffs' counsel's fee request, equivalent to 91.5% of lodestar, as moot).  *Id.* at *4.  Although Mr. Frank apparently sees no distinction, the difference between the $0 *Sobel* settlement and the $590 million cash recovery here is manifest.

Moreover, contrary to Mr. Frank's rhetoric, it is undisputed that the recovery here is: (i) the largest recovery *ever* in any CDO-related litigation; (ii) the third-largest in litigation stemming from the subprime crisis; and (iii) the second largest PSLRA recovery of all time in a fraud-only claim with no earnings restatement (*i.e.*, in cases where defendants contested rather than conceded falsity).  *See* Joint Decl. ¶¶ 119-23.  The Settlement, by every measure, is one for the record books.  Furthermore, the outcome in several parallel litigations against the *same defendants arising from the same facts* further highlights the superiority of the results achieved here:  the ERISA and derivative class litigation recovered $0; the Abu Dhabi action recovered $0; and the SEC action settled for $75 million.

Mr. Frank's remaining arguments fare no better.   *First*, Mr. Frank's claim that the requested 1.89 multiplier is "at the high end of what Second Circuit law allows," Frank Br. 18, is unsupported by a single citation.   In fact, Second Circuit law is replete with multipliers

substantially greater than 1.89, and the multiplier requested here is at the *low* end of multipliers awarded in *all* equivalent PSLRA settlements.  *See* Fee Br. 6-7; Joint Decl. ¶¶ 174-76.

*Second*, Mr. Frank's assertion that Professor Coffee's favorable opinion of the $590 million recovery was based primarily on Citigroup's insolvency risk, Frank Br. 18-19, is simply not true.    Professor Coffee's opinion rested on far broader grounds, including his: (i) consideration of the *particular* legal and factual issues and challenges at play in this case; and (ii) comparative analysis of this settlement *vis a vis* the *entire* history of securities class action litigation recoveries.  *See* Coffee Decl. ¶¶ 2-3, 12-25.  Such consideration is entirely absent from Mr. Frank's analysis.

*Third*, Mr. Frank's conclusion that the Plaintiffs would have faced minimal difficulties in taking this case to trial rests on nothing more than his crudely drawn caricature of a jury pool "disproportionately consisting of [] the unemployed or underemployed," whom he confidently predicts are clamoring to render a verdict against a large financial institution.  Frank Br. 19. Putting aside that Mr. Frank's description of New York City juries is offensive, his speculation conveniently ignores that the only two New York City jury verdicts rendered in CDO-related cases were for the *defendants*.  *See* Final Approval Br.[25] at 15-16.

More critically, Mr. Frank arrives at his conclusion by ignoring the myriad case-specific difficulties in proving culpability here, such as Plaintiffs' burden of establishing officer-level

---

[25]  References  herein to "Final Approval Br." are to Plaintiffs' December 7, 2012 Memorandum of Law in Support of Motion for Final Approval of Proposed Class Action Settlement and Approval of Plan of Allocation [Dkt. No. 169].

*scienter*, materiality and loss causation in a case involving incredibly complex financial instruments. *See* Joint Decl at ¶ 111-116, 154-62.[26]

*Fourth*, Mr. Frank again takes liberties with the record in claiming that the settlement here is deficient because "other financial crisis cases have resulted in enormous settlements." Frank Br. 19. Only two subprime-related PSLRA actions have yielded recoveries larger than this one: *Countrywide* ($601.5 million) and *Wachovia Preferred* ($627 million), and both of those recoveries are more similar to than distinct from this one. Specifically, the *Countrywide* and *Wachovia Preferred* recoveries were only 1.95% and 6.27% larger than the $590 million recovery here. And, as Plaintiffs previously noted, the *Countrywide* and *Wachovia Preferred* settlements were funded by multiple settling parties (each of whom paid *less* than Citigroup paid here) and were buoyed by the presence of easier-to-litigate, non-*scienter* claims. *See* Joint Decl. ¶ 123. In fact, the amount paid by Citigroup in this litigation *exceeds the amount paid by any other single defendant in any other subprime crisis-related PSLRA litigation*.

