UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC. SECURITIES LITIGATION | No. 07 Civ. 9901 (SHS) |
| | **ECF Case** |

**REPLY DECLARATION OF IRA M. PRESS AND PETER S. LINDEN
IN FURTHER SUPPORT OF (i) PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL
OF PLAN OF ALLOCATION AND (ii) PLAINTIFFS' COUNSEL'S MOTION FOR
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF
LITIGATION EXPENSES**

# TABLE OF CONTENTS

I.     THE CLASS' REACTION TO THE SETTLEMENT ........................................................ 2

     A.    Requests for Exclusion ........................................................................................ 3

     B.    Objections ................................................................................................................ 3

II.    RISK OF DISMISSAL IN PSLRA CASES ................................................................ 8

III.   FEE AWARDS IN OTHER LARGE PSLRA SETTLEMENTS .................................... 10

IV.   MR. FRANK'S OBJECTIONS CONCERNING PROJECT-SPECIFIC
     ATTORNEYS ................................................................................................................ 14

     A.    Overview ................................................................................................................ 14

     B.    Lead Counsel's Prior Submissions Disclosed the Use Of Project-Specific
          Attorneys and Provided the Means To Distinguish Them from Kirby
          McInerney Personnel ............................................................................................ 17

     C.    The Project-Specific Attorneys' Quality and Qualifications ................................ 21

     D.    The Work Actually Performed by Project-Specific Attorneys ............................ 27

          1.    Mr. Frank's Arguments Concerning "Objective Coding" Are
               Meritless Here:  No Such "Objective Coding" Was Performed .............. 27

          2.    Mr. Frank's Arguments that Project-Specific Attorneys Performed
               "First Tier" and "Low Skilled" Work Are Also Incorrect ........................ 28

          3.    The Work Actually Performed by Project-Specific Attorneys Here ........ 31

               a.  Overview ...................................................................................... 31

               b.  The High Level of Factual Complexity Here Required That
                   Project-Specific Attorneys Master a Vast Array of Sophisticated
                   Factual and Legal Issues ............................................................ 37

               c.  The Extensive Training Provided to Core Team Personnel ............... 40

               d.  Lead Counsel's Monitoring of Project-Specific Attorney Work ........ 43

               e.  The Core Team's Deposition Preparation Work ................................ 45

f.   The Supplemental Team and the Work Performed by the
Supplemental Team ........................................................................ 48

E.    Project-Specific Attorney Billing Rates Accurately Reflect Market Rates for
Such Work ........................................................................................... 49

V.    NOTICES AND PROOF OF CLAIM FORMS IN OTHER SETTLEMENTS ............... 51

A.    The Plan of Allocation .......................................................................... 51

B.    Information Required On The Proof Of Claim Forms............................ 52

C.    Amount of Time Provided For Class Members To Respond To The Notice ....... 54

D.    Release Granted To Class Counsel ...................................................... 55

VI.   THE FA CAP PLAINTIFFS.............................................................................. 56

VII.  CITIGROUP'S STOCK PRICE REACTION TO THE ANNOUNCEMENT OF
THE SETTLEMENT ...................................................................................... 59

**LIST OF EXHIBITS**

Exhibit 1      Class Notice from *In re Citigroup Inc. Sec. Litig.*, No. 07-cv-9901 (SHS) (S.D.N.Y.) dated October 10, 2012

Exhibit 2      Objection of Paul L. Agnew

Exhibit 3      Chart detailing class action cases in which Theodore Frank has filed objections

Exhibit 4      Article by Susan Beck titled, "A Conversation With Class Action Objector Ted Frank," that appeared in the *American Lawyer* on March 4, 2011

Exhibit 5      Article by Ashby Jones titled, "A Litigator Fights Class-Action Suits," that appeared in *The Wall Street Journal* on October 31, 2011

Exhibit 6      Excerpts from Objection of William B. James and Joy A. James dated December 8, 2012

Exhibit 7      Excerpts from Objection of Mildred Terry Warren by her son (Richard Paul Warren) dated December 21, 2012

Exhibit 8      Excerpts from Objection of Kenneth Patrick Wright and Hyejin Chung Wright dated November 16, 2012

Exhibit 9      Report by Cornerstone Research titled "Securities Class Action Settlements: 2011 Review and Analysis" ("Cornerstone Report")

Exhibit 10     Report by the National Economic Research Associates titled "Recent Trends in Securities Class Action Litigation: 2012 Mid-Year Review," dated July 24, 2012 ("NERA Report")

Exhibit 11      Chart titled Lodestar/Multiplier and Fee Percentages in PSLRA Settlements $400 Million and Above

Exhibit 12     Court's Pretrial Order No. 35 (Attorneys' Fees and Expenses) in *In re Lehman Bros. Secs. & ERISA Litig.*, No. 09-MD-2017 (S.D.N.Y. June 29, 2012) [Dkt. No. 970]

Exhibit 13     Excerpts from Notice of Pendency of Class Action and Proposed Settlements with the Bear Stearns Defendants and Deloitte and Motion for Attorneys' Fees and Expenses in *In re the Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.* Nos. 08 MDL No. 1963 (RWS), 08 Civ. 2793 (RWS) (Securities Action) (S.D.N.Y.) ("*In re Bear Stearns*") dated June 27, 2012

Exhibit 14    Court's Order Approving Plan of Allocation of Settlement Proceeds as to the Bear Stearns Settlement in *In re Bear Stearns* [Dkt. No. 250] dated November 29, 2012

Exhibit 15    Excerpts from the Memorandum of Law in Support of Motion for Final Approval of the Proposed Class Action Settlements (describing Plan of Allocation) in *In re Bear Stearns* [Dkt. No. 299] dated August 15, 2012

Exhibit 16    Excerpts from the Declaration in Support of Motion for Final Approval of the Proposed Class Settlements (describing Plan of Allocation) in *In re Bear Stearns* [Dkt. No. 302] dated August 15, 2012

Exhibit 17    Excerpts from Proof of Claim and Release in *In re CIT Group Inc. Sec. Litig.*, No. 08-cv-6613 (S.D.N.Y.)

Exhibit 18    Excerpts from Proof of Claim and Release in *In re Wachovia Equity Sec. Litig.*, No. 08-cv-6171 (S.D.N.Y.)

Exhibit 19    Excerpts from Proof of Claim and Release in *In re MBIA, Inc., Sec. Litig.*, No. 08-cv-264 (S.D.N.Y.)

Exhibit 20    Excerpts from Proof of Claim and Release in *Rubin v. MF Global, Ltd.*, No. 08-cv-2233 (S.D.N.Y.)

Exhibit 21    Excerpts from Proof of Claim and Release in *In re Satyam Computer Servs. Ltd. Sec. Litig.*, No. 09-MD-2027 (S.D.N.Y.)

Exhibit 22    Chart titled PSLRA Settlements Containing Release Language of Class Members' Claims Against Lead or Class Counsel with relevant excerpts attached hereto

Exhibit 23    Citigroup's FA CAP Plan's 2006 Voluntary FA Capital Accumulation Program Prospectus dated December 30, 2005, revised November 22, 2006

Exhibit 24    Certification of Daniel Brecher filed with the United States District Court for the Southern District of California on April 6, 2009

Exhibit 25    Certification of Paul Koch filed with the United States District Court for the Southern District of California on May 29, 2009

Exhibit 26    Certification of Jennifer Murphy filed with the United States District Court for the Southern District of California on May 29, 2009

Exhibit 27    Certification of Mark E. Oelfke filed with the United States District Court for the Southern District of California on May 29, 2009

Exhibit 28    Certification of Scott Short filed with the United States District Court for the Southern District of California on April 6, 2009

Exhibit 29    Certification of Chad Taylor filed with the United States District Court for the Southern District of California on May 29, 2009

Exhibit 30    Excerpts from the docket sheet in *International Fund Management S.A. v. Citigroup Inc.*, No. 09-civ-8755 (S.D.N.Y.)

Exhibit 31    Chart detailing daily prices for the S&P 500 Index for August and September 2012

Exhibit 32    Chart detailing daily prices for Bank of America stock for August and September 2012

Exhibit 33    Chart detailing intraday trading chart for Citigroup Inc. stock for August 29, 2012

Exhibit 34    Press release titled, "Kirby McInerney LLP Announces $590 Million Proposed Settlement of Class Action Claims Against Citigroup Inc." dated August 29, 2012

Exhibit 35    Letter from the State of New York Office of the Attorney General regarding Bank of America – Merrill Lynch dated September 8, 2009

**IRA M. PRESS** and **PETER S. LINDEN**, pursuant to 28 U.S.C. § 1746, declare as follows under penalty of perjury:

1.      We are members of the law firm of Kirby McInerney LLP, Court-appointed lead class counsel in this Action.[1]  We respectfully submit this reply declaration in further support of (i) Plaintiffs' motion for final approval of class action settlement and approval of plan of allocation and (ii) Plaintiffs' counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses.  We have personal knowledge of all material matters related to this Action based upon our active supervision and participation in the prosecution of this Action since its inception.  Unless otherwise stated, the statements in this declaration are made based upon our personal knowledge.

2.      The salient features demonstrating that the Settlement is fair, reasonable, and adequate, and that the application for attorneys' fees and nontaxable costs is reasonable and fair as well, are:

   a.   The amount paid by Citigroup in this litigation is greater than the amount paid by any other single defendant in any other subprime crisis-related, purely fraud-based PSLRA litigation.  It is also one of the five largest settlements *ever* of a fraud-only PSLRA claim.

   b.   The outcome here compares favorably to other parallel litigations against the same defendants arising from the same facts.  In fact, several of those litigations resulted in $0.

---

[1]  All capitalized terms as otherwise not defined herein shall have the meanings set forth in the Stipulation and Agreement of Settlement dated August 28, 2012 as amended (the "Stipulation") and filed with the Court on August 29, 2012 [Dkt. No. 155-1] and as modified by the Court's September 28, 2012 Order further amending the preliminary approval order [Dkt. No. 159].

    c.   More than two million Notices have been mailed out.  Less than 0.01% of the class sought exclusion.  Only 9 Class Members objected.  This translates to an approval or acquiescence rate of 99.99%.

    d.   The application seeks fees representing 16.5% of the Fund; which is less than averages awarded in similarly sized settlements, as is the lodestar multiplier of 1.89.

    e.   The attorneys who worked on this matter are highly-qualified and experienced and they did important, substantive work.

    f.   The billing rates of the attorneys who worked on this action are in line with market rates for similarly-qualified attorneys who do similar work.

    g.   To our knowledge, every court that has considered billing rates for project-specific attorneys in PSLRA settlements has approved the fee based on market rate billing.  Plaintiffs' firms bear the financial risk for employment of such attorneys, just as they do for firm associates.

We now provide the factual underpinnings for the foregoing.

## I.    THE CLASS' REACTION TO THE SETTLEMENT

3.    The Court-appointed Claims Administrator advises us that pursuant to the August 29, 2012 Order of this Court Preliminarily Approving Proposed Settlement and Providing for Notice [Dkt. No. 156] (the "Preliminary Approval Order"), it mailed more than two million copies of the Notice of (1) Pendency of Class Action, (2) Proposed Settlement and Plan of Allocation, (3) Settlement Fairness Hearing, and (4) Motion for An Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Class Notice" or "Notice") to potential class members prior to the Preliminary Approval Order's deadline for filing objections to the proposed Settlement.  Annexed hereto as Exhibit 1 is a true and correct copy of the Class Notice.

### A.   Requests for Exclusion

4.     The Claims Administrator also advised us that on or before December 6, 2012 (the deadline for filing Requests for Exclusion from the Settlement set forth in the Preliminary Approval Order), it had received only 135 Requests for Exclusion.  This number amounts to less than 0.01% of the Class Notices that had been mailed out to that point.  Moreover, 54 of these Requests came from persons who did not provide information concerning purchases of Citigroup common stock during the Class Period or provided information that reflected no purchases during that period.   Another 23 of the Requests came from persons or entities that had already commenced litigation against Citigroup prior to the parties' agreement to settle this Class Action.

5.     Each person who submitted a request for exclusion that did not provide all of the required information ("Non-Conforming Opt Outs") was sent a notice by the Claims Administrator between November 30 and December 7, 2012 advising of the deficiencies and providing an opportunity to cure those deficiencies by December 20, 2012.  We are advised by the Claims Administrator that only nine of the Non-Conforming Opt Outs have, in fact, cured those deficiencies.  Thus, of more than two million Notices mailed out, there were only 67 valid exclusion requests from class members who were not already engaged in individual litigation against Citigroup.[2]

### B.   Objections

6.     As of December 21, 2012 (the deadline for objections that was set forth in the Notice and in the September 6, 2012 Order Amending the Preliminary Approval Order [Dkt. No. 158]), we have received only 13 objections to the proposed Settlement and/or attorneys' fees request.  Only nine of these objections came from persons who supplied evidence, or provided

---

[2] *See* n.5, *infra.*

purported details, of purchases of Citigroup Inc. ("Citigroup") common stock during the Class Period.

7.     Annexed hereto as Exhibit 2 is a true and correct copy of the objection of Paul L. Agnew.   Mr. Agnew did not supply any documents evidencing, or make any assertions concerning, purchases of Citigroup common stock during the Class Period.

8.     Counsel also received an objection to the Settlement dated October 31, 2012 from Charles and Gladys Andersen.   The Andersens' objection attached a confirmation of a Class Period purchase of Citigroup common stock.   The objection is not attached hereto because it appears on the docket as entry number 163.

9.     Counsel received an objection to the proposed Settlement dated December 19, 2012 from David E. Breskin.   Mr. Breskin did not provide any documents or details concerning purported Citigroup common stock purchases during the Class Period.   The objection is not attached hereto because it appears on the docket as entry number 186.

