# EXHIBIT 35



| ANDREW M. CUOMO<br>Attorney General | STATE OF NEW YORK<br>OFFICE OF THE ATTORNEY GENERAL | ERIC CORNGOLD<br>Executive Deputy Attorney General<br>Division of Economic Justice |
|---|---|---|

DAVID A. MARKOWITZ
Bureau Chief
Investor Protection Bureau

September 8, 2009

BY ELECTRONIC MAIL

Lewis J. Liman, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

    Re:   Bank of America – Merrill Lynch

Dear Mr. Liman:

    I write regarding our ongoing investigation concerning Bank of America's merger with Merrill Lynch. We are at the stage in our investigation in which we are making charging decisions with respect to Bank of America and its executives. However, Bank of America's indiscriminate invocation of the attorney-client privilege is hindering this Office's ability to make fair and fully informed decisions as to what charges, if any, to bring and whether individual Bank of America officers should be charged. We cannot simply accept Bank of America's officers' naked assertions that they sought and relied on advice of counsel in good faith, and that, therefore, they should not be charged. Accordingly, we request that Bank of America reconsider its decision to prevent this Office from adequately probing these crucial issues.

    Our investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders:

> **Losses Prior to Shareholder Approval of the Merger:** By November, Bank of America knew that Merrill expected pre-tax losses for the fourth quarter of nearly $9 billion. Those expected losses jumped to more than $14 billion just prior to the December 5, 2008 shareholder meeting convened to vote on the merger's approval. Yet Bank of America failed to disclose those large and increasing losses to its shareholders prior to the December 5, 2008 vote. The losses were so great that Bank of America officers sought guidance – *before Bank of America shareholders approved the merger* – about the applicability of the material adverse change ("MAC") clause in its merger agreement with Merrill Lynch, the very same provision relied upon eight business days after the merger was approved, when Bank of America told regulators it had a legal basis to terminate the merger.

**Goodwill Write-Downs:** Bank of America and Merrill failed to disclose prior to the shareholder vote that Merrill needed to take a goodwill charge of more than $2 billion associated with sub-prime related losses. Even though it was known of by November, this write-down became part of the purportedly "surprising" losses that were included in Merrill's financials more than a month after the December 5 shareholder vote.

**Post-Vote Losses and Material Adverse Change Determination:** Bank of America failed to disclose that it had determined, eight business days after the merger was approved, that it had a legal basis to terminate the merger because of Merrill's losses. Indeed, Bank of America only decided against seeking to terminate the merger when the jobs of its officers and directors were threatened by senior federal regulators. Yet it took Bank of America more than a month to make public disclosure of its dire financial situation – a month during which millions of shares of Bank of America stock were traded based on entirely inaccurate and outdated financial information. Bank of America further failed to disclose that its officers faced a conflict of interest in responding to the federal government's threat, or that it had received the government's oral commitment to support the merger with taxpayer funds.

**Accelerated Bonus Payments:** It was in this environment – one where Merrill was facing increasing losses and Bank of America was seeking to unwind the deal – that Bank of America allowed Merrill to make $3.6 billion in undisclosed bonus payments. On November 11, 2008, Merrill decided to accelerate its bonus payments, and bonus determinations were approved on December 8, 2008. Bank of America knew about all of these decisions.

The facts of the cascading losses and bonus payments – and the facts of Bank of America's senior executives' knowledge of these events – are straightforward. However, as discussed in detail below, the decision-making process by which Bank of America and its executives decided not to disclose these material facts to Bank of America's shareholders has been hidden from our investigation by Bank of America's repeated invocation of the attorney-client privilege. These invocations have been made even though Bank of America has offered reliance on legal advice as a justification for each of its failures to disclose. It is axiomatic, however, that the attorney-client privilege may not be used as both a sword and a shield.[1]

---

[1]   Assertion of the advice of counsel defense waives the privilege by placing it at issue. *Veras Inv. Partners, LLC v. Akin Gump Strauss Hauer & Feld LLP*, 860 N.Y.S.2d 78, 82 (1st Dep't 2008) ("at issue waiver occurs when a party has asserted a claim or defense that he or she intends to prove by use of the privileged material"); *see also, e.g., Am. Re-Ins. Co. v. U.S. Fid. & Guar. Co.*, 837 N.Y.S.2d 616, 622 (1st Dep't 2007) (at issue waiver "reflects the principle that privilege is a shield and must not be used as a sword"); *see also Orco Bank, N.V. v. Proteinas Del Pacifico, S.A.*, 577 N.Y.S.2d 841 (1st Dep't 1992); *Pleasantville v. Rattner*, 515 N.Y.S.2d 585 (2d Dep't 1987).

