**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE CITIGROUP INC. | Case No: 07 Civ. 9901 (SHS) |
| SECURITIES LITIGATION | |

---

## SUPPLEMENTAL DECLARATION OF THEODORE H. FRANK
## IN SUPPORT OF OBJECTION

---

Theodore H. Frank

11307 Bulova Lane
Fairfax, VA 22030

1718 M Street NW, No. 236
Washington, DC 20036

Phone: (703) 203-3848
Email: tedfrank@gmail.com

*In pro per*

**DECLARATION OF THEODORE H. FRANK**
**IN SUPPORT OF OBJECTION**

I, Theodore H. Frank, declare as follows:

1.      I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      This declaration supplements my first declaration (Docket No. 181) and its nineteen exhibits.

**Exhibits**

3.      A true and correct copy of Brian Fitzpatrick's law review article *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studies 811 (2010), relied upon by Professor Miller, is attached as Exhibit 20.

4.      A true and correct copy of Professor John C. Coffee Jr.'s declaration in *In re AIG Securities Litigation*, No. 04 Civ 8141 (S.D.N.Y.) (Docket No. 603-8), is attached as Exhibit 21. In that declaration, Coffee uses the same boilerplate he used in this case, asserting that class counsel's performance was "extraordinary." *Compare* Dkt. 167 ¶ 1 *with* Ex. 21 ¶ 1.

5.      A true and correct copy of Professor John C. Coffee Jr.'s declaration in *In re Wachovia Preferred Securities and Bond/Notes Litigation*, No. 09 Civ 6351 (S.D.N.Y.), is attached as Exhibit 22. In that declaration, Coffee uses the same boilerplate he used in this case, asserting that class counsel's performance was "extraordinary." *Compare* Dkt. 167 ¶ 1 *with* Ex. 22 ¶ 1.

6.      Paragraph 1 of Professor John C. Coffee Jr.'s declaration in this case refers to his Columbia Law Review article, *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation*. A true and correct copy of the SSRN version of this 2006 paper is attached as Exhibit 23.

7.      On March 6, 2013, class counsel hand-delivered a letter to the Court discussing its time records, but did not file that record on the docket. A true and correct copy of this letter is attached as Exhibit 24.

8.      A true and correct copy of my Local Rule 37.2 letter to the Court of January 24, 2013, is attached as Exhibit 25.

9.      A true and correct copy of class counsel Ira M. Press's letter to the Court of January 29, 2013, is attached as Exhibit 26.

10.     A true and correct copy of the March 8, 2013 order in *In re Beacon Assoc. Lit.*, No. 09 Civ 777 (S.D.N.Y.) is attached as Exhibit 27.

## Some Observations of the Time Records

11.     India A.'s time records indicate that she spent 239 hours digesting a single one-day deposition where the transcript was under 400 pages, at a purported lodestar of over $90,000. $550/hour Colin S. billed at least 94.25 hours digesting a similarly-sized single-day deposition transcript at a claimed lodestar of $51,837.50.

12.     When I managed large-scale multi-district civil antitrust and intellectual property litigation at one of the thirty largest firms in the country, deposition digests were compiled either by a paralegal or by the junior-most attorney who attended the deposition. Because technology provides word indices and searchable text, it was rare for such digests to take more than ten hours of time; an efficient team simply couldn't expend more time than that. According to class counsel's Exhibit E, there were 55 days of depositions. If all of the deposition summaries were similarly inefficient, it suggests a lodestar exaggeration of between $3 million and $5 million—even assuming that these digests were necessary, rather than done as busywork to inflate the lodestar once a settlement offer was accepted.

13.     According to class counsel, the mediator made a proposal to settle the case on April 25, 2012, and the parties agreed to it on May 8, 2012. Dkt. 171 ¶ 98. But class counsel hired twenty new contract attorneys in the first week of May 2012. Dkt. 196 ¶ 106-107. These attorneys seem to have been instructed to bill as many hours as possible since the case was about to settle, and the sole purpose seems to have been to inflate the lodestar, since the parties had already agreed to the mediator's offer and depositions had ceased. *E.g.,* Janet P. time entries (273 hours from June 20-July 19); India A. (255 hours for coding from June 20-July 19); Seth A. (264 hours from June 20-July 19);

Michael S. (271.25 hours from June 20-July 19); Teresa L. (264.5 hours from June 20-July 19); Stephanie S. (81 hours last week of July 12-18); Anne B. time entries (70.5 hours in last week of July 12-18); Gale B. time entries (53.5 hours in last week of July 12-18); Paul K. (67.75 hours for "coding" in last week of July 12-18); Mashiriki D. (226 hours from June 20-July 19); Tilewa F. (278 hours from June 20-July 19); Steven W. (48.75 hours in last week of July 12-18 after usually working 30 hours/week). Even the Hudson attorneys stepped up their billing. *E.g.,* Eileen D. (55.5 hours in five days of the last week of July 12-18, after rarely working more than 8 hours a weekday in over a year on the case); Belden N. (311.25 hours in last month of June 20-July 19).

