D2S8CITC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2
     ------------------------------x

3
     IN RE CITIGROUP, INC.

4    SECURITIES LITIGATION                    07 Cv. 9901 (SHS)

5    ------------------------------x

6                                             February 28, 2013
                                              10:10 a.m.

7
     Before:

8
                         HON. SIDNEY H. STEIN

9
                                              District Judge

10
                              APPEARANCES

11
     KIRBY McINERNEY LLP

12        Attorneys for Plaintiffs
     BY:  IRA M. PRESS

13        PETER S. LINDEN
          ANDREW M. McNEELA

14
     ENTWISTLE & CAPPUCCI

15        Attorneys for Plaintiffs
     BY:  JONATHAN H. BEEMER

16
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

17        Attorneys for Defendants
     BY:  RICHARD A. ROSEN

18        JANE B. O'BRIEN

19

20   Also present:

21        THEODORE FRANK, Objector (by telephone)

22

23

24

25

D2S8CITC

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Attorneys please make your
 3    appearance for the record.
 4              MR. PRESS:  Good morning, your Honor.  Ira Press.
 5              THE COURT:  Speak loudly so that Mr. Frank, who is on
 6    the phone, can hear you.
 7              MR. PRESS:  Good morning, your Honor.  Ira Press,
 8    Kirby McInerney, for lead plaintiff.
 9              MR. LINDEN:  Good morning, your Honor.  Peter Linden
10    of Kirby McInerney for lead plaintiffs.
11              MR. McNEELA:  Good morning, your Honor.  Andrew
12    McNeela, Kirby McInerney, for lead plaintiffs.
13              MR. BEEMER:  Good morning, your Honor.  Jonathan
14    Beemer, Entwistle & Cappucci, for the public employees.
15              THE COURT:  Good morning.
16              For the defendant.
17              MR. ROSEN:  Good morning, your Honor.  Richard Rosen
18    and Jane O'Brien, from Paul, Weiss, Rifkind, for the
19    defendants.
20              THE COURT:  And on the phone we have?
21              MR. FRANK:  Theodore H. Frank for himself.
22              THE COURT:  Please be seated in the courtroom.
23              I asked the parties to come in and I wanted Mr. Frank
24    to participate as well.  He opted to participate by phone,
25    which is fine.  I think you're in DC.  Is that correct, sir?
```

D2S8CITC

1              MR. FRANK:  Yes, your Honor.

2              THE COURT:  It's in regard to Mr. Frank's request,

3      letter request, dated January 24, for certain discovery.

4              I have read the papers and thought about it and I have

5      views.  I want to tell you what those views are, and then I

6      will hear from the parties if there is any serious disagreement

7      with it.  I think that's probably more efficient than each of

8      you restating your positions, not the defendants, but the lead

9      plaintiffs' counsel and Mr. Frank.

10             I am denying Mr. Frank's request to depose the experts

11     on the fee.  The law does not provide for that except in

12     unusual circumstances.  As a matter of fact, the baseline is

13     that individual objectors are, by and large, not entitled to

14     discovery.  I am going to grant a substantial portion of

15     Mr. Frank's requests though because it's really information

16     that the Court will find helpful and that I was going to ask

17     for in any event.

18             I am not going to permit the depositions of the

19     experts.  There is really no basis for it.  Mr. Frank is

20     certainly entitled to respond to those expert declarations and

21     to critique them in any way he sees fit, but everything they

22     have to say is set forth right there in the declarations.  He

23     is perfectly able to attack those if he believes it's

24     appropriate.  So I am denying the request for depositions of

25     the fee experts.

D2S8CITC

1           I am also denying that area of his requests which seek

2      to know how much the contract attorneys -- I think the

3      plaintiffs call them project specific attorneys -- are paid.

4      The law is quite clear that the issue for me is what a

5      reasonable fee is.  The issue is what the market pays for the

6      various attorneys.  That's *Arbor Hill*.  There is a whole line

7      of cases on that.  The issue of how much profit there is in

8      this for the plaintiffs' attorneys I think is not relevant to

9      my inquiry under the law; that is, I am not supposed to look at

10     the difference between the costs to the plaintiffs' firms and

11     what a reasonable fee is.  The issue is what the market rate is

12     for these people.  So I am not going to grant any discovery in

13     regard to what these people are being paid.

14          However, I do think it's relevant, and something I

15     would like to know, as to what the qualifications and

16     reputations and skills of the contract attorneys are.  And I

17     know the declarations put in by the plaintiffs' attorneys say,

18     oh, they are the same as our regular attorneys, and some went

19     to fabulous law schools and others have had a great deal of

20     experience with CDO issues and others have worked on these

21     projects before.  I understand that.  But I think the Court and

22     Mr. Frank are entitled to specifics so that we can get beyond

23     the generalities and take a look and see if in fact the

24     contract attorneys do have comparable skills, experience and

25     reputations to the attorneys who are regular employees of the

D2S8CITC

```
 1    law firms.

 2                 That's one area that I want.  And I will be specific.

 3    I have a list here.  I will tell you what specifically I want.

 4                 Another area that I think I want information on, and I

 5    believe Mr. Frank does as well, is to get a better feel for the

 6    extent of duplication of effort, if any, and so I will talk

 7    about that.

 8                 Here is the list of what I want and you will have to

 9    make it available.  You will file it and therefore it will be

10    available to Mr. Frank as well.

11                 The plaintiffs' attorneys have already offered to

12    submit the daily time records, and I want that.  And when I say

13    plaintiffs' attorneys, I am not only talking about Kirby

14    McInerney, although obviously that's the bulk of it, but you're

15    going to be responsible for all of the plaintiffs' firms.

16                 I do want the daily time records.  I think the case

17    law in the Second Circuit read tightly is that there should be

18    contemporaneous time records filed with the Court so I am going

19    to ask for those.  I can't tell you what format they should

20    use.  I certainly don't want truckloads of documents.  I assume

21    disks are better, but I will leave that to you.  That's one

22    thing, daily time records of the attorneys, contemporaneous

23    time records if they are available.

