**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP INC.<br>SECURITIES LITIGATION | No. 07 Civ. 9901 (SHS)<br><br>**ECF Case** |

**DECLARATION OF KENNETH M. MOSCARET, ESQ.**

**Dated:**      **March 21, 2013**

## <u>DECLARATION OF KENNETH M. MOSCARET, ESQ.</u>

I, Kenneth Moscaret, under penalty of perjury declare as follows:

## I.   <u>INTRODUCTION</u>

1.   I am the principal of Moscaret Consulting, Inc., with offices in Sammamish, Washington (near Seattle) and Pasadena, California.  I have been retained by Lead Counsel Kirby McInerney LLP ("Lead Counsel" or "Kirby") to offer expert opinions in the current fee proceeding about discrete aspects of Plaintiffs' fee application in the instant class litigation.  I have personal knowledge of each of the facts and statements set forth in this declaration and would be competent to testify thereto if called upon to do so.

2.   I am an attorney at law licensed to practice before all courts of the State of California and before several federal district courts in California.  As explained in greater detail below in my expert qualifications, I am nationally known in my field for (i) being the sole lodestar fee reasonableness expert testifying in the *Enron* securities class action litigation in Houston federal court in 2008, (ii) being invited twice by JAMS in 2005 and 2008 to provide CLE training seminars for all of JAMS' retired federal and state court judges/justices nationwide regarding attorney fee awards, and (iii) being regularly retained nationally by *both* sides to testify about the

reasonableness and litigation management efficiency of multimillion-dollar legal fees billed by major law firms in large, complex, high-stakes lawsuits.

3.     Regarding the scope of my engagement, I am not offering any opinions on either the merits of the underlying litigation or the settlement. I am also not offering any opinions on Plaintiffs' fee application other than (i) my own knowledge of, and experience with, the customs and practices in the broad corporate client marketplace today regarding billing and payment related to contract attorney services, and (ii) how those customs and practices support Plaintiffs' request for reimbursement of Plaintiffs' Counsel's contract attorneys at the prevailing market rates set forth in Plaintiffs' fee application.

4.     I am respectful of the fact that this Court has broad discretion to consider expert testimony in making a fee award to Lead Counsel in the instant class litigation.  Hopefully the Court finds my opinions, observations, and reasoning in this declaration to be of assistance in that regard.

## II.   **BRIEF SUMMARY OF MY OPINIONS**

5.     In the broad corporate client marketplace today, which encompasses millions of small companies and middle market companies, not just large corporations, many law firms bill their project specific, or contract,

2

attorneys to corporate clients at prevailing market rates in expensive litigation, and many corporate clients pay those rates.

6.    As the demand for contract attorneys among corporate clients and law firms of all sizes continues to grow as a preferred staffing practice in expensive litigation, so do the different arrangements for billing and paying contract attorneys among clients and law firms.  There is no "one-size-fits-all" approach.

7.    Legal commentators in this forum indicate that contract attorneys may be billed by law firms at a profit if contract attorney time is billed as part of "fees," which is what Plaintiff's Counsel did here.

8.    Courts have shown a repeated, consistent unwillingness to become entangled in "cost-plus" accounting of contract attorney rates in making fee awards, and have simply looked to prevailing market rates instead.

## III.    EXPERT QUALIFICATIONS

9.    I have set forth immediately below the most relevant portions of my attorney fee expert credentials (up to Page 9 herein).  My complete expert qualifications are listed on my firm's website at www.FeeDispute.com.  Relevant biographical pages from that website are attached hereto as Exhibit "A" for this Court's quick reference.

10.    For the past 22 years since about 1991, I have been regularly retained as a full-time attorney fee consultant and expert witness by clients, policyholders, insurance carriers, public entities, and law firms nationwide to offer expert opinions as to the reasonableness of legal fees, propriety of attorney billing practices, efficient litigation management practices, and law firm case staffing in fee disputes, fee litigation, and fee arbitration.

11.    I would generally describe myself as a customs-and-practices expert who specializes in opining on multimillion-dollar legal fees in large, complex cases nationwide.  I started in this field in 1991, and have been involved in over 200 large fee disputes at this point in my career involving over $1.5 billion in legal fees to date.  I have been retained as a consultant and testifying expert witness by both sides in fee disputes.  I have also been retained to testify regarding lodestar issues in lead counsel fee applications in class actions in federal and state courts.

12.    I have been retained to testify in approximately 20 fee cases since 2008 alone wherein the disputed legal fees ranged from seven-figures to nine-figures, mostly involving major law firms.

13.    For example, I was found qualified to testify and offered attorney fee reasonableness expert testimony in February, 2008 in the *Enron* securities class action litigation before the U.S. District Court for the

4

Southern District of Texas in Houston, District Judge Melinda Harmon presiding.

