**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| IN RE CITIGROUP INC. SECURITIES LITIGATION | Master File No. 07 Civ. 9901 (SHS)<br><br>**ECF Case** |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN RESPONSE TO POST-DECEMBER 21, 2012 OBJECTIONS TO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAINTIFFS' COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

KIRBY McINERNEY, LLP
Ira M. Press
Peter S. Linden
Andrew McNeela
Mark A. Strauss
Beverly Tse Mirza
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Lead Counsel for Plaintiffs*

*Additional Plaintiffs' counsel on signature page*

Dated:   March 25, 2013

**Table of Contents**

INTRODUCTION……………………………………………………………………………...1

I.    THE PERCENTAGE FEE REQUESTED HERE IS REASONABLE............................ 6

    A.    Most Courts Within the Second Circuit Use the Percentage
        Method With a Lodestar Cross Check ...................................................................6

    B.    The Fee Percentage Requested Here is Reasonable .............................................6

    C.    Frank's Arguments Do Not Undermine the Reasonableness
        of the Percentage Fee Request, and Do Not Support
        Striking the Reports of Plaintiffs' Experts ..........................................................8

II.   LODESTAR CROSS-CHECK FURTHER CONFIRMS
    THAT THE FEE REQUESTED IS REASONABLE........................................................ 10

    A.    The Multiplier Here is Squarely Within (and Below)
        the Range of Multipliers Approved Generally and in Comparable Cases ................10

    B.    Franks' Argument that Multipliers Are Neither Permissible
        Nor Warranted Are Meritless and Demonstrably False ...............................................11

    C.    Frank's Argument that Contract Attorney Work is an Expense
        Rather Than Lodestar Has Been Rejected by This Court and
        Every Other Court Presented with the Same Objection ..............................................11

    D.    Frank's Arguments Concerning sub-$100 Lodestar Rates for
        Project Attorneys and/or Document Review are Meritless .......................................13

    E.    Plaintiffs' Analyst and Paralegal Rates are Reasonable...........................................15

    F.    Frank's Bid to Denigrate the Contract Attorney Qualifications Is Meritless............17

    G.    Frank's Bid to Denigrate the Work Performed by Contract Attorneys
        Is Meritless and Without Factual Basis......................................................................21

    H.    Frank's Arguments Regarding the Work Performed Between May
        and mid-July 2012 Are Meritless ...............................................................................24

    I.    Frank's and Toothman's Contemporaneous Time Record Arguments
        are Meritless ...............................................................................................................25

J.    Frank's Attempts to Manufacture a Host of Picayune, Highly-Specific
      Controversies Are Meritless ..................................................................28

K.    Frank's Rehashing of his Previously-Addressed Demand for
      Discovery Is Without Merit, and Fails .....................................................30

III.   FRANK'S EXPERTS AND AMICUS FAIL ................................................ 30

A.    Frank Himself ..........................................................................................30

B.    The ACC ...................................................................................................31

C.    Ruane ........................................................................................................34

D.    Toothman ..................................................................................................35

IV.   THE FA CAP SUPPLEMENTAL OBJECTION IS IMPROPER, AND FAILS ............ 39

A.    The Objection is Procedurally Improper ..................................................39

B.    Lead Counsel Has the Authority to Settle Claims Arising from
      Class Period Purchases of Citigroup Stock .............................................40

C.    The Settlement Does Not Release Claims Arising From the
      July 2008 FA Cap Share Awards .............................................................40

D.    The Plan of Allocation Does Not Treat the FA Cap Objectors Unfairly ...................41

V.    ALL OTHER OBJECTIONS FAIL ............................................................ 42

A.    Behar .........................................................................................................43

B.    St. Stephen ................................................................................................44

CONCLUSION...............................................................................................................44

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fla., Inc. v. Dixie County Fla.*,
   No. 1:07 Civ 18-MP-6RJ, 2012 U.S. Dist. LEXIS 40513 (N.D. Fla. Mar. 23, 2012).............. 15

*In re Amaranth Natural Gas Commodities Litig.*,
   No. 07 Civ. 6377, 2012 WL 2149094 (S.D.N.Y. June 11, 2012).............................................. 6

*In re American Int'l Group, Inc. Sec. Litig.*,
   No. 04 Civ. 8141, 2010 WL 5060697 (S.D.N.Y. Dec. 2, 2010)................................................ 9

*In re American Int'l Group, Inc. Sec. Litig.*,
   No. 04 Civ. 8141, 2012 WL 345509 (S.D.N.Y. Feb. 2, 2010) ................................................. 9

*In re AOL Time Warner S'holder Deriv. Litig.*,
   No. 02 Civ. 6302, 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ........................................ 12, 15

*Apple, Inc. v. Samsung, Elecs. Co.*,
   No. C11-1846, 2012 U.S. Dist. LEXIS 160668 (N.D. Cal. Nov. 7, 2012)............................. 14

*In re Beacon Assoc. Lit.*,
   No. 09 Civ 777 (S.D.N.Y. Mar. 8, 2013).............................................................................. 13

*Carlson v. Xerox Corp.*,
   596 F. Supp. 2d 400 (D. Conn. 2009) .................................................................................. 12

*Cassese v. Williams*,
   No. 11-4333-Civ, 2012 U.S. App. LEXIS 23834 (2d Cir. N.Y. Nov. 20, 2012) ................... 27

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010).................................................................................. 17

*In re Comverse Techs., Inc. Sec. Litig.*,
   06 Civ-1825, 2010 WL 265334 (E.D.N.Y. June 24, 2010) .................................................... 16

*Conners v. Connecticut Life Ins. Co.*,
   No. 98 Civ-8522, 2003 WL 188726 (S.D.N.Y. Apr. 15, 2003) ............................................. 16

*In re Corel Corp. Sec. Litig.*,
   293 F. Supp. 2d 484 (E.D. Pa. 2003) .................................................................................. 25

*Craig v. Rite Aid Corp.*,
   No. 08 Civ-2317, 2013 WL 84928 (M.D. Pa. Jan. 7, 2013).................................................. 39

*Detroit v. Grinnell Corp.*,
    560 F.2d 1093 (2d Cir. 1977).............................................................................. 15

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    No. 98 Civ. 4318, 2001 U.S. Dist. LEXIS 8418 (S.D.N.Y. Jun. 21, 2001)............................. 14

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) .................................................................. 12

*FB-Stark, LLC v. White*,
    No. CV-12-00095, 2012 U.S. Dist. LEXIS 137892 (D. Ariz. Sept. 26, 2012)................. 14, 15

*In re Fine Paper Antitrust Litig.*,
    98 F.R.D. 48 (E.D. Pa. 1983)............................................................................. 13

*G.B. v. Tuxedo Union Free Sch. Dist.*,
    No. 09 Civ. 859, 2012 U.S. Dist. LEXIS 134192 (S.D.N.Y. Sept. 18, 2012) ......................... 27

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000)................................................................. 4, 6, 11, 43

*High Sierra Hikers Ass'n v. Powell*,
    150 F. Supp. 2d 1023 (N.D. Cal. 2001) ............................................................... 31

*Hnot v. Willis Grp. Holdings Ltd.*,
    No. 01 Civ-6558, 2008 U.S. Dist. LEXIS 28312, (S.D.N.Y. Apr. 7, 2008)........................... 27

*In re IMAX Sec. Litig.*,
    No. 06 Civ. 6128, 2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) ......................................... 4, 6

*Kahlil v. Original Old Homestead Rest., Inc.*,
    657 F. Supp. 2d 470 (S.D.N.Y. 2009)................................................................... 15

*Loughner v. Univ. of Pittsburgh*,
    260 F.3d 173 (3d Cir. 2001).............................................................................. 15

*LV v. New York City Dep't of Educ.*,
    700 F. Supp. 2d 510 (S.D.N.Y. 2010)................................................................... 27

*Mautner v. Hirsch*,
    831 F. Supp. 1058 (S.D.N.Y. 1993)..................................................................... 15

*McDaniel v. County of Schenectady*,
    595 F.3d 411 (2d Cir. 2010).............................................................................. 14

iv

*Microsoft Corp. v. Computer Care Ctr., Inc.*,
    No. 06 Civ-1429, 2008 U.S. Dist. LEXIS 112080 (E.D.N.Y. Apr. 8, 2008) ......................... 14

*Nat'l Org. For Women, Inc. v. Scheidler*,
    223 F.3d 615 (7th Cir. 2000) ..................................................................................... 31

*New Mexico Citizens for Clean Air and Water v. Espanola Mercantile Co.*,
    72 F.3d 830 (10th Cir. 1996) ...................................................................................... 15

*In re Nortel Networks Corp. Sec. Litig.*,
    539 F.3d 129 (2d Cir. 2008).......................................................................................... 30

*In re PaineWebber Ltd. P'ships Litig.*,
    No. 94 Civ. 8547, 2003 U.S. Dist. LEXIS 13377 (S.D.N.Y. July 31, 2003)......................... 27

*Parm v. Shumate*,
    No. 01 Civ. 2624, 2006 U.S. Dist. LEXIS 27521 (W.D. La. May 1, 2006)........................... 31

*Perdue v. Kenny A*,
    130 S. Ct. 1662 (2010)................................................................................................. 11

*Planned Parenthood of Central New Jersey v. Attorney General. of New Jersey*,
    297 F.3d 253 (3d Cir. 2002)................................................................................... 14, 15

*In re Rent-Way Sec. Litig.*,
    305 F. Supp. 2d 491 (W.D. Pa. 2003) ............................................................................. 25

*In re Sadia S.A. Sec. Litig.*,
    No. 08 Civ. 9528, 2011 WL 6825235 (S.D.N.Y. Dec. 28, 2011).......................................... 6

*SEC v. Kirkland*,
    2008 U.S. Dist. LEXIS 123308 (M.D. Fla. June 30, 2008).................................................. 13

*Sheehan v. Metropolitan Life Ins. Co.*,
    450 F. Supp. 2d 321 (S.D.N.Y. 2006)............................................................................... 16

*Simmons v. New York City Transit Auth.*,
    No. Civ-02-1575, 2008 U.S. Dist. LEXIS 54870, (E.D.N.Y. July 17, 2008)........................... 15

*Staples, Inc. v. W.J.R. Assocs.*,
    No. 04-Civ-904, 2007 U.S. Dist. LEXIS 65211, (E.D.N.Y. Sept. 4, 2007) ..................... 14, 15

*Tampa Bay Water v. HDR Eng'g, Inc.*,
    No. 08 Civ. 2446, 2012 U.S. Dist. LEXIS 157631 (M.D. Fla. Nov. 2, 2012)......................... 14

*In re The Mills Corp. Sec. Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009) ........................................................................ 12

*Tucker v. City of New York*,
   704 F. Supp. 2d 347 (S.D.N.Y. 2010) ............................................................... 15

*In re Tyco Int'l., Ltd. Multidistrict Litig.*,
   535 F. Supp. 2d 249 (D. N. H. 2007) ................................................................ 12

*United States v. Metropolitan Dist. Com.*,
   847 F.2d 12 (1st Cir. 1988) ......................................................................... 14, 15

*In re UnitedHealth Group Inc. PSLRA Litig.*,
   643 F. Supp. 2d 1094 (D. Minn. 2009) ........................................................ 12, 13

*In re Wachovia Preferred Sec. & Bond/Notes Litig.*,
   No. 09 Civ. 6351 (S.D.N.Y.) ................................................................... *passim*

*Wachtel v. Health Net, Inc.*,
   No. 01 Civ. 4183, 2007 U.S. Dist. LEXIS 44225 (D.N.J. June 19, 2007) ........ 13, 14

*In re Warner Chilcott Ltd. Secs. Litig.*,
   06 Civ. 11515, 2009 U.S. Dist. LEXIS 58843 (S.D.N.Y. July 10, 2009) .......... 13, 14

*Weinberger v. Great N. Nekoosa Corp.*,
   801 F. Supp. 804 (D. Me. 1992) .................................................................. 14, 15

*Zubulake v. UBS Warburg LLC*,
   216 F.R.D. 280 (S.D.N.Y. 2003) ....................................................................... 15

**Statutes**

Fed. R. Civ. P. 26(a)(2)(A) ............................................................................... 31

Fed. R. Evid. 801 ............................................................................................. 31

Fed. R. Evid. 802 ............................................................................................. 31

## INTRODUCTION

Lead Plaintiffs and Lead Counsel submit this memorandum in response to those objections filed after December 21, 2012, pursuant to the Court's January 2, 2013 order.[1]

This settlement, the product of Class Counsel's hard work and persistence, is one of the top federal securities class action recoveries of all time.  After thousands of pages of briefing and supporting material, extensive notice to Class Members, and multiple opportunities for Class Members to object to, or opt out of, this Settlement, it remains that the reaction to the Settlement has been overwhelmingly positive.  Between the original notice mailing and subsequent supplemental mailings there have now been over 2.4 million Notices sent to possible Class Members.  In connection with this supplemental mailing program, there are only two new objections filed by Class Members (bringing the total number of Class Member objections to 11). The new objections are from Class Members Eric Behar and St. Stephen, Inc.[2]  In addition, a follow-up objection was received from Theodore Frank ("Frank"), who had previously submitted an objection on or about December 20, 2012 (which was addressed in the Reply Br. and Reply Decl.).  Significantly, although more than 68% of Citigroup common stock is held by institutional investors, *not a single institutional investor has objected to the proposed Settlement or to the fee request*.  As noted in our January 18, 2013 Reply Memorandum, the small number

---

[1]       All capitalized terms not otherwise defined carry the meaning set forth in the January 18, 2013 Declaration of Ira M Press and Peter S. Linden in Further Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plaintiffs' Counsel's Motion for Award of Attorneys' Fees ("Reply Decl.") [Dkt. No. 196] and the Reply Memorandum filed the same date ("Reply Br.") [Dkt. No. 195].  Citations to the "Supp. Decl." are to the Supplemental Declaration of Ira M. Press and Peter S. Linden, filed contemporaneously with this memorandum and, unless otherwise noted, all exhibits cited herein as "Ex. _" are attached to that declaration. Citations to the "Cirami Supp. Aff." are to the Supplemental Mailing Affivait of Stephen J. Cirami.

