Subj: **In re Citigroup Securities Litigation Master File No. 07 MDL CIV 9901 (SHS)**
Date: 3/11/2013 8:07:22 A.M. Central Daylight Time
From: RDShatt@aol.com
To: bkarp@paulweiss.com, plinden@kmllp.com

**BY US MAIL**
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/1/13

## IN RE CITIGROUP SECURITIES Master File No. 07 MDL CIV 9901 (SHS) LITIGATION
:::::
## ECF CASE

To the Honorable United States District Court of the Southern District of New York

I am not a member of the plaintiff class.

The enclosure is denominated an amicus objection.

The enclosure bears two case designations, one designation being for the above captioned Citigroup case and the second designation being for IN RE BANK OF AMERICA CORP. SECURITIES, DERIVATIVE, AND EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) LITIGATION Master File No. 09 MDL 2058 (PKC), which is also pending in the Southern District of New York.

The enclosure was previously sent by US mail on December 11, 2012 to the Court and also to counsel in the Citigroup Securities Litigation. Further, the below email (with an electronic link to the enclosure) was sent to counsel in both cases on December 13, 2012:

> From: RDShatt@aol.com
> To: bkarp@paulweiss.com, plinden@kmllp.com, gcastaldo@ktmc.com, mwb@blbglaw.com, rkaplan@kaplanfox.com
> Sent: 12/13/2012 11:28:09 A.M. Central Standard Time
> Subj: Amicus curiae objection in Citigroup and Bank of America cases
> To: Plaintiffs' counsel, Citigroup Inc. counsel and Bank of America Corp. counsel
> UNITED STATES DISTRICT COURT
> SOUTHERN DISTRICT OF NEW YORK
> IN RE BANK OF AMERICA CORP. Master File No. 09 MDL 2058 (PKC)
> SECURITIES, DERIVATIVE, AND
> EMPLOYEE RETIREMENT INCOME
> SECURITY ACT (ERISA) LITIGATION
> IN RE CITIGROUP INC. Master File No. 07 MDL CIV 9901 (SHS)
> SECURITIES LITIGATION
> AMICUS CURIAE OBJECTION OF ROBERT SHATTUCK TO SETTLEMENT AND ATTORNEYS FEES
> Please be advised that a paper copy of this amicus curiae objection was mailed on December 11, 2012 to the Clerk of the Court, plaintiffs' counsel and Citicorp counsel in the above Citigroup litigation and will be mailed in due course to the Clerk of the Court, plaintiff's counsel and Bank of America counsel in the above Bank of America litigation.
> Thank you.
> Sincerely,

Robert Shattuck
3812 Spring Valley Circle
Birmingham, AL 35223
(205) 967-5586

The enclosure was originally posted on the Internet in November 2012 at URL http://robertshattuck.blogspot.com/2012/11/bank-of-america-draft-objection.html. The posting underwent revision, but it has been in its present form (the form of the enclosure) since the aforesaid mailing to the Court on December 11, 2012.

This is in the nature of an amicus letter or amicus objection to the Court, which I would understand the Court has no obligation to read or consider.

If the Court should choose to consider the enclosure, I would like to make the following brief points in this transmittal letter:

First, does this class action lawsuit and its settlement have any deterrent value and is it counter productive to the deterrence of corporate wrongdoing?

I have done extensive solicitation of regulators, state attorneys general, prosecutors, corporate management, ethics and compliance professionals, defense lawyers, and tort reform organizations, among others, to try to obtain their views on the foregoing question and for such views to be submitted to the Court. To my knowledge, none of the persons or organizations I have solicited have submitted or are going to submit their views to the Court.

Second, I would like to raise a new issue that came to my mind since December 11th, and that concerns the adequacy of the disclosure in the Notice, relative to two points. Point one is that the Notice is not very explicit, and can be fairly called opaque, in describing how untold (and unknown) numbers of selling shareholders are walking away with windfall gains in an untold (and unknown) aggregate amount and are being allowed to keep the windfall gains, and the settlement in substance is largely an arbitrary shifting around of the corresponding losses experienced by purchasing shareholders. . Point two is, if I was a purchasing shareholder, and I had a loss, I would find it objectionable if the substance of the settlement was that my loss was being arbitrarily increased because my loss was less than the loss of other purchasing shareholders, and part of their greater loss is in substance getting arbitrarily shifted to me. As to this point two as well, the Notice is not very explicit and can be fairly be called opaque, in order for members of the plaintiff class ito decide to make an objection to the settlement or not.

Third, I make the suggestion to the Court that the Court request briefs from the plaintiffs and defendants addressing the issues raised in the enclosure and also the foregoing new issue.
Since this letter and the enclosure have no legal standing for recognition by the Court, and the Court has unfettered power to consider the same, or not, at this time, I am sending this letter and enclosure by US mail only to the Court and am sending this letter by email to counsel specified in the Notice (per the above email addresses), which email has the above Internet link to the posted form of the enclosure

Respectfully submitted,

Robert Shattuck
Birmingham, AL

*Robert Shattuck*

Monday, March 11, 2013 AOL: RDShatt

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE BANK OF AMERICA CORP.      Master File No. 09 MDL 2058 (PKC)
SECURITIES, DERIVATIVE, AND
EMPLOYEE RETIREMENT INCOME
SECURITY ACT (ERISA) LITIGATION
:::::
ECF CASE


IN RE CITIGROUP INC.      Master File No. 07 MDL CIV 9901 (SHS)
SECURITIESLITIGATION
:::::
ECF CASE

AMICUS CURIAE OBJECTION OF ROBERT SHATTUCK TO SETTLEMENT AND ATTORNEYS FEES

PROCEDURAL MATTERS

This objection is being filed or will be filed in each of the above two separate cases pending in the United States district court of the Southern District of New York. Information and statements herein that pertain to a particular case appear in brackets, together with an indication of the case for which the bracketed material is pertinent.

