UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE CITIGROUP INC. SECURITIES
LITIGATION

09 MD 2070 (SHS)
This document relates to:
07 Civ. 9901 (SHS)


<u>OPINION</u>

SIDNEY H. STEIN, U.S. District Judge.

I.    Introduction and Summary ................................................................2

II.   Background ........................................................................................5

   A.  The Alleged Fraud Summarized ....................................................5

   B.  Pre-Settlement Procedural History ...............................................6

      1.  Consolidation of Similar Suits and Appointment of Interim
          Lead Plaintiffs and Counsel .......................................................6

      2.  Consolidated Class Action Complaint and Motion to Dismiss.
          ....................................................................................................7

      3.  Discovery and Motion for Class Certification...........................8

   C.  Settlement Negotiation and the Approval Process ......................9

      1.  Negotiations and Preliminary Approval ...................................9

      2.  Objections and the Fairness Hearing........................................12

III.  Final Approval of Class Action Settlement ................................14

   A.  Proper Notice of Class Certification and the Settlement ...........14

   B.  Fairness of the Settlement ............................................................15

      1.  The Standard for Approving a Proposed Class Action
          Settlement ..................................................................................15

      2.  Procedural Fairness: Arm's-Length Negotiations..................15

      3.  Substantive Fairness: The Grinnell Factors .............................16

      4.  Overall Fairness Evaluation.......................................................21

IV.     Final Approval of the Plan of Allocation.....................................23

V.      Fee Award ......................................................................................26

    A.   Percentage of the Fund Method with Lodestar Cross-Check....26

    B.   Assessing Reasonableness Pursuant to *Goldberger* .....................27

        1.   Time and Labor Expended by Counsel: The Lodestar ..........27

        2.   The Magnitude and Complexities of the Litigation ...............44

        3.   The Risk of the Litigation............................................................44

        4.   The Quality of Representation ..................................................45

        5.   The Requested Fee in Relation to the Settlement ...................45

        6.   Public Policy Considerations....................................................46

    C.   The Lodestar Cross-Check and the Appropriate Award ..........46

VI.     Reimbursement of Litigation Expenses ........................................48

VII.    Conclusion ....................................................................................48

**I.     INTRODUCTION AND SUMMARY**

Plaintiffs bring this securities fraud action on behalf of a class of purchasers of Citigroup, Inc. common stock against that company and certain of its officials. Plaintiffs allege that Citigroup misled investors by understating the risks associated with assets backed by subprime mortgages and overstating the value of those assets, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934; as a result, all those who purchased Citigroup common stock between February 26, 2007 and April 18, 2008 paid an allegedly inflated price. The parties have now reached a settlement of their dispute for $590 million to be paid to the class. The Court must determine whether that settlement is fair, reasonable, and adequate and what a reasonable fee for plaintiffs' attorneys should be.

On plaintiffs' unopposed motion pursuant to Federal Rule of Civil Procedure 23, the Court preliminarily approved that proposed settlement, certified the class for settlement purposes, and provided for notice to the class of the proposed settlement. In certifying the class, the Court appointed the proposed representatives as class representatives and

appointed Kirby McInerney LLP as lead counsel for the class ("Kirby," "Lead Counsel," or "Counsel"). Now before the Court are two motions: (1) plaintiffs' motion for final approval of the class action settlement and approval of the plan of allocation (Dkt. No. 164) and (2) Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses (Dkt. No. 165). The Court considered written submissions both supporting and opposing the settlement and held a fairness hearing on April 8, 2013 pursuant to Rule 23(e)(2).

The Court finds that the proposed settlement is fair, reasonable, and adequate and should be approved. Class members received adequate notice and had a fair opportunity to object or exclude themselves; very few have voiced their opposition. The settlement is procedurally sound because it was negotiated at arm's length by qualified counsel. The Court also concludes that the settlement is substantively fair. Although the $590 million recovery is a fraction of the damages that might have been won at trial, it is substantial and reasonable in light of the risks faced if the action proceeded to trial.

The Court also approves the proposed plan of allocation, subject to a clarification sought by certain objecting class members. Specifically, the issue was how to treat purchases of Citigroup stock made through an employee stock-purchase plan in which employees committed to purchases on one date, determined their price on another date based on six dates spread over six months, and then received their shares on yet another date. The Court agrees with the objectors that the substance, rather than the form, of those transactions should determine how the purchasers are compensated in connection with the settlement. For purposes of the alleged securities law violations, plan members purchased shares as the money was deducted each month, and the plan of allocation should reflect that the share price inflation at the end of each month approximates their harm.

The Court also concludes that Lead Counsel is entitled to a fee award, albeit a smaller one than it has proposed, as well as reimbursement of the requested litigation expenses. Because of the size of the settlement, the Court places particular emphasis on the lodestar cross-check. Lead Counsel undoubtedly secured an impressive recovery for the class and

legitimately expended millions of dollars in attorney and staff hours doing so. But the Court finds that Counsel's proposed lodestar is significantly overstated.

The Court makes the following deductions in the lodestar:

1) $4 million in time that one plaintiffs' firm expended in an unsuccessful attempt to become Lead Counsel and now wants the class to pay for that unsuccessful effort;

2) $7.5 million for 16,292 hours of attorneys' time spent in pursuing discovery after the parties reached an agreement to settle their dispute. That time was spent largely on "document review" by contract attorneys, a full twenty of whom were hired for the first time on or about the same day the parties notified the Court that an agreement in principle had been reached;

3) A $12 million reduction by applying a reasonable blended hourly rate for the large number of contract attorneys of $200—rather than the blended rate submitted by Lead Counsel of $466 per hour—for the 45,300 hours worked by contract attorneys; and

4) A 10% cut from the remaining balance to account for waste and inefficiency which, the Court concludes, a reasonable hypothetical client would not accept. One such unfortunate example is the 157.5 hours for $66,937.50 in requested time spent digesting a single day's deposition.

These adjustments result in a lodestar of $51.4 million, resulting in a revised lodestar of $25.1 million. Factoring the proper lodestar into the Court's analysis of the requested $97.5 million fee pursuant to *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), the Court instead awards $70.8 million in attorneys' fees, which is 12% of the $590 million common fund and represents a multiplier of 2.8 on the reduced lodestar.

## II.   BACKGROUND

### A.   The Alleged Fraud Summarized

A brief summary of plaintiffs' claims frames the Court's discussion of these motions. The allegations at issue concern Citigroup's investment in, and exposure to, risks associated with a now-infamous species of complex financial instruments: collateralized debt obligations ("CDOs") that have as some or all of their collateral residential mortgage backed securities ("RMBS"). Following dismissal by the Court of a variety of additional claims, the only claims that have survived concern Citigroup's exposure to potential mortgage-backed-CDO losses. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206 (S.D.N.Y. 2010).

The gravamen of the surviving allegations is that Citigroup's public statements painted a misleading portrait of Citigroup as relatively safe from the market's concerns about potential losses resulting from falling CDO values. From February 26, 2007 to November 4, 2007, defendants allegedly "gave the impression that Citigroup had minimal, if any, exposure to CDOs when, in fact, it had more than $50 billion in exposure," *id.* at 235—CDOs that were backed by subprime mortgages and wrongly valued at par despite objective indications that such mortgage-backed CDOs had lost value by February 2007. "On November 4, 2007, Citigroup disclosed that it held $43 billion of super senior CDO tranches simultaneously with the fact of their writedown by an expected $8-$11 billion." *Id.* at 239-40. That disclosure, plaintiffs allege, omitted "$10.5 billion in hedged CDOs" that were purportedly insured against loss, and it also overstated the CDOs' value, thus underreporting losses. *Id.* at 240. Plaintiffs contend that defendants continued to overstate the value of the CDOs until a final corrective disclosure on April 18, 2008.

As relevant here, the overall effect of these alleged misstatements was that the market overvalued Citigroup's assets, or undervalued its liabilities, and thus overvalued Citigroup common stock. Class members, purchasing based on the market price, thus paid too much for the Citigroup stock they purchased, and so plaintiffs claim as damages the amount by which they allegedly overpaid.

### B.  Pre-Settlement Procedural History

#### 1.  *Consolidation of Similar Suits and Appointment of Interim Lead Plaintiffs and Counsel*

Various plaintiffs filed a number of separate complaints against defendants in distinct class actions, each purporting to represent the class of investors in Citigroup that were allegedly harmed by defendants' misstatements or omissions. Because of the similarity of the claims, the Court consolidated the actions filed by these and other plaintiffs into a single consolidated class action, No. 07 Civ. 9901. (*See* Order dated Aug. 19, 2008, Dkt. No. 59.)

The Court also resolved a contentious battle between competing plaintiffs and counsel to be appointed as interim lead plaintiffs and interim lead counsel—though the competition was primarily between the law firms and only derivatively between their clients. Two main groups of stock purchasers were vying for the appointment. First, Jonathan Butler, M. David Diamond, David Whitcomb and Henrietta Whitcomb  (the "ATD Group") were four former owners of Automated Trading Desk, Inc. ("ATD"); they acquired their Citigroup stock pursuant to a merger in which Citigroup purchased ATD in exchange for a mix of cash and Citigroup stock. Second, a group of five institutional investment funds (the "Funds") comprised of three foreign entities, as well as the Public Employees' Retirement Association of Colorado ("COPERA") and the Tennessee Consolidated Retirement System ("TCRS"), which all purchased Citigroup stock as part of their investments. Kirby represented the ATD Group, and Entwistle & Cappucci LLP represented the Funds.

The Court found that, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), the ATD Group was the presumptive lead plaintiff because it (1) timely moved for appointment, (2) "has the largest financial interest in the relief sought by the class," and (3) made a preliminary showing that it met the typicality and adequacy requirements of Federal Rule of Civil Procedure 23(a). *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The Court found that the other movants for appointment as lead plaintiff, including the Funds, failed to rebut the presumption that ATD was the most adequate lead plaintiff. (*See* Tr. of Aug. 19, 2008 Pretrial Conference

at 11-12, Dkt. No. 111-24.) The Court appointed the ATD Group as interim lead plaintiffs and Kirby, its counsel, as interim lead counsel.

COPERA and TCRS moved to reconsider that appointment. (Dkt. No. 60.) The Court granted the motion to the extent the Funds sought limited discovery on whether the ATD Group possessed non-public information at the time of their stock acquisition; the Court, however, stayed discovery pending resolution of defendants' then-pending motion to dismiss. (Order dated Aug. 31, 2009, Dkt. No. 85.) As explained below, COPERA and TCRS subsequently withdrew their motion to reconsider.

### 2. *Consolidated Class Action Complaint and Motion to Dismiss*

Following the appointment of the ATD Group, plaintiffs filed a consolidated amended complaint (Dkt. No. 69), and then amended once more, resulting in the "Amended Consolidated Class Action Complaint" (the "Complaint") (Dkt. No. 74). Defendants moved to dismiss the Complaint, and the Court granted that motion in part and denied it in part. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 212 (S.D.N.Y. 2010).

