**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP INC.<br>SECURITIES LITIGATION | No. 07 Civ. 9901 (SHS)<br><br><br>**ECF Case** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION TO AUTHORIZE DISTRIBUTION OF THE NET SETTLEMENT FUND**

**KIRBY McINERNEY LLP**
Ira M. Press
Peter S. Linden
Andrew M. McNeela
Beverly Tse Mirza
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Lead Counsel for Plaintiffs*

Dated:  April 25, 2014

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................ 1

II.  BACKGROUND ............................................................................................ 3

     A.   Notice to the Settlement Class ...................................................... 4

III. CLAIMS ADMINISTRATION ..................................................................... 5

IV.  PROPOSED DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND ............... 8

V.   ARGUMENT ................................................................................................ 11

     A.   The Court Should Authorize the Distribution of the Net Settlement Fund to
          Authorized Claimants ................................................................... 11

          1.   Timely and Valid Claims ...................................................... 11

          2.   Late But Otherwise Eligible Claims ..................................... 11

     B.   The Court Should Accept the Claims Administrator's Administrative
          Recommendations to Reject the Ineligible and Rejected Claims ......................... 13

          1.   Lead Plaintiffs Recommend That Claims That Did Not Fit the Definition
               of the Class Should be Rejected ........................................... 13

          2.   Lead Plaintiffs Recommend that Duplicate Claims Should be Rejected ........ 15

          3.   Lead Plaintiffs Recommend that Deficient Claims That Were Never Cured
               Should be Rejected ............................................................... 15

          4.   Lead Plaintiffs Recommend That Claims That Did Not Result in a
               Recognized Loss Should be Rejected ..................................... 17

     C.   The Court Should Authorize Distribution of the Net Settlement Fund ............... 20

     D.   The Release of Claims ................................................................... 21

     E.   The Court Should Authorize Payment of GCG's Fees and Expenses for
          Claims Administration ................................................................... 21

     F.   Retention of Proof of Claim Forms and Other Documents ................. 22

VI.  CONCLUSION ............................................................................................ 23

## **TABLE OF AUTHORITIES**

**Cases**

*In re Agent Orange Prods. Liab. Litig.*,
  689 F. Supp. 1250 (E.D.N.Y. 1988) ........................................................................... 12

*In re Gilat Satellite Networks Ltd.*,
  No. 02 Civ. 1510, 2009 WL 803382 (E.D.N.Y. Mar. 25, 2009) ............................... 12

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
  246 F.3d 315 (3d Cir. 2001)...................................................................................... 12

*Zients v. LaMorte*,
  459 F.2d 628 (2d Cir. 1972)...................................................................................... 12

**Statutes**

Fed. R. Civ. P. 23(e) ...................................................................................................... 1

# I.    INTRODUCTION

On August 1, 2013, this Court granted final approval to the settlement of this securities class action.[1]  The Final Judgment and Order, entered by the Court in this case, provides that the Court retains continuing jurisdiction over, *inter alia*, "implementation of this Settlement and any award or distribution of the Settlement Fund" and instructs that "[a]fter completion of the processing of all claims by the Claims Administrator, Lead Plaintiff shall file a motion for disbursement of the Net Settlement."  *See* Dkt. No. 276 at ¶¶ 17, 23.

Now, pursuant to Fed. R. Civ. P. 23(e), Lead Plaintiffs, on behalf of the Class, respectfully submit this memorandum of law in support of their motion for an Order Authorizing Distribution of the Net Settlement Fund ("Distribution Order") authorizing, *inter alia*: (i) initial distribution of the Net Settlement Fund established by the settlement of this action to Authorized Claimants; (ii) the Claims Administrator to deem timely otherwise eligible claims that were submitted after the applicable claim deadlines of either February 7, 2013 or March 8, 2013[2] but by March 31, 2014; (iii) rejection of the ineligible claims and directing these claims not be paid; (iv) payment of $3,889,889.37 to the Claims Administrator for its balance of fees and expenses in connection with the services performed in processing the Proofs of Claim and in administering the Settlement, as described more fully in the Affidavit of Stephen J. Cirami in Support of Motion to Authorize Distribution of the Net Settlement Fund with annexed exhibits (the "Cirami Affidavit"), filed concurrently herewith; (v) the Claims Administrator to hold 5% of the Net Settlement Fund as reserve to address Claims-in-Process (defined below) and any contingencies

---

[1]  Unless otherwise indicated, all capitalized terms herein shall have the same meaning as set forth in the Stipulation and Agreement of Settlement, dated August 28, 2012, as amended (the "Stipulation"), and filed with the Court on August 29, 2012 [Dkt. No. 155-1], and as modified by the Court's September 28, 2012 order further amending the preliminary approval order [Dkt. No. 159].

[2]  Pursuant to the Court's January 2, 2013 Order [Dkt. No. 183], the deadline to file claims for class members whose Notices were mailed to them by the Claims Administrator after November 9, 2012 was extended to March 8, 2013.

that may arise; (vi) distribution of the balance of the Net Settlement Fund, after deduction of the payment requested herein and elimination from the distribution of any Authorized Claimant whose *pro rata* share of the Net Settlement Fund ("Distribution Amounts") calculates to less than $10.00, to Class Members whose Proofs of Claim have been accepted whereby such Authorized Claimants whose Distribution Amounts are less than $100.00 will be paid in full ("Claims Paid in Full"); and (vii) distribution of 95% of the remaining Net Settlement Fund after deduction of the payments to the Claims Paid in Full to Authorized Claimants whose Distributions Amounts are $100.00 or greater.

