

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE CITIGROUP INC. SECURITIES
LITIGATION

---

09 MD 2070 (SHS)
This document relates to:
07 Civ. 9901 (SHS)

<u>MEMORANDUM OPINION</u>

SIDNEY H. STEIN, U.S. District Judge.

On August 1, 2013, this Court approved a settlement of this action as fair, reasonable, and adequate; directed the parties to consummate the settlement in accordance with its terms; directed the claims administrator to complete the processing of all claims; and directed lead counsel to move for an order authorizing distribution of the net settlement fund at the conclusion of that process. (*See* Opinion, Aug. 1, 2013, Dkt. No. 275; Final Judgment and Order of Dismissal with Prejudice, Aug. 1, 2013, Dkt. No. 276 ("Final Judgment").) Those steps have now been completed. Claimants submitted 670,869 claims to the claims administrator, amounting to approximately $3.3 billion in recognized losses. (Cirami Aff. ¶¶ 6, 9-10, 13, 17.) Out of more than two-thirds of a million claims submitted, fifteen rejected claims remain in dispute.

Lead counsel has moved for this Court to authorize distribution of the net settlement fund and to endorse the claims administrator's rejection of those fifteen disputed claims. (Dkt. No. 313.) Of the fifteen disputed claims, six claimants have written to the Court to object to lead counsel's motion (*see* Dkt. Nos. 309, 318, 319, 321, 323, 327), and the Court addresses each of the six objectors below. The Court concludes that those objections lack merit and that the class members should receive their recovery as expeditiously as possible. The Court therefore grants lead counsel's motion.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 23(e) mandates that courts oversee the distribution of class settlement funds. *See, e.g., Beecher v. Able*, 575 F.3d 1010, 1016 (2d Cir. 1978); *In re Agent Orange Prod. Liability Litig.*, 611 F. Supp. 1396, 1402 (E.D.N.Y. 1985), *aff'd in part and rev'd in part on other grounds*, 818 F.2d 179 (2d Cir. 1987). "The district court has broad supervisory powers with respect to the administration and allocation of settlement funds." *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 185 (2d Cir. 2001). Determinations of whether and how to distribute class settlement funds require district courts to "'exercise [] independent judgment to protect the interests of class absentees, regardless of their apparent indifference,' . . . as well as to protect the interests of more vocal members of the class." *In re Agent Orange Prod. Liability Litig. MDL No. 381*, 818 F.2d 179, 182 (quoting *In re Traffic Exec. Ass'n—E. R.R.*, 627 F.2d 631, 634 (2d Cir. 1980)). "So long as there is no 'abuse of discretion,' the district court's decision on distribution details is binding." *In re Agent Orange Prod. Liability Litig.*, 611 F. Supp. at 1402.

## II.  DISCUSSION

This class action alleged that in the period leading up to the subprime meltdown of the last decade Citigroup Inc. and several of its directors, officers, and agents fraudulently misled investors by materially understating the value of assets backed by subprime mortgages. To compensate individuals who purchased Citigroup common stock between February 26, 2007 and April 18, 2008, while avoiding the costs and risks of continued litigation, the parties settled this action. As noted above, the Court approved the $590 million settlement on August 1, 2013. (*See* Final Judgment.)

In approving the settlement, this Court also approved a "plan of allocation . . . derive[d] from the alleged corrective disclosures and the

market's reaction to those disclosures." *In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369, 386 (S.D.N.Y. 2013). Specifically, the settlement as approved sets forth a "schedule of estimated share-price inflation" that forms the basis for determining any recognized loss. *Id.* This Court explained the schedule as follows:

> The inflation at the time of each class member's purchase is the price per share harm she initially sustained due to the alleged fraud. If however, the class member sold before the final corrective disclosure, the Plan then subtracts from the harm at the time of purchase the inflation in the price she received at the time of sale. The result—the total harm at purchase minus gain at sale—is each class member's 'Recognized Loss.'

*Id.* The notice to potential class members provided the details of that plan of allocation. (Dkt. No. 156 Exh. 1 ("Notice") ¶¶ 44-46.)

When this Court granted its approval for the settlement, it also "retain[ed] continuing jurisdiction over . . . implementation of this Settlement and any award or distribution of the Settlement Fund." (Final Judgment ¶ 23.) The Court therefore analyzes lead counsel's motion based on the interests of the entire class—objecting and non-objecting members alike.

## A. The non-objecting class members are due an expeditious recovery.

When a court acts as fiduciary for a settling class, it pursues the "goal[] of expedient settlement distribution." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 321 (3d Cir. 2011). After all, "much of the value of a settlement lies in the ability to make funds available promptly." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. at 1406.

Several hundred thousand claimants, whose claims the administrator has accepted, currently await compensation. Their interest indisputably lies in the speedy distribution of the settlement fund.

3

### B. The claims administrator properly denied the claim of Ilse Lang.

Claimant Ilse Lang's transactions during the class period comprised a single acquisition and a single sale of Citigroup common stock: she acquired 1,000 shares on May 16, 2007, and sold them on September 5, 2007. (Cirami Aff. Ex. D, pt. 2 at 5-6.) At the end of the class period, Lang held no shares of Citigroup stock. (*Id.* at 6.)

It was only after Lang sold all of her Citigroup shares that Citigroup disclosed its vast exposure to collateralized debt obligations ("CDOs"), causing its stock price to decline and causing losses to those who held shares when the disclosure was made. Citigroup made its first critical disclosure on November 4, 2007. *See In re Citigroup Inc. Secs. Litig.*, 753 F. Supp. 2d. 206, 234 (S.D.N.Y. 2010).

