UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC. SECURITIES LITIGATION | No. 07 Civ. 9901 (SHS)<br><br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO
<u>PERMIT FINAL DISTRIBUTION OF FUNDS AND *CY PRES* DESIGNATION</u>**

**KIRBY McINERNEY LLP**
Peter S. Linden
Ira M. Press
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Lead Counsel for Plaintiffs*

Dated: February 5, 2016

Pursuant to Fed. R. Civ. P. 60(b), Lead Plaintiffs,[1] on behalf of the Class, respectfully submit this memorandum of law in support of their motion for a Final Distribution Order authorizing, *inter alia*: (1) the distribution of the remaining settlements funds (following the payment of unpaid costs of administration and taxes, if any) to the *cy pres* designees set forth below at I.B.; and (2) final payment to the Garden City Group, LLC (f/k/a The Garden City Group, Inc.) (the "Claims Administrator" or "GCG") in the amount of $360,954.66 for its balance of fees and expenses in connection with the services performed through December 15, 2015 in administering the Settlement. *See* Cirami Final Aff.,[2] Ex. A.

I. **BACKGROUND**

   A. **Claims Administration and Distributions**

On August 1, 2013, this Court granted final approval to the $590 million cash Settlement between and among Lead Plaintiffs, on behalf of the Class, and Defendants under the terms set forth in the Stipulation, and dismissed this action with prejudice. *See* Final Judgment and Order [Dkt. No. 276]. On April 25, 2014, Lead Plaintiffs filed their motion for an Order Authorizing Distribution of the Net Settlement Fund ("Distribution Motion") [Dkt. Nos. 313-316], which the Court granted on May 30, 2014 (the "Distribution Order") [Dkt. No. 331]. Pursuant to the Distribution Order, GCG distributed total proceeds of $483,091,186.61, or 95% of the Net Settlement Fund to 258,524 Authorized Claimants. Cirami Final Aff. ¶ 3. As set forth in the

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the same meaning as set forth in the Stipulation and Agreement of Settlement, dated August 28, 2012, as amended (the "Stipulation"), filed with the Court on August 29, 2012 [Dkt. No. 155-1], and as modified by the Court's September 28, 2012 order further amending the preliminary approval order [Dkt. No. 159]; the May 30, 2014 Order Authorizing Distribution of the Net Settlement Fund (the "Distribution Order") [Dkt No. 331]; and the December 29, 2014 Order Authorizing Distribution of the Reserve Fund (the "Reserve Distribution Order").

[2] Citations to "Cirami Final Aff." refer to the Affidavit of Stephen J. Cirami in Support of Motion for Final Distribution of the Net Settlement Fund, dated January 20, 2016, filed concurrently herewith.

Distribution Order, 5% of the Net Settlement Fund was held in reserve to address any contingencies, including the payment of any Claim-in-Process. Following the processing of the remaining Claims-in-Process, Lead Plaintiffs filed a motion for an Order Authorizing the Reserve Distribution ("Reserve Distribution Motion") [Dkt. Nos. 358-363], which the Court granted on December 29, 2014 (the "Reserve Distribution Order") [Dkt. No. 365]. Under the Reserve Distribution Order, GCG distributed total proceeds of $611,840.77 to 61 Authorized Claimants. *Id.* ¶ 5.

All distribution checks included a notation that the checks were to be cashed promptly, and were void and subject to redistribution if not cashed within 90 days after issue date. Cirami Final Aff. ¶ 5; Distribution Order at 4. Following the Initial Distribution and Reserve Distribution, to ensure that the maximum number of checks was cashed, GCG implemented a calling campaign to follow up with Authorized Claimants who had not cashed their checks, and continued to reissue checks through July 24, 2015, nearly a year after the Initial Distribution. Cirami Final Aff. ¶¶ 6-7. As a result of GCG's follow ups, a total of approximately 247,770 payments totaling approximately $480,304,850, or over 99% of the amounts distributed in the Initial Distribution and the Reserve Distribution, were cashed by Authorized Claimants. *Id.* ¶ 8.

