UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CITIGROUP INC. SECURITIES LITIGATION | No. 07 Civ. 9901 (SHS)<br><br>ECF Case |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THEODORE H. FRANK'S MOTION FOR RECONSIDERATION OF ORDER AUTHORIZING FINAL DISTRIBUTION OF FUNDS AND *CY PRES* DESIGNATION**

KIRBY McINERNEY LLP
Peter S. Linden
Ira M. Press
825 Third Avenue, 16th Floor
New York, NY 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2540
Email: plinden@kmllp.com
　　　　ipress@kmllp.com

*Attorneys for Lead Plaintiffs*

**TABLE OF CONTENTS**

**Page**

I. ARGUMENT ................................................................................................................... 1

    A. Standard on a Motion for Reconsideration ........................................................... 1

    B. This Court Authorized Lead Counsel to Select *Cy Pres* Recipients Subject to Its Approval ........................................................................................... 2

    C. The *Cy Pres* Designees That Were Approved By the Court Are Appropriate Recipients .......................................................................................... 3

        1. SBLS' Foreclosure Prevention Project ...................................................... 6

        2. NCL ............................................................................................................ 8

        3. CFA ........................................................................................................... 10

    D. The Alternative *Cy Pres* Recipients Proposed By Mr. Frank Are Irrelevant .............................................................................................................. 11

    E. The Court Should Reject the Motion for Reconsideration and Permit the Final Distribution of Funds and *Cy Pres* Designation to Proceed ................. 12

II. CONCLUSION ............................................................................................................. 13

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                          **Page**

*In re BankAmerica Corp. Sec. Litig.*,
    775 F.3d 1060 (8th Cir. 2015) .................................................................................... 3, 4, 5

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015)................................................................................ 6

*In re Holocaust Victims Assets Litig.*,
    424 F.3d 132 (2d Cir. 2005)............................................................................................. 11

*Johnson v. Brennan*,
    No. 10 Civ. 4712 (CM), 2012 WL 6584019 (S.D.N.Y. Dec. 12, 2012).............................. 3

*Jones v. Nat'l Distillers*,
    56 F. Supp. 2d 355 (S.D.N.Y. 1999)................................................................................ 12

*Masters v. Wilhemina Model Agency, Inc.*,
    473 F.3d 423 (2d. Cir. 2007).............................................................................................. 5

*Nakshin v. Holder*,
    360 F. App'x 192 (2d Cir. 2010) ....................................................................................... 2

*Plotz v. NYAT Maint. Corp.*,
    No. 98 Civ. 8860, 2006 WL 298427 (S.D.N.Y. Feb. 6, 2006) ..................................... 3, 12

*Reyes v. Buddha-Bar NYC*,
    No. 08 Civ. 02494, 2010 WL 2545859 (S.D.N.Y. June 18, 2010).................................... 3

*S.E.C. v. Bear, Stearns & Co. Inc.*,
    626 F. Supp. 2d 402 (S.D.N.Y. 2009).......................................................................... 5, 9

*Sewell v. Bovis Lend Lease, Inc.*,
    No. 09 Civ. 6548, 2013 WL 1316015 (S.D.N.Y. Mar. 29, 2013) ................................ 3, 12

*Shrader v. CSX Transp. Inc.*,
    70 F.3d 255 (2d Cir. 1995)................................................................................................. 1

*Stefaniak v. HSBC Bank US, N.A.*,
    No. 05 Civ. 720, 2011 WL 7051093 (W.D.N.Y. Dec. 15, 2011) ...................................... 3

**Other Sources**

American Law Institute, Principles of the Law of Aggregate Litigation § 3.07 (2010)............. 3, 5

Lead Plaintiffs respectfully submit this memorandum of law in opposition to Theodore H. Frank's Motion for Reconsideration of Order Authorizing Final Distribution of Funds and Cy Pres Designation filed on February 19, 2016 [ECF Nos. 379 & 380]. The Stipulation[1] provides that upon determination that further redistributions of any balance remaining in the Net Settlement Fund is no longer feasible, "Lead Counsel shall donate the remaining funds, if any, to a non-sectarian charitable organization(s) certified under the United States Internal Revenue Code § 501(c)(3), to be designated by Lead Counsel and approved by the Court." Stipulation ¶ 21.

