UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

IN RE CITIGROUP INC. SECURITIES
LITIGATION

07-Cv-9901 (SHS)

OPINION

------------------------------------------------------------

SIDNEY H. STEIN, U.S. District Judge.

This securities fraud class action arose out of last decade's great recession. The action was litigated vigorously over the course of several years by experienced and skilled counsel. The parties ultimately entered into a settlement agreement that provided principally for the class members to receive $590 million. Essentially all of that has already been distributed and the Court recently granted lead plaintiffs' motion for final distribution of the settlement fund, including $374,820 to three not-for-profit *cy pres* designees.

Class member Theodore H. Frank has now moved for reconsideration of this Court's order granting lead plaintiffs' motion for final distribution of the settlement funds and *cy pres* designation. The Court grants the motion to reconsider and upon reconsideration adheres to its earlier decision on the grounds that the three entities selected by lead counsel are appropriate *cy pres* designees.

I. BACKGROUND

Plaintiffs are current and former Citigroup shareholders who brought a number of securities fraud actions on behalf of a class of Citigroup investors against Citigroup and fourteen of its officials. *In re Citigroup Sec. Litig.*, 753 F. Supp. 2d 206, 212 (S.D.N.Y. 2010). The actions were consolidated and the consolidated class action complaint charged that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. *Id.* In essence, plaintiffs claimed that Citigroup "knowingly understated the risks it faced and overstated the value of the assets it possessed" with regard to its exposure to various financial instruments

prevalent prior to the financial crisis. *Id.* Plaintiffs claimed they suffered serious damage "when the truth about Citigroup's assets was finally revealed." *Id.*

After several years of active litigation, the parties settled their claims, and the Court approved the settlement agreement in 2013. *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 385 (S.D.N.Y. 2013). As part of the settlement, defendants agreed to create a fund of $590 million to compensate the class as well as to pay the costs and attorneys' fees incurred in maintaining the action. (Stip. & Agreement of Settlement, Ex. 1 to Decl. of Ira M. Press dated Aug. 29, 2012 at 12, Dkt. No. 155.) The settlement agreement established that a plan to distribute the $590 million to the class would be submitted to the Court at a later date. (*Id.* at 25.) The agreement also set forth what the parties were to do with any unclaimed funds:

> In the event that Lead Counsel determines that further redistribution of any balance remaining . . . is no longer feasible, thereafter Lead Counsel shall donate the remaining funds, if any, to a non-sectarian charitable organization(s) certified under the United States Internal Revenue Code § 501(c)(3), to be designated by Lead Counsel and approved by the Court.

(*Id.* at 26.) The parties thus agreed that, even when it was "no longer feasible" to distribute remaining funds to the class, no funds would revert to Citigroup but would rather be donated to one or more non-sectarian, not-for-profit organizations.

When the Court preliminarily approved the settlement agreement, it authorized lead counsel to retain Garden City Group, Inc., ("GCG") to administer the settlement fund. (Order dated Aug. 29, 2012 at 5, Dkt. No. 156.) GCG subsequently distributed $483,091,186.61 to 258,524 claimants. (Aff. of Stephen J. Cirami dated Jan. 20, 2016, ¶ 3, Dkt. No. 376.) *See In re Citigroup Inc. Sec. Litig.*, No. 07-cv-9901, 2014 WL 2445714 (S.D.N.Y. May 30, 2014). An additional $611,840.77 was distributed to 61 claimants in late 2014. (Cirami Aff. ¶ 5; Order Authorizing Distribution of the Reserve Fund dated Dec. 29, 2014, Dkt. No. 365.) After these distributions, GCG worked diligently, as the settlement agreement required, to ensure distribution checks would be cashed, including "implement[ing] a calling campaign to follow up with Authorized Claimants whose checks were initially

2

uncashed." (Cirami Aff. ¶ 6.) If needed, GCG reissued checks to ensure claimants would receive their due. (*Id.* at ¶ 7.)