Mr. Frank's reliance on the not-yet-approved *In re Bank of America* settlement is similarly misplaced. The plaintiffs in *Bank of America* brought claims under Sections 11 and 14, which, unlike the Section 10(b) claims here, do not require proof of *scienter*. Furthermore, that action piggy-backed at least three preexisting governmental investigations brought by the SEC, the United States House of Representatives Oversight and Government Reform Committee and New York's Attorney General. These investigations yielded, *inter alia*, admissions by Bank of America's senior officers of the key elements of plaintiffs' claim. *See* Reply Decl. ¶ 42; Ex. 35.

---

[26]   Moreover, any discussion of trial prospects, of course, assumes that Plaintiffs would have first (i) prevailed in certifying the class, despite the inherent difficulty in proving that Citigroup's stock decline was attributable to Defendants' alleged malfeasance rather than the credit crisis and other macroeconomic factors, and (ii) survived Defendants' summary judgment and *Daubert* challenges – all hurdles that Mr. Frank ignores.

Here, in contrast, the Plaintiffs led regulators, and the Defendants admitted nothing.  Joint Decl. ¶¶ 11-15.

Lastly, Mr. Frank argues that because Citigroup's shares purportedly rose on news of the settlement, while the S&P 500 and Bank of America declined in value that same day, the market viewed the Citigroup action as having been settled on the cheap.  *See* Frank Br. 19-20.  But this last argument, just like all his others, is simply wrong.  The S&P 500 and Bank of America closed *up* on August 29, 2012, not down.  Reply Decl. ¶¶ 184-85.  Moreover, intra-day trading information confirms that the increase in Citigroup's stock price that day (much of which *preceded* announcement of the Settlement) resulted from other factors.  *Id*. at ¶ 186.

In sum, Mr. Frank's arguments that the Settlement does not represent a significant recovery are simply uninformed, misleading, and careless.

### H.      Mr. Frank's Discovery Request Is Improper

#### 1.      Standard Governing Objector's Requests for Discovery

It is hornbook law that objecting class members "'are not automatically entitled to discovery.'"  *International Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. General Motors Corp.*, 497 F.3d 615, 637 (6th Cir. 2007) (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n.6 (6th Cir. 1984)); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 619 (S.D. Cal. 2004) ("class members who object do not have an absolute right to discovery") (collecting cases); *see also* 2 Newberg on Class Actions, § 11:57, at 184 (4th ed. 2002) (objectors do not have an absolute right to discovery).

Rather, a court may, in its discretion, elect to permit discovery, but only to the limited extent it would assist the court's evaluation of the settlement's fairness: "The fundamental question is whether the district judge has sufficient facts before him to intelligently approve or

disapprove the settlement." *Epstein v. Wittig*, No. 03 Civ. 4081, 2005 WL 3276390, at *7 (D. Kan. Dec. 2, 2005) (internal marks omitted); *see also Malchman v. Davis*, 761 F.2d 893, 897-98 (2d Cir. 1985) (noting that a district court is not required to "open the case for further discovery and an evidentiary hearing unless the district court found that the objectors raised 'cogent factual objections to the settlement'"), *abrogated on other grounds by Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Hemphill*, 225 F.R.D. at 619 (a "[c]ourt may, in its discretion, limit discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement") (collecting cases).

Where the record contains sufficient information for a court to evaluate a proposed settlement, "there is no reason . . . to give [objectors] authority to renew discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 120 (2d Cir. 2005) (internal quotations and citations omitted); *see also Dupler*, 705 F. Supp. 2d at 246 n.12 (same).  Conversely, if a court determines that it requires additional information, "'[d]iscovery should be minimal and conditioned on a showing of need, because it will delay settlement, introduce uncertainty, and might be undertaken primarily to justify an award of attorney's fees to objector's counsel.'" *Epstein*, 2005 WL 3276390, at *7 (quoting *Manual for Complex Litigation*, § 21.643, Role of Objectors in Settlement (4th ed. 2004)).