10.     Counsel received an objection dated December 20, 2012 from Ann Cochran and Gina Martin.   Only Ms. Cochran attached transactional data reflecting the purchase of Citigroup common stock during the Class Period.   The objection is not attached hereto because it appears on the docket as entry number 187.

11.     Counsel received an objection dated December 21, 2012 from Daniel Brecher, Scott Short, Jennifer Murphy, Chad Taylor, Paul Koch, and Mark Oelfke (collectively, the "Brecher Objectors" or the "FA Cap Objectors").   A copy of this objection is not attached hereto because it was filed with the Court and appears on the Court's docket.   The Brecher Objectors' December 21, 2012 Memorandum of Law in Support of Their Objection, the supporting declaration of the Brecher Objectors' Counsel, Matthew M. Guiney, and exhibits thereto, and the

Corrected Memorandum of Law in Support of Their Objection dated December 21, 2012 appear on the docket as entry numbers 175, 176 and 178, respectively.

12.     Counsel received an objection dated December 20, 2012 from Theodore H. Frank. Mr. Frank's December 20, 2012 objection, together with his supporting declaration and exhibits, appear on the docket as entries numbers 181 and 182 ("Frank Br." and "Frank Decl.", respectively).  Accordingly, Mr. Frank's objection is not annexed hereto.

13.     This is not the first time that Mr. Frank has objected to a class action settlement. Annexed hereto as Exhibit 3 is a chart listing 25 other class or derivative actions in which Mr. Frank objected to the proposed settlement since 2009, either as a class member or in his capacity as the founder and lead attorney of an organization that calls itself the Center for Class Action Fairness ("CCAF").  As shown in Exhibit 3, of the 25 class or derivative actions in which Mr. Frank has filed objections, only one of those cases was a securities fraud action (*In re Apple Inc. Sec. Litig.*).[3]  Fifteen of the 25 cases are tort, consumer fraud-related, and/or antitrust cases, and do not involve class counsel requesting a fee percentage from a common fund.  Ten of the cases involved a fee request from a common fund.  In six of those cases involving a common fund (none of which were securities actions), the courts granted the fee request in its entirety.  In three of the other four common fund cases (none of which was a securities fraud case), even though the courts reduced the fee awards, class counsel were awarded fee percentages and/or lodestar multipliers that were still *higher* than the percentage fee and multiplier requested here.  *See* Ex. 3 (*Dewey v. Volkswagen of America*; *In re Classmates.com Consolidated Litig.*; and *Fogel v.*

---

[3]  There was a 26th case in which Mr. Frank's organization, CCAF, filed an objection on behalf of a class member in an antitrust class action captioned *McDonough, et al. v. Toys "R" US, Inc., d/b/a Babies "R" US*, No. 2:06-cv-0242-AB (E.D. Pa.).

*Farmers Grp. Inc.*).[4]   Annexed hereto as Exhibit 4 is an article by Susan Beck, titled "A Conversation With Class Action Objector Ted Frank," that appeared in the *American Lawyer* on March 4, 2011, discussing Mr. Frank and the CCAF.   Attached hereto as Exhibit 5 is a true and correct copy of an article by Ashby Jones, titled "A Litigator Fights Class-Action Suits," that appeared in *The Wall Street Journal* on October 31, 2011.

14.   We believe that attorneys and other employees of CCAF are assisting Mr. Frank with his objection to the Settlement.   In several emails to class counsel shortly before the filing of his objection, Mr. Frank copied Adam Schulman and Melissa Holyoak.   Mr. Schulman has appeared on briefs filed by CCAF in other matters, and he and CCAF were listed as the "sender" on the overnight courier package containing Mr. Frank's objection.   Ms. Holyoak's Linkedin profile describes herself as Senior Counsel for CCAF.

15.   As Mr. Frank notes in his papers, his Citigroup shares were held in "street name" by his broker, Charles Schwab & Co. ("Schwab").   *See* Frank Decl. ¶ 7.   Accordingly, Mr. Frank is not a record holder of Citigroup shares.

16.   The Claims Administrator advised us that it mailed the Notice to Schwab on October 10, 2012.   In that mailing, the Claims Administrator requested that Schwab within 15 calendar days either (a) provide the Claims Administrator with the names and addresses of Schwab clients for whose benefit Schwab holds Citigroup stock, or (b) forward the Notice directly to such beneficial owners.   The Claims Administrator advises that it followed this protocol with each of the more than 2,000 brokers and other nominees to whom it mailed the Notice.   The Claims Administrator advises us that when it did not hear back from Schwab, the

---

[4]  The fourth case that involved a reduced fee award from a common fund was *Cobell v. Salazar* (D.D.C.) – a non-securities fraud case.   There, the court reduced class counsel's fee request pursuant to, *inter alia*, an express provision in the parties' agreement on attorneys' fees, controlling law and the Claims Resolution Act.   *See Cobell*, No. 1:96-cv-01285, slip op. (D. D.C. July 27, 2011) [Dkt. No. 3850].

Claims Administrator made follow up inquiries with Schwab on October 17 and November 16, 2012.

17.     The Claims Administrator informed us that Schwab provided the Claims Administrator with a list of beneficial Citigroup holders (including Mr. Frank) on December 3, 2012, and on or before December 8, 2012, the Claims Administrator mailed the Notice to those beneficial holders (including Mr. Frank).[5]

18.     Counsel received an objection dated December 6, 2012 from a purported class member named Seb Houle.  The objection is not attached hereto because it appears on the docket as number 173.   Houle's objection provided details concerning Class Period purchases of Citigroup stock.

19.     Annexed hereto as Exhibit 6 is a true and correct copy of an objection dated December 8, 2012 from William B. James and Joy A. James.  The James' objection attaches several pages of documentation reflecting Class Period purchases of Citigroup common stock.  While the James' objection attached a confirmation of a Class Period purchase of Citigroup common stock, due to privacy concerns, the transaction data and proof of claim form are not attached hereto.

20.     Counsel received an objection to the proposed Settlement filed on December 20, 2012 by Steve A. Miller for and on behalf of the Steve A. Miller P.C. Profit Sharing Plan.  The objection is not attached hereto because it appears on the docket as entry number 174.  Miller's objection provided details concerning Class Period purchases of Citigroup stock.

---

[5] Pursuant to the Court's January 2, 2013 Order [Dkt. No. 183], the deadline to file objections, claims or exclusion requests for class members whose Notices were mailed to them by the Claims Administrator after November 9, 2012 was extended to March 8, 2013.  Any timely-filed objections that are subject to this extended deadline will be addressed in a supplemental submission, which, pursuant to Court Order, will be filed on or before March 18, 2013.

21.     Counsel received an objection dated December 11, 2012 by Robert Shattuck.  Mr. Shattuck states on the first page of his objection that he is "not a member of the plaintiff class." The objection is not attached hereto because it appears on the docket as entry number 185.

22.     Annexed hereto as Exhibit 7 is a true and correct copy of an objection dated December 21, 2012 from Mildred Terry Warren by her son (Richard Paul Warren).  The Warrens' objection provided no evidence of transactions in Citigroup common stock during the Class Period.  The objection did contain a brokerage account statement that listed transactions in securities of companies other than Citigroup, as well as transactions during the Class Period in "Citigroup Inc. Perpetual Non-CUM 8.125% PFD STK Series AA."  It is our understanding that the security referenced in the Warrens' account statement is Citigroup preferred stock, not Citigroup common stock.  Due to privacy concerns, the transaction data is not attached hereto.

23.     Counsel received an undated objection from William J. Warren.  Mr. Warren attached documents setting forth details of purported purchases of Citigroup common stock during the Class Period.  The objection is not attached hereto because it appears on the docket as entry number 188.

24.     Annexed hereto as Exhibit 8 is a true and correct copy of an objection dated November 16, 2012 from Kenneth Patrick Wright and Hyejin Chung Wright.  While the Wrights' objection attached copies of information purporting to set forth Class Period purchases of Citigroup common stock, due to privacy concerns, the transaction data and proof of claim form are not attached hereto.

## II.     RISK OF DISMISSAL IN PSLRA CASES

25.     Mr. Frank contends that securities class actions brought pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") are subject to little risk once they progress beyond the motion to dismiss.  Our prior Joint Declaration contains a large volume of evidence

to the contrary.  *See* Joint Decl. ¶¶ 159-170.[6]  Surveys that specifically address rulings on class certification and summary judgment in securities class actions, as well as trial verdicts in such cases, further demonstrate that securities class action prosecution faces a high risk at all stages of the litigation.

26.     Annexed hereto as Exhibit 9 is a true and correct copy of a report prepared by Cornerstone Research, titled *Securities Class Action Filings – 2011 Year in Review* ("Cornerstone 2011 Report").  The report was cited by Mr. Frank at paragraph 56 of his declaration in support of his objection.

27.     Page 31 of the Cornerstone 2011 Report sets forth figures demonstrating that fewer than 50% of PSLRA actions commenced since 2008 have resulted in settlements.

28.     Annexed hereto as Exhibit 10 is a true and correct copy of a report prepared by NERA, titled *Recent Trends in Securities Class Action Litigation:  2012 Mid-Year Review* (July 24, 2012) (the "NERA Report").

29.     Figure 18 at page 19 of the NERA Report reflects the fact that class certification is denied in nearly 14% of the PSLRA cases in which the court rules on that issue.

30.     Figures at page 20 of the NERA Report show that summary judgment is granted for defendants in full in approximately 20% of the PSLRA cases in which the court rules on summary judgment.  Moreover, partial summary judgment is granted in part in an additional 37.5% of the cases in which the court rules on summary judgment.  In many instances, a partial grant of summary judgment effectively guts the case.

---

[6] References herein to "Joint Decl." refer to the December 7, 2012 Joint Declaration of Ira M. Press and Peter S. Linden in Support of (i) Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation and (ii) Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses [Dkt. No. 171].  The Joint Decl. along with the memoranda of law filed on the same date in support of the application for final approval of the settlement ("Settlement Br.") [Dkt. No. 169] and the memorandum of law filed on the same date in support of the Motion for Attorneys' Fees (the "Fee Br.") [Dkt. No. 170] are also referred to herein as the "Final Approval Papers."

31. The NERA Report also confirms that more than 40% of all securities class actions do not survive dismissal and the majority of the securities class actions that make it through trial result in verdicts for defendants. *See* NERA Report at 21, 37.

32. In our experience, this litigation was subject to these and other risks, including, *inter alia*, *Daubert* challenges to experts, possible denial of class certification or a limitation to the scope or size of the class, and loss causation. Moreover, the necessity of proving materiality during the Class Period is now before the Supreme Court. *See Amgen v. Connecticut Ret. Plans & Trust Funds*, No. 11-1085.

## III.   FEE AWARDS IN OTHER LARGE PSLRA SETTLEMENTS

33. We and other personnel at this law firm reviewed the fee award orders and opinions in every single class action commenced pursuant to the PSLRA which settled for $400 million or more. There were a total of 29 such actions. The chart annexed hereto as Exhibit 11 provides citations to the relevant court order concerning the fee award in each of those cases. The chart also sets forth (a) the total settlement amount, (b) the fee award, (c) the fee as a percentage of settlement, (d) the lodestar multiplier (the fee award multiplied by the total lodestar), and (e) whether or not the case had progressed beyond the motion to dismiss stage prior to the settlement.

34. The circumstances of these settlements and the fees that the courts awarded thereon contradict much of what Mr. Frank says about fee awards in comparable cases.

35. As Exhibit 11 hereto reflects, 25 of the 29 PSLRA actions that settled for more than $400 million progressed beyond a motion to dismiss prior to settlement. The average lodestar multiplier awarded in those cases was 3.89. As noted previously, the fee that Lead Counsel seeks in this case represents a lodestar multiplier of 1.89. The information from other large PSLRA cases suggests that courts do not believe that lodestar multipliers should decline if

a case progresses beyond the dismissal motion.[7]  Even if courts do believe that, the multiplier sought here is still significantly below the blended rates that courts apply in other PSLRA cases that result in large settlements after the motion to dismiss was decided and discovery commenced. In sum, the risk in such complex securities litigation remains high through discovery, and the court-approved multipliers confirm this.

36.     Our Final Approval Papers included a December 6, 2012 declaration from Professor John C. Coffee, Jr. [Dkt. No. 167] ("Coffee Decl.") as well as a December 6, 2012 declaration from Professor Geoffrey P. Miller [Dkt. No. 166] ("Miller Decl.").  Professor Coffee's declaration, at paragraph 17, included a chart of all PSLRA class actions that settled in the range of $490 million to $690 million.  There were a total of 7 cases listed in that chart. Professor Miller's declaration included, at paragraph 58, a table listing all PSLRA cases that had settled in the range of $550 million to $800 million.  There were a total of 6 cases listed in that table.

37.     Mr. Frank asserts that PSLRA fee awards must be calculated as a percentage of the net settlement fund, *i.e.*, after reduction of litigation costs and expenses.  Frank Br. 7. However, the fee awards in 4 of the 7 PSLRA cases that settled in the range of $490 million to $690 million (*i.e.*, the cases set forth in the table at paragraph 17 of Professor Coffee's declaration) were calculated as percentages of the total settlement funds, as opposed to percentages of the settlement funds net of counsels' expenses or other expense items.  The 4 actions are the *Wachovia Preferred*; *Lucent*; *Countrywide*; and *Lehman Bros.* actions that appear on the table set forth in Exhibit 11 hereto as items 14, 15, 16, and 19.

---

[7] In fact, the average lodestar multiplier in the 4 cases from the chart that settled prior to, or just after, denial of the motion to dismiss was 2.51, which is lower than the average lodestar multiplier for the cases that had progressed to discovery.  *See* Ex. 11.