2

What follows is a description of how Bank of America is improperly using the attorney-client privilege as both a sword and a shield in defending each of its failures to disclose material information to its shareholders:

i.  **Losses Prior to Shareholder Approval of the Merger:**

In November 2008, Bank of America became aware of at least $9 billion in previously undisclosed forecasted losses at Merrill Lynch. Bank of America's Chief Financial Officer, Joseph Price, has testified that his decision not to disclose those losses came after receiving legal advice from Bank of America's then General Counsel, Timothy Mayopoulos, as well as from outside counsel. Mr. Price further testified that Bank of America decided not to disclose Merrill's expected fourth quarter losses following a call on November 20, 2008 with outside counsel. However, we have been prevented from inquiring about these conversations because of Bank of America's invocation of the attorney-client privilege.

We have also learned that, four days before the shareholder vote on whether to approve the merger, Mr. Price and Gregory Curl, Bank of America's then Vice Chairman of Corporate Development, sought legal advice regarding the MAC clause. This fact is of tremendous significance because it is at odds with Bank of America's position that it only became concerned with mounting losses after the shareholder vote. In particular, on December 1, 2008, Mr. Price and Mr. Curl requested legal advice from Mr. Mayopoulos regarding whether Bank of America had a MAC in light of Merrill's deteriorating financial condition. Mr. Mayopoulos testified about the December 1, 2008 meeting:

> Question:      Did you give advice about whether there was a MAAC [sic] clause or not?
>
> Mayopoulos:  Did I give advice about whether I thought there was a material adverse affect [sic] or not?
>
> Question:      Yes.
>
> Mayopoulos:  Yes.

However, Bank of America has precluded Mr. Mayopoulos from answering any substantive questions about the meeting.

By December 3, 2008, Bank of America learned that Merrill's forecasted losses had risen to more than $11 billion, and with the addition of a $3 billion "contingency" they rose to more than $14 billion. Mr. Price testified that the decision not to disclose these escalating losses was not made until after conversations with Mr. Mayopoulos. Mr. Mayopoulos in turn testified that he spoke with outside counsel to request legal advice regarding the additional losses.

Despite the purported defense that the decision not to disclose Merrill's deteriorating financial condition was fully vetted by informed legal counsel, you have instructed Mr. Price and Mr. Mayopoulos not to answer questions regarding the discussions with counsel. Again, Mr. Price's response to the failure to disclose was that he relied upon his lawyers:

3

| | |
|---|---|
| Question: | So I'm clear, with regard to the conversation you had with Tim Mayopoulos on December 3rd after the second forecast was provided to him, were you speaking with him for the purpose of getting legal advice? |
| Price: | On that subject of disclosure he's our general counsel, yes. |
| Question: | [...] Was there a disclosure made on the financial losses after this conversation with Mr. Mayopoulos? |
| Price: | No. |
| Question: | Did you and Bank of America rely on Mr. Mayopoulos' advice? |
| Counsel for Price: | If you can answer that without revealing any substance, describe it. |
| Price: | Yes. |

### ii.  **Goodwill Write-Downs:**

In November 2008, Merrill determined that it would need to take a goodwill charge of approximately $2 billion, due partially to the complete failure of Merrill's 2006 acquisition of First Franklin Financial Corporation, one of the leading originators of sub-prime residential mortgage loans.  The goodwill charge, known about since at least November 2008, became part of the purportedly "surprising" losses that were included in Merrill's financials in January 2009, more than a month after the December 5, 2008 shareholder vote.  Merrill's former Corporate Controller, Gary Carlin, and former Chief Accounting Officer and Head of Accounting Policy and Corporate Reporting, David Moser, both claim that they did not disclose this charge based on advice received from then in-house attorney Richard Alsop.

When, for example, Mr. Carlin was asked about the basis for not disclosing the goodwill charge, he testified as follows:

| | |
|---|---|
| Question: | And what, generally, did he [Moser] say to you? |
| Carlin: | He [Moser] suggested that we discuss whether or not there was a need to file an 8K with OGC. |
| Question: | Why would there be a need to file an 8K? |
| Carlin: | Because we had a potential write-off of good-will. |
| | [...] |
| Question: | Back to your conversation with Mr. Moser. Who contacted, I |

4

|  |  |
|---|---|
|  | guess, in-house counsel, you or Mr. Moser? |
| Carlin: | I think we were both on the phone. |
| Question: | And who at in-house counsel did you contact? |
| Counsel for Carlin: | I just want to caution the witness we're definitely getting into a privileged conversation, so we should take it one question at a time. |
| Carlin: | Richard Alsop. |
|  | [...] |
| Question: | Why were you satisfied [with not making a disclosure and instead relying on prior disclosures]? |
| Counsel for Carlin: | Without revealing the contents of a privileged conversation. |
| Answer: | Based on several things, but the conversation with Richard Alsop. |

Mr. Moser similarly testified that he relied on legal advice concerning this issue. Despite these justifications, Bank of America has instructed all witnesses not to answer any questions about these conversations, preventing our investigation from assessing the truth of Bank of America's position. This is particularly troubling because, despite your refusals to provide information, we have evidence that Mr. Alsop did not have key information when he rendered his advice.