14.     $7,327,662.50 of lodestar was billed just by contract attorneys working under Kirby between May 9, 2012 (the day after the parties agreed to the settlement) to July 19, when work was apparently ordered to stop. That's about 30% of the total Kirby contract-attorney lodestar. If Kirby attorneys were working at a similar artificially accelerated pace, lodestar is inflated by $15 million.

15.     Class counsel originally submitted the timesheets to me in a low-resolution PDF format with OCR capability; Exhibit B was 19 megabytes in size. To do so, they had to take the trouble to print out a spreadsheet and scan it, creating additional work for themselves to preclude me from being able to review the timesheets. In fact, the timesheets are available in a spreadsheet Microsoft Excel format. After I complained to class counsel and noted the violation of Rule 26(g), they provided me the electronic spreadsheet file. The spreadsheet—which is less than 1/20th of the size of the PDF timesheets, permits easy searching and sorting of the data that was illuminating. For example, I was able to program a simple text-search macro that determined that $1,478,750 of the time entries mention the word "code" or "coding." Over $17 million in time just from Kirby contract attorneys simply says "document review." If class counsel has not provided the timesheets to the Court in electronic spreadsheet format, the Court should obtain those files from class counsel.

### Plaintiffs' Conspiracy Theories

16.     In the February 28 hearing, plaintiffs accused Forbes senior editor Daniel Fisher of working for me because he published two consecutive stories about my objections. The allegation is

false. I have never met Mr. Fisher and have only corresponded with him over the phone and by email. The only materials I've sent him are publicly-filed documents.

17.    In a letter to the Court, plaintiffs accuse me of coordinating with the Association of Corporate Counsel. I asked an ACC attorney whether ACC could identify in-house counsel willing to overcome corporate risk-aversion and general refusal to get involved. They did not do so, and are instead apparently filing an *amicus* brief. As of the morning of March 15, I have not seen their *amicus* brief; they have not seen my March 15 filings before I filed them.

**Offer of Proof**

18.    Daniel Fisher, a senior editor for Forbes, and a graduate of the Yale Law one-year program for journalists, has spoken with several contract attorneys in this case, and written multiple stories with factual details inconsistent with class counsel's representations to the Court about the level of work the contract attorneys were doing and the skills of the contract attorneys. *E.g.,* Daniel Fisher, *Citigroup Plaintiff Lawyers Fire Back at Fee Objectors*, Forbes.com (Jan. 24, 2013) (contract attorney reports that the work done could have been done by a paralegal). That class counsel's assertions merit testing through discovery is not pure speculation or a fishing expedition, but based on reasonable information and belief—especially since the timesheets produced last week refute class counsel's claims that there was no low-level coding being done, and fail to support class counsel's claims that the bulk of the contract attorneys were doing substantive work.

19.    Fisher reports that "several [contract attorneys] told me temp agencies actively blacklist lawyers they consider to be troublemakers." *Id.* Moreover, Kirby McInerney warned contract attorneys not to talk to reporters. Daniel Fisher, *Class-Action Firms Capitalize On Wretched Market For Law-School Grads*, Forbes.com (Jan. 4, 2013). This enforced wall of silence is why subpoenas are needed to resolve any factual disputes in this case if the Court does not find the timesheets persuasive in refuting class counsel's claims.

20.    Had I been able to depose the expert witnesses, I would have been able to directly impeach them with their prior inconsistent statements and their misstatements of academic studies on the subjects of their testimony.

21.     Had I been able to depose the expert witnesses, I would have been able to pose hypothetical questions whether a change in the false premises on which they based their opinion would have changed their opinion. The result would demonstrate either that their current conclusions are unprincipled (and thus not worthy of weight) or that their opinions would no longer be valid.

22.     Professor Coffee does not disclose his *Wachovia* expert report (Ex. 22), which contradicts his expert report in this case in multiple particulars, in his declaration in this case. *See* Dkt. 167 ¶ 10. I learned of it purely by happenstance in doing a search on Google for Professor Coffee's law review article. Discovery of the expert witnesses would likely have disclosed other hidden expert reports that contradicted the expert report in this case.