24                 Secondly, there was, in my recollection, a substantial

25    amount of time spent on, I will characterize it as internecine
```

D2S8CITC

1    disputes.  I don't know if that is quite the word, but there

2    was your standard disputation among potential lead counsel,

3    which actually led to a substantial motion practice, the motion

4    to appoint interim lead counsel and the motion for

5    reconsideration.  We had a very lengthy court conference and

6    there was a lot of briefing on it and Kirby McInerney was left

7    standing at the end of that match.  I don't think that all of

8    that assisted the class.

9            These are preliminary thoughts obviously.  We can hash

10   all of this out at the conference to review the settlement, the

11   conference for final approval, which will also deal with the

12   fees.  But my thinking is that that fight doesn't advance the

13   class, except to the extent that interim lead counsel is

14   appointed ultimately.  So I do want a breakdown of

15   pre-appointment of interim lead counsel and post-appointment of

16   interim lead counsel, hours and rates and total, so I can get a

17   sense of how much time was spent on what I don't think, in

18   large part, benefits the class.

19           In addition to that gross breakdown, I do want a

20   breakdown of, again, hours and rates total spent on the motion

21   to appoint the interim lead counsel and the motion opposing it,

22   and the motion for reconsideration and the motion opposing it,

23   including court time and preparation because that's all part of

24   the same analysis.

25           So that's what I call the issue of who is going to be

D2S8CITC

 1    the interim lead counsel.

 2              So far we have two areas I want, daily time records

 3    overall and then the interim lead counsel issue.

 4              The third area I want is to be able to think about the

 5    extent to which there has been duplication of effort, if any.

 6    I am not saying there has been, but I think I am obligated to

 7    take a look at that.

 8              My simplistic view of things is that the computers

 9    have all of this information, and as long as there is somebody

10    there who is pressing the right buttons, the information will

11    come out.  And if I am wrong about that, you will tell me,

12    because I do want this on a fairly short time period.

13              I want the number of attorneys, and who they are and

14    their billing rate -- I assume the same button will yield

15    that -- attending every deposition.  So who they are and their

16    rate again.  If there are six partners and seven associates

17    attending one deposition, I will want that.  And obviously this

18    is all for plaintiffs' lawyers.  Paul Weiss can have as many

19    lawyers as it wants; that's not part of my determination.

20              If it's possible, and I assume it is, I want the

21    number of attorneys and hours and rates for attorneys working

22    on each brief.  So think about that.  That may be a little

23    harder to gather, but perhaps not.  And then the number of

24    attorneys -- again, hours and rates -- preparing for and

25    attending each court conference.  That should be fairly

D2S8CITC

straightforward.  There were not that many physical

conferences.  So that's a third bundle of information.

A fourth bundle of information is expenses, and this

can be very straightforward.  If there was a policy for travel,

that it had to be economy or business or first, I want to know

that.  If it's free play, that is, you did whatever you want, I

am going to need a breakdown of what was economy, what was

business, and what was first class, in terms of travel, and it

won't surprise you that I am only going to be approving the

economy flights.  And I want, if it's available, the average

hotel rate in each city.  My assumption is most of these

depositions took place in New York, and the attorneys are in

New York so I think that will basically just drop out.  My

guess is I am not asking for a great deal of information for

the hotel rates, but I do think it is relevant.

Then perhaps a minor matter.  I want the per page

copying rate for each firm.

Now, let's turn to the next group, which is contract

attorneys.  Kirby McInerney is telling me, and I have no reason

to doubt it because I don't have the information, they are

telling me that the qualifications are the same for contract

attorneys as for Kirby McInerney attorneys.  And again, I am

just using Kirby McInerney, but I mean every firm.

If I understand the submissions, Kirby McInerney is

saying, Mr. Frank is saying, we don't know who those contract

D2S8CITC

1    attorneys are, and he is also saying they are paid less than

2    regular attorneys.  I have responded to that.  That's

3    irrelevant to me.  But I do need to know their skills,

4    experience, qualifications, reputation so I can attempt to

5    determine what the market rate is for their services vis-a-vis

6    regular associates and partners.

7         Kirby McInerney says, you know, Mr. Frank, who the

8    contract attorneys are because you have the bios of our lawyers

9    and everybody else is a contract attorney.  That's not terribly

10   helpful to me because I don't think I should be accepting at

11   face value the fact that, because Miss So and So went to NYU

12   Law, that's a woman who you both seem to focus on, therefore

13   her qualifications are the same as everybody else.  And because

14   some of these contract attorneys happen to work for major firms

15   their qualifications are the same.  I think I need more

16   information than that.

17        Kirby McInerney says it went through, I don't know,

18   100 bios and chose only one out of three or four.  I think

19   those are the basic figures.  And they were seen by two or

20   three personnel.  When I see a word like that, I am not sure

21   who the personnel is, although you do say that it was often

22   Mr. Press and Mr. Linden who were reviewing people.  But what I

23   want is, because you gave me the bios of your firm people, I

24   want the bios of the contract people.  Presumably those are

25   available.  I don't want you to be going to whatever agency

D2S8CITC

1    sent them to you, because that in itself would suggest that you

2    didn't have the bios.

3         So give me the bios of each of the contract people,

4    and I will assume, and you will tell me if I am wrong, for you

5    and all the other firms that the bios I have in all of this

6    material are for all of your firm attorneys and you will be

7    giving me the bios of the contract attorneys.  That will allow

8    me and Mr. Frank to reach a conclusion that the qualifications,

9    skills, experience, reputation is the same as for the firm

10   attorneys.

11        Now, in that regard, there are some bald statements in

12   the papers.  For example, the Kirby McInerney reply memorandum,

13   on page 2, "Moreover, to our knowledge, every court that has

14   examined the issue of billing rates for project specific

15   attorneys for PSLRA settlements has approved a fee based upon

16   market rate billing."

17        Well, to the extent you can give me that information,

18   I think it would be helpful.  If you know of courts, if there

19   are cases, published decisions, where courts have examined the

20   issue of billing rates for project specific attorneys in PSLRA

21   settlements, and have approved a fee based on market rate

22   billing, I would want to see that.  And that doesn't say that

23   those courts decided that the market rate billing for the

24   project attorneys was the same as for the firm attorneys, but

25   that's the information I would want, if you have it.

D2S8CITC

1          Then again you repeat that on page 15, second full

2     paragraph, "All of the authority we have seen supports the

3     practice of billing project attorneys at the market rate for

4     comparable in-house attorneys in calculating fee awards."  I

5     want to see that authority if you can recover it.

6          That section goes on to say, "These courts also have

7     expressly rejected Mr. Frank's argument that project attorney

8     fees should be considered an expense."  And as I have said

9     earlier in this monologue, I do accept that.  That is the law,

10    that is, project attorneys are not simply an overhead expense,

11    but can be treated as attorneys for billing purposes.

12          So that's what I want on contract attorneys.

13          I have a few specific questions, and I would raise

14    these at the conference, that is, the settlement hearing, but I

15    think it makes sense.  These are minor points.  I saw an

16    expense put in by the Glancy Binkow firm for $100,000 for

17    "litigation fund" and for Kenneth Allen, who is a separate

18    attorney, for $10,000.  It's titled slightly differently, but I

19    assume it's the same litigation fund.

20          My understanding of how these things work, and perhaps

21    Kirby McInerney can tell me if I am wrong, is that because the

22    expenses of these significant cases on an ongoing basis are so

23    large, that very often the plaintiffs' firms who are involved

24    in working on it will get together and estimate what the

25    disbursement fees have to be on an average basis, because they

D2S8CITC