14.    I was the sole lodestar fee expert testifying in the *Enron* case about reasonable hourly rates, reasonable hours billed, case staffing, litigation management efficiency, and other related fee and billing issues. *Enron* is the largest securities class action lawsuit in U.S. history, and one of the largest business lawsuits generally ever litigated in this country. *Enron* was a massive, exceedingly difficult, hugely-complex, and unprecedented case.

15.    The U.S. District Court in *Enron* relied heavily and favorably on my attorney fee expert opinions in its 209-page published fee ruling awarding $688 million, plus interest, in attorney's fees to lead counsel Coughlin Stoia Geller Rudman & Robbins (now known as Robbins, Geller Rudman & Dowd) in that case in September, 2008, a record-setting fee award for a securities class action in the U.S.[1] The District Court described me as one of the "nationally prominent experts on fee awards" who was testifying in the case, as well as a "recognized fee expert," and found me to be "highly qualified to testify about attorneys' fees and market rates." *In re*

---

[1]    I am informed that the final fee award, with accrued interest, exceeded $700 million.

*Enron Corporation Securities, Derivative & ERISA Litigation*, 586 F.Supp. 2d 732 (S.D.Tex. 2008).[2]

16.    Regarding my background, I graduated with a J.D. from Georgetown University Law Center in 1980, and was admitted to practice in California the same year.  From 1980-1990, I was primarily a business litigator practicing in Los Angeles in California state and federal courts.  I have "first-chair" and "second-chair" trial experience.[3]  As a litigator, I represented many large institutional clients in complex litigation, such as the Hearst Corporation and major savings and loan associations.

17.    Since 1991, I have testified as an expert witness over forty (40) times in court, at arbitrations and depositions, and by written declaration on the reasonableness of legal fees, the propriety of attorney billing practices, the lodestar issues of reasonable hourly rates and reasonable hours billed,

---

[2]    Judge Harmon mentioned me by name about 20 times in her published attorney fee ruling.  She awarded 100% of lead counsel's fee request, which had been my recommendation to the court from a lodestar fee reasonableness standpoint.

[3]    Before I became a full-time attorney fee expert, I primarily litigated cases for corporate clients on both the plaintiff and defense side.  Nearly all of those lawsuits settled before trial actually started.  I did take about five to six cases to trial through judgment, mainly in California state courts.  I was the sole trial counsel in half of those cases, second-chair in the rest.  My prior litigation experience and attorney fee expert credentials, including articles which I have published, are listed and readily available on my firm's website at www.FeeDispute.com.

and litigation management efficiency.[4]  I have submitted expert declarations in various state and federal courts.

18.    In addition to serving as an expert witness, I have conducted educational seminars on attorney's fees for a variety of business and legal organizations.  For example, in October, 2005 and then again in May, 2008, I was invited by the JAMS organization to conduct live CLE seminars on attorney fee awards in fee-shifting cases for all of JAMS retired federal and state court judges/justices in California and nationwide.   One of my CLE seminars was converted to DVD video and an audio podcast for JAMS judges to continue to access and use in the future.  A copy of the acknowledgment letter which JAMS sent me afterwards is attached hereto as Exhibit "B" to this declaration.

19.    Besides my testifying expert witness practice, I launched a litigation management consulting firm in 2011 for small and middle market companies without in-house legal departments, or with very small departments staffed by non-litigator attorneys, to assist them with outside legal fee oversight, litigation management efficiency, law firm case staffing, and case budgeting issues when they are involved in expensive litigation and

---

[4]    Although the majority of my expert witness cases have settled prior to trial, I have testified "live" about 8 times as a qualified fee expert in court and private arbitration hearings.  I have submitted at least 20 written expert declarations in various courts which were admitted into evidence.  I have also given oral expert depositions nearly 20 times.

have to pay substantial legal fees to outside law firms. I am exclusively on the "client" side in those consulting engagements, consulting primarily to CEOs, CFOs, non-litigator general counsels, and other senior management executives at small and middle market companies.[5]

20.    I have published nearly 30 articles to date in the legal and business media on attorney's fees and litigation management. I have also conducted nearly 40 continuing legal education seminars and other presentations on these subjects for client groups, law firms, and bar associations.

21.    I try to offer expert opinions which are consistent, wherever possible, with judicial decisions and ethical rules/opinions that have addressed similar attorney's fee and billing issues. In this declaration, I may cite to federal and state case law (both published and unpublished) and ethical authorities (both binding or advisory) which I have consulted, considered, reviewed, or relied upon in forming my own opinions. I do that only so that the Court can understand how those case authorities and ethical opinions fit into my overall reasoning and form a supporting foundation for my opinions. I am not attempting to offer "legal" opinions.

---

[5]    My litigation management consulting firm can be found online at www.MoscaretConsulting.com.