[2]       Two additional objections were filed since the supplemental mailing but neither of those (James Dimeff and Charles Hayden) are class members.  Finally, the FA CAP or *Brecher* plaintiffs and Robert Shattuck (who is not a class member) impermissibly supplement their prior objections, which we address below.

of objections weighs heavily in favor of approval of the Settlement and the Fee Application (*see* Reply Br. at 1).

Further evidence of the Class's positive reaction to the Settlement can be seen from the small number of Exclusion Requests.  The total number of timely Exclusion Requests received is now 294, which amounts to approximately 0.012% of the Class notices that have been mailed out.  And when one eliminates Requests from persons who were either not members of the Settlement Class or have not provided any evidence of such membership, and Requests from investors that had already commenced litigation against Citigroup prior to the parties' agreement to settle this action, the number of confirmed Class Members that affirmatively opted out of the Settlement once it was announced is just 111, which is less than 0.01% of the total number of Class notices mailed.  *See* Supp. Decl. ¶ 5.

Class Counsel previously demonstrated that the requested 16.5% fee is reasonable when compared to percentage fees awarded in comparable cases.  Frank challenges the sample of comparable cases, and proffers his own sample range – although he fails to explain why his range is superior to those of Class Counsel's experts.   Even assuming *arguendo* the reasonableness of Frank's range (which produces an average fee of more than 15%), Class Counsel's fee request is reasonable.

Class Counsel has also demonstrated previously that the requested fee is reasonable under the lodestar cross-check.  The requested fee represents a multiplier (1.89) that is below the average in the comparable cases analyzed by Class Counsel's experts.  It is also below the average lodestar multiplier in Frank's proposed range of comparable cases (2.27).

Frank continues to argue that the lodestar should not include the time of project-specific attorneys, and also argues that the lodestar should not include paralegals or analysts.  However,

the lodestars in the overwhelming majority of the similar cases cited by Class Counsel's experts include all of the foregoing in lodestar. The same is true of the overwhelming majority of the cases in Frank's proposed range of comparable cases.

More importantly, at a February 28, 2013 hearing on Frank's discovery application, this Court found that that contract or project-specific attorneys can be included in firm lodestar and the only issue to resolve is their appropriate market rate. *See* Feb. 28, 2013 Tr. at 4:9-12 (excerpt attached as Ex. 42). Nonetheless, Frank persists in arguing that Class Counsel's lodestar should not include project-specific attorneys, based on: (a) the anecdotal accounts of a former in-house attorney who has no personal knowledge of the way any law firms (plaintiff or defense) billed for contract attorneys; and (b) the *amicus* letter of a trade association purporting to describe purported rates paid by in-house counsel when they hire contract attorneys for "objective coding" document review. The ACC's limited survey, however, does not remotely support Frank's contention that all law firms working for corporate clients bill only at cost and do not bill their project-specific attorneys at market rates. Class Counsel previously proffered dozens of opinions and fee award orders in PSLRA actions where class counsel's lodestar included contract attorneys. Neither Frank nor his experts cite to a single PSLRA case where a court rejected inclusion of contract attorneys in the lodestar.

Frank attacks the quality of the work performed by the project-specific attorneys here. As amply demonstrated (Reply Decl. ¶¶ 50, 56, 81-146), the project-specific attorneys employed here did substantive legal work. Frank's contentions otherwise rest on speculation.

Similarly, Plaintiffs' use of the project attorneys after May 8, 2012 was not excessive or inefficient as Frank suggests. Plaintiffs employed project attorneys in document review, not to inflate their lodestar, but because there was work to be done and the parties had not agreed to

crucial aspects of the Settlement, resulting in the distinct possibility that the parties would have been returned to a litigating posture depending on the resolution of these issues.

While Frank's experts contend that the project attorneys' time records should have included extensive additional detail – such as identifying the precise documents reviewed, the quantity of the documents reviewed, the purpose of the review, and what the attorney actually did with the knowledge gained from that review – they provide no support for this requirement. In any event, the document management system employed in the review captured precise detail about the particular documents that were being reviewed – far more detail than is customarily included in attorney time sheets, thereby obviating the need for the wasteful and repetitive reporting of the information by the project attorneys.

Finally, Frank points to alleged improprieties in a handful of Class Counsel's more than 17,000 daily time entries in this action and speculates that the entire process was improper. As detailed below, many of Frank's individual examples are based on mischaracterizations of the record, and in any event, these isolated accidents do not alter the fundamental reasonableness of the fee request.

Crucially, Frank's protestations about lodestar ignore that the starting point in reviewing a fee request is the percentage of the recovery requested. The PSLRA itself calls for percentage-based fees in securities class actions. 15 U.S.C. § 78u-4(a)(6). Similarly, in common fund cases, most district courts in the Second Circuit use the percentage method, with the lodestar serving as a cross-check. *See In re IMAX Sec. Litig.*, 06 Civ. 6128, 2012 WL 3133476, at *5 (S.D.N.Y. Aug. 1, 2012). The Second Circuit has also made clear that where lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

The FA CAP Objectors have also filed a supplemental objection even though they were mailed the Class Notice prior to November 10, 2012 and therefore have no right to file a supplemental objection.  In any event, the new objection, in addition to being procedurally improper, fails on the merits.  The FA CAP Objectors cannot avoid the facts that: (a) Class Counsel is only settling claims arising from purchases of Citigroup common stock during the Class Period – claims that are within Lead Counsel's authority; (b) the Settlement does not release or otherwise impact claims arising from the FA CAP Objectors' post-Class Period purchases; and (c) the FA CAP Objectors acquired their Citigroup shares at a 25% discount from the applicable market prices, but are being treated under the Plan of Allocation the same as Class Members who paid full price for their shares.

The remaining handful of post-December 21, 2012 objections merely adopt Frank's objections, or assert in conclusory form that the Settlement or fee request is unfair.  For the reasons set forth in our prior submissions, such conclusory objections lack merit.

In short, the Settlement is an extraordinary result, and the requested fee is reasonable whether viewed as a percentage of the Settlement or under the lodestar cross-check.  The requested fee is below the average percentage fee in similar actions, as is the requested lodestar multiplier.  Accordingly, it is respectfully submitted that final approval of the Settlement should be granted, as should Class Counsel's request for a fee award and for reimbursement of expenses.[3]

---

[3]      The request for reimbursement of expenses was not challenged by any Class Members.

**ARGUMENT**

## I.     THE PERCENTAGE FEE REQUESTED HERE IS REASONABLE

### A.     Most Courts Within the Second Circuit Use the Percentage Method With a Lodestar Cross Check

In common fund cases, the majority of district courts in the Second Circuit use the percentage method, with the lodestar serving as a cross-check. *See In re IMAX Sec. Litig.*, 2012 WL 3133476, at *5. The Second Circuit has made clear that when lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). As discussed below, *see* Sections I.C and II., *infra*, Frank primarily asserts the exact kind of line item challenges to Class Counsel's billing records that the courts routinely have rejected as inconsistent with the very purpose of a lodestar crosscheck.[4]

### B.     The Fee Percentage Requested Here is Reasonable

As Class Counsel and their experts have previously explained, a fee award of 16.5% is merited in light of the results achieved, the difficulties faced, and awards in similar cases. *See* Fee Br. at 10-23; Reply Br. at 10-12, 15-24; Joint Decl. ¶¶ 159-83; Coffee Decl; Miller Decl. These experts' reviews of fees awarded in comparable cases found them to average 16.7% (Coffee) and 17.3% (Miller). Coffee Decl. ¶¶ 17-18; Miller Decl. ¶ 58. Frank himself finds that the average percentage fee award is 15.1%, before excluding data from his own selected range of

---

[4]     As *Goldberger* noted, the "primary source of dissatisfaction" with the lodestar methodology "was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits;" by contrast, the percentage method allowed district courts to avoid "undertak[ing] the 'cumbersome, enervating, and often surrealistic process' of lodestar computation" (citation omitted)). *Id.* at 48-50   *See also In re Sadia S.A. Sec. Litig.*, No. 08 Civ. 9528, 2011 WL 6825235, at *3 (S.D.N.Y. Dec. 28, 2011) ("Because the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable."); *In re Amaranth Natural Gas Commodities Litig.*, No. 07 Civ. 6377, 2012 WL 2149094, at *1 (S.D.N.Y. June 11, 2012) (same).

comparable cases that does not advance his argument.  *See* March 15, 2013 Supplemental

Objection of Theodore M. Frank ("Frank March Br.") [Dkt. 222] at 5 n.3. [5]

Frank does not explain why his proposed range ($590 million plus/minus 20%) is better

than Professor Coffee's proposed range ($590 million plus/minus $100 million).  Even accepting

Frank's analysis and its finding of a 15.1% average, Class Counsel respectfully submits that the

results achieved here, in light of the greater degree of difficulty faced here (versus the

comparable cases), support a fee that is 1.4% above the average, and well within the range of the

cases in Frank's proposed sample (fees between 7.73% and 33.3%).

Indeed, in all of the comparable cases cited by Frank, the recoveries were achieved with

the benefit of tailwinds, including: (1) claims that did not require a showing of scienter or

causation; (2) prior regulatory actions, including criminal prosecutions and convictions; or (3)

restatements of financial results (admissions of falsity and materiality).  *See* Ex. 38.  Here, Class

Counsel prosecuted far more difficult scienter- and loss-causation-based Section 10(b) claims,

without piggy-backing on prior regulatory actions, against Defendants who admitted nothing and

contested everything.  *See* Fee Br. at 19-21; Joint Decl. ¶¶ 6-7, 18-19, 33-35.

In any event, the analyses provided by Coffee, Miller and Frank are all in line with one

another, and all of them support the fee requested here.  Their average is 16.4%.  Class Counsel

requests 16.5%.

---

[5]    Although Frank erroneously accuses Plaintiffs' experts of cherry-picking their case ranges to reach a
predetermined conclusion, *Frank himself* admittedly excluded certain cases from his analysis in order to drive the
average fee percentage down to 12.54% or less (*Id*. at 5 and n.3, excluding two cases from his analysis, and noting
that exclusion of a third would drop the average lower still).  But when Frank's own test is conducted *without*
Frank's own cherry-picking, the result, as Frank acknowledges, is that the average fee award in comparable cases is
15.1%.  *Id*.

#### C.      Frank's Arguments Do Not Undermine the Reasonableness of the Percentage Fee Request, and Do Not Support Striking the Reports of Plaintiffs' Experts

Having established that there is effectively no dispute between Class Counsel, their experts and Frank himself as to what the evidence shows a reasonable percentage fee to be, Frank attempts to manufacture a dispute between Plaintiffs' experts' current and former opinions.

First, Frank says that Professor Coffee previously opined that fee awards on corporation-funded recoveries should not exceed 10%. Frank March Br. at 7-8. This is not true.[6] Frank says that Coffee's prior opinion in *Wachovia* contradicts his opinion here. *Id*. at 8-9. This is not true.[7] Frank says that Professor Coffee's prior opinion in *AIG* (based on analysis of 17 comparable cases) contradicts his opinion here (based on analysis of 7 comparable cases). *Id*. at 7. This is not true either.[8]

Second, Frank's other attempts to discredit the opinions of Professors Miller and Coffee are similarly unavailing. Frank says that their opinions analyzing fee data in comparable cases are impermissible legal opinions, rather than expert testimony. The many courts who have accepted similar expert reports from these very experts would no doubt be surprised to learn of

---

[6]      In fact, Professor Coffee wrote that plaintiffs' attorneys should be incentivized to seek recovery from individual wrongdoers by increasing fee awards from recoveries from such sources – and then illustrated *as a hypothetical* a settlement where counsel recovered 10% fees on the portion of the recovery funded by the corporation and 30% on the portion funded by individuals. *See* Supplemental Declaration of Theodore H. Frank in Support of Objection dated March 15, 2013 ("Frank March Decl.") [Dkt. No. 218] Ex. 23 at 63.