To my knowledge, I am not a member of the plaintiff class in either case. I am an interested member of the general public and the investing public and I wish to get before the Court a statement in that capacity in the form of this amicus curiae objection.. The undersigned does not have expertise in class action litigation and may be not following proper procedures for presenting to the Court the interest of the general public and the investing public in this litigation. This objection makes citations to resources, documents and information through the Internet. This objection may not, as a matter of procedure, be wholly adequate. The undersigned may make supplemental submissions in order to make the pleading more adequate in the ways intended and sought.

[In the Citigroup case, a paper form of this objection is being mailed on December 11, 2012 to the Clerk of the Court, Defendants' Counsel, and Lead Class Counsel, at the following addresses:

Clerk of the Court
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312
Re: In re Citigroup Inc. Securities Litigation,
Case No. 07 Civ. 9901 (SHS)

Brad S. Karp, Esq.
Richard A. Rosen, Esq.
Susanna M. Buergel, Esq.
Jane B. O'Brien, Esq.
Asad Kudiya, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas

New York, NY 10019

Peter S. Linden, Esq.
Ira M. Press, Esq.
Andrew McNeela, Esq.
Kirby McInerney LLP
825 Third Avenue
New York, NY 10022

Said counsel is also being informed of this objection by email.]

[The fairness hearing in the Bank of America case does not appear set yet. A paper form of this objection will be filed in due course as becomes appropriate. Counsel in the Bank of America case will be emailed prior to any paper filing, informing hem about this objection. ]

As stated above, this objection makes citations to resources, documents and information through the Internet. URL's for these citations are not set out in the text of this objection. Electronic links for these citations can be found at this URL:
http://www.blogger.com/blogger.g?blogID=1538178679463301757#editor/target=post;postID=5659695302069533751

This objection is posted at the foregoing URL. Said posted form of this objection may be revised after a paper form of the objection is mailed.

I may be emailed at rdshatt@aol.com for any needed help to access citations made herein through the Internet.

GENERAL STATEMENT OF OBJECTION

This (and other large class action litigation) has a significant adverse effect on the protection of the public from corporate wrongdoing, because of an undue focus of such litigation on entity liability to try to deter corporate wrongdoing. This focus undermines business ethics and diverts corporate and societal resources away from a more effective deterrent of holding individually liable the officers and employees who design and carry out the corporate wrongdoing.

This adverse effect flowing from the undue focus on entity liability is augmented by insufficient attention being paid to the fact that the litigation mainly seeks transfers of amounts by and among persons in interest who are not culpable of any wrongdoing and is, at bottom, a case of unjust enrichment. Instead of being treated as the unjust enrichment case it is, the litigation is allowed to play up the wrongdoing carried out by the culpable officers and employees, and it improperly makes the same relevant to the how the unjust enrichment involving innocent persons gets resolved. If more attention was paid to the case being about unjust enrichment as between innocent persons, there would be less willingness of the Court to allow entity liability to undermine the protection of the public from corporate wrongdoing.

Further, the innocent persons in this case who have benefited from the alleged wrongdoing are largely not parties to the litigation, they will not be required to pay over their unjust enrichment to other innocent persons who have suffered harm from the wrongdoing, and the transfers among innocent parties in interest who have losses are an arbitrary shifting around of losses of those parties, decreasing the losses of some and increasing the losses of others.

The dysfunctionality of this class action securities litigation is brought into relief by the fact that they are two cases among many similar cases. An innocent shareholder who may have his losses reduced by the settlement in one of these case can, in another case, have his losses increased. All the aggregate losses in all the cases are augmented by the attorneys fees and other costs of litigation. Thus, from the point of view of the investing public, not only are these cases counterproductive in deterring corporate wrongdoing, they harm the financial market place by their arbitrary shifting around of losses that variously lessen or increase

2

the losses of investors from case to case, and that augment the aggregate of the losses by the attorneys fees and costs of litigation.

In exercising its discretion to approve the settlement and attorney fees, the Court should determine whether the interest of the public in preventing corporate wrongdoing is being served or undermined and whether the case is only about unjust enrichment as among innocent persons in interest. and how well or how poorly the settlement does justice in that regard, particularly taking into account that the innocent persons who were unjustly enriched by the wrongdoing are not parties to the litigation and will not be required to disgorge their unjust enrichment, and there is only shifting of losses around among the parties in interest who had losses and the increasing of those aggregate losses.

Attorney fees that the Court approves should presumably have a connection with the value associated with the bringing of the litigation and its disposition. If little or no justice is being done in the case as an unjust enrichment case, if it adds burdens to investors by augmenting losses that are experienced, and if there is no deterrence value to the litigation and it is wasteful of resources and counterproductive to achieving deterrence, the Court should adjust its approval of the settlement and attorney fees accordingly. The higher the attorneys fees that are approved that do not provide value, the more there will be encouragement to the bringing of litigation that is on balance detrimental to the public interest and to the goal of doing justice.

I. This litigation is counterproductive to the deterrence of corporate wrongdoing

The deterrence value or lack of deterrence value, or the extent of undermining of deterrence by this case (and other large class action litigation), cannot be exactly quantified, and the Court will need to make a judgement for itself about the same based on consideration of argumentation, relevant evidence that is adduced, and informed opinion about the same.

A. General argumentation

I submit to the Court my article Does the civil liability system undermine business ethics?. The article sets forth my general argumentation why this litigation is counterproductive to the deterrence of corporate wrongdoing.

Briefly, the components of that argumentation are that (i) entity level liability is deficient for deterring corporate wrongdoing compared to holding culpable officers and employees individually liable for their participation in designing and implementing the corporate wrongdoing, (ii) there is a diversion and waste of corporate and societal resources in litigation dealing with entity level liability that can and should be more productively expended in the making of determinations of the liability of culpable officers and employees for the corporate wrongdoing, (iii) the litigation otherwise distracts and interferes with holding officers and employees liable and responsible, (iv) the frequent outcome of settlements in which no wrongdoing is admitted fails to give guidance to the world about what is permissible under the law and what is not permissible and contributes to the undermining of deterrence of corporate wrongdoing by reason of such failure of guidance, and (v) the driving force for the untoward consequences are the plaintiff attorney compensation arrangements which require getting into the pockets of large numbers of innocent parties in interest and cannot be satisfied out of the pockets of culpable officers and employees.