As explained above, the Court permitted only the claims concerning Citigroup's exposure to CDO-related losses to proceed, albeit for a narrower time period and against a narrower group of defendants than alleged in the Complaint. *Id.* at 249. The Court in its opinion described the dismissed claims and the "gallimaufry of financial instruments" involved in detail and summarizes those claims here to illustrate the breadth of the claims initially asserted. *See id.* at 214. The dismissed claims concern misstatements and omissions in the following categories:

1) that Citigroup misleadingly described and overvalued its investment in so-called "Alt-A" RMBS, which are RMBS backed by mortgages one cut above subprime, *see id.* at 227-28, 241-43;

2) that Citigroup concealed its exposure to risks associated with purportedly independent structured investment vehicles and overvalued the assets those vehicles held, *id.* at 228-29, 243-44;

3) "that defendants misrepresented Citigroup's mortgage lending business" in a number of ways, *id.* at 244;

4) that defendants concealed, and then overvalued, Citigroup's

auction-rate securities holdings, *id.* at 230, 245-46;

    5)   that Citigroup similarly misled investors about its exposure to losses from leveraged loans and collateralized loan obligations, *id.* at 231, 246-47; and

    6)   finally, that Citigroup broadly misrepresented its overall financial health and solvency, *id.* at 231, 247-48.

Overall, plaintiffs alleged that defendants could see the financial-crisis writing on the walls in multiple areas of Citigroup's operations and sought to obscure or downplay the extant and future losses. The Court found the allegations sufficient to proceed as a matter of law only for claims regarding Citigroup's exposure to CDO-related losses. *Id.* at 249.

### 3.  *Discovery and Motion for Class Certification*

Following the Court's decision on defendants' motion to dismiss, the parties conducted discovery related to class certification and the merits of the sustained CDO-related claims. That discovery, which overlapped with the class certification motion and the negotiation and finalization of the settlement, was voluminous. In all, Lead Counsel and the firms that were assisting it obtained and reviewed approximately 40 million pages of documents. Defendants produced approximately 35 million pages, and third parties produced 5 million additional pages. (Joint Decl. of Ira M. Press & Peter S. Linden dated Dec. 7, 2012 ("Joint Decl.") ¶ 68, Dkt. No. 171.) Lead Counsel also deposed thirty-three defense witnesses and defended depositions of sixteen witnesses. (*See* Joint Decl. ¶¶ 75, 87.)

Pursuant to the Court's decision on Entwistle & Cappucci's motion to reconsider the appointment of the ATD Group as interim lead plaintiffs, COPERA and TCRS were permitted to conduct discovery into the ATD Group's fitness to serve as class representatives following the decision on the motion to dismiss. Instead, those funds reached an agreement with the ATD Group that the motion would be withdrawn and the two sides to the appointment dispute would join forces to seek class certification with all of them as class representatives. Thus, following class discovery, the ATD Group, COPERA, TCRS, and five other individuals together moved for class certification and proposed the entire group as class representatives. Those added individuals were John A. Baden III, Warren Pinchuck,

Anthony Sedutto, Edward Claus, and Carol Weil, all of whom purchased shares of Citigroup stock on the open market during the class period.

The motion for class certification was heavily contested. The parties submitted legal memoranda as well as five attorney declarations appending hundreds of exhibits and four expert declarations from three different experts. Defendants challenged the commonality of the class and the typicality and adequacy of the proposed representatives pursuant to Rule 23(a). They further contended that common questions did not predominate over individualized questions pursuant to Rule 23(b)(3). Much of the dispute turned on two main issues: (1) whether the unique circumstances of the ATD Group's stock acquisition via merger agreement rendered it unfit to represent the class, and (2) whether plaintiffs had demonstrated that the alleged misrepresentations were material, a showing defendants contended was required for plaintiffs to invoke a class-wide presumption of reliance on the market price such that common questions would predominate.[1]

Prior to the Court's rendering a decision on the class certification motion, the parties entered into a settlement agreement.

## C. Settlement Negotiation and the Approval Process

### 1. Negotiations and Preliminary Approval

In early 2012, the parties jointly retained Layn R. Phillips, a retired federal district judge, to mediate their settlement negotiations. The parties participated in two full-day mediation sessions and also submitted extensive written materials. (Joint Decl. ¶¶ 96-97.) That process culminated in the mediator's ultimate proposal that the parties settle the action for $590 million; the parties on May 8, 2012 agreed to accept that proposal as the basis for a formal stipulation to be submitted to the Court for approval.

_____

[1]   The U.S. Supreme Court has since held that securities fraud plaintiffs need not prove that the misrepresentations are material at the class certification stage. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, --- U.S. ---, 133 S. Ct. 1184, 1191 (2013) (abrogating *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 486 n. 9 (2d Cir. 2008)).

(*Id.* ¶ 98.) As Lead Counsel has set forth in its fee request, "[s]hortly thereafter, Lead Counsel informed the Court of the proposed Settlement." (*Id.* ¶ 99.)

In the ensuing months, the parties hashed out the details of the formal stipulation. The main outstanding issue was the so-called exclusion threshold or "blow-up" provision. Defendants were empowered to withdraw from the settlement *if* the aggregate claim value of potential class members who excluded themselves from the settlement reached a certain threshold. A lower threshold meant a greater chance that defendants would have the discretion to nullify—or "blow up"—the settlement. In May, plaintiffs and defendants initially disagreed on the correct threshold, but they again sought the mediator's assistance and agreed on the threshold by "mid-July." (Supp. Joint Resp. Decl. of Ira M. Press & Peter S. Linden dated March 25, 2013 ("Supp. Joint Resp. Decl.") ¶ 54, Dkt. No. 233.)

The parties finalized the details of the settlement and entered into the Stipulation and Agreement of Settlement dated August 28, 2012; plaintiffs then moved for preliminary approval of the settlement and certification of the class for settlement purposes. Having had the benefit of the parties' earlier reports on the settlement terms and proposed approval procedures, as well as extensive submissions on consideration of the motion for class certification, the Court granted that motion. (Order Preliminarily Approving Proposed Settlement and Providing for Notice dated Aug. 29, 2012 ("Preliminary Approval Order"), Dkt. No. 156.) In doing so, the Court certified a class of "[a]ll persons who purchased or otherwise acquired common stock issued by Citigroup during the period between February 26, 2007 and April 18, 2008, inclusive." (*See id.*) The Court set forth a schedule for providing notice to the class and procedures by which class members could, *inter alia*, submit claim forms, object to the proposed settlement or Lead Counsel's fee request, exclude themselves from the class, and appear at a fairness hearing.[2] (*Id.*) At the parties' requests, the

---

[2]    Because Citigroup initially inadvertently provided an incomplete list of stockholders to the appointed claims administrator, the Court adjourned the fairness hearing and ordered extended deadlines and additional notice for class members

*(footnote continues on next page)*

Court in September 2012 made minor modifications to the Preliminary Approval Order, including the class definition and notice procedures, in two orders. (*See* Orders dated Sept. 6, 2012 & Sept. 28, 2012, Dkt. Nos. 158, 159.)[3]

---

potentially prejudiced by the error. (*See* Order dated Jan. 2, 2013, Dkt. No. 183; *see also* Supp. Aff. of Stephen J. Cirami dated Mar. 25, 2013 ("Cirami Supp. Aff."), Ex. 36 to Supp. Joint Resp. Decl.)

[3]    The full class definition, as amended by order dated September 28, 2012 (Dkt. No. 159), reads as follows:

> All persons who purchased or otherwise acquired common stock issued by Citigroup during the period between February 26, 2007 and April 18, 2008, inclusive, or their successor in interest, and who were damaged thereby, excluding (i) the defendants named in the Complaint, (ii) members of the immediate families of the individual defendants named in the Complaint, (iii) any firm, trust, partnership, corporation, present or former officer, director or other individual or entity in which any of the Citigroup Defendants has a controlling interest or which is related to or affiliated with any of the Citigroup Defendants, and (iv) the legal representatives, heirs, successors-in-interest or assigns of any such excluded persons or entities. The Settlement Class includes persons or entities who acquired shares of Citigroup common stock during the Class Period by any method, including but not limited to in the secondary market, in exchange for shares of acquired companies pursuant to a registration statement, or through the exercise of options including options acquired pursuant to employee stock plans, and persons or entities who acquired shares of Citigroup common stock after the Class Period pursuant to the sale of a put option during the Class Period. Regardless of the identity of the person or entity that beneficially owned Citigroup common stock in a fiduciary capacity or otherwise held Citigroup common stock on behalf of third party clients or any employee benefit plans, such third party clients and employee benefit plans shall not be excluded from the Settlement Class, irrespective of the identity of the entity or person in whose name the Citigroup common stock were beneficially owned, except that any beneficiaries of such third party clients, or beneficiaries of such benefit plans who are natural persons and, who are otherwise excluded above will not share in any settlement recovery. Notwithstanding any other provision of this Agreement, the Citibuilder 401(k) Plan for Puerto Rico and the Citigroup 401(k) Plan shall qualify as members of the Settlement Class. In addition, a person who owns

*(footnote continues on next page)*

11

### 2.  *Objections and the Fairness Hearing*

#### a.  *Few class members object or exclude themselves*

The claims administrator sent notices to over 2.4 million potential class members. (Cirami Supp. Aff. ¶ 17.) Excluding a few objections from individuals who did not provide the required evidence of class membership or who provided evidence indicating they were not class members, the Court received only eleven written objections. Further, only 294 recipients of the 2.4 million notices timely submitted exclusion requests, of which only 134 provided evidence of membership in the class. (*Id.* ¶ 21.) And twenty-three of the 134 exclusions came from investors who had already commenced separate actions. (Supp. Joint Resp. Decl. ¶ 5.)

---

Citigroup common stock shall not be excluded from the settlement class solely because that common stock is held (i) in a registered or unregistered investment company (including a unit investment trust) in which any defendant in the Action has a controlling interest, or serves as an investment manager, investment adviser, or depositor; or (ii)(a) in a life insurance company separate account, or (b) in a segment or subaccount of a life insurance company's general account to the extent associated with insurance contracts under which the insurer's obligation is determined by the investment return and/or market value of the assets held in such segment or subaccount of a life insurance company's general account to the extent associated with insurance contracts under which the insurer's obligation is determined by the investment return and/or market value of the assets held in such segment or subaccount. A defendant shall be deemed to have a "controlling interest" in an entity if such defendant has a beneficial ownership interest, directly or indirectly, in more than 50% of the total outstanding voting power of any class or classes of capital stock that entitle the holders thereof to vote in the election of members of the Board of Directors of such entity. "Beneficial ownership" shall have the meaning ascribed to such term under Rule 13d-3 of the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto. Notwithstanding the foregoing, the Settlement Class shall not include Persons whose only acquisition of Citigroup common stock during the Class Period was via gift or inheritance if the Person from which the common stock was received did not themselves acquire the common stock during the Class Period.