Following the initial distribution, upon a supplemental motion to the Court, Lead Plaintiffs will request further that the Court authorize, *inter alia*: (i) the Claims Administrator to pay eligible and valid claims that require additional processing ("Claims-In Process") and that were received through and including April 18, 2014 ("Claims-in-Process Cut-Off Date"), from the 5% of the Net Settlement Fund held in reserve and any residual funds remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks, or otherwise) (the "Reserve Distribution"); (ii) the Claims Administrator to reallocate to Authorized Claimants who are not Claims Paid in Full  (including late claimants approved by the Court), have cashed their distribution checks, and who would receive at least $10.00 from such redistribution, any residual funds remaining in the Net Settlement Fund six months after the Reserve Distribution, with subsequent distributions of the funds remaining in the Net Settlement Fund to take place in six-month intervals until no longer feasible and thereafter to donate any remaining balance (following payment of unpaid costs of administration and taxes, if any) to non-sectarian, not-for-profit, 501(c)(3) organization(s) to be proposed by Lead Counsel and approved by the Court; (iii) the destruction of paper copies of the Proofs of Claim and all supporting documentation one year

after final distribution of the Net Settlement Fund and of electronic copies of the Proofs of Claim and all supporting documentation three years after final distribution of the Net Settlement Fund; and (iv) finally and forever barring further claims submitted after the Claims-in-Process Cut-Off Date against the Settlement Fund.

Pursuant to the Stipulation, Defendants have no interest in the relief sought by this motion.[3]

## II.   BACKGROUND

The Stipulation provided for an all-cash payment of $590 million, plus accruing interest, to compensate members of the Class and to pay attorneys' fees and expenses as awarded by the Court.  Stipulation ¶¶ 1(ff), 8.  On August 1, 2013, this Court granted final approval to the $590 million cash Settlement between and among Lead Plaintiffs, on behalf of the Class, and Defendants under the terms set forth in the Stipulation, and dismissed this action with prejudice. *See* Final Judgment and Order [Dkt. No. 276].  The Court also awarded Lead Counsel and Additional Settlement Class Counsel attorneys' fees of 12% of the Settlement Fund ($70,800,000) plus interest and reimbursement of Plaintiffs' Counsel's litigation expenses in the amount of $2,842,841.59 plus interest.  *Id.* at ¶ 18.  As of April 24, 2014, the balance of the Settlement Fund, including accrued interest, is $511,849,261.60.  The Settlement Fund continues to accrue interest.  *See* Declaration of Peter S. Linden in Support of Plaintiffs' Motion to Authorize Distribution of Net Settlement Fund, dated April 25, 2014 ("Linden Decl."), ¶ 4, filed

---

[3] *See* Stipulation ¶ 22 (the "Citigroup Defendants, and their respective counsel shall have no responsibility or liability whatsoever for the investment or distribution of the Settlement Fund, the Net Settlement Fund, the Plan of Allocation, or the determination, administration, calculation, or payment of any Claim Form or nonperformance of the Administrator, the payment or withholding of taxes owed by the Settlement Fund, or any losses incurred in connection therewith."); ¶ 13 ("This is not a claims-made settlement.  As of the Effective Date, the Citigroup Defendants shall not have any right to the return of the Settlement Fund or any portion thereof irrespective of the number of Proofs of Claim filed, the collective amount of losses of Authorized Claimants, the percentage of recovery of losses, or the amounts to be paid to Authorized Claimants from the Settlement Fund.").

concurrently herewith.

The Stipulation provides for the distribution of the Net Settlement Fund, in accordance with the Court-approved Plan of Allocation, among Authorized Claimants who purchased or otherwise acquired common stock issued by Citigroup during the period between February 26, 2007 and April 18, 2008, inclusive, and who were damaged thereby. Stipulation ¶ 1(gg). On behalf of Lead Plaintiffs, Lead Counsel retained Garden City Group, Inc. ("GCG" or the "Claims Administrator") as the Claims Administrator. GCG has extensive experience in handling the administration of complex settlements of securities class actions. The Court approved the selection of GCG in its Order Preliminarily Approving Proposed Settlement and Providing for Notice dated August 29, 2012 ("Preliminary Approval Order") [Dkt. No. 156].

### A.     Notice to the Settlement Class

Pursuant to this Court's Preliminary Approval Order, on October 23, 2012, Lead Counsel caused to be published the Summary Notice in *The Wall Street Journal* and disseminated via *PR Newswire*. GCG also posted downloadable copies of, *inter alia*, the Notice and Proof of Claim at www.citigroupsecuritiessettlement.com. Moreover, GCG disseminated a total of 2,479,940 copies of the Notice and Proofs of Claim and Release (the "Claim Packet") to potential Class Members. *See* below and Cirami Aff. ¶ 13. In response to the notice efforts, through March 31, 2014, GCG received and processed a total of 670,869 claims from potential Class members in connection with this action. *Id.* at ¶¶ 17, 65, 68.

The Notice provided information concerning the Action, described the circumstances leading up to the Settlement, supplied the details of the Settlement and the process leading up to the Settlement, gave notice of the Settlement Hearing, and provided instructions for Class Members regarding submissions of claims, exclusion from the Settlement, objection to the terms

of Settlement and/or the application for attorneys' fees and reimbursement of expenses, and attendance at the Settlement Hearing.