Lang both acquired and then sold all her securities in Citigroup entirely during the time period in which Citigroup was making the alleged misleading statements that gave rise to this litigation. To whatever extent Citigroup's alleged misrepresentations artificially inflated the share price at which Lang acquired her stock, the same artificial inflation applied to the price at which she sold her stock. The claims administrator was correct to deny Lang's claim.

### C. The claims administrator properly denied the claim of Eugene Beard.

Like Lang, Eugene Beard submitted a claim based exclusively on Citigroup common stock bought and sold—in equal volume—prior to November 4, 2007. (Cirami Aff. ¶ 73(b)(ii); *id.* Ex. D, pt. 2 at 21-26.) Like Lang, claimant Beard held no Citigroup securities at the end of the class period. (*Id.* Ex. D, pt. 2 at 23-26.) Therefore, like Lang, he suffered no loss, having acquired and abandoned his interest in Citigroup during the same inflation period. The claims administrator was correct to deny Beard's claim.

4

### D.  The claims administrator properly denied the claim of Francisco Fuentez.

Unlike Lang and Beard, Francisco Fuentez lists many purchases and sales of Citigroup common stock during the class period. (Cirami Aff. Ex. D., pt. 6 at 48-109.) But like the others, Fuentez's purchases and sales all occurred during a single inflation period. He purchased 374,750 shares between January 16, 2008 and April 18, 2008, and he sold 374,750 shares in the same time. (Cirami Aff. ¶ 73(b)(x); *id.* Ex. D., pt. 6 at 66-105.) The plan of allocation places all of those trades within one inflation period, because no corrective disclosures fell between those dates. Therefore, Fuentez suffered no recognized loss and his claim was properly denied.

### E.  The claims administrator correctly calculated Robert Nodelman's loss.

Robert Nodelman submitted a claim on each of two separate accounts in which he and another person had held Citigroup common stock. One claim, associated with a Roth IRA, resulted in a recognized loss according to the claims administrator. (Cirami Aff. Ex. D., pt. 2 at 82.) The other claim listed nine stock purchases during the class period, representing 65,000 shares, and five sales during the class period, representing 60,000 shares. (*Id.* at 51-53.) The 60,000 shares were sold during the same inflation period in which Nodelman bought them, and thus Nodelman suffered no recognized loss in buying or selling those shares, for the same reason as Lang, Beard, and Fuentez.

That analysis leaves unaddressed the 5,000 shares that Nodelman purchased during the class period and still owned afterward. (*See id.* at 53, 82.) Lead counsel analyzed these shares in a letter to Nodelman: "[A]lthough you listed in your joint claim that you purchased 5,000 shares on November 6, 2007, these 5,000 shares actually belonged to your ROTH IRA account. Your separately filed claim for your ROTH IRA account . . . results in a Recognized Loss of $8,600." (*Id.* at 82 (Letter of Ira M. Press,

5

Feb. 11, 2014).) In response, Nodelman simply states: "They gave numerous reasons why I was denied. All their reasons are *false*." (Dkt. No. 327.) Nodelman's claim based on these 5,000 shares is duplicative of his claim that is based on his Roth IRA account, and the settlement fund will compensate Nodelman for the inflated price of these 5,000 shares. He cannot receive a settlement fund check twice for the same loss. Based on the evidence before the Court, the determinations of the claims administrator are correct.

## F. The claims administrator properly denied the claims of Jerry Malesovas and Paul Gupta.

The plan of allocation included a "look back" provision, consistent with that found in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. § 78u-4(e)(1). Specifically, the plan of allocation set forth a Holding Value of $21.07, based on the mean closing price of Citigroup common stock during the 90-day period immediately following the class period (from April 19, 2008 through July 17, 2008). (Notice ¶ 44(A) n.2; Cirami Aff. ¶ 73(b)(iv) n.11.) The notice to potential class members explained that claims would be limited to the difference between a claimant's purchase price and the Holding Value. (Notice ¶ 44 nn.2-3.) Jerry Malesovas and Paul Gupta's respective claims reveal that, in purchasing their securities, they each paid less per share than the Holding Value. Malesovas's claim shows 2,000 shares purchased at a total cost of $40,250 (Cirami Aff. Ex. D, pt. 2 at 85-102), less than the Holding Value of 2,000 shares, which is $42,140. Gupta's claim shows 1,000 shares purchased at a cost of $19,840 (*id*. Ex. D, pt. 6 at 3-16), less than the Holding Value of 1,000 shares, which is $21,070. Although both Malesovas and Gupta have objected to lead counsel's motion, neither disputes that they paid less than the Holding Value for their securities. (*See* Dkt. Nos. 321, 323.) The Court therefore determines that the claims administrator properly rejected their claims pursuant to the plan of allocation's look back provision.

## III. CONCLUSION

More than five years after this litigation began, hundreds of thousands of investors in Citigroup common stock are on the precipice of receiving compensation for the significant losses they suffered due to alleged misstatements by Citigroup about its subprime exposure. The Court has reviewed the precious few objections to the distribution of the settlement fund (*see* Cirami Aff. Ex. D), and the Court is confident in the determinations of the claims administrator. The Court therefore authorizes the claims administrator to distribute the settlement fund.

Dated: New York, New York
       May 30, 2014

Sidney H. Stein, U.S.D.J.

7