As of July 14, 2015, approximately $27 million remained in the Net Settlement Fund. *Id.* Following the terms of the Distribution Order, uncashed and undeliverable checks were voided on July 28, 2015 so that a second distribution could be made on a pro rata basis to eligible Authorized Claimants. *Id.* ¶ 10. The remaining amount in the Net Settlement Fund was subsequently redistributed on August 14, 2015 to Authorized Claimants whose claims were not Claims Paid in Full, who have cashed their Initial Distribution checks, and who would receive at least $10.00 from the redistribution (the "Second Distribution"). In the Second Distribution,

GCG distributed total proceeds of $26,779,189.30, or 99% of the Net Settlement Fund, to 55,345 Authorized Claimants. *Id.* GCG again implemented a calling campaign to follow up with Authorized Claimants to cash their Second Distribution checks. As a result of GCG's efforts, payments totaling approximately $26,519,930 or approximately 99% of the amount distributed in the Second Distribution were cashed by Authorized Claimants. As of January 15, 2016, approximately five (5) months after the Second Distribution, a balance of approximately $735,780 remains in the Net Settlement Fund. *Id.* ¶¶ 11-13.

The Court approved GCG's fees and out-of-pocket expenses through October 15, 2014. Reserve Distribution Order at 3. Since October 15, 2014, GCG has continued to administer the Settlement, including conducting the Reserve Distribution and the Second Distribution, and responding to inquiries from Class Members. *Id.* ¶¶ 5-14. Through December 15, 2015, there is a final balance of $360,954.66 for GCG's fees and expenses that should be paid. *See id.* ¶ 15 and Ex. A. If approved by the Court, a balance of approximately $374,820 will remain in the Net Settlement Fund. *Id.* ¶¶ 15, 17.

As noted above, uncashed Initial Distribution checks were redistributed. *Id.* ¶ 10. Requests from Authorized Claimants for reissues of their uncashed Initial Distribution checks after July 24, 2015 were not honored as those funds were redistributed in the Second Distribution. *Id.* ¶ 14. However, two additional Authorized Claimants continue to insist on the reissue of their Initial Distribution checks, well over a year after the checks were issued. Despite GCG's reasonable and diligent efforts to follow up with Authorized Claimants to cash their distributions in a timely manner and in accordance with the terms of the Distribution Order, these two Claimants did not request reissues of their Initial Distribution checks until October 2015 and December 2015. *Id.* The total amount at issue for Claim No. 2916498 is $792.57 (had this

3

claimant cashed his Initial Distribution amount of $751.81, he would have received a Second Distribution amount of $40.76); and the total amount at issue for Claim No. 1704243 is $494.74 (had this claimant cashed his Initial Distribution amount of $468.09, he would have received a Second Distribution amount of $26.65). *Id.* ¶ 14(a) and (b). While there are existing funds in the Net Settlement Fund to reissue these checks, these two recent late requests for reissues for their Initial Distributions are untimely and should be subject to approval by the Court.

Acceptance of any additional reissue requests would necessarily delay any final distribution. Requests to reissue Second Distribution checks were honored through January 13, 2016. *Id.* ¶ 12. Accordingly, it is also respectfully requested that this Court order that no further check reissue requests after January 13, 2016 be honored for any reason whatsoever.

**B.**     ***Cy Pres* Designees**

The Stipulation and the Distribution Order provide that any unclaimed funds shall be redistributed among Class Members who were not Claims Paid in Full in pro rata payments, until it is no longer economically feasible. Stipulation ¶ 21; Distribution Order at 5. Given the current balance in the Net Settlement Fund (following any Court-approved payment of unpaid administration fees or additional check reissues) and the cost of conducting a third distribution, Lead Counsel respectfully submits that further redistribution is no longer feasible. *See also* Cirami Final Aff. ¶¶ 16-17.

Under the terms of the Stipulation and the Distribution Order, Lead Counsel has selected the following non-sectarian charitable organizations certified under the United States Internal Revenue Code § 501(c)(3) for the Court's approval as the *cy pres* designees: (1) South Brooklyn Legal Services for use by its Foreclosure Prevention Project ("SBLS"); (2) National Consumers League ("NCL"); and (3) Consumer Federation of America for use by its Investor Protection

division (the "CFA").