The Court's Order authorizing final distribution of funds and *cy pres* designations on February 16, 2016 does not warrant reconsideration. Lead Counsel respectfully submits that each of the recipient organizations is a legitimate and appropriate recipient of a *cy pres* award as required under the Stipulation, and that the Court did not err in approving the final distribution of the Net Settlement Fund, including to the *cy pres* recipients designated by Lead Counsel.

**I.     ARGUMENT**

    **A.     Standard on a Motion for Reconsideration.**

The standard governing motions for reconsideration under S.D.N.Y. Local Civil Rule 6.3 "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.*

---

[1] Unless otherwise indicated, all capitalized terms herein shall have the same meaning as set forth in the Stipulation and Agreement of Settlement, dated August 28, 2012, as amended (the "Stipulation"), filed with the Court on August 29, 2012 [ECF. No. 155-1], and as modified by the Court's September 28, 2012 order further amending the preliminary approval order [ECF. No. 159]; the May 30, 2014 Order Authorizing Distribution of the Net Settlement Fund (the "Distribution Order") [ECF No. 331]; and the December 29, 2014 Order Authorizing Distribution of the Reserve Fund (the "Reserve Distribution Order") [ECF. No. 365].

1

*Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Nakshin v. Holder*, 360 F. App'x 192, 193 (2d Cir. 2010) ("The threshold for prevailing on a motion for reconsideration is high.").

However, even assuming *arguendo* that Mr. Frank's opposition is timely, his arguments against the *cy pres* recipients are misguided. Contrary to Mr. Frank's statements, he has not "correct[ed] a clear error or manifest injustice." This Court did not overlook any such argument. As discussed below, even if the Court were to approve Mr. Frank's motion for reconsideration, none of the concerns outlined in his opposition are of any consequence.[2] The *cy pres* recipients selected by Lead Plaintiffs and approved by the Court are legitimate charitable organizations that are satisfactory *cy pres* recipients here.

### B. This Court Authorized Lead Counsel to Select *Cy Pres* Recipients Subject to Its Approval.

The Stipulation expressly provides that "Lead Counsel shall donate the remaining funds, if any, to a non-sectarian charitable organization(s) certified under the United States Internal Revenue Code § 501(c)(3), *to be designated by Lead Counsel and approved by the Court*." Stipulation ¶ 21 (emphasis added); *see also* Notice ¶ 44. Mr. Frank did not register any objection to that provision, and after the Court ruled on his other objections, Mr. Frank did not appeal the decision. Moreover, there is nothing untoward about Lead Counsel's *cy pres* selections. As discussed below, each organization selected by Lead Counsel and approved by the Court devotes its efforts to combatting corporate fraudulent conduct. Mr. Frank has no basis to assert any nefarious motives or conflicts of interest in these selections.

The courts in the district of New York do not defer to the *cy pres* selection of a class member, but rather to the *cy pres* selection of plaintiffs and their counsel, unless there is good

---

[2] Mr. Frank's motion for reconsideration [ECF Nos. 379 and 380] relies on the Memorandum of Theodore H. Frank in Opposition to Motion to Permit Final Distribution of Funds and Cy Pres Designation, dated February 19, 2016 ("Frank Opp.") [ECF No. 378].

cause not to defer. *Sewell v. Bovis Lend Lease, Inc.*, No. 09 Civ. 6548, 2013 WL 1316015, at *3 (S.D.N.Y. Mar. 29, 2013) (citing *Plotz v. NYAT Maint. Corp.*, No. 98 Civ. 8860, 2006 WL 298427, at *2 (S.D.N.Y. Feb. 6, 2006); *Stefaniak v. HSBC Bank US, N.A.*, No. 05 Civ. 720, 2011 WL 7051093, at *1 (W.D.N.Y. Dec. 15, 2011)). Moreover, the district courts have allowed for designated *cy pres* recipients to be both national and local organizations as long as "each organization's mission is 'closely connected to the purpose of the instant lawsuit.'" *Sewell*, 2013 WL 1316015, at *2 (citing *Reyes v. Buddha-Bar NYC*, No. 08 Civ. 02494, 2010 WL 2545859, at *1 (S.D.N.Y. June 18, 2010)); *see also Johnson v. Brennan*, No. 10 Civ. 4712, 2012 WL 6584019 (S.D.N.Y. Dec. 12, 2012). Additionally, the work of the three *cy pres* recipients here are clearly connected to the purpose of the *Citigroup* case. *See* Sections I.C.1-3 *infra*.