As of July 2015, some $27 million remained in the settlement fund. (*Id.* ¶ 8.) Consequently, GCG made a second distribution of $26,779,189.30 to 55,345 claimants. (*Id.* ¶ 10.) Essentially all of those checks were cashed. (*Id.* at ¶ 12.) After this distribution, some $735,780 remained in the fund, though a large percentage of that remainder was designated for "estimated administrative fees and expenses." (*Id.* at ¶ 13.)

On February 5, 2016, class counsel notified the Court that $374,820 designated for the class remained undistributed in the settlement fund, that it was no longer feasible to make further distributions, and that further efforts to do so would not be effective. (Cirami Aff. ¶¶ 16-17; Decl. of Peter S. Linden dated Feb. 5, 2016, Dkt. No. 375.) The $374,820 constitutes 0.064 percent of the original $590 million fund. Lead plaintiffs designated three nonprofit organizations to receive the remaining funds: South Brooklyn Legal Services; the National Consumers League; and the Consumer Federation of America. (Linden Decl. ¶ 4.) In February 2016, the Court granted lead plaintiffs' motion. (Order dated Feb. 16, 2016, Dkt. No. 377.)

Three days later, Frank moved the Court to reconsider its determination. Frank is a Senior Attorney with the Competitive Enterprise Institute—an organization that states is "dedicated to advancing the principles of limited government, free enterprise, and individual liberty"[1]— and the Director of the Center for Class Action Fairness, which sets forth on its website that it "represents class members against unfair class action procedures and settlements."[2] *Ted Frank*, Competitive Enterprise Institute, https://cei.org/content/ted-frank (last visited Aug. 8, 2016). He is also a class member in this litigation, (Decl. of Theodore H. Frank dated Dec. 20, 2012 ¶ 3, Dkt. No. 182; Stip. & Agreement of Settlement, Ex. 1 to Press Decl. at 12), and participated in the settlement approval process, objecting vigorously to counsel's request for fees and expenses. *See In re Citigroup Inc.*

---

[1] *Class Action Fairness*, Competitive Enterprise Institute, https://cei.org/issues/class-action-fairness (last visited Aug. 8, 2016).

[2] *About*, Competitive Enterprise Institute, https://cei.org/about-cei (last visited Aug. 8, 2016).

*Sec. Litig.*, 965 F. Supp. 2d at 379. Neither Frank nor any other class member objected to the *cy pres* procedure set forth in the settlement agreement.

Shortly after receiving Frank's motion to reconsider, the Court stayed its February 16 order granting the *cy pres* distribution, (Order dated March 21, 2016, Dkt. No. 383), and, to the Court's knowledge, none of the residual funds have been distributed to the three proposed nonprofit donees. No one contests that it is no longer "feasible" to distribute the remaining settlement funds to class members nor does anyone dispute that the distribution of funds to one or more *cy pres* designees is now appropriate. The parties disagree solely as to whom those funds should be distributed.

## II. DISCUSSION

Pursuant to the parties' settlement agreement, lead plaintiffs seek to donate the remaining $374,820 of the $590,000,000 settlement fund to three nonprofit designees. The donation of residual settlement funds is often referred to as a "*cy pres*" designation, named after a doctrine originating in Roman and English trust law. Martin H. Redish et al., *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative & Empirical Analysis*, 62 Fla. L. Rev. 617, 625 (2010); *see generally Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). In its original trust law habitat, the *cy pres* doctrine allows courts to take trust money previously designated for a defunct purpose and reallocate that money to some other purpose consonant with the purpose for which the trust was originally created. *See Matter of Hummel*, 30 A.D.3d 802, 804 (N.Y. App. Div. 3d Dep't 2006). The *cy pres* doctrine provides useful guidance in the class action context. *See Nachshin*, 663 F.3d at 1038; *but see Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004).