### 2. Mr. Frank Has Not Demonstrated that There Is Any Additional Information this Court Requires to Assess the Fairness of the Settlement

Mr. Frank faults Plaintiffs for not producing their expert witnesses for deposition, but ignores that the Court, not the objector, determines whether to permit an objector the opportunity to take discovery.  *See Epstein*, 2005 WL 3276390, at *7; *Malchman*, 761 F.2d at 898.  The requirement that Mr. Frank first obtain a court order prior to taking discovery is also mirrored in

the Preliminary Approval Order.  *See* Dkt. No. 156 at ¶ 21 ("Unless otherwise ordered by the Court, the Court stays all proceedings in the Action other than proceedings necessary to carry out or enforce the terms and conditions of the Stipulation.").

Even if Mr. Frank's request for discovery were procedurally proper, he has wholly failed to carry his burden of establishing that the deposition of Plaintiffs' experts will aid the Court's assessment of the Settlement.  Mr. Frank is unable to cite a single case permitting such discovery under any, let alone similar, circumstances.  *See* Frank Br. 21-22.

Rather, Mr. Frank devotes considerable time discussing the purported distinction between challenges to reasonableness under Rule 23(h) and adequacy under Rule 23(e).  *Id.*  What is once again missing from Mr. Frank's analysis, however, is *any* authority holding that the touchstone for determining whether discovery is necessary differs depending on the nature of the objector's challenge.[27]  *See id*; *see also* Point I.A, *supra*.  In fact, the commentary to Rule 23(h) confirms that (i) objectors do not have an absolute right to discovery, including discovery with respect to fee applications; (ii) the decision whether to permit objector discovery is committed to the Court's sound discretion; and (iii) when, as here, the application is supported by thorough information, the objector bears the burden of establishing the need for discovery.  *See* Fed. R. Civ. P. 23, Advisory Committee Notes to 2003 Amendments, at subdivision (h)(2).

---

[27]  Moreover, the cases Mr. Frank cites are wholly inapt.  While the court in *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) noted that "in common fund cases the relationship between plaintiffs and their attorneys becomes adversarial at the fee-setting stage," it did so merely to emphasize the uncontroversial proposition that a court "must assume the role of fiduciary for the class plaintiffs" in deciding a fee award.  *Id.* (internal marks omitted).  *Vizcaino* had nothing to do with the objector's purported need for discovery, and, notably, affirmed a 28% fee award and 3.65 multiplier, far in excess of the recovery Mr. Frank challenges here.  *See id.* at 1050-51.  Similarly, *Goldberg v. Kelly*, 397 U.S. 254 (1970) has nothing to do with class action settlements or an objector's entitlement to discovery.  While *Goldberg* discusses due process principles in a far different context, it is notable that Mr. Frank cites no authority for the proposition that due process requires that an objector have the opportunity to depose an expert witness where the bases for the expert's opinion have already been identified in his report and are therefore subject to scrutiny by both the objector and the court.  *See* Frank Br. 22.

Accordingly, Mr. Frank's request for discovery should be denied.  *See generally Charron v. Pinnacle Group N.Y. LLC*, 874 F. Supp. 2d 179, 193 (S.D.N.Y. 2012) (denying objector's "due process" based request for discovery in connection with revised class action settlement notice).[28]

## II.   THE FA CAP OBJECTION IS MERITLESS

The FA Cap Objectors (Daniel Brecher, Scott Short, Jennifer Murphy, Chad Taylor, Paul Koch and Mark Gelfke) are plaintiffs in the uncertified *Brecher* class action (No. 09 civ. 7359) who acquired Citigroup shares pursuant to Citigroup's FA CAP program.[29]  They argue that: (i) the Settlement improperly "releases" claims relating to FA CAP shares acquired on July 1, 2008 (the "July 2008 Shares") without consideration (FA CAP Br. 17-22); (ii) the Plan of Allocation inadequately values their Section 12 claims (*id*. at 22-24); and (iii) Lead Counsel supposedly lacked authority to settle the claims asserted in this Action that were also asserted in *Brecher* (*id*. at 12-17).[30]  These arguments have no merit.