38.     Similarly, the fee awards in 4 of the 6 securities class actions that settled in the range of $550 million to $800 million (*i.e.*, the cases set forth and described on the table at paragraph 58 of Professor Miller's declaration) were calculated as percentages of the total settlement funds, as opposed to percentages of a net settlement fund reduced by the amount of attorneys' expenditures and other costs.  Those 4 cases are the *Wachovia Preferred*; *Lucent*; and *Countrywide* actions (described above) as well as *Carlson v. Xerox Corp.*, which appears in Exhibit 11 hereto as item 13.  The foregoing demonstrates that the courts do not share Mr. Frank's view that PSLRA fee awards *must* be calculated as a percentage of the *net* settlements.

39.     If all of the fee awards in the cases set forth in paragraph 17 of Professor Coffee's declaration and paragraph 58 of Professor Milller's declaration were calculated as percentages of the net settlement rather than the total settlement fund, the average percentage fee award in those other cases rises would be higher than the 16.69% and 17.34% averages set forth in the respective declarations of Professors Coffee and Miller.  *See*  Coffee Decl. ¶ 18; Miller Decl. ¶ 58.

40.     Here, in this Settlement, our fee request was for 16.5% of the gross settlement fund.  If our expenses are removed from the gross settlement fund, our fee request amounts to 16.58% of the remaining fund.  If one also takes out $8 million in projected notice costs, our fee request amounts to 16.81% of the remaining fund.

41.     Mr. Frank urges consideration of the fee award in the *Lehman Bros.* action. Annexed hereto as Exhibit 12 is a true and correct copy of the court's opinion awarding fees to class counsel in *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-MD-2017 (S.D.N.Y. June 29, 2012) [Dkt. No. 970].  In this opinion, the court granted a lower fee award than class counsel had requested.  The primary reason provided by the court was that:

> [P]laintiffs' counsel [in *Lehman*] had the benefit of the quite extraordinary report of the examiner appointed by the Bankruptcy Court in the Lehman bankruptcy. It was that report that revealed the facts regarding Lehman's use of and accounting for Repo 105s, which became the most important part of plaintiffs' case. [*See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp.2d 258 (S.D.N.Y. 2011).] Indeed, the second amended complaint, which antedated the examiner's report, did not even mention that subject while the third amended complaint ("TAC") relied heavily upon it - as did the Court in denying in significant respects defendants' motions to dismiss the TAC. [*See id.*]  Thus, plaintiffs took great and good advantage of the examiner's report, which became a roadmap for the most significant part of their case.  [Lead Counsel candidly acknowledged that the examiner's report provided plaintiffs with important information they had not had earlier, particular with respect to Repo 105s. (citation omitted)]  They were right to do so. But the fact remains that this very significant factor in the denial of much of the motions to dismiss and, doubtless, in the price defendants eventually paid to settle was the product of the examiner's efforts.  And just to be quite clear, this implies no criticism of plaintiffs' counsel, who lacked the examiner's access to the evidence. But it does bear on the amount of compensation appropriately paid to plaintiffs' counsel, particularly any amount above the lodestar.

Ex. 12, p. 2 (footnotes in the *Lehman* opinion included in brackets above).

42.     Mr. Frank also urges consideration of the recently-announced (but as of yet not-approved) $2.425 billion settlement in *In re Bank of America Securities Litigation*, No. 09-MDL-2058 (S.D.N.Y.).  In prosecuting that action, plaintiffs benefited from prior investigative efforts of at least three separate regulatory/governmental agencies:  the SEC, the United States House of Representatives Oversight and Government Reform Committee (the "Oversight Committee"), and New York Attorney General ("NYAG"), *prior* to the *Bank of America* plaintiffs' filing of their Consolidated Amended Complaint on September 25, 2009, which relied on such prior

efforts in pleading its claims.  On September 8, 2009, in connection with its investigation, the NYAG publicly released a letter to Bank of America's counsel, setting forth certain of the NYAG's findings (*see* http://www.ag.ny.gov/press-release/office-attorney-generals-letter-bank-america-regarding-merrill-lynch-merger).   That letter, a copy of which is annexed hereto as Exhibit 35, sets forth detailed facts concerning what senior Bank of America officers knew, and when they knew it, with respect to the matters at issue in the *Bank of America* private litigation, including sizeable Merrill Lynch losses during the fourth quarter of 2008.  *See* Ex. 35, pp. 3-6. The NYAG's September 8, 2009 letter stated that senior Bank of America officers "became aware" of such losses in November 2008 and early December 2008, prior to the December 5, 2008 shareholder vote on the merger.  *See* Ex. 35, pp. 3-4.

## IV.   MR. FRANK'S OBJECTIONS CONCERNING PROJECT-SPECIFIC ATTORNEYS

### A.   Overview

43.     In his objection, Mr. Frank: (1) charges that Kirby McInerney "misled the Court" in its fee petition concerning work performed in this litigation by "temporary contract attorneys"; (2) denigrates the qualifications and quality of certain attorneys that were hired to work on this case; (3) denigrates the work such attorneys performed in this litigation; and (4) argues that the rates at which such attorneys' work were billed in Kirby McInerney's fee petition and lodestar were not market rates.  *See* Frank Br. 1-2, 10-14; Frank Decl. ¶¶ 26-55.

44.     The facts set forth below demonstrate that each of Mr. Frank's above arguments are without basis.

45.     First, project-specific attorneys are no different from "regular" associates in terms of risk or the quality of the work.  Project-specific attorneys pose the same financial risk upon a plaintiffs' law firm as do general associates.  Any compensation paid to such attorneys is out-of-

pocket and at risk, just as an associate's compensation is at risk. Additionally, as shown below, the quality and nature of the work performed by project-specific attorneys here was comparable to, and often the same as, the work performed by firm associates.

46.     Defense firms also rely on project-specific attorneys. However, with respect to the devotion of attorney time and resources to litigation (including the employment of attorneys on a project basis), plaintiffs and defense firms are not equally situated. Defense firms are paid by their clients whether they win or lose, and they are paid as time and money is spent on the litigation. Accordingly, the resources invested by large non-contingent firms are not at any serious risk of non-recovery. On the other hand, all investments of time, money and other resources by plaintiffs' counsel in securities class actions (and by any other contingency-based litigation) are at tremendous risk. These investments are made without any guarantee of recoupment, and counsel often faces great risk that the entire investment will be lost entirely or, at a minimum, that any potential recovery will be delayed for years. *See* Joint Decl. ¶¶ 159-170.

47.     Second, Kirby McInerney disclosed its use of so-called temporary contract attorneys (*see* Joint Decl. ¶ 69), and provided the Court with (1) a lodestar report setting forth the names of each attorney who performed work in this litigation and the amount of those hours, together with (2) Kirby McInerney's firm resumé identifying Kirby McInerney's partners, of counsel and associates (*id*. at Ex. E). Comparison of these materials allows for easy distinguishing of personnel employed by Kirby McInerney on a continuing basis from those employed on a project-specific basis in connection with this litigation – as Mr. Frank himself recognizes (*see* Frank Br. 11).

48.     Third, regarding the issue of qualifications and quality, Mr. Frank: (1) cherry picks a handful of individuals; (2) reports selective aspects of their backgrounds in order to

distort their qualifications; and (3) then portrays these sensationalized and distorted instances as the norm.

49.      As set forth at ¶¶69-78, *infra*, however, many of the project-specific attorneys: (1) had graduated from the nation's most prestigious law schools; (2) had previously worked for certain of the nation's most prestigious law firms (both as associates and as project-specific personnel); (3) had previous legal experience not only in complex securities fraud class litigation, but also with respect to the highly complex mortgage-backed and structured finance securities at specific issue here, such as RMBS and CDOs; and/or (4) possessed further qualifications relevant to the work they performed here, including advanced degrees in accounting, finance and/or business, and/or substantial prior work experience in the securities industry.  This was not happenstance, but purposive: Kirby McInerney went to substantial lengths to assemble and retain a highly qualified, highly experienced and highly able "core team" that would be capable of performing the extremely complicated and important work that, after extensive training, was entrusted to them here.

50.      Fourth, regarding the issue of the work performed by project-specific attorneys, Mr. Frank, without basis, repeatedly characterizes the work performed by project-specific personnel as "ministerial work of first-tier document review" (Frank Br. 1), "trivial and relatively unskilled first-pass document review work" (*id*, p. 11; *see also* variations on "low skill" characterizations at each of pages 11-14 and at Frank Decl. ¶¶ 26-55).  He also speculates that "[i]t is entirely possible that 'such personnel' are not even doing low-skilled attorney work, but are doing purely clerical 'objective coding' work that need not be performed by an attorney at all" (*id*. at 12 and Frank Decl. ¶ 51), and then proceeds as if this distorted view actually existed (*id*. at 14 and Frank Decl. ¶¶ 54-55, accusing Lead Counsel of overbilling for "first-tier

document review and objective coding").  However, the work Mr. Frank imagines project-specific personnel to have done simply bears no relation to the work they actually did.  That work, as set forth in substantial detail at ¶¶ 96-127, 130-151, *infra*, was exactly the sort of work that Mr. Frank himself describes as "legally substantive" (*see* Frank Decl. ¶ 52).  Contrary to Mr. Frank's speculation, there was no "objective coding" work done by the attorneys here.

51.  Fifth, Mr. Frank accuses Kirby McInerney of billing project-specific personnel at above-market rates.  This too is simply false.  The billing rates charged for the attorneys that worked on this matter were in line with billing rates typically charged by attorneys of similar seniority in plaintiffs' securities class action law firms and by large non-contingency defense firms, as well.  *See* Joint Decl. ¶ 146; Miller Decl. ¶¶ 38-42.

**B.  Lead Counsel's Prior Submissions Disclosed the Use Of Project-Specific Attorneys and Provided the Means To Distinguish Them from Kirby McInerney Personnel**

52.  Mr. Frank accuses Kirby McInerney of misleading the Court in its fee application, purportedly by failing to disclose that certain of the attorneys performing work in this litigation were "temporary contract attorneys" and failing to distinguish such attorneys from "Lead Counsel attorneys" or "full-fledged attorneys doing highly-skilled legal work for class counsel's firms."  Frank Br. 11; *see also* Frank Decl. ¶¶ 26-27 *et seq*.  Mr. Frank's accusation is simply false.

53.  The Joint Declaration previously submitted to the Court explained that Kirby McInerney retained dozens of additional attorneys on a project-specific basis specifically to aid in document review, deposition preparation and further litigation efforts in proceeding towards

trial.  *See* Joint Decl. ¶ 69.[8]  Annexed to that Joint Declaration were (1) a lodestar report setting forth the names of each attorney who performed work in this litigation and the amount of those hours, together with (2) a Kirby McInerney's firm resumé identifying Kirby McInerney's partners, of counsel and associates.  *See* Joint Decl. Ex. E.  Comparison of these materials would allow anyone – and, in fact, actually did allow Mr. Frank (*see* Frank Br. 11) – to identify and distinguish those attorneys and personnel employed by Kirby McInerney on a continuing basis from those attorneys employed on a project-specific basis in connection with this litigation.

54.     Such a comparison, however, would yield a picture that differed from reality in two distinct but important ways.

55.     As a preliminary matter, both what Mr. Frank means by "temporary contract attorney" as well as the line separating such attorneys from Kirby McInerney personnel is not as clear as Mr. Frank assumes.  For purposes of analytical clarity, we will assume that Mr. Frank is referring to those attorneys specifically hired to work on this case, and use a defined term (hereinafter, "project-specific attorneys" or "project-specific personnel") for such persons.  Yet even though the definition seems clear in principle, it is not as clear in practice.  For example, some attorneys retained initially as project-specific personnel later transitioned into, respectively, associates and of counsel to the firm.  Others work (and are paid) on a project-by-project basis,

---

[8] Stating: "Given the size of the assembled productions, it was incumbent upon Lead Counsel to institute an efficient, streamlined, and effective document review process in preparation for depositions, settlement negotiations, and possible trial of the Action. Toward this end, Lead Counsel employed a review team of 35 highly qualified attorneys over the course of the litigation to review documents. Most of the review attorneys had either relevant experience with reviewing complex transactional documents or subject matter expertise gained through transactional experience at top law firms or large financial institutions. Plaintiffs' review team worked for over one year solely on the document review in the Action".  The Joint Declaration also attested to the quality and qualifications of such attorneys, to the extensive training and supervision provided by Kirby McInerney, and to the work they performed. *Id.* at ¶¶ 69-78.  Further factual detail on these matters is provided here to address Mr. Frank's assertions and arguments concerning the quality and qualifications of such attorneys, the work they performed, and the market rates for such work. *See* ¶¶96-127, 130-158, *infra*.

but have been doing so for years. Others continued to work for the firm on other matters after the Settlement in this litigation was reached.

56.     Looking to the substance of the work performed rather than status of the individual performing it, project-specific personnel were not different than or separate from Kirby McInerney personnel, but rather, as further detailed below, performed the same work as Kirby McInerney personnel did. Project-specific personnel were not segregated into "low-skilled" work as Mr. Frank repeatedly asserts, but rather were entrusted with the same high-level, high-complexity, high-importance work performed by Kirby McInerney personnel at both partner and associate levels. Their billing rates therefore reflect and are appropriate for the work *they actually performed*. For example, one of the project-specific attorneys was entrusted with taking the depositions of certain of Citigroup's senior executives and top officers (joining various Kirby McInerney partners for that task among Kirby McInerney's roster of deposing attorneys). Likewise, the "core team" discussed below, consisting of Kirby McInerney personnel and project-specific personnel working together, spent the lion's share of their time preparing for the depositions of dozens of Citigroup executives and officers – work Mr. Frank himself terms "legally substantive" (Frank Decl. ¶ 52).

57.     In any event, there is nothing unusual or untoward about the use of such project-specific personnel. The hiring of project-specific attorneys for a large project – such as the review of nearly 40 million pages of documents in order to prepare for the depositions of dozens of witnesses and to proceed to trial – is a practice that this and other securities class action plaintiff firms engage in frequently in order to effectively prosecute large complex litigation against some of the largest law firms in the country.