### iii. Post-Vote Losses and Material Adverse Change Determination:

Eight business days after receiving shareholder approval of the merger, Mr. Lewis and Mr. Price represented to senior Treasury Department and Federal Reserve officials that Bank of America had a basis to terminate the merger because of Merrill's increasing losses. By that point, Merrill's expected losses had increased to $18 billion. Shortly thereafter, Bank of America provided its regulators with updated financials showing that Merrill expected losses of $21 billion. Mr. Lewis testified before this Office that, as a result of not terminating the merger, the Merrill losses would have an impact on Bank of America's shareholders for two to three years. When asked about whether he considered disclosing these events, Mr. Lewis testified before Congress that "I'd leave that decision to our security lawyers and outside counsel."[2] As with the other issues, we have been prevented from testing this purported justification.

---

[2] We note that before this Office, however, Mr. Lewis testified that the question of disclosure was not up to him and that his decision not to disclose was based on direction from Secretary Paulson and Chairman Bernanke: "I was instructed that 'We do not want a public disclosure.'"

5

### iv. **Accelerated Bonus Payments:**

At the same time Merrill was facing these unprecedented losses and Bank of America was seeking to unwind the deal, Bank of America allowed Merrill to make $3.6 billion in bonus payments. Merrill decided on November 11, 2008 to accelerate its bonus payments, and bonus determinations were approved on December 8, 2008. Bank of America knew about all of these decisions.

Merrill had historically calculated annual bonuses in January – logically – after determining what its annual performance had been. This was consistent with its compensation practice, disclosed in its annual reports as a model with "an emphasis on pay for performance," that weighted heavily, among other considerations, "the performance of the Company as a whole."[3] Merrill and Bank of America did not disclose the decision to deviate from this historic practice. Nor did they disclose that they would in fact conveniently abandon the practice when they faced losses, instead setting the bonus pool according to what an outside consultant estimated Merrill's more successful competitors would be paying, and accelerating the cash bonus payment date to before year-end.

These irregular bonus payments were not disclosed in the proxy materials even though they clearly should have been under the circumstances. The payments were made even though Merrill faced results so disastrous that Bank of America was seeking to terminate the transaction. In fact, Bank of America only went forward with the transaction after its executives were threatened with removal and after getting verbal commitments from the United States Treasury to support the merger with taxpayer funds.

Bank of America's justification of these disclosure failures has been that the proxy documents were prepared by two outside law firms. But Bank of America has not permitted the issue to be explored at all, claiming attorney-client privilege. Indeed, we cannot even establish whether these law firms were asked any of the questions vital to deciding whether to disclose: Were the law firms asked to provide advice on whether Merrill and Bank of America needed to disclose the major change in how Merrill set its bonus pool? Were the law firms asked to opine on whether the accelerated bonus payments were appropriate given previously filed executive compensation disclosures? Should the bonuses have been paid given Merrill's losses and the need for taxpayer support? Were the bonuses appropriate? Should they have been disclosed given Merrill's unprecedented losses? Were the law firms asked to opine on whether the bonuses needed to be disclosed given that they were effectively being made possible by promised taxpayer support? Who were the officers that sought the advice on these issues, and what facts did they provide to counsel in seeking the advice? Without being afforded the opportunity to ask these central questions, which Bank of America clearly puts at issue through its position that its actions were made in reliance on advice of counsel, we cannot fully assess the culpability of the Bank and its management concerning these disclosure failures.

---

[3]   Merrill Lynch & Co., Inc., Definitive 2008 Proxy Statement (Schedule 14A), at 28 (March 14, 2008). Merrill also represented to the Attorney General (on November 5, 2008) and to the United States House Committee on Oversight and Government Reform (on November 24, 2008) that it planned to make incentive compensation decisions at year-end.

* * * * *

As set forth above, we cannot simply accept Bank of America's officers' bald assertions that their decisions to keep each of these material events from Bank of America's shareholders were based on a full review of all the relevant information by their inside and outside counsel. The law is clear that Bank of America and its officers cannot assert an advice of counsel defense for their decisions, and at the same time persist in refusing to disclose the substance of the conversations with counsel. Accordingly, we request that Bank of America reconsider its decision to prevent this Office from adequately probing these crucial issues. We provide you with this final opportunity to reconsider. Otherwise, we will proceed with our charging decisions without giving credit to the advice of counsel defenses that Bank of America has not permitted us to test.

Please provide us with Bank of America's decision by Monday, September 14, 2009. Feel free to contact me if you have any questions regarding the above request.

Sincerely yours,

David A. Markowitz
Chief, Investor Protection Bureau

7