23.     Had I been able to depose the expert witnesses, I would have questioned why relevant case law and data was inexplicably excluded  in concluding that a 17% fee percentage was reasonable; if relevant data had been included, the data would have demonstrated that the fee percentage was atypically high. Had I deposed the experts, I would have questioned why the case law and data on which they rely in concluding that a multiplier of 3 to 4.5 was "becoming common" was outdated and insufficient and questioned the experts on why relevant case law and data was excluded; if relevant case law had been included, the data would have demonstrated that the 3 to 4.5 multiplier was not "becoming common." I would have questioned them concerning multiple false premises relating to their lodestar conclusions including the inflated hourly rates of contract attorneys. I would have questioned them regarding data they failed to consider in concluding that the multiplier was necessary including risk assessments based on previous awards class counsel has received in similar cases and devotion of firm resources after risk of recovery significantly decreased from the court's order denying the motion to dismiss and mediation/settlement.  I would have questioned them on the multiple false premises on which they rely to support their conclusion that the recovery was successful, including financial stability of defendants.

24.     Had I been able to depose Michael M. (the 2006 graduate who supervised the document review by contract attorneys), on information and belief, I would have been able to

impeach numerous claims made by class counsel about the skills of the contract attorneys and the quality of their work product, about the document review and coding process, about the screening of the contract attorneys, whether attorneys were being judged on the quality of their review or on the raw quantity of work product generated, and whether this document review was exceptional compared to other document review projects.

25.     Had I been able to depose a contract attorney of my choosing following the Michael M. deposition, I would have been able to impeach numerous claims made by class counsel about the skills of the contract attorneys and the quality of their work product, about the document review and coding process, about the screening of the contract attorneys, whether attorneys were being judged on the quality of their review or on the raw quantity of work product generated, and whether this document review was exceptional compared to other document review projects.

26.     Had I had discovery of class counsel's lodestar from successful and unsuccessful PSLRA cases, I would have been able to demonstrate that the average hour expended by class counsel averages a substantial multiple of lodestar, and that class counsel's multiplier requests systematically overcompensate them under *Goldberger* and *Kenny A.*

27.     Had I had discovery of class counsel's pre-retention correspondence and contracts with Hudson and Special Counsel, I would have been able to prove beyond a shadow of a doubt that this was not an atypical document review; that class counsel's declaration exaggerated the scope of the work sought from the vast majority of the contract attorneys; and that class counsel faced little or no overhead expenditure from the use of contract attorneys.

28.     Class counsel's Exhibit C, submitted *in camera*, claims to be a sample of the work product of the contract attorneys. But this is plainly a self-selected group of documents to show the contract attorneys in the best light, rather than a sample truly representative of the contract attorneys' work. The Court should demand a random sample of work product from specific contract attorneys generated on specific days. Moreover, that random sample should be tied to specific time entries: a digest of a one-day deposition may be comparable to the works of Hemingway, but if class counsel attributes $50,000 of lodestar to it, it would suggest inefficient use

of resources. Permitting the *ex parte* submission without such checks will unfairly bias the proceedings.

### The Senior Analysts

29.     The Kirby website biography for Orie B. indicates that he has a B.A. and is the "Director of Research." If the other senior analysts were reporting to Orie B., they should not be being billed at the same $295/hour.

30.     Kya B. appears to be a 2010 law-school graduate who never passed the bar. Class counsel is claiming a $295/hour lodestar for her work, but provide no evidence that law-school graduates who have not passed the bar have a prevailing market rate of $295/hour.

31.     If Kya B. was performing the same document-review work as the contract attorneys, I question whether one needed experienced attorneys to do document review if a recent law graduate who had not passed the bar could do so.

32.     Elaine M.'s sole degree is a 2002 B.A. according to the Kirby website biography.

33.     I could not find a resume for Matthew M.

### The Cornerstone Report

34.     Plaintiffs try to stack the deck in the Cornerstone report by saying "fewer than 50% of PSLRA actions commenced since 2008 have resulted in settlements." Dkt. 196 ¶ 27. This makes a basic mathematical error. If a case is dismissed, it will be dismissed early in the age of the case; the longer a case lasts, the more likely it is to settle. Thus, data for more recent years will artificially look riskier than data for earlier years because the dataset is skewed to cases that have resolved early in the proceedings. As I noted in my original expert report, the Cornerstone report therefore *overstates* the risk PSLRA attorneys face. Dkt. 181 ¶¶ 61-62. For example, the Cornerstone report excludes the case at bar, which has settled, from the 2007 data, because it had not yet been resolved when the counting was done; the incomplete 2007 data thus understates the chances of plaintiffs' success for cases brought in 2007. Plaintiffs do not, and cannot, rebut this basic truism, and their cherry-picking use of time-biased data only serves to prove my point.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 15, 2013, in Fairfax, Virginia.

Theodore H. Frank