```
1    are not going to be recompensed until the case is resolved

2    either by settlement or trial, and each firm puts in its

3    out-of-pocket share each month, and then expenses are drawn

4    down out of that litigation fund.  If that analysis is correct,

5    then these two entries should not be independent expenses

6    because they would be reflected when the fund is drawn down on

7    a monthly basis.

8            Now, I must say that's just from my own experience as

9    a lawyer and some experience as a judge on these types of

10   cases.

11           Does somebody want to enlighten me on that or you may

12   need to look into that Glancy Binkow and Allen example.

13           MR. PRESS:  This is Ira Press speaking.

14           On that issue, your Honor, and I think there are

15   footnotes in the underlying exhibits that explain this, while

16   the Allen firm and the Glancy Binkow firm contributed those

17   amounts to the litigation fund, that was to pay down other

18   disbursements; they were not double counted.  The amounts paid

19   to the litigation fund were not counted as separate items in

20   the total expenses and the total expense does not double count.

21   It only counts the actual expenditures and doesn't count the

22   additional contributions.

23           THE COURT:  That's helpful.  Do I know what comprised

24   that $110,000?

25           MR. PRESS:  Money is fungible.  They paid money into a
```

D2S8CITC

1    fund and the actual expenditures were made by lead counsel for

2    whatever was itemized in our statement of expenses.

3              THE COURT:  Just let me think about that.  All the

4    firms put money into this fund?

5              MR. PRESS:  Yes.  Not all the firms, but some.

6              THE COURT:  Firms put money into the fund.  The firms

7    pay expenses, in other words, they have to pay to travel

8    somewhere, and then they will put a bill into that fund and the

9    fund pays that bill?

10             MR. PRESS:  The way it worked was we as lead counsel

11   would incur expenses -- court reporting, document management

12   services, experts.  To help defray those rather substantial

13   costs, we asked some of our co-counsel for contributions.  They

14   would make contributions into the fund.  But, importantly, your

15   Honor, the total figure that we set forth for our expenses that

16   we seek reimbursement for in this case does not include

17   contributions into the litigation fund; it only includes the

18   actual expenditures from the litigation fund when they were

19   made.  The contributions from the litigation fund were kept on,

20   I guess, the journal entries of the independent firms.

21             THE COURT:  So you have put in for every time you paid

22   the expert and the document management, so forth?

23             MR. PRESS:  Correct.  But we did not put in for the

24   litigation fund contributions because that would have been

25   double counting.

D2S8CITC

1              THE COURT:  The 100,000 that Glancy Binkow is seeking

2      because it paid into the litigation fund, what was that used

3      for?

4              MR. PRESS:  They are not seeking $100,000 from the

5      court or from the settlement fund, your Honor.  They are

6      seeking that, when the expenses are reimbursed to lead counsel,

7      lead counsel reimburses them that portion.

8              THE COURT:  Now I understand.  I will look at that

9      with that in mind.  Now I understand.  The 110,000 is not an

10     independent request for reimbursement; rather, the request for

11     expenses is the Kirby McInerney request.

12             MR. PRESS:  Yes, your Honor.  There is a figure put in

13     the request for expenses, I think it's $2-1/2 million or

14     something along those lines, and that does not include

15     litigation fund contributions by other firms.  That's the

16     actual expenditures.  That's all we seek reimbursement for.

17             THE COURT:  That's helpful.  I will look at that with

18     that in mind.

19             That's where I stand, gentlemen and lady, on what I

20     think I need.  And I think that essentially also gives

21     Mr. Frank what he wants, apart from the depositions, apart from

22     a cost request that he has.

23             So let me turn first to Mr. Frank.  Did you want to

24     respond in any way, sir?  Again, I have thought about this.

25             MR. FRANK:  Yes, your Honor.  Two points.

D2S8CITC

1          First of all, on the cost issue of the contract

2     attorneys.  Throughout the expert declaration, throughout their

3     briefs, what they say is, you should look at the market rates,

4     and you can tell what the market rates are by looking at what

5     bankruptcy courts do.  And what bankruptcy courts do with

6     contract attorneys is that they bill them at costs.  You're not

7     allowed to charge out contract attorneys in bankruptcy cases as

8     if they are full-time attorneys at a law firm.

9          So I would submit -- and the second point I would have

10    on that is we are going to submit a declaration from an expert

11    witness, who was an in-house counsel, who did many, many cases

12    of this magnitude, and he will testify that when you have a

13    paying client, who is paying real bills in the market rate to a

14    law firm, they do not accept $300 an hour, $400 an hour, $500

15    an hour rates for document review.  That is farmed out and

16    billed out at cost.

17         So even if at the end of the day you're going to rule

18    that they are entitled to bill them out at $300 an hour and

19    more, I think at least what the bills are to the third party

20    firms that are actually hosting these attorneys in their

21    offices, in these warehouses where the attorneys are sitting

22    side by side in large rooms of 20, 30 computers, doing what is

23    essentially clicking on buttons to indicate what words are in a

24    document, which if you look at the Press/Linden declaration,

25    what they are doing is they are going to a pull-down menu and

D2S8CITC

1    saying this CEO is mentioned in this document.  What the

2    contracts are with Hudson, with the other third party vendors,

3    I think it's relevant what the bills show what was paid to the

4    vendors.

5              I think, also, there is a factual dispute over what it

6    was that the attorneys were doing, and this could be very

7    easily demonstrated by contemporaneous documents.

8              THE COURT:  You're going to get the time records, sir.

9              MR. FRANK:  That's a start, your Honor.  But with

10   respect to the qualifications, I think it would be very

11   informative if they produce the requests for proposals to the

12   third party vendors.  They presumably put this out to bid.

13   They didn't go to the first document vendor they saw.  They

14   asked several document vendors, give us a proposal for how much

15   it's going to cost; here is what we want you to do, tell us how

16   much it's going to cost, how much you're going to charge us.

17   If we had those proposals in hand, I think what we would see is

18   they contradict what the Press/Linden declaration says.

19             THE COURT:  I understand your position.  When you talk

20   about the drop-down menu, is that what you refer to as

21   objective coding?  Because the Kirby affidavit says there is no

22   objective coding.

23             MR. FRANK:  You can classify it either way, but that's

24   not a skilled thing to do and it's what the Press/Linden

25   declaration says the attorneys were doing.  They had a list of

D2S8CITC