22.   I was retained and did testify as a fee expert over the past few years in other large fee cases involving major law firms headquartered in or near New York City, including:

(a)   A fee case in 2010 involving approximately $375 million in legal fees/costs billed to defend 100 different securities lawsuits filed against a well-known global bank, which actions were venued in a number of different federal and state jurisdictions nationwide (including this forum). The New York City offices of Sidley Austin, Morgan Lewis & Bockius, White & Case, Linklaters, and now-defunct Dewey & LeBoeuf performed all of that defense work.

(b)   A fee case in 2011 involving approximately $15 million in legal fees/costs billed by Pepper Hamilton's home office in Philadelphia to defend a major medical device manufacturer in MDL litigation in the District of New Jersey, plus related state court lawsuits in other jurisdictions such as Florida.

23.   I have not been retained as a fee expert by Kirby before.   I was paid a fixed fee for this declaration in lieu of my standard expert hourly rate.

## IV.   MATERIALS REVIEWED IN CONNECTION WITH THIS DECLARATION

24.   I undertook all of the below-listed steps to acquire sufficient facts and evidence to offer the opinions set forth in this declaration:

9

(a)  reviewing the Pacer federal court online docket (which numbered 227 docket entries as of March 19, 2013) and viewing case documents on Pacer from the current class litigation, including pleadings, motions, briefs, and other court-filed documents;[6]

(b) speaking at length by phone on at least five occasions with Peter Linden, Esq. of Kirby to learn more details about how Kirby and its co-counsel recruited, trained, supervised, staffed, and billed Plaintiffs' Counsel's contract attorneys in the instant class litigation;

(c) receiving from Kirby directly and reviewing the written materials itemized in Exhibit "C" hereto which relate to the current fee proceeding; and

(d) reviewing other information from my own independent research which I considered relevant to my engagement, e.g., legal media articles discussing current customs, practices, and trends in the legal marketplace for

---

[6]     Unlike the current fee proceeding, there have been a few occasions in my past expert engagements where I did not receive the actual case file materials to review, or was not allowed access to the litigation case file, before opining.  For example, where a client's former attorney withheld the entire case file under an attorney's retaining lien in Nevada, yet I had to testify anyway.  Where I have had to render expert opinions under those circumstances, it has been akin to testifying with "one hand tied behind my back." So long as I am given access to all or most of the actual litigation case file documents (as I was here), I can become sufficiently familiar with the facts, issues, and complexities in the case before opining.  As a general rule, time and cost permitting, I review as much of the litigation case file as possible before I testify.

the hiring, billing, and payment of contracts attorneys by corporate clients and law firms.

## V.   EXPERT OPINIONS AND REASONING

### A.   I Opined on the Exact Same Issue Regarding Contract Attorneys in the *Enron* Securities Class Action Litigation as This Court is Being Asked to Decide in the Instant Class Litigation

25.     Coincidentally, nearly five years ago this month, I submitted my lodestar expert declaration to the U.S. District Court in the *Enron* litigation. The presiding federal judge in *Enron* was grappling, among other lodestar issues, with the same question regarding contract attorneys as this Court is being asked to decide, namely, what are reasonable hourly rates to award contract attorneys who make a truly substantive contribution to the underlying class action. In some ways, nothing has changed in the past five years, even after the Great Recession. The debate over reasonable hourly rates for contract attorneys continues.

26.     In *Enron*, the district court was asked to allow as part of lead counsel Coughlin Stoia's lodestar calculation a total of 18 different contract attorneys who had been carefully selected, trained, closely supervised, and fully integrated into Coughlin Stoia's litigation team.[7] In its fee award, the

---

[7]     As shown in Coughlin Stoia's case staffing chart in *Enron* attached as Exhibit 1 to the Declaration of Helen J. Hodges in Support of Lead Counsel's Motion For An Award of Attorney Fees.

district court allowed all 18 of those contract attorneys at their claimed prevailing market rates.

27.     Those 18 contract attorneys in *Enron* were not just performing unnecessary or useless "make-work" in the case to artificially boost lead counsel's lodestar.   Rather, they were active, integrated, and productive members of lead counsel's litigation team.   Those 18 contract attorneys collectively accounted for over 52,200 hours by themselves in Coughlin Stoia 's lodestar calculation, all of which the district court allowed.

28.     More pertinently to the current fee proceeding, 16 of those 18 contract attorneys in *Enron* had billing rates ranging from *$275 - $500 per hour* (based on their rates in effect in *2007*, which was when lead counsel's fee application was filed).[8]   That was over five years ago, in a federal judicial forum (i.e., the Southern District of Texas in Houston) where hourly rates for partners and associates at high-quality business litigation law firms are well below the hourly rates charged by comparable high-quality law firms in New York City for comparable litigation.