[7]      Professor Coffee's opinion in *Wachovia* (a 17.5% fee reasonable in a $627 million recovery) is entirely consistent with his opinion here (16.5% fee in a $590 million recovery). Professor Coffee's Declaration here correctly notes that *Wachovia* "was based on a non-scienter theory," Coffee Decl. ¶ 23 n.27, which is not inconsistent with his discussion of the *Fait* opinion in his *Wachovia* declaration (which he also discusses in his Declaration here). *Id*. ¶ 27.

[8]      The 17 cases analyzed by Professor Coffee in *AIG* featured average fees of 14.97% (*see* Frank March Decl. Ex. 21 at ¶ 18). The 7 cases analyzed by Professor Coffee here (pursuant to the sort of effective range that Frank himself endorsed – a range with high and low points equidistant from and centered on the instant recovery) featured average fees of 16.69%. Coffee Decl. at ¶ 17. The difference between the two is immaterial: both are consistent not only with each other, but also with (1) Frank's own analysis, and (2) Class Counsel's actual fee request here. Nor does his reference to the SEC proceeding in *AIG* (*see* Coffee Decl. ¶ 23) contradict his opinion in *AIG*, which also references that SEC proceeding. *See* Frank March Decl. Ex. 21 at ¶ 23.

their error.[9]   Frank points out that Coffee has previously described other recoveries to be "extraordinary."   *Id.* at 8.   This is true, because the recoveries in question in fact were extraordinary.[10]   Frank argues that Miller's opinion must be rejected because it relies "heavily" on particular results from a prior empirical study that Frank deems irrelevant.   *Id.* at 4.   Yet Miller's opinion does not rest "heavily" on those results, but merely mentions them: instead, Miller relies more substantively on his own review of fee awards in comparable cases.   *See* Miller Decl. ¶¶ 57-58 (mentioning prior study and then conducting his own analysis).   Frank argues that Miller's study of comparable cases is unreliable due to a cherry-picked range of cases considered.   Yet the results of Miller's analysis are consistent with the results of Frank's own analysis when cleansed of Frank's own cherry-picking.

Third, unlike Frank's analysis, Class Counsel's and Plaintiffs' experts' analyses also take into account, over and above awards in comparable cases, the particulars of *this* case.   *See* Fee Br. at 17-21; Final Approval Br. at 19-22; Miller Decl. ¶¶ 22-23; Coffee Decl. ¶¶ 22-27, 37; Joint Decl. ¶¶ 123-29; Reply Br. at ¶¶ 21-24.   Plaintiffs have identified nearly a dozen other class actions alleging similar misrepresentation of similar CDO exposures at similar financial institutions that were dismissed with no recovery at all.[11]   The same is true of multiple actions against Citigroup itself arising from the exposures at issue here.   *See* Final Approval Br. at 20-21; Fee Br. at 18; Joint Decl. ¶ 128.   Instead, Frank offers merely a general ideology that there

---

[9]       *See* Coffee Decl. at ¶ 10; Miller Decl. at 62-65.   In any event, the experts' opinions clearly concern a factual analysis of custom and practice as it relates to the settlement of large securities fraud class actions, and are not opining on the ultimate legal issue.

[10]      The recoveries in those cases were, as here, among the 20 largest PSLRA recoveries ever secured: *In re American Int'l Group, Inc. Sec. Litig.*, No. 04 Civ. 8141, 2010 WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010); 2012 WL 345509, at *5 (S.D.N.Y. Feb. 2, 2012) ($822.5 million recovery); *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 Civ. 6351 (S.D.N.Y. Jan. 3, 2012) [Dkt. No. 161] ($627 million recovery).

[11]      Including securities class actions over multi-billion dollar CDO exposures at UBS, RBS, Bank of America, Deutsche Bank, Barclays, Societe General, Barclays, Fortis, ACA, SCA, and Swiss Re.   *See* Joint Decl. ¶ 125; Final Approval Br. at 21 and n.19; Reply Br. at 19.

was no risk of non-recovery here because all securities class actions settle.  *See* Frank March Br. at 26-29.

Lastly, Frank and his experts argue that Lead Plaintiffs here failed to cap Class Counsel fees, purportedly in contrast to large institutional investors appointed as lead plaintiffs in comparable cases who negotiated lower attorney fees.  Yet examination of comparable settlements shows *larger* fees were often granted in such cases led by such plaintiffs.  *See* Supp. Decl. ¶¶ 8-9.

In short, Frank has demonstrated no basis to strike the opinions of Professors Coffee and Miller.

## II.   LODESTAR CROSS-CHECK FURTHER CONFIRMS THAT THE FEE REQUESTED IS REASONABLE

### A.   The Multiplier Here is Squarely Within (and Below) the Range of Multipliers Approved Generally and in Comparable Cases

Prior submissions have already demonstrated that the requested lodestar multiplier of 1.89 is reasonable when compared to fee awards in comparable securities class action settlements. *See* Fee Br. at 5-8; Joint Decl. ¶¶ 174-79; Reply Br. at 18-20; Reply Decl. ¶ 35 and Ex. 11 thereto.   Further, the requested multiplier is *lower* than the average lodestar multiplier of comparable securities class action settlements.  *See* Coffee Decl. ¶¶ 17-18 (2.29 average lodestar multiplier for securities class action cases settling between $490-$690 million); Miller Decl. ¶ 58 (2.13 average lodestar multiplier for securities class action cases settling between $550-$880 million).[12]

---

[12]      Similarly, the average lodestar multiplier in the cases in Frank's proposed sample of similar cases is 2.27. *See* Supp. Decl. ¶¶ 12, 17.

**B.**     **Franks' Argument that Multipliers Are Neither Permissible Nor Warranted Are Meritless and Demonstrably False**

Frank repeats previously-dispelled arguments that *Perdue v. Kenny A*, 130 S. Ct. 1662 (2010), has largely done away with multipliers altogether, and that *Goldberger* and Frank's own "calculation" demonstrate that contingent class litigation features no risk and therefore merits no multiplier.  *See* Frank March Br. at 26-30.

These arguments fail for exactly the same reasons they failed when Frank first made them. *See* Reply Br. at 20.  Frank clearly misapplies *Perdue*, which was not a common fund case, and ignores that courts have continued to routinely award multipliers in contingent common fund PSLRA cases after *Perdue*.  *Id*.

*Goldberger*'s disinclination to award a multiplier stemmed from the particular facts of that litigation, which piggy-backed on successful criminal prosecutions and thus featured little risk.  *See* Reply Br. at 35.  Thus, *Goldberger* dealt with circumstances far different than those presented here.

Moreover, Frank's risk "model" (Frank Br. at 16-18; Frank March Br. at 27-28) – which he apparently offers in his role as a self-appointed "expert" on legal billing matters – disproves itself with the absurd conclusion that the risk in contingent class litigation is essentially zero. *See also* Reply Decl. ¶¶ 25-32.

**C.**     **Frank's Argument that Contract Attorney Work is an Expense Rather Than Lodestar Has Been Rejected by This Court and Every Other Court Presented with the Same Objection**

Frank's initial objection was that work performed by contract attorneys cannot be billed as lodestar, but only as an expense.  But this Court recently and explicitly rejected that theory (*see* Feb. 28, 2013 Tr. at 4 (Ex. 42)), *as has every court that has previously entertained*

*objections based on that theory.* *See* Reply Br. at 15-18.[13]  Bereft of *any* support in precedent,

Frank proclaims all such prior precedent irrelevant, because the world has changed since 2007

and precedent based on pre-2007 practice no longer holds.  *See* Frank Br. at 13-17; Frank March

Br. at 17.   But this self-serving argument does not withstand scrutiny.   The primary body of

authority *postdates* 2006.  *See, e.g.*, *In re AOL Time Warner S'holder Deriv. Litig.*, No. 02 Civ.

6302, 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010); *Carlson v. Xerox Corp.*, 596 F. Supp.

2d 400, 410 (D. Conn. 2009); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264-65 (E.D. Va.

2009); *In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1105 (D. Minn.

2009); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 782-83 (S.D. Tex.

2008); and *In re Tyco Int'l., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272-73 (D. N. H.

2007).   Frank's assertion that these courts were essentially "snookered" proves nothing more

than that Frank has a very dim view of courts that disagree with him.

Second, Class Counsel has already fully refuted Frank's erroneous contention that ABA

Formal Opinion 08-451 precludes contract attorneys from being included in lodestar.  *See* Reply

Br. at 17-18.  *See also* Moscaret Decl.[14] ¶¶ 52-55 (discussing ABA Formal Op. 08-451).   In

response, Frank is reduced to claiming that one of the cases *he* cited, which found the practice to

be completely in accord with ABA Opinion 08-451, is irrelevant because it did not specifically

mention the precise portion of the ABA Opinion Frank quotes here.   Frank's misgivings aside,

both *Xerox* and the ABA Opinion itself make crystal clear that, contra Frank, they authorize fee

billing for contract attorney work.

---

[13]      Moreover, in dozens of other PSLRA actions, courts have awarded class counsel fees that were multiples of
lodestar that clearly included contract attorney time.  *See* Reply Decl. ¶ 58 n.9; Plaintiffs' March 8, 2013 submission
[Dkt. No. 211] at 4-6.

[14]      "Moscaret Decl." refers to the concurrently-filed Declaration of Kenneth M. Moscaret, Esq. dated March
21, 2013.

Third, all of authorities recently marshaled by Frank (*see* Frank March Br. at 18-20) approve inclusion of contract attorney work in lodestar, as discussed in Section II.D *infra*. Similarly, at least 8 of the 9 cases in Frank's sample of allegedly comparable cases (*see* Frank March Br. at 5) include contract attorneys as lodestar, as do at least 6 of the 8 cases in the samples selected by Professors Coffee and Miller.  *See* Supp. Decl. ¶¶ 14.

### D.    Frank's Arguments Concerning sub-$100 Lodestar Rates for Project Attorneys and/or Document Review are Meritless

Plaintiffs have cited numerous PSLRA common fund settlement cases in which a court awarded a multiplier on a lodestar which included contract attorney fees.  *See, e.g.*, Reply Decl. ¶ 58 n.9; March 8, 2013 Submission at 4-6.  Conversely, Frank cites no common fund case in which a court reduced a contract attorney's billing rate due to the lawyer's status as a temporary contract attorney.[15]  Nor does Frank cite any case that endorses a particular billing rate for a contract attorney conducting substantive document review in a complex securities litigation case.[16]  That is because such work is customarily billed out at rates comparable to associates.[17]

In each of the remaining cases Frank cites as an example for an appropriate contract attorney billing rate, the decision engages in no analysis of the contract attorney pay rate in

[15]    Frank cites a single case in which a contract attorney's rate is reduced, *Wachtel v. Health Net, Inc.*, No. 01 Civ. 4183, 2007 U.S. Dist. LEXIS 44225, at *25 (D. N.J. June 19, 2007), but it was in the context of awarding Rule 37 sanctions in an ERISA action, not an award of fees on a common fund.

[16]    Several cases did not even address rates actually billed by contract attorneys. *See e.g., SEC v. Kirkland*, No. 06 Civ. 183, 2008 U.S. Dist. LEXIS 123308, at *5 (M.D. Fla. June 30, 2008) (fee award to receiver's counsel) (no contract attorney time was ever billed, but only contemplated in proposed terms of retention agreement); *In re Beacon Assocs. Litig.*, No. 09 Civ 3907, Dkt. 382 ¶ 4 (S.D.N.Y. Mar. 8, 2013) (Frank March. Decl. Ex. 27) (order only requested information on contract attorney rates, without suggesting what rate should be); *In re Fine Paper Antitrust Litig.*, 98 F.R.D. 48, 188 (E.D. Pa. 1983) (hours in question were not billed by a "contract attorney" but a partner in firm claiming to have been "associate counsel" to the firm representing parties to the litigation.).

[17]    Frank cites *In re Warner Chilcott Ltd. Secs. Litig.*, No. 06 Civ. 11515, 2009 U.S. Dist. LEXIS 58843, at *11 (S.D.N.Y. July 10, 2009), for the "reduced rates" accorded contract attorneys.  In *Warner*, plaintiffs' counsel billed its most prolific associate attorney on the case at $345 while the average rate of its contract attorneys was $308.75 (senior associates with higher rates accounted for only 5% of total associate time billed.); *see also In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1105 (D. Minn. 2009) (same rate applied "whether counsel, associate, or contract attorneys").