B. Informed opinions about entity level versus officer and employee liability

The Court is deserving of having before it the informed opinions of a variety of organizations and persons who have special interest and expertise regarding the subject matter in question.

I have this ongoing project to find out what lawmakers, judges, regulators, state attorneys general, criminal prosecutors, corporate management, ethics and compliance officers, corporation lawyers, various academics, plaintiffs' lawyers, defense lawyers, tort reform organizations, and consumer protection organizations, think concerning the subject of the effectiveness of entity level liability versus individual officer and employee liability for deterring corporate wrongdoing.

Among other things, the Court should review my Interim project report, which I submit to the Court as part of this filing.

There has been an extreme paucity of expression of any views in response to my inquiries. There are probably impairments that prevent certain forthright and unbiased statements of views. Corporate management is most likely very adverse to exploration of whether increased officer and employee individual liability is more efficacious than entity liability for deterring corporate wrongdoing. Corporate ethics officers are under corporate management and are likely inhibited by that. This issue would seem not to provide consultants in the ethics and compliance field with any money making opportunity and there is little in it for them to speak out. State attorneys general may be conflicted inasmuch as big corporate liability (such as the recent $25 billion settlement regarding "robo-siigning" practices that is further referred to below) have significant publicity value for them, and this could impair an honest expression of beliefs by state attorneys general.

It is further noted that there seems to be a lack of academic interest and a paucity of academic research.

As part of filing this objection, my solicitation of views will be continued to try to get responses and to provide the same to the Court. These are being compiled on an ongoing basis in this Appendix A to this objection [which is not included in the paper copy of the objection being mailed on December 11, 2012 in the Citigroup case]..

[This bracketed material regards the Bank of America case: As the plaintiffs' Complaint recites, the New York and North Carolina Attorneys General, the Tarp Inspector General, the Federal Reserve, the Comptroller of the Currency, and various lawmakers have undertaken investigations of the alleged wrongdoing in the Bank of America case, and those officials and authorities may have informed opinions about the deterrent value of this particular private class action securities litigation and the settlement. Also the Court should take judicial notice, as recited in the Complaint, there has been a Securities and Exchange Commission action, and in that SEC action, Judge,Rakoff rejected the proposed $33 million settlement of the suit by Bank of America, holding that the proposed settlement was "neither fair, nor reasonable, nor adequate" because no senior Bank of America executives were sued or contributed to the settlement, and the settlement violated the SEC's "normal policy in such situations [] to go after the company executives who were responsible for the lie," and Judge Rakoff rejected the SEC's contention that it did not have grounds for bringing claims against senior Bank of America officials.]

To the extent the Court does not receive "informed opinions" of others to aid the Court in making a decision about the deterrence value of this litigation and settlement, the Court should consider the possible increased responsibility that devolves on it .to try to answer important questions others are defaulting on.

Mr. Robert Pozen, a senior lecturer at Harvard Business School and a senior fellow at the Brookings Institute, recently gave this expression of informed opinion in the Wall Street Journal that recommends more regulatory civil actions against culpable officers and employees. Also, Judge Rakoff expressed the negative view described above about entity level liagbity if the SEC does not go after culpable company executives.

C. FSGO Sec. 8B2.1(b)(6)

Sec. 8B2.1(b)(6) of the Federal Sentencing Guidelines for Organizations is particularly called to the attention of the Court in its evaluation of whether this litigation interferes with achieving deterrence by means of holding culpable officers and employees liable.

FSGO Sec. 8B2.1(b)(6) provides that:
The organization 's compliance and ethics program shall be promoted and enforced consistently throughout the organization through (A) appropriate incentives to perform in accordance with the compliance and ethics program; and (B) appropriate disciplinary measures for engaging in criminal conduct and for failing to take reasonable steps to prevent or detect criminal conduct.

4

Recently, I made inquiry of the state attorneys general, the Department of Justice, the Conference of State Bank Supervisors, the American Association of Residential Mortgage Regulators, and the Mortgage Bankers Association, concerning Sec. 8B2.1(b)(6) of the Federal Sentencing Guidelines for Organizations, and how it relates to, and may be affected by, the $25 billion settlement that was made by Ally Financial, JPMorgan Chase, Wells Fargo, Citigroup, and Bank of America regarding the alleged mortgage-servicing and home-foreclosure abuses stemming from the so-called "robo-signing" practices. The questions were, in part, prompted by the recent HUD report about the pressures that were put on bank foreclosure workers (as reported in this Wall Street Journal article).

My questions were these: Is there, or should there be, any connection between, on the one hand, the prosecution of the governmental "robo-signing" complaint, and its settlement, and, on the other hand, the defendant banks, under their compliance and ethics programs, undertaking disciplinary measures against culpable officers and employees? To what extent is it expected that Federal and state authorities will undertake criminal or civil actions against individual bank officers and employees, and will the actual or expected interface, be it facilitative or otherwise, between governmental authorities and the banks related to undertaking disciplinary measures against officers and employees (including whether and how the "robo-signing" settlement affects, or will affect, the same, be it positively or negatively)?

The responses I received from these inquiries are set forth here and they are suggestive that the settlement may impair the banks in undertaking disciplinary measures against officers and employees.

The Court should consider whether the settlement will impinge the defendant bank under FSGO Sec. 8B2.1(b)(6).

D. Whistleblowing as a deterrent to corporate wrongdoing

In reaching its decision about the deterrent value of this litigation, the Court should consider the role of whistleblowing in deterring corporate wrongdoing. If whistleblowing has an important and necessary role, that may be suggestive that this litigation ultimately has little or no deterrence value.