Two objections merit discussion. The first such objection was filed by six purchasers of Citigroup stock through the company's voluntary employee stock-purchase plan—the FA Capital Accumulation Program ("FA CAP"). These FA CAP objectors are also interim lead plaintiffs in a parallel putative class action concerning Citigroup employees' stock purchases through the FA CAP, which is currently pending before this Court: *Brecher v. Citigroup, Inc.*, No. 09 Civ. 7359. Here, the FA CAP objectors contend that the Court cannot approve the settlement because, *inter alia*, the FA CAP participant class members would release certain claims without compensation and because the proposed plan of allocation does not properly compensate them.

The second detailed objection was filed pro se by Theodore H. Frank, an individual investor in Citigroup who is also an attorney and the founder of the Center for Class Action Fairness. Frank objects to Lead Counsel's fee request. He contends, *inter alia*, that the fees requested— nearly $100 million—are unreasonably high when compared with similarly sized settlements and that Lead Counsel has improperly inflated its lodestar calculation in a variety of ways. Frank focuses largely on Lead Counsel's extensive use of contract attorneys—both on whether their asserted hourly billing rates are consistent with market rates and on whether a reasonable client would pay for all of the hours included in the lodestar.

### b.   The fairness hearing

After proper notice to the class, the Court held a hearing on the fairness of the settlement and the reasonableness of the fee request on April 8, 2013. The settling parties, the FA CAP objectors, and Frank appeared, with each arguing its position regarding the pending motions. The Court also heard from plaintiffs' damages expert on the plan of allocation, and from Lead Counsel's expert on the reasonableness of the lawyers' hourly rates submitted in the request for attorneys' fees.

III.    Final Approval of Class Action Settlement

### A.   Proper Notice of Class Certification and the Settlement

Rule 23 requires notice to the class both when the class is certified pursuant to Rule 23(b)(3) and when a class action settlement has been proposed for court approval. *See* Rule 23(c)(2)(B), (e)(1). The Court provided for combined notice of both events in order to save the class the expense of a second round of class-wide notice. "As Rule 23(e)'s notice requirements are less specific than that of Rule 23(c)'s, the Court will focus on Rule 23(c)'s requirements." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 448 (S.D.N.Y. 2004) (citation omitted). The notice must describe

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Rule 23(c)(2)(B). Further, "due process and the Federal Rules require individual notice [] to 'all class members whose names and addresses may be ascertained through reasonable effort.'" *In re Global Crossing*, 225 F.R.D. at 448 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974)).

The notices distributed include all of the information that the Rules require, as well as the additional disclosures required in securities cases. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 185 (S.D.N.Y. 2012) (citing 15 U.S.C. § 78u–4(a)(7)). The Court further finds that the claims administrator provided individual notice to those class members who could "be identified through reasonable effort." *See* Fed. R. Civ. P. 23(c)(2)(B). The Court finds that the notice here complied with Rule 23 and due process.

### B.   Fairness of the Settlement

#### 1.   *The Standard for Approving a Proposed Class Action Settlement*

Settlement of the claims of a certified class requires court approval. Fed. R. Civ. P. 23(e). "A court may approve a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). Thus, the Court must scrutinize "both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores*, 396 F.3d at 116 (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).

The Court must exercise its discretion to approve or reject a settlement in light of the general judicial policy favoring settlement. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also Wal-Mart Stores*, 396 F.3d at 116 (citing *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)). Nonetheless, the policy favoring settlements generally will not substitute for rigorous scrutiny of this settlement. "[T]he Court must serve as a 'fiduciary' to protect the interests of absent class members affected by the settlement." *McBean v. City of New York*, 233 F.R.D. 377, 382 (S.D.N.Y. 2006) (quoting *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987)). Moreover, "[w]hen a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." *D'Amato*, 236 F.3d at 85; *see also Weinberger*, 698 F.2d at 73.

The Court first assesses "the negotiating process, examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983) (citing *Weinberger*, 698 F.2d at 73). The Court then considers the "substantive terms of the settlement compared to the likely result of a trial." *Id.*

#### 2.   *Procedural Fairness: Arm's-Length Negotiations*

The first indicator of the settlement's fairness is whether it was negotiated at arm's length by the parties. "As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the

best possible result for all sides." *In re PaineWebber Ltd. P'ships Litig.*
("*PaineWebber*"), 171 F.R.D. 104, 132 (S.D.N.Y. 1997). Further, a
"presumption of fairness, adequacy, and reasonableness may attach to a
class settlement reached in arm's-length negotiations between
experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*,
396 F.3d at 116 (quoting *Manual for Complex Litigation (Third)* § 30.42
(1995)). The negotiations here bear each of those hallmarks. The Court has
no doubts about the experience or ability of counsel. Nor, as explained
further below, did they lack for knowledge of this case. And the history of
the negotiations and the role of the mediator suggest that the parties
actually dealt with one another at arm's length—going so far as accepting
the mediator's proposed dollar amount. From his front row seat, the
mediator concluded that "negotiations in this case were hard fought and at
arm's-length at all times." (Decl. of Layn R. Phillips dated Nov. 19, 2012
¶ 5, Dkt. No. 168.) The Court agrees. Accordingly, the Court concludes
that the process was fair and free from collusion and that a presumption of
the settlement's fairness arises.

### 3.   *Substantive Fairness: The* **Grinnell** *Factors*

The Court must next consider whether the substantive terms of the
settlement support or rebut the presumption of fairness arising from the
arm's-length negotiations. Courts in this Circuit analyze substantive
fairness through the lens of the nine factors set forth in *City of Detroit v.
Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974):

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery
completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery;

(9) the range of reasonableness of the settlement fund [compared] to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart Stores*, 396 F.3d at 117 (quoting *Grinnell*, 495 F.2d at 463). In weighing the *Grinnell* factors, "[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell*, 495 F.2d at 462.

### a.   *The complexity, expense and likely duration of the litigation*

"As a general matter, the more complex, expensive, and time consuming the future litigation, the more beneficial settlement becomes as a matter of efficiency to the parties and to the Court." *McBean*, 233 F.R.D. at 385. Fact discovery here was nearly complete, and counsel for the parties had logged tens of thousands of hours. But because of the scope and complexity of this case, what remained was far from simple or brief, and certain to be costly. Of this there can be no doubt.

After the completion of fact discovery, the parties would undoubtedly pursue expert discovery, summary judgment motions, and pretrial motions prior to trial. A trial would then consume substantial resources, and its result would be appealable. In sum, the expense and duration of continued litigation weighs in favor of approving the settlement.

### b.   *The reaction of the class to the settlement*

A favorable reception by the class constitutes "strong evidence" that a proposed settlement is fair. *Grinnell*, 495 F.2d at 462. "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores*, 396 F.3d at 118 (quoting Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:41, at 108 (4th ed. 2002)). The numbers here overwhelmingly support approval of the settlement: a mere eleven objections in response to nearly 2.5 million notices, with only six objections challenging the settlement itself rather than the fee request or notice procedures. In addition, not a single

objection was received from any of the institutional investors that hold the majority of Citigroup stock. (*See* Supp. Joint Resp. Decl. ¶ 4.) Further, only 134 class members submitted exclusion requests. *Cf. D'Amato*, 236 F.3d at 86-87 (finding class response of eighteen objections and seventy-two exclusions from 28,000 notices weighs in favor of approval). The Court concludes that the class's reaction weighs heavily in favor of approval.

#### c.   The stage of the proceedings and the amount of discovery completed

Although discovery had largely, but not yet fully, concluded, "plaintiffs entered into settlement only after a thorough understanding of their case." *See Wal-Mart Stores*, 396 F.3d at 118. The parties completed extensive discovery that included millions of pages of documents and depositions of key witnesses on both sides. The parties had also conducted a preliminary battle of the experts, including depositions, regarding the materiality of the alleged misstatements in connection with the class certification motion. That dispute effectively foreshadowed a loss-causation debate insofar as Citigroup contested the alleged effect of the misrepresentations on the market price for Citigroup stock. Lead Counsel had ample time, documents, and information from Citigroup to develop its knowledge of the strengths—and weaknesses—of the class's claims; in filings, Counsel provided the Court with adequate factual information upon which to evaluate the fairness, reasonableness, and adequacy of the proposed settlement. Plaintiffs, in short, had more than enough information to make an informed and intelligent decision. Accordingly, this third *Grinnell* factor also weighs in favor of approval.

#### d.   The risks of continued litigation associated with maintaining the class through trial and establishing liability and damages

The road to recovery by means other than settlement was long and lacked a guardrail; the fourth, fifth, and sixth *Grinnell* factors all concern the obstacles plaintiffs faced in pursuing a final judgment in their favor. All litigation carries risk. *See PaineWebber*, 171 F.R.D. at 126. Indeed, "[i]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome." *In re Ira Haupt & Co.*, 304 F. Supp. 917, 934 (S.D.N.Y. 1969). It is no coincidence that the parties' settlement talks

18

ramped up specifically to avoid the first of these uncertainties: that the Court might deny class certification. In the class certification motion, the parties disputed, *inter alia*, the materiality of the alleged misstatements—a merits issue on which plaintiffs would have had to again prevail at summary judgment and trial. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. ---, ---, 131 S. Ct. 2179, 2185 (2011).

The most significant risks, however, concerned liability. Plaintiffs still had to prove that the alleged misstatements were false or misleading and that defendants had a duty to disclose information they had omitted from their public statements. The allegations here largely hinged on defendants' failure to provide the details of Citigroup's exposure to the super-senior tranches of CDOs, but the duty to provide those details had not been established. Further, plaintiffs would ultimately have to show that defendants had acted with fraudulent intent when making the alleged misstatements. Plaintiffs at summary judgment and trial would have to overcome defendants' arguments that Citigroup valued the CDOs in good faith, relying in part on their auditors and taking write downs when market data—the rating agency downgrades—required it. That is no small obstacle. The U.S. Securities and Exchange Commission elected not even to allege scienter-based fraud claims in its civil enforcement action against Citigroup for misleading investors about CDOs during this class period. *See* Complaint, *SEC v. Citigroup Inc.*, No. 10-cv-1277-ESH (D.D.C. July 29, 2010); *see also SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. July 31, 2012), Dkt. No. 118 (jury finding for Citigroup manager accused of fraud in connection with 2007 CDO transactions).

Finally, plaintiffs would have had to show loss causation in order to establish both liability and damages. *See generally In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). To prove liability, plaintiffs had to prove "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Omnicom*, 597 F.3d at 513 (citation omitted). Here, plaintiffs would have had to show that Citigroup's stock price fell specifically because the market learned the truth that defendants had concealed by their misstatements and omissions—not because the market learned of any of the myriad other developments in Citigroup's operations and the world financial system.