### III.    CLAIMS ADMINISTRATION

Pursuant to the Stipulation, the Court's Preliminary Approval Order, and the Notice, all Class Members wishing to be eligible to participate in the Settlement Fund were required to submit Proof of Claim forms, postmarked on or before February 7, 2013.   However, in December 2012, GCG learned that the list of names and addresses previously provided by Citigroup was not complete.   Following extensive analysis, GCG determined that 207,281 records were potential Settlement Class Members to whom GCG had not previously mailed Claim Packets (the "Transfer Agent List Shareholders").   Cirami Aff. ¶ 7.   The issue was brought to the Court, which, in an Order dated January 2, 2013 [Dkt. No. 183], determined, *inter alia*, that potential Settlement Class Members who were mailed the Notice after November 9, 2012 would receive an extension until March 8, 2013 to submit Proof of Claim forms.[4]

In addition to mailing the Claim Packet to the 207,281 Transfer Agent List Shareholders with a colored coversheet advising them of the extended deadline in order to comply with this Court's January 2, 2013 order, GCG's efforts to execute the terms of the Order included:  (1) identifying and mailing a total of 666,914  postcards to shareholders to whom Claim Packets were mailed after November 9, 2012 and advising them of the extended deadline; (2) mailing an additional 45,317 postcards to brokers who had requested copies of the Claim Packet for forwarding to their clients after November 9, 2012; and (3) conducting a manual review of the Transfer Agent List Shareholders and then contacting those brokers and nominees to determine

---

[4]    The parties have reached an agreement for the payment of the fees and expenses associated with this mailing records error.  Subject to approval from the Court, Defendants will pay $221,199 to the Settlement Fund.  *See* Joint Stipulation dated April 17, 2014, attached as Exhibit A to the Linden Declaration herewith.

whether the entity was a nominee purchaser or the beneficial owner.  Cirami Aff. ¶¶ 8-13.

GCG also made additional efforts with respect to the Court's determinations regarding the FA Cap Plaintiffs who are participants in Citigroup's Voluntary FA Cap Accumulation Program ("FA Cap").   GCG analyzed those claims separately and amended the Plan of Allocation to calculate the Recognized Loss for FA Cap shares as the FA Cap award prices were materially different from the prices at which Citigroup stock traded on the award dates.   On August 9, 2013, GCG mailed additional claim packets and cover letters to 4,705 FA Cap Plan Participants. *Id.* at ¶¶ 52-58.

In sum, as of March 31, 2014, GCG has mailed a total of 2,479,940 Claim Packets (of which, in addition to the Transfer Agent List Shareholders, 32,114 additional Claim Packets contained the colored coversheet); re-mailed 10,358 Claim Packets to persons whose original mailings were returned or for whom GCG received updated addresses; and also mailed 713,120 postcards as directed by the January 2, 2013 Order. *Id.* at ¶ 13.

As explained in detail in the accompanying Cirami Affidavit, as of March 31, 2014, GCG received a total of 670,869 Proof of Claim and Release forms in connection with this action. *Id.* at ¶¶ 17, 65.  GCG has prepared detailed ledgers of: (i) all valid and timely claims by Authorized Claimants ("Timely Authorized Claimants); (ii) claims that were submitted after the applicable claim deadline of either February 7, 2013 or March 8, 2013 (*see supra* and n.2) but by March 31, 2014 that are otherwise valid ("Late Postmarked But Otherwise Authorized Claimants"); and (iii) rejected claims that were deemed ineligible ("Rejected or Ineligible Claimants").  Cirami Aff. Exhibits C-1, C-2, and C-3, respectively.

GCG made substantial efforts to contact claimants that had submitted deficient claims (such as unsigned claims or claims lacking the required information or documentation to

substantiate the claimant's transactions during the Settlement Class Period) and instruct them on how to cure any such deficiencies.  Cirami Aff. ¶¶ 34-45.  GCG mailed a total of 307,013 deficiency letters to claimants describing the defect(s) with his, her or its claim and stating what, if anything, was necessary to cure the claim.  *Id.* at ¶¶ 35, 36; Cirami Aff. Ex. A (samples of the Notice of Conditional Rejection letters).  The deficiency letters also informed the claimant that failure to cure the deficiencies may lead to rejection of his, her or its claim.  *Id.*  GCG's efforts with respect to the deficiency process allowed claimants who presented deficient claims to have several opportunities to perfect those claims.  *Id.* at ¶¶ 37, 40-45.  GCG also contacted filers who filed claims and transactional data electronically to confirm their submissions and notified the filer of any deficiencies or claims that were ineligible.  *Id.* at ¶¶ 28-33.

Of the total 670,869 claims received as of March 31, 2014, GCG determined that 278,018 claims were ineligible to participate in the Settlement because the claims: (1) did not indicate any eligible purchases of Citigroup common stock during the Settlement Class Period; (2) were duplicative claims; (3) were deficient claims with insufficient information or documentation to support the claim that were never cured; or (4) did not calculate to have any Recognized Loss under the Court-approved Plan of Allocation.  *Id.* at ¶¶ 17, 71; Cirami Aff. Ex. C-3.  All of these claimants received letters entitled either "Notice of Conditional Rejection of Your Entire Claim" or "Notice of Conditional Rejection of Part of Your Claim," which explained the reason the claim was being rejected.  *Id.* at ¶ 72.

The Notices of Conditional Rejection provided a description of the reason for rejection.  *Id.* at ¶¶ 35, 36; Cirami Aff. Ex. A.  Claimants were advised that they had the right to disagree with GCG's administrative determination of deficiencies or ineligibility within 20 days by submitting information or documentation to fix or otherwise complete their claim, as applicable.

*Id.* GCG reviewed and addressed all responses to the Notices of Conditional Rejection, and reached out to claimants to facilitate the submission of missing information or documentation where applicable. Cirami Aff. ¶¶ 37, 40-45. As a result of these efforts, a significant number of claimants are now included as Authorized Claimants who are eligible to participate in the Settlement. *Id.* at ¶ 34.