SBLS' Foreclosure Prevention Project addresses high rates of foreclosures against low-income, non-white homeowners and is one of the oldest and largest projects in New York City to offer legal assistance to homeowners at risk of foreclosure due to discriminatory lending and home sales practices. The Project engages in systemic investigations of predatory and discriminatory lending practices, files affirmative litigation relating to abusive loan servicing and foreclosure rescue scams, and represents homeowners in foreclosure actions. *See* Exhibit 1 to the Linden Declaration.[3]

The National Consumers League's mission is to protect and promote the interests of consumers in a variety of areas. In the area of mortgage and investment fraud, NCL has combatted elder fraud by launching a step-by-step guide to help older adults avoid falling victim to investment scams, collected and analyzed consumer complaints allowing NCL to spot emerging trends and warn consumers, and launched a consumer education website designed to help guide consumers through the complicated process of purchasing a home and avoid falling victim to foreclosure. *See* Linden Decl. Exh. 2.

Additionally, for more than two decades, the Consumer Federation of America has been a consumer leader in advocating the interests of investors. For example, the CFA's work on investor protection issues has included significant contributions to the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform Act, and most recently, to the U.S. Department of Labor's pro-investor rule seeking to ensure that investment advisors are held to a fiduciary standard under the Employee Retirement Income Security Act (ERISA). *See* Linden Decl. Exh. 3.

---

[3] Citations to "Linden Decl." refer to the Declaration of Peter S. Linden in Support of Plaintiffs' Motion to Permit Final Distribution of Funds and *Cy Pres* Designation, dated February 5, 2016, filed concurrently herewith.

Lead Counsel respectfully submits that each of the above organizations is a legitimate and appropriate recipient of a *cy pres* award in this case. Specifically, Lead Counsel requests that the Court approve the selection of these *cy pres* designees and award the remaining portion of the fund as follows: 37.5% to the SBLS, 37.5% to the NCL, and 25% to the CFA (following any Court-approved payment of unpaid administration fees or additional check reissues).[4]

## II. ARGUMENT

### A. The Court Should Approve the Distribution of the Remaining Net Settlement Fund to Lead Counsel's *Cy Pres* Designees

"Most class actions result in some unclaimed funds." *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990); *In re Motorsports Merch. Antitrust Litig.*, 160 F. Supp. 2d 1392, 1393 (N.D. Ga. 2001) ("It is not uncommon in . . . class actions to have funds remaining after payment of all identifiable claims."). Indeed, "[d]espite best efforts[,] . . . it remains virtually certain – especially when large classes are involved – that not all class members will share in an aggregate class recovery. This situation may or may not result in a residue remaining after individual claim distribution." *Jones v. Nat'l Distillers*, 56 F. Supp. 2d 355, 356 (S.D.N.Y. 1999) (citations omitted).

In such circumstances, "[t]he Court has broad discretion and equitable powers to permit the use of *cy pres* principles." *Plotz v. NYAT Maint. Corp.*, No. 98 Civ. 8860, 2006 WL 298427, at *1 (S.D.N.Y. Feb. 6, 2006), *citing Jones*, 56 F. Supp. 2d at 359; *see Gates v. Rohm & Haas Co.*, No. 06 Civ. 1743, 2011 WL 1103683, at *2 (E.D. Pa. Mar. 24, 2011) (quoting *Six (6) Mexican Workers*, 904 F.2d at 1307 ("[f]ederal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds.")) (quotations omitted);

---

[4] If the Court approves payment of unpaid administration fees, approximately $374,820 would be available for *cy pres* distribution. If the Court also approves the two requests for reissuance, this amount would be reduced by $1,287.31.

*Coppolino v. Total Call Int'l, Inc.*, 588 F. Supp. 2d 594, 605 n.6 (D.N.J. 2008) (noting that "cy pres distributions are permitted in situations where class recovery cannot feasibly be distributed to individual class members or where unclaimed funds remain following distribution to the class . . . .").