    **C.**    **The *Cy Pres* Designees That Were Approved By the Court Are Appropriate Recipients.**

Mr. Frank's reliance on *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060 (8th Cir. 2015) is misguided. In *BankAmerica Corp.*, counsel sought to distribute $2.7 million (compared to the approximate $374,820 available here for *cy pres* distribution assuming the Court-approved payments of unpaid administration fees and additional claims are paid). Moreover, in its analysis, the Eighth Circuit in its *BankAmerica Corp.* ruling states that it has approved *cy pres* distribution in instances that met the criteria in ALI §3.07. *Id.* at 1064. Here, the criteria set forth in ALI §3.07 have been met.

As cited by Mr. Frank, the American Law Institute addressed the issue of *cy pres* settlements in § 3.07 of its published Principles of the Law of Aggregate Litigation (2010). The ALI recommended:

> A court may approve a settlement that proposes a cy pres remedy . . . . The court must apply the following criteria in determining whether a cy pres award is appropriate:

3

>(a) If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.
>
>(b) If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.
>
>(c) If the court finds that individual distributions are not viable based upon the criteria set forth in subsections (a) and (b), the settlement may utilize a cy pres approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interest reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

*BankAmerica Corp.*, 775 F.3d at 1063-64.

The ALI's recommendations have been followed here. With respect to subsections (a) and (b), the Claims Administrator has conducted several distributions, each with reasonable effort and extensive follow up, and approximately 99% of the amounts distributed through each distribution have been cashed. Specifically, 247,770 payments totaling approximately $480,304,850, or over **99%** of the $483,726,990 distributed in the Initial Distribution and the Reserve Distribution, have been cashed by Authorized Claimants. S*ee* January 20, 2016 Affidavit of Stephen J. Cirami in Support of Motion for Final Distribution of the Net Settlement Fund ("Cirami Final Aff.") [ECF No. 376] ¶¶ 6-8. Further, in the Second Distribution, payments totaling approximately $26,519,930 or approximately **99%** of the amount distributed in the Second Distribution were cashed by Authorized Claimants. *Id.* at ¶ 12.

After almost two years of distribution, all that remains in the Net Settlement Fund (assuming that the Court's February 16, 2016 approval that final payment be made to the Claims Administrator for $360,954.66 and approving the late reissues to Authorized Claim Numbers 2916498 and 1704243 is upheld), is just **$374,820**. *Id.* at ¶ 15.

This remaining figure is a small fraction (less than one-seventh) of the multimillion dollar remaining balance at issue in *BankAmerica Corp.* Mr. Frank's other authorities likewise concern far more substantial amounts of undistributed settlement funds than at issue here. *See, e.g.*, *Masters v. Wilhemina Model Agency, Inc.*, 473 F.3d 423, 431 (2d. Cir. 2007) (of a nearly $22 million fund, only $9.34 million was claimed by class members); *S.E.C. v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402 (S.D.N.Y. 2009) ($79 million dollars in undistributed settlement funds). The situation is different here, where extensive efforts to distribute the settlement monies to aggrieved Citigroup investors, including to Mr. Frank, have resulted in a remaining balance of approximately $374,820.

Lead Counsel's selection, which was subject to Court approval, further subdivided this sum by directing fractions of it to three different recipients: (1) 37.5% of $374,820, or **$140,557.50**, to South Brooklyn Legal Services for use by its Foreclosure Prevention Project ("SBLS"); (2) another 37.5% of $374,820, or **$140,557.50**, to the National Consumers League ("NCL"); and (3) the remaining 25% of $374,820, or **$93,705**, to the Consumer Federation of America for use by its Investor Protection division (the "CFA").