The analogy to trust law suggests that a class action *cy pres* designation is appropriate when two elements are met. First, *cy pres* designations should be made only when it is "'not feasible to make further distributions to class members.'" *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1064 (8th Cir. 2015) (quoting *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011)); *see Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007). This element derives from the stringent trust law requirement that prohibits *cy pres* designations of trust funds unless the trust's original purpose "could not be carried out." *SEC v. Bear, Sterns & Co. Inc.*, 626 F. Supp. 2d 402, 414 (S.D.N.Y. 2009). Second, the *cy pres* designee must have

4

some relationship to the original class. *In re Lupron Mktg. & Sales Practice Litig.*, 677 F.3d 21, 33 (1st Cir. 2012) ("[T]he recipients should be those 'whose interests reasonably approximate those being pursued by the class." (quoting ALI Principles of the Law of Aggregate Litigation [hereinafter "ALI Principles"] § 3.07(c) (2010)); *Nachshin*, 663 F.3d at 1039. This element stems from the trust law requirement that any new, *cy pres* beneficiary of a trust be related to the old beneficiary so as to preserve the settlor's original purpose in creating the trust.

Here, Frank does not contend that *cy pres* designations should not be made. Nor does he dispute that it is no longer feasible to make further distributions to class members. Instead, Frank contends solely that lead plaintiffs' three proposed *cy pres* designees have an insufficiently close nexus to the class and the purposes of this litigation. Specifically, Frank says the fund can only be distributed to the "'next best' class of beneficiaries," *Nachshin*, 663 F.3d at 1036; *BankAmerica Corp.*, 775 F.3d at 1067, and plaintiffs' three designees are simply not "next best." He contends, in essence, that it is not appropriate to distribute any *cy pres* funds to a recipient whose interests merely "reasonably approximate those being pursued by the class." *Lupron Mktg.*, 677 F.3d at 33 (quoting ALI Principles § 3.07(c)). Rather, the recipient must be the "next-best" recipient apart from the class members themselves.

For their part, lead plaintiffs dispute that Frank's next-best standard governs. Instead, they say that their designees are appropriate because the three nonprofits "'reasonably approximate'" the interest of the class. *See Lupron Mktg.*, 677 F.3d at 33 (quoting ALI Principles § 3.07(c)). Plaintiffs' "reasonable approximation" standard finds support in the Principles of the Law of Aggregate Litigation drafted by the American Law Institute, a highly respected organization of lawyers, judges, and academics that seeks to "clarify, modernize, and improve the law." *See About ALI*, The American Law Institute, https://www.ali.org/about-ali/ (last visited Aug. 8, 2016). Its work has often been accorded substantial consideration by the courts. *See, e.g., Smith v. Bayer Corp.*, 564 U.S. 299, 316 n.11 (2011). Numerous courts in this circuit have considered — and applied — ALI's Principles of the Law of Aggregate Litigation. *See Masters*, 473 F.3d at 436; *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855, 2010 WL 3431152, at *7 (S.D.N.Y. Aug. 20, 2010); *Bear, Sterns & Co.*, 626 F. Supp. 2d at 416. Among other things, the ALI

Principles state that before a Court grants a *cy pres* award, it "should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class." ALI Principles § 3.07(c).[3]

The U.S. Court of Appeals for the Second Circuit has yet to hold definitively which standard applies—the ALI's "reasonable approximation" standard or Frank's "next best" standard.[4]

### A. In the class action context, *cy pres* designees must reasonably approximate the interests of the class and the purposes of the litigation.

After reviewing relevant caselaw and commentary, this Court has concluded that the "next-best" rule is not only impractical but would also tax judicial resources and require courts to opine on matters over which they have little cognizance. The lower costs and greater benefits of the reasonable-approximation test render it superior.

Those courts that follow the stringent "next-best" standard stress the trust law origins of the *cy pres* doctrine. The doctrine took its name from the Norman French expression meaning, "as near as possible," and therefore *cy pres* designees in the trust context were selected to be "as near as possible"

---

[3] The ALI Principles also require that, prior to any distribution of a *cy pres* award: (1) "settlement proceeds should be distributed directly to individual class members" to the extent class members are individually identifiable and individual distributions are "economically viable," ALI Principles § 3.07(a); and (2) that there should be further distributions to class members until "the amounts involved are too small to make individual distributions economically viable," ALI Principles § 3.07(b). Both of those criteria have been met—and are not at issue—here.