---

[28]  Mr. Frank also repeats his grandiose claim that he has "shown probable cause that there was an abusive fee request for tens of millions of dollars more of the class's money than class counsel is entitled to."  Frank Br. 22.  As explained herein, however, Mr. Frank's specific arguments ignore the facts, the law, and common sense.  *See* Points I.D. through G., *supra*.

[29]  "FA CAP" was a Citigroup benefits program pursuant to which certain employees were able to have a percentage of their compensation paid in the form of awards of Citigroup common stock.  FA CAP awards were made twice each year.  The number of shares in each CAP award was calculated using a 25% discount from the average of the closing prices of Citigroup common stock on the last trading day of each of the six months prior to the award date.  *See* Ex. 23 (FA CAP Prosp.) at 5.  During the Class Period, shares were issued by Citigroup pursuant to the FA CAP program on July 1, 2007 and January 1, 2008.  *See* December 21, 2012 Memorandum of Points and Authorities in Support of FA CAP Lead Plaintiffs' Objection to the Proposed Settlement and Plan of Allocation ("FA CAP Br.") at 7-8 [Dkt. No. 178].

[30]  The FA CAP Objectors note that their counsel contacted Lead Counsel.  *See* FA CAP Br. 9-10.  FA CAP's counsel did *not* request that their claims be carved out of the settlement herein, however.  *See* Reply Decl. ¶¶ 187-88.  Rather, FA CAP's Counsel argued that the Plan of Allocation should treat each of the July 2007 and January 2008 FA CAP awards as six separate purchases of Citigroup stock made on the last day of each of the six preceding months.  *See* FA CAP Br. 6-7.

A.     **The Settlement Does Not Release Any Claims Relating to the July 2008 Share Awards**

The FA CAP Objectors' first argument is based on an incorrect premise: that the release in the Settlement applies to their claims in connection with the July 2008 Shares.  It does not.  The release in the Settlement extends only to investments in Citigroup stock through April 18, 2008, consistent with the Court's decision limiting the length of the Class Period to that date.  The July 2008 Shares were acquired after the Class Period.  Claims with respect to such shares are therefore not included in the Settlement, and not released.[31]

The FA CAP Objectors contend that the July 2008 Shares should nonetheless be treated as Class Period investments because their price was computed in July 2008 on the basis of three closing prices that occurred during the Class Period (as well as three that did not).  FA CAP Br. 21-22.  The law is clear, however, that grants of stock options under voluntary employee stock programs constitute "sales" by the employer – and thus purchases by the employee – on the grant date.  *See, e.g., Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129-30 (9th Cir. 2002); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 558-61 (2d Cir. 1985) (stock options grant qualifies as a "sale" under

---

[31]   The FA CAP Objectors' reliance on *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981) and *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648, 2001 US Dist. LEXIS 1713 (S.D.N.Y. Feb. 22, 2001), is thus misplaced.  Those cases involved objections by holders of claims that were released pursuant to settlements, but not compensated therein.  The cases that the FA CAP Objectors cite in note 17 of their brief are similarly inapposite.  *See Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 300 (M.D. Pa. 1995) (settlement consideration would have gone only to subset of class); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, LLP*, 212 F.R.D. 400, 406 (E.D. Wis. 2002) (parties agreed to narrow broad release in securities settlement that would have extinguished distinct ERISA claims of non-class members); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 285-86 (7th Cir.  2002) (settlement released claims against additional defendant with no increase in aggregate settlement value over what co-defendant had previously been willing to pay).

the Securities Exchange Act of 1934 ("Exchange Act")); *see also* Section 3(a)(13) of the

Exchange Act (defining "purchase" to include "contracts to purchase").[32]

The FA CAP Objectors' argument as to the relevant "purchase" date also contradicts

their own sworn certifications, filed at the commencement of their action.  Each certification lists

the date of the share award (including July 1, 2008) as the date of the relevant "purchase."  *See*

Exs. 24-29.  They cannot now contend otherwise.  *See Dean v. China Agritech, Inc.*, No. 11 Civ.