58.   Indeed, it appears that project-specific personnel were employed to significant extent in many of the largest PSLRA securities class action cases.  In those cases, the courts approved inclusion of those attorneys in the lodestar, and the court awarded fees that include multipliers on that lodestar.[9]

59.   Nor is the employment of attorneys on a project basis unique to the plaintiffs' bar: large defense-side law firms frequently engage in that practice as well (as evidenced by the prior experience of some of the attorneys that worked for us on the document review project in this Action – *see* ¶ 72 n.13, *infra*).  The widespread and/or large-scale use of such attorneys is further discussed at some length in several of the case opinions cited in the accompanying memorandum of law (*see* Reply Br. 15-17).[10]

60.   Here, Plaintiffs obtained approximately 35 million pages of documents from Citigroup as well as approximately 5 million further pages of documents from various third

---

[9] The issue is discussed in opinions in *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 410 (D. Conn. 2009) ($750 million settlement); *In re UnitedHealth Group, Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1105 (D. Minn. 2009) ($925 million settlement); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($7.2 billion settlement); *In re Tyco Int'l Ltd. Multidistrict Litig.*, 553 F. Supp. 2d 249, 272-73 (D.N.H. 2007) ($3.2 billion settlement); *In re WorldCom Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 WL 2591402, at *21 (S.D.N.Y. Nov. 17, 2004) ($6.13 billion settlement).  In addition, it is apparent from examination of the filings in many of the other cases listed in Ex. 11, that counsel in those cases included project attorneys in their lodestar, and the courts awarded counsel multipliers on that lodestar.   *See In re Nortel Networks Corp.* ("Nortel II"), No. 05 md 01659 (S.D.N.Y. Sept. 05, 2006) (Dkt. No. 61-2 at 4-6); *In re HealthSouth Corp. Sec. Litig.*, No. 03 Civ. 1500 (N.D. Ala.) (Dkt. Nos. 1055-2 at 3-4, 1055-3 at 3-5 (2008); 1608-7 at 5-6, 1608-8 at 4-5 (2009); 1689 at 2-3, 1690 at 2-3 (2010); 1700-3 at 9-11 (2010) (Bond)); *In re Wachovia Preferred Sec. and Bond/Notes Litig.*, No. 09 Civ. 6351 (S.D.N.Y. Oct. 10, 2011) (Dkt. Nos. 148-7 at 6-8; 148-8 at 5-6; 148-9 at 7-8); *In re Cardinal Health Inc. Sec. Litig.*, No. 04 Civ. 575 (S.D. Ohio Sept. 17, 2007) (Dkt. No. 319-10 at 2-4); *In re Lehman Bros. Sec. and ERISA Litig.*, No. 09 md 2017 (S.D.N.Y. Mar. 08, 2012) (Dkt. Nos. 807-12 at 6-9; 807-13 at 6-8); *In re Dynegy, Inc. Sec. Litig.*, No. H-02-1571 (S.D. Tex. June 30, 2005) (Dkt. No. 678 at 7-9); *In re Raytheon Co. Sec. Litig.*, No. 99 Civ. 12142 (D. Mass. Nov. 23, 2004) (Dkt. No. 633 at 9-13); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 mdl 1529 (S.D.N.Y. Nov. 2, 2006) (Dkt. No. 454); *In re Qwest Commc'ns Int'l Inc. Sec. Litig.*, No. 01 Civ. 01451 (D. Colo. Feb. 27, 2006) (Dkt. Nos. 939 at 2-4; 1162 at 2-3).

[10] References herein to "Reply Br." are to Plaintiffs' Reply Memorandum of Law in Further Support of the Proposed Settlement and Request for Attorneys' Fees, and in Response to All Objections to the Proposed Settlement and the Fee Request, filed concurrently herewith.

parties – or approximately 40 million pages in all.  These documents were produced in "rolling" fashion between March 2011 and April 2012.

61.     As previously stated in the Joint Declaration, in order to review, evaluate, organize and use this evidence (including for depositions of many dozens of Citigroup executives and yet further anticipated third party depositions) – in a timely fashion and within Court-ordered discovery deadlines – Kirby McInerney needed and retained, in addition to its current personnel, further project-specific personnel.  *See* Joint Decl. ¶ 69.

62.     The project-specific personnel retained for this litigation, and the work they then performed, are detailed below.

### C.     The Project-Specific Attorneys' Quality and Qualifications

63.     Kirby McInerney went to great lengths to ensure the quality of the project-specific attorneys employed.  As demonstrated below, many of these attorneys had prior experience working for large defense law firms on complex litigation or had other relevant prior work experience or education.  From the outset, Kirby McInerney sought to and did exercise substantial quality control with respect to the project-specific attorneys entrusted with work in this litigation.

64.     First, in order to assemble its "core team" for the discovery phase of this action (*see* ¶ 100 n.18, *infra*) Kirby McInerney hired approximately 20 project-specific attorneys to assist Kirby McInerney in document review and analysis and in deposition preparation.  However, to end up with those twenty, Kirby McInerney reviewed in excess of 100 attorney resumes, and rejected approximately 3 of every 4 candidates through such pre-screening.

65.     Second, before hiring any of its initial and core team of project-specific personnel, Kirby McInerney invited this more limited, pre-screened pool of the best candidates to interview in person with at least two and often three Kirby McInerney personnel (generally including

Kirby McInerney partners Peter Linden and Andrew McNeela or the Kirby McInerney attorney supervising the document review).   Kirby McInerney thereafter eliminated candidates that appeared more impressive on paper than in person, and ultimately hired only a fraction of the candidates it interviewed.  By this means, Kirby McInerney sought to and did retain the "best of the best," as further demonstrated below by closer examination of the relevant qualifications and experience they possessed.

66.    In addition to the core team, Lead Counsel also employed a "supplemental team" of attorneys for discrete document review projects (*see* ¶ 106 n.20, *infra*).   Here too, Lead Counsel sought to ensure that the attorneys possessed relevant or superior work experience or education.

67.    Specifically, Kirby McInerney sought to select from the pool of available attorneys a *more elite, experienced and able subset*, as evidenced by:  (1) traditional, general criteria of quality, such as the law schools from which they graduated and the firms at which they had previously worked; (2) concrete relevant prior experience and skills, such as prior document review work in large, complex securities litigation, prior securities litigation experience and/or familiarity with the intricacies and logic of litigating securities claims, and familiarity with the specialized software used in such litigation; or (3) specific prior experience in the extremely-complex exposures at the center of this litigation, such as prior legal work in connection with collateralized debt obligations (CDOs) and/or residential mortgage-backed securities (RMBS).

68.    The team of project-specific attorneys ultimately assembled by Kirby McInerney in fact met these goals, as detailed below, and subsequently satisfied on all counts (as further detailed in ¶¶ 96-127, 130-151, *infra*).

69.     Many of the project-specific personnel were graduates of the nation's top 10 or top 25 law schools, including attorney India Autry repeatedly and unfairly singled out by Mr. Frank (*see* repeated characterization of Ms. Autry as a "lipstick and style counselor" at Frank Br. 1, 11; Frank Decl. ¶ 29).[11]  Ms. Autry is a graduate of New York University School of Law.

70.     Some of the project-specific personnel selected by Kirby McInerney had previously worked as associates for certain of the nation's largest and most prestigious law firms.[12]

71.     The overwhelming majority of the project-specific attorneys had previous document review experience in complex, large-scale litigation and/or specifically in securities litigation (two of Kirby McInerney's practical selection criteria), and were familiar with the sophisticated database system chosen by Kirby McInerney for document review here.

72.     Indeed, almost all of the project-specific attorneys had previously performed document review work for some of the nation's largest and most-highly respected law firms.[13] This includes Ms. Autry, who had previously performed document review work for Davis Polk & Wardwell LLP; Skadden, Arps, Slate, Meagher & Flom LLP; and Sullivan & Cromwell LLP.

---

[11] The project-specific attorneys include two graduates from Columbia University School of Law, five from New York University School of Law, and four from Georgetown University Law Center.

[12] Attorneys on the team worked as associates for, *inter alia*, Allen & Overy; Arent Fox; Clifford Chance; Dewey & LeBoeuf; Foley & Lardner; Hogan & Hartson; Kramer, Levin, Naftalis & Frankel, LLP; Mayer, Brown & Platt; Orrick, Herrington & Sutcliffe; and Stroock & Stroock & Lavan.

[13] The attorneys previously worked on document review projects for, *inter alia*:  Cadwalader, Wickersham & Taft, LLP; Cleary, Gottlieb, Steen & Hamilton LLP; Clifford Chance LLP; Covington & Burling LLP; Cravath, Swaine & Moore LLP; Davis Polk & Wardwell LLP; Debevoise & Plimpton, LLP; Gibson Dunn & Crutcher LLP; Goodwin Proctor LLP; Hughes Hubbard & Reed LLP; Kirkland & Ellis; Latham & Watkins LLP; Mayer Brown LLP; Patterson Belknap Webb & Tyler; Paul, Hastings, Janosky & Walker LLP; Paul, Weiss, Rifkind, Wharton & Garrison; Proskauer Rose; Ropes & Gray LLP; Shearman & Sterling, P.C.; Sidley Austin, Brown & Wood; Simpson Thatcher & Bartlett LLP; Skadden, Arps, Slate, Meagher & Flom LLP; Sullivan & Cromwell, LLP; Wachtell, Lipton, Rosen & Katz; Wilkie Farr & Gallagher LLP; and Wilmer Cutler Pickering Hale and Dorr LLP.

73.     Additionally, certain of the project-specific attorneys had previously clerked for Federal District Court and Circuit Court judges or were employed as staff attorneys by, *inter alia*, the Securities & Exchange Commission (including Kumudini Uswatte-Aratchi, also singled out by Mr. Frank for suspicion) and the United States Courts of Appeals for the Second, Fourth and Eleventh Circuits.

74.     Due to the exceptional complexity of the structured finance securities at the center of this litigation, such as CDOs and RMBS, one of Kirby McInerney's most demanding selection criteria in selecting project-specific attorneys was prior experience with CDOs, structured finance, and/or subprime-backed securities.   For example, one attorney selected by Kirby McInerney already had substantial experience with CDOs from years of prior transactional work at a top defense firm, where he worked as an associate in the structured finance department and had even served as a "deal leader" in multiple CDO and CLO transactions, as well as in RMBS securitizations.   Two more attorneys similarly had years of experience via working on structured finance transactions when employed as associates by top firms.   Multiple attorneys had done prior project-specific work in matters concerning RMBS and CDOs, both on the plaintiffs' side and on the defense side (working for firms such as Simpson Thacher & Bartlett LLP and Debevoise & Plimpton LLP).   One attorney, hired by Lead Counsel to supervise the document review here, had recently led document review efforts in another very large securities class action case dealing with subprime exposures, where he managed a large team of document reviewers.

75.     Indeed, many of the attorneys singled out by name by Mr. Frank (*see*, *e.g.*, Frank Br. 11; Frank Decl. ¶¶ 28, 30) had exactly such prior experience.   For example, Kumudini Uswatte-Aratchi had prior experience in CDO-related litigation, substantial complex securities

litigation experience (both as an associate and as a project-specific attorney), and had previously worked as a staff attorney in the Enforcement Division of the SEC.  Similarly, Michael Balducci already was familiar with mortgage securitizations by virtue of years of work on such transactions as an associate in a top firm.  But Mr. Frank chooses to unfairly refer to Mr. Balducci as a "laid off real estate attorney" (Frank Br. 1).

76.    Contrary to Mr. Frank's depictions of such individuals, Lead Counsel found that such attorneys with similar prior experience with mortgage-backed securities or CDOs, including Michael Balducci as well as others not singled out by Mr. Frank, provided superior work-product, as further detailed below.  Such attorneys, including Michael Balducci, were among those to whom Lead Counsel entrusted the most complex and important assignments, such as preparing for the depositions of key Citigroup executives and officers.

77.    Other project-specific attorneys possessed advanced degrees or certificates in finance and/or accounting, or had prior finance work experience.  At least two possessed Masters degrees in Finance; one was also a Ph.D. candidate in business school.  Three possessed Masters of Laws; two possessed MBAs; one was a CFA (chartered financial analyst); another, a CPA (certified public accountant).  Indeed, this CPA was specially assigned in this litigation to focus, along with similarly-certificated and more experienced Kirby McInerney of counsel Henry Telias, on review, analysis and evaluation of a third-party document production from Citigroup's auditor.  Several project-specific attorneys previously had been employed by large financial institutions, including Deutsche Bank, HSBC, Morgan Stanley, Prudential Securities, PaineWebber, Smith Barney and UBS.  In fact, one of the attorneys singled out by name by Mr. Frank (Nelson De La Cruz; *see* Frank Decl. ¶ 31) had previously been employed by UBS AG.

78.     Furthermore, certain attorneys retained initially on a project basis in connection with this litigation were already "known quantities" to Kirby McInerney.  One had previously worked for 3 years as a Kirby McInerney associate (and had subsequently performed project-specific work for Kirby McInerney in other large securities litigation efforts), and was knowledgeable of the intricacies of securities litigation.  Likewise, one attorney, hired for this project to be of counsel to the firm (and who remains with Kirby McInerney) had even more extensive securities litigation experience by virtue of approximately a decade of work in other leading plaintiffs' firms.  Kirby McInerney had recently worked with one of these firms, and with this attorney specifically, as co-lead counsel in another large subprime- and CDO-related securities litigation, and we were very impressed with this attorney's abilities.  Kirby McInerney was very glad to retain this attorney in connection with this litigation, where this attorney – along with Kirby McInerney partners – shared responsibility for taking depositions of Citigroup's senior executives and officers, and the attorney continues to work at Kirby McInerney as of counsel.