```
 1   CDOs and other important terms.  They would look at a document
 2   and they would check little boxes on a software program, these
 3   are the CDOs that are mentioned in this document.
 4               THE COURT:  Thank you.  Let me hear from Kirby
 5   McInerney.
 6               MR. LINDEN:  Peter Linden here for Kirby McInerney.
 7               That is not accurate.  There was a program used for
 8   coding purposes.  First of all, as we explained in the
 9   Press/Linden declaration, there was a large amount of training
10   that went into explaining to these attorneys what to look for.
11   This is not just looking for words on the page.  You have to
12   understand what the documents are.  We asked the attorneys who
13   were reviewing these documents to provide their analysis, their
14   evaluation, in an attorney comment section of this program.
15   It's not as simple as just looking for a word and clicking it.
16   You have to understand what the documents are saying.  This, as
17   I think your Honor is aware, is an extremely complex case, and
18   we had to explain that case to the attorneys.  They had to
19   understand that and then look at these complex documents and
20   understand them.  It's not objective coding, your Honor; it's
21   analysis and it's evaluation.
22               THE COURT:  Can you talk to me about how you got these
23   people on board?  In other words, how did they come to your
24   firm?  Did you send out requests for proposals to different
25   agencies?  That's Mr. Frank's question.
```

D2S8CITC

1          MR. LINDEN:  I do not believe we did.  What we did do

2     was we contacted -- first of all, not all the attorneys were

3     hired through an agency.  There were a few attorneys who were

4     former employees for attorneys that we knew from other

5     litigation.

6          THE COURT:  I saw that, and, in fact, some of the

7     attorneys, the project specific attorneys, are still working on

8     different projects; in other words, some you knew from before

9     and some you even kept on after.

10         MR. LINDEN:  That's correct, your Honor.  Some of the

11    attorneys were hired directly by Kirby McInerney.  They were

12    employees of Kirby McInerney, not through an agency.

13         With respect to the ones that we got through an

14    agency, those attorneys, as I said, we did not put it out for

15    bid, but we were very careful in what we required.  We wanted

16    people who were admitted to the bar.  We wanted people who had

17    some experience.

18         THE COURT:  It's good that you wanted people admitted

19    to the bar.

20         MR. LINDEN:  Preferably people with some experience.

21    We asked for people who had, preferably, experience in the

22    securities area on complex litigation.  We wanted people who

23    had experience working on matters of this nature.  If they had

24    experience with CDOs or RMBSs, that was a plus, and we looked

25    for that.

D2S8CITC

1          THE COURT:  Presumably, all of this would be on the

2     bios of those you hired, correct?

3          MR. LINDEN:  Yes.  Not every single person, as we

4     explained in our declaration, had every one of those.

5          THE COURT:  Yes, of course.  But in terms of

6     qualifications, the Court and Mr. Frank will be able to look at

7     that when we see the bios.

8          MR. LINDEN:  That's correct.

9          THE COURT:  Go ahead.

10          MR. LINDEN:  So we received a select stack of resumes

11     from the agency.  We did not just ask them for a scattershot

12     approach, give us 150 resumes and we will go at it and pick the

13     best.  So to begin with, those resumes were preselected.  They

14     gave us what we were looking for.  And then from those 100-plus

15     resumes we went through them.  I personally interviewed the

16     attorneys who were part of the 14.  Mr. McNeela interviewed

17     some of those people.  And another KM attorney also joined us

18     and interviewed.  Some of the people were interviewed by three

19     of us, some by two.  I think there may have been one that was

20     interviewed by one person.

21          THE COURT:  What about Mr. Frank's coloration of a

22     warehouse with a big room with 30 computers.  I am not sure

23     that that's directly relevant, but I understand he is entitled

24     to colorate as he sees it.  Do you know what the facts are on

25     that?

D2S8CITC

1          MR. LINDEN:  We had the attorneys from the core team

2     who would be working --

3          THE COURT:  What is the core team?

4          MR. LINDEN:  As we explained in our declaration, the

5     core team were the people who did 95 percent of the work.  We

6     had a supplemental team who were with us on very discrete

7     projects and only worked for us for, I want to say seven or

8     eight weeks.  So the people who did the bulk --

9          THE COURT:  Talk to me about the core team.

10         MR. LINDEN:  So the people who did the bulk of the

11    work on the case were in a building a block from our office

12    that was affiliated with the agency that had sent their resumes

13    to us, but it wasn't only the people from the agency who were

14    there.  We also had some of our own employees there, some of

15    our own people that we hired directly working there.  And we

16    thought that was important to have them in one spot so there

17    could be communication amongst them.

18         THE COURT:  When you say people you hired directly,

19    you mean associates of Kirby McInerney?

20         MR. LINDEN:  Either associates of Kirby McInerney or

21    the project attorneys that we hired specifically for this case,

22    not through an agency.

23         THE COURT:  I see.

24         MR. LINDEN:  And we thought that was important so

25    there was a dialogue going and there was exchange of

D2S8CITC

1    information, as we explained in our declaration, which gets the

2    creative juices flowing.  This was not check a box and move on,

3    don't discuss anything, you're in a cubicle without discussion.

4    This was, and we encouraged, discussion amongst the attorneys

5    and with us either through interpersonal communication or

6    through e-mails.

7            THE COURT:  Thank you.

8            Mr. Frank, I am going to stand by my earlier position

9    that communications of Kirby McInerney with the agencies are

10   not required here.

11           Was there anything else that you wanted to say,

12   Mr. Frank?

13           MR. FRANK:  Yes.  There is a real factual dispute

14   here, because what we are hearing from the Kirby McInerney

15   attorney contradicts what press reports from a journalist who

16   interviewed these attorneys said.  And we can resolve this

17   with, I would say, at most, three depositions of contract

18   attorneys to let's learn what it was the attorneys were doing,

19   let's learn about the incidents not disclosed by Kirby

20   McInerney, but that I learned about, where they hired somebody

21   who was not a member of the bar and who was working there for a

22   long time without anybody noticing.  I don't know whether they

23   billed him or not; they probably didn't.  But the screen was

24   such that somebody who wasn't a member of the bar was working

25   there for a long period of time, and they were very upset about

D2S8CITC

1    it because they wouldn't be able to bill him out at the 300 to

2    500 dollar an hour rate.  We know that there is somebody else

3    out there that they mention in their own papers that graduated

4    law school in 1998 but wasn't able to become a member of the

5    bar until 2009.

6         THE COURT:  Sir, you're going to find all that out

7    when you see the bios of the contract attorneys.

8         MR. FRANK:  No, I will not find out from the bios what

9    it was that the attorneys were doing day to day.  Kirby

10   McInerney says they were doing substantive work.  The

11   journalist who covered the story says that the attorneys were

12   doing something that any paralegal could do, that any PA could

13   do.  One of those things is true; one of those things is false.

14   Did somebody lie to the journalist or is Kirby McInerney

15   shading the truth?  When you have a project like this, it's a

16   pyramid, and I am sure that there were some very skilled

17   attorneys at the top of the pyramid who deserve to be billed

18   out at legitimate rates, but at the bottom of the pyramid --

19        THE COURT:  Sir, you're going to get the time sheets

20   which will say what they are doing.  You're going to get the

21   bios which will have the qualifications.  If there is somebody

22   who said they were a member of the bar, and they weren't really

23   a member of the bar, at this point there is nothing I can do

24   about that.  If Kirby McInerney knows that somebody was

25   practicing law without a license, I assume they followed up on

D2S8CITC

1    that with the appropriate ethics authorities, but I am not

2    going to provide depositions and discovery to an objector when

3    the baseline is that there is no discovery permitted and I

4    can't rely on --

5           MR. FRANK:  I would disagree that that's what the

6    baseline is.  As *Malkman v. Davis* says, the baseline is, has

7    there been discovery on this?  And, thus, I agree, if an

8    objector is challenging 23(e) fairness, the objector doesn't

9    get discovery in that situation because they are just

10   reiterating what the plaintiffs have already deposed the

11   defendants on.  An objector doesn't get to relitigate the case.

12   I completely agree with that.  But we are not talking about

13   23(e).  We are talking about the 23(h) fee requests, and we

14   have tens of millions of dollars of the class's money at stake,

15   and there has been no factual testing of the claims that are

16   being made in a joint declaration that can't even be the

17   personal knowledge of the attorneys because it's a joint

18   declaration of these expert witnesses who are contradicting

19   their own academic writings.

20           If you want me to just do that in a narrative form, I

21   will do that in a narrative form, fine.  But we have a real

22   factual dispute here about what these attorneys were doing on a

23   day-to-day basis, and the time sheet is going to say spent 12

24   hours reviewing documents, and unless you're going to assume,

25   when the time entry just says reviewing documents, that they

D2S8CITC

1    are reviewing very low-level stuff, there is a dispute whether

2    the reviewing documents is the sort of thing that a paying

3    client would pay $50 an hour for or pay $300 an hour for.

4            THE COURT:  I have provided that you're going to get a

5    great deal of information that will assist you in that inquiry.

6    I may have misstated -- not misstated.  I may have

7    mischaracterized the basic law.  I think you're right that the

8    more accurate characterization is that there is no absolute

9    right to discovery.  I am quite familiar with *Malkman v. Davis*,

10   and this concept is set forth as well in the Manual for Complex

11   Litigation, Newberg on Class Actions, other cases.  So I am

12   employing that standard; that is, there is no absolute right to

13   discovery, but if discovery is appropriate in the particular

14   circumstance, I will order it.  And I am providing a great deal

15   of the information that you want.  I am not allowing you to

16   have depositions of selected attorneys based on a hearsay

17   journalist report.

18           That's my determination.  The question now is how soon

19   you can get this information.

20           Kirby McInerney?

21           MR. PRESS:  That certainly is one issue that has to be

22   addressed.

23           THE COURT:  That's why I asked it.

24           MR. PRESS:  The Court asked for a lot of information,

25   and while we have it all, it needs to be gathered and reviewed.

D2S8CITC