29.     On that point, I assumed for the moment here that attorney hourly rates in New York City are, very conservatively, one-third higher on

---

[8]     The two exceptions were one Coughlin Stoia contract attorney who billed at $235 per hour, and another at $195 per hour.  The other 16 fell into the $275 - $500 rate range.

average than in Houston.[9]   I also assumed that, due to the recent Great

Recession, hourly rates at high-quality business litigation law firms in New

York City increased only by a modest 2% each year, on average, over the

past five years from 2008 - 2012.   Based on those assumptions then, the

above-mentioned $275 - $500 per hour Houston contract attorney rate range

in 2007 in *Enron*, when extrapolated forward five years into the New York

City legal marketplace (since Plaintiffs' fee application was filed in 2012),

would look very consistent with the $350 - $550 rate range that Plaintiffs'

Counsel is seeking for its own contract attorneys in the instant class

litigation.

    30.    In *In re Tyco Int'l, Ltd. Multidistrict Litigation*, 535 F.Supp.2d

249 (D. N. H. 2007), decided the year before the *Enron* fee decision, the

*Tyco* district court made the following finding that was squarely on point not

only with the *Enron* fee proceeding, but also in the current fee proceeding

before this Court:

    "[Objector] argues that the work done by contract

    attorneys should be treated as an expense to be reimbursed,

    rather than being included in the lodestar.  This objection lacks

---

9      That means, for example, that the same litigation partner at a high-quality
business litigation law firm in Houston charging $600 per hour would likely charge at
least $800 per hour (i.e., one-third more) at a high-quality business litigation law firm in
New York City for the same legal work.

merit.   The lodestar calculation is intended not to reflect the costs incurred by the firm, but to approximate how much the firm would bill a paying client.   An attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney.   It is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar."   535 F.Supp.2d at 272.

31.   Attached at Exhibit "D" hereto for this Court's quick reference is the *Enron* fee decision.   At pages 782 - 785 thereof can be found the district court's reasoning for allowing lead counsel's contract attorneys in that case to be included in the lodestar at prevailing market rates.   The court's reasoning is directly on point in the current fee proceeding.

**B.   The Current Customs and Practices in the Broad Corporate Client Marketplace For Billing and Payment of Contract Attorneys in Expensive Litigation are Consistent With Plaintiffs' Counsel's Position**

1.   In the Broad Corporate Client Marketplace, Many Law Firms of All Sizes Currently Bill Their Contract Attorneys At Prevailing Market Rates in Expensive Litigation, and Many Corporate Clients Pay Those Rates

32.   In my 22-year career in this field, I have reviewed and offered expert opinions on law firm invoices, case file materials, efficient litigation

management practices, case budgeting practices, and case staffing practices in expensive litigation by small law firms (i.e., typically those with less than 30 attorneys), midsize law firms (typically with 30 - 100 attorneys), and major law firms with hundreds or thousands of attorneys.[10]  The corporate clients of those law firms have been small companies, middle market companies, and large corporations, some of whom are ranked in the Fortune 1000.

33.   I have found, and continue to find, that law firms of all sizes utilize contract attorneys (sometimes also known as part-time attorneys or project attorneys) in expensive litigated cases, just as Plaintiffs' Counsel did in the instant class litigation.  Often, although not always, those expensive cases involve heavy amounts of evidentiary documents and e-discovery.  To my knowledge and experience, many law firms of all sizes bill their contract attorneys to their corporate clients at prevailing market rates commensurate with the skill, experience, and abilities of those contract attorneys, and many corporate clients pay those prevailing market rates.  Not all of them, but many of them.  I cannot give the Court a precise breakdown, but I would estimate that a majority of corporate clients, when the broad corporate client

---

[10]     Kirby routinely litigates against major law firms, as they did in this case.

marketplace is considered. I discuss the broad corporate client marketplace below.

34. Mr. William Ruane's declaration submitted by objector Ted Frank represents one senior in-house counsel's viewpoint based on his experience at one Fortune 500 corporation, Wyeth. It does not address the broad corporate client marketplace.

35. The Association of Corporate Counsel ("ACC") letter also submitted by Mr. Frank discusses the litigation customs and practices of the ACC's membership, which the ACC's website says includes in-house counsel at over 10,000 corporations, associations, and other private-sector organizations in 75 countries (not just in the U.S.). However, not all in-house counsel belong to the ACC. I personally know in-house counsel who do not. More importantly, the vast majority of U.S. corporations are not included in this group, including, but not limited to, 5.8 million U.S. companies with 1 - 99 employees (*see* U.S. Census Bureau report, attached as Exhibit "E"). Companies with 1 - 99 employees are typically too small to have their own in-house legal department. I am aware of that fact from my litigation management consulting firm, which markets its services largely to companies without an in-house legal department.