13

relation to the attorneys' qualifications, experience, the skill required for the work they performed, or to the pay of equivalent associate attorneys. Moreover, with the exception of *Warner Chilcott* (discussed in fn.17, *supra*) the cases Frank cites were not awarding fees in securities fraud class actions; most involved fee-shifting provisions of statutes and contracts or fees awarded as sanctions.[18] Fees awarded as sanctions, and in fee shifting cases, are motivated by different policy concerns and provide little guidance for the appropriate fee in a common fund settlement. *See Staples, Inc. v. W.J.R. Assocs.*, No. 04 Civ. 904, 2007 U.S. Dist. LEXIS 65211, at *8 (E.D.N.Y. Sept. 4, 2007) ("The primary purpose of Rule 11 sanctions is deterrence . . . Therefore, it is also within . . . court's discretion to . . . award a lesser amount that appropriately fulfills the deterrent function") (quotations omitted); *McDaniel v. County of Schenectady*, 595 F.3d 411, 422 (2d Cir. 2010) (recognizing that different factors apply in fee-shifting and common fund cases).

Frank identifies just one instance in which a court reduced a billing rate for substantive issue document review (and only a 20% discount at that),[19] despite a sixteen case mega-cite that Frank erroneously contends supports the principle. Frank March Br. at 18-20.[20] Even if these

---

[18]     *Wachtel*, 2007 U.S. Dist. LEXIS 44225 (awarding Rule 37 sanction fees in ERISA action); *Kirkland*, 2008 U.S. Dist. LEXIS 123308 (fee award to receivers' counsel); *Tampa Bay Water v. HDR Eng'g, Inc.*, No. 08 Civ. 2446, 2012 U.S. Dist. LEXIS 157631 (M.D. Fla. Nov. 2, 2012) (fee awarded under loser pays contract provision); *Apple, Inc. v. Samsung, Elecs. Co.*, No. C-11-1846, No. C11-1846, 2012 U.S. Dist. LEXIS 160668 (N.D. Cal. Nov. 7, 2012) (Rule 37 fee awards in patent litigation).

[19]     *United States v. Metropolitan Dist. Comm.*, 847 F.2d 12, 19 (1st Cir. 1988) ($100/hr for preparing a complaint vs. $80/hr for document review). The court in *Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2001 U.S. Dist. LEXIS 8418, at *29-*30 (S.D.N.Y. Jun. 21, 2001) did criticize the use of partner billing rates for document review but suggested only that "junior associates" could have been assigned to it. *Id.* In neither case, nor any of the others cited, did a court suggest that "non-professionals" as Frank puts it (Frank March Br. at 19) perform a substantive review of a production of documents by an opposing party.

[20]     In *Planned Parenthood of Central New Jersey v. Attorney General of New Jersey*, 297 F.3d 253, 266 (3d Cir. 2002) the Third Circuit only raised a possibility that 18 hours of document review may have been done by a paralegal, remanding, without deciding the issue. *See also FB-Stark, LLC v. White*, No. CV-12-00095, 2012 U.S. Dist. LEXIS 137892, at *4-5 n.1 (D. Ariz. Sept. 26, 2012) ("documents" involved were two procedural orders, not a production by opposing party); *Microsoft Corp. v. Computer Care Ctr., Inc.*, No. 06 Civ. 1429, 2008 U.S. Dist. LEXIS 112080, at *47 (E.D.N.Y. Apr. 8, 2008) (no mention of document review); *Weinberger v. Great N. Nekoosa* (*footnote continued*)

cases actually held what Frank imputes to them, the vast majority involved fee awards in non-securities cases involving fee-shifting statutes and sanctions, not fees awarded out of a common fund from a class action.[21]

### E.   Plaintiffs' Analyst and Paralegal Rates are Reasonable

Although Frank and Behar object to the fact that Class Counsel's lodestar includes time spent by analysts and/or paralegals (*see* Frank March Br. at 26 and Behar Br. at 7), courts in the Second Circuit have repeatedly recognized that paralegals and other support personnel's time are properly included. Thus, in *In re AOL Time Warner Shareholder Derivative Litig.*, No. 02 Civ. 6302, 2010 WL 363113, at *13 (S.D.N.Y. Feb. 1, 2010), the court found that rates up to $250 per hour for paralegals "fall within the range of those commanded by leading lawyers in the

---

*Corp.*, 801 F. Supp. 804, 814 (D. Me. 1992) (partner rate disallowed for reading of Wall Street Journal); *Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1100 (2d Cir. 1977) (no mention of document review); *Tucker v. City of New York*, 704 F. Supp. 2d 347, 356 n.7 (S.D.N.Y. 2010) (bates-stamping, not substantive review of documents); *Kahlil v. Original Old Homestead Rest., Inc.*, 657 F. Supp. 2d 470, 477 (S.D.N.Y. 2009)(filing and faxing documents, no substantive review); *Simmons v. New York City Transit Auth.*, No. Civ-02-1575, 2008 U.S. Dist. LEXIS 54870, at *2 (E.D.N.Y. July 17, 2008) (no mention of document review); *Staples, Inc. v. W.J.R. Assocs.*, No. 04-Civ-904, 2007 U.S. Dist. LEXIS 65211, at *8 (E.D.N.Y. Sept. 4, 2007) (partner's assembling of exhibits could have been done by junior associate); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y. 2003) (court noted that privilege review (not substantive review) could have been done by first year associate rather than partner, "perhaps not as well"; *dicta*, since court was not awarding fees for privilege review); *Mautner v. Hirsch*, 831 F. Supp. 1058, 1076 (S.D.N.Y. 1993) (no mention of document review); *Loughner v. University of Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001) (no mention of document review); *New Mexico Citizens for Clean Air & Water v. Espanola Mercantile Co.*, 72 F.3d 830, 835 (10th Cir. 1996) (expressing "no opinion" on proper billing rate for tasks, none of which included document review); *ACLU of Fla., Inc. v. Dixie Cnty. Fla.*, No. 1:07 Civ 18-MP-6RJ, 2012 U.S. Dist. LEXIS 40513, at *3 (N.D. Fla. Mar. 23, 2012) (no mention of document review).

[21]   *Planned Parenthood*, 297 F.3d 253 (fee shifting under 42 USC § 1988); *Metropolitan Dist. Comm.*, 847 F.2d 12 (fee shifting under Clean Water Act); *FB-Stark*, 2012 U.S. Dist. LEXIS 137892 (fee shifting provision of promissory note); *Computer Care Ctr.*, 2008 U.S. Dist. LEXIS 112080 (fee shifting in copyright infringement default judgment); *Weinberger*, 801 F. Supp. 804 (no fees awarded; Frank cites dicta); *Tucker*, 704 F. Supp. 2d 347 (fee application on § 1983 excessive force claim); *Kahlil*, 657 F. Supp. 2d 470 (individual FLSA settlement); *Simmons*, 2008 U.S. Dist. LEXIS 54870 (individual ADA suit); *Staples,* 2007 U.S. Dist. LEXIS 65211 (Rule 11 sanctions in real estate suit); *Zubulake*, 216 F.R.D. 280 (expenses awarded in connection with the production of archived emails, not a settlement); *Mautner*, 831 F. Supp. 1058 (shareholder derivative settlement); *Loughner*, 260 F.3d 173 (individual FLSA suit); *ACLU v. Dixie Cnty.*, 2012 U.S. Dist. LEXIS 40513 (fees under 42 U.S.C. § 1988 in 1st Amendment litigation).

Southern District."[22]  *See also In re Comverse Techs., Inc. Sec. Litig.*, No. 06 Civ. 1825, 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) (including paralegal and support time in lodestar figure); *Sheehan v. Metropolitan Life Ins. Co.*, 450 F. Supp. 2d 321, 326 (S.D.N.Y. 2006) (quoting *Conners v. Conn. Life Ins. Co.,* No. 98 Civ. 8522, 2003 WL 188726, at *1 (S.D.N.Y. Apr. 15, 2003)) ("Under [the lodestar] approach, a baseline fee is determined by the number of hours reasonably expected, multiplied by reasonable hourly rates for attorneys and paralegals.").

As noted previously, the reasonableness of the fee sought here under the lodestar cross-check is supported by a comparison to the average lodestar multiplier in the PSLRA cases that settled in the $490 million to $690 million range that were discussed at ¶ 17 of the Coffee Declaration (the "Coffee Range") as well as PSLRA cases that settled in the $550 million to $800 million range that were discussed at ¶ 58 of the Miller Declaration (the "Miller Range").  A comparison of the requested lodestar multiplier here to the lodestar multipliers awarded in the cases in the Coffee and Miller Ranges would not be an apples-to-apples comparison if the Court were to exclude paralegals' and analysts' time from Class Counsel lodestar. That is because in 7 of the 8 cases in the Coffee or Miller Ranges, the lodestar submitted by class counsel included paralegals and/or analysts, often at rates that were far in excess of Class Counsel's paralegals and analysts here.  *See* Supp. Decl. ¶ 24.[23]

---

[22]     Note that these rates were more than 40% *higher* than the billing rates of the paralegals in this action, despite the fact that the fee submission in *AOL Time Warner* was made more than 3 years ago (and presumably rates have risen since then).

[23]     For the eighth case in the Coffee and Miller Ranges (*Lucent*, No. 00 Civ. 621 (D.N.J.)), we cannot determine for certain whether or not class counsel's lodestar included paralegal and/or analyst time, because the supporting documents are not accessible on PACER.  However, it is reasonable to assume that the lodestar included paralegals and/or analysts because the co-lead counsel in that action also served as lead or co-lead counsel in one or more of the other cases in the Ranges where the lodestar included paralegals and/or analysts.  *See* Supp. Decl. ¶ 24 n.9.

Including the paralegal and analyst time in Class Counsel's lodestar here is particularly appropriate, given the huge contributions that they made toward the prosecution of this action. Lead Counsel's analysts played a pivotal role in the massive task of reviewing, analyzing and dissembling the tangled web of Citigroup's Class Period CDOs – including CDOs that were comprised of tranches of previously-issued CDOs, which, in turn were comprised of tranches of Residential Mortgage-Backed Securities. *See* Supp. Decl. ¶¶ 21-23. The substantial work done in order to analyze these documents in connection with the drafting of the Consolidated Complaint is chronicled at length in the Joint Declation at ¶¶ 33-46. The detailed research and analysis was a major part of the reason why Plaintiffs in this action were able to meet the PSLRA's heightened pleading requirements, *see In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010), while plaintiffs in many contemporaneous lawsuits addressing CDO exposure and valuation failed to do so.[24]

### F.   Frank's Bid to Denigrate the Contract Attorney Qualifications Is Meritless

As previously explained (Reply Decl. ¶¶ 63-80), Lead Counsel hired project-specific attorneys whose backgrounds suggested that they possessed the intellect, skills and experience necessary to analyze the complex issues and concepts necessary for work on this litigation. Lead Counsel knew that the documents concerning Citigroup's CDO business would involve sophisticated financial structures and concepts, which these attorneys would need to understand in order to effectively review the documents and prepare for depositions. No computer program would be able to substitute for the work that Class Counsel need to perform here. For this reason, counsel looked for "plus factors" when assessing candidates, like high quality legal education, experience in the securities industry, experience at high caliber defense firms or with prior

---

[24]   *See, e.g.*, cases discussed at ¶¶ 125-128 of the Joint Declaration.

document reviews on complex actions, graduate degrees or professional licenses, or judicial clerkships or similar public sector experience.[25] Lead Counsel then enhanced the abilities of these attorneys to tackle their assignments by providing them with extensive training and materials.[26]   *See* Reply Decl. ¶¶ 108-29.

Class Counsel's prior submissions provided evidence of the reasonableness of the billing rates of *all* Class Counsel in this case.  *See* Fee Br. at 8.  At the February 28, 2013 hearing, this Court stated such billing rates are appropriate for contract attorneys "if in fact the contract attorneys do have comparable skills, experience and reputations to the attorneys who are regular employees of the law firms."  *See* Ex. 42 at 4-5.  Examination of the resumes of the project-specific attorneys and Lead Counsel's own attorneys reveals that the project-specific attorneys did have comparable backgrounds to those employed by Lead Counsel as measured by various *indicia*.[27]

While some project attorneys attended top ten law schools, others attended top 30 law schools, and still others regional law schools, just as Lead Counsel's regular attorneys did.  *See* Supp. Decl. ¶ 29.