In 2010 the Securities and Exchange Commission, in response to the Dodd Frank legislation, proposed certain rules related to whistleblowing. These drew over one hundred comments, which may be found on the SEC website here. (I submitted a January 3, 2011 comment, which is on the website.) These comments contain a lot of informed views that relate to what is needed to deter corporate wrongdoing. In thinking about what is needed to be effective in deterring corporate wrongdoing, the Court should take particular note of comments that discuss whether whistleblowers should be able to bypass reporting wrongdoing to the corporation first and be able to go directly to the SEC without first reporting to the corporation.

E. Difficulties of imposing individual liability

There is no getting around the difficulties and time and expense that are posed by trying to make factual findings and determinations and impose individual liability on culpable officers and employees for corporate wrongdoing in the modern, complex business world..

The activities of large corporations are designed and carried out through the collective action of numerous corporate officers, employees and other agents. Amidst complexity, there are many nooks and crannies for employing deceptions and tricks to obtain wrongful gains, and there are myriads of conflicts of interest in which persons can improperly exercise their authority in one position to favor another economic interest they have in a different position. Discovering all the relevant facts and elements of wrongdoing, including identifying all the officers and employees involved and determining their respective responsibilities, can be extremely difficult, time consuming and expensive.

There is a significant quandary for the Court (and for society and lawmakers) if it is concluded that entity liability has little or no deterrence value, that individual officer and employee liability is not necessarily 100% effective in deterring corporate wrongdoing, and the latter, with whatever increased deterrent value it has above entity liability, entails difficult, expensive and time consuming legal machinery to undertake.

Compare and contrast Robert Pozen's recent op/ed piece in the Wall Street Journal urging more SEC civil actions against individuals with the Journal's own recent editorial "Where Are the Criminals?".

To boot in this quandary, persons and organizations such as state attorneys general, the Ethics & Compliance Officer Association, BRICE (the Business Roundtable Institute of Corporate Ethics), and numerous others to whom this should be important, do not appear willing to help the Court out in the decision it needs to be made.

F. Monumental wrongdoing is alleged

The particulars of the wrongdoing that is alleged are important both for thinking about what will deter and also for considering whether the same get inappropriately played up in a way that prevents the case from being disposed of as a case of unjust enrichment involving innocent parties in interest.

[For the Bank of America case, the Table of Contents, Part IV Overview, of the class action Complaint does a pretty good job of depicting the wrongdoing. I have copied and posted such Part IV Overview here.]

[For the Citigroup case, a large part of the Table of Contents of the class action Complaint does a pretty good job of depicting the wrongdoing. I have copied and posted the same here.]

G. Other governmental and regulatory involvement

In evaluating the deterrent value of the instant litigation, the Court should consider the other governmental and regulatory involvement that has taken place.

[In the Bank of America case, Paragraphs 198 through 217 the class action Complaint, indicate other governmental and regulatory involvement that has taken place relative to the Bank of America case. I also copied posted said Paragraphs 198 throught 217 here.]

H. The significance of individual defendants and corporate governance procedures

In determining the deterrent value of this litigation, the Court needs to consider the extent to which the inclusion of individual defendants in the case adds or does not add to the deterrent value of this litigation. If the litigation is settled in which only defendant bank makes a payment, and individual defendants do not contribute to the payment, there is good reason to conclude that there is no deterrent value provided by the inclusion of individual defendants. The Court could conclude that non-contribution by individual defendants is tantamount to admission that there is no added deterrent value by their inclusion as defendants.

[According to paragrph 9 of the Citigroup Settlement Agreement, Citigroup is paying the entire $590 million settlement payment, and the individual defendants are paying nothing.]

[Regarding Bank of America, the September 12, 2012 announcement that the plaintiffs made about the settlement says that Bank of America will make the $2.48 billion and and says nothing about individual defendants contributing.]

[Also regarding Bank of America, the aforesaid announcement also refers to Bank of America implementing significant corporate governance improvements. The Court needs to decide whether the inclusion of the corporate governance improvements is meaningful and significant for deterring future corporate wrongdoing or whether it is window dressing. For this, much informed opinion of others could be usefully obtained by the Court, such as from the SEC, the ethics and compliance department of Bank of America, Bank of America general counsel and outside counsel (all of whom the plaintiffs are essentially asserting failed to equip or require Bank of America with adequate corporate governance procedures and would have continued to fail in this regard and thus there is needed for Bank of America to be forced into the same by this settlement).]

I. The Court's conclusion about deterrent value

The foregoing gives much reason, argumentation and evidence that would support a Court deciding that the deterrent value of the litigation is zero or nominal and that this litigation is counterproductive to and undermines deterrence.

II. This case of unjust enrichment

A. The pattern of this case

This litigation fits into a certain pattern of securities class action cases.

In the pattern, there is an accounting fraud or other failure to disclose adverse information concerning a corporation, the stock price is "artificially inflated" and higher than what it would be if the fraud or other adverse information was known to the market, and there is buying and selling of shares on the open market at these inflated prices prior to disclosure. In these share transactions, the selling shareholders obtain the high "artificially inflated" price. After there is disclosure, the buyers, who have losses from paying the inflated price (which falls after there is disclosure), sue the corporation in a class action lawsuit. In the lawsuit against the corporation, the selling shareholders, who got the benefit of the wrongdoing that delayed disclosure and enabled them to get the "artificially inflated" price, are not parties in the lawsuit (so there is no recovery from those shareholders), and recovery of the losses is sought from the corporation.

A recovery from the corporation is effectively out of the pockets of all the current shareholders, including the shareholders who bought the stock at the artificially inflated price and have experienced losses from the wrongdoing that delayed disclosure. As a result, such recovery against the corporation merely shifts losses around among various shareholders including those who experienced losses from buying at the inflated price. This shifting of losses around arbitrarily increases the losses of some of the shareholders who experienced losses from the wrongdoing (or shifts them to current shareholders who bought their shares before the wrongdoing occurred and did not either experience a loss or get a benefit from the wrongdoing) and reduces the losses of other shareholders who experienced losses. Further, those losses that are shifted around are increased by large amounts of attorneys fees and other costs of litigation that are paid in the class action lawsuit.