That loss causation analysis also highlights the risk that plaintiffs might not establish damages at the levels alleged. In other words, even if plaintiffs could have maintained class action status, and established defendants' liability, the question remained: could they prove that this fraud caused enough damages to justify the risk and expense of participating in a trial on the merits?

In sum, the risk that the plaintiffs might not prevail was significant. The Court concludes that the fourth *Grinnell* factor weighs heavily in favor of approval, and the fifth and sixth factors also support the conclusion that the settlement is fair and reasonable.

> *e.    The ability of the defendants to withstand a greater judgment*

Although plaintiffs initially conceded that "there is no basis to believe that Defendants are incapable of withstanding a greater judgment," they now suggest that Citigroup's solvency should not be conceded so cavalierly. (*Compare* Pls.' Mem. in Supp. of Preliminary Approval at 11, Dkt. No. 154, *with* Pls.' Mem. in Supp. of Final Approval at 18, Dkt. No. 169.) However, plaintiffs ignore that Citigroup carries insurance of unknown limits for this liability, and they fail to mention the ability of the *individual* defendants to pay more than the settlement requires them to pay—which is $0. But while the defendants' ability to pay more suggests a settlement might be unfair, "this factor, standing alone, does not suggest that the settlement is unfair." *D'Amato*, 236 F.3d at 86 (citing *PaineWebber*, 171 F.R.D. at 129).

> *f.    The range of reasonableness of the settlement fund in light of the best possible recovery and all attendant risks of litigation*

Finally, essential to analyzing a settlement's fairness is "the need to compare the terms of the compromise with the likely rewards of litigation." *Weinberger*, 698 F.2d at 73 (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)). The U.S. Court of Appeals for the Second Circuit has emphasized that "[t]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman*

*v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In other words, the question for the Court is not whether the settlement represents the highest recovery possible—which it does not—but whether it represents a reasonable one in light of the many uncertainties the class faces—which it does. The "best possible recovery" estimated at $6.3 billion is an astronomical sum, but $590 million—more than half a billion dollars—is no small sum itself, and the risk that the class would recover nothing or would recover a fraction of the maximum possible recovery must factor into the decision-making calculus.

Plaintiffs contend that, taking into account a number of variables, this is a truly impressive recovery. Those variables include the following: that the action concerned exposure to particularly complex risks associated with CDOs; that only one corporate defendant, Citigroup, can contribute to the fund; that no parallel SEC investigation or earnings restatement preceded the initiation of this suit; that related suits against some of the same defendants have failed or settled for far less; and, most of all, that the claims here require proof of scienter. (*See* Pls.' Mem. in Supp. of Mot. for Final Approval at 19-22.) Further, plaintiffs' experts point out that, for class actions with roughly equivalent alleged damages, investors have recovered a much smaller fraction of the amount claimed—a mean of 2.2% and median of 1% compared to roughly 9.4% here. (*See* Decl. of John C. Coffee, Jr. dated Dec. 6, 2012 ¶ 20, Dkt. No. 167; Decl. of Geoffrey P. Miller dated Dec. 6, 2012 ¶ 28, Dkt. No. 166 (discussing Jordan Milev, Robert Patton & Svetlana Starykh, National Economic Research Associates, *Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review*, (2011)).)

The Court need not heap superlatives on the outcome in order to conclude that these two *Grinnell* factors together weigh heavily in favor of approval. This recovery stands out in the crowd, and is well within the range of reasonableness when comparing the best possible recovery to the risks of continued litigation. Accordingly, nearly all of the *Grinnell* factors strongly support approval.

### 4. *Overall Fairness Evaluation*

The Court has pressed the parties to explain why they have agreed that the individuals allegedly responsible for Citigroup's wrongs will pay nothing in this settlement while Citigroup—that is, its current

shareholders, including many of those allegedly defrauded by defendants—foots the bill. After all, corporations only act through human beings. Indeed, the Court's concerns align with the scholarly work of one of Lead Counsel's own experts, Professor Coffee, and others. *See, e.g.,* John C. Coffee Jr., *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation*, 106 Colum. L. Rev. 1534 (2006). The Court shares Professor Coffee's concern that securities class actions in which the corporation and its insurers pay for the release of claims against its corporate officers and executives have essentially no deterrent value for those executives—the ones whose actions matter. The Court also laments that the shareholders, as owners, effectively pay the insurance premiums and any settlement amounts over the insurance coverage, such that most settlements are essentially transfers of wealth from all present shareholders to a subset of past and present shareholders, with significant sums siphoned off in the form of lawyers' fees and litigation costs. *Id.* at 1556-57.

The Court, however, concludes that the Rule 23 settlement approval process presents no occasion for the Court to consider whether plaintiffs' decision not to seek payment from the individual defendants and Citigroup's decision to use only corporate assets to pay for the release of all claims against high-ranking former employees and directors is fair to Citigroup's shareholders. As the Second Circuit has explained, district courts are to consider only whether "total compensation to class members is fair, reasonable, and adequate," not "how the defendants apportion liability for that compensation among themselves." *In re Warner Commc'ns. Sec. Litig.*, 798 F.2d 35, 37 (2d Cir. 1986). In other words, "[t]he adequacy of the settlement does not depend upon the allocation of that amount among the Defendants." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 184 F.R.D. 506, 512 (S.D.N.Y. 1999) (citing *Warner Commc'ns.*, 798 F.2d at 37) (denying class member access to sealed document detailing apportionment of defendants' payments). That the apportionment of liability here and in similar cases might not serve as a deterrent to future corporate wrongdoing is a concern for Congress and the SEC, not for a district court reviewing a securities class action settlement. *See Warner Commc'ns.*, 798 F.2d at 37; *NASDAQ Mkt.-Makers*, 184 F.R.D. at 512.

With that clarification, the Court concludes that nearly every traditional indicator of a settlement's fairness points in favor of approval of this settlement. The Court finds that it is certainly fair, reasonable, and adequate. Accordingly, the Court grants the motion for final approval of the settlement.

## IV.    FINAL APPROVAL OF THE PLAN OF ALLOCATION

"As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *PaineWebber*, 171 F.R.D. at 133. "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (citations and quotation marks omitted). "A reasonable plan may consider the relative strength and values of different categories of claims." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) (citing *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004)).

The plan of allocation in this action (the "Plan") derives from the alleged corrective disclosures and the market's reaction to those disclosures. Plaintiffs' expert estimated the portion of the drop in price following each corrective disclosure that is attributable to revelation of the information that the misstatements concealed pursuant to the law governing loss causation. The Plan then treats that portion of the price-drop as the estimated inflation in the price of Citigroup stock for the period between the prior corrective disclosure (or the start of the class period) and that corrective disclosure. The resulting schedule of estimated share-price inflation is the foundation for the Plan:

| Transaction Date | Per Share Price Inflation |
|---|---|
| 2/26/07 – 11/4/07 | $4.94 |
| 11/5/07 | $3.38 |
| 11/6/07 – 11/18/07 | $1.72 |
| 11/19/07 – 1/14/08 | $1.15 |
| 1/15/08 | $0.71 |

| 1/16/08 – 4/18/08 | $0.10 |
|---|---|

The inflation at the time of each class member's purchase is the per share harm she initially sustained due to the alleged fraud. If, however, the class member sold before the final corrective disclosure, the Plan then subtracts from the harm at the time of purchase the inflation in the price she received at the time of sale. The result—the total harm at purchase minus gain at sale—is each class member's "Recognized Loss." Once all class members' Recognized Losses are determined, the Plan provides for a proportional allocation of the net settlement fund. In other words, if the total Recognized Loss of all class members is triple the amount of the settlement fund that remains after deducting costs and fees, each class member will receive one third of their Recognized Loss. No one has filed any substantive objection to the fairness of that formula.

The principal objection to the Plan comes from the FA CAP objectors and relates to the application of its underlying formula to FA CAP participants' purchases. Class members who acquired their Citigroup stock through the FA CAP's employee stock-purchase plan did not purchase their shares in traditional open market transactions, and so the Court must clarify the application of the Plan to their purchases.

The FA CAP operated as follows: In December, before the start of each calendar year, employees eligible to participate in the FA CAP decided whether to receive part of their compensation for the year in the form of Citigroup stock. The participant agreed to have a certain amount of his pre-tax paycheck deducted each month to be applied to the purchase of stock. But the stock was awarded after completing each six-month block of employment based on an average of the closing price at the end of each of those six months, less a 25% discount. For example, the employee would elect to participate throughout 2007 in December 2006. Each month, money was deducted from his paycheck. In early July, he received an award based on his contributions over the prior six months and an average of the closing price on the last trading day of each month from January to June. If the participant had committed $1,000 per month and the average of the six closing prices was $40, such that the price after discount was $30, the participant in July was awarded 200 shares ($6,000 divided by $30). That cycle repeated for July 2007 through December 2007 based on the same December 2006 election, with shares then awarded in January 2008. Thus,

for each award, the participant commits in December, the price is determined using market prices from six different days spread over six months (January to June or July to December), and the shares are then awarded shortly after the final price input is determined.

The parties contend that only the July 2007 and January 2008 awards should be compensated under the Plan because those are the only *awards* that occurred during the class period: February 26, 2007 – April 18, 2008. The FA CAP objectors contend that the July 2008 award should also be included to the extent that participants committed during the class period, paid into the FA CAP during the class period in the form of both labor and payroll deductions, and paid a price determined in part by class period market prices. In substance, objectors contend, the transaction occurs in monthly installments even if the shares are awarded in semi-annual blocks; those monthly withdrawals and price-inputs determined the effect of the fraud on their purchases and so should determine their compensation here.

The Court agrees with objectors. The settling parties' formalistic view is inconsistent with the "flexib[ility]" required when applying Section 10(b) of the Exchange Act. *See SEC v. Zandford*, 535 U.S. 813, 819 (2002); *Superintendent of Ins. v. Banker's Life & Cas. Co.*, 404 U.S. 6, 12 (1971). Section 10(b) broadly prohibits fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). The employees, having already committed to participate, each month had money taken from their salaries to purchase shares based on the market price at the end of each month. The alleged fraud affected FA CAP participants' purchase of the security in monthly increments, and so too should their remedy be calculated in monthly increments. Treating the purchase as occurring in monthly installments for purposes of the Plan better accords with the substance of the transactions and so better "effectuate[s] [the statute's] remedial purposes." *See Zandford*, 535 U.S. at 819. Of course, the FA CAP participants cannot have it both ways. If the January, February, and March installments of the July 2008 award are included, then the January installment of the July 2007 award must be excluded because it precedes the start of the class period.

In sum, the Court concludes that the basis for the Plan is rational, and that the Plan is fair and adequate. The share-price inflation schedule reflects that "the injuries claimed by different class members have been sustained under significantly different . . . factual circumstances." *See PaineWebber*, 171 F.R.D. at 133. The effect of the fraud on the market price, and thus the harm suffered by purchasers, changed each time the market learned more of the truth. The Court interprets the Plan to apply to the FA CAP objectors in precisely the manner they propose. Accordingly, the Court grants the motion for final approval of the proposed plan of allocation.