There were a total of 93 claimants who disagreed with GCG's determinations. All of these claimants were contacted by GCG or Lead Counsel to explain GCG's determination. *See* Cirami Aff. ¶ 73. GCG successfully resolved 78 of these cases. In some instances, the claimant later agreed with GCG's determinations (and advised of such agreement in writing) or provided documentation to complete their claim forms. Cirami Aff. ¶ 73. However, there remain 15 disputed claims despite attempts by GCG to have these claimants withdraw their disagreement or otherwise complete their claim. As described below in Section V.B., Lead Counsel agrees with GCG's determinations on these 15 disputed claims and recommends that all 15 disputed claims be rejected by the Court.

## IV.   PROPOSED DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

The Claims Administrator, in consultation with Lead Counsel, has developed the Distribution Plan for Net Settlement Fund that will allow for the fair and expeditious distribution of the Net Settlement Fund, pursuant to the Plan of Allocation and Stipulation, until the fund is exhausted. *See* Cirami Aff. ¶¶ 19, 20 75. The overwhelming majority of the claims GCG has received through March 31, 2014 have been fully processed and over 380,000 eligible Authorized Claimants are ready to be paid from the Net Settlement Fund. *Id.* at ¶¶ 20, 65.

As described above, GCG has spent a significant time working with claimants to complete their claims. Due to the amount of time needed to process the volume of claims received (*see, e.g.*, Cirami Aff. ¶¶ 21-45, 52-64), GCG has continued to process late claims while

processing the timely claims and has identified 478 claims that were received as of March 31, 2014 but require additional time to process, including the provision of an opportunity for the claimant to cure any fixable deficiency.  Rather than delaying payment to the over 380,000 eligible Authorized Claimants, the key components of the Distribution Plan provide for an initial distribution of 95% of the Net Settlement Fund to all eligible Authorized Claimants whose claims are being recommended for payment below and reserving 5% of the Net Settlement Fund to accommodate the Reserve Distribution to approved Claims-in-Process that are deemed eligible to participate in the Settlement, upon a supplemental motion to the Court, and to address any contingencies that may arise.  Under the proposed distribution plan, payments from the Reserve Distribution to any approved Claims-in-Process will receive Distribution Amounts with the same *pro rata* share basis to bring them into a state of parity with the Authorized Claimants who are not Claims Paid in Full.  *Id.* at ¶¶ 18-20, 75.

A staggered process is consistent with the fact that it is customary in the industry to have multiple distributions of a net settlement fund in order to exhaust all settlement funds, as funds often remain after a distribution because of uncashed checks or tax refunds.  *Id.* at ¶ 19.  GCG has also successfully implemented a similar reserve approach to expedite distributions to Authorized Claimants in several of its administrations, including: (1) *In re Wachovia Preferred Sec. and Bond/Notes Litig.*, No. 09-cv-6351 (S.D.N.Y.); (2) *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855 (S.D.N.Y.) ("*Nortel I*"); (3) *In re Nortel Networks Corp. Sec. Litig.*, 05-MD-1659 (S.D.N.Y.) ("*Nortel II*"); and (4) *In re Tyco Int'l, Ltd. Sec. Litig.*, No. 02-cv-266 (D.N.H.), instead of compelling Authorized Claimants to wait for their distributions until after all claims are resolved.  *Id.*

However, in order to facilitate the efficient distribution of the Net Settlement Fund, there must be a final cut-off after which no other claims or adjustments to claims may be accepted. Accordingly, Lead Counsel respectfully requests that the Court order that any new claims and any adjustments to previously filed claims that are received through and including April 18, 2014 (the "Claims-in-Process Cut-off Date") shall be treated as Claims-in-Process; and any new claims or adjustments to previously filed claims that are postmarked or received after that Claims-in-Process Cut-off Date shall be barred.

Specifically, under the proposed Distribution Plan, GCG will conduct an Initial Distribution of the Net Settlement Fund, after deducting the payments previously allowed and requested herein, by determining each Authorized Claimant's Distribution Amount.  GCG will then eliminate from the distribution any Authorized Claimant whose Distribution Amount calculates to less than $10.00, and then re-calculate the Distribution Amounts for Authorized Claimants who are entitled to receive $10.00 or more.  Authorized Claimants whose Distribution Amounts are less than $100.00 will be paid in full.  GCG will then recalculate the Distribution Amounts based on 95% of the remaining Net Settlement Fund, after deduction of the payments to the Claims Paid in Full, to Authorized Claimants whose Distributions Amounts are $100.00 or greater.

Following completion of the processing of all claims received by the Claims-in-Process Cut-off Date, Lead Plaintiffs will submit a supplemental motion to the Court regarding any further claims deemed authorized or ineligible for a Reserve Distribution.  To the extent the 5% reserve is not depleted, the remainder will be available for redistribution to Authorized Claimants whose claims are not Claims Paid in Full, have cashed their initial distributions, and who would receive at least $10.00 from such redistribution.  Consistent with the terms of the Stipulation and

the Court-approved Plan of Allocation, if cost effective, subsequent distributions of the funds remaining in the Net Settlement Fund will take place in six-month intervals thereafter. Stipulation ¶ 21; Notice at 8.  Four months after the last distribution, and after the Claims Administrator has made reasonable and diligent efforts to have Settlement Class Members who are entitled to participate in the distribution of the Net Settlement Fund cash their distributions, any balance remaining in the Net Settlement Fund shall be donated, pursuant to the doctrine of *cy pres*, to non-sectarian charitable organization(s) certified under the United States Internal Revenue Code § 501(c), to be designated by Lead Counsel and approved by the Court.  *Id.*

## V.     ARGUMENT

### A.     The Court Should Authorize the Distribution of the Net Settlement Fund to Authorized Claimants

#### 1.   Timely and Valid Claims

There were 383,233 Authorized Claimants who submitted timely and valid claims postmarked on or before the Court-approved applicable claim deadline of either February 7, 2013 or March 8, 2013.  Cirami Aff. ¶¶ 65-67 and Ex. C-1.  The aggregate Recognized Loss of these Timely Authorized Claimants is $3,224,815,362.80.  *Id.*

Accordingly, Lead Plaintiffs respectfully request that the Court approve the 383,233 Timely Authorized Claimants listed in Exhibit C-1 to the Cirami Affidavit.