Courts allow *cy pres* distributions of unclaimed funds to one or more recipients that are "appropriate under the circumstances." *Jones*, 56 F. Supp. 2d at 357. Moreover, courts generally "have approved charitable donations to organizations geared toward combating harms similar to those that [] injured the class members. Such a donation may serve the *cy pres* principle of indirectly benefitting all class members." *Gates*, 2011 WL 1103683, at *2 (quotations and citations omitted).

Other courts, however, have expanded the *cy pres* doctrine to permit distributions to charitable organizations that do not necessarily directly relate to the litigation in which the funds were recovered. *See, e.g.*, *Superior Beverage Co., Inc. v. Owens-Illinois, Inc.*, 827 F. Supp. 477, 478-486 (N.D. Ill. 1993) (approving grants from unclaimed class settlement funds to legal aid bureau, various law school programs, museum, public television station, and other charities); *Motorsports Merch.*, 160 F. Supp. 2d at 1394 ("Courts have expanded the *cy pres* doctrine to also permit distributions to charitable organizations not directly related to the original claims."); *id.* at 1396-99 (approving *cy pres* distribution in antitrust action to, *inter alia*, the Make-A-Wish foundation, Atlanta chapter of the American Red Cross, various legal aid services, children's hospitals, and a breast cancer foundation).

Here, pursuant to the Stipulation and the Distribution Order, Lead Counsel designate: (1) South Brooklyn Legal Services for use by its Foreclosure Prevention Project; (2) National Consumers League; and the (3) Consumer Federation of America for use by its Investor

7

Protection division as the *cy pres* designees. Stipulation ¶ 21; Distribution Order at 5. Each is a non-sectarian charitable organizations certified under the United States Internal Revenue Code § 501(c)(3) and each is a legitimate and appropriate recipient of the *cy pres* award in this case because of their respective work on behalf of investors and consumers. *See Plotz*, 2006 WL 298427, at *2 ("The distribution preference of class counsel should be entitled to deference when it is the only entity with a meaningful and equitable interest in the remaining funds, especially where the designated recipient is a legitimate and appropriate organization."). Accordingly, Lead Plaintiffs respectfully request that the Court approve that the balance of the funds be divided as follows: 37.5% to the SBLS, 37.5% to the NCL, and 25% to the CFA.

### B. The Court Should Authorize Payment of GCG's Remaining Fees and Expenses for Claims Administration

The Stipulation authorized payment from the Settlement Fund for the reasonable fees and expenses associated with, *inter alia*, the dissemination of notice to the Settlement Class and the review of claims and administration of the Settlement. Stipulation ¶¶ 1(u), 19. In accordance with GCG's agreement with Lead Counsel to act as the Claims Administrator herein and pursuant to its appointment as Claims Administrator in the Preliminary Approval Order, GCG was responsible for, among other things, mailing and publishing notice to the Settlement Class, maintaining a website for the Settlement, processing the claims, and allocating and distributing the Net Settlement Fund to Authorized Claimants.

The Court approved GCG's fees and out-of-pocket expenses up through October 15, 2014. Reserve Distribution Order at 3. Through December 15, 2015, the total outstanding fees and out-of-pocket expenses for GCG's work is $360,954.66. Cirami Final Aff. Ex. A. This amount includes all unpaid fees and expenses that GCG has incurred for the administration of this Settlement. GCG respectfully requests approval of payment for the remainder of its fees and

expenses. Pursuant to the Preliminary Approval Order, ¶ 22 [Dkt. No. 156], Lead Counsel hereby submits this final request for the Court to approve GCG's additional administration costs.

## III. CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that this Court issue the accompanying proposed Final Distribution Order granting the relief sought herein.

Dated: February 5, 2016

Respectfully Submitted,

**KIRBY McINERNEY LLP**

By:    */s/Peter S. Linden*
      Peter S. Linden
      Ira M. Press
      825 Third Avenue, 16th Floor
      New York, NY 10022
      Tel: (212) 371-6600
      Fax: (212) 751-2540

*Lead Counsel for Plaintiffs*