ALI § 3.07(c) guides that courts "when feasible, should require the parties to identify a recipient whose interests *reasonably approximate* those being pursued by the class" (emphasis added. This case was about Citigroup's collateralized debt obligation ("CDO") exposures and disclosures. The Complaint alleged, in essence, a tremendous amount of the former and an

5

insufficient amount of the latter.  In extraordinary detail, the Complaint alleged how Citigroup's undisclosed CDO exposures rested, in an extremely complex way, on risky, fraudulent and unsustainable mortgages extended primarily to subprime borrowers.[3] Citigroup investors were damaged when Citigroup's undisclosed CDOs experienced all-but total losses, which CDO losses were themselves caused by the default of the underlying subprime mortgages.  As discussed below, Lead Counsel respectfully submits that the three *cy pres* recipients pursue work that is reasonably approximate to the interests of the class.

### 1. SBLS' Foreclosure Prevention Project

Precisely as Mr. Frank notes, this case was "a securities fraud case having to do with subprime mortgage-backed securities."  Frank Opp. 6.  SBLS addresses the same practices that are alleged to have contributed to losses to Citigroup shareholders because SBLS' foreclosure prevention work is a countervailing force to the shoddy mortgage and securitization practices at the heart of this case.

For example, Plaintiffs alleged that Citigroup's repackaging of mortgages exposed Citigroup to tens of billions of dollars of mortgage related losses.  SBLS has fought against fraudulent and predatory subprime mortgage lending practices that, in leading such mortgages to default, sparked the financial crisis.[4]  SBLS works against the misconduct that caused

---

[3] The Complaint's allegations explained the complex chain of structured risk flowing, from subprime mortgages at the very bottom to CDOs at the very top.  *See* Amended Consolidated Class Action Complaint ¶¶ 1-637, 891-946, 962-1036 [ECF No. 74].  Specifically, the Complaint alleged how ever-more-risky, fraudulent and/or unsustainable mortgages were:  (1) extended primarily to subprime borrowers; (2) made in order to be securitized into nonprime mortgage-backed securities ("RMBS"); (3) underlay the riskier and lower-rated tranches of such RMBS, exposed to relatively low levels of aggregate losses from pooled such mortgages, which were re-securitized again as CDOs; and (4) underlay the undisclosed hoard of unsold CDOs that piled up on (and off) the books of the world's largest CDO arrangers, exposing such CDOs – and the institutions holding them, which in largest part were the institutions that had created them – to total losses on such holdings.  *Id.*

[4] *See, e.g., Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 587 (S.D.N.Y. 2015) ("[S]hoddy origination practices contributed to the housing bubble, and were among the factors that contributed to the economic collapse that followed when that bubble burst. Defendants do not dispute this.  They do not deny that

6

irresponsible securitizations of mortgages such as those that are the subject of this case.[5] Contrary to Mr. Frank's supposition, those ramifications extend beyond Citigroup's backyard in New York City.[6] Providing approximately $140,000 to SBLS will be cost effective[7] and will work to ensure that the sort of conduct that caused the financial crisis will have a structural impediment in the form of an advocate for those most at risk in the roots of the financial crisis.

---

there is a link between the securitization frenzy associated with those shoddy practices and the very macroeconomic factors that they say caused the losses to the [mortgage-backed securities]").

[5] SBLS and its sister organization Bedford-Stuyvesant Community Legal Services (a merger of the two organizations has been approved by the New York State Attorney General and is pending before the Department of State) currently work on cases involving securitization and assignment irregularities. Relatedly, in 2006, SBLS filed an amicus brief with the New York Court of Appeals in the case of *Merscorp, Inc. v. Romaine*, 8 N.Y.3d 90 (N.Y. 2006), as part of an effort to prevent MERS (an entity created by the banking industry) from being entitled to record mortgages, assignments and discharges in its own name – a practice which allowed open-ended securitization of mortgages in the state. SBLS has also obtained sanctions against a trust because of its attempt to mislead the court regarding its shoddy securitization practices. *U.S. Bank N. A., as Trustee for ABFC 2007-WMC1 Trust v. Gonzalez*, Index No. 4137/09 (Kings County Sup. Ct., June 8, 2010), *aff'd sub nom.*, 2012 NY Slip Op 06596 (App. Div. 2d Dept., Oct. 3, 2012) (sanctions against bank upheld).