[4] In *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007), the court, after remanding the case to the district court on an unrelated ground, advised in passing that the district court should "bear in mind that the purpose of Cy Pres distribution is to 'put[] the unclaimed fund to its *next best* compensation use, e.g., for the aggregate, indirect, and prospective benefit of the class.'" *Id.* at 436 (emphasis and alteration in original) (quoting 2 Herbert B. Newberg & Alba Conte, *Newburg on Class Actions* § 10:17 (4th ed. 2002)); *see also In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 141 n.10 (2d Cir. 2005) (footnoting a similar standard). But what standard to use was not at issue in that litigation.

to the original trust beneficiaries. *Nachshin*, 663 F.3d at 1038. *But see* Restatement (Third) of Trusts § 67 (2003) (requiring that trust law *cy pres* designees merely "reasonably approximate[]" the trust's "designated purpose"). But the doctrine's ancestry alone is not enough to dictate governing law in a different context—the class action context. *See Holtzman v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013).

The purposes of class action *cy pres* on the one hand and trust *cy pres* on the other are sufficiently different so as to make the Court wary of importing wholesale the trust concept requirements into the context of class actions. The broad purpose of trust law's *cy pres* doctrine is to preserve to the extent possible the intent of the trust creator. The theory is that "the settlor would have preferred a modest alteration in the terms of the trust to having the corpus revert to his residuary legatees." *Mirfasihi*, 356 F.3d at 784. Because *cy pres* in trust law is designed to honor as much as possible the original purpose of the trust, *see Hummel*, 30 A.D. 3d at 804, the nexus between *cy pres* awardee and the trust's original beneficiary should be very snug.

But by the time a *cy pres* distribution is appropriate in the context of a class action settlement, the necessity of honoring the original purpose of that fund has been diminished. Generally, the point of creating a settlement fund is to compensate injured plaintiffs at the expense of the defendants. *Mirfasihi*, 356 F.3d at 784; *Bear, Sterns & Co.*, 626 F. Supp. 2d at 416; Redish, 62 Fla. L. Rev. at 631. That purpose has typically been achieved or essentially achieved by the time a *cy pres* award of remaining funds becomes appropriate. In this action, for example, 99.937 percent of the fund has already been paid out. The trust law goal of preserving the trust's original purpose thus carries less force, because the original purpose—compensating the class members—has almost entirely been achieved. As such, the trust law justification for requiring that a *cy pres* designee be limited to only the "next-best" entity—thus perpetuating the unfulfilled intent of the trust creator—is diminished in the class action context.

The "next-best" standard is also justified as a means of restraining the use of *cy pres* in the class action context generally. *See Nachshin*, 663 F.3d at 1038-39; Redish, 62 Fla. L. Rev. at 622. The theory is that a very strict standard for determining which group qualifies for *cy pres* donations—viz., only the "next-best" entity is entitled to participate—mitigates the dangers

of deploying *cy pres* awards, especially the risk that potentially conflicted class counsel will undercompensate, even ignore, class members in order to gift the class's money to a personally favored designee. *See Nachshin*, 663 F.3d at 1038-39.

However, the way to ensure class members recover as much as possible is not to limit to whom we deploy these awards, but rather to focus on *when* we deploy the award. The proper tactic to ensure class members obtain the fullest possible recovery is the requirement that *cy pres* designations occur only when it is no longer feasible to distribute funds to the class as it is in this action. *See Masters*, 473 F.3d at 436; ALI Principles § 3.07(a)-(b). This requirement ensures that *cy pres* designations occur as a last resort only, a requirement that the parties concede has been met here. Narrowing the substantive definition of which groups qualify for *cy pres* awards, by contrast, has little to do with the goal of ensuring class members are compensated as fully as possible.

The "next-best" standard is also no more adept at protecting silent class members than the reasonable-approximation standard is. *But see Nachshin*, 663 F.3d at 1038-39. The concern that silent class members will be ignored is an inherent feature of class action litigation, and the concern is traditionally mitigated through vesting in the district court the obligation to appoint as class counsel "the applicant best able to represent the interests of the class," Fed. R. Civ. P. 23(g)(2), as well as broad discretion to police class action settlements. *See McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009). The court's flexible settlement approval standard under Rule 23—asking whether the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2)—has long protected the rights of class members both silent and noisy. A standard that requires that designees "reasonably approximate" the goals and interests of the class should suffice as well, especially considering that in approving a *cy pres* designee there is less at issue than in approving the settlement of a class action. While settlement approval commences a process that ultimately vitiates the ability of class members to bring future claims, the approval of a *cy pres* designation causes no class member tangible harm: by the time *cy pres* designations are ripe, any remaining settlement funds cannot be distributed further to the class.