0331, 2011 WL 5148598, at *6 (C.D. Cal. Oct. 27, 2011) (dismissing claims contradicted by

plaintiffs' own PSLRA certifications).[33]

### B.    The Plan of Allocation is Not Unfair to FA CAP Members

The FA CAP Objectors argue that the Plan of Allocation is unfair because it does not

provide a higher recovery rate for the release of their Section 12 claims.  *See* FA CAP Br. 22-24.

The law is clear, however, that a plan of allocation is not unfair simply because it does not

---

[32]   The treatment of stock options under Section 16 of the Exchange Act is similar.  The grant date (as opposed to the exercise date and irrespective of whether the option vests when granted) constitutes the purchase date.  *See Strom v. United States*, 641 F.3d 1051, 1062 (9th Cir. 2011); *At Home Corp. v. Cox Comm'ns, Inc.*, 446 F.3d 403, 407 (2d Cir. 2006); *Gudmundsson v. United States*, 665 F. Supp. 2d 227, 235 (W.D.N.Y. 2009).   The grant date is also treated as the purchase date in bankruptcy. *See In re Enron Corp.*, 341 B.R. 141, 150 (Bankr. S.D.N.Y. 2006).  The definition of "purchase or sale" under Section 16(b) is substantially similar to the definition under Section 10(b).  *In Re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 187 (S.D.N.Y. 2003).

[33]   The FA CAP Objectors argue that "award dates" under the FA CAP plan are "akin to a settlement date, rather than a trade date" in a normal trade.  FA CAP Br. 21-22.  In a normal trade, however, the price is determined on the trade date.  The settlement date is simply the date by which the buyer must pay and the seller must deliver the shares.  The price of the FA CAP shares was not determined until the award dates.  Hence, if anything, the FA CAP award dates are "akin to" trade dates, not settlement dates.  The FA CAP Objectors' arguments with respect to the ATD Group members are erroneous for the same reason.  In the Citigroup-ATD Group merger transaction, the price was set on the date the merger agreement was executed, not the date that the shares ultimately were delivered.  Hence, the merger execution date constituted the "purchase" date.  *See* Plaintiffs' July 18, 2011 Reply Memorandum in Further Support of Their Motion for Class Certification [Dkt. No. 122] at 6-9.  Finally, if the FA CAP purchase date is the date that FA CAP participants committed to purchase their shares, the July 2007 and January 2008 FA CAP awards should be excluded from the class, because the purchase elections predated the Class Period.  *See* Reply Decl. ¶ 172.

compensate Securities Act claims at a greater rate than Exchange Act claims.  *See In re Cendant Corp. Litig.*, 264 F. 3d 201, 248-251 (3d Cir. 2001).[34]

Furthermore, FA CAP members *are* receiving a *de facto* higher rate of recovery, since FA CAP participants received their shares at a 25% discount, *see* Ex. 23 (FA CAP Prosp.) at 5, but will be compensated like other class members.[35]  Thus, insofar as Citigroup's shares were inflated by less than 25% on account of the alleged fraud, the FA CAP Objectors arguably did not pay inflated prices for their shares.

### C.    Class Counsel Had Full Authority to Enter Into This Settlement

The FA CAP Objectors maintain that Lead Counsel improperly usurped FA CAP counsel's authority by entering into a settlement that encompassed claims asserted in *Brecher*. *See* FA CAP Br. 12-14.  The Court, however, expressly authorized Lead Counsel to litigate and settle claims arising from the purchase of Citigroup common stock during the Class Period.  *See* Case Mgmt. Order No. 1 entered Sept. 24, 2008 [Dkt. No. 65] at 3.[36]  Accordingly, Lead Counsel properly included the *Brecher* claims in the Settlement insofar as they fall within this

---

[34]  Notably, this Court has already dismissed much of the FA CAP objectors' Section 12 claims. *See Brecher v. Citigroup, Inc.*, No. 09 civ 7359 (SHS), 2011 WL 5525353, at *3-5 (S.D.N.Y. Nov. 14, 2011).