79.     More fundamentally, as already mentioned, a "bright line" separation between project-specific attorneys and Kirby McInerney attorneys is difficult to ascertain, both in terms of "paper" status and in terms of the substance of the work assigned and performed.  First, on the merest surface/status level, multiple attorneys originally hired on a project-specific basis for this litigation either began as of counsel or associates, or later joined the firm on a continuing basis as an associate.  Second, on a deeper and more fundamental level, there was little difference between the work performed by attorneys hired on a project-specific basis and permanent Kirby McInerney attorneys.  Kirby McInerney associates and personnel worked together with project-specific attorneys engaged in document review and analysis and in deposition preparation.  In

sum, in terms of *actual work performed*, certain project-specific attorneys did the same work (such as deposing senior Citigroup executives) as Kirby McInerney partners, while other project attorneys did the same work as Kirby McInerney associates (such as document analysis and review, and deposition preparation).

80.     In sum, Kirby McInerney expended substantial effort and scrutiny to ensure that it retained the best team possible to assist in document review and analysis and deposition preparation.

**D.     The Work Actually Performed by Project-Specific Attorneys**

81.     Mr. Frank's objection: (1) raises the spectre that such work was mere "objective coding" and then treats that spectre as if it were actually real (*see* Frank Br. 12, 14; Frank Decl. ¶¶ 51, 54); (2) denigrates the work he imagines was performed by these "contract" attorneys as "low-skilled," "relatively unskilled," "ministerial," "largely administrative," etc. (*see* Frank Br. 1-2, 10-14; Frank Decl. ¶¶ 26-35, 52-53); and (3) characterizes it somewhat vaguely, but negatively, as "first tier document review" (*see* Frank Br. 1, 13-14, 24; Frank Decl. ¶¶ 39, 48-55). All of these characterizations were made without any specific factual basis, and are contrary to what actually happened.

**1.     Mr. Frank's Arguments Concerning "Objective Coding" Are Meritless Here:  No Such "Objective Coding" Was Performed**

82.     Objective coding refers to the practice of entering "objective" information into a document database, such as the date, sender, recipients and subject line of an email, or the bates numbers of a document.  This indeed is low-skilled work, as these entries are certain, obvious, objective, and require no judgment, analysis or expertise to do.

83.     There was effectively no objective coding here.  Almost without exception, the 40 million pages of documents produced in this case were produced with such objective coding

already supplied as metadata (*e.g.*, fields such as "date sent," "time sent," "sent from", "sent to," "cc", "subject," "document custodian," "bates begin" and "bates end" were already "populated" with the relevant data).[14]  This freed attorneys engaged in document review to focus on more complex tasks requiring greater discretion, judgment, analysis and expertise, as described below.

84.    Therefore, Mr. Frank's arguments about overbilling for "objective coding" – together with Mr. Frank's accusations concerning the same[15] – are wholly without basis.

## 2.  Mr. Frank's Arguments that Project-Specific Attorneys Performed "First Tier" and "Low Skilled" Work Are Also Incorrect

85.    Mr. Frank repeatedly asserts that the work performed by project-specific attorneys here was "first tier document review" (*see* Frank Br. 1, 13-14, 24; Frank Decl. ¶¶ 39, 48-55), and applies numerous negative epithets to further characterize such work (such as "low-skilled", "relatively unskilled," "ministerial," "largely administrative," etc. – *see* Frank Br. 1-2, 10-14; Frank Decl. ¶¶ 26-35, 52-53).

86.    These assertions, like those concerning "objective coding," are made without any factual basis, and are wrong.

87.    As an initial matter, it is not clear what Mr. Frank means by "first tier document review."  For example, in Mr. Frank's most specific description of his "first tier" document review epithet, Mr. Frank seeks to "distinguish[] between the largely administrative task of first-

---

[14] Certain "hard copy" documents (as opposed to email files) were produced with less objective coding metadata (for example, metadata identifying bates numbers and document custodian).  Of the 35 million pages of documents produced by Citigroup here, the total page count of such "hard copy" documents produced was far below 1%, and approximately on the order of 0.1% (*i.e.*, 35,000 pages).  Third-party productions totaling approximately 5 million pages featured a slightly higher percentage of documents lacking some pre-supplied objective coding:  we estimate that approximately 1%-5% of such third-party productions were so produced.  Lead Counsel developed a special, standard protocol to review, evaluate, and code such documents, which boiled down to providing slightly more fulsome descriptions in the "attorney comments" field for such documents in those cases where such documents appeared to be of interest.

[15] *See* Frank Br. 12 ("It is entirely possible that they are not even doing low-skilled attorney work, but are doing purely clerical 'objective coding' work that need not be performed by an attorney at all – all to inflate the lodestar and create tremendous profit for class counsel at the expense of the class.").

tier document review and the more legally substantive task of document review of pre-screened documents in preparation for depositions or trial." (Frank Decl. ¶ 52). It appears that Mr. Frank may be referring to a term of art customarily phrased as "first pass document review" (a term also used by Mr. Frank – *see* Frank Br. 11).

88.    As most commonly used, "first pass" document review is a document review generally employed by organizations *producing* documents or overseeing the production of documents, or by receiving firms choosing a broad selection of documents for production, in which: (1) "responsive" documents are distinguished from non-responsive documents; (2) confidential documents are distinguished from non-confidential documents; and (3) privileged documents are distinguished from non-privileged documents.[16]

89.    Such "first pass" review is little more than a series of blunt, mechanistic "yes/no" decisions concerning responsiveness, confidentiality, and privilege. There is no evaluation of the content or meaning of the document involved, let alone its probity or utility with respect to the claims and allegations at issue in the litigation. No such review work was done – or, indeed, could have been done – by project-specific attorneys here since they worked solely to review and evaluate the documents already produced by Defendants and third parties after Defendants and third parties themselves had conducted such "first pass" reviews, and were primarily tasked to prepare for and take depositions of Defendants and third parties.

---

[16] *See*, *e.g.*, http://www.wcsr.com/resources/pdfs/PL_StatementofWork.pdf ("'First-Pass'" Review to identify responsive documents, make required confidentiality designations, identify potentially privileged documents, identify important documents, and to otherwise narrow and categorize the universe of documents from which the Production Set will be drawn"); http://www.dorsey.com/legal_mine/?op=1309ca8d-7ace-4466-8555-d0018fba49df&ajax=no ("'What is "First Pass Document Review"? First pass document review segregates responsive/relevant documents from the non-responsive/irrelevant or privileged documents. Other flags include: confidential, key or 'hot' document, redaction, and further review. Documents deemed responsive or privileged are subject to further legal issue analysis.").

90.     It is generally contemplated that such a "first pass" document review will be followed by a "second pass" document review which typically involves a more detailed evaluation of documents previously-identified to be important, more detailed "issue coding" of the legal and factual issues to which those documents speak, and the selection and analysis of the most important documents for use in witness or expert depositions.[17]

91.     The division of labor and the segregation of project-specific attorneys into "first pass"-level work that Mr. Frank imagines to have occurred here did not, in fact, occur.

92.     Here, as detailed below, project-specific attorneys in Kirby McInerney's core team were not kept in any sort of restricted, "first pass" review pen, but rather spent most of their time in what is frequently described as "second level" review.

93.     More fundamentally, the "first pass"/"second pass" distinction, perhaps relevant in other litigations, was simply not relevant here.  Here, there was no distinction in work or personnel between "first pass" and "second pass," as these were not distinct activities but simultaneous parts of the more holistic work performed by Kirby McInerney personnel and project-specific attorneys.

94.     As detailed below, the project-specific attorneys here, together with Kirby McInerney personnel, engaged – after extensive training by and with supervision from Kirby McInerney – in a sophisticated evaluation and very detailed factual and legal issue coding of the documents they reviewed, including the subset of documents identified as most important,

---

[17] *See*, *e.g.*, http://www.sunlexis.com/document-review-services-india.html ("Second/Advanced Level Document Review: involves coding the documents; identification of privileged documents that can be withheld from production or redacted for content; identification of documents for deposition preparation, production and maintaining documents in specific folders based on issues, subject and parties"); http://discoverready.com/services/document-review/ ("Second-pass document review – Enhanced issue coding and preparation of witness and expert kits").

probative or interesting, in order to prepare the depositions of dozens of Citigroup's senior executives and officers.

95.     Therefore, project-specific attorneys here did not perform such "first pass" work, but rather – *and by Mr. Frank's own description* – the "more legally substantive" work of closely evaluating the best "pre-screened" documents "in preparation for deposition."

### 3.   The Work Actually Performed by Project-Specific Attorneys Here
#### a.   Overview

96.     After the Court sustained Plaintiffs' CDO-related claims over Defendants' motion to dismiss in November 2010, Plaintiffs sought production of documents from Citigroup and multiple third parties.  Defendants began document production in March 2011.  By April 2011, Defendants had produced approximately 12 million pages; by May 2011, more than 18 million pages (and third-party productions added nearly 3 million more pages); and by July 2011, approximately 30 million pages.

97.     However, a tight discovery schedule required depositions to begin in July 2011. Therefore, Plaintiffs' document review efforts: (1) had to begin quickly and on a very large scale, given timing constraints and the high volume of evidence to review and evaluate; and (2) quickly transformed from "generalized" review of the mass of documents to directed, targeted and particularized review and evaluation of specific documents associated with specific witnesses in order to prepare for depositions.

98.     To meet the scale and timeline of the task at hand, Kirby McInerney sought to supplement its already-available resources and personnel by retaining an initial group of further attorneys to assist in reviewing and evaluating these documents and in preparing for upcoming depositions.  As already detailed in ¶¶ 63-77, *supra*, Kirby McInerney went to substantial lengths to select a highly able, experienced and knowledgeable group of attorneys.

99.     As noted above, these project-specific attorneys, together with certain central Kirby McInerney personnel focusing on this litigation, constituted, as detailed below, a "core team" that worked full-time or more for slightly more than one year as the vanguard of Plaintiffs' litigation effort during the discovery phase of proceedings.

100.    In prosecuting this case, Kirby McInerney relied primarily on this core team[18] numbering approximately 35 individuals employed by Kirby McInerney or retained by Kirby McInerney on a project-specific basis.  Core team members performed the lion's share of the work from beginning to end and collectively make up the lion's share of Kirby McInerney's lodestar.  Specifically, core team members expended 71,266.25 hours (or 81.08% of Kirby McInerney's total hours) and comprise a lodestar of $33,679,305.00 (or 85.93% of Kirby McInerney's total lodestar).

101.    The core team's discovery effort, as detailed below, included:

a.      a sophisticated review and evaluation of the documents produced by Defendants and numerous third parties, of the sort often termed a "second pass" review, in which attorneys coded documents not merely for degree of relevance but for their probity with respect to an extremely wide array of different factual and legal issues, which here numbered more than 50 discrete issues, and which required extensive training in and understanding

---

[18] Core team members included: (1) 4 primary and 2 additional Kirby McInerney partners (respectively, Peter Linden, Ira Press, Mark Strauss and Andrew McNeela, and additionally Roger Kirby and Daniel Hume); (2) 2 attorneys "of counsel" to Kirby McInerney (Lauren Pedersen and Henry Telias); (3) 3 Kirby McInerney associates (Steven Cohn, Joshua Masters and Edward Varga) and 4 senior analysts (Kya Blackstone, Orie Braun, Matthew Meador and Elaine Mui); and (4) 20 project-specific attorneys retained by Kirby McInerney to form the vanguard of its discovery and deposition preparation efforts as further detailed herein (Michael Balducci, Peter Brueggen, Kristine Cangcuesta, Nelson De La Cruz, Steven Dimirsky, Eileen Dimitry, Thomas Elrod, Riley Fenner, Damien Figueroa, Joshua Greenberg, Brian Healey, Nader Khuri, Michael Markunas, Belden Nago, Kellen Stevens, Gail Torodash, Kumudini Uswatte-Aratchi, Ievgeniia Vatrenko, Andrew Watt, and Soo Woo).

of the most intricate factual complexities associated with Plaintiffs' claims;

b.    more particularly, and constituting the vast bulk of this effort, conducting such review specifically to prepare for the depositions of dozens of Citigroup officers and senior executives, which occupied this core team more than full-time between July 2011 and April 2012, and which involved, for each actual and/or noticed deponent:

    i.    the formation of a dedicated sub-team for each deponent, generally consisting of one to four attorneys (per the relative magnitude of the task), charged with reviewing, coding and evaluating *all* documents sent or received by, or from the files of, a given deponent (which, for many deponents, involved review of more than a million pages of documents);

    ii.    initial direction and training given to such sub-team to alert them to the most salient issues or documents that they would encounter;

    iii.    subsequent progress meetings during which the team presented to Kirby McInerney personnel (including senior investigators and the partners or other attorney tasked with deposing the particular witness at issue) their progress, findings, discoveries, questions and problems, and received further guidance to allow them to best complete their review and analysis;

    iv.    the production of a witness binder, as the goal and end result of the aforementioned review and evaluation process, for the use of the

partner or other attorney charged with deposing the witness, which binder included:

1. copies of 100 to 400 documents, chosen from tens or hundreds of thousands, that "told the story" of the deponent's involvement with and connection to the matters at issue in the litigation over the course of the Class Period;

2. an index of the aforementioned documents, containing the review team's observations and evaluations of each of the selected documents;

3. a narrative memorandum, typically 10-20 pages, summarizing the "story" evidenced by those documents and through the larger review, pointing the deposing attorney to the most salient and interesting issues, documents and questions, and recommending the most important lines of inquiry and documents for use in the upcoming deposition; and

4. a compendium of prior deposition testimony addressing either (i) the upcoming deponent, (ii) key meetings attended by that individual; or (iii) key documents sent or received by that individual;

v. in the weeks and days prior to depositions, further meetings between the members of these dedicated sub-teams and the attorney charged with conducting the deposition, in order to

prepare such attorney for the deposition and/or research and answer any further lines of inquiry suggested by such attorney; and

vi. assisting the deposing attorneys by, among other things, researching particular questions for review, analysis and evaluation by the deposing attorney of the materials provided to him or her, winnowing down these extensive materials (generally more than 200 documents, and often around 400 documents) in order to select the most promising or probative subset as potential deposition exhibits, and formulating a deposition outline and plan.