```
 1    We do want to make sure it's accurate and there are no errors
 2    in there.  We also have to get some of this information from
 3    other firms.
 4              THE COURT:  We are talking about a week.
 5              MR. PRESS:  It might take more than a week.  We are
 6    going to try to get it as quickly as possible.  As soon as we
 7    get back to the office we will start working.  It is a lot of
 8    information that has to be gathered and put into a form where
 9    it can be presented to the Court.
10              THE COURT:  I understand that.  My thinking, and I
11    guess I need some better sense, my thinking is that it's all in
12    the computer in some way or other, apart from the bios, which I
13    would think are in a personnel file for project Citigroup
14    securities litigation, but I may be too simplistic.
15              MR. PRESS:  Some of it is in the computer.  I don't
16    think it all is.  It certainly is not in one place.  For
17    instance, breakdowns of how much time was spent preparing for
18    particular depositions or particular hearings, how much time
19    was spent on particular briefs, that can't just be spit out of
20    a computer.
21              THE COURT:  I think you're right.  So it may have to
22    be staged.  For the brief part of it, you're quite right.  I
23    think it may be more difficult for that.  But certainly the
24    time sheets themselves can be pretty automatic, and you have
25    already offered those in your papers.  So that kind of thing
```

D2S8CITC

1    basically is pretty automatic.  It may be a little harder to

2    code the work on the brief.  That I am a little less concerned

3    about.  So you can stage some of this.

4         MR. PRESS:  The time sheets themselves and obviously

5    it should be simple enough to break down the time records as to

6    before or after the lead plaintiff proceeded.

7         THE COURT:  The number of attorneys at each deposition

8    should be pretty easy.  You put in the deposition and pull up

9    everybody who was there, I would think.

10        MR. PRESS:  That will be a little bit more difficult.

11   We can look at the deposition transcript, see who was there,

12   and certainly, therefore, we can tell you which attorneys were

13   at the deposition.  Who spent how much time preparing for any

14   of them is something that would very difficult.

15        THE COURT:  Again, you can stage it.  Who was at the

16   deposition can come in pretty quickly.

17        MR. PRESS:  That will take a little longer because

18   there were a few dozen.  I guess the transcript will say who

19   attended, and then to get the information of who was there will

20   probably take a little longer.  Like I said, breaking down for

21   time spent working on particular documents is a lot more

22   complicated.  We have to see when the documents were filed, who

23   was spending time.

24        THE COURT:  Time spent working on documents?

25        MR. PRESS:  You mentioned briefs.

D2S8CITC