36.    Some of these companies are engaged in expensive litigation each year in federal and state courts.  Perhaps not securities fraud litigation itself, but patent, trademark, copyright, trade secrets, unfair competition, and wage-and-hour class lawsuits, to name a few, all of which are expensive in terms of outside legal fees.  As discussed, in my experience some of those companies are billed by their outside law firms for contract attorneys at prevailing market rates, and they pay those billed rates.  For the above reasons, I would recommend adopting the broad market approach in the current fee proceeding.[11]

37.    Putting aside whether the ACC letter is truly representative of its membership, the above data means that the litigation customs and practices of millions of U.S. companies would automatically *not*, by definition, be reflected by the ACC's membership, because those companies may not have in-house counsel at all. Yet, as explained above, those companies can and do become involved as plaintiffs and defendants in expensive litigation in state and federal courts.  So the ACC's membership actually touches only a very small percentage of the broad corporate client marketplace in the U.S.

---

[11]    By analogy, I would not suggest that the practices of the AmLaw 200 law firms could or should alone define how tens of thousands of other small law firms and midsize law firms in the broad legal marketplace typically behave.

38.   The developments over the past five years due to the Great Recession might lead some observers today to make a categorical, "black-and-white" statement like, "No client pays full market rates for contract attorneys in today's marketplace anymore; they only pay base cost with little or no mark-up." But I have found the billing and payment practices for contract attorneys in the broad corporate client marketplace to be a much "grayer" area. There is simply no "one-size-fits-all" custom and practice regarding billing and payment for contract attorneys in the broad corporate client marketplace today.

39.   The continuing debate over what corporate clients pay for contract attorneys in expensive litigation in 2013 also brings to mind another categorical, black-and-white statement that I occasionally hear or read in the post-Great Recession legal media, namely, "No client pays for first-year associates anymore to work on their litigated matters, because clients are no longer willing to pay to train brand-new attorneys." In fee cases I have handled in the recent past, however, I have still seen even large law firms put first-year associates on expensive lawsuits (although in smaller numbers than in the past), bill them at prevailing market rates, and corporate clients pay those rates.

40.    Returning to the broad corporate client marketplace, the majority of companies do not automatically insist that law firms bill contract attorneys at cost. That means that, when law firms (of any size) use contract attorneys in handling expensive litigation for many companies, those law firms still tend to bill their contract attorneys at prevailing market rates.

41.    In my experience, plaintiffs' class action counsel such as Plaintiffs' Counsel here also typically hire, use, and bill their contract attorneys at prevailing market rates in document-intensive cases such as the instant class litigation. I am not aware of any court in securities class action litigation that has refused to consider prevailing market rates for contract attorneys as part of class counsel's lodestar in the context of a fee application.

2.    <u>As the Demand for Contract Attorneys Among Corporate Clients and Law Firms of All Sizes Continues to Grow As a Preferred Staffing Practice in Expensive Litigation, So Do the Different Arrangements For Billing and Paying Contract Attorneys Among Clients and Law Firms</u>

42.    Spurred by the continuing recession and structural disruptions in the U.S. legal marketplace, law firms of all sizes today are hiring more contract attorneys than ever before to assist their partners and associates in expensive litigation. Contract attorneys are no longer confined just to major law firms. A *NYSBA Journal* article published in early 2011 (Exhibit "F"

hereto) pointed out (at page 36 thereof) that contact attorneys are a smart, suitable staffing practice for law firms of *every* size from now on:[12]

> "The outsourcing of legal work may conjure up images of major law firms and Fortune 500 corporations using outside and even overseas entities to handle administrative tasks and routine legal projects. Yet outsourcing is also a vital tool for small firms, including solo practitioners." (Emphasis added.)

43.    In my opinion, there are currently, and will continue to be in the future, many different negotiated billing arrangements for contract attorneys between different types of corporate clients and different types of law firms (whether nationally or in this forum). I would characterize contract attorney billing arrangements as being "all over the map," with no consistency when I view them in relation to the broad corporate client marketplace.

44.    I actually remarked on this very point for the district court five years ago in my *Enron* expert declaration (excerpted below, at paragraph 66, page 36 of my declaration in that case):

> "For the past 15 - 20 years, since contract attorneys became fixtures at large law firms in major, complex,

---

[12]    "Contract Attorneys: How a Small Firm Can Reap Huge Benefits," *NYSBA Journal*, February 2011 (authored by Cynthia Feathers, Esq. and Craig S. Brown).

document-intensive litigation, there are, to my knowledge, still no clear, uniform, "consensus" rules among corporate/institutional clients on how to treat contract attorneys. In my experience, different corporate/institutional clients end up formulating their own individual billing policies for contract attorneys vis-à-vis their big-firm outside counsel. . . . "

45.   I was focusing on "large law firms" and "corporate/institutional clients" (whom I equated in my own mind with large corporate legal departments) in my *Enron* expert testimony, mainly because in 2008 there had not yet been the huge new supply of excellent contract attorneys released into the legal marketplace by the Great Recession (discussed further below). Today, contract attorneys can be found in every corner of the legal marketplace.