Additionally, both groups of attorneys, the project attorneys and Lead Counsel's attorneys, possessed comparable work experience.  Both project attorneys and Kirby attorneys

---

[25]    Lead Counsel has summarized the project-specific attorneys' backgrounds in a chart previously supplied to the Court.  Supp. Decl. ¶¶ 25-26, Ex. 41 (charts of work performed and background).

[26]    Contrary to Mr. Frank's suggestion, the project attorneys were not all employed through an agency, but were hired through a variety of arrangements.  Some were hired directly because Lead Counsel had worked with them in the past and knew the quality of their work first hand.  Supp. Decl. 26 n.12.  Others were referred to Lead Counsel by colleagues and hired directly.  *Id.*  Moreover, some were regular "in house" Kirby McInerney attorneys, *id.*, and some continued working for Lead Counsel on other cases after the work on this action concluded, as associates, Of Counsel or project attorneys on other actions.  *Id.*

[27]    The following discussion about the project-specific attorneys' experience and qualifications are based on the resumes Lead Counsel previously submitted to the Court on March 6, 2013.

18

worked at large defense law firms, at plaintiffs' securities firms, at medium or small sized law firms, in the public sector, at corporate legal departments; had securities industry or business sector experience, or had experience with structured financial products. *Id.* at ¶ 30.

Andrew W., a graduate of Columbia Law School where he was a Harlan Fisk Stone Scholar, had worked as an associate at Lead Counsel for over three years. Contrary to Frank's accusations (Frank March Br. at 22), he was not asked to leave, but left to pursue other interests. Supp. Decl. ¶ 31.

In fact, Lead Counsel was impressed with the project attorneys' work and performance here, and thus continues to have a relationship with several of them, including Tom E., Laurie P., Belden N. and Richard W. *Id.* at ¶ 32.

Contrary to Frank's assertion, Nelson D. had prior experience doing legal work at a large securities firm. Frank is wrong to say that Michael B. could "only find work doing e-discovery at Hudson." He has worked for the last several years as a solo practitioner, and prior to that, he had years of experience at large and medium-sized corporate law firms representing banks, investment banks and other corporate entities. *Id.* at ¶ 34.

Frank neglects to mention that Gail B. served as Chief of Staff for a U.S. Congresswoman for eight years and, prior to that, had substantial litigation experience in private practice for another eight years.

Similarly, Frank ignores that Peter B. had substantive experience handling securities fraud litigation as an associate at Labaton Sucharow. Lead Counsel had also worked with Peter B. before and knew first-hand the quality of his work. *Id.* at ¶ 26 n.12.

Frank also denigrates the qualifications of several attorneys whom he grudgingly admits have substantive legal experience. Belden N. was an MIT-trained engineer with a Columbia

Law School degree who had six years of structured finance experience at a large defense firm (experience that proved invaluable on this project). Janet P. had over ten years of experience as an administrative law judge. Steven W. had over five years of complex litigation experience at large intellectual property law firms, a Masters degree in Finance and is a Ph.D. Candidate in Business. Colin S. has degrees from Harvard and Columbia Law School and over four years of litigation experience at a large defense firm, and clerked for a federal district court judge.

Frank argues that even though project attorneys are often billed as lodestar, they are not billed at the same rate as "regular law firm associates." Frank March Br. at 20. Frank does not provide any basis to suggest that contract attorneys with lower billing rates in those other cases had the same qualifications as the full-time attorneys in those cases (as they do here).

In fact, Class Counsel has compared (1) court-approved rates for project attorneys in all PSLRA cases where recoveries exceeded of $400 million to (2) class counsels' associates' billing rates in those came cases. Supp. Decl. ¶ 16 and Ex. 39. In 6 of 14 cases in this survey, the average project attorney billing rates were higher than, or less than 4% below, the average associate rate. On average, court-approved rates for contract attorneys are approximately 89.42% of the court-approved rates for full associates. *Id*. Even assuming *arguendo* these averages warrant a reduction of the project attorney lodestar here, it would not affect the reasonableness of the requested fee. If Class Counsel's project attorneys' lodestar were reduced to a rate 10.58% below the average billing rate for Class Counsel's (full time) associates, Class Counsel's overall lodestar would be reduced to $45,229,039. The requested 16.5% fee would be a multiplier of 2.15 times that reduced lodestar. That multiplier is still below the average multipliers in the comparable cases identified by Professor Coffee and by Frank (2.29 and 2.27,

respectively), and only marginally higher than the average multiplier in the comparable cases identified by Professor Miller (2.13).

Moreover, the foregoing reduction does not account for the fact that, relative to the project attorneys, Class Counsel's average associate billing rates are artificially low because: (a) Class Counsel's lodestar includes several associates who left their firms prior to the conclusion of this action (billed at their pre-departure rates, which is often lower than current rates for attorneys of similar seniority), and (b) on the whole, the project attorneys were senior to Class Counsel's associates (and therefore the associates' average billing rates were lower than the project attorneys' billing rates for that reason). If, instead, one were to simply reduce the billing rates of Class Counsel project attorneys by 10.58%, the resulting lodestar would be $48,407,801.02.[28] The requested 16.5% fee represents a multiplier of just 2.01 times that reduced lodestar. *See* Supp. Decl. ¶ 18.[29]

### G.   Frank's Bid to Denigrate the Work Performed by Contract Attorneys Is Meritless and Without Factual Basis

Frank also goes to great lengths to denigrate document review generally and the work purportedly performed by contract attorneys in this litigation particularly. *See* Frank Br. at 10-14; Frank Decl. ¶¶ 39-54; Frank March Br. at 13-24; *see also* Toothman Decl. ¶¶ 42-74, 80, 83, 85-86. But Frank's and his experts' depiction of the work done here is deeply misleading. It rests entirely on three misleading premises each of which, as detailed below, is demonstrably false.

---

[28]      Neither of these lodestar figures includes more than $1 million of Class Counsel lodestar post November 2012, which was also not included in Class Counsel's original December 7, 2012 lodestar submission (Joint Decl. Exs. D and E).

[29]      For reasons explained above (*see* p. 18 *supra*), it is respectfully submitted that such a reduction is not warranted here, as the qualifications of and work done by the project attorneys were comparable to those of Class Counsel's full-time attorneys. *See* Ex. 42 (Feb. 28, 2013 Tr.) at 4-5, 8, 9.

First, Frank erroneously conflates two quite different types of work:  (1) the substantive review work performed here of evidence produced by adverse parties, with (2) the menial document review work (such as privilege reviews, relevance reviews, *etc.*) that defendants typically undertake on review of their own documents for production to others.  The former, the work done here, is literally "case-making":  evaluating the available evidence for its ability to support the elements of plaintiffs' claims.  Indeed, cases such as this one, where fact witnesses are primarily current or former employees of the defendant corporation and are thus often unwilling to volunteer, admit or recall much of anything, plaintiffs' case relies almost wholly on the documents.  Given the extremely complex subject matter of this litigation, CDOs, the evidence here as far more difficult than usual to parse and comprehend.  The latter, the typical privilege or relevance reviews conducted by defense firms, consists of little more than clicking a few boxes (privileged, relevant, trade secrets)  constrained by binary yes/no options.

Incredibly, on the few occasions Frank and his experts acknowledge the distinction between the two types of review, they seek to turn it upside down.  For example, Toothman argues that menial privilege/relevance review requires the presence of sophisticated, lawerly analysis, while substantive evaluation of documents' meaning and utility with respect to complex factual and legal claims requires neither lawyers, nor training, nor even any humans at all.  *See* Toothman Decl. ¶¶ 42, 63, 83 (claiming substantive review can be accomplished by computers).

Second, Frank erroneously divorces the project attorneys' document review from their companion task of deposition preparation.  While the sort of privilege/relevance document review that Frank and his experts focus on is wholly separate from deposition preparation, the substantive document review work actually performed here was part and parcel of deposition preparation.  As Class Counsel previously made clear (*see* Reply Decl. ¶¶ 81-146):  (1)

document review and project attorney efforts from July 2011 through May 2012 were devoted to preparation for dozens of impending depositions of Citigroup and third-party executives (*id.* ¶¶ 130-46); (2) documents associated with such witness frequently ran in excess of a million pages (*id.* ¶ 134); and therefore (3) time spent on such work constituted the lion's share of project attorney lodestar (*id.* ¶¶ 99-101).  Thus, Frank and his experts are simply wrong that only a small fraction of project attorney time was devoted to deposition preparation.

Third and lastly, Frank and his experts proffer rates for work that is not "similar" as they contend, but for different, more menial work conducted under different circumstances and for different purposes.  Notably, although Frank argues that document review work should be awarded rates of as little as $30/hour (and no more than $100/hour), that is not what his cases say.  Those courts typically award substantially greater fees for such work.  And these are only the exception: the relevant cases that Frank does not cite, whose far greater prevalence indicates the rule, authorize and approve substantially greater rates still, generally exceeding $300/hour and comparable to those here.  *See* Section II.C-D and pp. 20-31 *supra*.

It is relatively easy for someone who did not do one stitch of work on the merits of the underlying case to come forward and belittle or demean the work of others.  But an honest assessment of the monumental task facing Class Counsel – analyzing 40 million pages of very complex and sophisticated concepts and financial instruments and being prepared to examine Citigroup officials who had worked on such matters for much of their careers – demonstrates that the project attorneys here did substantive work.  Indeed, as we have said, the work was vital to plaintiffs' effort to prosecute this claim successfully.  Had plaintiffs' project attorneys truly performed busy work in this action and not done the analyses we required, Lead Counsel would

not have been able to marshal the evidence needed for plaintiffs' class certification motion, discovery motions, or mediation briefing, or to intelligently examine witnesses.

### H.     Frank's Arguments Regarding the Work Performed Between May and mid-July 2012 Are Meritless

Frank's challenge to Counsel's post-May 8, 2012 work, after the parties "had agreed to settlement," Frank March Br. at 1, simply ignores the context in which that work was performed, which demonstrates both the work's necessity as well as its benefit to the Class.

While the parties agreed to a *settlement amount* in May 2012, they did not sign the Settlement Agreement or any other settlement documents until August 28, 2012. In the weeks immediately following the May agreement the parties were still hammering out several thorny issues. Supp. Decl. ¶¶ 51-52. In this connection, through mid-July 2012, the parties were in disagreement about the contours of the "blow" provision, and eventually the parties submitted their dispute to the mediator in a bid to reach an accord. *Id.* ¶¶ 52-54.[30] During this time, counsel continued to diligently pursue the Class's interests, which included its continued review of Defendants' production. The possibility that the parties might return to litigation mode at that point was anything but remote. Had the Mediator accepted Defendants' proposed blow provision, the Exclusion Requests ultimately received in this action would have sufficed to provide Defendants with the unilateral right to terminate the Settlement (which is exactly what Lead Counsel had feared in the May-July period when this provision remained unresolved). *Id.* ¶ 54. Contra Frank's contention that Counsel sought to pad their hours, once the parties reached an agreement on the blow provision in mid-July, Lead Counsel promptly advised all project attorneys that they should wind up all of their projects in less than a week. *Id.* ¶ 55. Thus,

---

[30]     This is a provision, present in virtually all (if not all) securities class action settlements, that gives defendants the unilateral right to walk away from the settlement on the eve of the final approval hearing if the class member exclusion requests exceed a certain (confidential) threshold. *See* Supp. Decl. ¶ 52.

review of the more than 50,000 hours worked on this case by project attorneys reveals that just 42.25 hours were billed after July 19, 2012.[31]

Frank once again swings and misses in speculating that Lead Counsel's full-time attorneys too incurred a substantial portion of its lodestar after May 2012. Frank March Br. at 11. Rather, as the Court is aware having been provided with Class Counsel's time entries *in camera*, from May 8, 2012 until December 4, 2012, when Plaintiffs filed their final approval papers, Lead Counsel's full-time attorneys worked a total 1,664.25 hours for a lodestar of $1,033,537.50 (out of a total of 115,342.33 hours worked in this action for a total lodestar of $51,438,451.15). And the vast majority of that work concerned settlement related issues. *See* Supp. Decl. ¶ 56.

## I.    Frank's and Toothman's Contemporaneous Time Record Arguments are Meritless

Frank and Toothman argue that the time records previously submitted by Class Counsel are inadequate. Frank March Br. at 10; Toothman Decl. ¶¶ 3, 32-41. These arguments seek to manufacture controversy where none exists.

First, their arguments are fundamentally absurd. Neither Frank nor Toothman argues that the project attorneys were *not* doing document review work. The time records submitted merely confirm that the project attorneys were doing what Frank says they were doing: document review.