The failure of the class action to get recovery from the innocent persons who benefited from the wrongdoing in question and the arbitrary shifting of losses around among those who either experience losses or got no benefit from the wrongdoing largely makes the class action highly problematic for "doing justice".

The court should take judicial notice of the frequency of these types of lawsuits.

I have been involved or attentive to several such lawsuits. In 2007 Tyco was a particularly egregious example. See this: Tyco: On snookering clients out of $460 million, which I posted on the Wall Street Journal law blog.

In 2008 I was a member of the plaintiff class in a class action against Xerox and I wrote this letter to Judge Thompson and also corresponded with the Xerox Board of Directors and others, which correspondence can be found here. I think the unspoken sentiment of the Board of Direcotrs was, "we can't help the insanity of the law and the courts that this class action results in, but the (circular) payment is coming from Xerox and not out of our hides personally, so let Xerox pay the amount and let's move on."

Also in 2008, I was a member of the plaintiff class in a class action involving Monster, Inc. I wrote this to the lead plaintiff Middlesex County and then wrote this to various governmental retirement systems.

[B. Particulars of the Bank of America case

7

In the particular corporate mayhem of this case, contemporaneously with the Merrill acquisition, BofA did a stock offering at $22 a share and got $10 billion in its coffers. In addition, during the period September 18, 2008 through January 21, 2009, there were untold billions of dollars of BofA common stock, preferred tock,debt securities, and options and other securities that were bought and sold on the open market at inflated prices (i.e., prices that were higher than if the information about the Merrill losses and bonuses were publicly known). The inflated prices that were paid in the open market transaction went into the pockets of the sellers of the common stock, preferred stock, debt securities and call options, and the buyers were in for the losses that would happen to them when the information became public and the BofA stock and other securities prices went down. Further, the BofA shareholders approved a merger in which Merrill was overvalued (associated with the non-disclosure of Merrill losses and the Merrill bonuses) and the number of BofA shares received by Merrill shareholders for their Merrill shares was in the merger was correspondingly too large. The Merrill shareholders got the benefit of this and the BofA shareholders were damaged to a corresponding extent from the merger. After the merger the Merrill shareholders became BofA shareholders, and as BofA shareholders they held more BofA shares than they should have. Further, the billions of dollars that were paid out as Merrill bonuses went into the pockets of the Merrill employees and were dollars that were drained from all the Merrill and BofA shareholders.

To try to get a handle on the losses, reference is made to the following statements made on the securities litigation website" "On January 21, 2009, investors finally learned that despite Merrill's staggering losses, BoA had allowed Merrill to pay $3.6 billion in bonuses before the merger closed. As these facts became known, the price of BoA common stock plummeted from $12.99 per share to a low of $5.10 per share, causing a market capitalization loss of approximately $50 billion."

Using this information, the purchasers of $10 billion stock offering at $22 per share experienced a loss of approximately $7.5 billion. Purchasers of BofA common stock, preferred stock, debt securities and call options between September 18, 2008 and January 21, 2009, paid inflated prices that resulted in untold billions of dollars of losses that is an unjust enrichment in the pockets of the sellers that they will keep. The Merrill shareholders are unjustly enriched by billions of dollars of too much of BofA stock that they will be allowed to keep.

The $2.4 billion payment that BofA will make in the settlement will effectively come from all the current BofA shareholders on an equal per share basis, including from current BofA shareholders who are members of the plaintiff class and from former Merrill shareholders who became and are BofA shareholders. That payment will be allocated to members of the plaintiff class on the basis of some proportionality of the losses they experienced. Former Merrill shareholders who received BofA shares in exchange for their Merrill shares in the merger are not members of the plaintiff class and will not have any portion of the payment allocated to them. While those former Merrill shareholders will not receive any portion of the payment, they will be allowed to hold onto all the BofA shares they received in the merger. This extra value the Merrill shareholders got will greatly exceed their share of the $2.4 billion payment and so they will have a net gain from the corporate wrongdoing.

BofA current shareholders who get allocated a share of the settlement payment have in part been a source of funds for that payment (i.e., to that extent they are effectively making a payment to themselves). Also there is deducted their share of the attorneys fees that the plaintiffs' lawyers will receive. Some current BofA shareholders (who did not receive their shares in exchange for exchanging Merrill shares in the merger) will effectively contribute to the Settlement Payment but receive no allocated part of the Settlement Payment.

The Wall Street Journal, December 4, 2012, reported that $177 million in fees and costs are being claimed by the plaintiffs' lawyers.]

[B. Particulars of Citigroup case

The lawsuit in the Citigroup case alleged that the defendant Citigroup Inc. and certain of its former senior officers and directors, materially misrepresented Citigroup's exposure to collateralized debt obligations

8

("CDOs"), as well as the value of those CDOs, during the during the time period from February 26, 2007 through April 18, 2008. Plaintiffs alleged that the defendants were aware of both the size of Citigroup's CDO holdings and their impairment before either of these matters were disclosed to the public, and that public disclosure regarding Citigroup's CDO exposures caused the price of Citigroup common stock to decline.

Paragraphs 1186 through 1251 of the Complaint trace the gory decline of the Citigroup stock price during the foregoing period of time and beyond. The Complaint says that, through October 2007 the price was in artificially inflated range of $45 to $53 per share. On April 18, 2008, the last day of the foregoing period the price was $25.11. On July 15, 2008, it was $14.56, on November 19, 2008 it was $6.40, and on February 20, 2009, it was $1.94.

Int the period of time leading up to February 26, 2007, untold millions of dollars of Citigroup stock was bought and sold. The extent to which misrepresentation about CDO's, whether in violation or not in violation of federal securities laws, was not present before February 26, 2007 and only started on February 26, 2007, is very unclear. Regardless, many Citigroup stock sellers before February 26. 2007, got extremely favorable prices (in light of subsequent events, and the buyers of such shares who made subsequent sales of the shares at a loss di bit share in the settlement payment and those who did not seel their shares bear a portion of the burden of the settlement payment. Such buying shareholders might even have an argument that the misrepresentations from and after February 26, 2007 caused them to hold on to their shares and casued them losses.