## V.   FEE AWARD

### A.   Percentage of the Fund Method with Lodestar Cross-Check

Courts traditionally award plaintiffs' counsel fees in class actions based on either a reasonable percentage of the settlement fund or an assessment by the court of the market value of the work plaintiffs' attorneys performed. The former is known as the percentage of the fund method, and the latter is the lodestar method. In complex securities fraud class actions, courts have long observed that the "the trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases." *In re Beacon Assocs. Litig.*, No. 09 Civ. 777 (CM), 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013); *see also, e.g., In re Avon Prods., Inc. Sec. Litig.*, No. 89 Civ. 6216 (MEL), 1992 WL 349768 (S.D.N.Y. Nov. 6, 1992). In fact, the "trend" of using the percentage of the fund method to compensate plaintiffs' counsel in major securities fraud class actions is now firmly entrenched in the jurisprudence of this Circuit.

But that method does not render the lodestar irrelevant. "It bears emphasis that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (citation omitted). Part of the reasonableness inquiry is a comparison of the lodestar to the fees awarded pursuant to the percentage of the fund method "[a]s a 'cross-check.'" *Wal-Mart Stores*, 396 F.3d at 123 (quoting *Goldberger*, 209 F.3d at

50). Moreover, as Lead Counsel's own expert recognizes, the lodestar cross-check is particularly important in so-called mega-fund settlements such as this one. (Miller Decl. ¶ 32.) The cross-check is crucial because "economies of scale could cause windfalls in common fund cases" with large funds, again such as this one. *See Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 52). For that same reason, "courts have traditionally awarded fees for common fund cases in the lower range of what is reasonable." *Id.* With that background, the Court considers the reasonableness of Kirby's request for $97.5 million in attorneys' fees—an award of roughly 16.5% of the $590 million fund.

### B.   Assessing Reasonableness Pursuant to *Goldberger*

Courts in this Circuit determine reasonableness by reference to the factors set forth in *Goldberger v. Integrated Resources, Inc.*, and known as the *Goldberger* factors:

> (1) the time and labor expended by counsel;
>
> (2) the magnitude and complexities of the litigation;
>
> (3) the risk of the litigation . . . ;
>
> (4) the quality of representation;
>
> (5) the requested fee in relation to the settlement; and
>
> (6) public policy considerations.

*Wal-Mart Stores*, 396 F.3d at 121 (quoting *Goldberger*, 209 F.3d at 50). The Court will consider each factor in turn.

### 1.   *Time and Labor Expended by Counsel: The Lodestar*

Assessing the extent of time and labor expended effectively entails an estimate of Lead Counsel's lodestar. *See Febus v. Guardian First Funding Grp., LLC*, 870 F. Supp. 2d 337, 339 (S.D.N.Y. 2012) (citation omitted). The lodestar is "based upon the number of hours reasonably expended by counsel on the litigation multiplied by a reasonable hourly rate." *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006) (citing *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989)).

Lead Counsel and the law firms that worked with it expended vast numbers of hours and should be compensated for their efforts. What is in dispute is whether all of those hours and the hourly rates proffered—to translate those hours into a hypothetical fee—are reasonable. "Because the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable." *In re IPO Sec. Litig.*, 671 F. Supp. 2d 467, 506 (S.D.N.Y. 2009) (citing *Goldberger*, 209 F.3d at 50). Similarly, the Court need not determine with precision a reasonable hourly rate for each attorney. But the lodestar serves little purpose as a cross-check if it is accepted at face value.

The Court first identifies hours that it concludes were not reasonably expended for purposes of Lead Counsel's lodestar. The hours at issue include the following: (1) Entwistle & Cappucci's work unsuccessfully seeking appointment as lead counsel; (2) vast numbers of hours spent on discovery after settlement was reached, largely by contract attorneys; and (3) instances of waste and inefficiency that require an across-the-board lodestar cut. The Court next determines that a reasonable client, on balance, would accept the rates submitted for associates, counsel, partners and support staff, but would not pay the proffered associate-level rates for the services of contract attorneys to review documents.

> ### a.   *Hours reasonably expended*

The Court's task is to probe "the validity of the representations that a certain number of hours were usefully and reasonably expended." *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994).

> i.   The $4 million in lodestar that Entwistle & Cappucci expended unsuccessfully attempting to become lead counsel is not compensable.

Not every hour worked by every attorney who seeks to represent a class is due compensation from the class. Lead Counsel has included in the lodestar the hours incurred by attorneys at other firms that were assisting Kirby in prosecuting this action, including the hours of Entwistle & Cappucci. But Entwistle & Cappucci's hours are not limited to its work *assisting* Lead Counsel; those hours include $4 million Entwistle &

28

Cappucci spent attempting to secure appointment as lead counsel for itself—including its motion to reconsider the Court's appointment of Kirby as lead counsel. The hours Entwistle & Cappucci spent unsuccessfully seeking appointment should not yield compensation from a class they were not appointed to represent. Lead Counsel cannot, by later choosing Entwistle & Cappucci to assist its efforts, convert the hours Entwistle spent unsuccessfully attempting to become lead counsel into compensable time.

"It is well established that the common fund doctrine permits attorneys whose work created a common fund for the benefit of a group of plaintiffs to receive reasonable attorneys' fees from the fund." *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010). Although courts have typically applied that doctrine to compensate attorneys who performed work in the early stages of a class action but were not selected as lead counsel, such work is compensable only to the extent the attorney's work "confer[red] substantial benefits on the class." *Id.* at 87. As interim lead counsel, Kirby was free to seek assistance from other firms, including from recently competing movants for the same position, and to include in the lodestar the work those firms reasonably performed under Kirby's supervision in prosecuting the case. But the decision by Kirby to seek the assistance of Entwistle & Cappucci cannot turn $4 million in time Entwistle & Cappucci spent opposing Kirby's appointment as lead counsel into cash for the lawyers.

Kirby's arguments in favor of including Entwistle & Cappucci's hours prior to the alliance between those firms are the following: (1) that Entwistle & Cappucci was attempting to benefit the class because that firm was attempting to be appointed interim lead counsel and represent the class; (2) that the contestation of the interim appointment is itself a benefit to the class insofar as competition yields the best representative; and (3) that some of Entwistle & Cappucci's hours benefitted the class insofar as the ultimate consolidated complaint incorporated at least in part Entwistle & Cappucci's prior work product.

Lead Counsel's first argument is premised upon an untenable read of the case law that confuses intentions with impact; the work must have actually benefited the class. *See In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005) (striking from lodestar unappointed counsel's hours

because "their efforts do not appear appreciably to have benefitted the Class"). Accepting Lead Counsel's position would permit various competing firms to extract compensation for duplicative work. Further, it would encourage appointed counsel to choose their co-counsel not for their skill or knowledge but for the portfolio of lodestar-inflating work already completed.

Lead Counsel's second argument actually supports the inclusion of Kirby's hours, but not the inclusion of Entwistle & Cappucci's. The Court agrees that the interim appointment process is necessary to the progress of the action, and that the class benefits from the selection of capable counsel. The Court selected Kirby, the action proceeded, and the class thus benefited from Kirby's efforts to secure appointment. But the Court rejected Entwistle & Cappucci's arguments on behalf of the Funds against Kirby's appointment; Entwistle & Cappucci and its clients even abandoned those arguments in withdrawing their motion for reconsideration. Kirby cannot seriously argue that those unsuccessful efforts to remove Kirby conferred substantial benefits on the class. *See id.* (unappointed counsel had "not establish[ed] why they should be compensated for, among other things, seeking but failing to be appointed lead counsel").

Finally, the third argument is meritorious as a matter of doctrine but not supported on this record. Courts have invoked the common fund doctrine to award unappointed counsel "reasonable compensation" for unique work that in fact benefited the class. *See Victor*, 623 F.3d at 87. But "non-lead counsel is not automatically entitled to an award from a common fund each time one of its claims is utilized in the complaint that lead counsel ultimately files." *Id.* Entwistle & Cappucci has argued that its work on the Funds' complaint was incorporated into the operative consolidated complaint and thus benefitted the class. Neither Entwistle & Cappucci nor Kirby has identified any specific allegations that would not have been included but for Entwistle's pre-appointment efforts; they have only identified many allegations that were included in both the Funds' complaint and the consolidated complaint. Nor, more specifically, have they shown that their efforts added to the complaint a claim that survived the motion to dismiss. Work that is otherwise non-compensable cannot be billed to the class based only on Counsel's say-so that the work conferred

an unspecified benefit. Lead Counsel have failed to carry their burden of demonstrating that Entwistle & Cappucci's work prior to those firms' union as co-counsel conferred a substantial benefit on the class.

Accordingly, the Court will strike from the lodestar Entwistle & Cappucci's hours that were not undertaken at Kirby's direction. The impermissible hours are a not-insignificant fraction of the total lodestar. Indeed, Entwistle & Cappucci's pre-appointment lodestar dwarfs even that of Lead Counsel for the same time period. (*See* Pre- and Post-Lead Plaintiff Appointment, Ex. D to Pls.' Resp. to Court's Mar. 1, 2013 Order ("Fee App. Supp."), Dkt. No. 211.) The Court strikes $4 million from the lodestar, which is Entwistle & Cappucci's time for pre-complaint investigation, drafting its complaint, and opposing the appointment of Kirby. (*See* Entwistle Attorney Time Details, Ex. A to Fee App. Supp. (all entries up through Jan. 18, 2011 ).) To put these hours in perspective, that part of Entwistle & Cappucci's lodestar simply dedicated to seeking appointment and opposing Kirby's appointment—$1.5 million—is more than *double* the lodestar that all plaintiffs' firms spent opposing defendants' later motion to dismiss the complaint. (*See* Court Hearing Preparation & Attendance, Ex. F to Fee App. Supp.; Briefing Time & Lodestar Detail, Ex. K to Fee App. Supp.)

> ii. The post-settlement hours unrelated to settlement matters, totaling $7.5 million in lodestar, were not reasonably expended.

Objector Frank correctly challenges the reasonableness of thousands of hours expended on document review and discovery-related tasks *after* the parties reached a settlement agreement in principle. Lead Counsel do not dispute that a team of contract attorneys spent many hours reviewing documents after the agreement in principle was arrived at. Nor can they even dispute that many of these attorneys *began* their work on the case at the same time the parties reached the agreement on the settlement amount on or about May 8, 2012.[4] Now, however, Counsel contends that they had

---

[4]    In response to contentions that it had failed to identify contract attorneys and improperly billed for hours undertaken after settlement was reached, Lead Counsel

*(footnote continues on next page)*

not reached a definitive, binding agreement and thus had to be ready to conclude discovery on a short timetable. Therefore, Counsel brought on twenty additional contract attorneys and had them commence extensive document review work. The Court concludes that a reasonable paying client would not have authorized or paid for these hours.