#### 2.   Late But Otherwise Eligible Claims

GCG received 18,767 Proofs of Claim after the applicable claim deadline of either February 7, 2013 or March 8, 2013 through March 31, 2014 ("Late Claims").  Cirami Aff. ¶¶ 65-67 and Ex. C-2.  GCG processed all of these Late Claims and has determined that the total number of Authorized Claimants submitting valid, in whole or in part, Late Claims is 9,140 with an aggregate Recognized Loss of $60,734,256.33.  *Id.*  These Late Claims (listed in Exhibit C-2

11

to the Cirami Affidavit) were received by GCG while the processing of timely claims was ongoing, and due to the amount of time needed to process the hundreds of thousands of claims received, the processing of these late claims did not delay the completion of the claims administration process or the distribution of the Net Settlement Fund. Cirami Aff. ¶¶ 68-69. Inclusion of these Late Claims will not materially dilute the amount to be distributed to timely Authorized Claimants. *Id.* The Recognized Loss of the 383,233 timely valid Claims and the 9,140 Late Claims totals $3,285,549,619.13. *Id.* The Recognized Loss of the Late Claims processed through March 31, 2014 represents just 1.8% of the combined Recognized Loss of all Authorized Claimants.[5] *Id.*

Until the Net Settlement Fund is actually distributed, this Court retains broad and inherent equitable powers to include claims that were submitted late. *See Zients v. La Morte*, 459 F.2d 628, 630-31 (2d Cir. 1972) ("[W]here, as here, all the equities are on the side of the claimants, the fund has not been distributed and the administration of the fund would be insignificantly hampered by allowing these few late claims, appellants should be permitted to participate in the fund."). Lead Plaintiffs believe that, when the equities are balanced, it would be unfair to prevent an otherwise eligible claim from participating in the Net Settlement Fund solely because it was submitted after the cut-off date, when it was submitted while claims were still being processed.[6] Moreover, payment of the late claims will not cost Defendants any

---

[5]  It is expected that the number of Late Claims will increase following the processing of all claims through the Claims-in-Process Cut-Off Date, if ultimately determined to be eligible to participate in the Settlement. All additional claims recommended for approval or rejection will be provided to the Court for approval.

[6]  Courts have the equitable power to include late-filed claims as part of a settlement distribution even where the parties agreed to a claims deadline pursuant to the terms of a settlement agreement. *See, e.g.*, *Zients*, 459 F.2d at 630 ("[u]ntil the fund created by the settlement is actually distributed, the court retains its traditional equity powers."); *In re Gilat Satellite Networks, Ltd.*, No. 02 Civ. 1510, 2009 WL 803382, at *6 (E.D.N.Y. Mar. 25, 2009) (allowing payment of late claims); *In re Agent Orange Prods. Liab. Litig.*, 689 F. Supp. 1250, 1262-63 (E.D.N.Y. 1988) (a "district court overseeing settlement distribution has inherent power to accept late claims" where there is no prejudice to the defendants and no delay of pay-out to timely claimants) (internal citation omitted); *In re Orthopedic* (*footnote continued on next page*)

additional money nor will payment of these late claims materially prejudice or delay payment to the Timely Authorized Claimants.

Accordingly, Lead Plaintiffs respectfully request that the Court approve GCG's administrative recommendations with respect to the 9,140 Late Claims listed in Exhibit C-2 to the Cirami Affidavit.

**B.    The Court Should Accept the Claims Administrator's Administrative Recommendations to Reject the Ineligible and Rejected Claims**

GCG rejected a total of 278,018 claims.  GCG mailed each of the 278,018 claimants a Notice of Conditional Rejection Letter.  Cirami Aff. ¶¶ 34-36, 71-72.  The reasons for rejections included: (1) claims did not fit the definition of the Class; (2) claims were duplicate claims; (3) claims were deficient and were never cured; and (4) claims did not result in a Recognized Loss under the Court-approved Plan of Allocation.

**1.    Lead Plaintiffs Recommend That Claims That Did Not Fit the Definition of the Class Should be Rejected**

Under the terms of the Plan of Allocation as stated in the Notice, the Settlement Class consists of:

> All persons who purchased or otherwise acquired common stock issued by Citigroup during the period between February 26, 2007 and April 18, 2008, inclusive, or their successor in interest, and who were damaged thereby, excluding (i) the defendants named in the Complaint, (ii) members of the immediate families of the individual defendants named in the Complaint, (iii) any firm, trust, partnership, corporation, present or former officer, director or other individual or entity in which any of the Citigroup Defendants has a controlling interest or which is related to or affiliated with any of the Citigroup Defendants, and (iv) the legal representatives, heirs, successors-in-interest or assigns of any such excluded persons or entities. The Settlement Class includes persons or entities who acquired shares of Citigroup common stock during the Class Period by any method, including but not limited to in the secondary market, in exchange for shares of acquired companies pursuant to a registration statement, or through the exercise of options including options acquired pursuant to employee stock plans, and persons or entities who

---

*Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 321, 329 (3d Cir. 2001) (court allowed a late claim where all class members were asserting claims on a "finite pool of assets.").

acquired shares of Citigroup common stock after the Class Period pursuant to the sale of a put option during the Class Period. Regardless of the identity of the person or entity that beneficially owned Citigroup common stock in a fiduciary capacity or otherwise held Citigroup common stock on behalf of third party clients or any employee benefit plans, such third party clients and employee benefit plans shall not be excluded from the Settlement Class, irrespective of the identity of the entity or person in whose name the Citigroup common stock were beneficially owned, except that any beneficiaries of such third party clients, or beneficiaries of such benefit plans who are natural persons and, who are otherwise excluded above will not share in any settlement recovery. Notwithstanding the foregoing, the Settlement Class shall not include Persons whose only acquisition of Citigroup common stock during the Class Period was via gift or inheritance if the Person from which the common stock was received did not themselves acquire the common stock during the Class Period.