[6] SBLS has a broad impact on mortgage lending policy and case law. SBLS is a founding member of New Yorkers for Responsible Lending ("NYRL"), a statewide coalition of more than 160 organizations which promotes economic justice as a matter of racial and community equity. NYRL's Mortgage Working Group, which is co-chaired by the Director of the Foreclosure Prevention Project, was instrumental to the passage of New York Banking Law 6-l, which is New York's high-cost lending law, the Home Equity Theft Prevention Act, N.Y. RPAPL 265-a, which protects distressed mortgage borrowers from deed theft and other fraud, New York's mandatory settlement conference law, N.Y. CPLR 3408. NYRL also helped pass a 2013 law designed to prevent robo-signing in foreclosure actions, which had been a rampant problem prior to the passage of the act and prevented borrowers from accessing the settlement conference process until it was too late for their loans to be modified. N.Y. CPLR 3012-b. Among other things, the 2013 law requires plaintiff attorneys in residential foreclosure actions to certify that they have reviewed the mortgage, note, and instruments of assignment and that the plaintiff is the creditor entitled to sue. Of course, legislative developments in New York often have an impact on other states across the country, and New York has been a leader in predatory lending, loan servicing, and foreclosure protection rules, in part as a result of advocacy by SBLS.

[7] In 2016, SBLS' Foreclosure Prevention Project will lose twenty percent of its dedicated funding as a result of the loss of a U.S. Department of Housing and Urban Development grant that supported mortgage-related fair housing investigations, litigation, and loss mitigation advocacy relating to predatory and discriminatory lending. In response to the foreclosure crisis in 2009, HUD issued approximately $9 million in Fair Housing Organization Initiative funds for lending and foreclosure related work. This year, HUD authorized only $1.5 million for this program. Notwithstanding the loss of this critical funding, the foreclosure crisis has not subsided. Many regions across the country continue to struggle with high foreclosure rates, over-leveraged properties, and the blight caused by vacant and abandoned property. In New York, foreclosures *still* comprise nearly 30% of the state's civil Supreme Court caseload. *See* 2015 Report of the Chief Administrator of the Courts at 3, available at http://www.nycourts.gov/publications/pdfs/2015ForeclosureReport.pdf. Almost 90,000 foreclosure actions are pending statewide, *id.* at 3, with approximately 12,000 of these cases pending in Brooklyn alone. Moreover, "new foreclosure filings have remained at near historic highs for the past three years." *Id.* Because of this continued harm to homeowners and communities, the need for SBLS' services remains high, even though public perception may be that the financial crisis and foreclosure crisis are both ended, or funders may have moved on to a new cause. This *cy pres* award would help SBLS maintain current staffing levels and support the work of attorneys who are providing direct legal assistance to homeowners who are the victims of abusive lending and at risk of foreclosure.

Highlighting the nexus between what SBLS does and this case, when the New York State Attorney General settled with Citigroup in connection with its improper packaging, marketing, sale and issuance of residential mortgage-backed securities, a remedy in that settlement was to help struggling homeowners (like those SBLS represents).[8] Mr. Frank's suggested alternative recipients (*see* Section I.D., *infra*; Frank Opp. 7) do not nearly approach the direct connection that SBLS has to the conduct at the heart of this case.

### 2. NCL

The work of the NCL is also reasonably approximate to the interests of the class here. The NCL has long worked to provide transparency, fair play, strong SEC enforcement and protections for investors, including those who were exposed to CDO fraud during the financial crisis. Specifically, NCL supported the passage of the Dodd-Frank Act, which created the Consumer Financial Protection Bureau and strengthened investor protections against deception in the CDO market in particular (*see generally* Title IX of the Act).