The adoption of the stringent "next-best" standard also cannot be justified by a risk that class counsel's hypothetical conflicts of interest will harm the class more in the *cy pres* context than in other phases of the class

action. Indeed, class counsel is most certainly not entitled to unfettered discretion in selecting counsel's favorite *cy pres* designees. *See Bear, Sterns & Co.*, 626 F. Supp. 2d at 415. But in the absence of any evidence of an actual or apparent conflict of interest, class counsel is entitled to a certain amount of leeway. When *cy pres* designations are made—at the tail end of the litigation—class counsel has presumably already proved worthy of the court's trust. They have survived the crucible of the class counsel appointment inquiry by virtue of their experience, diligence, and fairness. *See Deangelis v. Corzine*, 286 F.R.D. 220, 223-24 (S.D.N.Y. 2012); Fed. R. Civ. P. 23(g). They have also withstood a district court's continuing scrutiny and ongoing obligation to police a settlement's implementation. *See In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 146 (2d Cir. 2006). Even if courts should be concerned that class counsel generally may be incentivized to use their *cy pres* authority to throw money at their personally favorite organizations, the trust that counsel has earned mitigates that danger.

There thus exists no heightened conflict-of-interest risk in the *cy pres* context that can justify ratcheting up the standard for *cy pres* designee approval. Courts use a more flexible standard to scrutinize counsel throughout the class action; the reasonable-approximation standard is similarly sufficient in the *cy pres* context. Certainly here, experienced class action counsel have labored assiduously in the interests of the class.

Indeed, the rigid and overly restrictive "next-best" standard actually risks the appearance of judicial impropriety by embroiling district courts in disputes over which the judiciary has no cognizance—judging the comparative worth of our nation's public interest organizations. In this action, for instance, Frank contends that one of lead plaintiffs' proposed designees—the National Consumers League ("NCL")—is inappropriate because the group helped draft the Dodd-Frank Wall Street Reform and Consumer Protection Act. (Mem. of Theodore H. Frank in Opp. at 10-11, Dkt. No. 378.) According to Frank, that group is not the "next-best" designee because Dodd-Frank may actually harm investors or, alternatively, that the public hotly disputes the statute's worth. Theoretically, the merits of Dodd-Frank would therefore help determine whether NCL satisfies the "next-best" test or not. Does Dodd-Frank advance the interests of investors or is it merely harmful overregulation?

Those are policy waters that Congress—not the courts—is best equipped to navigate. Under the "next-best" standard such ideological

9

issues—best avoided by the courts—must be faced and might well prove dispositive. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 820-21 (9th Cir. 2012).

Instead, this Court will approve counsel's proposed *cy pres* designees if those three organizations "reasonably approximate" the interests of the class. This standard best preserves the district court's "'broad supervisory powers . . . with respect to the administration and allocation of settlement funds,'" *Holocaust Victim Assets Litig.*, 424 F.3d at 146 (citation omitted); Fed. R. Civ. P. 23(e), and appropriately gives the Court needed flexibility to review the designations class counsel has proposed. *Cf., e.g., Stefaniak v. HSBC Bank USA, N.A.*, No. 05-cv-720S, 2011 WL 7051093, at *1-2 (W.D.N.Y. Dec. 15, 2011).[5]

This approach—approving counsel's *cy pres* designees if they reasonably approximate the interests of the class—is consistent with this Court's mandate throughout the settlement approval process. The Court approves not the *best* possible settlement but one that is "'fair, reasonable, and adequate.'" *McReynolds*, 588 F.3d at 803-04 (citation omitted); *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173-74 (3d Cir. 2013). That flexible settlement-approval standard harmonizes competing tensions between allowing parties to come to private agreements and protecting the rights of non-vocal people that those agreements may affect. *See Baby Products*, 708 F.3d at 173-74.