[35]  The FA CAP Objectors also argue that the court must accept or reject the settlement but is not empowered to modify it.  The FA CAP Objectors' arguments, however, relate to the Plan of Allocation, to which this general principle is inapplicable.  *See Union Asset Management Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 641 (5th Cir. 2012).  Furthermore, here, the Settlement expressly empowers the Court (at Notice ¶46) to "modify the Plan of Allocation without further notice to the Settlement Class."  *See also*, Stipulation ¶ 28.  Nevertheless, for the reasons set forth above, the Plan should not be modified.

[36]  That many *Brecher* claims fall within this definition is not surprising, as the *Brecher* allegations were for the most part copied verbatim from the complaint herein.  *See Brecher*, 2011 WL 5525353, at *2 (the FA CAP plaintiffs "reallege substantial swaths of the operative complaints in two separate consolidated class actions before this Court").  Notably, the aggregate recognized losses on FA CAP shares acquired during the Class Period comprise less than one third of one percent (0.33%) of class-wide losses.  *See* Reply Decl. ¶ 180.

definition.[37]   Insofar as *Brecher* claims fall outside this definition, they are not subject to the Settlement.

The FA CAP Objectors cite the fact that the Settlement carves out the claims asserted in the *Citigroup Bond* litigation.   FA CAP Br. 22 n.22.   Those claims, however, arose out of a different "factual predicate," *i.e.*, the purchase of Citigroup bonds, not stock.

Notably, the FA CAP Objectors are not the only Class members who had filed separate lawsuits prior to the settlement of this suit.   They are, however, among the few such individual litigants who did not opt out.   *See* Reply Decl. ¶ 183.   If the FA CAP Objectors truly wanted to continue litigating their case, they would have opted out of the Settlement.[38]

## III.     THE REMAINING OBJECTIONS LACK MERIT

Class counsel received 11 additional objections.   For the reasons set forth below, these objections – only 7 of which are from persons who claim to be class members – lack merit.[39]

---

[37]   *See In re American Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 135 (2d. Cir. 2011) ("'[t]he law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct.'"), *quoting Wal–Mart*, 396 F.3d at 107; *TBK Partners Ltd., v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir. 2000) ("[W]here there is a realistic identity of issues between the settled class action and the subsequent suit, and where the relationship between the suits is at the time of the class action foreseeably obvious to notified class members, the situation is analogous to the barring of claims that could have been asserted in the class action. Under such circumstances the paramount policy of encouraging settlements takes precedence.").

[38]   Notably, the Notice clearly alerted FA CAP Program participants to the existence of the *Brecher* action and that they must exclude themselves if they want to continue to participate in that action.  *See* Notice at ¶ 48.  Other than the named plaintiffs in *Brecher*, no FA CAP participants objected to the Settlement's treatment of such participants.

[39]   The objections were from Paul Agnew, Charles and Gladys Andersen, David Breskin, Anne Cochran and Gina Martin, Seb Houle, William and Joy James, Steve Miller, Robert Shattuck, Mildred and Richard Warren, William Warren, and Kenneth and Hyejin Wright (collectively, the "Remaining Objectors").  *See* Reply Decl. ¶¶ 7-10, 18-24; Exs. 2, 6-8.  Of this group, only Andersen, Cochran-Martin, Houle, James, Miller, William Warren and Wright provided details concerning purported Citigroup common stock purchases during the Class Period.

### A.    The Objections of Andersen, James, Shattuck and Wright to the Fairness of the Settlement Should be Denied

Andersen and James assert in conclusory fashion that the settlement amount is too low. Neither objector makes contact with the data in the Final Approval Papers demonstrating that the settlement: (a) is the second-highest recovery *ever* for a fraud-only PSLRA case with no earnings restatement; (b) is the highest-ever recovery on a PSLRA case involving CDOs; and (c) provides a recovery relative to potential damages that is several times the average PSLRA recovery rate for cases of this size.  Final Approval Br. 19-22.   Nor do they cite any authority suggesting otherwise.

Similarly, William Warren states in conclusory fashion that a recovery of approximately 30% of his out of pocket loss would be a "logical" settlement.  *See* Dkt. No. 188 at p. 1.  Like Andersen and James, Warren also does not address Lead Counsel's data nor proffer any contrary authorities.