102.    The members of this core team are generally evident on the face of Kirby McInerney's lodestar submission by the large number of hours (generally between 1,000 and 3,000) they expended during the course of this litigation.  *See* Joint Decl. Ex. E.

103.    At senior levels, this core team consisted primarily of 6 Kirby McInerney partners as well as 2 project-specific attorneys.  The partners were involved in drafting and editing pleadings and briefs; appearing before the Court on motions or other applications; negotiating discovery and discovery disputes with Defendants; overseeing and supervising the discovery work detailed herein; preparing for and deposing dozens of Citigroup executives and officers; preparing for and engaging in the mediation that led to the Settlement; and negotiating and finalizing the terms of the Settlement.  In many of these efforts – notably, in preparing for and deposing Citigroup executives, and in negotiating discovery and discovery disputes with Defendants – the aforementioned partners were joined by a project-specific attorney.

104.    In addition to the above-mentioned senior-most level, this core team included approximately 23 Kirby McInerney associates, of counsel, or project-specific attorneys retained

35

by Kirby McInerney to assist in the above-summarized and below-detailed discovery efforts, and attorneys who began as the latter but later joined the former.  For all practical purposes, this was one group of personnel (*e.g.*, the "discovery team") – not two (*e.g.*, Kirby McInerney personnel vs. other personnel) – engaged in unified, common effort.

105.    In addition to this core team, another 11 Kirby McInerney partners, associates and of counsel performed occasional work at all litigation stages, including researching and drafting the Complaint, briefing the motion to dismiss and class certification, legal research, discovery, mediation and settlement.[19]  Collectively, these additional Kirby McInerney personnel expended 1,194.50 hours (or 1.36% of Kirby McInerney's total hours) and comprise a lodestar of $515,106.25 (or 1.31% of Kirby McInerney's total lodestar).

106.    Lastly, Kirby McInerney employed a separate team (the "supplemental team") of approximately twenty attorneys[20] – also generally evident on the face of Kirby McInerney's lodestar submission by the smaller number of hours (generally between 200 and 600) they expended in this litigation – to perform necessary work that the core team simply had no time to do.  After providing them with extensive training similar to that received by the core team, Kirby McInerney tasked them, *inter* alia, with: (1) summarizing deposition testimony and evaluating it for potential use in later stages of the litigation, such as summary judgment and/or trial; and (2) reviewing, analyzing and evaluating documents so as to supplement the work of the core team.

---

[19] These additional Kirby McInerney personnel included 1 partner (David Kovel), 1 of counsel (Kenneth Walsh), and 9 associates and former associates (Kathryn Allen, Pamela Kulsrud-Corey, Sarah Lopez, Beverly Tse Mirza, Surya Palaniappan, Christopher Studebaker, Meghan Summers, Kalyani Sundararajan, and J. Brandon Walker).

[20] These attorneys included India Autry, Seth Ayarza, Ryan Belk, Anne Bodley, Gale Boesky, Mashariki Daniels, Joanne Donbeck, Tilewa Folami, Paul Keaton, Kevin Kessler, Teresa Lin, Kristie Ortiz, Nina Petraro-Bastardi, Janet Pitter, Michael Schnurr, Stephanie Siaw, Julian Stephenson, Colin Stewart, Jason Stowe, and Steven Willmore.

107.    The work performed by the supplemental team comprised a total of 8,946.50 hours, with a total lodestar of $3,976,050.   It thus represents a small fraction – specifically, 10.14% – of Kirby McInerney's total lodestar.

> **b.  The High Level of Factual Complexity Here Required That Project-Specific Attorneys Master a Vast Array of Sophisticated Factual and Legal Issues**

108.    Many of the attorneys retained by Kirby McInerney had prior experience with complex securities litigation, and thus already were familiar with the basic and generic elements and logic of securities fraud claims.   However, the unparalleled factual complexity of the specific CDO-related matters at issue here, meant that very substantial further training would be necessary to ensure that the attorneys would be able to comprehend the documents they would be reviewing, evaluate their significance, and understand exactly why, when, where and how the evidence supported the elements of Plaintiffs' securities fraud claims.[21]

109.    As previously detailed in the Joint Declaration, our pre-discovery investigation into Citigroup's CDO operations already had provided us with extensive insights into CDO structure and the conditions that would cause even super senior CDO tranches to be at risk, into Citigroup's specific CDO operations, and into the dozens of actual CDOs that made up the aggregate CDO exposures at issue here.   *See* Joint Decl. ¶¶ 33-46.   Similarly, that pre-investigation discovery had provided us with novel factual discoveries and arguments that, as this Court found in its November 2010 opinion, could support our claims.   These included, for example, arguments that: (1) although concealed by fearsome structural complexity, even the super senior tranches of CDOs were at risk upon (a) relatively small levels of aggregate

---

[21] As noted *supra* at ¶¶ 74-75, 77, one of the specific criteria used by Kirby McInerney to retain attorneys for this litigation was prior experience with CDOs or similar mortgage-backed securities, and many of the attorneys retained by Kirby McInerney had such prior experience.

subprime mortgage losses and (b) impairment of the *lower*-rated tranches of subprime RMBS; (2) although likewise concealed by structural complexity, such lower-rated RMBS tranches were at risk of total losses at relatively small levels of aggregate subprime mortgage losses; (3) although concealed by structural complexity, even small housing price declines could cause subprime mortgage losses to rise to levels that would impair lower-rated RMBS and thereby impair even super-senior tranches of CDOs; (4) that certain of Citigroup's own analysts and certain of Citigroup's published research themselves stated (1)-(3) above; (5) that ABX and TABX index declines also could evidence awareness of super senior risk; (6) that Citigroup's efforts to offload super senior risk to monoline insurers or to special-purpose vehicles such as Foraois could evidence awareness of super senior risk; (7) that so-called "CDO recycling" efforts in connection with specific Citigroup CDOs and in conjunction with particular CDO collateral managers could evidence awareness of CDO risk. *Id.*

110. Kirby McInerney used its comparatively detailed and advanced understanding of CDOs generally and of Citigroup's CDO operations specifically to craft an unusually-detailed "coding sheet" to be used in document review and evaluation, and to provide extensive advanced training to the attorneys entrusted with document review and evaluation.

111. The coding sheet developed by Lead Counsel and used by attorneys thereafter in review, analysis and evaluation of 40 million pages of documents, contained more than 50 discrete issues to which documents might relate, corresponding both to the basic elements of Plaintiffs' legal claims and to Lead Counsel's detailed understanding of the factual complexities.

112. For example, in addition to the more obvious issue "awareness of CDO risk", Lead Counsel also added further issues such as "awareness of RMBS risk," "awareness of subprime risk," or "awareness of credit ratings wrong," "ABX/TABX," and "mortgage/real

estate market observations." These latter issues reflected Kirby McInerney's understanding that awareness of these matters/risks could objectively equate to awareness of CDO risk, *even where no mention of CDOs was made at all*. Put more simply, even documents that made no mention of CDOs could nevertheless evidence effective awareness of CDO risk – and Lead Counsel sought to make sure that its review of the document production would proceed in a manner conscious of this fact.

113.    Likewise, the coding sheet included issues relating to Lead Counsel's factual discoveries – such as "attempts to swap super senior tranches to monolines," "other attempts to offload super senior tranches," and "attempts to reduce CDO exposures (CDO recycling)." Additionally, Lead Counsel included in the Coding Sheet a "drop-down" list of approximately 10 specific Citigroup CDOs of heightened interest (*e.g.*, CDOs which Lead Counsel believed to have been involved in "CDO recycling," or CDOs whose super senior tranches Citigroup transferred to monolines); as well as further "drop down" list of approximately 10 specific Citigroup CDO collateral managers of heightened interest for similar reasons.

114.    Moreover, Lead Counsel included numerous issues relating to analytically distinct elements of CDO valuation (including issues with respect to "CDO valuation," "model assumptions," and "model validation") and accounting (including issues relating to audit-related matters, as well as issues corresponding to specific, relevant accounting regulations such as FIN 46(R) [relating to consolidation of CDOs and other similar vehicles on or off balance sheet] and FAS 107 [concentration of credit risk]).

115.    In addition to the obvious issue of "CDO exposure", Lead Counsel added a separate issue relating specifically to the "liquidity put" or "commercial paper" CDOs. Lead Counsel included further issue tags to identify various categories of CDO-related documents,

such as CDO prospectuses, pitchbooks and termsheets, or research reports on, respectively, subprime, RMBS and/or CDOs.  Lead Counsel established further issue codes so as to capture Citigroup's communications, respectively, with credit rating agencies and with various regulators such as the SEC, OCC and the Federal Reserve.

116.    Lead Counsel also included further "bigger picture" issues relating more closely to the elements of Plaintiffs' legal claims rather than to factual minutiae.  For example, a "loss causation" issue was included in order to capture documents concerning Citigroup's share price and the causes of its declines.  Similarly, a set of issues was included in order to capture Citigroup's internal preparations for its public disclosures, including (1) documents associated with *each* of Citigroup's quarterly results disclosures between year-end 2006 and the first quarter of 2008, and (2) documents of heightened interest, such as "Flash Deck" documents released by the SEC, or documents associated with the "Flash Calls" as described by the SEC.

117.    In addition to all of the above, project-specific attorneys were asked to provide evaluative comments in the "attorney comments" section.  This information could then be mined by other counsel in preparing for depositions, briefs, or argument with opposing counsel.

118.    The point of the foregoing detail, which well describes but certainly does not exhaust the set of issues Kirby McInerney included in document review coding here, is to illustrate and concretize two simple facts:  (1) the extreme factual complexity of this litigation; and (2) the necessity to train attorneys involved in document review to a very high level of understanding with respect to the matters at issue.

### c.  The Extensive Training Provided to Core Team Personnel

119.    Initial training for the core team of attorneys – both Kirby McInerney associates and personnel, and project-specific attorneys – lasted more than one week.

120.    First, attorneys were required to review the Complaint, Plaintiffs' memorandum of law in opposition to Defendants' motion to dismiss; the Court's November 2010 opinion granting in part and denying in part Defendants' motion to dismiss; the SEC's July 2010 complaint against Citigroup and the certain internal Citigroup documents released by the SEC in September 2010.  After reviewing those materials, these individuals spent another day with other Kirby McInerney "core team" personnel, who presented and explained the materials, answered questions about matters thought to be unclear, and led a general discussion of the basic claims and the more and less obvious facts that could support such claims.

121.    Second, simultaneously, attorneys were also given what amounted to a CDO "boot camp," in which Kirby McInerney personnel sought to impart their detailed knowledge of CDOs generally and Citigroup's CDOs specifically.  We explained the path from subprime mortgages to RMBS, and from RMBS tranches to CDOs, in order to demonstrate the precise interlinkages that functioned to expose even the super senior tranches of CDOs to substantial impairment (even at relatively low levels of underlying mortgage losses sufficient merely to impair the lower-rated tranches of RMBS).  We emphasized how observations concerning subprime mortgage performance, housing prices, ABX and TABX index prices, and RMBS prices could all equate to awareness of CDO and/or super senior CDO tranche risk.  We provided a list of all of Citigroup's CDOs that were relevant to this action,[22] and explained why a subset of approximately ten of them, included in the coding sheet, was believed to be of particular interest.

---

[22] In addition to the ABS CDOs relevant to this action that comprised the exposures and caused the losses at issue, Citigroup also created dozens more CDOs that were entirely irrelevant here, such as CDOs backed by commercial real estate mortgages (CRE CDOs), CDOs backed by trust—preferred securities (TRuPS CDOs), CDOs backed by leveraged loans (CLOs), CDOs backed by project finance bonds, and CDOs backed by synthetic pools of corporate/sovereign debt (CSOs).

122.     Third, Lead Counsel provided a 30 page, single-spaced "case summary" to core team members, that detailed, *inter alia*:  (1) Plaintiffs' essential claims and arguments; (2) the counter-arguments that Defendants had made and/or were expected to make in response; (3) Citigroup's internal organization, including the hierarchy of groups and divisions connecting, for example, Citigroup's CDO desks through various layers to ever-more senior executives and officers; (4) what sorts of documents or evidence or facts we were looking for (*e.g.*, the many ways that internal awareness of CDO risk could be evidenced); (5) what we already believed we knew, such as the timeline of Citigroup's acquisition of its super senior exposures, or the timeline of market awareness of subprime, RMBS and CDO risk; and (6) the timeline of what Citigroup stated publicly concerning subprime and CDOs during 2007 and 2008.

123.     Importantly, training did not stop after the initial round, and did not merely flow in one direction.

124.     As the core team's review and evaluation of documents began to produce new factual discoveries, these discoveries were shared among core team members.  For example, core team members were encouraged to and did issue real-time reports via a group email list on documents of interest they had encountered.  Similarly, team members were encouraged to ask questions and to bring to light matters or documents that they did not understand, which provided further opportunities for training to be delivered to all team members.

125.     Several months into the review, as depositions were beginning, Kirby McInerney circulated a revised "case summary" document featuring and summarizing the team's evidentiary discoveries to date.  This document, in essence, sought to show who knew what when.  It organized, on a month by month basis – and at certain key periods, on a week by week and day by day basis – what was known *at each level* within Citigroup:  what CDO executives were

saying and/or doing; what more senior business executives were saying and/or doing; what risk management executives were saying and/or doing; what investment relations executives were saying and/or doing; and what financial executives were saying and/or doing.  This document was continuously revised as new documents were discovered and as new deposition testimony was produced.  This document allowed the core team to develop an ever-finer and more integrated understanding of what was happening within Citigroup at any given time, at all levels.