```
 1              THE COURT:  I have conceded that that one may take
 2     longer.
 3              MR. PRESS:  Also, your Honor, is it possible that the
 4     time records can be submitted in camera?  In the
 5     contemporaneous time records there is probably some work
 6     product information in there, mental thoughts and impressions
 7     about the case possibly.  This is a request that we don't
 8     usually confront.
 9              THE COURT:  I think the Second Circuit law on fee
10     requests, the baseline is the contemporaneous time records.
11              MR. PRESS:  To provide to the Court, yes.  We will
12     provide it to the Court.  But I am not sure about making that
13     information public.
14              THE COURT:  You may be right about that.
15              Mr. Frank, do you have any input on that?
16              MR. FRANK:  Well, we would certainly like to see at
17     least the time records of the contract attorneys, and I don't
18     think there will actually be any work product in there because
19     I think it will say document review, document review, document
20     review, if it even says that much.  It might just say billed
21     12.5 hours.
22              THE COURT:  Let me ask the plaintiffs' lawyer that.
23              MR. PRESS:  The answer is, standing here right now, I
24     really don't know.
25              THE COURT:  Take a look at it.
```

D2S8CITC

1    MR. PRESS:  I really don't know whether it has that or

2    not.  We have looked through them in the past.  Obviously, the

3    information was pulled to prepare the summary documents.

4    THE COURT:  Take a look at it.  And to the extent that

5    there are any problems in it let me know.  I think Mr. Frank is

6    probably right, that is, for contract attorneys you probably

7    can make that publicly available and the rest of the attorneys

8    in camera.  Give it to my chambers, but make absolutely certain

9    you put on it "presented in camera" so that it is not

10   inadvertently filed.  And if there are issues with the contract

11   attorneys' time sheets, you can make the Court aware of that in

12   an in camera, but written application as well.  But my

13   assumption is Mr. Frank is probably right that what they do is

14   they say ten hours' document review, and not much work product

15   issues are there.

16   MR. PRESS:  I would suspect that most do.  I don't

17   know whether all do.

18   THE COURT:  You will take a spot check and you will

19   see.

20   MR. PRESS:  Just looking at the Court's request, the

21   information about travel and hotel I suppose should not be too

22   difficult, just because most of the proceedings in this case

23   occurred in New York City.

24   THE COURT:  I thought so too.  I think in this day and

25   age, I would assume nobody is going first class.

D2S8CITC

1           MR. PRESS:  That's true, and I don't think anybody was

2    really going anywhere in connection with this case.

3           THE COURT:  Then there is no issue.

4           MR. PRESS:  That shouldn't really be an issue.

5           On the time spent on the lead plaintiff dispute or

6    time spent up until that point.

7           THE COURT:  Pretty easy.

8           MR. PRESS:  Two things I would say.  One, clearly not

9    all of the time spent prior to the appointment of lead

10   plaintiff was on the lead plaintiff suit as opposed to

11   investigating the case.

12          THE COURT:  I understand that.  I think I incorporated

13   that in my remarks.  A certain amount of that time is for the

14   benefit of the class a la preparing the complaint.

15          MR. PRESS:  The lead plaintiff motion process itself,

16   your Honor, I am not sure if it can be characterized as all

17   being not for the benefit of the class, when it is a process

18   that's required by the PSLRA, but we can provide the

19   information certainly to the Court.

20          THE COURT:  Realistically, a fair amount of that was

21   who is going to come out on top in terms of lead counsel.  And,

22   yes, the issue is who is the best person to represent the

23   class.  But we all know that the others didn't want it to be

24   you and you didn't want it to be them, and that's what a lot of

25   the fight was about.  And that's not for the benefit of the

D2S8CITC

1    class.  You're right, at its core, the Court is obligated to

2    appoint the person who is best able to represent the class,

3    but, nonetheless, the internecine fight is neither pretty nor

4    necessary, but it's part of the process.

5         MR. PRESS:  One other point of clarification.  The

6    Court asked about the backup for the assertions in our reply

7    brief that, as far as we can tell, every court that has

8    examined the issue of contract attorneys has allowed market

9    rate billing.  All the cases we found that discussed the issue

10   are at pages 16 through 18 of our reply brief, and in the reply

11   declaration, at paragraph 58, page 20, there is a footnote with

12   a lengthy string cite that includes, in addition to those cases

13   that have ever discussed the issue, more than a dozen other

14   cases where it's clear from the underlying documents that the

15   counsel lodestar, on which a multiplier was awarded by the

16   court, included project specific terms.  So we had provided all

17   of that information to the Court.

18        THE COURT:  That's fine.  You're telling me there is

19   no additional information.  In fact, I have starred that

20   footnote in paragraph 58 so I know what you have presented.  I

21   just thought you had specifics for the statements I set forth.

22   That's fine.  You have answered it.  You have told me right

23   now, Judge, we have given you everything we have on that point.

24        MR. PRESS:  That is correct.

25        MR. LINDEN:  Can me just raise one issue, if I may.

D2S8CITC

1    One concern that I had is that Mr. Frank, I believe, has been

2    working together with an online reporter who publishes a blog

3    for Forbes, and we have received --

4           THE COURT:  Is that why there are the quotes to the

5    Forbes articles in your view?

6           MR. LINDEN:  I believe so.  The reporter I think in

7    one article referred to himself as essentially the Ted Frank

8    channel.  So my concern is that -- and we have heard a concern

9    from one of our former attorneys complaining that he was being

10   harassed by inquiries about his background.  So my concern

11   about providing the bios is I am concerned that this will just

12   be additional fodder for the reporter and will be misused in

13   that way.  And perhaps the material that we provide with

14   respect to these attorneys could be provided under

15   confidentiality.  I don't know what provision could be made,

16   but I did want to bring that to the Court's attention.

17          THE COURT:  Mr. Frank, you want to respond?  Do you

18   have any objection to representing here in open court that the

19   bio information, the biographical information, the specifics of

20   it will be used by you only for purposes of filing your

21   objections in this litigation, period, and not to be fed to

22   outside sources given the personal nature of some of that

23   information?

24          MR. FRANK:  Your Honor, if I am not allowed to depose

25   anybody -- I have been asking under the assumption that I am

D2S8CITC

```
1    not allowed to contact any of these attorneys without

2    permission of the Court.  If they want to redact the addresses

3    and phone numbers so I can't contact them, there is no fear

4    that a reporter will contact them?