46.   For example, I know small law firm and solo practitioner litigators whose more nimble business models in today's legal marketplace are actually predicted upon "just-in-time" case staffing requiring the availability of experienced, capable, self-directed contract attorneys to meet the ebb and flow of expensive litigation, performing the same kinds of tasks that Plaintiffs' Counsel's contract attorneys performed in the instant class

litigation. That is one way for small law firms and solo practitioners, often populated by former litigators from large law firms, to be able to obtain the extra talent, depth, and flexibility they need to compete and litigate against large law firms in expensive lawsuits. But those law firms bill their talented contract attorneys to their corporate clients at rates which include a profit for the law firm. They bill them at prevailing market rates, just as law firms always bill their own associate attorneys at higher rates than those associates are actually paid by their law firms.

3.    Plaintiffs' Counsel Hired Many Contract Attorneys For the Instant Class Litigation That Are Representative of the Huge New Pool of Well-Qualified, Talented Contract Attorneys Available to Corporate Clients and Law Firms Today

47.    Not too many years ago, contract attorneys based here in the U.S. (not including India, the Philippines, and offshore locations) were stereotyped, rightly or wrongly, as "second-rate" attorneys by top-quality law firms. Their brainpower, educational achievements, and work commitment were often viewed skeptically by those law firms. The Great Recession changed all that by dramatically shifting the supply-and-demand dynamics of contract attorneys in an unprecedented way. In the compressed space of only a few years from 2008 - 2011, the Great Recession poured into the legal marketplace, particularly in major legal centers like New York City, thousands of talented, well-credentialed, hard-working but suddenly

unemployed attorneys, whose only offense at their former law firms was not having their own book of business or a hot litigation practice specialty such as IP litigation.

48.    Because of this huge new wave of talented contract attorneys hitting the legal marketplace and, more importantly, remaining in place and available today to law firms such as Plaintiffs' Counsel even after the Great Recession has ended, even the best law firms are no longer reluctant to hire contract attorneys to work on expensive litigation for their most important clients.   The law firms now integrate their contract attorneys as active, contributing members of their litigation teams alongside their own partners and associates. As discussed in detail below, Plaintiff's Counsel hired those very kinds of contract attorneys in the instant class litigation.

4.    Plaintiffs' Counsel's Contract Attorneys Were Generally Well-Qualified and Credentialed, the Types of Attorneys Who Previously Worked At or Would Be Capable of Working Full-Time at a Law Firm

49.    Many of Coughlin Stoia's contract attorneys in *Enron* were junior attorneys right out of law school, yet the district court allowed all of them.

50.    By comparison, below is what I learned about Plaintiffs' Counsel's 52 contract attorneys, which includes both Kirby's contract attorneys and their co-counsel's contract attorneys (collectively "Plaintiffs'

Counsel's contract attorneys"), which I believe supports their reimbursement at the prevailing market rates discussed in Paragraph 62 below.[13]   Finding itself in a buyer's market for contract attorneys, Plaintiffs' Counsel recruited, hired, and utilized a group of more experienced, more credentialed contract attorneys in the instant class litigation:[14]

(a)  Nineteen of Plaintiffs' Counsel's contract attorneys were admitted to practice nine or more years before 2012 (what I would typically consider to be at least "junior-partner equivalent" practice experience, although I do not know each of their actual number of years spent in litigation);

(b) Four of them were admitted to practice six to eight years before 2012 (what I would typically deem "senior-associate equivalent" experience);

(c) Fourteen others were admitted to practice three to five years before 2012 (typically "midlevel-associate equivalent" experience); and

(d) The final fifteen contract attorneys were admitted one to two years

---

[13]   Plaintiffs' Counsel's contract attorneys all carried the same general description in the January 18, 2013 Reply Declaration of Peter S. Linden and Ira M. Press (i.e., "project-specific attorneys").   All of those project-specific attorneys were divided into two groups: the "core" group and the "supplemental" group.   The core contract attorneys were longer term, i.e., they generally worked at least one year on the instant class litigation.   The supplemental contract attorneys were hired to augment the core group in connection with completing the discovery and case preparation process, e.g., massive amounts of document review/analysis that were necessary for taking depositions and other evidentiary purposes. This second group worked for just over 2 months.

[14]   Since Plaintiffs' fee application was filed in 2012, I computed their experience levels from that starting point.

before 2012 ("junior-associate equivalent" experience).

51.   Regarding their credentials and qualifications to make a substantive contribution to the instant class litigation:

(a)   Thirty-three of Plaintiffs' Counsel's 52 contract attorneys, or nearly two-thirds of them, had previously worked either full-time or part-time for major national law firms, including some of the largest, most prestigious law firms in New York City;

(b) Twenty-five of them, or roughly half, had previous experience working in the securities litigation field itself;

(c) About twenty-two of them, or over 40%, had prior experience in the securities industry, or were knowledgeable about some of the complex derivatives, i.e., subprime/CDO securities, at issue in the instant class litigation;

(d)  Five of the contract attorneys had federal or state court judicial clerkship experience, and one had been an administrative law judge; and,

(e)   Thirteen of them had advanced degrees or other special educational credentials, including master's degrees in taxation, MBA degrees, finance degrees, CPA licenses, and the like.