Second, arguments that project attorneys did not keep contemporaneous time records, and that Class Counsel manufactured time records for them *post facto*, are simply false. As Class Counsel has previously made clear, (1) the project attorneys *did* keep contemporaneous time

---

[31]        *See In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 497 (E.D. Pa. 2003) (fee approved despite objection that "at least half of . . . lodestar was spent on needless confirmatory discovery."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 503 (W.D. Pa. 2003) (objection to fee for confirmatory discovery rejected where counsel continued litigating throughout ten-month negotiation of settlement).

records, (2) these records were recorded *contemporaneously* into Class Counsel's timekeeping database; and (3) although as an administrative convenience such time records were entered into Class Counsel's system as "document review," the underlying daily time records maintained by the project attorneys themselves frequently contained more detailed information.  *See* Frank March Decl. Ex. 24 (March 6, 2013 letter to the Court) at 2; *see also* Frank March Br. at 10 (admitting that project attorneys kept handwritten records of their hours).

Third, Toothman's characterization of the detailed information necessary to render time records adequate (set forth in the Toothman Declaration at ¶ 34 – "what documents were reviewed, the quantity of such documents reviewed . . . , the purpose for which they were reviewed, what the 'attorney' doing the review actually did with the knowledge thereby gained upon looking at the document (such as enter coding data), and so on.") serves only to highlight the absurdity of the argument.  Toothman's *ipse dixit* requirements for time keeping would require that project attorneys spend as much time describing their work in their time records as actually performing such work.  Toothman's requirements are especially absurd in light of his simultaneous attempts to critique Class Counsel for wasteful and inefficient uses of time.[32]

Fourth, in any event, an *objective* record of exactly what documents were reviewed by each attorney, at any and all times on each and every day, exists in the document review database. As further detailed in the Supplemental Declaration, the database, among many other things, tracked and recorded every time a document reviewer reviewed a document, and every time a document reviewer entered in and/or altered coding/evaluative information.  Supp. Decl. ¶¶ 43-

---

[32]       As further detailed in Section III.D., *infra*, Toothman manufactures purported waste and inefficiency from facts that in reality the demonstrate exact opposite:  extensive training of project attorney personnel; an organized and structured deposition preparation process; and formulation and use of an unusually sophisticated and detailed review protocol capable of matching, mastering and organizing the complexity of the evidence.

48.  But this near-infinite detail would merely confirm what is anyway not in dispute:  that the project attorneys were reviewing documents.

Fifth, whereas project attorney time submitted here contains daily time information, the fee disallowed in the single case Frank cites only broke time down into "eight, broadly-defined matters" without noting date and time. *In re PaineWebber Ltd. P'ships Litig*., No. 94 Civ. 8547, 2003 U.S. Dist. LEXIS 13377, *13 (S.D.N.Y. July 31, 2003).   When another firm in *PaineWebber* submitted time with entries listing "the name of the attorney along with the date, time, and nature of the work performed", fees were awarded.  *Id*. at *16.

Sixth and lastly, Frank ignores that when lodestar is used as a cross-check, the "need for exact records [is] not . . . imperative," *Cassese v. Williams*, No. 11-4333-Civ, 2012 U.S. App. LEXIS 23834, at *8-9 (2d Cir. Nov. 20, 2012) (quoting lower court with approval).  Counsel "is not required to record in great detail how each minute of his time was expended . . . [but] should identify the general subject matter of his time expenditures." *G.B. v. Tuxedo Union Free Sch. Dist*., No. 09 Civ. 859, 2012 U.S. Dist. LEXIS 134192, 61 (S.D.N.Y. Sept. 18, 2012).[33]  Notably, although Frank claims that "document review" is not descriptive enough, he fails to indicate what type of document review he is looking for that would not be reimbursable or reimbursable at a different rate.  *See Hnot v. Willis Grp. Holdings Ltd*., No. 01 Civ. 6558, 2008 U.S. Dist. LEXIS 28312, at *6 (S.D.N.Y. Apr. 7, 2008) (noting that most often, "courts have ordered [] reductions for block-billing only where there was evidence that the hours billed were independently unreasonable or that the block-billing was mixing together tasks that were not all compensable, or not all compensable at the same rate," and "absent evidence that plaintiffs'

---

[33]     "Block-billing, the practice 'of aggregating multiple tasks into one billing entry,' is 'not prohibited.'" *LV v. New York City Dep't of Educ.*, 700 F. Supp. 2d 510, 525 (S.D.N.Y. 2010) (citation omitted).

block-billing has obscured such unreasonable billing, the Court will not impose an across-the-board penalty").

J.      **Frank's Attempts to Manufacture a Host of Picayune, Highly-Specific Controversies Are Meritless**

In constant search for evidence of some vast conspiracy, Frank attacks irregularities, real or imagined, in several of counsels' individual time entries.  Frank March Br. at 11-12, 14, 22, 24. These challenges fail.  As set forth above, this level of detailed scrutiny is unwarranted where lodestar is just a cross-check.  *See* Section I.A., *supra*.  In any event, Frank's cherry-picking of a few odds and ends from the more than 17,000 daily time entries submitted by class counsel does not warrant a finding that the fee request is unreasonable, even if Frank's criticisms were correct.

Frank nit-picks that one of the project attorneys, Stephen D., allegedly reconstructed his resume "after the fact," because it includes his time working on this action.  Frank March Br. at 22.  According to Frank, who sees villains lurking in every shadow, this "suggest[s] that class counsel may have exaggerated the degree to which it screened its contract attorneys."  *Id.*  The actual, and far more mundane, explanation is that Counsel mistakenly submitted Stephen D.'s updated resume, and not the resume Counsel reviewed during the interview process.  To quell Frank's concerns, Counsel provides the resume it initially received, as well as the October 4, 2011 email forwarding that resume to Mr. Linden to use in connection with his interview of Stephen D.  *See* Ex. 43.

Additionally, although Frank admits he has not seen Counsels' time entries, he speculates that Lead Counsel's attorneys did not conduct the majority of project attorney interviews because project attorney Michael M.'s time sheets indicate that he interviewed a number of the candidates.  The problem with Frank's speculation is that it ignores Counsel's Reply Declaration,

which explains that each attorney on the Core Team was interviewed by at least one and often two Kirby McInerney partners, in *addition to* Michael M.  *See* Reply Decl. ¶ 65.

Frank is also incorrect in asserting that the document review protocol used here was designed by project attorney Michael M.  *See* Frank March Br. at 13, 31-32.  As prior submissions made clear, Lead Counsel did.  Reply Decl. ¶¶ 110-16.  In fact, the document review protocol/coding sheet was developed by Lead Counsel's full-time personnel, including partners Ira Press and Peter Linden.  Supp. Decl. ¶ 38.  Lead Counsel invited Michael M. to participate with them in the design, given Michael M.'s prior experience overseeing document review of similar scale in other subprime-related securities litigation.  *Id*.  Under the circumstances, receiving Michael M.'s input in the process was helpful and efficient.

Frank argues that Lead Counsel's application for PSLRA lead counsel status should have disclosed that "temporary attorneys with no . . . future at the firm would be used to conduct . . . depositions in this case."  Frank March Br. at 22 fn. 11.  It is absurd to suggest that, when the lead plaintiff motions were filed – prior to the drafting of the operative pleading, let alone review of the document production following denial of the motion to dismiss, and identification of the deponents – that counsel knew who would be taking depositions in the action three years down the road.  In any event, Frank is also wrong as a matter of fact.  No depositions were taken by attorneys "with no future at the firm."  *See* Supp. Decl. ¶ 36.

Frank contends that two project attorneys on the Supplemental Team spent an excessive amount of time preparing written deposition digests.  Frank March Br. at 11.  Plaintiffs agree and volunteer that those attorneys' time on such tasks should be reduced.  That reduction does not change the reasonableness of the requested fee under the lodestar cross-check – let alone under the percentage method.

**K.      Frank's Rehashing of his Previously-Addressed Demand for Discovery Is Without Merit, and Fails**

Frank continues to argue that he is entitled to additional, invasive discovery in connection with his objection.  *See* Frank March Br. at 31-36.  In fact, as the Court noted at the February 28, 2013 conference, "individual objectors are, by and large, not entitled to discovery."  *See* Feb. 28, 2013 Tr. at 3 (Ex. 42); *see also* Reply Br. at 24-27; Frank March Decl. Ex. 26 (Class Counsel's Jan. 28, 2013 Response to Frank's pre-motion conference letter).

Moreover, the Court, in its February 28, 2013 order, already granted Frank more discovery than is generally granted to an objector in a PSLRA case.  Frank has not demonstrated the need or entitlement to additional discovery beyond what the Court has already granted him.

Finally, there is no merit to Frank's threat that a denial of his demand for additional discovery would be "reversible error" (Frank March Br. at 31-32).  The relevant standard for reversing a district court's fee award is abuse of discretion.  *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 134 (2d Cir. 2008).  Denial of Frank's request here is not error, let alone an abuse of the Court's discretion.

## III.     FRANK'S EXPERTS AND AMICUS FAIL

### A.      Frank Himself

Frank vies to defend his self-appointed role as an expert witness on customary billing practices in the legal market, notwithstanding his inability to identify a single court recognizing him in that capacity.  Putting aside that Frank's role as a partisan advocate in this matter is utterly irreconcilable with that of an expert witness, *see* Reply Br. at 4-6, Frank ignores the elephant in the room:  His utter lack of credentials qualifying him as an expert on the matters on which he purports to opine.  Indeed, only the most self-important advocate could believe that his idiosyncratic experiences as a law firm associate provide him with the gravitas to opine on the

customary billing practices of the broader legal market, as well as its intersection with the practice of Plaintiffs' counsel in PSLRA cases. Expert qualifications are not so easily acquired.

## B.   The ACC

Nor does the purported *amicus* submission of the Association of Corporate Counsel ("ACC"), which "has advocated across the country" for lower legal costs, undermine the reasonableness of the fees sought here.[34]   *See* Letter from Amar D. Sarwal, Vice President of Chief Legal Strategist, Association of Corporate Counsel, to the Court (March 15, 2013) ("ACC Ltr."), at 2.

As a preliminary matter, the ACC's letter is procedurally improper and should be rejected as out of hand. The letter is, in essence, an unsworn declaration and is therefore inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Compounding its error, the ACC purports to provide expert testimony regarding corporate legal billing practices and the "market for legal talent," in support of Frank's objection, without complying with the requirements of Fed. R. Civ. P. 26(a)(2)(A).[35] This failure is even more problematic considering that the ACC, as an *amicus curiae*, is not a party and is not entitled to submit evidence.[36]

---

[34]      The ACC is not an objector let alone a class member, and was only granted leave to participate in the objection process as an *amicus curiae*. *See* Memo Endorsement to McNeela Ltr. [Dkt. 209]. Tellingly, the ACC's submission, which is nothing more than an advocacy piece, is signed by its Chief Legal Strategist and its Director of Advocacy. *See* ACC Ltr. at 6; *see also Nat'l Org. For Women, Inc. v. Scheidler*, 223 F.3d 615, 616-17 (7th Cir. 2000) (noting that *amicus* submissions are generally disfavored because "[a]micus curiae briefs . . . are more often than not sponsored or encouraged by one or more of the parties," and "are often attempts to inject interest-group politics . . . by flaunting the interest of a trade association . . . .").

[35]      Notably, the ACC does not provide any basis to conclude that it is competent to opine on the state of the "market for legal talent," and, in fact, does nothing more than summarize news articles. *See* ACC Ltr. at 3-4. As an initial matter, it was improper for the ACC, as an *amicus curiae*, to perform this mundane task in support of Frank's objection, since it is something that Frank could have accomplished on his own. In any event, summarizing news articles does not require any specialized knowledge or experience, and therefore the ACC's submission is not properly admitted as expert testimony.

[36]      *See High Sierra Hikers Ass'n v. Powell*, 150 F. Supp. 2d 1023, 1045 (N.D. Cal. 2001) ("*Amici* are not parties and cannot introduce evidence"); *see also Parm v. Shumate*, No. 01 Civ. 2624, 2006 U.S. Dist. LEXIS 27521, *4-5 (W.D. La. May 1, 2006) (same).

Additionally, the ACC's methodology is fatally flawed.  Although the ACC admits that the relevant inquiry is whether Class Counsel's project attorney rates are reasonable in light of the rates prevailing in the local market, the 2011 study on which it relies states that nearly 18% of all respondents are located outside the United States, and does not provide any breakdown of where the domestic respondents are located.  *See* Ex. 46 (ACC/*Wall Street Journal* Contract-Attorney Survey ("ACC Study")).  Accordingly, there is simply no way of determining whether any portion of the data is relevant to assessing the prevailing rate in the New York market.

Moreover, although the ACC touts its "30,000 members . . . employed by over 10,000 organizations," it is notable that the ACC study indicates that it received only 319 "total responses" to its request for "the hourly rates for contracts attorneys performing document review."  *See* Ex. 46 at 8.  The ACC, of course, provides absolutely no basis to conclude that the handful of responses it received is consonant with the practices of the vast majority of its member organizations that did not respond to its inquiry, let alone defines what the legal "market" does or "does not permit."  ACC Ltr. at 1.