As to the buys and cells of Citigroup stock between February 26, 2007 (many presumably in the aforesaid $45 to $53 range) and April 18, 2008 (when the price was $25.11), sellers walked away with and pocketed untold millions of dollars from the inflated prices they received and buyers paid corresponding amounts in inflated prices. Such untold millions of dollars of inflated prices will largely not be recouped from the sellers in any way.

Buyers of Citigroup stock after April 18. 2008 who experienced substantial losses are not entitled to participate in the settlement payment by reason of such purchases but may be required to bear a share of the burden of the settlement payment.

In the banking industry mayhem that resulted in the Citigroup price going from the $45 to $ 53 range to $25.11 on April 18, 2008 and on down to $1.94 on February 20, 2009, and that caused billions of dollars of losses to Citigroup investors, the alleged misrepresentations during the period of Febrary 26, 2007 to April 18, 2008 probably played a very negligible role. Sellers of Citigroup stock, before, during and after this period of time, made sales that avoided a lot of losses for them, and buyers lost a lot by being buyers. in To the extent the alleged misrepresentations between February 26, 2007 and April 18, 2008 enabled sellers to sell at artificially inflated prices and walk away with untold millions of dollars more than they should have gotten, there seems a woeful failure of justice being done in shifting losses around among persons experiencing losses and increasing those losses by the attorneys fees and other expenses of litigation. (The plaintiffs lawyers are seeking 17% of the the $590 million plus expenses of $3,750,000. In addition the aggregate losses are increased by the millions of dollars of the defendant's attorney fees.)]

C. To summarize

In this litigation of "unjust enrichment," the parties who were unjustly enriched by the corporate wrongdoing are largely not before the Court in order for justice to be done by requiring those who were unjustly enriched to pay over to parties who were harmed by the corporate wrongdoing.

[It is noted that, in the Bank of America case, during the "artificially inflated period", there was a stock offering by Bank of America in which Bank of America received proceeds from the purchasers of the stock, as well as buying and selling of stock and securities in the open market that did not involve Bank of America as the seller.]

9

[Further, in the Bank of America case, the Merrill shareholders will be allowed to keep their unjust enrichment except they will not be allowed to share in the settlement payment, which is likely a small fraction of the unjust enrichment they are allowed to keep.]

In stark simple form, it may help to think about a shareholder A who bought one share at artificially inflated price $20 and shareholder B who bought one share at artificially inflated price $6 and the price after full disclosure goes to $5. Shareholder A has a loss from the wrongdoing of $15 and shareholder B has a loss of $1. Say the settlement payment by the corporation amounts to $.50 cents per outstanding share, and each of A and B effectively contribute $.50 to the settlement, and they receive an amount proportionate to their respective losses of $15 and $1. If the plaintiffs' attorneys receive 20%, leaving $.80 for the two shares in question, A receives $.75 and B receives $.05, meaning A's loss gets reduced by $.25 (the amount A receives of $.75 minus A's $.50 share of the corporate payment) to $14.75 and B's loss gets increased to $1.45.

That is like two people A and B being held up at gunpoint, A has $10,000 taken from him, and B has $1000 taken from him, and the law intervenes and says B must make a payment to A to decrease A's loss and increase B's loss. That is not the way the law normally operates, and the Court needs to make a conscious decision, where two shareholders, by random chance, experience different degrees of losses from an event, in this corporate class action context, the Court is compelled to allow the law to operate to cause the losses to be made more equal or whether the Court can allow the law to operate as it normally does, to wit, the innocent person having the lesser loss is not required to make a payment to a person having a greater loss in the name of making the losses more equal.

D. Solicitation of informed opinions of others

Besides soliciting informed opinions on the deterrence question, I have solicited opinions of securities regulators, securities law professors and others for their views about whether this litigation should be more viewed as a case of unjust enrichment among innocent parties and whether the law should shift around losses where there is no disgorgement from the innocent parties in interest who benefited from the wrongdoing. This is detailed in Appendix A as well. Little has been forthcoming.

III. Various things for the Court to think about

In default of expression of views by organizations and persons such as the Ethics & Compliance Officer Association, the Ethics Resource Center, the U.S. Chamber of Commerce, Business Roundtable, the National Association of Attorneys General, securities regulators, academics, and others, as set out in detail in Appendix A hereto, I feel at liberty to put forth to the Court a variety of things to think about and consider.

A. Rethinking the law of corporations

In class action lawsuits against corporations, it is much easier for a court to dispose of a case by treating the corporation as a separate entity and ignoring that there are disparate groups of persons who are the real persons in interest.

These disparate groups include shareholders, management, employees, customers, and the general public. These groups of persons gain the benefit in disparate ways if a corporation commits a wrongdoing, the groups bear the burden in disparate ways if a corporation has a liability for a wrongdoing, and even, among persons in one of the disparate groups, there can be material disparity as to the benefit obtained from a wrongdoing and the share of the burden of a liability imposed on the corporation.

Very importantly, it is usually the case that only a very small percentage of all such shareholders, management, employees, customers and members of the public have any culpability or knowledge concerning a corporate wrongdoing that is done, and the remainder have no culpability or knowledge about what was done and only, in some cases, happen to benefit from the corporate wrongdoing.

10

While it is much easier for a court to dispose of a case by treating the corporation as a separate entity and ignoring that there are disparate groups of persons who are the real parties in interest and the foregoing disparities about the real persons in interest, this leads to failure of justice being done in cases that are essentially unjust enrichment cases and also to failure of deterrence as described and discussed in this objection. .

It is further submitted that courts have rationalized their ignoring of the unjust enrichment problem/question mainly by relying on a purported deterrence benefit, i.e., ok, maybe there is not perfect justice for all the real persons in interest, but, darn it, there has been a big wrongdoing, and, darn it, someone has pay, and big, and there's the corporation to make pay. That might be fine, but what if doing things that way undermines deterrence of corporate wrongdoing, contrary to what is intended.