To begin, upon reaching the agreement in principle, the parties represented to the Court that settlement was essentially a *fait accompli*. Further, Lead Counsel's own submissions in support of their fee request similarly reflected their view that the case had been settled. Counsel initially represented that "at the time the parties *reached the Settlement*, there were still over two months remaining before the discovery cutoff set by the Court," including "depositions of numerous additional witnesses"—with all depositions after May 9 cancelled. (Joint Decl. ¶ 77 (emphasis added); *cf.* Stipulation and Revised Scheduling Order dated Feb. 2, 2012, Dkt. No. 150 (discovery cutoff on July 13).) Taking Lead Counsel at its word, "the parties reached the Settlement" by May 8, 2012.

Actions, of course, speak louder than words. Save for the ballooning of contract-attorney hours at issue, Lead Counsel's lodestar report confirms that by May 2012 the parties had little doubt that this case was settling. Most of the Kirby associates and partners, as distinct from separately

---

failed to note anywhere in its detailed descriptions of the work that the "supplemental team" that performed much of this work was not hired until May 2012. (*See, e.g.*, Joint Reply Decl. ¶ 106.) The only way the Court was able to determine that was by noticing that up to twenty newly hired attorneys spent full days reading the complaint in the same week the parties reported their settlement to the Court. (*See, e.g.*, Kirby Project Specific Attorney Time Details, Ex. B to Fee App. Supp. (attorney "began reading the introduction and section I of the amended complaint" on May 5, 2012 and finished on May 9; another began to "read complaint" on May 14, 2012 and finished on May 17).) In a similar vein, Counsel failed to note anywhere that the contract attorneys at issue were contract attorneys hired on an hourly basis for this project rather than being firm associate attorneys. (*See, e.g.*, Kirby McInerney LLP Lodestar Report, Ex. E to Joint Decl.) Counsel then contended, in response to Frank's objection and the Court's questions, that those attorneys' status should have been obvious from the absence of any firm biographies for those attorneys provided with the fee request. Counsel is expected to be more forthcoming.

retained contract attorneys, spent their time after May 8 negotiating a stay of discovery, and then finalizing the settlement and drafting preliminary approval papers (all of which is properly compensable)—or working on other matters. (*See* Kirby Attorney Time Details, Ex. A to Fee App. Supp. (attorney Telias's last entry on May 8); *id.* (attorney Masters's entries after May 8, 2012); *id.* (entries of attorneys Linden, Hume, and McNeela from May 10 to May 15, 2012 concerning stay of discovery).)

With that background, the question is whether a hypothetical paying client would have paid for this work. In analogous circumstances, the *In re AOL Time Warner, Inc. Securities & "ERISA" Litigation* court reduced the lodestar by 5,000 associate hours for document review performed after signing a memorandum of understanding and before a settlement agreement was signed because "few private clients paying hourly fees would absorb the cost of such unabated work over a two-month period." No. 02 Civ. 5575 (SWK), 2006 U.S. Dist. LEXIS 78101, at *73 (S.D.N.Y. Sept. 28, 2006) (R&R of Special Master), adopted, 2006 U.S. Dist. LEXIS 77926 (S.D.N.Y. Oct. 25, 2006). This Court has reached the same conclusion regarding the 16,291.8 hours at issue here.

The reality was that a settlement was reached on May 8 and the parties telephoned the Court two days later to report that "in the view of the parties, a settlement was reached subject to the Court's approval and draft documents." (*See* Tr. of Hearing dated Apr. 8, 2013 at 73:24-74:1, Dkt. No. 262.) At the same time, Lead Counsel was hiring a score of new contract attorneys and setting them and other attorneys to work on document review. The hours Lead Counsel expended finalizing the settlement are appropriately included in the lodestar. All other hours after the May 8 agreement, the vast majority of which consist of contract attorneys performing basic document review, serve only to inflate the lodestar.[5] The Court concludes that those hours were not "usefully and

---

[5]   Although the evidence is clear that the parties were confident that they had settled the action in early May, the months of May, June, and July 2012 have the three highest contract-attorney lodestar totals of this five-year litigation. (*See* Kirby Project Specific Attorney Time Details, Ex. B to Fee App. Supp.; Decl. of John W. Toothman dated Mar. 15, 2013 ¶ 92.)

reasonably expended." *See Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994). Accordingly, the Court strikes those 16,291.8 hours, representing $7.5 million dollars, from the lodestar.

iii. The lodestar should be reduced for waste and inefficiency.

In a case of this magnitude, it is inevitable that attorneys will spend more hours than turn out to be necessary on some projects. But it is, or ought to be, far from inevitable that attorneys will attempt to charge those hours to their client. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (counsel seeking fee award must exercise "billing judgment," which entails "good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary"). And some instances of waste and inefficiency are so egregious that their inclusion in a motion for fees casts a shadow over all of the hours submitted to the Court—just as the thirteenth stroke of a clock calls into doubt whether any previous stroke was accurate.

Frank highlighted two examples where contract attorneys spent an unacceptable number of hours digesting single-day depositions: 239 hours (for $89,625) on one and 94.25 hours on another (for $51,837.50). (*See* Supp. Decl. of Theodore H. Frank dated Mar. 15, 2013 ¶ 11, Dkt. No. 218.) Frank contends that the Court should treat these examples as representing consistent practice and drastically cut not only these hours, but all the hours of many attorneys. Lead Counsel agrees that these 333 hours were wasteful and withdraws them from the lodestar without further discussion of inefficiency. Neither approach is appropriate.

Frank is cherry-picking, but Counsel cannot agree to toss out those cherries and pretend no others are ripe for picking. Indeed, the Court's own review reveals a number of similar instances of waste. Two other contract attorneys, for example, appear to have spent over three weeks of eight-hour days each digesting a one-day deposition: 157.5 hours (for $66,937.50) for one attorney and 142.5 hours (for $53,437.50) for the other. (*See* Kirby Project Specific Attorney Time Details, Ex. B to Fee App. Supp (review of Brushammar deposition and Marsigliano deposition); Pls.' Counsel Appearing in Depositions, Ex. E to Fee App. Supp. (Investor Relation Head Arthur Tildesley, Jr. being the only two-day deposition).)

Multiple contract attorneys in the lodestar report spent more than a year simply listing "document review" as the task performed all day, every day, for approximately $1.5 million in lodestar for each attorney. (*See, e.g.*, Kirby Project Specific Attorney Time Details (attorney M.B.'s $1.7 million in lodestar and attorney D.F.'s $1.5 million, both listing "document review" every day from Mar. 14, 2011 to July 19, 2012).) Counsel asserts that "document review" was listed merely as an "administrative convenience" instead of reproducing more detailed handwritten records of contract attorneys' hours. (*See* Pls.' Supp. Reply Mem. at 26, Dkt. No. 232.) But whatever time the convenience saved, class counsel cannot present effectively unreviewable hours in the name of convenience. On the other hand, the Court finds, for example, the staffing for depositions and the hours Lead Counsel devoted to court filings and conferences are well within the range of reasonable.

In balancing the evidence of waste and unreviewable hours against the many instances of reasonable charges, the Court concludes that the lodestar should be further cut by 10% to account for waste and inefficiency that a paying client would not accept. To avoid double-counting the cuts, the Court will make this across-the-board adjustment only after all other cuts have been made.

### b.   Reasonable hourly rates

"The lodestar figure should be based on market rates 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Reiter*, 457 F.3d at 232 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). The Court must determine "the rate a paying client would be willing to pay." *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008); *see generally McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 421-22 (2d Cir. 2010) (discussing use of *Arbor Hill*-based lodestar calculation as part of cross-check on common fund percentage award). Because legal services are not a commodity traded on an open market, the price for similar services can vary significantly based not only on the product, but also on the client. Clients with greater bargaining leverage— those that consume the most services and are able to pay for them—are generally able to negotiate more favorable legal rates. In considering the

hypothetical paying client, the Second Circuit instructs courts to consider "whether a fully informed group of plaintiffs able to negotiate collectively" would agree to a given rate. *Goldberger*, 209 F.3d at 52. In other words, if the class were a reasonable, paying client free to choose its counsel and negotiate rates, what hourly rate would it accept for the attorneys and other professional staff employed here?

The Court's focus is on the proffered hourly rates for the services of contract attorneys—attorneys who are not permanent employees of the law firm, are hired largely from outside staffing agencies, are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action. The Court focuses more closely on the contract attorney rates not only because those rates are overstated, but also because the total proposed lodestar for contract attorneys dwarfs that of the firm associates, counsel, and partners: $28.6 million for contract attorneys compared to a *combined* $17 million for *all* other attorneys. (Ltr. of Peter S. Linden dated Apr. 7, 2013 ("Linden Ltr."), Dkt. No. 264.) The Court finds that, on balance, the proposed rates for firm attorneys are reasonable. The blended hourly rate for associates here is $402, and the blended rate for partners and counsel is $632. (*Id.*) These rates are within the range accepted in this district. *See, e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008). In addition, the Court finds the rates for support staff, who together make up roughly $6 million of the proposed lodestar, are reasonable.

In attempting to determine the market rate for the services of the contract attorneys here, the Court has been presented with a tale of two extremes. At one extreme, objector Frank suggests that the market rate for contract-attorney services is the rate that the law firms, not clients, pay for the services of contract attorneys, and that in any event no reasonable paying client would accept a rate above $100 per hour. Lead Counsel responds that these contract attorneys performed the work of, and have the qualifications of, law firm associates and so should be billed at rates commensurate with the rates of associates of similar experience levels. The proposed contract attorney rates reach as high as $550, with a blended hourly rate of $466—higher than the $402 per hour rate for associates!

(Linden Ltr.) The precise truth is unknown, but without doubt lies between these two extremes.

> i.  Courts agree that contract-attorney hours are not factually equivalent to associate hours.

Frank contends (1) that the contract attorneys should be treated as a litigation cost and not included in the lodestar at all, and (2) that, if included, a lodestar multiplier cannot be applied to their work because to do so permits too high a markup. Neither argument prevails. First, courts routinely reject claims that contract attorney labor should be treated as a reimbursable litigation expense. *See Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D. Conn. 2009) (collecting cases), *aff'd*, 355 F. App'x 523 (2d Cir.).[6] Second, courts have also regularly applied a lodestar multiplier to contract attorneys' hours. "The Court should no more attempt to determine a correct spread between the contract attorney's cost and his or her hourly rate than it should pass judgment on the differential between a regular associate's hourly rate and his or her salary." *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302 (CM), 2010 WL 363113, at *22 (S.D.N.Y. Feb. 1, 2010) (Special Master's R&R, adopted as Court's opinion, *id.* at *1). The lodestar multiplier, meanwhile, is determined by factors such as "the risk of the litigation and the performance of the attorneys"; the firm's cost of employing the attorney is not part of the *Goldberger* analysis. *See Goldberger*, 209 F.3d at 47.