Notice ¶ 24.  Further, "Settlement Class Member" means a member of the Settlement Class who does not exclude himself, herself or itself by submitting a request for exclusion in accordance with the requirements set forth in this Notice.  *Id.*

GCG received claims that did not fit the definition of the Settlement Class and thus are not eligible to participate in the Settlement.  This category of claims included claims that had no Class Period purchases or acquisitions, claims that were filed for non Citigroup stock, or claims filed by claimants who had already filed a valid and timely exclusion request.  Cirami Aff. ¶ 71.  Notices of Conditional Rejection were mailed (or emailed, in the case of Electronic Claims) to each of these claimants.  Such claimants who received a rejection letter because their claims and documentation demonstrated that they were ineligible to participate in the Settlement were given 20 days from the date of the letter to submit the appropriate information and/or documentary evidence to complete the Proof of Claim.  GCG processed and reviewed all responses to the Notices of Conditional Rejection and updated the database to reflect the change in the status of the claims, as necessary.  Cirami Aff. ¶¶ 34-45, 72.

Three of the remaining 15 claimants who disagreed with GCG's determination on the eligibility of their claims belong in this category.  Redacted versions of their claim forms as well

as the written correspondence related to the claim are annexed as Exhibit D to the Cirami Affidavit.  In sum, Disputed Claimant No. 1 (Claim 2025429) did not indicate that he purchased any shares of Citigroup during the Class Period; Disputed Claimant No. 2 (Claim 2641296) did not purchase any eligible shares of Citigroup common stock during the Class Period (although may receive a distribution from the 401(k) plan fiduciary as the plan itself is the purchaser of the shares); and Disputed Claimant No. 3 (Claim 3206031) purchased non-Citigroup stock in 1990. *See* Cirami Aff. ¶ 73(a).

GCG has identified 133,866 claims in this group, including the 3 claimants who disagreed with GCG's determination on their claim.  *Id.* at ¶¶ 71, 73(a).  Accordingly, Lead Plaintiffs respectfully request that the Court reject these claims that do not fit the definition of the Settlement Class (as reflected in the Cirami Affidavit at Exhibit C-3).

## 2.   Lead Plaintiffs Recommend that Duplicate Claims Should be Rejected

GCG identified 1,306 duplicate claims.  GCG mailed (or emailed, in the case of Electronic Claims) Notices of Conditional Rejection to each of these claimants.  GCG has confirmed that each of these duplicate claims has an exact match of a claim that has been included in the lists of Authorized Claimants.  Cirami Aff. ¶ 71 and fn.10.  Accordingly, Lead Plaintiffs respectfully request that the Court reject these duplicate claims (as reflected in the Cirami Affidavit at Exhibit C-3).

## 3.   Lead Plaintiffs Recommend that Deficient Claims That Were Never Cured Should be Rejected

GCG received claims from claimants who did not provide complete transactional information and/or supporting documentation needed to properly calculate their Recognized Losses and as required by the Court-approved Notice and Proof of Claim form.  GCG mailed (or emailed, in the case of Electronic Claims) Notices of Conditional Rejection to each of these

claimants.   The Notices of Conditional Rejection described the steps and documentation necessary that would render the Proof of Claim eligible and such claimants were given 20 days from the date of the letter to submit the appropriate information and/or documentary evidence to complete the Proof of Claim.   GCG provided extensive assistance to claimants with curable defects through the process of correcting and completing their claims and provided them various opportunities to file, and to complete, their claims.  Cirami Aff. ¶¶ 34-45, 72.  GCG guided a significant number of claimants in properly completing their otherwise deficient submissions so that they are now eligible to participate in the Settlement.  *Id.*

Two of the remaining 15 claimants who disagreed with GCG's determination on the eligibility of their claims belong in this category.  Redacted versions of their claim forms as well as the written correspondence related to the claim are annexed as Exhibit D to the Cirami Affidavit.  In sum, Disputed Claimants No. 14 (Claim 2021077) and No. 15 (Claim 2795505) failed to provide any documentation whatsoever to support their claims.  *See* Cirami Aff. ¶ 73(c).

GCG has received 34,805 deficient, but uncured, claims, including the 2 claimants who disagreed with GCG's determination on their claim.  *Id.* at ¶¶ 71, 73(c).  For all of these claims, because it is unknown if these shares were (a) sold during the Settlement Class Period or (b) held at the close of trading on July 17, 2008, GCG can neither fully process these uncured claims nor properly calculate a Recognized Loss.   GCG continues to receive, review and process correspondence or information submitted by claimants and will report any cured claims received through the Claims-in-Process Cut-Off Date.   Cirami Aff. ¶ 74.  Lead Plaintiffs respectfully request that the Court reject these deficient claims that were never cured (as reflected in the Cirami Affidavit at Exhibit C-3).