The NCL has organized events on the dangers of investment scams, including foreclosure and mortgage fraud scams related to the financial crisis at the heart of this case. Specifically, in October 2009, NCL organized "Solutions Forum on Fraud," featuring then-SEC Chairman Mary Schapiro, who spoke on the dangers of investment scams. The event included panels on topics that have nexus to the class, including "Stopping foreclosure rescue scams and mortgage frauds" and "Fighting Investment Fraud: Fostering Compliance and assuring enforcement."

The NCL also works to ensure that financial institutions remain in regulatory compliance and provide full and accurate information that allows investors to understand risk, make informed decisions and invest prudently. Consequently, the NCL's work benefits investors,

---

[8] *See* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-182-million-new-yorkers-part-7-billion-citigroup-settlement, last visited March 3, 2016.

including the class here. The November 2012 press release cited by Mr. Frank is taken out of context and does not suggest that the NCL's activities are adverse to the interests of the class.[9]

Mr. Frank suggests, with no basis whatsoever, that Lead Counsel has a conflict of interest in selecting the NCL as a *cy pres* recipient. But Lead Counsel "does not have an undisclosed conflict for [sic] interest with NCL" (Frank Opp. 8) and does not benefit from proposing that the NCL receive a *cy pres* award of approximately $140,000 for its investor protection work. The fact that Lead Counsel contributed money to the NCL, a worthwhile charitable organization, does not create a conflict of interest. More importantly, Mr. Frank cannot allege that Lead Counsel has ever received any benefit from the NCL.

As discussed above, Mr. Frank relies on *S.E.C. v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402 (S.D.N.Y. 2009). The court was correct to proceed with caution to exhaust all ways to distribute the enormous sum in undistributed settlement funds there – $79 million dollars, more than 200 times the amount here – and then further discussed scenarios where *cy pres* distributions have benefited attorneys on both defendants' and plaintiffs' sides. *Id.* at 415-16.

Here, extensive efforts have been focused to distribute the settlement monies to aggrieved Citigroup investors through several distributions. Lead Counsel does not benefit from asking the Court to approve the NCL as an appropriate *cy pres* recipient in this case and does not have any "significant prior affiliation" with the NCL. There is no conflict of interest here. Any contribution to the NCL goes towards its pro consumer and pro investor work. The investor advocacy work of the NCL benefits and aligns with the interests of Citigroup investors and other investors.

---

[9] The press release discusses the NCL's support for striking workers at Hostess Brand factories because Hostess had failed to make contributions to their pension plan, had reduced their wages and cut health benefits. The statement does not suggest that the NCL's activities are adverse to "wall street investors."

### 3. CFA

More than two-thirds of a million claims were submitted here. Mr. Frank claims to speak on behalf of the "policy preferences of many class members" and purports to be aware of "demographics of the class." Frank Opp. 11. Whether or not this is true, Mr. Frank's specific complaints about the CFA are not correct.

Contrary to Mr. Frank's beliefs, the CFA is not a political organization and does not involve itself in electoral campaigns. The interests of the Investor Protection division of the CFA are reasonably approximate to the class in this case as CFA's public policy research, education, and advocacy has and will continue to benefit shareholders of financial institutions, including Citigroup shareholders, as it works to support full and fair corporate disclosures, more reliable audits of corporate disclosures, and greater accountability for corporate officers who mislead shareholders, including Mr. Frank and other members of the Class, and shareholders of other large banks.

The work of the CFA does not boil down to "a lot of lobbying." Frank Opp. 10. The large majority of CFA's legislative and regulatory work involves analyzing concepts and proposals, then communicating these analyses to policy-makers, often at the initiative of legislators and regulators. The securities work done by the CFA serves the purpose of creating a fairer and more transparent financial services marketplace, thereby improving shareholder value. The principal goal of the Sarbanes-Oxley Act of 2002 was to increase information and protections to shareholders, and CFA was among the lead nonprofits supporting these reforms.

Lead Counsel has earmarked funds to the CFA specifically for use by the Investor Protection division of the CFA. Accordingly, as this specific use was approved by the Court, the

CFA is therefore required to use the approximate $93,705 in funds towards investor protection work. Mr. Frank's contrived fears that the money will be used for other purposes are unfounded.