## B. The three proposed nonprofit organizations are appropriate *cy pres* designees.

Lead plaintiffs have proposed to distribute the remaining 0.064 percent of the settlement fund to three nonprofit organizations: South Brooklyn Legal Services, the National Consumers League, and the Consumer Federation of America. The Court now addresses whether these three organizations "reasonably approximate" the interests of the class members

---

[5] It should be pointed out that the recipients were required to be "designated by Lead Counsel," subject to "approv[al] by the Court." (Stip. & Agreement of Settlement, Ex. 1 to Press Decl. at 26.) The Court itself should not be designating the designees, and it has not done so here. To do otherwise would run the risk of overly involving the Court in designating fund recipients. *See Bear, Stearns & Co.*, 626 F. Supp. 2d at 415; Adam Liptak, *Doling Out Other People's Money*, N.Y. Times (Nov. 26, 2007).

and the purposes of the litigation. ALI Principles § 3.07(c); *see Lupron Marketing*, 677 F.3d at 33.

First, lead plaintiffs ask to donate 37.5 percent of the remaining funds to South Brooklyn Legal Services' ("SBLS") Foreclosure Prevention Project. SBLS "redress[es] abusive lending and consumer practices" and attempts to aid homeowners misled by "lending and loan servicing abuses, mortgage fraud, and deceptive real estate transactions, and mortgage and tax lien foreclosures." (*Foreclosure Prevention Project Feb. 2016*, Ex. 1 to Linden Decl.) Lead plaintiffs contend that SBLS's work makes it an appropriate recipient because the organization fights the very practices that exposed Citigroup to risk in the first instance. *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d at 374. Lead counsel contends that, if more groups such as SBLS had stepped in to thwart subprime mortgage lending practices, Citigroup would not have exposed itself to those practices, and its investors might not have suffered the losses they did.

Frank responds that SBLS is not an appropriate recipient for two reasons: First SBLS is far too geographically limited since it focuses on lending practices primarily in Brooklyn, (*Foreclosure Prevention Project Feb. 2016*, Ex. 1 to Linden Decl. at 2), whereas the class resides throughout the country. The geographical scope, however, does not detract from SBLS's reasonableness, especially given the amount of funds available. Indeed, the Court concludes that, given the limited amount of money left to distribute, it is reasonable to conclude that the funds are likely to be more immediately impactful when directed to a narrow geographic area than if they were directed to an organization with a national footprint.

Second, Frank contends that SBLS's interests are contrary to the interests of the class, because SBLS's efforts to prevent foreclosures *harms* Citigroup's investors because those efforts drive up the bank's costs, thereby decreasing its profits. However, it is certainly in the direct interest of the class members to limit shoddy mortgage practices, something that SBLS targets. The organization's work arguably creates value for bank investors by limiting the proliferation and deterring the issuance of substandard loans. SBLS is an appropriate *cy pres* designee in this action.

Lead plaintiffs' next proposed donee, the National Consumers League ("NCL"), is similarly an appropriate designee. The NCL claims it is the

11

"nation's oldest consumer advocacy organization" and states that it dedicates itself to helping consumers "avoid scams targeting homeowners and investors," and "works for legislation and regulations that help create a fairer, more secure marketplace for homebuyers and investors." (*The Work of the Nat'l Consumers League: 116 Years of Fighting for Consumer Prot.*, Ex. 2 to Linden Decl.) For instance, the organization states it helped "shepherd[] through" the Dodd-Frank Wall Street Reform and Consumer Protection Act. (*Id.*) The NCL sufficiently targets the market pestilence that led to the damage plaintiffs suffered.

Frank again raises two arguments as to why NCL is an inappropriate *cy pres* designee. First, he again contends that the nexus between NCL and the class is too remote. In fact, Frank argues that NCL—which apparently in a press release "chastised" companies for giving priority to the interests of their "wall street investors"—is actually adverse to the shareholding class members. (Mem. of Theodore H. Frank at 8, Dkt. No. 378.) But press-release rhetoric alone does not render an organization unreasonable. NCL aims to "create a fairer, more secure marketplace for homebuyers and investors." (*The Work of the Nat'l Consumer's League*, Ex. 2 to Linden Decl.) Those efforts once again target the underlying market damage that caused plaintiffs' injury.