James asserts that the settlement is inadequate because it recovers a small percentage of Citigroup's market cap decline.  Ex. 6 at p. 2.  This contention improperly ignores the principles of loss-causation.  *See In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 511-514 (2d Cir. 2010); *In re BankAtlantic Bancorp. Inc. Sec. Litig.*, No. 07 Civ. 61542, 2011 WL 1585605, at *6, 20 (S.D. Fla. Apr. 25, 2011).

Shattuck, an admitted non-class member, rails against the current state of the securities laws.  *See* Dkt. No. 185 at 7-10.   Even if Shattuck had standing, however, he does not argue that the Settlement fails to comport with existing law.[40]

---

[40]  Among other things, Shattuck suggests that the Settlement is unfair because Citigroup is contributing the entire settlement amount.  In negotiating the Settlement, Plaintiffs specifically weighed the risks of establishing liability

*(footnote continued on next page)*

Finally Wright asserts that (i) there is no evidence that the settlement was the product of arms-length negotiation (Ex. 8 at pp. 3-4), and (ii) plaintiffs did not provide support for the plan of allocation (*id.* at pp. 1-4).

These objections ignore the Final Approval Papers, which contain detailed discussion of the arm's length, mediated, settlement negotiations (*see* Joint Decl. ¶¶ 4, 96-98; Phillips Decl.[41] ¶¶ 5-15), and the basis for the plan of allocation.  *See* Joint Decl. ¶¶ 134-36; Final Approval Br. 22-23.  These descriptions are sufficient.  Wright's authorities do not suggest otherwise.  In fact, the Notice here provides no less information about the plan of allocation than that in the case Wright cites, *In re Bear Stearns Company, Inc. Sec. Deriv. and ERISA Litig.*, No. 08 MD 1963, 2012 WL 5465381 (S.D.N.Y. Nov. 9, 2012).  *Compare* Notice's plan of allocation at ¶ 44 (Ex. 1) *with* the *Bear Stearns* plan of allocation.  Ex. 13 at ¶ 25.

Agnew, Breskin and Miller object to the fact that they must submit information concerning the dates, prices and share quantities of their Class Period transactions in Citigroup common stock in order to participate in the settlement recovery.  However, without trade data (which the parties do not have), it is impossible to administer the Plan of Allocation.  For that reason, transactional information is routinely required in settlements of PSLRA cases.  *See, e.g.*, Reply Decl. ¶¶ 162-64.

**B.    The Objections to the Fee Application Should be Rejected**

Objectors Andersen, Cochran-Martin, Houle, and Richard Warren assert, without any support, that the requested fee is too high.  *See* Dkt. No. 163 (Anderson); Dkt. No. 187 (Cochran-

---

against the Individual Defendants as part of their evaluation of the overall reasonableness of the settlement consideration.

[41]  References herein to the "Phillips Decl." are to the November 19, 2012 Declaration of Former United States District Court Judge Layn R. Phillips Regarding Approval of Settlement [Dkt. No. 168].

Martin); Dkt. No. 173 (Houle); Ex. 7 (Richard Warren).[42]  These conclusory objections do not rebut the extensive data provided by class counsel and Professors Coffee and Miller demonstrating the reasonableness of the fee request.[43]

Objector Miller suggests that counsel should be awarded their lodestar without a multiplier.  *See* Dkt. No. 174 at p. 2.  He cites to no supporting authority.  In fact, courts in the Second Circuit (and elsewhere) routinely award lodestar multipliers to securities class counsel in excess of the multiplier sought here.  *See, e.g.*, Joint Decl. ¶ 175; Fee Br. 6-7 nn. 5-6.

Miller also argues that the fee percentage requested is too high.  *See* Dkt. No. 174 at 2-3.  He cites *In re Nortel Networks Corp Sec. Litig.*, 539 F3d 129, 134 (2d Cir. 2008).  *Nortel*, however, provides no support as the fee award there represented a lodestar multiplier of 2.04, which is higher than that sought here.  *See id.* at 132, 134.[44]

Finally, Wright argues that the fee requested is too high because the risk of non-recovery was purportedly low.  (Ex. 8 at p. 5).  In support, he cites *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) and *In re Wachovia Equity Sec. Litig.*, No. 08 Civ. 6171, 2012 U.S. Dist. LEXIS 97910 (S.D.N.Y. June 8, 2012).  *See* Ex. 8 at 5-6.  Neither case was comparable to this case in terms of the dollar size of the settlement. Hence, they do not refute the extensive supporting authority submitted by Lead Counsel with respect to fee awards in comparable cases.