126.    Similarly, through "quality control" monitoring of the document review and through many formal and informal discussions with core team members, we came to an early understanding of factual and review matters that were still subjects of confusion.  Lead Counsel therefore held periodic follow-up training sessions, including one devoted to detailed explication of every single element of the issue coding protocol, with examples of what sorts of documents were properly described by each issue.

127.    In addition to training, directing, organizing and supervising the efforts of the core team, we also solicited input from the project-specific attorneys as to how to improve the document review and deposition preparation process.  For example, several months after document review began, insights from project-specific attorneys were used to make significant changes to the initial issue coding protocol, resulting in significant streamlining and efficiency gains without losing any ability to capture and organize the factual complexities at issue.

### d.  Lead Counsel's Monitoring of Project-Specific Attorney Work

128.    At all times, Kirby McInerney closely monitored the work done by project-specific members of the core team.  This was done continuously and through multiple means, including:

> a.  quality-control spot-checking of core team members' issue- and relevance-coding and document evaluations, to determine which team members had

solid grasp of the facts and issues and which team members were not fully up to speed;

b.  document database technology that allowed us to observe how many documents each team member was reviewing per day;

c.  observation through formal and informal conversations to ensure that team members evidenced solid understanding of the facts and issues;

d.  observation of the "discovery" emails circulated by team members (*see* ¶124, *supra*);

e.  numerous meetings with team members as part of the deposition preparation process, as is further detailed below (*see* ¶¶130-146, *infra*); and

f.  a Kirby McInerney attorney who worked together with other project-specific attorneys to supervise their work and respond to questions.

129.   At all times, our monitoring was further enhanced by the fact that certain Kirby McInerney personnel were working side-by-side with the core team, and could thus directly observe them.  Most members of the core team, including both project-specific attorneys and certain Kirby McInerney personnel, were established in offices one block away from Kirby McInerney's offices, putting everyone within easy reach of each other; while other Kirby McInerney core team members remained in Kirby McInerney's offices.  The project-specific attorneys on the core team regularly used Kirby McInerney's facilities for its work.  Conference rooms were used for regular meetings with attorneys assigned to prepare for a particular deponent.  Moreover, core team members used the Kirby McInerney support staff, printers,

photocopiers and other facilities to produce and disseminate their work product to the necessary Kirby McInerney attorneys.

### e. The Core Team's Deposition Preparation Work

130.   The initial two or three months of document review were organized and directed by Kirby McInerney to achieve two basic goals: (1) to develop an overall sense of which sorts of documents had been produced from the files of different Citigroup employees, so as to understand the roles, responsibilities and degree of relevance of such employees; (2)  to quickly build baseline knowledge on various topics – and, again, come to a better understanding of the roles, responsibilities and degree of relevance of various Citigroup employees – by conducting a multitude of targeted and iterative searches of the document database.

131.   However, an accelerated discovery schedule required the core team to shift its focus to deposition preparation, beginning in July 2011.  Thereafter, the daily work of the core team was almost entirely taken up with deposition preparation, as detailed below.

132.   Between June 2011 and October 2011, Lead Counsel, building on the initial review work of the core team, developed a list of Citigroup employees (and third parties) it wished to depose.  The list was effectively complete by October 2011 and modified only marginally thereafter:  subsequently, a few individuals were added as new discoveries came to light, while others were removed when their testimony was judged duplicative or otherwise unnecessary.  Prior to Settlement, Plaintiffs had already deposed more than 30 persons on the list, and intended to depose approximately another 30 witnesses, most of whom had already been noticed.

133.   The core team's deposition preparation efforts proceeded as follows.

134.   First, a sub-team of core team members consisting primarily of project-specific attorneys was assigned to review and evaluate *all* documents produced from the files of, or sent to or received by, the proposed deponent.  Depending on the scale of this initial task, as well as scheduling matters, this sub-team generally consisted of 1 to 3 people.  Certain deponents had relatively few documents, capable of timely review by one individual; many other individual deponents were associated with more than a million pages of documents, in which case the sub-team typically consisted of 3 or more core team members.

135.   Second, *before* beginning their review of these documents, members of the sub-team met with Kirby McInerney personnel who provided initial orientation concerning the deponent, the kinds of issues and documents that would present themselves, and issues and documents that were expected to be of heightened and/or most interest.

136.   Third, the set of documents relevant to that deponent was then carved out of the larger database and reviewed and evaluated in its entirety by the sub-team members for relevance and for issue coding.  As part of this process, core team members also appended evaluative or explanatory comments or observations for those documents they found to be most interesting or probative.

137.   Fourth, typically halfway or more through this process, the sub-team met again with Kirby McInerney personnel, including the partner or other attorney designated to take the deposition.  This meeting served a two-fold purpose:  to check on the progress and understanding of the sub-team members, and to orient the deposing attorney to what had been discovered so far.

138.   Fifth, and the immediate goal of this process, the sub-team produced a witness binder for the deposing attorney's review and use in preparing for and taking the deposition.

Typically, this witness binder, delivered two or three weeks prior to the deposition, contained a standardized set of materials.

139.    As an initial matter, sub-team members selected, from the entire universe of documents, a relatively large subset of documents (typically about 200, but often nearing 400) that together sufficed to demonstrate the deponent's involvement in relevant matters over the course of the Class Period.  The purpose behind this relatively large number was to provide the deposing attorney with a far more complete context regarding what the deponent was doing throughout the time period in question, rather than a more limited subset of documents that might leave the deposing attorney to guess at "what else" might exist.

140.    Additionally, sub-team members provided an index listing all of those documents, featuring basic objective information (*e.g.*, for emails, date sent, author, recipients, subject line, etc.) as well as the core team members' own comments describing, explaining or commenting on each document and/or its contents.

141.    Moreover, sub-team members authored a narrative memorandum (typically 10-20 pages) that identified the individual, his or her position within Citigroup, and his or her involvement in issues of interest.  These memoranda identified the most important and/or probative documents for various issues, and recommended lines of inquiry and documents to be used at deposition, with citations to dozens of the larger set of documents provided.

142.    Furthermore, sub-team members provided a compendium of prior deposition testimony from other witnesses that mentioned the current deponent, or that made important assertions about key meetings or documents with which the current deponent was also involved.

143.    Finally, as a "belts and suspenders" matter, sub-team members conducted two further searches.  They first searched a set of data extracted from the database, consisting of

calendar program-related documents scheduling meetings (*e.g.*, Microsoft Outlook meeting announcements, etc.), in order to get further information on the important meetings (if any) attended by the deponent.  Then, they searched a constantly updated list of documents previously marked as exhibits in prior depositions – presumably, a set of the "best" or most important documents – to double-check that all such documents associated with the current deponent had been included in the set of documents selected for the deposing attorney.

144.    After the deposing attorney received these materials and reviewed them, he or she typically met with sub-team members and other Kirby McInerney personnel repeatedly in the weeks prior to the deposition, to discuss the materials, identify key issues and documents, plan for the upcoming deposition, winnow down the set of documents to a more practical and most important subset of documents for use as potential deposition exhibits, and ask further research questions of sub-team members.

145.    This procedure was repeated for the more than 30 depositions taken here, as well as for further noticed depositions for which core team members had prepared prior to the Settlement.

146.    This work occupied core team members on a more-than-full-time basis for nearly one calendar year, from approximately July 2011 through approximately May 2012.

### f.  The Supplemental Team and the Work Performed by the Supplemental Team

147.    As core team members were fully occupied, Kirby McInerney retained a supplemental team of project-specific attorneys to conduct work that the core team simply had no time do.

148.    The supplemental team, numbering approximately 20 further project-specific attorneys, first received similar but more condensed training than earlier received by the core

team.  Although training was not as extensive as for core team members, it was more efficient: supplemental team members received the benefit of knowledge accumulated from months of intensive discovery work.  For example, supplemental team members, as part of their training, were provided with a set of memoranda on various distinct legal and factual issues that organized the evidence discovered to date.  These memos, depending on the issue, ranged from approximately 5 to approximately 50 pages, and *in toto* attached more than 500 of the most probative documents.  These materials allowed supplemental team members to come "up to speed" more easily.

149.    After this training, and familiarization with and immersion into the facts, the supplemental team proceeded to work on several different assignments.

150.    First, the supplemental team summarized deposition testimony and evaluated it for potential use later in the litigation.

151.    Second, the supplemental team reviewed, analyzed and evaluated documents. This document review work, like that of the core team, was substantive and in essence combined "first pass" and "second pass" review into one, but proceeded in slightly pared-down fashion from the core team review protocol.

### E.    Project-Specific Attorney Billing Rates Accurately Reflect Market Rates for Such Work

152.    Mr. Frank accuses Kirby McInerney of billing project-specific personnel at above-market rates, and doing so in order inflate its lodestar and requested fee.  Frank Br. 1; Frank Decl. ¶ 26.  This too is simply false.

153.    Mr. Frank's argument rests, in part, on the false premise that such personnel were doing "menial" or "low-skilled" work.  The detail provided above at paragraphs 96-127, 130-151 demonstrates that, in fact, they were not.  Project-specific personnel were performing highly

complicated, highly important work – work that, absent extensive training, almost no one else could do.  *Id*.  Mr. Frank himself concedes that the sort of work described here is "legally substantive."  Frank Decl. ¶ 52.  Moreover, as discussed above, the attorneys were well qualified.

154.   Factually, as already demonstrated in our prior Joint Declaration, the billing rates charged for the attorneys that worked on this matter were in line with billing rates typically charged by attorneys of similar seniority in plaintiffs' securities class action law firms and by large non-contingency firms.  This is evidenced by orders and opinions concerning attorneys' fees in other recent lawsuits and the back-up documentation submitted in those cases.  *See* Joint Decl. ¶ 146; Miller Decl. ¶¶ 38-42.

155.   Again, the work performed by project-specific attorneys here is precisely the sort of work performed by experienced associates, of counsel and partners.  Their billing rates accurately reflect this fact.

156.   Legally, as detailed in the accompanying memorandum of law, courts considering this issue are unanimous in dismissing exactly the objection raised by Mr. Frank here.  Courts faced with these objections have held – repeatedly, explicitly and unanimously – that such billing rates for such project-specific personnel performing such work are appropriate.  *See* Reply Br. 15-18.  Moreover, the same courts have also approved application of a multiplier to lodestar to reflect the risk involved.  *See id*., pp. 18-20.

157.   Lastly, Mr. Frank asserts that Kirby McInerney overbilled for one attorney, Nelson De La Cruz, by representing that he graduated from law school in 1998 and by billing his hours at a rate reflecting that fact.  Frank Decl. ¶ 31.  Mr. Frank asserts that this graduation date is false, and that Mr. De La Cruz in fact graduated in 2009 (and therefore should command a lower hourly rate).

158.     Mr. Frank is again wrong.   Mr. Frank appears to have misconstrued his own evidence, which shows merely that Mr. De La Cruz was admitted in 2009 but says nothing about when Mr. De La Cruz graduated.   *See* Frank Decl. Ex. 10.   In fact, when hired, Mr. De La Cruz confirmed that he graduated from law school in 1998, as initially represented by Lead Counsel, and we have since confirmed that date.   Accordingly, Mr. De La Cruz was billed at a rate accurately reflecting that fact and his experience.

## V.      NOTICES AND PROOF OF CLAIM FORMS IN OTHER SETTLEMENTS

### A.      The Plan of Allocation

159.     Objectors Kenneth and Hyejin Wright maintain that the settlement papers do not provide sufficient information about the plan of allocation.   The sole authority they purport to rely on is a description provided by the court in *In re the Bear Stearns Companies, Inc. Securities, Derivative & ERISA Litigation*, 08 MDL 1963, 2012 U.S. Dist. LEXIS 161269, at *25 (S.D.N.Y. Nov. 9, 2012) of the information that class counsel there provided concerning the plan of allocation relating to that settlement – information that the court found to be adequate. We have provided the same level of detail as that required by the *Bear Stearns* court.

160.     Annexed hereto as Exhibit 13 are true and correct copies of excerpts from the June 27, 2012 notice of class action settlement that was provided to potential class members in *In re Bear Stearns*.   The excerpts include paragraph 25 thereof, which discusses the plan of allocation of that settlement – a plan that was approved by the court in that action.   Annexed hereto as Exhibit 14 is a true and correct copy of the court's order approving the plan of allocation in *In re Bear Stearns* dated November 30, 2012 [Dkt. No. 250].

161.     Annexed hereto as Exhibits 15 and 16 are true and correct copies of excerpts from the brief and declaration, submitted by class counsel in *In re Bear Stearns* that describe the plan of allocation there [Dkt. No. 299 and Dkt. No. 302].   The foregoing can be compared to the

information concerning the Plan of Allocation that we supplied in the Notice (at ¶ 44), the Joint Declaration (at ¶¶ 134-136) and the Settlement Br. (at pp. 22-23).

**B.** **Information Required On The Proof Of Claim Forms**

162. Objectors Agnew, Breskin and Miller object to the fact that Class Members must submit information concerning the dates, prices, and share quantities of their Citigroup transactions in order to share in the Settlement recovery. However, without trade data, it is impossible to administer the Plan of Allocation – as the allocation to any particular Class Member depends on the dates, prices and share qualities of each Class Member's transactions in Citigroup stock.

163. While objectors Agnew, Breskin and Miller have each suggested that the parties already have their trade data, that is not the case. These objectors' shares were held in street name by their respective brokers (TD Ameritrade and Fidelity for Agnew; RBC for Breskin; and Charles Schwab for Miller). Therefore, the parties do not have records of their specific purchases and sales of Citigroup stock during the Class Period (if in fact they engaged in Class Period trades).