5            THE COURT:  I don't think that's the issue.  I think

6    the issue is they want some assurance that the purpose that

7    you're going to use the biographical information for is to make

8    your argument that the qualifications and skills and

9    reputations of the contract attorneys was not the same as the

10   plaintiffs' staff attorneys for purposes of billing rates

11   and -- let me finish.

12           Sir, the problem with your being on the phone is

13   simply that sometimes you're talking over me, I am sure

14   inadvertently.  I didn't hear what you just said, but what I

15   was saying was that their stated concern is for the personal

16   information of the attorneys, and what I would like from you is

17   a statement that you're only going to use the personal

18   information for purposes of publicly filing any objections to

19   the billing rates that are sought for the contract attorneys

20   and are not going to be providing personal information to

21   reporters.  Can you give me that assurance?

22           MR. FRANK:  If I publicly file a document, are you

23   saying I cannot take that publicly filed document and give it

24   to a reporter?

25           THE COURT:  No, of course not.  A publicly filed
```

D2S8CITC

1    document is a publicly filed document.  It's available to

2    anyone.

3            MR. FRANK:  The only thing I have given this reporter

4    are things that I have given the Court.  I have not given the

5    reporter anything I have not given the Court.

6            THE COURT:  What else?

7            MR. PRESS:  Just a point of clarification.  There is

8    information that has been provided to this reporter, that while

9    it was provided to the Court, it doesn't appear anywhere in the

10   public docket.

11           MR. FRANK:  The reporter has gone out and done his own

12   reporting.

13           THE COURT:  Gentlemen, let's move forward.

14           MR. PRESS:  The only issue is timing, and I think a

15   two-tiered process makes sense.  I suppose the daily time

16   records themselves and the breakdown of, obviously, before and

17   after the lead plaintiff appointment, we can probably have by

18   this coming Wednesday.

19           THE COURT:  The contract attorneys' qualifications

20   should be easy to get as well.

21           MR. PRESS:  That as well, yes, your Honor.

22           THE COURT:  That's fine.  I want that by this coming

23   Wednesday.

24           MR. PRESS:  The other information though --

25           THE COURT:  Which really deals with the duplication

D2S8CITC

1    issue and the expense issue.

2           MR. PRESS:  That's going to take a little more time to

3    go through.  I guess we would probably need the Wednesday

4    following for that.

5           THE COURT:  That's fine.

6           MR. PRESS:  I am just checking the list, your Honor,

7    to make sure there is nothing else.

8           THE COURT:  So what we are talking about is your first

9    group of information by March 6, following the next group of

10   information by the 13th.  I will want receipt of objections,

11   instead of March 8 -- that is class members' objections --

12   instead of the 8th, make it the 18th.  And then lead counsel's

13   reply to the objections and defense submissions by the 22nd.

14   You know what.  Let's do it by the 25th.  That should give

15   everybody adequate time, not fulsome time but adequate time.

16          MR. PRESS:  I just want to point out there are some

17   scheduling issues I think that we might have.  You said the

18   submissions from Mr. Frank come in on the 18th and responses on

19   the 25th.

20          First of all, what had been a fairly short amount of

21   time to respond to Mr. Frank's objection is cut even further.

22   But adding to that --

23          THE COURT:  Not really, sir.  You know what his

24   objections are.  There is no question about that.  All you're

25   going to be doing in that March 25 submission is dealing with

D2S8CITC

1    the specifics of things he is pointing out to you.  He has set

2    forth here what his concerns are.  As a matter of fact, you

3    have addressed them already in large part.

4              MR. PRESS:  Based also just on personal schedules,

5    both for myself and Mr. Linden, I know that Mr. Linden is going

6    to be out of the country, I guess in connection with the

7    upcoming holiday, from --

8              MR. LINDEN:  I am out of the country from the 22nd

9    through the 30th.

10             MR. PRESS:  I am also for the holiday largely

11   unavailable on the 25th.  Also, I have a family commitment out

12   of the country on the 18th and the 19th, and I won't be coming

13   back till some point on the 20th, which leaves us two business

14   days to be here and be able to work on the responses.

15             THE COURT:  That is an issue.  You're talking about

16   the Passover period?

17             MR. PRESS:  Mr. Linden will be out for the Passover

18   period and my unavailability for much of the 25th as well.  The

19   18th and 19th is just a family obligation I have out of the

20   country, and I can be back at some point on the 20th.

21             THE COURT:  Let me take a few moments to try to adjust

22   that.  This can be solved in part by your telling me you can

23   get the documents in earlier, or I will certainly take a good

24   faith representation that that's what you're aiming for, and

25   the production of the documents as they become available.

D2S8CITC

1          MR. PRESS:  We can try to get everything in to your

2     Honor by next Friday, the 8th.

3          MR. FRANK:  I would object if I had to do anything

4     before March 18.  I have been asking for this stuff since

5     December.

6          THE COURT:  Mr. Frank, if plaintiffs' firm is saying

7     that they can do this within the next week and a day, that is

8     March 8, I think that's a really good faith representation

9     because there is a lot of information you're going to be

10    getting.

11         MR. FRANK:  Right.  And if they can get it to me by

12    March 8, I am happy to file on March 18, even though I have my

13    own obligations.  I have congressional testimony I am giving

14    March 13.  I don't have a law firm of hundreds of attorneys or

15    multiple law firms of hundreds of attorneys to help me.  I am

16    just asking for at least March 18 to get this in.  If they need

17    additional time, if we need to bump the fairness hearing --

18         THE COURT:  No, no, no, no.  The fairness hearing was

19    already adjourned.

20         MR. PRESS:  I just wanted to point out one other

21    scheduling issue.  That is, between the 8th and the 18th,

22    plaintiffs' counsel will also have to respond to any objections

23    that come in from people who had received the delayed notice

24    and had the delayed opt out and objection deadlines, which are

25    still March 8, and we have till March 18 to respond to those.

D2S8CITC

1    So we will also have to be dealing with that in the interim.

2              THE COURT:  Yes.  I understand.  Give me a moment.

3              Mr. Press, your obligation is March 18 and 19?

4              MR. PRESS:  I am going to be out of the country, I