5.   A 2008 ABA Ethics Opinion Allows Law Firms to Choose Between Billing Contract Attorneys As Either Part of "Fees" or "Costs"

52.   One month before the *Enron* fee decision in September, 2008 (which adopted a "fees" view of contract attorney time, as I had opined to the district court), the American Bar Association weighed in on the subject for the first time with its August 5, 2008 Formal Opinion 08-451 by the ABA's Standing Committee on Ethics and Professional Responsibility, entitled "Lawyer's Obligations When Outsourcing Legal and Nonlegal Support Services." Opinion 08-451 is non-binding and advisory only, but I reviewed and considered it because it was relevant to the issues upon which I was opining.

53.   When it was first released, I viewed the ABA's intent behind Opinion 08-451 as being to grant first-time official legitimacy to offshoring arrangements between U.S. law firms (primarily large law firms) and legal process outsourcing firms ("LPOs") that are usually located in foreign countries like India and the Philippines.   So have some legal commentators.[15]

54.   Opinion 08-451 makes clear that a law firm can add a mark-up or surcharge to the base cost of contract attorneys whom it utilizes and bills

---

[15]     *See, e.g.,* "ABA Approval of Offshore Outsourcing," *The Practical Litigator,* March 2009 (authored by Joseph Ortega, Esq. and Scott Eisenberg, Esq. of Nixon Peabody); "ABA Issues Ethics Opinion Regarding Legal Outsourcing," Ethical Developments Update Resource Center, September 2008, Jenner & Block website; "Contract Attorneys: How a Small Firm Can Reap Huge Benefits," *NYSBA Journal, supra.*

to a client so long as the contract attorney time is considered part of timekeeper "fees" and not "costs," which is what Plaintiffs' Counsel chose to do in Plaintiffs' fee application.

      6.    <u>Legal Commentators in This Forum Have Said That Contract Attorneys May Be Billed By Law Firms At a Profit If Part of "Fees"</u>

      55.    The above-cited 2011 *NYSBA Journal* article appears to endorse the notion (at page 38 thereof) that it is permissible for contract attorneys, when billed as part of "fees," to yield a profit to the law firm:

> "Another reaffirmed ABA position [in Formal Opinion 08-451] is that a law firm that engages a contract lawyer may add a surcharge to the cost paid by the billing lawyers – as long as the total charge to the client is reasonable and otherwise complies with Rule 1.5 [citing ABA Committee on Ethics and Professional Responsibility, Formal Opinion 00-420 (Nov. 29, 2000) (Surcharge for Contract Lawyer)].

> "Finally, the 2008 ABA Formal Opinion explains [at page 5-6] the rationale behind a surcharge on fees paid to contract attorneys – to yield a profit to the law firm:

>> 'This is not substantively different from the manner in which a conventional law firm bills for the services of its lawyers. The firm pays a

lawyer a salary, provides him with employment benefits, incurs office space and overhead costs to support him, and also earns a profit for his services; the client generally is not informed of the details of the financial relationship between the law firm and the lawyer. Likewise, the lawyer is not obligated to inform the client how much the firm is paying the contract lawyer; the restraint is the overarching requirement that the fee charged for the services not be unreasonable. If the firm decides to pass those costs through to the client as a disbursement, however, no markup is permitted.' "[16]

### 7. In Making Fee Awards, Courts Prefer to Avoid Becoming Entangled in Cost-Plus Accounting of Contract Attorney Rates For Good Reason

56.   As previously mentioned, the *Enron* court addressed the question of whether to compensate contract attorneys at prevailing market

---

[16]    Formal Opinion 08-451 points out how a law firm should bill contract attorney time as a "cost" item should the law firm choose to do that, i.e., actual cost to the law firm plus a reasonable allocation of associated overhead, unless the client has agreed to some higher billing formula by the law firm. This "cost" billing approach is not relevant in the current fee proceeding.

rates, i.e., rates for attorneys of comparable skill, experience, and reputation in the local legal community.   Objectors in *Enron* had urged the district court to examine how much lead counsel had actually paid those contract attorneys, which would have put the district court in the untenable position of trying to conduct a cost-plus accounting analysis of contract attorney rates as part of its lodestar calculation.   The district court declined to follow the objectors' approach.

57.   Two years ago in *Fox v. Vice*, 131 S.Ct. 2205 (2011), the U.S. Supreme Court issued one of its fairly-infrequent but important decisions on determining the correct amount of reasonable attorney's fees in fee-shifting cases.   In that case, the Supreme Court instructed district judges to aim for "rough justice" in making fee awards, and not to be preoccupied with achieving "accounting precision" in the process.   The Supreme Court acknowledged what all litigators know -- that the real world of litigation today is "messy." 131 S.Ct. at 2214, 2216.