Substantively, beyond hurling pejoratives unbecoming an *amicus*, the ACC's submission actually supports Class Counsel's position.  The ACC admits that a law firm is entitled to charge a mark-up on temporary attorneys, and that the touchstone for determining reasonableness is the prevailing rate in the local market.  *See* ACC Ltr. at 5-6.  But then, instead of looking at the prevailing rate charged by those firms that include a mark-up for contract attorneys in order to determine if Class Counsel's practice here is reasonable, the ACC engages in an apples-to-oranges comparison by looking to the non-marked-up rates reported by the limited number of companies that responded to its survey.  *See* ACC Ltr. at 2-3 (noting that 65% of respondents hired contract attorneys directly or through a hiring agency and paid no "mark-up," and a similar

percentage paid $80 or less per hour).[37]  The reason for this sleight-of-hand is obvious:  Class Counsel provided innumerable examples where courts have approved fee requests where the rates charged for the temporary attorneys included a mark-up and were in line with those sought here.  *See* Reply Decl. ¶ 58 n.9; March 8, 2013 Submission at 4-5; *see also* Moscaret Decl. ¶¶ 32-41, 55.

Moreover, the $80 non-marked-up rate the ACC cites is particularly instructive because it is roughly equivalent to the rate major defense firms pay their junior associates (an associate who earns $160,000 a year for a standard 2,000 hour billable year, earns $80 for each billable hour).  It is customary practice, particularly in New York, for those same defense firms to bill those junior associates out to clients at many multiples of their $80 per hour cost; rates which are in line with those Plaintiffs seek here.  And, as the Court is aware, the caselaw uniformly rejects treating contract attorneys differently from permanent attorneys for the purposes of determining the reasonableness of lodestar calculations.  *See* Feb. 28, 2013 Tr. at 4, 9 (Ex. 42); Reply Br. at 15-18; March 8, 2013 Submission at 4-8.

Finally, the ACC fails to comprehend that plaintiffs' firms have fundamentally different economic incentives than the large defense firms typically retained by the ACC's member organizations.  Because corporate clients pay large defense firms periodically and on an hourly basis, there is little to no risk that the defense firm will bear the cost of its contract attorneys.  Conversely, because plaintiffs' counsel are compensated only if they prevail at trial or the case settles, they carry considerable risk in connection with substantial project attorney outlays.

---

[37]     Although the ACC finds it remarkable, the fact that certain of its member organizations who hired their own contract attorneys did not pay a mark-up is embarrassingly uncontroversial.  Of course those ACC members did not mark-up the rate *they* paid to *their own* temporary employees, just like no law firm marks-up the salary it pays to its own associates.  This, of course, has nothing to do with the basic economic principle that the rate a law firm charges *a client* for those same services necessarily includes a mark-up in order for the firm to generate a profit.

Accordingly, that certain of the ACC's members purportedly permit only a modest mark-up to the fees their defense firms charge for contract attorneys provides little guidance regarding the appropriateness of Class Counsel's fee application here.

### C.   Ruane

Although Mr. Ruane's career at Wyeth was long and impressive, this does not make him an expert on market rates for project attorneys.  Mr. Ruane has not conducted any study of the matter.  His opinion – which at times contradicts the arguments made by the objector who retained him[38] – relies entirely on, and is thus limited to, his experience in one company.    His anecdotes are neither reliable nor valid as a matter of expert analysis.

Ruane does not purport to have any experience with contingency fee class counsel's use of project attorneys – certainly not in common fund cases – let alone experience that would warrant disregarding all of the caselaw and fee awards that Class Counsel previously brought to the Court's attention.  *See* Reply Decl. ¶ 58 n.9; *see also* March 8, 2013 Submission at 4-8.  In fact, Ruane does not even have firsthand knowledge of how outside *defense* counsel bills for project attorneys.  Ruane Decl. ¶ 30.  That a client would not pay outside counsel billing rates for project attorneys that it hires directly is no more relevant than the fact that a client does not pay outside counsel billing rates for full-time associates it hires in-house.

Finally, that the actual billing rates that Ruane is familiar with (*see* Ruane Decl. ¶ 33) are lower than those of Class Counsel here  is, to a large degree, a function of the fact that most of Ruane's experience came years ago when all billing rates (including those of full time attorneys) were lower than they are now.  *See* Ruane Decl. ¶¶ 2, 9.

---

[38]      Ruane maintains that there is no substantive difference between a "first pass" document review and any subsequent document review.  Ruane Decl. ¶ 14.  However, Frank previously acknowledged otherwise.  *See* Frank Dec. Decl. ¶¶ 42-43, 52.

### D.      Toothman

John W. Toothman has proffered a purported expert declaration opining that Class Counsel lodestar was inflated through: (1) inadequate time records maintained for project attorney work, primarily document review (Toothman Decl. ¶¶ 3, 32-43); (2) unsupported hourly rates for such document review work (*id*. ¶¶ 4, 44-57); and (3) excessive hours spent doing a bad job on such low-skilled, low-importance document review work (*id*. ¶¶ 5, 42-43, 47-49, 58-74, 80, 83, 86).

The Toothman Decl. does not read like an expert report, but like an ideologically driven polemic.  It is not surprising, therefore, that Toothman finds evidence of malfeasance under any rock since he makes his living from that endeavor.

In any event, as the first two of Mr. Toothman's three opinions have already been addressed and rebutted, Class Counsel focuses below on the third:  Mr. Toothman's account of the document review done here.[39]  Simply put, Toothman's descriptions and analyses of the work performed here are not just inaccurate, but fanciful.

For example, Class Counsel previously detailed how the factual complexity of this CDO case, a complexity of which the Court itself is well aware, required that Class Counsel provide extensive training to Core Team personnel.  Reply Decl. ¶¶ 119-127; *see also* ¶¶ 108-118.  This indicates that the work performed was complex and sophisticated, and that Class Counsel acted diligently to ensure it was done well.  Toothman, however, recasts this description as not only an admission that attorneys on this case were "working outside their expertise" and merited lower rates, but as indication of "an ad hoc system [] created on the fly for this case" further suggesting lack of preparation (Toothman Decl. ¶¶ 45, 67).

---

[39]     Mr. Toothman's assertion that that project attorney time records were inadequate was addressed in Section II.H., *supra*; and the issue of appropriate hourly rates for such time in Section II.C-D., *supra*.

Class Counsel also previously detailed how the extreme factual complexity of this case led them to create an unusually sophisticated document review coding system.[40]  Reply Decl. ¶¶ 108-118.  This again indicates that the work performed was complex and sophisticated, and was organized in advance to yield optimal results – which it did in Class Counsel's experience.  According to Toothman, this was not only wasteful, unreasonable and unnecessary, but simply "an overly elaborate, ad hoc document review system" that yielded only "disorganized chaos," a "roadmap to collapse," and ultimately a "failed effort."  Toothman Decl. ¶¶ 5, 64, 66, 72.  But bombast is no substitute for the facts or reasoned argument.

Additionally, Class Counsel previously detailed, at length, how Core Team document review efforts: (1) required sophisticated evaluation and analysis of extremely complex documents for their applicability and utility to plaintiffs' claims; (2) were, between June 2011 and May 2012, wholly devoted to deposition preparation (itself extensively detailed); and (3) were therefore differentiated from more menial document review work (such as reviews for privilege or relevance, where attorneys make a handful of binary yes/no decisions) typically undertaken by defense firms.  *See* Reply Decl. ¶¶ 50, 56, 81-146.  Again, the facts indicated that the work performed here was complex, demanded thoughtful analysis and evaluation, and played a real role in advancing Class Counsel's prosecution of plaintiffs' claims.

Toothman, however, counterfactually asserts that the document review work done here was "lower level work" (Toothman Decl. ¶ 61), "not high in level, complexity, nor importance"

---

[40]     Coding, as Class Counsel previously detailed (Reply Decl. ¶¶ 110-18), involved review and evaluation of documents to identify the various factual and/or legal issues to which documents related (*e.g.*, "CDO exposure," "CDO risk," "CDO valuation," "loss causation," etc.).  Application of such factual and legal issue codes to documents, and storing such coding data in the common document database, allowed attorneys to quickly search for, identify, review and evaluate precisely-defined classes of documents (*e.g.*, "all documents on CDO risk between April 1 and April 15, 2007", or "all documents from the files of Alfred Smith concerning CDO valuation," *etc.*).  The sophistication of the coding protocol designed and used by Class Counsel required more initial work, but produced better results by allowing far finer identification of potentially probative documents with respect to a wide range of discrete issues.

(¶ 49), and "indicative of the lowest tier coding" (¶ 60); *see also* ¶¶ 42-43, 47-50, 60-61.[41]

Toothman further asserts that almost none of the project attorney lodestar related to deposition work (¶ 51) and almost all of it related to work that was not related to depositions (¶¶ 33, 60-61).[42]  Most incredibly, Toothman contends that the substantive evaluation and analysis that was fundamental to document review here required neither attorney skills nor even attorney presence (and could have been done by machine), while simultaneously asserting that the document reviews conducted by defense firms – *i.e.*, reviews for privilege, relevance, and/or trade secrets, in which reviewers merely click binary yes/no boxes – require the presence of attorneys to make these sophisticated determinations (¶¶ 73, 86; *see also* ¶¶ 42, 83).  This last assertion alone is so patently absurd that it is self-refuting.

In all the foregoing, *none* of Toothman's attempts to recast or simply manufacture the facts make contact with the work performed by the project attorneys here.  Indeed, Toothman's haste to criticize Class Counsel at every opportunity leads him into a series of absurd

---

[41]     The only factual basis Toothman supplies for his assertion beyond *ipse dixit* is that the time records for project attorneys often say "document review."  Toothman Decl. ¶¶ 60-61.  Toothman prefers these two words to Class Counsel's detailed explanation of what that document review consisted of, what it required, and how it was carried out (Reply Decl. ¶¶ 81-146).  Toothman also seeks to draw an inference that the work performed was "routine document coding" rather than "provision of professional attorney services" from several time records from one attorney, which evidence that Class Counsel established procedures to monitor project attorneys' work.  Toothman Decl. ¶ 35.  This is nonsense.  The attorney in question was a member of the Supplemental Team (as Class Counsel previously made clear – *see* Reply Decl. ¶ 106 n.20) rather than of the Core Team, which was tasked near-exclusively with deposition preparation.

[42]     Again, Toothman ignores Class Counsel's detailed explanation of the work performed by Core and Supplemental Team members, which made clear that Core Team time in effective entirety from June 2011 through May 2012 was devoted to deposition preparation (which involved document review) (*see* Reply Decl. ¶ 146), and instead bases his analysis on whether time records contained the words "document" and "review" (in which case document review), or the word "deposition" (in which case deposition).  Toothman Decl. ¶¶ 33, 51, 60-61.  This "analysis" yields a result almost completely contrary to fact, for three reasons.  First, Toothman relies on an artificial distinction between document review and deposition preparation, and purports not to recognize that the former is, and was here, largely inextricable from the latter.  *See* Section II.G., *supra*.  Thus, most of the time that Toothman classifies as document review was in fact, as Class Counsel previously made clear, deposition preparation.  Second, as Class Counsel previously explained, most project attorney time when doing such document review in preparation for depositions was entered into Kirby McInerney records as "document review" as an administrative convenience, thereby making such time fall into Toothman's document review bucket.  Third, relatedly, much of the time that fell into Toothman's "deposition" bucket was time spent by Supplemental Team members on reviewing and digesting depositions.

contradictions.  For example, Toothman mocks Class Counsel for pointing out that many project attorneys were already proficient with the document database used in document review here (Relativity) (Toothman Decl. ¶ 55), but later faults Class Counsel for purported lack of familiarity with that database system (*id.* ¶ 68).  Similarly, Toothman (1) faults Class Counsel for providing insufficient documentation of project attorneys' prior experience to justify their billing rates (*id.* ¶ 44), but then (2) acknowledges that Class Counsel did provide such information but (3) none of it matters for billing rate justification (*id.* ¶¶ 52-53), because (4) what really matters is the "nature of the work being done" (*id.* ¶ 47).