The cases of corporate wrongdoing are unending and are getting bigger and more of problem, and society, lawmakers, judges and others need to pay more attention to the question/problem of entity level liability versus individual officer and employee liability for deterring corporate wrongdoing.

B. The Vioxx case

While the instant case is a good example of the unjust enrichment question/problem and the deterrence question problem, another instructive case that the Court might think about is the $4.85 billion Vioxx settlement in 2009.

Where did the profits from the Vioxx drug go while it was on the market? There are various possible places. The profits may have been paid out to current shareholders in the form of dividends. The profits may have been used to compensate the current employees. Another place is that the profits may have gone into Merck's retained earnings and helped build up Merck stock price value. Before the problems of the Vioxx drug became publicly known, some shareholders, with no knowledge of the problems, sold their Merck stock and got the then Merck stock price. Persons who purchased Merck stock prior to the disclosure of the Vioxx problems paid that higher price. After the Vioxx problems were disclosed, the Merck stock price declined and all the current shareholders ultimately bore the burden of the settlement payment that Merck wound up making.

In other words, there is an unknown and possibly very significant disparity between the groups of innocent persons who received the benefit of the profits that Merck obtained while Vioxx was on the market, and the group of innocent persons who bore the burden of the settlement payment that Merck made and the respective amounts they bore. Further there are unkown and possibly significant disparities among the shareholders who bear the burden and how much they respectively benefited. A shareholder who owned stock from before Vioxx possibly comes out better to unkown extent compared to a person who bought Merck stock shortly before the Vioxx problems were disclosed. The long time holder of Merck stock possibly got a share of Vioxx profits in the form of dividends, or, if Vioxx profits went into Merck retained earning and built up the Merck share price, such a shareholder is in the end better off to an unkown extent compared to a purchaser of Merck stock shortly prior to the Vioxx problems becoming publicly known, such purchaser not having received any share of Vioxx profits in the form of dividends and his paying a higher stock price resulting from Vioxx profits going into retained earnings and that helped built up the stock price.

If, under the law, patients who used Vioxx were harmed by Vioxx for which they are entitled to compensation, those patients are also innocent persons who were harmed by the wrongdoing and their compensation comes in part from innocent persons who received a share of the Vioxx profits (i.e were unjustly enriched). and in part from innocent persons who received no share of Vioxx profits (i.e., were not unjustly enriched)

On the other hand, officers and other employees of Merck who were knowledgeable and responsible for Merck's wrongdoing may have received untold millions of dollars in compensation out of Merck's profits from Vioxx and these culpable individuals are not required to pay anything.

11

Besides the problem the law has in doing justice among patients, innocent persons who received no share of Vioxx, other innocent persons who received benefits from the Vioxx profit, and culpable offices and employees who received substantial amounts of the Vioxx profits in their compensation, there is the second problem of the deterrence effect and related societal effects.

Among other things, the making of the settlement payment by Merck left unresolved (or resolved wrongly) important societal matters, including whether Vioxx should cease to be available for those patients who, knowing of the risk, nonetheless desire to take Vioxx for its benefits, and whether a more proper use of the settlement payment would have been to pay for programs and activities that would concretely advance protective and preventive objectives related to drugs such as Vioxx, such as: greater FDA funding for post-drug approval monitoring and studies to detect adverse drug effects; design and implementation of better safeguards at the physician and patient level relative to decisions for a drug to be prescribed in a particular case; development of concrete protocols and guidelines for testing of drugs that drug companies could follow that would protect them against subsequent liability; development of concrete "conflict of interest" rules for researchers and physicians involved in testing or promoting a drug and punitive enforcement of the rules against researchers and physicians individually.

The blunderbuss approach of the Vioxx settlement that is heedless of trying to delineate what is or is not wrongful in order for society and the industry to make changes and improvements to avoid wrongdoing and prevent harm is highlighted by The Physician Payments Sunshine Act that is included in the 2010 Affordable Care Act.

As regards the deterrent value of the Vioxx settlement payment, in 2009 I wrote this email to persons who were mentioned in a book on the Vioxx case that I had read and I received these two responses, which say in part:

I agree with you that the treatment of corporations as individuals undermines business ethics. Most of the big drug companies have agreed to pay hundreds of millions of dollars to settle criminal and civil charges of fraud, and it is just a cost of doing business. Even the $1.4 billion Eli Lilly will pay for marketing Zyprexa for off-label uses is small compared with the sales income from Zyprexa. Like you, I believe the individuals within the drug companies who were responsible for unethical or illegal decisions should be held accountable, and until that happens, nothing much will change.
and
Couldn't agree more! Given the evidence that the top-end management of Merck knew about the problems with this drug, and actively tried to hide it from the regulatory agencies and the public, I still can't believe that none of them were charged with criminal negligence causing death!

Possibly judges have consciously thought their way through the foregoing two problems and find the law satisfactory (e.g., the Vioxx settlement did the right thing all around). Possibly judges have thought theetir way through the two problems, they don't think the law does the right thing, but they feel their hands are tied and they cannot do anything other than, say, approve the Vioxx settlement (and attorney fees). In the latter case, judges ought to inform the lawmakers that the judges don't think the law is doing the right thing and the lawmakers should try to fix the situation. Another possibility is that judges have not thought their way through the two problems, and, if they do think their way through the same, they may determine they have ways to do things better than in the past.

C. The SEC and its budget

To a layperson such as myself, the attorneys fees that get approved seem mindless and bear little correspondence to the value of the services rendered.

The Court might want to consider the SEC's 2013 budget request to Congress. The entire budge request for FY 2013 is $1.566 billion, of which the request for the SEC's Enforcement Division is $1.355 billion. The request states that, for FY 2011, the SEC filed 735 enforcement actions—more than ever filed in a single year in SEC history, and that the SEC obtained more than $2.8 billion in penalties and disgorgement ordered in FY 2011. The number of positions in the Enforcement Division requested for FY 2013 is 1,545.