Lead Counsel's own position finds no more support in court decisions than Frank's position does. Counsel asserted without reference to a single case that "[a]ll of the authority we have seen supports the practice of billing project attorneys at the market rate for comparable in-house

---

[6]  In a related attack on the inclusion of contract attorney hours in the lodestar, Frank invokes part of an American Bar Association ethics opinion limiting markup on contract attorney work to "a reasonable allocation of associated overhead" and supervision costs. ABA Comm. on Ethics & Prof'l Responsibility Formal Op. 08-451 (Aug. 5, 2008). But, in context, that rule addresses the situation "[i]f the firm decides to pass [the contract attorney] costs through to the client *as a disbursement*." *Id.* (emphasis added). This Court is aware of no requirement that a firm do so.

attorneys in calculating fee awards." (*See* Pls.' Reply Mem. at 15.)[7] But Courts seem to agree that a contract attorney's status as a contract attorney—rather than being a firm associate—affects his market rate. Even the authority on which Counsel relies presumes that clients generally pay less for the work of contract attorneys than for that of firm associates. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *21 n.48 (S.D.N.Y. Nov. 12, 2004) (finding use of contract attorneys justified because hiring them "was a far more efficient way of proceeding than giving the task to *more highly compensated counsel*" (emphasis added)). More recently, another judge in this district considered the proper billing practices for contract-attorney document-review services and observed as follows:

> There is little excuse in this day and age for delegating document review (particularly primary review or first pass review) to anyone other than extremely low-cost, low-overhead temporary employees (read, contract attorneys)—and there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes.

---

[7]    When pressed for the referenced authority, Lead Counsel cited cases that stand for the uncontroversial proposition that contract attorneys, as all professional staff, are billed at their market rates—not the proposition that their market rates are equivalent to the rates for comparable associates. In their supplemental reply, Counsel selectively quoted a PSLRA fee award permitting a blended hourly rate of $200 for non-partner attorneys "whether counsel, associate, or contract attorneys." *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009). But *UnitedHealth* contradicts Counsel's position. The court was streamlining its cross-check calculation by collapsing a range of rates, not finding that the prevailing market rate is the same for all counsel, associates, and contract attorneys regardless of their position, experience, and reputation. Indeed, that court recognized that using contract attorneys is efficient precisely because it "reduc[es] the need for associate and partner time." *Id.* at 1105. The implication is that the rates for contract attorneys are lower than for associates—and that those lower rates combined with the higher associate and counsel rates yielded the blended $200 rate. Thus, the accepted market rate for contract attorneys presumably was well below $200.

*In re Beacon Assocs. Litig.*, No. 09 Civ. 777 (CM), 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013). In sum, courts have largely rejected the proposition that the market treats contract attorneys as indistinguishable from firm associates for billing purposes; it does not.

> ii.   Paying clients negotiate a wide range of rates for contract-attorney services.

The question for determination is: what would a reasonable client pay a law firm for the services of "an extremely low-cost, low-overhead temporary employee[] (read, contract attorney[])"? *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18. To answer that question, the Court may "conduct an empirical inquiry based on the parties' evidence or may rely on the court's own familiarity with the rates if no such evidence is submitted." *Francois v. Mazer*, No. 09 Civ. 3275 (KBF), 2012 WL 3245439, at *1 (S.D.N.Y. Aug. 6, 2012) (citation omitted), *aff'd*, No. 12-3545-CV, 2013 WL 3185262 (2d Cir. June 25, 2013). "[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with" prevailing market rates. *Savoie v. Merchs. Bank*, 166 F.3d 456, 463 (2d Cir. 1999) (citation omitted).

Lead Counsel relies primarily on its own "empirical study" of the rates submitted in fee requests in similar cases and the expert declaration of Kenneth Moscaret. Neither persuades the Court that "a fully informed group of plaintiffs able to negotiate collectively would routinely agree to pay" between $350 and $550 per hour for contract attorneys to review documents. Those rates are reasonably applied to associate attorneys, whose duties involve such matters as legal research, drafting legal memoranda and court submissions, preparing for depositions, and drafting settlement documents; contract attorneys are overwhelmingly devoted to document review.

Far from illustrating market practices, Lead Counsel's "empirical study" presents rates that, as the rates under consideration here, were merely *submitted* to courts by plaintiffs' counsel in PSLRA common fund cases as part of a fee request. (*See* Joint Supp. Resp. Decl. ¶ 16; Ex. 39 to Joint Supp. Resp. Decl.) Counsel, for example, lists the rates submitted for contract attorneys and associates in the *UnitedHealth* fee request without

disclosing that the court there drastically reduced those proposed rates and the requested fee. *See In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1106 (D. Minn. 2009). More often, though, the decisions to which Lead Counsel points awarded fees without opining upon an appropriate differential between associate and contract-attorney rates. *See, e.g., Carlson*, 596 F. Supp. 2d at 410 (declining to undertake "gimlet-eyed" review of rate and hour details and finding multiplier reasonable assuming dramatic cuts to lodestar for contract attorneys). As a result, Counsel's "study" of the relationship between associate and contract-attorney rates is, at best, misleading. Moreover, Lead Counsel effectively concedes that the $466 blended rate sought here is inflated by pointing to an average *proposed* rate of $313 in its own selected sample of cases. (*See* Ex. 39 to Joint Supp. Resp. Decl.) *Cf., e.g., Apple, Inc. v. Samsung Elecs. Co.*, No. C 11-1846 LHK (PSG), 2012 WL 5451411, at *3 (N.D. Cal. Nov. 7, 2012) (major firm proposing $125 per hour for contract attorneys).

Next, Moscaret's opinion offers minimal evidence of the rate that would have been negotiated in these circumstances.[8] Moscaret opines, in sum, that in the "broad corporate client marketplace," clients accept a wide range of rates for contract attorneys, and that Counsel's proposed scheme is among those accepted. (*See, e.g.*, Decl. of Kenneth M. Moscaret dated Mar. 21, 2013 ¶ 5, Dkt. No. 231.) Though unwilling to offer specifics, he "estimate[s] that a majority of corporate clients" pay "prevailing market rates commensurate with the skill, experience, and abilities of those contract attorneys." (*Id.* ¶ 33.) Even assuming those "prevailing market rates" are equivalent to those of associates, as Counsel asserts, his estimate

---

[8]     Professor Miller also opines that the rates here generally are reasonable, but his declaration does not mention contract attorneys, nor does it specifically consider the appropriate rates for their services. Counsel has pointed out that bankruptcy court filings on which Miller relied, as well as other filings Counsel later submitted, asserted rates sometimes reaching as high as those here, and were approved. The Court accords those filings little weight given that the rates asserted were not explicitly analyzed. Moreover, separate from the contract attorney rates, Miller appears not to have considered the proffered hourly rates of Kirby's co-counsel. (*Compare* Miller Decl. ¶ 39, *with* Exs. G & H to Pls.' Joint Decl. (hourly rates for partners).)

nonetheless has no application here because of his premise: that the market includes the "5.8 million U.S. companies with 1 – 99 employees," nearly all of which lack in-house legal departments. (*See id.* ¶ 35.) Moscaret also concedes that most of those small companies on which his opinion is based are not engaged in securities litigation. (*Id.* ¶ 36.) As a result, his sample is materially skewed away from clients like plaintiffs here: a group of highly sophisticated lead plaintiffs able to negotiate collectively to secure appropriate hourly rates from their attorneys. One of the class representatives alone—COPERA—is a pension fund with billions of dollars under management and an in-house legal department. *See* About Colorado PERA Overview, https://www.copera.org/pera/about/overview.htm (last visited July 30, 2013).

Frank, meanwhile, relies on the opinions of William Ruane and John Toothman. Even assuming that Ruane is qualified to provide expert testimony, his opinion that the market rate for contract attorneys' document-review services is between $50 and $70 per hour is of little help because it derives entirely from his experience working for a single company that focused on defense-side products-liability. (Decl. of William J. Ruane dated Mar. 14, 2013, Dkt. No. 217.) One company's experience is not dispositive of prevailing market practices.[9]

Toothman opines that a reasonable client would pay at most the rates of "lower level paralegals." (Decl. of John W. Toothman dated Mar. 15, 2013 ¶ 4, Dkt. No. 224.) His opinion, which is grounded in his expertise on broader market practices, is more helpful but still limited by certain

---

[9]     The amicus submission of the Association of Corporate Counsel ("ACC") is, for related reasons, similarly narrow in its reach. The ACC's letter refers to a survey of its membership. The breadth and validity of that survey, however, is unclear and untested. The survey appears to be limited to the responses of a self-selected fraction of its already self-selected membership, and only a third of those respondents employed contract attorneys. At most, the survey confirms that a number of clients occupy one side of the spectrum that Moscaret acknowledges: that clients often hire contract attorneys directly or pay a relatively small markup. To the extent that Frank purports to offer his own views as an expert on billing practices, the Court finds that he is not qualified to do so.

assumptions. Toothman infers from the sometimes cursory time records that all of the work was simplistic. (*See, e.g., id.* ¶¶ 48-49.) As noted above, most of the contract-attorney time is attributed simply to variants of the term "document review," but not all document review is created equal. Many of the documents reviewed here concerned highly complex financial instruments and subtle nuances of circumstantial evidence of scienter. Toothman also ignores that some of these contract attorneys prepared others for, and a few participated in the taking of, depositions. (*See* Pls.' Counsel Appearing in Depositions, Ex. E to Fee App. Supp.) As a result, the adage that "Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn" has force here, but its application is not as simple as Toothman suggests.[10] *See Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983). In sum, Toothman provides evidence that a paying client would negotiate support-staff-level rates for some, but not all, of the hours at issue.

The Court also directed Counsel to produce the résumés of the contract attorneys here and considered them, and agrees with Counsel that some of these attorneys were particularly well-qualified. The Court further agrees that a paying client surely would have paid something approaching an associate's rate for some number of the hours here. But the Court finds that not all of the contract attorneys had the type of experience—and few performed the type of work—that justifies associate-level rates.[11] Only a

---

[10]     A lodestar report for purposes of a cross-check need not contain the same detail as hourly bills. *Cf. Cassese v. Williams*, 503 F. App'x 55, 59 (2d Cir. 2012) (finding that district court acted within discretion in calculating lodestar for cross-check purposes without "exact records"). By the same token, however, Lead Counsel cannot claim to have recorded millions of dollars in lodestar described only with the words "document review" and expect the Court to treat those hours as if they were for taking or defending a deposition or other more complex tasks for purposes of determining what a reasonable client would pay.