**4.   Lead Plaintiffs Recommend That Claims That Did Not Result in a Recognized Loss Should be Rejected**

The Plan of Allocation sets forth a formula to calculate Recognized Losses.  For Class

Period purchases of Citigroup common stock, the Recognized Losses are calculated as follows:

For shares of Citigroup common stock purchased or otherwise acquired between February 26, 2007 and April 18, 2008, inclusive, the Recognized Loss will be calculated as set forth below:

A.    For shares held at the end of trading on July 17, 2008, the Recognized Loss shall be that number of shares multiplied by the lesser of:

(1) the applicable purchase/acquisition date artificial inflation per share figure, as found in Table A below; or
(2) the difference between the purchase/acquisition price per share and $21.07.

B.    For shares sold between February 26, 2007 and April 18, 2008, inclusive, the Recognized Loss shall be that number of shares multiplied by the lesser of:

1) the applicable purchase/acquisition date artificial inflation per share figure less the applicable sale date artificial inflation per share figure, as found in Table A below; or
(2) the difference between the purchase/acquisition price per share and the sale price per share.

C.    For shares sold between April 19, 2008 and July 17, 2008, inclusive, the Recognized Loss shall be the lesser of:

(1) the applicable purchase/acquisition date artificial inflation per share figure, as found in Table A below;
(2) the difference between the purchase/acquisition price per share and the sale price per share; or
(3) the difference between the purchase/acquisition price per share and the average closing price of Citigroup common stock between April 19, 2008 and the date of sale.

Notice at 7.

Pursuant to the Plan of Allocation in the Notice at 7, Table A shows as follows:

| Purchase/Acquisition or Sale Date Range | Artificial Inflation Per Share |
|---|---|
| 2/26/07 – 11/4/07 | $4.94 |
| 11/5/07 | $3.38 |
| 11/6/07 – 11/18/07 | $1.72 |
| 11/19/07 – 1/14/08 | $1.15 |
| 1/15/08 | $0.71 |
| 1/16/08 – 4/18/08 | $0.10 |

The dates in Table A above are corrective disclosure dates and the artificial inflation figures are the stock price reactions to the disclosures (after removal of market and industry effects).  *Id.*

GCG received claims with transactional information that did not result in a Recognized Loss under the Court-approved Plan of Allocation because the purchases and sales occurred when the artificial inflation was the same.  In other words, the dollar amount of inflation per share at the date of acquisition was the same as the dollar amount of inflation per share at the date of sale.  This particular calculation prevents a recovery from the Settlement for losses sustained as a result of market forces rather than as a result of the alleged fraud.  *See, e.g.*, letter from Peter S. Linden to Ilse Lang dated March 3, 2014 [Dkt. No. 300], submitted as part of Exhibit D to the Cirami Aff (Ex. D, Part 2 at 18).  Six of the remaining 15 claimants who disagreed with GCG's determination on the eligibility of their claims belong in this category.  They are Disputed Claimants No. 4 (Claim 1137128), No. 5 (Claim 1146185), No. 6 (Claim 1841281), No. 8 (Claim 1984150), No. 12 (Claim 2762873), and No. 13 (Claim 2763543).  *See* Cirami Aff. ¶ 73(b).  Redacted versions of their claim forms as well as the written correspondence related to the claim are annexed as Exhibit D to the Cirami Affidavit.

Certain other claimants in this category with no Recognized Losses submitted trades that calculated to an overall market gain under the Plan of Allocation.  If sale proceeds exceed total purchase amounts, there is no Recognized Loss under the Plan of Allocation.  As set forth in the

Notice at Paragraph 44D, "[t]o the extent an Authorized Claimant had an aggregate gain from his, her or its transactions in Citigroup common stock during the Class Period, the value of his, her or its total Recognized Loss will be zero."  Notice at 7 at ¶ 44D.  Four of the remaining 15 claimants who disagreed with GCG's determination on the eligibility of their claims belong in this category.  They are Disputed Claimants No. 7 (Claim 1946902), No. 9 (Claim 20021), No. 10 (Claim 2203183), and No. 11 (Claim 2210262).  *See* Cirami Aff. ¶ 73(b).  Redacted versions of their claim forms as well as the written correspondence related to the claim are annexed as Exhibit D to the Cirami Affidavit.

The Notice also specifies at Paragraph 44D that "[t]here shall be no Recognized Loss on short sales of Citigroup common stock during the Class Period or Class Period purchases that were made in order to cover short sales; however, any aggregate gains with respect to short sales shall be offset against Recognized Losses on other transactions."  Some claimants submitted trades that resulted in no Recognized Loss under the Plan of Allocation pursuant to these short sale terms.

GCG mailed (or emailed, in the case of Electronic Claims) Notices of Conditional Rejection to each of these claimants.  The letter described to the claimant the defects with his, her or its claim and what, if anything, was necessary to cure the claim.  Such claimants were given 20 days from the date of the letter to submit the appropriate information and/or documentary evidence to complete the Proof of Claim.  GCG provided assistance to claimants where possible and provided explanations and instructions to claimants who had follow up questions.

GCG has identified 108,041 claims, including the 10 claimants discussed above who disagreed with GCG's determination on their claim, which did not result in a Recognized Loss

under the Plan of Allocation.  *Id.* at ¶¶ 71, 73(b).  Accordingly, Lead Plaintiffs respectfully request that the Court reject these claims with no Recognized Loss (as reflected in the Cirami Affidavit at Exhibit C-3).