### D. The Alternative *Cy Pres* Recipients Proposed By Mr. Frank Are Irrelevant.

In *In re Holocaust Victim Assets Litig.*, 424 F.3d 132 (2d Cir. 2005), the court noted that "[t]he district court has broad supervisory powers with respect to the administration and allocation of settlement funds, and we 'will disturb the scheme adopted by the district court only upon a showing of an abuse of discretion.'" *Id.* at 146. Mr. Frank has not made such a showing.

Mr. Frank argues that organizations devoted to "shareholder interests in securities litigation," including law professors and organizations housed at various universities and/or law schools, "are surely a closer fit to the class." Frank Opp. 7. While Mr. Frank is free to feel "sure" about it, his certainty is subjective rather than objective. There is nothing in the facts to indicate that a *cy pres* provision to a UCLA law professor or a Manhattan law school generates a closer geographic or substantive match than one to a Brooklyn non-profit fighting against mortgage lending abuse, for example.

Mr. Frank's suggestion of Stanford Law School's Securities Class Action Clearinghouse as an alternative recipient is clearly shaped by his own ideological views. A review of Stanford's website shows that it is funded largely by Cornerstone Research, one of the principal damages experts utilized by the defense bar in securities matters. Indeed, Cornerstone's list of its law firm clients is a veritable Who's Who of the defense bar (*see, e.g.*, https://www.cornerstone.com/The-Firm/Law-Firm-Clients).

Mr. Frank also argues that the SEC's "Fair Funds for Investors" program is a better match to class interests here. However, as the SEC has *already made a Fair Funds distribution to Citigroup shareholders harmed by inadequate disclosure of Citigroup's CDO exposure* (which, at $75 million, was less than 15% of the recovery here), any funds handed over to it now

11

will not only be redundant, but may not share any overlap at all with class interests here as they will flow to entirely different investors harmed by a variety of entirely different frauds.[10]

### E. The Court Should Reject the Motion for Reconsideration and Permit the Final Distribution of Funds and *Cy Pres* Designation to Proceed.

This Court "has broad discretion and equitable powers to permit the use of *cy pres* principles." *Plotz*, 2006 WL 298427, at *1 (*citing Jones v. Nat'l Distillers*, 56 F. Supp. 2d 355, 359 (S.D.N.Y. 1999)). The Court's February 16, 2016 order approving the *cy pres* recipients should not be vacated as there is no good cause to reconsider. Pursuant to the Stipulation, Lead Counsel selected *cy pres* recipients for approval by the Court. There is no reason to defer to the *cy pres* selections of Mr. Frank. *See Sewell*, 2013 WL 1316015, at *3.

Finally, Mr. Frank's motion necessarily delays any final distribution. Mr. Frank's opposition only concerns the *cy pres* recipients approved by the Court. Therefore, Lead Plaintiffs respectfully request that the Court permit the other portions of the Motion to Permit Final Distribution of Funds and *Cy Pres* Designation to proceed, namely that the Court: (1) order that no further check reissue requests after January 13, 2016 be honored for any reason whatsoever (*see* memorandum in support thereof [ECF 374] at 4); (2) allow final payment to GCG for $360,954.66, the outstanding balance of fees and expenses in connection with the services performed through December 15, 2015, as described more fully in the Cirami Final Affidavit [ECF No. 376]; and (3) allow payment of the late reissues to Claim No. 2916498 for $792.57 and Claim No. 1704243 for $494.74.

---

[10] Compare, for example, the SEC's July 29, 2010 announcement of its $75 million recovery for Citigroup shareholders (available at https://www.sec.gov/news/press/2010/2010-136.htm) with the SEC's current list of actions in which Fair Funds distributions are being made or pending (available at https://www.sec.gov/litigation/fairfundlist.htm).

## II.     CONCLUSION

For the foregoing reasons, Mr. Frank's motion should be denied.

Dated:  March 7, 2016                                             Respectfully Submitted,

**KIRBY McINERNEY LLP**

By:     */s/ Peter S. Linden*
          Peter S. Linden
          Ira M. Press
          825 Third Avenue, 16th Floor
          New York, NY 10022
          Tel: (212) 371-6600
          Fax: (212) 751-2540

*Lead Counsel for Plaintiffs*

13