Second, Frank contends that class counsel has a conflict of interest because counsel's law firm was one of scores of entities that donated $1,000 or more to NCL in 2012-13. *2013 National Consumers League Annual Report*, *available at* http://www.slideshare.net/nationalconsumersleague/2013-national-consumers-league-annual-report at 15 (last visited Aug. 8, 2016). Frank is correct that a conflict of interest or even class counsel's "significant prior affiliation" might well disqualify a proposed *cy pres* designee. ALI Principles 3.07 cmt. b; *see Bear, Sterns & Co.*, 626 F. Supp. 2d at 415. Here, however, the donation raises no actual or apparent impropriety. It simply signals what is evident: class counsel believes NCL is a legitimate and worthy operation whose interests are aligned with those of the class. There is no evidence in this record that class counsel has received any benefit whatsoever from NCL or that class counsel's affairs are intermingled with NCL's in any way. The Court can locate no conflict of interest that would disqualify NCL. *See* ALI Principles 3.07 cmt. b (warning that *cy pres* designations should not be approved when the "court or any party has any

*significant* prior affiliation with the intended recipient" (emphasis added)). NCL is an appropriate *cy pres* recipient in this action.

Finally, lead plaintiffs propose to donate 25 percent of the remaining funds to the Consumer Federation of America ("CFA"), which is heavily involved with investor protection activities. (*See CFA as a Leader on Investor Prot. Issues*, Ex. 3 to Linden Decl. at 1.) One of the CFA's directors helped draft the Sarbanes-Oxley Act and the Dodd-Frank Act as a "leading investor advocate." (*Id.*) Class counsel represents that they have "earmarked" the settlement funds to be used only by the Investor Protection division of the CFA, which "works to support full and fair corporate disclosures" and thus benefits shareholders. (Lead Pls.' Mem. in Opp. to Theodore H. Frank's Mot. for Reconsideration at 10, Dkt. No. 381.)

Frank contends that the CFA is an inappropriate *cy pres* designee because the organization "boils down to a lot of lobbying" and Citigroup shareholders oppose its message. (Mem. of Theodore H. Frank in Opp. at 10.) But nonprofit lobbying organizations are appropriate if their lobbying goals are consistent with the interests of the class as reflected in the litigation. The CFA advances investor interests through its efforts to regulate the financial industry. (*CFA as a Leader on Investor Prot. Issues*, Ex. 3 to Linden Decl.) This litigation sought to advance the interests of a group of investors of a particular company in the financial industry. That relationship is sufficient to justify a *cy pres* award here whether or not CFA's disputed regulatory tactics are ultimately successful.

Frank proposes alternate *cy pres* designees who he believes are truly "next best" recipients. The Court declines to consider his proposals. *See Lane*, 696 F.3d at 820-21. This class action settlement confers authority on lead counsel to propose to the Court *cy pres* designees, a procedure that this Court approved and to which Frank did not object at the time. This Court, in exercising its broad supervisory authority set forth in Fed. R. Civ. P. 23 and caselaw over the settlement's implementation, *Holocaust Victim Assets Litig.*, 424 F.3d at 146, finds that those organizations are consistent with, and reasonably approximate, the interests of the class.

### III. CONCLUSION

Frank's motion to reconsider the "Order Authorizing Final Distribution of Funds and *Cy Pres* Designation" dated February 13, 2016, is granted, and, upon reconsideration, the Court adheres to its earlier determination approving lead plaintiffs' three *cy pres* designees. The Court finds that the selection—by experienced counsel who have effectively worked in the interests of their clients throughout this litigation—of South Brooklyn Legal Services, the National Consumers League, and the Consumer Federation of America is closely tethered to the nature of this lawsuit and the interests of the class. Thus, lead plaintiffs' motion to distribute 37.5 percent of the remaining settlement funds to South Brooklyn Legal Services, 37.5 percent to the National Consumers League, and 25 percent to the Consumer Federation of America is granted.

Dated: New York, New York
       August 9, 2016

*[signature]*
Sidney H. Stein, U.S.D.J.