---

[42]  In addition, objector William Warren states that he "object[s] to everything from attorneys' fees to settlement amount," but he does not explain the basis for his objection to the fee request.

[43]  Mildred and Richard Warren's objections must be rejected for the additional reason that they have not demonstrated that they have standing to object.

[44]  Moreover, the Second Circuit was not terribly enthusiastic about the award.  After noting that it "is toward the lower end of reasonable fee awards," the Court stated that it was "troubled" by the district court's analysis, but affirmed nevertheless because "the question before us is not whether we would have awarded a different fee, but rather whether the district court abused its discretion in awarding this fee." *Id* at 134.  Thus, *Nortel* does not refute the reasonableness of the instant fee request.

Those cases are also distinguishable. In *Goldberger*, the Second Circuit affirmed a fee award in a settlement reached after the key defendants had pled guilty to criminal securities fraud. 209 F.3d at 45. The Court concluded that "counsel benefitted from the spadework done by federal authorities during the criminal and civil actions." *Id*. at 53-54. Accordingly, the Court concluded that counsel's efforts "fell in the low range of the risk continuum," (209 F.3d at 54). Here, by way of contrast, class counsel had no similar "coattails" to ride. *See* Joint Decl. ¶¶ 11-15, 34, 51-57. In *Wachovia*, the case settled after defendants' motion to dismiss had been granted. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 381 (S.D.N.Y. 2011). Hence, unlike here, the case settled before counsel had an opportunity to conduct any discovery, or to move for class certification.

## CONCLUSION

For all of the foregoing reasons and those set forth in their opening papers in support of the motions, as well as their supporting declarations, Plaintiffs respectfully request that the Court: (i) reject all objections; (ii) approve the proposed Settlement as fair, reasonable, and adequate; (iii) approve the Plan of Allocation as fair, reasonable, and adequate; (iv) approve the request for attorneys' fees and reimbursement of expenses; and (v) enter the corrected and proposed Final Judgment and Order of Dismissal with Prejudice.


Dated: January 18, 2013          Respectfully Submitted,

KIRBY McINERNEY LLP


By: ___*/s/ Ira M. Press*___
     Ira M. Press (ipress@kmllp.com)
     Peter S. Linden (plinden@kmllp.com)
     Andrew S. McNeela (amcneela@kmllp.com)
     Mark A. Strauss (mstrauss@kmllp.com)

35

Beverly Tse Mirza (bmirza@kmllp.com)
825 Third Avenue, 16th Floor
New York, NY 10022
Tel.:  (212) 371-6600
Fax:  (212) 751-2540


*Lead Counsel for Plaintiffs*


Andrew J. Entwistle
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue
26th Floor West
New York, NY  10017
Tel.: 212-894-7200
Fax: 212-894-7272


James Allen, Sr.
ALLEN BROTHERS, P.L.L.C.
400 Monroe, Suite 220
Detroit, MI   48226
Tel.: (313) 962-7777
Fax: (313) 962-0581


Kenneth Gold
439 Griffith Street
Saugatuck, MI 49453
Tel.: (248) 310-9870


Lionel Glancy
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East. Suite 2100
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160


William Narwold
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

36

Tel: 843.216.9000
Fax: 843.216.9450


Alan L. Kovacs
LAW OFFICE OF ALAN L. KOVACS
2001 Beacon St., Suite 106
Boston, MA 02135
Tel.: (617) 964-1177
Fax.: (617) 332-1223


Kenneth A. Elan
LAW OFFICE OF KENNETH A. ELAN
217 Broadway, Suite 606
New York, NY 10007
Tel.: (212) 619-0261
Fax.: (212) 385-2707


*Additional Plaintiffs' Counsel*

37