164. For that reason, transactional information has been required in every settlement of a PSLRA class action settlement that we are aware of brought on behalf of investors in publicly-traded securities. Our understanding comes from the fact that both of us have been actively involved in securities litigation since prior to the PSLRA's enactment in 1995. Below are a few recent examples.

a. Annexed hereto as Exhibit 17 is a true and correct copy of excerpts from the proof of claim form that class members were required to fill out in order to participate in the settlement fund in connection with the 2012 settlement in *In re CIT Group Inc. Sec. Litig.*, No. 08-cv-6613 (S.D.N.Y.). At page 2, the document advises class members that they must furnish

the details of their trades in the securities at issue in that action in order to obtain payment in connection with that settlement.

b.      Annexed hereto as Exhibit 18 is a true and correct copy of excerpts from the proof of claim form that class members were required to complete in order to share in the settlement fund in connection with the 2012 settlement in *In re Wachovia Equity Sec. Litig.*, No. 08-cv-6171 (S.D.N.Y.).  At page 1, the document advises class members that they must furnish the details of their trades in the securities at issue in that action in order to obtain payment in connection with that settlement.

c.      Annexed hereto as Exhibit 19 is a true and correct copy of excerpts from the proof of claim form that class members were required to complete in order to share in the settlement fund in connection with the 2011 settlement in *In re MBIA, Inc., Sec. Litig.*, No. 08-cv-264 (S.D.N.Y.).  At page 3, the document advises class members that they must furnish the details of their trades in the securities at issue in that action in order to obtain payment in connection with that settlement.

d.      Annexed hereto as Exhibit 20 is a true and correct copy of excerpts from the proof of claim form that class members were required to complete in order to share in the settlement fund in connection with the 2011 settlement of *Rubin v. MF Global, Ltd.*, No. 08-cv-2233 (S.D.N.Y.).  At page 3, the document advises class members that they must furnish the details of their trades in the securities at issue in that action in order to obtain payment in connection with that settlement.

e.      Annexed hereto as Exhibit 21 is a true and correct copy of excerpts from the proof of claim form that class members were required to complete in order to share in the settlement fund in connection with the 2011 settlement of *In re Satyam Computer Servs. Ltd. Sec.*

*Litig.*, No. 09-MD-2027 (S.D.N.Y.).  At page 2, the document advises class members that they must furnish the details of their trades in the securities at issue in that action in order to obtain payment in connection with that settlement.

           **C.**    **Amount of Time Provided For Class Members To Respond To The Notice**

        165.    Mr. Frank asserts that the Court-approved Notice did not provide sufficient time for Class Members to opt out or object, given the fact that many Class Members' shares are held in "street name", so several weeks elapsed before many Class Members received their mailed Notices (as the Claims Administrator could not mail the Notice to these persons until it received their contact information from their brokers in response to the Claims Administrator's initial mailing). Frank Br. 4-6.

        166.    The Court-approved Notice in this action provided for 57 days between the date of the initial mailing (October 10, 2012) and the earliest date by which a Class Member would have to take action (December 6, 2012 – the deadline to opt out of the Settlement).  *See* Ex. 1 hereto.  In our experience, this time-lag is typical of securities class actions, and it affords Class Members with ample time to take action – even assuming that many Class Members will receive their Notices several weeks after the initial mailing due to delays by their brokers in furnishing the contact information to the Claims Administrator.

        167.    Based on a review of notices in other securities class actions in this District, this amount of time between the deadline for the mailing of notice to the Class and the earliest deadline for class members to act is typical, and, in fact, class members are given less time in many instances.  *See, e.g.*, *In re MBIA, Inc., Sec. Litig.*, No. 08-cv-264 (S.D.N.Y.) (45 days between notice mailing deadline of October 11, 2011 and exclusion request deadline of November 25, 2011); *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09-cv-6351 (S.D.N.Y.) (56 days between notice mailing deadline of August 30, 2011 and exclusion request

deadline of October 25, 2011); *In re Giant Interactive Group, Inc. Sec. Litig.*, No. 07-cv-10588

(S.D.N.Y.) (56 days between notice mailing deadline of August 7, 2011 and exclusion request

deadline of October 12, 2011); *In re Take-Two Interactive Sec. Litig.*, No. 06-cv-803 (S.D.N.Y.)

(53 days between notice mailing deadline of August 3, 2010 and exclusion request deadline of

September 21, 2010); *In re Marsh McLennan Cos., Inc. Sec. Litig.*, No. 04-cv-8144 (S.D.N.Y.)

(31 days between notice mailing deadline of November 13, 2009 and exclusion request deadline

of December 14, 2009); *In re IPO Sec. Litig.*, No. 21-mc-92 (S.D.N.Y.) (39 days between notice

mailing deadline of July 2, 2009 and exclusion request deadline of August 10, 2009).

### D.     Release Granted To Class Counsel

168.     Mr. Frank also asserts that "the Settlement contains an extraordinary release

waiving claims against class counsel."  Frank Decl. ¶ 25.  Although Mr. Frank does not specify

the precise provision at issue, it appears that he is referring to the waiver of claims concerning

the administration of the Settlement Fund.  That waiver provides:

> Payment pursuant to this Plan of Allocation, or such other plan of allocation as
> may be approved by the Court, shall be conclusive against all Authorized
> Claimants.  No person shall have any claim against Plaintiffs, Lead Class Counsel,
> Defendants, and their respective counsel, or other agent designated by Lead Class
> Counsel, arising from distributions made substantially in accordance with the
> Stipulation, the Plan of Allocation approved by the Court, or further orders of the
> Court, and against Defendants under any circumstances with respect to
> distributions.  Lead Class Counsel, Plaintiffs, the Defendants and their respective
> counsel shall have no responsibility or liability whatsoever for the investment of
> distribution of the Settlement Fund, the Net Settlement Fund, the Plan of
> Allocation, or the determination, administration, calculation, or payment of any
> Claim Form or nonperformance of the Claims Administrator, the payment or
> withholding of taxes owed by the Settlement Fund, or any losses incurred in
> connection therewith.

Ex. 1, Notice, ¶ 45; *see also* Stipulation, ¶ 22 [Dkt. No. 155-1].

169.     Annexed hereto as Exhibit 22 is a true and correct copy of a chart containing

excerpts from the stipulations and notices in more than a dozen recent PSLRA settlements that

contain similar or identical release language.  True and correct copies of the relevant excerpts also are annexed herewith.

## VI.    THE FA CAP PLAINTIFFS

170.    The FA Cap Objectors all acquired Citigroup common stock pursuant to Citigroup's Voluntary Capital Accumulation Program (the "FA Cap Plan").  They are also the plaintiffs in a lawsuit filed in this Court titled, *Brecher v. Citigroup*, 09-cv-7359, which asserts claims against, *inter alia*, Citigroup on behalf of FA Cap Plan participants who received their Citigroup share on the following dates:

a.    An award of a total of 2,646,640 shares of Citigroup stock on or about July 1, 2007 at a price of $39.53.  The price was a 25% discount from the average of the closing prices of Citigroup common stock on the last trading days of January, February, March, April, May, and June of 2007.  While the shares were awarded during the Class Period in this Action and price was set during the Class Period, in order to be eligible to receive the shares employees had to make their designation in 2006, prior to the start of the Class Period.

b.    An award of 3,570,230 shares on January 1, 2008 at a price of $30.59 per share.  This price was a 25% discount to the average trading price for Citigroup common stock on the last trading days of July, August, September, October, November and December 2007.  While the award was made at a price that was set during the Class Period, in order to participate in this award, shareholders had to make an election in 2006, prior to the start of the Class Period.

c.    An award of 6,703,140 shares on July 1, 2008 at a price of $17.15 per share.  This price was a 25% discount off of the average trading price for Citigroup common stock on the last trading day of January, February, March, April, May and June 2008.  While the FA Cap Plan participants had to make their election to receive the shares during the Class Period

(in 2007), the shares were awarded and the share price was determined in July 2008, following the conclusion of the Class Period.

171.    Annexed hereto as Exhibit 23 is a true and correct copy of the prospectus dated December 30, 2005 and revised on November 22, 2006 for Citigroup's FA CAP Plan.

172.    Because of the way the FA CAP Plan is structured, to acquire shares pursuant to the Plan, the shares were priced and awarded many months later after Plan participants are required to make their elections.  The pricing and awards for the July 2007 and January 2008 awards were made during the Class Period, but the employee's election to participate in the FA CAP program with respect to those awards occurred prior to the Class Period (in 2006).  And, while the employees' election concerning the July 2008 award was made during the Class Period, the shares were not priced or awarded until after the end of the Class Period.

173.    In connection with the Plan of Allocation, the parties determined that the "purchase" date of shares issued pursuant to the FA Cap Plan was the date upon which the share price was set and the shares were awarded.  This position is consistent with the position that the Brecher Objectors took in the sworn certifications that they signed and their counsel filed in the Southern District of California in April and May 2009.

174.    Annexed hereto as Exhibit 24 is a true and correct copy of the April 2, 2009 Certification of Daniel Brecher that his counsel filed with the United States District Court for the Southern District of California on April 6, 2009.

175.    Annexed hereto as Exhibit 25 is a true and correct copy of the May 29, 2009 Certification of Paul Koch that was filed with the United States District Court for the Southern District of California on May 29, 2009.

176.    Annexed hereto as Exhibit 26 is a true and correct copy of the May 28, 2009 Certification of Jennifer Murphy that her counsel filed with the United States District Court for the Southern District of California on May 29, 2009.

177.    Annexed hereto as Exhibit 27 is a true and correct copy of the May 29, 2009 Certification of Mark E. Oelfke that was filed with the United States District Court for the Southern District of California on May 29, 2009.

178.    Annexed hereto as Exhibit 28 is a true and correct copy of the April 2, 2009 Certification of Scott Short that was filed by his counsel with the United States District Court for the Southern District of California on April 6, 2009.

179.    Annexed hereto as Exhibit 29 is a true and correct copy of the May 29, 2009 Certification of Chad Taylor that was filed by his counsel with the United States District Court for the Southern District of California on May 29, 2009.

180.    The 6 FA CAP Objectors acquired an aggregate total of fewer than 6,000 shares of Citigroup common stock during the Class Period pursuant to the FA CAP program.  As noted previously, a total of approximately 6.2 million shares of Citigroup stock were awarded pursuant to the FA CAP plan during the Class Period.  Pursuant to the Plan of Allocation, the Recognized Loss for these shares in the aggregate (approximately $17 million) represents less than one third of one percent (0.33%) of the aggregate class-wide Recognized Loss.

181.    On September 19, September 27, and November 5, 2012, we had telephone conversations with Matthew M. Guiney and Mark Rifkin of the law firm of Wolf Haldenstein Adler Freeman & Herz LLP (counsel for the FA CAP Objectors).  We also met in person with Messrs. Guiney and Rifkin on October 10, 2012.

182.     At no time during any of these discussions did counsel for the FA CAP  Objectors request that we make efforts to carve out the claims in the pending *Brecher* action from the settlement in this Action.  Nor did FA CAP's counsel at any time ever suggest that the FA CAP Objectors (or other FA Cap participants) should receive an enhanced Recognized Loss under the Plan of Allocation on account of 1933 Act claims that had been filed in the *Brecher* action.

183.     The FA Cap Objectors were not the only members of the Class herein to have filed their own actions against Citigroup prior to the announcement of the settlement herein, asserting claims for damages arising from their purchase of Citigroup common stock during the Class Period.  Annexed hereto as Exhibit 30 is a true and correct copy of the first 11 pages of the docket sheet from *International Fund Management S.A. v. Citigroup Inc.*, No. 09-civ-8755 (S.D.N.Y.).  Many of the plaintiffs in that action asserted claims arising from their purchases of Citigroup common stock during the Class Period at allegedly artificially inflated prices.  As reflected in Exhibit D to the December 7, 2012 Declaration of Steven J. Cirami [Dkt. No. 171-1], many of the plaintiffs in the *International Fund Management* action and other actions consolidated therewith filed timely Requests for Exclusion from this Action, including: International Fund Management S.A., Deka Investment GmbH, Swiss Life Investment Management Holding AG, Nord/LB Kapitalanlagegesellschaft AG, Metzler Investment GmbH, Norges Bank, Mineworkers' Pension Scheme, Salomon Melgen, Flor Melgen, and SFM Holdings LP, among others.

## VII.   CITIGROUP'S STOCK PRICE REACTION TO THE ANNOUNCEMENT OF THE SETTLEMENT

184.     Mr. Frank argues that the market did not view the Settlement favorably, because Citigroup's stock price increased from $29.34 to $29.91 per share on August 29, 2012, the day

that the Settlement was announced publicly, even though the S&P 500 Index and the common stock of Bank of America Corporation declined that day.  *See* Frank Br. at 19.

185.    In fact, the S&P 500 and Bank of America stock both <u>rose</u> on August 29, 2012. Annexed hereto as Exhibits 31 and 32, respectively, are true and correct copies of the daily prices for the S&P 500 Index and for Bank of America stock for August and September 2012.

186.    Moreover, a review of Citigroup's intraday stock trading on August 29, 2012 confirms that the news of the Settlement did not cause Citigroup's price increase that day. Annexed hereto as Exhibit 33 is a true and correct copy of an intraday trading chart for Citigroup for August 29, 2012.  It confirms that as of 11:51 a.m. that day, when the Settlement was first announced, Citigroup's stock price had already risen to $29.67 per share.  Annexed hereto as Exhibit 34 is a true and correct copy of the press release titled, "Kirby McInerney LLP Announces $590 Million Proposed Settlement of Class Action Claims Against Citigroup Inc." dated August 29, 2012.  This was the first public announcement of the Settlement in this action. It was issued at 11:51 a.m.  Moreover, Citigroup's stock price <u>fell</u> slightly in immediate reaction to the news of the Settlement at 11:51 a.m.  Finally, the remaining part of the increase in Citigroup's stock price that day (from $29.67 to $29.91 per share) occurred after 1:40 p.m. – approximately 2 hours after the Settlement was disclosed – apparently in reaction to other news.

We declare under penalty of perjury that the foregoing is true and correct.  Executed this 18th day of January 2013, in New York, New York.


_____
Ira M. Press

_____
Peter S. Linden