5    guess, March 16, 17, 18 and 19, and coming back on the 20th.

6              THE COURT:  Mr. Linden, your concerns are based around

7    the week of March 25?

8              MR. LINDEN:  From Friday the 22nd through the 30th.  I

9    am traveling with my family.

10             MR. PRESS:  Because of the holiday, I am completely

11   unavailable also for the 26th, 27th, and much of the 25th.

12             THE COURT:  Fine.  This is what we are going to do.

13   Provide that information to the Court and Mr. Frank.  When I

14   say provide it to the Court, it's publicly filed, apart from

15   that aspect that I have already talked about, the time sheets.

16             MR. PRESS:  The attorney bios as well, your Honor.

17   The attorney bios, our concern is not just Mr. Frank.

18             THE COURT:  That's all right.  But get it to Mr. Frank

19   because Mr. Frank has already told you he is only going to use

20   it for purposes of this litigation.

21             MR. PRESS:  Our concern is members of the press if we

22   publicly file it ourselves.

23             THE COURT:  I just said you don't have to publicly

24   file the bios.  Get them to Mr. Frank and get them to the

25   Court.  And mark on anything you send to the Court that it's

D2S8CITC

1    not being publicly filed so I know not to inadvertently file

2    it.

3              The easy stuff get to the Court and Mr. Frank even

4    before the 8th.  You can do that, right?  He is entitled to

5    more time.  Everything by March 8.

6              Then objections, Mr. Frank, by the 15th.  So you're

7    going to have more than a week because they are going to get

8    you documents beforehand, and I understand you don't have a

9    major firm behind you.

10             By the way, when you talk at the fairness hearing, I

11   will listen to what you have to say.  You can supplement your

12   comments at the fairness hearing, you will have an opportunity

13   to speak then.  But I do want the Court and the plaintiffs'

14   attorneys to know the essence of your objections in as many

15   specifics you can put in in the time that I am giving you.  So

16   don't take advantage of the fact that you do have a right to

17   speak.  Get as much information to them and the Court as you

18   can by the 15th.

19             I will enter an order that says that we had this

20   conference today in regard to Mr. Frank's requests for

21   discovery, and the Court granted it in part and denied it in

22   part, and provided that certain documents be produced to

23   Mr. Frank and the Court by March 8, and that the time for class

24   members to file written objections is adjourned to March 15,

25   and the time for lead counsel's reply to the objections and any

D2S8CITC

1   defense submission is adjourned to March 22.  That will press

2   everybody, including the Court, but we will all work at it.

3           MR. PRESS:  I would like to have some involvement in

4   this because I was principally involved in prosecuting the case

5   and in preparing the prior rounds of papers.

6           THE COURT:  You're having that.  March 22.

7           MR. PRESS:  I am told that I am going to have two

8   days, your Honor.

9           THE COURT:  How?

10          MR. PRESS:  That's what I am having.

11          THE COURT:  The objections are filed by March 15.

12  March 22 is a week.

13          MR. PRESS:  I am going to be out-of-pocket and out of

14  the country until some point on the 20th, your Honor, from the

15  15th.  I am not going to see those papers when they come in.

16  Basically, I guess I will be able to look at them while I am

17  out of the country, I won't be able to do much about them, but

18  otherwise I won't be able to be back and look at those papers

19  till the 20th.  I am not going to be around when they come in

20  on the 15th, and I am not going to be in a position where I can

21  see them until the 20th.  And then they are due on the 22nd,

22  which is a day that Mr. Linden will be leaving.

23          I would add also, while obviously Mr. Frank is

24  receiving this new information now, in terms of anything else

25  he might be saying in response to any reply papers, he has had

D2S8CITC

1    a month.

2              THE COURT:  In light of your concern, I will make it

3    the 25th, but that's all I can do, and that's not giving me

4    much time.  March 25 then.

5              Again, you know the core of what he is going to do,

6    and you have people who can deal with the specifics of this

7    attorney wasn't qualified for that reason.  You could have

8    people who can deal with that and tee up your response.

9              MR. LINDEN:  One clarification.  You mentioned the

10   objection deadline is extended only for Mr. Frank, correct,

11   because we have no way of communicating other than --

12             THE COURT:  It's a public filing.  That order will be

13   publicly filed.

14             MR. LINDEN:  OK.

15             THE COURT:  All that is doing, sir, is avoiding any

16   issues that may arise over an objection that's filed a day or

17   two late or something like that.  I am extending the time

18   period a few days.  Because it's publicly filed, it's

19   available.

20             MR. ROSEN:  Richard Rosen for the defendants.  I just

21   wanted to draw the Court's attention to one thing so that when

22   the Court does enter its order, we don't create any inadvertent

23   confusion.

24             The amended scheduling order that you entered in early

25   January in paragraph 2 says that the March 8 date is not only

D2S8CITC

1    the date for objections, but also the new deadline for requests

2    for exclusion and to file proofs of claim.  I would just ask

3    the Court, in setting forth whatever you do in your order, I

4    totally understand that the objection date for every member of

5    the class is extended, but I would ask the Court to make clear

6    that for opt outs and proofs of claim that the March 8 date is

7    not changed.

8            THE COURT:  I think that's an excellent point.  The

9    order will say that the last date for filing opt outs and

10   proofs of claim remains at March 8, as set forth in the order

11   dated -- do you have the date of that order?

12           MR. ROSEN:  I can hand it up if it would make it

13   easier.

14           THE COURT:  Yes.

15           MR. ROSEN:  Can I approach?

16           THE COURT:  I think that's an excellent point.

17           MR. ROSEN:  If you look at paragraph 2, your Honor,

18   that sets forth all of the deadlines other than the one for the

19   objections.

20           THE COURT:  All right.  Thank you.  I appreciate

21   everyone's attendance.

22           Mr. Frank, I think you're very much getting the

23   information you need, and I look forward to seeing your written

24   response, and if you choose to appear at the settlement

25   hearing, hearing what you have to say.

D2S8CITC

```
1              I thank everybody.
2              MR. PRESS:  Thank you, your Honor.
3              MR. ROSEN:  Thank you, your Honor.
4              MR. FRANK:  Thank you, your Honor.
5              (Adjourned)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```