58.   Notwithstanding the fact that there has been a buyer's market for contact attorneys for the past five years, I am not aware of any consensus or trend among district courts in class action fee awards of breaking from past precedent and starting to award "rock-bottom" rates for contract attorneys.   In my experience, it has not suddenly become a "race to the

bottom" where contract attorney rates in fee awards are concerned. To my knowledge, the test is still the U.S. Supreme Court's standard of awarding rates that are comparable to those charged by attorneys of comparable skill, experience, and reputation for similar work in the relevant legal community. *Blum v. Stenson*, 465 U.S. 886 (1984).

59.     There is also an important published appellate case in California directly on point regarding the issue of prevailing market rates vs. cost-plus accounting for contract attorneys which is relevant to the instant fee proceeding, too. In *Shaffer v. Superior Court*, 33 Cal. App. 4th 993 (1995), which predated *Tyco, supra,* a state appellate court in Los Angeles found that (i) a law firm could charge a paying hourly client for a contract attorney's time at a comparable prevailing market rate for an employed associate; and (ii) the court was not willing to inquire into any disparity between the contract attorney's billed rate to the law firm's client versus the contract attorney's own direct hourly compensation received from the law firm, because it was not practical for the court to delve into issues of purely internal cost-plus accounting. I cited the *Shaffer* decision to the district court in my *Enron* expert declaration.

60.     In *Shaffer*, a contract attorney had formerly worked as an associate at Gibson Dunn & Crutcher, historically one of the three largest,

most high-profile law firms in Los Angeles ("Gibson"). While she was employed full-time at Gibson as an associate from 1980-1983, the firm charged her time to clients at an associate rate. She left the firm, but was hired back some years later by Gibson, this time as a contract attorney. Thereafter, Gibson billed her as a contract attorney at a comparable rate for an associate, even though the firm paid her much less per hour as her direct compensation. The contract attorney was working on a particular client's litigated case at Gibson. That client later sued Gibson for malpractice and overbilling, and claimed, among other things, that the contract attorney's $215-$250 rate in 1989-1990 was "unconscionable" under the California Rules of Professional Conduct.[17]   The contract attorney's rate was a significant issue, because the contract attorney had billed about 19% of the total Gibson law firm hours on the client's case herself, according to the appellate court opinion.

61.    In its groundbreaking opinion, the appellate court sided with the law firm, holding that as long as the contract attorney's billed rate to the client was comparable to what other attorneys of similar skill and experience charged for similar work in the local legal marketplace, then the contract

---

[17]    A contract attorney rate of $215-$250 per hour back in 1989-1990 would, by my admittedly very rough extrapolation, equate to a rate of approximately $550 - $650 per hour in 2012. To make that extrapolation, I applied an average annual rate increase of 5% from 1989 - 2007, then a 2% average increase per year from 2008 - 2012 (per Paragraph 29 above).

attorney's rate was reasonable, and not unconscionable. Only prevailing market rates were taken into account by the appellate court, not internal cost-plus accounting at Gibson. The appellate court declined to inquire into how much Gibson was actually paying the contract attorney, because they said that line of inquiry would have opened a "Pandora's box" of problems for courts in fee cases.

8. <u>Plaintiffs' Counsel Is Seeking Prevailing Market Rates, Not Higher Rates Than That, for Its Contract Attorneys, Based on the Relevant Hourly Rate Information That I Reviewed In Plaintiffs' Fee Application</u>

62. I examined the attorney hourly rate data contained in Professor Geoffrey Miller's declaration, specifically his rate chart at paragraph 42, pages 21-22 of his declaration ("rate chart"). Professor Miller's rate chart contains a column of high/low rate ranges for "*non-partner* attorneys" in 17 representative class actions from 2008 - 2012, with most of those cases from the past few years. The upper-end hourly rate for non-partner attorneys in Professor Miller's chart is $550 or higher in 14 of those 17 class actions, with many of the upper-end rates for non-partners being between $600 - $700 per hour.

63. By comparison, the maximum upper-end rate that Plaintiffs' Counsel is seeking for *any* of its 52 contract attorneys (including the 19 most experienced who were admitted to practice nine or more years before 2012)

is $550 per hour.  When compared to Professor Miller's rate chart, it appears to me that Plaintiffs' Counsel has "priced" all of its contract attorneys very reasonably and consistently with what other lead counsel have sought for their own comparably-experienced contract attorneys in other similar class actions in recent years.  Plaintiffs' Counsel's contract attorney rates are certainly in the mainstream in that regard, not outliers.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 21st day of March, at Sammamish, Washington.

_____
Kenneth M. Moscaret