Lastly, Toothman's conclusion that lodestar was inflated because document review could have been accomplished here for "well under $5 million" (*id.* ¶¶ 52, 58) ignores what is involved in evaluating, mastering and organizing such a massive body of evidence (40 million pages), let alone one relating to so complex a topic as CDOs.  Toothman asserts there was no need for any "manual coding" (*id.* ¶¶ 42, 70) – though, in a now-familiar pattern, he later abandons this untenable assertion by later admitting that "someone must be doing the coding" (*id.* ¶ 61).  Instead, Toothman seems to believe that the meaning and utility of the documents could be ascertained by a computer, without need for any living attorneys to do it (*id.* ¶¶ 42, 63-64), even as Toothman also asserts that attorneys are required for far simpler tasks that computers, suddenly, cannot do (*id.* ¶¶ 42, 73, 86).   At bottom, Toothman seems to assert that no document review was necessary at all, and that instead, when it came time to prepare for depositions, a deposing attorney could have a paralegal run some text searches (*e.g.*, all documents containing the terms "CDO" and "risk") to identify the best documents (*id.* ¶¶ 43, 63-64).  Left unsaid is that this fanciful process would then require an army of trained personnel to review the million documents responsive to such searches.  Moreover, as Class Counsel has already explained,

many of the most probative documents relevant to the matter of "CDO risk" did not have the word "risk" anywhere in them, and often did not even have the term "CDO."  *See* Reply Decl. ¶¶ 110-13.

In any event, lodestars submitted in comparable class litigation show aggregate hours that routinely exceed the total here. *See* Ex. 40.  *Id.* Specifically, in PSLRA cases that settled for between $490 million and $690 million following denial of the motion to dismiss, class counsel spent an average of 191,141 hours. *Id.*  Similarly, in PSLRA cases that settled from $550 million to $800 million, counsel spent an average of 256,457 hours. *Id.* Finally, in the cases from Frank's proposed range that following commencement of discovery, the average number of hours was 190,216.   Counsel here expended just 115,342.33 hours.  *See* Joint Decl. Ex. D.

## IV.   THE FA CAP SUPPLEMENTAL OBJECTION IS IMPROPER, AND FAILS

### A.   The Objection is Procedurally Improper

As a threshold matter, the FA CAP Plaintiffs' March 15, 2013 Supplemental Objection is untimely.  The Court-ordered deadline to file objections was December 21, 2012 (and the FA CAP Objectors in fact filed a lengthy objection prior to that deadline).  The Court's January 2, 2013 and March 3-4, 2013 orders extended that deadline, but only for Class Members to whom Notice was not mailed by the Claims Administrator prior to November 10, 2012 [*see* Dkt. Nos. 183, 207-08].   In fact, the Notice was mailed by the Claims Administrator to the FA CAP Objectors several times on or before November 9, 2012.  Supp. Decl. ¶ 57.  Accordingly, the FA CAP Plaintiffs' March 15, 2013 Objection is improper.

The FA CAP Plaintiffs' Objection is also procedurally improper insofar as it purports to be filed on behalf of an entire class of objectors.  As the court noted in *Craig v. Rite Aid Corp.*, No. 08 Civ. 2317, 2013 WL 84928, at *9 (M.D. Pa. Jan. 7, 2013), "an objection cannot filed on

behalf of an entire class of objectors." The same must be true for the uncertified class of FA CAP awardees.

Additionally, the FA CAP Plaintiffs' Supplemental Objection also fails on the merits, for the reasons set forth below.

**B.    Lead Counsel Has the Authority to Settle Claims Arising from Class Period Purchases of Citigroup Stock**

The FA CAP Objectors once again challenge Lead Counsel's authority to settle the claims of FA CAP participants who acquired Citigroup common stock during the Class Period.[43] However, they do not dispute that the Court appointed Kirby McInerney LLP as Lead Counsel and later Class Counsel for a class of investors who acquired Citigroup common stock during the applicable Class Period (pursuant to the Court's November 9, 2010 Order, the period from February 2007 through April 2008). Thus, there can be no dispute that Kirby McInerney has the authority to settle claims arising from purchases of Citigroup stock during the Class Period. So long as the Settlement does not impact any other FA CAP investments – and it does not – there is no merit to the suggestion that Class Counsel overstepped their bounds.

**C.    The Settlement Does Not Release Claims Arising From the July 2008 FA CAP Share Awards**

Once again, the FA CAP Objectors contend that the Settlement unfairly releases the July 2008 FA CAP share awards. That is simply not true. As Class Counsel and Defendants' Counsel previously noted, those shares, having been acquired after the conclusion of the Class Period, are not covered by the Settlement and are not released thereby. *See* Reply Decl. ¶¶ 172-73. The FA CAP Objectors argue once again that FA CAP shares awarded in July 2008 were

---

[43]      Despite this challenge, several of the FA Cap Objectors have filed claims in connection with this settlement (*see* Supp. Decl. ¶ 64), a curious move for investors who maintain that the Settlement should not cover their investments.

actually "purchased" during the Class Period – even though the price of the shares was not determined until several months after the conclusion of the Class Period – because FA CAP Plan Participants committed during the Class Period (in late 2007) to purchase the shares in July 2008. For reasons set forth in Class Counsel's Reply Brief (at 27-30), that is not correct.

Furthermore, assuming arguendo that the relevant "purchase" date for FA CAP shares was when the election was made to acquire those shares, the July 2007 and January 2008 FA CAP awards would be excluded from the Class. While those shares were priced and awarded during the Class Period, the election to acquire FA CAP shares in July 2007 and January 2008 was made in 2006 (prior to the start of the Class Period). *See* Reply Decl. ¶ 172. The FA CAP Objectors cannot, however, have it both ways – including the July 2007 and January 2008 FA CAP awards, because they were priced and awarded during the Class Period, while arguing at the same time that the July 2008 awards should be included, because the determinative event was the election to participate in the program, rather than the pricing and awards of the shares.

### D.     The Plan of Allocation Does Not Treat the FA CAP Objectors Unfairly

The FA CAP Objectors continue to argue that the proposed Settlement is unfair because it does not provide any additional consideration to FA CAP Plan Participants on account of their 1933 Act claims (or least those 1933 Act claims that have not yet been dismissed by this Court).[44] As noted in the Reply Brief, the FA CAP Objectors have received enhanced recovery under the Plan of Allocation. This is because they purchased their shares at a 25% discount to the applicable market prices, yet the Plan of Allocation assigns them Recognized Loss at the same level as all other Class Members. *See* Reply Br. at 30.

---

[44]     It is puzzling that the FA Cap Objectors argue, on the one hand, that the Settlement does not adequately compensate them, while on the other hand they argue that the July 2008 FA Cap share awards should be included in the Class. If the settlement is unfair and inadequate why would the FA Cap Objectors seek to have more of their purchases included in the Settlement?

The FA CAP Objectors respond with a vague assertion that some of the FA CAP shares were in fact acquired at the market price, without any discount (*see* FA CAP. March Br.[45] at 5-6 n.9).  This is simply not true.  The FA CAP Prospectus explains that the total number of shares awarded to FA CAP Plan participants was calculated by (a) taking the average closing price for Citigroup common stock on the last day of each of the 6 months preceding the award date and then (b) reducing that price by 25% (*see* Supp. Decl. ¶¶ 62-63; Ex. 44).  In other words, the total amount that they paid for their shares was 25% below the market prices in question.  Thus, not surprisingly, the sworn certifications that the FA CAP Objectors filed at the commencement of their action list just one purchase price for each FA CAP award – a price that is exactly 25% below the average of the closing prices of Citigroup common stock on the last day of each of the 6 months prior to the award date.  *See* Reply Decl. Exs. 24-29.

## V.     ALL OTHER OBJECTIONS FAIL

The only new objectors among Settlement Class Members are: (1) Eric Behar and (2) St. Stephen, Inc., Smokestack Lightening, Ltd., Orloff Family Trust (DTD 10/3/91), and Orloff Family Trust (DTD 12/13/01) (collectively, "St. Stephen").  Neither of those objections raises any issues that had not already been raised by other objectors and rebutted in Class Counsel's prior responses to those other similar objections.[46]

---

[45]      "FA Cap March Br." refers to the March 15, 2013 Memorandum of Points and Authorities in Further Support of the FA CAP Lead Plaintiffs' Objection to the Proposed Settlement and Plan of Allocation [Dkt. No. 223].

[46]      In addition, objections were received from Charles Hayden, James Dimeff, and Robert Shattuck.  None of these objectors claim to be Class Members.  The Hayden and Dimeff objections also fail.  Dimeff merely states "I am opposed to and object to the settlement," with no further explanation of what he objects to or why.  *See* Ex. 45. Hayden does not argue that the Settlement is unfair to Class Members, but, rather, wants the Settlement to include *all* holders of Citigroup stock, regardless of when they acquired it.  Finally, Shattuck previously filed an objection. His renewed objection is improper for the same reasons that his December 11, 2012 objection was improper.  *See* Reply Br. at 32-33.

A.      **Behar**

Mr. Behar's objection largely incorporates portions of Frank's December 2012 objection. In addition, Behar argues, without any attempt to cite to fee awards in comparable PSLRA cases or to address the awards in comparable PSLRA cases cited by Class Counsel, that the requested 16.5% fee is too high.

Behar also asserts, in conclusory fashion, that Class Counsel faced no real risk of non-recovery in this action.   In so arguing, Behar does not address Class Counsel's extensive citations to recent similar PSLRA cases that were dismissed, nor does Behar cite to any contrary data.  In fact, Behar's sole purported support for this assertion is law review article written in 1991, more than 4 years before the PSLRA took effect.

Behar also challenges the detail supplied by Class Counsel in connection with the lodestar cross-check.  As noted previously, the Second Circuit has held that when lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.   Moreover, Behar does not appear to have reviewed Class Counsel's March 8, 2013 submission (which per, Order of the Court, supplied an immense amount of backup with respect to Class Counsel's lodestar) nor does Behar cite to any authority for the proposition that the detail supplied in Class Counsel's December 7, 2012 and January 18, 2013 submissions was insufficient to support the lodestar cross-check here.

Behar takes further exception to the inclusion of para-professionals in Class Counsel's lodestar, an argument that was addressed in Section II.E, *supra*.  Finally, he argues that the percentage fee should be of the net settlement recovery, rather than the gross recovery – an argument that was addressed at length in Class Counsel's January 18, 2013 Reply Brief (at 10-11).

### B.      St. Stephen

The St. Stephen Objection asserts, in conclusory fashion and without citation to a single PSLRA case, that the Settlement "provides little value" and is therefore "unfair."  Similarly, without any reference to PSLRA settlements, St. Stephen argues that the lodestar multiplier that counsel seeks is too high, although it is well within the heartland of multipliers approved by courts in the Second Circuit.

These conclusory assertions are insufficient to overcome the extensive support that Class Counsel has provided for the propositions that the Settlement and the fee application are fair, and that they compare favorably to settlements and fee awards in similar cases.

### CONCLUSION

For all of the foregoing reasons and those set forth in their opening papers in support of the motions, as well as their supporting declarations, Plaintiffs respectfully request that the Court: (i) reject all objections; (ii) approve the proposed Settlement as fair, reasonable, and adequate; (iii) approve the Plan of Allocation as fair, reasonable, and adequate; (iv) approve the request for attorneys' fees and reimbursement of expenses; and (v) enter the corrected and proposed Final Judgment and Order of Dismissal with Prejudice.


Dated:  March 25, 2013                    Respectfully Submitted,

                                       **KIRBY McINERNEY LLP**


                                     By:_____*/s/ Ira M. Press*_____
                                        Ira M. Press (ipress@kmllp.com)
                                        Peter S. Linden (plinden@kmllp.com)
                                        Andrew S. McNeela (amcneela@kmllp.com)
                                        Mark A. Strauss (mstrauss@kmllp.com)
                                        Beverly Tse Mirza (bmirza@kmllp.com)
                                        825 Third Avenue, 16th Floor
                                        New York, NY 10022
                                        Tel.:  (212) 371-6600

Fax:  (212) 751-2540


*Lead Counsel for Plaintiffs*


Andrew J. Entwistle
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue
26th Floor West
New York, NY  10017
Tel.: 212-894-7200
Fax: 212-894-7272


James Allen, Sr.
ALLEN BROTHERS, P.L.L.C.
400 Monroe, Suite 220
Detroit, MI   48226
Tel.: (313) 962-7777
Fax: (313) 962-0581


Kenneth Gold
439 Griffith Street
Saugatuck, MI 49453
Tel.: (248) 310-9870


Lionel Glancy
GLANCY BINKOW & GOLDBERG
LLP
1925 Century Park East. Suite 2100
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160


William Narwold
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: 843.216.9000
Fax: 843.216.9450


45

Alan L. Kovacs
LAW OFFICE OF ALAN L. KOVACS
2001 Beacon St., Suite 106
Boston, MA 02135
Tel.: (617) 964-1177
Fax.: (617) 332-1223


Kenneth A. Elan
LAW OFFICE OF KENNETH A. ELAN
217 Broadway, Suite 606
New York, NY 10007
Tel.: (212) 619-0261
Fax.: (212) 385-2707


*Additional Plaintiffs' Counsel*

46