In the 2007 Tyco securities class action litigation settlement, the requested attorneys fees were $460,000,000. On the face of it, this seems preposterously excessive when compared to the SEC's budget and the work, activities and value that said budget provides to the country..

The SEC is put to the task of justifying its budget request for the Enforcement Division as worthwhile for what the SEC does on the enforcement front, including the recoveries that are obtained. The SEC might be a good resource for evaluating whether the requested attorneys fees in this case are justified by its enforcement value, including the recovery.

D. The Affordable Care Act

The Affordable Care Act has a sense of the Senate that reads:
It is the sense of the Senate that—
(1) health care reform presents an opportunity to address issues related to medical malpractice and medical liability insurance;
(2) States should be encouraged to develop and test alternatives to the existing civil litigation system as a way of improving patient safety, reducing medical errors, encouraging the efficient resolution of disputes, increasing the availability of prompt and fair resolution of disputes, and improving access to liability insurance, while preserving an individual's right to seek redress in court; and
(3) Congress should consider establishing a State demonstration program to evaluate alternatives to the existing civil litigation system with respect to the resolution of medical malpractice claims.

The Court should ask itself why Congress thinks that there are deficiencies in the civil liability system related to medical malpractice, whether such deficiencies may have relevance to this litigation, and whether the judiciary ought to attempt to address such deficiencies.

E. The $25 billion "robo-signing" settlement

As mentioned above, in February of 2012, the federal government and 49 state attorneys general entered into a $25 billion settlement agreement with Ally Financial, JPMorgan Chase, Wells Fargo, Citigroup, and Bank of America regarding alleged mortgage-servicing and home-foreclosure abuses stemming from the so-called "robo-signing" practices. The Complaint and the Settlement Agreements can be found at this link.

This is an extremely large settlement, and the shareholder real parties in interest who bear the burden of the payment are largely innocent of the alleged wrongdoings that were perpetrated. These innocent shareholders variously may have benefited or not benefited from the wrongdoing. The extent of the harm experienced by homeowners by the wrongdoing is left unclear by the settlement.

I endeavored to make inquiry to the state attorneys general, the Department of Justice, the Conference of State Bank Supervisors, the American Association of Residential Mortgage Regulators, and the Mortgage Bankers Association related to the contribution that the settlement agreement makes for deterring wrongdoing in the future.

The settlement agreements are extensive in laying out practices to be followed in the future. Agreements about practices to be followed and other regulation affect corporate behavior.

The critical question at issue, however, is the extent of the deterrent effect of the settlement payment made by the banks the burden of which is on innocent shareholders and not by the culpable officers and employees in question.

The responses I received from these inquiries are set forth here. For good or bad reasons, basically none of the parties I made my inquiry to made any statement about whether the payment under the settlement agreements had a deterrent value for deterring future corporate wrongdoing.

IV. Decision for the Court in this case

13

It is respectfully requested that the Court think through the unjust enrichment question/problem and the deterrence question/problem in this case.

On the deterrence question/problem, the Court needs to decide whether the Court should assign any deterrence value to this litigation.

All things considered, it is submitted that no deterrence value should be given to this litigation and that the litigation is of a type that undermines deterrence of corporate wrongdoing for the various reasons discussed above.

If there is no deterrence value, or negative deterrence value, the Court needs to decide whether this case should be analyzed as a case of unjust enrichment in which, to a large extent, innocent persons who were stock sellers and who were unjustly enriched as a result of the wrongdoing and at the expense of other innocent persons are not before the Court, and those unjustly enriched persons (as well as former Merrill shareholders who were unjustly enriched with too much Bank of America stock) are not being called on to disgorge their unjust enrichment. Instead this litigation is largely shifting around in an arbitrary ways the losses that the wrongdoing caused to disparate groups of innocent persons, and further such rearranged losses are being augmented by substantial attorneys fees and other expenses of litigation.

If this unjust enrichment litigation is fundamentally flawed because innocent parties who got a benefit from the corporate wrongdoing are largely not before the Court and will not be called on to disgorge their unjust enrichment, it is within the discretion of the Court not to approve the settlement and the requested attorneys fees, and thereby send a message to lawmakers that there is a flaw that may need legislative fixing.

To help the Court think through the unjust enrichment question/problem and the deterrence question problem, at a minimum the Court require the plaintiffs and defendants to brief these problems/questions for the Court and, to the extent the Court deems advisable, requesting the submission of amicus curiae briefs from some of the various organizations and persons referred to in this pleading.

At a minimum, the Court should require the plaintiffs and the defendant bank to submit briefs about setting forth their contentions about the deterrence value of this litigation and settlement and whether the same should be treated as a case of unjust enrichment involving parties in interest who are not culpable of wrongdoing, taking particular account of the extent to which innocent parties in interest who have been unjustly enriched by the wrongdoing are not before the Court.

This objection is suggestive that there are societal interests involved that may not be adequately represented by the named parties, and the Court might consider whether and how those societal interests can be adequately represented by the named parties.

Then the Court needs to decide whether the proposed settlement agreement and requested attorneys fees are the right thing for the Court to approve in this litigation, and, if the Court does not think the same is the right thing for the Court to do, what discretion the Court has not to approve the settlement agreement and requested attorneys fee and to approve something different.

I hope, in determining what it is reasonable to pay for value received, the Court will keep in mind a comparison of, on the one hand, the SEC budge for its Enforcement Division for 2013 of $1.355 billion (and the SEC's 735 enforcement actions for 2011) and, on the other hand, the requested plaintiffs' attorneys fees and costs in these two cases of $177 million in the Bank of America case and $103 million in the Citigroup case (plus, in each case, whatever the defendants' attorneys fees are).

RESPECTFULLY SUBMITTED
Robert Shattuck
3812 Spring Valley Circle
Birmingham, AL 35223
   (205) 967-5586

*Robert Shattuck*

14