[11]     While the Court adheres to its view that the amount Counsel paid contract attorneys is not the issue, the Court notes that Counsel submitted evidence that at least one of the contract attorneys employed by a firm that assisted Lead Counsel received $15 per hour in wages—belying Counsel's suggestion that a full associate attorney's billing rate was appropriate. (*See* Elan Project Specific Attorney Time

*(footnote continues on next page)*

very few of the scores of contract attorneys here participated in depositions or supervised others' work, while the vast majority spent their time reviewing documents. *Cf. In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 781 (S.D. Tex. 2008) (relying on fact that contract attorney "had previous trial experience, took more than thirty fact depositions in the underlying case and took some of defendants' experts' depositions").

     iii.  The Court concludes that an appropriate blended hourly rate for the contract-attorney services here is $200.

In the end, the empirical data and other evidence before the Court offer no simple answers. No one number flows inexorably from the record; the Court must exercise its discretion to set the appropriate rate. The Court finds that the hypothetical paying client here is one with significant negotiating leverage, as evidenced by the hard-fought battle for appointment. This is true even though this client may not have the sort of leverage Citigroup, for example, possesses as a deep-pocketed client with a significant stream of litigation business. The Court has taken account of the qualifications and experience of the various contract attorneys here, the largely document-review work they performed, and the wide range of rates accepted in the market. Considering the hypothetical client and the range of services at issue, the Court concludes that a reasonable blended hourly rate for the contract attorneys here is $200.

The Court will apply that rate to the contract-attorney hours remaining after cutting the post-settlement hours, which constitute more than $21 million of the lodestar. (Linden Ltr.) Having applied the Court's rate of $200 to the roughly 45,300 hours at issue, the Court subtracts approximately $12 million from the proposed lodestar.

---

Details, Ex. B to Fee App. Supp. (attorney L.C. page for week of Aug. 8, 2011).) This same contract attorney, moreover, was listed as "Of Counsel" elsewhere in the fee request, with a proffered rate of $500 per hour. (*See* Decl. of Kenneth A. Elan dated Nov. 13, 2012 at 3, Ex. I to Joint Decl.)

> c.   *The proper lodestar for assessing the reasonableness of the
>      proposed award*

To review, Counsel proposed a lodestar of $51.4 million, and the
Court has cut $7.5 million in post-settlement discovery work, $4 million of
Entwistle & Cappucci's work before joining Lead Counsel, and $12 million
based on the reasonable hourly rate for all remaining contract attorney
work. After those reductions, $27.9 million remains before cutting 10%
($2.8 million) for waste and inefficiency. Thus, the Court calculates the
lodestar in this action to be $25.1 million.

Lead Counsel's proposed lodestar of $51.4 million was, in the Court's
judgment, significantly inflated. As revised, the requested $97.5 million fee
here would yield a lodestar multiplier of about 3.9, not the 1.9 multiplier
that Counsel proposed. The Court will return to the lodestar to use it as a
cross-check that takes into account other *Goldberger* factors—for example,
the risks involved and the quality of Counsel's work. That analysis aside,
Counsel certainly invested an enormous amount of time and energy in this
litigation. Thus, the first *Goldberger* factor weighs in favor of a substantial
fee award.

## 2.   *The Magnitude and Complexities of the Litigation*

As noted above, this action was highly complex. "Securities class
litigation is notably difficult and notoriously uncertain." *In re Merrill Lynch
Tyco Research Sec. Litig.* ("*ML Tyco*"), 249 F.R.D. 124, 138 (S.D.N.Y. 2008)
(citation and quotation marks omitted). Even among securities actions, the
financial instruments involved and the scope of the allegations render this
action more challenging than the standard securities class action. This
factor weighs in favor of a substantial fee.

## 3.   *The Risk of the Litigation*

Similarly, the class, and by extension Lead Counsel, faced substantial
risks that they would not prevail if the parties litigated the action through
trial and appeal. Significant risks weigh in favor of substantial
compensation above what a paying client would have paid because "[n]o
one expects a lawyer whose compensation is contingent upon his success
to charge, when successful, as little as he would charge a client who in

advance had agreed to pay for his services, regardless of success." *Grinnell*, 495 F.2d at 470.

However, for some time now, virtually all securities actions that survive motions to dismiss the pleadings ultimately settle prior to trial. *See ML Tyco*, 249 F.R.D. at 139. But the factors that traditionally render securities cases most likely to survive a motion to dismiss and, in turn, to settle—such as prior government investigations—are absent here. *Cf. id.* Thus, notwithstanding the likelihood of settlement, the risks involved in undertaking this litigation were real. "In numerous class actions . . . plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever." *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *18 (S.D.N.Y. Dec. 23, 2009). Settlement might be the norm, but it is not guaranteed. This factor also militates in favor of a substantial award.

### 4.    *The Quality of Representation*

"To evaluate the 'quality of the representation,' courts review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *ML Tyco*, 249 F.R.D. at 141 (quoting *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 467.) Lead Counsel's results are excellent. More than half a billion dollars is a significant and successful recovery under essentially *any* definition of success. The Court's quarrels with the lodestar submission do not detract from the quality of Counsel's work. Given the significant challenges posed by scienter-based fraud claims and the complexity and size of this case, the recovery here is substantial, as the class's overwhelmingly favorable reaction reflects. Further, the Court in appointing Kirby took into account its outstanding reputation as a leading plaintiffs' class action firm. The quality of the representation here weighs in favor of a substantial fee award.

### 5.    *The Requested Fee in Relation to the Settlement*

The requested fee of $97.5 million is 16.5% of the $590 million settlement fund. The inquiry for this factor focuses on whether that percentage is reasonable when compared to fees awarded in similar cases. Lead Counsel and Frank sparred at length over what constitutes a similar

case. Each side suggests that the other is inappropriately including or excluding certain cases in order to skew the average fee award up or down, and each side is correct. Based on slightly different ranges, Counsel's experts found the average fee in similar cases was 16.7% (Prof. Coffee) and 17.3% (Prof. Miller), with slightly lower medians of 16.8% and 16.5%. (Coffee Decl. ¶ 17-18; Miller Decl. ¶ 58.) Frank's own selections yielded averages of 15.1% or 12.5%, and medians of 12% or 11.5%. (*See* Objection of Theodore H. Frank at 5, Dkt. No. 222.) This dispute only helps illustrate why "reference to awards in other cases is of limited usefulness . . . because fee awards should be assessed based on the unique circumstances of each case." *ML Tyco*, 249 F.R.D. at 141 (citations and quotation marks omitted). While awards in other cases in the same ballpark as this one help to determine a range of reasonableness, the Court need not pass upon each potential comparator. On balance, the requested fee here falls within the range of reasonable fees awarded in generally similar cases, but toward the high end of that range. *See In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 Civ. 6351 (RJS), 2011 U.S. Dist. LEXIS 155622, at *10, *14 (S.D.N.Y. Dec. 30, 2011) (noting awards below 8% of large settlements, and awarding 12% of $627 million settlement). Accordingly, this factor weighs in favor of a substantial fee award, albeit lower than Lead Counsel has requested.

### 6.   *Public Policy Considerations*

"In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d at 359. The fees paid to class counsel thus should be "both fair and rewarding." *ML Tyco*, 249 F.R.D. at 142 (citation omitted). "An award of fees in excess of that required to encourage class litigation, however, does not necessarily serve public policy." *Id.* A significant award is appropriate here.

### C.   The Lodestar Cross-Check and the Appropriate Award

Having considered all the *Goldberger* factors, which together support a substantial fee, the Court returns to the lodestar as a cross-check on the requested fee. By Lead Counsel's experts' own calculations, the 3.9

multiplier—the multiplier based on the reduced lodestar as calculated by the Court—is well above the norm in securities class action settlements of similar size. (*See* Coffee Decl. ¶¶ 17-18 (mean of 2.29 and median of 2.14 for $490-$690 million settlement range); Miller Decl. ¶ 58 (mean of 2.13 and median of 1.70 for $550-$880 million settlement range).) Courts in this Circuit have trended toward awarding lower percentages and lower multipliers for awards from extremely large common funds such as this one. *Compare In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d at 590 (observing that "lodestar multiples of over 4 are routinely awarded by courts" in context of $5 million settlement), *with In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MD 1484 (JFK), 2007 WL 313474, at *23 (S.D.N.Y. Feb. 1, 2007) (concluding, for $39 million settlement, that request representing multiplier of 2.43 "is excessive," and recognizing that courts since *Goldberger* question multipliers over 2.03). That trend, reflected in the experts' analyses, likely reflects concern about the "danger of 'routine overcompensation' for risk that has troubled [the Second Circuit] in the context of 'mega-fund' class actions." *See McDaniel*, 595 F.3d at 426 (quoting *Goldberger*, 209 F. 3d at 57).

The Court concludes that a significant multiplier is justified here, but not one as high as 3.9—the multiplier that would need to be applied to the trimmed lodestar to reach Counsel's requested fee. Indeed, it is well above the multiplier of 3.0 that COPERA negotiated with Entwistle & Cappucci as a cross-check in the event that firm was appointed class counsel. (Reply. Decl. of Andrew J. Entwistle dated Mar. 22, 2013 ¶ 6, Dkt. No. 230.) As already discussed at length, Counsel took on a contingency risk, and brought considerable skill and experience to bear on a very complex case. *See Goldberger*, 209 F.3d at 47 (citation omitted) (multiplier is based on "less objective factors, such as the risk of the litigation and the performance of the attorneys," which also help determine correct percentage (quotation marks omitted)); *see also Savoie*, 166 F.3d at 460. On balance, however, the Court concludes, based on its analysis of all the *Goldberger* factors and the lodestar cross-check, that the requested $97.5 million fee—constituting 16.5% of the settlement and a lodestar multiplier of 3.9 based on the revised lodestar—is not reasonable.

The Court concludes that a reasonable fee here is 12% of the $590 million common fund, or $70.8 million dollars. On a properly calculated

lodestar, $70.8 million yields a 2.8 multiplier, which in the Court's view is high but not excessive when taking into account all of the *Goldberger* factors. This is a sizeable award that rewards Counsel for years of excellent work. It cannot be forgotten that this is the class's money, and the class is paying its attorneys handsomely for their services.

## VI. REIMBURSEMENT OF LITIGATION EXPENSES

No one has objected to the requested reimbursement for litigation expenses, and the Court is satisfied that these expenses are reasonable. Accordingly, the Court awards Lead Counsel $2,842,841.59 in reimbursable expenses.

## VII. CONCLUSION

The Court finds that the proposed $590 million settlement and the proposed plan of allocation are fair, reasonable, and adequate. The Court further finds that the class was provided with adequate notice of class certification and the settlement. The Court thus grants plaintiffs' motion for final approval of the settlement and plan of allocation.

The Court also grants Lead Counsel's motion for an award of attorneys' fees—albeit a lower fee than requested. The Court awards Lead Counsel $70.8 million in attorneys' fees. Finally, the Court grants Lead Counsel's motion for reimbursement of $2,842,841.59 in litigation expenses.

Dated:  New York, New York
        August 1, 2013

Sidney H. Stein, U.S.D.J.