### C.      The Court Should Authorize Distribution of the Net Settlement Fund

The Net Settlement Fund is ready to be distributed at this time to over 380,000 eligible Authorized Claimants.[7]  Lead Counsel respectfully requests that the Court direct GCG to hold 5% of the Net Settlement Fund as reserve and immediately distribute 95% of the Net Settlement Fund in the manner discussed above in Part IV above, the proposed Distribution Plan, to the claimants whose claims GCG has administratively determined to be valid (those listed in Exhibits C-1 and C-2 to the Cirami Affidavit), and who would receive a Distribution Amount of at least $10.00 pursuant to the Court-approved Plan of Allocation in the Notice.  *See* Notice ¶ 34.

It may be expected that not all of the payments to be distributed to Authorized Claimants (including late filing claimants) will be cashed promptly.  In order to encourage Authorized Claimants to promptly cash their Distribution checks, and to avoid or reduce future expenses relating to unpaid Distributions, Lead Plaintiffs propose that all the Distribution checks bear a notation "CASH PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED WITHIN 90 DAYS AFTER ISSUE DATE."  Lead Plaintiffs also propose that Authorized Claimants who do not cash their Distribution checks within the time allotted shall irrevocably forfeit all recovery from the Settlement, and the funds allocated to all such stale-dated checks shall be available in the redistribution to other Authorized Claimants.

---

[7] Pursuant to the Stipulation, the Net Settlement Fund will be distributed to Authorized Claimants after, *inter alia*, the outstanding fees and expenses of claims administration and any further tax liabilities are satisfied.  *See* Stipulation ¶ 19.

### D.   The Release of Claims

In order to allow the full and final distribution of the Net Settlement Fund, it is respectfully requested that the Court bar any further claims against the Net Settlement Fund received after the Claims-in-Process Cut-Off Date (April 18, 2014) beyond the amount allocated to Authorized Claimants, and provide that all persons involved in the review, verification, calculation, tabulation, or any other aspect of the processing of the Proofs of Claim submitted herein, or otherwise involved in the administration or taxation of the Settlement Fund or Net Settlement Fund, be released and discharged from any and all claims arising out of such involvement, provided, however, that the Court's distribution order shall not release any claim by Lead Plaintiffs against the Claims Administrator with respect to distributions, if any, if later discovered to have been made not substantially in accordance with the Stipulation, the Plan of Allocation or any order of the Court.[8]

### E.   The Court Should Authorize Payment of GCG's Fees and Expenses for Claims Administration

The Stipulation authorized payment from the Settlement Fund for the reasonable fees and expenses associated with, *inter alia*, the dissemination of notice to the Settlement Class and the review of claims and administration of the Settlement.  Stipulation ¶¶ 1(u), 19.  Further, the Preliminary Approval Order authorized Lead Counsel to pay from the Settlement Fund the reasonable costs incurred in identifying and notifying Settlement Class Members as well as administering the Settlement, up to a limit of $5,000,000 without further order of the Court.  Preliminary Approval Order ¶ 22 [Dkt. No. 156].  In accordance with GCG's agreement with

---

[8]  The Notice also states: "Lead Class Counsel, Plaintiffs, the Defendants and their respective counsel shall have no responsibility or liability whatsoever for the investment or distribution of the Settlement Fund, the Net Settlement Fund, the Plan of Allocation, or the determination, administration, calculation, or payment of any Claim Form or nonperformance of the Claims Administrator, the payment or withholding of taxes owed by the Settlement Fund, or any losses incurred in connection therewith."  Notice at 8; *see also* Stipulation ¶ 22.

Lead Counsel to act as the Claims Administrator herein and pursuant to its appointment as Claims Administrator in the Preliminary Approval Order, GCG was responsible for, among other things, mailing and publishing notice to the Settlement Class, maintaining a website for the Settlement, processing the claims, and allocating and distributing the Net Settlement Fund to Authorized Claimants.

Through March 15, 2014, GCG has incurred fees and out-of-pocket expenses in the amount of $8,889,889.37.  *See* Cirami Aff. ¶ 84 and Ex. E.[9]  To date, GCG has received interim payments for its fees and out-of-pocket expenses in the amount of $5,000,000 from the Settlement Fund.  Cirami Aff. ¶ 84; Preliminary Approval Order ¶ 22.  Accordingly, there is an outstanding balance of $3,889,889.37 payable to GCG for its work performed through March 15, 2014.  Cirami Aff. Ex. E at p. 14.  GCG respectfully requests approval of payment for the remainder of its fees and expenses through March 15, 2014.  GCG will incur additional fees and expenses to complete the distribution of the Net Settlement Fund, including the printing and mailing of checks and follow up with and from Class Members.  Pursuant to the Court's Preliminary Approval Order, at a future date, Lead Plaintiffs will submit a supplemental request for the Court to approve any additional Notice and Administration Costs.

### F.    Retention of Proof of Claim Forms and Other Documents

Lead Plaintiffs respectfully request that the Court authorize GCG to destroy: (a) paper copies of the Proofs of Claim and all supporting documentation one year after final distribution of the Net Settlement Fund; and (b) electronic copies of the Proofs of Claim and all supporting documentation three years after final distribution of the Net Settlement Fund.

---

[9]   The Notice disclosed the following: "Lead Class Counsel are authorized by the Stipulation to pay the Claims Administrator's fees and expenses incurred in connection with giving notice, administering the Settlement, and distributing the Net Settlement Fund to Settlement Class Members."  Notice at 10.

**VI.    CONCLUSION**

For the foregoing reasons, Lead Plaintiffs respectfully request that this Court issue the accompanying proposed Distribution Order granting the relief sought herein.

Dated:   April 25, 2014

Respectfully Submitted,

**KIRBY McINERNEY LLP**

By:    _/s/Peter S. Linden_
Ira M. Press
Peter S. Linden
Andrew M. McNeela
Beverly Tse Mirza
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

_Lead Counsel for Plaintiffs_